IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No.: 1:20-CR-239-TSE-2 |
| v. | ) | |
| | ) | |
| EL SHAFEE ELSHEIKH | ) | |
| | ) | |
| Defendant. | ) | Hearings: November 17-18, 2021 |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO ESTABLISH ADMISSIBILITY OF DEFENDANT'S FALSE
IDENTITY STATEMENTS AND RELATED CO-CONSPIRATOR STATEMENTS**

**INTRODUCTION**

During a routine screening at a detention facility run by the Syrian Defense Forces ("SDF"), U.S. Department of Defense ("DOD") personnel asked defendant El Shafee Elsheikh and his co-conspirator Alexanda Amon Kotey for basic biographical information, including their names, dates of birth, and countries of origin. In response, defendants gave false information that was only revealed when biometric scans of Elsheikh returned his true identity. These initial lies during an administrative screening fall squarely within the well-established routine booking exception and thus are admissible even without preceding *Miranda* warnings. Moreover, these statements are relevant and admissible as non-hearsay false exculpatory statements. Accordingly, the government moves in limine for a preliminary hearing and determination of admissibility under Rule 104.

**STATEMENT OF FACTS**

El Shafee Elsheikh ("defendant") and his co-conspirator Alexanda Amon Kotey ("Kotey") have been charged with numerous terrorism-related offenses, including conspiring to murder

United States citizens abroad, conspiring to commit and committing hostage-taking resulting in death, and providing material support to ISIS, a designated foreign terrorist organization, and to terrorist activity. The defendant and Kotey were central members of a hostage-taking cell that captured numerous individuals from the United States, the United Kingdom, Japan, and several European countries. The defendant and Kotey went to great lengths to conceal their identities from the hostages; they wore masks, compelled hostages to face the wall whenever the defendant and his co-conspirators entered the hostages' cell, and assaulted hostages who looked at their faces. All four United States hostages and two United Kingdom nationals died in ISIS captivity.

The defendant and Kotey were captured by the SDF in northern Syria on or about January 4, 2018. The United States government was not involved in the capture and was initially unaware that the defendant and Kotey were being held in an SDF facility. On January 21, 2018, DOD personnel conducted routine screenings at the facility as part of administrative procedures to obtain basic identifying information for detainees at Ayn Issa. DOD personnel asked for detainees' names, dates of birth, and country of origin, in order to properly and accurately identify and catalog captured individuals held at the SDF detention facility. The process also involved taking photographs and obtaining fingerprints from the detainees in a process known as "biometric enrollment."

During the processing and enrollment on January 21, 2018, the defendant claimed his name was "Suhayb Abdallah Jasim," and Kotey claimed to be "Yahya Mustafa Ibrahim." The defendant and Kotey both claimed they were from Yemen and only spoke Arabic. When shown a picture of Kotey, the defendant claimed Kotey was someone he only knew as "Yahya." The defendant also claimed he had just met "Yahya" shortly before their capture. DOD submitted the detainees' fingerprints to a database for comparison.

On January 22, 2018, DOD personnel received a notification that the defendant's

fingerprints matched those on record for El Shafee Elsheikh, not "Suhayb Abdallah Jasim" as the defendant had falsely identified himself. On January 23, 2018, a military member questioned the defendant in order to further ascertain his identity. The defendant once again stated that his name was "Suhayb Abdallah Jasim" and spoke in Arabic. Shortly thereafter, the defendant abandoned his false identity ruse; he began speaking in English and acknowledged his true name as El Shafee Elsheikh. El Sheikh spoke with a British dialect and stated he was from London. The defendant also acknowledged that he was captured with Alexanda Kotey and identified Kotey using his true name.

Kotey was also questioned about his identity on January 23, 2018. Kotey initially maintained that his name was "Yahya Mustafa Ibrahim," denied being able to speak English, and claimed he was from Yemen. Shortly thereafter, Kotey also abandoned his false identity ruse and began speaking in English, acknowledging his true name as Alexanda Kotey. Kotey also admitted that he was from West London. Kotey and the defendant remained in secure facilities controlled by the SDF until they were transferred to the custody of the United States military on October 8, 2019.

## ARGUMENT

The Federal Rules of Evidence vest this Court with authority to make preliminary evidentiary determinations, which it may do before trial for efficiency's sake. *See* Fed. R. Evid. 104(a); *cf. Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (noting district courts have inherent authority to rule on evidentiary issues before trial); *United States v. Valencia*, 826 F.2d 169, 171–72 (2d Cir. 1987) (similar). In doing so, the Court is not constrained by rules of evidence other than privilege and may consider the proffered evidence in addition to all other relevant information to determine admissibility. *See, e.g.*, Fed. R. Evid 1101; *Bourjaily v. United States*, 483 U.S. 171, 175–81

(1987). The party propounding the evidence generally bears the burden to show its admissibility by a preponderance of evidence. *See, e.g.*, *United States v. Shores*, 33 F.3d 438, 442 (4th Cir. 1994).

