IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:20-CR-239-TSE-2 |
| v. | ) | |
| | ) | Hon. T. S. Ellis, III |
| EL SHAFEE ELSHEIKH | ) | |
| | ) | |
| Defendant. | ) | Hearings: November 16-19, 2021 |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

Defendant's motion to suppress his statements, first to the FBI interviewers and then to media outlets, as involuntary should be denied. With respect to defendant's statements in law-enforcement interviews, the *Miranda* warnings given prior to those statements were effective, and defendant correctly understood (and even exercised) his rights during those interviews. Similarly, defendant's statements to various media outlets were not the product of coercive conduct that overbore his will. Rather, the evidence at the upcoming motions hearing will rebut defendant's assertions of torture and brutal treatment, and in fact, will demonstrate that the defendant made those statements as a product of a free and voluntary choice.

**I.     Because the government's law-enforcement interviews did not contravene *Miranda*, suppression is not warranted.**

In this case, personnel from the U.S. Department of Defense (DOD) conducted initial interviews with the defendant. The purpose of these interviews was not to investigate criminal conduct but to determine whether the defendant possessed actionable intelligence beneficial to coalition forces in an armed conflict. In these intelligence-gathering interviews, DOD personnel ("the intelligence team") did not give *Miranda* warnings prior to questioning.

More than 20 days after the last intelligence interview, an entirely different team of special agents from the U.S. Federal Bureau of Investigation (FBI) conducted law-enforcement interviews with the defendant. This team ("the clean team") engaged a number of procedures to ensure an independent and voluntary interview process, well within Constitutional boundaries:

- There was no overlap between the law enforcement and intelligence teams, and the clean team members who conducted the Mirandized interviews did not read any DOD reports containing the defendant's statements from the DOD intelligence-gathering interviews.

- The clean team interviews took place 20 days after the final intelligence-gathering interview, and the law enforcement team requested the Syrian Democratic Forces (SDF) place the defendant in different rooms than those in which the intelligence team had interviewed defendant.

- The clean team then read an enhanced *Miranda* form to the defendant; this form provided the standard warnings as well as modified warnings particular to the two-step process. Specifically, the form advised defendant that the clean team did not know what statements he had made to previous U.S. Government interviewers, that the defendant was not obligated to answer questions now just because he had answered them before, and that he and the interviewers were "starting anew." *See* Attachment 1 to Dkt. 96 (Advice of Rights form), Government's Memorandum of Law in Support of its Motion in Limine to Establish Admissibility of Defendant's Statements Pursuant to Federal Rule of Evidence 104 ("Govt. Memorandum"). Although defendant refused to sign the form, he verbally waived his rights and agreed to speak with the clean team about certain subjects (but not about others).

- The room where the clean team conducted the interview was air conditioned and there was a restroom adjacent to the interview room that the defendant was given an opportunity to

use if he so wished.  The clean team also offered the defendant bottled water, soda, and miscellaneous snacks, all of which he politely declined. The defendant was told that he could pray, use the restroom or take a break at any time he requested.  There were no visible weapons in the room, though the clean team agents were armed.  When the defendant refused to discuss certain topics, such as the American and Western hostages held and executed by ISIS, the agents respected his wishes and did not delve into those topics.

Because this process fully protected defendant's Fifth Amendment rights and accorded with governing precedent, defendant's statements in those interviews were given voluntarily and should not be suppressed.

### A.    The legal landscape governing the admissibility of defendant's statements.

In general, the courts must suppress statements made during a custodial interrogation in which *Miranda* warnings are not given. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, the same rule does not apply when a defendant makes statements after a *Miranda* warning, even if he was previously questioned without them. Two Supreme Court cases—*Oregon v. Elstad*, 470 U.S. 298 (1985), and *Missouri v. Seibert*, 542 U.S. 600 (2004)—define the legal rules applicable in such situations.

In *Elstad*, the defendant made unwarned incriminating statements in response to questioning while being arrested; later, at the police station, the officers administered *Miranda* warnings, and the defendant confessed. *See* 470 U.S. at 300–01. In declining to suppress the second, warned confession, the Supreme Court observed that "[a] *Miranda* violation does not constitute [unconstitutional] coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." *Id.* at 306 n.1. Instead, the Court held that it would be "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's

ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309. The Court also rejected the view that a defendant who makes unwarned inculpatory statements, and then gives a Miran-dized confession, is subject to "a subtle form of lingering compulsion, the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id.* at 311. Such a result would "practically speaking, disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amend-ment played no part in either his warned or unwarned confessions." *Ibid.* As a result, *Elstad* stands for the proposition that "an initial failure of law enforcement officers to administer the warnings required by *Miranda*, without more," does not "'taint[]' subsequent admissions after a suspect has been fully advised of and has waived his *Miranda* rights." *Id.* at 309.

