**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          v.<br><br>EL SHAFEE ELSHEIKH,<br>                              *Defendant*. | Case No. 1:20CR239-2<br>Honorable T.S. Ellis, III<br><br>Hearing: Nov. 16, 2021<br>Trial: Jan. 18, 2022 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO GOVERNMENT'S
MOTION *IN LIMINE* TO ESTABLISH ADMISSIBILITY OF DEFENDANT'S FALSE
IDENTITY STATEMENTS AND RELATED CO-CONSPIRATOR STATEMENTS**

**SUMMARY OF ARGUMENT**

The government's brief baldly asserts that "common sense" requires this Court to find

that being captured by paramilitary forces during ongoing armed conflict in Syria "falls

comfortably" in the same situation as being booked into a police station in Charlotte, North

Carolina. *See Gov. Mem.* ECF No. 97 at 6.  The government cites no authority for this Court to

hold that the *Miranda* exception for routine booking questions should apply in an area of armed

conflict.  Yet, the government asks this Court to draw the same conclusions as if Mr. Elsheikh

had lied to a deputy at the local jail.  This argument is illogical.

The false names provided to the Syrian Democratic Forces (SDF) and to Department of

Defense (DoD) interrogators are not evidence of consciousness of guilt, but rather reflect an

effort to survive in an exceptionally dangerous situation. As such, the legal issue as to whether

the booking questions here were "designed to elicit an incriminating response" is simply

inapplicable. Instead, the dilemma facing Mr. Elsheikh was to admit he was a westerner, at the

risk of his life, or mislead his captors that he was from Yemen. Moreover, the answers given to

the booking questions in 2018 could not possibly be deemed to be in furtherance of the

1

conspiracy alleged in this case. Therefore, and for the reasons set forth fully below, Mr. Elsheikh, by counsel, moves this Court to deny the government's motion in limine to establish the admissibility of false identity statements and co-conspirator statements.  *See* ECF No. 97.

## **DISCUSSION**

Armed conflict in Syria began in 2011, after the Syrian government responded with deadly force and torture to pro-democracy protests and demonstrations that began in March of that year.[1]  The Syrian government also used chemical weapons on its citizens.[2]  By the end of 2011, several opposition militias had formed and over 5,000 people had been killed.[3]  In 2014, the Islamic State in Iraq and the Levant (ISIL), or the Islamic State of Iraq and Syria ("ISIS"), declared itself a caliphate and took control of large portions of Syria.  In 2017, the Syrian Democratic Forces (SDF) formed to fight against the growing ISIS threat.[4]  The SDF is the military wing of the Autonomous Administration of North and East Syria (AANES), aka Rojava, an unofficial autonomous region in northeastern Syria. The main fighting of the SDF is the Kurdish People's Protection Units ("YPG").[5]  Turkey considers the YPG as a subordinate component of a U.S. designated terror group, the Kurdistan Workers' Party ("PKK").[6]  By December of 2017, ISIS had lost 95% of its territory in Syria.[7]

---

[1] Britannica, The Editors of Encyclopedia, "Syrian Civil War," Encyclopedia Britannica, 17 Jul. 2020, available at https://www.britannica.com/event/Syrian-Civil-War.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] Lead Inspector General for Operation Inherent Resolve | Quarterly Report to the United States Congress | April 1, 2019 – June 30, 2019, pg. 26 (August 6, 2019) available at: https://www.dodig.mil/reports.html/Article/1926689/lead-inspector-general-for-operation-inherent-resolve-quarterly-report-to-the-u/.
[6] *Id.*
[7] C. Glenn, et al., *Timeline: the Rise, Spread, and Fall of the Islamic State*, The Wilson Center, Oct. 2019, available at https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.

SDF captured Mr. Elsheikh and Kotey on January 4, 2018.  Seventeen days later, DoD interrogators came to an unknown SDF detention facility somewhere near Raqqa, Syria to question Mr. Elsheikh.  Mr. Elsheikh was not told at any point in time that he was under arrest or had been charged with a crime.  He was not told he would see a judge or speak with an attorney or that an attorney would be provided for him.  And of course, Mr. Elsheikh was not read his rights pursuant to *Miranda v. Arizona*[8] until many months later.  He did not know his legal status or whether his life was in danger.  Mr. Elsheikh was simply detained indefinitely by a hostile paramilitary group.

