IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:20-CR-239-TSE-2 |
| v. | ) | |
| | ) | Hon. T. S. Ellis, III |
| EL SHAFEE ELSHEIKH | ) | |
| | ) | |
| Defendant. | ) | Hearings: November 16-18, 2021 |

**GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO ESTABLISH ADMISSIBILITY OF DEFENDANTS' STATEMENTS PURSUANT TO FEDERAL RULE OF EVIDENCE 104**

The Government submits its Reply to Defendant's Response in Opposition to the Government's Motion *in Limine* to Establish the Admissibility of the Defendants' Statements Pursuant to Federal Rule of Evidence 104. With respect to the media interviews, the government does not intend to seek to introduce any media interviews of the co-defendant, Alexanda Kotey, appearing alone. To the extent that any statements of Kotey will be introduced, they will be in interviews where both Kotey and the defendant appeared together. Currently there are only a total of six such interviews, and they were all interviews where the defendant did most of the talking. Those six interviews took place in 2018 when the defense acknowledges that the defendant was free to say whatever he wanted. The government can authenticate these interviews through a number of methods, especially given that authentication is not a particularly high bar. Finally, the recently released Washington Post interview from August 2019 demonstrates yet again that the defendant was speaking voluntarily in those later interviews. The Washington Post interview also serves to bolster the admissibility of the Sean Langan interviews, which are likewise admissible because the government can establish that the defendant's statements were made freely and voluntarily.

I. **Only a Small Number of Recorded Interviews with Alexanda Kotey will be Offered at Trial.**

The defense is incorrect in asserting that "the government asks this Court to admit wholesale all of Mr. Kotey's prior statements, without attempting to identify any specific statements and underlying legal rationale for their admission." Dkt. 129, Defendant's Response in Opposition to Government's Motion In Limine to Establish Admissibility of Defendants' Statements Pursuant to Federal Rule of Evidence 104 ("Defendant's Response") at 2. To the contrary, the government only seeks to admit a very limited number of statements of Kotey where he was present with, and being interviewed jointly with, the defendant. Attachment 1 is a table setting forth the media clips that the government currently intends to offer at trial.[1] Clips corresponding to this table are attached to this motion at Attachments 2-27 for the Court's review. There are only 9 media clips that the government currently intends to offer by the media organizations listed in Attachments 2-8 and 26-27. The other 17 are clips of the July 2019 interview of the defendant by Sean Langan, who is expected to testify at the suppression hearing and at trial.

A. **The First Seven Media Clips All Come from Interviews in 2018 when the Defendant Acknowledges he was Acting Voluntarily.**

The clips listed in Attachments 2-8 include interviews with Jenan Moussa in April 2018, an interview with Isobel Yeung from Vice News in July 2018, an interview with Nick Patton Walsh of CNN in April 2018, an interview with Stuart Ramsey from Sky News in April 2018, and finally, an interview with Quentin Somerville of the BBC in approximately August 2018. The defense contends that all of these 2018 interviews were involuntary, while being forced to acknowledge

---

[1] The government notes that this table lists the current best estimate of which clips it intends to offer at trial. However, it is possible that in the run-up to trial additional clips will become relevant and probative for a jury. Should that occur, the government will seek admission of those clips on an individualized basis.

that the defendant was free to say whatever he wanted in them. *See* Defendant's Response at 8, fn. 2 ("The Media interviews in question can be generally categorized into two separate groups, the first being the early media interviews that took place roughly between March 2018 and August 2018. During these media interviews, Elsheikh did not have a choice of whether to participate in the media interviews themselves but was given slightly more freedom regarding what he discussed with the media outlets);" *See also* Defendant's Response at 24 ("In the early media interviews, those taking place before May 2019, SDF officials were far less concerned about the contents of the media interviews themselves. In these interviews, SDF officials did not provide Elsheikh the option to participate in the interviews, but informed him that he was free to discuss what he wished during the interviews themselves.").

