**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20CR239-2 |
| | Honorable T.S. Ellis, III |
| v. | |
| | Hearing: Nov. 16, 2021 |
| EL SHAFEE ELSHEIKH, | Trial: Jan. 18, 2022 |
| *Defendant.* | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO SUPPRESS**

El Shafee Elsheikh, by counsel, submits this Reply to the government's Response in

Opposition to Defendant's Motion seeking to suppress various statements given by Mr. Elsheikh

to law enforcement officials and media outlets. *See* Dkt. 101; 122. In support thereof, Mr.

Elsheikh states as follows:

**DISCUSSION**

The out-of-court statements the government seeks to admit at trial were made by Mr.

Elsheikh during two separate FBI interviews in March 2018 and various media interviews

between March 2018 and August 2019. As set forth below, the modified *Miranda* warnings

given prior to Mr. Elsheikh's March 2018 FBI interviews were wholly insufficient to insulate

him from his prior twenty-six day long unmirandized "intelligence interviews" conducted by

both the FBI and the DoD.  Separately, Mr. Elsheikh was coerced by a paramilitary

organization—the SDF—into participating in various media interviews that the SDF clearly

knew would be broadcast worldwide and subsequently used by prosecutorial authorities in

various countries.  More to the point, later media interviews occurring between May 2019 and

August 2019 with CNN, Sean Langan, the Washington Post, iTV and a Kurdish News outlet

were the direct product of abuse and torture by the SDF against Mr. Elsheikh.

1

As such, Mr. Elsheikh's statements to the FBI in March 2018, and his media interviews between May 2019 and August 2019, were not the product of free and voluntary choice, but instead the direct result of unconstitutional coercion and physical and mental abuse.  For the reasons stated below, Mr. Elsheikh requests, at minimum, this Court exclude the above referenced statements from the evidence presented at his January 2021 trial.

## I.     The Government's Intentional Two-Step Interrogation Process Violated the Constitutional Safeguards of *Miranda v. Arizona*

While the government has asserted that the purpose of the joint DoD and FBI unmirandized interviews "was not to investigate criminal conduct but to determine whether [Elsheikh] possessed actionable intelligence beneficial to coalition forces in an armed conflict[,]" Dkt. 122, pg. 1, the driving motivation of these joint interviews was to further an ongoing law enforcement investigation. Elsheikh's statements to the FBI in March 2018, following the DoD/FBI interviews, were a clear continuation of the prior unmirandized interviews, and as such must be excluded from evidence at trial. See *United States v. Khweis*, 971 F.3d 453, 461 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1712 (2021) ("if a "deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made") (citing *Missouri v. Seibert*,  542 U.S. 600 (2004)).

In *Missouri v. Seibert*, Justice Kennedy's concurring opinion, which the Fourth Circuit has previously held represents the binding opinion of the Court, made clear that:

> "the two-step [interrogation] technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained. This tactic relies on an intentional misrepresentation of the protection that *Miranda* offers and does not serve any legitimate objectives that might otherwise justify its use.

2

*Missouri v. Seibert*, 542 U.S. at 620–21; *United States v. Khweis*, 971 F.3d at 461 ("Justice Kennedy concurred in the judgment on narrower grounds, providing the fifth vote for suppression. We have previously determined that his opinion therefore represents the holding of the *Seibert* Court).

In *Seibert*, the police arrived at the defendant's home in the middle of the night and took her to the police station, where they deliberately chose not to administer *Miranda* warnings. 542 U.S. at 604. Upon their arrival, a police officer questioned the defendant for 30 to 40 minutes until she admitted her involvement in the alleged murder. *Id*. After the initial unmirandized interview, the defendant was permitted a 20-minute break, after which the same officer turned on a tape recorder, gave the defendant her *Miranda* warnings and obtained a signed waiver of rights. *Id*. at 605. Reiterating the above refenced rationale, Justice Kennedy concluded that the police in *Seibert* "used a two-step questioning technique based on a deliberate violation of *Miranda*. The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given." *Seibert*, 542 U.S. 620. Ultimately, Justice Kennedy concluded that if a deliberate "two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id* at 622.

