# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

**UNITED STATES OF AMERICA**

**v.**

**EL SHAFEE ELSHEIKH,**
                    **Defendant.**

**Criminal Action No. 1:20-cr-239**

## UNCLASSIFIED MEMORANDUM OPINION

On October 6, 2020, a grand jury in the Eastern District of Virginia returned an Indictment charging Defendant El Shafee Elsheikh and Co-Defendant Alexanda Amon Kotey[1] with hostage-taking and criminal conspiracy while allegedly acting as members of the Islamic State of Iraq and Syria ("ISIS") in Syria between 2012 and 2015. The Indictment sets forth the following eight counts:

(1) conspiracy to commit hostage-taking resulting in death, in violation of 18 U.S.C. § 1203;
(2) hostage-taking resulting in the death of James Foley, in violation of 18 U.S.C. §§ 1203 and 2;
(3) hostage-taking resulting in the death of Kayla Mueller, in violation of 18 U.S.C. §§ 1203 and 2;
(4) hostage-taking resulting in the death of Steven Sotloff, in violation of 18 U.S.C. §§ 1203 and 2;
(5) hostage-taking resulting in the death of Peter Kassig, in violation of 18 U.S.C. §§ 1203 and 2;
(6) conspiracy to murder United States citizens outside of the United States, in violation of 18 U.S.C. § 2339B;
(7) conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A; and
(8) conspiracy to provide material support to a designated foreign terror organization, in violation of 18 U.S.C. § 2339B.

---

[1] Alexanda Kotey has pled guilty to all counts charged in the Indictment and is awaiting sentencing.

This criminal prosecution is before the Court on Defendant's Motion to Suppress incriminating statements made by Defendant while in the custody of the Syrian Democratic Forces (SDF) in Syria in 2018 and 2019. Specifically, Defendant seeks to exclude from use at trial statements made by Defendant to Federal Bureau of Investigation (FBI) interviewers on March 27, 2018 and to journalists from various media outlets in 2019.[2] With respect to the former set of statements, although the FBI interviewers provided *Miranda* warnings on March 27, 2018, Defendant asserts that any statements offered during that interview must be suppressed because the Government utilized an impermissible two-step interrogation procedure to undermine *Miranda*,[3] in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). And with respect to the 2019 media statements, Defendant contends that those statements constitute the involuntary products of torture by SDF personnel.

The parties' positions on Defendant's Motion to Suppress have been fully briefed and orally argued at a hearing on December 10, 2021. In addition, a pre-trial evidentiary hearing was held on November 16–18, 2021, during which the Government presented testimony from a number of witnesses. Five witnesses, including four from the Department of Defense (DOD), offered classified testimony in a closed courtroom on the first day of the hearing.[4] During the second and third days of the hearing, the following witnesses offered unclassified testimony: three SDF officials with authority over or within prisons where the SDF held ISIS detainees, FBI Special Agents John Chiappone and Julius Nutter, who conducted *Mirandized* interviews of

---

[2] The FBI interviewers also questioned Defendant on March 28, 2018, but the Government has represented that it will not introduce any statements made during the second interview at trial. Additionally, Defendant spoke to media interviewers in both 2018 and 2019, but Defendant does not seek to suppress any statements offered to journalists in 2018.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] [REDACTED]

2

Defendant on March 27 and 28, 2018, documentary filmmaker Sean Langan, who interviewed both Defendant and Co-Defendant Kotey in July 2019, and FBI Agent Daniel O'Toole. The parties also submitted a substantial volume of evidence, both as attachments to their briefing and as exhibits during the evidentiary hearing, including reports documenting Defendant's statements during the DOD and FBI interviews, communications to and from various DOD and FBI interviewers and other officials, video clips from Defendant's media interviews, and other relevant documentary evidence.

A Motion in *Limine* by the Government is also pending before the Court (Dkt. 97). That motion seeks to establish the admissibility of false identifying statements provided by Defendant and Co-Defendant Kotey to DOD officials soon after Defendant's capture by the SDF. Although those statements were made by Defendant and Kotey prior to the provision of any *Miranda* warnings, the Government contends that they are admissible pursuant to the routine booking exception. Finally, also before the Court are portions of Defendant's Motion to Compel for which ruling was deferred in a previous Order entered on November 15, 2021. *See* Dkt. 158. For the reasons stated in this Memorandum Opinion, Defendant's Motion to Suppress and the remaining portions of the Motion to Compel must be denied and the Government's Motion in *Limine* must be granted.

## I.

The testimony of the witnesses at the November 16–18, 2021 hearing as well as the documentary and video evidence submitted by the parties, establishes convincingly the following facts pertinent to disposition of the pending motions:

- The SDF is a military force comprised largely of Syrian Kurds which operates in an autonomous region of northeastern Syria. Since 2015, the SDF has served as a military

opponent of ISIS and as an ally of the United States in the battle against ISIS. The SDF is not part of the Syrian government.

- As part of the SDF's anti-ISIS operations, the SDF has captured and detained numerous ISIS combatants. The SDF operates several prisons in northeastern Syria for the purpose of housing captured ISIS detainees. During the relevant time period, *i.e.* from January 2018 to October 2019, those facilities included: (1) Ayn Issa Prison, (2) Kobani Prison, and (3) Derik Prison.

- During the relevant time period, the SDF allowed members of the DOD to have discretionary access to suspected ISIS prisoners. The DOD's operations in SDF prisons included routine "biometric enrollment" of substantial numbers of detainees. During the standard enrollment process, DOD officials asked detainees for basic biographical information. DOD officials also collected fingerprints and photographs of detainees. Biometric enrollment served an administrative function (identification and tracking of prisoners) as well as advanced the United States' national security interests.

- DOD personnel had the ability to upload biometric data to certain government databases. This permitted DOD officials to ascertain or confirm the identity of some detainees who previously had biometric data stored in a government database. This process also served the interest of national security: for example, United States immigration officials might later be able to identify a suspected ISIS detainee attempting to enter the United States.

- DOD interrogators also interviewed suspected ISIS prisoners. In general, each time a DOD interrogator interviewed an SDF prisoner, the interrogator generated a Tactical Interrogation Report ("TIR") summarizing the prisoner's statements during the interview. The questions asked during interviews were driven by DOD intelligence needs. Interrogators sometimes asked questions submitted by other U.S. government agencies called Source Directed Requirements ("SDRs"), but only when the SDRs related to intelligence requirements.[5]

- In January 2018, the SDF captured a group of individuals attempting to cross the border from northern Syria into Turkey. These individuals, including Defendant and Co-Defendant Kotey, were soon thereafter transported to Ayn Issa Prison.

- At Ayn Issa Prison, Defendant, Co-Defendant Kotey, and other new detainees were subjected to the standard DOD biometric enrollment process. During preliminary questioning, both Defendant and Kotey offered false identities. Specifically, Defendant claimed to be a national of Yemen named "Suhayb Abdallah Jasim." Kotey claimed to be a Yemeni named "Yahya Mustafa Ibrahim." Defendant also identified Kotey as Yahya. Both Defendant and Kotey denied being able to speak English.

---

[5] The Government has produced to Defendant all TIRs memorializing Defendant's intelligence interviews with DOD interrogators as well as all TIRs memorializing the DOD's intelligence interviews of Co-Defendant Kotey.

- As part of the intake process, the DOD collected Defendant's fingerprints and uploaded them to a government database. Defendant's fingerprints matched those collected when Defendant entered the United States in 2008, thereby revealing Defendant's true identity.

- When Defendant was confronted with a fingerprint match revealing his identity, he then admitted that he was British national El Shafee Elsheikh. Co-Defendant Kotey also ultimately admitted his identity to DOD officials.

- LCF was a DOD facility located in close proximity to the Ayn Issa and Kobani Prisons in January 2018. Because Defendant was suspected to be a member of the notorious and high-level group of ISIS operatives known as the "Beatles,"[6] a DOD official at LCF set interviewing Defendant as a high level priority.

- Between January and March 2018, DOD officials interviewed Defendant a total of twenty-six times. These interviews were for the purpose of gathering intelligence rather than for the law enforcement purpose of gathering evidence to support a criminal prosecution. *Miranda* warnings were not provided in advance of these interviews. During these interviews, Defendant provided extensive and detailed answers which established Defendant's involvement in the activities of ISIS, including the hostage-taking conspiracy alleged in the Indictment.

