IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:20-CR-239 |
| v. | ) | |
| | ) | |
| ELSHAFEE ELSHEIKH, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MEMORANDUM RE**
**ADMISSIBILITY OF OUT-OF-COURT STATEMENTS**

**INTRODUCTION**

As the Court knows, the government has alleged that, as a member of foreign terrorist organization the Islamic State of Iraq and al-Sham (ISIS), defendant conspired with other ISIS members to take as hostages and then murder multiple citizens of the United States and other countries, including the United Kingdom. The government has further alleged that these offenses resulted in the deaths of U.S. citizens James Wright Foley, Kayla Jean Mueller, Steven Joel Sotloff, and Peter Edward Kassig.

At trial, the government intends to call some of the hostages held by this ISIS conspiracy but ultimately released. These former hostages will testify that they were held in the same locations and came to know the circumstances of their fellow captives' abductions and detention, as well as mistreatment, pain and injury they suffered at the hands of their captors. They will further testify that the hostages were required to make video- or audio-recorded statements and answer questions to provide proof-of-life, as their captors attempted to negotiate ransoms. Moreover, the hostages learned information about their captors' backgrounds from the captors themselves and their fellow hostages. Later in their captivity, some hostages were required to write letters that were carried out

by released hostages. Some hostages also surreptitiously wrote letters to their families that were smuggled out. ISIS as an organization also published statements about the hostages through its media bureau.

Through these former hostage witnesses, the government will seek to introduce various types of out-of-court statements made by deceased or missing hostages about the circumstances of their capture and detention, their treatment, and the identity of their captors or that were made in response to the hostage-takers' demands for proof-of-life or communications to strengthen the ransom demands. The government will also seek to introduce numerous statements by ISIS members in both publicly disseminated media and statements made to the hostages and their families, including ransom demands. Moreover, the government will seek to introduce the communications and public statements of the hostages' families to ISIS regarding their children's captivity. Because the purpose and use of these statements are factually diverse, the government believes the Court can rule on the admissibility of individual statements at trial as the government seeks to introduce them. However, to preview the issues for the Court and to provide necessary background for the Court's trial determinations, the government submits this memorandum addressing the types of statements it will seek to introduce and the various bases for admissibility it intends to invoke.

## OUT-OF-COURT STATEMENTS

The government will not attempt to list every out-of-court statement here but respectfully notes that it intends to introduce statements falling within the following general categories: (1) statements by the hostages to their fellow captives about the circumstances of their own abductions and captivity, their physical and mental state, including descriptions of pain and injury, and statements concerning observations about the individuals holding them whom the hostages dubbed "the Beatles," or background information the hostages learned about the Beatles; (2) video and audio

2

recordings of the hostages that were sent to the hostages' families as proof of life; (3) responses the hostages made to demands by the Beatles for information relating to the ransom negotiations such as email addresses, contact details, and answers to proof-of-life questions, and (4) letters written by the hostages while in captivity.

The government also intends to introduce statements published by ISIS through its media operation. In videos and online magazine publications, ISIS not only admitted the offenses committed by members of the conspiracy but also aggressively publicized them. By publicizing the murder of hostages, these statements furthered the hostage-taking scheme by communicating threats to kill, injure, or continue detaining hostages to induce the United States to take action or abstain from action. In addition, this propaganda served to incite others to violence, and ISIS glorified and justified its actions through this sophisticated media operation. Lastly, because conspiring to provide material support or resources to a designated foreign terrorist organization requires the government to prove the defendant's knowledge, ISIS's brazen and open publication of its terrorist activity permits the jury to infer that an ISIS member like Elsheikh knew exactly the sort of conduct in which the organization engaged.

