**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20CR239-2 |
| v. | Honorable T.S. Ellis, III |
| EL SHAFEE ELSHEIKH,<br>*Defendant*. | Trial: March 29, 2022 |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MEMORANDUM
CONCERNING THE ADMISSIBILITY OF OUT-OF-COURT STATEMENTS**

El Shafee Elsheikh, by counsel, submits this response to the government's Memorandum

concerning the admissibility of certain out-of-court statements purportedly made by deceased or

missing hostages. No such statements have as yet been identified by the government. *See* Dkt.

218. In support thereof, Mr. Elsheikh states as follows:

**DISCUSSION**

The government's memorandum indicates that at trial it will seek to introduce the

following "general categories" of out-of-court statements: " (1) statements by the hostages to

their fellow captives about the circumstances of their own abductions and captivity, their

physical and mental state, including descriptions of pain and injury, and statements concerning

observations about the individuals holding them whom the hostages dubbed "the Beatles," or

background information the hostages learned about the Beatles; (2) video and audio recordings

of the hostages that were sent to the hostages' families as proof of life; (3) responses the hostages

made to demands by the Beatles for information relating to the ransom negotiations such as

email addresses, contact details, and answers to proof-of-life questions, [] (4) letters written by

the hostages while in captivity, [and (5)] statements published by ISIS through its media

organization." Dkt. 218, 2-3.

1

The government maintains that it is premature to attempt to identify every out-of-court statement it intends to introduce at trial, and its' memorandum only specifically identifies two such statements. *Id*. at 5, 15.  Given the general nature of the government's memorandum, Elsheikh will attempt to address the government's arguments in similarly general terms.

I.        **The Confrontation Clause**

The Supreme Court has repeatedly stressed, "[t]he Sixth Amendment's Confrontation Clause confers upon the accused, in all criminal prosecutions, the right to be confronted with the witnesses against him[,]" *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and "the text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Id*. at 662 (internal citations omitted).  Accordingly, providing that the accused has right to confront and cross-examine witnesses against him, the Confrontation Clause applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under the law of evidence.  See *Crawford v. Washington*, 541 U.S. 36, 50-51 (2004).

Admittedly, not all hearsay implicates the "Sixth Amendment's core concerns[;]" only those out of court statements which carry the hallmarks of " bear[ing] testimony" concern the Sixth Amendment's confrontation clause. *Crawford*, 541 U.S. at 51.  In attempting to define the parameters of "testimonial" statements, the Supreme Court has held:

> "Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; *"statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"* These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it."

*Id*. at 51–52 (internal citations omitted) (emphasis added).

In more recent cases, the Supreme Court has attempted to further explain what it means for a statement to be "testimonial."  In *Davis v. Washington*, the Court announced what has become known as the "primary purpose" test: "[statements] are testimonial when the circumstances objectively indicate that there is no [] ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  547 U.S. 813, 822 (2006); *Michigan v. Bryant*, 562 U.S. 344, 359 (2011) ("[w]here no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.").

In *Ohio v. Clark*, the Supreme Court recently grappled with the question of whether statements to persons other than law enforcement officers or governmental officials are subject to the Confrontation Clause.  *Ohio v. Clark*, 576 U.S. 237 (2015).  In *Clark*, a preschool teacher noticed facial injuries on one of her three-year-old students.  *Id*. at 240.  When the teacher asked about the injuries, the student indicated that his mother's boyfriend caused them.  *Id*. The teacher forwarded her concerns to a child abuse hotline which resulted in the arrest of the defendant for child abuse.  *Id*. 241.  At trial, the district court ruled that the three-year-old child was incompetent to testify and refused to exclude the child's out-of-court identification of the defendant as his abuser. The defendant was eventually found guilty at trial.  *Id*. 242.  The Supreme Court was confronted with a "question [that it had] repeatedly reserved: whether statements to persons other than law enforcement officers are subject to the Confrontation Clause."  *Id*. at 246.

