IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:20-CR-239-TSE-2 |
| v. | ) | |
| | ) | |
| EL SHAFEE ELSHEIKH | ) | |
| | ) | Hearing: March 18, 2022 |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION IN LIMINE TO EXCLUDE EVIDENCE**

Defendant has moved to exclude certain testimony from a government witness (pseudonymously referred to herein as Jane Doe) as well as documents seized from the ISIS members who held Kayla Mueller captive. The motion should be denied. As the Court knows, to establish the resulting-in-death element of several charged offenses and the murder conspiracy charge, the government will prove that Mueller's detention and captivity as a hostage and the charged conspiracy to provide material support to ISIS were but-for causes of her death. Jane Doe's testimony will not only lay the necessary foundation for how she came to be co-located with Mueller but will also support the government's argument that Mueller's captivity was part of a single ISIS hostage-taking conspiracy that ultimately resulted in her death, including after she was removed from the prison in which the other hostages were kept. Similarly, the documents discussing slavery recovered from the ISIS members who detained Mueller mirror statements made by defendant in his televised media interviews, which tends to prove that defendant was a member of the conspiracy that kept Mueller as a hostage and then a slave and ultimately resulted in her death.

**Background**

Mueller was a humanitarian aid worker who was abducted by ISIS in Aleppo, Syria on August 4, 2013. Mueller was held for several months in facilities where other hostages from Western countries were also detained, including United States citizens James Foley, Steven Sotloff, and Peter Kassig. Defendant and his co-conspirators extracted email addresses and personal details from the hostages to send ransom demands to and to answer proof-of-life questions from the hostages' families. In late November and December 2013, the families and associates of Foley, Sotloff, and Kassig began receiving emails that contained similar language and similar ransom demands, and that all originated from safe-mail.net accounts. In May 2014, Mueller's family also received an email from a safe-mail.net account, and subsequent emails from this account sent in June and July of 2014 contained ransom demands and language similar to the messages sent to the Foley, Sotloff, and Kassig families.

On August 3, 2014, ISIS fighters invaded Yazidi communities near Sinjar Mountain in Iraq and abducted women and girls, including Jane Doe (Doe)[1]. ISIS fighters transported Doe and several other Yazidi girls to a house in Raqqa, where Doe and eight other girls were selected by a man they came to know as "Abu Khalid." Doe later identified photographs of "Abu Khalid" as then-ISIS leader Abu Baker al-Baghdadi. Doe and the other girls were moved to al-Baghdadi's residence and locked in a room. Doe saw al-Baghdadi at the residence daily. Al-Baghdadi told the girls to study the Koran, to convert to Islam, and to forget their families because they were going

---

[1] ISIS did not hide the fact that it enslaved many of the Yazidi women and children that they abducted near Mt. Sinjar. In the fourth edition of the ISIS publication Dabiq, called "The Failed Crusade," ISIS claimed that "Yazidi women and children were then divided according to the Shariah amongst the fighters of the Islamic State who participated in the Sinjar operation." This division followed a strict protocol where 4/5 of the Yazidi women and children went to the ISIS fighters, and 1/5, known as "Khums," was transferred to the Islamic State's authority.

to be married off. Al-Baghdadi told the girls they belonged to him, and that he could sell them or give them as gifts to his friends. Al-Baghdadi made Doe and the other juveniles watch a video of a man in an orange jumpsuit who was beheaded and told the girls they would be killed if they tried to escape. Doe and the other Yazidi juveniles were not allowed to go outside the house and were forced to perform household labor. Al-Baghdadi gave Doe a ring to wear on her left hand.

In late August 2014, Doe and some of the other girls escaped from the house where they were being held. The juveniles were recaptured by ISIS and Doe was severely beaten by al-Baghdadi. Doe suffered bruises and injuries to her wrist. Doe was handcuffed and taken to a prison in Raqqa, where she was placed in a cell with Mueller. Mueller and Doe were held in the same cell for approximately one month. Mueller and Doe were able to communicate at a basic level in Arabic and became close during the time they were imprisoned together. In approximately mid-September 2014, Mueller and Doe were removed from the prison in Raqqa and taken to the residence of a senior ISIS member named Abu Sayyaf. Al-Baghdadi came to stay at Abu Sayyaf's residence and raped Mueller several times. Doe and another juvenile escaped from the Sayyaf residence in early October 2014, but Mueller remained in ISIS captivity.

