IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20CR239-2 |
| v. | Honorable T.S. Ellis, III |
| EL SHAFEE ELSHEIKH,<br>    *Defendant*. | Trial: March 29, 2022 |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MEMORANDUM CONCERNING THE ADMISSIBILITY OF OUT-OF-COURT STATEMENTS AND THE APPLICATION OF**

El Shafee Elsheikh, by counsel, submits this response to the government's Memorandum concerning the admissibility of certain out-of-court statements purportedly made by deceased or missing hostages. Specifically, Mr. Elsheikh addresses the inapplicability of the forfeiture by wrongdoing hearsay exception, codified at Fed. R. Evid. 804(b)(6), to the facts of this case. In support thereof, Mr. Elsheikh states as follows:

**DISCUSSION**

At trial, a criminal defendant's confrontation rights, and his ability to object to certain hearsay statements, are subject to the forfeiture-by-wrongdoing exception, "a common law doctrine that allows the introduction of unconfronted testimonial statements 'where the defendant ha[s] engaged in wrongful conduct designed to prevent a witness's testimony.'" *United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) (citing *Giles v. California*, 554 U.S. 353, 366 (2008)) (emphasis added). However, "in order for the exception to apply, *the desire to keep the witness from testifying must be a reason* for procuring the unavailability of the declarant, but not necessarily the only motivation." *United States v. Adoma*, 781 Fed. Appx. 199, 204 (4th Cir. 2019) (emphasis added); *United States v. Becker*, 81 M.J. 483, 489 (C.A.A.F.

1

2021) (requiring that "the party caused the witness's unavailability with the intent to make that witness unavailable, i.e., that the accused intended their conduct to prevent the witness from testifying against them in court"); *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005) (before such evidence is permitted to come before a jury, the district court must find, by the preponderance of the evidence, that the exception applies).

As such, before a trial court can apply the forfeiture-by-wrongdoing exception, it must find by a preponderance of the evidence that: "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012).

As previously argued, none of the hostage killings were designed, or intended, to prevent them from reporting their abuse or prevent their testimony at a later criminal trial. The government has previously admitted that ISIS used the murder of the various hostages for their own propaganda purposes. Indeed, it is expected that the government will attempt to introduce, through ████████████████████████████████████████████████████████, the ISIS execution videos and other "official" ISIS online publications that both showcased and justified the murders of the various hostages. According to the government:

> "████ is a private organization that specializes in using human based intelligence to track and monitor the online activity of various online extremist groups. Senior Analysts at ████ have specialized knowledge and become experts in the online ecosystems of a wide range of radicalized groups and terrorist organizations. [Specifically,] ████████ work focuses on the monitoring and collection of ISIS distributed online propaganda."

Government Notice of Expert Witnesses, Nov. 18, 2021.

Furthermore, over the years the government has conducted interviews with several released hostages about their time in captivity and collected the e-mail exchanges between the

2

purported hostage takers and the family members of the deceased hostages. Taken together, the government's evidence overwhelmingly demonstrates that ISIS did not kill the hostages in an attempt to prevent their future testimony or prevent them from cooperating with law enforcement, but instead committed these crimes to accomplish the organization's own political and ideological objectives.

### A. The Public ISIS Execution Videos

At trial, it is expected that the government will attempt to prove that ISIS, and more specifically "The Beatles," produced at least six execution videos—that of James Foley, Steven Sotloff, David Haines, Alan Henning, Peter Kassig, and Kenji Goto.[1] All of these hostage execution videos released by ISIS follow the same pattern and were used for the same purpose: an ISIS fighter standing next to his victim giving a speech directed at victim's home country, followed by that victim's execution, and a threat to a separate hostage and his home county if their demands were not met.

In the hostage execution video of James Foley, the ISIS fighter carrying out the execution gives a long explanation for the killing, condemning U.S. airstrikes in Syria and claiming that the United States is not fighting an extremist insurgency, but rather:



Ex. 1, pg. 3 (█████ Analysis of Foley Execution Video)

The Foley video concludes with the same fighter holding Steven Sotloff on the ground and stating, "████████████████████████████████████████████. *Id.*

---

[1] Both David Haines and Alan Henning were British citizens, and Kenji Goto was a Japanese national.

Foley's death was also publicized in ▇▇▇, an online propaganda magazine used by ISIS for Islamic radicalization and recruitment, also not a tool to prevent witness testimony. In that publication, ISIS editors railed about the U.S. military's intervention in Iraq and the fact that the U.S. government had "arrogantly" ignored its ransom demands for Foley's release.

The Sotloff execution film begins with Mr. Sotloff claiming that he is being executed as retribution for the United States' involvement in Iraq and the presence of American troops in the region fighting ISIS. Ex. 2, p. 1 (▇▇▇ Analysis of Sotloff Execution Video). Later, an ISIS fighter appears and states:



*Id.* at 2-3.

