IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 1:20-cr-239 |
| | ) | |
| EL SHAFEE ELSHEIKH, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In the course of this trial in which Defendant stands accused of various crimes, including hostage-taking resulting in death and criminal conspiracy, the Government seeks the admission of testimony, letters, and audio and video recordings containing out-of-court statements by deceased or otherwise unavailable victims of the alleged hostage-taking conspiracy. Defendant objects to admission of the unavailable hostages' statements, contending that they constitute inadmissible hearsay and that their admission would violate the Confrontation Clause of the Sixth Amendment. The Government contends that Defendant's objection should be overruled based on the forfeiture by wrongdoing exception, as set forth in *Giles v. California*, 554 U.S. 353 (2008) and Rule 804(d)(6), Fed. R. Evid. This matter was fully briefed and argued, and a bench ruling issued on April 1, 2022. The purpose of this Memorandum Opinion is to memorialize and elucidate that ruling.

### I.

On October 6, 2020, a grand jury in the Eastern District of Virginia returned an indictment charging Defendant El Shafee Elsheikh and Co-Defendant Alexanda Amon Kotey[1] with the following eight counts:

(1) conspiracy to commit hostage-taking resulting in death, in violation of 18 U.S.C. § 1203;

---

[1] On September 2, 2021, Co-Defendant Kotey pled guilty to all counts set forth in the Indictment.

(2) hostage-taking resulting in the death of James Foley, in violation of 18 U.S.C. § 1203 and 2;

(3) hostage-taking resulting in the death of Kayla Mueller, in violation of 18 U.S.C. § 1203 and 2;

(4) hostage-taking resulting in the death of Steven Sotloff, in violation of 18 U.S.C. § 1203 and 2;

(5) hostage-taking resulting in the death of Peter Kassig, in violation of 18 U.S.C. § 1203 and 2;

(6) conspiracy to murder United States citizens outside of the United States, in violation of 18 U.S.C. § 2232(b)(2);

(7) conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A; and

(8) conspiracy to provide material support to a designated foreign terror organization, namely the Islamic State of Iraq and Syria ("ISIS"), in violation of 18 U.S.C. § 2339B.

Distilled to its essence, the Indictment alleges that Defendant travelled to Syria in 2012, where he became a member of ISIS. The Indictment further alleges that, between 2012 and 2015, Defendant, Co-Defendant Kotey, Mohammad Emwazi, and others conspired to capture foreign hostages and hold them for ransom, as well as to provide material support to ISIS. The Indictment also alleges that Americans James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig were victims of the hostage-taking scheme, and were subsequently murdered or otherwise died in captivity.

Prior to the commencement of trial on March 29, 2022, the Government filed a memorandum regarding the admissibility of various out-of-court statements by deceased or

otherwise unavailable victims of the alleged hostage-taking conspiracy.[2] Dkt. 218. The Government's memorandum argued, *inter alia*, that the victims' statements are admissible pursuant to the forfeiture by wrongdoing exception to both the Confrontation Clause and the rule excluding hearsay testimony. Defendant subsequently filed a response objecting to the admissibility of the statements and contesting the Government's forfeiture by wrongdoing argument (Dkt. 229), and the parties presented additional oral argument and briefing on the issue before trial. *See* Dkts. 252, 257. A ruling on the admissibility of the victims' statements was deferred pending development of the evidentiary record at trial.[3] For reasons stated in this Memorandum Opinion and in the course of trial on April 1, 2022, the record evidence now makes clear that the forfeiture by wrongdoing exception applies to the unavailable hostages' out-of-court statements that the Government seeks to admit, and Defendant's objection to the admissibility of those statements must be overruled.

## II.

A substantial volume of evidence has been received, the great bulk of which was received without objection, both during the course of a November 2021 evidentiary hearing related to the parties' pretrial motions[4] and during trial. The following list summarizes relevant portions of the trial record, but does not constitute an exhaustive account of all relevant evidence heard at trial.

---

[2] These include statements by the murdered American victims listed in the Indictment, namely James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig, as well as statements by deceased or missing British victims David Haines, Alan Henning, and John Cantlie.

[3] The Fourth Circuit has made clear that, when ruling on the applicability of the forfeiture by wrongdoing exception, a "district court need not hold an independent evidentiary hearing if the requisite findings may be made based upon evidence presented in the course of the trial." *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005).

[4] The evidence heard at the November 2021 evidentiary hearing is discussed in detail in the Court's Memorandum Opinion with respect to Defendant's Motion to Suppress. *See United States v. Elsheikh*, No. 20-CR-239, 2022 WL 37776 (E.D. Va. Jan. 4, 2022) (Dkt. 188).

Defendant's September 11, 2011 Arrest

- Defendant, then a citizen of the United Kingdom,[5] was arrested in London, England, on September 11, 2011.

- In this respect, three members of London's Metropolitan Police, namely Officers Barry Goodman and Dan Godfrey as well as Detective William Van-Der-Reijden, testified credibly regarding the circumstances of Defendant's arrest.

- On September 11, 2011, Officers Goodman and Godfrey responded to reports of an altercation and stabbing incident between protestors from the group Muslims Against Crusaders ("MAC") and counter-protestors from the English Defense League ("EDL").

- Members of the MAC group, including Defendant and Co-Defendant Alexanda Kotey, were detained outside of a pub in London. Defendant and Co-Defendant Kotey were subsequently taken into custody on suspicion of involvement in the stabbing incident.

- On September 12, 2011, Defendant was interviewed by Detective Van-Der-Reijden. At the interview, Defendant provided a written statement of facts, which Defendant had prepared with the aid of a solicitor.

Defendant's Travel in 2012

- Flight records admitted in evidence in this case indicate that, in 2012, Defendant travelled by air from the United Kingdom to Turkey.

- Several witnesses, including surviving victims of the alleged hostage-taking scheme, testified at trial that they entered northern Syria—a region in which ISIS was active in 2013 and thereafter—by way of the land border between Turkey and Syria.

The Islamic State of Iraq and Syria ("ISIS")

- Professor Bruce Hoffman testified at trial as an expert in the field of terrorism and counterterrorism.

- Professor Hoffman testified, *inter alia*, that:

  o ISIS began as a splinter organization from Al-Nusra Front, a designated foreign terrorist organization and radical Islamic jihadist group which operated in Syria;

  o ISIS, which has also been designated a terrorist organization by the United States government, was initially led by an individual named Abu Bakr Al-Baghdadi;

---

[5] Defendant's citizenship has since been revoked by the United Kingdom.

     o ISIS made concerted efforts to recruit foreign Muslims to join its ranks as fighters;

     o ISIS was unique among radical jihadist organizations in controlling and administering a wide portion of physical territory in Iraq and Syria, which ISIS had accumulated by the time it announced the establishment of a "caliphate" in 2014; and

     o ISIS undertook concerted efforts to capture and hold for ransom foreign hostages, which ISIS announced in propaganda materials.

