IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:20-cr-239 |
| | ) | |
| EL SHAFEE ELSHEIKH, | ) | Hon. T. S. Ellis, III |
| | ) | |
| *Defendant*. | ) | Sentencing: August 19, 2022 |

**UNITED STATES' POSITION ON SENTENCING**

## I.    INTRODUCTION

During ISIS's murderous crusade across wide swaths of Syria and Iraq, defendant El

Shafee Elsheikh, along with Mohammed Emwazi and Alexanda Kotey, led a brutal hostage-and-

execution cell that targeted foreign journalists and humanitarian aid workers.  Those three

British-accented, high-ranking ISIS fighters—whom the hostages dubbed the "Beatles"—

oversaw a network of at least nine detention facilities from November 2012 to February 2015, in

which 26 civilian hostages from 12 countries were held captive in Syria.

The ISIS Beatles engaged in the systematic torture and abuse of their victims, ultimately

resulting in the horrific deaths of at least eight American, British, and Japanese citizens, among

others, including gruesome executions that were videotaped and broadcast globally.  The

deceased victims included journalists who came to shine a light on the shadowy corners of

international conflict, such as American citizens James Foley and Steven Sotloff, and Japanese

citizen Kenji Goto; humanitarian aid workers who sought to alleviate suffering among vulnerable

populations in a war zone, such as American citizens Peter Kassig and Kayla Mueller, and

British citizens David Haines and Alan Henning; and Japanese citizen Haruna Yukawa, who

courageously aspired to provide security for his country's companies that were operating in conflict zones.

Elsheikh and his co-conspirators kidnapped and agreed to murder these altruistic and kind souls, who came to Syria to pursue truth and accountability and help those in need.  As for the released hostage victims, they will forever carry the scars of relentless psychological and physical pain that they forcibly endured during their captivity by the Beatles.  Elsheikh and Kotey have been afforded every form of due process available consistent with this country's sacred value of equal justice under law.  And rather than becoming martyrs to their monstrous cause, they have been fairly and impartially convicted, in an open courtroom, of their heinous crimes.  Based on all of the sentencing factors, the imposition of a life term of imprisonment for all eight counts is the only appropriate and just sentence in this case.

## II.    ELSHEIKH & KOTEY'S CAPTURE, INDICTMENT, AND ELSHEIKH'S TRIAL

After years of evading justice in ISIS-controlled territory, El Shafee Elsheikh and Alexanda Kotey were captured together in January 2018 by the Syrian Democratic Forces (SDF) as they attempted to escape Syria for Turkey.  Mohammed Emwazi was previously killed in November 2015 in a U.S. military airstrike in Syria.

On October 6, 2020, a grand jury in the Eastern District of Virginia returned an eight-count indictment charging Elsheikh and Kotey with one count of conspiracy to commit hostage taking resulting in death, in violation of 18 U.S.C. § 1203; four counts of hostage taking resulting in the deaths of four Americans (James Wright Foley, Kayla Jean Mueller, Steven Joel Sotloff, and Peter Edward Kassig), in violation of 18 U.S.C. §§ 1203 and 2; one count of conspiracy to murder U.S. citizens outside of the United States, in violation of 18 U.S.C. § 2332(b)(2); one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British, and Japanese nationals, in violation of 18 U.S.C. § 2339A; and one count of

conspiracy to provide material support or resources to a designated foreign terrorist organization resulting in the deaths of U.S., British, and Japanese nationals, in violation of 18 U.S.C. § 2339B.

On October 7, 2020, Elsheikh and Kotey were flown in custody from overseas to the Eastern District of Virginia to face the indictment that was pending against them.  On September 2, 2021, Kotey pleaded guilty to all eight charges.  This Court sentenced Kotey to eight concurrent mandatory life sentences in prison on April 29, 2022.

From March 29 through April 13, 2022, the government presented the testimony of 35 witnesses and introduced volumes of exhibits during Elsheikh's trial.  The jury convicted Elsheikh of all eight charges on April 14, 2022.  The government asks that the Court adopt the factual findings of the Presentence Investigation Report ("PSR") at Elsheikh's upcoming sentencing hearing.  *See* PSR ¶¶ 1-82.

## III.   APPLICABLE LAW GOVERNING SENTENCING

The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The sentencing court, however, "may not presume that the Guidelines range is reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009).  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence.  *Id.*  In addition, the Fourth Circuit requires that district courts provide an individualized explanation of reasons for their sentence, including any deviation from the recommended Guidelines sentence, as well as address any non-frivolous argument in favor of a particular sentence.  *See, e.g.*, *United States v. Provence*, 944 F.3d 213, 218 (4th Cir. 2019).  The Fourth Circuit likewise requires that district courts orally impose all discretionary conditions of supervised release at sentencing.  *See United States v.*

*Rogers*, 961 F.3d 291, 297-98 (4th Cir. 2021).

