## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-cr-00239-TSE |
| v. | Honorable T. S. Ellis, III |
| EL SHAFEE ELSHEIKH, | Sentencing Date: August 19, 2022 |
| *Defendant.* | **UNDER SEAL** |

### DEFENDANT'S POSITION ON SENTENCING
### AND GUIDELINES OBJECTIONS

El Shafee Elsheikh, by counsel, respectfully submits his objections to the Presentence Report and his position with respect to sentencing. For his conviction in the instant offense*,* Mr. Elsheikh will spend the rest of his life in federal custody. Indeed, the Court's sentencing discretion is limited by the multiple statutorily mandated life sentences required for Counts 1 through 5. See 18 U.S.C. § 1203. Though the Court has the discretion to impose up to life for Counts 6 through 8. See 18 U.S.C. §§ 2332(b)(2), 2339A & 2339B.

Put simply, there is nothing that this Court can do to bring the victims back or restore their families' losses. Instead, the only real choice this Court has left in sentencing Mr. Elsheikh is whether to recommend that he be placed in a prison environment that is appropriate *for him*— as the sentencing statutes require, see 18 U.S.C. §§ 3553(a) & 3621*.* Accordingly, given Mr. Elsheikh's exemplary history while incarcerated and demonstrated lack of security risk, the defense respectfully asks this Court to recommend that the Bureau of Prisons ("BOP") evaluate Mr. Elsheikh for designation to a Communications Management Unit ("CMU") or other alternative placement short of condemning him to a life of solitary confinement at Florence ADX*.*

**<u>DISCUSSION</u>**

I.      **Objections To The Presentence Report**

Before a sentencing Court can apply any given sentencing enhancement, the Court must first find, under a preponderance standard, that evidence supports such an enhancement.  See *United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes"); *United States v. Noe*, 191 Fed. Appx. 216 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional).

Here, as made apparent below, the probation officer's application of the Leadership Role enhancement, under U.S.S.G. §3B1.1(a), the Obstruction of Justice enhancement, under U.S.S.G. §3C1.1, and application of the Sexual Exploitation enhancement, under U.S.S.G. §2A4.1(b)(5), is unsupported by the evidence.

   *a.   Leadership Role—U.S.S.G. §3B1.1(a)*

Mr. Elsheikh objects to the application of the "Role in the Offense" enhancement under USSG §3B1.1(a) (leadership role) as it is applied to this case.  PSR, ¶ 86, 98, 108, 117, 126.  The Sentencing Guidelines provide for a four-level increase "[if] the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. §3B1.1(a).  Application Note 2 to this guideline makes clear that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1(c) (2000), comment. (n.2); see *United States v. Hodge*, 295 F. App'x 597, 603 (4th Cir. 2008).

In determining whether a defendant possessed a leadership or organizational role in a given case, the sentencing commission indicated that a sentencing court should consider seven

factors: "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others." *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) (citing U.S.S.G. § 3B1.1, cmt. N. 4). Applying these factors here, the only thing established by the government's evidence is that, with the possible exception of Emwazi, all the members of the ISIS "Beatles" group were equal and co-dependent participants—working in tandem to achieve their common goals.

Indeed, the evidence at trial did not establish a discernable delineation of decision-making authority between the various "Beatles" members. To the extent that the government's investigation established a leadership hierarchy, it is clear Mr. Elsheikh did not occupy this role. Indeed, in the numerous FBI debriefing sessions ███████████████████████ clearly identified the leader of the "Beatles" group:



███████████████████████████. A released hostage, ████████████, also identified Emwazi as the person she believed to be the leader of the "Beatles" group responsible for her detention:





████████████████████████████.[1]

Moreover, ████, in ██ debriefings with the government, stated that in February 2014 the "Beatles" group ████████████████████████████████████████████ ████████████████████████████████████████. ████████████ ████████████████████. In these negotiations, the "Beatles" group "████████ ████████████████████████████████████████████████████ ████████████████" ████████████. *Id.* at 2.

The evidence adduced at trial and through the government's investigation is muddled as to the specific identities of all the "Beatles"—as the Beatles always wore black masks and took steps to conceal their physical characteristics. Consequently, it cannot be proven, by a preponderance of the evidence, that Mr. Elsheikh exercised control and authority over others, possessed decision-making authority, or that his participation in the commission of the offense was any different from the other member of the group. As such, the 4-level leadership role enhancement under U.S.S.G. §3B1.1(a) should be removed.

