# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No.: 0422 1:20CR00239-002 |
| v. | HONORABLE T.S. ELLIS, III |
| El Shafee Elsheikh<br><br>Defendant | **DECLARATION OF JACK T. DONSON** |

## **STATEMENT OF EXPERTISE**

1. I am the Founder and President of My Federal Prison Consultant, LLC which provides Continuing Legal Education (CLE), consulting, and expert testimony on matters regarding the Federal Bureau of Prisons (BOP). For the last eleven years I have submitted expert witness opinions and testified in federal district courts throughout the country regarding federal prison issues.

2. I worked in the field of corrections for more than thirty-four years, with twenty-three years employed by the BOP working in security classification, correctional programs, treatment, and re-entry. Since retirement, I actively follow policy initiatives and have attended conferences, including the U.S. Sentencing Commission conference trainings. I serve on the ABA and National Association of Criminal Defense Lawyers' (NACDL) Corrections Committees advising on Federal prison issues. In my capacity as Director of Programs and Case Management Services for FedCURE, I have had regular contact with BOP central office administrators regarding inmate and policy issues.

3. During most of my career, I managed a caseload of approximately 150 inmates as a Correctional Treatment Specialist. In that capacity, I was responsible for the development and monitoring of inmate correctional treatment plans, inmate counseling, security classification,

DEFENDANT'S
EXHIBIT
3

program monitoring and re-entry. I held assignments as a Case Management Coordinator (CMC) and Correctional Programs Officer (Unit Manager) and had several collateral administrative responsibilities including training staff, writing local policy, conducting facility audits, and monitoring institutional programs including the screening the classification data of new designations. I have experience working with international terrorists and have had inmates on my caseload who served time in the Florence ADX. In addition, my general correctional experience is comprehensive having worked with Minimum (camp), Low, Medium, Administrative (pre-trial and high security), and Witness Security populations. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I have been a Lecturer at Marywood University where I taught several Criminal Justice courses including a course entitled The American Prison. A true and correct copy of my curriculum vitae is attached.

## CASE EVALUATION

4. I was retained by DiMuroGinsbeg, P.C. on behalf of El Shafee Elsheikh to explain the living conditions within the Florence ADX (Administrative Maximum) facility and offer my professional opinion on his classification and suggestions for an alternate designation aside from the ADX, which can accommodate his security needs and Special Administrative Measures (SAMs) requirements. This information can provide context from a correctional treatment perspective to assist in the sentencing phase of his case. I have consulted with counsel and reviewed case information including the draft Presentence Report (PSR) and the Department of Treasury's Global Terrorism Sanctions Regulations License of Attorney Zachary Deubler.

## BOP CLASSIFICATION SYSTEM (BRAVO)

5. The BOP classifies facilities into several categories including Minimum (Camp), Low FCI, Medium FCI, and High Security (USP). There are also administrative facilities such as the Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC), and Federal Medical Centers (FMC), which house all security levels, as well as facilities with specialized missions such as the Florence ADX, USP Thompson (Special Management Unit), and several

reintegration and communications management units.

6. After sentencing, defendants are assigned a security classification using a system referred to as BRAVO (Bureau Risk Assessment Verification and Observation) to determine the appropriate degree of control and supervision required for facility designation. The tool is an objective assessment based on several readily assessable criteria which include age, history of violence, escape, criminal history score, and severity of the instant offense. Each factor has a corresponding security point value that, when totaled, determines a security level. Below is a chart indicating the breakdown of the security points in the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification):

| Security Level | Male | Female |
| --- | --- | --- |
| **MINIMUM** | **0-11 Points** | **0-15 Points** |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24+ Points | 31+ Points |

7. It should be noted that in my professional opinion in scoring thousands of inmate classifications, Mr. Elsheikh has only <u>eleven security points</u> which is actually commensurate with minimum security inmates housed in camp environments. (See Exhibit One- BP-337, <u>Inmate Load and Security Designation</u> form).

8. However, security points alone do not determine a security level as the classification manual also includes subjective factors, which are referred to as "<u>Public Safety Factors</u>" (PSF) that can enhance the security scoring to increase a person's classification to a higher security level. For instance, a sentence requiring over thirty years to serve, such as a Life sentence, will automatically assign a high security classification.

