1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   ------------------------------x
                                   :
 4   UNITED STATES OF AMERICA,     : Criminal Action No.
                                   :
 5             versus              : 1:20-cr-239
                                   :
 6   EL SHAFEE ELSHEIKH,           : April 5, 2022
                                   :
 7                  Defendant. : Volume 6 (PM Session)
     ------------------------------x

 8

 9        The above-entitled Jury Trial was heard before the
     Honorable T.S. Ellis, III, United States District Judge.

10                     A P P E A R A N C E S

11   FOR THE GOVERNMENT:    DENNIS FITZPATRICK, AUSA
                            JOHN T. GIBBS, AUSA
12                          RAJ PAREKH, AUSA
                            ALICIA H. COOK, AUSA
13                          United States Attorney's Office
                            2100 Jamieson Ave
14                          Alexandria, VA 22314

15                          AIDAN T. GRANO-MICKELSEN, DOJ-USAO
                            919 East Main Street
16                          Suite 1900
                            Richmond, VA 22319
17
     FOR THE DEFENDANT:     EDWARD B. MACMAHON, ESQ.
18                          Law Offices of Edward B MacMahon Jr.
                            P.O. Box 25
19                          107 East Washington Street
                            Middleburg, VA 20118
20
                            JOHN E. YANCEY ELLIS, ESQ.
21                          Carmichael Ellis & Brock
                            108 N Alfred St
22                          1st Floor
                            Alexandria, VA 22314
23
                            NINA J. GINSBERG, ESQ.
24                          DiMuroGinsberg PC
                            1101 King Street
25                          Suite 610
                            Alexandria, VA 22314-2956
```

2

```
 1                         ZACHARY A. DEUBLER, ESQ.
                          DiMuroGinsberg PC
 2                        1101 King Street
                          Suite 610
 3                        Alexandria, VA 22314-2956

 4                        JESSICA N. CARMICHAEL, ESQ.
                          Carmichael Ellis & Brock
 5                        108 N Alfred St
                          1st Floor
 6                        Alexandria, VA 22314

 7

 8

 9  OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                     United States District Court
10                                   401 Courthouse Square
                                     Fifth Floor
11                                   Alexandria, VA 22314

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Arthur Sotloff

        Direct examination by Mr. Gibbs............. 07

Mohammad Almahmoud

        Direct examination by Mr. Parekh............ 44

EXHIBITS

On behalf of the Government:

                                                 Admitted

Number 7-5........................................... 16
Number 7-6........................................... 39
Number 7-8........................................... 26
Number 7-9........................................... 37
Number 8-8A.......................................... 46
Number 8-8B.......................................... 48

MISCELLANY

Preliminary matters.................................. 04
Certificate of Court Reporter....................... 90

EASTERN DISTRICT OF VIRGINIA

─────────────── United States v. Elsheikh ───────────────

4

1                    **P R O C E E D I N G S**

2              **A F T E R N O O N   S E S S I O N**

3              THE COURT:  You may be seated.

4              All right.  Counsel, it may have escaped your

5    attention or it may not have, but after I recessed and left

6    the courtroom, there was an indication from a member out here

7    of some anger towards the defendant.

8              Did you see it, Mr. Gibbs?

9              MR. GIBBS:  I did not, Judge.

10             THE COURT:  Did you?

11             MR. DEUBLER:  I did, Your Honor.

12             THE COURT:  All right.

13             Is he here?

14             MR. DEUBLER:  Yes.

15             THE COURT:  All right.  Do you understand you can't

16   do that?

17             UNIDENTIFIED SPEAKER:  I do, sir.

18             THE COURT:  I can't hear you.

19             UNIDENTIFIED SPEAKER:  I do.

20             THE COURT:  All right.  If there is any further

21   manifestation of your feelings -- I don't doubt that you have

22   strong feelings.  You were, after all, held.

23             Now, whether it was these people or someone else,

24   that's an issue to be resolved here by the jury, but you have

25   your own views.  You'll have to keep them to yourself;

─────────────── United States v. Elsheikh ───────────────

5

1    otherwise, I won't permit you to be in the courtroom.

2            Do you understand that?

3            UNIDENTIFIED SPEAKER:  I do.

4            THE COURT:  Can you be quiet?

5            UNIDENTIFIED SPEAKER:  Yes.

6            THE COURT:  And abstain from any expressions

7    regarding your feelings about this defendant or what has

8    happened to you?

9            UNIDENTIFIED SPEAKER:  Yes.

10           THE COURT:  All right.  And make no mistake about

11   it, nobody misunderstands your feelings.  They're valid.  But

12   you may not express them in court.

13           Do you understand that?

14           UNIDENTIFIED SPEAKER:  Thank you.

15           THE COURT:  You may be seated, sir.

16           I have considered, seriously, whether to exclude

17   this person, but I have undertaken to ascertain what it is

18   that he said to defense counsel or to the defendant to be sure

19   that it wasn't a threat.  Had it been a threat, he would be

20   gone.  It was not a threat.  It was a prediction for the

21   future.  In essence, he said, "You'll go to hell."  And I

22   don't see that as I'm going to send you there.  That would

23   have excluded him.

24           Any objection, Mr. Gibbs?

25           MR. GIBBS:  No, Your Honor.

─────United States v. Elsheikh─────

6

```
 1            THE COURT:  Mr. Ellis?
 2            MR. DEUBLER:  Mr. Duebler.  No, sir.
 3            THE COURT:  Duebler.  I'm sorry, sir.
 4            All right.  This was just brought to my attention.
 5   Anything else that we need to do before we have the jury
 6   brought back in?
 7            MR. GIBBS:  Judge, I do have one very brief matter.
 8   I would like to go on the headsets very quickly and just to
 9   advise the Court and then we can proceed.
10            (Side bar.)
11            THE COURT:  Go ahead, Mr. Gibbs.
12            MR. GIBBS:  Judge, our next witness is Art Sotloff,
13   who is Steven Sotloff's father.
14            THE COURT:  Yes.
15            MR. GIBBS:  He was in the -- in the bathroom with a
16   very bad bloody nose.  He managed to stop the bleeding.  We
17   hope that will not continue, but if it starts again on the
18   stand, we may ask for a brief recess to stop the bleeding.
19            THE COURT:  Of course, that's not a problem.
20   Mr. Deubler, you don't have a problem with that?
21            MR. DEUBLER:  Absolutely not, Judge.
22            THE COURT:  Let's proceed.
23            (Open court.)
24            THE COURT:  Bring the jury in, please.
25            MR. FITZPATRICK:  I see you looking at the witness
```

Direct Examination - A. Sotloff 10/6/22

────────United States v. Elsheikh────────
7

1   list.  Tomorrow morning, we'll provide you an updated list.

2            THE COURT:  Good.  Thank you.

3            (Off the record.)

4            (Jury present.)

5            THE COURT:  All right.  You may be seated.

6            And, Mr. Gibbs, you may call the government's next

7   witness.

8            MR. GIBBS:  Thank you, Your Honor.  The government

9   calls Art Sotloff to the stand.

10           THE COURT:  Come forward, sir, and take the oath,

11  please.

12           (Government's witness, Arthur Sotloff, sworn.)

13           (Witness seated.)

14           THE DEPUTY CLERK:  Thank you.

15           THE COURT:  All right.  Mr. Gibbs, you may proceed,

16  sir.

17                       DIRECT EXAMINATION

18  BY MR. GIBBS:

19  Q.   Good afternoon, sir.

20  A.   Good afternoon, Your Honor.

21  Q.   Sir, for the record, would you please state and spell

22  your name.

23  A.   Arthur Sotloff, A-R-T-H-U-R S-O-T-L-O-F-F.

24  Q.   And you go by Arthur or Art typically?

25  A.   Either or.

─United States v. Elsheikh─

8

```
 1   Q.   Mr. Sotloff, what city are you from?

 2   A.   Miami.

 3   Q.   And are you the father of Steven Sotloff?

 4   A.   Yes.

 5   Q.   Do you also have a daughter who is his younger sister?

 6   A.   Yes.

 7   Q.   When was Steven Sotloff born?

 8   A.   May 11, 1983.

 9   Q.   Where was he born?

10   A.   Miami, Florida.

11   Q.   So he's a national of the United States?

12   A.   Yes, he is.

13   Q.   Now, I want to ask you some questions about Steven when

14   he was growing up.  In his later years, when he was an adult,

15   he became a journalist, correct?

16   A.   Correct.

17   Q.   Now, when he was very young, when did you first sort of

18   see that he had a talent for journalism?

19   A.   Well, he was very inquisitive about a lot of things.  In

20   1st grade, they had a writer's contest, and he had won that.

21   And also he used to write stories.  He was into a lot of

22   fantasy stuff.  He used to write it all down.  So at a very

23   young age I think that was important.

24   Q.   And was he also an outgoing child in the sense of wanting

25   to learn about other people and asked a lot of questions about
```

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

9

1   other people?

2   A.   Oh, absolutely, yes.

3   Q.   Can you sort of describe an example of that?

4   A.   Well, he always liked the *Seven Wonders of the World*.  He

5   always wanted to travel and he had books on that.  At a very

6   young age, about six or seven years old, he was already

7   venturing into that.

8   Q.   And so, as he grew older, did this interest in travel and

9   interest in journalism, how did that manifest itself?

10  A.   I really don't know to tell you the truth.

11  Q.   And where did Steven go to college?

12  A.   He went to UCF.

13  Q.   That's the University of Central Florida?

14  A.   University of Central Florida, correct.

15  Q.   Is that down in Orlando?

16  A.   Yes, it is.

17  Q.   What did he study in college?

18  A.   Business, and he was doing journalism more so at that

19  time.  He was also a part of the newspaper.  I think that's

20  where he got his interest in journalism.

21  Q.   When you say the newspaper, was that a student newspaper

22  at UCF?

23  A.   That is correct.

24  Q.   Did get his degree from UCF?

25  A.   He did not.  He attended there for two-and-a-half years,

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

United States v. Elsheikh

10

1   and he went on a trip to Israel through the birthright, and I

2   think that was a two-week journey, and then he came home and

3   he didn't go back to school.  And so, I confronted him, I

4   said, "Steven, how come you're not going back to UCF?"  At

5   that point, he turned around and he said "I decided that I

6   want to go to school in Israel."  So that was his venture for

7   that.  He put that all together.  And he gave up all his

8   credits.  I think he maybe needed 10 credits to graduate.  And

9   he went to IDC Herzilya, which is in Israel, and he started

10  with no credits at the very beginning.  He graduated cum

11  laude.  And that's it.

12  Q.   And so, how long did he live in Israel while he was going

13  to school?

14  A.   I'd say four or five years.

15  Q.   And did he, in fact, take on Israeli citizenship, so he

16  was actually a dual citizen once he did that?

17  A.   That is correct.

18  Q.   So he was both a dual American and Israeli citizen?

19  A.   That is correct.

20  Q.   All right.  I'd like to move forward a bit, Mr. Sotloff.

21  After Steven's schooling, did he, in fact, go into journalism

22  as a career?

23  A.   He did.  In his first year that he was attending IDC, he

24  had ventured out on his own, and I believe he went to Lebanon

25  and he went to the refugee camps, and he was astonished at

─────United States v. Elsheikh─────

11

1    what he saw, and it really bothered him tremendously, that he

2    decided to turn his life around a little bit as far as

3    journalism and he wanted to report on it and write about it,

4    and he did.  And he was very good at it also.

5    Q.   And was Steven what's known as a freelance journalist?

6    A.   Yes, he was.

7    Q.   Can you explain what a freelance journalist is?

8    A.   A freelance journalist is you're out there on your own.

9    You have no protection.  You're writing stories and you're

10   submitting them to various organizations and publications and,

11   hopefully, somebody will be interested; and if they are

12   interested, they pay you pennies or whatever it might be.  He

13   definitely wasn't there for the money.

14   Q.   And you mentioned that, you know, you produce a product,

15   you produce an article or a story, and then you try to sell

16   it.

17   A.   Correct.

18   Q.   What are some of the publications that published Steven's

19   work over the years?

20   A.   *Jerusalem Post*, *Time*, *Christian Science Monitor*, *Foreign*

21   *Policy*, *L.A. Times*, and, I believe, the *New York Post*.  I

22   mean, he was -- he was an extraordinary writer, so there's a

23   lot of agencies that picked up his writings.

24   Q.   Sir, you mentioned a few moments ago that Steven's

25   experience of witnessing a refugee camp really opened his eyes

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

12

1   and it had drove him to do that sort of work where he was

2   describing events in really troubled parts of the world.

3           When he continued with his career as a freelance

4   journalist, would he go to those types of locations to report?

5   A.   Absolutely.  He first came to the Arab Spring, and he was

6   in Egypt for a couple of months, and after that he went to

7   Libya, and he was at Libya for probably six or seven months.

8   He also broke the Benghazi story.

9   Q.   Right.  In fact, was he one of the first western

10  journalists who was on the ground in Benghazi reporting on --

11  A.   That is correct.

12  Q.   And the Benghazi story, was that the attack on the U.S.

13  Consulate?

14  A.   The U.S. Consulate and Ambassador Stevens, that's

15  correct.

16          MR. GIBBS:  If we could pull up and publish Exhibit

17  7-2, which is already in evidence.

18          (Exhibit published.)

