```
                                                              1

1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,     : Criminal Action No.
                                   :
5              versus              : 1:20-cr-239
                                   :
6    EL SHAFEE ELSHEIKH,           : April 12, 2022
                                   :
7                     Defendant. : Volume 11
     ------------------------------x
8

9         The above-entitled Jury Trial was heard before the
     Honorable T.S. Ellis, III, United States District Judge.

10                     A P P E A R A N C E S

11   FOR THE GOVERNMENT:      DENNIS FITZPATRICK, AUSA
                              JOHN T. GIBBS, AUSA
12                            RAJ PAREKH, AUSA
                              ALICIA H. COOK, AUSA
13                            United States Attorney's Office
                              2100 Jamieson Ave
14                            Alexandria, VA 22314

15                            AIDAN T. GRANO-MICKELSEN, DOJ-USAO
                              919 East Main Street
16                            Suite 1900
                              Richmond, VA 22319
17
     FOR THE DEFENDANT:       EDWARD B. MACMAHON, ESQ.
18                            Law Offices of Edward B MacMahon Jr.
                              P.O. Box 25
19                            107 East Washington Street
                              Middleburg, VA 20118
20
                              JOHN E. YANCEY ELLIS, ESQ.
21                            Carmichael Ellis & Brock
                              108 N Alfred St
22                            1st Floor
                              Alexandria, VA 22314
23
                              NINA J. GINSBERG, ESQ.
24                            DiMuroGinsberg PC
                              1101 King Street
25                            Suite 610
                              Alexandria, VA 22314-2956
```

```
                                                                     2
 1                           ZACHARY A. DEUBLER, ESQ.
                             DiMuroGinsberg PC
 2                           1101 King Street
                             Suite 610
 3                           Alexandria, VA 22314-2956

 4                           JESSICA N. CARMICHAEL, ESQ.
                             Carmichael Ellis & Brock
 5                           108 N Alfred St
                             1st Floor
 6                           Alexandria, VA 22314

 7

 8

 9   OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                      United States District Court
10                                    401 Courthouse Square
                                      Fifth Floor
11                                    Alexandria, VA 22314

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Brian Driscoll

        Direct examination by Ms. Cook.............. 22
        Cross-examination by Ms. Deubler........... 54
        Redirect examination by Ms. Cook........... 56

Daniel Ottosen

        Direct examination by Mr. Gibbs............. 58
        Cross-examination by Mr. MacMahon.......... 132
        Redirect examination by Ms. Cook........... 134

EXHIBITS

On behalf of the Government:

                                                 Admitted

Number 1-52...................................... 135
Number 11-4...................................... 87
Number 11-5...................................... 104
Number 20-1...................................... 37
Number 20-2...................................... 37
Number 20-3...................................... 37
Number 20-4...................................... 37
Number 20-5...................................... 37
Number 20-6...................................... 37
Number 20-9...................................... 37
Number 20-11A.................................... 37
Number 20-12A.................................... 37
Number 20-13A.................................... 37
Number 20-14A.................................... 37
Number 20-11..................................... 37
Number 20-12..................................... 37
Number 20-13..................................... 37
Number 20-14..................................... 37
Number 28-11..................................... 166

MISCELLANY

Preliminary matters.................................. 04
Jury instruction conference......................... 169
Certificate of Court Reporter....................... 188

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

4

**P R O C E E D I N G**

(Court proceedings commenced at 9:13 a.m.)

        THE COURT:  All right.  Good morning.  This is United States against El Shafee Elsheikh.  20-cr-239.  And I can see by a quick visual glance that everybody -- that counsel for the government and the defendants are present, and the defendant is present in the custody of the marshals. We're prepared to proceed.

        I received yet another filing.  I don't know whether it was last night.  I didn't get it until this morning by you, Mr. Fitzpatrick, is that right?

        MR. GRANO-MICKELSON:  That was by me, Your Honor.

        THE COURT:  I beg your pardon.

        MR. GRANO-MICKELSON:  That was mine.

        THE COURT:  All right.  Well, but it was -- it's about a stipulation that you and the defendants have reached that would admit clips from interviews of the defendant in which the defendant was told by this British interviewer that Iraqis were killing ISIS members.

        MR. GRANO-MICKELSON:  That's correct, Your Honor.

        THE COURT:  All right.  And so that would obviate the necessity for the defendant to call those witnesses.

        MR. GRANO-MICKELSON:  That's correct, Your Honor.

        THE COURT:  All right.  Is there anything else in that pleading?  That was it, wasn't it?

─United States v. Elsheikh─

5

1        MR. GRANO-MICKELSON:  No, Your Honor, it was just to

2   inform the Court of the agreement.

3        THE COURT:  All right.  All stipulations will go to

4   the jury.  I typically read them.  I think there was a

5   stipulation that I didn't read that counsel read.  Am I

6   correct?

7        MR. GRANO-MICKELSON:  Yes, I think plaintiff read

8   one.

9        THE COURT:  You read that, Mr. Fitzpatrick?

10       MR. FITZPATRICK:  Yes, Judge.

11       THE COURT:  Well, that will still go to the jury and

12   I will tell them about that.

13       MS. GINSBERG:  Judge, may I be heard on this just

14   briefly?

15       THE COURT:  On what?

16       MS. GINSBERG:  On the stipulation and the video

17   clips.

18       THE COURT:  Yes.

19       MS. GINSBERG:  Your Honor, just as Mr. Fitzpatrick

20   read his stipulation, I would ask that I be permitted to read

21   our stipulation to put the video clips in context because the

22   stipulation explains what the video clip is and then I'd like

23   the jury to hear what the clip is and then have Ms. Bishop

24   play the clip.

25       THE COURT:  Yes, you can do it, but that's a

──────United States v. Elsheikh──────

6

1   mistake.  It's better if I read it for you, but you make your

2   own choice there.  I've interviewed jurors for the last 35

3   years, occasionally.  Not all of them.  They don't like to be

4   interviewed.  They want to be done.

5              MS. GINSBERG:  Judge, if Your Honor will allow me to

6   interject in-between the paragraphs --

7              THE COURT:  No.  Either you do it or I do it.

8              MS. GINSBERG:  I think I'd prefer to do it.

9              THE COURT:  I'll permit you to do it.  I wouldn't

10  ordinarily do that, but I allowed Mr. Fitzpatrick to do it, so

11  I'll allow you to do it.

12             MS. GINSBERG:  Thank you.  And, Judge, just one

13  other question about the clips.  There is one additional clip

14  from the deposition of Sean Langan, which will be played also.

15  There is no -- we didn't think of drafting a stipulation with

16  respect to that video.  But we would like for the Court, if

17  Your Honor thinks it's appropriate, to explain to the jury

18  that there is video tape testimony from Mr. Langan who is an

19  unavailable witness at trial, and that the jury -- the Court

20  is permitting the defendant to put on a short clip of his

21  testimony that was taken.  It was actually in court.

22             THE COURT:  It seems to me it goes well beyond the

23  Iraqis are killing ISIS people.

24             MS. GINSBERG:  The clip relates solely to his -- to

25  his testimony regarding the Iraqi -- his telling Mr. Elsheikh

─United States v. Elsheikh─

7

 1   about the Iraqis killing --

 2            THE COURT:  Do you have any objection to that?

 3            MR. GRANO-MICKELSON:  No, Your Honor.

 4            THE COURT:  All right.

 5            MS. GINSBERG:  We've discussed all of this with the

 6   government.  The question is, does Your Honor -- would Your

 7   Honor prefer to explain the reason for the video clip --

 8            THE COURT:  Well, if there's no objection to it,

 9   just play it.

10            MS. GINSBERG:  Very well.  I'd just like to be able

11   to tell the jury that this is being played instead of live

12   testimony as -- because the witness is unavailable.

13            THE COURT:  Well, the witness is unavailable

14   generally.  You're going to have a stipulation.  Just read it.

15   I'll think about that.  I will only ask if necessary.

16            MS. GINSBERG:  Okay.  Thank you, Your Honor.

17            THE COURT:  Anything else this morning?

18            MR. GRANO-MICKELSON:  Not from the government, Your

19   Honor.

20            MR. DEUBLER:  Your Honor, we're about to hear the

21   testimony of a FBI Special Agent regarding a military raid.

22   The witness shouldn't take very long, but I believe the

23   government is planning on introducing the slavery documents

24   through this witness, if I am correct.

25            MS. COOK:  That is correct, Your Honor.

—————United States v. Elsheikh—————

1          MR. DEUBLER:  And I have conferred with the

2     government, when the government does move to admit that piece

3     of evidence, we are going to be objecting on hearsay grounds

4     and we can take that -- a brief argument on the hearsay matter

5     now or we can take it up over the headphones which --

6          THE COURT:  Now.  Now.  What is it that you intend

7     to introduce, Ms. Cook?

8          MS. COOK:  Your Honor, these are the four documents

9     --

10          THE COURT:  Tell the jury we'll be about 20 minutes.

11          MS. COOK:  These are the four documents that were

12     the subject of earlier litigation between the parties.  These

13     documents are ISIS documents that contain justifications for

14     and rules about slavery.

15          THE COURT:  All right.  And your argument is what?

16     They're admissible for what reason?

17          MS. COOK:  They've already been ruled as relevant

18     and admissible under Rule 403 by the Court.  The defendant's

19     current objection is that these documents contain hearsay.

20     The government's response is, first of all, we're not offering

21     these documents to prove the truth of the contents.

22          And secondly, that they are statements of

23     co-conspirators.

24          THE COURT:  Well, I'm not sure about your first

25     reason.  Aren't you offering these documents to prove the

───────────United States v. Elsheikh───────────

1    truth as to what ISIS thought and believed and acted on?

2            MS. COOK:  Your Honor, we're certainly offering them

3    to prove that these are things ISIS said and things that ISIS

4    claimed, but we are --

5            THE COURT:  That's the conspiracy, isn't it?

6            MS. COOK:  Yes.  Yes, Your Honor.

7            THE COURT:  Go on.

8            MS. COOK:  And along that line, Your Honor, our

9    argument is also that these are statements of co-conspirators.

10   And as the Court previously articulated in its March 24

11   ruling, the government has alleged a conspiracy, alleged the

12   defendant was a member of that conspiracy.  And one of the

13   objectives --

14           THE COURT:  What was the March 24th ruling?  Refresh

15   my recollection.

16           MS. COOK:  That the documents are relevant and also

17   admissible under Rule 403.  That they are, in fact, probative

18   of the conspiratorial agreement between the defendant and

19   ISIS.

20           THE COURT:  All right.  And let me then hear from

21   defendant as to the objection.

22           MR. DEUBLER:  Good morning, Your Honor.  Zachary

23   Deubler.  Very briefly, Your Honor.

24           The only evidence we have in this record concerning

25   Mr. Elsheikh's belief regarding slavery is a statement that I

1  believe the government has played about him not disavowing

2  slavery.

3          However, we did hear from Mr. Treml on the stand,

4  and Mr. Treml went through, for over an hour, about various

5  ISIS publications and documents that are widely disseminated.

6  These documents were not among those documents.  So I would

7  put to the Court that these are just pamphlets found in

8  somebody's house.  Mr. Treml didn't talk about that these

9  documents were widely disseminated amongst ISIS.  These could

10  be documents authored by the residents of that house.  There's

11  no evidence that Mr. Elsheikh saw these statements.

12  Therefore, we would say that these are not statements by a

13  party opponent.

14          THE COURT:  All right.  Let me hear further from

15  you, Ms. Cook.

16          MS. COOK:  Your Honor, the government intends to

17  play a media clip during this very witness where the defendant

18  is asked if he denounces ISIS's practice of slavery.

19          THE COURT:  I'm sorry, say that again.

20          MS. COOK:  Where the defendant is asked if he

21  denounces --

22          THE COURT:  By whom?

23          MS. COOK:  Asked by a reporter.

24          THE COURT:  Yes.

25          MS. COOK:  If he denounces ISIS's practice of

Direct Examination of Margaret Cook 10/12/22

─United States v. Elsheikh─

11

1   slavery.  And the defendant says, "No, I don't denounce it."

2   And then goes on to say things very similar to what is found

3   in these documents.

4          So the government's argument is the defendant was

5   conspiring with ISIS to provide material support to that

6   organization to promote its objectives and purposes.  And the

7   Court has already found these documents are probative of his

8   knowledge of the purposes and objectives of this conspiracy.

9          THE COURT:  All right.  Let me ask you this, isn't

10  there an interview of the defendant in which he admits that he

11  was a Beatle?

12         MS. COOK:  I believe that that admission can be

13  found throughout several of the media interviews the

14  government has offered.

15         THE COURT:  Are they in the record now?

16         MS. COOK:  Yes, Your Honor.

17         THE COURT:  Refresh my recollection.  Where are

18  they?  Or give me an example of such an interview.

19         MS. COOK:  If I could confer with counsel, Your

20  Honor.

21         (Counsel confers.)

22         MS. COOK:  Your Honor, the clips offered in the 26

23  and 27 series contain multiple statements by the defendant

24  about the hostages whom the jury has heard from here.  That he

25  interacted with them, that he took e-mail addresses from them,

1   and that he was, in fact, part of the group that the hostages

2   have described as the Beatles.

3            THE COURT:  All right.  And those are already in

4   evidence?

5            MS. COOK:  That's correct, Your Honor.

6            THE COURT:  Have they been played?

7            MS. COOK:  Yes.

8            THE COURT:  All right.  The only thing that he

9   doesn't say is that, Yes, I'm a Beatle.  But he says he was

10  involved in guarding and dealing with the hostages during that

11  period.  Is that what you're saying?

12           MS. COOK:  Yes, Your Honor.

13           THE COURT:  That was my recollection.  I think the

14  defendant contends that that was an involuntary statement

15  because he was afraid of being shipped off to Iraq where he

16  thought he might be killed and so he thought he would admit to

17  some things and that would keep him, at least, in British and

18  American -- or Kurdish hands rather than Iraqi hands.  That, I

19  think, is my recollection of the argument.

20           Am I wrong about that?

21           MR. DEUBLER:  You're correct, Your Honor.

22           THE COURT:  I think I said to Mr. Deubler and his

23  colleagues on the defense they can argue that.  They can argue

24  involuntary.  All right.  Thank you.

25           All right.  I have ruled -- I need to rule on this

Direct Examination of Special Agent 10/24/22

─United States v. Elsheikh─

13

1   issue, this objection by Mr. Deubler on the admission of these

2   pamphlets.  I have already ruled on this issue once before, I

3   believe.  I think the pamphlets or the -- the information that

4   it was part of the ISIS ideology and part of the ISIS purpose

5   in this conspiracy to take hostages -- not hostages -- to take

6   young women prisoners and farm them out, as it were, to ISIS

7   fighters.  You get a pretty stiff prison sentence in this

8   country, if you do it in this country.  It's called sex

9   trafficking.  But it's a big world.  People have different

10  views.  And that's what ISIS -- the evidence suggests and

11  compels the conclusion that they did.

12          I think these particular pamphlets, Ms. Cook,

13  confirm -- or contradict me if I'm wrong -- were found in a

14  house where Lea Mueller and Kayla Mueller were held.

15          MS. COOK:  Your Honor, just a quick correction.  The

16  pamphlets were recovered from a residence that the Sayyafs had

17  moved to after Lea escaped.

18          The government's argument has always been that

19  they're connected to the conspiracy because they're found in

20  the possession of Abu Sayyaf, the person who held Lea and

21  Kayla.

22          THE COURT:  Yes.  I think that's right.  It does tie

23  it to that.  So I think they are certainly relevant.  It's

24  part of the conspiracy.  It isn't correct to say this

25  conspiracy that's alleged in the indictment is limited to

───────United States v. Elsheikh───────

14

1   holding some American hostages.  It's broader than that.  And

2   the indictment suggests that.  The indictment suggests that

3   the conspiracy is ISIS and members of ISIS.

4         Now, the object of the conspiracy was hostage taking

5   and all that went with that, together with the abuse of

6   hostages.

7         Let me go back for a moment, Ms. Cook.  Tell me

8   where these pamphlets you're going to offer through this

9   witness were found.

10        MS. COOK:  They were found in a residence that

11  belonged to Abu and Um Sayyaf.  The persons that the last

12  witness testified held both herself and Kayla Mueller.

13        THE COURT:  And, of course, Abu Baghdadi visited

14  that house, am I correct?

15        MS. COOK:  I don't have information about this

16  specific residence where the documents were found, but Abu

17  Baghdadi did visit the Sayaafs while Lea was being held there.

18        THE COURT:  Mr. Deubler, do you have anything else

19  you want to tell me?

20        MR. DEUBLER:  No, Your Honor.  Just that we don't

21  know the provenance of these documents, so to attribute them

22  as a statement to Mr. Elsheik would require the Court to find

23  that he at least adopted them in some way, and there's no

24  evidence that he saw them, that ISIS distributed them.

25  Mr. Elsheik's statement that he doesn't disavow slavery,

─────United States v. Elsheikh─────

15

1  doesn't adopt these statements and the justifications --

2  purported justifications of ISIS found in these documents.

3  That's all, Your Honor.

4  　　　　　THE COURT:  Last word, Ms. Cook.

5  　　　　　MS. COOK:  I disagree.  I believe that the

6  defendant's assertion in the interview that we intend to play

7  with this witness is in fact an adoption of that ideology.

8  These documents are found in the possession of an ISIS member.

9  They bear the insignia of ISIS and they are very similar to

10  the statements that the defendant made in the interview.

11  　　　　　THE COURT:  All right.  The matter is before the

12  Court on a preemptive objection by Mr. Deubler to documents

13  that are going to be offered in the course of this -- not this

14  witness but the next witness.  Is that right?

15  　　　　　MS. COOK:  Your Honor, we intend to offer the

16  document Agent Driscoll who will testify next.

17  　　　　　THE COURT:  Oh, Driscoll will testify next?

18  　　　　　MS. COOK:  Correct.

19  　　　　　THE COURT:  All right.  And the information that I

20  have indicates that these are -- the evidence will be these

21  are ISIS documents.  They were found in a home in which

22  Mueller and Muller were held.  Is that correct?  Or just

23  Muller?

24  　　　　　MS. COOK:  They were found in the residence of the

25  Sayaafs.  It is the government's contention that after Lea

─────United States v. Elsheikh─────

16

1   escaped from what she called the dirty house, the Sayaafs

2   moved to the location where the documents were later found by

3   U.S. personnel.

4          THE COURT:  Well, that doesn't make any difference

5   because the issue is whether these can be attributed to the

6   ISIS conspiracy.  And then you also wish to offer a statement

7   by the defendant in which he is asked in a media interview

8   about it and tell me one more time, Ms. Cook, what this clip

9   will show the defendant saying with respect to this material.

10         MS. COOK:  The defendant is asked if he denounces

11  ISIS's practice of slavery.

12         THE COURT:  Which is reflected in these documents?

13         MS. COOK:  Precisely, Your Honor.  The defendant

14  says, no, I do not denounce slavery.  And he tells the

15  reporter, in essence, you have to understand slavery has been

16  around as long as there have been people.  Just because

17  America decides to abolish something doesn't mean that

18  everyone else in the world has to follow suit.  He then

19  references Islamic jurisprudence that talks about owning

20  slaves and the rights of slaves and slave owners.

21         One of the documents that the government seeks to

22  offer, recovered from the Sayyaf residence, contains very

23  similar language that talks about -- it claims that slavery is

24  a designedly instituted historic practice within Islam and the

25  rest of these documents do, in fact, contain justifications

—United States v. Elsheikh—

17

1  for slavery and talk about certain rules with regard to

2  permissible and impermissible activities with slaves.

3          THE COURT:  I've already considered 403.

4          MS. COOK:  Correct.

5          THE COURT:  Clearly it is prejudicial to the

6  defendant, but unfairly prejudicial.  And that was my

7  conclusion then.  Almost all the evidence that the government

8  introduces is prejudicial to the defendant, but it's not

9  inadmissibly or unfairly prejudicial.  And many cases reflect

10 that.  It's not whether or not it's prejudicial.  It's whether

11 it's unfairly prejudicial and whether it's going to -- going

12 to -- an inappropriate excessive effect.  And in my view, it's

13 not.  It's important to have a complete, accurate and whole

14 picture of this.  Just a moment.

15          (Discussion off the record.)

16          THE COURT:  I think I would also note that these

17 documents were found in the home of Abu Sayyaf who, I think,

18 can fairly be found, as I do, to be a member of the conspiracy

19 because he was holding Kayla Mueller and this other person.

20 So he was part of the hostage holding and taking conspiracy.

21 And I am convinced that I'm going -- and I do overrule the

22 objection and admit these exhibits, both under 402 and over

23 any objection under 403.  It paints a complete picture of the

24 hostage taking conspiracy, including the taking of these young

25 girls, and I think we've already had testimony, have we not,

─United States v. Elsheikh─

18

1  that Ms. Mueller was raped.  Is that correct?

2         MS. COOK:  Your Honor, the witness was ambivalent on

3  that, but she certainly testified that the Yazidi girls were

4  being raped in the Sayyaf residence.  And she also testified

5  that Kayla was raped by the leader of ISIS Abu Bakr al

6  Baghdadi.

7         THE COURT:  Yes, that's my recollection.  And that,

8  of course, is especially relevant to the alleged conspiracy in

9  this case.

10        All right.  We're going to proceed.  I've overruled

11 the objection for the reasons I stated and the government

12 argued, but I think it's appropriate, Mr. Deubler, for you to

13 have raised it, and at this point in time.  So we're now ready

14 to proceed with Driscoll.

15        Do you still plan to call Mr. Ottosen?

16        We do, Judge.

17        MR. GIBBS:  We do, Judge.

18        THE COURT:  All right.  And is that your final

19 witness?

20        MR. GIBBS:  Yes, Judge.  We will rest after

21 Mr. Ottosen's testimony.

22        THE COURT:  All right.  Thank you.  Bring the jury

23 in, please.

24        (Discussion off the record.)

25        THE COURT:  The March 24th order that I'd referenced

 1   in the previous objection overruling that is entered and

 2   ordered dated March 24th.  This is a little different because

 3   this raises a hearsay objection, not the 403 objection, which

 4   I've already ruled on.  But I'm satisfied with the hearsay

 5   objection has overcome, pursuant to 801(d)(2)(E), the

 6   statement of co-conspirators.  It goes to show object and

 7   purposes and modus operandi to the conspiracy.

 8            And I think that's --

 9            (Knock on the door.)

10            THE COURT:  Just a moment.  And I think there's

11   ample connection between the place in which these were found,

12   even though by that time the hostages were no longer there.

13   Is that right, Ms. Cook?

14            MS. COOK:  That is correct, Your Honor.

15            THE COURT:  But nonetheless, Abu Sayyaf was, in my

16   view, a member of the conspiracy, at least the circumstances

17   reflect that.  And so, it is a statement, in effect, of a

18   co-conspirator in furtherance of the conspiracy and part of

19   the conspiracy was to take hostages and to take prisoners for

20   the purposes that we've heard about.

21            All right.  You may bring the jury in.

22            (Jury present.)

23            THE COURT:  All right.  You may be seated.  Ladies

24   and gentlemen, thank you for your patience this morning.

25   We'll begin with the taking of the roll as usual.

─United States v. Elsheikh─

20

1      THE DEPUTY CLERK:  Juror No. 50, Laura Ann Younger.

2      JUROR:  Present.

3      THE DEPUTY CLERK:  Juror No. 29, Wayne Phoel.

4      JUROR:  Present.

5      THE DEPUTY CLERK:  Juror No. 3, James Bailes.

6      JUROR:  Present.

7      THE DEPUTY CLERK:  Juror No. 20, Alfred Keyser.

8      JUROR:  Present.

9      THE DEPUTY CLERK:  Juror No. 50, Esthar Zangeneh.

10     JUROR:  Present.

11     THE DEPUTY CLERK:  Juror No. 22, John Kugelman.

12     JUROR:  Present.

13     THE DEPUTY CLERK:  Juror No. 26, Jennifer Murray.

14     JUROR:  Present.

15     THE DEPUTY CLERK:  Juror No. 14, Anne Fay.

16     JUROR:  Present.

17     THE DEPUTY CLERK:  Juror No. 10, Erica Denham.

18     JUROR:  Present.

19     THE DEPUTY CLERK:  Juror No. 30, Camille Morrison.

20     JUROR:  Present.

21     THE DEPUTY CLERK:  Juror No. 47, Adrian White.

22     JUROR:  Present.

23     THE DEPUTY CLERK:  Juror No. 14, Mirenda Fields.

24     JUROR:  Present.

25     THE DEPUTY CLERK:  Juror No. 22, Gwendolin McCrea.

─────United States v. Elsheikh─────

```
 1            JUROR:  Present.

 2            THE DEPUTY CLERK:  Juror No. 17, Lewis Hoge.

 3            JUROR:  Present.

 4            THE DEPUTY CLERK:  Juror No. 26, Eileen Liles.

 5            JUROR:  Present.

 6            THE DEPUTY CLERK:  Juror No. 39, Ralph Stallings.

 7            JUROR:  Present.

 8            THE DEPUTY CLERK:  And Juror No. 7, Laura Buschman.

 9            JUROR:  Present.

10            THE COURT:  All right.  Again, good morning, ladies

11   and gentlemen.  I hope you had a restful evening.  The weather

12   has turned for the better which is a plus.  In my area all the

13   trees are beginning to bloom and I like it.  There's only one

14   down side.  I live in the country and the coming of spring

15   with warm weather means a lot of wonderful things, but it also

16   means copperheads.  So we're very careful during the spring to

17   make sure that we dispatch any copperheads that we find.  And

18   every year we have both found and dispatched copperheads.

19   Even had one of our dogs bitten by a copperhead and she's no

20   longer with us.  Not for that reason, but because of age.  She

21   survived, but not before I was nearly impoverished by the vet

22   news.