The government seeks to introduce the following evidence at trial: (1) testimony that the defendant and Kotey lied about their names, countries of origin, and language capabilities on January 21; (2) testimony that the defendant falsely identified Kotey as "Yahya" and claimed he met "Yahya" shortly before their capture by SDF; (3) testimony that when the defendant was questioned on January 23, 2018, he initially persisted in lying about his name, background, and language ability before he admitted his true name, admitted he was from London, and spoke in fluent English with a British accent; (4) testimony that the defendant admitted he had been captured with his associate, Alexanda Kotey; and (5) testimony that when Kotey was questioned on January 23, 2018, he initially persisted in lying about his name, background, and language ability, then admitted his true name, admitted he was from West London, and spoke in fluent English with a British accent. Accordingly, the United States seeks a pre-trial determination that Elsheikh's and Kotey's false self-identifications to DOD personnel are admissible (1) under the routine booking exception recognized by *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), and (2) as relevant, non-hearsay statements pursuant to Federal Rule of Evidence 801(d)(2).

**I.     The false self-identifications are admissible notwithstanding the lack of *Miranda* warnings because they were in response to routine booking questions.**

Generally, statements made in custodial interrogations without any *Miranda* warnings are inadmissible. *See, e.g.*, *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995). "As a general rule, interrogation has been defined as express questioning or its functional equivalent, which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response

4

from the suspect.'" *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (plurality opinion)). However, under the exception for routine booking questions, a defendant's responses to "biographical data necessary to complete booking or pretrial services" are admissible even absent *Miranda* warnings, as long as the questions were not designed to elicit incriminatory admissions. *Ibid.* at 608 (quoting *Muniz*, 496 U.S. at 600–02 & n.14).[1] Indeed, even prior to *Muniz*, the Fourth Circuit had held that eliciting a defendant's name and biographical information was not "interrogation" within the meaning of the Fifth Amendment. *See United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986); *United States v. Morrow*, 731 F.2d 233, 237 (4th Cir. 1984).

Courts have regularly held that names, dates of birth, and birthplaces are among the most basic of routine booking questions. *See, e.g.*, *United States v. Washington*, 462 F.3d 1124, 1133 (9th Cir. 2006) ("Questions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime."); *see also United States v. Lara-Garcia*, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007); *United States v. Carmona*, 873 F.3d 569, 573 (2d Cir. 1989). Courts have also noted that asking a standardized set of questions, without specific focus on a particular defendant or crime charged, supports a finding that the questions constituted routine booking questions. *See, e.g.*, *United States v. Zapien*, 861 F.3d 971, 976 (9th Cir. 2017); *Rosa v. McCray*, 396 F.3d 210, 221–23 (2d Cir. 2005); *United States v. Reyes*, 225

---

[1] Notably, the Supreme Court has also held that statutes requiring individuals to identify themselves and to provide fingerprints generally do not implicate Fifth Amendment rights against self-incrimination. *See, e.g.*, *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 191 (2004) ("Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances."); *California v. Byers*, 402 U.S. 424, 432–44 (1971) ("Disclosure of name and address is an essentially neutral act … [A name] identifies but does not by itself implicate anyone in criminal conduct."); *United States v. Wade*, 388 U.S. 218, 222–23 (1967) (holding the Fifth Amendment does not prohibit requiring a defendant to provide physical characteristics, including fingerprints, a blood sample, or voice sample in a lineup).

F.3d 71, 77 (1st Cir. 2000).[2] Moreover, the Fourth Circuit has held that just because a defendant's false answers to booking questions become incriminating by their falsity does not vitiate the exception. *See D'Anjou*, 16 F.3d at 609 ("[T]here was no incriminatory element of the questioning until D'Anjou began supplying false information regarding his citizenship and place of birth."); *see also Rosa*, 396 F.3d at 221 ("Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of *Miranda*.").