In *Seibert*, the Court returned to the two-step interrogation once more. There, a police of-ficer "made a 'conscious decision' to withhold *Miranda* warnings" as part of a deliberate "inter-rogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06 (quoting the appendix). The defendant made inculpatory statements during the first unwarned 30 to 40 minutes of questioning; the officer then provided *Miranda* warnings after a 20-minute break, turned on a tape recorder, obtained defendant's waiver, and then "confronted her with her prewarning state-ments," securing her agreement to statements she had given in the unwarned portion of the inter-rogation. *Id.* at 604–05. Four justices writing in plurality, and Justice Kennedy concurring in judg-ment, concluded that the post-*Miranda* statements should be suppressed but without a majority opinion. Applying the rule from *Marks v. United States*, 430 U.S. 188 (1977), the Fourth Circuit has held that Justice Kennedy's concurrence in judgment constitutes the binding holding of the

*Seibert* Court. *See United States v. Khweis*, 971 F.3d 453, 461 (4th Cir. 2020) (citing *United States v. Mashburn*, 406 F.3d 303, 308–09 (4th Cir. 2005)).

The plurality in *Seibert* adopted an objective multifactor test to determine "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." 542 U.S. at 615–16 (plurality opinion). But Justice Kennedy rejected the application of such a test "in the case of both intentional and unintentional two-stage interrogations." *Id.* at 622 (Kennedy, J., concurring in judgment). Instead, he concluded that *Elstad* should continue to control all cases except "the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Ibid.* If such a "deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Ibid*. Such curative measures should "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver;" he further noted that "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances," as might "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Ibid*.

The Fourth Circuit has twice addressed the standard for suppressing postwarning statements because of prewarning incriminating statements. *See Khweis*, 971 F.3d 453; *Mashburn*, 406 F.3d 303. In *Mashburn*, the Fourth Circuit reiterated that *Elstad* governed all cases in which "the deliberate 'question-first' strategy" is not "used in a calculated way to undermine the *Miranda* warning." 406 F.3d at 309. Applying *Elstad*, therefore, the Circuit held that because no "deliberately coercive or improper tactics" were used to obtain the prewarning statements, the conceded voluntariness of the second statements precluded suppression. *Ibid*. The Circuit also rejected the

argument that, by describing the potential punishments for his crimes and the benefits of cooperating, officers had employed coercive or improper tactics in their initial questioning. *See id.* at 309–10.

Most recently, in *Khweis*, the Circuit addressed a very similar separation of intelligence and law-enforcement interviews, as was used in this case. *See* 971 F.3d at 456–58. The district court concluded that the government had not employed a deliberate two-step process designed to undermine *Miranda*; Khweis disputed this conclusion, but the Circuit declined to reach the issue. *Id.* at 461. Instead, the Circuit held that even if such deliberate undermining had occurred, the FBI had used "sufficient curative measures 'designed to ensure that a reasonable person in Khweis's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.'" *Ibid.* (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment)). Specifically, the Circuit concluded that a ten-day break after the prewarning interviews concluded, the different interviewing room, and different personnel all constituted curative measures. *Ibid.* In addition, the Circuit found notable that the clean team "could not treat the second set of interviews as continuous with the first, ask leading questions, or cross-examine Khweis with his previous statements" because they did not know what had been said. *Id.* at 461–62. Moreover, the Circuit noted that the *Miranda* advice-of-rights forms included not only the standard rights but specifically advised Khweis that he did not need to speak with the FBI merely because he had spoken with others in the past, that the FBI were not interested in statements made previously, and that the clean team was "starting anew." *Id.* at 462. The Circuit found such measures went far beyond "the 'continuum' of questioning in *Seibert*," where the interview was "conducted by the same police officer in the same room, using statements from the first to obtain confessions in the second, separated by a pause of only 15 to 20 minutes." *Ibid.*

**B.   The FBI's "clean team" interviews were conducted well within established constitutional boundaries.**

Under these precedents, *Elstad*, and not Justice Kennedy's opinion in *Seibert*, governs this case. Although defendant's motion suggests that the government will not contest the "deliberate two-step interrogation technique" (Def. Br. 21), that is not precisely accurate. The government certainly does not contest that it intentionally conducted unwarned intelligence interviews first and then chose to conduct *Mirandized* law-enforcement interviews. But the standard for applying *Seibert* is not that the government conducted its interviews in two stages; it is whether "the two-step interrogation technique was used *in a calculated way to undermine the* Miranda *warning*." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment) (emphasis added); *accord Khweis*, 971 F.3d at 461; *Mashburn*, 406 F.3d at 308–09.[1] And here, the government went to great lengths *not* to undermine the *Miranda* warnings in its law-enforcement interviews. To the contrary: the government took numerous steps to ensure that the *Miranda* warnings in its law-enforcement interviews were not undermined in any way.

When applying *Elstad* and *Mashburn*, the conclusion is straightforward. Defendant does not allege that the DOD interviewers employed "deliberately coercive or improper tactics" in their questioning.[2] *Cf. Mashburn*, 406 F.3d at 309 ("*Elstad* instructs that 'absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an

---

[1] Other circuits have also emphasized the necessity of specific intent to undermine *Miranda* to apply the *Seibert* test. *See e.g., United States v. More*, 670 F.3d 222, 229 (2d Cir. 2012); *United States v. Thomas*, 664 F.3d 217, 223 (8th Cir. 2011); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007).