During the seventeen days before DoD interrogators questioned Mr. Elsheikh, the SDF repeatedly assaulted him.  At the time of his detention on January 4th, the SDF punched and kicked Mr. Elsheikh and beat him with the butt of a rifle.  After taking him to the unknown detention facility near Raqqa, the SDF held a gun to his head and tortured him.  *See* Dkt. 101, pp. 2-4.  Mr. Elsheikh feared for his safety and therefore gave a false name and said he was from Yemen, instead of admitting he was from the United Kingdom.  *Id*.  He feared that being a Westerner would expose him to much greater danger.  Moreover, before Mr. Elsheikh departed for the Turkish border on January 4th, his Syrian "smuggler," whom he had hired to escort him across the border, told Mr. Elsheikh that if they were captured he should provide false identification for his own protection. Dkt. 101-1.  Later, Mr. Elsheikh told the SDF that Kotey was also from Yemen to protect him.  The government seeks the admission of Mr. Elsheikh's false answers, as well as Kotey's, in response to these initial questions by DoD interrogators on January 21, 2018 and January 23, 2018.

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

The government asserts as fact that "DOD personnel conducted routine screenings at the facility as part of administrative procedures to obtain basic identifying information for detainees." *See* Dkt. 97 at 2.  However, "biometric enrollment" and the biometric data it produces is hardly an administrative procedure.  Biometric data has long been an intelligence tool in the Global War on Terrorism.[9]  Mr. Elsheikh continued to believe if he were identified as a Westerner, his death could be imminent. This belief was compounded by the fact that there were numerous media outlets claiming the Mr. Elsheikh was a member of the ISIS "Beatles" cell—a fact which put his life more in jeopardy given he was in SDF custody. Dkt. 101-1, pg.4 (Elsheikh declaration). And although the DoD interrogators collected the biometric data and identifying information, Mr. Elsheikh remained in an SDF prison and subject to their will.  Mr. Elsheikh had no information on January 21 or 23, 2018 that he would be repatriated to the United Kingdom or face a western criminal justice system.  At the time, Mr. Elsheikh thought it possible he would be transferred to Iraq to face execution.[10]

---

[9] "Department of Defense Biometric Standards Development Recommended Approach," DOD Report from Biometrics Management Office, September 2004, Homeland Security Digital Library, ¶¶ 1.1, 1.3, available at https://www.hsdl.org/?view&did=449571 ("The importance of biometric technology in fighting the Global War on Terrorism has grown significantly … [and] have led to actions by the BMO to work more closely with the Department of Homeland Security (DHS), the intelligence community, the Department of State, the Justice Department, the FBI, and other U.S. Government organizations in the coordination of biometric standards development activities.").

[10] James F. Jeffrey, "*Part 2: ISIS Prisoners and Families*," Four-Part ISIS Series: Its Fighters, Prisoners, and Future, The Wilson Center, December 2020, available at https://www.wilsoncenter.org/article/part-2-isis-prisoners-and-families ("The Iraqi judicial system is generally harsh with ISIS fighters, and some have been executed.").

I.      **The exception to *Miranda* warnings for routine booking questions does not apply to foreign nationals captured by paramilitary forces during armed conflict outside of the United States**

Being questioned by SDF and DoD forces in Syria during armed conflict is not akin to a regular criminal defendant in the United States, cloaked with due process rights, being asked biographical booking questions in Charlotte, North Carolina or anywhere else in the United States.  The government cites no authority as to why these situations are legally similar.  Nor does the government cite authority that *Pennsylvania v. Muniz* should apply outside the United States, to a foreign national held by a hostile militia, in an unofficial, autonomous region with no clear rules or procedures for due process.  Therefore, Mr. Elsheikh asks this Court to find that the exception to *Miranda* for routine booking questions does not apply.

After *Miranda* established prophylactic rules to protect a defendant's due process rights under the Fifth Amendment, *Muniz* first recognized an exception to these rules for "routine booking questions." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).  The answers to these questions are admissible absent *Miranda* warnings because police need to obtain "biographical data necessary to complete booking or pretrial services." *Id.*  Questions that are "normally attendant to arrest and custody" fall within this exception. *Id.* at 600 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  After all, "[d]isclosure of name and address is an essentially neutral act." *California v. Byers*, 402 U.S. 424, 432 (1971).