The defendant says as much about the 2018 interviews in his ten-page Declaration dated September 30, 2021. *See* Declaration of El Shafee Elsheikh at ¶ 9 ("Moreover, they [SDF] also told me that they did not care what I spoke about during the interviews"); *See also*, Declaration of El Shafee Elsheikh at ¶ 9 where he describes "several media interviews with different outlets." The defendant confirms that he participated in some of the media interviews that the government intends to offer at trial. For example, he states in his Declaration that "[t]he first media interview I did was with CNN." *See* Declaration of El Shafee Elsheikh at ¶ 9. This corresponds to the interview with Nick Patton Walsh from April 2018,[2] *See* Attachment 4, where Elsheikh describes

---

[2] The defense makes reference in its motion to a number of media interviews that occurred in 2019, including an interview with CNN. Defendant's Response at 24. It is important to note that Nick Patton Walsh of CNN conducted two interviews with the defendant and Alexanda Kotey. The first was an in-person interview that occurred in 2018. Attachment 4. The second was a later interview in 2019 that occurred over a video link. The only clip that the government seeks to introduce at trial is from the 2018 in-person interview.

Mohammed Emwazi as a loyal, upstanding friend. Later, he says that "[a]fter roughly four interviews, sometime in April 2018, I was transferred to Derik prison where I conducted one additional media interview with VICE news." *See* Declaration of El Shafee Elsheikh at ⁋ 10. This VICE news interview corresponds with the interview that Isobel Yeung conducted of Elsheikh and Kotey in July 2018 where they talked about the things that justified James Foley's murder. *See* Attachment 3. Finally, the defendant acknowledged participating in an interview with a BBC news journalist when he was being held at the Kobani prison.[3] *See* Declaration of El Shafee Elsheikh at ⁋ 10. This description corresponds to the interview that Quentin Somerville of the BBC conducted with the defendant and Kotey in approximately August 2018. *See* Attachment 7, 8.[4]

> **B.   Alexanda Kotey is Only Present in Six of the Clips that the Government Intends to Offer, and Most of the Statements in those Interviews are Made by the Defendant Elsheikh**

It is important to emphasize how limited the clips are that include Alexanda Kotey, as he only appears in Attachments 3-8. In Attachment 3 the defendant and Kotey are interviewed together by Isobel Yeung who asks about whether the murder of James Foley was justified. Elsheikh does most of the talking during this particular clip, but it is very clear that the two of them are in agreement that the murder was justified. When Kotey likens it to collateral damage, that is not at

---

[3] Significantly, in his Declaration, the defendant describes an incident that occurred prior to this BBC interview where he was asked to speak to a Spanish investigator. The defendant stated that, "I asked the Spanish investigator if he was going to provide me a lawyer which he denied. I refused to do the interview despite the Americans' aggressive behavior." *See* Declaration of El Shafee Elsheikh at ⁋ 10. This demonstrates once again that the defendant was very familiar with his legal rights, and with exercising those legal rights, and that as to these early interviews, they truly were voluntary.

[4] As noted *infra*, authentication is not a particularly high bar, and the government has a number of methods by which it can demonstrate the authenticity of the interview clips that it intends to offer at trial. Yet the fact that the defendant has acknowledged in a signed declaration that he participated in most of these interviews, at a time when he was free to say or not say, what he wanted to, is one factor that the Court should be able to rely on in finding that they are authentic.

4

all inconsistent with what Elsheikh had already said.  In the CNN clip, Attachment 4, Kotey is present when the defendant praises Mohammed Emwazi, but he does not say anything, so nothing testimonial occurs on the part of Kotey in that clip.

In the two interviews with Stuart Ramsey of Sky News, Attachments 5 and 6, the defendant and Kotey are clearly in agreement in what they are saying.  In fact, in Attachment 5, they both talk over each other to challenge Stuart Ramsey when he says they're not compelled to stay in a state as barbaric as ISIS.  Both of them quickly ask, "by what standards," and then Elsheikh attempts to offer an Islamic justification for his position.  It is only at the end that Kotey comments on how the U.S. government did not come here [to Syria] with the approval of the Syrian government.  Attachment 6 is similar.  Elsheikh does most of the talking in order to offer a religious justification for the acts of ISIS.  It is only at the end that Kotey chimes in to say that he does not want to offer specific condemnations "given my current disposition."

Finally, Attachments 7 and 8, the Quentin Somerville interviews, primarily feature the defendant though Kotey is present and does speak briefly.  In the first clip, the defendant is asked to spell his name which he does using "Echo, Lima, Sierra, Hotel…"  He then tells the interviewer that he was formerly an Army Cadet who likes to show it off sometimes.  The only comment made by Kotey is when he laughs and says, "I'm not going to do none of that Echo stuff here."  Similarly, the second clip largely features Elsheikh who tries to explain how Emwazi, with no military training and being able to speak little Arabic, was able to rise so far in the Islamic State.  In response, Elsheikh says that he and Emwazi both spoke very good Arabic, and the defendant said that he received military training.  Kotey does not speak during this clip, so again there is nothing testimonial from him.