Later, in *United States v. Khweis*, the Fourth Circuit was confronted with a two-step interrogation method employed by the FBI in relation to a captured ISIS fighter in Iraq. There, the FBI conducted eleven "intelligence interviews" with the defendant without providing him *Miranda* warnings. *Khweis*, 971 F.3d 453, 457 (4th Cir. 2020). Ten days after the last intelligence interview, a second separate team of interviewers met with the defendant:

> "This team consisted of [two] FBI Special Agents [], along with a Kurdish official who had not attended the previous interviews. [The FBI Agents] were walled off from the [prior]

3

intelligence team: they did not read [the intelligence teams]'s interview memoranda, did not receive [their] electronic communications about the interviews, did not speak to [them] about the substance of [defendant]'s previous interviews, and did not ask [defendant] about what he told [the intelligence team]. They were informed only that [defendant] had previously been interviewed for intelligence purposes. This interview was conducted in a different conference room in the [] detention center and did not involve any of the same American or Kurdish officials. The agents advised [the defendant] of his Miranda rights orally and in writing before the interview."

971 F.3d 457–58. In addition, the FBI agents also informed the defendant of his right to counsel and advised him that his family had retained counsel for him in the United States. *Id*. The defendant eventually provided incriminating statements to the FBI officials.

In ruling that the defendant's subsequent mirandized statements to the FBI were admissible, the Fourth Circuit in *Khweis* held that curative measures, as laid out above, "were sufficient to allow a reasonable person in [the defendant]'s position to distinguish between the unwarned interviews with [the intelligence team] and the later warned interviews with [the FBI agents] and to appreciate that the interrogation ha[d] taken a new turn. *Id*. at 462.

Here, the two-step interrogation technique employed by the FBI and the DoD and the lack of sufficient curative measures are markedly different from *Khweis*. First, the defendant in *Khweis* only participated in eleven unmirandized intelligence interviews. By comparison, Mr. Elsheikh was subjected to *twenty-six unmirandized* joint DoD/FBI intelligence interviews—well over double the amount in *Khweis*.  In addition to the DoD/FBI unMirandized interviews, Elsheikh was forced to participate in unMirandized interviews with the SDF. *See* Dkt. 101, pg. 3-4.  Moreover, unlike *Khweis*, and contrary to the government's assertions, there was in-fact cross-over of personnel between the joint DoD/FBI intelligence interviews and the March 2018 law enforcement interviews with the FBI. *See* Dkt. 101-1, pg. 6 (Declaration of El Shafee Elsheikh) ("During the first FBI interview, the SDF official who accompanied the FBI was the same SDF official who was present during several of "John's" DoD interviews"); Dkt. 101, pg. 9

4

("The United States is unable to confirm whether any of these SDF guards [present at the March 2018 FBI interviews] are the same SDF guards who were present during the DoD interrogations. However, El Sheikh recalls that during the March 27th interview, an SDF official who was present during several of his DoD interviews also accompanied the FBI interrogators").[1] Moreover, there was overlap in the rooms that the joint DoD/FBI intelligence team and the subsequent law enforcement team used during their respective interrogations.

Far from being "walled off" from the initial intelligence interrogations, the government has admitted that the FBI agents involved in the March 2018 law enforcement interviews had access to, and actively confronted Elsheikh with, information gathered during the unMirandized joint DoD/FBI intelligence interrogations. Specifically, on March 29, 2018, the FBI agents confronted Elsheikh with his supposed SDF intake interview:

> "[Elsheikh] was shown and allowed to read an English translation of the SDF report documenting his statements to the SDF.  After reading the report [Elsheikh] said that this is not the report of the [SDF]…[Elsheikh] recalled meeting with the Americans four 4 times and only provided the information in the report to the Americans…On numerous occasions throughout the interview [Elsheikh] reiterated that he provided the information to the Americans but did not provide the information in the report to the SDF. He informed the interviewing agents that he knew the law and that the interviewing agents should not have access to information he provided to other Americans."

Ex. 1, pg. 1-2 (Elsheikh March 29, 2018 FBI Interview).[2]

Later, the government confirmed that the SDF intake interview the FBI used to confront Elsheikh was in-fact directly derived from the joint unmirandized intelligence interrogations. See Dkt. 122, pg. 9 n. 3 ("The government does acknowledge that the SDF officials provided the FBI

---

[1] Any error or confusion regarding whether Elsheikh actually recognized the same SDF officials during both his intelligence and law enforcement interviews is the fault of counsel. Elsheikh's declaration makes clear that there was overlap of SDF officials between the two sets of interviews.

[2] The government has informed counsel, that given the problematic circumstances surrounding the SDF intake interview, it does not intend to introduce the so-called SDF intake interview at trial.

with a report ostensibly from their own interviews that may have in-fact come from the DoD interviews"); Ex. 2 (Email to Defense Counsel) ("Based on recently learned information, [the government] [has] reason to conclude that at least some of the post-capture statements made by [Elsheikh] documented in an SDF report were actually made during DoD un-Mirandized interrogations from January 21 to January 31. Contrary to what we and the FBI previously understood, these statements were not all made during your client's post-capture intake interview by the SDF on January 4, 2018").