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED][7]

- [REDACTED]

- [REDACTED]

- [REDACTED]

---

[6] The so-called ISIS "Beatles" were a group of ISIS militants who took part in an ISIS conspiracy to capture foreign hostages and hold the foreign victims for ransom in Syria between 2012 and 2015. The "Beatles"—so named by the Western hostages due to their pronounced British accents—subjected their hostages to brutal treatment, and some hostages were ultimately murdered by beheading. The Indictment alleges that Defendant was one of the "Beatles."

[7] [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- Defendant was relocated from Ayn Issa Prison to Kobani Prison between February 18, 2018 and February 20, 2018.

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED][8]

- During the course of the DOD interviews, Defendant admitted that he had taken direct part in the alleged hostage-taking conspiracy by serving as a guard, by interacting with hostages to collect information, including the names and contact information of family members, and by taking part in some ransom negotiations, including with the government of Norway. Although Defendant denied taking part in the murder of any hostages, he divulged detailed knowledge about some murders, such as that Defendant knew that his friend Mohammad Emwazi had carried out several beheadings of hostages. Additionally, Defendant helped his DOD interrogators pinpoint the location of the remains of James Foley and Steven Sotloff on a map. Defendant also his interactions with non-American victims, including British aid worker David Haines.

---

[8] Defendant contends that his statements to the FBI and the media were coerced, in part, by Defendant's purported fear that Defendant could be transferred to the custody of the Iraqi government, which, Defendant asserts, engaged in sham trials and summary execution of suspected members of ISIS. However, nothing in the record indicates that any member of the DOD or FBI threatened Defendant with that outcome beyond a passing reference to transfer to Iraq in a list of possible outcomes.

- Access to Defendant at the Ayn Issa and Kobani Prisons was a matter of discretion on the part of the SDF. SDF guards were often present during the course of the DOD interviews.

- [REDACTED]

- [REDACTED]

- In summary, the credible testimony of classified witnesses convincingly establishes the following facts with respect to the DOD interviews:

  o The DOD interrogators' un-*Mirandized* interviews focused on a wide range of intelligence-oriented subjects. Defendant's extensive and thorough answers during those interviews indicated Defendant's involvement in the activities of ISIS and the hostage-taking conspiracy alleged in the Indictment.

  o The DOD interrogators never communicated with or otherwise coordinated with subsequent FBI law enforcement interviewers, namely Special Agents John Chiappone and Julius Nutter.

  o The DOD interrogators did not observe any signs of physical abuse of Defendant.

  o The DOD interrogators did not note any poor conditions, other than overcrowding, in the Ayn Issa or Kobani Prisons.

  o The DOD interrogators sought to build a positive rapport with Defendant and did not rely on threats or coercion to extract answers.

- On March 27 and 28, 2018—twenty days after cessation of the DOD intelligence interviews—Special Agents Chiappone and Nutter interviewed Defendant at the Kobani Prison in Syria for the purpose of gathering evidence for a criminal prosecution.

- In preparation for those interviews, Agents Chiappone and Nutter took careful steps to insulate themselves from the previous DOD intelligence interviews. Specifically, Agent Chiappone credibly testified that he reviewed relevant caselaw related to the Supreme Court's decision in *Missouri v. Seibert*, including *United States v. Khweis*, No. 16-cr-143, 2017 WL 2385355 (E.D. Va. June 1, 2017)[9] and that Agents Chiappone and Nutter took steps to comply with relevant decisions.

- At the time of the interview in 2018, Agents Chiappone and Nutter both worked in the field of counter-terrorism. In theory, Agents Chiappone and Nutter could have accessed FBI intelligence related to certain counter-terrorism investigations, including the FBI's

---

[9] The district court's opinion in *Khweis* was affirmed by the Fourth Circuit. *See United States v. Khweis*, 971 F.3d 453 (4th Cir. 2020), cert. denied, 141 S. Ct. 1712 (2021). The Fourth Circuit's opinion is discussed in detail *infra*.

investigation into Defendant. However, after Agents Chiappone and Nutter were assigned to conduct a law enforcement interview of Defendant, they took steps to avoid any contact with any intelligence reports regarding Defendant.

- For instance, on several occasions, Agent Chiappone sent emails instructing other FBI personnel to avoid sharing with him any intelligence related to Defendant:

  o In an email dated January 25, 2018, Agent Chiappone informed several other FBI Agents that he had been selected as "one of the members of any LE interviews of Kotey and Elshafee" and asked the Agents to inform their DOD counterparts so that DOD officials "don't send me anything."

  o In an email dated February 1, 2018, Agent Chiappone indicated that he had deleted, without reading, an email that appeared to be related to Defendant or Co-Defendant Kotey and asked to be taken off a certain email distribution list.

  o An email from March 8, 2018, sent in advance of a meeting for which Agent Chiappone was a participant, indicated that members of the law enforcement interview team would remove themselves before "anyone has post-detention information to discuss."

- Agents Chiappone and Nutter did not speak to or coordinate with anyone involved in the DOD intelligence interviews. Neither Agent Chiappone nor Agent Nutter submitted any information requests to the DOD interrogators.

- Agents Chiappone and Nutter did not depart from the United States to Syria until after the DOD interviews had concluded. While in Syria, Agents Chiappone and Nutter were housed at the LCF facility near the Ayn Issa and Kobani Prisons. Although other DOD interrogators were also stationed at LCF, Agents Chiappone and Nutter slept in separate quarters from and did not interact with anyone involved in the earlier intelligence interrogations of Defendant.

- Before Agents Chiappone and Nutter interviewed Defendant at Kobani Prison, they requested that the SDF provide an interview room different from any room that had been used during the DOD interviews of Defendant. Because of their separation from the DOD interrogators and lack of knowledge of the DOD interviews, Agents Chiappone and Nutter could not verify whether their request was honored.

- When Agents Chiappone and Nutter interviewed Defendant, a translator and an SDF guard were also present. Although the interview took place in English, the translator translated the questions and answers from English to Arabic, which allowed the SDF guard to understand the interview.

- Agents Chiappone and Nutter memorialized the content of the interview in a standard Form FD-302. Agent Chiappone verified the accuracy of Defendant's statements as recorded in the Form FD-302 during his testimony at the Evidentiary Hearing.

- When the interview commenced at Kobani Prison on March 27, 2018, Agents Chiappone and Nutter asked Defendant some preliminary questions about Defendant's well-being. Defendant remarked that he was pleasantly surprised at how well he had been treated in SDF custody. Agents Chiappone and Nutter both assessed Defendant's demeanor as calm and relaxed.

- Throughout the interview, Defendant was offered food, drinks, and cigarettes and permitted to take bathroom and prayer breaks. Agents Chiappone and Nutter wore plain clothing consisting of button-down shirts and khaki pants. Both carried concealed firearms, but no firearms were visible to Defendant.

- Before substantive questioning began on March 27, 2018, Agent Chiappone read Defendant a set of modified *Miranda* warnings.[10] The advice-of-rights form that Agent Chiappone read to Defendant included the standard *Miranda* language as well as additional language that clearly distinguished the DOD intelligence interviews from Agent Chiappone and Nutter's law enforcement interview. Specifically, Agent Chiappone read the following statements, among others, to Defendant:

  o "You have the right to remain silent. We understand that you may have already spoken to others from the U.S. Government. We do not know what, if anything, they said to you, or what you said to them. Likewise, we are not interested in any of the statements you may have made to them previously. We are starting anew. You do not need to speak with us today just because you have spoken with others in the past."

  o "If you previously made statements to others in the U.S. Government, it is likely that those statements will not be useable against you in a U.S. court. Anything you now say can be used against you in a U.S. court."

  o Following standard warnings regarding the right to an attorney: "However, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."

---

[10] Defendant points out that, in one email sent from Agent Nutter to Agent Chiappone outlining potential interview strategies, Agent Nutter listed "down-play advice-of-rights" as a potential strategy. However, nothing in the record indicates that the Agents actually did so during the course of the interview. Both Agent Chiappone and Agent Nutter credibly testified that Agent Chiappone read the modified *Miranda* warnings in full while Defendant listened attentively. Additionally, Defendant's signed declaration attests that he received *Miranda* warnings at the outset of the law enforcement interview.