## ARGUMENT

**I.     These statements do not implicate the Confrontation Clause.**

The Sixth Amendment prohibits the introduction of testimonial statements by a non-testifying witness to prove the matter asserted in the statement, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 51, 54 (2004); *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010). Statements are testimonial when the circumstances objectively indicate the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *See Ohio v. Clark*, 576 U.S. 237, 244 (2015) (holding that statements of child abuse victim to teacher were

non-testimonial). Factors such as the presence of an ongoing emergency or informality of a situation or questioning tend to reduce the likelihood that the primary purpose is to procure testimonial statements, and statements made to non-law enforcement are much less likely to be considered testimonial than statements to police. *See id*. at 245–46; *see also, e.g.*, *United States v. Mathis*, 932 F.3d 242, 255–56 (4th Cir. 2019) (holding that co-conspirator statements in furtherance of a conspiracy were non-testimonial because not intended for use at trial); *United States v. Cabrera-Beltran*, 660 F.3d 742, 752 (4th Cir. 2011) (holding that records generated by a business for purposes unrelated to trial preparation are non-testimonial); *United States v. Jordan*, 509 F.3d 191, 201 (4th Cir. 2007) (holding that statements to friends or acquaintances were non-testimonial when no made in anticipation of use at trial). When no primary purpose to produce testimonial statements exists, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Clark*, 576 U.S. at 245 (quoting *Michigan v. Bryant*, 562 U.S. 344, 359 (2011)). None of the statements the government intends to introduce here were made for the primary purpose and in the context of creating an out-of-court record to prove facts relevant to criminal prosecution. Accordingly, their admissibility is governed solely by the Federal Rules of Evidence.

II. **Many of the statements are not being offered for their truth and are therefore not hearsay.**

A statement is only hearsay if "a party offers [it] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2).[1] Examples of permissible purposes for a statement that render it non-hearsay include: (1) to explain why an individual took a particular action

---

[1] Relatedly, testimony by a witness "that convey direct observations of the physical appearance and actions of another person are not hearsay at all, but rather direct evidence of the facts in question." *Ross v. St. Augustine's College*, 103 F.3d 338, 342 (4th Cir. 1996).

4

or to show its effect on subsequent actions, *see United States v. Davis*, 918 F.3d 397, 401 (4th Cir. 2019); (2) to show the basis for a witness's belief in a particular fact, *see United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014); (3) to show the defendant's knowledge of a particular fact proved through other evidence, *see United States v. Rafiekian*, 991 F.3d 529, 550 (4th Cir. 2021); *United States v. Safari*, 894 F.2d 891, 894 (4th Cir. 1988); (4) to prove the simple fact that the words were spoken at all, *see United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010); (5) to demonstrate that a person held a belief at a particular time, *see United States v. Ibisevic*, 675 F.3d 349 (4th Cir. 2012); or (6) to provide context to other admissible statements so that the jury can understand their import and judge their weight, *see United States v. Leake*, 642 F.2d 715, 720 n.6 (4th Cir. 1981). Questions are often non-hearsay unless they are highly accusatory and function as a statement of a factual matter. *See, e.g.*, *United States v. Williams*, 445 F.3d 724, 735–36 (4th Cir. 2006).

The government will elicit evidence that the defendant and his co-conspirators demanded email addresses, contact details for family members, and answers to proof-of-life questions from the hostages. The government is not offering the responses from the hostages for their truth but rather to show that they were made in the first place and to provide context and explanation for the subsequent ransom demands that were sent to the families through that contact information. These statements are evidence that the defendant and his co-conspirators played a central role in the hostage-taking scheme and were responsible for collecting information to generate ransom demands. For example, when an anticipated government witness named Omar was imprisoned in "the Dungeon," Omar heard the Western hostages giving personal details and email addresses to the British-accented guards. The government intends to offer these statements as proof of the defendant's role in the ransom negotiations and also to corroborate the statements of the hostages.

Likewise, the government intends to offer the ransom demands contained in the video and audio recordings and letters sent to the hostages' families as well as the families' responses in private emails, videos, and public statements. These statements serve a number of relevant evidentiary purposes but are not being introduced to prove the matters asserted in them. First, the ransom demands are direct proof of a central element of the hostage-taking offenses, which require that threats be made in order to coerce a third party to take an action or refrain from acting (*see* 18 U.S.C. § 1203(a)); they therefore may be introduced solely to prove the fact that they were made at all. *See Ayala*, 601 F.3d at 272.[2] Second, because the government will introduce evidence showing that it was defendant who took the hostages' contact information and was involved in the sending of the ransom demands, the content of the demands and the families' responses show that the defendant knew the extent and purpose of the hostage-taking scheme and intended to further it. Additionally, the ransom demands and the responses are admissible to show their effect on the individuals who received them and the basis for subsequent actions, including further ransom demands or other actions by the co-conspirators.