The Court held as a general matter that "[b]ecause at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns, we decline

to adopt a categorical rule excluding them from the Sixth Amendment's reach." *Clark*, 576 U.S. at 246. The Court then examined the primary purpose of the exchange between the child and his teacher. *Id*. at 246 ("considering all the relevant circumstances here, [the child]'s statements clearly were not made with the primary purpose of creating evidence for [defendant]'s prosecution"). Critically important however, the Court based its' "primary purpose" analysis on a host of factors that considered the context and circumstances of both the speaker and his surroundings:

> "There is no indication that the primary purpose of the conversation was to gather evidence for [defendant's] prosecution. On the contrary, it is clear that the first objective was to protect [the child]. At no point did the teachers inform [child] that his answers would be used to arrest or punish his abuser. [The child] never hinted that he intended his statements to be used by the police or prosecutors. And the conversation between [child] and his teachers was informal and spontaneous. The teachers asked [child] about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse… [The child]'s age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system."

*Id*. at 247-48.

While it may be the case that many of the former hostages' hearsay statements were not made with the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution, it is impossible for this Court to perform its' vital gatekeeping function without knowledge of the statements themselves and the circumstances under which they were made. See *Davis,* 547 U.S. 813, 822 (2006).

As such, until the government identifies the hearsay statements of the deceased hostages that it proposes to introduce, such statements must be excluded at trial.

### A.  Forfeiture-by-wrongdoing—Rule 804(b)(6)

It is also the case that a criminal defendant's confrontation rights are subject to the

forfeiture-by-wrongdoing exception, "a common law doctrine that allows the introduction of

unconfronted testimonial statements 'where the defendant ha[s] engaged in wrongful conduct

*designed* to prevent a witness's testimony.'"  *United States v. Jackson*, 706 F.3d 264, 267 (4th

Cir. 2013) (citing *Giles v. California*, 554 U.S. 353, 366 (2008)) (emphasis added).  However,

"in order for the exception to apply, *the desire to keep the witness from testifying must be a*

*reason* for procuring the unavailability of the declarant, but not necessarily the only motivation."

*United States v. Adoma*, 781 Fed. Appx. 199, 204 (4th Cir. 2019) (emphasis added); *United*

*States v. Becker*, 81 M.J. 483, 489 (C.A.A.F. 2021) (requiring that "the party caused the witness's

unavailability with the intent to make that witness unavailable, i.e., that the accused intended

their conduct to prevent the witness from testifying against them in court"); *United States v.*

*Gray*, 405 F.3d 227, 241 (4th Cir. 2005) (before such evidence is permitted to come before a

jury, the district court must find, by the preponderance of the evidence, that the exception

applies.)[1]

None of the hostage killings was designed to prevent a witness's testimony.  As the

government readily admits, ISIS used the murders of the various hostages for their own

propaganda purposes.  Indeed, it is expected that the government will attempt to introduce ISIS

publications and other "official" ISIS media material that not only boasted about, but justified

the murders of the various hostages.  Indeed, in the hostage execution film of ███████, the

---

[1] Regardless of whether the former hostages' out-of-court statements are testimonial, Fed. R. Evid. 804(b)(6) provides an independent basis for the admission of such statements. Accordingly, the Court must make an independent ruling on their admissibility under Fed. R. Evid. 804(b)(6).

fighter depicted carrying out the execution first gives a long preamble condemning U.S. airstrikes in Syria and claiming that the United States is not fighting an extremist insurgency, but rather:



The ▮▮▮ video concludes with the same fighter holding ▮▮▮▮ on the ground and stating, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"—a far cry from preventing a witness's testimony.

▮▮▮'s death was also publicized in ▮▮▮▮▮▮▮▮ used by ISIS for Islamic radicalization and recruitment, also not a tool to prevent witness testimony. In that publication, ISIS editors railed about the U.S. military's intervention in Iraq and the fact that the U.S. government had "arrogantly" ignored its ransom demands for ▮▮'s release.