Mueller's parents received emails from the safe-mail.net account in August and September of 2014. One email sent by the hostage-takers on September 19, 2014, stated Mueller's safe release was still a possibility if their demands were met. On February 7, 2015, Mueller's parents received a final email from the same safe-mail.net address claiming that Mueller had been killed in an airstrike outside of Raqqa. The email contained three photographs of Mueller's face that partially show a laceration to Mueller's right cheek. Mueller's parents did not receive any further communications from ISIS about their daughter.

In May 2015 the United States government carried out a military operation that targeted Abu Sayyaf's residence. Abu Sayyaf was killed during the operation and his wife Umm Sayyaf was captured. United States personnel recovered weapons, electronic devices, stamps, documents bearing the ISIS insignia, and handcuffs from the residence. United States personnel also found ISIS publications advocating the enslavement of non-Muslims, attached as Exhibits 1 through 4. (Translations of these documents are attached as Exhibits 1a through 4a). Exhibit 1 claims the enslavement of non-Muslims was prescribed by Allah and contains rules concerning enslaved family members, such as a prohibition on separating young children from their mothers. Exhibit 1 also proclaims that the marriages of enslaved women are annulled upon their capture, and that it is "permissible" to have sexual intercourse with enslaved women. *See* Ex. 1a, at 14. Exhibit 2 contains several justifications for enslaving non-Muslim women, including the proliferation of monotheism, humiliating non-believers, reviving historic practices, sparing women from prostitution and poverty, and increasing Muslim offspring. *See* Ex. 2a. Exhibit 3 is a prohibition on sexual intercourse with enslaved women who are or may be pregnant. *See* Ex. 3a. Exhibit 4 contains decrees on various practices, including sexual intercourse with enslaved women. *See* Ex. 4a, at 4–5.

Defendant and co-defendant Kotey were captured by the Syrian Democratic Forces (SDF) in early January 2018 while trying to escape from Syria into Turkey. Defendant and co-defendant Kotey participated in interviews with various media outlets and made several statements about their activities in ISIS and their role in the hostage-taking scheme. In April 2018, defendant told a reporter named Jenan Moussa that he did not denounce ISIS's practice of slavery and talked about Islamic jurisprudence governing slavery and the rights of slaves and slave owners. On July 19, 2019, defendant told free-lance journalist Sean Langan (Langan) that defendant personally

collected email addresses from Mueller while she was imprisoned by herself in a cold, dark room. Defendant also told Langan he gathered personal details from Mueller such as her age and postal address. In an August 2019 interview by Souad Mekhennet of the Washington Post defendant said he interacted with Mueller and other hostages at the oil facility. In answer to a question about whether he knew that Kayla Mueller was taken as a slave, he denied knowledge, but he did use the term "concubine" when answering that question.

## Argument

Defendant argues that Jane Doe's testimony about her capture, escape, and subsequent detention and the documents recovered from the ISIS members who held Mueller are both irrelevant and unfairly prejudicial. But Jane Doe's testimony is necessary foundation to explain how she came to be co-located with Mueller, and the documents are relevant to corroborate statements of the defendant in which he acknowledges and even defends the slavery in which Mueller was held as part of the charged conspiracies. Such evidence thus goes directly to defendant's knowledge and intent participating in the charged conspiracies and shows that the ISIS conspiracies to detain and kill Mueller extended from her capture through her detention at the Sayyaf house and ultimately resulted in her death.