Following Mr. Sotloff's execution, ISIS executed British nationals David Haines and Alan Henning. Like the previous videos of American journalists James Foley and Steven Joel Sotloff, each hostage introduces himself and explains why he is being executed. In both videos, the victims denounce the British government's actions against the Islamic State and holds its leadership responsible for their deaths. See Ex. 3 & 4 (▇▇▇ Analysis of Haines and Henning Execution Videos). Again, as with both the Foley and Sotloff executions, ISIS defends its reason for both Haines' and Henning's deaths. In the Haines video, the ISIS fighter states:



4

Ex. 3, p. 2.  In the Henning video, after the victim has spoken, the ISIS fighter states "█████████████████████████████████████████████████████████████████████████████████████." Ex. 4, p. 1.  At the end of the Haines video, ISIS threatens the life of Peter Kassig.



Finally, ISIS also released a video of the beheading of Japanese hostage Kenji Goto Jogo. See Ex. 6 (███ Analysis of Jogo Execution Video).  In the video, the ISIS fighter addresses his remarks to the Japanese government and states:



Ex. 6, p. 2.

ISIS did not perpetrate these crimes with an eye towards preventing witnesses from testifying at a criminal trial in the United States.  Rather, as evidenced by the circumstances and the timing of the videos themselves, the killings were committed solely to further ISIS's battlefield and propaganda objectives.  If the hostages' captors intended to prevent the hostages from cooperating with the authorities or resorting to outside help, or were at all interested in ensuring that no witness would be available to testify against them at a later trial, they would

have never released a single hostage who could and did provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, or testify—as they plan to do here.

**B. E-Mail Communications with Hostage Families & Audio Messages**

The government argues that the various hearsay statements of deceased hostages are admissible because the former hostages were killed to prevent them from "going public," and to ensure their continued silence. See Dkt. 218, pp. 6-9. To support its' argument, the government relies on several e-mails that family members of deceased hostages received during the failed hostage negotiations, in which the captors warned the families not to go public regarding their ransom demands. As evidenced below, this argument does not withstand scrutiny.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is clearly in reference to the fact that the hostage takers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6

███████. In view of this evidence, there is simply no indication that ██████ death had anything to do with ensuring ██ silence or with ██ potential testimony at a later criminal trial. Similarly, in a November 2013 email █████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████," ████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ █████████████████████
███████████████████████████████████████
█████████████████████████████████████████.
          █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

―――――――――――――――――
2 ████████████████████████████████████████████
█████████████████████████

[REDACTED]

As tragic as the hostages' death were, ISIS did not kill the hostages with an eye towards preventing them from testifying at a future criminal trial in the United States. Rather, the hostages were killed to further ISIS's battlefield and propaganda objectives. Telling the freed hostages and family members of deceased hostages not to go public or speak to the media or the authorities bears no relation to preventing witness testimony at trial.

C. **Statements of Release Hostages**

During the course of its' investigation, the United States government interviewed a number of the released hostages regarding their time in captivity. As horrific as their detention was, it is clear from their interviews that their captors were unconcerned about the hostages' future potential testimony. Statements given by [REDACTED] illustrate this point, both of them are expected to testify at trial.

When interviewed by the FBI in July 2014, [REDACTED] described his interactions with his captors, specifically reiterating an instance in which "the Beatles" asked [REDACTED] what the hostages knew about them:

"[REDACTED]

[REDACTED]."

July 21, 2014 FBI 302 of [REDACTED], pg. 9.

As obvious from [REDACTED] answer, the "Beatles" clearly knew that the hostages were discussing the "Beatles" amongst themselves and were trying to piece together who they were using the information they gleaned from their collective interactions with their captors. With this knowledge, the "Beatles" still released [REDACTED]. Had ISIS wanted to prevent [REDACTED] (or any other hostage) from going to the authorities or testifying about his captors' identities, it would never have permitted him to be released.

In an FBI interview in October of 2014, [REDACTED]

[REDACTED] Again, armed with this information, ISIS still released many of the hostages—who will now testify about the information they learned through this [REDACTED].

Another hostage, [REDACTED], confirmed the existence of the [REDACTED] scheme during his FBI interviews, as well as outlining a similar conversation regarding the identity of the Beatles that he and a fellow hostage had with their captors before they were released. In his August 2015 interview, [REDACTED] described his interactions with his captors,

specifically reiterating an instance in which "the Beatles" asked him what he and the other hostages knew about them:

▮▮▮"

August 25, 2015, FBI 302 of ▮▮▮, pp. 2-3. Regarding the ▮▮▮, ▮▮▮ stated:

"▮▮▮."

June 24, 2014 FBI 302 of ▮▮▮, p. 2.