<u>iPhone Evidence</u>

- Matthew Husher, a member of the London Metropolitan Police, credibly testified at trial that he recovered an iPhone during a search of the London residence of Khalid Elsheikh in 2014. Khalid Elsheikh and Defendant's birth certificate state that Khalid Elsheikh is the brother of Defendant.

- Matthew Hamilton, a law enforcement expert in digital forensics and data extraction from the United Kingdom, credibly testified that he performed an extraction of data from the iPhone recovered in Khalid Elsheikh's residence.

- The data from the iPhone included messages from an application called Telegram. Through Telegram, the user of the iPhone exchanged messages with an account called "Kaasir," who referred to the user as his "brother."

- Among other things, the user named "Kaasir" sent the following Telegram messages to the user of the iPhone:

     o a photograph of the user posing with a firearm, which Special Agent Chiappone identified as an image of Defendant;

     o images and messages indicating that Kaasir, whose photograph Special Agent Chiappone identified as Defendant, was involved in violent warfare as a member of ISIS, including references to a battle with Division 17 of the Syrian Army and pictures of severed human heads on poles; and

     o a voice message expressing concern that the aforementioned images could expose Kaasir to criminal liability.

Testimony by and about Surviving Hostages

- Several surviving hostages of the ISIS hostage-taking conspiracy alleged in the Indictment testified at trial, including Federico Motka, Patricia Chavez Mejia, Marcos Marginedas, and Nicholas Henin.[6]

- Italian citizen Federico Motka testified credibly, *inter alia*, that:

  o On March 8, 2013, while undertaking humanitarian aid work in Northwestern Syria, Motka and a British colleague named David Haines were captured by armed men and transported to a makeshift prison. Motka remained in captivity in Syria for the next fourteen months.

  o Haines and Motka were held with other hostages named James Foley and John Cantlie in a location that they called "The Box."

  o Throughout their captivity, Motka and the others hostages routinely interacted with a group of three captors the hostages dubbed the "Beatles" because the captors spoke English with British accents. The hostages called the individual members of the Beatles John, Ringo, and George. Motka testified that he overheard one of the Beatles state that he had previously been involved in an altercation with the "EDL" outside a pub in London.

  o Motka further testified that the Beatles: (i) routinely subjected the hostages to physical beatings and other brutal treatment, including waterboarding; and (ii) undertook efforts to conceal their identities from the hostages, including consistently wearing balaclavas, which are full-faced masks, in the hostages' presence and ordering hostages to face a wall or the ground when the Beatles entered a room. Motka stated that, during the entire fourteen months of his captivity, he caught only two fleeting glimpses of the Beatles without masks, in a dark room and through a narrow slot in a door.

  o Motka and the other hostages were routinely transported among various makeshift prison locations. At these locations, Motka met a number of other foreign hostages, including Steven Sotloff, Peter Kassig, Alan Henning, Nicholas Henin, Daniel Rye Ottosen, Marcos Marginedas, a Russian named Sergei, and Kayla Mueller, who were also held as hostages.

  o Motka described efforts by the Beatles to coordinate the collection of ransom payments, including the collection from the hostages of family members' email addresses and answers to proof of life questions.

  o Motka identified photos of certain prison locations, including a location that the prisoners dubbed "The Quarry."

---

[6] Additional hostages, including Frida Saide, Edouard Elias, Didier Francois, and Daniel Rye Ottosen are scheduled to testify following the writing of this Memorandum Opinion.

- o Motka described evidence that his captors were members of ISIS. Among other details, Motka overheard his captors discuss the existence of an "Islamic State" and saw the hallmark black and white flag of ISIS at various locations.

- o Motka described an event he called "Black Friday," which occurred shortly after the release of Spanish hostage Marcos Marginedas. Specifically, Motka stated that the three Beatles removed the Russian hostage, Sergei, from the makeshift prison where they were held. When the three Beatles returned, they beat the remaining hostages savagely, and forced the hostages to view and describe a photograph on a laptop which depicted the corpse of the Russian hostage with an apparent gunshot wound to the head. The Beatles stated that the beating and threats were in response to press reports about Marginedas's release.

- o Motka also described being present at the execution of a Syrian hostage by the Beatles, after which the Beatles photographed five hostages standing in a makeshift grave with the Syrian's corpse while holding signs demanding ransom payments.

- o At the time of Motka's release by the ISIS captors, following a payment of ransom, Motka attempted to sneak letters from remaining hostages past the guards by hiding them on his person. The Beatles discovered the letters but refused to touch them. Instead, the Beatles forced Motka to read the letters aloud.

- o Motka testified that, following his release from ISIS captivity, he took steps to ensure any information he provided to government entities would remain private out of fear that any public provision of information would prompt further attacks or killings of the remaining hostages.

- Patricia Chavez Mejia, who currently resides in Belgium, testified credibly at trial that:

  - o While working with the aid organization Medicines San Frontiers ("MSF"), or Doctors Without Borders, in northern Syria in 2013, she and four other employees of MSF were captured by armed men.

  - o Mejia was subsequently held hostage for several months, during which time she observed ISIS flags flying on or near the makeshift prison locations in which she was held.

  - o While in captivity, Mejia interacted with a group of three men who spoke English with British accents. Mejia later became aware that this group of captors had been dubbed the "Beatles" by other hostages. Mejia described efforts by the three Beatles to coordinate collection of ransom payments, including forcing Mejia and two other female hostages from MSF to record a proof of life video. Mejia further testified that the Beatles appeared to know each other well and interacted as though they were close friends.

- o Mejia identified the same photographs of a makeshift prison location that Motka had identified.

- o Mejia testified that she was held hostage in the same location as Kayla Mueller during portions of her captivity.

- o Mejia testified that she was released at the Turkish border following the payment of ransom.

- Spanish citizen Marcos Marginedas testified credibly at trial that:

  - o Marginedas travelled to northern Syria as a journalist in 2013, where he was captured by a group of armed men. Marginedas was thereafter held hostage for several months at various locations in Syria by ISIS.

  - o While in captivity, Marginedas interacted with a group of three men who spoke English with British accents. Marginedas and the other hostages referred to these captors as the "Beatles."

  - o While in captivity, Marginedas was held with Nicholas Henin, Federico Motka, David Haines, Daniel Rye Ottosen, Steven Sotloff, Peter Kassig, James Foley, John Cantlie, Alan Henning, and others.

  - o Marginedas observed that the Beatles operated as a team and appeared to know each other well. Marginedas further testified that the Beatles routinely beat him and the other hostages with whom he was held. Marginedas also stated that the Beatles coordinated efforts to collect ransom payments. Finally, Marginedas stated that the Beatles always wore full-face masks in the hostages' presence.