The jury's verdict on Counts One through Five of the Indictment require a mandatory term of life imprisonment for each count.  *See* 18 U.S.C. § 1203.  Nonetheless, as the Court knows, all of the procedures governing sentencing must be addressed, particularly as to Counts Six through Eight of the Indictment, which carry sentencing ranges from any term of years or for life.  *See* 18 U.S.C. §§ 2332, 2339A, 2339B.

## IV.    SENTENCING GUIDELINES

The U.S. Probation Office has correctly determined that Elsheikh's combined adjusted offense level is 73 and his criminal history category is VI.  PSR at ¶¶ 132, 139.  Because this is one of those "rare cases" where the offense conduct yields a total offense level higher than 43, which is the maximum offense level in the Sentencing Table, the offense level is treated as 43. *See* U.S.S.G. 5A cmt. n.2; PSR ¶ 135.  Although Elsheikh disputes the application of three enhancements (totaling 12 offense levels), it is undisputed that the Guidelines call for a sentence of life imprisonment in this case even without them.

       1.    The Sexual Exploitation Enhancement Applies

The government concurs with the U.S. Probation Office that the six-level sexual exploitation enhancement set forth in U.S.S.G. § 2A4.1(b)(5) applies.  While the repeated rape of Kayla Mueller by then-ISIS leader Abu Bakr al-Baghdadi was a horrific consequence of the ISIS hostage-taking and material support conspiracies, it was one that was committed well within the scope of those conspiracies and reasonably foreseeable to Elsheikh.  PSR ¶¶ 49-53, 106.

The Guidelines provide that sexual exploitation "includes offenses set forth in 18 U.S.C. §§ 2241–2244, 2251, and 2421–2423."  U.S.S.G. § 2A4.1 cmt. n.3.  The offenses prohibited in § 2241(a) criminalize knowingly causing another to engage in a sexual act by force or by threats

of death or serious bodily injury against that person.  In the case of a jointly undertaken criminal

activity, the Guidelines are determined by not only the defendant's own actions but all acts and

omissions of others that were (i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with

that criminal activity.  U.S.S.G. § 1B1.3(a)(B); *see also United States v. Stanley*, 711 F. App'x

693, 695–96 (4th Cir. 2017) (applying reasonably foreseeable standard to sexual exploitation by

force (§ 2241(a)(1)) under U.S.S.G. 2A4.1(b)(5)); *United States v. Cole*, 594 F. App'x 35, 38 (2d

Cir. 2015) ("[A]nd even if the sexual exploitation was undertaken by accomplices rather than by

[the defendants], the district court had discretion to find that the sentencing enhancement applied

for the reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity" (internal quotation marks and citations omitted)).

At trial, the government introduced evidence that Elsheikh's participation in the hostage-

taking conspiracy continued after Kayla Mueller had been separated from the other hostages and

into the final months of her life.  The Mueller family began receiving ransom emails from a

specific Safe-Mail.net email address (tyegfwfugsu8389248@safe-mail.net) in May 2014, and

received emails with ransom demands from the same Safe-Mail.net address on July 12, August

1, and September 19, 2014.  *See* Ex. 6-8.  The government also introduced admissions by

Elsheikh in a media interview that he personally extracted an email address from Mueller to

facilitate ransom demands for her release.  *See* Ex. 26-4.  In early August 2014, ISIS abducted

witness Lea Mulla and detained her with Kayla Mueller at a prison in Raqqah, Syria, beginning

in approximately late August 2014.

In mid-to-late September 2014, Mueller and Mulla were moved from the Raqqa prison to

the residence of a senior ISIS member named Abu Sayyaf.  There, according to Mulla's

testimony during trial, they were threatened and abused by the Sayyafs, and Mueller was repeatedly sexually abused by al-Baghdadi.  Mulla also testified that Abu Sayyaf showed ISIS beheading videos to the enslaved young girls and women to illustrate their fate should they try to escape.  Mulla identified Ex. 1-24e (depicting a kneeling James Foley) as a video that she and Mueller were forced to watch.  On September 19, 2014, which was either shortly before or shortly after Kayla Mueller and Lea Mulla were taken to Abu Sayyaf's residence, the Mueller family received an email containing ransom demands from the same Safe-mail.net email address.  *See* Ex. 6-8 at 33.  On February 7, 2015, this same Safe-mail.net address was used to notify the Mueller family of Kayla's death.  This evidence therefore demonstrates that Mueller's detention and sexual abuse at the Sayyaf house remained part of the same conspiracies of which the jury convicted Elsheikh.  *See* Order at 5, Dkt. 260, *United States v. Elsheikh*, No. 1:20-cr-239 (E.D. Va. Mar. 24, 2022) ("The fact that Mueller and [Mulla] were forcibly confined in the same facilities at the same times, during which time conspirators were actively soliciting ransom payments from Mueller's family, rebuts the contention that [Mulla] and Mueller were victims of completely separate conspiracies.").