### b. *Obstruction of Justice—U.S.S.G. §3C1.1*

Mr. Elsheikh objects to applying the "Obstruction of Justice" enhancement under U.S.S.G. §3C1.1 (perjury, false document, false information to a judge) as applied to this case. PSR, ¶ 88, 99, 109, 118, 127. The Sentencing Guidelines provide for a two-level increase "[if] [] the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

---

[1] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction[.]" U.S.S.G. §3C1.1.  Application Note 4 to this guideline provides a non-exhaustive list of conduct covered by the enhancement: committing perjury, producing a false document during a judicial proceeding, providing materially false information to a judge, or providing a materially false statement to a law enforcement officer that obstructed or impeded the official investigation or prosecution.  U.S.S.G. §3C1.1, cmt. N.4 (A-G).  However, the application notes also make clear that this enhancement

> "[I]s not intended to punish a defendant for the exercise of a constitutional right… in applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."

*Id*. cmt 2.

The Fourth Circuit has held that for a sentencing court to apply the obstruction of justice enhancement based upon perjury, the district court must find by a preponderance of the evidence that the defendant "(1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones,* 308 F.3d 425, 428 (4th Cir. 2002).  Moreover, the "sentencing court also must specifically identify the perjurious statements and make a finding either as to each element of perjury or " 'that encompasses all of the factual predicates for a finding of perjury.' " *Id*.  The same analysis applies under application note 4(f)—providing materially false information to a judge.  See *United States v. Savage*, 885 F.3d 212, 225 (4th Cir. 2018) (citing the aforementioned *Jones* factors under an U.S.S.G. §3C1.1 cmt. N.4(F) analysis).

Alternatively, the production of a false document, under application note 4(c), "requires that either in producing or attempting to produce fabricated documents in the course of an

investigation, a defendant must consciously act with the purpose of obstructing justice." *United States v. Thorson*, 633 F.3d 312, 321 (4th Cir. 2011).   Regardless of which application note the Court chooses to apply, Mr. Elsheikh's declaration and his attendant efforts to suppress his 2018 law enforcement interview and 2019 media statements did not amount to the obstruction of justice.

Here, the district court did not find that Mr. Elsheikh submitted a false or perjured statements when he offered his declaration to support his motion to suppress.  Instead, the district court simply found that Mr. Elsheikh did not *sustain his burden of proof* regarding the claims he raised in his declaration.  Indeed, at the evidentiary hearing regarding Mr. Elsheikh's motion to suppress the district Court stated:

> "THE COURT…His declaration is not going to cut it because it has not been subject to cross-examination. You understand that Ms. Ginsberg? MS. GINSBERG: Your Honor, if he does not testify, the declaration is admitted for whatever purpose– --THE COURT: Exactly. MS. GINSBERG: -- whatever weight it has. THE COURT: Whatever weight it may have because it was not cross-examined."

*United States v. Elsheikh*, Nov. 17, 2021, Evidentiary Hearing Transcript (Day 2, pp. 162-63).

The district court further elaborated its reasoning in the memorandum opinion denying Mr. Elsheikh's motion to suppress:

> "Put simply, Defendant's claims regarding the severity and frequency of abuse in SDF custody are not credible when weighed against other record evidence." [FN 16] "It bears emphasizing that Defendant's claims were presented in a self-serving declaration rather than on the witness stand at the evidentiary hearing, where they would have been subject to cross-examination."

Dkt. 188, p. 16 (memorandum opinion).  After reviewing the factual assertions made in Mr. Elsheikh's declaration and determining that the record adduced during the evidentiary hearing did not support a finding by a preponderance of the evidence that Mr. Elsheikh's statements should be suppressed, the district court concluded by ruling that:

"[T]he *Government has sustained its burden* of establishing *by a preponderance* of the evidence that Defendant's will was not overborne and that his statements to the media in Syria in 2019 were voluntary. [FN 34]. It is worth noting, however, that this ruling does not bar Defendant from arguing to the jury that his statements were involuntary and therefore that the jury should assign them little or no weight."

*Id.* at 30 (emphasis added).

Simply put, the district court did not find that Mr. Elsheikh's statements in his declaration were false. Instead, the Court determined the evidence that Mr. Elsheikh presented during the evidentiary hearing did not meet the evidentiary threshold, a preponderance standard, to warrant exclusion of his statements.