9. Aside from a person's security level classification, the BOP also assigns a "custody level classification" defined in the classification manual as:

> "Custody Classification: *The review process to assign a custody level based on an inmate's criminal history, instant offense, and institutional adjustment. A custody level (i.e., COMMUNITY, OUT, IN, and MAXIMUM) dictates the degree of staff supervision required for an individual inmate.*"

10. A custody level is discretionary unlike the security classification which is determined by the input of the classification factors into BRAVO. Custody levels are assigned based on the mission of the designated facility and ordinarily inmates designated to the Florence ADX are assigned "Maximum" custody. The classification manual defines maximum custody as:

> "Maximum Custody: *This classification is for individuals who, by their behavior, have been identified as **assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution.***"

While the BOP considers all people with life sentences to be an escape risk they often exercise their discretion to house Lifers in medium security facilities, provided their behavior warrants such discretion. It has always been the general philosophy when the BOP classification system was developed to house inmates in the least restrictive setting commensurate with their security needs.

11. Here, based on the objective BRAVO system, Mr. Elsheikh could end up with security points commensurate with <u>minimum</u> security because he is void of the typical classification factors that elevate a person's classification such as a serious history of violence (Note: BOP policy excludes scoring the instant offense as a history item) or escape and predatory prison behavior. However, in my professional opinion, Mr. Elsheikh will be classified as <u>High</u> security due to the "sentence length" PSF.

## CONDITIONS IN ISOLATION AT THE FLORENCE ADX

12. ADX Florence, referred to as a "super-max," is the only one of its kind in the federal system. Upon activation, it replaced the mission of the former Marion, Illinois Control Unit which was created after the brutal murders of two BOP staff members by the Aryan Brotherhood in separate incidents on the same day in 1983. The super-max concept involves

total isolation, which is the true meaning of "Solitary Confinement." The purpose is to incapacitate, isolate, and eliminate contact between inmates while limiting the contact with staff. Inmates are locked in a small cell (approximately 75 Sq. Ft.) twenty-three hours a day aside from being shackled in handcuffs and leg irons to be moved to a caged-in shower area. The cell, desk, and mattress platform are made of concrete and food is delivered to the cell where inmates eat near an open toilet. Recreation is offered one hour daily based on the availability of staff and is conducted a small caged in area. All programming is done through a closed-circuit TV.

13. Amnesty International has obtained pictures of some of the facilities at ADX, which I am including here:



The inside of a cell in a General Population Unit at ADX © Private



An outdoor recreation cage for prisoners in the Step Down Program at ADX © Private

14. A review of the BOP website on August 8, 2022, indicated there were 344 inmates housed at the ADX. The facility is subdivided into separate units with specialized missions but there is no official public policy that I am aware of that outlines the details of the individual unit missions. My opinions on the ADX are based on experience working for the agency, reading court declarations, reports from organizations such as the Department of Justice (IG), the BOP website and Amnesty International. The government has acknowledged that international terrorists are housed in the "Special Security Unit" known as "H Unit." Most, if not all prisoners in H Unit, are under SAMs for reasons related to national security.

15. The isolation of solitary confinement for prolonged periods has been a controversial subject for decades. In 2012, eleven inmates filed a federal class-action against the BOP in *Cunningham v. Federal Bureau of Prisons*. The suit alleged chronic abuse and failure to accurately diagnose prisoners who were mentally ill. The case included seven inmates who allegedly died by suicide while housed in the ADX.

16. The pre-sentence report indicates that Mr. Elsheikh has already expressed that his isolation has been "challenging mentally" so it is unknow how his mental health would deteriorate further given prolonged isolation. A concern I have from the pre-sentence investigation is regarding his hospitalization during pre-trial detention which included heart

palpitations. It would be a sound correctional practice from a treatment perspective to have the BOP provide a mental health evaluation prior to a designation to the Florence ADX control unit which is standard procedure for institution transfers and a similar isolated environment to the H Unit. In addition, the above referenced policy on classification, Chapter 7, page 18 specifically states, *"Inmates currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX Florence."*