19  BY MR. GIBBS:

20  Q.   Mr. Sotloff, who is depicted in this photograph?

21  A.   Steven.

22  Q.   And where was this photograph taken?

23  A.   I believe that this was taken in Libya.

24  Q.   Thank you.  Now, Mr. Sotloff, I'd like to move ahead to

25  the year 2013.

──────United States v. Elsheikh──────

13

1      Was Steven still working as a freelance journalist

2   in that year?

3   A.   Yes.

4   Q.   And when was the last time you saw Steven in person in

5   2013?

6   A.   May of 2013, and then he left, he went to Turkey.  He had

7   plans to go to Israel to see -- to attend his best friend's

8   wedding, which he did.  And after that he continued going to

9   Turkey and then going into Syria.

10  Q.   And, Mr. Sotloff, in the summer of 2013, did you receive

11  a phone call from your son where he said, "Dad, just listen,

12  don't talk," and then he described an event for you?

13  A.   That's correct.

14  Q.   And what did he tell you in that phone call?

15  A.   Well, number one, he said, "Don't talk, just listen."

16  And he said, I'm planning on crossing over into the border

17  into Syria, and if you don't hear from me for three days, that

18  I should contact his friend that he was traveling with, who

19  was Barak, and let him know.

20  Q.   And you mentioned this friend that is Barak.  What's

21  Barak's last name?

22  A.   Barfi.

23  Q.   And, Mr. Sotloff, was this the last time you spoke to

24  your son --

25  A.   Yes, it was.

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

—United States v. Elsheikh—

14

1   Q.   -- was this phone call?

2   A.   Yes, it was.

3   Q.   And in the phone call, did he tell you what you were

4   supposed to do if three days elapsed and you hadn't heard from

5   him?

6   A.   I was suppose to contact Mr. Barfi and let him know, but

7   I didn't say anything to my wife at that point because I

8   didn't want to worry her.  And about a half a day, almost a

9   day went by and Mr. Barfi called me to let me know that he

10  thinks that Steven was taken.

11  Q.   And did he give you any other details beyond that or just

12  saying that he believed he had been taken?

13  A.   Not at that point.  He just said that the bad guys got

14  him.

15  Q.   And roughly when was that that Steven was taken?

16  A.   August 4th.

17  Q.   August 4th of which year?

18  A.   2013.

19  Q.   And, Mr. Sotloff, you mentioned your wife; is your wife

20  Shirley?

21  A.   Yes.

22  Q.   And did you tell her about what had happened at that

23  point?

24  A.   It took a couple of hours for me to break it to her.

25  Q.   And, Mr. Sotloff, so you get this information in August

─────────United States v. Elsheikh─────────

15

1   of 2013, did a lengthy period of time elapse between then

2   until you got any additional word about Steven's whereabouts?

3   A.   Well, it was December -- December 4th, I believe, where

4   we received a ransom letter.

5   Q.   I do -- and was that an email that came to your e-mail

6   address?

7   A.   It didn't come to my email -- they had gotten e-mail

8   addresses from his computer, and there was five or six of

9   them, and three or four of them were completely wrong by one

10  letter or a word or whatever.  It did go through to Mr. Barfi,

11  and Mr. Barfi is the one that received it and contacted me,

12  and also contacted the FBI.

13  Q.   Okay.  And --

14            THE COURT:  Who is Mr. Barfi?

15            THE WITNESS:  He is a journalist, and Steven had met

16  him in Israel while he was going to school, and they worked

17  together.  Steven was very good at research, so he did a lot

18  of research for Mr. Barfi, and Mr. Barfi would use that

19  information for his own projects.

20            THE COURT:  Next question.

21  BY MR. GIBBS:

22  Q.   Now, Mr. Sotloff, from the time you learned of Steven's

23  capture in August of 2013 until those first emails came in

24  December, can you describe briefly what was going on?  First

25  of all, what was Mr. Barfi doing during this period?

1   A.   We left Mr. Barfi in Turkey because we really weren't

2   getting any cooperation from the government, from the FBI, and

3   so we decided -- he decided that he was going to stay there.

4   And we bought a computer for him and flew a couple of people

5   over there for him.  And he was constantly going over and

6   getting information, trying to find Steven.

7   Q.   And during that period, were you in regular contact with

8   Mr. Barfi trying to get any information?

9   A.   Just about every night.

10  Q.   And you mentioned a moment ago that in December, you

11  received an email or an email was received.  Can you turn to

12  the binders.  It's Exhibit 7-5, which I believe is --

13  A.   What was that now?

14  Q.   It's 7-5.

15          THE COURT:  Has this been admitted?

16          MR. GIBBS:  This, I believe, has not been admitted,

17  but I'm planning to do that right now, Your Honor.

18          THE COURT:  All right.

19          THE WITNESS:  I have it.

20          MR. DEUBLER:  No objection.

21          THE COURT:  You may -- it's -- 7-5 is admitted.  You

22  may display as much of it as you wish to move things along.

23  (Government's Exhibit No. 7-5 admitted into evidence.)

24          MR. GIBBS:  Thank you.  If we could display the

25  first page.  And, Ms. Lopez, if we could enlarge the caption

Direct Examination of Sotloff/22

—————United States v. Elsheikh—————

17

1  at the top, the from/to and the date.

2          (Exhibit published.)

3          THE COURT:  Mr. Sotloff, this ought to be on a

4  screen right in front of you.

5          THE WITNESS:  Thank you.

6          THE COURT:  Do you see the screen?

7          THE WITNESS:  Yes, I do.  Thank you, Your Honor.

8          THE COURT:  Next question.

9  BY MR. GIBBS:

10 Q.   So, Mr. Sotloff, let's start with the from line.  The

11 email is 0101nsdkmds@safe-mail.net, had you ever seen that

12 email address before?

13 A.   I hadn't.

14 Q.   And how about the e-mails in the "to" line.  Can you just

15 walk us through?  So the first one, thehome333784; whose

16 e-mail address is that?

17 A.   That is mine, which is correct.  Goldiesonny is my wife,

18 but she spells Sonny with an O, so she never received any

19 correspondence at all.  The L or the lsotloff is my daughter,

20 but she never checked her email.  She was more like a Facebook

21 than anything else.  So there might have been something sent

22 to her, but, you know, she was not looking for anything.

23          The bbarfi is Mr. Barfi.  I have no idea who Howard

24 Chuaeoan or whoever that be or the others.

25 Q.   And Steven had a lot of contacts in the media world,

———United States v. Elsheikh———

18

1   correct?

2   A.   Correct.  The one I recognize is myself and Barfi.

3   Q.   Well, and lsotloff, right?

4   A.   Lsotloff, yes.

5   Q.   And what's the date of this email, Mr. Sotloff?

6   A.   This was dated December 4, 2013.

7        MR. GIBBS:  And then, Ms. Lopez, if we could enlarge

8   the block that's six lines down beginning with "Steven Joel

9   Sotloff is indeed. . ."  Enlarge those five or so lines.

10  BY MR. GIBBS:

11  Q.   Do you see that, Mr. Sotloff?

12  A.   I do.

13  Q.   Now, the statement in there about him -- about Steven

14  having written articles for *Time Magazine*, *Foreign Policy* and

15  other prominent think tanks, online blogs, magazines and

16  forums, was that accurate?

17  A.   Yes.

18       MR. GIBBS:  Then, Ms. Lopez, if we can go down a

19  couple of lines to, "We demand in return," if you could

20  highlight those two lines, those next two lines.

21       (Exhibit published.)

22  BY MR. GIBBS:

23  Q.   Can you just read that, Mr. Sotloff?

24  A.   "We demand in return for Steven's release, the release of

25  all Muslim prisoners that have been detained directly or

1   indirectly by your government."

2   Q.   And, Mr. Sotloff, did you have the ability to make the

3   United States government release all Muslim prisoners that had

4   been obtained directly or indirectly by the U.S.?

5   A.   Of course not.

6          MR. GIBBS:  And then if we can go down three lines

7   to the one that begins, "This must be done."  If we can

8   highlight that or enlarge that.

9          (Exhibit published.)

10  BY MR. GIBBS:

11  Q.   Can you read that?

12  A.   "This must be done while taking every measure not to

13  involve any media at all."

14  Q.   Mr. Sotloff, during the time that Steven was in

15  captivity, did you make every effort to adhere to that

16  condition and not go to the media?

17  A.   We didn't have a choice.  We were kind of threatened by

18  the government that we shouldn't do it and we could be

19  prosecuted.  And so, we just kept quiet about everything and

20  no media was involved at all.

21         MR. GIBBS:  And then, finally, if we can go to the

22  last two lines and enlarge those.

23         (Exhibit published.)

24  BY MR. GIBBS:

25  Q.   Can you read that Mr. Sotloff?

—United States v. Elsheikh—

20

1   A.   "If pressuring the government does not achieve the

2   desired results, then there is a last option.  100 million

3   euro will be secured for Steven's release."

4   Q.   Mr. Sotloff, at the time you received this email, did you

5   know how much 100 million euros was?

6   A.   After I Googled it, I did.

7   Q.   And how much was it?

8   A.   $137,000,000.

9   Q.   And did you have the ability to pay $137,000,000 for

10  Steven's release?

11  A.   No.

12           MR. GIBBS:  Next, if we could go to page 3 of

13  Exhibit 7-5.  Ms. Lopez, if you could enlarge the caption at

14  the top.

15           (Exhibit published.)

16  BY MR. GIBBS:

17  Q.   Is this also, Mr. Sotloff, from that same safe-mail.net

18  account?

19  A.   It is.

20  Q.   And who is - whose email is in the "to" line?

21  A.   This is my wife's email, which is correct.  It's AOL, but

22  it doesn't show that, so I'm sure it's correct.

23  Q.   And what's the date of this email?

24  A.   December 13, 2013.

25           MR. GIBBS:  Could we just enlarge the text of the

─────United States v. Elsheikh─────

21

1    email in its entirety?

2    BY MR. GIBBS:

3    Q.   And, Mr. Sotloff, if you can just look at that briefly.

4    Is much of what's contained in this email very similar to or,

5    in fact, identical to what was contained in the prior email of

6    December 4th?

7    A.   Pretty much.  I didn't remember any media at all. . .

8    Without any attachments. . .  The hearts and minds of Muslims.

9    Pretty much.

10   Q.   I just want to point out a couple of differences.  Four

11   lines down, the line beginning, If you can confirm --

12   Ms. Lopez, if we could enlarge that sentence.

13              (Exhibit published.)

14   BY MR. GIBBS:

15   Q.   Could you read that, Mr. Sotloff.

16   A.   "You can confirm the validity of our claim of having

17   Steven by asking three simple, yet personal questions which

18   only Steven would be able to answer."

19              MR. GIBBS:  And then, finally, if we could highlight

20   the last sentence of that email.

21              THE WITNESS:  "Be sure to make your reply clear.

22   Write in text section and without any attachments."

23              MR. GIBBS:  And then if we could go to page 5.

24              Ms. Lopez, if you could enlarge the entire email.  I

25   think it may be small enough where we can read it.

— United States v. Elsheikh —

22

1           (Exhibit published.)

2   BY MR. GIBBS:

3   Q.   Mr. Sotloff, what is the date of this email?

4   A.   December 20, 2013.

5   Q.   And, again, who is the email from, what e-mail address?

6   A.   The same as before.

7   Q.   That's the safe-mail.net address?

8   A.   That is correct.

9   Q.   And who is it to?

10  A.   This time it's to my daughter's email.

11  Q.   And are there responses to the three proof-of-life

12  questions that were sent to the people claiming to hold

13  Steven?

14  A.   Yes.

15  Q.   And then at the end of the email, can you read the last

16  sentence?

17  A.   "I am sure now that you have no doubt that you are indeed

18  communicating with the holders of Steven.  I remind you to be

19  sure you observe our conditions and act fast, and time,

20  unfortunately, for Steven is a factor."

21  Q.   And did that last line concern you?

22  A.   Of course, yes.

23  Q.   And did you want to find out what it was that made time a

24  factor in regards to Steven's captivity?

25  A.   I did, but I think we realized that they were looking for

─────United States v. Elsheikh─────

23

1   the ransom.

2   Q.   And then Mr. --

3        MR. GIBBS:   If we could go to page 6 of Exhibit 7-5,

4   which is another email.   Again, if we could just enlarge the

5   caption to start with.

6   BY MR. GIBBS:

7   Q.   What is the date of this email, Mr. Sotloff?

8   A.   December 28, 2013.

9   Q.   And who is this from?

10  A.   This is from my daughter's email.   My daughter's email

11  was taken over by Mr. Barak.   Because we felt that would be --

12  there should only be one e-mail address to communicate with.

13  So since my daughter was never using that, we used that.   So

14  that's why you see her name there.

15  Q.   And this was an idea that you came up with along with

16  Mr. Barfi?

17  A.   That is correct, and my wife.

18  Q.   Okay.

19        MR. GIBBS:   And let's see.   Ms. Lopez, if we could

20  just enlarge the entire message, I believe we should be able

21  to read that.   That's it.

22  BY MR. GIBBS:

23  Q.   Mr. Sotloff, can you see the block down towards the

24  bottom that begins, "Earlier, I asked."