23            All right.  Let me confirm that -- let me ask

24   whether any of you were unable to adhere to the Court's

25   instructions to refrain from discussing the matter with anyone
```

─────United States v. Elsheikh─────
                                                                        22

 1   or undertaking any investigation on your own?

 2          All right.  No hands are raised.  So I will assume

 3   that all of you were successful in adhering to the Court's

 4   instructions.

 5          Thank you for your patience, but I can assure you

 6   that the lawyers were working hard to see whether this case

 7   could be expedited and streamlined, and I think they have

 8   succeeded.

 9          So I hope we'll see benefits of that.  Ms. Cook, you

10   may call the government's next witness.

11          MS. COOK:  Thank you, Your Honor.  The government

12   calls Agent Brian Driscoll.

13          THE COURT:  Come forward and take the oath, please.

14          (Government's witness, Agent Brian Driscoll, sworn.)

15          THE DEPUTY CLERK:  Thank you.

16          (Witness seated.)

17          THE COURT:  All right.  Ms. Cook, you may proceed.

18          MS. COOK:  Thank you, Your Honor.

19                       DIRECT EXAMINATION

20   BY MS. COOK:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   Will you please state your name and spell it for the

24   record?

25   A.   Yes.  Brian, B-r-i-a-n.  Driscoll, D-r-i-s-c-o-l-l.

─United States v. Elsheikh─

23

1   Q.   How are you currently employed?

2   A.   I'm a Special Agent in the Federal Bureau of

3   Investigation or the FBI.

4   Q.   What is your position with the FBI?

5   A.   Currently I serve as what we refer to as the assistant

6   special agent in charge in the New York office of the FBI.  I

7   run the extraterritorial terrorism investigations branch on

8   the New York Joint Terrorism Task Force.

9   Q.   Can you please explain some of the duties of the

10  extraterritorial terrorism branch in the Joint Terrorism Task

11  Force.

12  A.   Yes.  So the FBI splits the global responsibilities for

13  counterterrorism investigations between four offices.  The New

14  York area of responsibility is the every terrorism threat or

15  investigation related to the United States emanating from or

16  relating to the African continent, the U.K., Western Europe,

17  and Canada.

18  Q.   As part of your involvement with that task force, do you

19  investigate cases involving ISIS?

20  A.   Yes, we do.

21  Q.   How long have you been a special agent with the FBI?

22  A.   Since December 2007.

23  Q.   Have you recently received a promotion?

24  A.   Yes, I have.

25  Q.   And please describe what you're being promoted to?

1   A.   So I've been recently promoted to take command of the

2   FBI's hostage rescue team.

3   Q.   Will you please describe briefly the hostage rescue team?

4   A.   Yes.  So the hostage rescue team is a full-time tactical

5   team made up of elite tactical operators who are all FBI

6   special agents.  And they are tasked with the -- the team

7   itself is tasked with supporting our field offices, first and

8   foremost, as well as our state, local, and global and -- as

9   well as federal law enforcement partners to offer a tactical

10  solution to scenarios or situations that exceed the

11  capabilities through training or resources of SWAT teams or

12  tactical teams organic to those departments or those partners.

13  Q.   Do the missions of the hostage rescue team, as the name

14  suggests, include rescuing hostages overseas?

15  A.   Yes.  In partnership embedded with our U.S. military

16  partners.

17  Q.   Is hostage rescue team also referred to as HRT?

18  A.   Yes.

19  Q.   Were you a member of HRT in 2015?

20  A.   Yes, I was.

21  Q.   In May of 2015, were you embedded with the U.S. military

22  to carry out an operation related to Abu Sayyaf?

23  A.   Yes.

24  Q.   What was the objective of HRT's involvement in that

25  operation?

─United States v. Elsheikh─

25

1   A.   So the objective was multifaceted.  One was to represent

2   the FBI in furtherance of an investigation into the Kayla

3   Mueller hostage taking run out of the Washington Field Office

4   here.  Second, was to collect items of interest off of the

5   objective itself, the target residence of the Sayyafs.  Third,

6   was to gain custody of Um Sayyaf, Abu Sayyaf, and a Yazidi

7   slave woman and to support the investigation.  Again,

8   primarily to collect items of interest.

9   Q.   Was part of the objective also to disrupt and dismantle

10  the ISIS organization?

11  A.   Yes, that was the ultimate objective.

12          MS. COOK:  Could we please display Government's

13  Exhibit 19-2, which is already in evidence.

14          THE COURT:  You may do so.

15          (Exhibit published.)

16  BY MS. COOK:

17  Q.   Agent Driscoll, do you recognize the person shown in this

18  photograph?

19  A.   Yes, I do.

20  Q.   Who is this?

21  A.   This is Abu Sayyaf.

22  Q.   How are you able to recognize this person?

23  A.   Leading up to the mission itself, we were shown this

24  picture in relation to his identity in intel briefs.

25  Q.   Was that to ensure you would be able to recognize him

United States v. Elsheikh

26

1   during the operation?

2   A.   Yes.

3   Q.   Who was Abu Sayyaf?

4   A.   Abu Sayyaf was a member of ISIS.

5   Q.   What was his position within ISIS?

6   A.   So he had a leadership position, and according to the

7   briefs I received, he was referred to as the oil emir in

8   Syria.

9   Q.   Would capturing Abu Sayyaf achieve the objective of

10  disrupting the ISIS organization?

11  A.   Yes, it would.

12       MS. COOK:   Could we please display Government's

13  Exhibit 19-3, which is also already in evidence.

14       (Exhibit published.)

15  BY MS. COOK:

16  Q.   Do you recognize the person in this photograph?

17  A.   Yes.

18  Q.   Who is this?

19  A.   This is Um Sayyaf.

20  Q.   And how are you able to recognize Um Sayyaf?

21  A.   The same way we were shown pictures of Um Sayyaf leading

22  up to the mission and intelligence briefs.

23  Q.   What is Um Sayyaf's connection to Abu Sayyaf?

24  A.   She was his wife.

25  Q.   Thank you.   In May of 2015, what was your understanding

─────United States v. Elsheikh─────

27

1  of where Abu and Um Sayyaf were located?

2  A.   So according to the briefs we received, my understanding

3  is that they were located in a town called al-Amr in Syria.

4  Q.   Are you able to spell al-Amr?

5  A.   I think, it's multiple ways I've seen, but a-l, hyphen,

6  A-m-r.

7  Q.   At an earlier point had the Sayyafs been living in

8  Shaddadi?

9  A.   Yes.

10 Q.   And did you have information that by May of 2015 the

11 Sayyafs had moved from Shaddadi to al-Amr?

12 A.   Yes, I did.

13        MS. COOK:  If we could please display Exhibit 2-1,

14 which is already in evidence.

15        (Exhibit published.)

16 BY MS. COOK:

17 Q.   Agent Driscoll, if you touch the screen with your finger,

18 it will leave a mark.

19        Could you please indicate for the jury, in general,

20 the location of al-Amr?

21 A.   In general, it's right around that region.  Do you need

22 me to touch it again?

23 Q.   Make it bigger.  Thank you.

24        Was al-Amr near the Deir Ez-Zur region, which is

25 indicated on the map?

Direct Examination of Dr. Bradshaw 5/17/22

─United States v. Elsheikh─

28

1   A.   Yes, somewhere in that area, yes.

2   Q.   Thank you.  Could you please describe the town in al-Amr?

3   A.   So the town was -- it was more of an enclosed compound,

4   so to speak, enclosed in a somewhat high concrete wall.  And

5   within that compound were multiple multistory residential

6   structures.

7   Q.   Did you have any information that Kayla Mueller had been

8   held in that compound in al-Amr?

9   A.   No.

10  Q.   Where were you before the operation?

11  A.   I was in Erbil, Iraq.

12  Q.   Were other HRT members also involved in the operation?

13  A.   Yes, they were.

14  Q.   How many total HRT members were involved in that

15  operation?

16  A.   Including myself, there were three of us.

17  Q.   Were there also U.S. military personnel on that team?

18  A.   Yes.

19  Q.   When did the team leave for Syria?

20  A.   So we left from Erbil to Syria in what we called the

21  "period of darkness."  From the -- in the period of darkness

22  between March 15th leading up to March 16th.

23  Q.   Fair to say you left very late in the day on May 15,

24  2016?

25  A.   Yes, very.

─────United States v. Elsheikh─────

1   Q.   How did you get to al-Amr?

2   A.   Via helicopters.

3   Q.   What was your role?

4   A.   So like the mission itself my role was multifaceted.  To

5   collect items of interest, to interview and interrogate any

6   ISIS members or that survived the ordeal on the target itself.

7   And also, to gain custody of Um and Abu Sayyaf and remove them

8   from the target, and rescue the Yazidi slave woman.

9   Q.   Was the Sayyaf residence in al-Amr in a hostile location?

10  A.   Yes.

11  Q.   Why was it a hostile location?

12  A.   It was well-known through intel reports that al-Amr is in

13  ISIS controlled territory within Syria.

14  Q.   Can you describe the Sayyaf residence in al-Amr?

15  A.   Yes, so, it was a multistory structure within that

16  concrete enclosed compound with multiple units, residential

17  units, within the structure itself.  It had a small backyard.

18  Q.   And was it your understanding that the entirety of the

19  structure was a Sayyaf residence?

20  A.   Yes, they had access.

21  Q.   Would you please describe what happened as the

22  helicopters approached the compound?

23  A.   As we approached the compound on the helicopters, we

24  started to receive heavy volume of gunfire from the ground.

25  Q.   Did the helicopters land anyway?

─United States v. Elsheikh─

30

1   A.   Yes.

2   Q.   Where did you go after the helicopters landed?

3   A.   After we landed we went through a -- the concrete -- the

4   concrete wall into the backyard into the Sayyaf structure.

5   Q.   Did the gunfire continue as you approached the structure?

6   A.   Yes.

7   Q.   Were you able to get through the wall and into the

8   structure?

9   A.   Yes, we were.

10  Q.   What did you do upon entering the residence?

11  A.   So I personally moved to the top level of the structure

12  itself, and working from the top down, coordinated the

13  collection and seizure of the items of interest such as the

14  laptop computers, storage devices, such as USB's or SIM cards

15  or things like that; documents, paper documents, communication

16  devices, telephones, radios, and such, artifacts and currency.

17  Q.   Would you please turn to Exhibit 19-2.

18       Agent Driscoll, this is Abu Sayyaf, is that right?

19  A.   Yes, it is.

20  Q.   Did you see this person in that residence on that May

21  15th through May 16th operation?

22  A.   Yes, I did.

23  Q.   Was Abu Sayyaf captured?

24  A.   No.

25  Q.   Why not?

┌─────────────────────────────────────────────────────────────────┐
United States v. Elsheikh

31

1    A.   He was killed.

2         MS. COOK:  Can we now please display Government's

3    Exhibit 19-3.

4         (Exhibit published.)

5    BY MS. COOK:

6    Q.   And Agent Driscoll, who is this again?

7    A.   Um Sayyaf.

8    Q.   Did you see Um Sayyaf at the residence during that

9    operation?

10   A.   Yes, I did.

11   Q.   Was Um Sayyaf captured?

12   A.   Yes.

13   Q.   Thank you.  Can you please describe what was happening

14   inside the residence?

15   A.   So inside the residence myself, the two other FBI agents,

16   HRT operators, and the U.S. military were collecting all of

17   the items of interest that we could find.  While outside the

18   residence there was still a sustained high volume of gunfire

19   and explosions.

20   Q.   Were there other ISIS members inside that residence,

21   other than Abu and Um Sayyaf?

22   A.   Yes.

23   Q.   Did you personally assist in the collection of items of

24   interest?

25   A.   Yes, I did.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

United States v. Elsheikh

32

1   Q.   You testified that among the items of interest that you

2   were looking for were computers and storage devices.

3            Why were you looking for those items?

4   A.   So with the ultimate goal of disrupting and dismantling

5   the ISIS organization, those devices could contain information

6   or intelligence on how to disrupt, but also on future plans,

7   the structure of the organization itself and other attacks

8   that could be being planned.

9   Q.   You also testified that you and your team seized paper

10  documents.  Why would paper documents have been among the

11  items of interest?

12  A.   Same reasons as the tactical evidence.  It could indicate

13  membership of ISIS, who those members are, current plans, how

14  the structure is run or how the organization is run, and the

15  like.

16  Q.   Would you and your team have been particularly interested

17  in documents that bore the ISIS logo?

18  A.   Yes.

19  Q.   Did you and your team also collect weapons?

20  A.   Yes, we did.

21  Q.   Did you seize ammunition?

22  A.   Yes.

23  Q.   Were the items placed in any kind of a bag or packaging?

24  A.   Yes, they were.

25  Q.   Where were they placed?

─United States v. Elsheikh─

```
1    A.   Where were the items placed?  In those bags, usually in
2    the center of every room we were in to consolidate, and then
3    brought off the target itself.
4    Q.   Did you hear anything happening outside the residence?
5    A.   Yes.
6    Q.   What could you hear?
7    A.   A high volume of sustained gunfire and explosions the
8    entire time we were there.
9    Q.   Were you ever able to see what was happening outside the
10   residence?
11   A.   Yes.
12   Q.   Describe that?
13   A.   So at one point, as we were processing the structure
14   itself, myself and another FBI agent moved to an open door to
15   the exterior.  And part of our responsibility was that we were
16   aware of a vehicle associated with the Sayyafs parked in kind
17   of a carport outside of the house itself.  And when we got to
18   the door, there was a large amount of gunfire going on between
19   where that door was inside the house and getting to the car,
20   and so we decided against it.
21   Q.   Were you ever able to search that vehicle?
22   A.   No.
23   Q.   How long did you and your team have on that scene?
24   A.   To the best of my recollection, we were there for
25   approximately 45 minutes.
```

─────────United States v. Elsheikh─────────

34

1   Q.   Why was the time so short?

2   A.   For a number of reasons.  The gunfire and explosions

3   never stopped.  The fighting never stopped from the outside of

4   the structure and there was information that the longer we

5   stayed there, and because of the controlled territory and the

6   number of ISIS fighters in the compound itself collapsing upon

7   the location we were at, because we were assumed to be

8   outnumbered exponentially and the security situation was

9   diminishing greatly for every moment we stayed there.

10  Q.   So is it fair to say that the longer you were there, the

11  more dangerous the situation became?

12  A.   Yes.

13  Q.   Who decided when it was time to leave?

14  A.   The U.S. military personnel, leadership.

15  Q.   What did you do after receiving the order to leave?

16  A.   Hastily moved to the bottom floor of the structure,

17  grabbed what I could carry, gained physical custody of Um

18  Sayyaf and the Yazidi slave woman and we moved out of the back

19  of the structure the way we came in and out towards where our

20  exfil was, our helicopters.

21  Q.   What does exfil mean?

22  A.   Exfiltration from the area.  Basically helicopters came

23  and picked us up and took us out of there.

24  Q.   Did you get back to the helicopters?

25  A.   Yeah.

──United States v. Elsheikh──

35

1   Q.   Was Um Sayyaf placed on the helicopters?

2   A.   Yes, she was.

3   Q.   What about the young Yazidi woman?

4   A.   Yes.

5   Q.   And what happened with the bags containing the items of

6   interest?

7   A.   Also placed on the helicopters.

8   Q.   Where did the helicopters go?

9   A.   Back to Erbil, Iraq.

10  Q.   Did FBI personnel photograph and catalog the items that

11  had been seized from the Sayyaf residence?

12  A.   Yes.

13  Q.   What happened to Um Sayyaf?

14  A.   When we landed back in Erbil, I relinquished custody of

15  Um.

16  Q.   Were you able to observe the Yazidi young woman as she

17  exited the Sayyaf residence and went to the helicopters?

18  A.   Yes, she was with me.

19  Q.   How would you describe her reaction upon leaving?

20  A.   She was smiling, she -- to me seemed to be relieved and

21  filled with joy.

22          MS. COOK:  Your Honor, at this time, the parties

23  have a stipulation to offer with regard to items seized from

24  the residence.  May I hand it to the courtroom deputy?

25          THE COURT:  Yes.  All right.  This is a stipulation

—United States v. Elsheikh—

36

1  by and between the parties.

2          And it states:  That the parties stipulate and agree

3  that the items shown in the following exhibits were collected

4  by United States personnel from the residence of Abu Sayyaf in

5  Syria on or about May 16, 2015.

6          And then the stipulation lists, I'm not going to

7  read all of the exhibit numbers.  Well, yes, I will.  19-1,

8  19-5, 20-1, 20-2, 20-3, 20-4, 20-5, 20-6, 20-9, 11A -- 20-11A,

9  20-12A, 20-13A, 20-14A.  Those are the exhibits collected by

10  the United States personnel from the residence of Abu Sayyaf

11  in Syria on or about May 16, 2015 and the parties have

12  stipulated to that.  And this will be provided to the jury in

13  the jury room.

14          MS. COOK:  Thank you, Your Honor.

15          THE COURT:  Next.

16          MS. COOK:  Exhibits 19-1 and 19-5 were previously

17  admitted.  At this time, Your Honor, the government moves for

18  the admission of Exhibits 20-1, 20-2, 20-3, 20-4, 20-5, 20-6,

19  20-9, 20-11A, 20-12A, 20-13A, and 20-14A.

20          THE COURT:  All of which were in the stipulation.

21          MS. COOK:  Correct, Your Honor.

22          THE COURT:  Any objection since it's stipulated?

23          MR. DEUBLER:  Subject to our discussion and the

24  defendant's objection this morning.

25          THE COURT:  All right.  They're admitted.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

37

1    (Government's Exhibit Nos. 20-1, 20-2, 20-3, 20-4, 20-5, 20-6,

2    20-9, 20-11A, 20-12A, 20-13A, and 20-14A were admitted into

3    evidence.)

4            MS. COOK:  And, Your Honor, Government's Exhibits

5    20-11, 20-12, 20-13 and 20-14 are translations of 20-11A,

6    20-12A, and 20-13A, and 20-14A.  Those translations were

7    previously provisionally admitted.  At this time, the

8    government moves for the admission of those translations.

9            THE COURT:  Any objection to the accuracy of those

10   translations?

11           MR. DEUBLER:  No, sir.

12           THE COURT:  All right.  They're admitted.  Next

13   question.

14   (Government's Exhibit Nos. 20-11, 20-12, 20-13 and 20-14 were

15   admitted into evidence.)

16           MS. COOK:  Could we please display Exhibit 20-1.

17           (Exhibit published.)

18   BY MS. COOK:

19   Q.   Agent Driscoll, what is shown here?

20   A.   These were items that we seized from the Sayyaf

21   residence.

22           MS. COOK:  Can we please go to Exhibit 20-2.

23   BY MS. COOK:

24   Q.   Does this photograph show some of the computers and media

25   devices that were seized from the Sayyaf residence?

─────United States v. Elsheikh─────

38

1    A.   Yes.

2    Q.   Now, among the computers, do you note a red laptop?

3    A.   Yes.

4         MS. COOK:  Can we please display Exhibit 19-1, which

5    has previously been admitted.

6         THE COURT:  You may do so.

7         (Exhibit published.)

8    BY MS. COOK:

9    Q.   Agent Driscoll, was this laptop taken from the Sayyaf

10   residence?

11   A.   Yes.

12        MS. COOK:  Could we please display Exhibit 20-3.

13   BY MS. COOK:

14   Q.   Agent Driscoll, did your team seize paper documents from

15   the Sayyaf residence?

16   A.   Yes.

17   Q.   How many?

18   A.   A very large amount.

19   Q.   Did your team also seize weapons from the Sayyaf

20   residence?

21   A.   Yes.

22        MS. COOK:  Could we please display Exhibit 20-4.

23   BY MS. COOK:

24   Q.   Agent Driscoll, what is shown here?

25   A.   Weapons we seized from the Sayyaf residence and

─────United States v. Elsheikh─────

39

1   ammunition, sorry.

2   Q.   Weapons and ammunition?

3   A.   Yes.

4        MS. COOK:   Could we please display Exhibit 19-5,

5   which was previously admitted.

6   BY MS. COOK:

7   Q.   Agent Driscoll, is this also a weapon that was seized

8   from the Sayyaf residence?

9   A.   Yes.

10        MS. COOK:   Can we please go to page 3 of the

11   exhibit.

12   BY MS. COOK:

13   Q.   Agent Driscoll, was the gun shown here also seized from

14   the Sayyaf residence?

15   A.   Yes.

16        MS. COOK:   Can we please display Exhibit 20-5 and

17   20-6 simultaneously.

18   BY MS. COOK:

19   Q.   Agent Driscoll, what are we looking at in these

20   photographs?

21   A.   These are stamps that we seized from the Sayyaf

22   residence.

23   Q.   Do you recall these items?

24   A.   Yes.

25   Q.   Did they stand out to you?

──United States v. Elsheikh──

40

1   A.   Yes, they did.

2   Q.   Why is that?

3   A.   A couple of reasons.  One, a number of these stamps have

4   the ISIS insignia on them.  And because of my training and

5   experience, I know that these stamps indicate membership but

6   also whoever possesses these stamps it's -- it's typical that

7   they have some kind of position of leadership or power within

8   the ISIS organization.

9            THE COURT:  Just to be clear what we're looking at.

10  We see the stamps and then right below each stamp there is

11  what?

12           THE WITNESS:  They -- the usage of said stamp.  So

13  the punched.

14           THE COURT:  Next question.

15           THE WITNESS:  Thank you, sir.

16           MS. COOK:  Would you please display Exhibit 20-9.

17  BY MS. COOK:

18  Q.   Did your team also find and seize handcuffs in the Sayyaf

19  residence?

20  A.   Yes.

21  Q.   Did your team find documents in the Sayyaf residence that

22  contain justifications for and rules about slavery?

23  A.   Yes, we did.

24           MS. COOK:  Please go to Exhibit 20-11A.  Can we

25  enlarge the left side of the document?

─────United States v. Elsheikh─────

41

1    BY MS. COOK:

2    Q.   Agent Driscoll, do you see the logo in the top left

3    corner of this exhibit?

4    A.   Yes.

5    Q.   What is that logo?

6    A.   That's the ISIS insignia.

7    Q.   Please turn to Exhibit 20-11.

8         MS. COOK:  And please enlarge the center text of

9    this exhibit.

10   BY MS. COOK:

11   Q.   Agent Driscoll, is there a reference to ISIS on this

12   page?

13   A.   Yes.

14   Q.   What is that reference?

15   A.   To the ISIS insignia on the top right corner there and

16   then it's stated -- the Islamic State Research and Fatwa

17   Committee on the left there.

18   Q.   What is a Fatwa?

19   A.   A religious decree.

20        MS. COOK:  Could we please display Exhibit 3-14,

21   which has previously been admitted.

22        (Exhibit published.)

23   BY MS. COOK:

24   Q.   Agent Driscoll, what is this?

25   A.   The ISIS flag.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

—————United States v. Elsheikh—————

42

1   Q.   Did you observe this same insignia found on the ISIS flag

2   on the stamps that we looked at earlier and the documents that

3   we are talking about now?

4   A.   Yes.

5   Q.   And is that same insignia from the flag found in that

6   logo on the top left corner that you just described?

7   A.   Yes, it is.

8          MS. COOK:  Your Honor, at this time, I will ask to

9   display 20-4 to the jury.  It's a media interview that has

10  previously been admitted.

11         THE COURT:  Yes, you may do so.  How long a clip is

12  it?

13         MS. COOK:  Three minutes and eight seconds.

14         THE COURT:  All right.  Proceed.

15         (Video played.)

16         MS. COOK:  And can we return to Exhibit 20-11, page

17  3.  Will you please enlarge the first two sentences of the

18  first highlighted portion.

19  BY MS. COOK:

20  Q.   Agent Driscoll, will you read the first sentence there.

21  A.   "The praiseworthy Allah prescribe for his fellow

22  believers the capture and enslavement of the combatant

23  infidels."

24         MS. COOK:  And let's please enlarge the second

25  highlighted portion.

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

43