Applying these principles to the facts of this case leads to the common-sense conclusion that Elsheikh's and Kotey's false self-identifications fall comfortably within the exception. DOD has no law enforcement functions, and the personnel conducting the detainee screenings were not investigating any particular crimes or individuals. Rather, they were engaged in an untargeted administrative procedure designed solely to identify the individuals in SDF detention. While this process might have resulted in the United States or the SDF learning that one of their detainees was a person of interest in relevant criminal or terrorist activity, the detainee's identity or biographical information would not itself be evidence of that criminal conduct nor be likely to incriminate them. Similarly, DOD's administrative efforts to determine who among the detainees were captured together fall within the exception. DOD had no reason to suspect that answers to such questions would be incriminating. Rather, DOD personnel were seeking to obtain basic identifying information about additional detainees. *See Washington*, 462 F.3d at 1132–33 (holding that questions about defendant's gang affiliation and gang moniker were proper booking questions and

---

[2] By contrast, courts have noted that the "closer cases" for the exception "all involve situations where the police asked questions to extract answers 'clearly' and 'directly' tied to the 'suspected' criminal activities." *United States v. Sanchez*, 817 F.3d 38, 46 (1st Cir. 2016) (holding a non-member of the investigative team did not exceed the exception by asking basic questions unrelated to the offenses under investigation).

police desire to confirm information it had was proper booking purpose). Only when Elsheikh and Kotey chose to respond to these routine questions with false information did those false answers become relevant evidence of consciousness of guilt. *See D'Anjou*, 16 F.3d at 609 ("The United States argues that [defendant's] lying is probative of consciousness of guilt; certainly, it does seem to be somewhat probative that when caught in the net, he tried to slip through its strands.").

In short, the DOD screening questions were neither intended nor had an objective likelihood of producing self-incriminating testimony, and *Miranda* warnings were not required. As such, Elsheikh's and Kotey's false answers to these questions are admissible.

## II. Elsheikh's and Kotey's false self-identifications are relevant and probative consciousness-of-guilt evidence.

The defendant's false statements about his identity are relevant and admissible as evidence of consciousness of guilt. "It is universally conceded today that … assumption of a false name, and related conduct, are admissible as evidence of guilt, and thus of guilt itself." *United States v. Clark*, 45 F.3d 1247, 1250 (8th Cir. 1995) (citation omitted); *see also United States v. D'Anjou*, 16 F.3d 604, 609 (4th Cir. 1994) (holding that a defendant's provision of false name during interview was probative of consciousness of guilt); *United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020) ("Juries may also consider false exculpatory statements as evidence of a defendant's 'consciousness of guilt,' meaning the defendant knew he was doing something wrong or illegal, which bears on the issue of knowledge.").

The *D'Anjou* case is particularly instructive here. D'Anjou was arrested for weapons and drugs violations and questioned by a special agent for the United States Immigration and Naturalization Service, who began the interview by requesting standard background information concerning D'anjou's name, citizenship, place of birth, address, and length of time in the area. *See* 16 F.3d at 608. D'Anjou provided false information in response to each of these questions. *Ibid*. Following

7

the initial questioning, the agent read D'Anjou his *Miranda* rights and terminated the interview after D'Anjou invoked his right to be silent. *Ibid*. D'Anjou argued on appeal that his false statements should not have been admitted pursuant to Federal Rule of Evidence 403. *Id*. at 608–09. The Fourth Circuit agreed with the government's argument that D'Anjou's lies about his identity were probative of consciousness of guilt and upheld the trial court's admission of the statements. *See id*. at 609.

Similarly, the defendant's false statements about his identity in the instant case are probative of the defendant's knowledge that he had engaged in criminal conduct and sought to escape detection by the United States or other governments. The Fourth Circuit has noted that later attempts to hide or obscure conduct indicates consciousness of guilt and, therefore, criminal intent. *See, e.g.*, *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014). Likewise, false exculpatory statements are clearly probative evidence "of guilt, of illicit intent, and of consciousness of guilt." *United States v. Martindale*, 790 F.3d 1129, 1132–33 (4th Cir. 1986). That defendant made such false exculpatory claims about his identity is not seriously in question, as the defendant later admitted his true name and background and the United States has substantial other evidence establishing his true identity. The jury can fairly infer from such evidence that the defendant knew he had engaged in serious criminal activity and—given the identical false stories given by both Elsheikh and Kotey—that the defendant was involved in a conspiratorial criminal agreement with Kotey. "Inferences and presumptions are a staple of our adversary system of factfinding." *County Court of Ulster County v. Allen*, 442 U.S. 140, 156 (1979); *see also United States v. Rafiekian*, 991 F.3d 529, 548 (4th Cir. 2021) (holding that jury could reasonably infer conspiratorial agreement from coordinated false stories used by co-conspirators to hide their activities).