[2] The government addresses the defendant's allegations of mistreatment and coercion by SDF officials *infra* in addressing the voluntariness of his statements.

unwarned admissions does not warrant a presumption of coercion as to any subsequent postwarn-

ing statement.'" (quoting *Elstad,* 470 U.S. at 314)). The government witnesses at the evidentiary

hearing will establish that they read the enhanced *Miranda* form to defendant and that he verbally

acknowledged that he understood those rights. The witnesses will also establish that defendant

chose to exercise his right not to answer some questions (and to not answer some questions without

a lawyer) but verbally agreed to answer others. Such selective choices about how to engage with

law enforcement interviewers, and when to invoke what rights, is a hallmark of voluntariness.

But even if this Court were to take the same approach as the Fourth Circuit in *Khweis*,

ample curative measures demonstrate that a reasonable person in Elsheikh's position would have

understood—and, in fact, did understand—that the interviews had "taken a new turn" and that the

*Miranda* warnings would be effective. *Cf. Khweis*, 971 F.3d at 461 (quoting *Seibert*, 542 U.S. at

622 (Kennedy, J., concurring in judgment)). Taken as a whole, the measures employed by the clean

team were unequivocal—and explicit—about the difference from prior intelligence interviews.

The law-enforcement interviews here began 20 days after the last intelligence interview—twice as

long as in *Khweis*. *Cf. ibid.* While defendant references that a member of the FBI was part of the

DOD "fly" team, in *Khweis*, the intelligence interviews were conducted by an FBI legal attaché

and then a different FBI clean team; the fact that the interviews were conducted by entirely separate

agencies, even with one FBI special agent who embedded within DOD at the time, only strengthens

the positive comparison to *Khweis*. *Cf. id.* at 455–56. Similarly, as in *Khweis*, the clean team mem-

bers did not review the content of defendant's statements to the intelligence teams, so they could

not treat the second set of interviews as a continuation of the first or cross-examine defendant using

his prior statements to DOD interviewers. *Cf. id.* at 461–62.[3] Though defendant argues that he was

---

[3] Although defendant seems to suggest that there was not "total separation" in Kurdish officials or

threatened with trial in Iraq with severe penalties, such information about the potential conse-

quences of criminal conduct falls squarely outside improper coercive influences under both *Mash-*

*burn* and *Khweis*. *See Khweis*, 971 F.3d at 463–64 ("Khweis emphasizes that 'the only thing he

cared about' was avoiding the Kurdish and Iraqi court systems in favor of returning to the United

States, which he had come to understand was contingent upon providing the FBI agents with ad-

missions to criminal activity. … [T]he context of Khweis's capture in the Middle East, a circum-

stance of Khweis's own making when he chose to travel to Syria and Iraq to join ISIL, does not

undermine the effectiveness of the *Miranda* warnings he received or his waiver of those rights.");

*Mashburn*, 406 F.3d at 310 ("[T]he agents simply informed Mashburn of the gravity of his sus-

pected offenses and the benefits of cooperation under the federal system. Any coercion that Mash-

burn may have felt was not the product of official action, but rather the consequence of the severity

of the offenses he chose to commit." (internal citations omitted)).

In short, the Court should apply *Elstad* and conclude that the *Miranda* warnings provided

in the law-enforcement interviews were effective and that defendant's statements were voluntary.

---

guards, he does not actually allege—either in his sworn affidavit or his briefing—that he recog-
nized any of the Kurdish guards present as *actually* being the same individuals. Instead, he merely
alleges that there were *some* Kurdish guards in both sets of interviews and that they "may have
been present" during the DOD interviews; he contends that even if they were not the same, they
did not have the same formal separation. However, the relevant question is a totality-of-the-cir-
cumstances analysis, asking whether a "reasonable person" in Elsheikh's position would under-
stand "the import and effect of the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., con-
curring in judgment). Defendant's speculations about the identity of the Kurdish guards does not
defeat the other weighty curative measures, such as the substantial break in time, change in loca-
tion, and—perhaps most importantly—the express warnings and disclaimers about prior state-
ments, warnings which Elsheikh then in fact exercised on some questions.

The government does acknowledge that the SDF officials provided the FBI with a report
ostensibly from their own interviews that may have in fact come from the DOD interviews. The
government informed defense counsel of this fact prior to filing of these motions and stated that it
would not seek to introduce any statements Elsheikh made in this report.

However, because these questions involve credibility determinations and findings of historical fact, the government also requests that the Court make alternative holdings for the completeness of the record that: (a) the government's decision to conduct unwarned intelligence-gathering interviews first was not calculated to undermine the subsequent *Miranda* warnings, and (b) even assuming the *Seibert* analysis applies, sufficient curative measures were taken to ensure that a reasonable person in Elsheikh's position would have understood the effectiveness of the warnings.