However, Mr. Elsheikh was not under arrest.  He was not being booked into a jail in the United States of America and entitled to the protections of the United States Constitution.  There would be no due process that followed once he was detained in an unknown, austere detention facility in northeastern Syria.  And disclosure of his name or address would not be a "neutral act." *Id.*  Mr. Elsheikh feared for his life.  He believed disclosure of his true name was too

dangerous and that he could be punished, or killed, for being a Westerner or an alleged member

of the ISIS "Beatles" cell.  In the following month, February of 2018, Iraqi court sentenced

fifteen Turkish women suspected of being ISIS members to death by hanging.[11]  Whether the

DoD interrogators' questions were designed to illicit incriminating admissions therefore is not

applicable in this environment.  *Muniz*, 496 U.S. at 602 n.14.  The DoD officials who questioned

Mr. Elsheikh were not deputy sheriffs on routine booking duty.  Their purpose was to gather

intelligence information and not routine booking information.

From the beginning of his detention, SDF interrogators and guards repeatedly beat and

abused Elsheikh.  *See* Dkt. 101, pp. 3-14.  On January 21st or 23rd of 2018, Mr. Elsheikh had no

reason to believe he would be transferred to the United Kingdom or United States for trial.

Although he was questioned by DoD interrogators, Mr. Elsheikh remained, at all times, in an

SDF prison even after DoD interrogators learned his true identity.  In his mind, maintaining that

he was from an Arab country was the most likely way to stay alive.

## II.      Providing a false identity has no relevance or probative value in this environment

Providing a false name to a paramilitary force abroad, or to the DoD while engaged in

intelligence interrogations, is not the functional equivalent of giving a false name to a police

officer in the United States after having been arrested.  The government asks the Court to find

that Mr. Elsheikh's, and Kotey's, false statements were evidence of consciousness of guilt.  *See*

Dkt. 97 at 7.  The government cites no authority holding that Mr. Elsheikh's situation is legally

similar to giving a false name to an INS agent in Charlotte, *United States v. D'Anjou*, 16 F.3d

604, 608 (4th Cir. 1994), to giving a false name to a police officer during an arrest in

---

[11] C. Glenn, et al., *Timeline: the Rise, Spread, and Fall of the Islamic State*, The Wilson Center, Oct. 2019, available at https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.

Minneapolis, *United States v. Clark*, 45 F.3d 1247, 1249 (8th Cir. 1995), or to giving false

statements to the FBI in Spartanburg.  *United States v. Ath*, 951 F.3d 179, 185 (4th Cir. 2020).  In

those situations, the defendants did not have to fear for their lives once they provided law

enforcement officers with truthful information.  They did not have to fear being sent to another

country to be summarily executed.  The U.S. Constitution guaranteed those defendants due

process and prohibited cruel and unusual punishment.  U.S. Const. amend. V, amend. VIII.  Mr.

Elsheikh and Kotey could not count on the same guarantees.

Mr. Elsheikh's false identity cannot be viewed as an attempt "to escape detection by the

United States or other governments."  See Dkt. 97 at 8.  At the time Mr. Elsheikh gave the false

name, the SDF had already captured him and it was already suspected that he was an ISIS

fighter.[12]  Further, providing a false name after being detained as a potential enemy combatant in

Syria does not prove an attempt to hide or obscure conduct like attempting to flush illegal pills

down the toilet.  *United States v. Zayyad*, 741 F.3d 452, 463 (4th Cir. 2014).  And while

"[i]nferences and presumptions are a staple of our adversary system of factfinding … [t]he value

of these evidentiary devices, and their validity under the Due Process Clause, vary from case to

case … depending on the strength of the connection between the particular basic and elemental

facts involved."  *County Court v. Allen*, 442 U.S. 140, 156 (1979).

The connection between the "particular basic and elemental facts" in Mr. Elsheikh's case,

i.e., his false identity, and the elements of the offenses with which he is charged is weak.  Being

in a battle zone evokes an instinct for survival. It is a far cry from an environment that adheres to

---

[12] A. Goldman & S. Mekhennet, "'*That is not the son I raised': How a British citizen became one of the most notorious members of ISIS*," The Washington Post, May 2016, available at https://www.washingtonpost.com/world/national-security/that-is-not-the-son-i-raised-how-a-british-citizen-became-one-of-the-most-notorious-members-of-isis/2016/05/23/6d66276c-1cfd-11e6-b6e0-c53b7ef63b45_story.html.

processes and norms.  Mr. Elsheikh's false name was related to a survival instinct on a battlefield, not the elements of the charged offenses.  This Court should not find that Mr. Elsheikh's and Kotey's false identity statements were analogous to a criminal defendant in America giving false information to a U.S. law enforcement officer.  The facts of this case do not support that conclusion.