  **C.** **The Very Small Number of Clips where the Defendant and Kotey are Interviewed Together do not Create a Confrontation Clause Problem**

  All of the media clips where Kotey and the defendant are present involve the defendant doing most of the talking, and in fact, in two of them Kotey does not speak at all. These are simply not the types of statements that implicate a Confrontation Clause violation. The basic test is whether the statement was "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011); *see Ohio v. Clark*, 576 U.S. 237, 244-45 (2015). A statement to a journalist is quite unlikely to satisfy that standard. As the Court in *Clark* explained, statements made to "persons other than law enforcement officers" are "much less likely to be testimonial than statements to law enforcement officers." 576 U.S. at 246. If a declarant used a civilian solely as a conduit to communicate with the police, or the police enlisted a civilian as a surrogate to generate witness statements to further a criminal investigation, then the Confrontation Clause might apply. But in general, the primary purpose test recognizes the key distinction between law enforcement agents, whose prime objective is typically investigating and prosecuting crime, and others who interview subjects for reasons unrelated to criminal prosecution. And statements to journalists seem especially unlikely to be deemed testimonial given journalists' traditionally zealous efforts to maintain independence from government action, including law enforcement. Unlike law enforcement agents, journalists do not have a professional duty to investigate crime, and they do not typically act with the primary purpose of gathering evidence for a criminal trial.

  Here there is no evidence that Vice News, CNN, BBC or any of these media organizations were attempting to further a criminal investigation. To the contrary, they appeared to be doing precisely what media organizations do on a daily basis, that is, obtaining a story that was

of public interest. The fact that Kotey made a few statements in the defendant's presence that the defendant seemingly agreed with is not inadmissible. A statement is not hearsay if it is offered against an opposing party and was made by the party or is one the party has manifested that it adopted or believed to be true. Fed.R.Evid. 801(2)(B). That is precisely what the defendant did in those brief interview clips.

Finally, it is clear that the defendant's own statements do not implicate the Confrontation Clause. *See, e.g., United States v. Frank*, 599 F.3d 1221, 1240 & n.21 (11th Cir. 2010) ("a party's own admission offered against him is admissible under the Sixth amendment"). His argument that certain statements were "testimonial" (even though they were made to journalists) applies only to Kotey's statements. Defendant's Response at 3. And if the defendant adopted those statements, that would eliminate any Confrontation Clause problem even if the statements were testimonial. *See United States v. Santos*, 947 F.3d 711, 729 n.10 (11th Cir. 2020).

### D. There are a Number of Ways to Authenticate the Interview Clips

In an additional attempt to suppress defendant's statements, the defense argues that "the government has not articulated how FBI agents who were not involved with the production of the media interviews would be able to testify that the copies they received from either the British law enforcement of [sic] other sources were preserved in a proper manner, were not subject to post-production editing or manipulation, or even that the videos depict the interview in question." Defendant's Response at 25.

As noted in the government's Motion *in Limine* at Dkt. 96, under Federal Rule of Evidence 901, the offering party must provide "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a); *accord United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). The ultimate determination of authenticity is a jury question. *Vidacak*, 553 F.3d at 349. Therefore, "at the motion *in limine* stage, '[t]he district court's role is to

7

serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *United States v. Habteyes*, 356 F. Supp. 3d 573, 581 (E.D. Va. 2018) (quoting *Vidacak*, 553 F.3d at 349)). In other words, the burden for admissibility purposes "is not high—only a *prima facie* showing is required." *Ibid.*

Proponents of evidence "need not establish a perfect chain of custody or documentary evidence to support their admissibility." *Vidacak*, 553 F.3d at 350; *accord United States v. Jones*, 356 F.3d 529, 535–36 (4th Cir. 2004) (holding that a "missing link" in the chain of custody does not prevent admission of evidence, so long as there is sufficient proof that evidence is what it purports to be and has not been altered). Instead, a party may meet its burden "largely by offering circumstantial evidence," including for example that the evidence was found "in a place where they would be expected to be found," had identifying characteristics, and the opponent offered no basis for inferring that the evidence had been forged or altered. *Id.* at 350–51. Similarly, Rule 901(b)(4) permits proponents to authenticate an item of evidence by identifying its "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken together with all of the circumstances." Fed. R. Evid. 901(b)(4).