Moreover, no attempt was made to signal or otherwise inform Elsheikh that the law enforcement and intelligence interviews were in-fact walled off from one another and were separate and distinct interviews. In-fact, during the joint DoD/FBI intelligence interviews, the interrogator openly discussed and _encouraged_ Elsheikh to participate in the FBI law enforcement interviews, implying that in order for Elsheikh "to move on" with his life he should participate and cooperate with the law enforcement investigation:

> "The focus of today's session was to establish a greater level of rapport with [Elsheikh], as well as to reinforce approaches utilized in previous sessions. US FBI personnel began law enforcement investigations at Ayn Issa prison today. Collector spent the majority of today's session quelling [Elsheikh]'s fears of the beginning of an FBI investigation, explaining to [Elsheikh] that this investigation is _good news because it is the first step to [Elsheikh]getting on with his life_. [Elsheikh] eventually accepted this as a positive step forward in [Elsheikh]'s case and is looking forward to making progress towards [Elsheikh]'s final disposition.
> ****
> [Elsheikh] was extremely nervous throughout today's session, as the US FBI was present at the facility today conducting their initial law enforcement investigations. _Collector spent approximately two hours calming [Elsheikh] and explaining to [Elsheikh] that this was all part of the process to [Elsheikh]'s final disposition_. By the end of today's session, Detainee accepted this investigation and _agreed to cooperate_."

Ex. 3, pg. 1 (Elsheikh TIR) (emphasis added).

Indeed, the very purpose of the joint DoD/FBI "intelligence" interviews is called into question by a Skype chat sent by one of the intelligence team members on January 26, 2018—

only five days into the intelligence interviews— expressing his frustration that thus far, their

only concern has seemingly been the law enforcement investigation as opposed to the collection

of intelligence:

> "[I] guess FBI is sending fly team folks out there to get witness statements from the co-captors (who don't know them) and the case agent for the Beatles is also coming into country within the next few days. It's a pain in the ass that we have to keep dealing with only focusing on hostages with these guys because of the time constraint. If we could actually spend a little time looking at ERO roles, *that'd be beneficial to more than just the [Law Enforcement] investigation*."

Ex. 4, pg. 4. (DoD Skype Chat) (emphasis added). In a separate message, the same individual

comments that the author does not want to "abuse" the intelligence team with all the SDRs

(requests for information) from the FBI. *Id*., pg. 3.

It is evident from these excerpts that there was a deliberate attempt by members of both

the intelligence and law enforcement teams to circumvent the protections afford by *Miranda v.*

*Arizona*, 384 U.S. 436 (1966) and to aid the law enforcement investigation.  The intelligence

team actively encouraged Elsheikh to participate in the law enforcement investigation. Taken

together with the fact that Elsheikh was actively confronted multiple times with his

"intelligence" statements during his law enforcement interview, and the overlap of personnel

between the two interrogation teams; "a reasonable person in [Elsheikh]'s position [would be

unable] to distinguish between the unwarned interviews with [the intelligence team] and the later

warned interviews with [the law enforcement team] and to appreciate that the interrogation ha[d]

taken a new turn." *United States v. Khweis*, 971 F.3d 453, 462 (4th Cir. 2020).

As laid-out above, the limited measures the FBI employed to distinguish the two sets of

interviews were easily distinguishable from those undertaken in *Khweis* and were plainly

insufficient. *Supra,* pg. 4. The clear purpose of the DoD and FBI interrogators was to get

Elsheikh to make unguarded self-incriminatory statements and as such, his statements made to the FBI in March 2018 must be excluded as evidence at trial.

### a. Elsheikh's Request for an Attorney Was Not Honored, and All Questions Should Have Ceased

It is a fundamental principle of American jurisprudence that "[w]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [He] is not subject to further interrogation by the authorities until counsel has been made available to him[.]" *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). Indeed, once a "suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Id*. This common sense bright-line rule comes from the notion that "once a suspect indicates that he is not capable of undergoing custodial questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Id*. at 104-05 (internal citations omitted).

As such, if the accused invoked his right to counsel, courts may admit his responses to further questioning "only on finding that he (a) initiated further discussions with the police, *and* (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (*Edwards v. Arizona*, 451 U.S. 477, 485, n. 9 (1981)).