- Defendant listened attentively to Agent Chiappone's reading of the advice-of-rights form but Defendant refused to sign a written acknowledgment at the bottom of the document.

- The information provided by Defendant during the interview with Agents Chiappone and Nutter was extremely limited when compared to Defendant's answers during the DOD interviews. Unlike the DOD interviews—in which Defendant extensively described his involvement in the activities of ISIS—Defendant provided to Agents Chiappone and Nutter only minimal details about his involvement with ISIS. Defendant also declined to answer questions about criminal activity in the United Kingdom before travelling to Syria, but admitted that he had previously interacted with the British criminal justice system.

- Defendant stated that he would only answer certain questions without a lawyer present but did not request a lawyer or otherwise seek to end the interview.[11]

- During the course of the interview, neither Agent Chiappone nor Agent Nutter ever confronted Defendant with any of the statements that he had previously made to the DOD interrogators.

- During the course of the interview, neither Agent Chiappone nor Agent Nutter ever threatened Defendant in any way, including any threat of transfer to Iraq and summary execution.

- Following the conclusion of the interview with Defendant on March 27, 2018, Agents Chiappone and Nutter also attempted to interview Co-Defendant Kotey. Unlike Defendant, Kotey invoked his right to an attorney, and the Agents then promptly ceased the interview. Thereafter, Agents Chiappone and Nutter sought to secure an attorney for Kotey, but an SDF official denied the Agents permission to bring an attorney into Kobani Prison. Accordingly, Agents Chiappone and Nutter did not again seek to interview Kotey.

---

[11] This fact is drawn from the testimony of Agents Chiappone and Nutter, which was credible and convincing. In a signed Declaration, Defendant offers a different account, claiming that the Agents ignored Defendant's repeated requests for an attorney and Defendant's statement that he did not wish to speak without a lawyer present. Put simply, the account offered by Agents Chiappone and Nutter is more credible. Unlike Defendant's declaration, Agents Chiappone and Nutter were called to the witness stand and subjected to cross-examination, and the Agents' demeanor and thorough testimony on the stand left the Court with no doubt as to their credibility. Moreover, the record indicates that Defendant carefully chose what to say to the Agents; Defendant both refused to answer certain questions by the Agents and shared substantially less information with the Agents than Defendant had provided to the DOD interviewers. Accordingly, had Defendant truly wished to refrain from speaking entirely without a lawyer present, the record convincingly indicates that Defendant would have felt free to do so. Finally, Defendant's account is also rebutted by the uncontested fact that, on the same day, Agents Chiappone and Nutter immediately ceased an interview with Co-Defendant Kotey when Kotey invoked his right to an attorney.

- In summary, the record and the credible and persuasive testimony of Agents Chiappone and Nutter convincingly establishes the following facts with respect to the FBI interview on March 27, 2018:

  o Before the interview, Agents Chiappone and Nutter took careful steps to insulate themselves from any intelligence-gathering efforts with respect to Defendant.

  o Agents Chiappone and Nutter did not coordinate with Defendant's DOD interrogators or learn anything Defendant stated during his DOD interviews.

  o Agent Chiappone read Defendant a modified set of *Miranda* warnings at the outset of the interview which distinguished between the DOD and FBI interviews and explained that Defendant's statements to the DOD were likely inadmissible at subsequent trial, were unknown to the Agents, and did not require Defendant to speak to the Agents.

  o Defendant never affirmatively invoked his right to an attorney or to remain silent. In a subsequent interview, when Co-Defendant Kotey did invoke his right to an attorney, the Agents immediately ceased the interview.

  o Defendant appeared comfortable during the interview and declined to answer several questions. Defendant remarked about his positive treatment in SDF custody.

  o Agents Chiappone and Nutter did not employ any coercive tactics during the interview.

  o Agents Chiappone and Nutter did not confront Defendant with his statements to the DOD.

- Following the conclusion of the FBI interviews on March 28, 2018, Defendant remained in the custody of the SDF until October 2019, at which time Defendant was transferred to the custody of the United States. For much of the period between March 2018 and October 2019, Defendant was held at Derik Prison.

- Three officials from the SDF testified during the course of the evidentiary hearing in this matter. In order to protect their identities, given ongoing ISIS-related security threats in Syria, they testified under the pseudonyms SDF Witness #1, SDF Witness #2, and SDF Witness #3.

- At all relevant times—*i.e.* during Defendant's detention in Syria in 2018 and 2019—SDF Witness #1 served in a supervisory role with respect to the prisons where the SDF held ISIS prisoners.

11

- As part of his supervisory duties, SDF Witness #1 had occasion to visit the Ayn Issa and Kobani Prisons in 2018. SDF Witness #1 described at length the amenities provided to prisoners at Ayn Issa and Kobani, including: clothing, personal bedding, three meals a day, heating and air conditioning, generators to supplement Syria's inconsistent electrical grid, opportunities to pray, opportunities to speak to family members, recreation activities such as outdoor time and televisions, permission to meet privately with members of humanitarian groups such as the International Committee of the Red Cross, and medical care to the extent available in war-torn Syria.

- Given SDF Witness #1's supervision of the SDF prison system, SDF Witness #1 was in a position to receive reports of prisoner mistreatment. SDF Witness #1 credibly testified that he never received any reports of mistreatment with respect to Defendant during 2018 or 2019.

- According to SDF Witness #1, the SDF has a standard media policy with respect to detainees. Journalists who wish to interview detainees must first request permission from the SDF. SDF officials then relay the request to detainees. If detainees agree to be interviewed, the SDF arranges the interview, but detainees are free to refuse to give interviews.[12]

- At all relevant times, SDF Witness #2 served as the deputy head of the Derik Prison. SDF Witness #2 confirmed that Defendant was in the custody of the Derik Prison during his tenure in that position.

- SDF Witness #2 described in detail the amenities provided to prisoners at the Derik Prison, including three meals per day, heating and cooling, hygiene items, personal bedding, outdoor time, and games and books for recreation. Those amenities were somewhat curtailed following an April 5, 2019 riot instigated by the ISIS prisoners. For instance, after the riot, the SDF removed bed frames—which the prisoners had fashioned into makeshift weapons—from the prison.

- As deputy head of Derik Prison, SDF Witness #2 was in a position to hear and address reports of prisoner abuse. For instance, one prisoner reported physical abuse by an SDF guard in 2018, and the guard was thereafter removed from his post. SDF personnel at the prison were required to report any known instances of mistreatment.

- SDF Witness #2 credibly testified that he did not receive any reports or other information indicating abuse or mistreatment of Defendant while Defendant was housed at Derik Prison.

---

[12] SDF Witness #1's description of the SDF's media policy was confirmed by the testimony of both SDF Witness #2 and documentary filmmaker Sean Langan, who interviewed Defendant in Syria in July 2019. At the evidentiary hearing in this matter, Langan testified that he was required to both seek permission from the SDF and to write a letter to Defendant and Kotey seeking their assent to be interviewed.

- SDF Witness #2 described the same media interview policy as SDF Witness #1. SDF Witness #2 sometimes had the responsibility for transporting prisoners from Derik Prison to an offsite location for interviews.

- Prisoners were free to refuse to participate in interviews with journalists. SDF Witness #2 denied pressuring Defendant or any other prisoner to be interviewed by journalists, noting that Witness #2 had no desire to waste time and resources transporting an unwilling participant for an interview.

- At all relevant times, SDF Witness #3 served as a counter-terrorism investigator for the SDF. As part of his duties, SDF Witness #3 interviewed Defendant at Derik prison on several occasions.

- SDF Witness #3 credibly testified that Defendant never reported mistreatment or abuse by any SDF personnel during SDF Witness #3's interviews with Defendant at Derik Prison.

- SDF Witness #3 never observed any signs or abuse of mistreatment in his interviews with Defendant. Defendant often refused to answer SDF Witness #3's question and, sometimes, refused to participate in interviews altogether.