### III. Because the hostage-takers intended to silence hostages they killed, statements by the deceased hostages are admissible on forfeiture-by-wrongdoing grounds.

Even otherwise testimonial hearsay statements by an unavailable witness are admissible against a party who wrongfully caused, or acquiesced in wrongfully causing, a witness's unavailability. *See* Fed. R. Evid. 804(b)(6). The deceased hostages are clearly unavailable (*see* Fed. R.

---

[2] Moreover, in certain cases, the hostages repeated statements that had been drafted for them by the hostage-takers for communication to their families. In those instances, the statements are admissions by a party-opponent, whether by theories of agency, adoption, or co-conspirator statements. *See, e.g.*, Fed. R. Evid. 801(d)(2). For example, a compelled statement by a hostage is undoubtedly "made by a person whom [the hostage-takers] authorized to make a statement on the subject." Fed. R. Evid. 801(d)(2)(C).

Evid. 804(a)(4)), and the government will adduce evidence that one of the purposes for killing hostages was to prevent them from identifying or otherwise incriminating members of the ISIS hostage cell.

The Supreme Court has "made clear that a defendant's confrontation rights are subject to the forfeiture-by-wrongdoing exception, a common law doctrine that allows the introduction of unconfronted testimonial statements 'where the defendant ha[s] engaged in wrongful conduct designed to prevent a witness's testimony.'" *United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) (citing *Giles v. California*, 554 U.S. 353, 366 (2008)). "Such 'wrongful conduct' includes but is not limited to murdering a witness." *Id*. The exception is based on the maxim that no one should be permitted to take advantage of his wrongful conduct. *Id*. at 268. The Supreme Court has emphasized that the "Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts." *Id*. (citing *Giles*, 554 U.S. at 359). In other words, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006).

Silencing a witness need not be the defendant's sole motivation for the exception to apply. *See Jackson*, 706 F.3d at 267. The Fourth Circuit has stated that "eroding the forfeiture-by-wrongdoing exception" with a restrictive sole-intent requirement risks giving defendants an "intolerable incentive" to "bribe, intimidate, or even kill witnesses against them." *Id*. at 269. It would also provide a disincentive for witnesses to come forward and testify. *Id*. The Fourth Circuit's decision to apply the forfeiture-by-wrongdoing exception even when a defendant has multiple motivations for harming a witness is in accord with other circuits. *See id*.; *United States v. Martinez*, 476 F.3d 961, 966 (D.C. Cir. 2007) (reasonable to conclude anyone who murders informant intends to exact revenge and prevent informant from testifying); *United States v. Houlihan*, 92 F.3d 1271, 1279

7

(1st Cir. 1996) (sufficient to show defendant was motivated in part by desire to silence the witness).

Rule 804(b)(6) also applies where a defendant's co-conspirators have procured the unavailability of a witness. *See United States v. Dinkins*, 691 F.3d 358, 384-85 (4th Cir. 2012). As explained by the Fourth Circuit in *Dinkins*,

> The principles of conspiratorial liability articulated in *Pinkerton* provide that a person is liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy. Thus, *Pinkerton* liability encompasses a person who, while not directly committing an offense, has participated in a conspiracy that leads a confederate to engage in that conduct. The principle underlying the Pinkerton doctrine is that conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency. The language of Rule 804(b)(6) supports the application of *Pinkerton* principles of conspiratorial liability in the forfeiture-by-wrongdoing context, by requiring that the defendant either have wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability. The term acquiesce, within the meaning of Rule 804(b)(6), encompasses wrongdoing that, while not directly caused by a defendant coconspirator, is nevertheless attributable to that defendant because he accepted or tacitly approved the wrongdoing.

*Id*. at 384 (citations and internal quotation marks omitted).