All the hostage execution videos released by ISIS follow the same pattern and were used for the same purpose: an ISIS fighter standing next to his victim giving a speech directed at victim's home country, followed by that victim's execution, and a threat to a separate hostage and his home county. While the ▮▮▮▮▮▮▮▮▮▮▮

The government argues that the statements are admissible because the former hostages were killed to prevent them from "going public," and to ensure their continued silence. See Dkt. 218, pp. 6-9. This argument does not withstand scrutiny. First, telling freed hostages and family members of deceased hostages not to go public or speak to the media upon their release bears no relation to preventing witness testimony at trial. In an email communication with the alleged



hostage takers, ▮▮▮▮▮▮▮▮▮▮▮▮ were told ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮." The alleged hostage specifically linked their demand to "keep silent" to achieving their objective—the payment of ransom monies: "▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Separately, the family of ▮▮▮▮▮ was told by ▮▮▮▮▮ alleged captors that: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮.'"

As evident from the ransom demands the government intends to introduce at trial, and the numerous released hostages expected to testify, the captors were simply interested in the payment of monies for the furtherment of their cause. As horrific as these murders were, ISIS did not perpetrate these crimes with an eye towards preventing witnesses from testifying at a criminal trial in the United States. Rather, these crimes were committed to further ISIS's battlefield and propaganda objectives. Simply put, if the hostages' captors were at all interested in ensuring that no witness would be available to testify against them later at trial, they would have never released a single hostage who could later testify—as they plan to do here.

Moreover, the facts in, *United States v. Jackson* 706 F.3d 264 (4th Cir. 2013), the principal case on which the government relies, are markedly different from the facts in this case. In *Jackson,* the defendant—who was on trial for murder and various other offenses—argued that the introduction of incriminating statements made by the murder victim was error because the statements did not fall within the forfeiture-by-wrongdoing exception to the Confrontation Clause. *Id*. at 265. In its pre-trial motion seeking to admit the murder victim's statement, the

7

government claimed that the defendant had "waived his right to confront any of [the victim]'s out-of-court statements by killing [the victim] with the intent, at least in part, of securing his unavailability as a witness." *Id.* at 266.  In granting the government's motion, the district court found that "that [defendant]'s desire to silence [victim] was a 'precipitating' and 'substantial reason' for the murder and concluded that any other motives for killing [victim] did not preclude application of the forfeiture-by-wrongdoing exception." *Id.* at 266–67.

In upholding the district court's decision, the Fourth Circuit held that there was "*ample*" support in the record to justify the district court's conclusion that preventing the victim from testify was a "precipitating" and "substantial" reason why the defendant partook in the murder. *Id.* at 269.  Specifically, the Fourth Circuit cited the fact that (1) the defendant "told others that [the victim] 'was an informant trying to bring down [defendant] and his brothers' and that [the victim] 'deserved' to be killed," and (2) the victim's murder occurred within a short time after defendant learned that the victim was released from jail as an apparent reward for his cooperation, as "ample" basis for the district court's ruling.  *Id.*

There is simply no evidence in the current record establishing that a purpose of the hostages' murders was to prevent them from later testifying in a criminal trial.  See *United States v. Becker*, 81 M.J. 483, 486–87 (C.A.A.F. 2021) (noting that the Supreme Court under *Giles v. California*, 554 U.S. 353, 366 (2008) requires the district court conduct a *subjective inquiry*, not objective inquiry, into the intent of the party who wrongfully caused the unavailability) (emphasis added); see also *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012).  As such, these statements must be excluded as evidence at trial.

## II.      Exceptions to the Rule Against Hearsay

The government has loosely claimed that "some statements [of the unreleased hostages] are admissible as present sense impressions, excited utterances, or as statements of mental, physical, or emotional conditions." Dkt. 218, p. 10.  Without knowing the specific statements that the government seeks to introduce and the circumstances under which each of the statements was made, the Court and Mr. Elsheikh are left to speculate regarding the applicability of the aforementioned hearsay exceptions.  To the extent possible, each exception will be generally addressed in-turn.