**I.    Doe's abduction and detention by ISIS and ISIS documents found at the Sayyaf residence are relevant.**

Evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence and (2) the fact is of consequence in determining the action. *See* Fed. R. Evid. 401. Relevant evidence is admissible unless otherwise proscribed. *See* Fed. R. Evid. 402. Moreover, "[t]he threshold for relevancy is relatively low." *United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995). To be relevant, evidence need not conclusively decide the ultimate issue in the case, nor make the proposition appear more probable, but must in some degree advance

5

the inquiry. *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014) (photographs admissible in part because they aided witnesses in explaining their experiences); *see also United States v. Clifford*, 704 F.2d 86, 90 (3rd Cir. 1983); *United States v. Madera*, 574 F.2d 1320, 1322 (5th Cir. 1978). The Fourth Circuit has noted that materials such as song lyrics are relevant because a defendant's lyrics about committing certain acts tends to make it more likely that he actually engaged in the conduct. *See, e.g.*, *United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018).

Doe's testimony about her capture and early treatment by ISIS members is a necessary part of the narrative establishing how she met Mueller and came to be co-located with her; it is therefore appropriate to allow the jury to evaluate her credibility and the consistency of her testimony. Specifically, Doe will testify that she was taken by ISIS fighters and given to Abu Bakr al-Baghdadi, who mistreated her, and that mistreatment caused her to attempt an escape.[2] When she was recaptured from the escape attempt, she was taken to the Raqqa prison, where she met Mueller. Both Mueller and Doe were then taken to the house of Abu and Umm Sayyaf, high-ranking ISIS officials, where they were both subjected to brutal conditions of confinement and maltreatment. During that time, al-Baghdadi visited the Sayyaf home and sexually abused Mueller. Doe's testimony about her pre-Raqqa interactions with ISIS and al-Baghdadi therefore explains why Doe was held as a prisoner at Raqqa with Mueller and explains how Doe could recognize al-Baghdadi.

---

[2] Significantly, ISIS drew a direct connection between the plight of the Yazidi victims like Jane Doe and the murder of some of the American hostages. The video "A Message to America" both depicted the murder of James Foley and threatened the life of Steven Sotloff if its demands were not met. The video begins by showing the U.S. President, who describes the reasons that a coalition bombing campaign against ISIS had been undertaken. One such reason was a need to protect U.S. personnel and the Yazidis trapped around Mount Sinjar. At the end of that video, the masked man holding a knife condemned the U.S.-led bombing campaign, and he specifically threatened the President by saying that any aggression against the Islamic State would result in "the bloodshed of your people." Following that statement, he beheaded James Foley.

Doe's testimony is also highly probative to link the defendant himself with Mueller's detention and subsequent murder. The government will adduce evidence that while Mueller and Doe were held at Raqqa, Mueller's family received ransom demands from a specific Safe-Mail email address (tyegfwfugsu8389248@safe-mail.net). The government will also introduce admissions by the defendant in a media interview that he took contact information from Mueller to facilitate those ransom demands. The government will then introduce further evidence showing that the ransom demands continued from the same email address *after* Doe and Mueller had been relocated to the Sayyaf house, where they were held and abused by the Sayyafs and al-Baghdadi. This evidence thus demonstrates that Mueller's detention and treatment at the Sayyaf house remained part of the *same conspiracies* to detain her and to commit murder as when she had been held at Raqqa, where the defendant admitted that he facilitated portions of the conspiracy by collecting contact information from her. In this way, the evidence directly tends to support the government's theory that the defendant aided and abetted the substantive hostage-taking charges as well as personally took overt acts in furtherance of the charged conspiracies. Moreover, as the Court knows, the government has charged resulting-in-death elements to a number of conspiracy and substantive charges. Accordingly, the government must prove that Mueller's detention and the conspiracies defendant joined were a but-for cause of her death. This evidence linking Mueller's detention at Raqqa and her subsequent treatment at the Sayyaf house demonstrates that the conspiracies and substantive hostage-taking conduct was continuing without a break in intervening circumstances that might sever the causation between the charged conduct and Mueller's death.