The government relies on a single statement by released hostage ▮▮▮ as proof that a purposes of killing the deceased hostages was to make them unavailable as a witness at trial. Dkt. 252, pg. 14 ▮▮▮"). However, as repeatedly demonstrated in the email communications with the actual captors, the families were expressly told to contact their governments to arrange for the payment of ransom monies and the release of Muslim prisoners. ▮▮▮

10

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████

Additionally, the released hostages were instructed by their captor to contact the families of those still held captive, and to contact their respective governments, to assist and help in the release effort. ████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████

As evident from these interviews, the captors were well aware that the hostages knew revealing information about their identities. Despite this fact, both ████████████████ ██████ were released, and are currently expected to testify in the pending trial. The released hostages, and family members of detained hostages, were also repeatedly told to contact their governments to further negotiations. Had ISIS or the Beatles truly wanted to "silence" the hostages from ever testifying in a future criminal trial, there would not be any released hostages to testify in the current trial.

**D.** ████████████████████████████

During the course of the hostage taking scheme, ████████████████████████ ████████████████████████████████████████████████████████████. During

11

the ▮▮▮ ▮▮▮ Two of the hostages depicted in the video—▮▮▮—are expected to testify at trial. ▮▮▮ was videotaped, and according to several hostages, performed by the Beatles group. The video ▮▮▮. Instead, photos ▮▮▮ ▮▮▮ As evident from ▮▮▮ depicted in photos, the only interest ISIS had in ▮▮▮ was to advance the ransom negotiations. The ▮▮▮ video was used as a clear threat ▮▮▮. ▮▮▮. ▮▮▮ was both barbaric and needless, however ISIS did not ▮▮▮ to prevent the hostages from going to the authorities, or with an eye towards preventing witnesses from testifying at a future criminal trial.

## CONCLUSION

The government's evidence does not support the conclusion that at least one purpose of the hostage killings was to prevent the hostages from providing evidence or testifying at trial. In *United States v. Jackson*, 706 F.3d 264 (4th Cir. 2013), the defendant—who was on trial for murder and various other offenses—argued that the introduction of incriminating statements made by the murder victim was error because the statements did not fall within the forfeiture-by-wrongdoing exception to the Confrontation Clause. *Id.* at 265. In its pre-trial motion seeking to admit the murder victim's statement, the government claimed that the defendant had "waived his

right to confront any of [the victim]'s out-of-court statements by killing [the victim] with the intent, at least in part, of securing his unavailability as a witness." *Id*. at 266.  In granting the government's motion, the district court found that "that [defendant]'s desire to silence [victim] was a 'precipitating' and 'substantial reason' for the murder and concluded that any other motives for killing [victim] did not preclude application of the forfeiture-by-wrongdoing exception." *Id*. at 266–67.

In upholding the district court's decision, the Fourth Circuit held that there was "*ample*" support in the record to justify the district court's conclusion that preventing the victim from testify was a "precipitating" and "substantial" reason why the defendant partook in the murder. *Id*. at 269.  Specifically, the Fourth Circuit pointed to the facts that (1) the defendant "told others that [the victim] 'was an informant trying to bring down [defendant] and his brothers' and that [the victim] 'deserved' to be killed," and (2) the victim's murder occurred within a short time after defendant learned that the victim was released from jail as an apparent reward for his cooperation, as "ample" basis for the district court's ruling. *Id*.

The circumstantial evidence proffered by the government fails to meet the standard established in *Jackson* that even a purpose of the hostages killings was to prevent them from testifying, and is refuted by the greater weight of the evidence.  Moreover, as noted in *United States v. Becker*, 81 M.J. 483, 486–87 (C.A.A.F. 2021), under *Giles v. California*, 554 U.S. 353, 366 (2008), the Supreme Court requires the district court conduct a subjective not an objective inquiry, into the intent of the party who wrongfully caused the unavailability.  The Supreme Court clarified that the forfeiture-by-wrongdoing exception applies "only when the defendant engaged in conduct designed to prevent the witness from testifying." *United States v. Dinkins*, 691 F.3d 358, 383 (4th Cir. 2012)  (quoting *Giles v. California*, 554 U.S. 353 (2008)).

13

Because the government cannot prove by a preponderance of the evidence that one of the purposes of the deceased hostages' murders was to prevent their future testimony at trial, the government's request to introduce the deceased hostages' out-of-court statements under Fed. R. Evid. 804(b)(6) must be denied.

Respectfully Submitted,

EL SHAFEE ELSHEIKH,
By Counsel

_____/s/_____
Nina J. Ginsberg, VSB # 19472
Zachary A. Deubler, VSB # 90669
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com
zdeubler@dimuro.com

_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
Law Offices of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com

_____/s/_____
Yancey Ellis, VSB #70970
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
yancey@carmichaellegal.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 24th day of March 2022, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

                                        /s/
                             Zachary A. Deubler, Esq.