  - o Marginedas identified the same photographs of makeshift prison locations that Motka and Mejia identified.

  - o Marginedas overheard the Beatle dubbed "John" speak at length about the origins of ISIS.

  - o Marginedas stated that, on being released following a ransom payment, he received serious threats from the Beatles. Marginedas testified that a member of the Beatles held a firearm against his head, and that the Beatles forced him to write a letter promising not to speak to any government or media entities about his experience. Marginedas further testified that the Beatles threatened to harm the remaining hostages if he spoke out about his experience.

- French citizen Nicholas Henin testified credibly at trial that:

- o Henin travelled to Raqqa, Syria as a journalist in 2013, where he was captured by a group of armed men. Henin was thereafter held captive at several locations in Syria over the course of several months.

- o Henin's captors told him, on one occasion, that he would be taken to meet Abu Bakr Al-Baghdadi, who was then the leader of ISIS.

- o While in captivity, Henin interacted with a group of three captors who spoke English with British accents. The hostages dubbed this group the "Beatles," and labeled them as John, Ringo, and George. This group frequently beat hostages and coordinated ransom negotiations, including by collecting proof of life information from Henin and others.

- o Henin further testified that the Beatles always wore full face masks in the hostages' presence. Henin also observed the Beatles wearing gloves while touching items in the makeshift prison cells.

- o While in captivity, Henin met other hostages named Federico Motka, Marcos Marginedas, James Foley, John Cantlie, Steven Sotloff, Peter Kassig, Daniel Rye Ottosen, Kayla Mueller, and others.

- o The Beatles forced the hostages to sing a parody version of the song "Hotel California" that the Beatles called "Hotel Osama."

- o Henin was released by the Beatles following payment of a ransom.

- Danish citizen Jens Serup testified credibly at trial that:

  - o Serup worked as a travel security adviser for Daniel Rye Ottosen, a Danish photojournalist who travelled to northern Syria in May 2013.

  - o Serup became aware that Ottosen had been taken hostage in Syria. Specifically, Serup viewed emails that Ottosen's captors sent to Ottosen's family from a "safe-mail.net" email account. The emails demanded ransom payments and permitted the family to ask three proof of life questions. In later emails, the captors sent photos and an audio recording of Ottosen.

  - o In 2014, Ottosen's family received an email, which was shared with Serup, containing a link to a video file. The video file depicted a hostage being shot in the head in front of other hostages, including Ottosen, who were holding signs.

  - o Thereafter, Serup coordinated the transfer of a ransom payment to the hostage-takers in Syria. Ottosen was thereafter released at the Turkish border. Serup observed and photographed severe bruising on Ottosen's torso, which he testified resulted from a beating that Ottosen had received as a "farewell present" from his captors, who Ottosen called the Beatles.

9

Testimony and Evidence Regarding Unreleased Hostages

- Michael Foley, the brother of murdered hostage James Foley, and Diane Foley, the mother of James Foley, testified credibly at trial that:

  o Prior to 2012, James Foley worked as a photojournalist in various warzones. On October 22, 2012, James Foley departed the United States to travel to northern Syria as a journalist.

  o Thereafter, the Foley family became aware that James Foley had been taken hostage in Syria. Specifically, in 2013 and 2014, the Foley family exchanged a number of emails with Foley's ISIS captors. The hostage-takers sent ransom demands and proof of life information to the Foleys from a "safe-mail.net" email account.

  o In 2014, the Foley family became aware that James Foley had been murdered by beheading in Syria.

- Art Sotloff, the father of Steven Sotloff, testified credibly at trial that:

  o Steven Sotloff travelled to northern Syria as a journalist in 2013. In June 2013, Art Sotloff became aware that Steven had been taken hostage by ISIS in Syria.

  o Specifically, in 2013 and 2014, the Sotloff family received a number of emails from Steven's ISIS captors via a "safe-mail.net" email account. These emails included ransom demands and proof of life information.

  o In late 2014, Art Sotloff became aware that Steven had been executed by beheading in Syria.

- Rodwan Safarjalani, a Syrian national, testified credibly at trial that:

  o Safarjalani and Kayla Mueller became friends while Mueller was visiting Egypt in 2010.

  o In August 2013, Mueller traveled into northern Syria from Turkey, where she was working as a humanitarian aid worker. Safarjalani joined Mueller on this trip.

  o During that trip, Mueller and Safarjalani were captured by armed men. Safarjalani observed evidence indicating that their captors were members of ISIS. Safarjalani was subsequently released by the hostage-takers, after which time he attempted unsuccessfully to negotiate for Mueller's release.

- Marsha Mueller, the mother of Kayla Mueller, testified credibly at trial that:

10

- o She became aware that Kayla Mueller was taken hostage during a trip to Syria in 2013.

- o Specifically, during 2013 and 2014, the Mueller family received emails from Mueller's captors via a "safe-mail.net" account. The emails included ransom demands and proof of life information.

- o On February 7, 2015, Mueller's family received an email from the safe-mail.net address which reported that Kayla had been killed in an airstrike carried out by the Jordanian armed forces. The email included image attachments, which constituted three photographs of Mueller's corpse.

- Mohammad Almahmoud, a man of Syrian origin who now resides in Canada, testified credibly at trial that:

  - o Almahmoud joined Peter Kassig on a trip to northern Syria in 2013, where Kassig was working with a humanitarian organization named "SERA" that Kassig had founded.

  - o Almahmoud and Kassig were captured by armed men and taken to a building that had the name for ISIS in Arabic spray-painted on the exterior.

  - o Almahmoud was subsequently released, although Kassig remained in captivity.

- Ed Kassig, the father of Peter Kassig, testified credibly at trial that:

  - o In 2013, Ed Kassig became aware that his son, Peter, had been captured by ISIS in Syria. Specifically, the Kassig family received emails from Kassig's captors sent from a "safe-mail.net" account. The emails included ransom demands and proof of life information.

  - o In 2014, Ed Kassig became aware that his son Peter had been executed by beheading in Syria.

- The trial record includes the following evidence concerning the disposition of the unavailable hostages:

  - o The murders by beheading of James Foley, Steven Sotloff, Peter Kassig, David Haines, and Alan Henning were recorded in ISIS propaganda videos that are now in record evidence. In these videos, the hostages appeared in orange jumpsuits next to a masked, knife-wielding man who spoke English with a British accent. Witnesses at trial, including surviving hostages and family members, identified still images of the hostages captured from the execution videos.

11

o In February 2014, a Twitter account linked to ISIS issued a press release announcing that "American prisoner" Kayla Mueller had been killed in a Jordanian airstrike.

o No evidence indicates that John Cantlie was killed or ever released from ISIS captivity. FBI Special Agent Chiappone testified that, so far as he knows, Cantlie has not been seen or heard from in years.