Furthermore, a U.S. military operation later recovered from the Sayyafs' residence certain formal ISIS documents, which the government introduced at trial.  All four documents bore official ISIS seals; three were issued by the "Research and Fatwa Committee" and one was issued by the "Diwan of Justice and Grievances."  *See* Exs. 20-11, 20-12, 20-13, 20-14 (translations).  These documents discussed ISIS's interpretations of Islamic law governing slavery, particularly of non-Muslim women, and mirror statements made by Elsheikh in 2018 and 2019 media interviews that were introduced during the trial.  The Court can and should infer from Elsheikh's statements that he was aware of ISIS's positions governing the treatment of non-

Muslim women as slaves, which in turn renders it more likely than not that Elsheikh could reasonably foresee that while keeping Mueller as a hostage and a slave, his co-conspirators would subject her to sexual exploitation.

The jury also heard testimony from released hostage Frida Saide that, when Mueller was at the Desert Prison outside Raqqah in or around March 2014, Saide heard all three ISIS Beatles tell Mueller that she will be held forever if the ransom demands are not paid. *See also* Ex. 6-8 at 33 ("Kayla will not be released until these conditions are met."). Accordingly, it was reasonably foreseeable to Elsheikh, one of the very people who threatened to hold Mueller forever if a ransom was not paid, that Mueller would be held by ISIS for the rest of her life and subjected to the same horrific treatment, including rape, suffered by other women and young girls who had been abducted by ISIS. As noted above, this Court has already concluded that Mueller's continued detention at the Sayyaf residences was a continuation of the same hostage-taking conspiracy in which Elsheikh participated. These formal ISIS documents addressing slavery were then found in the residence of the very person responsible for detaining Mueller after Mueller and Mulla were removed from the prison in Raqqah. Coupled with Mulla's testimony about the circumstances of their detention, the documents further provide evidence that Mueller's detention by ISIS continued to be involuntary until the time of her death.

Moreover, the principles contained in these formal ISIS documents directly correspond to statements made by Elsheikh defending and advocating for this approach to the treatment of non-Muslims in ISIS territory.[1]   For example, during trial, the Court saw video of Elsheikh's April

---

[1] Elsheikh's objection to the PSR in which he argues that there is no evidence linking him to the authoring of these publications is of no significance. The government's argument is not that Elsheikh is responsible for creating the content of the documents. Rather, it is that Elsheikh's statements and the evidence at trial established that he was familiar with and knew ISIS's interpretations of Islamic law justifying the enslavement and sexual abuse of non-Muslim

2018 interview with reporter Jenan Moussa, in which he stated:

> Do I denounce slavery?  ***I don't denounce slavery, no.***  You have to understand that just because America decided to abolish something, I don't know what year it is was, anyways, does not mean that every person has to run behind America and say uh this is now an abominable act that nobody can do.  The reality is slavery is something that's been around as long as humans have been around.  Islamic texts have spoken about slavery and the rights of a slave and ***there's a whole jurisprudence about slavery and the rights of slaves and the rights of slave owners.***

*See* Ex. 27-4 (emphases added).  Similarly, one of the ISIS documents recovered from the Sayyaf residence claims that slavery is a divinely sanctioned historical practice that was disrupted by non-Muslims and restored by the Islamic State.  *See* Ex. 20-11, at 3.  The same ISIS document also proclaims that the marriages of enslaved women are annulled upon their capture and that it is "permissible" to have sexual intercourse with enslaved women.  *Id.* at 17.

Elsheikh demonstrated knowledge of and agreement with other principles espoused in the recovered ISIS slavery documents.[2]  During an interview with the Washington Post in August 2019, the reporter asked Elsheikh how he felt about the imprisonment of journalists and aid workers by ISIS.  Elsheikh responded:

> …according to Islamic law, uh, if you're in an Islamic community, and a non-believer enters that community without having one of three things, either a covenant between that community and the community he belongs to, or being of those who pay the jizya, the tax, or having a pact of security from one of the people in that community.  This person is considered a combatant according to Islamic law, is considered a combatant, uh, and it doesn't mean the

women, and thus could reasonably foresee his ISIS co-conspirators' sexual exploitation of Mueller during her continued captivity.

[2] The government also introduced evidence showing that Elsheikh was likely the ISIS Beatle known as "Ringo" to the detained hostages, such as Ringo's statements to Federico Motka about getting into a confrontation with the English Defence League outside of a London pub.  Multiple released hostages also testified that Ringo gave "da'wah" sessions, in which he lectured the hostages on Islamic theology and law, further tending to support Elsheikh's knowledge of ISIS's legal interpretations justifying the enslavement and sexual exploitation of non-Muslim women.

person has to be arrested or harmed, it just means that if he is imprisoned or captured or anything, it wouldn't be a sin Islamically to do so.