Though the district court concluded that ███████████████████████ did not rise to the level of proving that Mr. Elsheikh's 2019 media interviews were coerced, and ███████████████████████, they do lend support to Elsheikh's claims and further demonstrate that a sentencing court could not find by a preponderance of the evidence that Mr. Elsheikh submitted a perjuries or false document to a tribunal.  As such, the sentencing enhancement under §3C1.1 should be removed.

### c.   Sexual Exploitation—U.S.S.G. §2A4.1(b)(5)

Mr. Elsheikh objects to the application of the "Specific Offense Characteristics" enhancement under U.S.S.G. §2A4.1(b)(5) as it is applied to this case.  PSR, ¶ 106.  The Sentencing Guidelines provide for a six-level increase "[if] the victim was sexually exploited[.]"  U.S.S.G. 2A4.1(b)(5).  The basis for this enhancement is the capture or sale of female hostages into slavery, including Kayla Mueller, who along with other female prisoners, were transferred from an ISIS prison to the residence of Abu Sayyaf and his wife, Nisreen Assad Ibrahim Bahar (a.k.a. "Umm Sayyaf") and were "threatened, beaten, tortured, raped, starved, and shown violent ISIS propaganda videos. Abu Bakr al-Baghdadi claimed Mueller as his slave and repeatedly raped her whenever he was at the Sayyaf residence."  PSR, ¶ 49.

The enhancement is supported by ISIS publications located during the May 15, 2015, military raid on the Sayyaf residence, *Id*. ¶ 49, FN 3, that justified the keeping of enslaved people. *Id*. However, there is no evidence that Mr. Elsheikh participated in the sexual abuse of any civilian hostage, nor is there any evidence that he assisted in holding hostages for that purpose. Mr. Elsheikh's refusal to disavow ISIS's practice of enslaving women, based on his interpretation of religious text, does not implicate him in the sexual crimes of other ISIS members. Notably, during the trial, an FBI agent testified that there was no evidence linking Mr. Elsheikh to the Sayyaf residence or that he was ever present within the home. There was no evidence that Mr. Elsheikh authored, or was in any way linked to, the publications found within the Sayyaf home. Moreover, in a government debriefing session, ████████████████

████████████████████████████████████████████████████

████████████████████████████████

Though the fact of Kayla Mueller and the Yazidi women's enslavement was a tragic aspect of ISIS's campaign of terror; there is no evidence to support a sexual abuse Specific Offense Characteristics enhancement, much less by a preponderance, in Mr. Elsheikh's case. As such, the sentencing enhancement under §2A4.1(b)(5) should be removed.

## II.   A Sufficient Sentence Under 18 U.S.C. § 3553(a)

In crafting an appropriate sentence, Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in 18 U.S.C. § 3553(a).[3] Indeed, the United States

---

[3] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the

Supreme Court has held that sentencing courts are required to "consider what sentence is appropriate *for the individual defendant* in light of the [§ 3553(a)] sentencing factors." *Nelson v. United States*, 555 U.S. 350, 351 (2009) (emphasis added). As such, consistent with both Congress' and the Supreme Court's direction, here a recommendation to the BOP to consider placing Mr. Elsheikh in a CMU rather than Florence ADX is warranted in this case.

Here, though this Court does not enjoy its' normal discretion in determining the length of Mr. Elsheikh's sentence, given the multiple mandatory life sentences, the Court does have the ability to make a recommendation to the BOP regarding Mr. Elsheikh's placement within the federal penal system. See, e.g., 18 U.S.C. § 3621(b)(4)(B) (BOP can designate any facility determined to be "appropriate and suitable, considering," *inter alia*, "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as appropriate"). Though any recommendation that this Court chooses to make is not binding, the BOP is statutorily required to consider such a recommendation when making its ultimate decision regarding Mr. Elsheikh's placement. *Id*., § 3621(b)(4)(B) & (b)(5).

The BOP's stated goal is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society," U.S. Dep't of Just., BOP Program Statement P5100.08 (2016),[4] in conjunction with the relevant § 3553(a) factors. As applied to Mr. Elsheikh, it becomes clear that the Florence ADX is inappropriate.

---

public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a).