17. In 2017, the DOJ-Inspector General issued a report entitled <u>Review of the Federal Bureau of Prison's Use of Restrictive Housing of Inmate with Mental Illness</u>. The results of the review determined the BOP was not forthcoming about its practices of solitary confinement and the detrimental impact isolation has on a person's mental health. Attorney General Horowitz released a video regarding the findings of the report which were critical of the BOP's significant inadequacy in the implementation of mental health policy.
https://youtu.be/bnKcpO40eeU

18. Prolonged isolation directly impacts mental health and was prohibited by the United Nations General Assembly in a resolution adopted in December of 2015 referred to as "The Mandella Rules" regarding the minimum rules for the treatment of prisoners. According to an article in The Journal of the American Academy of Psychiatry and the Law, "solitary confinement is recognized as difficult to withstand ; indeed, and psychological stressors such as isolation can be as clinically distressing as physical torture." In 2020, a British Magistrate refused to extradite Julian Assange to the United States in part because of the possibility he would be subject to solitary confinement and special administrative measures. On July 7, 2021, the British High Court agreed to allow the U.S. to appeal this decision with the understanding that he would not be subject to imprisonment at ADX if he is extradited.

19. On many occasions while working in the federal system, I personally noticed a drastic deterioration in the inmates on my caseload when isolated for as little as four months in our special housing unit (SHU). When I worked in a federal pre-trial facility, I was responsible for the case management of inmates pending authorization into the federal witness protection program referred to as "WITSEC." The inmates were placed in single cells within the SHU until the BOP Central Office and DOJ Office of Enforcement Operations (OEO) authorized

placement into one of the BOP Protective Custody Units. This required an FBI Polygraph examination, U.S. Marshals Interview, and U.S. Attorney threat assessment. After prolonged isolation, I made numerous referrals to the psychology services department due to deteriorating mental health issues which manifested in incident report behavior, anger, and overall frustration and hopelessness. My direct observations of the mental effects of isolation were in an environment where there was much more human contact than an individual faces in the ADX (H Unit) environment.

## COMMUNICATIONS MANAGEMENT UNIT (CMU)

20. Program Statement 5214.02, Communications Management Units is the governing BOP policy on CMUs. These are described as units where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. The purpose of a CMU "*is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community.*" In addition, the Program Statement describes several sources for CMU referrals two of which are:

    (i) The BOP Counter Terrorism Unit (CTU)
    (ii) Recommendations from law enforcement agencies or the court

21. Unlike the Florence ADX, CMUs allow programming and some human interaction in an administrative (high security) environment. It does not involve the isolation issues of solitary confinement that negatively impact a person's mental health and sanity. It can accomplish the goals for SAMs in an environment that is more commensurate with Mr. Elsheikh's security needs. I am aware of international terrorists being housed in CMUs which is also supported by the DOJ audit report entitled Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization # 20-042 - March 2020. It was clear from this audit that the BOP has been housing SAMs inmates in facilities other than the ADX. It was equally clear from the audit that international terrorists were also housed in units throughout the country. While working in a protective custody unit, I even had a SAMs inmate on my case load who was involved with Osama bin Laden and other al-Qaeda members.

## POLICY AND CLASSIFICATION CONSIDERATIONS

22. The BOP has almost unlimited discretion regarding facility designation. The agency's historical philosophy has been to place an offender in the least restrictive setting to meet their security and correctional program needs. Their discretion is outlined in the classification manual which allows them to designate offenders both above and below the scored security level. When I worked for the BOP, on more than one occasion I had terrorists on my caseload relative to the first World Trade Center bombing in a pre-trial facility and I am also aware that the BOP does house inmates with terrorism convictions in medium security general population settings when appropriate. I recently have worked with several inmates sentenced to Life who were housed in medium, Federal Correctional Institution (FCI) environments. In my professional opinion, there is simply no technical public policy mandate for Mr. Elsheikh to be housed in the Florence ADX because he has the security classification points commensurate with minimum security and his SAMS communication restrictions can be accomplished in a CMU. It should be noted Christine Farrow, Inmate Classification Counselor of the Alexandria's Sheriff's Office provided a letter to counsel which indicated Mr. Elsheikh has not incurred any major disciplinary infractions in the 1 year and 10 months he has spent in detention at the Alexandria ADC, which demonstrates his ability to follow rules.