25  A.   Yes.

———United States v. Elsheikh———

24

1   Q.   Could you just read that block?

2   A.   "Earlier, I asked if there was a name I could call you.

3   It was -- it would be easier for me to communicate if I could

4   call you by name and help me confirm that we are both dealing

5   with the same person.  I am Steven's father and my name is

6   Arthur."

7   Q.   Did you ever receive an answer to that question about

8   getting a name that you could refer to?

9   A.   I don't believe we did.

10           MR. GIBBS:  And then, Ms. Lopez, maybe we can

11   enlarge that last block that begins, "I can assure you."

12   BY MR. GIBBS:

13   Q.   And, Mr. Sotloff, can you read the beginning of the

14   second sentence that begins with the word "however" at the end

15   of that first line?

16   A.   "However, I am concerned about your last statement.

17   Time, unfortunately, for Steven is a factor.  What has

18   happened to Steven that time is now a factor after all these

19   months?  It is important that there is no miscommunications or

20   misunderstandings.  Help me understand what is happening to

21   Steven."

22   Q.   And, Mr. Sotloff, did you ever receive an answer to that

23   question about what the statement about time being a factor

24   was?

25   A.   No.

─United States v. Elsheikh─

25

```
 1   Q.   And, again, what was the date of this email?

 2   A.   It looks like -- you have to enlarge it.  It looks like

 3   the 28th of December.

 4   Q.   Okay.  And, Mr. Sotloff, after sending this email from

 5   your daughter's e-mail account, did a lengthy period of time

 6   go by without any further email communications with the people

 7   claiming to hold Steven?

 8   A.   Yes.

 9   Q.   And during that time, did you become aware that other

10   hostages held in the same place as Steven were being released?

11   A.   A couple of weeks or, like, two weeks after we received

12   this letter, the ransom letter, we found out that Steven

13   wasn't alone, that he was with other people, that's correct.

14   And within a week or so, we kind of tried to communicate with

15   everybody.  We got together through telephone.

16   Q.   And, in fact, during the course of that effort to

17   communicate, did you, in fact, receive a couple of handwritten

18   emails from Steven?

19   A.   No.  With letters, yes, not emails.

20   Q.   I'm sorry.  If I said emails, I apologize.  Handwritten

21   letters.

22   A.   Yes.

23   Q.   If you could turn to Government's Exhibit 7-7.  I believe

24   it should be in that same binder.

25   A.   Okay.
```

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

—United States v. Elsheikh—

26

```
1  Q.   What is 7-7?
2  A.   This is Steven's first letter that we received that's
3  dated April 18, 2014.
4        MR. GIBBS:  Your Honor, at this time we would move
5  Government's Exhibit 7-7 into evidence.
6        THE COURT:  Are you going to offer 7-8 as well?
7        MR. GIBBS:  7-8 is already in evidence, I believe,
8  Your Honor.
9        MR. DEUBLER:  Same 804(6) objection, Your Honor.
10        THE COURT:  All right.  It's overruled for the
11  reasons I've already stated in the record.  You may -- it's
12  admitted and you may publish.
13  (Government's Exhibit No. 7-8 admitted into evidence.)
14        MR. GIBBS:  Thank you, Your Honor.
15        Ms. Lopez, just highlight the top line at the top
16  just to start.
17        (Exhibit published.)
18  BY MR. GIBBS:
19  Q.   Mr. Sotloff, do you recognize the handwriting in this
20  letter?
21  A.   Absolutely.
22  Q.   What's that?
23  A.   And the names that it was addressed to.  Those are
24  nicknames.
25  Q.   Can you describe poppyseed quickly?
```

Direct Examination of Ms. Lopez 4/27/22

─────United States v. Elsheikh─────

27

1   A.   Poppyseed is the nickname for myself that actually my

2   daughter made up.  Instead of poppy, like pop, it was

3   poppyseed.  Mom is mom, obviously; Lauren is my daughter, and

4   Barak.

5         MR. GIBBS:  And then if we can go down, Ms. Lopez,

6   about four lines.  The sentence that begins, "I was captured

7   at noon. . ."  If we could highlight the next three or four

8   lines there.

9         THE WITNESS:  "I was captured at noon on August 4th

10  by the Islamic State of Iraq and sham al-Qaeda.  About 15

11  minutes after crossing into Aleppo via Bab al-Salama KLS."

12  BY MR. GIBBS:

13  Q.   Okay.  You can stop there.  Mr. Sotloff, at the time you

14  received this letter, did you know those details about

15  Steven's capture?

16  A.   No.  Well, what date is this letter?  This is the -- yes,

17  I did know where they were because some of the captives were

18  already released, and because of that, there was a lot of

19  information coming from them, which were the French, and the

20  Spaniard.  So we had an idea of what was going on.

21        MR. GIBBS:  And then, Ms. Lopez, if we can go down

22  about two lines and enlarge the sentence that begins "after

23  three days.

24  BY MR. GIBBS:

25  A.   After three days, I was placed with other foreign

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

—United States v. Elsheikh—

28

1    journalists, aid workers; and over time, our number had grown

2    as high as 23.  And at the time of this letter, it is 12.

3    Q.   And, Mr. Sotloff, at the time you received the letter,

4    did you know that Steven was being held with that many people?

5    A.   Yes.

6    Q.   And was that from some of the released hostages?

7    A.   That is correct.

8              MR. GIBBS:  Then if we can go down -- it's about

9    five lines, Ms. Lopez; it's the one that begins "a Syrian

10   man."

11             (A pause in the proceedings.)

12   BY MR. GIBBS:

13   Q.   Mr. Sotloff, it looks as though the letter was folded and

14   there's sort of a crease in it.

15             Are you able to make out most of the text that

16   begins the end of that line "a Syrian man"?

17   A.   Yeah.  It says "foreign," and it's kind of scratched out,

18   million.  "In-between these two groups of crazy Russians. . ."

19   I can't read the rest of that.

20   Q.   Well, if you -- I think it's -- let's see -- let me see

21   if I can help a little bit with that.

22             It's off to the right-hand column.  It's the

23   sentence that begins "a Syrian man."

24   A.   Oh, okay.  "A Syrian was also executed, Danish

25   governments as well as MSF for their remaining people.  A

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

───────United States v. Elsheikh───────

29

1   Syrian man was executed" -- I'd say it's kind of -- I'm kind

2   of missing it there.  It's all scratched out.  "Above

3   countries in yesterday to apparently break. . ."

4           I can't understand that.

5   Q.   That's fine.

6   A.   It's hard to read.

7   Q.   Right.  No, it is, it is.

8           But in terms of this statement about a Syrian man

9   being executed, Mr. Sotloff, did you receive any photographs

10  from the people claiming to hold Steven showing that event?

11  A.   Of the Syrian?

12  Q.   Yes.

13  A.   No.

14  Q.   Did you receive any videos of that event?

15  A.   No.

16          MR. GIBBS:  And then, Ms. Lopez -- I think this will

17  be easier to read -- three lines from there, the line that

18  begins "until last week, there were only six of us," if you

19  could enlarge those four lines.

20          THE WITNESS:  You want me to start at the beginning?

21  BY MR. GIBBS:

22  Q.   You can start where it begins to the right "until last

23  week."

24  A.   Until last week?

25  Q.   It's two or three lines down from "the Syrian man."

— United States v. Elsheikh —

30

1   A.   "Until last week, there were only six of us, three

2   Britains and three American, but we were also introduced to

3   25-year-old, Kayla Mueller of Arizona, on April 10th.  And she

4   has been mostly held in isolation since July.

5   Q.   Stop there for the moment.  That statement about Kayla

6   Mueller from Arizona, did you know who Kayla Mueller was at

7   this point?

8   A.   Yes.

9   Q.   And had you met the Mueller family by this point?

10  A.   Yes.

11  Q.   Can you read the next sentence after that that begins

12  "our captors"?

13  A.   "Our captors are currently asking 100,000 euro from us,

14  but we will -- we will accept 2-to-1 prisoner exchange -- oh,

15  that's probably for the prisoners that they're asking for --

16  for the likes of Africa?  I can't read the rest of it.

17  Q.   Okay.  Let's go back to the amount.  I think you said

18  100,000, but could you look at that amount again?

19  A.   100 million euros.

20  Q.   At the time of this letter, Mr. Sotloff, have you heard

21  of Omar Abdel-Rahman?

22  A.   Yes.

23  Q.   And did you know him as the Blind Sheikh?

24  A.   I did know of the Blind Sheikh, but I knew the Blind

25  Sheikh from previous news things that I saw.  I never really

─────United States v. Elsheikh─────

31

1  knew his name, but I knew the Blind Sheikh.

2  Q.   And how about Aafia Siddiqi.  Have you ever heard of

3  Aafia Siddiqi?

4  A.   Yes.

5  Q.   If we go to page 2.

6          MR. GIBBS:  And Ms. Lopez, down towards the bottom.

7  It's about 10 lines up.  It's the sentence over to the right

8  that begins, "tell Barak that Peter. . ."  If we can enlarge

9  that.

10         THE WITNESS:  Do you want me to start at "tell

11  Barak"?

12  BY MR. GIBBS:

13  Q.   Please.

14  A.   "Tell Barak that Peter told me he had worked on the

15  outside for me and I thank him for not leaving a mine field --

16  me in the field."  I'm sorry.

17  Q.   No, that's fine.

18  A.   We had some of the true -- I can't -- together.  Tell

19  him.

20  Q.   No, that's fine.  That's all I wanted to cover with that.

21         Mr. Sotloff, at the time of this letter, from

22  Steven, did you know who Peter Kassig was?

23  A.   Yes.

24  Q.   And was that as a result of being in contact with the

25  other American families?

———United States v. Elsheikh———

32

1   A.   Yes.

2          MR. GIBBS:  And finally, Ms. Lopez, if we could

3   enlarge the PS in the bottom right corner.

4          And could you read that, Mr. Sotloff.

5          THE WITNESS:  You're asking a lot.

6          It says, "PS.  May 9th.  U.S. guys made an audio in

7   orange suits.  May 1st.  Got update from whomever delivers

8   this letter."

9   BY MR. GIBBS:

10  Q.   And did you ever receive any videos or audios from --

11  well, via video, of the U.S. guys in orange suits?

12  A.   No.

13  Q.   I think that concludes that one, Mr. Sotloff.

14          MR. GIBBS:  If we can now publish the second letter,

15  which is Exhibit 7-8, which is in evidence.

16          (Exhibit published.)

17  BY MR. GIBBS:

18  Q.   And Mr. Sotloff, can you just orient us.  What is this?

19  A.   This is the second letter that was delivered from

20  Federico, who was the last person I believe to be released.

21          MR. GIBBS:  And Ms. Lopez, if we can highlight the

22  portion.  It's about ten lines down.  It begins "I made a

23  video."

24          THE WITNESS:  "I made a video with the US/UK guys on

25  May 1st.  Vague demands for prisoners, nothing financial

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

──────United States v. Elsheikh──────

1    mentioned, and telling my fellow citizens it's addressed to

2    them and not to the government to rise up and. . ."  It's cut

3    off from there.

4           MR. GIBBS:  Can we go down another couple lines,

5    Ms. Lopez.

6           THE WITNESS:  Oh, okay.  "To rise up as citizens and

7    addressed to them and not to the government to rise up again

8    and avenge U.S. if we are killed.  We wear orange jumpsuits.

9    Allah Guantanamo."

10   BY MR. GIBBS:

11   Q.   You can stop there, sir.

12          Now, the statement in this letter about making a

13   video with the US/UK guys and wearing orange jumpsuits.

14          Did you ever receive such a video?

15   A.   No.

16          MR. GIBBS:  And then, Ms. Lopez, if we could go

17   down -- it's the indented paragraph towards the bottom that

18   begins "A few days ago."  If we could enlarge that sentence.

19   BY MR. GIBBS:

20   Q.   Mr. Sotloff, can you just read the sentence that begins

21   "a few days ago."

22   A.    "A few days ago, we were told to write you a letter."  I

23   can't read the following letter after that, but then it says,

24   "raise money for the release that the price has been lowered

25   from. . ."

─United States v. Elsheikh─

34

```
 1  Q.   That's good.  You can stop there.

 2            So Mr. Sotloff, did you ever receive a letter

 3  indicating that the price for Steven had been lowered?

 4  A.   No.

 5  Q.   And the amount you testified about earlier, the $100

 6  million, was that the only amount that was ever conveyed to

 7  you for Steven's release?

 8  A.   That's correct, yes.

 9  Q.   We can take that down.  Thank you.

10            If we can go back to the email, 7-5, and go to page

11  7 of that.  Again, let's enlarge -- well, when you get there,

12  let's enlarge the caption first.

13            Mr. Sotloff, what is this email?

14  A.   It's August 22, 2014.  And this is from Oscar Barak.

15  Q.   And who is it to?

16  A.   It is to the same address, e-mail address, that has

17  contacted us before.

18  Q.   And this is -- so this is August 22nd.  You testified

19  earlier that there had been email communications back in

20  December, but then there was a long gap, between emails,

21  correct?

22  A.   Correct.

23            MR. GIBBS:  And if we could, Ms. Lopez, if we could

24  highlight the first paragraph or enlarge the first paragraph.

25            Could you just read that highlight -- or enlarged?
```

─────United States v. Elsheikh─────

35

1   A.   "Dear holders of Steve, we have witnessed the seriousness

2   of your commitment in your video.  Your actions have changed

3   the options available to our family.  Steve is of great

4   importance to us as he is to you.  All the hostages are

5   important to you."