```
 1  BY MS. COOK:
 2  Q.   Agent Driscoll, will you please read this.
 3  A.    "When the crusaders took over House of Islam and
 4  installed tyrants loyal to them, they pushed aside Allah's
 5  laws and ruled by manmade laws.  They allowed what was
 6  forbidden by Allah and forbad what was allowed by Allah.
 7  Among those was banning slavery on the pretext of humanism and
 8  equality among people, Muslims, and infidels, the ritual was
 9  put away, and its rulings were forgotten."
10         MS. COOK:  Please enlarge the large highlighted
11  portion.
12  BY MS. COOK:
13  Q.   Agent Driscoll, will you please read this.
14  A.    "Until Allah allowed the establishment of the Islamic
15  State, may Allah strengthen it, which ruled, according to
16  Shariah, enforced laws, fought the infidels, imposed Jizya on
17  the people of the book and took enslaved captives as
18  idolaters.  The believers became glorious and the infidels and
19  idolaters became humiliated and despised."
20  Q.   Is Jizya defined in the document you just read from?
21  A.   Yes.
22  Q.   What is the definition given in this document?
23  A.    In the footnote it's tax levied on people of the book.
24  Thank you.  Who live under Islamic rule.  It's a protection
25  tax.
```

─── United States v. Elsheikh ───

44

1    MS. COOK:  Please enlarge the last highlighted

2  portion.

3  BY MS. COOK:

4  Q.   And Agent Driscoll, will you read this.

5  A.   "Although Allah almighty has enabled us to take the neck

6  of the infidels and by his mercy has given us their women and

7  offspring, it is incumbent upon us to know the rules of

8  dealing with them so that we are aware of what we do and not

9  wrong them or fall into what Allah has forbidden."

10  Q.   Does this particular document contain texts about the

11  rights of slaves and slave owners?

12  A.   Yes.

13  Q.   Does this ISIS document also contain text about enslaving

14  married women?

15  A.   Yes.

16  Q.   Will you please turn to page 17.

17    MS. COOK:  And please enlarge the two highlighted

18  portions here.

19  BY MS. COOK:

20  Q.   Agent Driscoll, will you please read this.

21  A.   "There is no disagreement among the scholars that her

22  marriage is annulled simply due to her capture.  The Almighty

23  said, also forbidden are married women, except female captives

24  in your possession. (Women, 24.)  Al-Tabari, may Allah have

25  mercy on him, said, 'Some of them, and rightfully possessed,

┌─────────────────United States v. Elsheikh─────────────────┐

45

1   are the female captives whom the captivity separated from

2   their captive husbands.  They are permissible to whom they

3   became the possession without divorce from her combatant

4   husband.'"

5           MS. COOK:  Please display Exhibit 20-12A.  Please

6   enlarge the left side of this exhibit.

7   BY MS. COOK:

8   Q.   Agent Driscoll, do you see the logo in the top left

9   corner of this document?

10  A.   Yes.

11  Q.   What is the significance of this logo?

12  A.   It's the ISIS insignia.

13  Q.   And is this the same insignia we saw on the prior

14  document?

15  A.   Yes.

16          MS. COOK:  Will you please display Exhibit 20-12,

17  which is the translation of 20-12A.  Please go to page 2.  Can

18  we enlarge the text in the center.

19  BY MS. COOK:

20  Q.   Agent Driscoll, does this document make any references to

21  ISIS?

22  A.   Yes.

23  Q.   What references are you finding here?

24  A.   In addition to the insignia on the left, it looks like it

25  was published by the Islamic State Research and Fatwa

Case 1:20-cr-00239-TSE   Document 340   Filed 10/24/22   Page 46 of 188 PageID# 3547
Direct Examination of Brian Driscoll   10/11/22

46

──────United States v. Elsheikh──────

Committee.

Q.   Does this particular ISIS document contain claims about
what can be done to nonmembers of ISIS?

A.   Yes.

Q.   Please go to page 3.

        MS. COOK:  Please enlarge the highlighted portions
here.

BY MS. COOK:

Q.   Agent Driscoll, will you please read this text.

A.   "One of the matters that the Shariah ruled on is the
capture of the women of infidel combatants and their
enslavement.  The infidels who have no pledge of protection,
peace or security with Muslims, the standard is that their
blood and money are permissible with impunity unless they
submit to pay Jizya and come under the rule of Shariah.

        With this description, their women and offspring are
enslaved.  However, the deliberate killing of women is not
permissible unless they helped in the war against Muslims, the
Qur'an, Sunnah, and consensus establish this religious
ruling."

Q.   Is there also a definition of Jizya in this document?

A.   Yes, in the footnote below.

Q.   What is that definition?

A.   "Tax levied on people of the book who live under Islamic
rule; a protection tax."

─────United States v. Elsheikh─────

47

1   Q.   Does this particular ISIS document contain various

2   justifications for enslaving women?

3   A.   Yes, it does.

4   Q.   Would you please turn to page 5.

5            MS. COOK:  Please highlight or enlarge the

6   highlighted portion there.

7   BY MS. COOK:

8   Q.   What is the first justification for enslaving women?

9   A.   "Capturing prisoners and enslavement is a method for

10  spreading monotheism."

11  Q.   Please turn to page 7 of the exhibit.

12           MS. COOK:  Please enlarge the first highlighted

13  portion.

14  BY MS. COOK:

15  Q.   What is the second justification for enslaving women?

16  A.   "Capturing and enslaving demonstrates the glory of Islam

17  and its followers."

18           MS. COOK:  Please enlarge the second highlighted

19  portion.

20  BY MS. COOK:

21  Q.   Agent Driscoll, will you please read this.

22  A.   "While Jihad of spite is confined to killing infidel

23  combatants and apostates, fighting them, and inflicting harm

24  on them, and plundering their money and spoils; Jihad of

25  establishment also includes capturing women of infidel

────United States v. Elsheikh────

48

1  combatants, enslaving them, dividing them among the

2  mujahideen, and making their genitals permissible.  This is

3  the highlight of the establishment and triumph with the sword.

4  It has been said."

5  Q.   And let me just pause you there.  What does "mujahideen"

6  mean?

7  A.   Fighters on behalf of Islam.

8         MS. COOK:  Could we please enlarge the last

9  highlighted portion.

10  BY MS. COOK:

11  Q.   Agent Driscoll, I believe this is the continuation of "it

12  has been said."  Will you please read this?

13  A.   "A wife married by our spheres it is permissible to marry

14  and to consummate the marriage; she is not to be released."

15  Q.   In essence is this ISIS document claiming that ISIS

16  fighters can have sex with enslaved women?

17  A.   Yes, it is.

18  Q.   Please turn to page 8.

19         MS. COOK:  Please enlarge the highlighted portion at

20  the top.

21  BY MS. COOK:

22  Q.   What is the third justification for enslaving women?

23  A.   "Capturing and enslaving prisoners humiliates the

24  disbelief and its people."

25         MS. COOK:  Please enlarge the second highlighted

─────────── United States v. Elsheikh ───────────

49

1   portion on this page.

2   BY MS. COOK:

3   Q.   Agent Driscoll, will you please read this.

4   A.   "Allah has struck the infidels with affliction and

5   humiliation.  That will be those who violated the command of

6   Allah and the command of his messenger.  Prayer and peace

7   be..."  upon or -- I'm sorry.

8           "Prayer and peace of Allah be upon him.  The

9   afflictions imposed on them include the captivity and

10  enslavement of their women and the permission to have

11  intercourse with them."

12  Q.   Please turn to page 9.

13          MS. COOK:  Please enlarge the highlighted portion

14  there.

15  BY MS. COOK:

16  Q.   What is the fourth justification for enslavement?

17  A.   "Capturing prisoners in enslavement is one of the

18  practices of the prophet."

19  Q.   Please turn to page 10.

20          MS. COOK:  And enlarge the highlighted portion at

21  the top.

22  BY MS. COOK:

23  Q.   What is the fifth justification for enslaving women?

24  A.   "Capturing prisoners and enslavement is mercy from Allah

25  on the women of infidels and their offspring."

─── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───

EASTERN DISTRICT OF VIRGINIA

─────────── United States v. Elsheikh ───────────

50

1          MS. COOK:  Please enlarge the second highlighted

2    portion on this page.

3    BY MS. COOK:

4    Q.   Agent Driscoll, will you read this.

5    A.   "Whenever the infidels refuse to enter Islam or pay a

6    Jizya and submit to the rule of Shariah, there is nothing left

7    but for us to conquer them, fight them, kill them, capture

8    them, ambush them, surround them, and pursue them so that they

9    are either slain, detained, or displaced."

10   Q.   And is Jizya the same term that you have previously read

11   a definition of, essentially a protection tax?

12   A.   Yes.

13   Q.   Please turn to page 12.

14          What is the sixth justification for enslavement?

15   A.   "Showing the mercy and justice of Shariah in dealing with

16   bond women and slaves."

17          MS. COOK:  Please enlarge the next highlighted

18   portion on this page.

19   BY MS. COOK:

20   Q.   Agent Driscoll, according to this ISIS document, how long

21   has slavery existed?

22   A.   "Captivity and enslavement have existed throughout

23   history."

24   Q.   Please turn to page 14.

25          MS. COOK:  Enlarge the highlighted portion at the

─────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────

EASTERN DISTRICT OF VIRGINIA

1   top.

2   BY MS. COOK:

3   Q.   What is the seventh justification for slavery?

4   A.   "Capturing prisoners in enslavement is a reprieve for men

5   who are unable to marry."

6   Q.   Please turn to page 15.

7           MS. COOK:   And enlarge the highlighted portion at

8   the top.

9   BY MS. COOK:

10  Q.   What is the eighth justification for slavery?

11  A.   "Capturing prisoners in enslavement is a method to

12  increase the Muslim offspring."

13          MS. COOK:   Can we now display Exhibit 20-13A.   Can

14  we enlarge the header at the top of this exhibit.

15  BY MS. COOK:

16  Q.   Agent Driscoll, do you see the symbol at the top right

17  corner of this document?

18  A.   Yes.

19  Q.   What is the significance of that symbol?

20  A.   It's the ISIS insignia.

21          MS. COOK:   Can we now enlarge the stamp at the

22  bottom of this exhibit.

23  BY MS. COOK:

24  Q.   Agent Driscoll, is this mark similar to stamps that were

25  seized from the Sayyaf residence on or about May 16, 2015?

─United States v. Elsheikh─

52

1   A.   Yes.

2             MS. COOK:  Please display Exhibit 20-13, which is a

3   translation of 20-13A.

4   BY MS. COOK:

5   Q.   Does this document make any references to ISIS?

6   A.   Yes.

7   Q.   Please explain.

8   A.   So the ISIS insignia on the top left there, in the

9   center, it says the Islamic State and the Research and Fatwa

10  Committee again.

11  Q.   Can we please turn to page 3.

12            MS. COOK:  And enlarge the highlighted portion at

13  the top.

14  BY MS. COOK:

15  Q.   Agent Driscoll, will you read this.

16  A.   "Question:  Some of the brothers have committed

17  violations in the matter of the female slaves not permitted by

18  the Shariah.  It is not hidden that this is because it has

19  been long ages since these rulings.  Are there any warnings

20  pertaining to this matter?  May Allah protect and keep you."

21  Q.   Does this document go on to claim that it is permissible

22  for slave owners to have sexual intercourse with their female

23  slaves?

24  A.   Yes.

25            MS. COOK:  Can we now display Exhibit 20-14A.  Please

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Direct Examination of Special Agent Driscoll  10/12/22

─────United States v. Elsheikh─────

53

1   enlarge the heading at the top of this exhibit.

2   BY MS. COOK:

3   Q.   Agent Driscoll, do you see the symbol at the top left

4   corner of this document?

5   A.   Yes.

6   Q.   What is the significance of that symbol?

7   A.   It's the ISIS insignia.

8        MS. COOK:  Please display Exhibit 20-14, which is

9   the translation of 20-14A.  And if we can enlarge the heading

10  of the top of this document.

11  BY MS. COOK:

12  Q.   Are there any references to the Islamic State in this

13  document?

14  A.   Yes.

15  Q.   What references do you see here?

16  A.   So on the right is the ISIS insignia again.  And it says,

17  The Islamic State, Diwan of Justice Grievances, on the left.

18        MS. COOK:  Can we turn to page 3.  And enlarge the

19  highlighted portions here.

20  BY MS. COOK:

21  Q.   Agent Driscoll, will you read this.

22  A.   "And in the expression 'Whoever believes in Allah and the

23  hereafter shall not consummate the marriage with a deflowered

24  slave woman until she has had a period.'  Ahmad and

25  al-Tirmidhi narrated it.  Meaning, it is unnecessary in the

─────────United States v. Elsheikh─────────

54

1  case of a virgin.  And Ibin-'Umar said, 'When a girl with whom

2  intercourse might be had was given as a present, or sold, or

3  set free, it is necessary to wait until she had a menstrual

4  period, but this was unnecessary in the case of a virgin.'

5  Al-Bukhari narrated in his Sahih."

6         MS. COOK:  If I can have the Court's indulgence for

7  a moment, Your Honor.

8         THE COURT:  All right.

9         (Counsel confers.)

10         MS. COOK:  Thank you.  I have no further questions

11  at this time.

12         THE COURT:  Any cross-examination?

13         MR. DEUBLER:  Very briefly, Your Honor.

14         THE COURT:  All right.

15                    CROSS-EXAMINATION

16  BY MR. DEUBLER:

17  Q.   My name is Zachary Deubler.  I'm one of El Shafee

18  Elsheikh's attorneys.

19         You previously testified that Abu Sayyaf was a

20  leader of ISIS?

21  A.   In a leadership position, yes.

22  Q.   Okay.  And the May 2016 raid was a search of one of his

23  residences?

24  A.   To my knowledge, yes.

25  Q.   And you collected a number of items from that residence?

1   A.    Yes.

2   Q.    Electronic devices, I think you previously testified.

3   A.    Correct.

4   Q.    And the FBI searched those electronic devices?

5   A.    To my knowledge, yes.

6   Q.    Was there anything linking Mr. El Shafee Elsheikh to

7   those devices?

8   A.    I don't know.

9   Q.    The FBI collected a number of items for DNA comparison,

10  correct?

11  A.    Correct.

12  Q.    Any of that DNA comparison lead to Mr. El Shafee

13  Elsheikh?

14  A.    I don't know.

15  Q.    Did any of that DNA comparison lead to identifying any of

16  the Western hostages in this -- in this particular residence?

17  A.    I don't know.

18  Q.    Was there anything forensically found in that house that

19  you have knowledge of that linked either Mr. Elsheik or any of

20  the Western hostages to that house?

21  A.    I don't have that knowledge.  I don't know.

22          THE COURT:  What do you mean by "linked"?

23          MR. DEUBLER:  Was there a DNA match to Mr. Elsheikh

24  to any of the DNA found in that house or to any of the other

25  Western hostages?

─────United States v. Elsheikh─────

56

1        THE COURT:  All right.  That's what you mean by

2    "linked"?

3        MR. DEUBLER:  Yes, sir.

4        THE COURT:  All right.  Next question.

5        MR. DEUBLER:  No further questions, Your Honor.

6        THE COURT:  Any redirect?

7        MS. COOK:  Briefly, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MS. COOK:

10   Q.   Agent Driscoll, you recall the computers that were seized

11   from the Sayyaf residence, correct?

12   A.   Correct.

13   Q.   And do you recall that one of those items was a red

14   laptop?

15   A.   Yes.

16       MS. COOK:  Nothing further, Your Honor.

17       THE COURT:  All right.  Thank you.  You may step

18   down, Agent Driscoll.

19       THE WITNESS:  Thank you, sir.

20       MS. COOK:  Your Honor, may this witness be excused?

21       THE COURT:  Say it again.

22       MS. COOK:  May this witness be excused?

23       THE COURT:  Unless there's an objection, yes, you

24   may be excused.

25       MR. DEUBLER:  No objection.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

───United States v. Elsheikh───

57

```
 1              (Witness excused.)

 2              THE COURT:  Who is your next witness?

 3              MR. GIBBS:  Your Honor, Daniel Ottosen is the next

 4   witness.

 5              THE COURT:  And how long will he take?

 6              MR. GIBBS:  Approximately two hours, Judge.

 7              THE COURT:  All right.  We'll take the morning

 8   recess a bit early.  Put your books in the cubbyhole, avail

 9   yourselves of treats and drinks and the like and relax.  We'll

10   reconvene at 10 minutes to 11:00.  And then we will hear from

11   your next witness, Mr. Ottosen.

12              MR. GIBBS:  Correct, yes, Your Honor.

13              THE COURT:  And is that the final witness?

14              MR. GIBBS:  It is, Judge.

15              THE COURT:  Follow the court security officer out,

16   put your books in the cubbyhole.  And remember to refrain from

17   discussing the matter among yourselves and with anyone or

18   undertaking any investigation on your own.

19              (Jury dismissed.)

20              THE COURT:  All right.  Court stands in recess until

21   10 minutes to 11:00.

22              (Recess.)

23              THE COURT:  All right.  You may be seated.  You may

24   bring the jury in.