### III. The false self-identifications are admissible as non-hearsay statements.

Elsheikh's own statements are paradigmatic, admissible non-hearsay statements of a party-opponent under Rule 801(d)(2)(A). *See, e.g.*, *United States v. Benson*, 957 F.3d 218, 229 (4th Cir. 2020).

As for Kotey's statements, the government is not introducing them for the truth of the matter asserted. Indeed, just the opposite: the government is introducing them specifically for their falsity, and that purpose places them outside the hearsay definition. *See, e.g.*, *Anderson v. United States*, 417 U.S. 211, 220 & n.8 (1974) (holding that the hearsay rule does not prevent a prosecutor from introducing statements "simply to prove that they were made so as to establish the foundation for later showing, through other admissible evidence, that they were false"); *United States v. Vidacak*, 553 F.3d 344, 353 (4th Cir. 2009) (same). Likewise, by introducing both Elsheikh and Kotey's statements and their identical false cover stories, the government can demonstrate concerted action and coordination between the two co-conspirators to hide their identities together.

Alternately, Kotey's statements may be admitted as non-hearsay statements of a co-conspirator under Rule 801(d)(2)(E). Between January 21 and January 23, 2018, Kotey and the defendant engaged in nearly identical conduct in trying to conceal their true identities when engaging in a detainee enrollment process with the United States military. Both provided false names, the same false country of origin (Yemen), and both only chose to speak in Arabic even though they were questioned by U.S. personnel speaking in English and they both speak the English language fluently. The clear inference from this conduct is that Kotey and the defendant had coordinated this plan in advance in the event they were questioned about their identity. *See, e.g.*, *Rafiekian*, 991 F.3d at 547–48 ("[C]onspiracy may be inferred from facts and circumstances of the case, i.e., circumstances indicating that two or more persons acted in concert to achieve an illegal goal.").

These statements are in furtherance of the material support conspiracy as they are designed to preserve and protect the conspiracy. Concealment of identity was a central feature of the criminal conduct engaged in by the defendant and co-defendant Kotey. Consequently, the concerns raised in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) are not present under these facts. In Grunewald, the court criticized the admission of co-conspirator statements that were made "for the purpose only of covering up the crime." *Id*. at 405. The false identity statements here were not made solely to cover up the crime. Rather, the fair inferences demonstrate that the false statements served as an attempt to preserve the conspiracy and potentially as an effort to avoid prolonged detention and continue the conspiracy.

Federal Rule of Evidence 801(d)(2)(E) provides that statements "made by the party's co-conspirator during and in furtherance of the conspiracy" falls outside the definition of hearsay. As a general matter, statements are in furtherance of the conspiracy if they are intended to promote the conspiratorial objectives, explain events important to the conspiracy in order to facilitate its operation, provide reassurance and maintain trust and cohesiveness, inform them of the current status of the conspiracy, identify a coconspirator, induce enlistment or further participation, are part of the information intended to help each conspirator perform his role; statements are not in furtherance if they are narrative declarations, idle chatter, superfluous casual conversations. *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007); *United States v. Roberts*, 14 F.3d 502, 515 (10th Cir.1993); *United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *Gajo*, *supra*; *United States v. Gupta*, 747 F.3d 111, 124 (2d Cir. 2014).

The defendant and Kotey conspired with each other and others to promote the creation of an Islamic state through criminal conduct and violence, including carrying out a brutal hostage-taking scheme. Concealment of their identities was an intrinsic part of the conspiracy as

10

demonstrated by their conduct in wearing masks, forcing hostages to face the wall when they entered the hostages' cell, and assaulting hostages who looked at their faces. The co-conspirators sought to protect ISIS's hostage captor network by making it difficult to identify and disrupt the network's members. It is also fair to infer the co-conspirators agreed to hide their identities in order to evade lengthy incarceration for their crimes in the event that they were captured. The defendant and Kotey were clearly aware they faced prosecution in multiple countries for their crimes, and consequently wore masks and worked as a unit to minimize any opportunity for the hostages to obtain identifying information. When the defendant and Kotey were captured in Syria, their pre-arranged lies about their identities were part of a long-established practice of concealment to protect themselves, their co-conspirators, and the terrorist organization they had served for several years. Kotey's statements about his identity on January 21 and January 23 are therefore admissible as co-conspirator statements.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: _____/s/_____
Alicia Cook, DOJ trial attorney
Raj Parekh, Acting US Attorney
Dennis Fitzpatrick, AUSA
Aidan Taft Grano-Mickelsen, AUSA
John T. Gibbs, AUSA
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:         /s/
Alicia Cook
Department of Justice, Trial Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700