## II.    Defendant's statements were not products of torture or abuse, and their admission does not violate the Due Process Clause.

An involuntary confession or self-inculpatory statement procured by coercive police activity is inadmissible under the Due Process Clause. *See e.g.*, *Colorado v. Connolly*, 479 U.S. 157, 167 (1986). A confession is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Connolly*, 479 U.S. at 167 (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)); *accord United States v. Nguyen*, 313 F. Supp. 2d 579, 587 (E.D. Va. 2004) (Ellis, J.).[4]

---

[4] Defendant spends a substantial portion of his briefing arguing that the Due Process Clause operates to limit the admissibility of confessions obtained under coercive influence when the relevant government is a foreign government and not the United States. In doing so, he argues that the general "voluntariness" standard, and not the "shocks the conscience" test, should control. As the government noted in its motion to admit the defendant's statements, whether the Due Process Clause applies at all to foreign governmental conduct is not established and, indeed, is called into question by the Supreme Court's decision in *Connolly*. *See, e.g.*, Govt. Memorandum, at 21 n.16. Moreover, although the Fourth Circuit used the voluntariness standard in *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008), it did so without dispute from the government, and such assumptions are not holdings that create binding precedent. *See United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019). Nonetheless, because the government believes that the evidence in this case, as in *Abu Ali*, will demonstrate that defendant was not factually subjected to coercion under even the more expansive standard, it does not believe that the Court needs to resolve the more novel, unsettled issues of law at this time. If the Court resolves the factual disputes in favor of the defendant's allegations of coercive influence, the government reserves the right to consider whether it will still seek to admit such statements and, if so, the appropriate standard for admissibility in light of the facts found by the Court.

In making this determination, "a court must consider the totality of the circumstances, including [the] defendant's characteristics and the nature of the interview." *Nguyen*, 313 F. Supp. 2d at 587. The court thus considers the circumstances of the confession—including the length of questioning, any promises or threats made, or deprivation of essentials—and the "defendant's personal attributes, such as his age, education, intelligence, and mental state." *Ayesh*, 702 F.3d at 168; *see also United States v. Abu Ali*, 528 F.3d 210, 233 (4th Cir. 2010) (relying on defendant's intelligence, familiarity with culture of detaining authority, and lack of evidence of coercive detention conditions). A defendant's familiarity with the criminal justice system is evidence that decisions to admit or make inculpatory statements is voluntary and knowing. *See Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (noting that a suspect's intelligence, education, age, and familiarity with the criminal justice system are relevant factors for voluntariness). If the government meets its burden of demonstrating by a preponderance of the evidence that a statement was given freely and voluntarily, it must not be suppressed. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (en banc). Notably, "courts in this circuit grant motions to suppress statements on the grounds of involuntariness only in rare and exceptional circumstances." *Nguyen*, 313 F. Supp. 2d at 587 n.15.

### A.   A finding of causation is necessary to demonstrate that a defendant's statement was involuntary.

At the evidentiary hearing, the government will call witnesses, including members of the SDF with responsibility for the defendant's custody, to testify as to the conditions of defendant's confinement in Syria. The government believes the evidence will contradict, not support, defend-

ant's assertions that his will in making each of these statements was overborne by systemic phys-ical abuse and coercive force.[5] While the voluntariness of defendant's statements based on the totality of the circumstances is a question of fact that this Court will determine after a hearing (*e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)), the government identifies some important legal principles in response to defendant's motion.

One such core requirement of a voluntariness analysis is causation. More specifically, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Connolly*, 479 U.S. at 167. Instead, the Supreme Court has required "police conduct *causally related* to the con-fession." *Id.* at 164 (emphasis added). Moreover, "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Id.* at 164 n.2 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)). Rather, coercive police conduct renders a confession "involuntary" and inadmissible only when "the defendant's will has been overborne or his or her capacity for self-determination critically impaired" by such means. *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012). Similarly, just because coercive or improper conduct happened at one time "does not permanently disable [the defendant] from giving a voluntary statement at a later time." *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992). In other words, to determine whether each of defendant's statements is inadmissible as involuntary, the Court must conclude that not only did defendant

---

[5] For example, defendant references text messages between two U.S. government employees that ostensibly reference "torturing." However, as the government will demonstrate at the hearing, the author of the messages had no personal knowledge of any conditions of detention, and the recipient understood the reference to be Elsheikh's torturing of the hostages.

suffer the kind of serious coercion that he alleges but that it in fact *caused* him to make the challenged statement by overbearing his ability to make a free and voluntary choice.