**III.     Kotey's false identity statements are not non-hearsay and should be excluded**

Mr. Elsheikh's false identity statements likely qualify as admissions of a party opponent. Fed. R. Evid. 801(d)(2)(A).  However, these statements should still be excluded because their probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  Fed. R. Evid. 403.  As argued above, Mr. Elsheikh's statements are not probative of consciousness of guilt based on the facts of this case.  To allow this evidence, and the government's inevitable argument, would signal to the jury that Mr. Elsheikh's situation was no different than being booked into an America jail.  However, Mr. Elsheikh's situation was far different.  From his initial detention, he was continually beaten, tortured, threatened, and denied medical care.  The "consciousness of guilt" argument ignores the complexity of the situation and will confuse and mislead the jury.  The issues in this case are whether Mr. Elsheikh engaged in the charged terrorist activity, not his reasons for lying about his background when he was captured by the SDF.

Kotey's false identity statements should be excluded based on Rule 403 and because they do not qualify as statements of a co-conspirator.  First, even if not offered for their truth, Kotey's statements have no probative value as to consciousness of guilt for the same reasons that Mr. Elsheikh's statements do not prove that.  Second, these statements are just as likely to confuse and mislead the jury, especially when Kotey will not testify.  They should be excluded.

The government argues that Kotey's statements could be introduced as statements of a co-conspirator. *See* Dkt. 97 at 9. This argument fails because the government has not met its burden by a preponderance to show that the statements were made in furtherance of the conspiracy. The government argues that Kotey's statements furthered the conspiracy by attempting to conceal their identities and cover-up the crime. *See* Dkt. 97 at 10. However, "[i]t is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise." *Dutton v. Evans*, 400 U.S. 74, 81 (1970) (citing *Lutwak v. United States*, 344 U.S. 604 (1953); *Krulewitch v. United States*, 336 U.S. 440 (1949)). Since the government argues that Kotey's statements were made for "nothing more than concealment," the statements were not made in furtherance of the conspiracy. *Id.*

Post-arrest statements are generally not made in furtherance of a conspiracy. *See United States v. Williams*, 87 F.3d 249, 254 (8th Cir. 1996); *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979) ("post-arrest utterances of co-conspirators do not qualify as non-hearsay under Fed. R. Evid. 801(d)(2)(E) … A co-conspirator's participation in a conspiracy ends with his arrest, and therefore his post arrest statements are not made during the course of the conspiracy"). The government bears the burden of showing that "co-conspirators still at large are fully capable of perpetuating an on-going conspiracy." *United States v. Register*, 496 F.2d 1072, 1079 (5th Cir. 1974) (citing *United States v. Sarno*, 456 F.2d 875 (1st Cir. 1972)).

Kotey's false identity statements could not have possibly been in furtherance of a conspiracy that was essentially dismantled in December of 2017 as ISIS had lost 95% of its

9

territory in Syria.[13]   The government offers no other argument, aside from concealment of identity, to explain how Kotey's statements furthered an on-going conspiracy.  The answers to the DoD background questions were given well after Kotey had been captured and detained by the SDF.  Moreover, all the alleged members of the "Beatles" ISIS cell who were responsible for the plot had either been captured or killed.  Clearly this information was in no sense of the word "in furtherance" of the conspiracy.  The government's argument that Kotey's statements could be introduced as prior statements by a co-conspirator is wholly without support.  "While [post-detention statements are] admissible against the others where it is in furtherance of the criminal undertaking, all such responsibility is at an end when the conspiracy ends." *Wong Sun v. United States*, 371 U.S. 471, 490 (1963).

### CONCLUSION

The government's motion in limine seeking to introduce Mr. Elsheikh's and Kotey's false identification and alleged co-conspirator statements should be denied.  Moreover, those statements should be excluded because their limited probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

Respectfully Submitted,

EL SHAFEE ELSHEIKH,
By Counsel
_____/s/_____
Nina J. Ginsberg, VSB # 19472
Zachary A. Deubler, VSB # 90669
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com
zdeubler@dimuro.com

---

[13] C. Glenn, et al., *Timeline: the Rise, Spread, and Fall of the Islamic State*, The Wilson Center, Oct. 2019, available at https://www.wilsoncenter.org/article/timeline-the-rise-spread-and-fall-the-islamic-state.

_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
Law Offices of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com


_____/s/_____
Jessica N. Carmichael, VSB #78339
Yancey Ellis, VSB #70970
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com
yancey@carmichaellegal.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October 2021, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.


_____/s/_____
Zachary A. Deubler, Esq.