The testimony of an FBI agent would be only one method to authenticate these recordings, but such testimony would be consistent with *Vidacak* given that this evidence has certain identifying characteristics. Specifically, an FBI agent who had met and interviewed the defendant could testify that he recognized the defendant's physical appearance in the videos, and that he also recognized his voice. The agent could further testify that based on the totality of those characteristics, that the person in the media interviews was plainly the defendant. Those are the sorts of identifying characteristics that an agent can testify about.

In addition, the complete footage of the media interviews with CNN, Sky News and the

BBC (Attachments 4-8) were all obtained with Production Orders issued by the Central Criminal Court in London, England pursuant to Schedule 5 of the Terrorism Act of 2000. Attachments 28 – 30. These Production Orders were obtained in October and November 2019. Upon obtaining the Production Orders, a Detective Chief Inspector with the Metropolitan Police in London then served these Production Orders on CNN, Sky News and the BBC, among others. All three media organizations complied with the Production Orders and turned over their interviews with the defendant. Attachment 31 at p.p. 6-8.

These media interviews were then obtained by the United States pursuant to a Mutual Legal Assistance Treaty (MLAT) between the United States government and the United Kingdom. As part of the MLAT request to the UK dated October 21, 2020, the US government requested the full and complete copies of the media interviews with the defendants, including the interviews with CNN, Sky News and the BBC. Attachment 32 at p.p. 3, 5. On November 27, 2020, the materials requested in this MLAT were transmitted from the UK government to the US government.

The method used to obtain these interviews offers another basis upon which to conclude that they are authentic. First, they were obtained pursuant to UK law with an Order from a Judge in the Central Criminal Court. As noted on the first page of each Production Order, "WARNING: failure to comply with this order is a contempt of court, punishable with a fine or 2 years' imprisonment or both." Clearly each media company had a strong incentive to comply with the Production Order. And, in fact, what all three of them produced were lengthy interviews which show the defendant speaking on camera. There is simply no basis to doubt the authenticity of what these interviews show. Especially when, as noted previously, the defendant acknowledged in his declaration that he participated in numerous media interviews in 2018, including interviews with CNN

and the BBC.

### E. The Jenan Moussa and Isobel Yeung Interviews Should Also be Admitted

The interview clips from YouTube by Jenan Moussa and the Vice News clip by Isobel Yeung (Attachments 2 and 3) should also be admissible. While those interviews could not be obtained via Production Order in the UK because Jenan Moussa operates outside of the UK, and no Production Order was sought for Vice News as they were deemed to be outside of the jurisdiction of the UK Courts, *See*, Attachment 31 at p. 6, there are still sufficient indicia of reliability to find that they are admissible.

In the case of the Jenan Moussa clip, it was taken from the full ten-minute interview of Elsheikh that Moussa conducted with him up until he terminated the interview. That interview was later posted on-line in its entirety. This full clip was included as Attachment 4 to the Government's Motion *in Limine* at Dkt. 96. The interview speaks for itself. The defendant looks calm and in control. He speaks deliberately. He is dismissive of Jenan Moussa. And, in fact, when he decides that he does not like her line of questioning, he says "done" in Arabic and gets up and walks out of the interview. And equally important, it looks and sounds like him. An agent who is familiar with him from having spoken to him will be able to testify that the person in the Jenan Moussa interview is the defendant.

With regards to the Vice News interview in which both the defendant and Kotey appear, that too should be admissible. To begin with, the defendant and Kotey are both very recognizable in that clip. The sound and picture quality are both good. They appear relaxed and comfortable. Moreover, Elsheikh specifically says that he participated in an interview with Vice News after he was transferred to Derik Prison in 2018. *See* Declaration of El Shafee Elsheikh at ¶ 10.

### F. No Continuance is Required in this Case

In arguing that Kotey is not an unavailable witness for purposes of the Confrontation

10

Clause, the defense suggests that a brief continuance of this trial would allow for Kotey's sentencing to occur by which time, they claim, he could be made available to testify. Defendant's Response at p.p. 11-14. Yet as the very short clips listed in Attachments 3-8 make clear, there is not much for Kotey to testify about. Elsheikh does most of the talking in those clips, and when Kotey does speak, his statements plainly speak for themselves. Those statements should be viewed as adoptive admissions on the part of Elsheikh who was present when they were made and made no effort to dispute them. Ultimately there is no basis to continue this case for a handful of short clips that largely feature the defendant.