On March 27, 2018, the FBI conducted their first of two law enforcement interviews with ElSheikh. See Ex. 5, pg. 1 (Conditions of 3.27). During that interview, the agents claim they advised Elsheikh of his *Miranda* rights and presented him with a modified written *Miranda* warning. *Id*.: Ex. 6 (Advise of Rights Form). After advising Elsheikh of his rights, the agents

further claim that Elsheikh "waived his rights and voluntarily provided the information documented in a separate []302. [Elsheikh] refused to sign the attached advice of rights form." *Id*.

Elsheikh disputes the notion that he "waived his rights and voluntarily provided information," specifically as it related to his request for an attorney:

> "At the first interview, the agents introduced themselves and showed me a sheet of paper with my rights printed on it and asked me to sign if I understood its' contents. I questioned what the statement "we are starting anew" meant and wanted to know where my lawyer was—as it was referenced on the sheet that I had a right to an attorney. The FBI told me that there was no lawyer for me, and that getting one here was going to be extremely difficult, given the unusual situation that I was in. I told the agents that I did not want to speak with anyone until I got my lawyer and refused to sign the sheet of paper. Despite my request for a lawyer, the agent kept trying to speak with me. I had to repeat my request for a lawyer multiple times. At some point during the first interview, I asked one of the agents how they got into Syria and made a joke about the airline making me miss my connecting flight when I made my journey into Syria. The agents then used my joke to lure me into an interview discussing my travels into Syria and what I did while I was there."

Dkt. 101-1, pg. 5-6 (Declaration of El Shafee Elsheikh).

Indeed, Elsheikh's co-defendant, Alexandra Kotey, made a similar request for an attorney during his initial FBI interviews. See Ex. 7, pg. 2 (Kotey's Request for Attorney). The agents who conducted Elsheikh's and Kotey's March 27 law enforcement interviews were told that day by a SDF official that "there are numerous prisoners held in Kobani and none of the prisoners have met with an attorney, including the Syrian prisoners. [SDF Official] did not see why Kotey should receive different treatment from the rest of the prisoners." *Id*.  As such, at least by the time of Elsheikh's March 29th law enforcement interview, the agents knew that their assurances to Elsheikh that he had "the right to talk to a lawyer for advice before [the FBI] ask[ed] [him] questions," and had "the right to have a lawyer with [him] during questioning" were false.  Ex. 6.

The agents' claim that ElSheikh waived his rights and simultaneously refused to sign the waiver does not withstand scrutiny. Elsheikh made his wishes known to the interviewing agents

9

that he wanted an attorney present before any law enforcement interview begin. At this point, the interviewing agents should have ceased all interactions with Elsheikh and respected his wishes. As the Supreme Court stated in *Smith v. Illinois*, 469 U.S. 91 (1984):

> *"all* questioning must cease after an accused requests counsel...we accordingly have emphasized that a valid waiver cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation. Using an accused's subsequent responses to cast doubt on the adequacy of the initial request itself is even more intolerable. No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all. (emphasis added)."

*Id*. at 98-99. Instead, the interviewing agents pressed forward with their interrogation, despite Elsheikh's insistence on an attorney. As such, any statements made by Elsheikh during either his March 27th or 29th law enforcement interviews must be suppressed as evidence at trial.

**II.    Elsheikh's Later Media Interviews were the Product of Coercion and Torture.**

In the case of interrogations or interviews performed by non-governmental actors, courts must "assess the voluntariness of a defendant's statements by asking whether the confession is the product of an essentially free and unconstrained choice by its maker. *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008). Indeed, "if the defendant's will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id*. The government's claim however, that "whether the Due Process Clause applies at all to foreign government conduct is not established," Dkt. 122, pg. 10, completely misses the mark. It is a fundamental precept of American jurisprudence that "[t]he Constitution of the United States stands as a bar against the conviction of any individual *in an American court* by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy: governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons

suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government." *Ashcraft v. State of Tenn*., 322 U.S. 143, 155 (1944) (emphasis added).

Thus, the only question before this Court is whether Elsheikh's statements to various media outlets were the product of torture and coercion that overtook his ability to make a "free and unconstrained choice;" not whether the Due Process Clause places restraints on the actions of third parties outside the United States.