- Defendant participated in several videotaped media interviews while in SDF custody. Several of these interviews took place between April and August 2018.[13] During these interviews, Defendant said little about his involvement in the hostage-taking conspiracy alleged in the Indictment. Defendant's 2018 interviews included:

  o In April 2018, journalist Jenan Moussa published a one-on-one interview with Defendant. During the course of the interview, Defendant largely declined to answer any substantive questions about his alleged involvement with ISIS and the hostage-taking conspiracy described in the Indictment.

  o Also in April 2018, British journalist Stuart Ramsey conducted a joint interview with Kotey and Defendant. Defendant appeared to be an alert and active interviewee. In the interview, Kotey and Defendant discussed the goals and activities of ISIS but said little about the hostage-taking conspiracy alleged in the Indictment.

  o In August 2018, BBC journalist Quentin Sommerville conducted a joint interview with Kotey and Defendant. Co-Defendant Kotey and Defendant acknowledged

---

[13] It bears emphasizing that Defendant does not seek to exclude at trial any 2018 media interviews. Rather, Defendant's Motion to Suppress targets only media interviews conducted in 2019.

13

their friendship with Mohammad Emwazi[14] but otherwise denied involvement in the hostage-taking conspiracy alleged in the indictment. Defendant mentioned that he had received some military training in the United Kingdom.

- Defendant appeared to be an alert and engaged participant during his 2018 interviews and these interviews contain no evidence that Defendant was abused or tortured by SDF personnel.

- Defendant sat for substantially more in-depth interviews while in SDF custody in mid-2019. In those interviews, Defendant offered more detail about activities with ISIS and his involvement in the hostage-taking conspiracy alleged in the Indictment. Specifically:

  o In June 2019, a journalist from CNN remotely conducted a joint video interview with Kotey and Defendant. In contrast to other interview clips submitted by the parties—in which Defendant generally appeared to be an alert, articulate, and active participant—Defendant appeared fatigued and unfocused during the CNN interview.[15] During the interview, Defendant acknowledged his involvement with Western hostages captured by ISIS, but described his role as a mere liaison and denied that Defendant took part in physical abuse of the hostages.

  o In July 2019, Defendant sat for an interview with British documentary filmmaker Sean Langan. In contrast to his demeanor during the CNN interview, Defendant appeared to be an alert, engaged, and articulate interview participant. In the lengthy interview with Langan, Defendant described in detail his involvement in the alleged hostage scheme, stating that he collected emails and other information from hostages and physically struck hostages on several occasions. However, Defendant denied knowing any details about the deaths of certain hostages.

  o Defendant was interviewed by journalists from the Washington Post in August 2019. Again, Defendant appeared to be at ease and actively engaged in the conversation. During the course of the interview, Defendant discussed his role in

---

[14] The Government contends that Mohammad Emwazi was the individual dubbed "Jihadi John," a member of the so-called ISIS "Beatles" responsible for executing some hostages. Defendant seemed to confirm this contention during his 2019 interview with a journalist from the *Washington Post*.

[15] Defendant also contends that he had visible bruising during the interview, which Defendant alleges resulted from abuse by SDF personnel. The evidence on this point is inconclusive. In the CNN clips submitted by the parties, Defendant does appear to have some dark discoloration on his face, most prominently in the middle of his forehead and perhaps on his right cheek as well. It bears noting, however, that in an October 2019 medical exam performed by a DOD medical official following Defendant's transfer into United States custody, the DOD physician observed a similar dark discoloration in the center of Defendant's forehead. The doctor's report attributed the mark not to abuse but to the effect of Defendant routinely laying his forehead against the ground during Muslim prayer.

Defendant also argues that his difficulty hearing the off-site interviewer's questions during the interview stemmed from an ear infection resulting from abuse by the SDF. However, Co-Defendant Kotey also demonstrated difficulty hearing questions throughout the interview.

the hostage-taking conspiracy alleged in the Indictment and described interactions with various Western hostages, including James Foley, Steven Sotloff, and Kayla Mueller.

o Finally, Defendant also sat for an interview with ITV News in the summer of 2019. Again, Defendant discussed his role in the hostage-taking conspiracy alleged in the Indictment but denied knowledge of details regarding some hostages (including British national David Haines).

- In general, although Defendant's 2019 media interviews were substantially more incriminating than his 2018 media interviews, Defendant denied or omitted a number of important facts he had previously admitted to his DOD interrogators. For instance, Defendant routinely denied to media interviewers any knowledge regarding the deaths of certain hostages. Despite insistence from interviewers, Defendant declined to say anything substantive about the death of James Foley to Sean Langan or to say anything about David Haines to ITV News. By contrast, Defendant described personally interacting with David Haines to a DOD interrogator. Defendant also aided the DOD interrogators in drawing a map to the location of James Foley's remains and described the approximate depth of Foley's grave.

- Defendant and Kotey were transferred to the custody of the United States in October 2019.

- Defendant underwent an intake medical exam by a DOD physician. The physician: (i) reported "no concerns" under the heading "Injuries/Abuse," (ii) reported that Defendant had a weight of 133.4 pounds and Body Mass Index (BMI) of 19.4 (which falls within the healthy range), and (iii) noted that Defendant enjoyed "FAROM" (full active range of motion) in his upper extremities.

- Soon after transfer to DOD custody, Defendant and Co-Defendant Kotey both reported to the DOD that they had suffered severe physical abuse by SDF personnel. For instance, Defendant claimed that one SDF official kicked and attempted to break Defendant's shoulder, leaving lasting damage to the socket.

- In support of the Motion to Suppress, Defendant submitted a signed declaration which claims that the SDF subjected Defendant to repeated, severe physical abuse. Specifically:

o Defendant claims that he was beaten with fists and rifle butts immediately after being captured.

o Defendant claims that, during the course of DOD interviews at Ayn Issa Prison, Defendant was removed from his cell by SDF guards, threatened with a loaded pistol, and punched in the head. Defendant claims that he reported this abuse to his DOD interrogator at the next interview, at which time Defendant's jaw was so swollen that he could not swallow beverages.

15

- o   Defendant claims that he was repeatedly attacked by SDF guards at Kobani Prison, including by being thrown down a flight of stairs.

- o   Defendant claims that SDF officials threatened Defendant with "worse conditions" if he did not participate in media interviews prior to Defendant's interviews in April 2018.

- o   Defendant claims that he was severely attacked by SDF personnel at Derik prison in 2019, including by being beaten in the head and stomach, kicked in the genitals, and repeatedly struck in the shoulder (which left lasting damage to the socket).

- o   Defendant claims that he "kept restating [his] false DOD confessions to the media outlets" to avoid further beatings.

- o   Defendant claims that he was starved by the SDF and weighed just 120 pounds when transferred to DOD custody.

- Put simply, Defendant's claims regarding the severity and frequency of abuse in SDF custody are not credible when weighed against other record evidence.[16]

  - o   Defendant claims that he was severely beaten on at least one occasion during the time period that he was being interviewed by the DOD. But Defendant's DOD interrogators credibly testified that they observed no signs of physical abuse during the course of their interviews with Defendant.[17]

  - o   Defendant claims that he was physically abused at each of the Ayn Issa, Kobani, and Derik Prisons. But three SDF officials who worked at or had supervisory authority over those facilities credibly testified that they were unaware of any reports or evidence indicating that Defendant had suffered mistreatment.

  - o   A medical examination performed by a DOD physician upon Defendant's entry into DOD custody in October 2019 squarely rebuts two of Defendant's claims. First, Defendant claims that he suffers from lingering shoulder socket damage from the alleged attack at Derik Prison, but the DOD physician's report indicated that Defendant enjoyed a full range of motion in his upper extremities. Second, contrary to Defendant's claim that he was starved, the DOD physician listed Defendant's weight at 133.4 lbs and Defendant's Body Mass Index at 19.4 (which

---

[16] It bears emphasizing that Defendant's claims were presented in a self-serving declaration rather than on the witness stand at the evidentiary hearing, where they would have been subject to cross-examination.

[17] [REDACTED]

16

falls within the healthy range). The report of Defendant's medical exam includes no other indications of physical abuse.

o   Defendant claims that the SDF threatened and coerced him into participating in media interviews before Defendant's first interviews in April 2018. But that claim is rebutted by the credible testimony of two of the SDF Witnesses and Sean Langan that, under SDF policy, detainees were free to refuse to participate in interviews. Moreover, Defendant's claim is also rebutted by Defendant's demeanor in the interviews. With the single exception of Defendant's fatigued appearance in CNN's June 2019 interview, Defendant generally appeared to be a comfortable, alert, and engaged interview subject.

o   Contrary to Defendant's claim that he repeated his "DOD confessions" to the media, the record clearly indicates that Defendant provided substantially more incriminatory statements and information to DOD interrogators than Defendant provided to any media outlets. Even in later media interviews, Defendant downplayed his level of interaction with and knowledge of the hostages, but in DOD interrogations Defendant shared extensive personal knowledge about his contacts with the hostages.