Before applying the forfeiture-by-wrongdoing exception, a trial court must find, by a preponderance of the evidence, that "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *Dinkins*, 691 F.3d at 383 (quoting *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005)). The purpose of the forfeiture-by-wrongdoing exception is to prevent "abhorrent behavior which strikes at the heart of the system of justice itself." *Id*. (quoting Fed. R. Evid. 804(b)(6) advisory committee note). To effectuate this purpose, federal courts have broadly construed the elements of the forfeiture-by-wrongdoing exception. *Dinkins*, 691 F.3d at 383 (citation omitted).

Rule 804(b)(6) applies here. The defendant was a member of a hostage captor network that abducted numerous people and killed several of them. The deaths of James Foley, Steven Sotloff, David Haines, Alan Henning, and Peter Kassig were publicized by ISIS in videos and publications released online. Although ISIS clearly utilized these murders for their own propaganda purposes, it is also clear that these murders served the purpose of silencing these victims and preventing them from providing any information about their captors. As the government will demonstrate at trial, the captor network went to great lengths to maintain secrecy. For example, the government will elicit testimony demonstrating that family members who received ransom demands were warned not to go to the media. The hostages were beaten after the first hostage was released and told if any released hostage "went public," the remaining hostages would be tortured. The government will also introduce evidence demonstrating that the defendant and his co-conspirators murdered a Russian hostage and showed a picture of his corpse to the remaining hostages as a warning not "to go public."

The defendant and his co-conspirators also went to great effort to conceal their identities, including wearing masks, making the hostages face the wall when the Beatles entered their cell, and assaulting hostages who attempted to look at their faces. The defendant and co-defendant Kotey also lied about their identities when they were captured by Syrian Democratic Forces in January 2018. The defendant knew he was a member of a terrorist organization that sought to protect itself through secrecy and administered harsh measures to maintain that secrecy. The defendant also knew, as demonstrated by the death of the Russian hostage and the threats he and his co-conspirators made, that torture and death were promised results if released hostages "went public." It was foreseeable that the remaining hostages would be killed in part to prevent them from sharing information about the captor network.

Furthermore, Kayla Mueller's death was not published in an ISIS propaganda video, and it cannot be argued that Mueller was killed for the propaganda purposes of that organization. Mueller's death served the purpose of silencing her and preventing her from sharing information after she had been held captive for a time by the defendant and his co-conspirators, and then later in the residences of ISIS leadership. As a result, any hearsay statements by hostages killed by defendant and his co-conspirators are admissible under the forfeiture-by-wrongdoing exception.

**IV.  Some statements are admissible as present sense impressions, excited utterances, or as statements of mental, physical, or emotional conditions.**

Other exceptions to the prohibition on hearsay include: (1) present sense impressions, in which a declarant makes a statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it" (Fed. R. Evid. 803(1)); (2) excited utterances, in which a declarant "relat[es] a startling event or condition, made while the declarant was under the stress of excitement that it caused" (Fed. R. Evid. 803(2)); and (3) statements of state of mind or physical or mental condition, in which a declarant contemporaneously describes their "then-existing state of mind" or "emotional, sensory, or physical condition" (Fed. R. Evid. 803(3)). Even if hearsay, many of the governments' proffered statements will be admissible on these bases. The government provides some general examples below.

**A.  Present Sense Impressions**

The government will introduce statements by some hostages to others regarding the circumstances of their detention by the hostage-takers, including descriptions of their captors, the conditions in which they were being held, or specific events that happened during their detention. The government will adduce testimony that the hostages shared information they learned about their captors or events they experienced separately from the others as they learned or experienced them. These statements describing things the hostages had contemporaneously seen or experienced

fall squarely within this exception. Similarly, statements by the hostages in proof-of-life videos or other ransom communications with their families about the circumstances of their detention are admissible as present sense impressions. For example, the Fourth Circuit has upheld statements made by a defendant's mother to police officers arriving at her home describing her son's threats to the family and that he had a gun. *See United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997). The underlying theory of Rule 803(1) is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation. Rule 803 advisory committee note. Here, the hostages' contemporaneous statements to co-hostages about their circumstances or captors are admissible to prove those circumstances or facts.