### A.  Present Sense Impression—Rule 803(1)

The government argues that statements "by some hostages to other regarding the circumstances of their detentions by the hostage-takers, including descriptions of their captors, the conditions in which they were being held, [and] specific events that happened during their detention," (Dkt. 218, p. 10) are admissible under Fed. R. Evid. 803(1)—present sense impression.  A present sense impression is a statement "describing or explaining an event or condition made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).  To be admissible under this exception, the declarant "must utter the hearsay contemporaneously or substantially contemporaneously to the event." *United States v. Jones*, 742 F. App'x 710, 712 (4th Cir. 2018); *United States v. Jackson*, 124 F.3d 607, 618 (4th Cir.1997).  The crucial provision of this exception is immediacy, which operates to negate the likelihood of a deliberate or conscious misrepresentation.  See *First State Bank of Denton v. Md. Cas. Co.*, 918 F.2d 38, 41 (5th Cir.1990); Charles E. Wagner, 2 Federal Rules of Evidence Case Law Commentary 589 (2001–2002 ed.).

However, at present, the government as the proponent of the proffered hearsay statements, has failed to lay an adequate foundation for the hearsay statements it intends to introduce.  For example, in describing one of his captors, released hostage ███████████, stated that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████."  ████████████, another released hostage, also recounted a conversation he had with ████████ during which he stated: "████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████"

Nothing about either of these statements suggests that it was made while ████████ was "describing or explaining an event [] while or immediately after the [he] perceived it."  See Fed. R. Evid. 803(1).  Given the host of other hearsay statements that these, and other released hostages, are expected to offer at trial, the government has come woefully short of meeting its burden under Fed. R. Evid. 803(1), and as such, the statements must be excluded.

### B. Excited Utterance—Rule 803(2)

An exited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2).  To qualify under the excited utterance exception, "(1) the declarant must have experienced a startling event or condition; (2) she must have related the statement while under the stress or excitement of that event or condition, not from reflection; and (3) the statement or utterance must have related[ed] to the startling event or condition." *United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007) (internal citations omitted).  The key to this exception is that the statement must be made contemporaneously with the excitement of the startling event.  See *United States v. Wesela*, 223

F.3d 656, 663 (7th Cir.2000); see also *United States v. Phelps*, 168 F.3d 1048, 1054 (8th

Cir.1999) (citation omitted) (holding that statements made to 911 dispatcher that someone had

been shooting at her and requesting assistance are admissible under excited utterance exception);

*Sakaria v. Trans World Airlines*, 8 F.3d 164 (4th Cir.1993) (noting the significance of

spontaneity in order to ensure trustwhiness).

The government seeks to introduce out-of-court statements by deceased hostages "about

the conditions and events to which the hostages were subjected, including threats of physical

harm and death, actual assaults and compelled activities designed to threaten or intimidate

them." Dkt. 218, p. 12. Again, the government has identified no hearsay statement it intends to

introduce as an excited utterance, nor does it attempt to lay a foundation for these statements

apart from vaguely stating that declarations made "by the hostages to other hostages about the

circumstances of their capture or detention—while still in that state of fear and captivity—are

undoubtedly still made while under the stress of their seizure and detention." *Id.*

Even a cursory examination of four short statements given by released hostages to

various law enforcement entities underscores the inadequacy of the foundation for admitting

these and similar statements::



"—Interview of ▓▓▓▓▓▓▓▓, FBI 302.

"—Interview of ▓▓▓▓▓▓▓, ▓▓▓▓▓▓, FBI 302.



"███████████████████████████████████████████."—*Interview of* ██████████, *Police*

"███████████████████████████████████████████."—*Interview of* ██████████, *FBI 302.*

Nothing about the proffered hearsay statements would permit the Court to determine whether the declarant was still under the stress or excitement of a startling event or condition, or had time to reflect on the underlying event. Fed. R. Evid. 803(2). The principal justification for admitting an "excited utterance" as an exception to the hearsay rule is based on the "assumption that an excited declarant will not have had time to reflect on events to fabricate." *Morgan v. Foretich,* 846 F.2d 941, 946 (4th Cir.1988). Indeed, the importance of the contemporaneous component of Rule 803(2) is to ensure that "errors in memory will have had less time to accumulate." *Jennings* 496 F.3d at 349.