For similar reasons, the slavery documents recovered from the Sayyaf house tend to make defendant's participation in the conspiracies to detain and murder Mueller more likely.[3] These documents bear the ISIS insignia and stamps from various ISIS departments such as the "Office of Archiving and Document Classifications" and purport to have been issued by the Islamic State Research and Fatwa Committee. Some of these documents reflect ISIS's advocacy of and justification for the enslavement and sexual abuse of non-Muslim women. Exhibit 2, for example, states that capturing non-Muslim women has many benefits and will solve problems. *See* Ex. 2a, at 4. The same page of this document justifies the enslavement of women as a method to spread monotheism and claims that slavery will remove women from a polytheistic environment into a "new wholesome environment." The document also states that jihad also advocates for capturing women, dividing them among ISIS fighters, and making the women sexually available to them. *See* Ex. 2a, at 6. Passages from Exhibits 3 and 4 also make it clear that, in ISIS's view, sexual intercourse with enslaved women and girls is "permissible." *See, e.g.*, Ex. 3a, at 3, 5; Ex. 4a, at 4–5.

These documents corroborate and explain Doe's testimony in several helpful ways. These documents are replete with the ISIS insignia and corroborate Doe's statement that she and Mueller were held by ISIS members. The documents also contain ISIS's explicit endorsement of enslaving women and explain why Doe and other juveniles were abducted by ISIS and detained in the residences of ISIS members. The documents also corroborate Doe's statement that she and other

---

[3] Defendant refers to these as the "slavery documents" but does not otherwise identify or describe the particular documents at issue. The government presumes defendant is seeking to exclude the documents attached to this response as Exhibits 1 through 4. The government has also attached the translations of those documents as Exhibits 1a through 4a. For the ease of the Court's review, the government has highlighted relevant portions of Exhibits 1a–4a that correspond to its arguments here.

juveniles were forced to perform unpaid labor and subjected to mental, physical, and sexual abuse. Further, the documents corroborate Doe's statement that al-Baghdadi lectured her and other juveniles about Islam and told Doe that he could do whatever he wanted with them, including selling them or giving them away to other ISIS members.

The documents also provide evidence of the coercive circumstances in which Mueller was held during the last months of her life. These documents were found in the residence of the very person responsible for detaining Mueller after Mueller and Doe were removed from the prison in Raqqa, and provide evidence that Mueller continued to be detained by ISIS until the time of her death. These documents help to establish that ISIS controlled Mueller's fate, that Mueller did not have the freedom to leave ISIS-controlled territory, and that Mueller died as a result of being abducted and detained by ISIS.

The documents also directly correspond to statements made by defendant defending—and even advocating for—this approach to the treatment of non-Muslims in ISIS territory. For example, in April 2018 defendant told reporter Moussa:

> Do I denounce slavery? I don't denounce slavery, no. You have to understand that just because America decided to abolish something, I don't know what year it is was, anyways, does not mean that every person has to run behind America and say uh this is now an abominable act that nobody can do. The reality is slavery is something that's been around as long as humans have been around. Islamic texts have spoken about slavery and the rights of a slave and there's a whole jurisprudence about slavery and the rights of slaves and the rights of slave owners.

Similarly, Exhibit 1 claims that slavery is a divinely sanctioned historical practice that was disrupted by non-Muslims and restored by the Islamic State. *See* Ex. 1a, at 3. The same document contains certain rules with regard to slaves, such as a prohibition on separating an enslaved mother and child before the child reaches puberty. *See* Ex. 1a, at 11–13.

Defendant demonstrated agreement with other ideas espoused in the documents as well. During an interview with the Washington Post in August 2019, reporter Mekhennet asked defendant how he felt about the imprisonment of journalists and aid workers by ISIS. Defendant responded:

> …according to Islamic law, uh, if you're in an Islamic community, and a non-believer enters that community without having one of three things, either a covenant between that community and the community he belongs to, or being of those who pay the jizya, the tax, or having a pact of security from one of the people in that community. This person is considered a combatant according to Islamic law, is considered a combatant, uh, and it doesn't mean the person has to be arrested or harmed, it just means that if he is imprisoned or captured or anything, it wouldn't be a sin Islamically to do so.