## Defendant's Capture by the Syrian Democratic Forces ("SDF")

- Department of Defense interrogators George Smith and Jason Richards credibly testified at trial that, in January 2018, they were stationed in northern Syria in territory controlled by the SDF, a Kurdish paramilitary force which is allied with the United States in the fight against ISIS.

- Smith and Richards testified that, as part of their job duties, they interviewed captured ISIS fighters detained in prisons operated by the SDF.

- In January 2018, Smith and Richards interviewed two men who had been captured by the SDF while attempting to cross the border into Turkey. These men claimed to be Yemeni nationals, spoke exclusively in Arabic, and identified themselves as "Suhayb" and "Ya-Ya."

- Subsequently, Smith received notice that biometric information collected from "Suhayb," including fingerprints, matched Defendant. When confronted with the match, "Suhayb" admitted that his true identity was El Shafee Elsheikh and began to speak English with a British accent. Defendant also admitted that "Ya-Ya" was in fact Co-Defendant Kotey.

- Smith and Richards identified the Defendant in the courtroom during their testimony as the man they interviewed in Syria.

## Defendant's March 2018 FBI Interview

- Special Agent Chiappone testified credibly at trial that he and a second FBI Special Agent, Julius Nutter, travelled to Syria for the purpose of interviewing Defendant at an SDF prison facility.

- Agents Chiappone and Nutter interviewed Defendant on March 27, 2018, following the provision of *Miranda* warnings.[7]

- Agent Chiappone testified that Defendant shared the following information, among other things, during his interview with Agents Chiappone and Nutter:

---

[7] A Memorandum Opinion issued before trial rejected Defendant's contention that the FBI interview was conducted in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Missouri v. Seibert*, 542 U.S. 600 (2004). *See United States v. Elsheikh*, No. 20-CR-239, 2022 WL 37776 (E.D. Va. Jan. 4, 2022) (Dkt. 188).

- o Defendant moved to the United Kingdom with his family at a young age. As a young man in London, Defendant received training as an Army Cadet, and participated in certain criminal activities.

- o Defendant travelled to Syria in 2012 and became a combatant with the Al-Nusra Front. Defendant then joined ISIS when it split off from the Al-Nusra Front.

- o Defendant became friends with both Emwazi and Co-Defendant Kotey while living in the United Kingdom. Defendant confirmed that he knew that the masked individual who appeared in the ISIS execution videos of Foley, Sotloff, Kassig, Haines, and Henning was his friend, Emwazi.

- At trial, agent Chiappone identified Defendant as the man he interviewed in Syria.

Defendant's Media Interviews in 2018 and 2019

- Defendant participated in a number of interviews with media journalists in Syria in 2018 and 2019 while he remained in the custody of the SDF.

- In 2019, during recorded interviews with British journalist Sean Langan and with a journalist from the *Washington Post*,[8] portions of which have been admitted as evidence, Defendant admitted to taking part in the hostage-taking conspiracy alleged in the Indictment. Among other things, Defendant admitted that:

- o Defendant arrived in Syria in 2012 and thereafter joined ISIS.

- o While in ISIS, Defendant was tasked with dealing with a number of hostages, the first of whom were James Foley and John Cantlie. Among other things, Defendant collected email addresses and other information from the hostages.

- o Defendant also discussed interacting with hostages named Peter, Alan, David, and Kayla Mueller.

- o Defendant admitted to hitting hostages and carrying out other physical "transgressions" against the hostages.

- o Defendant discussed being present at the execution of a Syrian hostage.

- o Defendant stated that Emwazi, who was dubbed "Jihadi John" in foreign press reports, was among Defendant's most loyal friends. Defendant again confirmed that he was aware that the masked executioner in the ISIS propaganda videos was Emwazi.

---

[8] At trial, Special Agent Chiappone identified the person interviewed in videos of the Langan and *Washington Post* interviews as Defendant.

### III.

At trial, the Government seeks to introduce into evidence several categories of statements by murdered or otherwise unavailable victims of the hostage-taking conspiracy alleged in the Indictment, namely:

> (1) statements by the hostages to their fellow captives about the circumstances of their own abductions and captivity, their physical and mental state, including descriptions of pain and injury, and statements concerning observations about the individuals holding them whom the hostages dubbed "the Beatles," or background information the hostages learned about the Beatles; (2) video and audio recordings of the hostages that were sent to the hostages' families as proof of life; (3) responses the hostages made to demands by the Beatles for information relating to the ransom negotiations such as email addresses, contact details, and answers to proof-of-life questions, and (4) letters written by the hostages while in captivity.

Dkt. 218 at 2–3. Defendant objects to the admissibility of these statements on two grounds: (i) pursuant to the Confrontation Clause of the Sixth Amendment and (ii) pursuant to the rule against hearsay.

With respect to Defendant's objection pursuant to the Sixth Amendment, the Supreme Court has made clear that the Confrontation Clause bars the admission of "testimonial hearsay" during a criminal prosecution when a defendant does not have an opportunity to cross-examine the hearsay declarant. *See Crawford v. Washington*, 541 U.S. 36 (2004).[9] According to the Court, "testimonial hearsay" includes statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (citing *Crawford*, 541 U.S. at 52). However, under the so-called forfeiture by wrongdoing exception, a defendant may not rely on the Confrontation Clause to bar admission of testimonial hearsay when he has engaged in

---

[9] The decision in *Crawford* reserved the question of whether the Confrontation Clause applies *only* to testimonial hearsay, but the Court confirmed in *Davis v. Washington* that the Clause in fact covers only testimonial statements. 547 U.S. 813, 823–26 (2006).

conduct "designed to prevent the witness from testifying." *Giles v. California*, 554 U.S. 353, 359 (2008).

Defendant also asserts that the unavailable victims' statements constitute inadmissible hearsay pursuant to Rule 802, Fed. R. Evid. Under Rule 801, hearsay constitutes any out-of-court which a "party offers in evidence to prove the truth of the matter asserted." As with the Confrontation Clause, the rule against hearsay also includes a forfeiture by wrongdoing exception. Specifically, pursuant to Rule 804(d)(6), the rule against hearsay does not apply to "any statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." The Supreme Court has clarified that Rule 804(d)(6) simply "codifies the [Confrontation Clause] forfeiture doctrine." *Davis v. Washington*, 547 U.S. 813, 833 (2006). Accordingly, the analysis of the applicability of the forfeiture by wrongdoing exception is the same with respect to both the Confrontation Clause and the rule against hearsay.