*See* Ex. 27-8.  Another recovered ISIS document from the Sayyaf residence contains a similar statement that non-Muslims have no protection in the Islamic State and that it is permissible to shed their blood and take their money, unless they pay a tax called jizya.  *See* Ex. 20-12 at 3.  Additionally, when asked by the Washington Post reporter whether he knew that Mueller was taken as a slave, Elsheikh denied knowledge but then proceeded to use the term "concubine" when answering that question.  *See* Ex. 27-9.  One of the ISIS documents twice mentions "concubines," including that it is allowed for unmarried men "to own bondwomen as concubines."  Ex. 20-12, at 14–15.  The same document describes the "afflictions imposed on" non-Muslims as including "the captivity and enslavement of their women and the permission to have intercourse with them" (Ex. 20-12, at 8); states that "it is allowed to enjoy the captives (bondwomen) and have intercourse with them" (Ex. 20-12, at 11); and offers as one justification that "[c]apturing prisoners and enslavement is a method to increase the Muslim offspring" (Ex. 20-12 at 15).

In sum, Elsheikh's statements in media interviews establish by a preponderance of evidence that he not only knew of—but also agreed with—ISIS's interpretations of Islamic law governing the treatment of non-Muslim women kept as slaves.  Accordingly, the Court can and should conclude that Mueller's sexual exploitation by Abu Bakr al-Baghdadi in the Sayyaf residence was reasonably foreseeable to Elsheikh and occurred within the scope of and in furtherance of the conspiracy as part of her continuing detention by ISIS.  Indeed, as the Court previously recognized, Elsheikh's parroting of ISIS documents justifying slavery four years after the conduct at issue demonstrates that he was fully aware of and intentionally participated in conspiracies to further the organization's activities with full knowledge of its nature.  *See* Order

9

at 7, Dkt. 260, *United States v. Elsheikh*, No. 1:20-cr-239 (E.D. Va. Mar. 24, 2022) ("[T]he slavery documents espouse ISIS's support for the capture of hostages and slaves, and Defendant's corresponding statements demonstrate Defendant's knowledge of and support for ISIS's objectives and activities.").

      2.      <u>The Obstruction of Justice Enhancement Applies</u>

The government concurs with the U.S. Probation Office that the obstruction of justice enhancement set forth in U.S.S.G. § 3C1.1 applies because Elsheikh knowingly made a series of materially false statements in a declaration, signed under penalty of perjury, with the willful intent to deceive this Court during pretrial litigation.  PSR ¶¶ 87-88; *cf.* 28 U.S.C. § 1746 (providing that unsworn declarations signed under penalty of perjury may be treated as sworn affidavits for evidentiary purposes).[3]  The declaration, offered in support of Elsheikh's motion to suppress, alleged that he made involuntary statements while being severely abused in SDF custody, among a litany of other false statements.  *See* Dkt. 101, Ex. 1.  Following the November 16–18, 2021 evidentiary hearings, this Court issued an unclassified memorandum opinion finding Elsheikh's claims not credible.  *See United States v. Elsheikh*, No. 1:20-cr-239, 2022 WL 37776 (E.D. Va. Jan. 4, 2022).

A sentencing court must undertake an independent perjury analysis before applying the obstruction of justice enhancement.  *See United States v. Savage*, 885 F.3d 212, 225 (4th Cir. 2018).  The Court "must find, by a preponderance of the evidence, that the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the

---

[3] Application Note 4 to § 3C1.1 provides several examples of conduct that triggers the enhancement.  The non-exhaustive list includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" and "providing materially false information to a judge or magistrate judge."  U.S.S.G. § 3C1.1, cmt. n.4(C), (F).

willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).  In applying the enhancement, a sentencing court can "address each element of the alleged perjury in a clear and separate" statement, but it is also sufficient if its finding simply "encompasses all of the factual predicates for a finding of perjury."  *United States v. Gordon*, 61 F.3d 263, 270 (4th Cir. 1995)) (quoting *Dunnigan*, 507 U.S. at 95); *see also Jones*, 185 F.3d at 428 n.2 ("The sentencing court also must specifically identify the perjurious statements and make a finding either as to each element of perjury or that encompasses all of the factual predicates for a finding of perjury." (internal quotation marks omitted)).

While the Court's January 4, 2022, opinion did not make all the findings necessary to sustain the obstruction of justice enhancement, it was unnecessary for the Court to reach such a question in resolving Elsheikh's motion to suppress.  However, the findings of fact made in that detailed opinion lead inexorably to the conclusion that Elsheikh willfully made false statements in a declaration he signed under penalty of perjury in order to sway the Court to rule in his favor.  Thus, while this Court did not make an explicit perjury finding in its earlier opinion, the government respectfully asks the Court to do so during the upcoming sentencing hearing based on the extensive record in this case and the factual findings already made, including:

- In Elsheikh's sworn declaration (paragraphs 6-7), he claimed that an SDF interrogated "flew into a total rage and repeatedly punched me in the head, specifically the jaw area."  Elsheikh also claimed that he specifically informed a DOD interrogator of this alleged physical abuse, and that during "the DOD interrogation, my jaw was swollen to the point where I could not drink any of the beverages provided to me."  All of these allegations were proven to be false.  As the Court concluded, "the credible testimony of classified witnesses convincingly establishes" that the "DOD interrogators did not observe any signs of physical abuse of Defendant."  *Elsheikh*, 2022 WL 37776, at *4.