[4] Available at: https://www.bop.gov/policy/progstat/5100_008.pdf

### a.  Mr. Elsheikh's Personal History & The Offense Conduct

Mr. Elsheikh, is currently 34 years old.  He was born in Omdurman, Sudan as the second

son of ███████████████ and ██████████.  When Mr. Elsheikh was approximately

3 years old, he and his family were forced to flee Sudan as the result of a military coup that

ousted the democratically elected government, replacing it with a totalitarian regime.  The coup

d'état led to more than 78,000 people being "purged" from the army, police and civil

administration.[5]

As political refugees, the Elsheikhs and their extended family emigrated to Cairo, Egypt,

where they resided for the next four years.  During his time, Mr. Elsheikh had a tough, but loving

childhood.  Though his family was finically strained, he enjoyed the love and comfort of a large

extended family, all of whom took turns looking after each other.  Indeed, Mr. Elsheikh's aunts,

uncles and cousins played a huge role in his upbringing.  In discussing his childhood with

counsel, Mr. Elsheikh stated that when he was a young child in Cairo, he was never alone.  When

his parents were working, or otherwise engaged, he spent time with his aunts, whom he

described as being like second mothers.  His young cousins were also a staple in his life and he

never lacked a playmate or was left to fend for himself.

While in Egypt, Mr. Elsheikh's father applied as an asylum seeker with the United

Nations, seeking to be relocated to a more permanent and stable country.  In 1994, the United

Kingdom accepted the Elsheikhs' U.N. asylum application, and Mr. Elsheikh, his parents, and

his brother relocated to London, England.  Unfortunately, however, none of Mr. Elsheikh's

extended family, with whom he had spent his entire life, emigrated with him.  Mr. Elsheikh no

---

[5] Human Rights Watch (August 1998). "Global Trade, Local Impact: Arms Transfers to all Sides in the Civil War in Sudan. ||. The Civil War". World Report 1998: Sudan. 10 (4 (A)) (available at: https://www.hrw.org/legacy/reports98/sudan/Sudarm988-03.htm#P310_36140)

longer had his extended family network to rely upon, and his childhood took a turn. Roughly 6 years after immigrating to the United Kingdom, Mr. Elsheikh's parents divorced, and he and his siblings went to live with their mother. Unfortunately, given the nature of his father's work, and the family split, Mr. Elsheikh did not see much of his father going forward. His mother, who now had to work full time to support Mr. Elsheikh and his two brothers, spent most of the time out of the house, leaving the brothers to their own devices.[6]

It was during these formative years, as a young immigrant in an adopted country, that Mr. Elsheikh learned to fend for himself and taught himself life skills. It was a jarring experience to say the least. Mr. Elsheikh went from a large family network in Egypt to only himself and his two siblings. In school, Mr. Elsheikh was a quick study, learning his new native language, English, easily and was able to comprehend lessons from other subjects with relative ease. Unfortunately, his ability to make and keep friends was stymied by the "rivalry" between his local and school neighborhoods—each viewed the others' inhabits with suspicion and prejudice. Mr. Elsheikh was able to complete primary and secondary school without incident, after which he enrolled in trade school—learning skills such as plumbing, bricklaying, and basic mechanical work. To help support himself, Mr. Elsheikh did random "gig" work—odd one-off jobs.

In 2009, Mr. Elsheikh started his personal study of religious Islamic texts. Up to and until that point, Mr. Elsheikh did not have much to do with his family's religion—Islam. Though he and his family identified as Muslims, no one in the family was particularly devout and Islam did not play a huge role in his or his family's lives. The genesis of Mr. Elsheikh's religious interests started when he started seeing his contemporaries, those with troubled pasts, leave the streets and ways of crime after finding a religious home for themselves. Inspired, Mr.

---

[6] Mr. Elsheikh's youngest brother was born after the family moved to the United Kingdom.

Elsheikh determined what was missing from his life was a greater sense of purpose, meaning, and community—something that a religious home promised.

In 2010 and 2011, Mr. Elsheikh observed with horror the atrocities committed by Bashar al-Assad and his regime against the Syrian people. Indeed, Mr. Elsheikh followed the events in Syria almost as they were unfolding, however, he felt helpless and guilty—as he was living a relatively comfortable life in a stable country in the West. When the regime started bombing its own people, Mr. Elsheikh joined the efforts of his local Syrian aid organization—helping to collect food, clothing, and medication. Eventually, in 2012, Mr. Elsheikh elected to leave the United Kingdom and travel to Syria to fight against Assad and his regime.