## GLOBAL TERRORISM SANCTIONS REGULATIONS

23. Based on the complexities of the above regulations, there is the potential for further isolation upon designation due to the lack of human interaction by way of telephonic communication and visiting. Without some proactive guidance by the court, the transfer of the money in his current prison account will impeded the ability to communicate with his family who do not reside in the United States. Thus far, he has been able to participate in regular telephone calls and video visitation which is unlikely to be facilitated within the ADX due to the intricacies of the OFAC regulations which only license Attorney Deubler to transfer money to

Mr. Elsheikh's trust fund account to pay for necessities. It is my understanding it took several months for counsel to obtain the appropriate OFAC license which will expire after sentencing. This raises the likely possibility that Mr. Elsheikh will not only be isolated in H Unit, but he will not have the necessary funds for regular communication with his family.

24. The BOP attempts to comply with judicial recommendations regarding defendant placement and tracks its compliance at approximately 74%. The BOP historically responded in writing to the court when it was not able to comply with recommendations, however, that practice was discontinued in what the agency referred to as REDMAP (Reduction and Elimination in Duties Management Assessment Project) initiatives. At the time of REDMAP, the BOP circulated a memorandum that it would continue to provide responses to the court for non-compliance upon request from the sentencing judge.

## CONCLUSION & RECOMMENDATIONS

25.     Mr. Elsheikh faces the likely possibility of being designated to the Florence ADX based on his status as an international terrorist in combination with the SAMs. From a classification perspective, he does not have a violent and predatory *prior* criminal history as the instant offense appears to be his first conviction. During his pre-trial detention, he has maintained good conduct, has not attempted escape, and does not appear to have the ties to the ISIS network to effectuate an escape. It is clear from a historical and philosophical perspective, the BOP attempts to confine individuals in the least restrictive setting to accommodate their security needs.  With communication being the paramount issue in this case due to SAMS, it is well within the agency policy and past practices to place Mr. Elsheikh in an administrative environment other than the Florence ADX. The potential short and long-term negative effects from prolonged isolation should outweigh the need for ADX placement simply due to SAMs requirements. From a correctional treatment perspective, the BOP has other options aside from the Florence ADX which can restrict communication and provide for his security needs. Therefore, such placement options could be best facilitated by a judicial recommendation which is non-binding on the BOP but may cause the

agency to consider other designation options more deliberately within the policy parameters and exercise its discretion accordingly.

26. Therefore, I recommend that the Court consider a judicial recommendation as follows:

*The court recommends initial designation to a facility other than the Florence ADX. The court's recommendation is based on the determination that other placement options can provide programming and limited interaction in a setting that can meet Mr. Elsheikh's security needs and still provide for communications monitoring. Total isolation is unnecessary considering the characteristics of the defendant when weighed against the needs of the government. In addition, it is also recommended the BOP formulate a communications plan with the Department of the Treasury to alleviate some of the logistical concerns on the receipt and transfer of funds to his trust fund account. If the BOP is unable to comply with this placement recommendation, the court requests a written justification regarding the non-compliance.*

I state under penalty of perjury that the foregoing is true and correct.

_____
Jack T. Donson, Founder and President
August 11th, 2022

| BP-A0337 | INMATE LOAD AND SECURITY DESIGNATION CDFRM | |
|---|---|---|
| JUNE 10 | | |
| U.S. DEPARTMENT OF JUSTICE | | FEDERAL BUREAU OF PRISONS |

### INMATE LOAD DATA

| 1. REGISTER NUMBER: 11685-509 | | | | |
|---|---|---|---|---|
| 2. LAST NAME<br>Elsheikh | 3. FIRST NAME<br>El Shafee | | 4. MIDDLE | 5. SUFFIX |
| 6. RACE<br>B | 7. SEX<br>M | 8. ETHNIC ORIGIN<br>NH | 9. DATE OF BIRTH<br>12/18/1983 | |
| 10. OFFENSE/SENTENCE<br>Conspiracy to Commit Hostage Taking Resulting in Death, etc. ( 8 realted counts ) | | | | |
| 11. FBI NUMBER<br>905831AH5 | | | 12. SSN NUMBER | |
| 13. STATE OF BIRTH<br>N/A | | 14. OR COUNTRY OF BIRTH<br>Sudan | 15. CITIZENSHIP<br>None | |
| 16. ADDRESS-STREET<br>No fized address | | | | |
| 17. CITY<br>X | | 18. STATE<br>X | 19. ZIP<br>X | 20. OR FOREIGN COUNTRY<br>X |
| 21. HEIGHT<br>   FT       IN | | 22. WEIGHT<br>            LBS | 23. HAIR COLOR | 24. EYE COLOR |
| 25. ARS ASSIGNMENT: A-HLD | | | | |