6   Q.   And Mr. Sotloff, what was the video you were referring to

7   in this email?

8   A.   Um, that was probably the murder of Jim Foley.

9   Q.   And did you see, at least a portion of the video,

10   depicting the murder of James Foley?

11   A.   I did.  And at the end of that I -- my son.  That was the

12   first time that we have seen him this whole time he was gone,

13   being held up by his neck.  Saying that this message is to you

14   President Obama.  Steven's life depends on your next decision.

15   Q.   And if we could publish Exhibit 1-24F, which is in

16   evidence.  Mr. Sotloff, you just testified about what was

17   depicted at the end of a message to America, but what is this

18   photograph?

19   A.   This is one of the two photographs.  I believe that this

20   was a mock execution that he went through months before,

21   because when he -- the way he looks he still looks like he's a

22   little nourished.  And when he was beheaded, he was very thin.

23   So I think that this was a picture that was, again, probably a

24   mock execution just to frighten them.

25   Q.   And you testified a moment ago that you saw Steven at the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

—United States v. Elsheikh—

36

1   end of a message to America?

2   A.   Correct.

3   Q.   Was that the first time you had seen a picture of him

4   since his capture?

5   A.   That's correct.

6   Q.   We can take that down.

7           Now, Mr. Sotloff, in the email we just looked at it

8   said, "We have witnessed the seriousness of your commitment in

9   your video."

10          At some point after that video came out, was a

11  decision made within your family to make a video appeal to the

12  leader of ISIS?

13  A.   Yes.

14  Q.   And was the idea that that would actually be published or

15  sent out in the media to try to get their attention?

16  A.   Yes.

17  Q.   And was this the first time that any effort had been made

18  to go to the media?

19  A.   Yes, it was.

20  Q.   If we could -- if you could go to the binder to Exhibit

21  7-9.  There should be a disk there.

22  A.   Yes.

23  Q.   What is Government's Exhibit 7-9?

24  A.   It's a video.

25  Q.   And do you recognize your signature and the date on

37

1   there?

2   A.   I do.

3         MR. GIBBS:  Your Honor, at this time we would move

4   in Exhibit 7-9 and ask to play it.  It's 1 minute and 55

5   seconds in length.

6         MR. DEUBLER:  No objection.

7         THE COURT:  Admitted.  You may display it.

8   (Government's Exhibit No. 7-9 admitted into evidence.)

9         (Video played.)

10  BY MR. GIBBS:

11  Q.   Mr. Sotloff, who was speaking in that video?

12  A.   Shirley Sotloff, my wife.

13  Q.   Your wife.  And this video that was produced, was it

14  actually publicly disseminated?

15  A.   It was going to be released at a certain time at night

16  that was supposed to go everywhere, so it would be available

17  to everybody at one time.

18  Q.   And at some point after the video was disseminated, did

19  you receive another email from that safe-mail.net account?

20  A.   I don't believe so.

21  Q.   Well, can we -- why don't we do it this way.

22        Can we go to page 8 of Exhibit 7-5.

23  A.   This is December 4, 2014.

24  Q.   Well, yeah.

25  A.   August 30th.

─────United States v. Elsheikh─────

38

1  Q.   Yup.

2        MR. GIBBS:  Can we just enlarge the caption and then

3  the first line at the top.

4  BY MR. GIBBS:

5  Q.   Again, what's the date of this email, Mr. Sotloff?

6  A.   This is August 30th.

7  Q.   And who is it from?

8  A.   This is from the same email that was holding Steven.

9  Q.   And who is it to?

10  A.   It was to -- it was actually to my daughter.

11  Q.   And what is the email message, what did that say?

12  A.   "Attached is an audio message from Steven."

13  Q.   And did you, in fact, receive an audio message from

14  Steven that you were able to listen to?

15  A.   Not in this source.  I believe it went to Barak first.

16  Actually, I think it was an FBI person, Bill Haney (ph), who

17  sent it to us.  So it went through the channels and then it

18  finally was funneled in to us.

19  Q.   Can you take a look at the binder one last time at

20  Exhibit 7-6.  It's another disk.

21  A.   7-6?

22  Q.   Yes, sir.

23  A.   Yes.

24  Q.   Do you recognize 7-6?

25  A.   I do.

Direct Examination of Arthur Sotloff  10/14/22

─────United States v. Elsheikh─────

39

1  Q.   And do you see your signature and the date on there?

2  A.   I do.

3        MR. GIBBS:  Your Honor, at this time we would move

4  in Government's Exhibit 7-6 and ask to play it.  It's about a

5  minute-and-a-half long, I believe.

6        MR. DEUBLER:  Same 804(6) objection, Your Honor.

7        THE COURT:  All right.  Overruled for the same

8  reasons I've stated and will state in writing.  So it's

9  overruled.  It's admitted.  You may play it.

10        MR. GIBBS:  Thank you, Judge.

11  (Government's Exhibit No. 7-6 admitted into evidence.)

12        (Video played.)

13  BY MR. GIBBS:

14  Q.   Mr. Sotloff, did you recognize your son's voice in that

15  audio we just heard?

16  A.   Yes, I do.

17  Q.   Was that the first time you heard his voice since he was

18  captured back in 2013?

19  A.   The first and last, yes.

20  Q.   And in the audio we just heard Steven made a reference to

21  your recent video appeal.  Did you understand what that was in

22  reference to?

23  A.   That was the video that we just showed previously, which

24  was -- which was his mother pleading for his life.

25  Q.   And, Mr. Sotloff, the email that we just looked at that

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

40

1   said "attached is an audio message from Steve -- or Steven,"

2   was dated August 30th, 2014.

3          At some point after that, did you learn that Steven

4   had been murdered?

5   A.   The day that he was murdered, yes.

6   Q.   Do you recall what the date was or what the day was?

7   A.   I don't know which day it was, but I was in my car

8   getting ready to go on an errand, and I had my phone sitting

9   on the passenger seat, and whenever I get an email or

10  anything, it makes a sound.  And this was the news flash that

11  a second journalist was beheaded.  So I didn't read it, but I

12  kind of knew that it was probably Steven, and I went in the

13  house and got Shirley and we read it, and it was him.

14          MR. GIBBS:  And if we could publish Exhibit 1-25C,

15  which is in evidence.

16  BY MR. GIBBS:

17  Q.   And, Mr. Sotloff, did you, at some point, view at least a

18  portion of the video, a second message to America?

19  A.   Yes.

20  Q.   And do you recall seeing this photograph or this still?

21  A.   Yes.

22  Q.   Do you recognize this still from that video?

23  A.   Yes.

24  Q.   And you recognize your son Steven?

25  A.   Yes.

────United States v. Elsheikh────

41

1   Q.   You can take that down.

2          MR. GIBBS:  Now, finally, Ms. Lopez, if we can pull

3   up Exhibit 1-35, which is in evidence, and go to page 47.  Can

4   we enlarge the --

5   BY MR. GIBBS:

6   Q.   Well, first of all, Mr. Sotloff, do you recognize the

7   photographs of your son on this page?

8   A.   I do.

9   Q.   And what is the photograph of the document in the lower

10  left-hand corner; can you tell what that is?

11  A.   That is a picture of his Israeli passport.

12         MR. GIBBS:  Ms. Lopez, if we can highlight the first

13  paragraph there which, I think, is in yellow.

14  BY MR. GIBBS:

15  Q.   Mr. Sotloff, can you read that?

16  A.   "Below, you will read the message sent from Steven

17  Sotloff to his mother days before his execution.  Again, his

18  killing was the consequence of the U.S. arrogance and

19  transgression which all U.S. citizens are responsible for as

20  they are represented by the government they have elected,

21  approved of and supported through votes, polls, and taxes."

22         MR. GIBBS:  And then, Ms. Lopez, if you can enlarge

23  the sentence immediately below that that begins "The case of

24  Steven Sotloff."

25  BY MR. GIBBS:

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

42

1   Q.   Mr. Sotloff, could you just read that, just the first

2   sentence, if you would.

3   A.   "The case of Steven Sotloff contains a direct refutation

4   against those who portray western journalism and humanitarian

5   aid as purely innocent, for this man was a Jew and citizen of

6   a Jewish state.  In addition. . ."

7   Q.   That's fine.  That's good.  Thank you, sir.

8        MR. GIBBS:  And, next, if we can go to 48 of Exhibit

9   1-35.

10  BY MR. GIBBS:

11  Q.   Mr. Sotloff, first of all, do you recognize -- who is

12  depicted in that photograph?

13  A.   That is Steven.

14  Q.   And if you could look at the text to the left of that

15  photograph, do you recognize where that text is from?

16  A.   I have -- that's the audio that you just played of his

17  last words.

18  Q.   From Steven's audio we just listened to?

19  A.   Correct.

20  Q.   Thank you.

21       MR. GIBBS:  And, finally, Ms. Lopez, if we could go

22  to Page 51.  Let's start at the top.  If you could enlarge

23  that article there.

24  BY MR. GIBBS:

25  Q.   And, Mr. Sotloff, do you see that enlarged portion at the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

43

1  top, it says, "U.S. military airstrikes hit ISIL."

2  A.   Correct.

3  Q.   And then below that, it has Tampa, Florida.

4        What's the date that's listed there?

5  A.   Correct.

6  Q.   What is the date?

7  A.   September 16, 2014.

8  Q.   And then if we could go down below that, there's a

9  redacted photograph.  There's also a box of text.  If you

10  could read the text for us.

11  A.   "These strikes were. . ."

12        MR. GIBBS:  I'm sorry.  If Ms. Lopez could go down.

13  Yeah.

14  BY MR. GIBBS:

15  Q.   If you could read that text, sir.

16  A.   (As read):  "Sotloff was executed in retaliation for the

17  numerous Muslims killed in Iraq by the U.S. American

18  airstrikes.  Similarly, killed the Muslim families on

19  September 15th after Sotloff's death."

20        MR. GIBBS:  One moment, Your Honor.

21        (Counsel confers.)

22        MR. GIBBS:  All right.  Mr. Sotloff, I want to thank

23  you.

24        THE COURT:  All right.  Any cross-examination?

25        MR. DEUBLER:  No, sir.

—United States v. Elsheikh—

44

1      THE COURT:  You may step down.  Call your next

2  witness.

3          (Witness excused.)

4      MR. PAREKH:  Your Honor, the United States calls

5  Mr. Mohammad Almahmoud to the stand.

6      THE COURT:  Come forward and take the oath, please,

7  sir.

8  (Government's witness, Mohammad Almahmoud, affirmed.)

9          (Witness seated.)

10      THE DEPUTY CLERK:  Thank you.

11      THE COURT:  You may proceed, Mr. Parekh.

12      MR. PAREKH:  Thank you, Your Honor.

13                  DIRECT EXAMINATION

14  BY MR. PAREKH:

15  Q.   Good afternoon, sir.

16  A.   Good afternoon.

17  Q.   If you could pull your seat forward and keep your voice

18  up so everyone in the courtroom can hear you, we'd all really

19  appreciate it.

20  A.   Okay.

21  Q.   Could you please state and spell your name for the

22  record.

23  A.   My name is Mohammad Almahmoud, M-O-H-A-M-M-A-D,

24  A-L-M-A-H-M-O-U-D.

25  Q.   Mr. Almahmoud, where are you from?

Direct Examination of - 10/5/22

──United States v. Elsheikh──

45

1   A.   I'm from Aleppo, Syria.

2   Q.   What languages do you speak?

3   A.   I speak Arabic, Turkish, and English.

4   Q.   Are you comfortable testifying today solely in the

5   English language?

6   A.   Yes, sir.

7   Q.   Where do you currently reside?

8   A.   I reside in Toronto, Canada.

9   Q.   Were you born in Syria?

10  A.   I was born in Aleppo, Syria.

11  Q.   When did you move to Canada?

12  A.   Late September 2018.

13  Q.   Where did you reside prior to your move to Canada?

14  A.   Turkey.

15  Q.   How are you currently employed?

16  A.   I do freelancing interpretation, language interpretation.

17  Q.   Did you know Peter Edward Kassig?

18  A.   Yes, sir.

19  Q.   I want you to take a look at Binder No. 3, if you would,

20  with the assistance of the court security officer.  And it's

21  Exhibit 8-8A.

22        MR. PAREKH:  And there's no objection, Your Honor,

23  so I would move to admit 8-8A.

24        THE COURT:  All right.  It's admitted without

25  objection.  Go ahead.

─────United States v. Elsheikh─────

46

1   (Government's Exhibit No. 8-8A, received into evidence.)

2           MR. PAREKH:  Can we please publish that Exhibit?

3   BY MR. PAREKH:

4   Q.   Mr. Almahmoud, if you can take a look at your computer

5   screen.  Do you recognize the individual depicted here?

6   A.   Yes, he's Peter Kassig.

7   Q.   How did you meet Peter?

8   A.   We met in a cafe in Istanbul, Turkey.

9   Q.   And when was that?

10  A.   It was like early 2013.

11  Q.   And what were the circumstances of your meeting Peter?

12  A.   So I was doing some voluntary activities with the field

13  hospitals inside Syria, and Peter was also doing the same, but

14  he was doing it from Libya to work on Southern Syria; and when

15  he moved to Turkey, he wanted to work on Northern Syria and

16  that was, like, my area where I used to work in that area.  So

17  we agreed on working together, and after 2013 when we met.