25              (Jury present.)
```

─────────────────────────United States v. Elsheikh─────────────────────────

58

1        THE COURT:  All right.  You may be seated.

2   Mr. Gibbs, you may call the next witness on behalf of the

3   government.

4        MR. GIBBS:  Thank you, Your Honor.  The government

5   calls Daniel Ottosen to the stand.

6        THE COURT:  Come forward and take the oath.

7        Mr. Ottosen, you may take the oath by using the

8   Bible or simply affirm.  It's entirely up to you.

9        THE WITNESS:  I just affirm.

10        THE COURT:  All right.  Proceed.

11        (Government's witness, Daniel Ottosen, affirmed.)

12        THE DEPUTY CLERK:  Thank you.

13        (Witness seated.)

14        THE COURT:  All right.  Mr. Gibbs, you may proceed,

15   sir.

16        MR. GIBBS:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18   BY MR. GIBBS:

19   Q.   Good morning, sir.

20   A.   Good morning.

21   Q.   Would you please state your name for the record.

22   A.   My name is Daniel Rye Ottosen.

23   Q.   And can you spell Ottosen?

24   A.   O-T-T-O-S-E-N.

25   Q.   What country are you from, sir?

Cross-examination of ... 10/24/2022

─────United States v. Elsheikh─────

59

1   A.   I'm from Denmark.

2   Q.   And did you have a sports background in Denmark?

3   A.   Yes, I did.

4   Q.   What was your sport?

5   A.   I was on the national gymnast team doing gymnastics.

6   Q.   And after your time on the national gymnastics team in

7   Denmark, did you become a photographer?

8   A.   Yes, I did.

9   Q.   What sorts of stories did you want to focus on with your

10  photography?

11  A.   I was very much into the inequality in the world.

12  Q.   And were you familiar with the uprising called the Arab

13  Spring?

14  A.   Yes, I was.

15  Q.   And after the Arab Spring began, did you want to focus on

16  inequality in the world by going to Syria to do some

17  photographic work?

18  A.   Yes.

19  Q.   And did you, in fact, go to Syria?

20  A.   Yes, I did.

21  Q.   What date did you enter Syria?

22  A.   I entered the 16th of May, 2013.

23       MR. GIBBS:  And with Ms. Lopez's assistance, if we

24  could pull up Government's Exhibit 2-1, which is in evidence.

25       THE COURT:  You may.

─────United States v. Elsheikh─────

60

1          MR. GIBBS:  Thank you, Your Honor.

2          THE COURT:  Any admitted exhibit may be displayed.

3          MR. GIBBS:  Thank you, Judge.

4          (Exhibit published.)

5          THE COURT:  If it can be found.

6          MR. GIBBS:  That's fine.  We'll come back to it.

7          THE COURT:  Which exhibit number are you asking for?

8          MR. GIBBS:  2-1.  It's the map of Syria.

9          Judge, I'm advised that the system needs to be

10   rebooted, if I could ask Ms. Randall to do that, but I can

11   move on at this point.

12          THE COURT:  Well, let's -- she can do that.

13          THE DEPUTY CLERK:  Judge, that will take about two

14   minutes.

15          THE COURT:  All right.  Let's take the two minutes.

16          MR. GIBBS:  While the two minutes is elapsing, I can

17   just ask my questions.  There will be some exhibits on me, but

18   I don't necessarily need this one at this time.

19          THE COURT:  All right.  Continue.

20   BY MR. GIBBS:

21   Q.   Now, Mr. Ottosen, on May 16, 2013 which border crossing

22   did you go through to enter into Syria?

23   A.   I went through the border crossing of Kilis and I went

24   directly to the town of Azaz.

25   Q.   We can probably use your help to spell a couple of those.

─────United States v. Elsheikh─────

Cross-Examination of P. Ottosen 10/11/22

61

1          Do you know how to spell Kilis?

2    A.    K-I-L-L-I-S [sic].

3    Q.    And the second town Azaz, how is that spelled?

4    A.    A-Z-A-Z.

5    Q.    And the next day on May 17, 2013, what happened to you?

6    A.    We went to the local authorities and to tell them that we

7    were here and that we were working and that we intended to

8    come back, and they decided to hold us back.  They didn't want

9    to release us.  And when I say "us" it was together with my

10   driver and my fixer.

11   Q.    And you said they wanted to hold us back, at that time on

12   May 17th, were you, in fact, taken hostage?

13   A.    Yes, I was.

14   Q.    And Mr. Ottosen, when you were taken hostage, were you

15   held in two places that you called The Basement Room and The

16   Farmhouse at the outset?

17   A.    That is correct.

18   Q.    How long were you held in The Basement Room and The

19   Farmhouse?

20   A.    In total of about 10 days.

21   Q.    And after your stay in those two places, were you moved

22   to a location called The Torture Center?

23   A.    Yes, I was.

24   Q.    And were these names you gave these places?

25   A.    Yup.

─United States v. Elsheikh─

62

1   Q.   And Mr. Ottosen, were you interrogated in The Torture

2   Center?

3   A.   Yes, I was.

4   Q.   Were you accused of being a spy in The Torture Center?

5   A.   Yes, I was.

6   Q.   And, in fact, were you tortured at that place?

7   A.   Yes.

8   Q.   Can you describe the worst torture that you endured in

9   that location?

10  A.   I think the worst part was the combination of many days

11  without anything to drink or to eat.  So my body became more

12  and more exhausted.  And at some point they hanged me up with

13  my arms above my head like this.

14  Q.   So extended straight above your head?

15  A.   Yeah, my feet was still touching the ground and they told

16  me that I would be staying there for 24 hours.  And in the

17  beginning it was okay, but after some time, I realized that I

18  haven't got anything to drink for about four or five days.

19  Only very, very little.  And, yeah, and suddenly the thirst

20  actually started to be much worse than getting beaten or

21  kicked or anything.

22          And -- but I -- I managed to endure the whole 24

23  hours.  They came in, they took me down.  And when they opened

24  my handcuff, I just passed out.  I woke up some hours later

25  when some guards was opening my handcuffs to put me into

─United States v. Elsheikh─

63

1    another interrogation.  And then there I was told I had two

2    options.  I could either tell them that I was a spy and if I

3    did that, they will give me something to drink and then they

4    will shoot me and everything will be done.  I didn't have to

5    suffer anymore.  And the second option was if I continued to

6    lie to them, they will put me up again with my arms over my

7    head in another room for three days without any water, without

8    any food, and after that they would come in and they will

9    videotape me, when they cut my hair off, and then they will

10   send the video to my family.

11        So 10 minutes later, I found myself in a room with

12   my hands over my head.  And at that point, I broke down.  I

13   didn't have any more hope left inside of me.  So I became

14   desperate and they left me there alone.  And I think in the

15   room it was about two-and-a-half times four meters.  It was

16   not that big.  In the end there was, like, a window, big

17   window of glass.  Of course the glass was gone because of all

18   the bombs that had been dropped over this area the past two

19   years.  And there was some kind of cover in front of this

20   glass door kind of thing.  It didn't -- it didn't hide the

21   last half meter.  It was open and some air came in, so I could

22   see right to my left there was a table.

23        And after, I think, a few hours, I realized that if

24   I -- if I could swing from each side, maybe I could reach with

25   the tip of my toe, and it actually succeeded.  I managed to

─────United States v. Elsheikh─────

64

1  pull the table towards me and I stepped up.  I was so afraid

2  that any of the guards heard what was going on, and I stepped

3  up on the table.  I took the chain around my neck and I

4  decided I would use some minutes thinking about, you know, the

5  good things in life, thinking about my mom, my dad, my

6  girlfriend, my sisters, to put them into my head because my

7  head was full of the idea of having horror, and I wanted to

8  have the loved ones inside of my head.  So I stood there for

9  some time thinking.  And suddenly I heard something behind me.

10  I turned around and I saw the silhouette of a person.  And at

11  that point, I decided that if I wanted to kill myself I have

12  to jump as high as possible to actually try to snap my neck

13  and otherwise they could take me down and continue torturing

14  me.

15  Q.   Did you do that, did you jump and try to snap your neck?

16  A.   Yeah, I jumped as high I could and I managed -- I

17  remember that I lost conscious and that was nice, because it

18  didn't hurt.  It felt some kind of relief.  And at some point,

19  I had the feeling that I was flying, like, I don't know if it

20  was my soul or whatever it was going up.  But then, suddenly,

21  I came into the reality again and I realized it was some of

22  the guards lifting me up, took away the chain, and put me on

23  the ground, and I immediately passed out.

24  Q.   And so, obviously, your attempt to take your own life was

25  unsuccessful on that occasion, correct?

─────────United States v. Elsheikh─────────

65

1   A.   That is correct.

2          MR. GIBBS:  If we could publish Exhibit 11-3, which

3   is in evidence.  Oh, it's still not working.

4          THE COURT:  Just a minute.

5          (Discussion off the record.)

6          THE COURT:  All right.  We're going to take a one to

7   two-minute recess in place, which is sit quiet at this time.

8          (A pause in the proceedings.)

9          MR. GIBBS:  Pull up 11-2, please.

10  BY MR. GIBBS:

11  Q.   Mr. Ottosen, what is Government's Exhibit 11-3, which

12  should be on your screen there?

13  A.   That is a proof-of-life picture of me.

14  Q.   When was this taken?

15  A.   It was taken around two months after I tried to commit

16  suicide.

17  Q.   And is there any evidence of that suicide attempt visible

18  in this picture?

19  A.   Yeah.  So on my neck, you can see some marks from the

20  chain.

21  Q.   And Mr. Ottosen, by this point in time had you lost a

22  great deal of weight while in captivity?

23  A.   Yeah, I think I lost around one-third of my weight.

24         MR. GIBBS:  Okay.  We can take that down.  Thank

25  you.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────
66

BY MR. GIBBS:

Q.   Mr. Ottosen, at some point after this suicide attempt,
were you able to open up your handcuffs using a piece of wire?

A.   That is correct.

Q.   And did you attempt to escape from The Torture Center at
that point?

A.   Yes, I did.

Q.   Can you describe that attempt?

A.   Yeah, so with this small piece of wire, I managed to open
my handcuffs and I escaped underneath this metal protection
thing and I climbed the rail on the balcony.  I think I fell
down a few, I think six feet or so, and landed on the ground.
I looked around, it was early in the morning and I could see
that the sun was rising in the east, so I decided to go around
the corner from the building that I was just escaping to try
to run north, and I think I found myself walking for about one
hour or so, and in the end I came to the end of the city and
decided to jump into a corn field.

        At this point, it was about harvest time so the corn
was quite high in some places so I tried to hide there and
crawling on my stomach, you call it.  I think after maybe 15
minutes I suddenly heard something around me and I stopped
moving, I stopped breathing, I just listened.  And suddenly,
something appeared right next to me, started yelling, so I
jumped up, and I started to run until I heard whoever it was

Case 1:20-cr-00239-TSE   Document 340   Filed 10/24/22   Page 67 of 188 PageID# 3568
Cross-Examination of Todd Ottosen 10/20/2022

United States v. Elsheikh

67

1    trying to catch me they started shooting.  So I had to give

2    up, jump down on the ground, and they took me.  Then I ended

3    up back at The Torture Center.

4    Q.   And Mr. Ottosen, I want to move forward in the timeline

5    for a moment.  At some point in your detention, did you meet

6    three English-speaking captors that you came to know as the

7    Beatles?

8    A.   Yes, I did.

9    Q.   At some point after you came in contact with the Beatles,

10   did they confront you about your previous suicide attempt?

11   A.   Yes, they did.

12   Q.   What did they say?

13   A.   They told me I was a coward to try to kill myself.  It

14   was stupid and there is only one person who can decide who

15   will live or die and that is the will of Allah.

16   Q.   And did the people that you came to know as the Beatles

17   also confront you about your attempted escape?

18   A.   Yes, they did.

19   Q.   What did they say about that?

20   A.   That I was lucky that I survived that and if I would ever

21   try to do that again, I will be executed.

22   Q.   Now, Mr. Ottosen, after being held at The Torture Center,

23   were you moved to another prison where you met some other

24   Western hostages?

25   A.   Yes, I was.

─United States v. Elsheikh─

68

1   Q.   And what was that prison called?

2   A.   We called it the hospital.

3          MR. GIBBS:   If we could publish Exhibit 2-7, which

4   is in evidence.

5          (Exhibit published.)

6   BY MR. GIBBS:

7   Q.   Mr. Ottosen, do you see this exhibit?

8   A.   Yes.

9   Q.   Now, starting at box 4 with the hospital and moving

10  through box 9 with the Desert Prison, does this fairly and

11  accurately depict the prisons you were held in once you

12  arrived at the hospital?

13  A.   Yup.

14  Q.   And if we moved to box No. 5 there, in late August of

15  2013 were you and the other Western hostages moved to this

16  prison that was known as the dungeon?

17  A.   Yes.

18  Q.   And again, the hostages gave these prisons the names,

19  correct?

20  A.   Yes, we did.

21  Q.   And so, did the hostages also call this place Sheik

22  Najjar or the Wood Factory?

23  A.   Yeah.

24  Q.   And Mr. Ottosen, after you arrived at the dungeon, did

25  you encounter those three English-speaking guards that you

—United States v. Elsheikh—

69

1   came to know as the Beatles?

2   A.   Yes.

3   Q.   And have you heard about them even before you first met

4   them?

5   A.   Yes.

6   Q.   How had you heard about them?

7   A.   I heard them through two of my -- two of my cellmates,

8   the two in -- the Italian, Edouard, Federico Motka, and his

9   colleague, the British citizen, David Haines.  So when we were

10   put together, we told each other a little bit about our past

11   and what we endured before we ended up together.  And David

12   and Federico was kidnapped three months before me and they

13   told me that they were held at some place they called The Box.

14   And they described it to me.  They also described that the one

15   who -- who ran that prison was some guys they called the Brits

16   at that time.  We also came to call them the Beatles

17   afterwards.  And they were very, very harsh to them.  And, as

18   they described their everyday life there, I remember I thought

19   that I felt lucky that I was kept in two weeks at The Torture

20   Center rather the time that they spent at The Box.  It sounded

21   to be both physically but also mentally completely extreme.

22   And, yeah, I had an idea of who these three British guards was

23   before I came to know them myself.

24   Q.   And tell us about when you met them for the first time

25   yourself, describe that event.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

70

1   A.   I remember that they knocked very loudly on the door and

2   they yelled at us, hands to the walls.  And I remember

3   Federico and David they -- they were -- they whispered as loud

4   as they could, "hands to the wall, hands to the wall," and I

5   could sense that they were scared and I hadn't -- I didn't

6   know exactly who these guys were yet, who were coming into the

7   cell, so I jumped to the walls and they came in, the three

8   guards who we named the Beatles, and said to us that now

9   things will change from now on.  They had a very military

10  approach.  So they wanted to keep everything very strict, very

11  controlled.  So the way we were sitting, the way they spoke,

12  and right away they jumped on the American prisoner, Steven

13  Sotloff, and at this time he was the only American in the

14  room.  And they asked him if -- who he were, and immediately

15  they started to tell him that the Americans are the most evil

16  ones and because he lives in a democracy that is killing

17  Muslims around the world, he has blood on his hands.

18          So they started lecturing us in the political part

19  of why we were sitting here, held captive.  And suddenly they

20  asked him about his job as a journalist and immediately jumped

21  on him for writing for different medias and that they

22  didn't -- that they thought was also a part of this whole plot

23  against their beliefs.  And so, it was very important for them

24  to single out Steven at this point.  And I remember that they

25  wasn't there for that long, but they left.  I don't remember

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

71

1  if they kicked any of us, maybe -- maybe they kicked Steven a

2  few times, but they left the room.  When the door closed, we

3  could hear that so we know we can take our blindfold off and,

4  of course, we -- all of us was looking at Steven and Federico

5  and David, and they were completely pale in the faces.  It was

6  like their worst nightmare, ever just came back into their

7  lives.  And I remember thinking that I was so afraid that we

8  were going to look into what they witnessed at The Box.  So

9  they just started lecturing us in how to behave around these

10  three British guards, how to answer the questions short,

11  precise.  Never ask them questions, don't do anything when

12  they're in there.  And after that, it was silence.  Nobody

13  said anything, everybody was just sitting there afraid of what

14  was about to come.

15  Q.  And Mr. Ottosen, you talked in that first encounter that

16  the Beatles had a very military sort of presence to them.

17         In your dealings with them, did you observe that

18  they were very careful about protecting their identities?

19  A.  Very much.

20  Q.  What sorts of things would they do to protect their

21  identities?

22  A.  One of the first things that they did was, of course, to

23  ask us to face the wall whenever we were inside the room.  So

24  basically in a position where we could not see them.  And then

25  they also told us that if we looked at their faces, if we saw

─────United States v. Elsheikh─────

72

1   their faces, that would be enough reason for them to kill us

2   because we would be able to identify them.  And then they wear

3   their gloves, their clothes.  I didn't wear my glasses at this

4   time.  They were taken away from me, and I use my glasses to

5   be able to see long distance.  So it wasn't possible for me to

6   kind of look at them that much, but I could see that they

7   usually wear gloves and they were close to me pretty much the

8   same, boots and --

9   Q.   Mr. Ottosen, you mentioned about the warning about not

10  looking at their faces, did you ever attempt to look at their

11  faces?

12  A.   No, I did not.

13  Q.   And why not?

14  A.   Because I was afraid that they will kill me then.

15  Q.   And Mr. Ottosen, you mentioned about the hostages came up

16  with a name -- it was first the Brits and then the Beatles to

17  describe these three individuals.  What names were given to

18  the individual Beatles?

19  A.   We called them John, and Ringo, and George.

20  Q.   And Mr. Ottosen, do you recall an incident at the dungeon

21  where one of the Beatles placed a gun in your mouth?

22  A.   Yes.

23  Q.   Can you describe that incident?

24  A.   Yeah, so they came to the room, knocked the door, and

25  they asked me -- they followed me in the room next door.  And

─────United States v. Elsheikh─────

73

1    I was put on the ground, on the floor, and I remember it was

2    very cold.  And then I was asked to give my -- some email

3    addresses of my family or anybody who would secure my release,

4    anybody who has money.  They asked about companies, whatever

5    could, yeah, pay for my release.  And then suddenly, he --

6    everything kind of escalated.  Because the -- the Beatles

7    guard came over to me and started yelling into my head, If I

8    didn't care about my life, if I thought this was just for fun,

9    if this was a game, how serious this might be.  And then he

10   put a gun into my mouth.

11   Q.   You recall what kind of gun it was?

12   A.   I think it was an MP5.

13   Q.   And do you recall which Beatle this was that put the gun

14   in your mouth?

15   A.   No, I did not.

16   Q.   During this incident with the gun, were all three Beatles

17   there?

18   A.   I think I was, as far as I knew, there was only me and

19   another one in the room.

20   Q.   And was he masked at that time, was his face covered?

21   A.   I'm not sure.  I was too afraid to look.

22   Q.   And in your dealings with the Beatles, did they wear

23   masks when they were around the other hostages?

24   A.   Yeah.

25   Q.   And what did the mask look like?

1   A.   I never really looked.

2   Q.   Okay.

3   A.   I think at some point, one of them wanted to take me for

4   a dance and wanted to do a boxing match with me.  At that

5   point I had an idea of how it looked and it -- it's like a

6   mask made of cloth.  I don't recall if this was sand color or

7   black.  Something that I had the feeling covered their whole

8   face.  So even though I didn't try not to look at them, at

9   some point, they were so close and they were playing around

10  with me.  So I couldn't avoid having some kind of glimpse of

11  them.

12  Q.   And just going back briefly to the incident with the MP5

13  in your mouth.  Did the Beatle who did that to you, did he say

14  anything to you at that time that you can recall?

15  A.   Yeah, he yelled that he will kill me and he'll actually

16  love to kill me and -- and that I should work harder to

17  remember companies and people who can pay for me.  And I

18  thought it was a little bit strange because if you want a

19  person to be -- help them, you know, remember things, I don't

20  think it's a good idea to put a gun into their mouth and yell

21  at them.  I don't know if it was to scare me or to help me

22  remember.

23  Q.   Mr. Ottosen, I'd like to move forward to late December,

24  2013.  At that time were you and the other hostages moved to a

25  new location that you came to call the Five Star Hotel?

──────United States v. Elsheikh──────

75

1  A.   That is correct.

2  Q.   And after you got to the Five Star Hotel, what did the

3  Beatles do?

4  A.   I remember I was taken into a room where it was only me

5  and two of the Beatles guards.  They asked me to strip down,

6  to take all my clothes off, so I did that.  I threw it to the

7  corner and one of the guards went to check if I had something

8  hidden in my clothes, because I didn't.  And the other guy

9  stepped forward and started searching me, so, yeah, touched

10  wherever.  And I even recall that I had to show them that I

11  didn't have anything in my rectum.  So they were very -- what

12  do you call it, they were very tight in the way of controlling

13  that we didn't have anything on us that they don't want us to

14  have.  And then I was given some new clothes.  I put it on as

15  fast as I could.  And I don't remember if I saw the color of

16  the dress at this point or if it was a bit later when I was

17  put into a -- a new room where I realized that the clothes

18  that I was just wearing were completely orange.  So it was

19  like kind of orange jumpsuits.  And --

20  Q.   Were the other hostages given the same type of clothing?

21  A.   Yes, they were.

22  Q.   Did you understand the significance of the orange

23  jumpsuits?

24  A.   Yeah, all of us did.  Because at this point I -- I was

25  together with a James Foley and John Cantlie, and as far as

─────United States v. Elsheikh─────

76

1   they told me they were the first that met the Beatles and they

2   always talked about -- the Beatles always talked about

3   their -- their big goal was to create their own kind of

4   Guantanamo and they would love to put all of us in orange

5   jumpsuits and I think James Foley said this is their big

6   dreams coming true.

7   Q.   Mr. Ottosen, I'd like to move forward from the Five Star

8   Hotel.  So beginning in early January of 2014, were you and

9   the other hostages moved to a new location called The Office?

10  A.   Yeah, that is correct.

11  Q.   Now, was The Office a very secure facility?

12  A.   No, it was not.

13  Q.   And at some point, while you were being held in The

14  Office, did one of the Beatles threaten you with a sword?

15  A.   Yes.

16  Q.   Can you describe that event?

17  A.   Yeah, so, the Beatles came into the room and they started

18  to mark on us, going around saying a lot of different things.

19  And then I remember they came to me and they asked if I have

20  ever tried to escape.  I said, yes, I have.  And I became very

21  nervous because what will they use that information for.  I

22  didn't want to lie.  I tried to always to be honest.  And

23  then, I was put on the floor and I think they told me that --

24  do you know what will happen if you try to escape and I think

25  they placed a sword on my shoulder and I said, "Yeah, you will

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

1  kill me."  And then I was pushed to the side and then they

2  continued with -- with Peter and James, because at this point

3  Peter Kassig, he joined the group and now they had to single

4  him out also as an American.  And I think him and James had a

5  pretty hard time at this specific encounter.  And they were

6  also told that -- that what will happen if we try to escape.

7  Q.   Mr. Ottosen, you talked, you know, at this time there was

8  talk of escape by you and threats about escaping.

9           During your detention, did you learn about a

10  previous escape attempt by James Foley and John Cantlie?

11  A.   Yes, I did.

12  Q.   And can you describe that?

13  A.   Yeah.  And so, when John and James was held back in The

14  Box, before I was kidnapped, they really wanted to escape

15  because the treatment was so harsh and awful.  And they

16  actually managed -- managed to, I think James jumped on John's

17  shoulder and, John Cantlie's shoulders, and he managed to open

18  a hatch in the top of the room and somehow pulled himself up.

19  So he was sitting on the roof of the building looking down at

20  John Cantlie.  And James had the opportunity to actually flee

21  at that time, give an attempt, but James -- I don't know if it

22  was heroic or very stupid, he just decided to jump back in --

23  back in the room with John, decided not to escape.

24  Q.   And had John Cantlie been unable to get up on the roof

25  with James Foley?

1    A.   Yes, he -- because there was no one he could stand on top

2    of so he wouldn't be able to reach the hatch.  So they were

3    not able to flee together and that's when James jumped back

4    into the room and stayed with John.

5    Q.   Mr. Ottosen, where did -- where were you and the other

6    hostages moved after The Office?

7    A.   We were put into a truck, handcuffed, most of us was

8    handcuffed two and two together.  I was handcuffed with the

9    Russian hostage, Sergey; and the Belgium hostage, Gert, and we

10   were brought into the back of this huge truck and I think -- I

11   think we were on the four-day drive at this point and then we

12   realized that we were sitting on the top of like tons of dates

13   and a lot of military equipment, like, some kind of

14   explosives, explosive devices.  And at some point we needed to

15   go to the toilet.  The toilet it's probably the wrong word to

16   use, we would put -- taken out to a field, and it was in the

17   middle of the night, and I remember it was very misty and

18   foggy.  It was difficult to see very far.  But you could see

19   the light from all the trucks in the middle of the night

20   glowing through the mist.  And I looked forward and downward

21   and as long as my vision was able to see, there was a long

22   military convoy.  And I was taken back into the truck and the

23   journey continued.

24   Q.   You mentioned the journey took multiple days, is that

25   correct?

1  A.   Yeah, I think about four days.

2  Q.   Mr. Ottosen, once you got to Riverside, was Peter Kassig

3  one of the hostages being held with you?

4  A.   Yes.

5  Q.   Did Peter Kassig receive any memorable punishments that

6  you could recall at Riverside?

7  A.   Yeah, because he was the newest American in the group, he

8  got the most attention at this point, and he was told by the

9  Beatles that were in control of our day-to-day life, at this

10  point, they told him to stand up for 24 hours.  And to stand

11  for 24 hours it's usually not a big deal when you get a lot of

12  food and can rest.  But at this point we didn't receive much

13  food.  So it was kind of a big deal to stand the whole night,

14  but he did.

15         And then there was also, when I first realized how

16  the Americans started to understand that they probably could

17  be on a journey just for them.  So I started to see how the

18  Americans started -- started to pull together, because James

19  and Steven decided to join Peter in standing up the whole day.

20  Q.   And you mentioned James Foley, was James Foley also

21  treated very harshly by the Beatles?

22  A.   Yeah, he was always singled out.  And whenever they came

23  in, they will always jump on some of us.  And because we were

24  many people together at this time, I knew that I wouldn't be

25  singled out every time.  Maybe every third or fourth time they

─────United States v. Elsheikh─────

80

 1  would come in, but we knew that the Americans was singled out

 2  every time.  So --

 3  Q.   Mr. Ottosen, with regards to James Foley were there ever

 4  instances that you observed where James Foley would stand up

 5  for the other hostages when it came to things like getting

 6  more food?

 7  A.   Yes, so asking for food was kind of James's thing.  He

 8  cared a lot about food.  Of course we didn't get that much.

 9  So every time he had the chance, he will knock on the door and

10  ask for a little bit more.

11  Q.   Was that asking the guards or was that asking the Beatles

12  for more food?

13  A.   Both.

14  Q.   And Mr. Ottosen, did you ever ask for more food?

15  A.   No.

16  Q.   Why not?

17  A.   I was too afraid.

18  Q.   And Mr. Ottosen, were there instances where the Beatles

19  actually prevented a hostage from sharing food with James

20  Foley?

21  A.   Yeah, there was.

22  Q.   Can you describe that?

23  A.   Yeah, so being a hostage -- and I think there are two

24  ways of being -- being dealt with very harshly.  And one of

25  them is the physical part and the other one is the

1   psychological part.  And I think that the Beatles was very

2   good at both things.

3        So therefore, they decided to treat the German

4   hostage, Tony Neukirch, a little bit better than some others.

5   And at some point, they came in and gave him a big portion of

6   food, like much more than we were used to.  I think it was a

7   grilled chicken with fries, and that meal was for all of us,

8   you know.  The most amazing thing that you can imagine at this

9   point.  I once heard during the Holocaust that somebody said

10   that they -- some people would swap their freedom for a bit of

11   bread.  And I think some of us had it like that at some point

12   in our captivity.  And then therefore, Tony was asked that he

13   could share this with one other guy, but not with James,

14   because he's evil.

15   Q.   And who told Tony Neukirch that he could share the food

16   with anybody but James because he was evil?

17   A.   That was the Beatles.

18   Q.   Mr. Ottosen, where were you and the other hostages moved

19   after The Riverside prison?

20   A.   We were moved to a location that we called the Desert

21   Prison.

22   Q.   And did some of the hostages also call that The Quarry or

23   The Oil Refinery?

24   A.   Yes.

25   Q.   For purposes of my questions, though, I'll refer to it as

1   the Desert Prison.

2            Mr. Ottosen, was that the last prison you were held

3   in until your release?

4   A.   Yeah, it was the last main prison I was held at before I

5   got released.

6   Q.   And Mr. Ottosen, when the Beatles would come in to get

7   you for things like emails or proof-of-life questions, were

8   there particular nicknames they would call you?

9   A.   Yeah, they would call me Denmark or Danish, or Danish

10  boy.

11  Q.   And at some point at the Desert Prison did the Beatles

12  come in and take you out so you can answer some proof-of-life

13  questions?

14  A.   I think it happened inside the room.

15  Q.   I didn't mean take you out.  Did they come in and ask you

16  proof-of-life questions?

17  A.   Yeah, inside the room, yes, they did.

18  Q.   Can you describe that event?

19  A.   So I -- every time they came, we could hear how the car

20  stopped right outside the wall and we could hear how they

21  entered the corridor and by then we could smell their perfume

22  coming underneath the door into our room.  And at this point

23  everybody would already be sitting with their hands on the

24  walls shaking, being so afraid, just sitting there waiting for

25  the knock on the door.

─United States v. Elsheikh─

83

1        And when I was released, actually the knock on doors

2   was the thing that -- that was the biggest trauma that I took

3   with me from Syria.  It was people knocking --

4        (Witness knocking.)

5        -- loudly on doors.  Because every time I had the

6   feeling now things are going to get bad.  So they knock the

7   door, they came in and I think they went, one of them went to

8   me, ask Denmark or Danish boy, I can't remember, and they

9   asked me three proof-of-life questions.  So one from my --

10  from my family, one from my girlfriend, and one from my

11  friends.

12       And at this point, I was -- I was so happy to

13  receive some proof that there was negotiation going on.  So I

14  was just happy and I could hear in the back of my head that

15  they were punishing some of the other hostages and I think I

16  thought this would probably be James at this time.  But they

17  also started to kick me and beat me up.  A little bit like

18  when they come with some good, they need to level it out with

19  some bad things.

20  Q.   And was it visible on your face at that time that you

21  were happy to be getting these proof-of-life questions?

22  A.   I guess that I would not be able to hide my excitement.

23  I'm not very good at lying.  Hiding my feelings.

24  Q.   And Mr. Ottosen, as time passed during this period, was

25  the treatment by the Beatles at the Desert Prison getting

─United States v. Elsheikh─

84

1   progressively worse?

2   A.   Yeah, it was.

3   Q.   And which hostages were getting the worst treatment?

4   A.   It was the Americans.  By far the Americans.  So James,

5   Steven, and Peter.

6            MR. GIBBS:  And at this time, Your Honor, I'd like

7   to play Government's Exhibit 26-14, which is in evidence.  I

8   believe it's about a minute and a half.

9            THE COURT:  All right.  You may do so.

10           (Video played.)

11  BY MR. GIBBS:

12  Q.   Now Mr. Ottosen, is what was described in that clip

13  consistent with the treatment that you received from the

14  Beatles?

15  A.   It was.

16  Q.   And, in fact, did you receive that punishment known as

17  dead legs from the Beatles?

18  A.   Yes, I was.

19  Q.   And can you describe that punishment, what was it like?

20  A.   I remember all three of the Beatles came into the room at

21  this point, and one went to Steven Sotloff and the other one

22  went to James Foley.  And the last one went directly to me.

23  And it's interesting to see this clip, because they decided to

24  go for the strong ones.  And I'm pretty, I don't know, proud

25  of being seen as the strong one at this point.  I always seen

1   myself as one of the weakest ones, but I don't know why they

2   wanted to do it to us, but I had to stand in a stress

3   position.

4   Q.   What is a stress position?

5   A.   So it can be many things, but a position where you do not

6   relax.  And I stood with my hands over my head and I stood

7   with bended knees.  So basically a position where you would

8   use all the muscles inside of your legs.  And then they

9   started to -- to -- with their knees, to kick the side of my

10   legs.  And, yeah, they continued and I remember that I started

11   crying like with real tears because it hurt a lot and I've

12   been tortured from like -- at this time, quite a lot of times,

13   so I -- but it was rare that I cried from pain.  But at this

14   situation I did and I think that was one of the worst things

15   that I endured, like short kind of pain.  And I was so afraid

16   that they will break my leg bone.  I remember screaming to

17   them that they should stop because they will end up breaking

18   my bones.  I had this hope that because there was negotiation

19   going on for me they were not interested in damaging me so

20   much that anything could go wrong in the negotiation, kind

21   of -- I don't know -- I was worth money at this point, so I

22   hoped that they will protect somehow my legs.  But they kind

23   of continued and I had to stand in this position again and

24   again.  And, yeah, it hurts.  It hurted a lot.

25   Q.   And did that punishment affect your ability to walk at

─United States v. Elsheikh─

1   all?

2   A.   Yeah, for the next three days, I wasn't able to walk by

3   myself properly.  And we had to go to the toilet four times a