Application of this principle demonstrates certain general gaps in the defendant's arguments from the beginning. For example, while defendant alleges that the SDF forced him to participate in media interviews in 2018, he concedes that they did not care about the content of his answers at all. *See* Def. Ex. 1, ¶ 9.  As a result, defendant admits that he had leeway to answer them—or refuse to answer them, as he did repeatedly in many interviews—any way he chose. Such freedom is quintessential voluntariness. Being compelled to be present during an interview is not the same thing as being compelled to make self-incriminating statements or even to answer a question at all; otherwise, all statements made under arrest would be per se involuntary and always inadmissible. *But see Elstad*, 470 U.S. at 306–08 (describing circumstances in which un-*Mirandized* statements may be nonetheless voluntary and admissible). As another example, the government anticipates that certain evidence may demonstrate that during the defendant's detention at Deyrick, a prison riot by some of the detainees prompted some SDF guards to use physical force to break up conflict or to enforce more rigid conduct requirements. The government does not believe that the evidence will support the severity that defendant's affidavit alleges. But in any event, more rigorous enforcement of prison rules, even if physically enforced, is not necessarily causally linked to the defendant being compelled to make statements, whether to official interviewers or to media outlets. Accordingly, it remains critical to consider the totality of circumstances with respect to each challenged statement to determine if that statement was, in fact, the causal result of coercive conduct or whether it remained the product of a voluntary choice even in restrictive confinement or conditions. The governments addresses some of the defendant's specific factual arguments below.

**B.     In addition to conceding the voluntariness of his early media-interview statements, defendant's assertion that he was coerced in later interviews contradicts the record.**

The defense argues that starting in the spring of 2019, Elsheikh's conditions of confinement within the SDF prison became much harsher.  As part of that harsh treatment, the defense claims that Elsheikh was told to submit to future media interviews, and in those interviews, he was to repeat the statements that he had previously made during the DOD interrogations in early-2018. *See* Def. Br. 13  at 13 ("Elsheikh was informed that he was going to be performing more media interviews, and that during these interviews he was to repeat what he told the U.S. Government during his DOD interviews"); Def. Ex. 1, ¶ 12 ("From now on you don't refuse to speak to anyone, and when you speak to anyone you tell them exactly what you told the American DoD, I dare you to say anything else.").[6]

As discussed above, this argument must necessarily acknowledge that the earlier media interviews in 2018 were, in fact, voluntary.  *See* Def. Br. at 11 ("Though the SDF pressured Elsheikh to participate in the media interviews, they were initially unconcerned with his responses to the interviewers' questions. Ex 1, ¶ 9.  During several of the media interviews, Elsheikh refused to answer several questions posed to him, and, at times, was openly hostile to the interviewer."). The defense was not wrong in how they characterized those earlier media interviews. Elsheikh was often openly hostile to the interviewers, and he frequently refused to answer their questions.  *See*,

---

[6] As noted in the Government's Memorandum (*see* Dkt No. 96 at 25-26), once they were safely in DOD custody, both Kotey and Elsheikh claimed to the FBI that their statements to the media had been coerced. Yet significantly, Elsheikh never said that he had been told to repeat what he had said to DOD in the media interviews. Kotey never claimed that either. Instead, Kotey told the FBI that he was to promote arguments against the Turkish government. Moreover, at his guilty plea hearing, Kotey recanted these statements and stated, under oath, that his statements to the media had been voluntary. Elsheikh's statements to the FBI cannot be squared with what he now claims in his affidavit, and Kotey's recantation calls Elsheikh's account into significant doubt.

Govt. Memorandum at Attachments 2, 4, 10 and 12.

And those were not the only instances of Elsheikh refusing to be cooperative with the media. *See* Attachment 1. In this Associated Press video dated April 5, 2018, an unsuccessful attempt was made to interview Elsheikh and Kotey. At the beginning of the video, Elsheikh's voice is heard saying, "No fair trial when I am the Beatle in the media. No fair trial. 'Cause the jury or the judge or whoever's going to come to a decision has already been influenced. It's too late for a fair trial."[7] Later, Elsheikh can be heard saying he was not "here to justify or, or shun every act I did."

That was not the only interview that Elsheikh refused to participate in. During his interview with Sean Langan, he described an incident where he was approached by a representative of the Richardson Foundation who was trying to locate Kayla Mueller's body on behalf of her family. *See*, Attachment 2. The meeting that Elsheikh described occurred on October 26, 2018, more than ten months after he was taken into custody. The representative of the Richardson Foundation was able to speak to Elsheikh and Kotey for over two hours, and the pair remained relaxed and confident throughout the interview. *See*, Attachment 3 (Photograph of Elsheikh and Kotey during that interview). Yet significantly, Elsheikh and Kotey told the representative of the Richardson Foundation that they would not give any information regarding the location of the murdered hostages because, "our stance was the stance of, the previous stance which was not, not to speak to anybody and just to wait for some kind of legal advice at least."

**C.    Defendant's coercion assertions cannot be reconciled with what he actually said in media interviews.**

A core claim of defendant's motion is that the SDF abused him in order to coerce him to make statements to the media that repeated admissions he had made to the DOD. However, this

---

[7]  In making these comments, Elsheikh demonstrates the same familiarity with the criminal justice system that he showed throughout his time in SDF custody.

claim cannot hold up under scrutiny. In fact, Elsheikh told the DOD interviewers far more than he ever told the media interviewers. It defies common sense that a person would divulge *more* information before being subjected to abuse and coercion than afterwards. In reality, the record demonstrates that Elsheikh carefully weighed his legal exposure in media interviews and refused to answer or provide information where it might be too inculpatory.