      **G.**      **The Washington Post Interview Helps to Bolster the Admissibility of the Sean Langan Interviews**

On October 1, 2021, the defense filed a motion and proposed order for a trial subpoena to compel the Washington Post to release footage of an interview that it conducted with the defendant in August 2019 while he was still held in SDF custody. *See* Dkt. 98. The defense claimed that this footage would show Elsheikh visibly demonstrating that he was under duress. On October 4, 2012, the Court granted the issuance of this subpoena to the Washington Post. *See* Dkt. 111. On October 22, 2021, the Washington Post publicly released this interview in its entirety.

As a threshold matter, the manner in which this material was released helps to establish its authenticity. The defense clearly knew from the defendant what he thought the interview would show. That is a strong indication that the defendant participated in and was aware of what happened in that interview. And, in fact, the released footage shows one, continuous interview of the defendant lasting for an hour and 23 minutes. It looks like the defendant on the video. It sounds like the defendant on the video. The camera remains in place and is not manipulated or moved. There are no cutaway shots and, in fact, the released footage included a second camera angle of the same interview.

In reviewing this footage, there are no obvious indications that the defendant was under duress. This despite the fact that in his sworn Declaration the defendant claimed that, "[D]uring the July or August 2019 Washington Post interview, the interviewer asked me why I looked so poorly in the last CNN interview. I responded by stating, 'let's just say I was not feeling so good.'" *See* Declaration of El Shafee Elsheikh at ¶ 14. In the government's review of the Washington Post footage, it was unable to locate any questions related to how the defendant looked in the CNN interview, or any responses where the defendant said "I was not feeling so good." To the contrary, at various points in the Washington Post interview, the defendant can be seen smiling with the interviewer,[5] and at times being combative with her. Yet what stands out most starkly in this interview is that, for an hour and 23 minutes, the defendant did precisely what he had done a few weeks earlier in the Sean Langan interview. That is, he failed to repeat to the Washington Post what he had said in his DOD interviews, even though, according to his Declaration, that was the one thing SDF had told him he had to do. *See* Declaration of El Shafee Elsheikh at ¶ 12 ("From now on you don't refuse to speak to anyone, and when you speak to anyone you tell them exactly what you told the American DOD, I dare you to say anything else"); Declaration of El Shafee Elsheikh at ¶ 13 ("At this point, I knew that I would not be physically beaten if I kept restating my false DOD confessions to the media outlets").

For example, the interviewer from the Washington Post was clearly interested in getting information about Mohammed Emwazi, the individual who had beheaded the American and British hostages. Just four minutes into the interview she asked about "Mohammed" and his problems

---

[5] At the 5:15 mark of the interview, the defendant talked about how unhappy Mohammed Emwazi was with his treatment by the UK's MI5. He described an agent telling Emwazi that he would be on him like his shadow and, after Emwazi got to Syria, he told the defendant "I never seen anyone leave his own shadow. So he was very proud of that." The defendant smiled as he made this comment.

in the UK. At the 5:30 mark she asked about how the defendant had met up with Emwazi after he traveled to Syria in 2012. At 39:20 she asked how things changed for the defendant after Emwazi's name came out. In a follow-up question at 46:30 she asked the defendant if he got worried when Emwazi's name came out. At 55:30 she asked the defendant if he knew how Emwazi's name had come out. At 59:52 she asked if Emwazi's treatment in the UK had caused his behavior in Syria.

All of this focus on Mohammed Emwazi certainly should have prompted the defendant to tell the interviewer what he had said about Emwazi in the DOD interviews. Yet it did not. Attachment 33 is a clip from the Washington Post interview where Elsheikh was first asked whether he knew that Emwazi was Jihadi John. He said that he did know that, but he claims that the reason that he knew it was from knowing him for a number of years and from being able to recognize his physical appearance. Yet what he fails to say is what he told DOD. That is that Emwazi personally told him specific details about the execution of some of the western hostages and what Emwazi did during and after those executions. *See* Attachment 4 to Dkt. 122 Government's Response in Opposition to Defendant's Motion to Suppress at p.p. 1-2.

In this same interview clip, Elsheikh is also asked about any torture of the hostages. Once again, he downplays his role, telling the interviewer that he was not saying they were pampered. Yet he seems to blame the guards by telling her, "what they would have experienced from the guards in the prison would have been harsh treatment." For his part he only admitted that what the prisoners may have experienced from him was not "what was incumbent upon me Islamically."