In determining the voluntariness of a supposed confession, the "ultimate question is whether the pressure [exerted on the defendant], in whatever form, was sufficient to cause the [defendant]'s will to be overborne and his capacity for self-determination to be critically impaired." *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977). A court's finding of coercion and involuntariness as related to an alleged confession "must be based upon a careful consideration of the totality of the circumstances," *Id*., and take into account that "the degree of pressure necessary to crush one's will varies with the individual and the circumstances of the arrest and detention[.]" *Id*. Indeed, in making this determination, it is critical that the court take into consideration the circumstances immediately surrounding *each* statement that the government seeks to admit. See *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("The question in each case is whether a defendant's will was overborne *at the time he confessed*. In resolving the issue, *all the circumstances attendant* upon the confession must be taken into account") (emphasis added).

Here, the government relies almost exclusively on Elsheikh's early 2018 interviews as justification for the admitting his 2019 interviews with CNN, the Washington Post, iTV, Sean

Langan, and an unknown Kurdish news outlet.  Assuming that the 2018 media interviews were in-fact voluntary, they have no bearing on the admissibility of the 2019 interviews which were the direct product of physical abuse and mistreatment at the hands of the SDF.  Over eight months elapsed between the 2018 and 2019 interviews.  Over the course of those eight months, Elsheikh was subjected to unremitting physical and mental abuse at the hands of his SDF captors, including severe beatings, threats to his family's safety, starvation, and extended periods of solitary confinement. Notably, the government's response lacks any mention of the 2019 CNN interview during which the effects of ElSheikh's torture are most apparent.

As can be observed from the CNN interview itself, Elsheikh is clearly unwell and unable to properly hear the interviewer's question. Ex. 8 (CNN Clip). In-fact, when the interviewer asks if he is being well treated at the SDF detention facility, Elsheikh continuously looks off camera at his SDF guards and offers a prayer instead of a direct answer. *Id*. When asked by the interviewer why he was supposedly confessing now, after having previously denied any involvement in the hostage scheme in the earlier interviews, Elsheikh responds by saying "everything has changed…enough is enough, I just want to go back to a normal life, I just want this to be over, I think it is enough." Ex. 9 (CNN Clip). Moreover, during the interview, bruising is clearly observable on Elsheikh's face and head. Ex. 10 (CNN Photos).  Elsheikh's physical demeanor and appearance are completely consistent with what he claims occurred in the days leading up to the 2019 CNN interview:

> "In mid-May 2019, I was moved to an auxiliary building near the Derik prison. When I arrived, Alexander Kotey was already there. When I first saw Alexander, he looked completely emaciated and weak - the last time I saw Alexander was in November 2018. The SDF guards allowed Alexander and I to hug each other in greetings, and when Alexander got close enough he whispered in my ear "torture, forced confession."
>                         ***
> On the fifth day, the head of the prison, along with roughly four other guards, took me out of my cell and threw me out on the prison corridor. One of the guards proceeded to lift my

handcuffed arms behind my back—I could only assume they were trying to dislocate my arms. While lifted in the air, one of the guards beat me with a bat in the shoulder. The guards continued to repeatedly beat my head and stomach, I could hardly breath. I again hit the ground and several guards kicked me in the genitals. The entire beating lasted roughly twenty minutes... I was brought back to my cell and because of the amount of pain I was in, I could not move for the next several hours. For roughly the next twenty days I could barely eat the little food I was being provided and was given no medical care. During this time, and because of the beating to my head, I developed a horrible ear infection in which blood and puss were coming from my ear. For a long time after this prolonged beating, I was in constant pain and had difficulty hearing. After roughly twenty days of being effectively starved in solitary confinement, I was taken out of my cell to conduct a media interview with CNN."

Dkt. 101-1, pg. 7-8 (Declaration of El Shafee Elsheikh).

Also missing from the government's response are statements by Alexander Kotey from his numerous debriefing sessions since his plea which substantiate Elsheikh's claims of abuse and mistreatment in connection with the media interviews:

"Mr. Kotey saw Mr. Elsheikh and told Mr. Elsheikh what had happened to him and that he had confessed…When Mr. Kotey and Mr. Elsheikh were returned to their cells, the guards began to be rough with Mr. Elsheikh. Mr. Kotey heard the guards punch Mr. Elsheikh twice. Mr. Elsheikh and Mr. Kotey had cells next to each other, and they could talk by standing near their doors. Mr. Kotey advised Mr. Elsheikh to request to speak to whoever wanted to prosecute him and ask for a guilty plea. The next day Mr. Elsheikh was taken from his cell. Mr. Kotey noted Mr. Elsheikh was cuffed behind his back. Mr. Kotey could hear him being repeatedly hit and his head being banged against a wall. Mr. Elsheikh was returned after a short while and taken to a cell on the next aisle. Mr. Kotey did not see Mr. Elsheikh again until the CNN interview… Mr. Kotey was cuffed and given minimal food prior to the CNN interview…Mr. Kotey talked with Mr. Elsheikh while they waited for the CNN interview to start. Mr. Elsheikh had an ear injury and could not hear properly from one ear. Mr. Elsheikh had been kicked or hit in the head. Mr. Kotey noted Mr. Elsheikh's demeanor was different, more subdued."