   ▪   For instance, in CNN's April 2019 interview, Defendant claimed he had a limited "liaison" role with the hostages, and denied having any personal knowledge about the hostages or their whereabouts for a long period before some of the hostages were executed. But, among other details, Defendant told a DOD interrogator that he had personally spoken to Mohammad Emwazi and knew that Emwazi had beheaded James Foley, Steven Sotloff, and others. Defendant also identified burial sites for the remains of some of the murdered hostages.

   ▪   In DOD interrogations, Defendant described directly participating in ransom negotiations with foreign governments. By contrast, despite several media interviews which sharply focused on Defendant's role in the hostage-taking conspiracy alleged in the Indictment, Defendant never discussed taking part in ransom negotiations during any media interviews.

   ▪   Furthermore, in a 2019 interview with ITV news, Defendant denied any knowledge regarding David Haines, a British aid worker who was taken hostage and beheaded by ISIS. But Defendant told a DOD interrogator that Defendant had personally interacted with David Haines and described locations at which Haines had been held captive.

17

## II.

Defendant's Motion to Suppress relies on two principal arguments. First, Defendant contends that any statements provided to the FBI during the *Mirandized* March 27, 2018 interview in Syria should be suppressed because the DOD and FBI employed a deliberate two-step strategy to undermine *Miranda* in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). Second, Defendant contends that statements to media outlets in 2019 should be suppressed because those statements were the involuntary products of alleged torture by SDF personnel.

With respect to Defendant's first argument, the Supreme Court has "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Seibert*, 542 U.S. at 608 (plurality opinion). A difficult question arises when *Miranda* warnings are given only when a custodial interrogation is well underway. Specifically, if law enforcement interviewers elicit an unwarned confession from a suspect, then provide *Miranda* warnings, and then again elicit a confession, is the post-warning confession admissible at trial? The Supreme Court has addressed that issue on two occasions.

First, in *Oregon v. Elstad*, the Supreme Court held that incriminating statements offered after mid-interview *Miranda* warnings are admissible in at least some cases. 470 U.S. 298 (1985). In that case, police officers arrested defendant Michael Elstad in his home pursuant to a warrant. While there, the officers questioned Elstad without *Miranda* warnings, and Elstad confessed to his involvement in a burglary. Approximately one hour later, the officers transported Elstad to the police station, administered *Miranda* warnings, and again elicited Elstad's confession. *Id.* at 300–301. The Supreme Court held that the latter confession was

admissible, concluding that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. In so ruling, the *Elstad* Court rejected the contention that the post-warning statement was tainted by a "subtle form of lingering compulsion," namely "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id.* at 311.

The Supreme Court revisited its *Elstad* holding in 2004, when a divided majority of the Court in *Seibert* held that a confession elicited following a mid-interview statement was inadmissible at trial under the facts of that case. In *Seibert,* the record indicated that the police officers deliberately utilized a two-step process to circumvent *Miranda.* The officers brought defendant Patrice Seibert to the station, where they questioned her without *Miranda* warnings and elicited a number of incriminating statements. Following a twenty-minute break, the same officers provided *Miranda* warnings and prompted Seibert to repeat her incriminating statements by using leading questions and confronting her with the pre-warning statements. 542 U.S. at 604–05. A four member plurality opinion authored by Justice Souter concluded that Seibert's post-warning statements were inadmissible because, under the circumstances, the warnings could not "function effectively as *Miranda* requires." *Id.* at 611–12. The plurality identified "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id.* at 615.[18]

---

[18] Specifically, in order to assess whether a two-step interrogation rendered *Miranda* warnings ineffective, the plurality instructed courts to consider: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." 542 U.S. at 615.

Justice Kennedy provided a fifth vote to suppress Seibert's post-warning statements, concurring on narrower grounds. The Fourth Circuit has instructed that Justice Kennedy's concurrence "therefore represents the holding of the *Seibert* Court." *Kwheis*, 971 F.3d at 416 (citing *United States v. Mashburn*, 406 F.3d 303, 309 (4ᵗʰ Cir. 2005)). Justice Kennedy set forth a "narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." 542 U.S. at 622. According to Justice Kennedy, if law enforcement interviewers did not deliberately seek to undermine *Miranda*, the analysis "should continue to be governed by the [voluntariness] principles of *Elstad*." *Id.* But when the record indicates that interviewers deliberately employed a two-step strategy to circumvent *Miranda*, the post-warning statements are inadmissible unless curative measures are used to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Potential curative measures include "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" as well as modified *Miranda* warnings. *Id.*

In summary, as the Fourth Circuit has made clear, Justice Kennedy's narrow concurrence represents the controlling statement of the Supreme Court's holding in *Seibert*. Under Justice Kennedy's framework, the critical question is whether law enforcement interviewers deliberately employed a two-step interrogation strategy to undermine *Miranda*. If interviewers did not do so, the post-warning statements are admissible provided that the defendant "knowingly and voluntarily" waived his rights and elected to speak to interviewers. *Elstad*, 470 U.S. at 309. If the interviewers did do so, the post-warning statements are inadmissible unless interviewers take "curative measures" to ensure a reasonable person would grasp the "import and effect" of the warnings. *Seibert*, 542 U.S. at 622.

20

The Fourth Circuit has had occasion to apply the *Seibert* analysis, including in a case closely analogous to the one now before the Court. In *United States v. Khweis*, the defendant was interviewed in Iraq while held in Kurdish custody under suspicion of involvement in ISIS activities. One FBI interviewer questioned Khweis without *Miranda* warnings on eleven occasions for the purpose of gathering intelligence. Subsequently, two other FBI agents interviewed Khweis after providing *Miranda* warnings in order to prepare for a possible criminal prosecution in the United States. *See* 971 F.3d at 455–56. Khweis contended that his confessions to the second set of interviewers following *Miranda* warnings should be suppressed under *Seibert*. The Fourth Circuit disagreed, holding that even if the FBI had employed a deliberate two-step strategy, a reasonable person in Khweis's position would have readily appreciated the "import and effect" of the *Miranda* warnings and waiver. *Id.* at 456. In support of that conclusion, the Fourth Circuit noted a gap of ten days between the unwarned and warned interviews, the use of a different interview room and complete separation of personnel, the fact that the second interviewers had received no information about the content of the intelligence interviews, and the provision of modified *Miranda* warnings which clearly indicated that the interviewers were "starting anew." *Id.* at 461–62.

Given *Seibert* and the Fourth Circuit's closely analogous application in *Khweis*, it is clear that Defendant's contention suffers from two fatal defects. First, the record does not support the assertion that the DOD and FBI deliberately orchestrated a two-step interview process "in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). The record clearly establishes that the course of the DOD and FBI interviews of Defendant in Syria in 2018 stemmed not from coordination to undermine *Miranda* but from the starkly different needs of different agencies within the U.S. government. Defendant's interviews

with DOD interrogators focused on a wide panoply of subjects related to military intelligence: hostage locations, ISIS's infrastructure and capabilities, the identities of ISIS members, and so on.[19] By contrast, the FBI's interviews on March 27 and 28, 2018 were clearly designed to develop evidence for a potential criminal prosecution in the United States. To that end, the record also discloses that Agents Chiappone and Nutter, Defendant's law enforcement interviewers, took a number of careful steps to avoid communicating or interacting with any of the members of the DOD interrogation team. In summary, no persuasive record evidence supports the contention that the DOD and FBI teams deliberated coordinated "in a calculated way" to undermine *Miranda*.

To continue, under Justice Kennedy's controlling framework in *Seibert*, if the government does not deliberately employ a two-step interrogation tactic to undermine *Miranda*, the admissibility of a *Mirandized* confession turns on whether a defendant knowingly and voluntarily waived his rights and agreed to speak with law enforcement. Here, the record leaves no doubt that Defendant's statements to the FBI were knowing and voluntary. Agent Chiappone credibly testified that he read a thorough, modified set of *Miranda* warnings while Defendant attentively listened (and, indeed, Defendant's declaration confirms that the interviewing agents

---

[19] The fact that un-*Mirandized* interviews of Defendant by the DOD took place before *Mirandized* interviews of Defendant by the FBI does not, in these circumstances, evidence a two-step interrogation tactic designed to undermine *Miranda*. Rather, the fact that the DOD intelligence team had the first crack at interviewing Defendant undoubtedly stemmed from the DOD's presence on the ground in northeastern Syria in 2018 and the urgent need for intelligence in the ongoing war effort against ISIS.