   B.   **Excited Utterances**

Similarly, the rules permit admission of hearsay statements about a startling event or condition when made under the stress of that circumstance. *See* Fed. R. Evid. 803(2). To qualify under the excited utterance exception: (1) the declarant must have experienced a startling event or condition; (2) the declarant must have related the statement while under the stress or excitement of that event or condition, not from reflection; and (3) the statement or utterance must have related to the startling event or condition. *See United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007) (approving admission of out-of-court statements of sexual assault victim) (citation and quotation marks omitted). Like the present sense impression, the Fourth Circuit has noted that the justification for this exception is based on the assumption that an excited declarant will not have had time to reflect on events to fabricate, and errors in memory will have had less time to accumulate. *Id*. (citation and quotation marks omitted). The Fourth Circuit has also held that courts should consider a number of factors in determining whether a statement is made while "under the stress" of the event. *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988); *accord Jennings*, 496 F.3d at 349.

11

Particularly where there are other indicia of trustworthiness, including lack of motives to lie, the demeanor of the individual when making the statement, or extrinsic evidence, the Fourth Circuit recognized that the excited utterance exception could apply even where there is some delay between the event and the statement. *See Morgan*, 846 F.2d at 947–48.

The government will introduce evidence about the conditions and events to which the hostages were subjected, including threats of physical harm and death, actual assaults, and compelled activities designed to threaten or intimidate them. The circumstances of these statements weigh heavily in favor of their trustworthiness and reliability. For example, statements by the hostages to other hostages about the circumstances of their capture or detention—while still in that state of fear and captivity—are undoubtedly still made while under the stress of their seizure and detention. Hostages have no motive to lie to each other under such circumstances, and the hostage-witnesses can corroborate certain elements of these statements. In such cases, the Court may make a fact-specific determination that a particular statement by a hostage was made under the stress of a startling event or condition and admit the statement for its truth.

    **C.**    **State of Mind or Physical and Mental Conditions**

Contemporaneous statements about an individual's then-current state of mind, including their motives, plans, and intention, as well as their physical, mental, or emotional condition are all admissible for their truth. *See* Fed. R. Evid. 803(3). The Fourth Circuit has noted that the exception covers statements by an individual about her feelings and mental or emotional state, her fears or her reactions to specific events, and what she believed about a particular circumstance. *See, e.g.*, *Ross v. St. Augustine's College*, 103 F.3d 338, 342–43 (4th Cir. 1996); *see also Williams*, 445 F.3d at 736 n.5. Accordingly, statements by the hostages to other hostages, or in their proof of life videos, about their current conditions, fears, beliefs, or other physical, mental, or emotional

conditions are admissible to prove those beliefs or conditions. Similarly, statements by the hostages' families about their fears or beliefs about their children's captivity would also be admissible to prove those states of mind or mental, emotional, or physical conditions.

V. **Statements by the ISIS media bureau are non-hearsay admissions by a party opponent under the co-conspirator exception.**

The standard for admission of a co-conspirator statement is clear in this Circuit: a statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" and is offered against the party. *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (citing Fed. R. Evid. 801(d)(2)(E)). In order to admit a statement under Rule 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist; (ii) the declarant and the defendant were members of the conspiracy; and (iii) the statement was made in the course of, and in furtherance, of the conspiracy. *Id.* (citation omitted). Idle conversation that touches on, but does not further, the purposes of the conspiracy does not constitute a statement in furtherance of a conspiracy. *Id.* (citation omitted). A statement by a co-conspirator is made "in furtherance" of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect. *Id.* (citation omitted). The district court is not required to make an explicit finding that a conspiracy exists before admitting co-conspirator statements. *Id.*

The government has alleged the defendant joined a conspiracy to promote the growth and profile of a terrorist organization (*i.e.*, ISIS) through criminal acts and violence. To that end, the defendant and his co-conspirators kidnapped, tortured, and unlawfully detained numerous individuals to acquire ransom money for ISIS, and to assert demands and pressure on the United States and other governments to cease military action in the Middle East and release certain prisoners. The murders of five of these hostages were used by ISIS in its propaganda and distributed widely online by means of carefully edited videos and magazine articles. ISIS's public statements about

13

the deaths of the hostages were in furtherance of the common goal of promoting ISIS's ideology, raising ISIS's public profile, attracting additional recruits and resources. In addition, any statements that the captors said directly to the hostages would also fall within this exception.