Accordingly, on the present record, the government has failed to establish that such hearsay statement are excited utterances, admissible under Fed. R. Evid. 803(2), and as such must be excluded at trial.

### C. *State of Mind or Physical and Mental Conditions—Rule 803(3)*

A statement is admissible hearsay under the state of mind exception to the hearsay rule if it is a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed…" Fed. R.

Evid. 803(3).  To be admissible under this exception, a declaration should not look backward or

describe a declarant's past memory or belief about another's conduct.  See *United States v.*

*Carmichael*, 232 F.3d 510, 521 (6th Cir.2000) (citing *United States v. LeMaster*, 54 F.3d 1224,

1231 (6th Cir.1995)).  The statement must be limited to a declaration showing the declarant's

state of mind and not the factual occurrence engendering that state of mind.  See *United States v.*

*Joe*, 8 F.3d 1488, 1492 (10th Cir.1993) (holding that a victim's statement that she feared the

defendant is admissible under the state of mind exception, however, the reasons why the victim

feared the defendant was an inadmissible factual occurrence).

The government claims that "statements by the hostages to other hostages, or in their

proof of life videos, about their current conditions, fears, beliefs, or other physical, mental, or

emotional conditions are admissible to prove those beliefs or conditions." Dkt. 218, p. 13.

However, yet again, the government identifies no hearsay statements for the Court to evaluate

under Fed. R. Evid 803(3).

As with the examples of statements described above, the government has failed to lay a

foundation for admissibility under Rule 803(3) for statements like the following statement of

released hostage ▮▮▮▮▮▮▮▮, who is expected to testify at trial:



13

████████████████████████ ”—*Interview of* ████████████████████ *Police*
*Interview*

Rather than describing present conditions or declarant's present beliefs or state of mind,

the statement is a declaration "looking backward," describing a declarant's memories and beliefs

about past occurrences and the conditions under which certain prior treatment occurred.

A statement may also fail to meet the requirements of Fed. R. Evid 803(3) when a

declarant has time to reflect because the proffered statement may reflect the declarant's then

existing state of mind *as to a past fact* as opposed to a present existing fact. *United States v.*

*Lentz*, 282 F. Supp. 2d 399, 411, aff'd, 58 Fed. Appx. 961 (4th Cir. 2003).

"The declarant's statement of mind must [also] be relevant to some issue in the case

before such testimony can be admitted under Rule 803(3)." *United States v. Srivastava,* 411 Fed.

Appx. 671, 684 (4th Cir. 2011) (internal citations omitted). "Where state of mind itself is in

issue, the court must determine if *the declarant's state of mind* at the time of the declaration is

relevant to the declarant's state of mind at the time at issue." *United States v. Ponticelli*, 622 F.2d

985, 991 (9th Cir.1980) (emphasis added). The state of mind of the defendant, not the hostages

is the "state of mind" at issue in this case.

In this example, it is unclear who the actual declarant was, or how much time had elapsed

between the declarant's then existing state of mind and its retelling to ████████ . The same

questions can be asked of many other hearsay statements by released hostages that the

government will undoubtedly seek to introduce at trial. As the proponent of these statements, the

government has thus far failed to meet its burden to establish their admissibility under Fed. R.

Evid. 803(3), and as such must be excluded at trial.

### D. *Residual Hearsay Exception—Rule 807(a)*

The government also seeks to introduce all of the aforementioned categories of statements under the residual hearsay exception in Fed. R. Evid 807(A).  A statement is admissible hearsay under the residual exception to the hearsay rule if "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid 807 (1)-(2).  In applying Rule 807, "[c]ourts must use caution when admitting evidence under [Rule 807], for an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule." *United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1995); *United States v. Dunford*, 148 F.3d 385, 394 (4th Cir.1998). See also *In re Katzburg*, 326 B.R. 603, 605 (Bankr.D.S.C.2004) ("The legislative history for Rule 807 provides that the residual exception is to be used very rarely, and only in exceptional circumstances."); *United States v. Ealy*, No. 1:00CR00104, 2002 WL 1205035, at * 3 (W.D.Va. June 3, 2002) ("The residual hearsay exception is intended to be used rarely and only in exceptional circumstances."); *Boca Investerings P'ship v. United States*, 128 F.Supp.2d 16, 22 (D.D.C.2000) ("The residual exception to the hearsay rule is intended to be used very sparingly, and only when there exists equivalent circumstantial guarantees of trustworthiness.")