Exhibit 2 contains a similar statement that non-Muslims have no protection in the Islamic State and that it is permissible to shed their blood and take their money, unless they pay a tax called jizya. *See* Ex. 2a, at 2.

These similarities are probative of a number of key evidentiary questions the jury will have to resolve. The government has alleged crimes with specific intent and knowledge elements, which will require the jury to determine what defendant knew and intended at various points during the conduct at issue. Similarly, the government has included jury instructions addressing vicarious liability theories, including aiding and abetting and *Pinkerton* liability—both of which require a different level of knowledge or reasonable foreseeability for the principal's conduct. *See, e.g.*, Dkt. 182, at 45–48. Defendant's statements on slavery and combatant status for non-Muslims is both directly probative of his intent to detain the hostages, including Mueller, and to kill them if their conditions were not met; likewise, the similarity in the statements show defendant's actual knowledge of the detention and killings of non-Muslims by his co-conspirators or, at the very minimum, their reasonable foreseeability. For example, on the conspiracy to murder U.S. nationals

abroad count, the government must prove that the defendant entered into an agreement with another person that one of the co-conspirators would kill a U.S. national with the specific intent to do so.[4] Statements by the defendant expressing support for such an ideology and documents stating the same justification and ideology found in the residence of ISIS members responsible for holding a U.S. hostage who was ultimately killed by the conspiracy, are squarely probative of that fact.

As further probative value, the corroborative texts seized from the ISIS members who detained Mueller again demonstrates that her detention and eventual killing was the result of the same conspiracies to detain and murder her in which defendant knowingly participated, not a separate or discrete conspiracy or unrelated actions. Moreover, because the government has charged conspiracies to provide material support to terrorists and to a foreign terrorist organization, the parroting of ISIS documents justifying slavery and killing of non-Muslims by defendant four years after the conduct at issue demonstrates that the defendant was fully aware of and intentionally participated in conspiracies to further the organization's activities with full knowledge of its nature. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (holding that the requisite mens rea for a violation of 18 U.S.C. § 2339B is "knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities").

In sum, Doe's testimony about her capture and pre-Raqqa prison treatment is necessary to both explain the circumstances of her co-location with Mueller at Raqqa and to explain her subsequent identification of al-Baghdadi at the Sayyaf house. Likewise, her testimony linking Mueller at Raqqa to Mueller at the Sayyaf house, while ransom demands continued to be sent to Mueller's

---

[4] As the government's jury instructions note, a conditional intent to kill a person if some condition or requirement is not met constitutes an intent to kill under the law. *See* Dkt. 182, at 52; *see also Holloway v. United States*, 526 U.S. 1, 11 (1999).

11

family, bolsters the government's case that Mueller's detention at the Sayyaf house was a continuation of the same conspiracy in which defendant admitted participating. The slavery documents similarly demonstrate a correlation between defendant's statements in media interviews and the official ISIS positions on slavery and the treatment of non-Muslims, all of which tends to support the elements requiring knowledge, intent, and purpose as to various charged offenses.

**II.     Evidence of Doe's abduction and detention by ISIS and ISIS documents found at the Sayyaf residence are admissible under Rule 403.**

Relevant evidence may be excluded if it is unfairly prejudicial. *See* Fed. R. Evid. 403. "[G]eneral prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence." *United States v. Byers*, 649 F.3d 197, 210 (4th Cir. 2011); *see also United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) ("The mere fact that the evidence will damage the defendant's case is not enough[.]"), *reinstated*, 405 F.3d 1034 (4th Cir. 2005). Instead, to exclude evidence, the defendant must show that the evidence "is *unfairly prejudicial*" and that it "*substantially* outweighs the probative value of the evidence." *Byers*, 649 F.3d at 210. If the damage to a defendant's case results "from the legitimate probative force of the evidence," the evidence is not unfairly prejudicial. *United States v. Mohr*, 318 F.3d 613, 619 (4th Cir. 2003) (quoting Weinstein's Federal Evidence § 404.21[3][b] (2d ed. 2002)). To cause unfair prejudice, evidence must create a "disproportionate" and "genuine risk that the emotions of a jury will be excited to irrational behavior." *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006). "Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996). Accordingly, "Rule 403 is not an injunction to exclude prejudicial evidence but a mandate, entrusted mainly to the trial

court, to weigh prejudice against probative value." *United States v. Benkhala*, 530 F.3d 300, 310 (4th Cir. 2008).