The prosecution bears the burden of establishing the elements of the forfeiture by wrongdoing exception by a preponderance of the evidence. Specifically, the prosecution must show that "(1) the defendant engaged or acquiesced in wrongdoing (2) that was intended to render the declarant unavailable as a witness and (3) that did, in fact, render the declarant unavailable as a witness." *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005). With respect to a defendant's intent, the exception may "apply even when a defendant has multiple motivations for harming a witness." *United States v. Jackson*, 706 F.3d 264, 269 (4th Cir. 2013). The Fourth Circuit has further held that "traditional principles of conspiracy liability are applicable within the forfeiture-by-wrongdoing analysis." *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012). In this regard, the exception applies "when (1) the defendant participated directly in planning or procuring

15

the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *Id.* at 385.

## A.

In this case, the Government seeks to admit out-of-court statements by American hostages James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig as well as British hostages David Haines, Alan Henning, and John Cantlie. The Government asserts that these witnesses were rendered unavailable by the criminal wrongdoing of the ISIS conspiracies in which Defendant allegedly participated.[10] In order to establish the applicability of the forfeiture by wrongdoing exception, the Government must first demonstrate that Defendant "engaged or acquiesced in wrongdoing." *Gray*, 405 F.3d at 241. The Government does not argue, nor does the evidence demonstrate, that Defendant personally murdered any of the hostages listed above. Instead, the Government argues that "the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of [the] ongoing conspiracy." *Dinkins*, 691 F.3d at 384.

As an initial matter, several former ISIS hostages, many of whom were held in the same cells as the American and British hostages, testified credibly at trial and described the ISIS conspiracy alleged in the Indictment. These witnesses, including Federico Motka, Patricia Chavez Mejia, Marcos Marginedas, Nicholas Henin, and others, each testified for hours regarding their months-long confinements, and offered accounts that closely comported with one another. Specifically, each hostage testified that they were captured by armed men in northwestern Syrian

---

[10] As discussed *infra*, in most cases, these hostages were murdered by a member of the alleged conspiracy, namely Mohammad Emwazi, as depicted in ISIS propaganda videos. The evidence also demonstrates that Kayla Mueller died while held in ISIS captivity, and that John Cantlie was last seen in ISIS captivity and has not been heard from in several years.

in 2013, and were thereafter held hostage for months. During captivity, each hostage became aware that their captors were members of ISIS, including by observing ISIS flags and by overhearing their captors discuss the Islamic State. These witnesses also offered consistent descriptions of the various makeshift prison locations in which they were held in Syria, and multiple hostages identified the same photographs of certain locations in which they were confined. Finally, multiple hostages confirmed seeing and interacting with James Foley, Kayla Mueller, Steven Sotloff, Peter Kassig, David Haines, Alan Henning, and John Cantlie while in ISIS captivity.[11]

Importantly, the former hostages who testified at trial each described interacting frequently with a group of three ISIS members who spoke English with British accents. The hostages referred to this trio as the "Beatles," and labeled them John, Ringo, and George. Each of the hostages who testified described the Beatles in essentially identical terms. The witnesses noted, *inter alia*, that the Beatles frequently beat or otherwise abused the hostages. The witnesses also observed that the Beatles interacted with one another as though they were a tightly-knit group of friends. The witnesses further testified that the Beatles took steps to safeguard their identities, including by wearing face-covering balaclavas and by ordering hostages to face against a wall when the Beatles entered a room. Moreover, the witnesses indicated that the Beatles coordinated efforts to negotiate ransom for the hostages, including by collecting contact email addresses, by gathering answers to proof of life questions, and by requiring hostages to write letters and to record videos to be used to demand ransom payments from the hostages' families.

---

[11] It is worth noting that the Government also introduced other evidence that James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig were in ISIS captivity during the period specified in the Indictment, namely 2012 to 2015. For instance, family members of each of those victims testified to engaging in ransom negotiations by email with the ISIS captors, as well as the receipt of letters smuggled out by surviving hostages and proof-of-life materials sent by the captors.

Further, the evidence introduced at trial clearly establishes that Defendant took part in the ISIS conspiracy alleged in the Indictment, and that Defendant was one of the so-called Beatles. Significantly, Defendant admitted his involvement in the hostage-taking scheme during media interviews conducted in mid-2019 by documentary filmmaker Sean Langan, the *Washington Post*, and others.[12] Specifically, Defendant's interview answers confirm: (i) that Defendant travelled to Syria in 2012 and joined ISIS, (ii) that Defendant was a close associate of alleged co-conspirators Mohammed Emwazi and Alexanda Kotey, (iii) that Defendant knew that Emwazi was the masked individual who appeared in ISIS propaganda videos and was the ISIS member who beheaded James Foley, Steven Sotloff, and other hostages, (iv) that Defendant interacted with hostages, including Kayla Mueller, James Foley, and others, (v) that Defendant collected email contact information and other information from hostages, (vi) that Defendant physically struck and beat hostages, and (viii) that Defendant was present at the execution by ISIS of a Syrian hostage.

Other circumstantial evidence confirms the truth of the admissions made by Defendant during the course of the 2019 media interviews. For example, the Government has submitted 2012 travel records indicating that Defendant traveled via air, without a return trip, from the United Kingdom to Turkey, which shares a border with Syria. In turn, the Government also presented data extracted from a phone collected in the home Defendant's brother, Khaled Elsheikh, which contained messages from the Telegram application between the phone's user and an account

---

[12] Before trial, Defendant filed a Motion to Suppress media interviews recorded while he was in the custody of the Syrian Democratic Forces ("SDF") in 2018 and 2019, arguing that the interviews were the involuntary products of torture by the SDF. Following extensive briefing and a three-day evidentiary hearing on November 16–18, 2021, the Court denied Defendant's Motion to Suppress. *See* Dkts. 177, 188. The evidence developed during the November 2021 hearing failed to substantiate Defendant's claim of torture. Instead, the evidence compelled the conclusion that Defendant is an intelligent individual who made careful choices about what information to reveal in different contexts, and the Government therefore satisfied its burden to establish by a preponderance of the evidence that Defendant's statements were voluntary. In light of these findings, it is appropriate to give weight to the admissions that Defendant made during the course of the 2019 media interviews.

named "Kaasir." The Kaasir account, which appears to belong to Defendant,[13] sent a number of messages in 2012 indicating that the user of the account was present in Syria and involved in ISIS combat operations. These messages included photographs of severed human heads on poles. Next, before traveling to Syria in 2012, trial testimony establishes that Defendant was involved in an altercation with members of the English Defense League ("EDL") outside of a pub in London, which resulted in Defendant's arrest. In this regard, former hostage Motka testified that, while in captivity, he overheard a member of the Beatles discuss facing trouble following an altercation with "EDL" outside of a pub. Lastly, certain testimony by the hostage witnesses closely corresponds to details divulged by Defendant to media interviewers. For example, Motka testified that he and other hostages were present at an execution, orchestrated by the Beatles, of a Syrian man who was accused of being a spy against ISIS.[14] Defendant discussed being present at that execution during his interview with Sean Langan.[15]

Finally, the evidence makes clear that the murder of hostages was an established part of the conspiracy and that the Beatles used the murder of hostages to further their goals. First, on several occasions, ransom demands sent to hostages' family members threatened that the deaths of the hostages would result from the failure to meet ransom demands. Additionally, as noted, the evidence at trial established that several hostages, as well as Defendant and the other Beatles, were present at the ISIS execution of a Syrian man. Thereafter, the Beatles forced the surviving hostages to stand in a makeshift grave with the murdered Syrian man's corpse, and photographed the

---

[13] Specifically, in one message sent via the Telegram app, "Kaasir" transmitted a photo of himself posing with a firearm. At trial, FBI Special Agent John Chiappone identified the man depicted in that photograph as Defendant.