- In Elsheikh's sworn declaration (paragraph 8), he claimed that he told FBI agents multiple times that he "did not want to speak with anyone until I got

my lawyer" and that "[d]espite my request for a lawyer, the agent kept trying to speak with me."  However, as the Court concluded, Elsheikh "stated that he would only answer certain questions without a lawyer present did not request a lawyer or otherwise seek to end the interview" and "this fact is drawn from the testimony of Agents Chiappone and Nutter, which was credible and convincing."  *Elsheikh*, 2022 WL 37776, at *10 and n. 11.

- In Elsheikh's sworn declaration (paragraph 9), he claimed that the SDF told him that his "conditions as a prisoner could get a lot worse if [he] refused to do the media interviews."  However, as the Court concluded, "the Government persuasively argues that Defendant's claim that he was forced to participate and make incriminating statements in media interviews by the SDF is simply not credible."  *Elsheikh*, 2022 WL 37776, at *15.

- In Elsheikh's sworn declaration (paragraph 12), and in an attempt to suppress his 2019 media statements, he claimed that the SDF subjected Defendant to repeated, severe physical abuse.  However, as the Court concluded, "Defendant's claims regarding the severity and frequency of abuse in SDF custody are not credible when weighed against other record evidence." *Elsheikh*, 2022 WL 37776, at *9.  The Court also stated that, "Defendant claims that he was physically abused at each of the Ayn Issa, Kobani, and Derik Prisons.  But three SDF officials who worked at or had supervisory authority over those facilities credibly testified that they were unaware of any reports or evidence indicating that Defendant had suffered mistreatment."  *Id.*

- In Elsheikh's sworn declaration (paragraph 12), he claimed that the head of Derik prison told him, after he was allegedly beaten for about twenty minutes, that, "when you speak to anyone you tell them exactly what you told the American DOD, I dare you to say anything else."  However, as the Court concluded, "Defendant's claim that he repeated his false DOD confessions to appease the SDF is flatly contradicted by record evidence[.]  *Elsheikh*, 2022 WL 37776, at *15.  The Court also stated that, "the record clearly indicates that Defendant provided substantially more incriminatory statements and information to DOD interrogators than Defendant provided to any media outlets.  Even in later media interviews, Defendant downplayed his level of interaction with and knowledge of the hostages, but in DOD interrogations Defendant shared extensive personal knowledge about his contacts with the hostages.  *Id.* at *10.

- In Elsheikh's sworn declaration (paragraph 16), he claimed that he told a DOD medical officer at his initial screening in Iraq that he "was severely mistreated at the hands of the SDF."  However, as the Court concluded, "[a] medical examination performed by a DOD physician upon Defendant's entry into DOD custody in October 2019 squarely rebuts two of Defendant's claims.  First, Defendant claims that he suffers from lingering shoulder socket damage from the alleged attack at Derik Prison, but the DOD physician's report

indicated that Defendant enjoyed a full range of motion in his upper extremities . . .The report of Defendant's medical exam includes no other indications of physical abuse." *Elsheikh*, 2022 WL 37776, at *9.

As the facts recounted above demonstrate, Elsheikh's allegations of torture and abuse are not the kind of allegations about which one can be mistaken or confused whether they happened. *See United States v. Bonsu*, 291 F. App'x 505, 515 (4th Cir. 2008) (affirming enhancement where "the district court concluded that Bonsu's testimony conflicted with that of the agent to such a degree that either Bonsu or the agent had lied" and "then found the agent's testimony credible"). Nor has there even been a scintilla of evidence at any point during these proceedings suggesting that Elsheikh suffers from any condition that might result in false or faulty—but innocently intended—memories. To the contrary, the Court already emphasized that Elsheikh made his choices knowingly, not out of confusion or mistake. *Id.* ("[T]he record discloses that Defendant is an intelligent individual who made careful and calculated choices about what to say and how much to share in different contexts.").[4] In short, in these circumstances, the Court's conclusion that Elsheikh's allegations were resoundingly disproved by the government's evidence necessarily renders it more likely than not that those allegations were willfully

---

[4] The Court should reject Elsheikh's misplaced reliance on cherry-picked statements from Kotey or Mohammed Khalifa. *See United States v. Elsheikh*, No. 1:20-CR-239, 2022 WL 37776, at *14, n.29 (E.D. Va. Jan. 4, 2022) ("Other portions of the record pointed to by Defendant fail to bolster Defendant's account when weighed against the totality of the evidence. For example, Defendant points out that Alexanda Kotey also reported physical abuse by the SDF. But Kotey's claim that Kotey was abused by the SDF, even if deemed credible, does not establish that *Defendant* was abused.") (emphasis in original). Unlike Elsheikh, neither Kotey nor Khalifa lodged their allegations under oath before this Court, and Khalifa did not allege that Elsheikh was abused by the SDF. Moreover, Elsheikh's obstructive conduct includes several sworn false statements about his interactions with DOD and FBI personnel, some of which are noted above, and the Court has already credited the sworn in-court testimony of the personnel themselves. Those equally false misrepresentations undercut Elsheikh's credibility, and the Court can apply the enhancement based on any of those examples regardless of the SDF allegations.