Upon his arrival in Syria, Mr. Elsheikh initially joined the Jabhat al-Nusra front and participated in ground battles against Assad's military forces. Eventually, given the changing geo-political landscape within Syria and the various of factions fighting one another, Mr. Elsheikh joined the Islamic State ("ISIS") as a fighter. On January 4, 2018, Mr. Elsheikh and his co-defendant, Mr. Kotey, were captured in Syria by the Syrian Democratic Forces ("SDF") while attempting to leave the country. Both Mr. Elsheikh and Mr. Kotey remained in SDF custody until approximately October 2019, when they were transferred to U.S. custody in Iraq.

Mr. Elsheikh was indicted on October 6, 2020 on one count of conspiracy to commit hostage-taking resulting in death (in violation of 18 U.S.C. § 1203), four counts of hostage-taking resulting in death (in violation of 18 U.S.C. §§ 1203 and 2), one count of conspiracy to murder United States citizens outside of the country (in violation of 18 U.S.C. § 2332(b)(2)), one count of conspiracy to provide material support to terrorists—hostage-taking/murder—resulting in death (in violation of 18 U.S.C. § 2339A), and one count of conspiracy to provide material support to a designated FTO resulting in death (in violation of 18 U.S.C. § 2339B). Dkt. 1. The

14

next day, both Mr. Elsheikh and Mr. Kotey were transported from the U.S. military detention

center in Iraq to the Eastern District of Virginia.  Mr. Elsheikh pled not guilty to all counts and

elected to proceed to trial.  Dkt. 24.

After presiding over a multi-day suppression hearing and the underlying multi-week jury

trial, the facts of this case are known all too well to this Court and need not be restated here.

Suffice it to say that the ISIS foreign hostage scheme, in which so many were killed and injured,

was a tragic and needless endeavor without justification.  Mr. Elsheikh was convicted on all

counts on April 14, 2022.  Dkt. 283.

### b. Mr. Elsheikh's Time at the Alexandria ADC & Special Administrative Measures

Since Mr. Elsheikh's arrival in this country, he has been detained at the Alexandria

Detention Center ("ADC") and kept under strict isolation—pursuant to the DOJ-imposed Special

Administrative Measures ("SAMs").  These SAMs require that Mr. Elsheikh be held under far

more stringent restrictions than almost all other inmates at the ADC.  See **Exhibit 1**, Elsheikh

SAMs.  Indeed, under these measures, Mr. Elsheikh may not have any outside contact except

with members of his legal defense team or immediate family.  Apart from his lawyers, Mr.

Elsheikh is limited to a single recorded video call per month, lasting roughly 45-minutes, with

his immediate family.  All of Mr. Elsheikh's outgoing communications (letters) must be

approved by the United States Marshall Service before they are permitted to be sent.  Mr.

Elsheikh is not permitted any contact with other inmates at any detention center and must be held

in isolation.  These SAMs are solely administered by the DOJ and for the most part are immune

from judicial scrutiny.

Indeed, Mr. Elsheikh is confined to a single-person cell 23 hours a day, with his single

hour spent outside his cell split between taking a shower and participating in limited "rec" time.

Mr. Elsheikh's "rec" time comprises of either walking in circles in the ADC's gym or watching limited TV programming—again, both activities must be done in isolation.  The reading material to which Mr. Elsheikh has access to is greatly curtailed by his inability to visit the ADC library and is most times limited to a small selection of books brought around on a "reading cart"— whose titles are normally randomly selected by the ADC staff.

Despite these severe restrictions, Mr. Elsheikh has never committed a major disciplinary violation within the ADC and has complied with the requirements of his SAMs.  See **Exhibit 2**, ADC Jail Adjustment Report.

### c. *Judicial Recommendation to BOP Regarding Housing Designation*

As previously stated, though this Court has little discretion in the ultimate sentence that Mr. Elsheikh receives—given the five mandatory life sentences on Counts 1 through 5—the Court retains its discretion in providing a non-binding recommendation to the BOP regarding Mr. Elsheikh's housing location and conditions. See 18 U.S.C. § 3621 (b)(4)(B) ("The [BOP] may designate any available penal or correctional facility…considering…any statement by the court that imposed the sentence--recommending a type of penal or correctional facility as appropriate[.]").  Given Mr. Elsheikh's established history as a model inmate, a judicial recommendation that asks the BOP to house Mr. Elsheikh in a facility other than Florence ADX, *to serve his life sentences*, comports with the requirements of 18 U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing.