### SECURITY DESIGNATION DATA

| 1. JUDGE<br>Honarable T. S. Ellis, III | 2. REC FACILITY<br>TBD | 3. REC PROGRAM | 4. USM OFFICE<br>ED/VA | |
|---|---|---|---|---|
| 5. VOLUNTARY SURRENDER STATUS     0 = NO     (-3) = YES<br>IF YES, MUST INDICATE:  5a. VOLUNTARY SURRENDER DATE:<br>                        5b. VOLUNTARY SURRENDER LOCATION: | | | | 0 |
| 6. MONTHS TO RELEASE : | N/A | | | |
| 7. SEVERITY OF CURRENT OFFENSE | 0 = LOWEST<br>1 = LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 7 |
| 8. CRIMINAL HISTORY SCORE | 0 = 0-1<br>2 = 2-3 | 4 = 4-6<br>6 = 7-9 | 8 = 10-12<br>10= 13 + | 0 |
| 8a. SOURCE OF DOCUMENTED     - PRESENTENCE INVESTIGATION REPORT or     - NCIC III | | | | |
| 9. HISTORY OF VIOLENCE    MINOR<br>                          SERIOUS | NONE   >15 YEARS<br>0       1<br>0       2 | 10-15 YEARS<br>1<br>4 | 5-10 YEARS   <5 YEARS<br>3            5<br>6            7 | 0 |
| 10. HISTORY OF ESCAPE OR  MINOR<br>    ATTEMPTS         SERIOUS | NONE   >15 YEARS<br>0       1<br>0       3(S) | >10 YEARS<br>1<br>3(S) | 5-10 YEARS   <5 YEARS<br>2            3<br>3(S)         3(S) | 0 |
| 11. TYPE OF DETAINER | 0 = NONE<br>1 = LOWEST/LOW MODERATE | 3 = MODERATE<br>5 = HIGH | 7 = GREATEST | 0 |
| 12. AGE | 0 = 55 and over<br>2 = 36 through 54 | 4 = 25 through 35<br>8 = 24 or less | | 4 |
| 13. EDUCATION LEVEL | 0 = Verified High School Degree or GED<br>1 = Enrolled in and making satisfactory progress in GED Program<br>2 = No verified High School Degree/GED and not participating in GED Program | | | 0 |
| 13.a HIGHEST GRADE COMPLETED | | | | |
| 14. DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 Years | 1 = <5 Years | | 0 |
| 15. SECURITY POINT TOTAL | | | | 11 |
| 16. PUBLIC SAFETY FACTORS | A-NONE<br>B-DISRUPTIVE GROUP (males only)<br>C-GREATEST SEVERITY OFFENSE (males only)<br>F-SEX OFFENDER<br>G-THREAT TO GOVERNMENT OFFICIALS<br>H-DEPORTABLE ALIEN | I-SENTENCE LENGTH (males only)<br>K-VIOLENT BEHAVIOR (females only)<br>L-SERIOUS ESCAPE<br>M-PRISON DISTURBANCE<br>N-JUVENILE VIOLENCE<br>O-SERIOUS TELEPHONE ABUSE | | C<br><br>h<br><br>I |
| 17. REMARKS<br>Projected for Life Sentence, High security with security points commensurate with Minimum (11), SAMS issue, appropriate for CMU- | | | | |
| 18. OMDT REFERRAL (YES/NO)      no | | | | |

FILE IN SECTION 2 UNLESS APPROPRIATE FOR PRIVACY FOLDER

**SECTION 2**

PDF            Prescribed by P5100            Replaces BP-S337 of FEB 02

Exhibit One