18  Q.   And after you met, what did you agree to do together?

19  A.   To connect with field hospitals, provide them with

20  medical supplies and trainings, yeah.

21  Q.   Did Peter organize or create a business at that point?

22  A.   Yes.  It was called SERA, which is Special Emergency

23  Response and Assistance.

24  Q.   Was that a not-for-profit organization?

25  A.   A not-for-profit organization, yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

47

1   Q.   And what did Peter do for SERA?

2   A.   Peter was the founder for SERA.  He found SERA in

3   Lebanon, Beirut.  And, yeah, I was the operations manager at

4   SERA.

5   Q.   And do you know someone by the name of Eliot Stempf?

6   A.   Yes, I do.

7   Q.   How do you know him?

8   A.   He is a co-worker and roommate and friend as well.

9   Q.   Did you all reside together in Turkey?

10  A.   Yes.

11  Q.   Why were you all interested in delivering humanitarian

12  aid?

13  A.   Well, that was my duty towards like to support my country

14  in that situation.  So the regime was bombing hospitals and I

15  had to find a way to serve civilians in Northern Syria and

16  that's how I started.

17          THE COURT:  When you said "regime," what regime?

18          THE WITNESS:  The regime of Bashar al-Assad.

19          THE COURT:  Next question.

20  BY MR. PAREKH:

21  Q.   And when did you, Peter, and Eliot reside in Turkey?

22  A.   It was like summer of 2013.  So like mid-summer of 2013

23  or before.

24  Q.   Where in Turkey was that?

25  A.   Turkey Garden City.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

48

```
 1   Q.   Is that near the Turkish-Syrian border?

 2   A.   That's 60 kilometers from the Syrian-Turkish border, yes.

 3   Q.   Did you and Peter make trips into Syria at that point to

 4   deliver humanitarian aid?

 5   A.   Yes, several trips.

 6            MR. PAREKH:  Your Honor, I'd move to admit Exhibit

 7   8-8B.  I don't believe there's an objection.

 8            MR. DEUBLER:  No, Your Honor.

 9            THE COURT:  All right.  It's admitted.  You may

10   display it.

11   (Government's Exhibit No. 8-8B admitted into evidence.)

12   BY MR. PAREKH:

13   Q.   Please describe what we're looking at here,

14   Mr. Almahmoud.

15   A.   It was -- this is Peter in one of our missions in Eastern

16   Syria, in the Ezzor province.  Peter was helping one of the

17   injured people as you can see.  This picture was taken by me.

18   And, yeah, we were like back and forth between like the

19   clashing areas and the bombing areas to the nearest field

20   hospitals in Eastern Syria.

21   Q.   And was this Peter treating a wounded civilian?

22   A.   Yes, sir.

23   Q.   And this is inside an ambulance?

24   A.   Yes.

25   Q.   Now, did there come a point in time in late September
```

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────United States v. Elsheikh─────

49

1 | 2013 when you, Peter, and others traveled into Syria?

2 | A.   Uh-huh.  So may I have the question again, please.

3 | Q.   Yes.  Did there come a point in time in late September

4 | 2013 when you, Peter, and others traveled into Syria?

5 | A.   Yeah.  So we, Peter and I, traveled to Syria like

6 | September the 30th, 2013.  We went to Aleppo province to meet

7 | with some of the field hospitals' doctors in Northern Aleppo.

8 | And the same day we made it to Ar Raqqah City.  We stayed

9 | there for like about -- for one night exactly.

10 | Q.   And what was the purpose of that trip?

11 | A.   It's like, as usual, we always go for missions, aid

12 | missions, like, training for first trauma response and first

13 | aid.  And also, delivering medical supplies.  And in that

14 | trip, in particular, we were delivering also some gifts for

15 | children in Eastern Syria.

16 |      MR. PAREKH:  And if we can pull up Exhibit 2-1.

17 | It's already been admitted.  It's a map.

18 | BY MR. PAREKH:

19 | Q.   Can you just circle -- you mentioned a couple of areas of

20 | Syria.  Can you just point out exactly where you were on that

21 | trip and where you were headed?

22 | A.   Yeah.  We've entered Syria from this point and we went to

23 | Northern Aleppo and after that we went all the way to

24 | Ar Raqqah City.  One night in Ar Raqqah, and then heading to

25 | Eastern Syria Deir ez-Zur.  We were stopped 40 kilometers away

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

---United States v. Elsheikh---

50

1    from Ar Raqqah towards Deir ez-Zur.

2            MR. PAREKH:  We can take down the map.

3    BY MR. PAREKH:

4    Q.   I want to direct your attention now to October 1, 2013.

5    Do you remember that day?

6    A.   I do remember that day.

7    Q.   And you just testified that you were headed towards Deir

8    ez-Zur, Syria?

9    A.   Correct.

10   Q.   What happened on that day?

11   A.   On our way, 40 kilometers away from Ar Raqqah, we were

12   stopped by six armed masked individuals with -- armed with

13   AK-47, and they were like wearing bullet clothes as well.  And

14   yup, we were stopped by them.  We were like smoking tobacco

15   and it was like an ambulance car.  We were at the back of the

16   ambulance car, Peter and I and two other local people.

17   Q.   And you mentioned that there were six armed gunmen?

18   A.   Correct.

19   Q.   The mask that they were wearing, could you see their

20   faces?

21   A.   Nope.  Nope.

22   Q.   Just their eyes?

23   A.   Only eyes.

24   Q.   And did those masked gunmen ask you and Peter and others

25   for anything?

─United States v. Elsheikh─

51

 1   A.   Yes.  So, like, they -- they were upset that we were

 2   smoking since it's, like, not okay with them.  And also they

 3   asked for IDs immediately.  We provided IDs.  The first ID was

 4   my ID and it was a guy from, I believe, Saudi Arabia, and he

 5   was asking me if you're from Aleppo why are you going to Deir

 6   ez-Zur.  And, you know, you can't tell them anything at that

 7   point.

 8          The second ID was Peter Kassig's ID.  It was his

 9   driver's license.  And when they saw the ID, it was like, "Oh,

10   Amreekiyy."  And you can tell, like, they -- they weren't

11   happy to see an American, and as he saw, like, an enemy at

12   that time.  We were asked to follow an ISIS vehicle back to a

13   point -- to a small town called Al Karama.  And we had the

14   chance to make a couple of calls, Peter and I, so we called

15   Eliot Stempf and we explained the situation.

16   Q.   And did Peter call Eliot Stempf?

17   A.   Yes.

18   Q.   And did you call someone else?

19   A.   I did call my friend Ibrahim.

20   Q.   And were you scared at the time?

21   A.   Yup.  Peter was turning red and pink, kind of, since he

22   was, like, very white looking.  We were really stressed.  Our

23   hearts were like -- like beating very, very fast, and we were,

24   like, anxious and angry and nervous at the same time.

25   Q.   What did you say to the person that you called?

Direct Examination of Elsheikh   10/05/22

─────United States v. Elsheikh─────

52

```
 1   A.    I told him that --

 2   Q.    And who was it?

 3   A.    The person I called?

 4   Q.    Yes.

 5   A.    He was Ibrahim Baragi (ph).  He was my university friend

 6   from the University of Gaziantep.  And I trust him, so I

 7   called him, and I told him if he has a pen and paper and if

 8   he's able to take any notes.  So he did, and then I told him

 9   we were stopped at the checkpoint, 40 kilometers from Ar

10   Raqqah east, and we are back now.  We are following an ISIS

11   car to an area called Al Karama.  He told me, "What can I do?"

12   I said, "I don't know."  And then he told me, "Do you see any

13   signs around you?"  And I saw the sign, a hand-sprayed sign,

14   of -- it's Islam for al-Sham, which is the Islamic State in

15   Iraq in al-Sham or Levant.

16   Q.    Also known as ISIS?

17   A.    Also known as ISIS, yes.

18   Q.    And did you and Peter have a saying for what would happen

19   if you were both in trouble?

20   A.    Yeah, I told Ibrahim if he does not hear -- because we've

21   been told that we will be spending about five to ten minutes

22   with the emir, just like a normal procedure.  And we were like

23   okay, sure.  But we had no other choice but following their

24   car, their vehicle.  And yes, I told Ibrahim if I do not call

25   you back in three hours, then there's three hours.  Obviously,
```

─United States v. Elsheikh─

53

1   I did not call him.  At that time they took my phone from me.

2   Q.   So at that point you're following an ISIS vehicle to

3   another location in Al Karama?

4   A.   Exactly.

5   Q.   And where exactly is Al Karama in relation to Ar Raqqah?

6   A.   It's also in Eastern Ar Raqqah.  It's 20 kilometers from

7   -- away from Ar Raqqah, east.  Yeah.

8   Q.   And so you follow this vehicle to Al Karama, and do you

9   eventually reach a location?

10  A.   Yes.  And while I'm on the call with Ibrahim they came to

11  us and they took my phone and other belongings.

12  Q.   Who is they?

13  A.   The ISIS members.

14  Q.   So what happened when you arrived at the location in Al

15  Karama?

16  A.   We -- they told us to wait like in a big room.  It was

17  like kind of fancy.  It was like a governmental building.  And

18  there were like some ISIS members and us basically.  We waited

19  about like 10 minutes.  During that time they, like, ISIS

20  member came and they was like, "Oh, you're Amreekiyy?" or

21  "Okay, you're American?"  All right, okay.  And he was like so

22  angry.  And as like Peter killed his father or, like, he was

23  so angry and upset at that time.

24        And then we were told like after about 15, 20

25  minutes that we should -- that the emir is going to be late

─United States v. Elsheikh─

54

1   and that we should wait upstairs.  And we went there,

2   upstairs, where it was six of us to a room.  It has like two

3   inches foams, like, a few of them.  And like a pot of tomato,

4   cooked tomato, and dried bread, and that was it.  And then we

5   have been asked to wait there until the emir comes.

6   Q.   What does it mean to -- an emir?

7   A.   Yeah.  An emir could be anything between like a leader of

8   three to the highest -- al-Baghdadi was like emir.  So, like,

9   anyone who has the authority of over two to like thousands of

10  people would be called emir.

11  Q.   And you just mentioned a name al-Baghdadi?

12  A.   It's an emir.  Like he is an emir and a leader of two

13  persons could also be called emir.

14  Q.   Was he the then leader of ISIS at the time you were

15  abducted?

16  A.   I don't think so.

17  Q.   But he eventually became the leader of ISIS?

18  A.   Sorry?

19  Q.   He eventually became the leader of ISIS?

20  A.   Yes, correct.

21  Q.   The building that you're describing, is that the same

22  building where you saw ISIS spray painted outside?

23  A.   Yes, Al Karama building, yes, correct.

24  Q.   How did the guards treat you and Peter?

25  A.   Well, they were not nice at all.  They were moving us

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

55

1   from a place to place like aggressively and being pushed to

2   the wall and blindfolded and assaulted as well.  As me, as was

3   everyone, like, not -- yeah, so we were like -- they used to

4   abuse us, abuse us like verbally saying like, "Donkeys, you

5   don't know how to walk."  Like we're blindfolded.  And they're

6   telling us only just like "You walk.  You donkeys don't know

7   how to walk.  You an idiot, stupid," and this kind of words.

8   Q.   What was Peter's demeanor like when you were inside this

9   building in Al Karama?

10  A.   We were like clearly stressed.  And we have -- we used

11  like an expression, we -- it's banana river.  It means we are

12  fucked.

13  Q.   Say that again?

14  A.   Banana river.

15  Q.   What does banana river mean?

16  A.   It means we're fucked.  Like that word.  We're done.

17  Q.   Where did you and Peter sleep that night?

18  A.   Well, we slept on the ground, I guess, like, yeah.  It

19  was, like, as I mentioned, we had some foams at -- in the

20  room.  And so, like, on the foams or maybe blankets as well.

21  Q.   Was it difficult to sleep?

22  A.   Yes, it was.

23  Q.   Now, after the first night, what happened the next

24  morning?

25  A.   The next morning, so like -- the local guys with us were

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

56

1    always shouting and yelling and, like, hey, you can't do that

2    to me, you know.  Like, when I was against the Syrian regime

3    and when I was active, you were not there, and so on.  So they

4    used to move some of them to cells that has no windows or

5    anything as like a punishment.  And then they bring them back.

6    And we were brought also to these rooms when they saw me

7    looking out from the window of the room.  So they brought --

8    they brought us all to the room that has no windows so we

9    don't look to the outside.

10   Q.    And this is just six individuals total?

11   A.    Yes.

12   Q.    Including you and Peter Kassig?

13   A.    That's correct.

14   Q.    What happened next?

15   A.    They told us that they -- they started, like, taking us

16   and putting us in cells.  I spent, like, three hours in a cell

17   by myself.  And I believe all of them did also.  And we were

18   interrogated by, again, a masked ISIS member for the first

19   time.

20   Q.    Did the masked ISIS members blindfold you?

21   A.    We were blindfolded all the time if we are out of the

22   room, yes.

23   Q.    And just now, you said, "I believe all of them were put

24   into cells alone."  Did that include Peter Kassig?