4   day, so -- so I needed to go, but I needed help from my fellow

5   hostages.  And, yeah, and I remember I cried afterwards when

6   they left the room.  And I remember -- I think it was James

7   who was sitting -- who just received the same treatment as me,

8   he raised his head and was, like, "Are you okay, man?"  And

9   Daniel was like "Shut up, James," you know.  I was, like, how

10  can you ask me if I'm okay if we just received the same kind

11  of treatment.  And I was in a position where I could not say

12  anything.  I just cried.  I found it a little bit irritated at

13  that time.  And afterwards I was thinking about it I said,

14  typically James to -- I don't know if he felt better whenever

15  he looked at other people's worries.

16  Q.   Mr. Ottosen, there was also a statement in that clip

17  about rules and about not hitting the hostages in the face.

18  A.   Yeah.

19  Q.   In your experiences, were the hostages primarily hit in

20  the body as opposed to the face?

21  A.   Yeah.

22  Q.   Mr. Ottosen, was there a point in time at the Desert

23  Prison that a hostage named Marcos Marginedas was released?

24  A.   Yes.

25  Q.   And before he was released were you instructed to write a

─United States v. Elsheikh─

87

1   letter?

2   A.   Yeah.

3   Q.   And who told you to write a letter?

4   A.   I'm pretty sure it was the Beatles who did that.

5            MR. GIBBS:  With the court security officer's

6   assistance, I would like you to take a look at Government's

7   Exhibit 11-4, which is not in evidence.

8            THE WITNESS:  So you're saying 11 dash what?

9   BY MR. GIBBS:

10  Q.   11-4.

11  A.   Yes, it's right here.  Yup.

12  Q.   Mr. Ottosen, what is 11-4?

13  A.   That is a handwritten letter from me signed the 17th of

14  February, 2014.  And it's for my mom and dad.

15           MR. GIBBS:  At this time, Your Honor, we would ask

16  to move in 11-4 and publish it.

17           MR. MACMAHON:  No objection, Your Honor.

18           THE COURT:  Admitted.  You may do so.

19  (Government's Exhibit No. 11-4 was admitted into evidence.)

20           (Exhibit published.)

21  BY MR. GIBBS:

22  Q.   Is this the letter that you wrote at the Beatles

23  direction before Marcos Marginedas was released?

24  A.   Yes.

25  Q.   And who carried this letter out?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Elsheikh—

88

1   A.   I believe that they gave it to -- to Marcos.

2        MR. GIBBS:  Thank you.  We can take that down.

3   BY MR. GIBBS:

4   Q.   Mr. Ottosen, when Marcos Marginedas was removed from the

5   cell for the last time, what did one of the Beatles say to

6   James Foley?

7   A.   "Take a good look at Marcos because this is the closest

8   you will ever come to freedom."

9   Q.   And Mr. Ottosen, at that time was the Russian hostage you

10  talked about, Sergey, was he still with you?

11  A.   Yes, he was.

12  Q.   And what happened to Sergey soon after Marcos's release?

13  A.   He was picked up by the Beatles.  They came, knocked the

14  door, and told him that he was about to go home, to be

15  released.  Somebody paid a lot of money for him and he left.

16  Q.   And after some period of time, did the Beatles come back

17  to the -- to your cell?

18  A.   Yes, they did.

19  Q.   And what happened at that time?

20  A.   So they came into the room and I remember it was very

21  strange, because they asked us to take our hands down from the

22  wall and turn around so we faced -- all of us faced the center

23  of the room, and then they brought a laptop.  And they asked

24  us to pass around the laptop so we could see the picture on

25  the screen.  And when the computer was given to me, I was

1    asked, "Hey, are you a photographer?"  The Beatles asked me.

2    And I said, "Yes, I am."  "So what do you think about our

3    picture, is it good quality?  What do you think about the

4    colors; do you think it was the right angle?"

5          So I had to describe this picture as I was in -- in

6    boarding school or something in front of my teacher doing

7    an examination thing about photos.  And it seems so strange

8    because the picture was a picture of a man that I, five days

9    earlier, played chess against.  I think he won against me.

10   And now, I looked at the screen and I could see that it was

11   the -- the head of Sergey and a bullet had passed through his

12   head, through his eye.

13         And also, I was asked to describe the bullet and I

14   actually remember them bragging about they used a special kind

15   of bullet with a flat tip so it would make more damage when it

16   hit -- goes through a head, and, yeah, and that was the last

17   picture we saw of Sergey.

18   Q.   Mr. Ottosen, during the time you were held captive, was

19   there also a song that the Beatles forced all the hostages to

20   sing out loud?

21   A.   Yes, there was.

22   Q.   What was that song?

23   A.   The song was on the lyric *Hotel California* by -- no, the

24   melody of the *Hotel California* by the Eagles.  And so, they

25   just put in some new lyrics and wanted us to sing that.

─United States v. Elsheikh─

90

1   Q.   And was there a particular way that the Beatles would

2   make the hostages sing this song?

3   A.   So in the beginning they wanted us to practice it to just

4   learn -- get to learn the text.  And then some time later they

5   came in and put us into groups.  I think there were five

6   different groups or four different groups, and we had to sing

7   it.  In Danish we call it *i kanon*.  So basically when we start

8   at different times as you used to do in children's songs in

9   the first year of school.

10  Q.   And can you recite the lyrics to that song?

11  A.   Yeah.  So it's going by "Welcome to Osama's lovely hotel,

12  such a lovely place, such a lovely place.  Welcome to Osama's

13  lovely hotel where you will never leave and if you try you

14  will die Mr. Bigley style."

15  Q.   And did you know who Mr. Bigley was?

16  A.   Yeah, it was a guy, a British contractor, who was

17  beheaded in Iraq by the Zarqawi movement.

18  Q.   And did the Beatles seem to enjoy this when the hostages

19  were forced to sing this song?

20  A.   Yeah, they cheered for us and asked us to sing louder and

21  perform better and they were laughing.

22  Q.   Did you enjoy it?

23  A.   No, not at all.  I thought it was --

24  Q.   And Mr. Ottosen, were you forced to make a proof-of-life

25  video at the Desert Prison where you were told to take your

─────United States v. Elsheikh─────

91

1    shirt off?

2    A.   Yes.

3    Q.   And what did the Beatles do to you in preparation for

4    that video once you took your shirt off?

5    A.   So they slapped me with a flat hand on my upper body, so

6    my skin turned pink, red.

7            MR. GIBBS:  And if we could, Ms. Lopez, if we can

8    play 26-8.  It is another video and it is in evidence.

9            THE COURT:  How long?

10           MR. GIBBS:  It's about a minute-and-and-a-half,

11   Judge.

12           THE COURT:  All right.  Proceed.

13           (Video played.)

14   BY MR. GIBBS:

15   Q.   Mr. Ottosen, do you recognize the event that's described

16   in that clip?

17   A.   I do, yes.

18   Q.   And how many of the Beatles were present with you when

19   you were slapped in the chest?

20   A.   I think -- I think it was all three of them.

21   Q.   And also in that clip, Mr. Ottosen, there was a reference

22   in there about the hostages playing makeshift chess, do you

23   recall that?

24   A.   Yes.

25   Q.   Did the hostages actually make a chess board that they

1   can play on?

2   A.   Yes, we did.

3   Q.   What did you make it out of?

4   A.   We made it out of cardboards that we received food from.

5   So cheese boxes or things like that.  And then when we were

6   asked to write letters, we will use the pen to color the marks

7   and we use a nail clipper that we were given once to cut out

8   the small pieces.

9   Q.   And was that chess board a way for the hostages to pass

10  time in the cell?

11  A.   Yeah, to compete among us.

12  Q.   Now, Mr. Ottosen, I want to move forward, were you born

13  on March 10, 1989?

14  A.   Yes.

15  Q.   What happened on your 25th birthday?

16  A.   The Beatles came into the room knocking the door, asking

17  us to put the hands on -- put hands on the walls and they came

18  directly to me and told me that I had a stupid mom.  And she

19  asked them to create my birthday.  So they -- I was sitting

20  with my hands above my head on the wall and one of them stood

21  right next to me, he lifted his knee up, and started to kick

22  me with the tip of his boot in my rib and he did that 25 times

23  at the same spot, and it was quite painful.  Not as painful as

24  the horse legs, but afterwards, when they left, I looked down

25  and I saw that there was a -- a bruise like you would glue a

1  tennis ball on the side of my rib.  It went completely like in

2  the cartoons.  It looked quite strange.

3  Q.   After the Beatles left, did any of your hostages -- did

4  any of your fellow hostages come to your aid?

5  A.   Yeah.  So whenever somebody had been beaten up, we always

6  went to each other to, yeah, to help and to ease.  But it

7  was -- it was not a -- an awful beating, because when it's a

8  message from your family that means that there is something

9  going on, planning towards freedom.  So would you -- would you

10 take a little bit of beating for something that could lead you

11 to be released.  Of course you will.  The worst thing is when

12 you get beaten up and there is no sign of negotiations.  So I

13 felt quite happy whenever I got a proof-of-life or any message

14 from the outside world from my family.

15 Q.   I'm sorry.  You also mentioned, Mr. Ottosen, getting this

16 bump --

17            THE COURT:  Wait just a moment, did you finish your

18 answer?

19            THE WITNESS:  Yeah, yeah, I did.

20            THE COURT:  Next question.

21 BY MR. GIBBS:

22 Q.   Mr. Ottosen, you mentioned this bump on the side of your

23 rib cage.  You described it as a size of a tennis ball.

24 During the time you were in custody, did James Foley ever

25 receive a beating where he got a really big contusion as well?

─────United States v. Elsheikh─────

1  A.   Yes, he did.

2  Q.   Can you describe that?

3  A.   It was a long time when the Beatles came in and I

4  couldn't see what was going on because I had my back towards

5  the center of the room and my hands on the wall, but I could

6  hear that they were doing something with James, talking about

7  his brother in the military and all the things.  And suddenly,

8  I heard a big knock to the ground, and it was a concrete

9  floor.  And after I heard that big knock to the floor, the

10  three Beatles left the room very quickly.  So we turned around

11  and we realized that James had been strangled by his neck so

12  he was unconscious and they somehow apparently let him go.

13        So when you do that to a person who is not -- who

14  is -- who has passed out, he fell directly to the floor, and I

15  think he must have landed with his head first on the floor

16  because quite quickly afterwards he started to get a big

17  bruise over his eye and then we was talking about why they

18  left so quick afterwards, after they did that.  Usually they

19  don't just run away.  They just -- they always have one last

20  thing to say.

21  Q.   Mr. Ottosen, are you familiar with the cartoons that were

22  published in Denmark at one time and viewed as insulting to

23  Islam?

24  A.   Yes.

25  Q.   Did the Beatles ever bring that topic up with you?

─────United States v. Elsheikh─────

95

1  A.   Yeah.  Quite some time, yes.

2  Q.   What would they say to you about that cartoon

3  controversy?

4  A.   That's because I am a Danish citizen living in a

5  democracy.  I'm also guilty of those cartoons and you are

6  being a part of a democracy.  It's power of the people they

7  told us and I was a part of the people and therefore I am also

8  had blood on my hands and, therefore, I also was guilty of

9  insulting their prophet.

10  Q.   Mr. Ottosen, in April of 2013, after Marcos Marginedas

11  was released, were there three women from MSF who were also

12  released?

13  A.   Yeah.

14  Q.   And then, soon after that, were there four male French

15  hostages who were released?

16  A.   Yes.

17  Q.   And can you describe what occurred just prior to the

18  release of the four French hostages?

19  A.   Yes.  We were all put in the end of the room facing the

20  same direction and asked to take away our blindfolds.  And

21  when we did that, there was in front of us a woman standing.

22  She took away her scarf and there we saw a woman who started

23  telling us that she -- her name was Kayla Mueller and she was

24  an American citizen.  And she have been basically staying

25  right next to us since the Dungeon.  And now she was there to

1  give a message to the French hostages that was about to be

2  released.  And then -- and she told them that -- that there

3  was two ways of her to be released.  One of them was, I think,

4  a payment of 5 million euros or a prisoner exchange with --

5  the convicted terrorist Aafia Siddiqui.

6  Q.   At that time did you know who Aafia Siddiqui was?

7  A.   Yeah.

8  Q.   And after Kayla Mueller spoke to the hostages and said

9  what the ransom demands were, what happened with her, where

10  did she go?

11  A.   She was taken back out the room.

12  Q.   And who took her out of the room?

13  A.   The Beatles did.

14  Q.   And so, soon after that the four French hostages were

15  released?

16  A.   Yes.

17       MR. GIBBS:  If we can publish Government's Exhibit

18  11-6, which is in evidence.

19  BY MR. GIBBS:

20  Q.   Mr. Ottosen, what is this exhibit?

21  A.   This is a proof-of-life picture of me holding a letter

22  that I did not write myself.  Where it was written, "We

23  appreciate your quick reply and the fact that four more have

24  been united."  And it's dated the 24th of April 2014.

25  Q.   And who were the four more who had been reunited?

┌─United States v. Elsheikh─

97

1   A.   I am pretty sure it must have been an email exchange with

2   my family about the release of the French hostages.

3   Q.   And what role did the Beatles have in the production of

4   this picture?

5   A.   So they hang up the flag on the wall and they make the

6   letter or maybe it was Federico who wrote the letter, I'm not

7   quite sure.  And they were the ones who told me to stand at

8   this point looking afraid and also them to took the picture.

9            MR. GIBBS:  Thank you.  We can take that down.

10  BY MR. GIBBS:

11  Q.   Mr. Ottosen, at some point did the Beatles bring a new

12  hostage into the cell with you who was a Syrian prisoner?

13  A.   Yeah.

14  Q.   What did they say about that prisoner when they brought

15  him into the room?

16  A.   They told us to get to know him, because we were -- we

17  were supposed to sit with him for quite some time.  And then

18  they left and we were sitting together with this man and

19  immediately he started praying.  We asked him if he wanted any

20  food or something to drink and he refused.  He really didn't

21  want to interact with us.  He just wanted to do his own thing.

22  So we had the feeling that something bad for him was about to

23  happen.

24  Q.   And soon after that, did the Beatles come back into your

25  cell?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

1  A.   Yes, they did.

2  Q.   And what did they get you to do?

3  A.   They asked us to write a letter.  So it was me, Federico,

4  Tony, and the two working for MSF, so Dan and Gert.  All five

5  of us had to write a letter but with different messages

6  written on them.  And they asked me to write my letter, go to

7  the Danish government, 2 million, or I will end up like this

8  guy, or I will end up like this.  And I tried to write that

9  down, but whenever I came to government, I turned the g wrong

10 and they got very angry at me.

11 Q.   Who got very angry at you?

12 A.   The Beatles did.  Started to yell at me, saying that I

13 was stupid and weak and frightened and everything.  So I think

14 after three attempts, I ended up asking Federico if he wanted

15 to write the letter for me.  So he did that.

16         And then we were brought out of the room, the five

17 of us, so the two guys from MSF, Dan and Gert, me, Tony, and

18 Federico brought into a car and taken not far from there, I

19 think a mile or so, maximum.  And I was taken out of the car.

20 I had a blindfold on and I immediately felt that it was very

21 windy.  And I was taken to a place where they asked me to sit

22 down on my knees and there they took off our blindfolds and in

23 front of me I saw the Syrian prisoner.

24 Q.   And was there also a camera set up there where the Syrian

25 prisoner was located?

─────────United States v. Elsheikh─────────

99

1   A.   Yes.  So in-between the Syrian prisoner and a bit further

2   away, in the line of the Syrian prisoner, there was a man

3   standing with a camera.

4   Q.   Was that one of the Beatles?

5   A.   Yeah.  I believe that it was the guy I identified as

6   Ringo.

7   Q.   And what did Ringo tell you about what you needed to do

8   while he was filming?

9   A.   I think he yelled "Don't fuck it up or you will regret

10  this."  I think he referred to me holding the letter, the

11  piece of paper, because of the wind there was a big chance

12  that the letter to just slip out of our hands and fly away.

13  Q.   So pick it up there then, so he tells you don't eff it up

14  or you'll regret it, and then describe what happened at that

15  point?

16  A.   So it was like they orchestrated this whole thing for the

17  Syrian prisoner and the five hostages to be in the frame, and

18  they started recording.  And then I saw one of the other

19  Beatles standing right behind the Syrian prisoner and he shot

20  him in the back of his head, and I remember the sound from the

21  gun was loud.  But also I saw that the prisoner was dead right

22  away.  And I thought to myself that if I'm going to end up

23  like this, I hope they will shoot me in my head because he

24  didn't feel any pain, he was dead right away.  And then I

25  thought that was it, but then one of the Beatles was standing

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

───United States v. Elsheikh───

100

1   with the gun took a step forward and emptied the magazine down

2   into this Syrian man.

3   Q.   After that happened, what were you and the other four

4   hostages made to do?

5   A.   We were told to jump into the ditch with him with our

6   letters and the guy held the camera.  He went closer to us to

7   be able to frame a picture and he photographed us.

8   Q.   What did he tell you to do with your handwritten pages

9   while he photographed you?

10  A.   To hold it up so the camera could see it.

11          MR. GIBBS:  And if we can publish Exhibit 10-22A,

12  which is already in evidence.

13  BY MR. GIBBS:

14  Q.   Mr. Ottosen, what does this depict?

15  A.   This -- yeah, this is the picture that was taken.

16  Q.   And is this before the Syrian prisoner had been shot?

17  A.   Yeah, at this point he's still alive.

18          MR. GIBBS:  If we can go to 10-22B.

19  BY MR. GIBBS:

20  Q.   And what does this depict?

21  A.   Can you say again?

22  Q.   What does this picture show?

23  A.   This is showing us standing in the ditch right next to

24  the dead Syrian prisoner.

25  Q.   And where are you located in this photograph?

─────────United States v. Elsheikh─────────

101

1   A.   I'm standing in the middle.

2        MR. GIBBS:  Thank you.  We can take that down.

3

4   BY MR. GIBBS:

5   Q.   Mr. Ottosen, at some point after your release, did you

6   draw a sketch of this scene where the Syrian was executed?

7   A.   Yes, I did.

8        MR. GIBBS:  And with the court security officer's

9   assistance, if you could take a look at Exhibit 11-5.

10        THE COURT:  Mr. Ginsberg, while Mr. Ottosen looks at

11   that, I'm not limiting you, but how much more do you have with

12   this witness?

13        MR. GIBBS:  Judge, I've tried to cut it down.  I

14   think I may have 30 to 40 minutes is my best estimate.

15        THE COURT:  To remain?

16        MR. GIBBS:  Remaining.

17        THE COURT:  As soon as he identifies this exhibit

18   and it's offered, if it is going to be offered, and I rule on

19   it, then we will take the luncheon recess.

20        MR. GIBBS:  That's a good stopping point, Judge.

21   Thank you.

22        THE WITNESS:  Yes, sir.  I'm seeing the -- sorry.

23   BY MR. GIBBS:

24   Q.   And what is 11-5?

25   A.   That is a sketch drawn by me of the scene that we just

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────United States v. Elsheikh─────

102

1    saw.

2            MR. GIBBS:  Your Honor, at this time I would move it

3    in.  And as Your Honor noted, it's probably a good time to

4    break.  I can ask him about this when we come back from lunch.

5            THE COURT:  All right.

6            MR. GIBBS:  Thank you.

7            THE COURT:  Mr. Ottosen, we're going to take a

8    luncheon recess now and we will take a luncheon recess --

9    we'll take it until 1:15.  I hope that will give you

10   sufficient time to have lunch.

11           And then we'll resume and Mr. Gibbs has indicated

12   that he has about 30 to 45 minutes more of examination.  And

13   after that, the defendant will have an opportunity to examine

14   you by his counsel, if he wishes to, and then we'll be done.

15   So you may step down.

16           Now during the recess, Mr. Ottosen, do not discuss

17   your testimony with anybody, with any lawyers or anybody else.

18   If somebody comes up to you and wants to talk about it, stop

19   them and tell them that I have told you that you may not

20   discuss the matter with anybody.  If they bother you about it,

21   you let me know and I'll take care of it.

22           All right.  You may step down, sir.  Ladies and

23   gentlemen, we'll take a luncheon recess.  Remember to put your

24   books in the usual cubbyholes and I hope your lunches are here

25   by now.  Let me check with the powers that be.  And you saw

—United States v. Elsheikh—

103

1  the thumbs up.  It's here.  Remember, not to discuss the

2  matter among yourselves or with anyone or permit anyone to

3  discuss it with you, and don't undertake any investigation.

4  You may follow the court security officer out.

5          (Jury dismissed.)

6          THE COURT:  Court stands in recess until 1:15.

7          (Lunch Recess 12:30 p.m.)

8          (Court proceedings resumed at 1:19 p.m.)

9          THE COURT:  Do we have Mr. Ottosen nearby?

10          MR. GIBBS:  I believe so, Your Honor.  We'll have

11  him brought in.

12          THE COURT:  As you know, it takes time for the jury

13  to come around.  Let's have the jury brought in, please.

14          (A pause in the proceedings.)

15          (Jury present.)

16          THE COURT:  All right.  You may be seated.

17          Mr. Ottosen, you may be brought in, please.

18          (Witness seated.)

19          THE COURT:  Mr. Ottosen, you may resume the stand,

20  sir, and you'll recall you remain under oath.  I hope you had

21  enough time for lunch.

22          (Witness seated.)

23          THE COURT:  All right.  Mr. Gibbs, you may proceed

24  with your examination of Mr. Ottosen.

25          MR. GIBBS:  Thank you, Judge.  And, Your Honor, when

┌─ United States v. Elsheikh ─┐

104

1   we had broke, I had Mr. Ottosen identify Exhibit 11-5, which

2   was the sketch.

3              THE COURT:  That's right.

4              MR. GIBBS:  I hadn't moved it into evidence.  So I'd

5   like to do it at this time.

6              THE COURT:  Well, did he answer that it was the

7   sketch that he made?

8              MR. GIBBS:  He did, Your Honor.

9              MR. MACMAHON:  And there's no objection, Your Honor.

10             THE COURT:  All right.  Admitted.

11  (Government's Exhibit No. 11-5 was admitted into evidence.)

12             MR. GIBBS:  And Ms. Lopez, can you publish that and

13  zoom in as best as we can.

14  BY MR. GIBBS:

15  Q.   Mr. Ottosen, can you describe what we're looking at here

16  in Exhibit 11-5.

17  A.   So it's a sketch of the -- of the scenery when the --

18  when we were taken out to witness the murder of the Syrian

19  prisoner and been taken photograph of.

20  Q.   And did you identify some of the individuals that were

21  present at the time of the execution?

22  A.   Yeah, I saw Federico Motka, Tony Neukirch, myself and

23  Gert from MSF, and Dan also from MSF.

24             And then I recognized the three guards that we

25  called the Beatles.  And also I saw a fourth guard that we

─United States v. Elsheikh─

105

1   called the Big French.  He was one of the everyday guards

2   taking care of us when the Beatles was not around.

3   Q.   Mr. Ottosen, let me stop you there.  In terms of our

4   orientation, is this drawn so that we're looking down on the

5   execution scene?

6   A.   Yeah, so it's kind of a bird perspective on the scenery.

7   Q.   And Mr. Ottosen, I think you can use your finger to draw

8   on the screen so you can do a circle or an X.  I would like

9   you to identify some features in this exhibit.

10         First, can you identify where the Beatle you knew as

11   John is located?

12   A.   Yeah, he is right here.

13         (Witness marks the screen.)

14   Q.   And how about the individual you knew as George?

15   A.   He is standing right here. (Witness marks the screen.)

16   Q.   How about the individual known as Ringo?

17   A.   He is standing here. (Witness marks the screen.)  And

18   later on he moved himself here. (Witness marks the screen.)

19   Q.   And you said he moved, did the camera also move?

20   A.   Yeah.

21   Q.   Can you explain that?

22   A.   Yes, so first pictures or videos was taken of the killing

23   a bit further away.  And then he walked, the Beatle I

24   identified as Ringo, walked over to stand close to the dead

25   Syrian guy and the five hostages.

1  Q.   And did you identify the five hostages in this diagram at

2  two different times during this event?

3  A.   Yes.  So the first picture when we were standing on top

4  of the ground before and while he executed the Syrian

5  prisoner, and after he's executed and he's laying down in the

6  ditch, you can see the body that I drew of him dragged there,

7  and then we are sitting here, standing here, the five

8  hostages.  And --

9  Q.   And we saw those photographs earlier that reflected the

10  five of you in with the body, correct?

11  A.   Yes.

12  Q.   Now at the top of diagram it looks like a large piece of

13  equipment, can you explain what that is?

14  A.   I think it's a digger.

15  Q.   And you testified this morning about being driven there

16  in a car, is that correct?

17  A.   Yes.

18  Q.   But the vehicles are out of the frame on this diagram?

19  A.   Yeah.  So the cars, I believe, are behind me at this

20  point and because I'm not allowed to look around or do

21  anything else than actually look down, I couldn't see them, so

22  the cars must have been behind us.

23  Q.   And you testified there , you said you were still made to

24  look down.  Obviously, in some of the pictures, we saw you

25  looking up with your sign.

Cross-examination of Todd Ottosen                3092

┌─────────────────────────────────────────────
United States v. Elsheikh
                                                                    107

 1              At any point, did any of the Beatles yell at you for

 2      looking up too much?

 3      A.    Yeah.  So I looked in the camera and he yelled "Don't

 4      look at me or you will regret it."

 5      Q.    And who yelled that?

 6      A.    That was, I believe, the guy who held the camera who was

 7      also -- whom I identified as Ringo.

 8      Q.    Mr. Ottosen, was this a very frightening event for you?

 9      A.    Yeah.  It was a complex event, because on one hand it was

10      horrific to see a person get killed standing like this among

11      the Beatles and also with the signs.  But then, again, I knew

12      this was another proof-of-life picture, a video.  It was a way

13      of, for me at least, to see that there was something going on

14      with my case and that gave me some hope as well.

15      Q.    And after this event --

16              MR. GIBBS:  And we can take down the exhibit now.

17      Thank you, Ms. Lopez.

18      BY MR. GIBBS:

19      Q.    After this event, were you placed back in the car and

20      driven back to the prison?

21      A.    Yes.

22      Q.    And who placed you back in the car?

23      A.    The Beatles.

24      Q.    And when you were put in the car, did anybody say

25      anything threatening to you at that point?

─────────────────────────────────────────────
                                Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

108

1   A.   Yeah.  Some of the Beatles whispered to me that I would

2   be next.

3   Q.   And Mr. Ottosen, the two male MSF hostages that we saw in

4   that photograph, were they released in May of 2014?

5   A.   Yes, they were.

6   Q.   And did you give one of those male hostages a letter to

7   carry out for you?

8   A.   Yeah.

9   Q.   And was this a letter that you snuck out or that the

10  Beatles told you to send out?

11  A.   I believe it was a letter that they asked me to send out.

12  Q.   And if you could, again, take a look in the binder at

13  another exhibit, Exhibit 11-7.

14  A.   Yup.

15  Q.   And what is 11-7?

16  A.   It's a letter for my mom and dad.  And it's written by

17  me.  And it's a way of coming up with all the people that can

18  contribute to paying the ransom for my release.

19  Q.   So it's sort of ideas about where to go find money?

20  A.   Yeah.

21       MR. GIBBS:  Your Honor, at this time we would move

22  in 11-7.  I'm not going to publish it.  I'll move on, but --

23       MR. MACMAHON:  No objection.

24       THE COURT:  You can publish it, if you wish.

25       MR. GIBBS:  We can publish it briefly, but I'm not

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

109

1    going to go into much detail.

2    BY MR. GIBBS:

3    Q.   Mr. Ottosen, is this the letter you just testified about?

4    A.   Yes.

5    Q.   And this was carried out by the MSF employee, Dan?

6    A.   That is correct, yes.

7    Q.   And did Dan also carry out a -- I think what I'll refer

8    to, is a traffic light code for you?

9    A.   Yes, he did.

10   Q.   Can you explain the traffic light code, what does that

11   mean?

12   A.   So that was a way for us to see if we could find some

13   information from our families.  So this code was given to my

14   family.  So if they send in a proof-of-life message to me

15   saying something about a red object, it meant that there was

16   no negotiation, they didn't have the money for my release, and

17   I could expect nothing to happen.

18           So another way was to let me know that there was no

19   chance for me to get out and maybe an opportunity to try to

20   escape or something like this.  But if it was a yellow sign, a

21   yellow code, it meant that something was going on and I should

22   stay put and wait.  But if it was a green object or a code in

23   the proof-of-life question, then it meant that the money have

24   been paid and I was basically on my way home.

25   Q.   The idea was for Dan to take this code to your parents so

Cross-examination of Ottosen  Aldr.  22

┌─────────────────────────────────────────────────────┐
────United States v. Elsheikh────

110

1   they would know which questions to ask?

2   A.   Yes.

3   Q.   And did Pierre Torres carry out that same code for you?

4   A.   Yes, he did.

5   Q.   And Mr. Ottosen, in terms of the negotiations with your

6   family, at any point did any of the Beatles tell you how much

7   money your family had raised up to a certain point?

8   A.   Yes.

9   Q.   And what did they tell you?

10  A.   They told me that -- I think it was about 8 or 750,000

11  euros to go.

12  Q.   And do you recall which -- who told you this?

13  A.   I think it was the one I saw as George.

14  Q.   And that was 850,000 euros to go?

15  A.   Yeah.

16  Q.   And Mr. Ottosen, in terms --

17          THE COURT:  What was the total amount?

18          THE WITNESS:  So the total amount was 2 million

19  euros for my release.  And so, my family must have raised

20  around 1.25 or 1.15.

21          THE COURT:  Next question.

22  BY MR. GIBBS:

23  Q.   Mr. Ottosen, in terms of these proof-of-life events, do

24  you recall an event with the American and the British man

25  where they were forced to do a proof-of-life video at the

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

111

1   Desert Prison?

2   A.   Yes.

3   Q.   And were you forced to participate in that in some way?

4   A.   I was not asked to participate in the video, but to the

5   preparation of the video.

6   Q.   And what was your role in the preparation of the video?

7   A.   So the Beatles, they came to the room and asked if any of

8   us could cut hair.  And because my mom used to be a hair

9   dresser, then I had an idea of how to do it.  So I

10   volunteered.  Say I could do it.  And they brought me out in

11   the corridor where I was sat down with some tools for cutting

12   hair.

13   Q.   And did you cut the hair of the British and the American

14   hostages?

15   A.   Yes, I cut the hair of all six of them, yes.

16   Q.   And did you have any problems cutting the hair the way

17   the Beatles wanted you to?

18   A.   Yeah, so I wanted to know how to cut them, and they told

19   me to do a goatee, and at that point I didn't know what it

20   was.  So they started to laugh at me and telling me that I was

21   stupid and everybody knows what a goatee is.  And so, I got

22   pretty stressed out, but managed to do what they told me and

23   tried to make my friends look as well as possible.

24           THE COURT:  Are you saying goatee as in a beard?

25           THE WITNESS:  That is correct, yeah.

Cross-examination of ___ ___ 3613

─────United States v. Elsheikh─────

112

1         THE COURT:  Next question.

2   BY MR. GIBBS:

3   Q.   And after you cut the hair of your friends, were you

4   returned to the cell?

5   A.   Yes.

6   Q.   How long were the British and the Americans out doing

7   this proof-of-life video?

8   A.   It's difficult to say exact time, but it felt quite long,

9   maybe half-hour, maybe one hour.  Because we were very, very

10  interested and find out what they were doing in the room next

11  door.  If that was there, it is time to do a proof-of-life

12  video or to start up something that could point to towards

13  their release.

14  Q.   And was there some optimism among you and your fellow

15  hostages that this might be good news for the American and the

16  British hostages?

17  A.   I think we hoped with everything that we had, but we were

18  also quite sure that there was -- it was a very, very small

19  chance that it would be good news that would come back through

20  the door, but we hoped.

21  Q.   And when they came back through the door, first of all,

22  how were they dressed when they came back through the door?

23  A.   They were all dressed in new orange jumpsuits.

24  Q.   And you make the distinction of new orange jumpsuits, why

25  is that?

—United States v. Elsheikh—

113

1  A.   Because they realized that if they gave us orange

2  jumpsuits, they would be dirty and they will break.  And so

3  therefore, they decided to give us normal clothes and then

4  only have some orange jumpsuits ready for us if they were

5  doing some kind of video.  So we were told that to be sure

6  that these orange jumpsuits was kept clean and tight.

7  Q.   And what was the demeanor of the British and American

8  hostages like when they came back into the cell in those new

9  orange jumpsuits?

10  A.   It was clear when the door had closed and the Beatles was

11  gone that something significant just happened, something.

12  And, yeah, we asked -- I think -- I think we asked what

13  happened and I remembered John Cantlie said very quietly that

14  we just -- we just did a video saying that we'll be dead.

15  Q.   And if we could pull up Exhibit 3-5, which is in

16  evidence.

17       Do you recognize this exhibit, Mr. Ottosen?

18  A.   I do not recognize the exhibit, but I recognize the

19  handwritings.

20  Q.   And whose handwritings is this?

21  A.   This is the handwriting of John Cantlie.  He always wrote

22  with capital letters.

23  Q.   And if we could enlarge item 13.

24       And Mr. Ottosen, can you see that well enough to

25  read it out loud?

Cross-examination of Mr. Ottosen   3615 10/11/22

─────United States v. Elsheikh─────

114

1  A.   As it is written:  "And if we are killed, rise up against

2  the government and take our revenge on them.  Revenge our

3  death for any one of you could be in our positions tomorrow."

4        MR. GIBBS:  Thank you.  We can take that down.

5  BY MR. GIBBS:

6  Q.   Mr. Ottosen, was your fellow hostage, Federico Motka, was

7  he released towards the end of May 2014?

8  A.   Yes, he was.

9  Q.   And shortly before his release, was Kayla Mueller and

10  another woman brought into your cell?

11  A.   Yes.

12  Q.   And who brought them into your cell?

13  A.   The Beatles.

14  Q.   And can you describe what happened on that occasion?

15  A.   So when Kayla and Louisa was brought into our room and

16  sat down next to us, to Federico and I, and the Beatles told

17  Louisa to make a letter or some kind of message too.  And I

18  remember that day Louisa was very frightened.  She had

19  problems focussing on the task, and, therefore, Kayla, she

20  tried to calm her down and ask her to stay focused and asked

21  her to come up with -- with what should be written in this

22  message.

23  Q.   And did Kayla calm her down enough that she succeeded in

24  finishing the letter?

25  A.   Yes, she did.

─United States v. Elsheikh─

115