When Elsheikh submitted to the media interviews he now claims were coerced, including a two-hour recorded interview with documentarian Sean Langan, he did not tell Langan the things that he told the DOD—as he now claims the SDF coerced him to do. To the contrary, the interview with Langan was much less detailed than what Elsheikh had said in the earlier DOD interviews. He also left out some of the most critical information that he had previously told the DOD. In addition, he often contested Langan's questions, and disagreed with the premise of those questions throughout the interview. In short, comparing defendant's statements in the Langan interview with those he made to DOD demonstrates that he was not operating under coercion; instead, he was carefully choosing what and how much to divulge about those events. Had the SDF truly been coercing him to make these admissions, he would not have been less forthcoming with the interviewers than he had been in DOD interviews long before the alleged coercion took place. The attached chart sets forth some of the answers that Elsheikh gave in those interviews, and contrasts those answers with what he later said to Sean Langan. *See* Attachment 4.

Notably, the topics on which Elsheikh was more forthcoming with DOD than with Langan were among the most critical facts imaginable: information about the location of the deceased hostages, how the hostage negotiations were handled, and the chain of command within ISIS. When Sean Langan interviewed Elsheikh, he pressed him about a number of these topics, especially about recovering the bodies of the deceased victims. At the 39:30 mark of the interview,

Langan tells Elsheikh how desperate Kayla Mueller's mother is to find out what happened to her and to gain closure. At the 43:00 mark, Elsheikh talks about Diane Foley and Marsha Mueller, after Langan brought their names up. Yet at no point in the interview did Elsheikh say what he had told DOD – specifically that Emwazi had disposed of the remains of James Foley and Steven Sotloff in the place where they were executed.

Even when Langan asked Elsheikh a very open-ended question that certainly should have elicited at least as much information as he previously told DOD, he continued to minimize. *See*, Attachment 5. After being asked about his involvement in the "hostages case," Elsheikh acknowledged that he was directed by Emwazi to get email addresses from some of the hostages, but he downplayed his role, telling Langan that he was simply helping in "some of the logistics" and to act as "just a liaison."

As this clip makes clear, Elsheikh withheld information in the Langan interview that he had already shared with DOD. While the defense makes much of the fact that the cameraman in the interview described Elsheikh as "broken," the inference that he was broken by SDF abuse is not supported by the evidence. First, Elsheikh began the interview resistant to answering Langan's efforts to obtain information from him. Instead, the same cameraman who described him as "broken" noted that Elsheikh's willingness to answer questions was not equally present throughout the interview (as one would expect if SDF coercion were the cause) but was in fact precipitated because "Sean opened the conversation with Elsheikh by showing him a picture of him with his Mum." *See* Defense Exhibit 22 at 4. The cameraman's recollection was correct. At the 21:37 minute mark of the interview, Langan showed Elsheikh a picture of his mother and Elsheikh grew emotional. At 35:30, Langan showed Elsheikh a photograph of his younger brother who had followed Elsheikh to Syria in 2015, joined ISIS, and been killed. Once again, he grew emotional. It

was after looking at these two photographs that Elsheikh began to open up, but that occurred more than a half-an-hour into the interview. Most of the incriminating admissions made by Elsheikh occurred after looking at those photographs.

Yet even seeing the photographs and developing some willingness to answer questions did not cause Elsheikh to simply agree with any question put to him. Even after that point, Elsheikh frequently disputed things that Langan asked, all showing defendant's free will and discrediting his claims of coercion:

- Langan pressed Elsheikh about having choked James Foley. *See* Attachment 6. In response, Elsheikh categorically denied choking him, even though he did admit to hitting "most of the prisoners." Langan asked Elsheikh about a Russian hostage[8] who had been executed and he told Elsheikh that some of the hostages had seen his face. *See* Attachment 8. In response, Elsheikh denied knowing that the Russian had been executed ("I don't know if he was killed…I don't know where he went."). He also disputed the notion that someone had seen his face, telling Langan, that "that's highly unlikely" because covering his face was "just protocol."