Yet when it came to questions about whether he tortured the hostages in his captivity, the defendant admitted much more in the DOD interviews. Attachment 34 sets forth some of the statements that the defendant made in the February 20, 2018 and March 7, 2018 DOD interviews. As the attachment makes clear, the defendant acknowledged that the hostages were beaten in a

way that can only be described as torture. Moreover, the defendant admitted to participating in this mistreatment of the hostages.

In Attachment 35 the defendant is again asked about Emwazi in the Washington Post interview and, once again, he seeks to downplay what he knew about the murder of the hostages. He first states that "I believe so" when asked if Emwazi was the one who executed James Foley, Peter Kassig and the others. Though he later admits that "I know so," because "I asked him after." Yet glaringly left unsaid is what the defendant had told DOD more than a year earlier about the specific details regarding the executions of some of the hostages. The defendant knew that information because, as he told DOD, Emwazi had personally told him those details.

In Attachment 36 the defendant is once again asked about punishments for the prisoners and about who received the harshest punishments. Once again, he downplays those punishments, saying that any claims of mock executions or crucifixions was "malarkey" and a "load of rubbish." He also minimizes any punishments that were imposed, claiming that they were just "like a dead leg or a punch in the chest or you know a stress position" and that Emwazi would be the one to order the punishments.

Also of note in this clip is the fact that the defendant, in attempting to minimize the way that the western hostages were treated, compared it to the way he was treated in SDF custody. He told the interviewer, "I'm going to be blunt here and probably just deal with it later, nothing different to what I've experienced here. Nothing different at all from U.S. allies." So here the defendant is both minimizing the treatment that he received from the SDF by equating it to what he clearly described as pretty minimal punishments, but also criticizing the SDF on-camera. That seems inexplicable for someone who alleges such grievous mistreatment at the hands of the SDF. *See* Declaration of El Shafee Elsheikh at ¶ 13 ("I felt like a broken and abused animal, doing

whatever I could to be properly fed and not physically abused"); *See also* Declaration of El Shafee Elsheikh at ¶ 12 ("One of the guards proceeded to lift my handcuffed arms behind my back – I could only assume they were trying to dislocate my arms. While lifted in the air, one of the guards beat me with a bat in the shoulder. The guards continued to repeatedly beat my head and stomach, I could hardly breathe. I again hit the ground and several guards kicked me in the genitals."). Given the level of abuse that the defendant alleges, it is difficult to imagine that he would deviate from what he previously told DOD in the media interviews, or that he would be emboldened to criticize SDF. Yet, in fact, he did both.

    The clip included at Attachment 37 includes a number of questions about how Emwazi's name ultimately came out in public. Once again demonstrating his knowledge of the law, the defendant talks about evidence such as voice recognition, though he asserts that "legally it is not considered as a primary evidence," though "for intelligence, intelligence is extrajudicial." Later in the clip when the interviewer tells him that someone leaked that information to her, Elsheikh appears dismissive, saying "Congratulations." He then says, "I'm sure there's some kind of achievement as a journalist." His tone during this clip appears haughty and dismissive. He seems intent on belittling the interviewer, telling her that "I have a problem believing everything I hear when I come to the media and join the media." His demeanor during this clip did not make him look like a broken animal. To the contrary, he seems confident and in control. And most importantly, he fails to do the one thing he claims was demanded of him, that is, to repeat what he said to DOD to the Washington Post journalist. The defendant's demeanor in these clips reflects an individual who is comfortable saying, or not saying, anything he so chooses. That is the hallmark of voluntariness. Those clips should not be suppressed.

## CONCLUSION

The interview clips listed in Attachment 1 should be ruled admissible pursuant to Federal Rule of Evidence 104. The government can establish the authenticity of those interviews. The government can also establish that the defendant was acting voluntarily when he answered, or in some cases refused to answer, the questions that were posed to him. For the foregoing reasons, these interview clips should be deemed admissible.

                                                Respectfully submitted,

                                                Jessica D. Aber
                                                United States Attorney

By:     /s/   John T. Gibbs
            Dennis M. Fitzpatrick
            Raj Parekh, First Assistant U.S. Attorney
            John T. Gibbs
            Aidan Taft Grano-Mickelsen
            Assistant United States Attorneys
            Eastern District of Virginia
            Alicia H. Cook, Trial Attorney
            United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case.

      /s/ John T. Gibbs
John T. Gibbs
Assistant United States Attorney
United States Attorney's Office for the
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: 703-299-3700
Fax: 703-299-3981
Email: john.gibbs@usdoj.gov