Ex. 11, pg. 5 (Summary of Kotey Debrief). In-fact, Kotey describes the "last voluntary interview" that he participated as occurring in March 2019—two months before the 2019 CNN interview. *Id*. at 3.

The physical trauma from Elsheikh's brutal treatment is still visible in the Sean Langan interview which occurred several weeks after the 2019 CNN interview. Ex. 12 (Photos from

Langan Interview). Specifically, during the Langan interview, Elsheikh's facial bruising and the swollen ear he sustained after a twenty-minute long beating that Kotey confirmed, are both still clearly visible.

Kotey's description of his time in SDF custody can only be described as horrifying and chilling. See Ex. 11. While in SDF custody, Kotey describes being hit with rifles and fists, pushed down flights of stairs on top of other prisoners, beaten with plastic pipes, beaten for refusing to participate in interrogations, kicked in the head and punched in the face, burnt with cigarettes, being made to stand on a baton.  He described being threatened into telling reporters that he was being treated fairly by the SDF, being kept in isolation for extended periods of time, and effectively starved for sustained periods. Ex.11, pg. 2-4. In a separate report with the DoD, Kotey details how in May 2019 the SDF broke his nose and chipped his tooth in their bid to force Kotey to confess.  According to the DoD, Kotey reported that "the head of security of the [SDF] punched [Kotey] in the face, hit him with an object, and kicked him in the face and stomach in an attempt to force him to confess. [Kotey] claimed that the right side of his nose was broken, a tooth chipped…and because of being kicked in the stomach, he urinated blood for one week." Ex. 13 (Kotey DoD Report of Abuse). The DoD concluded that "based on all of the information available, the alleged abuse as described by [Kotey] is assessed as credible." *Id*. Importantly, this occurred during the same month as the 2019 CNN interview.

In 2018, there were eleven reports of abuse by SDF personnel against detainees, and in 2019 there were nine such reports.[3] Ex. 14 (Summary of SDF Reports of Abuse). Astonishingly,

---

[3] See also UN Human Rights Council Report of the Independent International Commission of Inquiry on the Syrian Arab Republic (Mar. 11, 2021) available at: https://www.ohchr.org/EN/HRBodies/HRC/IICISyria/Pages/Detention-report.aspx (Recognizing that the SDF has kept foreign fighters "in detention, in substandard conditions conducive to detainee abuse.")

it is in this torturous environment that the government now claims Elsheikh voluntarily choose to participate in the media interviews and that his statements during the interviews were free of coercion. This argument simply lacks merit.

The government also argues that Kotey recanted his assertion that he was forced to participate in various media interviews in his Statement of Facts. However, even a cursory examination of Kotey's Statements of Facts reveals no such recantation. See Dkt. 90, pg. 11. In pertinent part, the Statement of Facts states:

> "[b]eginning in approximately March 2018, and continuing until approximately July 2019, while in SDF custody, the defendant *voluntarily participated in a number of on-camera*, media interviews with journalists from various media organizations" (emphasis added).

Clearly, Kotey did not state that <u>all</u> the media interviews were voluntary. In-fact, it is entirely consistent with Elsheikh's statement that the SDF was unconcerned with early media interviews in 2018, and that though Elsheikh and Kotey had no ability to refuse these early interviews, both he and Kotey were left to their own devices to determine what they would and would not talk about. More importantly, however, Kotey does not state that the later 2019 media interviews were voluntarily given.

### a.   *Elsheikh's Statements During the Media Interviews*

The government argues that because Elsheikh did not mirror his 2018 statements to the joint FBI/DoD intelligence team during the 2019 media interviews, this somehow demonstrates that Elsheikh voluntary chose to participate in the interviews and that he had full agency over what he stated during the interviews. This argument is overly simplistic, and is not an accurate statement of the law. In determining whether a given statement was voluntarily made, the reliability or truth or falsity of the statement is not a factor to be considered. See *Jackson v. Denno*, 378 U.S. 368, 385 (1964); *Rogers v. Richmond*, 365 U.S. 534, 541 (1961).