Additionally, the fact that one of Defendant's intelligence interviewers, Agent Kath, was technically an FBI employee, rather than a DOD employee, does not alter the outcome of this analysis. The record clearly establishes that members of the so-called "FBI Fly Team" stood in for DOD interrogators, that Agent Kath stood in and conducted intelligence-focused interviews which picked up where the previous interrogator left off, and that Agent Kath was presented as a DOD interrogator to Defendant, which in essence he was.

read an advice-of-rights form).[20] In turn, Agents Chiappone and Nutter both credibly testified that Defendant declined to speak about some subjects without an attorney present but otherwise never demanded an attorney, invoked his right to silence, or sought to cease the interview.[21] Finally, it is also apparent that Agent Chiappone's warnings had some effect, given that Defendant reiterated only a very small fraction of the incriminating information to the FBI that he had previously shared with DOD interrogators.

Second, even assuming the United States deliberately employed a two-step strategy to undermine the *Miranda* warnings—a contention unsupported by the record—the record also makes clear that a reasonable person in Defendant's position would have readily understood the "import and effect" of the *Miranda* warnings. *Khweis*, 971 F.3d at 456. Put simply, any reasonable person in Defendant's position would have readily "appreciate[d] that the interrogations had taken a new turn." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). During the first stage, the DOD interrogators clearly presented themselves as such and explained to Defendant, among other things, that they were not law enforcement interviewers and that he was therefore not entitled to an attorney. Following the DOD interviews, twenty days elapsed before the FBI interviews, which was a time period substantially longer than any gap between any of the DOD interviews and twice as long as the period that the Fourth Circuit in *Khweis* viewed as a sufficient curative measure.

---

[20] It also bears emphasizing that Defendant gave intelligent, articulate answers throughout the interviews in the record, and also that Defendant grew up in the United Kingdom and had some experience with the British criminal justice system. Accordingly, there is no doubt that Defendant possessed the capacity to understand his rights as Agent Chiappone communicated them to him.

[21] Defendant's claim to the contrary in his declaration, which alleges that Defendant repeatedly requested an attorney and was ignored by the interviewing FBI agents, is not credible. Defendant's account is rebutted by the credible testimony of Agents Chiappone and Nutter, the fact that Agents Chiappone and Nutter subsequently promptly ended an interview with Co-Defendant Kotey when Kotey requested an attorney, and the fact that Defendant clearly exercised free choice during the FBI interview, such as by refusing to sign the advice-of-rights form and declining to speak on a number of subjects during the interview.

Then, at the outset of the FBI interviewers, Agents Chiappone and Nutter clearly identified themselves as FBI law enforcement interviewers and provided modified and appropriately thorough *Miranda* warnings. Those warnings explained in clear terms that the Agents were "starting anew," thereby distinguishing the DOD and FBI interviews and making clear that any prior statements Defendant had made to the DOD were unknown to the Agents and did not require him to speak to the Agents. True to their word, the Agents had previously taken careful steps to avoid any knowledge of the intelligence interviews, and they did not confront Defendant with any prior statements to the DOD interviewers.[22] In summary, the plethora of curative steps taken by the Agents in this case would have allowed the *Miranda* warnings to function effectively and thus, under Justice Kennedy's framework, those curative measures render the *Mirandized* statements admissible.

### III.

With respect to Defendant's second argument, a suspect's confessions or incriminating statements may be involuntary and therefore inadmissible at trial in at least some circumstances. In order to weigh the voluntariness of a confession sought to be introduced at trial, a court must assess whether a defendant's "will has been overborne and his capacity for self-determination critically impaired." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)). In turn, to assess whether a defendant's will was overborne, a court must assess "the totality of the circumstances, taking into

---

[22] Ultimately, the facts of this case are closely analogous to *Khweis*, in which the Fourth Circuit concluded that the defendant could have apprehended the "import and effect" of the *Miranda* warnings. 971 F.3d at 456. Defendant's attempts to distinguish *Kwheis* are unpersuasive. Defendant points out, for instance, that unlike *Khweis*—where there was no personnel overlap—SDF guards *may* have overlapped between the DOD and FBI interviews. But others facts cut in the opposite direction. For instance, as noted, the gap between the DOD and FBI interviews in this case was twice the length of the gap between interviews in *Khweis*. It is also notable that, in Khweis, both the intelligence and law enforcement interviews were conducted by FBI agents who represented themselves as such, whereas Defendant here was interviewed by different agencies during the two sets of interviews.

account characteristics of the accused, and details of the interrogation." *Id.* Relevant factors include: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, and the use of physical punishment such as the deprivation of sleep." *Id.* For the purpose of this inquiry, the prosecution bears the burden to establish that a confession was voluntary by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).

One important caveat bears emphasis with respect to exclusion of involuntary confessions: the Supreme Court has clearly held that coercive state action is a necessary predicate to exclusion. *See Colorado v. Connelly*, 479 U.S. 157, 165 (1982) ("Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause . . ."). Generally, state action takes the form of coercive conduct by law enforcement;[23] the mere admission of a purportedly involuntary confession at a criminal trial does not satisfy the state action requirement. *See Connelly*, 479 U.S. at 165–66. Some courts, including the Fourth Circuit, have suggested that torture by officials of a foreign government *might* serve as the basis for exclusion of a confession.[24] However, Defendant cites no cases in which torture or coercive treatment by actors not affiliated with *any* state served as a valid basis for exclusion of a confession, and any such decisions would clearly conflict with the Supreme Court's instruction that "[t]he most outrageous

---

[23] A prototypical example is the extraction of a suspect's confession through torture by local, state, or federal law enforcement in the United States, which unquestionably renders the confession inadmissible at subsequent criminal trial. *See, e.g., Brown v. State of Mississippi*, 297 U.S. 278, 281 (1936).

[24] In *United States v. Abu Ali*, the Fourth Circuit suggested, without clearly deciding, that the admissibility of a confession allegedly procured through torture by Saudi Arabian officials might be properly analyzed under the voluntariness framework outlined *supra*. 528 F.3d at 231–34. However, because the Fourth Circuit affirmed the district court's factual finding that the record did not support the defendant's claim of involuntariness in any event, that suggestion does not represent the holding of the *Abu Ali* decision. *See id.*

behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Connelly*, 479 U.S. at 166.[25]

Defendant's contention that his 2019 statements to journalists from various media outlets (including CNN, ITV News, and the *Washington Post*) should be suppressed as the involuntary products of torture by the SDF is unpersuasive. As an initial matter, it is far from clear that the alleged treatment by the SDF meets the threshold requirement of state action, which the Supreme Court set forth in *Connelly* as a predicate for exclusion of a purportedly involuntary confession.[26] But even assuming that this threshold requirement is satisfied here, the record clearly reflects that the Government has amply carried its burden to prove that Defendant's will was not overborne and therefore that his statements were voluntary by a preponderance of the evidence. First, Defendant's claim that he was subjected to repeated, extreme physical abuse by SDF personnel is supported by little more than Defendant's own uncorroborated words, and is rebutted by a great deal of credible witness testimony and other record evidence. For instance, Defendant's signed declaration alleges that SDF officials severely beat Defendant at each of the Ayn Issa, Kobani, and Derik Prisons, but witnesses from the DOD, FBI, and SDF who interacted with Defendant at each of those facilities all credibly testified that they did not receive any

---

[25] In this respect, the *Connelly* Court persuasively noted that the purpose of excluding evidence seized in violation of the Constitution is to deter future violations, and therefore excluding statements based on or the conduct of private parties "would serve absolutely no purpose in enforcing constitutional guarantees." *Connelly*, 479 U.S. at 166.