### VI. In appropriate cases, this Court may admit some of these statements under the residual hearsay exception.

An out-of-court statement may be admitted, even if other hearsay exceptions do not apply, under the following circumstances: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. Fed. R. Evid. 807(a); *accord Burgess v. Goldstein*, 997 F.3d 541, 560 (4th Cir. 2021).[3] As with any hearsay statement offered under an exception, the court's threshold finding that admissibility requirements are met merely means that the jury may consider the statement and not that it must assume the statement to be true. Rule 807 advisory committee note to 2019 Amendments. In evaluating whether to apply the residual hearsay exception, this Court may consider whether statements are a "near miss" for one of the other exceptions, which along with other indicia of reliability and trustworthiness may weigh in favor of admissibility. *See, e.g.*, *United States v. Clarke*, 2 F.3d 81, 83–85 (4th Cir. 1993). The most important requirement of Rule 807 "is that the district court properly determine that equivalent circumstantial guarantees of trustworthiness are present." *United States v. Dunford*, 148 F.3d 385, 393 (4th Cir. 1998).

---

[3] Rule 807(b) also requires the proponent of the statement to provide the opposing party with reasonable notice of the intent to offer it. The government provided notice of statements it may seek to introduce under the residual hearsay exception in a letter to defense counsel on December 22, 2021.

To cite just one example, the government intends to introduce a portion of a video-taped speech given by Kayla Mueller to the Kiwanis Club in May 2013.[4] Several circumstances illustrate Mueller's Kiwanis club speech is sufficiently trustworthy to be considered by the jury. The speech was videotaped, and the accuracy of the recording can be verified by Mueller's parents, who were in attendance. Mueller was invited to give the speech when she returned to the United States for a visit in May 2013 and was asked to speak about her humanitarian work, particularly her work with Syrian refugees. Mueller was expressing her own interest in and concern about conditions in Syria and had no motivation to fabricate her statements. *See United States v. Cunningham*, 761 F. App'x 203 (4th Cir. 2019) (circumstances of trustworthiness considered by district court included declarant's lack of motivation to lie). The speech is also strongly corroborated by other evidence. Mueller's brief description of her prior humanitarian work is corroborated by her own resume, and also by family members familiar with her employment background. Mueller's then-current employment with Support to Life in Turkey can also be corroborated by her family members and other government witnesses.

The Kiwanis club speech is the most probative evidence available to the government concerning Mueller's humanitarian work and the background that led her into Syria on August 3, 2013. The government does not intend to introduce the entire thirty-six-minute speech; the government only seeks to play the first seven minutes, where Mueller explains her interest in Syria and decision to work for a non-profit organization in Turkey. The government is unable to call Mueller as a witness to testify about her long-term interest in Syria and her desire to travel

---

[4] This speech is perhaps most readily recognizable as a statement about Kayla Mueller's then-existing state of mind regarding her plans to travel to Syria and the reasons behind them. However, if the Court were to disagree, the government maintains that this evidence also meets the requirements of Rule 807 as described here.

15

into that country to help Syrian refugees. The video-taped speech provides an explanation from Mueller herself about how she came to be present in Aleppo in August 2013 and is therefore the best evidence available to the government.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:          /s/
Raj Parekh, First Assistant U.S. Attorney
Dennis Fitzpatrick
John T. Gibbs
Aidan Taft Grano-Mickelsen
Assistant United States Attorneys
Alicia Cook
Department of Justice Trial Attorney

## CERTIFICATE OF SERVICE

      I hereby certify that on March 1, 2022, I electronically filed this motion with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case.

      By:       /s/
          Aidan Taft Grano-Mickelsen
          Assistant United States Attorney
          U.S. Attorney's Office for the
          Eastern District of Virginia
          2100 Jamieson Avenue
          Alexandria, VA 22314
          T: 703-299-3700
          Email: aidan.grano-mickelsen@usdoj.gov