As such and given Rule 807's potential to "swallow the entirety of the hearsay rule," a reviewing court "when determining the admissibility of a [statement under Rule 807], must examine it sentence by sentence and rule upon the admissibility of each "single declaration or remark."  *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995) (internal citations omitted). Further, as the Advisory Committee Notes to Fed. R. Evid 807 make clear, "the rule provides

that the focus for trustworthiness is on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement.  The credibility of the witness relating the statement is not a part of either enquiry."  Fed. R. Evid. 807 advisory committee's notes.

Until the government establishes the requisite "indicia of reliability" of the various hearsay statements it seeks to admit, the hearsay statements of the deceased hostages must be excluded as evidence from trial.   See *Crawford v. Washington*, 541 U.S. 36 (2004) ("when a hearsay declarant is not present for cross-examination at trial, his statement is admissible only if it bears adequate 'indicia of reliability'").

### III.    Statements By The ISIS Media Bureau & Co-Conspirator Admissions Exception

Finally, the government is seeking to introduce various "statements"—videos and magazine articles—produced as propaganda by the ISIS Media Bureau—as admissions of a co-conspirator under Fed. R. Evid. 801(d)(2)(E). See Dkt. 218, pg. 13.  In order to admit a statement pursuant to 801(d)(2)(E), "the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy."  *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013).  While the government is correct that a trial court is not required to hold a separate hearing to determine whether a conspiracy exists before admitting statements under the rule, "the existence of the three prongs of admissibility for coconspirator statements [] must be supported by a preponderance of the evidence" in order for the supposed conspiratorial statements to be admitted.  *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir.1992).  The government, as the proponent of such statements, "must demonstrate the existence of the conspiracy by evidence extrinsic to the hearsay statements." *United States v.*

16

*Stroupe*, 538 F.2d 1063, 1065 (4th Cir. 1976); see also *United States v. Mitchell*, 596 F.3d 18, 23 (1st Cir. 2010) (noting that "[t]he proponent of the statement must introduce some extrinsic evidence ... sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it") (internal quotation marks omitted).

To support its' argument for admission, the government has alleged that "the defendant joined a conspiracy to promote the growth and profile of a terrorist organization (i.e. ISIS) through criminal acts and violence. To that end, the defendant and his co-conspirators kidnapped, tortured, and unlawfully detained numerous individuals to acquire ransom money for ISIS…" Dkt. 218, pg. 13.  Apart from this over-arching allegation, the government points to no extrinsic evidence that the hostage takers and the ISIS media bureau were part of a common conspiracy, no less that Mr. Elsheikh was a member of the same.  *Bourjaily v. United States*, 483 U.S. 171, 189 (1987) ("[t]he final feature of the co-conspirator hearsay exemption, the independent-evidence requirement, directly corresponds to the agency concept that an agent's statement cannot be used alone to prove the existence of the agency relationship").

Until such time as the government can establish by a preponderance of the evidence that a conspiracy existed between the ISIS media bureau and the hostage takers, and that Mr. Elsheikh was a member of that conspiracy the "statements" made by the ISIS media bureau should be excluded as evidence at trial.

## CONCLUSION

For the aforementioned reasons, the government's memorandum seeking to introduce

various out-of-court statements by deceased hostages is premature and should be denied.

Respectfully Submitted,

EL SHAFEE ELSHEIKH,
By Counsel

_____/s/_____
Nina J. Ginsberg, VSB # 19472
Zachary A. Deubler, VSB # 90669
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com
zdeubler@dimuro.com

_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
Law Offices of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com

_____/s/_____
Yancey Ellis, VSB #70970
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
yancey@carmichaellegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March 2022, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Zachary A. Deubler, Esq.

18