The conduct alleged in this case is severe. As the Court knows, the government alleges that, among other charges, the defendant was a member of a wide-ranging conspiracy to take as hostage and then murder four American citizens, three of them on film to create propaganda and threats against remaining hostages. In doing so, the government must prove not only the conduct involved in taking Americans hostage and then murdering them but also the mental state of the co-conspirators, including the defendant. But the circumstances of Mueller's detention and eventual murder at the hands of ISIS are particularly brutal. And unlike the other three hostages, Mueller's death was not filmed and released by ISIS. Accordingly, the government must adduce additional proof as to her continued detention and eventual murder to establish the resulting-in-death elements for the charged offenses. As explained above, both Jane Doe's testimony and the slavery documents go directly to supporting the existence of the continuing conspiracy through her detention at the Sayyaf house, preceding her ultimate death, and the defendant's participation in and knowledge of the ongoing conspiracy to detain and murder her. Likewise, the material-support charges against defendant require proof that he knew the material support to be provided would be used in terrorist activity or to benefit a foreign terrorist organization, and therefore proof of his knowledge and the nature of ISIS's terrorist activities are also squarely probative.

There is no doubt that ISIS's conduct with respect to Jane Doe and Mueller is egregious. But the government's proffered testimony and documents here go directly to the core elements of both conduct and mental states of the charged offenses.[5] As the Fourth Circuit observed in a similar

---

[5] Moreover, the government notes that it does not intend to go into extensive detail about Jane Doe's sexual abuse or other brutalities. It has no wish to make Jane Doe relive the severity of her

13

case: "Although linking the appellants to extremist jihadist groups was undoubtedly prejudicial, it was not unfairly so. Indeed, the charges that were lodged against the appellants meant that the prosecution would necessarily seek to establish that link." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014). So too here: the government's allegations that defendant knowingly joined and participated in the extremely serious charged offenses necessitates the government putting on proof about the development of Mueller's detention and her ultimate death, as well as facts necessary to support the defendant's mental state and intent. Jane Doe's testimony and the slavery documents are probative of those facts.

---

traumatic experiences in an unnecessary manner. Rather, the government intends to adduce the simple facts of her capture, detention, escape, and recapture solely to establish the narrative foundation for her encountering Mueller and to establish the necessary basis for her subsequent identification of al-Baghdadi at the Sayyaf house.

14

## Conclusion

The testimony of Jane Doe and the documents recovered from Kayla Mueller's captors are relevant and not unfairly prejudicial. The evidence advances the government's case by showing the jury that Mueller's detention at the Sayyaf residence was a continuation of the same conspiracies defendant participated in at the Raqqa prison where he admits taking contact information from her. While the evidence involves severe conduct and language, it is not unfairly prejudicial because it goes to the core of the conspiracy defendant is charged with joining. Accordingly, the defendant's motion to exclude this evidence should be denied.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Raj Parekh, First Assistant U.S. Attorney
Dennis Fitzpatrick
Aidan Taft Grano-Mickelsen
John T. Gibbs
Assistant United States Attorneys
Alicia Cook
Department of Justice Trial Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
T: 703-299-3700

15

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2022, I electronically filed this response with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to all counsel of record in this case. I further certify that in lieu of filing on the public docket pending the Court's ruling on the government's motion to seal the exhibits, I will submit sealed paper copies of the exhibits to this response to the Clerk of Court and electronic copies to chambers and to defense counsel by email.

By: _____/s/_____
Aidan Taft Grano-Mickelsen
Assistant United States Attorney
U.S. Attorney's Office for the
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
T: 703-299-3700
Email: aidan.grano-mickelsen@usdoj.gov