[14] A video of the execution has been admitted into the record by the Government.

[15] For another example, Henin testified at trial that the Beatles forced the hostages to sing a mock version of the song "Hotel California" called "Hotel Osama." Defendant also discussed hostages singing "Hotel Osama" during the Langan interview.

surviving hostages holding signs demanding ransom payments. Moreover, multiple hostage witnesses, including Motka and Henin, also testified about an incident in which the Beatles removed a Russian hostage from the makeshift prison in which the hostages were then confined. All three Beatles later returned with a laptop displaying a disturbing photograph of the Russian hostage's corpse, with an obvious bullet wound in his head. The Beatles used the photograph to instill fear in the hostages.

It is worth emphasizing that the murder of the Syrian and Russian hostages occurred before the murder or disappearance of the American and British captives whose statements the Government seeks to admit pursuant to the forfeiture by wrongdoing doctrine. Accordingly, by the time the American and British hostages were slain, each member of the Beatles would have been well aware that the murder of hostages was "in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of [the] ongoing conspiracy." *Dinkins*, 691 F.3d at 384. Notably, the record reflects that the murders of James Foley, Steven Sotloff, Peter Kassig, David Haines, and Alan Henning were made part of published ISIS propaganda materials. Accordingly, the murder of the American and British hostages was also in furtherance of the conspiracy to provide material support to ISIS

In summary, the evidence clearly demonstrates that Defendant "acquiesced in wrongdoing," *i.e.* the murders and other acts that rendered James Foley, Kayla Mueller, Steven Sotloff, Peter Kassig, David Haines, Alan Henning, and John Cantlie unavailable at trial. *Gray*, 405 F.3d at 241. The evidence elicited at trial clearly establishes: (i) that members of ISIS engaged in a brutal conspiracy to capture foreign hostages in Syria between 2012 and 2015, (ii) that Defendant was a member of the ISIS hostage-taking conspiracy, and (iii) that the murder of hostages was part and parcel of the conspiracy. Accordingly, the Government has satisfied its

burden to establish the first element of the forfeiture by wrongdoing doctrine by more than a preponderance of the evidence.

## B.

At the next step of the forfeiture by wrongdoing analysis, the Government must prove that the wrongdoing was "intended to render the declarant[s] unavailable as [] witness[es]." *Gray*, 405 F.3d at 241. In this regard, the evidence admitted at trial gives rise to a reasonable and compelling inference that the unavailable American and British victims were murdered, or otherwise wrongfully detained, at least in part to prevent their participation in future criminal proceedings against the conspirators. *See Jackson*, 706 F.3d 264, 269 (forfeiture by wrongdoing applies even when a defendant has multiple movies for procuring the unavailability of a witness). Specifically, the trial evidence clearly demonstrates: (i) that Defendant was aware that criminal prosecution was a potential consequence of his involvement in the alleged ISIS conspiracy and (ii) that the Defendant and the other Beatles took extraordinary steps to conceal their identities and to insulate themselves from the consequences of their criminal conduct.

With respect to Defendant's knowledge of the possibility of prosecution, it is important to emphasize that Defendant grew up in the United Kingdom and therefore had knowledge of, and had previously interacted with, a Western criminal justice system. At trial, FBI Special Agent Chiappone testified that he interviewed Defendant in an SDF facility in Syria in 2018, and that Defendant discussed his upbringing in the United Kingdom during that interview. Among other things, Defendant told Agent Chiappone that he received training as a British Army Cadet and had participated in certain criminal activities, including theft crimes.[16] The evidence at trial further

---

[16] Defendant's alleged co-conspirators, Emwazi and Co-Defendant Kotey, were also citizens of the United Kingdom. Special Agent Chiappone testified that, during the course of his 2018 interview with Defendant, Defendant stated that he became friends with both Emwazi and Kotey while living in London.

21

indicated that Defendant, as well as Co-Defendant Kotey, were arrested in London following an altercation with English Defense League members prior to Defendant's travel to Syria in 2012. Following his arrest, Defendant prepared a statement of facts with the aid of a solicitor. Thus, Defendant had first-hand experience with a Western criminal justice system.

To continue, even after Defendant travelled to Syria to join ISIS, Defendant expressed a consciousness of the possibility of criminal prosecution abroad. As discussed *supra*, data recovered from a phone collected from Khalid Elsheikh's home includes messages exchanged via Telegram with a user named Kaasir. As further noted, the Kaasir account, which evidence demonstrates belonged to Defendant, transmitted a handful of images of severed heads on poles. Shortly thereafter, Kaasir, *i.e.* Defendant, sent a voice message via Telegram in which he stated:

> These are all pictures you can get on the Internet, you understand? . . . I could have sent you a link to a, like, Twitter; I could have sent you a link to a YouTube video . . . for the record's sake, I didn't take them [sic] pictures. I did not take them [sic] pictures. I have no knowledge of how these pictures were taken. I am absolutely dumbfounded as to who and when these pictures were taken. I am totally innocent of any crimes, and er . . . I have no comment further than that and if you want to ask me any more questions, you can just speak to my lawyer.

This statement clearly demonstrates that Defendant contemplated the possibility of criminal prosecution related to his activities in Syria. In sum, the evidence indicates that Defendant interacted with the criminal justice system in the United Kingdom, and carried with him an awareness of the risk of foreign criminal prosecution as he joined ISIS in Syria.[17]

---

[17] Defendant's conduct during his in time in SDF custody in 2018 and 2019 also demonstrated Defendant's concern regarding the possibility of criminal prosecution. As noted in the Court's Order with respect to Defendant's Motion to Suppress, Defendant made careful choices about what information to reveal in different contexts with an eye toward possible criminal prosecution. For instance, Defendant revealed substantially more incriminating information to Department of Defense interrogators than he disclosed, following the provision of *Miranda* warnings, to Special Agents Chiappone and Julius Nutter. Defendant also declined to answer certain questions by media interviewers in 2018, citing the pendency of foreign criminal proceedings. *See* Dkt. 188.