fabricated in an attempt to sway this Court's ruling on the suppression motion.[5]

Courts have routinely applied the obstruction of justice enhancement when a defendant makes (or causes) false statements in an affidavit during a judicial proceeding. *See, e.g.*, *United States v. Blue*, 603 F. App'x 162, 169-70 (4th Cir. 2015) (false affidavit to support suppression); *see also United States v. Muslim*, 944 F.3d 154, 169 (4th Cir. 2019) (defendant caused victim to file a false affidavit that she was not kidnapped); *United States v. Gonzalez*, 644 F. App'x 456, 463-64 (6th Cir. 2016) (false financial affidavit produced during a judicial proceeding sufficient to apply the enhancement); *United States v. Crenshaw*, 703 F. App'x 308, 310-11 (5th Cir. 2017) (false affidavit of fact in support of motion to suppress confession sufficient to apply the enhancement). In *Blue*, the Fourth Circuit affirmed application of the enhancement because the defendant submitted a false affidavit that ATF agents "placed him in custody without reading him his *Miranda* rights" and, because that the district court found that affidavit to be willfully false, "provided 'materially false information to a judge.'" 603 F. App'x at 169.

Elsheikh's false declaration is also unquestionably material. The sworn declaration seeks to cast doubt on the voluntariness of Elsheikh's statements, and if credited, could have influenced the Court's disposition of his suppression motion. *See United States v. Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) ("An obstruction enhancement under § 3C1.1 may be imposed on the basis of a defendant's knowingly false affidavit submitted in support of a motion to suppress if the affidavit could have influenced disposition of the suppression motion."). Elsheikh's

---

[5] In his objections to the PSR, Elsheikh suggested that the Court had merely found that Elsheikh had not sustained his burden of proof—but the burden to prove voluntariness rests with the government, as the Court noted. *See Elsheikh*, 2022 WL 37776, at *14 (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *see also United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (same). Thus, it is true not only that Elsheikh failed to support his bald allegations, but also that the government's evidence affirmatively showed them to be false.

flagrantly false claims about his time in SDF custody and interactions with FBI and DOD

personnel did not consist of trivial details.  Rather, the very purpose of Elsheikh's allegations

was to secure suppression of his incriminating statements to the FBI and the media.  *See Blue*,

603 F. App'x at 169 ("As we have previously held, the obstruction enhancement is warranted

when a defendant lies in a suppression hearing regarding whether police administered a *Miranda*

warning." (citing *Bonsu*, 291 F. App'x at 515).  And the details that Elsheikh proffered to dress

up his fanciful claims, under penalty of perjury, demonstrates that he had the willful intent to

deceive this Court.  Elsheikh's false declaration, under any of the theories permitted by U.S.S.G.

§ 3C1.1, constitutes obstruction of justice.

> 3.   The Leadership Enhancement Applies

The government concurs with the U.S. Probation Office that the four-level leadership

enhancement set forth in U.S.S.G. § 3B1.1(a) applies because Elsheikh unquestionably was an

organizer or leader of a criminal activity that involved five or more participants[6] or was

otherwise extensive.  The Fourth Circuit has held, in line with the Guidelines commentary, that a

defendant "need not be an organizer or leader of all of the participants involved in the criminal

activity so long as he was an organizer or leader 'of one or more other participants.'"  *United*

*States v. Thorson*, 633 F.3d 312, 318 (4th Cir. 2011) (quoting U.S.S.G. § 3B1.1 cmt. 2).  The

Guideline commentary describes several non-exhaustive factors relevant to the leadership

determination, including "the nature of the defendant's participation in the commission of the

offense, the degree of participation in planning or organizing the offense, or the nature and scope

of the illegal activity."  *Ibid.* (quoting U.S.S.G. § 3B1.1 cmt. 4) (internal quotation marks and

---

[6] As the Application Notes state, "[a] 'participant' is a person who is criminally responsible for
the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. 1.
The trial revealed the existence of numerous participants who served under the ISIS Beatles.

alterations omitted).  In addition to these factors, the commentary also states that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  U.S.S.G. § 3B1.1, cmt. n. 4; *see also Thorson*, 633 F.3d at 317.

The evidence presented at trial firmly established that the hostage-taking, murder, and material support terrorism conspiracies were extensive undertakings, involving numerous Islamic State participants.  The released hostages testified about the massive support structure involved in this vast criminal enterprise: the nine different prisons where the hostages were held captive, from Idlib, to Aleppo, to Raqqah, and the many local guards who kept watch and performed daily ministerial tasks, such as bringing the hostages food or taking them to the bathroom.  At the heart of these conspiracies were the ISIS Beatles, including Elsheikh, who oversaw the detention operations and served as the sole hostage negotiators, the primary terrorizers and torturers, and the chief organizers of these unconscionable crimes.