According to Jack Donson, a former BOP security classification officer and recognized expert on matters regarding the BOP, Florence ADX is a federal penal institution in Fremont County, Colorado which is referred to as:

> "a "super-max [prison]," [] only one of its kind in the federal system. Upon activation, it replaced the mission of the former Marion, Illinois Control Unit which was created after

the brutal murders of two BOP staff members by the Aryan Brotherhood in separate incidents on the same day in 1983.  The super-max concept involves total isolation, which is the true meaning of "Solitary Confinement."  The purpose is to incapacitate, isolate, and eliminate contact between inmates while limiting the contact with staff. Inmates are locked in a small cell (approximately 75 Sq. Ft.) twenty-three hours a day aside from being shackled in handcuffs and leg irons to be moved to a caged-in shower area. The cell, desk, and mattress platform are made of concrete and food is delivered to the cell where inmates eat near an open toilet. Recreation is offered one hour daily based on the availability of staff and is conducted a small caged in area. All programming is done through a closed-circuit TV."

**Exhibit 3**, pp. 4-5, ¶12, *Donson Declaration*.

Absent a judicial recommendation to the contrary, "Mr. Elsheikh faces the likely possibility of being designated to the Florence ADX based on his status as an international terrorist in combination with the SAMs." Ex. 3, p. 10, ¶25.[7]  As stated below, this outcome is both unwarranted and overly punitive—especially because no matter where Mr. Elsheikh is housed, he will still be placed under very restrictive SAMs that all but guarantee a more severe, and isolated, punishment.

BOP's practice of subjecting its inmates to the type of confinement practiced at Florence ADX has come under increased scrutiny in recent years.  Indeed, in "2012, eleven inmates filed a federal class-action against the BOP in *Cunningham v. Federal Bureau of Prisons*. The suit alleged chronic abuse and failure to accurately diagnose prisoners who were mentally ill. The case included seven inmates who allegedly died by suicide while housed in the ADX." Ex. 3, p. 6, ¶15; *Id*. ¶17 ("[i]n 2017, the DOJ-Inspector General issued a report entitled Review of the Federal Bureau of Prison's Use of Restrictive Housing of Inmate with Mental Illness. The results

---

[7] Admittedly, even if the Court was to grant Mr. Elsheikh's request for a judicial recommendation to be housed at a facility other than Florence ADX, the BOP is not legally required to follow judicial recommendations.

of the review determined the BOP was not forthcoming about its practices of solitary confinement and the detrimental impact isolation has on a person's mental health.").

In fact, Florence ADX recently made headlines when in 2020, "a British Magistrate refused to extradite Julian Assange to the United States in part because of the possibility he would be subject to solitary confinement and special administrative measures." *Id.* ¶18. Eventually, the British high court allowed for Assange's extradition, but only after it received assurances that he would not be imprisoned at Florence ADX.  See U.*S. Says Assange Won't Face Supermax Prison If Extradited,* Katharine Gemmell, BLOOMBERG (last visited 8.11.2022).[8]

As highlighted by Mr. Donson's declaration to the Court, Ex. 3, Mr. Elsheikh is not the type of individual that Florence ADX was intended to house:

> "In my professional opinion, there is simply no technical public policy mandate for Mr. Elsheikh to be housed in the Florence ADX because he has the security classification points commensurate with minimum security and his SAMS communication restrictions can be accomplished in a CMU."

Ex. 3, p. 9, ¶22; *Id.*, p. 4, ¶10 ("[Maximum custody] classification is for individuals who, by *their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution*.").

Indeed, under the BOP's own security assessment scoring system, Mr. Elsheikh's score is "commensurate with <u>minimum</u> security because he is void of the typical classification factors that elevate a person's classification such as a serious history of violence (Note: BOP policy excludes scoring the instant offense as a history item) or escape and predatory prison behavior." *Id.* ¶11.  Moreover, the BOP's own policy statements would seem to exclude Mr. Elsheikh from designation to ADX Florence, given his positive detention history: "USP Marion/ADX Florence

---

[8] Available at: https://www.bloomberg.com/news/articles/2021-10-27/u-s-says-assange-won-t-face-supermax-prison-if-extradited

…units are designed for male inmates who have demonstrated an inability to function in a less restrictive environment[s.]" BOP, Program Statement 5100.08 (Inmate Security Designation and Custody Classification), at 92.[9]  However, given the nature of the current offense, the BOP is nevertheless likely to designate Mr. Elsheikh to Florence ADX.  Ex. 3, p. 10, ¶25.