25   A.    That is correct, yes.

57

1    Q.    Were you eventually taken to an interrogation room?

2    A.    Yes.

3    Q.    What happened?

4    A.    Of being asked so many questions, such as like my

5    relationship with Peter and what do we do together and what

6    type of activities we've done in the past, and why did we not

7    get their permission to go there.  And, yeah.  I've been asked

8    about my salary.  I've been asked about -- yeah, like, how

9    many times did I go with Peter, how many times did, like,

10   since how long do I know Peter.

11   Q.    Who was interrogating you?

12   A.    I'm not sure.  It was like an ISIS member like wearing

13   black with the balaclava, yeah.

14   Q.    Full face mask?

15   A.    Full face mask, yes.

16   Q.    And it sounds like they were taking a specific interest

17   in Peter Kassig at the time?

18   A.    Absolutely, yes.

19   Q.    Do you remember in your interrogation the interrogator

20   saying anything specific about what they were doing there?

21   A.    Yeah.  He told me we are here to establish the Islamic

22   State since there is no government or country -- government or

23   state ruling this area.  And that was their goal.

24   Q.    And this would have been on or about October 2, 2013?

25   A.    Yes.

—United States v. Elsheikh—

58

1  Q.   Did the ISIS guards at the prison ever accuse you and

2  Peter of being spies?

3  A.   I have been accused of being like a secret journalist and

4  like a Kafir or like someone who rejected the religion.  And,

5  yeah.  And, like, yeah, secret journalist.  So that means like

6  some sort of a spy.

7  Q.   All right.  After your interrogation, did you eventually

8  reunite with Peter?

9  A.   Yes.

10 Q.   And what happened next?

11 A.   So Peter like told us like we -- to teach him Qur'an.  He

12 mentioned before converting to Islam before we got imprisoned,

13 but he never told me to teach him Qur'an before.  And me and

14 the other locals as well.  And we did so.  So we spent hours

15 and hours teaching Peter Kassig the Qur'an.

16 Q.   And how was Peter feeling on the second day?

17 A.   It was -- most of the time it was like so angry and

18 stressed and walking around and his face, as I mentioned

19 earlier, would turn red and pink time to time.  And he

20 repeated the word "banana" several times as we were in

21 troubles.

22 Q.   Did something notable happen the second or third night

23 after you and Peter were abducted?

24 A.   Sorry?

25 Q.   Did something notable happen the second or third night

─United States v. Elsheikh─

59

1    after you and Peter were abducted?

2    A.    Yeah, we were -- they came to our room at some point,

3    like, during the night.

4    Q.    Who is they?

5    A.    The ISIS members, like, about three ISIS members entered

6    the room that we were in.

7    Q.    Three ISIS members?

8    A.    Three ISIS members.

9    Q.    And what do you remember about the three ISIS members who

10   entered the room on the second or third night of your

11   captivity?

12   A.    They came to Peter.  They told him, Hey, Peter, we are

13   going.

14   Q.    In English?

15   A.    In English, yes.

16   Q.    Was that notable?

17   A.    Sorry?

18   Q.    Was that memorable for you, the fact that they spoke

19   English?

20   A.    Definitely, yes.

21   Q.    Why is that?

22   A.    That was the first time that someone was, like, speaking

23   in English with us.

24   Q.    And were they armed?

25   A.    Yes.  AK-47.

—United States v. Elsheikh—

60

1   Q.   Did they take Peter's glasses?

2   A.   They took Peter's glasses off and they blindfolded him

3   and they handcuffed him as well.

4         THE COURT:  Did you recognize his English?

5         THE WITNESS:  Like, not maybe as an accent because

6   they -- they only used several words, like, such as Hey,

7   Peter, we're going, but that was it.  So I recognized they

8   were like speaking in English, yes.  I was not sure about

9   their accent.

10        THE COURT:  Next question.

11  BY MR. PAREKH:

12  Q.   And after they blindfolded Peter, did they remove him

13  from the room from which you and he were staying?

14  A.   Yes.  That was the last time that I saw Peter.

15  Q.   Did they just take Peter?

16  A.   They only took Peter, yes.

17  Q.   What was your reaction?

18  A.   Whose reaction?  Sorry?

19  Q.   What was your reaction?

20  A.   About -- so I -- my heart was like getting smaller and

21  squeezing, and I was like -- I was helpless.  I -- you know,

22  like you can't say or do anything, like, to three men with

23  Kalashnikov.  That they may kill a tribe with their guns.

24  And, yeah, that was it.

25  Q.   And that was the last time that you saw Peter?

─────United States v. Elsheikh─────

61

1   A.   That was the last time I saw Peter.

2   Q.   Even though that was the last time you saw Peter, did

3   your captors continue to ask about Peter throughout your

4   detention with ISIS?

5   A.   Yes.

6   Q.   So what happened after this second or third night?

7   A.   Like right after Peter Kassig was taken somewhere -- I

8   don't know where exactly -- we were also the same way, all of

9   us in the room, we were like immediately blindfolded and

10  handcuffed to behind and pushed to the wall as type of

11  humiliation.

12  Q.   A type of humiliation?

13  A.   Yes, correct.

14  Q.   Did they put handcuffs on you?

15  A.   Yes.

16  Q.   And those are masked ISIS members?

17  A.   Correct.

18  Q.   And at this point, there were five of you total in the

19  group including yourself?

20  A.   Yes, correct.  And who were the other individuals?

21          MR. DEUBLER:  I would object just to the leading

22  questions.  We've heard several of them.

23          THE WITNESS:  Sorry.

24          THE COURT:  Well, I'm not sure I know what

25  questions, unless you raise an objection, but I don't think

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Direct Examination of — — — /22

————United States v. Elsheikh————

62

1    these were anything other than summary questions.  But by all

2    means, if you have a problem with leading questions, you

3    should assert it.  To say that you've heard a lot of leading

4    questions doesn't help me very much.

5              MR. DEUBLER:  Yes, sir.

6              THE COURT:  Next question.

7    BY MR. PAREKH:

8    Q.   Who was with you in your group?

9    A.   I remember Dr. Solomon (ph).  We walked with him several

10   times in the Deir ez-Zur field hospital, and I remember also a

11   driver, the ambulance driver, and two other civilians, we

12   picked them up to give them a ride to Deir ez-Zur because they

13   were from the Deir ez-Zur.

14   Q.   Did the masked ISIS members, who put handcuffs on you,

15   threaten you at any point?

16   A.   Yes.

17   Q.   What did they say?

18   A.   Like, I was like -- when we were like walking, we walked

19   to the outside and they're, like, using this, like, idiot and

20   stupid and donkey words.  I was asked to -- if I don't walk

21   properly, and later on, if I don't get to the car properly,

22   that, like, they will kill me, and they repeated the same for

23   the others as well.  And I was, like, not put in a proper car.

24   It was like a four-by-four, and they folded the back chairs,

25   and I was, like, asked to get up and go there, but I was not

───United States v. Elsheikh───

63

1   seeing anything, so he pushed me in, and then he was like this

2   is it, and then he started giving me instructions on how to

3   get into -- sorry -- the car.

4             (Witness kicked something.)

5             And so I did.  And there was -- later on I realized

6   like Dr. Solomon was like the person who was right beside me.

7   Q.   What you're describing now, did this take place after the

8   three English-speaking masked ISIS members took Peter Kassig?

9   A.   Correct.

10  Q.   Where were you taken then?

11  A.   At that time, we did not have any idea.  But, like, later

12  on, I realized that it was, like, what do you call it?  The

13  Provincial Palace of Ar Raqqah, which is like a huge massive

14  governmental -- government building.

15  Q.   Was it controlled by ISIS at the time?

16  A.   It was, yes.

17  Q.   What happened when you arrived at that building?

18  A.   They -- yeah, we were like -- we walked upstairs and then

19  like we walked straight and then downstairs to the basement of

20  that building.  And then, they asked us to recognize our

21  belongings so they can write down our names and then they --

22  they put us in separate rooms.  I was with Dr. Solomon for the

23  first few days.

24  Q.   How many prisoners were in the room with you?

25  A.   When I arrived, it was like over 40 people in the room.

───Tonia M. Harris OCR-USDC/EDVA 703-646-1438───

EASTERN DISTRICT OF VIRGINIA

────United States v. Elsheikh────

64

1  Q.   Was it a crowded room?

2  A.   It was a very crowded room.

3  Q.   And how many days did you spend at this Raqqah government

4  controlled by ISIS?

5  A.   13 days or like, sorry, 16, that will be 16 total, yup.

6  Q.   Describe the conditions of confinement there?

7  A.   So in the beginning it was, as I mentioned -- so in

8  prisons, usually, who goes first takes, like, the comfiest

9  place.  So I had no place at that time.  So I was like behind

10 the door on the floor, sitting and sleeping there for about a

11 couple of nights.  The guard, Abu Khattab, used to open the

12 door and hit me by the door because I was behind the door and

13 he always repeated that I am the stupid who does not

14 understand not to be behind the door.  And after like a couple

15 of days, I found like a spot in a corner nearby the toilet so

16 I can, like, sleep.

17         MR. DEUBLER:  Your Honor, can I request the

18 headphones?

19         THE COURT:  I'm sorry?

20         MR. DEUBLER:  May I request the headphones?

21         THE COURT:  Yes.

22         (Side bar.)

23         THE COURT:  All right.  Mr. Duebler.

24         MR. DEUBLER:  The objection here is relevance and

25 overly prejudicial.  We've heard testimony now that the last

─United States v. Elsheikh─

65

1   time this witness saw Mr. Kassig was several days ago.  I

2   believe this witness is about to testify as to several

3   beatings and witnessing torture and pretty horrific events.

4   However, he's not testifying about seeing any western hostages

5   or hearing any other guards speaking in English.  So at this

6   point, Your Honor, though what this witness is going to be

7   testifying to is truly sad and horrifying, I do not see the

8   relevance; or if it does have relevance, it's going -- our

9   contention is that it's greatly outweighed by prejudicial

10  effect.

11          THE COURT:  All right.  Mr. Parekh.

12          MR. PAREKH:  This witness just testified earlier

13  that even though October 2nd or 3rd of 2013 was the last time

14  he saw Peter Kassig, through his captivity, the ISIS members

15  continued to ask about him.  So that will be elicited again,

16  as well as the fact that the manner and means of this ISIS

17  conspiracy includes things like threatening to shoot hostages,

18  threatening to behead them.  That was done to this witness.

19  And, obviously, those are the two means of execution that

20  we've alleged throughout this case was threats issued by the

21  Beatles in the Kayla Mueller emails entered into evidence

22  where he talks about putting a bullet in her head and other

23  western hostages.

24          In this case, we've already saw evidence where

25  hostages were beheaded.  I do think that is relevant as well

1    as the fact this individual was captured with Peter Kassig.

2    So we've alleged the ISIS conspiracy, the manner and means of

3    the ISIS conspiracy, and how he's treated, particularly given

4    that hostages are being moved around is relevant.

5            Lastly, I would note, Your Honor, that this witness

6    will testify that he received information from another

7    prisoner at this Raqqah provincial building.  The place he's

8    describing now, that indicated to him that Peter was there.

9    He just wasn't seen by him.

10           THE COURT:  All right.  Mr. Duebler.

11           MR. DEUBLER:  Very briefly, Your Honor.  I would

12   completely agree with the summary that the government just

13   gave.  You have heard all of this evidence before and at some

14   point, witness after witness, testifying to this type of

15   stuff, the relevance and the importance of such information

16   starts being diminished and its prejudicial effect keeps going

17   as the Court keeps hearing the same type of information over

18   and over again.  I believe the jury and the Court has heard a

19   substantial story, very substantial, to this several times

20   before.

21           THE COURT:  Mr. Parekh, you have the burden.  Since

22   you're offering this testimony, I'll give you the last word.

23           MR. PAREKH:  Thank you, Your Honor.  And we do have

24   the burden of proof in this case as to each and every charge

25   in this case.  Furthermore, we are now getting to Peter

─────United States v. Elsheikh─────

67

1    Kassig's time in captivity, and this witness is the only

2    witness that Your Honor and the jury will hear throughout the

3    entire trial who was actually captured with Peter Kassig.  And

4    so this is the early days of that captivity, and it's the

5    early days of what the organization is doing with respect to

6    hostages, and so, it is relevant to the conspiracy and --

7         THE COURT:  Did you tell me that this witness will

8    testify that Peter Kassig was here after this witness saw him?

9    He didn't see Peter Kassig.  He will testify through

10   conversations, including with another prisoner?

11        MR. PAREKH:  He believes that based on the

12   description of what another prisoner told him that Peter

13   Kassig was there.  He will describe that the prisoner

14   indicated that there was an individual with white complexion

15   who did not speak much Arabic and who was strong enough to

16   climb the walls of a prison cell in order to speak to one of

17   the fellow prisoners.  And based on the testimony Your Honor

18   already heard, that's a unique situation to have a prisoner

19   who has a white complexion, and, obviously, they were captured

20   together.  So that's the inference, Your Honor, I think the

21   jury will be allowed to draw.

22        THE COURT:  All right.  The matter is before the

23   Court on an objection to this testimony.  Mr. Deubler has

24   argued that what probative value it has is not substantial and

25   it's outweighed by the prejudice.  His argument is that this

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

68

1  witness has already testified that Kassig was taken away and

2  that he didn't see him after that.