```
 1  Q.   You described Louisa as being very nervous.  Was she also

 2  a good bit older than Kayla?

 3  A.   Yes, she was.

 4          MR. GIBBS:  If we can publish 10-4, which is also in

 5  evidence.

 6  BY MR. GIBBS:

 7  Q.   Who is this, Mr. Ottosen?

 8  A.   This is Louisa.

 9          MR. GIBBS:  Thank you.  If we can take that down.

10  BY MR. GIBBS:

11  Q.   And what happened with Kayla and Louisa after they came

12  into the cell and wrote the letter?

13  A.   They were taken away by the Beatles.

14  Q.   And Mr. Ottosen, I want to take you back to the day that

15  Federico Motka was actually released.  What did the Beatles

16  say to the American and the British hostages on that date?

17  A.   I remember them saying that somebody cared for Federico

18  Motka and that nobody cared about you, not your family, not

19  your government, nobody.

20  Q.   And after that Federico Motka was taken away?

21  A.   Yes.

22  Q.   After he was removed, what happened to all the personal

23  effects in the cell where you and the other hostages were

24  staying?

25  A.   So right after Federico was taken out, our everyday guard
```

1    came in and he took away everything inside the room.  So

2    because we have been sitting together, 19 guys when we were

3    the most, and now we were only 8 guys left, we had extra

4    blankets and we had some extra food.  And suddenly they came

5    in and took away all of that and left us with nothing.  And I

6    think a few hours later they gave us all one blanket each and

7    we had a feeling that now things will change.

8    Q.   And, in fact, what did that do to the mood in the cell

9    when the guards took everything away?

10   A.   The mood was already quite tense and dark because two of

11   us, me and Tony Neukirch, we had a good feeling that we were

12   probably on our way home -- where the British and the American

13   hostages had just made this video saying that they probably

14   would be killed.  Like a kind of death video, I think they

15   called it.

16           So we were in a situation where we had been -- where

17   we had been sitting together.  So many people in the small

18   room that we have to lay, you know, feet by shoulder, to be

19   able to be in there, to certainly feel that the room became

20   bigger and bigger and we have seen so many people coming home

21   -- going home to their families, and every time it was a

22   reminder that there's a possibility that we will not go home.

23   But we all knew that we were not in the same boat anymore.

24   The British and the American kind of sat in their own

25   situation and the way I could see that physically was that the

117

1  American hostages now were sitting right next to each other in

2  one corner.  The British hostages chose to sit in another

3  corner together and me and Tony was sitting together in the

4  third corner.  And, yeah, the situation was just silence and

5  people went inside their own heads.

6  Q.   When you used the phrase "people were inside of their own

7  heads," what do you mean by that?

8  A.   I mean that there was not much to talk about.  There was

9  not much to discuss.  We knew, all of us kind of knew, where

10  this would -- where this would go.  We had been singing songs

11  about beheadings and told so many times, especially the

12  Americans, that they will never leave, that they will be

13  killed here, and then they would be beheaded like all the

14  hostages had been beheaded in Iraq.

15  Q.   Mr. Ottosen, you testified earlier about that

16  proof-of-life video where the British and the Americans put on

17  the new orange jumpsuits.  Following that video, did the

18  hostages start to communicate with Kayla Mueller by leaving

19  notes in the toilet?

20  A.   Yes.

21  Q.   And how did that come about?

22  A.   It came about because Steven, especially Steven, felt

23  very bad that there was an American girl right next to them

24  and she was sitting by herself.  This was before we knew that

25  Louisa was there.  And he insisted he would like to, in some

─────United States v. Elsheikh─────

118

1   way, try to start communicating with Kayla.  And I was against

2   this.  I was afraid that doing this might cause that we will

3   be caught in the act and the Beatles would use that as an

4   excuse to harm us even more.  But Steven insisted and he said

5   if we are caught, I will take the blame for it.  And --

6   Q.   And, in fact, were you caught?

7   A.   We were, yes.

8   Q.   And can you describe the day that you were caught passing

9   the notes to Kayla?

10   A.   That was right after Federico's release.  So they -- the

11   Beatles came into the room and asking if we had anything we

12   would like to tell them.  And I think all of us knew what this

13   was about.  And they, of course, nobody said anything.  And

14   they started to pressure us even more, "Are you sure?"  "Are

15   you hiding something?"  They talked about a letter.  And at

16   that point, I remember I got so, so scared, and now I was just

17   sitting there waiting for Steven to tell that it was him, but

18   there was complete silence.

19   Q.   And were you still facing the wall with your face covered

20   at this point?

21   A.   I was, yeah.

22   Q.   What could you hear?

23   A.   At some point I heard Steven said it was him, that he was

24   the one in charge of this note.  And then the Beatles asked if

25   there was anybody else involved.  And then James and Peter

─United States v. Elsheikh─

119

1    said that they also helped writing these letters.  And then

2    the Beatles started to yell something about the Manhattan

3    project, they yelled about them reading the letters and what

4    were we up to, were we planning an escape, and we have not

5    talked about any escape at all at this point.  Especially not

6    me.  I had the feeling I was about to be released.  I could

7    understand if the American and British was talking about it,

8    but we couldn't speak about anything in the room unless

9    everybody heard it.  And they became very aggressive and angry

10   and started, yeah --

11            THE COURT:  Who became very aggressive?

12            THE WITNESS:  Sorry.  It was the Beatles who became

13   very aggressive.

14            THE COURT:  Continue.

15   BY MR. GIBBS:

16   Q.   And after that point, Mr. Ottosen, did the violence

17   towards the hostages from the Beatles increase even more?

18   A.   Yeah.

19   Q.   And, in fact, was there an event where you were hit so

20   hard in the head by one of the Beatles that you thought it

21   might kill you?

22   A.   Yeah.  At that point, it was -- the one identified as

23   Ringo who came and start yelling at us for the notes and us

24   trying to escape and saying we are treating you so good, we're

25   giving you food, and you just don't care, and you just, you

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Cross Examination of Mr. Ottosen 3621-22

─United States v. Elsheikh─

120

1   know, make things worse for yourself.  And at some point I

2   heard that this police club had hit other people and suddenly

3   it hit me in the back of my head.  And I remember that my

4   sight flickered like you lose connection to a television or

5   something.  And when I came back to my mind, I thought that

6   this -- this kick to my head could as well kill me.  Maybe I

7   had some kind of blood thing going on inside of my head.  And

8   I thought it was so strange because I felt I was on my way to

9   be released, why would you, you know, kill me with -- with a

10  beating.

11  Q.   And Mr. Ottosen, you mentioned that you felt like, at

12  least for you, you were close to being released.  During this

13  time with all this violence, what, if anything, did John

14  Cantlie say to you about what you should do if you got

15  released?

16  A.   Yes, John came to me and said that he would like me to

17  bring out a message to whoever was on this case to say that if

18  you cannot get us released, then kill us, put a bomb onto this

19  compound.  Kill us or we will not end up being used as

20  propaganda for these guys.

21  Q.   Then, Mr. Ottosen, you talked about the negotiations and

22  the proof-of-life, shortly before you were released, were you

23  forced to do a final audio message to your parents?

24  A.   Yes.

25        MR. GIBBS:  Your Honor, at this time we'd ask to

─────────────United States v. Elsheikh─────────────

121

1    play that audio message, which is in evidence.  It's Exhibit

2    11-8.

3              THE COURT:  You may do so.  How long is it?

4              MR. GIBBS:  Twenty seconds.

5              THE COURT:  All right.

6              MR. GIBBS:  Judge, if we can hold on for one second.

7    The defense advises they don't think it has been introduced.

8              MR. MACMAHON:  No objection, Your Honor.  I'm

9    advised it has been admitted, Your Honor.

10             THE COURT:  All right.

11             MR. GIBBS:  That was my recollection as well.

12             THE COURT:  If something hasn't been admitted, the

13   powers that be advised me of that and I'll deal with it.  She

14   was silent.

15             MR. GIBBS:  That seems like a good sign to me as

16   well, Your Honor.  Thank you.

17             THE COURT:  It's admitted.

18             (Audio played.)

19   BY MR. GIBBS:

20   Q.   Mr. Ottosen, how was that particular audio message

21   recorded?

22   A.   It was recorded into the watch -- the watch of some of --

23   of one of the Beatles.

24   Q.   And do you recall which Beatle had that watch that it was

25   recorded in?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

122

1  A.   I'm pretty sure it was George.

2  Q.   And who told you what to say in that message?

3  A.   George did.

4  Q.   And where was that message recorded?

5  A.   It was recorded inside the room where Tony and the three

6  Americans and the three British hostages was also kept.

7  Q.   So could the other hostages hear you making that

8  recording?

9  A.   They could, yes.

10 Q.   And in the message we just heard you sounded very

11 desperate.  Was that an act for your parents or was that real?

12 A.   That was real.

13 Q.   And after that message was made did the Beatles leave the

14 cell?

15 A.   Yes, I think they did.

16 Q.   And were you then alone in the cell with your fellow

17 hostages?

18 A.   Yes.

19 Q.   And what were you doing at that point?

20 A.   I was crying and my fellow hostages came over to me to

21 cheer me up and I think James told me that it will be okay.

22 It was a good sign.  It was a good sign for me.

23 Q.   Okay.  And, in fact, on that note, at some point near the

24 end of your captivity, did one of the Beatles come in and ask

25 you who bought your old car?

1   A.   Yes.

2   Q.   What was the significance of that question?

3   A.   It was that it was a proof-of-life question with a code

4   in it.  And it was about my old green car.  And green meant

5   that it was the green part of the traffic light and I then

6   immediately knew that the money had probably been given for my

7   release and I was on my way home soon.

8   Q.   And how did the other hostages react upon learning that

9   you had gotten this very positive news from home?

10  A.   They -- all of them stood up and walked over to my side

11  of the room and started to congratulate me, giving me hugs.

12  And I remember at this point I felt very, very bad for them to

13  congratulate me, because I knew myself how it was to see other

14  people being released, leaving going home, and I would

15  probably be the last one to go, together with Tony.  So for me

16  it was, it was -- I felt so bad standing there being so happy

17  and to cry in front of them, because they -- the British and

18  the American hostages had nothing at all to look forward to.

19  Q.   And Mr. Ottosen, at some point during the days before you

20  were released, did James Foley ask if you could sneak out a

21  letter for him?

22  A.   Yes, he did.

23  Q.   What was your response?

24  A.   That I didn't want to take out a physical letter.  I was

25  afraid I will lose it or that the Beatle might -- Beatles

1   might find it.  So I told him that I would rather try to

2   remember the letter inside of my head.  So I would not be able

3   to lose it.

4   Q.   And did you and James Foley sit together so he could walk

5   you through memorizing that letter?

6   A.   Yes, we did.

7   Q.   Now, Mr. Ottosen, during the entirety of James Foley's

8   captivity, had he been able to get any letters out to his

9   family?

10   A.   No, he was not allowed to.

11   Q.   And was he ever able to even try to sneak any letters

12   out?

13   A.   I don't -- James didn't want to bother anybody doing that

14   for him.  So I think it was John Cantlie who actually forced

15   James to make this letter and to pass it on to me as I was

16   the -- the last one, probably, to be released.  It was the

17   last chance for him to give -- to send a message to his

18   family.

19   Q.   And when you sat there in the cell with James Foley, did

20   you manage to memorize the entirety of that letter accurately?

21   A.   Yes.

22   Q.   How long did it take to get it all correct?

23   A.   I think it took about three weeks.

24   Q.   Mr. Ottosen, I want to get to the day that you and Tony

25   Neukirch left the prison.  When you finally left the prison,

─────United States v. Elsheikh─────

125

1   who were the male hostages that remained behind?

2   A.    That was Peter Kassig, Steven Sotloff, and James Foley,

3   and Alan Henning, David Haines, and John Cantlie.

4   Q.    And to your knowledge which women remained behind?

5   A.    I knew that in the room next to us Louisa and Kayla

6   Mueller was sitting.

7   Q.    And can you describe the actual day when you were taken

8   out of the cell for the last time?

9   A.    Yeah, I remember it was about a week since I received the

10  proof-of-life message with my green car and every night I've

11  been so afraid and problems sleeping and cried a lot, and the

12  last night was an exception, because I knew if I was going to

13  be released it will be soon.  And then in the morning I heard

14  the car outside braking.  I heard the Beatles walk through the

15  corridor, knock the door, they came in.  We were sitting with

16  our hands on the wall.  And the last two weeks since Federico

17  was released those two weeks had been so awful and horrific

18  and I had the feeling that I got a glimpse of how their

19  treatment was back in The Box.  So at this point we were not

20  allowed to put our hands on the wall.  We had to have them --

21  so we couldn't rest against the wall.  We had to put -- about

22  10 centimeters from the wall.  And they came directly to me,

23  the Beatles came directly to me, and also Tony Neukirch, and

24  told us that we were on our way home.  And then they put a

25  blanket over my head and they put a blanket over Tony's head.

Cross-Examination of   Cross-Examination of   Cross-Examination of

─────United States v. Elsheikh─────

126

1    I remember they did the same with some of the hostages that

2    was about to be released.

3           And then they followed us out of the room and in the

4    doorway I was told by one of the Beatles to stop and look

5    back, take one last look at your friends, and I did that, and

6    I remember that looking at them would probably be the last

7    time I would see them alive.  And I also had this strange

8    feeling of because I knew how it was to sit there with your

9    arms on the wall listening to somebody being released.

10          Now I was on our way and they were sitting back in

11   the room and I felt ashamed and I felt so sorry that we

12   couldn't go on together.  And then I took a look down at David

13   Haines.  David is a former military guy.  He has lived most of

14   his life in conflict areas and he was a tough guy before all

15   this happened to him.  But at this point, I saw his hands was

16   shaking like this and I will never ever forgot this view,

17   because I knew how afraid he was.  And he had a good reason to

18   feel that way.  And then I was pushed out of the room.  The

19   door closed and we were taken into a car.

20   Q.   Let me stop you there.

21          When you were taken out of the cell and taken into a

22   car, who took you into the car?

23   A.   The Beatles did.

24   Q.   All three of them?

25   A.   Yes.

─United States v. Elsheikh─

127

1  Q.   And okay, pick it up there.  What happened at that point?

2  A.   So Tony and I we sat at the backseat of the car where we

3  were told to put our hands between our legs.  So if you look

4  from outside, you would only be able to see three persons in

5  the car, which was the Beatles, you would not be able to see

6  Tony and I.  And then we started driving and I think we drove

7  for probably one and a half hours, maybe two hours.  It was

8  difficult for me to feel the time at this point.  I was quite

9  stressed, especially when the Beatles started to ask me about

10  this code name.  They asked me if I knew who the Beatles were.

11  Q.   And were you scared when you heard that question?

12  A.   Yeah, I was.  Because I thought that whatever I would say

13  now could possibly affect the three American and the three

14  British hostages still in the cell.  So I thought okay, I may

15  answer short and precise as Federico told me in the beginning.

16  And I did, I said, as normal as I could, that yeah the Beatles

17  mean -- is the code name for you guys.

18  Q.   And how did they react when you told them the Beatles are

19  the code name for you guys?

20  A.   I had the feeling they got excited and started laughing.

21  And I was so happy that they didn't continue to ask about

22  things that could put my friends in trouble.

23  Q.   And at some point during this journey, Mr. Ottosen, did

24  the Beatles turn you and Tony Neukirch over to a second

25  driver?

─────United States v. Elsheikh─────

128

1    A.   Yeah.  So at some point they left the car and a new

2    driver entered and the journey continued.

3    Q.   Was that the last time you saw the Beatles?

4    A.   Yeah.  Yeah, it was.

5    Q.   And Mr. Ottosen, were you taken to a location where you

6    and Tony stayed briefly where you saw some items that you

7    recognized?

8    A.   Yes.

9    Q.   Can you describe that?

10   A.   Yes, so I could recognize the blanket on the floor.  It

11   was Federico's old blanket.  I could also recognize some

12   writings on the wall.  It was somebody with a nail had

13   scratched MSF, which I thought could be either the three MSF

14   women or the MSF guys that left that message.  So both Tony

15   and I knew that we were probably on the right path.

16   Q.   And, in fact, after spending a few days in that location,

17   were you and Tony eventually allowed to cross the border into

18   Turkey?

19   A.   Yes, we were.

20   Q.   And did you meet Jens Serup on the other side of the

21   border?

22   A.   Yes, I did.

23   Q.   After you were released, did you eventually return to

24   Denmark in pretty short order?

25   A.   Yes, I flew back to Denmark the day after.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of Ole Ottosen

United States v. Elsheikh

129

1   Q.   And after returning to Denmark, did you get an

2   opportunity to deliver James Foley's letter to his family?

3   A.   Yes, I did.

4   Q.   And describe how you did that?

5   A.   It was Jens Serup who gave me a phone and the only thing

6   I should do was to press call.  And then I could hear that

7   Diane Foley and John Foley, James's parents picked up the

8   phone, and they seemed so polite and happy to talk to me.  And

9   I remembered the feeling of -- feeling that they didn't want

10  to talk with me.  Inside of myself I knew that they didn't

11  want to talk to me, they rather want to talk to James.  So I

12  told them the letter, as I remembered word by word.  A letter

13  was very direct messages to each one of his family members

14  of memories that he had and this was the first and the only

15  time I said his letter out loud, because it was quite -- it

16  was quite hard to have -- to deliver a good-bye message to the

17  mother of her son.  And, yeah.

18           So I remember after the call I felt that I did what

19  I was supposed to do.  And in the middle of this whole thing

20  of being a victim and somebody who was always relying on other

21  people to survive, it was nice to have a little bit to give

22  suddenly.

23  Q.   Mr. Ottosen, what was the date you were actually released

24  from captivity?

25  A.   The day I crossed the border into Turkey was the 19th of

─────────United States v. Elsheikh─────────

130

1  June, 2014.

2  Q.   And a couple months after that, did you take a trip with

3  another former hostage?

4  A.   Yes, I did.

5  Q.   Can you describe that trip?

6  A.   So when we sat back in Syria, me and the French hostage

7  Pierre Torres and David Haines, we planned that we will go,

8  all three of us, on a trip up and see Scotland where David is

9  from.  But since David wasn't released at this point, Pierre

10  and I decided to make the trip ourselves and also to visit

11  some of the families, visit the family of Alan Henning and

12  John Cantlie and David Haines.

13  Q.   And did you and Pierre Torres travel to England?

14  A.   Yeah, we did.

15  Q.   And soon after getting to England, did you receive a call

16  from Jens Serup?

17  A.   Yes.

18  Q.   And what did he ask you to do?

19  A.   He asked us to -- he asked me to stop the car and he

20  asked me if I had an internet connection.  So I plugged my

21  phone to my laptop and started roaming.  So we opened up the

22  back part of the car, put the computer in front of us, and at

23  this point I put my phone into a speaker mode so Pierre was

24  able to hear what Jens was saying.  And Jens told us that they

25  just received the information that James Foley might have been

Cross Examination of Jens Otto Claussen Serup

─United States v. Elsheikh─

131

1  killed.  And now he had a link to a video and he wanted me to

2  see a specific part of the video.  And because I was the last

3  one seeing James alive, I might be the person to identify him.

4  So we opened up the video and yeah.

5  Q.   And did you watch what was in the video?

6  A.   Yes.

7         MR. GIBBS:  Can we publish 1-24E, which is in

8  evidence.

9  BY MR. GIBBS:

10 Q.   Mr. Ottosen, is this part of the video that you watched

11 that night in England?

12 A.   Yes.

13 Q.   And did you recognize James Foley in this video?

14 A.   Yes.

15 Q.   Did you tell Jens Serup that?

16 A.   Yes, I did.

17 Q.   And this is, obviously, the still photo, but did you

18 watch that video all the way to the end?

19 A.   Yes, I did.

20 Q.   And what happened to James Foley at the end of that

21 video?

22 A.   At the end of this video, that happened to him what the

23 Beatles have continuously told us will happen for many, many

24 months.  And to see him laying there in the sand with his head

25 between his shoulders did not make me angry or sad.  I

Cross-Examination of Daniel Ottosen 132

─────United States v. Elsheikh─────

132

1  remember that I felt happy for James that now nobody can,

2  like, hurt him anymore.  He somehow found peace.  And I knew

3  myself how it is to be in a situation where you rather would

4  be dead than being alive.  And now James was there when nobody

5  could torture him anymore.

6          But the absolutely worst thing that I experienced

7  after my release was what happened at the end of the movie

8  where they showed a picture, a video clip of Steven Sotloff.

9  Q.   And why was that the worst part of the video for you?

10 A.   Because I have been to an execution scene before.  I have

11 an idea of how it's done, and knowing that Steven had been

12 standing right there next to and witnessed his good friend and

13 fellow countryman being brutally beheaded and afterwards told

14 that this will happen to you.  So I had the feeling that

15 Steven now is sitting somewhere inside a room, maybe together

16 with the four other guys -- now one other American and three

17 other British guys, hostages, and I don't know maybe he told

18 them that -- what he saw.  Maybe he didn't to save them from

19 what was going to happen as well.

20          MR. GIBBS:  One moment, Your Honor.

21          Thank you, Mr. Ottosen, that's all I've got at this

22 time.

23                  CROSS-EXAMINATION

24 BY MR. MACMAHON:

25 Q.   Mr. Ottosen, my name is Edward MacMahon.  I'm one of the

Redirect Examination of Daniel Rye Ottosen 3634

─United States v. Elsheikh─

133

1   lawyers for Mr. Elsheikh.  I just have a couple of questions

2   for you.

3           After you were released, you participated in an HBO

4   video about James Foley, didn't you?

5   A.   Yes.

6   Q.   In that video, you described in detail much of what you

7   talked about today, didn't you?

8   A.   I can't remember in detail what I talked about in that

9   video.

10  Q.   Do you remember talking about the dead leg that you

11  testified to earlier today of the HBO video?

12  A.   I probably did, yeah.

13  Q.   You remember that video came out in early 2016?

14  A.   Yes.

15  Q.   And you also published a book, didn't you?

16  A.   Yes.

17  Q.   And that book is called:  *The ISIS Hostage:  One Man's*

18  *Story 13 Months in ISIS Captivity.*

19  A.   Yes.  That's the translation from the Danish book, which

20  is called *Do You See the Moon, Daniel?* originally.

21  Q.   And in that book, in much part, covers a lot of what your

22  testimony was today as well?

23  A.   Exactly, yes.

24           MR. MACMAHON:  That's all, sir.  Thank you.

25           THE WITNESS:  Thank you.

─────────────────── United States v. Elsheikh ───────────────────

134

1          MR. GIBBS:  Just a couple of questions, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. GIBBS:

4    Q.   In terms of your book, Mr. Ottosen, you indicated that it

5    was published originally in Danish?

6    A.   Yes.

7    Q.   What year was that?

8    A.   I believe it was October 2015.

9    Q.   Was it ever published in English?

10   A.   Yes.

11   Q.   When was that?

12   A.   I'm not quite sure.

13          MR. GIBBS:  Okay.  That's all I have, Your Honor.

14          THE COURT:  All right.  Mr. Ottosen, you may step

15   down, now, sir.  You may either depart or remain in the

16   courtroom, as you wish.

17          THE WITNESS:  Thank you, sir.

18          (Witness excused.)

19          THE COURT:  All right.  Mr. Gibbs.

20          MR. GIBBS:  Your Honor, at this time the government

21   will rest.

22          But before I do that, there's one exhibit that had

23   been offered but not admitted.  I don't believe there was an

24   objection.  And it's Government's Exhibit 1-52, which is a

25   message to the government and people of Japan.  We would ask

─────United States v. Elsheikh─────

135

1    to move that into evidence at this time.

2              MR. MACMAHON:  No objection, Your Honor.

3              THE COURT:  It's admitted.

4    (Government's Exhibit No. 1-52 was admitted into evidence.)

5              MR. GIBBS:  At this time, Your Honor, the government

6    rests.

7              THE COURT:  All right.  Mr. MacMahon, does the

8    defendant wish to offer -- well, first, do you have motions

9    that you wish to make?

10             MR. MACMAHON:  We do have a brief motion but

11   Mr. Ellis is going to handle it, Your Honor, if that's okay.

12             THE COURT:  Ladies and gentlemen, let me ask you to

13   take another recess at this time.  If you put your books in

14   the cubbyhole and refrain from discussing the matter with

15   anyone or undertaking any investigation, I think this will be

16   about a 20-minute recess.  Let's say we will convene again at

17   25 minutes to 3:00.  Let's make it 20 minutes to 3:00.  You

18   may follow the court security officer out.

19             (Jury excused.)

20             THE COURT:  Mr. Gibbs, Mr. Fitzpatrick, any of the

21   four of you, I take it you've been verifying every evening

22   that the exhibits you have offered have been admitted.

23             MR. GIBBS:  We have, Judge.  And the defense has

24   been very helpful in coordinating with us on what they've

25   recorded.  I believe that we are confident that everything

─United States v. Elsheikh─

136

1    that we intended to offer and enter has been offered and

2    entered.

3            THE COURT:  All right.  Who wishes to make this

4    motion on behalf of the defendant?

5            MR. ELLIS:  I will, Your Honor.

6            Your Honor, we'll submit a motion under Rule 29 at

7    this time as to counts 1 through 7, and resulting in death

8    portion of Count 8 due to insufficient evidence of the

9    defendant's participation in these conspiracies.

10           THE COURT:  All right.  So you would not attack any

11   of the elements of the offense with proof that's been offered?

12   What you argue is that there isn't adequate proof to establish

13   that your client was one of the Beatles?

14           MR. ELLIS:  That's correct, Your Honor.

15           THE COURT:  All right.  Mr. -- you want to address

16   that?  Who will address that?

17           MR. GIBBS:  Mr. Grano-Mickelson will take that one,

18   Judge.

19           THE COURT:  All right.

20           MR. GRANO-MICKELSON:  Your Honor, I have written

21   down a couple of notes, but I think the Court has beat me to

22   the punch.  As you know, you've entered an order today on the

23   government's forfeiture by wrongdoing arguments in which the

24   Court concludes that by a preponderance of the evidence, the

25   defendant was a member of the charged conspiracies.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Elsheikh─

137

1          THE COURT:  Yes.  I think there is a mountain of

2    evidence to that effect.  But now what Mr. Ellis would argue

3    is there isn't enough evidence on which a jury could find

4    beyond a reasonable doubt that he was a Beatle.

5          And do I take it that in the interest of saving time

6    that you would rely on all the evidence I cited in this

7    opinion that I issued today?

8          MR. GRANO-MICKELSON:  That is correct, Your Honor.

9          THE COURT:  Tell me this.  What do you think is the

10   most important part?  And, obviously, it's a rhetorical

11   question.  I know what the most important part, but I want to

12   hear it from you.

13         MR. GRANO-MICKELSON:  Yes, Your Honor.  It is the

14   defendant's numerous corroborated admissions as to

15   participation in the hostage-taking conspiracy.

16         THE COURT:  That's right.  And you're referring, I

17   take it, to his interview answers?

18         MR. GRANO-MICKELSON:  That is correct, Your Honor.

19   The defendant repeatedly mentioned that he took email

20   addresses from hostages and explained often with minute

21   details corroborated by the hostages about those events.

22         THE COURT:  Yes.  I think is the most direct

23   evidence, but there is, as you've heard, or as I've pointed

24   out in this opinion, there is much more in addition.

25         All right.  Thank you.  The motion for judgment of

Direct Examination of Dodwell 3539-12

————United States v. Elsheikh————

138

1  acquittal, pursuant to Rule 29 by the defendant for all

2  counts, must be denied.

3          There is ample evidence from which a reasonable jury

4  could find beyond a reasonable doubt each and every element of

5  the offenses charged in the indictment, counts 1 through -- I

6  believe it's 8.

7          The elements of the offense of Count 1, which is

8  conspiracy to commit hostage-taking resulting in death, again

9  if two or more persons entered into a conspiracy, the object

10 of which was to -- an object of which were to commit

11 hostage-taking, that clearly has been satisfied.

12         As I said, a mountain of evidence on that.

13         At some time during the conspiracy, the defendant

14 knew of the purpose of the conspiracy.  I think there is ample

15 evidence there as well, including, what we've just discussed.

16 And I think there is evidence which a jury could find beyond a

17 reasonable doubt that he was one the Beatles, and that the

18 defendant deliberately joined a conspiracy with the intent to

19 further its purpose.  I don't think there's any serious doubt

20 about that.  Then it's also necessary to establish

21 jurisdiction whereas here the offense took place outside the

22 United States.  The government in that event, has to prove

23 beyond a reasonable doubt at least one of the following.  And

24 I'm going to pick the one that that has proved and that is

25 that the person was seized or detained was a national of the

Direct Examination -- Redacted -- 10/5/22

United States v. Elsheikh

139

1   United States.  And, yes, there were several nationals of the

2   United -- or citizens of the United States who were seized,

3   including the four we've been talking about a great deal in

4   this case.

5          And also, that the United States government was the

6   organization sought to be compelled by the demands for ransom.

7   And I think there's ample evidence which a jury could find

8   that.

9          And then, as an element of the offense, if the

10  defendant is guilty of hostage-taking in Count 1, the jury has

11  to determine whether the government has proven beyond a

12  reasonable doubt that the victims' death resulted from the

13  commission of the offense.  And I think there's ample evidence

14  to which a jury could find beyond a reasonable doubt that

15  three, in fact, all four died as a result.

16         Now, the next group of counts is 2 through 5.  And

17  I'm only going through them because I think Mr. Ellis

18  deliberately said he was moving for judgment of acquittal on

19  all of them.  He focused, chiefly, entirely, not chiefly, but

20  solely on whether or not there was proof that a jury could

21  find beyond a reasonable doubt that this defendant was one of