- Similarly, when Elsheikh was asked about his role in the execution of another hostage, a Syrian prisoner who had been put in a cell with the other western hostages, he minimized that role. *See* Attachments 9 and 10. Langan confronted Elsheikh about being the shooter

---

[8] The Russian hostage was an individual named Sergey who had been captured and detained along with the other western hostages. In approximately March 2014, the three British guards known as the Beatles came and removed Sergey from his cell and took him away. A few days later, they returned and forced each hostage to look at a photograph on a laptop showing Sergey's head with a bullet wound through it. *See* Attachment 7. This photograph was subsequently emailed to various victim families to pressure them into negotiating for the release of their loved ones. An email dated March 11, 2014 to the family of a Danish hostage stated in part, "Attached is a picture of a man who shared a cold cell with your son for a long time. The fate of Daniel would very well be the same if you continue stalling and wasting TIME!!"

and he quickly shot back, "Who shot who?" At that point, Elsheikh admitted that he was aware that Emwazi shot this person, but he claimed that "I didn't know there was going to be an execution." Nonetheless, Elsheikh admitted that he was present for this execution, and he described what occurred when the Syrian was murdered, "We get to a place and uh they're all sitting around in like a little semi-circle and uh they're holding cards. I don't remember exactly what was on the cards but it was a message.  The whole point of the video was a message."[9]  In the second clip (*see* Attachment 9), Elsheikh seeks to minimize his role in the above execution by claiming that all he did was move a car so it would not be in the camera shot. He did say that he was told that the victim was supposedly a spy, which is what the Western hostages were also told. But ultimately, he did not offer a great amount of detail about this incident beyond saying that if the Syrian was really an apostate, then the punishment for an "apostate is that he's uh killed."

At another stage of the interview with Langan, Elsheikh appeared ready to talk about an incident that occurred in the prison he was in in Syria that came out in the media. *See* Attachment 12. If Elsheikh was truly subjected to the type of mistreatment that he claims at the hands of SDF (and continued to be under the threat of that same mistreatment at the time of the interview), it seems odd that he would so willingly want to talk about that detention with a journalist.  In fact, Langan actually cut him off when he tried to talk about that. Instead, Elsheikh described his own role in overseeing the Western hostages. He talked about what it was like be in charge of prisoners

---

[9] Elsheikh's description of this as a "message" was an apt description. This event was intended as an effort to put maximum pressure on the families of some of the European hostages by sending this video to them. Five of the hostages were made to write pieces of paper asking their governments to pay large sums of money for their release. The murder of this Syrian prisoner was videotaped as the hostages witnessed it at close range. After the dead man's body fell into a pit, the camera panned to the hostages holding their ransom demands. *See* Attachment 11 [Redacted Still Photo of Murder Scene]. These were the "cards" that Elsheikh described.

and to ensure that they subdued them enough so that they did not try to escape. Once again, he attempted to minimize his role by telling Langan that he "didn't run" the prison and that he "wouldn't word it that way."

Not surprisingly, Langan also pressed Elsheikh about what he knew about the murder of James Foley. *See* Attachment 13. The answer that he gave was a far cry from what he told DOD. In short, he claimed that he suspected that Emwazi was the masked beheader in the Foley execution video, but he only gleaned that because he confronted Emwazi who "just looked at me and gave me that look like so what, like don't…Anyone who doesn't know it's me, you don't need to tell them it's me basically."

In total, all of these statements and interactions with Langan discredit Elsheikh's claims that he was under the spell of SDF threats at the time of the interview. Rather, defendant voluntarily engaged in those sessions, drew the boundaries of what we wanted to talk about, and purposefully minimized his involvement at a much lower level than what he told the DOD interviewers.

> **D.    Elsheikh's familiarity with the Anglo-American criminal justice system reinforces the conclusion that his statements to the media were the product of considered choices.**

One of the factors in evaluating whether a defendant's statements were made voluntarily is his familiarity with the criminal justice system. As noted at pages 23-24 of the Government's Motion In Limine to Establish Admissibility of Defendant's Statements Pursuant to Federal Rule of Evidence 104 (*see* Dkt. No. 96),[10] both Kotey and Elsheikh were very familiar with the criminal justice system. As if to underscore this point, Elsheikh confirmed as much to Sean Langan. *See*

---

[10]   In his Mirandized interview in March 2018, Elsheikh also demonstrated a firm grasp of his legal rights which included his refusal to sign the *Miranda* waiver form and his refusal to answer certain questions. *See* Govt. Memorandum, Dkt. No. 96 at 2-5 for a more detailed factual recitation of the March 2018 FBI interviews.

Attachment 14. Elsheikh's point about being in trouble with the police a few times is consistent with his criminal history in the UK. And the comment about protecting his legal rights is a strong indicator that he knows what his legal rights are, and that he knows how to protect those rights, just as he did when he asked questions about the *Miranda* waiver form in March 2018 that he ultimately refused to sign.

### E. The record contradicts defendant's assertion that he was coerced by fear of an Iraqi trial.

As noted above, references to a defendant facing the consequences of his own criminal conduct is simply not coercive under the well-established law of this Circuit. *See Mashburn*, 406 F.3d at 310 ("[T]he agents simply informed Mashburn of the gravity of his suspected offenses and the benefits of cooperation under the federal system. Any coercion that Mashburn may have felt was not the product of official action, but rather the consequence of the severity of the offenses he chose to commit." (internal citations omitted)); *see also Khweis*, 971 F.3d at 463–64 (rejecting Khweis's argument that fear of an Iraqi trial rendered his statements involuntary). The defense argues that Elsheikh "had also been warned that if he did not produce actionable intelligence, he faced the very realistic possibility of being sent to Iraq for a summary trial and a swift hanging – a fate that one interviewer, Sean Langan, overtly mentioned several times during his interview." *See* Def. Br.  at 29. While it is true that Langan mentioned what had happened to some French ISIS members who were sent to Iraq for trial to Elsheikh, this information had no discernable effect on Elsheikh, and, in fact, he seemed totally unfazed by it. *See* Attachment 15. As this clip makes clear, Elsheikh did not appear particularly fearful at hearing this information, and as if to under-score his familiarity with the legal system, he talked about the "Iraqi constitution" and questioned "what authority the Iraqi government has to try people who didn't commit crimes on their own turf."