Though the government has submitted a five-page chart dissecting the discrepancies between Elsheikh's DoD/FBI statements—occurring in early 2018—and the Langan interview, which took place in mid-2019, the substance of his statements remains the same regarding his supposed involvement in the hostage taking scheme. Regardless, Elsheikh's attempt to minimize the amount of information that he was being forced to reveal on a worldwide platform does not indicate that he was voluntarily making these statements; it simply shows Elsheikh's attempt to mitigate against the possible future harm that these forced confessions would have on him in the future.  Indeed, during the Langan interview, the interviewer specifically pushes Elsheikh about why he was not being more forthcoming in his media interviews. See Ex. 15 (Langan Media Clip). Elsheikh responds by stating that: "[I will] give you an example, you're a prisoner not in Geneva, and you say that you did something then you get some young bootstrap puffing his chest who is going teach you a lesson for it…you [the interviewer] need to understand the mentality of the people here…I don't think you have been to Syria." *Id*.  Clearly, Elsheikh was fearful of the other detainees and guards who were not familiar with the facts of his case learning the allegations and retaliating against him for it.

More important than what Elsheikh did not discuss during the interviews are the implicit threats made during the interviews themselves—i.e., the threat of being sent to Iraq for a ten-minute trial and quick execution. It is a fundamental principle of the "voluntariness" analysis that "that a confession is involuntary if it is extracted by any sort of *threats* or violence, or obtained by any direct or *implied promises*, however slight, or by the extension of any improper influence." *United States v. Shears*, 762 F.2d 397, 401–02 (4th Cir. 1985) (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976)) (emphasis added).  Here, the government readily admits that during the course of the Langan interviews, Langan himself brings up the prospect of Elsheikh being sent to

Iraq to face a sham criminal trial. See Dkt. 122, pg. 21; Ex. 16 (Langan Media Clip). Indeed, in an apparent external monologue with himself, Langan discusses his motivations for doing the interviews and the tactics that he used to get Elsheikh to speak with him: "[Elsheikh and Kotey] are now talking because this, and what Elsheikh actually said so I don't have to wonder if this is true, they're now very worried that they could be sent to [Iraq] for a quick trial…because other European prisoners have been sent there…it seems that the reason why they started talking and admitting minor details." Ex. 17 (Langan Media Clip).

In fact, Langan uses this fear and implies that unless Elsheikh participates fully in his interview and confesses the full extent of his involvement in the hostage taking scheme, there was a real possibility that he could be sent to Iraq for a ten-minute trial and then executed. Specifically: "[Interviewer] I think now when reading that French thing that you're probably on your way,  [and] certainly some are thinking about sending you to go to Iraq to go to trial…this TV film…I do think it's up to you to think if this is the time [to confess.]" Ex. 18 (Langan Media Clip). Thus, contrary to the government assertion, Elsheikh was clearly 'fazed' by the prospect of an Iraqi trial.

The government also conflates discussions of the threat of an Iraqi criminal trial and those of American police discussing the benefit of cooperating with authorities with a defendant during a routine criminal investigation. The analogy is simply absurd. As previously mentioned, the Lead Inspector General for Operation Inherent Resolve described the ISIS trials in Iraq as "arbitrary government-sanctioned killing":

> "The NGO Human Rights Watch reported that alleged ISIS affiliates are often denied due process in trials and subjected to torture and coercion to elicit confessions, inhumane detention facilities, and arbitrary sentencing. After monitoring several hundred trials of alleged ISIS affiliates, the UN Assistance Mission for Iraq (UNAMI) human rights office in Baghdad cited significant procedural and policy concerns about the trials.… According to the UN Special Rapporteur on Extra-Judicial, Summary, or Arbitrary Executions, any

executions resulting from the current ISIS trials may be designated as *arbitrary government-sanctioned killing*."[4]

Moreover, the government's assertion that Elsheikh was "resistant to answering Langan's efforts to obtain information" during his interview and that Langan's cameraman, who described Elsheikh as "broken" before the interview, also somehow implied that Elsheikh was resistant to answering questions has no support in the evidence. Dkt. 122, pp. 17-18. Upon even a cursory review of the Langan interview footage, it shows that during the first twenty-five to thirty minutes of the interview both Elsheikh and Langan were simply discussing their shared background as Londoners and general introductory topics—Langan does not start to address the hostage scheme in earnest until rough thirty minutes into the interview. As such, there was no substantive question for Elsheikh to resist.