[26] As the record makes clear, the SDF is an ad hoc Kurdish military force which sprang up to combat ISIS in an autonomous region of Syria. The SDF is not a component of the Syrian regime or any other formal state; nor does the record contain a scintilla of evidence that the SDF committed torture at the behest of or in concert with the United States or any other recognized state. Furthermore, it is important to note that Defendant, under his involuntariness argument, seeks to suppress statements made to media outlets in 2019. Accordingly, the relevant questioning of Defendant was also conducted by purely private individuals, namely journalists not affiliated with any government. Put simply, it is difficult to see how Defendant alleges anything more than "outrageous behavior by . . . private part[ies]," which is insufficient to support constitutionally-required exclusion. *Connelly*, 479 U.S. at 166.

reports or observe any signs of abuse of Defendant.[27] It is of course possible that these individuals could have overlooked *some* signs of mistreatment, but exceedingly unlikely that all of these individuals—including the DOD/FBI interrogators, SDF prison officials, and a DOD physician who examined Defendant in October 2019—could have failed to observe any evidence of a two-year-long course of extreme physical abuse.[28] Other aspects of Defendant's account are also squarely countered by documentary evidence, such as an October 2019 DOD medical report showing full range of motion in Defendant's upper extremities, which rebuts Defendant's claim of lasting shoulder damage stemming from an SDF assault. Ultimately, the record discloses ample reasons to doubt, and vanishingly few reasons to credit,[29] Defendant's account of his treatment in SDF custody.

More specifically, the Government persuasively argues that Defendant's claim that he was forced to participate and make incriminating statements in media interviews by the SDF is simply not credible. To begin with, two SDF witnesses, as well as documentary filmmaker Sean Langan, each credibly testified that detainees in SDF custody were free to refuse to participate in media interviews. Furthermore, Defendant's claim that he repeated his false DOD confessions to

---

[27] [REDACTED]

[28] Defendant also contends that the SDF witnesses possessed a motive to obscure any issues at their prisons. While true, Defendant also possesses a strong motive to fabricate or exaggerate mistreatment by the SDF. Additionally, the SDF witnesses were subject to cross examination and key portions of their testimony were corroborated by other portions of the record, unlike Defendant's declaration.

[29] Other portions of the record pointed to by Defendant fail to bolster Defendant's account when weighed against the totality of the evidence. For example, Defendant points out that Alexanda Kotey also reported physical abuse by the SDF. But Kotey's claim that Kotey was abused by the SDF, even if deemed credible, does not establish that *Defendant* was abused.

Defendant also relies heavily on his appearance and demeanor during CNN's June 2019 interview. But Defendant's apparent fatigue and possible facial markings could have stemmed from a number of other events, such as an altercation with another detainee. Defendant's demeanor in that interview also sharply contrasts with Defendant's demeanor in other interviews, where he appeared to be a comfortable and engaged participant.

27

appease the SDF is flatly contradicted by record evidence which clearly indicates that Defendant either denied or declined to share several incriminating details with journalists that he had previously shared with DOD interrogators.[30] Defendant's calm and engaged demeanor in all interviews (with the exception of the 2019 CNN interview) also rebuts Defendant's contention that his will was overborn. Finally, other aspects of Defendant's account with respect to the media interviews are simply implausible. For instance, Defendant offers no plausible reason why SDF officials would permit Defendant to deny his role in the alleged hostage-taking scheme to journalists in April and August of 2018 but force him to admit his role to journalists in July 2019.

To continue, Defendant further relies on prison conditions and fear of prosecution in Iraq to bolster his involuntariness claim, but Defendant's allegations in these respects are also not credible. With regards to prison conditions, Defendant claims, among other things, the he was starved by SDF personnel. However, although the SDF clearly was forced to make do with limited resources in war-torn Syria,[31] credible testimony from the DOD interrogators and others establishes that the basic needs of Defendant and other detainees were met at the Ayn Issa, Kobani, and Derik Prisons in 2018 and 2019. And, indeed, Defendant's claim of starvation is squarely rebutted by the fact that Defendant had a healthy BMI when taken into DOD custody in

---

[30] It is also worth emphasizing that, in Defendant's account, Defendant was savagely beaten relatively shortly before his CNN interview in 2019, and that beating compelled him to repeat his DOD confessions to interviewers. But careful review of the CNN interview reveals that Defendant said relatively little about his role in the alleged hostage-taking scheme, other than to admit generally to a "liaison" role with respect to hostages. Simply put, Defendant's claim is not supported by the record or a review of the relevant media interviews.

[31] For instance, record evidence indicates that the SDF prisons were overcrowded, and that some medicines were not available in the Syrian warzone. But credible testimony also indicates, among other things, that Defendant and other detainees received three meals each day, clothing, bedding, bathroom and cleaning facilities, and recreation time. Of course, this does not mean that SDF prisons were equivalent to Western detention facilities or perfectly pleasant in all regards. After all, the SDF's prisons were war zone facilities housing hostile combatants. But Defendant's claims regarding the *severity* of his treatment, such as that he was starved, are not supported by the record.

October 2019. With respect to Defendant's alleged fear of prosecution, the record evidence establishes that Defendant's American interviewers mentioned transfer to Iraqi custody as one possible outcome, but did not threaten Defendant with sham prosecution or summary execution. And if Defendant was truly afraid of transfer to Iraq—a possible outcome he was aware of as early as his DOD interviews—it makes little sense that Defendant downplayed his role in the alleged hostage-taking conspiracy to the FBI interviewers (who could have advanced Defendant's criminal prosecution in the United States) or waited well over a year to admit his role to journalists in media interviews.

In sum, the record does not support Defendant's contention that he was forced to make incriminating statements to the media in 2019. Rather, the record discloses that Defendant is an intelligent individual who made careful and calculated choices about what to say and how much to share in different contexts.[32] With respect to Defendant's personal characteristics, the record indicates that Defendant spent his formative years in the United Kingdom, received at least some exposure to the British criminal justice system, and received some degree of military training. Defendant's upbringing left him well-prepared to understand the nature of the American legal system and his rights within that system—rights which FBI Special Agent Chiappone explained in a detailed set of modified *Miranda* warnings. It is quite clear that Defendant understood the nature of the *Mirandized* law enforcement interview with Agents Chiappone and Nutter, and elected to share only a very small fraction of the incriminating information he had previously shared with DOD interrogators.

---

[32] On this point, one TIR prepared in January 2018 described Defendant as "highly intelligent." This characterization is confirmed by Defendant's careful choices about sharing information in different contexts and well-articulated answers in various interviews.

With respect to the media interviews, the record makes clear that Defendant felt free to deny or downplay his role in the alleged hostage-taking scheme to journalists in 2018. Later, in 2019, Defendant changed course and admitted some involvement with the hostage-taking conspiracy. Defendant attributes this change of heart to abuse and compulsion by the SDF to share with the media what he had shared with the DOD, but the record clearly establishes that Defendant told the DOD substantially more than he shared with journalists, including in 2019.[33] In summary, the record includes a clear pattern of statements consistent with Defendant having made careful choices about what to say to different Individuals in different contexts, and thus it is more likely than not that his statements to the media were "the product of an essentially free and unconstrained choice by [their] maker." *Abu Ali*, 528 F.3d at 210 (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Accordingly, the Government has sustained its burden of establishing by a preponderance of the evidence that Defendant's will was not overborne and that his statements to the media in Syria in 2019 were voluntary.[34]

## IV.

The next issue for review is the Government's contention that false identifying statements offered by Defendant and alleged co-conspirator Kotey to DOD officials soon after capture by the SDF are admissible pursuant to the routine booking exception to *Miranda*. It is a well-settled principle that statements made during the course of custodial interrogation[35] without *Miranda*

---

[33] It also bears emphasizing that Defendant's change of heart could have stemmed from a number of plausible motives that have nothing to do with a coerced false confession, such as a desire by Defendant to share his side of the story or to expedite criminal prosecution in and transfer to the United Kingdom or the United States. In other words, an individual may sometimes advance personal goals by electing to admit the truth.

[34] It is worth noting, however, that this ruling does not bar Defendant from arguing to the jury that his statements were involuntary and therefore that the jury should assign them little or no weight.

[35] The parties agree that questioning by DOD officials at Ayn Issa constituted custodial interrogation of Defendant and Kotey. As a result, the analysis presented here with respect to the routine booking exception assumes, without

warnings are inadmissible at subsequent criminal trial. *See, e.g.*, *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995). Importantly, however, the Supreme Court has, under the so-called routine booking exception, "exempt[ed] from *Miranda*'s coverage questions to secure the biographical data necessary" to accomplish administrative tasks such as booking or pretrial services. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (quotation marks and citation omitted). The exception may cover requests for a suspect's "name, citizenship, place of birth, address," and any other questions not "designed to elicit incriminatory admissions." *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994). The exception applies even when a suspect provides false (and therefore incriminatory) responses to booking questions. *Id.* at 609.