Next, the evidence at trial also clearly establishes that Defendant and the Beatles took careful steps to avoid the consequences of their criminal wrongdoing. Indeed, the former hostages who testified at trial described the measures the Beatles took to safeguard their identities and to instill a culture of silence among current and former hostages. Among other things, the hostages stated that the Beatles always wore face-covering balaclavas in the hostages' presence, and frequently ordered hostages to put their faces against a wall or on the ground when the Beatles entered a room.[18] Similarly, other hostage testimony indicates that the Beatles took steps to avoid leaving fingerprint evidence. For example, multiple hostages testified at trial that the Beatles wore gloves in the hostages' presence.[19] It is clear the Beatles took careful steps to avoid disclosing any information that might identify them.

To continue, the Beatles also engaged in severe "abuse, [and] threats of abuse, intended to dissuade the victim[s] from resorting to outside help." *Giles*, 554 U.S. at 377. This point is clearly demonstrated by hostage testimony related to the release of Spanish hostage Marcos Marginedas. Marginedas testified at trial that, upon his release, one or more of the Beatles: (i) placed a gun against Marginedas' head, (ii) forced Marginedas to write a letter promising he would not speak to government or media entities, and (iii) threatened to harm the remaining hostages if Marginedas failed to comply with the Beatles' instruction to refrain from speaking out. As a result, Marginedas

---

[18] For example, Motka testified that he remained in ISIS captivity for a total of fourteen months. During that period, Motka frequently saw and interacted with the Beatles, including during numerous physical beatings he endured at the hands of the Beatles. Despite the substantial volume of interactions, Motka testified that the Beatles *always* wore balaclavas in his presence. Indeed, in fourteen months, Motka testified that he caught just two fleeting glimpses of the Beatles' faces in a dark room through a slot in a door. By contrast, the hostage witnesses testified that they saw the faces of other ISIS guards while in captivity. Accordingly, the evidence shows that the Beatles were uniquely zealous about shielding their faces from hostages.

[19] Similarly, Motka testified that, upon his release, he attempted to sneak letters past his captors by hiding them on his person. The Beatles discovered the hidden letters, but conspicuously avoided handling the letters. Instead, the Beatles forced Motka to read the letters aloud before determining whether he would be permitted to keep them.

testified that he was afraid to speak to the government or to the media upon release.[20] Henin and Motka testified that, shortly after Margineda's release, the Beatles savagely beat the hostages and threatened them with the aforementioned image of the executed Russian hostage. Motka further testified that the Beatles stated that the beatings and threats were in response to the release of news articles about Margineda's release, and Motka stated that these acts were quite clearly an attempt to silence the hostages.

In sum, the evidence persuasively establishes that Defendant and his co-conspirators were cognizant of the possibility of future prosecution as a consequence of their participation in a criminal ISIS hostage-taking conspiracy. The evidence further demonstrates that Defendant and his co-conspirators went to substantial lengths to shield their identities from hostages, to avoid the creation of evidence (such as fingerprints), and to create and enforce a culture of silence among current and former hostages regarding the details of their captivity. Based on the persuasive and compelling evidence presented, it is appropriate to conclude that it is far more likely than not that one of the motivations for the conspirators' murder of the hostages was to render the hostages unavailable in the event of criminal proceedings.[21]

---

[20] Margineda's testimony comports with the experience of other hostages. For example, Jens Serup, who coordinated the release of Danish hostage Daniel Rye Ottosen, testified that he observed evidence that Ottosen was severely beaten as a "farewell present" by the Beatles. The trial record includes photographs of severe bruising on Ottosen's torso taken by Serup shortly after Ottosen's release. Other hostages who testified at trial also stated that they were afraid to speak publicly about their experience following their release.

[21] Because intent to render a hostage unavailable is rarely expressly stated, courts routinely infer the requisite intent from the circumstances. For instance, in *United States v. Lentz*, the defendant was accused of murdering his ex-wife, whose body was never recovered. This Court found that the forfeiture by wrongdoing exception applied, despite the lack of direct evidence of that defendant's intent, where: (i) the defendant was verbally and physically abusive towards the deceased victim, (ii) the defendant was embroiled in bitter child support and marital property distribution disputes with the victim, and (iii) ample circumstantial evidence supported the conclusion that the defendant murdered the victim. *United States v. Lentz*, 384 F. Supp. 2d 934, 943–44 (E.D. Va. 2005), *affirmed*, 524 F.3d 501 (4th Cir. 2008) (*cert. denied*, 555 U.S. 928). Here, the evidence with respect to the conspirators' wrongdoing and intent is more compelling than the evidence at issue in *Lentz*, which there was plainly sufficient to support application of the forfeiture by wrongdoing doctrine.

Defendant's primary contention against application of the forfeiture by wrongdoing exception, namely that the Government cannot satisfy the exception's subjective intent element, is unpersuasive. Defendant's assertion that the ISIS conspirators did not kill hostages in order to "prevent the hostages from going to the authorities, or with an eye towards preventing witnesses from testifying at a future criminal trial" (Dkt. 257 at 13) is squarely rebutted by the evidence cited above. Additionally, Defendant points out that the murder of hostages may have been driven by other motives, such as the creation of ISIS propaganda. However, as the Fourth Circuit has made clear, forfeiture by wrongdoing may apply even when, as here, conspirators have "multiple motivations for harming a witness." *Jackson*, 706 F.3d at 269.

Defendant also asserts, unpersuasively, that certain evidence suggests that the conspirators were not concerned with the prospect of future prosecution. For instance, Defendant points out that, in ransom demand emails, the conspirators instructed hostages' family members to contact their governments for assistance in meeting ransom demands. Defendant also points out that, ultimately, a number of hostages were released by the Beatles. However, these and other facts proffered by Defendant demonstrate nothing more than that the conspirators were motivated, in part, by the desire to collect ransom payments. It is obvious that a scheme to take hostages for ransom cannot exist in a state of perfect secrecy: demands must be made to hostages' family members or associates, who in turn may require assistance in procuring ransom money, and hostages must be released upon the payment of ransom (as to do otherwise would undoubtedly thwart further negotiations). Yet, it is also obvious that Defendant and his fellow hostage-takers were motivated, as well, by a desire to minimize the evidence of their criminal scheme, as clearly demonstrated by their efforts to conceal any identifying information, to instill fear into released

hostages to prevent them from speaking to government or media entities, and to render unavailable any hostages for whom ransom demands were not met.

Accordingly, the Government has more than satisfied its burden to establish, by a preponderance of the evidence, the second element of the forfeiture by wrongdoing doctrine.