The evidence at trial established that Elsheikh, Kotey, and Emwazi occupied leadership positions of authority over their other ISIS co-conspirators.[7]  Unlike the ordinary day-to-day guards, the ISIS Beatles worked together as a unit to subject the hostages to physical and psychological torture; they were the ones meting out truly inhumane punishments, including forcing hostages to fight each other, forcing Peter Kassig to stand throughout the night, savagely beating Steven Sotloff because of his perceived religion, and pulling hostages in the center of the room to administer severe beatings, among many other acts of extreme cruelty.  Likewise, the released hostages uniformly testified that the three Beatles were the ones collecting email addresses and conducting the Proof of Life process.  Didier Francois testified that, the day after

---

[7] Because the plain text of the Guideline applies "[i]f the defendant was *an* organizer or leader" (U.S.S.G. § 3B1.1(a) (emphasis added)) and not "*the* organizer or leader," Elsheikh's argument that Emwazi occupied a hierarchical position above him is irrelevant and unavailing.

James Foley was choked into unconsciousness and fell on the concrete floor, a Tunisian guard suggested that the other ISIS guards had "no control over those guys" and that the Beatles were in charge.  Nicholas Henin testified that Abu Idris told the hostages that the more they saw the Beatles, the better it was for them because they were in charge of hostage negotiations.  Henin also testified that the Beatles acted like the elite force of the ISIS caliphate.  The Court also viewed the Syrian execution video that was made at the Beatles' direction as a threat to the European hostages.

Edouard Elias and Federico Motka testified that only the three Beatles came inside the cell, while the local guards stayed outside.  Motka also testified that some of the hostages were initially guarded by younger ISIS guards who seemed less fanatic; by contrast, the Beatles did not do ministerial work, only came to the hostages for purposes of torture or hostage negotiations, and were far more violent.  Former ISIS member Omer Kuzu testified that when he first met Elsheikh, he observed that Elsheikh was armed with a Glock firearm, which Kuzu believed was "a symbol of ISIS aristocracy" because Glocks were typically only carried by wealthy or experienced ISIS members or those who had a position within the ISIS hierarchy.  Similarly, Henin, Elias, and Francois all testified that the Beatles were the only ones armed with Glocks.  Henin and Elias also both testified that it was the Beatles who decided to handcuff one hostage from a "negotiating country" to a hostage from a "non-negotiating" country when making the multi-day journey from The Office Prison in Idlib to the Riverside Prison in Raqqah.  Patricia Chavez Mejia and Frida Saide testified that the Beatles were all business and threatened the female hostages more than the local guards.  Marc Marginedas and Saide testified that the Beatles changed the rules that the local guards imposed at the Riverside Prison and enforced stricter requirements, resulting in harsh punishments for the men and prohibiting movement for

the women, including more aggressive treatment towards Mueller.  In sum, the trial record is replete with evidence supporting the leadership enhancement for Elsheikh, and the government respectfully asks the Court to apply it.

## V.    LIFE IMPRISONMENT IS MANDATORY FOR FIVE COUNTS AND WARRANTED FOR THE OTHER THREE UNDER THE SECTION 3553(a) FACTORS

After calculating the appropriate advisory Guidelines range, a sentencing court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors."  *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant.  Additional factors set forth in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Based on a careful consideration of those factors, the imposition of eight concurrent life terms of imprisonment for Elsheikh is appropriate and just for all eight counts.

For this defendant—the most notorious ISIS member to face a jury trial in the United States, who helped lead a network of at least nine detention facilities in which 26 civilian hostages from 12 countries were held captive in Syria—the nature and seriousness of the offenses are the most compelling sentencing considerations.  As the trial in Elsheikh's case laid bare, the horrifying and inhumane hostage-taking scheme that this defendant and his co-conspirators carried out on behalf of ISIS have earned him nothing short of a lifetime in prison.

The ISIS hostage-taking scheme represented exceptionally vicious acts of terrorism against the world, publicized on a global scale and perversely touted by ISIS propaganda.  The extreme torture and videotaped brutality with which American, British, and Japanese hostages were executed, and the horrific abuse and death of Kayla Mueller, make these offenses truly astounding in their depths of cruelty and depravity.

One primary purpose of the hostage-taking scheme was to extract exorbitant ransoms to fund ISIS operations and secure political concessions from foreign governments.  The three Beatles—Emwazi, Kotey, and Elsheikh—played essential leadership roles in that scheme.  The released hostages uniformly described the Beatles as being responsible for gathering the information of individuals to whom ransom demands were sent, collecting the answers to Proof of Life questions asked by victim families, and creating video or audio messages from the hostages encouraging their families to pay ransom.  Those ransom demands contained direct and explicit threats to the life and well-being of the hostages, and the Beatles were ruthless torturers who physically and psychologically abused their captives on a regular basis.