At present, Mr. Elsheikh is already showing signs that his intense isolation is having a negative impact on his physical and mental well-being:

> "The pre-sentence report indicates that Mr. Elsheikh has already expressed that his isolation has been "challenging mentally" so it is unknown how his mental health would deteriorate further given prolonged isolation. A concern I have from the pre-sentence investigation is regarding his hospitalization during pre-trial detention which included heart palpitations.  It would be a sound correctional practice from a treatment perspective to have the BOP provide a mental health evaluation prior to a designation to the Florence ADX…"

Ex. 3, p. 6, ¶16.

Clearly, sending Mr. Elsheikh, an individual who is already showing signs of mental and physical deterioration from his present and past detention to Florence ADX is not an appropriate sentence.  This point is clearer when considering BOP's own policy on classification that states "Inmates currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX Florence."  *Id*., p. 7, ¶16.

A reasonable alternative exists for those inmates that must be designated to a secure facility that would comply with the requirements of the SAMs.  Indeed, the BOP operates two facilities specifically designed for inmates whose activities or offenses trigger a need for tightly monitored communications with the outside world: the communications management units (CMUs) at USP Marion, Illinois, and USP Terre Haute, Indiana.  The stated purpose of the CMUs "is to provide an inmate housing unit environment that enables [BOP] staff to more

---

[9] Available at: https://www.bop.gov/policy/progstat/5100_008.pdf

effectively monitor communication between inmates in CMUs and persons in the community."
See BOP, Program Statement 5214.02 (Communications Management Units), at 1;[10] Ex. 3, p. 7,
¶21 ("[u]nlike the Florence ADX, CMUs allow programming and some human interaction in an
administrative (high security) environment. It does not involve the isolation issues of solitary
confinement that negatively impact a person's mental health and sanity. *It can accomplish the
goals for SAMs in an environment that is more commensurate with Mr. Elsheikh's security
needs*.") (emphasis added).

Given Mr. Elsheikh's exemplary history while incarcerated and the lack of any objective
criteria that would warrant his designation to Florence ADX, the defense requests that this Court
make a recommendation to the BOP that is in line with the proffered recommendation set
forward below:

> "The court recommends initial designation to a facility other than the Florence ADX.
> The court's recommendation is based on the determination that other placement options
> can provide programming and limited interaction in a setting that can meet Mr.
> Elsheikh's security needs and still provide for communications monitoring. Total
> isolation is unnecessary considering the characteristics of the defendant when weighed
> against the needs of the government.  In addition, it is also recommended the BOP
> formulate a communications plan with the Department of the Treasury to alleviate some
> of the logistical concerns on the receipt and transfer of funds to his trust fund account.  If
> the BOP is unable to comply with this placement recommendation, the court requests a
> written justification regarding the non-compliance."

Ex. 3, p. 11, ¶26.

A judicial recommendation of this sort would be keeping in line with the dictates of 18
U.S.C. § 3553(a) to "impose a sentence sufficient, but not greater than necessary," and ensure
that Mr. Elsheikh's BOP housing designation is not overly punitive.

---

[10] Available at: https://www.bop.gov/policy/progstat/5214_002.pdf

## CONCLUSION

Mr. Elsheikh respectfully requests that the PSR be amended in conformity with the corrections and objections detailed above.  Moreover, Mr. Elsheikh requests that this Court provide a recommendation to the BOP in conformity with the housing designation proffered above.

Respectfully Submitted,

EL SHAFEE ELSHEIKH,
By Counsel

_____/s/_____
Nina J. Ginsberg, VSB # 19472
Zachary A. Deubler, VSB # 90669
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
(703) 684-4333 (T)
nginsberg@dimuro.com
zdeubler@dimuro.com


_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
Law Offices of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com


_____/s/_____
Yancey Ellis, VSB #70970
Carmichael Ellis & Brock, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908 (T)
yancey@carmichaellegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of August 2022, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Zachary A. Deubler, Esq.