3       Mr. Parekh has pointed out that the government has

4  to prove that this is a conspiracy.  Neither side has argued

5  what precisely is the conspiracy in this case.  Is it ISIS or

6  is it some part of ISIS.  I think that remains to be somewhat

7  determined.  I think the defendant would argue that it's a

8  very narrow conspiracy of only hostage-taking ISIS.  And I

9  think, Mr. Parekh, you will argue that it's broader than that.

10  Am I correct?

11       MR. PAREKH:  Yes, Your Honor.  Counts 7 and 8.  We

12  have the --

13       THE COURT:  In the end, what I'm going to do, in

14  part, because Mr. Parekh, you told me this is the only other

15  witness for Mr. Kassig.  I see another name on the witness

16  list, but that's a family member?

17       MR. PAREKH:  A family member and Eliot Stempf who

18  received the ransom.  But this is the only witness who can

19  testify as to eyewitness observations of Peter Kassig's early

20  days in captivity and the subsequent actions of the terrorist

21  organization who abducted Peter Kassig, which goes to the

22  manner and means of the ISIS conspiracy that we alleged,

23  namely, hostage-taking, resulting in death.  The manner and

24  means of that conspiracy, includes shootings, beheading, as we

25  saw with Kayla Mueller, and other hostages.  And material

———United States v. Elsheikh———

69

1    support, Your Honor, where we need to prove, and we have the

2    burden of proof that ISIS has engaged in terrorism.

3           THE COURT:  All right.  Mr. Deubler, do you have

4    anything else?

5           MR. DEUBLER:  Just -- one moment, Your Honor.

6           (Counsel confers.)

7           THE COURT:  I can hear Mr. Ellis when he speaks to

8    you, so, in the future, don't do it that way.

9           MR. DEUBLER:  Yes, I'll hit the button, Your Honor.

10   Very, very briefly.  The prisoner exchange that Mr. Parekh was

11   just describing -- and I guess we can take it up when we get

12   there -- that is hearsay.  These are two prisoners speaking to

13   each other.  The co-defendant exception is not going to be

14   applying there, but we can take that matter up once we get to

15   that testimony.

16          Second, Mr. Parekh is correct about the manner and

17   means, but I would just say to the Court, this Court and jury

18   has heard plenty of manner and means and have seen the point

19   of probative value that this witness is offering --

20          THE COURT:  This is an argument you already made?

21          MR. DEUBLER:  Yes, sir.

22          THE COURT:  All right, Mr. Parekh, Mr. Deubler

23   raises a new point that we could either wait and take up when

24   you elicit or can you address it now?

25          MR. PAREKH:  As to what?

─────United States v. Elsheikh─────

70

1          THE COURT:  As to whether the other prisoner's

2     statement to this witness would be inadmissible hearsay.

3          MR. PAREKH:  Well, Your Honor, I think if this

4     witness already testified as to Peter Kassig's demeanor,

5     particularly the early days of his captivity, they're being

6     kept in, obviously, not great conditions.  Peter is very

7     stressed.  He's turning pink and red and so --

8          THE COURT:  What is this other witness going to say

9     that the prisoner told him?  That he spoke to another

10    individual and that individual was able to observe another

11    prisoner who had white complexion and was not speaking in good

12    Arabic and he was strong enough to climb the walls in order to

13    reach the point where they could speak to each other?

14          What's the relevance of any of that?

15          MR. PAREKH:  Well, this witness would say he

16    believes that Peter Kassig was actually at the same detention

17    center.  So this is now the second detention center.  And this

18    witness will describe the thing that ISIS did at that

19    detention center, including threats made.

20          THE COURT:  We'll take up this hearsay objection

21    when we get to it, but be prepared to address it.

22          I'm going to overrule the objection based on 402 and

23    403.  I think it is relevant given the government's burden of

24    proof on all of the counts in the indictment, and I think it

25    is relevant and it's probative and it isn't outweighed

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

71

1   substantially by any prejudicial --

2           MR. DEUBLER:  Understood, Your Honor.

3           THE COURT:  The objection is overruled, but I'll not

4   rule on the hearsay objection yet.

5           MR. DEUBLER:  Understood, Your Honor.

6           (Open court.)

7           THE COURT:  How much more do you anticipate,

8   Mr. Parekh, with this witness?

9           MR. PAREKH:  Maybe another 30 to 45 minutes, Your

10  Honor.

11          THE COURT:  All right.  Let's continue at least

12  until 3:30.

13          MR. PAREKH:  Yes, Your Honor.

14  BY MR. PAREKH:

15  Q.   Mr. Almahmoud, where we last left off, you were

16  describing your captivity in the second location in which you

17  were held, is that correct?

18  A.   Yes.

19  Q.   And that's the Raqqah provincial building controlled by

20  ISIS at the time?

21  A.   That's correct.

22  Q.   And you were also describing the conditions of

23  confinement that you endured during that time?

24  A.   Yes.

25  Q.   I believe we're --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

72

1        THE COURT:  I'm sorry, you have to answer -- nodding

2   your head isn't enough.

3        THE WITNESS:  Yes.

4   BY MR. PAREKH:

5   Q.   I believe where we last left off you were describing some

6   of those conditions of confinement.  Please continue.

7   A.   The conditions in the Raqqah provincial building?

8   Q.   Yes.

9   A.   So where were we at?

10       THE COURT:  He's asked you to describe the

11   conditions for prisoners there were experiencing.

12       THE WITNESS:  Okay.  So I was in -- we used to have,

13   like, one meal a day, sometimes two.  It was like mostly rice

14   and bread, and that was it about the food.  We had also a

15   toilet for everyone, like the 40 people had, like, a wall and

16   a curtain.  So when you enter the toilet, you just like hang

17   the curtain so nobody sees you, but everyone can see and smell

18   everything in that toilet.  And we did not really have lots of

19   space to lay down.  So we are like laying down sometimes on

20   the side instead of laying down on like on your back.  And no

21   blankets, but I had someone -- I used someone's shoe as a

22   pillow, since like my shoe was, like, taken on the day first

23   by someone, I don't know.  And, like, we hear like the

24   humiliation of Abu Khattab, the Saudi guard -- the ugly Saudi

25   guard.  Everything about him was ugly.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

73

```
 1   BY MR. PAREKH:

 2   Q.   Let me ask you.  During your time at this particular

 3   location, did you continue to be guarded by ISIS members?

 4   A.   Did I continue?

 5   Q.   Were ISIS members continuing to control your confinement?

 6   A.   Yes.

 7   Q.   And were ISIS members continuing to ask about Peter

 8   Kassig?

 9   A.   Yes.

10   Q.   Please describe that.

11   A.   And about like 10 days after my captivity, I was

12   interrogated by a committee.  I did not see anyone.  Again,

13   blindfolded and my hands were like cuffed as well.

14   Q.   You were blindfolded?

15   A.   Yes, sir.

16   Q.   And handcuffed?

17   A.   Yes.

18   Q.   Please continue.

19   A.   And I was taken to a room, I believe, I would hear five

20   different voices.  They were like all asking me questions

21   about Peter Kassig, my relation with him, how did we start

22   working together and so on.  So similar questions about our

23   relationship.

24           THE COURT:  And was all this in Arabic?

25           THE WITNESS:  Yes, sir.
```

─────United States v. Elsheikh─────

74

1      THE COURT:  Next question.

2  BY MR. PAREKH:

3  Q.   Without going into anything that might have been said,

4  did you receive information that another prisoner had heard

5  Peter Kassig's voice at the prison?

6  A.   Yes.  So at some point in like the -- I guess day 14, we

7  had like a shepherd came to our room.  So whenever someone

8  comes from the outside, we ask them like millions of questions

9  because we want to know what is going on in the outside since

10  we had access to no news or any information.  So --

11  Q.   Were you all still under stress at the time?

12  A.   Yes, of course.

13  Q.   Were you -- sorry -- did you have fear at the time?

14  A.   Definitely, yeah.  Absolutely.

15  Q.   And that's true for all the prisoners you were with?

16  A.   Yes.  Definitely, yes.

17  Q.   Okay.  Please continue.

18      MR. DEUBLER:  Objection, Your Honor, to hearsay.  To

19  hearsay, sir.

20      THE COURT:  Overruled.

21  BY MR. PAREKH:

22  Q.   Please continue.

23  A.   And so, in the day -- I started asking the shepherd like

24  about the outside and where he was before coming here, and he

25  told me that he was in a cell by himself.  He was accused of

─United States v. Elsheikh─

75

1  delivering bread to PKK, which is like the Kurdish forces in

2  Northern Syria, and it was funded by the U.S. government at

3  that time.

4          THE COURT:  Mr. Parekh, you don't need to elicit

5  this, do you?

6          MR. PAREKH:  No, Your Honor.

7  BY MR. PAREKH:

8  Q.   Continue to how you learned if this prisoner was able to

9  hear Peter Kassig.

10  A.   He told me that in the next room he had like a window --

11  like a high window in the direct next room, and someone was

12  like strong enough who was able to climb and talk to him with

13  very broken Arabic and told him about that he has a friend

14  from Aleppo and he will visit him when he gets released.

15  Q.   And are you from Aleppo?

16  A.   I am from Aleppo, yes.

17  Q.   Did ISIS ever tell you what your fate will be?

18  A.   I was sentenced like to be killed in a court.  The court

19  was like about the day 13 of my captivity.  Someone called Abu

20  Luqman, he was also wearing the balaclava, and two other

21  persons.  They brought a chair to Abu Luqman and they started

22  some field court.  They started sentencing people, such as

23  like imprisoning them or killing them or releasing them.  Six

24  people -- four people before me were sentenced to be killed

25  or, like, at that time.  And I was avoiding to be like -- to

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

──────United States v. Elsheikh──────

76

1  talk.  And so, maybe that, like, Abu Luqman calms down and

2  starts, like, stops sentencing the death penalty.  At some

3  point Abu Hamza, one of the guards, told the emir that this

4  guy is with the American.

5  Q.   So stop right there.  When one of the guards said, "This

6  one is with the American," was the guard pointing at you?

7  A.   Yes.

8  Q.   And who did you believe he was referring to?

9  A.   Like to Peter Kassig, yes.

10 Q.   And going back to your description earlier of the

11 shepherd that you were interacting with, the other prisoner,

12 did he tell you the skin color of the person that was able to

13 climb the wall?

14 A.   Yeah.  He was a white person and he was not an

15 Arabic-speaking person.

16 Q.   Does that match Peter Kassig?

17 A.   Absolutely, yes.

18 Q.   Please continue with what happened after the guard

19 pointed at you and said, "This one is with the American."

20 A.   Yeah.  He started asking me like what I was doing, and I

21 started to explain that we were -- we deliver medication and

22 we do first aid and trauma trainings.  And he told me like,

23 "Okay, your organization, like -- like, what organization?  Is

24 it like the WHO?" which is like the World Health Organization.

25 I was like, "not really.  This is -- it's sole based."  So he

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

77

1   told me like, "Okay.  What about your activity?  Are they

2   similar to what?"  I told him like, "Maybe the Red Cross."

3   And he was like "Cross?  Okay.  Behead him" or, like, kill

4   him.

5          And then I was like brought to the outside, like,

6   blindfolded and handcuffed and pushed to the wall, as he did

7   four people before me from my room.  And I waited about two

8   hours in the corridors waiting for the death penalty.

9   Q.   Did they ask you how you wanted to die?

10  A.   They did ask me, and they did ask the others of how we

11  would like to die.  Do you want to be beheaded or shooting.

12  While I preferred shooting since it's very quick.

13  Q.   So what happened next?

14  A.   We were like told to wait until the bus that will take us

15  to the execution field comes and it was like that -- that was

16  like in another city, the bus was in another city, and then we

17  waited like about two hours, as I mentioned.  And after that,

18  they told us to go to the inside and wait until the bus comes.

19  Q.   And how were you feeling at this moment?

20  A.   I was so exhausted then.  I was like sweating, like, cold

21  sweating.  And I was really tired.  Like, I was using my leg

22  as a -- sorry, my head as a third leg because, like, my legs

23  were like shaking, kind of.  And so, I was hearing like this

24  kind of, like, when someone asked them, like, may I have --

25  may I use the washroom, they told him, like, Okay, let him use

─────United States v. Elsheikh─────

78

1   the washroom for the last time in his life.  And then asking

2   other people how would you like to die.  And someone wanted to

3   drink water, they told him, Okay, give him the water for the

4   last time in his life.

5           And so, whenever they see you using your head, like

6   laying it to the wall, they would just like yell and shout at

7   you and maybe like they slap you on your neck so you -- you

8   don't do that.  I saw my life moving.  I was -- I questioned

9   everything, and I was going comfortable to the other life or

10  to the nowhere and --

11  Q.   Were other people being sent to execute -- let me

12  rephrase that.

13          Were other people going off to be executed before

14  you?

15  A.   So we were like all waiting from my room.  We were six

16  people.  From other rooms there were like some people.  I did

17  not see them since I was like blindfolded.  I was able to hear

18  that, like, we were over like 15 people in that -- waiting for

19  the death penalty.