22  the Beatles and I had found that.  But going to 2 through 5,

23  which is the hostage-taking resulting in the deaths of James

24  Wright Foley, Kayla Jean Mueller, Steven Joel Sotloff, and

25  Peter Edward Kassig.  The first thing the government has to

─────United States v. Elsheikh─────

1   prove is that the defendant seized to detain the victims' name

2   in the indictment.   There's ample proof of that.

3           And then he threatened to kill, injure, or continue

4   to detain that person.   Again, I think there is ample proof

5   from which a jury can find that beyond a reasonable doubt.

6           And third, that the defendant acted with a purpose

7   of compelling a third person or government organization to act

8   in some way or to do or abstain from doing an act as an

9   explicit or implicit condition from releasing the person

10  detained.   Well, again, there's a mountain of evidence about

11  ransom notes and that sort of thing.

12          And again, to establish jurisdiction where the

13  offense occurred outside the United States, the government

14  must prove beyond a reasonable doubt one of the following, but

15  first, that the person was seized/detained was a citizen of

16  the United States and James Wright Foley, Kayla Jean Mueller,

17  Steven Sotloff, and Peter Edward Kassig were all United States

18  citizens.   And the United States government was the

19  organization sought to be compelled.   Compelled either to

20  release this person who was imprisoned in the United States

21  for a terrorist conviction or to pay a large sum of money.

22          And finally, the jury must find that if they were --

23  if the defendant is guilty of hostage-taking, the jury must

24  then determine whether the government has proven beyond a

25  reasonable doubt that the victim's death resulted from the

─────United States v. Elsheikh─────

141

1   commission of the offense.  Well, there's no doubt that James

2   Wright Foley, Steven Joel Sotloff, and Peter Edward Kassig

3   were killed or beheaded or murdered by the ISIS people, the

4   defendants.  The conspiracy.

5          There is a dispute, to some extent about Kayla Jean

6   Mueller.  The dispute is not material to the Rule 29 motion

7   because she was detained and if she died as a result of a

8   Jordanian air strike, she couldn't escape that because they

9   had detained her then.  So that's not a problem, I think, for

10  the government.  But, of course -- so the government doesn't

11  have to prove beyond a reasonable doubt that she was killed by

12  ISIS.  She was detained by ISIS in a war zone and died as a

13  result.  They might have killed her.  We don't really know.

14  By "they," I mean ISIS.

15         Then we go to conspiracy to murder United States

16  citizen outside the United States.  That's Count 6.  Again,

17  there has to be evidence of a conspiracy as there is on the

18  other counts or Count 1, and there clearly is evidence of a

19  conspiracy that the defendant knowingly and voluntarily became

20  a member of the conspiracy.  Again, I think the proof shows

21  that he was one of the Beatles and therefore clearly engaged

22  and voluntarily joined and became a member of the conspiracy.

23  And that the defendant engaged in the conspiracy while outside

24  the United States.  Clearly occurred in Syria.  And that one

25  or more conspirators committed an overt act to affect the

──────United States v. Elsheikh──────

142

1    object of the conspiracy.  Again, there is no doubt that there

2    is evidence of countless --

3            Next, we go to Count 7, conspiracy to provide

4    material support to terrorists.  Hostage-taking and murder

5    resulting in death.  Again, there must be proof of two or more

6    persons entering into a conspiracy.  The object of which was

7    for a co-conspirator to provide material support or resources

8    and material support can be providing services.  So if you

9    provide services to a terrorist organization, designated

10   terrorist organization, that is a violation of the act.  You

11   don't have to provide food, money, or ammunition or guns.

12   Services is a part of it.

13           And again, there must be proof from which a jury

14   could find beyond a reasonable doubt that the defendant joined

15   in the conspiracy with the intent to further its purpose.  And

16   here again, we come back to the proof that I mentioned.  It's

17   also found in the opinion I issued today, not completely, not

18   everything is in there, because I'm doing this simultaneously

19   with hearing evidence.  But clearly, there is more than ample

20   evidence to show that this defendant was one of the Beatles.

21   And the jury could find that beyond a reasonable doubt.  They

22   don't have to.  They could acquit the defendant if they find

23   that they're not satisfied beyond a reasonable doubt of that.

24   And as Mr. Ellis pointed out, if they decide that then he

25   would be innocent of all the charges.  It's a jury issue,

Redirect Examination of   Jo Dougan        3644

─────────United States v. Elsheikh─────────

143

1   clearly.  It is not an issue that should be resolved in the

2   defendant's favor on motion for judgment of acquittal.

3          And finally, I don't have to repeat all I've said on

4   Count 8, which is the conspiracy to provide material support

5   to a designated foreign terrorist organization.  ISIS is

6   clearly a foreign terrorist organization.

7          And Count 7 was hostage -- conspiracy to provide

8   material support to terrorist, hostage-taking and murder

9   resulting in death.  Ample evidence of that.  And there's

10  ample evidence of material support.

11         The comments I made about what constitutes material

12  support applied chiefly to Count 8.  In other words, you can

13  supply services as well as money, ammunition, guns, food, and

14  that's material support.  So is services.  And there's ample

15  evidence in which a jury could find beyond a reasonable doubt

16  that the defendant did that.  There also, the government must

17  prove beyond a reasonable doubt that the defendant knew the

18  object of the conspiracy and that he joined the conspiracy

19  with the intent to further its purpose.  I think there is

20  ample evidence.  If they find that he was a Beatle, obviously,

21  he too -- the object of the conspiracy and joined it with the

22  intent to further its purpose.

23         The defendant knew that the organization was a

24  designated terrorist organization or that the organization had

25  engaged in or was engaging in terrorist activity or terrorism.

─────United States v. Elsheikh─────

144

1   There was no evidence that this defendant knew ISIS was a

2   designated terrorist organization, but there is ample evidence

3   from which a jury could find alternatively that ISIS had

4   engaged in or was engaging in terrorist activities or

5   terrorism.

6           So the motion to dismiss on evidentiary grounds and

7   the motion for judgment of acquittal on the basis that the

8   government has failed to adduce evidence to permit a jury to

9   find beyond a reasonable doubt each and every element of the

10  eight offenses, eight charges in the indictment is denied.

11          Now, let's come to -- I'm going to have the jury

12  brought in.  I'm going to release the jury for today.  Then

13  I'm going to prepare -- well, before that, I'm going to give

14  the government an opportunity to rest before the jury.  Then

15  I'm going to ask Mr. MacMahon whether you have any evidence.

16  And you've told me you have how much evidence?

17          MR. MACMAHON:  Ms. Ginsberg is going to put it on,

18  but I don't believe it's 20 minutes of evidence.  I think we

19  can do it today, if the Court please.

20          THE COURT:  Yes, well, we will do it today.

21          MR. MACMAHON:  Oh, I thought you said you were going

22  to send them home.

23          THE COURT:  I misspoke.

24          MR. MACMAHON:  I may have misheard too, Your Honor.

25          THE COURT:  No, you didn't.  I misspoke.  You heard

─────United States v. Elsheikh─────

145

1   right.

2           All right.  Ms. Ginsberg, these are film clips.

3           MS. GINSBERG:  Yes, Your Honor.

4           THE COURT:  All right.  That's fine.

5           MS. GINSBERG:  Five short film clips.  Five short

6   film clips.

7           THE COURT:  Five short film clips.  Thank you.

8           All right.  Then what I will do is I'll have the

9   jury brought in.  I'll give you, whoever is going to do it,

10  Mr. Parekh or Mr. Gibbs, an opportunity to rest in front of

11  the jury.  And I'll ask Ms. Ginsberg whether the defendant

12  wish -- I'm going to voir dire the defendant in a minute.

13          I'm going to have Ms. Ginsberg tell me in front of

14  the jury whether you have evidence and we'll go ahead and

15  offer it.

16          Now, Mr. Elsheikh, come to the podium, please, sir.

17  Mr. Elsheikh, I'm going to ask you a series of questions.

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Very short, very brief.  And the whole

20  purpose of this is to understand and make clear for the record

21  whether you wish to testify or not.

22          Now, the reason for that is this:  you have an

23  absolute right under United States law to testify or to remain

24  silent.  If you choose to remain silent, the Court will

25  instruct the jury that the jury may draw no inference from

EASTERN DISTRICT OF VIRGINIA

Direct Examination of Douglas 9/23/22

─────United States v. Elsheikh─────

146

1  your silence.  If you elect to testify, then, of course, you

2  may do so.  You will then be examined by your counsel and

3  cross-examined by government's counsel.  And then, the jury

4  will be told that they should evaluate your testimony just as

5  they would evaluate the testimony of any witness who

6  testifies.  So you have the right to testify, you have the

7  right to remain silent.

8         Now, you must be the person who decides whether you

9  testify or remain silent, but you can receive advice from your

10  counsel, all of them, one, two, three, four, five, six.  You

11  can receive advice from them on whether you should testify --

12  Mr. MacMahon is counting up and doesn't count the same as I

13  do.

14         Well, maybe I'm promoting your paralegal.

15         MR. MACMAHON:  And one of the --

16         THE COURT:  I beg your pardon?

17         MR. MACMAHON:  And a deputy, Your Honor, I think.

18         MS. GINSBERG:  Judge, we're four.

19         THE COURT:  All right.  Four.  That's right.  So the

20  young lady back there is the paralegal?

21         MR. MACMAHON:  Yes, Your Honor.

22         THE COURT:  All right.  But I'm sure she's as

23  essential as any lawyer.  I don't have any doubt about that.

24  And she certainly has been active in it.

25         In any event you may, Mr. Elsheikh, you may rely, if

147

1   you wish, on the advice of your counsel.  Now, I've told you

2   all that so I'm now going to have the deputy clerk give you an

3   oath to affirm that you're going to answer the questions

4   truthfully, but the questions will be limited only to whether

5   you wish to testify.  Now, if I -- if I ask a question that

6   you have some doubt about it, you're perfectly at liberty to

7   turn to your lawyers to ask them about it.

8              Do you understand that?

9              THE DEFENDANT:  I do.

10             THE COURT:  And do you understand, sir, that you do

11  have the right to testify or remain silent and you understand

12  that testifying will subject you to cross-examination and not

13  testifying will result with my advising or instructing the

14  jury that they may draw no inference from your silence and

15  when they retire to deliberate on your verdict they can't even

16  discuss the fact that you have not testified.

17             Now understanding all of that, let me have the

18  deputy clerk administer briefly the oath.

19             THE DEPUTY CLERK:  Would you please raise your right

20  hand.

21             (Witness affirmed.)

22             THE DEFENDANT:  I do.

23             THE COURT:  Briefly, sir, would you just state your

24  name for the record.

25             THE DEFENDANT:  El Shafee Elsheikh.

─United States v. Elsheikh─

148

1          THE COURT:  Sir, do you understand what I've told

2     you about your right to testify or to remain silent?

3          THE DEFENDANT:  I do.

4          THE COURT:  Have you had an adequate opportunity to

5     discuss with your attorneys whether you wish to testify or to

6     remain silent?

7          THE DEFENDANT:  I have.

8          THE COURT:  Do you wish to testify?

9          THE DEFENDANT:  I do not.

10         THE COURT:  All right, sir, you may be seated.

11         Does the defendant need to be voir dire any further,

12    counsel for the government, anybody from the government?

13         MR. GIBBS:  No, Your Honor.  That was more than

14    sufficient.  Thank you.

15         THE COURT:  All right.

16         I'm dying to ask, but I'm not going to.  Who is in

17    charge over there?

18         MR. GIBBS:  It's a collaborative effort.  I think if

19    you ask any of us, we would say we're in charge, but that's

20    probably not the case.

21         THE COURT:  I see.  Well, as a lawyer, I

22    participated in a lot of large trials, and I learned very

23    early on that every effort has to have a general.  And I doubt

24    seriously that you have a part of that lesson.

25         Now, as I said let me finish because, Ms. Ginsberg,

─────United States v. Elsheikh─────

149

1   you made a suggestion yesterday and told me that it was what

2   you and the government have agreed to and I want to carry

3   through on that so that you'll know.

4           MS. GINSBERG:  Yes, sir.  We actually have two

5   stipulations.  One that relates to the media clips.  There are

6   four media clips.  And that stipulation identifies those media

7   clips and the parties have agreed that the portions that are

8   being played are true and accurate portions of those media

9   interviews.

10          THE COURT:  All right.  And you can tell the jury

11  that.  Hand the -- I need to file those.  They need to be

12  filed in this case.

13          MS. GINSBERG:  Yes, sir.  And there is a second

14  stipulation that relates only to the one short clip from

15  Mr. Langan's deposition, which advises -- which agrees that

16  Mr. Langan is unavailable to testify at trial, that his

17  testimony was previously recorded in this court, and that the

18  Defendant's Exhibit No. 11 is a true and accurate copy of a

19  portion of that testimony.

20          THE COURT:  I'm not sure -- well, it may have been

21  recorded in this court during the motion to suppress.

22          MS. GINSBERG:  Yes, that's correct, Your Honor.

23          THE COURT:  All right.  There are other times where

24  Langan is recorded and those were not in this court.

25          MS. GINSBERG:  That's correct.  And Your Honor,

Direct examination of Dr. Rodgers 3651-2

─United States v. Elsheikh─

150

1  actually, the clip is of Mr. Langan in the witness stand and

2  it shows exactly what you would see in the witness stand.

3              THE COURT:  All right.

4              MS. GINSBERG:  And then we also have notebooks with

5  transcripts of each of these five clips.  The government has

6  agreed that they are accurate and does not object to their

7  admission.

8              THE COURT:  What do you mean notebooks?

9  Transcripts?

10              MS. GINSBERG:  Small notebooks with copies of

11  transcripts that --

12              THE COURT:  Why should that be any different from

13  any other transcript -- any other clips introduced?

14              MS. GINSBERG:  Your Honor, I think the government

15  was able to put the transcripts of some of their clips right

16  in.

17              THE COURT:  Well, you can do that.

18              MS. GINSBERG:  We didn't and didn't know how to do

19  that.  But I believe that there may have been transcripts that

20  were provided to the jury with respect to certain of the

21  government's exhibits.

22              THE COURT:  Do you have transcripts, Mr. Parekh?

23              MR. PAREKH:  Your Honor, for the clips that we

24  played in front of the jury, the Sean Langan clips, and the

25  other media interviews, we entered the transcripts into

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Direct examination of Moussa Elsheikh

────────United States v. Elsheikh────────

151

1   evidence and Ms. Ginsberg is right we had subtitles.

2           THE COURT:  So that's in there?

3           MR. PAREKH:  That's in there.

4           THE COURT:  And so then it's perfectly appropriate

5   for her transcripts to go in.

6           MR. PAREKH:  Yes, Your Honor.

7           THE COURT:  All right.

8           MS. GINSBERG:  So we've prepared separate notebooks

9   with five transcripts corresponding --

10          THE COURT:  No, these will be exhibits just like

11  theirs are exhibits.  We're not going to put these -- I don't

12  want them singled out.  Do you see what I mean?  It's got to

13  be an exhibit.

14          MS. GINSBERG:  Your Honor, it was -- and Your Honor

15  will tell me how to do this, I'm sure.

16          THE COURT:  I am.  I'm telling you right now.

17          MS. GINSBERG:  It was our intention to provide the

18  jury with a copy -- each juror with a copy of the transcript

19  so they could follow along.

20          THE COURT:  No, no.  It's going to be an exhibit

21  just like any other exhibit.  If you want to give them

22  something to follow it while they're doing it, yes, that will

23  be collected --

24          MS. GINSBERG:  Yes, that's --

25          THE COURT:  -- after that.  But to go into the jury

 1  room, it's going to be like any other exhibit.

 2          MS. GINSBERG:  Yes, sir.  That was my intention.

 3  I'm sorry if I didn't explain myself well, but that was my

 4  intention.

 5          THE COURT:  All right.  Anything else?

 6          MS. GINSBERG:  No, Your Honor, I can provide the

 7  court security officer with copies of these two stipulations.

 8  One of them is handwritten as we just came to it this

 9  afternoon.

10          THE COURT:  All right.  Hand it to the court

11  security officer.

12          (A pause in the proceedings.)

13          MS. GINSBERG:  And, Your Honor, we can substitute a

14  typewritten copy of the handwritten copy for the jury to take

15  back --

16          THE COURT:  No, this is fine.

17          MS. GINSBERG:  Thank you, Your Honor.

18          THE COURT:  How many clips are there, Ms. Ginsberg?

19          MS. GINSBERG:  Five, Your Honor.

20          THE COURT:  And what is it that you have to give to

21  each juror?

22          MS. GINSBERG:  A notebook that has five -- the

23  transcripts that are associated with each of the five video

24  clips.  If I may, Your Honor.

25          THE COURT:  You have 17 of those notebooks.

Redirect Examination of Bonnie Dougan - 10-5-21

United States v. Elsheikh

153

1          MS. GINSBERG:  Yes, sir.  Ms. Bishop assures me that
2    we do.
3          THE COURT:  My concern is that this elevates it
4    above what the government's exhibits did.  But I'm going to
5    permit it.
6          Did you hand up notebooks, Mr. Parekh or Mr. Gibbs?
7          MR. PAREKH:  Your Honor, when we had the Matthew
8    Hamilton presentation, there were six audio clips that we
9    played.  Five of them contained some Arabic words and so for
10   that select portion of the government's case we handed out
11   notebooks.
12         THE COURT:  Yeah, that was different because that
13   was in Arabic and that was a translation.  But I'm going to do
14   it.  You may do it.
15         MS. GINSBERG:  Thank you.
16         THE COURT:  But these will be collected.  They will
17   not go to the jury room.
18         MS. GINSBERG:  Yes.  Understood, Your Honor.
19         THE COURT:  All right.  Anything else?
20         MR. GIBBS:  Your Honor, just for planning purposes,
21   we anticipate when the defense rests we'll have a rebuttal
22   case consisting of one 30-second clip and we propose to play
23   it exactly the way defense did.  We won't call a witness,
24   we'll simply play it on the screen.  It will have a
25   transcript.  And then we'll rest --

─────────────────────United States v. Elsheikh─────────────────────

154

1                  (Simultaneously speaking.)

2                  THE COURT:  -- or a stipulation for this?

3                  MR. GIBBS:  No, Your Honor, we're going to take our

4    chances on this.  I don't believe there will be an objection.

5                  MS. GINSBERG:  There is no objection.

6                  THE COURT:  All right.  Let me review what we're

7    going to do so that it's clear.

8                  I will have the jury brought back in.  Mr. Gibbs, I

9    will give you an opportunity to close the government's case in

10   chief.  I will then ask Ms. Ginsberg whether the defendant

11   wishes to offer any evidence.  She'll say, yes.  And I'll say,

12   can you give me a sense of what -- how much or the extent of

13   it.  And I will preface that, Ms. Ginsberg, by saying that the

14   defendant has the right to testify before the jury and he has

15   the right to remain silent before the jury.  And if he remains

16   silent, then I will instruct you in my instructions that you

17   may not consider -- you may not draw any inferences from his

18   silence and you may not even discuss whether he has testified

19   or not.  I'll probably tell them that several times.

20                 MS. GINSBERG:  Your Honor, would you like me to

21   inform the Court that Mr. Elsheikh does not intend to testify?

22                 THE COURT:  He informed me that.

23                 MS. GINSBERG:  I mean in front of the jury.

24                 THE COURT:  I don't know that it's necessary.  Do

25   you care, Mr. Gibbs?

─United States v. Elsheikh─

155

1          MR. GIBBS:  No, Your Honor.

2          MS. GINSBERG:  Judge, I don't believe it is

3    necessary but, obviously, it's the Court's discretion.

4          THE COURT:  Well, yes, it might be better if you

5    tell them rather than I tell them.  But I will tell the jury

6    that I will instruct him at the appropriate time that they are

7    to draw no inference from the silence nor are they to discuss

8    the fact that he has not testified when they deliberate on

9    their verdict.

10          MS. GINSBERG:  Your Honor, would it be acceptable to

11   the Court if we offered the clips and then I inform the Court

12   that we have no further testimony -- no further evidence?

13          THE COURT:  Yes, yes.

14          MS. GINSBERG:  Thank you.

15          THE COURT:  That will be fine if you want to do it

16   that way.  The reason I was going to do it the other way is

17   that it tells the jury how much they've got left, but I can

18   tell them that anyway.

19          But after that, we will recess.  We will convene --

20   well, you all aren't going to go anywhere because we're going

21   to have an instructions conference later this afternoon.  And

22   we'll convene at 9 o'clock or maybe 10:00, I don't know which,

23   tomorrow for closing arguments and the Court's final

24   instructions.

25          Mr. Parekh, you said you needed an hour-and-a-half

─United States v. Elsheikh─

1   with another half-hour for rebuttal.  Have you revised that?

2          MR. PAREKH:  Well, Your Honor, based on the advice

3   I've heard from the Court, I'm estimating much higher than

4   hopefully I think I'll need so I will not exceed an

5   hour-and-a-half, but I hope to do it in shorter time.

6          THE COURT:  And Ms. Ginsberg, you estimated an hour.

7          MS. GINSBERG:  Your Honor, I don't believe I'll need

8   a full hour.

9          THE COURT:  Yes.  I'll ask you again, Mr. Parekh, to

10  see if you can pare it down.  I'm not going to cut you off.

11  Well, if you go to an hour-and-a-half, you may hear me say "do

12  you have much more."  That is judge speak for "you're done."

13  All right.  Then you'll reserve how much for rebuttal?

14         MR. PAREKH:  Your Honor, 30 minutes or less.

15         THE COURT:  All right.  And then the jury will get

16  the instructions of the Court.  They won't have the

17  instructions in writing, but they'll have a tape recording of

18  my instructions as I give them.  When I complete the

19  instructions, and before I excuse the jury, of course, as you

20  know, seven of the jurors at this time -- no, six -- five --

21  how many are alternates, five or six?  One of them has already

22  been excused.  Five are alternate jurors and I'll thank them

23  and excuse them and then permit the others to retire and

24  deliberate on their verdict.  And I'll be telling them, as I

25  always do, that they can deliberate as long as or as little as

—United States v. Elsheikh—

157

 1   they like.  It's entirely up to them.

 2          So that's how we will proceed for the rest of today

 3   and for tomorrow morning.  Any questions, Mr. Parekh or

 4   Mr. Gibbs?

 5          MR. GIBBS:  No, Your Honor.

 6          THE COURT:  It helps me to know who is the general.

 7          MR. PAREKH:  You're the general, Your Honor.

 8          THE COURT:  Well, no, I'm the commander in chief.

 9          MR. PAREKH:  Touche.

10          THE COURT:  All right.  Ms. Ginsberg, any questions

11   on your part?  You've been through this before.

12          MS. GINSBERG:  No, Your Honor.  Only if we can have

13   a five-minute break before the jury comes back in.

14          THE COURT:  Of course.  I will do that.

15          We might give the jury a warning that we're going to

16   reconvene in about 15 minutes.

17          MS. GINSBERG:  Judge, I do have one question.  How

18   does the Court want us to have the -- these notebooks handed

19   to the jury?  Should we just give them to the court security

20   officer?

21          THE COURT:  That's right.

22          MS. GINSBERG:  And I think --

23          THE COURT:  Because you all can't walk around in the

24   courtroom.

25          MS. GINSBERG:  Yes, sir.  I think we're going to

─United States v. Elsheikh─

158

1   need the one back from the judge --

2           THE COURT:  Oh, all right.

3           MS. GINSBERG:  -- so we have one for each of the

4   jurors.

5           THE COURT:  That's fine.  How about one for the

6   Court?

7           MS. GINSBERG:  When they come back, we -- I have a

8   copy.  I will give my copy to the Court.

9           THE COURT:  I'm kidding with you, Ms. Ginsberg.  I

10  don't need a copy.  You keep it.

11          MS. GINSBERG:  I'm happy to give you my copy.

12          THE COURT:  I'm happy to decline your offer.  All

13  right.  I'm going to recess now.  And we will reconvene in 15

14  minutes.  Let's reconvene at 10 after 3:00.  And go ahead and

15  have that ready, if you would.

16          Court stands in recess until a quarter after 3:00.

17          (Recess.)

18          (Court proceedings resumed at 3:16 p.m.)

19          THE COURT:  Do you need to go and get them or are

20  they right nearby?

21          THE CSO:  I need to get them, sir.

22          THE COURT:  All right.  You may retrieve them and

23  bring them here.

24          MR. GIBBS:  I did have one housekeeping matter.

25          THE COURT:  All right.

─United States v. Elsheikh─

159

1        MR. GIBBS:  There are three FBI witnesses that the

2   defense had noticed, and I just spoke with them, they said

3   they did not intend to call them.  They are in the courtroom.

4   So they have been released.

5        THE COURT:  All right.  They can either remain or go

6   home.

7        MR. GIBBS:  They will remain, Your Honor.  Thank

8   you.

9        THE COURT:  All right.

10       (Jury present.)

11       THE COURT:  All right.  You may be seated.

12       Mr. Gibbs, do you have any further evidence?

13       MR. GIBBS:  We do not, Judge.  At this time, the

14   government rests.

15       THE COURT:  Ms. Ginsberg, does the defendant wish to

16   offer any evidence?  He's not required to, but he has an

17   opportunity to do so if he wishes to.

18       MS. GINSBERG:  Yes, Your Honor, but we'll be brief.

19       THE COURT:  All right.  And there aren't any

20   witnesses are there?  You're going to do this by film.

21       MS. GINSBERG:  That's correct, Your Honor.

22       THE COURT:  All right.  You may proceed.

23       MS. GINSBERG:  Your Honor, the parties have reached

24   -- actually two stipulations with respect to the defendant's

25   exhibits.  May I have permission to read the first one?

─────United States v. Elsheikh─────

160

1           THE COURT:  Yes, you may read them.  I usually do

2    it, but in this case I haven't so you may do so.

3           MS. GINSBERG:  And just to forecast briefly, there

4    are a series of five clips and I'm going to read a stipulation

5    with respect to each of the clips and then ask that the clip

6    be shown.

7           THE COURT:  All right.  Permitted to do so.

8           MS. GINSBERG:  Stipulation, which is Defendant's

9    Exhibit 72 states:

10           The parties stipulate and agree that Mr. El Shafee

11   Elsheikh participated in an interview with Nick Paton Walsh of

12   CNN in June of 2019.  Defendant's Exhibit 9 is a true and

13   accurate copy of a portion of that interview.

14           May I have Exhibit 9, please.

15           (Video played.)

16           MS. GINSBERG:  Your Honor, I think it may be a

17   little difficult to understand.  We have copies of

18   transcripts.  May I ask the court security officer to pass

19   those out.

20           THE COURT:  All right.  You may do so.

21           You won't have these transcripts in the jury room.

22   They are merely provided to you to help you follow the

23   statements as they're made.  But we don't need to hear this

24   one over again, do we?

25           MS. GINSBERG:  May I ask the jury if they were able

─────United States v. Elsheikh─────

161

1    to --

2              THE COURT:  No, you may not ask the jury anything.

3              MS. GINSBERG:  Then we don't need to hear it over

4    again.

5              THE COURT:  All right.  Thank you.

6              MS. GINSBERG:  I'm going to continue with the

7    stipulation, Your Honor.

8              THE COURT:  Go right ahead.

9              MS. GINSBERG:  Mr. El Shafee Elsheikh participated

10   in an interview with Sean Langan in July of 2019; portions of

11   which have already been admitted into evidence during the

12   government's case in chief.  Defendant's Exhibits 2, 3, and 5

13   are true and accurate copies of portions of that interview.

14             May we publish Defendant's Exhibit 2, Your Honor?

15             THE COURT:  You may.

16             (Video played.)

17             MS. GINSBERG:  May we publish, Your Honor, Exhibit

18   3?

19             THE COURT:  Yes, you may.

20             (Video played.)

21             THE COURT:  Ms. Ginsberg, that was just a statement

22   by some TV person, news person.

23             MS. GINSBERG:  Your Honor, it was the context for

24   Mr. Elsheikh's proceedings.

25             THE COURT:  All right.  I see.  I recall that now.

Direct Examination of Various Diagrams 162

─────United States v. Elsheikh─────

162

 1    All right.

 2              MS. GINSBERG:  Thank you.  May we publish Exhibit 5?

 3              THE COURT:  But you all agreed to that, as I recall?

 4              MR. GIBBS:  Correct, Judge.

 5              THE COURT:  Next.  Is this the last one?

 6              MS. GINSBERG:  The second to last one, Your Honor.

 7    Can we have Exhibit 5.

 8              THE COURT:  All right.  Go ahead.

 9              (Video played.)

10              MS. GINSBERG:  Your Honor, we have one more clip

11    that is the subject of the second stipulation, which is --

12    Defendant's Exhibit 73.

13              THE COURT:  All right.  You may play it.

14              MS. GINSBERG:  And may I read the stipulation first?

15              THE COURT:  Yes, you may.

16              MS. GINSBERG:  The parties stipulate and agree that

17    the reporter, Sean Langan, is unavailable to testify at trial.

18    Mr. Langan's testimony was previously recorded in this court.

19    Defendant's Exhibit 11 is a true and accurate copy of a

20    portion of that testimony.

21              THE COURT:  All right.  You may play it.

22              MS. GINSBERG:  Thank you, Your Honor.

23              (Video played.)

24              MS. GINSBERG:  Thank you, Your Honor.  That will be

25    the last clip.

─────United States v. Elsheikh─────

1       THE COURT:  And you were also going to inform the

2    Court and the jury whether or not your client wishes to

3    testify.

4       MS. GINSBERG:  Your Honor, we do not.  Other than

5    offering Defense Exhibits 2, 3, 5, 9, 11, 72, and 73.

6       THE COURT:  Which we've heard.

7       MS. GINSBERG:  Which we've heard.  I'm offering

8    them -- their admission.  And, Your Honor, I may have

9    misunderstood Your Honor's earlier ruling about the

10    transcripts, but I think we can address that.

11       THE COURT:  No, they are not going back to the jury

12    room.  We're going collect them now.  Just -- it's exactly

13    what I allowed the government.  I allowed the government to

14    use a transcript book.  They are not going back to the jury

15    room.

16       MS. GINSBERG:  Your Honor, I think the government's

17    transcripts have been admitted and the government did expect

18    them to go back to the jury room.

19       THE COURT:  Well, were they played?

20       MR. GIBBS:  Yes, Judge.  When the clips were played,

21    the transcripts played on the screen with them and for each

22    clip there will be a corresponding, same number with an A --

23       THE COURT:  The difference is in your case, the

24    transcripts were already on the videos.  And so, what

25    Ms. Ginsberg is saying that the books that she had aren't part

—Redirect Examination of MD Elsheikh   10/05/22—

┌─ United States v. Elsheikh ─

164