At another point in the interview, Langan pressed Elsheikh about having written the ransom emails that were sent to the families of the hostages. *See* Attachment 16. In forcefully rejecting that premise, Elsheikh alluded to the Iraqi trial, referring to it as a "ten-minute kangaroo court." But more importantly, he continued to dispute Langan's questions, and he refused to acknowledge that he was the person who wrote the emails. In fact, he said that Emwazi was the person who wrote the emails, telling Langan, "how do I analyze that…the person who wrote the emails is dead." Ultimately, the reference to the ten-minute Iraqi trial did not have any discernible effect on Elsheikh. He remained combative and unwilling to accept many of the questions posed by Langan.

### F.   Defendant's statements after being released from SDF custody.

Further evidence after the defendant was transferred to DOD custody in October 2019 confirm that his allegations of coercion are insubstantial. In October 2019, both Elsheikh and Kotey were moved from SDF custody to DOD custody. For the next year, up until they were flown to the United States to face charges here, they remained in a U.S. DOD facility in Iraq. Near the end of their stay with DOD, Kotey and Elsheikh, who had been housed separately, were allowed what were referred to as "Socialization Visits." For an hour on most days in August and September 2019, they were placed in adjacent cells where they could talk, or even play chess. These socialization visits were all recorded. In the course of these sessions, Elsheikh and Kotey talked about all manner of topics including politics, the situation in Iraq and Syria, books that they were reading, what was happening in England, their fellow prisoners in the DOD facility, food, exercising, and what they expected would happen to them, among other topics.

At one point, they even spoke about their previous SDF detention. *See* Attachment 17. Significantly, neither Elsheikh nor Kotey described the type of mistreatment that Elsheikh now alleges in his affidavit. To the contrary, they both talk about aspects of their SDF custody that they

enjoyed. Kotey said that the "rec" was better and Elsheikh agreed that it was "bigger."[11] They both also agreed that one of the benefits of SDF custody was that there were people to socialize with, and SDF had begun handing out clothes, providing access to washing machines, and tea with meals. Ultimately, when Kotey said that, "I would swap places with one of them any day," Elsheikh agreed, telling him "same here." And while Kotey made a brief reference to physical abuse like hits at the end of that clip, he did not claim anywhere near the sort of torture that Elsheikh claimed. If Elsheikh had truly experienced the level of mistreatment that he alleges, it defies belief that he would say that he would happily return to SDF custody once he was safely in a DOD facility. In short, defendant's self-serving assertions to obtain suppression are not credible in light of his candid admissions to a friend when he had nothing to gain by obscuring the truth.

## CONCLUSION

Because the government's use of separate intelligence-gathering and law-enforcement interviews was not a deliberate attempt to undermine the efficacy of the law enforcement *Miranda* warnings, the *Elstad* standard applies, and defendant's *Mirandized* statements are admissible. Even if the Court were to assume that Justice Kennedy's *Seibert* concurrence applies instead, the circumstances here demonstrate ample curative measures such that a reasonable person in Elsheikh's position would understand the warnings—as he, in fact, did when he chose to exercise some of those rights and limit his answers to the FBI. Additionally, the evidence demonstrates that defend-

---

[11]  It is clear that SDF did afford Elsheikh with recreational opportunities. *See* Declaration of El Shafee Elsheikh at ⁋ 8 (Describing times when "I was let out of my cell to take my rec time in the courtyard"). In addition, during the clean team interviews in March 2018,  Elsheikh described his SDF custody to the agents in ways that were very similar to what he and Kotey discussed in the Socialization Visits. He told the agents that SDF gave the prisoners opportunities to wash clothes, work out,  shower, play tea and chat with the other prisoners.

ant's statements were made voluntarily and not as the result of undue coercive influences. Accordingly, defendant's motion to suppress should be denied.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      /s/   John T. Gibbs
Dennis M. Fitzpatrick
Raj Parekh, First Assistant U.S. Attorney
John T. Gibbs
Aidan Taft Grano-Mickelsen
Assistant United States Attorneys
Eastern District of Virginia
Alicia H. Cook, Trial Attorney
United States Department of Justice

24

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2021, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case.

    /s/    John T. Gibbs
_____
John T. Gibbs
Assistant United States Attorney
United States Attorney's Office for the
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
Fax: 703-299-3981
Email: john.gibbs@usdoj.gov