Elsheikh was a prisoner being indefinitely detained by a foreign para-military organization, repeatedly beaten and abused, denied access to counsel and threatened with the possibility of a sham trial and execution in Iraq. No prior experience in a western criminal justice system could prepare an individual for these types of conditions. The culmination of these circumstances directly led to Elsheikh making statements to various media outlets. However, that decision can hardly be characterized as an expression of "free will." See generally *Payne v. State of Ark.*, 356 U.S. 560, 566–67 (1958) ("That petitioner was not physically tortured affords no answer to the question whether the confession was coerced, for there is torture of mind as well as body; the will is as much affected by fear as by force…It seems obvious from the totality of this course of conduct, and particularly the culminating threat of mob violence, that the confession

---

[4] Lead Inspector General for Operation Inherent Resolve | April 1, 2019 – June 30, 2019, pg. 53 (August 6, 2019) available at: https://www.dodig.mil/reports.html/Article/1926689/lead-inspector-general-for-operation-inherent-resolve-quarterly-report-to-the-u/

was coerced and did not constitute an 'expression of free choice[.]"); *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) ("It has long been recognized that involuntary confessions may be exacted as a result of mental coercion as well as physical abuse…The ultimate question is whether the pressure, in whatever form, was sufficient to cause the petitioner's will to be overborne.")

### b. Elsheikh's Statements While in DoD Custody

Finally, the government relies on recorded conversations between Elsheikh and Kotey while in DoD custody as proof that the abuse and torture ElSheikh described did not occur. This argument is also unpersuasive. First, the government's claim that simply because Elsheikh and Kotey preferred the "rec time" given to them by the SDF over that of the DoD, somehow equates to Elsheikh's claim of abuse as not being credible is a false premise. Elsheikh never claimed that the SDF did not offer him and Kotey "rec time." However simply preferring the recreational time of one prison/detention center over another is not grounds to claim that the officials within those facilities did not abuse their detainees. Moreover, the government's claim that the media interviews were not coerced because the SDF allowed Kotey and Elsheikh to wash their own clothes, work out, and drink tea, is also without merit. The relevant inquiry is whether an accused's statement was voluntarily given when made, not whether his jailers provided bare necessities in addition to pressuring him to confess. *Haynes v. State of Wash.*, 373 U.S. 503, 513 (1963) ("confession obtained [] through the use of threats is violative of due process and that the question in each case is whether the defendant's will was overborne *at the time he confessed*") (emphasis added).

Regardless, the DoD recordings do substantiate Elsheikh's claims. In one recording, Elsheikh describes an SDF official who tried to dislocate his shoulder: "[Elsheikh] he tried to

19

break my shoulder, he tried to dislocate my shoulder, [Kotey] he tried to do that to me as well, [Elsheikh]…he twisted my arms up and elbowed me kneed me and kicked me." Ex. 19 (DoD Clip). Indeed, in another conversation, Elsheikh mentions that he was deliberately left out of one media interview because the SDF did not want the news outlet to see him after his beating: "they did not bring me because they did not like how I looked on the camera, when they brought me out when I was f***ed up." Ex. 20 (DoD Clip); "they said let him heal-up a bit and then put him in-front of the camera again." Ex. 21 (DoD Clip). Finally, Elsheikh and Kotey also recount how one of their fellow detainees died while in SDF custody: "he knew he was dying, he knew if he did not get his medication he was going to die, so he was just hostile whenever they came into the room, whenever they were speaking, they did not bother hitting him or doing anything to him because they know his illness…even the Americans know about illness, but no one gave him any medicine, they just let him die…then some of the [fellow detainees] got a bit rowdy about that…how could you let him die." Ex. 22 (DoD Clip). As the government correctly notes, these statements are "candid admissions to a friend when [Elsheikh] had nothing to gain by obscuring the truth." Dkt. 122, pg. 23.

What is clear from the DoD recordings was that the conditions of Elsheikh's confinement while in SDF custody was far from the idyllic picture the government would have the court believe. Elsheikh personally describes times where the SDF did not want him in-front of media camera's because his physical appearance was so poor, that the SDF attempted to dislocate his shoulders, and that, due to the lack of medical care, one of his fellow detainees died while in SDF custody. In short, Elsheikh's statements to the various media outlets and the FBI were involuntary and must be suppressed as evidence at trial.

Respectfully Submitted,

EL SHAFEE ELSHEIKH,
By Counsel
_____/s/_____
Nina J. Ginsberg, VSB # 19472
Zachary A. Deubler, VSB # 90669
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com
zdeubler@dimuro.com


_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
Law Offices of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com


_____/s/_____
Jessica N. Carmichael, VSB #78339
Yancey Ellis, VSB #70970
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
jessica@carmichaellegal.com
yancey@carmichaellegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of November 2021, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Zachary A. Deubler, Esq.