Here, the Government persuasively argues that the routine booking exception applies to the biometric enrollment questions posed to Defendant and Co-Defendant Kotey by DOD officials at Ayn Issa Prison. To be sure, the biometric enrollment of Defendant and Kotey took place in a context different from a typical stationhouse booking, but the enrollment process here is clearly closely analogous to standard law enforcement booking. As in a standard booking process, DOD officials did not (prior to substantive interrogation) question Defendant or Kotey about their alleged criminal activities. Instead, the enrollment questions elicited basic biographical information, such as Defendant and Co-Defendant Kotey's names, ages, and countries of origin. And, indeed, the record clearly indicates that DOD officials did not act in any way for the purpose of criminal law enforcement. Instead, the collection of biometric data from SDF detainees served administrative goals, such as identifying and tracking detainees, as well as other national security interests. Put simply, the biometric enrollment process at issue here did not involve questions "designed to elicit incriminatory admissions" to be used at trial, and hence

deciding, that *Miranda* applies in the first place to questioning by DOD officials of detainees in the custody of non-state actors in a foreign nation.

answers provided during that intake process fall within the routine booking exception. *D'Anjou*, 16 F.3d at 608.

Defendant does not contend—nor could Defendant plausibly argue in light of the evidentiary record—that the DOD officials conducting biometric enrollment sought to elicit incriminatory admissions for law enforcement purposes. Indeed, Defendant says little to rebut the analogy between routine booking and biometric enrollment.[36] Instead, Defendant's principal contention is that the factual circumstances here are so disparate from the typical *Miranda* context, *i.e.* police questioning at the stationhouse, that the booking exception is completely inapplicable to any SDF detainees. Defendant points out that he "was not under arrest" by the police, but instead in the custody of "paramilitary forces" (the SDF), and the DOD officials were not "deputies on routine booking duty" but military officials seeking "intelligence tool[s]" in the war on terror. Defendant's argument is puzzling, insofar as it casts doubt not only on the applicability of the routine booking exception but of *Miranda* altogether. Defendant cannot coherently argue that the circumstances of SDF custody are sufficiently similar to domestic police custody that Defendant's false identifying statements must be excluded due to the lack of *Miranda* warnings but at the same time so dissimilar as to bar categorically the application of the routine booking exception. It is clear that, as in any routine booking, the questions asked by DOD officials during biometric enrollment consisted of simple biographical questions designed

---

[36] Defendant emphasizes that DOD officials routinely upload the biometric data of SDF detainees to various government databases. Although true, this does not defeat application of the routine booking exception; similar procedures are also followed by domestic law enforcement agencies. For instance, police departments often upload suspects' fingerprints to national fingerprint databases. Defendant cites no authority to support the contention that uploading information to a database defeats application of the routine booking exception. Indeed, the fact that the DOD's collection of biometric data is connected to intelligence goals or tools such as fingerprint databases does not alter the straightforward conclusion that, during biometric enrollment, Defendant and Co-Defendant Kotey were asked straightforward biographical questions completely unrelated to eliciting incriminating admissions.

for administrative purposes, and the lack of *Miranda* warnings therefore does not preclude the admission of Defendant and Co-Defendant Kotey's false identifying statements at trial.

Two additional points merit mention. First, the false identifying statements are plainly relevant, insofar as they may demonstrate consciousness of guilt on the part of Defendant and Defendant's alleged co-conspirator. As the Fourth Circuit and other circuits have routinely held, the making of false exculpatory statements, including the provision of a false identity, is probative of a Defendant's knowledge of his wrongdoing. *See United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020); *D'Anjou*, 16 F.3d at 609; *United States v. Clark*, 45 F.3d 1247, 1250 (8th Cir. 1995). Defendant counters that his motive was not concealment of wrongdoing but fear for his well-being in SDF custody.[37] However, the fact that Defendant may argue a different motive does not render the false identifying statements irrelevant or substantially more prejudicial under Rule 403, Fed. R. Evid. Rather, Defendant is free to argue to the jury that the statements did not stem from consciousness of guilt, and the jury may assign the statements whatever weight, if any, the jurors see as appropriate.

Finally, Defendant argues that Co-Defendant Kotey's false identifying statements should be excluded as hearsay statements that do not fall within any exception carved out by the Federal Rules of Evidence. This argument can be readily dispensed with: the false identifying statements at issue here are not hearsay. Obviously, the Government does not seek to rely on these statements for the truth of the matter asserted, such as to prove that Defendant is in fact named Suhayb or that Kotey is in fact named Yahya. The statements' falsity is the very point of their

---

[37] In this regard, Defendant relies on the account of brutal treatment by SDF personnel contained in Defendant's declaration. Defendant contends that, because media reports had linked his name to the alleged "ISIS Beatles" conspiracy, Defendant feared that revelation of his identity as a suspected high-level ISIS operative meant that "his death could be imminent." As noted *supra* in this Memorandum Opinion, however, Defendant's account of his treatment in SDF custody is not credible.

relevance. In summary, the Government has readily carried its burden to demonstrate the admissibility of the false identifying statements made by Defendant and Kotey during the biometric enrollment process at Ayn Issa Prison in January 2018. Those statements are plainly relevant, do not constitute hearsay, and fall within the routine booking exception to *Miranda*. Accordingly, the Government's Motion in *Limine* must be granted.

<h2 style="text-align:center;">V.</h2>

Also pending before the Court are portions of Defendant's Motion to Compel for which ruling was deferred by a previous Order. *See* Dkt. 158. Defendant's Motion to Compel sought several categories of information to bolster Defendant's Motion to Suppress which Defendant contended were discoverable under Rule 16(a)(1)(E), Fed. R. Crim. P. The Court's previous Order deferred ruling on three requested categories of information relevant to Defendant's *Seibert* argument, namely: (1) the agencies of any overlapping U.S. personnel between the intelligence and law enforcement interviews, (2) communications between the FBI law enforcement team and officials with access to Defendant's intelligence interrogation reports, and (3) communications regarding the dispatching of the FBI law enforcement team. It is now appropriate to deny the remaining portions of the Motion to Compel.

As discussed in detail in the Court's previous Order, Rule 16(a)(1)(E) requires that the Government produce documents in its "possession, custody, and control" that are "material" to the defense, which is a higher bar than mere relevance. *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010). According to the Fourth Circuit, material evidence is that which would enable the defendant "significantly to alter the quantum of proof in his favor." *Id.* (citation omitted). In light of the evidence presented by the parties with respect to the Motion to Suppress, there is no non-speculative reason to think that the three categories of requested information would prompt

production of **material** evidence. First, it is apparent that the Government has produced voluminous discovery with respect to the DOD and FBI interviews of Defendant, including a substantial number of communications sent to and from the DOD and FBI interrogators, and Defendant has offered no reason to think the Government possesses *additional* communications or other documents not yet produced.

Moreover, although the three categories of information requested by Defendant are designed to bolster the contention that the FBI and DOD deliberately coordinated a two-step process to undermine *Miranda*, the voluminous record now before the Court contains no indication of any such coordination. And, again, Defendant offers no non-speculative reasons to think that the Government has withheld any evidence of direct coordination between the intelligence and law enforcement teams, which the Government would have held a duty to disclose under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). Finally, even assuming that the DOD and FBI deliberately coordinated to undermine *Miranda*—a contention which finds no support in the record—it is clear that the FBI interviewers took ample curative measures to render the *Miranda* warnings effective and Defendant's post-warning statements admissible. Accordingly, the three requested categories of information simply could not "alter the quantum of proof" in Defendant's favor, and the outstanding portions of the Motion to Compel must therefore be denied.

## VI.

For reasons stated in this Memorandum Opinion, Defendant's Motion to Suppress, as well as the remaining portions of Defendant's Motion to Compel, must be denied. Additionally, the Government's Motion in *Limine* to establish the admissibility of Defendant's false identifying statements must be granted. An appropriate Order will issue separately.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, VA
January 4, 2022

/s/

T. S. Ellis, III
United States District Judge