## C.

Third, and finally, the Government must establish by a preponderance of the evidence that the conspirators' wrongdoing "did, in fact, render the declarant[s] unavailable" at trial. *Gray*, 405 F.3d at 241. There can be no doubt that a member of the conspiracy rendered Foley, Sotloff, Kassig, Haines, and Henning unavailable to testify in the instant trial. ISIS propaganda videos— which the Government has introduced into the record at trial—depict those hostages, handcuffed and in orange jumpsuits, next to a masked, knife-wielding man that Defendant later confirmed in media interviews, admitted at trial, to be his friend Emwazi. The ISIS propaganda videos depict Emwazi beginning to slice into the throats of Foley, Sotloff, Haines, and Henning, each of whom died by beheading. The videos do not depict the decapitation of Kassig, but Emwazi is shown standing next to Kassig's severed head. Thus, it is clear that Foley, Sotloff, Kassig, Haines, and Henning were murdered by an ISIS conspirator, and each hostage thus rendered unavailable by the conspiracy.

To continue, it is also clear that Mueller died while in ISIS captivity. At trial, several hostage witnesses confirmed that they saw and interacted with Kayla Mueller while held by ISIS. In February 2015, ISIS announced on Twitter and elsewhere that "American prisoner" Kayla Mueller had died as a result of an airstrike carried out by the Jordanian military. That same month, Kayla Mueller's family received an email from the same account which had previously sent them ransom demands, which also stated that Mueller had died in a Jordanian airstrike. The emails

included photographs of Mueller's corpse, which Mueller's mother, Marsha Mueller, identified during the course of trial testimony.[22]

Although it is clear that Mueller died while still a hostage of ISIS, the parties dispute the exact circumstances of Mueller's death. The Government asserts that the trial evidence will support the conclusion that Mueller was deliberately murdered by her ISIS captors. Defendant asserts that Mueller may have died as the result of a Jordanian airstrike. Even assuming, *arguendo*, that Mueller did in fact die as the inadvertent result of an airstrike, the forfeiture by wrongdoing exception still authorizes admission of her out-of-court statements.

Here, it is important to emphasize that the forfeiture by wrongdoing exception applies to wrongs other than murder, so long as the wrongs are designed to procure the unavailability of a witness at trial. *See Giles*, 554 U.S. at 365 (noting that the doctrine serves to eliminate the incentive for "defendants to *bribe, intimidate*, or even kill witnesses against them") (emphasis added). Even if Mueller was not intentionally murdered by her ISIS captors, the evidence clearly demonstrates that Mueller was wrongfully detained by ISIS on an ongoing basis. Nothing in the record indicates that ISIS had any intent to free Mueller, and the indefinite detention of a hostage undoubtedly constitutes wrongdoing which "render[s] the declarant unavailable." *Gray*, 405 F.3d at 241. The alleged fact that a hostage died as the result of aerial bombardment while confined in a violent warzone does not relieve the hostage-taker from application of the forfeiture by wrongdoing exception.

---

[22] The Government forecasts that the testimony of forthcoming witness Jane Doe, a Yazidi woman who was captured and held by ISIS in 2014, will further establish that Mueller was detained by ISIS in late 2014. Specifically, the Government indicates that Doe will testify that she was held captive in the same home as Mueller as late as October 2014. The Government further forecasts that Doe will testify that then-ISIS leader Abu Bakr al-Baghdadi was also present at the home, where he repeatedly raped Mueller.

Finally, the circumstances surrounding Cantlie's unavailability at trial are also unclear. Specifically, several witnesses at trial confirmed that they interacted with Cantlie in ISIS captivity, where Cantlie was also subject to confinement and brutal treatment by the Beatles. However, unlike the other unavailable victims, no evidence establishes that Cantlie was murdered or otherwise died in ISIS captivity. Instead, Special Agent Chiappone, who was assigned to a years-long investigation into the Beatles' hostage-taking conspiracy, testified at trial that Cantlie remained in ISIS captivity and has never been seen or heard from in the years since.

To be sure, it is uncertain whether Cantlie is deceased, and Cantlie could in theory remain a captive of ISIS. Yet, in light of the deaths of Cantlie's fellow American and British hostages, it is reasonable to infer that Cantlie did not survive several years in the hands of ISIS. In any case, in the absence of any contact from Cantlie following his capture and detention by the ISIS conspirators, it is certainly far more likely than not that Cantlie either died in captivity *or* remains a captive. In either event, the conspirators' wrongdoing resulted in Cantlie's unavailability at trial, and the forfeiture by wrongdoing exception properly applies to Cantlie's out-of-court statements. *See Lentz*, 524 F.3d at 528–29 (the Fourth Circuit affirming application of the forfeiture by wrongdoing exception despite the fact that the victim's body was never found).

Accordingly, the Government has satisfied its burden to establish the third element of the forfeiture by wrongdoing doctrine by a preponderance of the evidence.

### IV.

In sum, the evidence admitted at trial in this matter firmly supports application of the forfeiture by wrongdoing exception with respect to out-of-court statements by deceased or otherwise unavailable victims of the hostage-taking conspiracy alleged in the Indictment, namely James Foley, Kayla Mueller, Steven Sotloff, Peter Kassig, David Haines, Alan Henning, and John

Cantlie. To conclude otherwise would permit Defendant to benefit from the detention and brutal murders of those hostages who, as a result of the charged conspiracy, are now unavailable to testify against Defendant at trial. Such a ruling would provide an unacceptable green light to hostage-takers to kill their victims. However, as the Supreme Court made clear in *Giles v. California*, the forfeiture by wrongdoing exception militates against the "intolerable incentive" for defendants to threaten, harm, or kill witnesses against them. 554 U.S. at 365. As a result, Defendant's objections to the admissibility of out-of-court statements pursuant to the Confrontation Clause[23] and the rule against hearsay must be overruled. An appropriate Order will issue separately.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, VA
April 12, 2022

_____  /s/
T. S. Ellis, III
United States District Judge

---

[23] In closing, it is worth noting that, even if the forfeiture by wrongdoing exception did not apply under the facts of this case, the Confrontation Clause would not bar admission of most or all of the unavailable hostages' statements. As discussed *supra*, the Confrontation Clause only covers "testimonial hearsay," which includes only statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 311. As set forth in the Government's pre-trial briefing, the Government seeks to elicit a variety of out-of-court statements by the unavailable victims of the alleged ISIS hostage-taking scheme, including: (i) discussions between the unavailable hostages and surviving hostages, (ii) responses to proof of life questions and proof of life videos and audio clips recorded by the unavailable hostages at the behest of their captors, and (iii) letters written by the unavailable hostages to family members. Information shared between captives in a terrifying and confusing hostage situation, compelled proof of life statements, and attempts to communicate with worried family members—all of which are "totally unrelated to any trial or law enforcement purpose"—are plainly not testimonial and do not implicate the concerns of the Confrontation Clause. *United States v. Robinson*, 583 F. App'x 86, 89 (4th Cir. 2014) (citation omitted).