This systematic brutality included mock executions, waterboarding, sustained beatings, stress positions, orders to fight each other, and other shocking acts of violence while the victims were also starved and forced to live in squalid conditions.  It also included sadistic mind games, such as forcing the hostages to memorize the words to "Hotel Osama," as Nicholas Henin, Edouard Elias, and Daniel Rye Ottosen recounted from the witness stand.  *See also* Ex. 26-15.  The lyrics to the song parody were very threatening—"You will never leave.  If you try, you'll die Mr. Bigley style"—a reference to British citizen Kenneth Bigley (*see* Ex. 1-11), who was beheaded in 2004 by Abu Musab al-Zarqawi (*see* Ex. 1-14), a former senior al-Qaeda official.  In addition, the evidence at trial demonstrated that Elsheikh and his co-conspirators participated in

forcibly exposing the hostages to the murder of other prisoners held by ISIS (*see* Ex. 10-21), including a Russian hostage who was killed in or about February 2014 and a Syrian prisoner who was executed in or about April 2014 (*see* Ex. 10-20).

At trial, the government also established that Elsheikh was entrusted by Emwazi to help oversee the hostages and that he joined the hostage-taking conspiracy at the very beginning when there were only two hostages: James Foley and John Cantlie.  *See* Ex. 26-2.  During media interviews, Elsheikh brazenly admitted that he hit most of the hostages; that he knows "how to inflict pain;" that the objective was punishment; and that no one would hit in the face, so instead they would hit in the "meat of the muscle."  *See* Exs. 26-13, 26-14.  The released male hostages uniformly testified about the ferocious beatings that all three Beatles inflicted on the hostages, where they would drag a hostage to the center of the room and punch and kick them.  Marc Marginedas testified that the three Beatles knew how to inflict pain and where to hit.  Daniel Rye Ottosen testified about the "granddad" or "dead legs" the Beatles would inflict on them—the very same terms Elsheikh would use to describe it five years later—and how the Beatles would avoid striking their faces when inflicting the beatings.  *See* Ex. 26-14.

The history and characteristics of the defendant are summarized in the PSR.  *See* ¶¶ 144-161.  While "his basic needs were always met" by his family, Elsheikh described having a troubled youth, including his employment in "delinquency and crime" from his teenage years to age 21.  *Id.* ¶¶ 146, 159.  Additionally, FBI Special Agent John Chiappone testified that Elsheikh admitted during the March 27, 2018, post-*Miranda* interview in Syria that he engaged in criminal activity while residing in the United Kingdom, including robberies, physical assaults, and knife fighting.  The trial also revealed that Elsheikh and Kotey were arrested together in London on September 11, 2011, at a protest against a memorial service honoring the British victims who

were killed during the 9/11 attacks.  *Id.* ¶ 15.  However, there is nothing in Elsheikh's background that can even remotely explain or justify his cowardly actions against the hostages, which were fueled by hate and extreme cruelty.

The imposition of eight concurrent life sentences will also ensure that no unwarranted disparity exists between Elsheikh's sentence and the sentence that this Court imposed on his co-defendant, Kotey, who pleaded guilty last year.  Elsheikh remains defiantly remorseless and unrepentant and, like Kotey, should spend the rest of his life in prison.

A life sentence is also needed to protect the public from further crimes of Elsheikh, who has demonstrated a complete lack of respect for the law and human dignity, and has exhibited a callous disregard for the victims that he and his co-conspirators ruthlessly victimized.  The need for deterrence is enhanced by ISIS's devastating brutality, which must be met with full accountability.  As the four American victim families wrote two years ago when advocating for Elsheikh and Kotey to face prosecution in the United States: "The U.S. government should send a more powerful message:  It doesn't matter who you are or where you are.  If you harm American citizens, you will not escape.  You will be hunted down.  And when you are caught, you will face the full power of American law."[8]

---

[8] Diane and John Foley, Paula and Ed Kassig, Marsha and Carl Mueller, and Shirley and Art Sotloff: *Our children were killed by Islamic State members.  They must face trial*.  WASH. POST., July 23, 2020, *available at* https://www.washingtonpost.com/opinions/2020/07/23/our-children-were-killed-by-islamic-state-members-they-must-face-trial/.

## **CONCLUSION**

For the foregoing reasons, the government submits that eight concurrent life terms of imprisonment for the eight offenses of conviction is sufficient, and certainly not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    _____/s/_____

Raj Parekh, First Assistant U.S. Attorney
Dennis M. Fitzpatrick
John T. Gibbs
Aidan Taft Grano-Mickelsen
Assistant United States Attorneys
Eastern District of Virginia
Alicia Cook, Trial Attorney
2100 Jamieson Avenue
Alexandria, VA 22314

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record in this case.

_____/s/_____

Raj Parekh
First Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
raj.parekh@usdoj.gov