20  Q.   And were people going one after another?

21  A.    No.  They put us back in and they sent us back to our

22  rooms to wait for the bus to come and take us to the execution

23  field.  We went to the rooms like hours later, around

24  about the midnight, they -- we were six people.  They wrote

25  our names down, and my name was the fifth one on that list,

─────United States v. Elsheikh─────

79

1   and they -- yeah, they -- they told us to wait.  And then --

2   so my -- like you see in the movie when they tell you, like,

3   to have the last wish, my last wish was like just to rest and

4   have like a sleep for half an hour.  I was so tired and

5   exhausted.

6   Q.   What happened next?

7   A.   And around midnight they came, they called the first name

8   on that list.  And --

9            (Witness crying.)

10           They called the second man and the third man and the

11  fourth man, and then I did not see them again.

12           (Witness crying.)

13           MR. PAREKH:  Why don't you take a sip of water.

14           THE COURT:  How much more do you have?

15           MR. PAREKH:  Not long, Your Honor.  Maybe 10 more

16  minutes.

17           THE COURT:  Let's take a recess.  You may not

18  discuss your testimony with anyone during the recess.  But

19  we're going to take a recess so you can relax for a few

20  minutes.

21           THE WITNESS:  Okay, sure.

22           THE COURT:  All right.  We will reconvene at 4

23  o'clock.  Ladies and gentlemen, put your books in the

24  customary cubbyhole.  Refrain from discussing the matter among

25  yourselves or with anyone or undertaking any investigation on

─────United States v. Elsheikh─────
                                                              80

1   your own.  And you may have soft drinks, and efforts are still

2   underway for the snacks.  I'm beginning to lose a little

3   confidence in the power and Wizard of Oz, but we'll see.  You

4   may follow the court security officer out.

5              (Jury dismissed.)

6              THE COURT:  All right.  Court stands in recess until

7   -- what time did I say?  4?  4 o'clock.

8              (Recess.)

9              (Court proceedings resumed at 4:06 p.m.)

10             THE COURT:  All right.  Is your witness here?

11             MR. PAREKH:  Your Honor, we just wanted to take up

12  one quick matter before the jury comes in.  We're going to be

13  wrapping up with Mr. Almahmoud, and I've spoken to the

14  defense, and if Your Honor is willing, I think we'd like to

15  wrap up for the day.

16             The next witness would be Mr. Ed Kassig, Peter

17  Kassig's father.  Obviously, it's been a long day for everyone

18  and I think to have him testify at this late hour could be,

19  you know, could be difficult at this point on everyone.

20             So if Your Honor is willing, we could start tomorrow

21  morning with Mr. Kassig.

22             THE COURT:  How long a witness is Mr. Kassig?

23             MR. PAREKH:  I would say at least an hour.

24             THE COURT:  What's your view, Mr. Deubler?

25             MR. DEUBLER:  No objection, Your Honor.  And from

────────────United States v. Elsheikh────────────

81

1   forecasting it looks like we would be staying on the same

2   schedule that we discussed yesterday.

3           MR. PAREKH:  That's correct, Your Honor.

4           THE COURT:  And the same schedule is that we

5   would -- the Government's case would be completed by the end

6   of the day Tuesday?

7           MR. PAREKH:  That's what we're aiming for, Your

8   Honor, correct.

9           THE COURT:  And, you're asking this, Mr. Parekh,

10  because you think this will be emotionally difficult for the

11  next witness and for everybody?

12          MR. PAREKH:  That's right, Your Honor.

13          THE COURT:  All right.  Just a moment.

14          (A pause in the proceedings.)

15          THE COURT:  All right.  I will do it.  I'm reluctant

16  to do it, but I think there's good cause to do it.  And I

17  think it's not only emotionally difficult for the witness, but

18  it's also for the jury and indeed everyone in the courtroom.

19  All right.  Let's bring the jury in, please.  And I will tell

20  the jury that we have about another -- how long?

21          MR. PAREKH:  Not long, Your Honor.  Just probably

22  five minutes or so, if that, for direct examination.

23          THE COURT:  All right.  And do you have much for

24  cross?

25          MR. DEUBLER:  No, sir.

─────United States v. Elsheikh─────

82

 1          THE COURT:  All right.  So they'll go early today,

 2    but I will emphasize that we're on schedule to complete the

 3    matter for the government on Tuesday, by the close of business

 4    Tuesday, maybe earlier, am I right?

 5          MR. PAREKH:  Well, Your Honor, as we mentioned

 6    yesterday, some of our witnesses will be flying in Friday and,

 7    you know, over the course of the weekend.  We will have

 8    additional developments, but we're working towards that

 9    Tuesday goal.

10          THE COURT:  All right.  Bring the jury in, please.

11          MR. PAREKH:  And, Your Honor, would you like the

12    witness to remain outside while you tell the jury?

13          THE COURT:  Yes.  How do you pronounce the witness's

14    last name again?

15          MR. PAREKH:  His last name is Almahmoud, and his

16    first name is Mohammad.

17          THE COURT:  Almahmoud?

18          MR. PAREKH:  Yes.

19          (Jury present.)

20          THE COURT:  All right.  You may be seated.  Ladies

21    and gentlemen, let me give you some good news.  Progress has

22    been made on snacks.  I think I have finally contacted the

23    person with power and so we're taking steps to see that this

24    happens soon.

25          Now, I want to thank you for your close attention

─United States v. Elsheikh─

83

1   you're paying to the evidence, and make no mistake, I

2   understand it's not easy always to hear this evidence.  Some

3   of it is -- is difficult to see and watch, and others, it's

4   difficult to understand what people say, and it takes

5   concentration.  And the lawyers, both sides, defense and the

6   government, are working hard to streamline this and to see if

7   we can get this matter over.  The current plan is that the

8   government will end its case by the close of business on

9   Tuesday.  Hope springs eternal that they might even do better

10  than that, but we'll see.  But the other piece of good news is

11  that I believe that in the circumstances we can hear this

12  witness, however much more of this witness, and then go home,

13  and start again tomorrow.

14          All right.  May we have Mr. Almahmoud back in the

15  courtroom, please.

16          MR. PAREKH:  Yes, Your Honor.  Mr. Almahmoud, do you

17  feel all right?  Do you feel as though you can go ahead now?

18          THE WITNESS:  Yes.

19          THE COURT:  All right, sir.  You will remember you

20  remain under oath.  You may return to the stand.

21          (Witness seated.)

22          THE COURT:  And Mr. Parekh, you may proceed.

23          MR. PAREKH:  Thank you, Your Honor.

24  BY MR. PAREKH:

25  Q.   Mr. Almahmoud, how many days in total did you spend in

---United States v. Elsheikh---

84

1    captivity with ISIS?

2    A.    Nineteen days.

3    Q.    And throughout your entire time in captivity, was Peter

4    Kassig a constant focus of the ISIS members who were holding

5    you?

6    A.    Yes.

7    Q.    I want to direct your attention to October 18, 2013, did

8    anything memorable happen on that day?

9    A.    Yes.  We had the window.  Like, we were like in the

10   basement, and the window was like 20-something meters wide and

11   2 meters long. So we used to have the sun coming an hour or

12   two per day, so we used to, like, put our skin so we can get

13   some sun and some warmth.  And at that time, someone came from

14   that window, an ISIS guard, and he announced my name, and he

15   told me that like my mother is waiting in the outside.  I was

16   told before -- we were told before that they would -- if we

17   don't get released like in couple of weeks, that means we will

18   spend like a long time, so they will allow visits.  I knocked

19   on the door and I told them that, hey, you told me that you

20   will allow visits, and my mother is outside waiting for me.

21           He told me, like, "shut the fuck up and go inside"

22   in like this kind of humiliating words.  I was helpless, and

23   then I went back and then I -- I was shocked.  I was like not

24   speaking to anyone after that.

25   Q.    Did anything happen on the next day, October 19, 2013?

---Tonia M. Harris OCR-USDC/EDVA 703-646-1438---

─United States v. Elsheikh─

85

1   A.   Yes.  Abu Hamza, which was one of the guards, and he was

2   also during that field court I mentioned, opened the door in

3   the evening, October the 19th.  And right after he opened, we

4   had like an eye contact and he told me that "didn't we behead

5   you yet?"  And I was --

6   Q.   Just to clarify, this is a question that the ISIS guard

7   is asking you?

8   A.   Yes.

9   Q.   Didn't we behead you yet?

10  A.   Yes, correct.

11  Q.   Please continue.

12  A.   And I started like kind of laughing, like, I asked him,

13  Why would you behead me?  And he just went, he left, after I

14  asked him, without answering me.

15  Q.   And is this the same individual that said "This is with

16  the American"?

17  A.   Yes.

18  Q.   Referring to Peter Kassig?

19  A.   Yes, correct.

20  Q.   The same person who asked you that question also pointed

21  at you earlier and said "This one is with the American"?

22  A.   Correct, yes.

23  Q.   And what, if anything, happened next?

24  A.   I -- he went and then he came back in about a couple of

25  hours.  He asked me and the sixth person who was on the list

———United States v. Elsheikh———

86

1    of the death penalty, and he told us to collect our stuff, and

2    I had no stuff to collect, but -- and then we went blindfolded

3    and handcuffed to another like room, and they told me what are

4    my belongings, and then they start searching my phone, and

5    they asked me if I am a believer or not.

6    Q.   A believer in what?

7    A.   A believer in Islam and if I'm practicing the religion.

8    And I answered, "Yes."  And I told him, like, hey, listen, my

9    name is Mohammad, of course, I am.  After that, he was like

10   reading papers that was, like, in my backpack, and he was also

11   like going through my cards and my wallet.  And then he told

12   me, okay, we will forgive you for this time.  And that like --

13   they brought me to the outside, and then they released me with

14   the other man I mentioned earlier.

15   Q.   And these are ISIS members?

16   A.   Yes.

17   Q.   Did you ever hear anything else about why you were

18   released?

19   A.   I did not hear any -- anything.  I -- I believe that I

20   was released for several reasons.  Maybe one of them is to

21   maybe deliver the message that like I was with Peter and he

22   was taken by ISIS.  My mother, who came like the day before,

23   might be one of the reasons as well that I was released.  I

24   wish that this was not the case.  I wish that like Peter

25   Kassig was released and I was not.  I -- it's been eight years

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

87

1    after he died and nine years since I was taken with him.  The

2    guilt was like what ate part of my brains.  The guilt is

3    surrounding me every night, every day.

4              MR. PAREKH:  Thank you.  I don't have any further

5    questions, Your Honor.

6              MR. DEUBLER:  No questions, sir.

7              THE COURT:  All right.  Mr. Almahmoud, you may

8    leave.  You're done.

9              (Witness excused.)

10             THE COURT:  Any reason why he shouldn't be excused?

11             MR. PAREKH:  No, Your Honor.

12             THE COURT:  And you may be excused, sir.

13             Anything further this evening?  I've indicated we're

14   going to recess unless there is anything further at this time.

15             MR. PAREKH:  Not from the government, Your Honor.

16             THE COURT:  Tomorrow when we proceed, I take it,

17   Mr. Parekh, you will begin with Mr. Kassig.

18             MR. PAREKH:  Yes.  Peter Edward Kassig's father will

19   testify first in the morning, followed by Eliot Stempf, and

20   then we anticipate that Nicholas --

21             THE COURT:  Remind me again who he is.

22             MR. PAREKH:  Eliot Stempf received the ransom demand

23   emails that we expect will be entered into evidence.  I don't

24   anticipate that he will be a long witness.  Mr. Kassig,

25   Peter's father, will be around an hour, maybe a little bit

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────United States v. Elsheikh─────────

88

1    more.  Eliot Stempf, I hope to keep 30 to 45 minutes,

2    hopefully closer to the 30-minute mark, and then we expect

3    Nicolas Henin, a former hostage from France to testify.

4              THE COURT:  Thank you.  Mr. Deubler, did you have

5    something?  I saw you rise.

6              MR. DEUBLER:  No, sir.

7              THE COURT:  Ladies and gentlemen, put your books in

8    the cubbyhole as you go out.  Remember to refrain from

9    discussing the matter among yourselves or with anyone or

10   undertaking any investigation on your own, and we will

11   reconvene at nine o'clock tomorrow morning.  Thank you for

12   your close attention to the evidence today, and I hope this

13   early recess will help reinvigorate you.  This is not easy.

14   It's difficult to understand some of these witnesses, and it

15   takes an effort, and you're making that effort, and we all

16   appreciate that.  You may follow the court security officer

17   out.

18             I may begin that matter as early at 4:30.

19             MR. DEUBLER:  We will move quickly.

20             THE COURT:  All right.  And I will see you all

21   tomorrow morning.

22             MR. PAREKH:  Thank you, Your Honor.

23             THE COURT:  Court stands in recess for a few

24   minutes.  Are parties here in the next case?

25             THE DEPUTY CLERK:  Are parties here in the Caprice

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

1   Foster matter?

2           THE COURT:  I will recess until 4:30 so they can

3   come in and get settled.

4           (Discussion off the record.)

5           THE COURT:  Court stands in recess.

6

7              **(Proceedings adjourned at 4:25 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus EL**

8    **SHAFEE ELSHEIKH**, Criminal Action No.: 1:20-cr-239, in said

9    court on the 5th day of April, 2022.

10         I further certify that the foregoing 90 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this October 24, 2022.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

90