1   of the clips that she's shown.  So in order to do the same

2   thing, the books would have to be sent back as well.  Is that

3   correct?

4              MR. GIBBS:  Well --

5              THE COURT:  Ms. Ginsberg.

6              MS. GINSBERG:  Yes.  And, Your Honor -- I don't want

7   to speak for --

8              THE COURT:  Enough.

9              MS. GINSBERG:  Yes.

10             THE COURT:  Pick up your earphones.  There's one

11   thing I do want to cover with you.

12             (Side bar.)

13             THE COURT:  Can you hear me?  Can you hear me,

14   Mr. Gibbs?

15             MR. GIBBS:  Yes, Judge.

16             THE COURT:  Mr. Gibbs, can you hear me?

17             MR. GIBBS:  Yes, Your Honor.

18             THE COURT:  Ms. Ginsberg, can you hear me?

19             MS. GINSBERG:  Yes, Your Honor.

20             THE COURT:  Who the devil is Mr. Langan again?

21             MS. GINSBERG:  He is one --

22             THE COURT:  I know who he is.  Is there anything in

23   this record that indicates who he is?

24             MR. GIBBS:  Yes, Your Honor.  When Special Agent

25   Chiappone testified, he explained that, I believe, Sean Langan

─────────United States v. Elsheikh─────────

165

1   again also in the stipulation that the defense just offered,

2   it indicates he was, you know, an interviewer who interviewed

3   the defendant in July of 2019.

4            THE COURT:  All right.  Is it clear from that

5   stipulation that he is not a member of either the government

6   or the defense?

7            MS. GINSBERG:  Your Honor, I believe it is.  And

8   he -- the government introduced, I believe, 19 clips from

9   interviews -- an interview -- the interview with Mr. Langan.

10           THE COURT:  What's that got to do with identifying

11   who Mr. Langan is?

12           MS. GINSBERG:  I believe he was identified as

13   being an independent reporter.

14           THE COURT:  All right.  You agree with that,

15   Mr. Gibbs?

16           MR. GIBBS:  I do, Your Honor.  And Special Agent

17   Chiappone testified to that.

18           THE COURT:  All right.  That's enough.

19           (Open court.)

20           THE COURT:  Thank you.  All right.

21           MS. GINSBERG:  Your Honor, we have no additional

22   evidence at this time.  We would rest.

23           THE COURT:  All right.  Does the government have any

24   rebuttal testimony?

25           MR. GIBBS:  Very briefly, Judge.  We have one

Direct Examination of Hamza Chaudhry 10/20/22

─────United States v. Elsheikh─────

166

1  additional clip from the interview of defendant, Sean Langan.

2  It's Government's Exhibit 28-11.  We would ask to move it in

3  and publish it at this time.

4          THE COURT:  How long is it?

5          MR. GIBBS:  30 seconds.

6          THE COURT:  All right.  You may do so.  I take it

7  there is no -- oh, it is down here at the bottom here as well.

8          MR. GIBBS:  Correct, Judge.  It is a transcript that

9  scrolls along with the audio.

10         THE COURT:  All right.  Go ahead.

11 (Government's Exhibit No. 28-11, was received into evidence.)

12         (Video played.)

13         MR. GIBBS:  Your Honor, that concludes the

14 government's evidence.  At this time we rest yet again.

15         THE COURT:  Now, ladies and gentlemen, that

16 concludes the evidence in this trial.  What remains are

17 closing arguments and the Court's final instructions.  But we

18 won't do that until tomorrow morning.  But I am confident that

19 we can do both tomorrow and then by the time of let's say 1 or

20 2 o'clock, I hope that the matter will be committed to you all

21 for your considerations and deliberation some time early

22 afternoon is my best estimate.  So you have another early

23 release.  I hope your lunches, by the way, are satisfactory

24 and continue to be all right.  I don't know where they are

25 coming from, now.

─────── United States v. Elsheikh ───────

167

1            (A pause in the proceedings.)

2            THE COURT:  Well, you have some good choices, and

3   that's fine.  Myself I choose usually Panera.  And I'm going

4   to start tomorrow on one of the salads.  All right.  Thank you

5   for your careful and close attention to the evidence as it was

6   presented today.  Remember, you're to refrain from discussing

7   the matter among yourselves or with anyone or undertaking any

8   investigation on your own.  I'll see you tomorrow morning at 9

9   o'clock.  We will begin tomorrow morning with closing

10  arguments.  They will be somewhat lengthy because of the

11  amount of evidence that's been presented.  They will -- the

12  government will have both an opening argument, and since the

13  government has the burden of proof, it will have an

14  opportunity for rebuttal, and I would expect that the

15  arguments will be roughly an hour in length or thereabouts.

16  And following that, I will give you instructions on the law

17  and permit you to retire to deliberate on your verdict.

18            Thank you.  You're excused now to go home before the

19  traffic.  Although I find, frankly, that the traffic by 3

20  o'clock is already there.  The only way to beat the traffic is

21  to leave about 9:00 in the morning.

22            (Jury dismissed.)

23            THE COURT:  All right.  You may be seated.  Now, the

24  parties have submitted instructions and objections, but I also

25  understand that you all have conferred, as is appropriate, and

─United States v. Elsheikh─

168

1    I appreciate that, that you have conferred and that there are

2    agreements such that the instruction disputes are now sharply

3    focused and narrowed.  So what I would like to do is to hear

4    from you what agreements you've reached and what disputes

5    remain and then I will recess, put together a package of

6    instructions, have those submitted to you this afternoon, and

7    then we will have an instructions conference so at the end of

8    that, and it will happen all today, it will be clear to you

9    what instructions I have -- I will give, and so that you will

10   have that in order to assist you in preparing your closing

11   arguments.

12            All right.  Now --

13            MS. GINSBERG:  Judge, before you start, if I may,

14   Mr. Deubler is going to address the instructions for the

15   defense, but today is Mr. Ellis's young son's birthday and

16   we'd like to ask if he could be excused from the instruction

17   conferences.

18            THE COURT:  Of course.  I'll excuse him.  How old is

19   he?

20            MR. ELLIS:  He's 8 years old, Your Honor.

21            THE COURT:  Hell, you have to be there for that.

22            MS. GINSBERG:  Thank you, Your Honor.

23            THE COURT:  Of course.  You may be excused.  Don't

24   miss that.

25            Anything else?  All right.  Now,

─────United States v. Elsheikh─────

169

1    Mr. Grano-Mickelson, is that right?

2                MR. GRANO-MICKELSON:  Yes, Your Honor.

3                THE COURT:  What is the party -- what are the

4    party's agreements with respect to the instructions, the

5    exhibits that have been filed and the objections that have

6    been filed?

7                MR. GRANO-MICKELSON:  Yes, Your Honor.  We have

8    reached resolution as to all but three instructions.

9    Mr. Deubler and I have compiled a combined list of proposed

10   instructions and we have indicated the three on which there

11   still remain an outstanding dispute.  If the Court would like,

12   I can hand that up.

13               THE COURT:  Yes, please give that to the court

14   security officer and let me look at it for a moment.

15               I see attached you've attached -- you know, I have

16   standard opening and closing instructions.  I assume you've

17   looked at those and incorporated them.

18               MR. GRANO-MICKELSON:  Yes, Your Honor.

19               THE COURT:  This is very helpful.  So I compliment

20   you and Mr. Deubler for having done that, and I'm going to

21   recess so that I can examine it carefully and put together a

22   final package and submit it to you so that we can be clear

23   about what instructions I will give before you make your

24   closing arguments.

25               Thank you.  Court stands in recess.  It will take

─────United States v. Elsheikh─────

170

1   me -- let's recess until 4:15.  That means I can examine this

2   carefully and put together a group of instructions.

3            I will tell you that if you're going to use exhibits

4   in your argument, as you're entitled to do, any admitted

5   exhibits, it's not easy to ensure that we don't have

6   electronic glitches.  But I hope you will take steps to do

7   that.  If there is a problem, we also have a court expert who

8   can help the powers that be, we might want to have Lance up

9   here tomorrow morning, Tanya.

10           THE DEPUTY CLERK:  Yes, Judge.

11           THE COURT:  Court stands in recess until 4:15.  If

12  it's going to be any more than that, and I don't think so, I

13  will have the court security officer tell you.  Thank you.

14  Court stands in recess.

15           (Recess.)

16           (Court proceedings resumed at 5:06 p.m.)

17           THE COURT:  I thank you once again for meeting -- be

18  seated, please.

19           -- for meeting and attempting to narrow your areas

20  of dispute and that's helpful, but not entirely.  But it was

21  helpful.  I typically do things in terms of a three-part

22  package.  Opening, substantive, and closing.  And we're going

23  to do it that way now.  I've given you three packages.  And

24  I've asked you to number the pages since we didn't get around

25  to numbering them.  So that will be how we will do it and I

171

1   have focused on the objections that you all focused my

2   attention on.

3           All right.  The first thing I just want to get rid

4   of.  Included in your package was credibility of witnesses,

5   inconsistent statements.  I don't remember any inconsistent

6   statements.

7           MR. DEUBLER:  That's correct, Your Honor.  We

8   withdraw that one.

9           THE COURT:  All right.  Thank you.  Let's go on now.

10  The opening instructions are 1 through 29 and paragraph 29 has

11  one of the objections you all raised on voluntariness, but

12  let's go with page by page.  If we get to 29, that's when

13  we'll do it.  Is there anything before 29?

14          MR. DEUBLER:  Not from the defendant.

15          MR. GRANO-MICKELSON:  Yes, Your Honor.  This is one.

16  The Court's model instruction on cooperating witness for first

17  and mandatory minimum sentences.

18          THE COURT:  What page are we on?

19          MR. GRANO-MICKELSON:  It is page -- the second page

20  15 in the packet.

21          THE COURT:  Second -- there's only one page 15.

22          MR. GRANO-MICKELSON:  There is -- I think the Court

23  inserted our jury instruction 12 and 14.  25 in the packet.

24          THE COURT:  22.  I told you to number the pages or I

25  asked you to number the pages because there were a lot of

─────United States v. Elsheikh─────

172

1    different numbers in there.  And 22, I'm informed, is the

2    instruction, I think, you're referring to.

3              MR. GRANO-MICKELSON:  I believe credibility,

4    cooperating witness, Your Honor.

5              THE COURT:  That's right.  That should be 22.  Did

6    you go through and number them?

7              MR. GRANO-MICKELSON:  I did not, Your Honor.

8              THE COURT:  Okay.  Big omission.

9              MR. DEUBLER:  Neither did I, Your Honor.

10             THE COURT:  The whole purpose of that was that so we

11   would both be referring to the same page number.  All right.

12   So what is it -- yes, I see what you're saying.  Just a

13   moment.

14             (A pause in the proceedings.)

15             THE COURT:  What was it that he testified to?

16             MR. GRANO-MICKELSON:  He testified that he is facing

17   a guideline sentence of 240 months that has not yet been

18   sentenced.

19             THE COURT:  Why don't we just say, We'll recommend

20   the less severe sentence, which could be less than the 240

21   months sentence which he expects.  The whole purpose of this

22   is -- and this comes up so frequently in these trials, a

23   cooperating witness has a certain expectation.  That's what

24   you focus on, either the government or the defense, when you

25   are considering how much effect on the defendant is the

─────United States v. Elsheikh─────

173

1   cooperation.  If he -- if he's been told the most he could get

2   is five years and the statute permits 30 years, then it isn't

3   accurate to say that his cooperation is really measured by

4   that.  So why don't we change it, Mr. Deubler, to:  It could

5   be less severe -- a less severe sentence which should be less

6   than the 240 months with which he -- or which he expects or

7   which he's been told -- or the guidelines or something like

8   that.  240 months, which is the guideline maximum for his

9   offense.

10          MR. GRANO-MICKELSON:  Your Honor, I don't believe

11  the jury heard testimony about the guidelines.  I think we

12  just said a recommended sentence during testimony.

13          THE COURT:  All right.  What about the less than the

14  240 months recommended sentence for the crimes with which he's

15  charged.

16          MR. GRANO-MICKELSON:  That's fine with us, Your

17  Honor.  The second paragraph also refers to a substantial

18  assistance motion to depart beneath the mandatory minimum.

19          THE COURT:  You can excise that.  Let me be sure

20  that we're dealing with exactly the same language.  I'm going

21  to write in what I said and then I'm going to read it to you

22  so we're on the same page.

23          MR. GRANO-MICKELSON:  Yes, sir.

24          THE COURT:  Literally.

25          (A pause in the proceedings.)

─────United States v. Elsheikh─────

174

1          THE COURT:  This is what I think is agreeable to

2   both sides.  Let me read it:  We'll recommend a less severe

3   sentence which could be less than the 240 months recommended

4   sentence for the crimes with which he is charged.

5          Oh, we didn't change it in the next paragraph.

6          (A pause in the proceedings.)

7          MR. GRANO-MICKELSON:  Your Honor.

8          THE COURT:  Yes.

9          MR. GRANO-MICKELSON:  We would just note that the

10  witness was only charged with one crime.  So "the crime with

11  which he is charged" and he was actually convicted.

12         THE COURT:  Crime.  Let's change it to singular.

13         MR. GRANO-MICKELSON:  And he was convicted.  The

14  charges are not pending, he's just awaiting sentence.

15         THE COURT:  All right.  So we'll say "convicted."

16  Is that all right with you, Mr. Deubler?

17         MR. DEUBLER:  Yes, sir.

18         THE COURT:  It now reads -- the second sentence

19  reads that:  To reduce the sentence below the 240 month

20  sentence recommended, period.  And the first one says:  240

21  months recommended sentence for the crime for which he has

22  been convicted or the crime of which he has been convicted.

23         MR. DEUBLER:  "Of which" is fine.

24         THE COURT:  I beg your pardon?

25         MR. DEUBLER:  "Of which" is fine.

─── United States v. Elsheikh ───

175

1          THE COURT:  All right.  All right.  Anything else on

2    pages 1 through 28, 29?  I want to address --

3          MR. GRANO-MICKELSON:  Not from the government, Your

4    Honor.

5          MR. DEUBLER:  Not from the defendant, Your Honor.

6          THE COURT:  Let's go to 29 because that is an area

7    of dispute.  Now, let me tell you what my current view is and

8    you can address it and see if you can change my mind.

9          The reason, I don't think, the sentence that says,

10   "of what we call" I got rid of "what we call," I don't think

11   that makes any sense to the jury.  I just said:  Consider the

12   totality of the circumstances.

13         Then the next paragraph or two sentences that says:

14   You can consider whether it was induced by any promise or

15   threat and you can consider any other factor which your common

16   sense tells you is relevant.

17         I don't mind that last sentence, but to focus on a

18   promise or threat is to focus on the defendant's argument.  I

19   would prefer, frankly, just to leave it:  You may consider the

20   totality of the circumstances.  And you all can argue threats

21   or anything else.

22         But I looked at a previous instruction I've given

23   recently and this is what I -- something similar to this is

24   what I gave:  In determining whether any statement,

25   confession, admission or act or omission alleged to have been

─────United States v. Elsheikh─────

176

1   made by a defendant outside of court and after a crime has

2   been committed -- after a crime has been committed was

3   knowingly and voluntarily made or done, the jury should

4   consider the age, training, education, occupation, and

5   physical and mental condition of the defendant and his

6   treatment while making the statements as shown by the evidence

7   in the case.

8          I'm certainly not whetted to giving all of that, but

9   what I have determined not to do is to give an instruction

10   that says, jury, by the way, consider this factor which the

11   defendant is going to argue.

12          So, given what I have said to you, what's the

13   government's view, and then I'll ask what the defendant's view

14   is.

15          MR. GRANO-MICKELSON:  Your Honor, our preference

16   would be just to end after the totality of the circumstances

17   as we indicated, but the Court's additional paragraph we think

18   is even handed.

19          THE COURT:  All right.  What about for the

20   defendant?

21          MR. DEUBLER:  The defendant agrees with your

22   additional paragraph and we would ask that that be included.

23          THE COURT:  All right.  I'll do that.

24          MR. DEUBLER:  Thank you, Your Honor.

25          THE COURT:  It lengthens it, it's unnecessary, but

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

1    that's better than what was there.

2            That takes care of the preliminary instructions.

3            Now, we go to the substantive instructions, which

4    for those of us who renumbered the pages, as I suggested you

5    do, that starts on page 8 -- 30 rather, 30.  And I can focus

6    your attention to the argument that you had on various

7    conspiracies.  Yes.  Page 34.

8            (A pause in the proceedings.)

9            THE COURT:  Any problem with page 30 and 31?

10           MR. DEUBLER:  Not from the defendant, Your Honor.

11           MR. GRANO-MICKELSON:  That's the government's

12   proposal.  We're fine with that, Your Honor.

13           THE COURT:  All right.  Let's go to 34, because I

14   think that is your disagreement.

15           MR. GRANO-MICKELSON:  Yes, Your Honor.

16           THE COURT:  And I'm not entirely happy with what

17   I've written in here.  But let's talk about it.

18           This is a multiple versus single conspiracy as a

19   frequently given instruction in a drug case.  It doesn't

20   really fit in this case.  The fact of the matter is that a

21   number of counts in this indictment charged conspiracies.

22   They may be the same conspiracy, they may be different.  As I

23   see it, they're all the same conspiracy, but the jury may not

24   see it that way.  And as Mr. Deubler may argue, there may be

25   conspiracies completely different from anything alleged in the

─────United States v. Elsheikh─────

178

1    indictment, which the jury could find.

2         So I tried to craft something that says that:  The

3    government has charged a particular conspiracy -- that should

4    be:  Has charged particular conspiracies in counts 1, 6, 7,

5    and 8.  And the government has to prove that the defendant was

6    a member of -- I didn't like this, "each of the conspiracies,"

7    because I want to be clear that what I've said down here, "The

8    jury may or may not find that the conspiracies charged in 1,

9    6, 7 and 8 are the same."  Because they may.

10        They could also find, Mr. Deubler would argue, that

11   they were members of the conspiracies not charged in the

12   indictment.  I think that's stretching things.  But it's

13   conceivable.  Barely plausible.  I mean there's a conspiracy.

14   We know that that's charged.

15        So I'm happy to hear your suggestions as to how we

16   can change.  This instruction is not right because it suggests

17   that the government has charged a particular conspiracy.

18   Well, it's charged conspiracies.  They may be the same, they

19   may be different, but it has charged particular conspiracies

20   for those counts.  It could find that he's a member of all

21   those conspiracies, it could find that those conspiracies are

22   all the same, or it could find that there are other

23   conspiracies that have been shown that he's not a member of.

24        Those are the possibilities.  Now, for the

25   government, what do you think?

─────United States v. Elsheikh─────

179

1        MR. GRANO-MICKELSON:  Your Honor, we think the

2   defense's concerns are addressed by a combination of other

3   instructions.  The Court has a -- the defendant is not on

4   trial for any act or conduct not charged in the indictment, as

5   well as an instruction to consider each count separately.  As

6   I understand the defense's concern, it's that the defendant

7   will be found guilty of one of the charged conspiracies and

8   that will spill over into the other conspiracies.

9        THE COURT:  Well, it might if they find that the

10   conspiracies are all the same.

11        MR. GRANO-MICKELSON:  Correct, Your Honor, but the

12   way the instruction is currently worded suggests that the

13   government has to win on all of the conspiracies in order to

14   win on one.

15        THE COURT:  If there are different conspiracies, it

16   does have to do that.

17        MR. GRANO-MICKELSON:  Your Honor, I think that the

18   jury should be instructed that they have to consider the

19   elements of each charge separately, and, therefore, finding

20   guilty as the Court's instructions do.  A finding of guilty on

21   one conspiracy does not mean automatically a finding of guilty

22   on another charge of conspiracy.  But the problem with the

23   current multiple versus a single conspiracy instruction is

24   that it suggests that the government has to sweep the table,

25   essentially, on conspiracy counts or all of them are a not

1   guilty verdict.

2         So I think it has more potential to confuse the jury

3   as to what they should do when considering the multiple

4   conspiracies that are charged, particularly, when in this

5   case, we haven't seen evidence of an uncharged conspiracy.

6   The cases that I found in the Fourth Circuit that address this

7   issue dealt with situations where, for example, a defendant

8   was involved in a drug trafficking conspiracy, but was charged

9   with a conspiracy to commit murder.  And the concern was that

10  the jury would find him guilty because he had been involved in

11  the drug trafficking and not think about the fact that the

12  murder conspiracy was separate.

13        We don't have a separate conspiracy that the

14  defendant was involved in that threatens spillover prejudice

15  like that.  It's also a concern when you have multiple

16  defendants charged with multiple interlocking conspiracies.

17  And again, we have a single defendant in this case.  I think

18  that the Court's instructions about not considering acts or

19  not considering crimes not charged in the indictment and

20  considering each count independently and separately, suffices

21  to address the defense's concern.

22        THE COURT:  All right.  Mr. Deubler.

23        MR. DEUBLER:  Very briefly, Your Honor.  Throughout

24  this entire, almost three weeks, we've been hearing about the

25  Western hostages:  James Foley, John Cantlie, and just I could

─────United States v. Elsheikh─────

181

1  go on.  What I do not want the jury walking away with is that

2  that is a single conspiracy or that they need to look --

3        THE COURT:  What is a single conspiracy?

4        MR. DEUBLER:  That they might disagree that he was

5  involved with the conspiracy to kidnap Kayla Mueller, for

6  example.  But if they think that she's lumped in by law with

7  all of the other hostages, they just might run the board and

8  say you're guilty of all the conspiracies.  We want them to

9  look at each one individually.

10       THE COURT:  What do you mean "each one"?

11       MR. DEUBLER:  Each one of the counts individually

12  and look at the conspiracy within that count, because the way

13  the trial evidence --

14       THE COURT:  Is there three or four counts that's

15  charged in the conspiracy?

16       MR. DEUBLER:  I believe it's four.

17       MR. GRANO-MICKELSON:  Four, Your Honor.

18       THE COURT:  All right.  Why isn't that taken care

19  of, as Mr. Grano-Mickelson says, by the instructions that are

20  here saying you have to -- what was it again?

21       MR. GRANO-MICKELSON:  It's to consider each count

22  separately.  Just because you find guilty on one count does

23  not control your decision --

24       THE COURT:  Why doesn't that take care of it?

25       MR. DEUBLER:  It might, Your Honor.  I put the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

182

1    instruction forward out of an abundance of caution.  Just the

2    way the trial evidence came out, we always talked about the

3    hostages more or less together.  And I think that's how we're

4    all conditioned in thinking of them, and I think that's how

5    the jury might think of them.  So the instruction was put out

6    just out of an abundance of caution.

7            THE COURT:  What are the other conspiracies that you

8    think are involved here?  It's the same conspiracy, isn't it?

9            MR. DEUBLER:  Well, there are other conspiracies,

10   but there's generally a material support conspiracy that they

11   could -- the jury could find if they credit what they heard on

12   Mr. Elsheikh's brother's phone that he was a fighter in ISIS

13   and that he was providing material to support, i.e., himself

14   to ISIS in the battlefield fight.

15           THE COURT:  That wouldn't work necessarily, because

16   don't you have to -- what's the nexus to the United States

17   there?  I guess it's the terrorist act.  All right, that's one

18   possibility.  Go on.

19           MR. DEUBLER:  There's another conspiracy.  Vaguely,

20   though the Yazidi women are never mentioned by name, the

21   indictment does allege that al-Baghdadi -- I will always

22   mispronounce that man's name -- enslaved people and committed

23   acts of rape against them.  So we're talking about the Yazidi

24   women there.  And if the jury somehow credits Mr. Elsheikh in

25   participating in that in some way, that's a separate

─────United States v. Elsheikh─────

183

1    conspiracy than the foreign hostage conspiracy.

2              THE COURT:  Are you familiar with the *United States*

3    against *Cannady*, 924 F.3d of 2019 Fourth Circuit decision?

4              MR. DEUBLER:  I am not, Your Honor.

5              THE COURT:  There I have some language from that

6    that says:  A multiple conspiracy instruction is not required

7    unless proof at trial demonstrates that appellants were

8    involved only in separate conspiracies unrelated to the

9    overall conspiracy charged in the indictment.

10             Why doesn't that --

11             MR. DEUBLER:  That appears, yes, that would be

12   controlling here, Your Honor.

13             THE COURT:  I think it is.  And I think that you

14   certainly can argue that there's some conspiracy that exists

15   that isn't one that's charged.  But I'm not going to give the

16   multiple versus single conspiracy instruction, because of the

17   *Cannady* case which is 924 F.3d 94 at page 101.  And I think

18   that there really isn't any substantial risk that there's a

19   spillover from a charged conspiracy to an uncharged or to a --

20   from an uncharged conspiracy to the charged conspiracies.

21             MR. DEUBLER:  Understood, Your Honor.

22             THE COURT:  All right.  That takes care of 34.

23             Now, there are other substantive instructions.

24   What's the next problem we have to deal with from there to

25   64 -- 65?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

184

1          MR. DEUBLER:  I don't believe either side has any

2     other problems with any of the other instructions, Your Honor.

3          MR. GRANO-MICKELSON:  That's correct, Your Honor.

4          THE COURT:  Wonderful.  Then we go to the closing

5     instructions.  I'll give you some good news, I found your

6     agreed jury verdict form to be a little complicated, but I'll

7     use it.  I would have suggested a simpler form, but yours has

8     the virtue that you've agreed to it.

9          Now, 66 through 77 -- I'm sorry, not 77.  66 through

10    72 are standard closing instructions.

11         MR. DEUBLER:  There's no issue from the defense,

12    Your Honor.

13         MR. GRANO-MICKELSON:  Nothing from the government,

14    Your Honor.

15         THE COURT:  All right.  And the exhibits that

16    Ms. Ginsberg offered, which were transcripts to help them

17    follow, which are exhibits.  I've admitted them.  I've also

18    admitted what the government had when they used the

19    transcripts as well.

20         MR. DEUBLER:  Yes, sir.

21         THE COURT:  And I want you to come to the clerk's

22    table tomorrow or not tonight --

23              (A pause in the proceedings.)

24         THE COURT:  As usual she's way ahead of me.  You all

25    have already gone through with Ms. Randall the exhibits and

United States v. Elsheikh

185

1  you're confident she's got the right exhibits.

2          The one thing I was going to tell you, and I

3  haven't, is there an index to these exhibits?  They're just by

4  numbers 14 -- so if they -- we don't need an index because

5  it's the numbers of the exhibit are what's been used during

6  the course of the trial.  So we don't need to bother with an

7  index.  If they haven't written down the numbers they're

8  interested in, they will wish they had if they want to.

9          Is there anything else we need to do this evening?

10          MR. GRANO-MICKELSON:  Not from the government, Your

11 Honor.

12          MR. DEUBLER:  Just to confirm 9 a.m.

13          THE COURT:  9 a.m., Mr. Deubler.  9 a.m.

14          MR. DEUBLER:  Thank you, Your Honor.

15          THE COURT:  What's the party's view on whether the

16 indictment should go back with the jury?

17          MR. GRANO-MICKELSON:  It's fine with us if Your

18 Honor would like to.

19          MR. DEUBLER:  The defense would ask that it not go

20 back to the jury.

21          THE COURT:  I think that's the better view,

22 Mr. Deubler, because there may be material.  I'm not going to

23 go back over it now.  Especially in the overt acts that are

24 maybe new or they haven't read before.  I think the fact that

25 I review each count of the indictment in detail and verbatim

─────────────────── United States v. Elsheikh ───────────────────

186

1   in the instructions is sufficient.  If we get a request from

2   the jury to see the indictment, we'll revisit this issue.  But

3   I think to begin with we will, as you've requested

4   Mr. Deubler, leave it out.

5           Anything else we need to discuss this evening?

6           MR. DEUBLER:  Your Honor, is there any way that the

7   parties could come in as early as 8:30 just to make sure their

8   computers work with the system?

9           THE COURT:  Yes, there is.  The courtroom will be

10  open at 8:30.

11          MR. DEUBLER:  Thank you, Your Honor.

12          THE COURT:  Anything else?

13          MR. GRANO-MICKELSON:  Not from the government, Your

14  Honor.

15          THE COURT:  All right.  All right.  Thank you for

16  your cooperation.

17          Court stands in recess until tomorrow at 9 o'clock.

18          MR. PAREKH:  Just a few questions.  I apologize.

19  Does Your Honor intend to do instructions after we conclude

20  our closing arguments?

21          THE COURT:  Oh, yes.

22          MR. PAREKH:  Okay.

23          THE COURT:  Yes, by all means.

24          MR. PAREKH:  We'll start with our closing and then

25  Your Honor will --

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438───────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Elsheikh─────

187

1        THE COURT:  Once you finish the closings, and I

2    think that I'm going to try to finish closings before the

3    first recess, but I may not.  I may have to take a recess

4    after the -- your opening and Ms. Ginsberg's response before I

5    hear a reply or rebuttal.  I don't know how long they can sit

6    there or how long I can sit here.  So I don't know, but I

7    certainly intend to complete all of the arguments before the

8    luncheon recess, and then do the instructions in one period or

9    one slot of time.  Probably just following lunch.

10        Anything else?

11        MR. DEUBLER:  No, sir.

12        MR. PAREKH:  No, Your Honor.

13        THE COURT:  Again, I thank counsel for your

14    cooperation.  And we'll stand in recess until 9 o'clock

15    tomorrow morning.

16        MR. PAREKH:  Thank you, Your Honor.

17

18        **(Proceedings adjourned at 5:34 p.m.)**

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3             I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus EL**

8    **SHAFEE ELSHEIKH**, Criminal Action No.: 1:20-cr-239, in said

9    court on the 12th day of April, 2022.

10            I further certify that the foregoing 188 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15            In witness whereof, I have hereto subscribed my

16   name, this October 24, 2022.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              188