1

                        UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
2                              Alexandria Division

3    UNITED STATES OF AMERICA,          :     Criminal Case
                                        :     No. 20-CR-00239-TSE
4                  Plaintiff            :
             v.                         :
5                                       :
     EL SHAFEE ELSHEIKH,                :     March 30, 2022
6                                       :     9:09 a.m.
                   Defendant            :
7    ...........................        :     .......................

8                      TRANSCRIPT OF TRIAL PROCEEDINGS
                                  VOLUME 2
9                   BEFORE THE HONORABLE T.S. ELLIS, III
                       UNITED STATES DISTRICT JUDGE
10                            and a jury

11   APPEARANCES:

12      FOR THE PLAINTIFF:         RAJ PAREKH
                                   JOHN T. GIBBS
13                                 DENNIS FITZPATRICK
                                   ALICIA H. COOK
14                                 U.S. ATTORNEY'S OFFICE
                                   2100 Jamieson Avenue
15                                 Alexandria, VA  22314
                                   703-299-3700
16
        FOR THE DEFENDANT:         NINA J. GINSBERG
17                                 ZACHARY ANDREW DEUBLER
                                   DiMURO GINSBERG PC
18                                 1101 King Street
                                   Suite 610
19                                 Alexandria, VA  22314
                                   703-684-4333
20
                                   EDWARD B. MacMAHON
21                                 LAW OFFICES OF
                                   EDWARD B. MacMAHON, JR.
22                                 PO Box 25
                                   107 East Washington Street
23                                 Middleburg, VA  20118
                                   540-687-6366
24
                                   (APPEARANCES CONTINUED ON
25                                 FOLLOWING PAGE.)

2

1      FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                                   CARMICHAEL ELLIS & BROCK
2                                  108 N. Alfred Street
                                   1st Floor
3                                  Alexandria, VA  22314
                                   703-684-7908
4

5      OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                   U.S. District Court, 9th Floor
6                                  401 Courthouse Square
                                   Alexandria, Virginia  22314
7                                  (240) 426-7767

8
                           ( Pages 1 - 223)
9

10
              COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **BRUCE HOFFMAN** | | | | |
| By Mr. Gibbs | 56 | -- | 133 | -- |
| By Mr. MacMahon | -- | 128 | -- | -- |
| **BARRY GOODMAN** | | | | |
| By Mr. Fitzpatrick | 134 | -- | -- | -- |
| By Ms. Ginsberg | -- | 143 | -- | -- |
| **DANIEL GODFREY** | | | | |
| By Mr. Fitzpatrick | 145 | -- | 159 | -- |
| By Ms. Ginsberg | -- | 156 | -- | -- |
| **WILLEM VAN-DER-REIJDEN** | | | | |
| By Mr. Parekh | 160 | -- | -- | -- |
| By Ms. Ginsberg | -- | 166 | -- | -- |
| **MATTHEW HUSHER** | | | | |
| By Mr. Parekh | 171 | -- | -- | -- |
| **JENS SERUP** | | | | |
| By Mr. Gibbs | 187 | -- | -- | -- |

# E X H I B I T S

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| Number 1-4 | 73 |
| Number 1-10 | 70 |
| Number 1-11 | 71 |
| Number 1-12 | 20 |
| Number 1-13 | 125 |
| Number 1-14 | 66 |
| Number 1-15 | 88 |
| Number 1-16 | 79 |
| Number 1-17 | 102 |
| Number 1-24 | 108 |
| Number 1-27A | 114 |
| Number 1-33 | 106 |
| Number 1-35 | 95 |
| Number 1-36 | 94 |
| Number 1-37 | 122 |

4

C O N T E N T S   C O N T I N U E D

**GOVERNMENT EXHIBITS**                                    **PAGE**

**Number 1-41A**                                          83
**Number 1-42**                                           123
**Number 1-43**                                           126
**Number 1-51**                                           102
**Number 1-54**                                           90
**Number 2-1**                                            92
**Number 11-1**                                           196
**Number 11-2**                                           198
**Number 11-3**                                           197
**Number 12-2  through  12-9**                            201
**Number 22-1**                                           138
**Number 22-2**                                           138
**Number 22-3**                                           138
**Number 22-4**                                           140
**Number 22-5**                                           151
**Number 22-7**                                           163
**Number 22-8**                                           154
**Number 22-9**                                           142
**Number 22-10**                                          142
**Number 22-11**                                          142
**Number 22-13**                                          155
**Number 23-4**                                           180
**Number 23-5**                                           180
**Number 23-6**                                           180
**Number 25-6**                                           177
**Number 25-7**                                           175
**Number 25-9  through  25-13**                           69
**Number 27-5**                                           115

**P R O C E E D I N G S**

1

2          THE COURT:  This is United States against

3  El Shafee Elsheikh, and it is 20-CR-239.  And the record will

4  reflect that at least some, if not all, of counsel for both

5  parties are present, and the defendant is present in the custody

6  of the marshals.  And we may still be missing one.  Now they're

7  all here.

8          Let me cover a couple of minor things.

9  Mr. Fitzpatrick, one of the names on your witness list is

10  Kaiser.  Is that right?

11          MR. FITZPATRICK:  Andrew Miller.

12          THE COURT:  Oh, Miller, Andrew Miller.

13          MR. FITZPATRICK:  Correct.

14          THE COURT:  And do you know where Andrew Miller, your

15  witness, lives?  It's not an uncommon name.

16          MR. FITZPATRICK:  He's an FBI agent, Your Honor.  He

17  lives in the western part of Virginia.  Not West Virginia.  But

18  western Virginia.

19          THE COURT:  Does he live in Vienna, Virginia?

20          MR. FITZPATRICK:  I do not believe so.

21          THE COURT:  Check.

22          MR. FITZPATRICK:  I will.

23          THE COURT:  Because a juror has advised the court

24  security officer that he may know an Andrew Miller who lives in

25  Vienna.

6

1          MR. FITZPATRICK:  Do you want me to check right now?

2          THE COURT:  Yes.

3          MR. FITZPATRICK:  We're very certain it's not Vienna,

4   Virginia.  I can't tell you that to a moral certainty, but I'm

5   very certain it's not Vienna, Virginia.

6          THE COURT:  Let me verify that by having the juror

7   brought in, please.

8          COURT SECURITY OFFICER:  Just one that juror, sir?

9          THE COURT:  Just that one juror.

10          (Juror enters courtroom.)

11          THE COURT:  Good morning, sir.  Would you just take a

12   seat right here for a moment.

13          JUROR:  Yes, sir.

14          THE COURT:  You have called to the attention of the

15   court security officer - very appropriately, by the way - that

16   you recognize the name of one of the witnesses, on reflection,

17   that I called out, Andrew Miller.  And I think you have

18   indicated that the Andrew Miller you know is on East Street in

19   Vienna.  Is that correct?

20          JUROR:  I'm pretty sure it's East Street.

21          THE COURT:  Do you know what occupation that person is

22   in?

23          JUROR:  I think he was a contractor.

24          THE COURT:  All right.  And what is your association or

25   affiliation or relationship with him?

```
 1              JUROR:  We're friends.  My daughter and his daughter
 2    went to the same preschool, and I've known him for 20 years.
 3    But I see him occasionally at a country club, and --
 4              THE COURT:  All right.  Is he or was he, to your
 5    knowledge, an FBI agent?
 6              JUROR:  No.  No, but he worked for the courts.  Because
 7    my neighbor, he's a judge, and he was in the
 8    Clinton Administration -- I mean, Obama Administration, and I
 9    know that they worked in the same office.  The Andrew Miller I
10    knew was in computer systems, nothing to do with the law.
11              THE COURT:  Different person.
12              MR. FITZPATRICK:  Different person, Your Honor.
13              JUROR:  I think so, yeah.  Okay.  Thank you, sir.
14              THE COURT:  You may return.
15              (Juror exits the courtroom.)
16              THE COURT:  Now, one other matter.  Yesterday I had a
17    request for earphones for the phalanx of lawyers that we have
18    here on both sides.  I declined that because we don't have all
19    of that.  We have rustled up enough earphones now.  You may all
20    have earphones on both sides.
21              MR. FITZPATRICK:  Thank you.
22              THE COURT:  But only one lawyer can speak, so don't hit
23    that button on yours.  When you object either to a question or
24    you seek to have something stricken, only say "objection," with
25    one word, like relevance, competency, whatever, a single word or
```

1    phrase.  If I need to hear argument from you, we will go to the

2    earphones and we'll do it in that fashion.

3         I do that because it's not appropriate for the jury to

4    hear arguments of lawyers.  That, of course, happens the other

5    way in most trials.  In many state courts, you hear the closing

6    argument of a lawyer every time she or he stands up to make an

7    objection to evidence.  We don't do that here.  It's

8    inappropriate and it's not evidence for the jury to consider.

9         So if you wish to make an objection, you may do so.

10   Stand, state what the objection is in a word or a phrase, and if

11   I need argument, which I may or may not, I will ask you to

12   resort to the earphones and I'll hear you in that fashion.

13        Now, I also had a request, I believe, from the

14   government.  You had a paralegal you wanted to sit in the first

15   row.

16        MR. FITZPATRICK:  That's correct, Your Honor.  She's

17   assisting Ms. Lopez throughout the trial.

18        THE COURT:  All right.  But that's only for

19   intermittently, not --

20        MR. FITZPATRICK:  Correct, Your Honor.

21        THE COURT:  All right.  I want the first row otherwise

22   cleared.  The only reason I make this exception is the purpose

23   of that is security, and a member of the U.S. Attorney's Office

24   does not present a concern about security.

25        MR. FITZPATRICK:  Thank you, Your Honor.

```
1              THE COURT:  All right.  All jurors are now here?

2              COURT SECURITY OFFICER:  Yes, sir.

3              THE COURT:  All right.  Mr. Gibbs, you're ready to make

4     your opening statement?

5              MR. GIBBS:  I am, Judge.  We've got a couple of

6     additional housekeeping matters very briefly, and then I will

7     proceed with opening.

8              THE COURT:  And you're going to tell me that you have

9     worked hard to reduce the amount of time for your opening

10    statement?

11             MR. GIBBS:  Judge, I have tried hard.  I think it's

12    still -- it's not going to be an hour, but it will probably be

13    at least 45 minutes.

14             THE COURT:  Well, that's appropriate, in the

15    circumstances.

16             And, Mr. MacMahon, you're still at your original

17    estimate, and you too will pare it down if you can.

18             MR. MACMAHON:  Yes, Your Honor.

19             THE COURT:  Thank you.  Yes, Mr. Fitzpatrick.

20             MR. FITZPATRICK:  Thank you for indulging me.  I just

21    wanted to raise as a housekeeping matter.  On our last pretrial

22    conference, the issue of summary charts came up, and I want to

23    bring a point of clarification on that.  The government may be

24    seeking to formally admit some of the summary charts to aid the

25    jury in their final deliberations, and I wanted to alert the
```

10

1    Court to our jury instruction Number 17 that we filed in

2    December which addresses that.  And the defense filed a counter

3    summary chart jury instruction at their 24; we filed an

4    opposition to theirs.

5         The point is, I don't think the parties had any

6    disagreement on the admissibility of summary charts, just the

7    legal support for it.

8         Our instruction 17, Your Honor -- or excuse me.  Our

9    instruction is 24, and -- I stand corrected.  Our instruction is

10   17.  And the legal support, Your Honor, is *United States vs.*

11   *Simmons*, a 2021 case.  I direct the Court and the Court's clerks

12   to page 262 of that opinion, 11 F.4th 239 at 262, specifically

13   footnote 12.  It cites from *Johnson*, which says:  "Johnson

14   governs the question.  Summary charts may be admitted into

15   evidence under Rule 611(a)."  Standard fare within the Fourth

16   Circuit.

17        We don't need to resolve the issue today, Your Honor.

18   I just wanted to bring it to the Court's attention that we may

19   be wishing to admit some of the charts as summary aids for the

20   jury's deliberation.

21        THE COURT:  Anything else by way of housekeeping?

22        MR. FITZPATRICK:  Your Honor, Mr. Parekh has one issue.

23        THE COURT:  All right.

24        MR. PAREKH:  Good morning, Your Honor.  I just wanted

25   to let the Court know that we have prepared two discs for SDF

1    Witness 2 and 3.  These are two of the SDF officials that

2    testified via video at the November 2021 suppression hearing,

3    Syrian Democratic Forces officials.

4         Your Honor issued an order on March 18, 2022, that both

5    myself and Ms. Ginsberg signed, the government and the defense

6    agreeing that certain portions of their testimony would be

7    admissible at trial should the government or the parties elect

8    to play that testimony for the jury.  And so I have copies of

9    both videos and the transcripts.  They won't be admitted into

10   evidence, Your Honor.

11        As Your Honor knows, we're treating these as if they

12   were live testimony.  But in the event Your Honor or your

13   chamber staff wanted to review them, we have prepared them in

14   compliance with your March 18th order.

15        THE COURT:  It doesn't matter what my chamber staff

16   wants.  All that matters is what I want.

17        MR. PAREKH:  Absolutely, Your Honor.

18        THE COURT:  You need not refer to them.

19        MR. PAREKH:  Yes, Your Honor.

20        THE COURT:  Let me be clear.  SDF 2 and 3.  Right?

21        MR. PAREKH:  Correct.

22        THE COURT:  Well, they're down the ways from your

23   beginning.  We won't get to them until this afternoon, at the

24   earliest?

25        MR. PAREKH:  Probably not at least for a number of

1    days.  But in the event Your Honor wanted it in advance, we have

2    it.

3              THE COURT:  All right.  And let me be clear:  Are you

4    going to offer that in your case-in-chief as evidence; that is,

5    excerpts from the testimony?

6              MR. PAREKH:  It's probable, either case-in-chief, or,

7    if there's a rebuttal case, we may offer it then.  But --

8              THE COURT:  All right.  And the way you intend to offer

9    it is the usual way of reading the deposition transcript using

10   the dramatic device of putting someone in the witness box?

11             MR. PAREKH:  No, Your Honor.  We actually have prepared

12   excerpts of their testimony on video.  So we would play the

13   video for the jury and we would hand out the transcripts that

14   have been redacted in compliance with your order.

15             THE COURT:  All right.  And then the transcripts would

16   not be admitted; it would be the video that would be admitted?

17             MR. PAREKH:  Well, Your Honor, because we're treating

18   the testimony as live testimony, we don't intend to admit the

19   video.  As Your Honor knows, the SDF officials serve in a war

20   zone --

21             THE COURT:  All right.  That's fine.  That's fine.

22   That's why they're not here.

23             MR. PAREKH:  That's correct.

24             THE COURT:  Yes, I understood that.  All right.  So in

25   other words, what you intend to do with respect to SDF 2 and 3

1    is to play the video, and the jury will have a transcript to

2    follow when the video is played.  The transcript will be

3    collected from them when the video is through, and they will

4    have to rely on their own recollections of the videos because

5    the transcripts will not be admitted into evidence.

6            MR. PAREKH:  Entirely correct, Your Honor.

7            THE COURT:  All right.  Anything else you want to

8    raise?

9            MR. PAREKH:  Nothing else, Your Honor.

10           THE COURT:  All right.  Mr. MacMahon, did you have

11   anything you wanted to raise?

12           MR. MACMAHON:  No, Your Honor.  Thank you.

13           THE COURT:  Thank you.

14           All right.  Let's bring the jury in and we'll begin.

15           (Jury in at 9:22 a.m.)

16           THE COURT:  Good morning, ladies and gentlemen.  We

17   will begin today as we will begin every day, with the

18   deputy clerk calling the roll to ensure all of you are here.

19           Proceed, please.

20           COURTROOM CLERK:  Juror number 50, Laura Ann Younger.

21           JUROR:  Present.

22           COURTROOM CLERK:  Juror number 29, Wayne Phoel.

23           JUROR:  Present.

24           COURTROOM CLERK:  Juror number 3, James Bailes.

25           JUROR:  Present.

14

1        COURTROOM CLERK:  Juror number 20, Alfred Keyser.

2        JUROR:  Present.

3        COURTROOM CLERK:  Juror number 50, Esthar Zangeneh.

4        JUROR:  Present.

5        COURTROOM CLERK:  Juror number 22, John Kugelman.

6        JUROR:  Present.

7        COURTROOM CLERK:  Juror number 26, Jennifer Murray.

8        JUROR:  Present.

9        COURTROOM CLERK:  Juror number 24, Vicki Moffitt.

10        JUROR:  Present.

11        COURTROOM CLERK:  Juror number 14, Anne Fay.

12        JUROR:  Present.

13        COURTROOM CLERK:  Juror number 10, Erica Denham.

14        JUROR:  Present.

15        COURTROOM CLERK:  Juror number 30, Camille Morrison.

16        JUROR:  Present.

17        COURTROOM CLERK:  Juror number 47, Adrian White.

18        JUROR:  Present.

19        COURTROOM CLERK:  Juror number 14, Mirenda Fields.

20        JUROR:  Present.

21        COURTROOM CLERK:  Juror number 22, Gwendolin McCrea.

22        JUROR:  Present.

23        COURTROOM CLERK:  Juror number 17, Lewis Hoge.

24        JUROR:  Present.

25        COURTROOM CLERK:  Juror number 26, Eileen Liles.

15

1          JUROR:  Present.

2          COURTROOM CLERK:  Juror number 39, Ralph Stallings.

3          JUROR:  Present.

4          COURTROOM CLERK:  And juror number 7, Laura Buschman.

5          JUROR:  Present.

6          THE COURT:  Again, ladies and gentlemen, good morning.

7    Now, let me confirm that all of you were able to and successful

8    in following the Court's instructions to refrain from discussing

9    the matter among yourselves or with anyone, or undertaking any

10   investigation on your own.  Did anybody have any difficulty

11   doing that?

12         The record will reflect no hands are raised, so I think

13   that's clear that you were successful.  And I thank you for

14   that.

15         All right.  We'll proceed today.  We will begin with

16   opening statements by the parties.  The government and the

17   defendant will both have an opportunity to present opening

18   statements to you.  Opening statements are neither argument nor

19   evidence.  They are a forecast of the evidence that you will

20   hear, and it's provided to you to aid you in your following the

21   evidence as it is presented.

22         As I mentioned to you yesterday, you now have your

23   books.  Your books have your names on them.  Only you will see

24   what's in these books, no one else.  Neither the court security

25   officer nor I, nor indeed anybody, will look at your books but

1    you.  And you may take as many notes or as few notes as you

2    wish.  You may want to have in mind that there will be a

3    significant number of witnesses - I would say north of 30 and

4    south of 40, somewhere in there - that you will hear.  So you

5    may want to take notes in that regard.

6         All right.  We will proceed now.  Mr. Gibbs, are you

7    ready to make your opening statement?

8         MR. GIBBS:  I am, Your Honor.

9         THE COURT:  And the opening statement will be, as I

10   indicated, somewhere between 30 minutes and an hour.  I will

11   have the podium moved so that you can use it, Mr. Gibbs.  All

12   arguments or statements by the lawyers to the jury will be made

13   from the podium.  They won't -- as television indicates in many

14   other courts or cases or drama, they won't wander around and

15   raise their hands.

16        I actually saw a TV program years and years ago, before

17   I quit watching TV, where a lawyer went and very nearly sat on

18   the lap of a judge in making arguments.  We don't do that.  I

19   don't know what happens in many other courts, but not here.

20        All right.  Mr. Gibbs?

21        MR. GIBBS:  Thank you, Your Honor.

22        We come together today in the case of United States of

23   America versus El Shafee Elsheikh.  This is a case about the

24   captivity in Syria of four American citizens, James Foley,

25   Kayla Mueller, Steven Sotloff, and Peter Kassig.  It is a case

1   about their brutal mistreatment while in captivity, and it is a
2   case about their deaths while in captivity.
3          During this trial, you will hear horrific testimony
4   about their treatment and about the treatment of other western
5   hostages who were also held captive.  But let's begin with the
6   defendant.  Who is the defendant, El Shafee Elsheikh?
7          As you will hear during the course of this trial, the
8   defendant was born in the African country of Sudan in 1988.  At
9   a very young age he moved with his family to England, and for
10  most of his life, he lived in London.  It was there that he met
11  two people who will be of particular importance to him during
12  this trial, Mohammed Emwazi and Alexanda Kotey.
13         The evidence will show that the three of them worked
14  closely together in this hostage-taking conspiracy.  That
15  evidence will also show that the defendant and Emwazi and Kotey
16  had a common purpose in the detention and mistreatment of those
17  hostages.  The defendant would later describe Emwazi as "one of
18  the most loyal friends I've had, trustworthy, honest,
19  upstanding."
20         As for Kotey, he and the defendant had been friends for
21  years when they were arrested together on September 11, 2011, at
22  what will be described as an EDL protest.  EDL stands for the
23  English Defence League.  The defendant and Kotey were arrested
24  together at a place called the Tyburn Pub in London, when the
25  group that they were a part of, Muslims Against Crusaders, got

18

1    into a violent confrontation with the EDL.  Part of that dispute

2    arose because the defendant, Kotey, and others were protesting

3    against a memorial service honoring the British victims who died

4    during the 9/11 attacks.

5         But, ladies and gentlemen, we're not here today because

6    of the defendant's activity in London.  We are here today

7    because of his activities in Syria.  Beginning in 2011, an event

8    arose in Syria that came to be known as the Arab Spring.  It

9    swept through much of the Arab world.  One of the countries most

10   impacted was Syria.  And the Arab Spring led to a popular

11   uprising against the government of the Bashar al-Assad, the

12   president of Syria.  A number of groups rose up to fight against

13   the Assad regime, the Free Syrian Army, the Al-Nusra Front, and,

14   most significantly, the Islamic State, which is also known as

15   ISIS.

16        ISIS was designated by the United States government as

17   a Foreign Terrorist Organization, or FTO for short.  That

18   designation made it illegal for anyone to provide what is known

19   as material support to ISIS.  That can include things like

20   personnel and services.

21        Now, as these groups fought against the Assad regime, a

22   number of things happened.  First, people from outside of Syria

23   traveled there to take part in the fighting.  Second, as a

24   result of that fighting, a huge humanitarian crisis arose within

25   Syria with civilians caught in the middle.  And finally, as that

 1    humanitarian crisis got worse, people from outside of Syria

 2    traveled there to help, aid workers, medics, ambulance drivers.

 3    In addition, journalists from around the world traveled to Syria

 4    to document the atrocities going on there.

 5        The defendant was one of the people who traveled to

 6    Syria.  He went there not as an aid worker or a journalist, but

 7    as a fighter.  In April 2012 he purchased a roundtrip ticket

 8    from London to Sweden, but he never used that return ticket.

 9    Instead, he traveled from Sweden to Turkey, and then crossed the

10    border into Syria.  A few months later, Mohammed Emwazi and

11    Alexanda Kotey also traveled from England to Syria, where they

12    joined the defendant.

13        The defendant started out as a fighter with the

14    Al-Nusra Front when he first arrived in Syria, but he soon left

15    Al-Nusra and joined the Islamic State.  He, along with

16    Mohammed Emwazi and Alexanda Kotey, fought in military missions

17    for the Islamic State.  In fact, in July of 2014, the defendant

18    communicated with his younger brother back in London using an

19    application called Telegram.  He told his brother about a famous

20    ISIS military victory that had just occurred.  It led to the

21    fall of Raqqa, Syria.  He described a Syrian Army Unit called

22    Division 17 had been wiped out and their soldiers have been

23    beheaded.  The defendant sent his brother graphic photographs

24    showing decapitated heads mounted on poles.  The defendant also

25    sent his brother what you will hear referred to as the "Rambo

20

1    mode" photograph.  It depicted the defendant dressed in

2    military-style clothing.

3            The defendant, Mohammed Emwazi, and Alexanda Kotey also

4    did something else after joining ISIS.  And that is why we are

5    all here today.  The three of them played a central role in a

6    brutal hostage-taking scheme that resulted in the deaths of

7    American, British, and Japanese hostages, as well as individuals

8    from other countries.  They helped to detain those hostages,

9    they tortured and mistreated those hostages, and they negotiated

10   for the release of some of those hostages.

11           So let's talk about that hostage-taking scheme.  But

12   before I do that, I need to stress for you that the events I'm

13   about to describe are often incredibly violent and graphic.  In

14   fact, we do not intend to display the most graphic images in

15   this trial publicly.  However, that evidence will be made

16   available to you, the jury, to take back in the jury room during

17   your deliberations.

18           Now, the hostage-taking scheme.  On August 19, 2014,

19   ISIS publicly released a horrifying video showing the murder of

20   an American citizen.  It began with text on the screen in both

21   Arabic and English stating that:  Obama authorizes military

22   operations against the Islamic State, effectively placing

23   America upon a slippery slope towards a new war front towards

24   Muslims.

25           It then cut to the President speaking on camera about

1    two targeted military operations in Iraq, targeted air strikes

2    to protect U.S. personnel, and a humanitarian operation to

3    protect Iraqi citizens trapped on a mountain without food or

4    water and facing almost certain death.  The video displayed an

5    air strike beneath the words "American aggression against the

6    Islamic State."

7            A few moments later the caption, "A Message to

8    America," appeared on the screen, followed by an image of two

9    men in a desert.  One of the men was dressed all in black, his

10   face was covered.  The only thing visible through his mask were

11   his eyes.  Next to him, on his knees, was a young American man

12   wearing an orange jumpsuit with his hands behind his back.  That

13   American was James Foley, of New Hampshire.  He was a journalist

14   who had traveled to Syria in 2012 to report on the unfolding

15   humanitarian crisis there.  Journalism was still a relatively

16   new profession for James Foley, but he had chosen to travel to

17   one of the most dangerous places in the world to cover a civil

18   war and a violent insurgency.

19           He, along with a British journalist named John Cantlie,

20   had been captured in November 2012 and been held hostage ever

21   since.  Now, in that desert landscape in 2014, James Foley

22   stared into the camera and began to speak in scripted tones.  He

23   talked about the U.S. bombing campaign and said, "They signed my

24   death certificate with the attacks against the Islamic State."

25           Once James Foley had finished, the man dressed this

1    black began to speak.  His accent was British.  He held a large

2    knife in his left hand.  As he waved the knife, he condemned the

3    U.S. attack saying that the U.S. government had "found reasons

4    to interfere in our affairs."  He claimed that the

5    U.S. Air Force was attacking ISIS daily in Iraq.  He described

6    ISIS as an Islamic Army.  He said it was a state that has been

7    accepted by a large number of Muslims worldwide, and that any

8    aggression against the Islamic State is an aggression towards

9    Muslims from all walks of life.  He said ISIS was the Islamic

10   caliphate, and that any aggression against that caliphate would

11   result in the, quote, "bloodshed of your people."

12          With that, the man pulled James Foley's head back and

13   brought the knife up to his throat.  For a moment the screen

14   went dark, and then the camera panned across James Foley's

15   lifeless body.  His decapitated head rested on his back.  His

16   hands were still cuffed.

17          A moment later, the man dressed in black was back on

18   the screen.  He stood beside another man who was on his knees.

19   That man also wore an orange jumpsuit like the one James Foley

20   had just been murdered in.  His name was Steven Sotloff.  He was

21   from Florida.  He had been a journalist for longer than

22   James Foley, but, like James Foley, he had chosen to go to one

23   of the most dangerous places in the world to report on the

24   suffering going on there.  He had been kidnapped in August 2013.

25          The man grabbed the back of Steven Sotloff's jumpsuit

1    and said, "The life of this American citizen, Obama, depends on

2    your next decision."

3            The video went dark.

4            "A Message to America" was shocking in its brutality,

5    and it also spurred a tremendous effort to learn who the man was

6    who had beheaded James Foley and threatened the life of

7    Steven Sotloff.  And, in fact, at the time of that video, there

8    were things that were known about him.  Because James Foley and

9    Steven Sotloff were not alone in being held captive by ISIS.

10   Going back to 2012, many Western hostages had been captured in

11   Syria.  Over time, a number of them were held together in a

12   series of makeshift prisons.  By early 2014, when they were

13   moved to the ISIS stronghold of Raqqa, Syria, more than 20

14   Westerners were held together.  They were kept there alongside

15   James Foley, John Cantlie, Steven Sotloff and otherwise.

16           I want to take a moment to talk about this

17   hostage-taking scheme and about those makeshift prisons.

18           THE COURT:  I will point out, Mr. Gibbs, as I'm sure

19   you will remind everyone, that your opening statement is neither

20   evidence nor arguments.  You're really forecasting that this is

21   evidence you intend to present.  Is that correct?

22           MR. GIBBS:  That's absolutely correct, Judge.

23           THE COURT:  All right.  Proceed.

24           MR. GIBBS:  Now, ladies and gentlemen, what you see on

25   your screen is a chart that summarized some of that evidence

24

1   that we intend to present during this trial.  And what you see

2   on your screens is a map of Northern Syria.  Superimposed over

3   that map are the names or descriptions of some of the hostages

4   captured during the course of this conspiracy.  We also list the

5   approximate dates that the hostages were captured.  And finally,

6   it gives you the locations where they were captured.

7        So if you look at Box Number 1 in the upper left, the

8   first two hostages, James Foley and John Cantlie, the evidence

9   will show were captured in a place called Binnish, in

10  Western Syria, on November 22, 2012.  In fact, the defendant

11  would later say in a media interview that his role with the

12  Western hostages started at the very beginning, when there were

13  only two hostages, James Foley and John Cantlie.  And, in fact,

14  Federico Motka, who was captured along with a British citizen,

15  David Haines, in Atmeh, Syria, in March 2013, will testify that

16  very early on in his captivity, he endured brutal treatment at

17  the hands of three British men he would later come to know as

18  "The Beatles."

19       Now, if you go to Box Number 6 in the lower left, you

20  can see that Steven Sotloff, who I just spoke about, was

21  captured in Aleppo on August 4th, 2013.  On that same day,

22  another American, a young woman named Kayla Mueller, was also

23  captured there.  And finally, in October 2013, as you can see in

24  Box 9, in the lower right, a fourth American, Peter Kassig, was

25  captured out in Eastern Syria in a place called Al-Karamah.

```
 1              Ladies and gentlemen, over the course of this
 2     conspiracy, numerous other Western hostages were also captured.
 3     They were captured at different times, in different locations
 4     all across Syria.  And yet they would all come to share two
 5     particular things in common:  First, they all ended up being in
 6     prison together; and, second, they all experienced brutal
 7     mistreatment at the hands of those three British-speaking men
 8     that they would call The Beatles.
 9              So let's look at how those hostages all ended up being
10     held together.  Ladies and gentlemen, again, this summarizes the
11     evidence we expect to present during the course of this trial.
12     And, again, this is a demonstrative.  It's a chart that shows a
13     map of Northwest Syria with a number of locations plotted on it.
14              These are listed chronologically in the order that they
15     were used.  And it doesn't represent every prison that was used
16     to house a Western hostage, but it is largely focused on the
17     prisons where the hostages were housed together.  And, as they
18     came to be housed together, they gave these makeshift prisons
19     different names.
20              So, for example, early on in Box Number 1, you can see
21     that Foley, Cantlie, Motka, and Haines were held in a prison in
22     Idlib, Syria that they called "The Box."  Up until the summer of
23     2014, those four essentially stayed together, with the exception
24     of a month-long stay by Motka in a place he called "The
25     Warehouse."
```

1        However, if we go to Box Number 4 at the top, we see

2   that Foley, Cantlie, Motka, and Haines were moved to a prison in

3   Aleppo called "The Hospital."  That happened in July 2013.  At

4   The Hospital they joined a number of other Western hostages, and

5   from July until late December, that group of hostages was held

6   in two prisons in Aleppo, The Hospital and The Dungeon.  And you

7   will hear all of these names during the course of the trial.

8   Those are Boxes 4 and 5.  During that period, more hostages

9   joined them, and you can see their names on this chart.

10       Then, for roughly a month, from late December until

11  late January of 2014, the hostages were held in two prisons near

12  Idlib that they called "The Mansion" and "The Office," Boxes 6

13  and 7.  But in late January they were all moved again.  This

14  time they were moved much farther east, to the Islamic State

15  stronghold of Raqqa.  There they were held in two prisons,

16  "Riverside" and "The Desert Prison," Box 8 and Box 9.

17       You can see in Box 9 the names of all of the hostages

18  who were held together there beginning on February 20th, 2014.

19  At its height, there were a total of 26 Western hostages held

20  together at the desert prison.

21       Now, what was the fate of those Western hostages?

22  Beginning in February, some of the European hostages were

23  released.  They all gave very similar descriptions of their

24  captivity after they were released.  Specifically they said

25  while they had regular day-to-day prison guards, there were

1    three people involved in their captivity who were utterly

2    terrifying.  They all spoke with British accents.  They acted as

3    if they had known each other for a long time.  They often came

4    to the prison locations together, and they made the hostages

5    follow a very strict protocol.

6           When the three British men entered, the hostages had to

7    kneel down, face the wall, and not make eye contact with them,

8    even though the three British men always wore masks.  And they

9    had to put their hands up against the walls.  If a hostage

10   didn't follow the protocol, he would be beaten.  If a hostage

11   looked at one of the three men, he would be beaten.  In fact,

12   the hostages didn't have to do anything to be beaten.  The

13   physical abuse was unrelenting and unpredictable.

14          The three British men seemed to enjoy physically

15   abusing the hostages.  James Foley was choked out so hard that

16   he collapsed to the floor and got a huge contusion on his eye.

17   Federico Motka was water-boarded to the point where he could

18   feel his lungs starting to fill with water and he began to have

19   seizures.  When the three British men learned that it was

20   Daniel Ottosen's 25th birthday, they made sure he received

21   exactly 25 blows.

22          The hostages were kicked, they were punched, they were

23   beaten with clubs.  The three British men imposed what they

24   called "dead legs" or "granddads" where they delivered a knee to

25   the meat of a hostage's thigh.  The hostages were put in stress

1    positions and threatened with murder.

2         And those were not idle threats.  In February, a

3    Russian hostage named Sergei was taken from the cell by the

4    three British men.  When they returned, they showed a photograph

5    of Sergei with a bullet wound through his head.  The British men

6    said that Sergei had been killed because a released hostage had

7    spoken to the media after being told not to.  That photograph

8    was later emailed to the families of a number of the Western

9    hostages to pressure them into paying ransoms.

10        In April, five hostages were forced to write ransom

11   demands on sheets of paper.  The three British men then drove

12   them into the desert where a Syrian hostage was blindfolded and

13   handcuffed.  He knelt at the edge of a pit.  The hostages were

14   then forced to watch as one of the British men shot the Syrian

15   multiple times.  After his body toppled into the pit, they were

16   told to climb in with him.  They were forced to hold their

17   ransom demands up for the camera.

18        The defendant would later say that he participated in

19   this event.  He explained that holding those ransom demands up

20   for the camera was all just a part of the negotiations.

21        And the three British men were not just in charge of

22   male hostages.  By the time the hostages were moved to Raqqa,

23   they had at least five women in their custody.  That included

24   the young American, Kayla Mueller.  She had traveled from her

25   home in Arizona to serve as an aid worker in Syria.  She wanted

1    to provide whatever assistance she could in the unfolding

2    humanitarian crisis.  She was captured in August 2013.  Her 25th

3    birthday was just days away.

4           According to the released hostages, the three British

5    men were not present every day, but when they appeared at these

6    makeshift prisons, they seemed more senior than the day-to-day

7    guards and they were very involved in the hostage negotiations.

8    They took emails from the hostages that were used to negotiate

9    for their release.  They obtained photos, videos, and audio

10   messages from the hostages that were sent to their families.

11          When a hostage was released, they were usually the ones

12   who drove them on the first leg to their journey to freedom.

13   And they would quiz the hostages about what they knew about

14   them.  Some of the hostages also received one final beating from

15   those three British men before being released.

16          In order to distinguish those three British men, the

17   hostages secretly came up with names for them.  They called them

18   The Beatles as a group, and Ringo, George, and John as

19   individuals.  We anticipate, and I submit to you, that the

20   evidence in this case will prove that the British man known as

21   Ringo was, in fact, the defendant, El Shafee Elsheikh.

22          And the defendant would later insist that despite the

23   name "The Beatles," there were not four English speakers in

24   charge of the hostages.  There were only three.  And he

25   described in detail the roles that he, Mohammed Emwazi, and

1    Alexanda Kotey played in the detention and physical abuse of

2    these Western hostages.

3          And he, like those other two British men, was very

4    disciplined.  He would later say that it was, quote, "protocol"

5    to always wear masks whenever he was around the hostages.  And

6    even though he always followed that protocol, whenever he

7    entered the cell, he made the hostages turn and face the wall

8    anyway.

9          Now, by June of 2014, the hostage negotiations had

10   resulted in the release of most of the European hostages.  A

11   Dane and a German left in mid-June.  Only six male hostages

12   remained, James Foley, Steven Sotloff, and a third American,

13   Peter Kassig, from Indiana.  Peter Kassig had served in the

14   U.S. military.  After leaving the service, he founded an

15   organization called "SERA," which stands for Special Emergency

16   Response and Assistance.  It's an organization that trains

17   people how to teach and administer medical aid under harsh

18   conditions.  Peter Kassig was captured in Syria in October 2013.

19         There were also three British hostages housed with the

20   Americans:  John Cantlie, David Haines, and Alan Henning.

21   John Cantlie was the journalist I mentioned earlier who was

22   captured with James Foley.  David Haines was an aid worker who

23   was working in and around refugee camps in Syria to try to bring

24   relief to one of the most desperate corners of the world.

25         As for Alan Henning, he was a taxi driver from

 1    Northern England.  His only connection to Syria was a desire to

 2    help the Syrian people.  He was captured in December 2013,

 3    shortly after crossing into Syria as part of an aid convoy

 4    delivering relief supplies.

 5         In addition to those six male hostages, there were two

 6    women still in the custody of these three British men:

 7    Kayla Mueller and Louisa Akavi.  Louisa Akavi was an aid worker

 8    from New Zealand.  The defendant would later describe seeing

 9    Louisa Akavi while she was in custody, and he commented on the

10    fact that she was older than the other hostages.

11         Now, the summer and fall of 2014 was also somewhat of a

12    high water mark for the Islamic State, both in terms of its

13    expansion into Iraq and Syria and in terms of the level of their

14    violence and brutality.  By that point they were in control of a

15    large swath of territory extending across Syria and Iraq that

16    they had taken through brutal force, their so called Islamic

17    caliphate.  And on July 5th, 2014, the Islamic State released a

18    video showing a man ascending the pulpit of a mosque and

19    declaring himself the khalif, or leader, of the Islamic State.

20    That man's name was Abu Bakr al-Baghdadi.

21         A short while later, the coalition bombing campaign

22    against the Islamic State began, and then "A Message to America"

23    was released, which brings us full circle to where we began, the

24    murder of James Foley and the threats against Steven Sotloff.

25         ISIS demonstrated that those were not idle threats.  On

1    September 2nd, 2014, a second "Message to America" was released.

2    It showed that same British-speaking man dressed all in black.

3    He stood next to a kneeling Steven Sotloff, who was wearing an

4    orange jumpsuit.  He held a large knife in his left hand.  He

5    once again condemned the American-led bombing campaign in a

6    distinctive British accent.  After he was finished speaking, he

7    pulled Steven Sotloff's head back and brought the knife up to

8    his throat.

9         The video then cut away from a moment and then showed

10   Steven Sotloff's decapitated head and body.  It ended with a

11   masked British man standing next to another hostage, who was

12   also on his knees, David Haines.  The masked British man told

13   coalition forces to back off.

14        On September 13th, 2014, in "A Message to the Allies of

15   America," the murder of David Haines was depicted.  It was

16   virtually identical to the two prior ones.  He was on his knees,

17   handcuffed, in an orange jumpsuit.  The executioner was dressed

18   the same.  He spoke with that now familiar British accent.  He

19   held a large knife in his left hand, and, as in the two previous

20   videos, he brought that knife up to the neck of David Haines.

21   Haines' decapitated body was shown at the end.

22        Then the executioner could be seen next to another

23   individual in an orange jumpsuit.  This time it was the taxi

24   driver, Alan Henning.  On October 3rd, 2014, ISIS broadcast the

25   murder of Alan Henning in another "Message to America and Its

1   Allies."  That murder was committed in the same way as the

2   previous ones, same executioner, same orange jumpsuit, same

3   large knife.  At the end, the executioner stood next to a

4   kneeling Peter Kassig, and stated that "Because of the bombing,

5   it's only right that we strike the necks of your people."

6        Peter Kassig's murder was broadcast by ISIS on

7   November 16, 2014, in a video called "Although the Disbelievers

8   Dislike It."  While this one showed the same executioner, it

9   differed in that it did not show Peter Kassig while he was

10  alive.  Instead, his severed head was shown at the feet of the

11  British executioner, who mocked Peter Kassig, claiming that he

12  doesn't have much to say.

13       As late as January 2015, ISIS was still broadcasting

14  videos showing hostages being murdered.  Two Japanese hostages,

15  Haruna Yukawa and Kenji Goto, were killed.  Yukawa was killed

16  first.  ISIS published a photograph of his decapitated body.

17  The second Japanese hostage, Kenji Goto, was shown holding that

18  photograph.  In an ISIS video a week later, that same masked

19  British man spoke into the camera and then murdered Kenji Goto.

20  At the end, the camera panned over his decapitated body in

21  exactly the same way it had in that James Foley video.

22       Now, from the time that these videos began, a central

23  question was figuring out who the executioner was.  His voice

24  was relatively clear on all of the recordings.  He had a

25  distinctive British accent.  The cadence and rhythm of his

1    speech was consistent.

2          Ultimately, what you will hear referred to as a voice

3    analysis, was conducted on those execution videos in Great

4    Britain.  You will hear from the witnesses who did that voice

5    analysis.  They will describe their methodology.  They will tell

6    you the steps they took to identify the speaker, and ultimately,

7    they will tell you that the voice on those execution videos was

8    consistent with the voice of Mohammed Emwazi.

9          Now, I'll get back to the defendant in a moment.  But

10   there's one last aspect of this hostage-taking scheme that we

11   need to discuss, Kayla Mueller, the American aid worker.  There

12   were two demands that were emailed to the parents of

13   Kayla Mueller for her release.  They were described as

14   nonnegotiable.  Either a payment of 5 million Euros, which is

15   more than $5 million, or the release of a Muslim prisoner being

16   held in the United States named Aafia Siddiqui.  You will hear

17   the name Aafia Siddiqui during this trial.  In fact, some of the

18   released hostages were say that The Beatles brought up her name

19   frequently when criticizing the United States.

20         On June 3rd, 2014, Kayla's parents received an email

21   that repeated those demands.  It ended by saying the following

22   about Kayla Mueller:  "This is nonnegotiable, as it is more

23   beloved to us to put a bullet in her head than release her for

24   anything less."

25         In an email dated July 12, 2014, Kayla's parents were

1   told that they had 30 days to comply, and if they did not, "We
2   will send you a picture of Kayla's dead body."  About two months
3   later, Kayla's parents received another email which stated that
4   one more demand had been added in addition to the payment of
5   5 million Euros or the release of Aafia Siddiqui.  The email
6   stated as follows:  Quote, "Now, however, due to recent
7   developments within the region - i.e., your government's
8   criminal aerial bombardments of the Islamic State - an extra
9   condition must be met.  That is the immediate halt of all
10  military activities by your government within and around the
11  lands of the Islamic State."  That email was dated September 19,
12  2014.  The last two European hostages who were colocated with
13  Kayla were released in June.
14         The next information we have about her comes from a
15  Yazidi witness who met her in around August or September of
16  2014.  Now, who are the Yazidis?  As you will hear, the Yazidis
17  are a Kurdish-speaking minority group who primarily live in and
18  around Northern Iraq.  They have been persecuted frequently over
19  the years, and in 2014 they were being persecuted by ISIS.  In
20  fact, do you remember when I told you about that first execution
21  video, "A Message to America," how ISIS included a clip by the
22  President saying that the bombing campaign was necessary to
23  protect Iraqi citizens trapped on a mountain without food or
24  water and facing almost certain death?  Well, that mountain was
25  in a place in Iraq called Mount Sinjar, and many of the people

1    facing certain death were there Yazidis fleeing from the

2    Islamic State to try to find safety.

3            ISIS captured a number of Yazidis in and around

4    Mount Sinjar.  One of the girls was a young girl that was

5    captured by ISIS and forced into slavery.  She will testify

6    about her experiences as an ISIS slave.  Of particular

7    importance, she will tell you that in late August or early

8    September, she was taken to a location where she was held

9    captive in the same place as Kayla Mueller.  She can describe

10   meeting Kayla, she can describe getting to know Kayla, and she

11   can describe Kayla's condition while they were together.

12           This young Yazidi witness will also describe for you

13   how Kayla Mueller was forced into slavery.  Starting in

14   approximately October 2014, Kayla was moved to a number of

15   locations known collectively as the Abu Sayyaf houses.  At that

16   point she was forced to become the slave of

17   Abu Bakr al-Baghdadi, the man who had proclaimed himself to be

18   the khalif, or leader, of ISIS at that mosque in July.

19           The leader of ISIS, Abu Bakr al-Baghdadi, raped

20   Kayla Mueller on a number of occasions after forcing her to

21   become his slave.  For Kayla Mueller, an ISIS hostage and an

22   ISIS slave, ISIS's willingness to commit even the most horrific

23   acts of violence ultimately determined her fate.  Because you

24   remember those executions of American, British, and Japanese

25   hostages that were broadcast by ISIS?  They were not the only

1    ones that ISIS publicized.  In their videos and in their printed

2    publications, ISIS took great pride in describing how violent

3    they could be, and that included violence toward captured enemy

4    soldiers.

5          One especially barbaric execution involved an

6    individual named Kassabeh.  He was a pilot in the

7    Jordanian Air Force who took part in the fight against ISIS.  He

8    was shot down and captured by ISIS.  After holding him hostage,

9    ISIS released a video on February 3rd, 2015, showing Kassabeh as

10   he was burned alive inside of a metal cage.

11         The government of Jordan promptly responded by

12   executing a female prisoner that they were holding named

13   Sajida Rishawi.  She had been serving a prison term in Syria.

14   They had tried to release Sajida Rishawi.  In fact, in a message

15   published by ISIS in late January, that Japanese hostage I told

16   you about, Kenji Goto, he implored his government to exchange

17   him for Sajida Rishawi.  In that audio message he said that if

18   they did not comply by January 29, 2015, the pilot Kassabeh

19   would be killed.

20         And on February 6th, 2015, two days after that

21   Jordanian prisoner, Sajida Rishawi, was executed, following

22   Kassabeh's immolation, ISIS issued a Tweet in which they claimed

23   that Kayla Mueller had been killed the day before.  They claimed

24   that her death was caused by a coalition air strike.  And

25   finally, they claimed that that coalition air strike was carried

1    out by, in their words, "the failing Jordanian Air Force."

2    Three photographs claiming to show Kayla Mueller's dead body

3    under the rubble of a collapsed building were emailed to her

4    parents in Arizona.  Kayla Mueller was the last of the Americans

5    held hostage by those three British-speaking men whose death was

6    publicized by ISIS.

7           Ladies and gentlemen, that brings me to the final chart

8    I want to show you.  If we could pull that up.

9           Now, I don't know whether it's easier to see on the

10   screen or the poster board, but we gave you both options.  But

11   the chart that you see on your screen, it's a demonstrative

12   chart and it lists out the hostages that you will hear about

13   during this trial.  It lists their names or their descriptions

14   in that left-hand column.  It lists where they were from and

15   their occupation in that next column under the heading

16   "Affiliation."  And finally --

17          THE COURT:  Let me be clear about one thing, Mr. Gibbs.

18   You used the term "demonstrative."  Let me tell the jury that

19   that means that it is an exhibit that is not being offered in

20   the evidence in the case, but it's an exhibit that the

21   government has prepared to illustrate or clarify the

22   government's position on matters.

23          Is that accurate, Mr. Gibbs?

24          MR. GIBBS:  It is, Judge.  And thank you for that

25   clarification.

1          THE COURT:  And whether or not this goes back with you

2     in the jury room when you deliberate is a matter I will consider

3     later in the case.  But typically they do not go back there.  In

4     other words, you won't have this in the jury room.

5          Proceed, Mr. Gibbs.

6          MR. GIBBS:  Thank you, Your Honor.

7          And, ladies and gentlemen, precisely as the judge said,

8     this is an aid that describes some of the evidence we expect to

9     be presented during the trial.  And what we believe some of this

10    evidence will show includes information about the names of the

11    Western hostages, and it begins at the top with James Foley and

12    John Cantlie, starting on their capture date of November 22nd of

13    2012, and it ends all the way at bottom with the Japanese

14    citizen, Kenji Goto, who was captured last, on October 25th,

15    2014.

16         And within this chart it also lists evidence that will

17    be presented at trial indicating the fate of each hostage,

18    whether released or executed or unknown.  And in the coming days

19    and weeks, ladies and gentlemen, a number of released hostages

20    will testify in this trial.

21         We can take that down.

22         Also during this trial, ladies and gentlemen, you will

23    hear about the fate of Mohammed Emwazi, the person who was

24    identified as the masked beheader in those execution videos

25    based on that voice analysis I told you about.  In fact, ISIS

1    publicly reported on his death.  In a tribute to Emwazi, ISIS

2    said that he had been killed when the car he was in was targeted

3    in a strike by an unmanned drone in the city of Raqqa,

4    destroying the car and killing him instantly.  He was described

5    as an honorable brother who had fought in the battle against

6    Division 17 in Raqqa, the very same battle that the defendant

7    had told his brother about in that Telegram chat.

8            ISIS said that he had gained world renown as "Jihadi

9    John," a name that the international media used to describe the

10   masked British man in those execution videos.  The ISIS tribute

11   described him in glowing terms, saying, quote, "His harshness

12   towards the kafir," which means unbeliever, "was manifested

13   through deeds that enraged all the nations, religions, and

14   factions of kafir, the entire world bearing witness to this."

15   And finally, they identified him by his alias, or what is known

16   as a kunya, as Abu Muharib al-Muhajir.  You will hear that name,

17   Abu Muharib, again.

18           Let's talk about the defendant.  After the death of

19   Mohammed Emwazi, the fight against ISIS continued.  Its

20   territory, that once sprawling Islamic State, what it proudly

21   called its caliphate, was shrinking.  The coalition bombing

22   campaign was having a real impact.  In addition, there were

23   boots on the ground that were working to defeat ISIS.

24           You will hear during this trial about a group called

25   the Syrian Democratic Forces, or SDF.  In the ongoing battle

1    against ISIS, they were a valuable U.S. ally who could be

2    depended upon to fight hard against ISIS.  On January 4th, 2018,

3    a group of 20 suspected ISIS fighters were captured by the SDF.

4    An attempt was made to determine their identities.  One of those

5    captured men claimed that his name was Suhayb Abdallah Jasim.

6    He claimed that he was from Yemen and that he could only speak

7    Arabic.

8         A second man captured with Jasim on January 4th claimed

9    that his name was Yahya Mustafa Ibrahim, that he was also from

10   Yemen, and that he too could only speak Arabic.  A few days

11   later, members of the U.S. Department of Defense came to the SDF

12   prison where those two were being held.  They proceeded to do

13   what is called a biometric enrollment; essentially, to take

14   fingerprints and photographs.

15        When Suhayb Abdallah Jasim was biometrically enrolled,

16   he continued to claim that he could only speak Arabic.  The

17   fingerprints told a different story.  After being run through

18   the DoD's database, they were determined to belong to the

19   defendant, El Shafee Elsheikh.  When he was confronted with that

20   fact, he quickly lapsed into British-accented English and

21   admitted that he was, in fact, El Shafee Elsheikh.  He also

22   identified Alexanda Kotey as the man who claimed to be

23   Yahya Mustafa Ibrahim.  Soon thereafter, Kotey admitted to his

24   own identity.

25        The defendant was interviewed at the SDF prison by the

1    FBI in March of 2018.  Among other things, he told the FBI the

2    following:  He grew up in London.  He had been friends with

3    Alexanda Kotey since 2009.  He also got to know Mohammed Emwazi

4    in London before they traveled to Syria.  The defendant said he

5    traveled to Syria by air in 2012, going first to Sweden, then on

6    to Syria via Turkey.  He said that Emwazi and Kotey both

7    traveled to Syria together a few months later.

8         The defendant told the FBI that he started out as a

9    fighter with the Al-Nusra Front, but then he soon joined ISIS.

10   According to the defendant, he was a fighter with ISIS until

11   2015.  The defendant said he took part in military missions with

12   Emwazi and Kotey.

13        The defendant also told the FBI that while with ISIS,

14   he came to know two other ISIS members named

15   Abu Omar al-Belgique and Abu Idris.  He identified both of their

16   photographs.  Abu Omar al-Belgique was an ISIS member who took

17   part in a terrorist attack in Paris in November 2015 that

18   resulted in the deaths of more than 100 people.  Abu Idris was

19   an ISIS member who took part in a terrorist attack against an

20   airport in Belgium in March 2016 that resulted in the deaths of

21   more than 30 people.

22        The defendant also talked about Aafia Siddiqui.  He

23   said he did not have faith in the U.S. justice system because

24   Aafia Siddiqui had received a lengthy jail sentence in the

25   United States.  He described that jail sentence as unfair.

1          The defendant told the FBI that he knew that Emwazi

2    went by the alias of Abu Mahara, the same name that was used in

3    the ISIS eulogy.  He said Emwazi had been given the name

4    Jihadi John by the United States.

5          The defendant said he recognized Emwazi in the

6    execution videos based on his voice and because of the way he

7    looked in those execution videos.  And according to the

8    defendant, he knew what Emwazi looked like in a mask because he

9    had seen Emwazi wear a mask before.  The defendant told the FBI

10   that he had also worn a mask before.  And finally, the defendant

11   said that when Emwazi was killed, it made him very depressed.

12         And, ladies and gentlemen, when you hear descriptions

13   of masks during this trial, we're not talking about the COVID

14   masks that we've all been wearing for these last two years.  The

15   released hostages will testify that these were full masks that

16   covered virtually the entire faces of The Beatles with little

17   more than their eyes showing.

18         From his capture in 2018 until October 2019, the

19   defendant remained in SDF custody.  During that time, he took

20   part in a number of recorded media interviews.  You will see

21   clips of some of those interviews during this trial.  And in

22   those interviews, you will see the defendant, seated right over

23   there, speaking on camera and answering questions.  Among other

24   things, he said the following in those interviews:  He admitted

25   that he was one of the individuals overseeing the Western

1    hostages; he said that he saw and interacted with all of them;

2    he first became involved when there were only two hostages,

3    James Foley and John Cantlie.  He described his role in getting

4    email addresses from the hostages to be used in negotiations.

5    The defendant said that the email addresses that he obtained

6    were then used to send and receive proof-of-life questions.

7         And, in fact, during this trial, you will see the email

8    correspondence with the families of James Foley, Steven Sotloff,

9    and Peter Kassig.  All three of those families emailed

10   proof-of-life questions to the people holding their loved ones

11   that were answered correctly.  In addition, all three of those

12   families received emails making precisely the same demand, a

13   payment of 100 million Euros, which is more than $100 million,

14   or the release of, quote, "our Muslim prisoners."

15        The defendant also stated in a media interview that it

16   was standard protocol to always wear a mask whenever he was

17   around the hostages.  He described a number of those hostages by

18   name.  He said that he was the person who took email addresses

19   directly from Kayla Mueller.  He described how Kayla Mueller was

20   housed alone in a room, separate from the other hostages.

21        The defendant identified a photograph of James Foley.

22   He gave specific details about how James Foley interacted with

23   the other hostages.  He even said that Mohammed Emwazi had a

24   particular dislike for James Foley.

25        The defendant admitted that he hit most of the

1    hostages.  He described specific beatings that he imposed, such

2    as granddads and dead legs.  He admitted that he was there when

3    the Syrian hostage was executed.  He explained that the purpose

4    of that murder was to send a message as part of those hostage

5    negotiations.  He also said that he knew that Mohammed Emwazi

6    was the one who killed James Foley.

7        The defendant's time in SDF custody came to an end in

8    2019.  He was later transferred to U.S. custody and charged with

9    crimes here in the United States, which is why we are all here

10   today.

11       So let's talk briefly about the crimes with which he is

12   charged, and about the law.  At the end of all of the evidence

13   in this case, after the parties have given their final

14   arguments, the judge will instruct you on the law and on how to

15   apply the law to the facts in this case.  So I won't go into too

16   much detail about that right now, but there are a couple of

17   points to know.

18       First, the defendant is charged in an eight-count

19   indictment.  The offenses with which he is charged in that

20   eight-count indictment all relate to his activity in this

21   hostage-taking scheme and in his activities as a member of ISIS.

22   They could broadly be divided into the following three

23   categories:  Conspiracy counts, substantive counts, and material

24   support counts.  The judge will explain the law to you regarding

25   all of those counts.

1          But there is one particular feature that is common in

2     all eight of them.  That is, the government has alleged in each

3     of these counts that as a result of these crimes, the deaths of

4     James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig

5     resulted.

6          Finally, as I told you at the outset, we're here today

7     in the case of United States of America versus

8     El Shafee Elsheikh.  While you will hear plenty of evidence in

9     this case about the defendant's co-conspirators, Alexandra Kotey,

10    Mohammed Emwazi, and others, the eight counts in this indictment

11    relate solely to the defendant, El Shafee Elsheikh.  But as to

12    that evidence, it will show that this defendant,

13    El Shafee Elsheikh, knowingly conspired with Kotey and Emwazi to

14    hold Americans and others captive.

15         Ladies and gentlemen, that is an overview of some of

16    the evidence that you will hear during the course of this trial.

17    But let me stress that it is just that, an overview.  I did not

18    try to summarize all of the evidence that will be presented in

19    the course of what could be a three to four-week trial.

20         Finally, I would be remiss if I didn't end by thanking

21    you all for your service in this trial.  It is not a small

22    matter to ask our fellow citizens to sit as jurors in a case

23    such as this.  Yet without people like you, our system simply

24    couldn't function.  So I want to thank you, and the trial team

25    wants to thank you all in advance for your roles in paying

1    close, careful attention to the evidence in this case.  We will

2    do our best to present that evidence to you as efficiently as we

3    can.

4          And, ladies and gentlemen, once all of that evidence

5    has been presented, the government will again make its closing

6    arguments at the end of the case.  And at that time we will ask

7    that you find the defendant guilty of the crimes with which he

8    is charged, because at that time, the government will have

9    proven his guilt beyond a reasonable doubt.

10         Thank you very much for your time this morning.

11         THE COURT:  Mr. MacMahon, are you ready to make your

12   opening statement?

13         MR. MACMAHON:  I am, Your Honor.  Thank you.

14         THE COURT:  All right, sir.  You may proceed.

15         MR. MACMAHON:  May it please the Court, Your Honor,

16   counsel, distinguished counsel from the government, ladies and

17   gentlemen of the jury, we were all introduced to you yesterday.

18   My name is Edward MacMahon, I'm a lawyer here in Virginia.  With

19   me is Nina Ginsberg, Yancey Ellis, and Zack Deubler.  And, of

20   course, next to Ms. Ginsberg is Mr. Elsheikh.

21         I want to join -- I know the judge thanked you all

22   yesterday as well, and Mr. Gibbs just did here.  But we want to

23   thank you for your service as well.  Trial by jury is one of the

24   fundamental freedoms enshrined by our Constitution, and it

25   serves as a bulwark to protect accused people.  Because no one

1    can be convicted of a crime unless the government provides to a

2    jury beyond a reasonable doubt that that person is, in fact,

3    guilty.

4            The evidence that Mr. Gibbs just told you that the

5    government will prove in this case is beyond heartbreaking and

6    horrific.  There's no way around it, other than to say that.

7    And there will be no dispute about that.  There will be no

8    dispute about the gravity of the charges here.  But I would

9    submit, what you've heard can make it hard for you to keep an

10   open mind.  And Judge Ellis gave you a charge to do so, and we

11   assume and hope that you will do so.

12           But as you hear this case, please remember that even

13   the most unpopular and porous defendants charged with the most

14   heinous of crimes are presumed innocent.  Mr. Elsheikh cannot be

15   convicted in this case of any of these charges unless the

16   government proves to you each and every element of these

17   offenses beyond a reasonable doubt.  And in this effort, I

18   submit to you that the evidence you will hear will fail to prove

19   that, that Mr. Elsheikh was a member of the so-called Beatles,

20   and that he was not involved in the kidnappings or killings in

21   this case.

22           And there's another initial matter, I think a critical

23   matter, to say, I want to tell you what the evidence in this

24   case is not about.  The kidnapping and the imprisonment and the

25   deaths - the awful deaths - of James Wright Foley,

1    Peter Edward Kassig, Kayla Jean Mueller, and Steven Joel Sotloff
2    were horrible, despicable, and senseless acts.  There will be no
3    debate in this case that that is true.

4           And the same is true for what happened to the British
5    citizens, David Cawthorne Haines and Alan Henning.  It was
6    horrible and senseless.  The same is true for the all the ISIS
7    and Yazidi people that were taken hostage by -- excuse me, all
8    the hostages that ISIS took, regardless of their citizenship.

9           And the evidence you will hear in this case involving
10   the kidnapping and imprisonment of hostages who were even
11   released by ISIS after payments were made for them, such as
12   Federico Motka and Daniel Ottosen, was also senseless and
13   horrific.  I can't come up with another word for it other than
14   "horrific."  And it involved the willful mistreatment of human
15   beings, fellow human beings, by other human beings.  You will be
16   inundated with the evidence in this case about the willful
17   treatment of human beings by other human beings.  None of this
18   is in dispute.

19          What is in dispute, however, and what you must decide,
20   based upon the facts and the evidence in this case, is whether
21   Mr. Elsheikh, who sits before you, bears legal responsibility
22   for any of these horrific acts.  And I submit to you that based
23   upon the facts and the evidence in this case, you will find
24   again that Mr. Elsheikh was not a member of The Beatles and was
25   not involved in the kidnapping, torture, or killing of any of

1    these people.  We will therefore, at the end, ask you to find

2    him innocent of all these charges.  In fact, I will submit to

3    you that the evidence in this case will be that only law

4    enforcement agents who knew who Mr. Elsheikh was before they

5    talked to him will be able to identify him.

6           Now, in this trial, as you heard from Mr. Gibbs, there

7    will be a lot of evidence about Mr. Elsheikh and a group of

8    British-speaking men who the government and other released

9    hostages refer to as "The Beatles."  The evidence you will hear

10   of Mr. Elsheikh's involvement with The Beatles will be

11   inconsistent, at best.  You will hear evidence attributing

12   different attributes to different people.  Again, it will all be

13   inconsistent as to what it's going to show.

14          The released hostages that you are going to hear

15   testify will tell a lot of different versions of who the

16   different Beatles were, and you will hear as well that over

17   many, many -- and you can imagine how many times these people

18   have been interviewed, that they give very -- you will hear very

19   many different stories as to which Beatle is which, who is

20   Ringo, who is John, who is George, and maybe even a Paul.  You

21   might hear about another British man who comes into this case.

22          And, ladies and gentlemen, the evidence will be that

23   the released hostages assigned many different characteristics to

24   each one of The Beatles.  And you will hear also that the

25   British men that Mr. Gibbs just told you about shared many

1    similar traits and a familiar background.  So the evidence,

2    again, will be inconsistent and unconvincing as to

3    identification of Mr. Elsheikh.

4          Mr. Gibbs told you, again, that Mr. Elsheikh was born

5    in the Sudan in 1988, and he spent most of his formative life in

6    England before he traveled to Syria, where, like many other

7    young Muslim men from England, he traveled believing he could

8    help fellow Muslims who he believed were suffering in Syria.  He

9    went specifically to help the Syrian people who were brutally

10   oppressed by the Syrian regime, and he traveled alone to Syria.

11         Mr. Gibbs told you that the evidence will be that he

12   did not travel with Kotey or Emwazi to Syria or anyone else that

13   the government now calls "The Beatles."  At that time there was

14   no such thing as ISIS or the Islamic State; though Mr. Elsheikh

15   unquestionably did, for a period of time, provide services to

16   the Islamic State.  There will be no doubt about that from the

17   evidence that you hear in this case.

18         Now, again, in this case, you will hear much about

19   other young British Muslims who traveled to Syria in the same

20   time who were joined there by many other British Muslims.  Among

21   these men certainly were Mohammed Emwazi, whose acts that you

22   heard described in detail by Mr. Gibbs.  Again, the defense

23   makes no excuse or minimizes any of the acts.  These beheadings

24   were simply despicable.

25         But you also had Mr. Kotey and another man named

1    Aine Davis, who you will hear about.  Those are the British men

2    suspected being part of The Beatles.  And you will have to

3    decide, when you hear all the evidence, whether Mr. Elsheikh was

4    part of The Beatles.  Again, they shared many of the same

5    characteristics and backgrounds and accents, and when the

6    released hostages tell you about what they saw with

7    characteristics, again, you're going to have to decide whether

8    these identifications are correct or not.

9         So the evidence of which British person, any one of

10   these Beatles is, is going to be up for you to decide, and

11   you're going to have to figure that out as you hear these

12   discrepancies in identification as to whether or not you find

13   beyond a reasonable doubt that Mr. Elsheikh was a member of

14   The Beatles.

15        Now, we are certainly mindful in the defense that the

16   government will play for you many, many media interviews of

17   Mr. Elsheikh in which he appears to make admissions and

18   statements about his involvement in the these terrorist acts.

19   There's no question that you're going to see that.  But when you

20   see that evidence, please keep in mind the facts and

21   circumstances surrounding where those and how those statements

22   were made.

23        As Mr. Gibbs told you, Mr. Elsheikh was captured by

24   Syrian forces in January of 2018.  He was with his wife and

25   children.  He was fleeing a war zone and he was facing nothing

1    but bad choices.  The evidence will show that as a simple ISIS

2    fighter, Mr. Elsheikh was correctly worried that he might be

3    imprisoned or killed in Syria by his captors, and he had good

4    reason to worry about that.  There's no doubt that Mr. Elsheikh

5    gave a false name when he was arrested.  He was trying to

6    protect himself, the evidence will be, and his family in Syria.

7    But he obviously failed because he's here.

8            The U.S. government had biometric information that

9    identified Mr. Elsheikh.  They knew exactly who he was.  He was

10   then transferred to Kurdish custody and held in conditions that

11   you will hear about for several years before he was transferred

12   to the United States to face these charges.  And in Kurdish

13   custody, Mr. Elsheikh and others were held as prisoners and had

14   no idea what was going to happen to them.  They were never told

15   where they were going to go, if they were going to be released,

16   what would happen to them at all.

17           And in that timeframe, the evidence will be

18   Mr. Elsheikh and others began to learn that ISIS members were

19   being transferred from Kurdish custody to Iraqi custody, where

20   he was told ISIS members were being given 10-minute trials and

21   then they were hanged.  The prospect of such a trial, as well as

22   the overall conditions of his confinement and the uncertainty of

23   his eventual disposition, the evidence, you will see, shows that

24   Mr. Elsheikh had many motivations to make statements that he

25   made to a number of journalists.

1        This is most easily seen by you in the evidence that

2   you will see of Mr. Elsheikh's interview with a British

3   journalist named Sean Langan, in which Mr. Langan repeatedly

4   told Mr. Elsheikh that ISIS members were being sent to Iraq for

5   very short trials and being executed, and told him that making

6   admissions might help him avoid that fate.  You will see that

7   evidence in this case.

8        So the other thing I want to tell you is that the

9   evidence in the case about Mr. Elsheikh's statements will also

10  be inconsistent.  The evidence that what he told journalists

11  will be inconsistent with what you hear, the evidence from

12  released hostages and how they would try to identify the various

13  Beatles.  That will come out to you as you hear the evidence.

14       And in the end of this case, Ms. Ginsberg is going to

15  get up and she will give a closing argument, and she will

16  explain to you in much more detail.  As the judge told you, this

17  is just a road map.  Like Mr. Gibbs, I'm not telling you all the

18  evidence that the case will show.  In the end she will tell you

19  why you should disregard these media statements entirely, or

20  give them no weight at all if that's what you decide to do once

21  you get back in the jury room.

22       As I mentioned to you earlier, it is a hallmark of our

23  system of justice that all individuals are presumed innocent

24  until proven guilty.  And this system of justice sets us apart.

25  And without people like you to guard individual defendants'

1       rights as jurors, the Constitution is just a document.

2              And so, again, we appreciate your service here, because

3       it's people like you that have the responsibility to safeguard

4       these liberties, especially -- and I know the circumstances of

5       this case make this even more difficult.  But these liberties

6       need to be protected, even with the worst defendants charged

7       with the most horrific crimes.

8              So we ask you again, try to keep an open mind as you

9       hear this case, which will be sad and terrible.  It's going to

10      be an ordeal for all of us to go through.  It won't be easy.

11      But that's part of your oath.

12             So in the end, I will close by saying that in the end,

13      we believe the evidence in this case will show that Mr. Elsheikh

14      was not a member of The Beatles, and is not legally responsible

15      for the acts of others in this case.  And at the end, you should

16      deliver a verdict of not guilty.  Thank you.

17             THE COURT:  All right.  Ladies and gentlemen, I'm going

18      to take a recess now before we begin with the first witness.

19             Who is your first witness, Mr. Gibbs?

20             MR. GIBBS:  Professor Bruce Hoffman, Your Honor.

21             THE COURT:  All right.  During the recess, you will

22      hear the familiar litany every time that I do this; that is,

23      refrain from discussing the matter among yourselves or with

24      anyone, or undertaking any investigation on your own.

25             We will reconvene at five minutes to 11:00.  There will

 1    be soft drinks available to you, and you can relax for a bit.

 2    Remember, don't discuss it with anybody and don't undertake any

 3    investigation.  Put it out of your mind for this rest period,

 4    have a soft drink, and you'll be called back at five to 11:00.

 5    You may follow the court security officer out.

 6             (Jury out at 10:36 a.m.)

 7             THE COURT:  Court stands in recess until five minutes

 8    to 11:00.

 9             (Recess taken at 10:37 a.m.)

10             THE COURT:  You may bring the jury in.

11             (Jury in at 11:04 a.m.)

12             THE COURT:  Mr. Gibbs, you may call your first witness,

13    sir.

14             MR. GIBBS:  Thank you, Your Honor.  The government

15    calls Professor Bruce Hoffman to the stand.

16             (Oath administered by courtroom deputy clerk.)

17             THE COURT:  You may proceed, Mr. Gibbs.

18     **(BRUCE HOFFMAN, having been duly sworn, testified as follows:)**

19             **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

20    BY MR. GIBBS:

21    Q.  Good morning, sir.  Will you please state and tell your name

22    for the record?

23    A.  Bruce Hoffman, H-O-F-F-M-A-N.

24    Q.  And if you can just endeavor, as we go through this, keep

25    your voice up.  The mic may not amplify that great, and I think

1     the glass is not helping.

2            Sir, where are you currently employed?

3     A.   Georgetown University.

4     Q.   In what capacity?

5     A.   I'm a professor.

6     Q.   And do you specialize in any particular course of study?

7     A.   I specialize in terrorism and counterterrorism.

8     Q.   And how long have you been engaged in the study of terrorism

9     and counterterrorism?

10    A.   Since 46 years, since I first went to graduate school in

11    1976.

12    Q.   And have you written books on terrorism?

13    A.   I have.

14    Q.   Have you written papers on terrorism?

15    A.   I have.

16    Q.   Have you testified before Congress on issues related to

17    terrorism?

18    A.   On many occasions.

19           MR. GIBBS:  Your Honor, I don't believe there's an

20    objection from the defense, so at this time, just to move things

21    along, I would go ahead and present --

22           THE COURT:  Do you seek to elicit opinions from this

23    witness?

24           MR. GIBBS:  Judge, I don't expect that he will testify

25    to much, if any, opinion testimony.  It's related to facts that

1    will come into evidence that are not common knowledge.

2          THE COURT:  Well, ladies and gentlemen, ordinarily

3    witnesses cannot testify as to their opinions about matters.

4    However, some witnesses, who, by virtue of their training or

5    experience, may have special knowledge that may help the jury

6    understand and decide the questions before them, and those

7    persons are allowed to give their opinion.  However, the extent

8    to which you find that their opinion is soundly based and you

9    find it persuasive, you may accept it or you may not.  You may

10    accept as much or as little of an expert's testimony as you

11    wish.

12          I'll have further instructions for you at the end of

13    the case on that.  However, the extent to which this witness is

14    going to give his opinion is not at all clear at this point.

15          You may proceed, Mr. Gibbs.

16          MR. GIBBS:  Thank you, Judge.  We would simply tender

17    him as an expert in the field of terrorism.

18          THE COURT:  All right.  You may proceed without

19    objection, I think.

20          Mr. MacMahon?

21          MR. MACMAHON:  That's correct, Your Honor, there is no

22    objection.

23          THE COURT:  Proceed.

24    BY MR. GIBBS:

25    Q.  Professor Hoffman, you've just been tendered as an expert in

```
 1    terrorism.  What is terrorism?
 2    A.   Terrorism is the creation or exploitation of fear through
 3    violence or the threat of violence in the attainment of
 4    political power.  Terrorism is designed to coerce or intimidate
 5    a government or individuals to accede to the terrorists'
 6    demands.
 7              MR. GIBBS:  Your Honor, both parties are having a
 8    little difficulty hearing Professor Hoffman, which it concerns
 9    me, perhaps, that's the case for the jury as well.  Is there any
10    way to possibly turn his microphone up?  I'm getting plenty of
11    volume through my microphone, but it seems like his is low.
12              THE COURT:  Just move the microphone closer to the
13    witness.  That's all you need to do.
14              THE WITNESS:  Is that better?
15              MR. GIBBS:  Yeah, it does sound better, but just make
16    sure you keep your voice up.
17    BY MR. GIBBS:
18    Q.   Did you complete your answer in terms of what terrorism is?
19    A.   I did.
20    Q.   What is Al-Qaeda?
21    A.   Al-Qaeda literally means the base or the method or the
22    concept.  It is the name of a terrorist group that has been
23    active in the world since 1998.
24    Q.   And who were the initial leaders of Al-Qaeda in 1998?
25    A.   It was founded by Osama bin Laden, who was killed in 2011,
```

1    and also by Ayman al-Zawahiri, who remains the emir and the

2    leader of Al-Qaeda today.

3    Q.  Starting in the 1990s, did Al-Qaeda increasingly come into

4    violate conflict with the United States?

5    A.  Yes, it did.

6    Q.  And did those violent conflicts with the United States

7    culminate in the attacks on September 11th in New York,

8    Washington, and Shanksville, Pennsylvania?

9    A.  Yes, they did.

10   Q.  Now, Professor Hoffman, are you familiar with what is known

11   as a Foreign Terrorist Organization, or an FTO, for short?

12   A.  I am.

13   Q.  What is that?

14   A.  A Foreign Terrorist Organization, pursuant to Section 219 of

15   the Immigration and Nationality Act, empowers the United States

16   Secretary of State, in consultation with the Attorney General

17   and the Secretary of the Treasury, to designate either

18   organizations or individuals as terrorists entities; that is, to

19   say entities that threaten the security of American citizens or

20   the national security of the United States.

21        In terms of what that means, it's not only acts of

22   violence or the threats of violence, but the provision of any

23   material support to any terrorist organization, material support

24   raising money for a terrorist group, procuring weapons, engaging

25   in activities designed to recruit members or radicalize

1    individuals who join the terrorist group, and, indeed, the

2    delivering of ransom requests for hostages.

3    Q.  And was Al-Qaeda ultimately designated by the United States

4    Government as a Foreign Terrorist Organization, or FTO?

5    A.  Yes, it was, in October 1999.

6    Q.  And, Professor Hoffman, you testified a moment ago, you

7    touched on the September 11, 2001, attacks committed by

8    Al-Qaeda.  What was the United States Government's military

9    response to 9/11?

10   A.  The United States's military response was to declare, in

11   President Bush's words, a war on terror, and Operation Enduring

12   Freedom, the liberation of Afghanistan, commenced immediately

13   afterwards.  But the actual invasion took place on October 7,

14   2001.

15   Q.  And what was the reason that the first target of Operation

16   Enduring Freedom was Afghanistan?

17   A.  The Taliban, which, much like now, then was in power in

18   Afghanistan, had provided shelter and sanctuary to

19   Osama bin Laden and Al-Qaeda.  It had, despite repeated U.S.

20   requests, refused the turn Osama bin Laden over to the

21   United States.  So therefore, the United States invaded

22   Afghanistan to overthrow the Taliban and defeat Al-Qaeda.

23   Q.  After the invasion of Afghanistan, did the leadership of

24   Al-Qaeda largely escape capture?

25   A.  Yes, almost all the leadership.  The official U.S. Army

1    account of the invasion of Afghanistan puts the number of

2    Al-Qaeda leaders who escaped at somewhere between 150 and 200,

3    and perhaps as many as 800 to 1,000 fighters disappeared after

4    the final engagement in Tora Bora.

5    Q.   Did it include Osama bin Laden?

6    A.   It did.

7    Q.   Did it include Ayman al-Zawahiri?

8    A.   It did.

9    Q.   How about suspected fighters?  Were a number of suspected

10   fighters captured during the U.S. invasion?

11   A.   Yes, many were captured.  In the hundreds.

12   Q.   And where were many of those suspected fighters sent?

13   A.   Well, as then-Secretary of Defense Donald Rumsfeld had said,

14   the worst of the worst were sent to the U.S. naval base in

15   Guantanamo, Cuba.

16   Q.   I want to talk about the individuals described as the worst

17   as the worst.  Were images of those individuals shown in the

18   media when they were transferred to Guantanamo Bay, Cuba?

19   A.   Yes, they were.  They were transferred in January 2002.  I

20   would argue one of the iconic images of that entire period was

21   indeed of a group of men forced to kneel in an obvious prison

22   courtyard, a courtyard surrounded by chain link fence and barbed

23   wire.  They were attired in orange jumpsuits, they were shackled

24   at the waist, they were wearing earmuffs and blackout goggles.

25   And seen ministering to them, or taking care of them, as it

1    were, were United States soldiers.

2    Q.  And you described the orange jumpsuits that they were issued

3    in Guantanamo Bay, Cuba.  Did those -- the images of those

4    orange jumpsuits, was that controversial?

5    A.  It was controversial, because, I mean, here, the

6    United States was delivering people to a military facility where

7    at least at the time charges were not brought against them.

8    They were not really given the right to defend themselves, and

9    they were being indefinitely detained.

10          And then, of course, the images of United States

11   democracy, men shackled in an other-worldly appearance with

12   blackout goggles and ear muffs, I think -- I mean, frankly, it

13   somewhat eviscerated the higher moral ground that the

14   United States hoped to maintain in the war on terror.

15   Q.  And in fact, in terms of that -- and you talk about

16   vitiating the higher moral ground, those images.  Did they prove

17   especially controversial within the Muslim world?

18   A.  Yes, of course.  I mean, President Bush had gone to great

19   lengths to say that the war on terror was not a war on Islam,

20   but those images, I think, had a striking effect on global

21   opinion, and indeed, I think one could argue, created many

22   enemies of the United States.

23          THE COURT:  Mr. Gibbs, focus it on relevant matters in

24   this case.

25          MR. GIBBS:  I'm getting there right now, Judge.

```
 1              THE COURT:  All right.
 2    BY MR. GIBBS:
 3    Q.   Professor Hoffman, can you explain what waterboarding is?
 4    A.   Waterboarding is a reputedly 14th Century torture that was
 5    invented, as it were, in the midst of the Spanish Inquisition,
 6    tormenta de toca, torture by the mouth.  In essence, someone is
 7    strapped to a board, turned upside down so their feet are in the
 8    air; a cloth is placed over their nostrils and their mouth, and
 9    water is poured on to basically induce a sense of drowning or
10    suffocation.  It was very graphically depicted in the 2012 film
11    "Zero Dark Thirty."
12    Q.   Professor Hoffman, moving to early 2003, what military
13    campaign was launched by the United States in that year?
14    A.   In March 2003, the United States launched Operation Iraqi
15    Freedom, the invasion of Iraq.
16    Q.   And who was the United States fighting against when that war
17    began?
18    A.   Saddam Hussein and the Ba'athist Party that ruled Iraq at
19    the time.
20    Q.   And was the government of Saddam Hussein deposed very
21    quickly in that invasion?
22    A.   Yes.  By April of 2003, Bagdad was captured, and the
23    Government of Iraq was deposed and Saddam Hussein went into
24    hiding.
25    Q.   And when that occurred, did that end the fighting in Iraq,
```

1    or did other groups rise up against the United States?

2    A.  No, it didn't.  And the fighting, I would say, in a matter

3    of weeks, an array of insurgent or terrorist groups arose to

4    challenge the United States, and, indeed, the international

5    presence in Iraq.

6    Q.  I now want to ask you about one of those groups in

7    particular.  And to do that, I would ask to see if --

8            MR. GIBBS:  If we could get volume -- Binder 1 for the

9    witness.

10           THE WITNESS:  Thank you.

11   Q.  Professor Hoffman, in the witness binder you have, if you

12   could look at Exhibit 1-14.

13   A.  Yes, sir.

14   Q.  What is Exhibit 1-14?

15   A.  Hold on one second.  I'm sorry.  1-14 is

16   Abu Musab al-Zarqawi.

17   Q.  And that's a photograph of that individual?

18   A.  It is.

19   Q.  And just briefly, who is he?

20   A.  Abu Musab al-Zarqawi is a Jordanian national who was born in

21   1976.  He went to fight against the Soviet occupation of

22   Afghanistan.  He arrived a bit too late and started fighting

23   against the pro-Soviet regime there.  Returned to Jordan in the

24   1990s, cofounded an extremist group; was arrested by the

25   Jordanian authorities and imprisoned.  He was pardoned in the

1   late 1990s, after King Hussein passed away, as an act of

2   compassion by the Hashemite government.

3            He made his way to Afghanistan, where he presented

4   himself to Osama bin Laden and Ayman al-Zawahiri and attempted

5   to join Al-Qaeda.  Zarqawi had a rather checkered background.

6   He was something of a thug, wall-to-wall tattoos.  Nothing wrong

7   with that, but for people that were devout, that was seen as

8   blasphemous.  He was from a very rough background.  He had

9   previously been a thug and a criminal.

10           So bin Laden did not accept his oath of allegiance,

11  but, nonetheless, gave him what has I think been reliably

12  reportedly to be about $200,000 to establish his own terrorist

13  training camp, which he did in Herat.  When the United States

14  invaded in 2001, Abu Musab al-Zarqawi fought against

15  U.S. forces, was injured, fled to Iran, received medical

16  treatment, and then eventually, before 2003, made his way to the

17  Kurdish autonomous provinces of Iraq.

18           MR. GIBBS:  Your Honor, at this time we would offer

19  Government Exhibit 1-14, move it into evidence, and ask to

20  publish it.

21           MR. MACMAHON:  No objection.

22           THE COURT:  Admitted without objection.  You may do so.

23           (GOVERNMENT EXHIBIT Number 1-14 was admitted into

24  evidence.)

25  Q.  And, Professor Hoffman, in the photograph we see on the

1    screen, Exhibit 1-14, this is a photograph of

2    Abu Masab al-Zarqawi?

3    A.  It is.

4         MR. GIBBS:  We can take that down.

5    Q.  Now, in describing him, you had essentially taken us up to

6    the year 2003.  Can you describe his activities at that point,

7    after the U.S. invasion of Iraq?

8    A.  Yes.  While in Afghanistan, he formed a terrorist group

9    that, in English, the name is Monotheism and Holy War.  He

10   reconstituted that group in Iraq.  He partnered with another

11   group that was there, Ansar al-Islam, which was a group of other

12   Afghan veterans and extremists.  And then, once the

13   United States invaded Iraq, he commenced terrorist attacks

14   against the United States.

15        The group itself was -- in 2004 he then swore, offered

16   again his oath of allegiance to Al-Qaeda.  He had proven his

17   mettle, as it were.  That was accepted.  And in 2004 he changed

18   the name of the group from Monotheism and Holy War to the

19   Base of Jihad, which is to say, Al-Qaeda of Holy War in the Land

20   of the Two Rivers, meaning the Tigres and Euphrates Rivers,

21   which are in Iraq.  And that group was designated as a Foreign

22   Terrorist Organization by the United States in December 2004.

23        In 2006 --

24   Q.  Actually, let me stop you there.  I'm sorry.

25        So you mentioned the name of the group was originally

1   Monotheism and Jihad?

2   A.  Yes.

3   Q.  And Jamaat al Tawhid, is that the same name in Arabic or in

4   some other language?

5   A.  Yes, that would be the group of Monotheism, yes.

6   Q.  And you testified that Zarqawi's group, which he renamed

7   as -- give us the name again.

8   A.  Well, the formal name was the Base of Jihad in the Land of

9   Two Rivers.  But for all intents and purposes, it was Al-Qaeda

10  in Iraq.

11  Q.  And the group had also been known as Jamaat al Tawhid.

12  Correct?

13  A.  Right.  Just rebranded itself or renamed itself.

14  Q.  And you just testified that Zarqawi's group was designated

15  as an FTO in 2004?

16  A.  That's correct.

17          MR. GIBBS:  Your Honor, at this time it would be

18  appropriate, pursuant to this Court's order, to move in

19  Government Exhibits 25-9 through 25-13.  I'm not planning to

20  publish those, but, for the record, 25-9 is that original

21  designation from 2004, Jamaat al Tawhid, also known as the

22  Monotheism and Jihad group, also known as the al-Zarqawi

23  network.  Exhibit 25-10 is an amendment to that original

24  designation, which adds a number of names including Al-Qaeda and

25  Iraq.  Exhibit 25-11 is from the year 2012.  It maintains the

1    original designation of Al-Qaeda in Iraq under its various

2    aliases and names.  Exhibit 25-12 is from 2014.  It adds new

3    aliases to the original designation, to include the

4    Islamic State of Iraq in Syria and the Islamic State of Iraq in

5    al-Sham.  And 25-13, in the year 2015, adds a number of new

6    aliases to the original designation, including Islamic State,

7    ISIL, and ISIS.

8              THE COURT:  Any objection to those?

9              MR. MACMAHON:  No, Your Honor.

10             THE COURT:  Tell me briefly, Mr. Gibbs, why all of that

11   history is necessary, when what you're really focused on is

12   ISIS?

13             MR. GIBBS:  Well, I'm going to move on from that point

14   now, but that was sort of the background of how the group

15   evolved out of the Iraq war.

16             THE COURT:  All right.  I'll admit those exhibits

17   without objection.  Let's proceed.

18             (GOVERNMENT EXHIBIT Numbers 25-9 through 25-13 were

19   admitted into evidence.)

20   BY MR. GIBBS:

21   Q.  Now, Professor Hoffman, I would like to turn to some

22   specific acts committed by Zarqawi's group in Iraq.  And to do

23   that, I would like you to turn to Government Exhibit 1-10 in

24   your binder.

25   A.  Yes, sir.

1    Q.  What is Government's Exhibit 1-10?

2    A.  That is a photograph of an American citizen, a young man

3    named Nicholas Berg, who was captured by Al-Qaeda in Iraq in

4    May 2004, and shortly afterwards was executed by

5    Abu Musaf al-Zarqawi.

6            MR. GIBBS:  And if we could move in Government

7    Exhibit 1-10 and publish it for the jury.

8            THE COURT:  Any objection?

9            MR. MACMAHON:  No, Your Honor.

10           THE COURT:  It's admitted.  You may do so.

11           (GOVERNMENT EXHIBIT Number 1-10 was admitted into

12   evidence.)

13   Q.  So Government Exhibit 1-10, Professor Hoffman, which

14   individual here is Nicholas Berg?

15   A.  He is the one kneeling in front of a person who is presumed

16   to be Abu Musab al-Zarqawi, and he's wearing an orange jumpsuit.

17   Q.  And that jumpsuit he's wearing, is that reminiscent of the

18   Guantanamo Bay jumpsuits that you testified about earlier?

19   A.  It's said that it's to be reminiscent of those, yes.

20   Q.  And how was Nicholas Berg killed?

21   A.  Only seconds later he was beheaded.

22           MR. GIBBS:  We can take that down.

23   Q.  If you could look at the next exhibit in the binder, 1-11.

24   A.  Yes, sir.

25   Q.  What is 1-11?

1    A.  That's a British national named Kenneth Bigley, who was a

2    civil engineer who was kidnapped in September 2004 by Al-Qaeda

3    in Iraq, along with two Americans, Eugene Armstrong and

4    Jack Hensley.  As you can see, Kenneth Bigley is also attired in

5    something that's meant to evoke the orange jumpsuits.

6         MR. GIBBS:  We would move Government Exhibit 1-11 into

7    evidence and ask to publish it.

8         THE COURT:  All right.

9         MR. MACMAHON:  No objection, Your Honor.

10        THE COURT:  It's admitted without objection.

11        (GOVERNMENT EXHIBIT Number 1-11 was admitted into

12   evidence.)

13   Q.  And Bigley, is that spelled B-I-G-L-E-Y?

14   A.  Yes, sir.

15   Q.  How was Ken Bigley executed?

16   A.  Beheaded as well.

17   Q.  And what group was responsible for his beheading?

18   A.  Al-Qaeda in Iraq.

19   Q.  Now, Professor Hoffman, I want to turn to a slightly

20   different topic.  Are you familiar with the controversy related

21   to the publication of some cartoons in Denmark that were deemed

22   to be insulting to the Prophet Muhammad?

23   A.  I am.

24   Q.  Can you describe that event?

25   A.  Yes.  On September 30, 2005, a Dutch newspaper,

1    *Jyllands-Posten*, published a dozen cartoons of the

2    Prophet Muhammad.  For especially devout Muslims, a depiction of

3    any living thing is forbidden, not least, of course, the most

4    venerated figure in that religion.  Some of the cartoons

5    depicted the Prophet Muhammad in an unflattering light.  One in

6    particular transformed his turban into a bomb with a fuse lit on

7    it.

8              This evoked considerable outrage throughout the world.

9    The *New York Times* estimates that between 139 and 200 persons

10   were killed as a result of the cartoons.  The cartoonists

11   themselves were threatened.  In January 2015, the offices of a

12   French newspaper, *Charlie Hebdo*, were attacked by two

13   individuals because of their roles in publications of the

14   depictions of the Prophet Muhammad.

15   Q.  Professor Hoffman, I would like you to turn to another

16   exhibit in your binder.  It's Exhibit 1-4.

17   A.  Yes, sir.

18   Q.  What is Exhibit 1-4?

19   A.  That is a photograph of the late Sheikh Omar Abdel-Rahman.

20             MR. GIBBS:  We would ask to admit Exhibit 1-4, and ask

21   to publish it.

22             MR. MACMAHON:  No objection, Your Honor.

23             THE COURT:  Why is this relevant?

24             MR. GIBBS:  One of the letters from one of the hostages

25   indicated to his family that this individual, Omar Abdel-Rahman,

1    he was being told that he could be swapped essentially for this

2    individual.

3              THE COURT:  All right.  Proceed.  I'm not sure we need

4    a photograph of the person to do it, but move it along.

5              (GOVERNMENT EXHIBIT 1-4 was admitted into evidence.)

6    BY MR. GIBBS:

7    Q.  And you indicated this individual is Omar Abdel-Rahman,

8    Professor Hoffman?

9    A.  Yes, sir.

10   Q.  Was he also known as the Blind Sheikh?

11   A.  Yes, sir.  He lost his eyesight when he was 10 months old.

12   Q.  And what was his -- you indicated, I believe, that he was in

13   prison.  What was he in prison for?

14   A.  He was a longtime extremist in Egypt, implicated in the 1980

15   plot to assassinate President Anwar Sadat; eventually came to

16   the United States in 1990; three years later, he blessed the

17   attack on the World Trade Center in Lower Manhattan, the first

18   attack on the World Trade Center.

19             He was subsequently convicted of seditious conspiracy

20   in 1995 for his role in a plot called "The Tunnels and Bridges

21   Plot," which was a plot using terrorist tactics to free the four

22   individuals who had been convicted of the 1993 World Trade

23   Center bombing, and entailed the bombings -- the plot to bomb

24   the Holland and Lincoln Tunnels, the George Washington Bridge,

25   the United Nations headquarters, and the FBI field office in

74

1    Lower Manhattan.

2        He was, in fact, the last person convicted in the

3    United States of seditious conspiracy.  Because he was a blind

4    elderly cleric, he was not very healthy.  He suffered from

5    diabetes and coronary problems.  He became something of a

6    *cause célèbre* because he was a man of the cloth, he was a holy

7    man, because he was elderly and blind and infirm.  There were

8    many efforts to petition for his freedom.  He died in

9    February 2017, while still in a United States prison, of a

10    combination of diabetes and, I believe, arteriosclerosis.

11    Q.  If you could go to Exhibit 1-12 in your binder.

12    A.  Yes, sir.

13    Q.  What is Government Exhibit 1-12?

14    A.  That is a photograph of Dr. Aafia Siddiqui.

15        MR. GIBBS:  Your Honor, at this time we would ask to

16    move Exhibit 1-12 into evidence and publish it.

17        MR. MACMAHON:  No objection.

18        THE COURT:  Admitted.

19        Again, Mr. Gibbs, focus sharply, from here on out, if

20    you will, on matters of relevance.  Continue.

21        (Government EXHIBIT Number 1-12 was admitted into

22    evidence.)

23    Q.  Professor Hoffman, who was or who is Aafia Siddiqui?

24    A.  Aafia Siddiqui is a Pakistani woman who was educated in the

25    United States at the University of Houston, and subsequently got

1    her B.A. from -- or bachelor of science from

2    Massachusetts Institute of Technology, her Ph.D. from

3    Brandeis University in neuroscience.

4         She returned to South Asia in 2008, was arrested in

5    Ghazni Province in Afghanistan, reputedly carried out

6    reconnaissance for an Al-Qaeda attack.  During questioning two

7    days after her arrest, a soldier had put an M4 carbine on the

8    floor which she seized and attempted to shoot her way to

9    freedom.  She was grievously wounded -- or seriously wounded, I

10   should say.

11        THE COURT:  Let me point out that his answer is now a

12   narrative and goes well beyond the question put to him.

13        MR. GIBBS:  I can focus it, Judge.

14        THE COURT:  Yes.

15   Q.  Now, Professor Hoffman, after the event that you described,

16   was Aafia Siddiqui ultimately sentenced to imprisonment in the

17   United States?

18   A.  In 2010 she was sentenced to 86 years in prison, was

19   remanded to the federal prison at Carswell Federal Prison

20   outside of Ft. Worth.

21   Q.  And I want to get to that in a moment.  But a moment ago you

22   described the Blind Sheikh, Omar Abdel Rahman, as a

23   *cause célèbre*.  Was Aafia Siddiqui's lengthy jail sentence, did

24   that also turn her into a *cause célèbre* as well?

25   A.  Absolutely.  She was being described in hagiographic terms

1   as a daughter of Pakistan.  The only other person described as

2   such was the two-time prime minister, the late Benazir Bhutto.

3   There have been many efforts and entreaties to win her freedom,

4   not least of which because she was seriously wounded.  To my

5   knowledge, she spends her entire time in a federal prison

6   hospital, detention facility.

7   Q.  Let's talk about that prison facility.  Where was that

8   located?

9   A.  Outside of Ft. Worth, Texas.

10  Q.  And at some point did a news report come out claiming that

11  Aafia Siddiqui had been assaulted while in that prison?

12  A.  Yes, or assaulted and abused.  This was reported in an

13  online news site called 5Pillars on June 8th, 2013.  5Pillars

14  styles itself as a Muslim news site.  About 70 percent of its

15  readership, it claims, is in the United Kingdom.

16        And they published an article on June 8th, 2013,

17  detailing an assault and the mistreatment of Aafia Siddiqui,

18  arguing for her release, providing her address, and beseeching

19  people to write to her in support.

20        THE COURT:  Mr. Gibbs, pick up your earphones, please.

21        (BENCH CONFERENCE ON THE RECORD.)

22        THE COURT:  Mr. Gibbs, can you hear me?

23        MR. GIBBS:  I can hear you.

24        THE COURT:  Mr. Gibbs, this case is scheduled to last

25  three weeks, maybe four.  It's very important that you focus

1    sharply on what's really relevant.  And it seems to me that much

2    of the evidence you have elicited from this terrorism expert

3    might be nice to know if you were interested in the history of

4    terrorism in the United States.  I'm not clear at all that it

5    has any relevance; that is, that it makes any fact in issue in

6    this case more likely true than not true.

7           So there is no objection, so I'm going to permit you to

8    continue.  But I want to make clear to you that you need to

9    focus sharply on what's relevant.  We don't need an evening

10   speech by someone on history of terrorism.  Am I clear?

11          MR. GIBBS:  Yes, Judge.

12          THE COURT:  All right.  Let's proceed.

13          (END BENCH CONFERENCE.)

14   BY MR. GIBBS:

15   Q.  Professor Hoffman, what is the Arab Spring?

16   A.  The Arab Spring commenced in Tunisia in the spring of 2011.

17   It was a campaign for freedom and economic and political reform,

18   and subsequently very quickly spread to Libya, Egypt, and

19   subsequently Syria.

20   Q.  And when the Arab Spring spread to Syria, were there groups

21   there that rose up against the Government of Syria?

22   A.  Yes.  In response to the deprivations and killing of

23   peaceful demonstrators by the regime of Bashar al-Assad.

24   Q.  Was that the Free Syrian Army?

25   A.  Yes, it was.

1    Q.  And did Al-Qaeda also attempt to establish its own group in

2    Syria to fight against the Assad regime?

3    A.  Yes, sir, it did.

4    Q.  And what group was that?

5    A.  It was called Jabat Al-Nusra, or the Support Front.

6    Q.  And does that also -- is it also known as Al-Nusra Front, or

7    ANF?

8    A.  Yes, sir.

9    Q.  And who did Al-Qaeda select -- or who did Al-Qaeda want to

10    run Al-Nusra Front when it was established?

11    A.  Someone named Mohammad Julani, a Syrian.

12    Q.  Can you spell Julani?

13    A.  J-U-L-A-N-I.

14    Q.  And ultimately was Al-Nusra Front designated by [sic] a

15    Foreign Terrorist Organization by the United States?

16    A.  Yes, on December 11, 2012.

17    Q.  Now, you mentioned Julani as being the person that Al-Qaeda

18    selected to lead Al-Nusra Front.  Did Al-Qaeda also attempt to

19    get an individual named Abu Bakr al-Baghdadi to assist with

20    Al-Nusra Front?

21    A.  Yes, that's correct.

22    Q.  And can you describe that?

23    A.  Yes, Abu Bakr al-Baghdadi was the latest in a series of

24    leaders of what had evolved from Al-Qaeda in Iraq to the Islamic

25    State in Iraq, and subsequently, in 2013, to the Islamic State

1    in Iraq or Syria, or ISIS.  And Abu Bakr al-Baghdadi saw

2    Jabat Al-Nusra as his own creation, and basically wanted to

3    command it, whereas Al-Qaeda wanted Jabat Al-Nusra it to be a

4    separate arm of Al-Qaeda, unique and different from that in

5    Iraq.

6    Q.  And given -- well, first of all, can you take a look at your

7    binder at Government Exhibit 1-16.

8    A.  Yes, sir.

9    Q.  And what is Government Exhibit 1-16?

10   A.  That's a photograph of Abu Bakr al-Baghdadi from the fall of

11   2019, before he was killed.

12          MR. GIBBS:  If we could move into evidence Government

13   Exhibit 1-16, and publish it.

14          THE COURT:  You may do so without objection.

15          MR. MACMAHON:  No objection.

16          (GOVERNMENT EXHIBIT Number 1-16 was admitted into

17   evidence.)

18   Q.  Professor Hoffman, what did Abu Bakr al-Baghdadi claim about

19   his relationship to the Prophet Muhammad?

20   A.  He claims familial lineage to the prophet.  In fact, his

21   full -- Abu Bakr al-Baghdadi is his *nom de guerre*, let's say.

22   His given name actually refers to the persons that were closely

23   associated with the prophet from the time of the founding of

24   Islam.

25   Q.  And you testified a moment ago that Baghdadi actually wanted

1    to run Al-Nusra Front, and Al-Qaeda wanted Julani to run it.

2    Did that result in conflicts between the two of them?

3    A.  Yes, al-Baghdadi, in April of 2013, announced the formation

4    of Al-Nusra Front, and already, I think, evidenced indications

5    that he was aggregating responsibility for himself, which

6    brought him into conflict with al-Zawahiri.

7         During that period, a number of fighters who joined

8    Al-Nusra Front defected and proclaimed their allegiance to

9    al-Baghdadi, and joined what was then ISIS.

10   Q.  And by early January 2014, what did Al-Qaeda do with regards

11   to this rift between Julani and Baghdadi?

12   A.  Well, it was a power struggle between al-Baghdadi and

13   al-Zawahiri, the leader of Al-Qaeda, who would actually command

14   Al-Nusra Front.  In the end al-Zawahiri expelled

15   Abu Bakr al-Baghdadi and the Islamic State of Iraq and Syria

16   from the Al-Qaeda fold, and they henceforth became an

17   independent entity.

18        THE COURT:  You said "dispelled"?

19        THE WITNESS:  Expelled.

20   Q.  After being expelled, was Baghdadi's group essentially going

21   forward as ISIS, or the Islamic State?

22   A.  Yes.  In direct competition with Jabat Al-Nusra, with the

23   Al-Qaeda operations in Syria.

24   Q.  And in terms of its direct competition with Al-Nusra Front,

25   did ISIS attempt to attract new recruits to come join ISIS in

1    Syria to fight?

2    A.  Yes, absolutely.

3    Q.  And how did ISIS go about trying to attract new recruits?

4    A.  Well, frankly, it revolutionized radicalization and

5    recruitment in the field of terrorism.  It explored what was

6    then the emerging platforms of social media.

7    Q.  And were they successful in taking advantage of those

8    platforms of social media in attracting fighters to come to

9    Syria?

10   A.  Extraordinarily successful.  I think in the annals of

11   history, they were the first truly international terrorist

12   organization.  They attracted somewhere between 40,000 foreign

13   fighters from somewhere between 120 and 140 countries around the

14   world.

15          Given that there are 180 countries in the

16   United Nations, that - my math isn't very good - means 60 or

17   70 percent of the world's countries contributed foreign fighters

18   to ISIS.

19   Q.  In terms of harnessing new technologies, was ISIS very

20   sophisticated in its media approach?

21   A.  Well, ISIS's motto was, "Don't hear about us, hear from us."

22   And they made extensive use of all social media, ones that are

23   familiar names now, Facebook, Twitter, WhatsApp.  They had their

24   own app on Twitter, The Dawn of Glad Tidings, that pushed out

25   information worldwide in order to recruit foreign fighters.

1    Q.  And if you could take a look in your binder, and I believe

2    it will be in Binder Number 2.  Do you have it there?

3    A.  I do, sir.

4    Q.  Toward the beginning, it's Exhibit 1-41A.

5    A.  Yes, sir.

6    Q.  Is that a CD?

7    A.  It is.

8    Q.  And do you recognize that CD?

9    A.  One second.  Sorry, it's 1-41, not 1-41A.  Yes, sir, that's

10   my signature.  I viewed that in your office on January 6th,

11   2022.

12   Q.  And is this a portion of a video that ISIS produced called

13   "Although the Disbelievers Dislike It"?

14   A.  Yes, sir, it is.

15          MR. GIBBS:  Your Honor, at this time we would ask to

16   move in Government Exhibit 1-41 -- is it A or just 41?

17          THE WITNESS:  Mine is 1-41A.

18          MR. GIBBS:  Yeah, this is about a four-minute clip from

19   that video.  We would ask to play it and move it into evidence.

20          THE COURT:  All right.  Without objection, it's

21   admitted.

22          MR. MACMAHON:  Your Honor, I'm sorry to say, I have an

23   Exhibit 1-41 and 14-1A.  I'm not exactly sure which one it is.

24          MR. GIBBS:  It's A.

25          THE COURT:  Which one are you moving in, Mr. Gibbs?

1           MR. GIBBS:  I believe it's 1-41A.  It's the first

2    4 minutes and 14 seconds of the video.  It's in Arabic, but

3    there are English subtitles.

4           THE COURT:  Any objection?

5           MR. MACMAHON:  No, Your Honor.

6           THE COURT:  It's admitted.  Without objection, you may

7    display it.

8           (GOVERNMENT EXHIBIT Number 1-41A was admitted into

9    evidence.)

10           THE COURT:  Ladies and gentlemen, you can see it on the

11   various repeaters.  Go ahead, you may play it.

12           (Video played in open court.)

13           THE COURT:  Pick up the earphones again, Mr. Gibbs.

14           (BENCH CONFERENCE ON THE RECORD.)

15           THE COURT:  Can you hear me, Mr. Gibbs?

16           MR. GIBBS:  I can.

17           THE COURT:  Mr. Gibbs, I understand that the government

18   has the burden of proving that this defendant and others were in

19   a conspiracy with ISIS to take hostages and to do other things

20   as a conspiracy.  But it seems to me, I don't quite understand

21   why you needed to show that film.  Can you explain the relevance

22   of that film to me?

23           MR. GIBBS:  Sure, Judge.  That sets forth the creation

24   of ISIS starting in the Iraqi war going up through

25   Abu Bakr Al-Baghdadi, who is shown at the end in the mosque.  So

1    it's ISIS's media sort of describing its evolution and its

2    creation, and the entire video will be entered.  We just played

3    that portion for the jury, but that entire video will come in.

4         In addition, as I mentioned in the opening statement,

5    at the end of that video it shows Peter Kassig's decapitated

6    head.

7         THE COURT:  The video we just saw?

8         MR. GIBBS:  It's not in the portion we saw, but it's in

9    the longer video which will be entered into evidence.

10        THE COURT:  All right.  Let's proceed.  But, again, let

11   me encourage, admonish you, to focus very sharply on what's

12   relevant to the elements of the offenses charge.  Otherwise, I

13   despair that we may be here while you give us all a course in

14   terrorism for some Ph.D. students or even history students.  We

15   don't need that.

16        MR. GIBBS:  Well, understood, Judge.  The one thing I

17   would say is, the jury will get a tremendous amount of that.  It

18   really does require some specialized knowledge, and I'm trying

19   to lay a foundation with Professor Bruce Hoffman for information

20   they will be hearing through subsequent witnesses.

21        THE COURT:  All right.  Do so.

22        MR. GIBBS:  Thank you.

23        (END BENCH CONFERENCE.)

24   BY MR. GIBBS:

25   Q.  Professor Bruce Hoffman, the clip we just saw from "Although

1    the Disbelievers Dislike It" - that was the first four minutes

2    or so - have you seen that before?

3    A.  Yes, I have.

4    Q.  Is there any references or any images of Peter Kassig

5    anywhere in that video?

6    A.  Yes, there are.

7    Q.  What is depicted there?

8    A.  Peter Kassig wearing the orange jumpsuit, about to be

9    beheaded.

10   Q.  And there was also a photograph in there of Abu -- or a

11   video of Abu Bakr Al-Baghdadi?

12   A.  Yes, sir.

13   Q.  And how frequently did Baghdadi speak in public?

14   A.  Only twice that he was videotaped; in the image on that

15   video, which is from July 4th, 2014, the Nur al-Din Mosque in

16   Mosul, and then the first photograph of Abu Bakr al-Baghdadi

17   from the fall of 2015.

18   Q.  And the photograph -- or the video of him shown from the

19   mosque in Mosul, what was he doing at that time?

20   A.  In essence, he was declaring himself the khalif, or the

21   leader, of the Muslim world, and declaring the caliphate ruled

22   by the Islamic State.

23   Q.  And if you could take a look in, I believe it's Binder

24   Number 1, to Exhibit 1-17.

25   A.  1-17?

1    Q.  Yeah, 1-17.

2    A.  Yes.

3    Q.  And what is 1-17?

4    A.  That's a photograph of Mohammad al-Adnani.

5    Q.  Who was or who is Mohammad al-Adnani?

6    A.  He was a leading figure in ISIS.  He was -- it's really a

7    spokesperson, but also commanded its intelligence and also its

8    external operations units.

9    Q.  And was he one of the senior figures within ISIS on par with

10   Abu Bakr al-Baghdadi?

11   A.  One of the most senior.

12   Q.  And did he make an important statement called on June 29,

13   2014 called "This is the Promise of Allah"?

14   A.  Yes.  In fact, that statement was a preview of

15   Abu Bakr al-Baghdadi appearing at the Nur al-Din Mosque a few

16   days later.  And that statement from al-Adnani declaration the

17   caliphate, and Abu Bakr al-Baghdadi as the Khalif.

18   Q.  If we can go in Binder Number 2 to Exhibit 1-51.  I just

19   want to have you identify and move it in, but not publish it.

20   A.  Yes, sir.

21   Q.  What is 1-51?

22   A.  That is a copy of *Dabiq* magazine, that "This is the Promise

23   of Allah," which is the text of al-Baghdadi's June 2014 speech.

24          MR. GIBBS:  I won't publish it, but I would ask to move

25   in Government Exhibit 1-51.

1          MR. MACMAHON:  No objection, Your Honor.

2          THE COURT:  All right.  Why is this relevant?

3          MR. GIBBS:  I'll ask some follow-up questions, Judge.

4          THE COURT:  All right.  I'll do so.  I'll rule at the

5     end if I find it's relevant.

6     BY MR. GIBBS:

7     Q.  Now, Professor Hoffman, in the exhibit that you just

8     identified, "This is the Promise of Allah," did Adnani declare

9     that ISIS now consisted of a physical caliphate?

10    A.  Yes.  He basically declared that it was a government, that

11    it was the Islamic State.

12    Q.  And now that there was a -- did ISIS -- or in this

13    statement, did ISIS also claim to control an actual physical

14    territory?

15    A.  It did indeed do that, and it did indeed control physical

16    territory.

17    Q.  And was that new in the annals of terrorism; certainly in

18    this time?

19    A.  Yes.  It's rare that any terrorist group actually can gain

20    sovereignty and exercise control and governance over a

21    population.  In ISIS's case, again, I would say it's unique in

22    the annals of history.  It controlled about a third of Syria and

23    40 percent of Iraq, about 81,000 square miles.  When one thinks

24    that England, Wales, and Scotland are 80,000 miles,

25    Islamic State is almost as large as the entire United Kingdom,

1    with some 7.7 million people under its control.

2    Q.  And now that ISIS claimed to control physical territory, did

3    they actively encourage fighters to come fight in that physical

4    territory?

5    A.  Absolutely.

6    Q.  And if you can next turn to, I believe it's in Binder 1,

7    Government Exhibit 1-15.

8    A.  Did you say 1-15?

9    Q.  Yeah, 1-15.

10   A.  Yes, sir.

11   Q.  What is Government Exhibit 1-15?

12   A.  "Hijrah of the Islamic State," or Emigration to the Islamic

13   State.

14   Q.  So that's a publication?

15   A.  That is a publication from the Islamic State directed at

16   English-speaking individuals, and, in essence, beseeching them

17   not just to come to the Islamic State, but providing a handbook

18   or a guide, a how-to version to actually effect their travels to

19   the Islamic State in Syria and Iraq.

20        MR. GIBBS:  Your Honor, we would ask to move in

21   Government Exhibit 1-15, and just publish the cover page.

22        MR. MACMAHON:  No objection, Your Honor.

23        THE COURT:  Admitted.  You may do so.

24        (GOVERNMENT EXHIBIT Number 1-15 was admitted into

25   evidence.)

1   Q.  Professor Hoffman, what we see on the screen, is this the

2   cover of this English version publication, "Hijrah to the

3   Islamic State"?

4   A.  It is.

5   Q.  And that word "Hijrah," H-I-J-R-A-H, what does that mean?

6   A.  Migration or immigration.

7   Q.  Now, Professor Hoffman, you indicated that ISIS encouraged

8   fighters to come to the Islamic State.  Did ISIS also use its

9   media operation to publicize stories about fighters who had

10  successfully made it there and fought with the Islamic State?

11  A.  Yes, it did.

12  Q.  If you could turn to Government Exhibit 1-54, which would be

13  in Binder 2.

14  A.  Yes.

15  Q.  Do you have it there?

16  A.  1-52?

17  Q.  I'm sorry, if I said 52, it's 1-54.

18  A.  Okay.  Yes, I see it.

19  Q.  What is 1-54?

20  A.  That is a photograph of the Canadian national named

21  Andre Poulin, whose *nom de guerre*, or kunya, was

22  Abu Muslim al-Kanadi, "Father of Muslims from Canada."

23  Q.  How do you spell Poulin?

24  A.  P-O-U-L-I-N.

25  Q.  And you mentioned an alias, or did you use the word kunya?

1    A.  I did.

2    Q.  Is that spelled K-U-N-Y-A?

3    A.  It is.

4    Q.  What is a kunya?

5    A.  Well, it literally means "father of," but in the case where

6    we're talking about it to groups like this, it's kind of a

7    *nom de guerre*, a name of war, an adopted name.  It often

8    signifies where they're from, in essence.

9           MR. GIBBS:  Your Honor, if we could move Government

10   Exhibit 1-54 into evidence and publish it.

11          MR. MACMAHON:  No objection, Your Honor.

12          THE COURT:  Admitted.  You may do so.

13          (GOVERNMENT EXHIBIT Number 1-54 was admitted into

14   evidence.)

15   Q.  Professor Hoffman, the photograph on the screen, this is

16   Andre Poulin, also known as Abu Muslim al-Kanadi, you said?

17   A.  Yes.

18   Q.  Who was that?

19   A.  He was a Canadian national born in Ontario.  He converted to

20   Islam, and in 2011 he made his way to -- 2012, actually, made

21   his way to Syria.  In 2013 he was -- in July 2013, he was killed

22   in an ISIS assault on a Syrian air base in the Aleppo

23   directorate.

24   Q.  And did ISIS actually produce a recruitment video

25   highlighting his exploits?

1    A.  It was the first video directed against Westerners or

2    English language speakers, and it was released in July 2014.

3    Q.  And what was depicted in that video?

4    A.  Poulin talks about his life.  He implores other Westerners,

5    particularly Canadians, to come and join ISIS.  He describes the

6    Islamic State as paradise, a very welcoming environment.  He

7    tries to make it accessible.  He says that even if you can't

8    come, there are all sorts of ways that you can render assistance

9    to the Islamic State.

10          I think interestingly, he talks about technical

11   information, technology know-how, social media.  He calls upon

12   Muslims in Western countries not to pay taxes, because those

13   taxes are being used to wage war on Islam.  And I would say he

14   tries to normalize the process of leaving one's homeland and

15   coming to Syria or Iraq to fight alongside or on behalf of ISIS.

16   And he's depicted being killed, actually, very dramatically.

17   Q.  That's in the video?

18   A.  A group of ISIS fighters are assaulting this air base, and

19   it depicts him running out ahead, almost alone in a open field,

20   and he's cut down in a hail of gun fire and then is heralded as

21   a martyr.

22   Q.  Professor Hoffman, the video we looked at earlier, the

23   four-minute clip or so, there was a reference in there to Dabiq,

24   but it's spelled D-A-B-I-Q.  Did you recognize that reference?

25   A.  Yes, I did.

1    Q.  And what is the significance of Dabiq in ISIS's mythology?

2    A.  Well, twofold.  I mean, it's prophesied as the place of

3    Armageddon, or the apocalypse or the final battle, between the

4    true believers against the infidels will take place.  It also is

5    the name of the English language online magazine that ISIS

6    published.

7    Q.  In terms of the physical location of Dabiq, where is that

8    located?

9    A.  Yes, it's a genuine place.  It's in Northern Syria.

10   Q.  If you can take a look in Binder Number 2 to Government

11   Exhibit 2-1.

12   A.  Yes, sir.

13   Q.  What is 2-1?

14   A.  That is a map of the province of Lebanon, Syria, and Iraq.

15          MR. GIBBS:  Your Honor, we would ask to move Government

16   Exhibit 2-1, the map, into evidence, and to publish it.

17          THE COURT:  All right.

18          MR. MACMAHON:  No objection, Your Honor.

19          THE COURT:  Without objection, it's admitted.  You may

20   do so.

21          (GOVERNMENT EXHIBIT Number 2-1 was admitted into

22   evidence.)

23   Q.  Professor Hoffman, do you see the location of Dabiq on this

24   map on 2-1?

25   A.  Yes, it's in the extreme north of Syria, right along the

1   Turkish border, fairly close to the Turkish border.

2   Q.  I'd like to have you do something.  I believe that the

3   screen -- you may be able to put your finger on the screen, it

4   may be possible to circle it.

5   A.  Yeah, it is, actually.

6   Q.  Okay.  So, Professor Hoffman, what is it that you just

7   circled on that exhibit?

8   A.  I circled a place called Dabiq.

9   Q.  And you pronounce it Dabiq?

10  A.  I pronounce it Dabiq.

11  Q.  And if you could tap the screen, I think that will clear it

12  for us.

13          MR. GIBBS:  And we can take that down.

14  Q.  So, Professor Hoffman, Dabiq is a physical location in

15  Syria.  Is *Dabiq* also the name of a series of ISIS publications?

16  A.  It is.

17  Q.  And if you could take a look in Binder Number 1 to

18  Exhibit 1-36.

19  A.  Yes.

20  Q.  What is Government Exhibit 1-36?

21  A.  That is *Dabiq*, Issue Number 5.

22  Q.  So these publications, *Dabiq*, there were multiple issues

23  that were published?

24  A.  Yes.

25          MR. GIBBS:  Your Honor, at this time we would ask to

1    move in Government Exhibit 1-36.  There's one page I would like

2    to publish.

3              MR. MACMAHON:  No objection, Your Honor.

4              THE COURT:  Admitted without objection.  You may do so.

5              (GOVERNMENT EXHIBIT Number 1-36 was admitted into

6    evidence.)

7              MR. GIBBS:  If we could go to the second page, there's

8    a quote at the top I would like to blow up or highlight.

9    Q.  The quote that's on your screen or on our screens,

10   Professor Hoffman, "The spark has been lit here in Iraq," who is

11   that attributed to?

12   A.  Abu Musab al-Zarqawi.

13   Q.  And reference to "Crusader Armies," what is Crusader Armies

14   a reference to?

15   A.  The Armies of Western countries.  Particularly the

16   United States and Great Britain, but certainly any Western Army.

17             MR. GIBBS:  We can take that down.

18             THE COURT:  How much more do you have of this witness?

19             MR. GIBBS:  Your Honor, assuming we break at 1:00, it

20   will go through that, probably.  I can work on my questions over

21   lunch, but probably another hour and a half.

22             THE COURT:  Yet to go?

23             MR. GIBBS:  Correct, Your Honor.

24             THE COURT:  All right.  Continue.  I'll break once the

25   lunches are here and we'll proceed.

 1                Go ahead, Mr. Gibbs.

 2      BY MR. GIBBS:

 3      Q.  Professor Hoffman, beginning in 2014, did ISIS encourage

 4      attacks on the West?

 5      A.  Yes, it did.

 6      Q.  And, in fact, did the individual you testified earlier,

 7      Abu al-Adnani, was he involved in encouraging attacks on the

 8      West?

 9      A.  Yes, he made a very famous pubic address in September 2014

10      to that effect.

11      Q.  And we can -- I could have you turn to Government

12      Exhibit 1-35.

13      A.  Yes.

14      Q.  What is 1-35?

15      A.  1-35 is *Dabiq* magazine, Issue Number 4.

16                MR. GIBBS:  Your Honor, at this time we would ask to

17      move in Government Exhibit 1-35, and I have one page in there I

18      would like to publish.

19                MR. MACMAHON:  No objection, Your Honor.

20                THE COURT:  Admitted.  You may do so.

21                (GOVERNMENT EXHIBIT Number 1-35 was admitted into

22      evidence.)

23      Q.  If we could go to page 9.

24                MR. GIBBS:  Can we pull up the yellow highlighted

25      portion?

1   Q.  Now, Professor Hoffman, can you explain this statement as it

2   relates to al-Adnani?

3   A.  Yes.  I mean, in essence, it was a call to arms.  It was

4   calling upon Muslims anywhere in the world to attack, in

5   particular Americans, Europeans, French, Australians, Canadians.

6   In other words, what the media often calls "lone wolf" act or

7   attack; it was meant to inspire acts of violence in their own

8   countries on behalf of ISIS.

9           MR. GIBBS:  We can take that down.

10  Q.  And, Professor Hoffman, you talked about lone wolf attacks.

11  Were there, in fact -- after this Adnani statement, were there

12  lone wolf attacks in the West that ISIS claimed credit for?

13          MR. MACMAHON:  Your Honor, I object to relevance.  This

14  is far afield.

15          THE COURT:  Pick up the earphones, please.

16          (BENCH CONFERENCE ON THE RECORD.)

17          THE COURT:  Mr. MacMahon, tell me what your objection

18  is.

19          MR. MACMAHON:  It's to relevance, Your Honor.  I

20  understand it's a background that the jury is going to need

21  here, but there's no issue in this case over lone wolf attacks

22  in the West.  And all the terrible things that ISIS has or is

23  accused of being done, we could go on forever talking about

24  ISIS.

25          THE COURT:  Mr. Gibbs?

1          MR. GIBBS:  Yes, Your Honor.  We have a subsequent

2     witness, Tyler Treml --

3          THE COURT:  You're speaking up too much.  Cover your

4     mouth.

5          MR. GIBBS:  Your Honor, we have another witness by the

6     name of Tyler Treml, who will testify about ISIS's media and

7     some of the publications that were put out, which includes

8     graphic images of some of these lone wolf attacks.  They

9     essentially plotted on a map and identified --

10          THE COURT:  Tell me this.  Why is that relevant to this

11     case?

12          MR. GIBBS:  Well, Your Honor, part of the material

13     support charges involve us having to prove the defendant knew

14     ISIS was a designated FTO, or that ISIS engaged in terrorism.

15     And the fact that the organization --

16          THE COURT:  I'm not sure that -- just a moment.  Let me

17     check something.  I'm not sure I agree with you on that.  I'm

18     not sure you have to prove that the defendant knew it was an

19     FTO.

20          MR. GIBBS:  No, it's in the alternative.  Knew that it

21     was an FTO, or that the organization engaged or engages in

22     terrorism.

23          THE COURT:  All right.  I'll go ahead and overrule the

24     objection.  I see some relevance because of the material support

25     issues, and we'll proceed.  But I'm going to take a luncheon

1    recess at this time, and I may address it further before I

2    recess for lunch.

3              (END BENCH CONFERENCE.)

4              THE COURT:  Ladies and gentlemen, the good news is the

5    lunches are here, and so we're going to take the luncheon recess

6    at this time and we will reconvene at 1:15.  That should give

7    you sufficient time to have a reasonably leisurely lunch.

8              Again, I hope that it's adequate.  Remember to refrain

9    from discussing the matter among yourselves or with anyone, or

10   undertaking any investigation on your own.  You may follow the

11   court security officer out.  Put your books in the cubbyholes.

12             (Jury out at 12:09 p.m.)

13             MR. FITZPATRICK:  May the witness be excused?

14             THE COURT:  Yes.  Professor, you may step down, sir.

15   During the luncheon recess you are not to discuss your testimony

16   with anybody, none of the lawyers or anyone else.  And I will

17   see you at 1:15.  Thank you, sir.

18             All right.  Now, Mr. Gibbs, I have overruled the

19   objection, so I'm going to permit you to continue; that is, the

20   objection that it's irrelevant.  But I want to underscore, I

21   want to emphasize to you, that you need to focus sharply.  I

22   understand that in the allegations of engaging in a conspiracy

23   to provide material support to terrorists, to a Foreign

24   Terrorist Organization, and that you have to show that the

25   defendant knew the organization was a designated terrorist

1   organization, or that the organization had engaged in or was

2   engaging in terrorist activities or terrorism, you have to show

3   that.  Is that what you're contending all this testimony helps

4   you to show to the jury?

5           MR. GIBBS:  Certainly as to this portion, that's

6   correct, Judge.  On a number of the earlier ones - for example,

7   Andre Poulin, the Canadian - that was more aimed at the fact

8   that the defendant indicated he knew that individual, and, you

9   know, had met him within his time in ISIS.

10          THE COURT:  But I take it that what you want to

11   introduce this testimony -- the purpose is to persuade the jury

12   that the government has met its burden to show that the

13   defendant knew the object of the ISIS conspiracy, and knowingly

14   joined it, and that he knew that it was a foreign terrorist --

15   or designated terrorist organization, or that the organization

16   had engaged in or was engaging in terrorist activity.

17          MR. GIBBS:  Absolutely, Judge.

18          THE COURT:  All right.  Again, let me encourage you to

19   sharpen your focus.  And I think I understand your position on

20   relevancy, but we need to avoid it becoming a college course on

21   terrorism generally.  It needs to focus sharply on evidence you

22   intend to be able to point to to tell the jury that the

23   government has met its burden of proving beyond a reasonable

24   doubt that he knew that it was a Foreign Terrorist Organization,

25   or that he knew that it engaged in terrorist activity, and that

1    he knew the purpose of ISIS when he joined ISIS.  And one of the

2    purposes will be, I take it, the hostage-taking.

3              MR. GIBBS:  Correct.

4              THE COURT:  All right.  I've ruled on your objection,

5    Mr. MacMahon, and I think I've made clear the basis for my

6    overruling of it.  But I have also encouraged Mr. Gibbs to

7    sharpen his focus.

8              MR. MACMAHON:  Yes, Your Honor.

9              MR. GIBBS:  Judge, I will work on that at lunch.

10             THE COURT:  All right.  Court stands in recess until

11   1:15.

12             (Recess taken at 12:13 p.m.)

13             (BENCH CONFERENCE ON THE RECORD.)

14             THE COURT:  As I understand it from the court reporter,

15   you've made a request for what?  And the reason I ask you is

16   that, unless there's a necessity for it, I'm not going to

17   authorize the expenditure.

18             MR. MACMAHON:  If I may, Your Honor, the only thing we

19   asked for was the opening statement, so Ms. Ginsberg can look at

20   those and prepare for her closing.  They don't have to be done

21   on an expedited basis or anything like that.  That's all we

22   asked for.

23             THE COURT:  All right.  And you wanted that for your

24   closing, and you're not asking for it on an expedited basis?

25             MR. MACMAHON:  No, Your Honor.

 1          THE COURT:  And the reason, as I said, that I ask you

 2     about that is I have to approve expenditures, and all I knew is

 3     that you wanted something done already that's been on an

 4     expedited basis.  So I thought it best to ask you so you

 5     wouldn't have to -- you would understand why I either didn't

 6     approve it, or why, if I did, you wouldn't have to pay for it.

 7          MR. MACMAHON:  Of course, Your Honor.  I'm sorry for

 8     the confusion.  It doesn't need to be done on an expedited

 9     basis.  It's 50, 60 pages total.

10          THE COURT:  I quite agree.  I don't think there's any

11     basis in the law for it being *ex parte*, so I'm going to tell the

12     government what I've just done.

13          MR. MACMAHON:  That's fine, Your Honor.  Thank you.

14          (END BENCH CONFERENCE.)

15          THE COURT:  That was *ex parte* because I thought it

16     might need to be *ex parte*.  It doesn't have to be *ex parte*.

17     What happened, to put it briefly, is it was reported to me that

18     the defense wanted portions of the proceedings thus far to be

19     prepared.  And I misunderstood, is a better way to put it, that

20     it was to be done on an expedited basis.

21          Well, these are busy times, that's expensive, and

22     although I have spent 35 years as a judge trying to persuade my

23     fellows that we should not -- district judges should not have to

24     approve expenses that defense or the government or anyone else

25     undertakes, I have not succeeded.  We still have to approve all

1      the CJA and everything else.

2              And I'm sort of glad I haven't succeeded, because you

3      know what would happen if I did succeed.  There would be a whole

4      new bureaucracy created for that.

5              In any event, all that was requested, reasonably

6      requested, is a copy of the opening statements, and that will be

7      prepared, not on an expedited basis, and it will be available to

8      both sides, both opening statements will be available to both

9      sides on a non-expedited basis.

10             All right.  Are you ready to proceed, Mr. Gibbs?

11             MR. GIBBS:  Yes, Your Honor.

12             THE COURT:  All right.  Now, there is an exhibit that I

13     had not ruled on.  And I think I've reviewed that.  Let me

14     ask...

15             Exhibit 17 and 51, remind me, Mr. Gibbs, what they

16     were.

17             MR. GIBBS:  Correct.  So 1-17 is the photograph of

18     al-Adnani, who is one of the leaders of ISIS.  It was published

19     for the jury, I believe.

20             THE COURT:  So it's clearly admitted.

21             MR. GIBBS:  And 1-51 is a publication called "Hijrah to

22     the Islamic State."  The cover was also published.

23             THE COURT:  It's admitted as well.

24             (GOVERNMENT EXHIBIT Numbers 1-17, 1-51 were admitted

25     into evidence.)

1          THE COURT:  Let me reiterate what I said before, which

2     is that I have admitted this because -- a lot of the material

3     that you have admitted, because it was without objection and I

4     think it is relevant because it does go to the government's

5     burden to prove beyond a reasonable doubt -- with respect to the

6     counts relating to material support to a Foreign Terrorist

7     Organization, the government has to prove that the defendant

8     knew that the organization was a designated terrorist

9     organization, or that the organization had engaged in or was

10    engaging in terrorist activity or terrorism.

11         That was your aim, was it not?

12         MR. GIBBS:  It was, Judge.

13         THE COURT:  And all I did was suggest to you, I hope

14    gently, don't gild the lily.  Let's get through this.

15         MR. GIBBS:  Fair enough.  And I did cut my outline down

16    substantially over lunch, Your Honor.

17         THE COURT:  All right.  Good.

18         Bring the jury in, please.

19         (Jury in at 1:30 p.m.)

20         THE COURT:  Ladies and gentlemen, I hope you had

21    sufficient time for lunch, and that you were satisfied with your

22    Baked Alaska or the substitute on the menu for today.  I don't

23    even know what Baked Alaska is.  I've never had it.

24         In any event, we're prepared to go on, Mr. Gibbs?

25         MR. GIBBS:  We are, Your Honor.

104

 1          THE COURT:  All right.  Let's bring Professor Hoffman

 2    back to the stand, please.

 3          You may resume the stand, Professor Hoffman.  You'll

 4    recall, sir, that you remain under oath.

 5          THE WITNESS:  Yes, Your Honor.

 6          THE COURT:  Mr. Gibbs, you may continue your direct

 7    examination of Professor Hoffman.

 8    BY MR. GIBBS:

 9    Q.  When you testified this morning, you testified about ISIS's

10    media operation.  Do you recall that?

11    A.  Yes, sir.

12    Q.  Did ISIS use its media operation to claim credit for its

13    military successes?

14    A.  Yes, it did.

15    Q.  And did it claim credit for seizing a large military base

16    outside Raqqa, Syria, in 2018?

17    A.  Yes, they did.

18    Q.  Can you describe what happened in that event?

19    A.  Yes.  The Division 17 Syrian Army base was the largest

20    Syrian military facility in the north of Syria.  It was overrun

21    by ISIS on July 25, 26, 2014.

22    Q.  And when ISIS overran the military base, what happened to

23    the soldiers of Division 17 of the Syrian Army?

24    A.  Well, those who escaped were rounded up in the surrounding

25    countryside.  Others who were captured, some were crucified and

1    nailed to telephone poles, others were recorded on film being --

2    50 to 75 of them were systematically beheaded.

3    Q.  And was the event surrounding Division 17, was that one of

4    the first mass beheadings by ISIS that were actually publicized?

5    A.  To my knowledge, yes.

6    Q.  And how did ISIS go about publicizing those beheadings?

7    A.  Publicized in both videos from *Al-Furqan*, and then also in

8    print by *Al-Hayat*, and in *Dabiq* as well.

9    Q.  And *Al-Furqan* and *Al-Hayat*, are those additional ISIS

10   publications?

11   A.  Well, *Al-Furqan* is *The Criterion*, I guess, in English.  It

12   was basically ISIS's media arm.  *Al-Hayat*, which means life, was

13   specifically the media arm which communicated in English,

14   French, German, and Russian, and was more hard copy publications

15   or online magazines.

16   Q.  And in terms of publicizing the events surrounding

17   Division 17, if you could turn to Exhibit 1-33, which I believe

18   is in Binder 2.  No, it's Binder 1.

19   A.  Yes.

20   Q.  What is Government Exhibit 1-33?

21   A.  It is *Dabiq* Issue Number 2.

22          MR. GIBBS:  Your Honor, at this time we would ask to

23   move in Government Exhibit 1-33, and I would like to publish a

24   section that relates to Division 17.

25          THE COURT:  All right.

```
 1            MR. MACMAHON:  No objection, Your Honor.

 2            THE COURT:  Admitted.  You may do so.

 3            (GOVERNMENT EXHIBIT Number 1-33 was admitted into

 4    evidence.)

 5            MR. GIBBS:  If we could publish page 42.

 6    BY MR. GIBBS:

 7    Q.  And, Professor Hoffman, what is the title of this article in

 8    Dabiq Issue 2?

 9    A.  The capture of Division 17.

10    Q.  What is described in this article?

11    A.  Preparing for battle, and then a ghanimah from the battle.

12    Q.  And let's talk about ghanimah.  Is that spelled

13    G-H-A-N-I-M-A-H?

14    A.  Yes, sir.

15    Q.  What goes Ghanimah mean?

16    A.  War spoils, or plunder.

17    Q.  And would that include slaves?

18    A.  Yes, it can.

19            MR. GIBBS:  We can take that down.

20    Q.  Now, Professor Hoffman, who are the Kurds?

21    A.  The Kurds are today the largest non-state peoples, I

22    believe, in the world.  Some 30 million Kurds are spread across

23    Turkey, Syria, Iraq, and Iran.

24    Q.  And who are the Syrian Democratic Forces, or SDF?

25    A.  Syrian Democratic Forces are under the command of the
```

1   People's Protection Units, the YPG, which is the Kurdish

2   militia.  It's a combination of Kurdish and Arab militias,

3   self-defense forces, in Syria.

4   Q.  And finally, who are the Yazidi people?

5   A.  The Yazidi people live in Iraq, near Mosul.  It is an

6   offshoot of Islam.  They have their own particular

7   interpretation of the religion.  It's what's called the

8   syncretic religion, which takes parts of different religions.

9   But the main thing is that their form of worship centers around

10  seven angels, one of whom, reputably, Tawuse Melek, who is the

11  devil who fell to earth and subsequently repented, and acts as a

12  liaison between humans and God.  And therefore, this is why the

13  Yazidis have been incorrectly called devil worshippers.

14  Q.  And, Professor Hoffman, what was the fate of the Yazidi

15  people in areas that ISIS conquered?

16  A.  Absolutely tragic.  The men were taken away and executed,

17  the women were enslaved, and the children were separated from

18  their mothers and raised, and forcibly converted into ISIS's

19  particular interpretation of Islam.

20  Q.  And, Professor Hoffman, if you can turn to Exhibit 1-24

21  in, I believe it's Binder Number 1.

22  A.  Yes, sir.

23  Q.  What is 1-24?

24  A.  It is a CD with my signature that I watched in your office

25  on January 6th, 2022.

108

 1   Q.  And is that the video, "Message to America"?

 2   A.  Yes, it is.

 3           MR. GIBBS:  Your Honor, we would ask to move in

 4   Exhibit 1-24, and play the first 2 minutes and 15 seconds of

 5   that video.

 6           THE COURT:  Any objection?

 7           MR. MACMAHON:  No, Your Honor.

 8           THE COURT:  It's admitted.  You may do so.

 9           (GOVERNMENT EXHIBIT Number 1-24 was admitted into

10   evidence.)

11           (Video played in open court.)

12           MR. GIBBS:  Can we pull up Government Exhibit 2-1, the

13   map that is in evidence.

14   Q.  Professor Hoffman, the clip we just listened to or just saw,

15   the President mentioned Erbil and Baghdad in the video.  Can you

16   indicate where those places are on map?

17   A.  Sure.  Baghdad is the south of Iraq, here, and Erbil is in

18   the Kurdish area, here.

19   Q.  And that would be considered the Kurdish area of

20   Northern Iraq?

21   A.  Yes.

22   Q.  And there was also a statement in the video by the President

23   talking about people trapped on a mountain facing almost certain

24   death.  What was that a reference to?

25   A.  That was a reference to Mount Sinjar, which, in the Yazidi

1    religion, is one of their holiest places.

2    Q.  Can you indicate where Mount Sinjar is on the map?

3    A.  Yes.  It's just west of Mosul.

4         MR. GIBBS:  We can take that down.

5    Q.  Next, Professor Hoffman, if you could turn to Government

6    Exhibit 1-35, in the binder -- actually, you know what, I think

7    what I'll do...

8         MR. GIBBS:  Your Honor, that one is already in

9    evidence, so if we could publish the cover, I have some

10   questions for Professor Hoffman.

11        THE COURT:  All right.  You may do so.

12   Q.  And, Professor Hoffman, what's the caption in the lower

13   right-hand corner?  What does that read?

14   A.  "The revival of slavery before the hour."

15        MR. GIBBS:  Next, if we can publish page 14 of this

16   exhibit and highlight that portion in the left-hand column.

17   Q.  Professor Hoffman, first of all, there's a reference to

18   Sinjar right at the beginning of that portion.  Do you recognize

19   that reference?

20   A.  Yes, I do.

21   Q.  And what is that reference to?

22   A.  It's talking about Sinjar, the area of the Yazidis in

23   Mount Sinjar that's in the province of Nineveh.

24   Q.  There's also a reference to a term, Z-A-K-A-H.  What does

25   that mean?

1   A.  Alms.

2         MR. GIBBS:  And then, if we could highlight the portion

3   in the right-hand column.  Or enlarge, rather.

4   BY MR. GIBBS:

5   Q.  And, Professor, I believed you testified about this earlier,

6   but where it says, "The President cites these devil worshippers

7   as the main cause for his intervention," remind us what the term

8   "devil worshippers" refers to.

9   A.  It's referring to the Yazidi people.

10        MR. GIBBS:  Next if we could go to page 15 of this same

11   exhibit.  And if we could highlight the first portion, yeah, on

12   the left-hand side.

13   Q.  Professor Hoffman, in that -- I believe it's the second

14   sentence of that highlighted portion, it says:  "Unlike the Jews

15   and Christians, there was no room for jizyah payment."  What is

16   a jizyah payment?

17   A.  Traditionally, jizyah payment is what non-Muslims could pay

18   to their Muslim rulers, in essence to live within Muslim

19   territory.

20        THE COURT:  What is the term "Mushrikun," Professor?

21        THE WITNESS:  Polytheists, which ISIS accuses the

22   Yazidis of being.

23        THE COURT:  So that refers, then, to those who believe

24   in more than one god?

25        THE WITNESS:  Yes, Your Honor.

1           THE COURT:  Does that include the Yazidis?

2           THE WITNESS:  That reference, yes, Your Honor, is

3    referring to the Yazidis.

4           THE COURT:  Next question.

5    BY MR. GIBBS:

6    Q.  And you testified a moment ago about these jizyah payments.

7    Did ISIS actually allow the people it captured to make these

8    jizyah payments, even if they were Jews or Christians?

9    A.  Not to my knowledge.

10   Q.  And in the last sentence of that highlighted portion, it

11   says that the Yazidi women and children were divided amongst the

12   fighters of the Islamic State, and to be divided as khums,

13   K-H-U-M-S.  What does that term mean, Professor Hoffman?

14   A.  This referred back -- it refers back to war spoils or

15   plunder, where a fifth, or 20 percent, would be reserved for the

16   state.  So that would have been given to the Islamic State, to

17   their -- it was named the Bureau of Plunder and Spoils.  So it

18   was a payment.

19   Q.  So a fifth as khums was provided to the Islamic State.  What

20   happened to the other four-fifths?

21   A.  Fighters got to keep it.

22   Q.  And would that include slaves?

23   A.  Yes, it did.

24   Q.  And did ISIS use the fact that its fighters could take

25   slaves as a recruiting tool?

1    A.   Absolutely.

2    Q.   And which slaves were valued the most highly among the ISIS

3    fighters?

4    A.   There was a whole gradation.  Generally speaking, there were

5    at least four categories, maybe more.  But generally, the

6    younger the women were, the younger the girls were, the higher

7    their price was, up until women that were rather elderly

8    commanded the lowest price.  So it was a question of

9    desirability and virginity.

10         MR. GIBBS:  Next if we could turn to page 17 of that

11   same exhibit and enlarge the highlighted portion of that

12   section.

13   Q.   Now, Professor Hoffman, in the highlighted portion, it talks

14   about the fact that -- or it says, "Enslaving the families of

15   the Kuffar and taking their women as concubines is a firmly

16   established fact of the Sharia."

17         Again, what does Kuffar mean?

18   A.   Infidel or a nonbeliever.

19   Q.   And what does Sharia mean?

20   A.   Islamic law.

21         MR. GIBBS:  Thank you, we can take that down.

22   Q.   Professor Hoffman, in the clip we just saw with the

23   President speaking, he talked about this bombing campaign.  When

24   did the coalition bombing campaign against ISIS start?

25   A.   In August 2014.

113

1    Q.  And by September 2014, how many countries had entered into a

2    coalition against the Islamic State?

3    A.  By September 4th, 2014, there were 10 countries, almost all

4    Western, and then, by September 14, there were a total of 26,

5    including some countries from the Middle East.

6    Q.  And other than the plight of the Yazidi peoples around

7    Mount Sinjar, was another catalyst for this coalition bombing

8    campaign the seizure of the Mosul Dam by ISIS?

9    A.  Yes, it was.

10   Q.  What was the significance of the Mosul Dam?

11   A.  Well, it's one of the largest dams in Iraq.  It's one of the

12   largest dams in the world.  It is enormously unstable.  It has

13   to, almost on a daily basis, have cement pumped into it to

14   maintain its integrity.  It's on the Tigris River.

15          If it ruptured -- in 2007, then-Ambassador Ryan Crocker

16   and then-Commanding General David Petraeus had written to the

17   then-prime minister of Iraq, Nouri al-Maliki, and said:  If that

18   dam ruptured, it could create a tidal wave of 65.5 feet that

19   could sweep down to Baghdad.

20   Q.  Professor, I want to stay on the Mosul Dam for the moment.

21   If you could turn to Government Exhibit 1-27A in your binder.

22   A.  Yes.

23   Q.  Do you recognize 1-27A?

24   A.  Yes, it is a DVD of a video that I saw in your office on

25   January 6th, 2022.

1    Q.  And this is from "A Message to the Allies of America"?

2    A.  Yes.

3         MR. GIBBS:  Your Honor, we would ask to move in

4    Government Exhibit 1-27A and play it.  It's a portion of this

5    video.  It's about a minute and six seconds in length.

6         MR. MACMAHON:  No objection, Your Honor.

7         THE COURT:  Admitted.  You may do so.

8         (GOVERNMENT EXHIBIT Number 1-27A was admitted into

9    evidence.)

10        (Video played in open court.)

11        MR. GIBBS:  Professor Hoffman, I'll need you to go to

12   Binder 5 for this one.  But there's a second clip I would like

13   to have you identify.  If you could take a look at Government

14   Exhibit 27-5.

15   A.  Yes, sir.

16   Q.  What is Government Exhibit 27-5?

17   A.  It is a DVD that has my signature on it that I viewed in

18   your office on February 25th, 2022.

19   Q.  And this is from a VICE News report, "Bringing Down

20   Baghdadi" is the title?

21   A.  Yes.

22        MR. GIBBS:  Your Honor, at this time we would ask to

23   move in Government Exhibit 27-5, and play that as well.

24        THE COURT:  You may do so.

25        It's admitted without objection?

```
 1                MR. MACMAHON:  Yes, Your Honor, no objection.

 2                THE COURT:  All right.  Proceed.

 3                (GOVERNMENT EXHIBIT Number 27-5 was admitted into

 4      evidence.)

 5                (Video played in open court.)

 6      Q.  Now, Professor Hoffman, in the first exhibit we saw --

 7                THE COURT:  So we're clear, what was that exhibit

 8      number?

 9                MR. GIBBS:  Your Honor, that was 27-5.

10                THE COURT:  And this witness doesn't know, but you can

11      represent -- are you going to put on evidence to indicate when

12      and where that was taken?

13                MR. GIBBS:  We are, Your Honor.

14                THE COURT:  All right.  And who those two speakers

15      were?

16                MR. GIBBS:  Correct.  We'll have

17      Special Agent Chiappone testify as to all the video clips in the

18      case, Your Honor.

19                THE COURT:  All right.  So he'll identify who those two

20      speakers were?

21                MR. GIBBS:  Correct.

22                THE COURT:  Not the journalist, the woman, but the two

23      men?

24                MR. GIBBS:  That's correct, Judge.

25                THE COURT:  Proceed.
```

1    Q.  Professor Hoffman, at the first exhibit we looked at, 1-27A,

2    there were two individuals shown on their knees in orange

3    jumpsuits.  Who was that first person?

4    A.  David Haines.

5    Q.  And where was David Haines from?

6    A.  The United Kingdom.  He was an aid worker.

7    Q.  And who was the second person?

8    A.  Alan Henning.

9    Q.  And where was he from?

10   A.  Also United Kingdom, also an aid worker.

11   Q.  And at the beginning of that clip, the person speaking made

12   a reference to someone named Cameron.  Who was Cameron?

13   A.  David Cameron, the prime minister of the United Kingdom at

14   the time.

15   Q.  And in both of those clips we saw, 1-27A and 27-5, there

16   were references to dams, the Mosul Dam and the Haditha Dam.

17   Let's talk about that for a moment.

18        You've already talked about the Mosul Dam.  How about

19   the Haditha Dam.  What was the significance of the Haditha Dam?

20   A.  The Haditha Dam is the second largest dam in Iraq.  It was

21   an actually a strategically very important dam on the

22   Euphrates River.  In fact, some of the most intense fighting

23   during the U.S. invasion of Iraq in 2003 was at the Haditha Dam.

24        ISIS seized control of it.  Again, had the dam ruptured

25   or the flood waters been released, it could have flooded a large

1    portion of Iraq.

2    Q.  And so was the coalition bombing campaign instituted, at

3    least in part, to protect the Mosul Dam and the Haditha Dam from

4    being seized by ISIS?

5    A.  To support Kurdish forces that were attempting to recapture

6    it from ISIS, and Iraqi security forces as well.

7    Q.  And, in fact, Professor Hoffman, despite the beheadings of

8    James Foley and Steven Sotloff and others, did that coalition

9    bombing campaign against ISIS go on?

10   A.  Yes, it did.

11   Q.  And was one of the countries that participated in the

12   coalition bombing campaign the country of Jordan?

13   A.  Yes.

14   Q.  Professor Hoffman, are you familiar with an individual named

15   Maaz Safi Yousef al-Kassabeh?

16   A.  Yes, I am.

17   Q.  Who was that individual?

18   A.  At the time he was a lieutenant in the Jordanian Air Force.

19   He was shot down in Syria on September 24th of 2014, and taken

20   prisoner by ISIS.

21   Q.  And did ISIS publicize the fact that they had taken this

22   Jordanian pilot hostage?

23   A.  Yes, they did.

24   Q.  And if you could take a look in your binder, it should be

25   the last exhibit in Binder Number 1, to Exhibit 1-37.

118

1    A.  Yes.

2    Q.  What is 1-37?

3    A.  It is *Dabiq* Issue Number 6.

4            MR. GIBBS:  Your Honor, at this time we would move in

5    Government Exhibit 1-37.

6            MR. MACMAHON:  This one I'm going to object to.

7            THE COURT:  All right.  Put on the earphones, please.

8            (BENCH CONFERENCE ON THE RECORD.)

9            THE COURT:  Can you hear me, Mr. Gibbs?

10           MR. GIBBS:  Yes, Your Honor.

11           THE COURT:  All right.  And you can hear me also,

12   Mr. MacMahon?

13           MR. MACMAHON:  Yes, Your Honor, I can.

14           THE COURT:  Mr. Gibbs, tell me what the exhibit is?

15           MR. GIBBS:  It's 1-37.

16           THE COURT:  1-37?

17           MR. GIBBS:  Correct.

18           THE COURT:  And what is 1-37?

19           MR. GIBBS:  It is an issue of *Dabiq* magazine where they

20   publicize the capture of the Jordanian pilot.

21           THE COURT:  All right.  And what's the relevance of

22   that -- well, let me ask Mr. MacMahon, what's the objection?

23           MR. MACMAHON:  The objection is twofold, Your Honor.

24   One is to relevance, that there's no -- this isn't necessary to

25   prove any of the charges against Mr. Elsheikh.  Of course

1    there's no -- I know it's a conspiracy case, but there's no

2    allegation of his involvement in the capture, or as you heard in

3    the opening statement, the eventual burning of this person while

4    he was alive.

5            And I'm sure this is where this is going, to show the

6    jury a picture or video of a Jordanian being executed.  That's

7    just not necessary, and unduly prejudicial, I think, Your Honor.

8            THE COURT:  All right.  Anything else you want to tell

9    me, Mr. MacMahon?

10           MR. MACMAHON:  No, Your Honor.

11           THE COURT:  All right.  Mr. Gibbs, you can respond?

12           MR. GIBBS:  Judge, we are not going to show the

13   depiction of the pilot burning.

14           THE COURT:  Are you putting your hand between the

15   microphone and your mouth?

16           MR. GIBBS:  Is that better, Judge?

17           THE COURT:  Much better.

18           MR. GIBBS:  We will not show the depiction of the

19   burning of the pilot.  This photograph is simply the pilot in an

20   orange jumpsuit.  That's what I wanted to show.

21           THE COURT:  Okay.

22           MR. GIBBS:  The pilot, this is the sort of end result

23   of what happened to Kayla Mueller.  It was essentially a tit for

24   tat.  The pilot was captured, there were attempts to ransom him

25   for somebody else; ultimately, ISIS killed him.

1        The Government of Jordan responded by killing a female

2    prisoner, and within two days, ISIS reported that Kayla Mueller

3    had been killed in a Jordanian air strike.  I guess they were

4    saying it was some sort of collateral damage and some sort of

5    coincidence.

6        So we believe it's very relevant that this event ties

7    to the ultimate fate of Kayla Mueller, who was held hostage by

8    the defendant.

9        THE COURT:  You have proof that she died by ISIS's

10   hand, or would it be the Jordanian air strike?

11       MR. GIBBS:  Our view would be, circumstantially, we

12   believe it was by ISIS's hands because it was so incredibly

13   coincidental.  But ISIS did claim in a Tweet in February 2016

14   that that's how she had died, but it seems incredibly

15   suspicious, and certainly we plan to argue in closing that, in

16   fact, it was ISIS that killed her.

17       But even so, it was -- the fact that she was taken

18   captive that resulted in her death, she was still in captivity

19   at the time.  Even if that is the way it occurred, the only

20   reason she was being held captive at all is because of the

21   efforts of the defendant and his co-conspirators.

22       THE COURT:  All right.  Let's go back to the evidence

23   and the objection.  The evidence is a picture of a Jordanian

24   pilot being captured, and that's it, isn't it, Mr. Gibbs?

25       MR. GIBBS:  Yes, that's the image I want to show.

1           THE COURT:  All right.  And the government does not

2      intend to show anything about his being burned alive in a cage,

3      and therefore any 403 problem I think doesn't exist.  The only

4      question is whether it has any relevance to the charges in this

5      case.

6           Tell me once again.  As I understand it, Mr. Gibbs, you

7      say that it's relevant because it goes to what happened to

8      Kayla Mueller.  Is that what you're saying?

9           MR. GIBBS:  Correct, Judge.

10          THE COURT:  And you're saying that you want to argue in

11     the end - that is, the government wishes to argue in the end -

12     that Kayla Mueller really died by the hand of ISIS in

13     retaliation for this air strike?

14          MR. GIBBS:  Correct, Judge.  And, in addition to that,

15     the fact that she was -- that the defendant had assisted in her

16     detention means that she was part of the hostage-taking that

17     ultimately resulted in her death.

18          THE COURT:  Yes, I understood that.  All right.  I'm

19     going to overrule the objection.  It's a close question, but I'm

20     going to overrule the objection, permit you to show this, and

21     let's proceed.

22          MR. MACMAHON:  Thank you.

23          (END BENCH CONFERENCE.)

24          THE COURT:  Next question.

25          MR. GIBBS:  If we could publish page 34 of

1   Exhibit 1-37.

2          THE COURT:  Have I already admitted 1-37?

3          MR. GIBBS:  I believe so, Judge.

4          THE COURT:  Yes, it's admitted.

5          (GOVERNMENT EXHIBIT Number 1-37 was admitted into

6   evidence.)

7          THE COURT:  You may publish that page.  That's not the

8   page you want.  There it is.

9          All right.  Go on.

10  BY MR. GIBBS:

11  Q.  Professor Hoffman, who is depicted in this photograph

12  wearing the orange clothing?

13  A.  That is the Jordanian pilot Maaz Safi Yousef al-Kassabeh.

14  Q.  And the reference to Crusader Pilot, what is that a

15  reference to?

16  A.  That's a reference to him because he was flying his mission

17  as part of the international coalition against ISIS.

18  Q.  And next --

19          MR. GIBBS:  So we can take that down.

20  Q.  Professor Hoffman, the next exhibit I would like you to take

21  a look at is in the second binder.  It's 1-42.

22  A.  Yes.

23  Q.  What is Government Exhibit 1-42?

24  A.  It is a DVD that I signed and I viewed in your office on

25  January 6th, 2022.

1    Q.  And is the title of it, "This Message was Received By the

2    Family of Kenji Goto"?

3    A.  Yes, it is.

4         MR. GIBBS:  Your Honor, at this time we would ask to

5    move in Government Exhibit 1-42.  We would like to play just the

6    audio, not the video of this piece of media.

7         THE COURT:  All right.  Any objection to this?

8         MR. MACMAHON:  No objection, Your Honor.

9         THE COURT:  Admitted.  You may do so.

10        (GOVERNMENT EXHIBIT Number 1-42 was admitted into

11   evidence.)

12        (Video played in open court.)

13   BY MR. GIBBS:

14   Q.  The reference to Abe on a number of occasions there, who was

15   Abe?

16   A.  The prime minister of Japan at the time.

17   Q.  And the person we heard speaking in that audio, who was

18   that?

19   A.  Kenji Goto, a Japanese journalist.

20   Q.  In that audio he made a reference to Haruna.  Who was

21   Haruna?

22   A.  Haruna Yukawa was another Japanese national security

23   consultant who, like Goto, was kidnapped or seized by ISIS.

24   Q.  And what we just listened to there in Government

25   Exhibit 1-42, that was audio.  But was there a -- if you watch

1    the video, is there a photograph that you could see?

2    A.  Yes.  Of Kenji Goto wearing an orange jumpsuit, and also of

3    the decapitation of Haruna Yukawa.

4    Q.  And is he shown holding a photograph of the decapitated

5    body?

6    A.  Yes, he is.

7    Q.  Now, also in that audio we heard, there were references to

8    Sajida al-Rishawi, or their sister Sajida.  Who is that person?

9    A.  Sajida al-Rishawi was an Iraqi woman from al-Ramadi.  Two of

10   her brothers and a brother-in-law were killed fighting alongside

11   Abu Musab al-Zarqawi by the American forces.  She was recruited

12   by Al-Qaeda as part of a team that was sent to Amman, Jordan, in

13   November 2005 to carry out three simultaneous suicide attacks

14   against Western hotels.

15          She and someone posing as her husband entered the

16   Radisson Hotel, and the fictitious husband's bomb exploded and

17   killed 60 people at a wedding reception.  Her bomb misfired,

18   didn't explode, and she was apprehended by the Jordanian

19   authorities and tried and sentenced to death.  She was awaiting

20   execution at the end of 2014, early 2015.

21   Q.  But she was still in Jordanian custody at that time?

22   A.  Yes.

23   Q.  And if you can go to Binder Number 1, if you can go to

24   Exhibit 1-13.

25   A.  Yes.

1    Q.  What is 1-13?

2    A.  That is a photograph of Sajida al-Rishawi wearing her

3    suicide vest that was fired.

4         MR. GIBBS:  Your Honor, we would ask to move in

5    Government Exhibit 1-13, and publish it for the jury.

6         MR. MACMAHON:  No objection.

7         THE COURT:  Admitted.  You may do so.

8         (GOVERNMENT EXHIBIT Number 1-13 was admitted into

9    evidence.)

10   Q.  Professor Hoffman, the image on the screen, remind us again

11   who this is.

12   A.  That's Sajida Al-Rishawi.

13   Q.  And you indicated that ISIS publicly sought to obtain her

14   release.  Was ISIS also attempting --

15        MR. GIBBS:  You can take it down.

16   Q.  Was ISIS also attempting to use the fact that they had

17   captured the Jordanian pilot as leverage in some negotiations?

18   A.  Yes, they were.  But the Jordanian authorities repeatedly

19   requested proof of life, which ISIS never furnished.

20   Q.  If you can go to Binder 2, stay on Binder 2 to Government

21   Exhibit 1-43.  That's a second video.

22   A.  You said 1-43?

23   Q.  Yeah, 1-43.

24   A.  Yes.

25   Q.  And do you recognize that item?

1   A.  Yes.  It is a DVD with my signature on it that I watched in

2   your office on January 6, 2022.

3   Q.  And is the title "Kenji Goto Video, A Second Message to the

4   Government of Japan"?

5   A.  Yes, it is.

6           MR. GIBBS:  At this time we would move Government

7   Exhibit 1-43 into evidence, and ask to publish it for the jury.

8           MR. MACMAHON:  No objection, Your Honor.

9           THE COURT:  Admitted.  You may do so.

10           MR. GIBBS:  Thank you, Your Honor.  This is about a

11   minute and 50 seconds in length.

12           (GOVERNMENT EXHIBIT Number 1-43 was admitted into

13   evidence.)

14           (Video played in open court.)

15   BY MR. GIBBS:

16   Q.  Professor Hoffman, in the video we just saw, whose

17   photograph is Kenji Goto shown holding in that video?

18   A.  The Jordanian fighter pilot, Lieutenant Kassabeh.

19   Q.  And what had the Jordanian government threatened to do if

20   Kassabeh was harmed?

21   A.  Carry out the death penalty on Sajida Al-Rishawi.

22   Q.  And was Sajida Al-Rishawi exchanged for Kenji Goto?

23   A.  No.

24   Q.  And what ultimately happened to Kenji Goto?

25   A.  He was beheaded.

1    Q.  And what happened to the Jordanian pilot?

2    A.  ISIS made a film that's believed he was killed on or about

3    the 3rd of January 2015.  He was placed in a cage, he was doused

4    in gasoline, and then a trail of gasoline was set alight and

5    then he -- it was a terrible spectacle of him being immolated,

6    consumed by fire.

7    Q.  How did the Government of Jordan respond to that event?

8    A.  They carried out the execution of Sajida Al-Rishawi on

9    February 4th of 2015.

10   Q.  February 4th of 2015?

11   A.  Yes, sir.

12   Q.  Now, Professor Hoffman, you testified earlier that despite

13   the beheadings of these Western hostages, the coalition bombing

14   campaign didn't stop?

15   A.  That's correct.

16   Q.  What happened then?

17   A.  That vast Islamic State that I described that existed in

18   2014 was gradually diminished, so by 2017, 95 percent of it had

19   been recaptured by the coalition.  And by 2019, the Islamic

20   State no longer really controlled any territory.

21   Q.  And separate and apart from the coalition bombing, what

22   impact did the SDF forces have on that process of shrinking

23   ISIS's territory?

24   A.  The SDF were the key fighters on the ground, especially

25   after they seized Kobani near the Turkish border.  That's really

128

1    when the Islamic State began to contract appreciably.

2    Q.  As they contracted, where did they move to as their

3    territory started to shrink?

4    A.  They basically concentrated around Raqqa at the time, the

5    upper Euphrates River Valley.

6    Q.  And Raqqa is in what country?

7    A.  In Syria.  That was the capital of the Islamic State.

8    Q.  And I think you already said this, but how much territory

9    had ISIS lost by the end of 2017?

10   A.  95 percent.

11          MR. GIBBS:  One moment, Your Honor.

12          Thank you, Professor Hoffman.  That's all the questions

13   I have for you.  I believe the defense may have some things to

14   ask you.

15          THE COURT:  All right.  Mr. MacMahon?

16          MR. MACMAHON:  If I may, Your Honor.

17          THE COURT:  You may.

18               **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19   **BY MR. MACMAHON:**

20   Q.  Professor Hoffman, my name is Edward MacMahon.  I'm one of

21   the counsel here for Mr. Elsheikh.  I just have a few questions

22   for you.

23          You talked about - and I'm going to say it wrong -

24   Aafia Siddiqui.  Did I say that wrong?

25   A.  Aafia Siddiqui, yes, sir.

1    Q.  And Ms. Siddiqui is serving time in the United States, was

2    your testimony.  Right?

3    A.  Yes, an 86-year prison sentence.

4    Q.  60-year prison sentence [sic].

5         And I think you described that as a *cause célèbre* in

6    the Muslim world.  Is that correct?

7    A.  Yes.

8    Q.  So many, many Muslims were concerned about her sentence and

9    trying to get her free.  Isn't that correct?

10   A.  Absolutely.

11   Q.  There were governments that asked for her to be released.

12   The Government of Pakistan, for example, asked to have her

13   freed.  Correct?

14   A.  Yes, sir.

15   Q.  And it would have been widely reported in the Muslim press -

16   or, for lack of a way to put it, Arabic press - that people

17   wanted to agitate to have her freed.  Correct?

18   A.  Yes, sir.

19   Q.  You described also, and I think we looked at an exhibit

20   called "Hijrah to the Islamic State."  Do remember that?

21   A.  Yes, sir.

22   Q.  Government Exhibit 1-15 --

23   A.  Yes, sir.

24   Q.  -- in which you talked about how ISIS sought to attract

25   people from the Western world to come and join ISIS in Syria.

```
 1    Correct?
 2    A.  Yes, sir.
 3    Q.  And they were very -- they were widely successful in that
 4    endeavor.  Correct?
 5    A.  Yes.
 6    Q.  And, for example, from England, hundreds -- hundreds and
 7    hundreds of young British men went to Syria, didn't they?
 8    A.  I think the most authoritative estimate is about 800.
 9    Q.  About 800.  To your knowledge, have any of those 800 people
10    returned to the United Kingdom?
11    A.  At least the most authoritative sources I've seen estimate
12    that about 400 or so were killed, and 100, 150 or so likely
13    returned to the United Kingdom.
14    Q.  I'm sorry, I didn't hear your last --
15    A.  About a hundred, I believe, hundred or so returned to the
16    United Kingdom.
17    Q.  And you also said that -- you mentioned that in
18    Guantanamo Bay, Cuba -- and I think you specifically cited to
19    former secretary of defense, Mr. Rumsfeld, that the worst of the
20    worst were taken to Gitmo?
21    A.  That was his claim, yes, sir.
22    Q.  And that was, what, 900 people?
23    A.  I can't recall the exact number, but it certainly was in the
24    hundreds, yes.
25    Q.  Wouldn't you agree with me it's between eight and nine
```

```
1    hundred?

2    A.  Yes, sir.

3    Q.  And there's 20 people left in Gitmo today.  Correct?

4    A.  Yes, sir.

5    Q.  So out of the worst of the worst the American defense

6    department decided should go to Guantanamo, almost all of them

7    were released and have gone home.  Correct?

8    A.  Well, yes.  Yes, sir.

9    Q.  And you mentioned the waterboarding in Guantanamo.  That was

10   real.  That's something that really happened, wasn't it?

11   A.  Absolutely.

12   Q.  Right.  It was something that was well publicized in the

13   Muslim world, correct, that the United States had waterboarded

14   people that hadn't even faced charges?

15   A.  It was well publicized everywhere.

16   Q.  Right.  And you said, I think, it was a stain on our

17   democracy, I think was your term?

18   A.  Yes.

19   Q.  And you would still say that.  Correct?

20   A.  Yes, I would.

21   Q.  And the same with what happened at Abu Ghraib --

22        THE COURT:  This isn't a test of the motives that are

23   before the Court.  It doesn't matter what their motives are.  If

24   they violated the law in a manner as alleged by the indictment,

25   this isn't a contest of motives.
```

1              Next question.

2              MR. MACMAHON:  Thank you, Your Honor.  I wasn't

3    suggesting as much.  I apologize.

4              THE COURT:  Well, I'm glad you weren't suggesting it.

5    BY MR. MACMAHON:

6    Q.  Professor Hoffman, you wrote an article - I think it was

7    published in April of 2019 - called "Caliphate Soldiers and Lone

8    Actors."  Do you remember that?

9    A.  No, I don't, actually.

10   Q.  You've got a very long résumé.  You've written a lot of

11   articles, haven't you?

12   A.  I have.  I don't think that's one of mine, though.  Where

13   was it published, if I may ask?

14   Q.  International Centre of Counter-Terrorism at the Hagan.

15   A.  I'm under oath.  I don't believe that I wrote that article.

16   Q.  Let me ask you this, then.  If I'm wrong, then I apologize

17   for that.

18              Do you remember writing an article that suggested that

19   ISIS would often make claims for attacks that it didn't make?

20   A.  I cannot recall.  I don't think so.  Well, no, let me go

21   back for a second.  I think ISIS opportunistically would claim

22   credit for attacks, particularly lone wolf or lone actor attacks

23   in the West, where there wasn't necessarily a direct tie, a

24   direct commanding control relationship.  But clearly those

25   attacks were inspired by the ISIS ideology.

1   Q.  Do you remember writing a paper where ISIS sometimes made

2   false claims, taking credit for things that maybe they didn't

3   have anything to do with?

4   A.  I honestly don't recall that.

5            THE COURT:  Anything further?

6            MR. MACMAHON:  No, Your Honor.

7            THE COURT:  Any redirect?

8            MR. GIBBS:  Just real brief.

9        **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

10   **BY MR. GIBBS:**

11   Q.  On the length of the prison sentence for Aafia Siddiqui, how

12   many years did you say that was?

13   A.  I thought it was 86 years.

14            MR. GIBBS:  That's all, Judge.

15            THE COURT:  All right.  Thank you.  You may step down.

16            All right.  Mr. Fitzpatrick, the next witness is yours.

17            MR. FITZPATRICK:  Yes, Your Honor.

18            THE COURT:  All right.  Call that witness.  Let's move

19   it along.

20            MR. FITZPATRICK:  Thank you, Your Honor.  The next

21   witness is Officer Barry Goodman, a police constable with the

22   London police.

23            THE COURT:  Come forward and take the oath, please,

24   sir.

25            (Oath administered by courtroom deputy clerk.)

1       THE COURT:  Mr. Fitzpatrick, you may proceed.

2       **(BARRY GOODMAN, having been duly sworn, testified as follows:)**

3       **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

4    **BY MR. FITZPATRICK:**

5    Q.  Good afternoon, sir.  I'm going to ask you a series of

6    questions.  There's a microphone in front of you.  I ask you to

7    keep your voice up so we can all hear your responses.

8    A.  Okay.

9    Q.  Please state your name.

10   A.  Police Constable Barry Goodman, B-A-R-R-Y, G-O-O-D-M-A-N.

11   Q.  And who do you work for?

12   A.  I work for the Metropolitan Police Service, London, England.

13   Q.  And how long have you been a police constable?

14   A.  I've been a serving officer for 15 years.

15   Q.  Were you so employed on September 11th of 2011?

16   A.  I was, yes.

17   Q.  And, sir, were you on a special detail or assignment on that

18   day?

19   A.  Yes, I was.  I was tasked to Central London Aid to a protest

20   near to the United States Embassy in London, for protests

21   organized by a group called the MAC, which were the Muslims

22   Against Crusaders.  And there was a counter protest by a

23   far-right English group called the English Defence League, EDL.

24   Q.  And were you part of what is called a Level 2 public order

25   serial?

1    A.   That's correct, yes.

2    Q.   Describe what a Level 2 public order serial is.

3    A.   Okay.  So in the United Kingdom there are three levels to

4    sort of riot control, if you like, public order incidents.

5    Level 3, every police officer in the UK is trained to Level 3.

6    It's very basic crowd control tactics.

7            Level 2 is a shield-trained serial, so we're trained to

8    use more dynamic forcible methods.  So our shield-trained, we

9    have additional equipment, helmets, body armor, et cetera.

10           Level 1 is the same training that you have at Level 2,

11   but it's their full-time job.

12   Q.   How many police officers were a part of your serial?

13   A.   My serial, that day, there was one sergeant.  We also had

14   the inspector with us.  And there were six constables plus one

15   driver.

16   Q.   Was Police Constable Dan Godfrey part of your serial?

17   A.   Yes, he was.

18   Q.   Were you working with him that day?

19   A.   Yes, I was.

20   Q.   Amongst others?

21   A.   Amongst other officers, yes.

22   Q.   Did the Metropolitan Police Department also deploy spotters

23   or photographers or videographers for this event?

24   A.   Yes, they did.  Yes.

25   Q.   During the course of your work that day, were you called to

1   dispatch -- were you dispatched to a particular area?

2   A.  Yeah, during the day we policed both sides of the protest,

3   the MAC side and the EDL side.  As the crowds started to

4   disperse, we were held on reserve near Marble Arch in London.

5   Q.  And were you ultimately dispatched to an event near

6   Edgewell Road?

7   A.  Yes, our sister serial, 3500C, Charlie, called for urgent

8   assistance.  They had come across two people from the EDL group

9   that had been stabbed, and they needed urgent assistance.  So we

10  deployed to help our sister serial.

11  Q.  And did you deploy to that area?

12  A.  Yes, we did.  We deployed to the Tyburn public house, where

13  we were directed to a group of eight -- I think it was about

14  eight individuals on the other side of the road that had been

15  detained, and it was thought that the person responsible for

16  these double stabbings was in that group.

17  Q.  And how many -- did Officer Godfrey and the rest of your

18  serial crew respond to that area?

19  A.  Yes, we deployed as a serial, and when we went to the Tyburn

20  to detain these eight individuals.  We were deployed as a unit.

21  Q.  Describe in respect to the Tyburn Pub, where were you?

22  Where did you detain these individuals?

23  A.  They were deployed on the opposite side of the street,

24  slightly further along from the Tyburn.  So as I was facing the

25  eight individuals with my back to the road, the Tyburn public

1    house was behind me and slightly to the left.

2    Q.  And the individuals that you had detained, what was behind

3    them?

4    A.  I seem to remember a brick wall and a fence.  I can't

5    remember much more than that.

6    Q.  Thank you, Officer.  With the assistance of the court

7    security officer, I want to show you Volume 4.  And I would like

8    to show you Exhibits 22-1, 22-2, and 3.

9    A.  Sorry, just repeat those numbers for me, please.

10   Q.  Yes, sir.  22-1, then dash 2, and dash 3.  Take a look at

11   those three photographs and tell me when you're done.

12   A.  Sorry, tell you...

13   Q.  Just alert me when you've reviewed the photographs.

14   A.  Okay.  Yes, I've...

15   Q.  And do you recognize those photographs?

16   A.  I do, yes.

17   Q.  And what are those photographs?

18   A.  So this is my serial -- or members of my serial.  I'm not in

19   the first photo.  And that's the group that we detained on the

20   far side of Edgewell Road.

21          MR. FITZPATRICK:  Move for admission of 22-1, -2, and

22   -3.

23          THE COURT:  All right.  In the absence of objection --

24          MS. GINSBERG:  No objection, Your Honor.

25          THE COURT:  -- I'll admit them.  They're admitted.

138

```
 1              (GOVERNMENT EXHIBIT Numbers 22-1, 22-2, 22-3 were

 2     admitted into evidence.)

 3              MR. FITZPATRICK:  And permission to publish 22-1.

 4              THE COURT:  Yes, you may do so.

 5     BY MR. FITZPATRICK:

 6     Q.  Officer Goodman, the gentleman dressed in police uniform

 7     with their back to the photographer, are those members of your

 8     serial?

 9     A.  Yes, they were.  Yes.

10     Q.  And are you in that photograph?

11     A.  I'm not in that photograph, no.

12     Q.  Where are you?

13     A.  I imagine I'm slightly to the left of the officer on the

14     left-hand side.  That's PC Dan Godfrey.

15     Q.  Did there come a time when you arrested someone for the

16     stabbing event?

17     A.  Yes.  The man in the hat that you can see he's pointing at

18     the middle officer, I arrested him at 18:45 hours for grievous

19     bodily harm.

20     Q.  And who that person?

21     A.  That person was Alexanda Kotey.

22     Q.  And what was the charge -- what was he arrested for?

23     A.  He was arrested for -- it was on suspicion of causing

24     grievous bodily harm, stabbing someone.

25     Q.  And were there other --
```

```
 1              THE COURT:  You can mark on the screen there,

 2    Officer Goodman, with your finger the person you say was

 3    arrested for that as you've described it.

 4    BY MR. FITZPATRICK:

 5    Q.  I believe your screen, Officer Goodman, it's such that if

 6    you touch it, a mark will appear.

 7    A.  Yeah.

 8              THE COURT:  Okay.  That's the person you say was

 9    arrested, Officer Goodman?

10              THE WITNESS:  Yes, Your Honor, that's Alexanda Kotey.

11              THE COURT:  Next question.

12    Q.  If you could turn to the next photograph.

13              MR. FITZPATRICK:  If we can publish 22-2, please.

14    Q.  Who is the individual in the left of this photograph with

15    the head gear?

16    A.  That's Alexanda Kotey.

17              THE COURT:  Did you move to admit this?

18              MR. FITZPATRICK:  It was admitted, Your Honor.

19              THE COURT:  All right.  Go ahead.

20    Q.  And in addition to yourself, did Officer Godfrey also make

21    an arrest that day?

22    A.  He did, yes.

23    Q.  Turn to Exhibit 22-3, please.

24              MR. FITZPATRICK:  Or if we can publish that, please.

25    This has been admitted, Your Honor.
```

1          THE COURT:  All right.

2     BY MR. FITZPATRICK:

3     Q.  And identify what's in that photograph, please.

4     A.  Yes, the group that we detained -- that's my serial.  I

5     recognize one of the officers in the photo.  And that's

6     Alexanda Kotey in the center of the photo, with his hand raised.

7     Q.  Thank you.  Officer Goodman, if you could please remove the

8     disc that says 22-4 on it, please.

9     A.  (Witness complies.)

10    Q.  Do you recognize your handwriting on that disc?

11    A.  Yes, I do.

12    Q.  And when did you review that disc and date it?

13    A.  That was on the 15th of July 2021.

14    Q.  And what does this video depict?  What does this video show?

15    A.  This shows footage from -- I think it's the police evidence

16    gatherer where we detained the group.

17          MR. FITZPATRICK:  Move for admission of 22-4.

18          MS. GINSBERG:  No objection, Your Honor.

19          THE COURT:  Admitted.

20          (GOVERNMENT EXHIBIT Number 22-4 was admitted into

21    evidence.)

22          MR. FITZPATRICK:  And permission to publish the first

23    29 seconds.

24          THE COURT:  You may do so.

25          (Video played in open court.)

1    Q.  Officer Goodman, what was the demeanor of the individual you

2    arrested that day, Mr. Kotey, when you were engaging with him?

3    A.  Much like a street gang that I've dealt with in East London.

4    Very argumentative, didn't know why he had been detained,

5    although we told him numerous times why he had been detained.

6    Quite antagonistic, trying to get a response from us, being

7    called racist.  Being called that so many times over and over

8    the years, it's just words to me, really, when someone is

9    accusing me of something like that.

10   Q.  Was that consistent with the other individuals who were also

11   detained?

12   A.  Pretty much.  It's the same sort of interaction, just really

13   trying to get a rise from us.  And we were just letting him go

14   past us without reacting to it at all.  You know, we hear it

15   every day.

16   Q.  Once you arrested Mr. Kotey, where did you take him?

17   A.  I took him to Peckham police station, I believe.

18   Q.  And if you could, please, take a look at 22-9, -10, and -11.

19   When you've reviewed those photographs, please tell me.

20   A.  Yes, I've reviewed them.

21   Q.  And what do we see in 22-9, 10, and 11?

22   A.  This is images from custody, CCTV at Peckham police station,

23   and this shows the booking-in procedure with myself,

24   Alexanda Kotey, and two custody sergeants.

25           MR. FITZPATRICK:  Your Honor, move to admit 22-9, 10,

1    and 11.

2              MS. GINSBERG:  No objection.

3              THE COURT:  Admitted.  Next question.

4              (GOVERNMENT EXHIBIT Numbers 22-9, 22-10, and 22-11 were

5    admitted into evidence.)

6              MR. FITZPATRICK:  If we can publish 22-9, please.

7    BY MR. FITZPATRICK:

8    Q.  Do you see the screen in front of you, Officer Goodman?

9    A.  Yes, I do.

10   Q.  If you could identify yourself and Mr. Kotey.

11   A.  I'm the police officer wearing a hat on the left-hand side

12   of the screen.  Mr. Kotey is next to me wearing a sort of beige

13   shirt and hat, and the two custody sergeants are behind the

14   desk.

15             MR. FITZPATRICK:  And if you could please publish

16   22-10, please.

17   Q.  Officer Goodman, you had responded to the Tyburn Pub at

18   approximately 18:00 hours, which is 6 p.m.  Is that accurate?

19   A.  Yes.  I think it was just after that, but yes.

20   Q.  So the time stamp here, to your knowledge, is that accurate?

21   The booking takes place approximately two hours later?

22   A.  Yes, approximately.  It'd be about -- yeah, approximately,

23   yes.

24   Q.  And once again, do we see yourself and Alexanda Kotey going

25   through the booking procedure?

1    A.  Correct, yes.

2           MR. FITZPATRICK:  And if we could publish 22-11.

3    Q.  And once again, identify yourself and the person you've

4    arrested.

5    A.  Yes, I'm the police officer with the radio that's glowing.

6    Mr. Kotey is on my left wearing a hat and a beige shirt.

7           THE COURT:  He's actually on your right, isn't he?

8           THE WITNESS:  As I've described the photo, Your Honor,

9    he's on my left but --

10          THE COURT:  Oh, I see.  To the left of you, but he's on

11   your right in the picture.

12          THE WITNESS:  In the picture, yes, he would be on my

13   right side, Your Honor.

14          MR. FITZPATRICK:  Thank you for the clarification,

15   Your Honor.

16          THE COURT:  Next question.

17          MR. FITZPATRICK:  Court's indulgence for one moment.

18   Q.  Officer Goodman, that's all the questions I have for you at

19   this moment.  Defense counsel may have a few questions for you.

20          THE WITNESS:  Okay.  Thank you.

21              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

22   **BY MS. GINSBERG:**

23   Q.  Good afternoon, Officer Goodman.  My name is Nina Ginsberg.

24   I'm one of the attorneys who is representing Mr. Elsheikh.  As I

25   understand it, you were not at all involved in the arrest of

144

1    Mr. Elsheikh.  Is that correct?

2    A.  I was not personally involved.  I was obviously present when

3    he was arrested, but that was my sum total of my involvement.

4    Q.  And as part of the booking process for Mr. Kotey, is it part

5    of your booking process to check the criminal records of

6    individuals who you arrest?

7    A.  It wouldn't be part of my booking process.  The custody

8    sergeant would authorize us to take fingerprints, photographs,

9    and DNA samples.  From that we would try and connect to a PNC, a

10   Police National Computer profile, based on the fingerprint.  So

11   there would be a criminal record check, but it wouldn't be

12   confirmed until his fingerprints had been matched or not

13   matched.

14   Q.  So did you participate in that process at all?

15   A.  I took Mr. Kotey's fingerprints, but not Mr. Elsheikh.

16   Q.  And did you ever -- were you ever able to determine whether

17   a record check had been returned for Mr. Kotey?

18   A.  No.  That wouldn't have been one of my duties.  That would

19   be the custody sergeant's duties.

20   Q.  I understand.  As far as you're aware, no charges were ever

21   placed against either Mr. Kotey or Mr. Elsheikh.  Correct?

22   A.  Correct.  I don't believe anyone was charged with that

23   offense, no.

24   Q.  And is it your understanding that the reason for that was

25   that there was insufficient evidence to connect them, either one

1    of them, to the stabbing?

2    A.   I would be speculating.  My involvement in the investigation

3    ended when I left Peckham police station.

4    Q.   All right.  Thank you very much.

5              THE COURT:  Any redirect?

6              MR. FITZPATRICK:  No, sir.  No further questions.

7              THE COURT:  Thank you.  You may step down.

8              Call your next witness.

9              MR. FITZPATRICK:  Thank you, Your Honor.  The witness

10   may be excused.

11             And Officer Dan Godfrey.

12             THE COURT:  Come forward and take the oath, please,

13   sir.

14             (Oath administered by courtroom deputy clerk.)

15             MR. FITZPATRICK:  Officer Godfrey, hand your papers to

16   the court security officer.  If we need those, I'll provide them

17   to you.

18   **(DANIEL GODFREY, having been duly sworn, testified as follows:)**

19              **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

20   **BY MR. FITZPATRICK:**

21   Q.   Good afternoon, sir.  Please state your name.

22   A.   My name is Daniel Godfrey.

23   Q.   And who do you work for?

24   A.   The Metropolitan Police.

25   Q.   And is that based in London?

1    A.   That's correct.

2    Q.   And what do you do for the Metropolitan Police?

3    A.   I'm currently a serving police officer, and I deal with the

4    course of it; basically dealing with calls, telling people where

5    to go and such.

6    Q.   And have you served as a police constable?

7    A.   That's correct, yes.

8    Q.   And how long have you worked for the Metropolitan Police

9    Department?

10   A.   15 years.

11   Q.   And were you so employed as a police constable for the

12   Metropolitan Police on September 11th of 2011?

13   A.   That's correct, sir.

14   Q.   And were you assigned to a Level 2 public serial -- public

15   order serial on that day?

16   A.   That's correct.

17   Q.   And how many officers make up a public order serial?

18   A.   It's basically three carriers.  It tends to be three

19   sergeants, the sergeant and the carriers, and that's between six

20   and eight PC's.  Between the three carriers, there's an

21   inspector that's in charge of a serial.

22   Q.   So there are approximately -- there's a sergeant and between

23   six and eight officers within a serial?

24   A.   That's correct.

25   Q.   And amongst the other officers in your serial, was

1    Officer Goodman also working with you that day?

2    A.  That's true, yeah.  Yes, that's correct.

3    Q.  I want to show you Government Exhibit 22-5.  With the

4    assistance of the court security officer, it's Volume 4.  If you

5    could turn to a photograph at 22-5.

6    A.  Yes, sir.

7    Q.  Do you recognize that photograph?

8    A.  This was where -- on the day instant, this was where we was

9    based to patrol.  It's outside the American Embassy in London.

10   Q.  That is an area near the American Embassy in London?

11   A.  That's correct.

12   Q.  And what was occurring at that location -- did you respond

13   there, or did part of --

14            THE COURT:  Your question is now compound.

15            MR. FITZPATRICK:  I understand, Your Honor.

16   Q.  Was part of your job responsibility on that day to patrol

17   near that area shown in 26-5?

18   A.  That's correct, sir.

19   Q.  And what was occurring at that area when you patrolled

20   there?

21   A.  It was the 10-year anniversary of 9/11.  There was a

22   memorial for the families of the people that were killed in the

23   atrocities, inside the fenced area.

24   Q.  And what were you there to protect against?

25   A.  During the day, there was preplanned posts that there may be

1    people from the Muslim community and the British National Party,

2    the English Defence League.

3    Q.  The English Defence League?

4    A.  That's correct.

5    Q.  And were there counter-protests between the Muslims Against

6    Crusaders and the English Defence League?

7    A.  Yes, during the day.

8    Q.  And to your recollection, were these vocal, loud protests?

9    A.  Yes, they were vocal, lots of shouting during the day,

10   during the memorial, even.

11   Q.  Were skirmishes breaking out during the day?

12   A.  I heard from the radio that there was lots of --

13           MS. GINSBERG:  Objection, if he heard.

14           MR. FITZPATRICK:  Not offered for the truth.

15           MS. GINSBERG:  Foundation, Your Honor.

16           THE COURT:  I'll overrule the objection.

17   Q.  You may answer the question.

18   A.  Whilst I was on patrol, I was listening to the radio, and

19   you could hear that there were altercations happening throughout

20   or nearby through the radio.

21   Q.  And during that day, were you asked to respond to an

22   incident near Edgewell Road within London?

23   A.  That's correct.

24   Q.  And what were you asked to respond to?

25   A.  It was what's known to the police, comes through as an

1    emergency; officer needs help, basically.  So I then drove to

2    assist the officer that was needing help, basically.

3    Q.  And was there also -- did you later learn of another

4    incident that had occurred at that place?

5    A.  That's correct.

6    Q.  And what had happened?

7    A.  There was a stabbing in the area.  Somebody had been

8    stabbed.

9    Q.  And was there -- what was near -- the area that you

10   responded to on Edgewell Road, what was near there?

11   A.  The call came out it was a pub, it was nearby to a pub, I

12   believe the Tyburn Pub along Edgewell Road, and that's where we

13   responded to, opposite the pub.

14   Q.  And when you responded there, did you take part in the

15   detention of a number of individuals?

16   A.  That's correct.

17           MR. FITZPATRICK:  It's previously been admitted,

18   Your Honor.  I want to show Government Exhibit 22-1.

19           THE COURT:  All right.

20   Q.  Officer Godfrey on the screen in front of you, do you see

21   Government Exhibit 22-1?  You can just look at the screen.

22   A.  Yes, that's correct, sir.

23   Q.  And where do you see yourself?

24   A.  I am on the left-hand side.

25   Q.  And the screen, if you touch the screen it will make a mark.

1    Can you identify yourself?

2    A.  (Witness complies.)

3    Q.  Now, did there come a point in time after this detention,

4    were you given authorization to make an arrest?

5    A.  That's correct, yes.

6    Q.  And who did you arrest?

7    A.  El Shafee Elsheikh.

8    Q.  And do you see Mr. El Shafee Elsheikh in this photograph?

9    A.  Yes, I do.

10   Q.  And where is he?

11   A.  He is...

12   Q.  You can mark him on the screen.

13   A.  Just here (indicating).

14   Q.  And what was Mr. El Shafee Elsheikh arrested for?

15   A.  He was arrested for GBH, grievous bodily harm.

16   Q.  And upon the arrest, where did you take him?

17   A.  To Walworth police station in South London.

18   Q.  During the encounter with these individuals -- and this is

19   the same -- is Officer Goodman with you in this?

20   A.  He's not in that image there, no.

21   Q.  But was he with you at this --

22   A.  He was with me, yes, he was.

23   Q.  During this encounter, what was the demeanor of Mr. Elsheikh

24   like?  Can you explain that to the Court?

25   A.  He was angry, agitated and angry.

1    Q.  And was that consistent with the other individuals?

2    A.  Yes.

3    Q.  I want to go back.

4        MR. FITZPATRICK:  Government Exhibit 22-5, Your Honor,

5    I would move to admit that.

6        MS. GINSBERG:  No objection.

7        THE COURT:  All right.  It's admitted.  You may display

8    it.

9        MR. FITZPATRICK:  Thank you, Your Honor.

10       (GOVERNMENT EXHIBIT Number 22-5 was admitted into

11   evidence.)

12   Q.  Officer Godfrey, I'm going to put back up 22-5.  Is this the

13   area that you were describing earlier where the service was held

14   for the 9/11 victims?

15   A.  That's correct.  That's where the family were, the families.

16   Q.  Thank you.  If we can now move to 22-2.  Do you recognize

17   that photograph?

18   A.  Yes, I do.

19   Q.  And where is Mr. Elsheikh in that photograph?

20   A.  He's the gentleman in front of this gentleman here.

21   Q.  And do you know the man who is wearing the traditional head

22   covering?

23   A.  I know who he is now, but I didn't know at the time.

24   Q.  Who do you know that to be?

25   A.  Mr. Kotey.

1    Q.   Alexanda Kotey?

2    A.   Correct.

3           MR. FITZPATRICK:   If we can move to 22-3.

4    Q.   And do you recognize the individuals in this photograph?

5    A.   Yes, I do.

6    Q.   And is this from the same day, September 11th of 2011?

7    A.   Yes, that's correct.

8    Q.   And where is Mr. Elsheikh in this photograph?

9    A.   Mr. Elsheikh is this gentleman here (indicating).

10   Q.   Thank you.  Officer Godfrey, I'm going to play for you a

11   video.  To your knowledge, were there police aides and spotters

12   recording different events on that day?

13   A.   They would have been, yes, but I'm not sure.  I can't

14   remember.  But I'm sure they would have been.

15          MR. FITZPATRICK:   If we publish again 22-4, please, the

16   first 49 seconds.

17          (Video played in open court.)

18   Q.   We've paused that, Officer Godfrey.  Do you see that?

19   A.   Yes.  Yes.

20   Q.   Are you shown there?

21   A.   Yes, I am.

22   Q.   And where are you?

23   A.   I'm this officer here.

24   Q.   And where is Mr. Elsheikh?

25   A.   Mr. Elsheikh is this man here.

153

1    Q.  And put a mark on Mr. Kotey.

2    A.  Mr. Kotey is this man here (indicating).

3    Q.  Thank you.

4         MR. FITZPATRICK:  Please continue.

5         (Video played in open court.)

6    Q.  Officer Godfrey, you previously testified that you took

7    Mr. Elsheikh to the Walworth police station?

8    A.  That's correct.

9    Q.  Did you take him through an arrest and booking procedure

10   there?

11   A.  Yes, I did.

12   Q.  I would like to show you Government Exhibit 22-8.  If you

13   could look at that, please, in the binder.  This photograph

14   would have been 22-8.

15   A.  (Witness complies.)

16   Q.  Do you recognize that photograph?

17   A.  Yes, I do.

18   Q.  And what is that photograph?

19   A.  That is a identification photograph of myself and

20   El Shafee Elsheikh after his arrest, in custody.

21   Q.  And is this at the Walworth police station?

22   A.  Yes, it is.

23        MR. FITZPATRICK:  Move for admission of 22-8.

24        MS. GINSBERG:  No objection.

25        THE COURT:  Admitted.

```
 1              (GOVERNMENT EXHIBIT Number 22-8 was admitted into
 2     evidence.)
 3     BY MR. FITZPATRICK:
 4     Q.  Officer Godfrey, do you see yourself in these photographs?
 5     A.  Yes, I do.
 6     Q.  And who is this with you?
 7     A.  It is El Shafee Elsheikh.
 8     Q.  Thank you.
 9              MR. FITZPATRICK:  You can take it down.
10     Q.  And the last photograph I want to show you, Officer Godfrey,
11     is 22-13.  Do you see that individual?
12     A.  Yes, I do.
13     Q.  And who is that individual?
14     A.  That is El Shafee Elsheikh.
15     Q.  At the completion of the booking process, are custody image
16     photographs taken?
17     A.  Yes, they are.
18     Q.  And what is this of Mr. Elsheikh?
19     A.  That is the custody image that would be taken after his
20     arrest, in custody.
21     Q.  Does it show a front and then two profile pictures?
22     A.  Yes, that's correct.
23              MR. FITZPATRICK:  Move for admission of 22-13.
24              MS. GINSBERG:  No objection.
25              THE COURT:  All right.  It's admitted.
```

155

```
 1              (GOVERNMENT EXHIBIT Number 22-13 was admitted into

 2    evidence.)

 3              THE COURT:  Next question.

 4              MR. FITZPATRICK:  Permission to publish.

 5              THE COURT:  You may do so.

 6    BY MR. FITZPATRICK:

 7    Q.  Is that Mr. Elsheikh?

 8    A.  Yes, it is.

 9    Q.  Is that Mr. Elsheikh?

10    A.  Yes, that's Mr. Elsheikh.

11              MR. FITZPATRICK:  You can take it down.  Thank you.

12    Q.  When your responsibilities -- describe the booking process.

13    How far through the arrest process do you take --

14              THE COURT:  Your question is now compound.

15              MR. FITZPATRICK:  I understand, Your Honor.  Thank you.

16    Q.  Describe the booking process to its completion with

17    Mr. Elsheikh.

18    A.  I would have taken Mr. Elsheikh into custody, stood in front

19    of a custody sergeant with Mr. Elsheikh, give him our grounds of

20    arrest, so the potential to be authorized in custody.  I then

21    would have taken the images and obviously swabs, forensics,

22    because of the offense and type of offense, which was obviously

23    quite serious.

24              After that, much that was done, he was handed over to

25    what is known as a CID officer, who would take a statement,
```

1    provide interviews, and leading the case on.

2    Q.  Do you know who the next person is who picks up the

3    detective work on the case?

4    A.  No, I didn't.

5    Q.  And does your involvement end after the booking procedure is

6    completed?

7    A.  Yes, it does.

8             MR. FITZPATRICK:  Court's indulgence for one moment,

9    Your Honor.

10            No further questions, Your Honor.

11            THE COURT:  Ms. Ginsberg, any cross-examination.

12            **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

13   **BY MS. GINSBERG:**

14   Q.  My name is Nina Ginsberg.  I'm one of Mr. Elsheikh's

15   attorneys.  I just have a few questions, if you don't mind.

16   A.  No problem.

17   Q.  As I understand your testimony, you didn't observe any of

18   the conduct that gave rise to either Mr. Elsheikh or Mr. Kotey's

19   being detained?

20   A.  I only seen the conduct when I had them stopped and detained

21   prior to arrest and during arrest.

22   Q.  But you did not see what occurred that was the basis for the

23   allegation of grievous bodily harm?

24   A.  I did not see the stabbing, no.

25   Q.  And you didn't see Mr. Elsheikh engage in any physical

```
1    interactions with the members of the National Front who had been
2    stabbed?
3    A.  No.
4    Q.  And, in fact, you didn't know why -- you received a call
5    telling you to detain Mr. Elsheikh.  Is that right?
6    A.  That's correct.
7    Q.  And you didn't have any personal knowledge as to why?
8    A.  No.
9    Q.  And you described Mr. Elsheikh as being angry?
10   A.  That's correct.
11   Q.  And that was during the time he was being detained on the
12   street?
13   A.  The time with myself, yes, angry.
14   Q.  Are we talking about the timeframe that's depicted in the
15   photographs that you just identified?
16   A.  Yes, that's correct.
17   Q.  And am I correct that the officers and the individuals
18   milling around in those photographs, that is the area where
19   Mr. Elsheikh was detained on the street?
20   A.  That's correct, yes.
21   Q.  Now, you are -- did you hear anything that Mr. Elsheikh
22   said?
23   A.  I can't remember.
24   Q.  So do you know why he was angry?
25   A.  No.  No, I don't.  Not at the time I didn't, no.
```

1   Q.  You were fairly close to him in some of those photographs.

2   Isn't that correct?

3   A.  That's correct.

4   Q.  Did you hear him object to being detained because he hadn't

5   done anything?

6   A.  I can't remember words because it was too long ago.  I do

7   apologize.

8   Q.  You just don't remember one way or the other?

9   A.  I can't remember from what was exactly said to be confident

10  enough to quote in whole.

11  Q.  Had you previously encountered this group you called the

12  National Front?

13  A.  Yes, I have.

14  Q.  And you know them from your previous encounters to be a

15  group of what I think you previously described as racist?

16  A.  There would be racist elements within, yes.

17  Q.  And I understand that your involvement with Mr. Elsheikh's

18  detention and arrest ended where you just described.  But did

19  you come to learn that he was released and not charged with any

20  criminal offense?

21  A.  No.  Once I left custody and left Mr. Elsheikh's in the

22  cell, I had no more dealings.  I do not know what happened.  I

23  was not contacted.  It was literally the end of my dealings with

24  Mr. Elsheikh, and I never seen again or never heard anything

25  after that incident.

```
 1              MS. GINSBERG:  Thank you very much.

 2              THE COURT:  Any redirect?

 3              MR. FITZPATRICK:  Very briefly, Your Honor.

 4         REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES

 5    BY MR. FITZPATRICK:

 6    Q.  Ms. Ginsberg asked you about receiving a call prior to

 7    arresting Mr. Elsheikh.  Who did you receive permission from to

 8    make the arrest?

 9    A.  It would have been my sergeant.  So the sergeant of patrol

10    who's my superior and the officers that was in that shot would

11    have been informed that this incident had taken place and effect

12    the arrest at the time.  So it would have been my sergeant that

13    told me to arrest Mr. Elsheikh.

14    Q.  And was your sergeant in communication with others surveying

15    the scene and doing an investigation?

16    A.  Yes.  He would have, yeah, focusing the investigation.

17              MR. FITZPATRICK:  Thank you, Your Honor.

18              THE COURT:  All right.  Anything further?

19              All right.  Mr. Parekh, you're next.

20              MR. PAREKH:  Yes, Your Honor.

21              THE COURT:  Thank you.  You may be excused,

22    Officer Godfrey.

23              MR. PAREKH:  The United States calls

24    Willem Van-Der-Reijden to the stand.

25              (Oath administered by courtroom deputy clerk.)
```

 1            THE COURT:  You may proceed.

 2            MR. PAREKH:  Thank you, Your Honor.

 3       **(WILLEM VAN-DER-REIJDEN, having been duly sworn, testified as**

 4                        **follows:)**

 5            **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

 6   **BY MR. PAREKH:**

 7   Q.  Good afternoon, sir.

 8   A.  Hello.

 9   Q.  If you can please keep your voice up so everyone in the

10   courtroom can hear you during your testimony.  Please state and

11   spell your name for the record.

12   A.  My name is Willem Van-Der-Reijden.  It's spelled

13   W-I-L-L-E-M, V-A-N, D-E-R, R-E-I-J-D-E-N.

14   Q.  How are you currently employed?

15   A.  I'm currently a police officer, a detective.

16   Q.  And where do you work?

17   A.  I work for the Metropolitan Police in London.

18   Q.  And how long have you worked for the Metropolitan Police

19   Department in London?

20   A.  I'm now in my 19th year.  Sorry, my 18th year.  19 this

21   year.

22   Q.  Please summarize your training and experience while working

23   for the Metropolitan Police Department in London.

24   A.  When I joined, I was a uniform constable for four years.

25   Then I trained or started training as a detective, and I've been

161

1    a detective ever since.

2    Q.  I want to direct your attention now to the date

3    September 12, 2011.  Were you working for the Metropolitan

4    Police Department in London on that day?

5    A.  Yes.

6    Q.  Do you remember what you did at work that day?

7    A.  Yes, I do.

8    Q.  And what did you do?

9    A.  I went to Walworth police station and I interviewed somebody

10   called El Shafee Elsheikh.

11   Q.  Why did you interview El Shafee Elsheikh?

12   A.  He had been arrested the day before, and was held in custody

13   at Walworth police station.  And he was arrested because he

14   allegedly had stabbed somebody the day before.

15   Q.  And that police station where you interviewed him, is that

16   located in London, United Kingdom?

17   A.  Yes, it is.

18   Q.  And the day you interviewed him was September 12th, 2011?

19   A.  Yes, that's correct.

20   Q.  And that's the day after the 10th anniversary of the

21   September 11, 2001 attacks?

22   A.  Yes, that's correct.

23   Q.  I want to show you Government Exhibit 22-13.

24        MR. PAREKH:  It was previously admitted, Your Honor.

25   May I publish?

```
 1              THE COURT:  You may.
 2   Q.  Taking a look at this exhibit, 22-13, do you recognize this
 3   individual?
 4   A.  Yes.
 5   Q.  Who is it?
 6   A.  That's El Shafee Elsheikh.
 7   Q.  Is that the same El Shafee Elsheikh that you interviewed on
 8   September 12, 2011?
 9   A.  Yes, it is.
10              MR. PAREKH:  If we can briefly scroll through the other
11   two pages.
12   Q.  Officer Van-Der-Reijden, did you meet with
13   El Shafee Elsheikh in person?
14   A.  Yes, I did.
15   Q.  When was the last time you saw him in person?
16   A.  That would have been on that date, the 12th of September,
17   2011.
18   Q.  Did you ask him to confirm his date of birth?
19   A.  Yes, I did.
20   Q.  What was that?
21   A.  16th of July, 1988.
22   Q.  And who else was present during that interview?
23   A.  There was a solicitor called Mr. Gurling (ph), a lawyer.
24   Q.  A lawyer for Mr. Elsheikh?
25   A.  Yes.
```

1    Q.  And did Mr. Elsheikh provide you with any written statements

2    when you interviewed him on September 12th, 2011?

3    A.  Yes, he did.

4    Q.  Can you please turn to Binder Number 4, and it's

5    Exhibit 22-7.  It should be a three-page exhibit.  When you've

6    turned to it and you've reviewed it, please look up.

7    A.  Yes.

8    Q.  Do you recognize that exhibit?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  That's the prepared statement that was given to me in the

12   interview.

13           MR. PAREKH:  Move to admit Exhibit 22-7.

14           THE COURT:  It's admitted.

15           (GOVERNMENT EXHIBIT Number 22-7 was admitted into

16   evidence.)

17           THE COURT:  You say "given" to you.  You mean given by

18   the solicitor?

19           THE WITNESS:  Yes.  One or the other of them.  I can't

20   remember exactly who gave it to me.

21           THE COURT:  Next question.

22   Q.  And this statement was provided while Mr. Elsheikh was in

23   the room with you?

24   A.  Yes, that's correct.

25   Q.  And did Mr. Elsheikh confirm the accuracy of the entire

1    contents of this statement?

2    A.  Yes, that's correct.

3    Q.  Did he confirm anything else?

4    A.  I asked him his date of birth, and he confirmed his date of

5    birth.  And I asked him about the signature on each page, and he

6    confirmed that was his signature.

7    Q.  And he confirmed that it's his signature,

8    El Shafee Elsheikh's signature, on the bottom of each page?

9    A.  Yes, that's correct.

10             MR. PAREKH:  Your Honor, permission to publish.  We'll

11   explain the relevance of this statement later on through another

12   witness, Federico Motka.  But if we could show it now that it's

13   been published to the jury, I want to direct the witness'

14   attention to a few words in the statements.

15             THE COURT:  Ms. Ginsberg, any objection?

16             MS. GINSBERG:  No objection.

17             THE COURT:  It's admitted.  You may do so.

18   Q.  Taking a look at the first page of the exhibit, do you see

19   the word "pub" highlighted by us?

20   A.  Yes, I do.

21   Q.  And how many times is the word "pub" highlighted on page 1?

22   A.  That's three times.

23             MR. PAREKH:  And on the bottom, if we can just zoom on

24   on "EDL."

25   Q.  So we've highlighted "EDL."  Was that in the statement that

165

1    Mr. Elsheikh confirmed the accuracy of its contents to you?

2    A.  Yes.

3    Q.  And what does the acronym stand for?

4    A.  It stands for English Defence League.

5          MR. PAREKH:  If we can turn to page 2 of this exhibit.

6    And if we can just enlarge "EDL" again.

7    Q.  And we've highlighted the word "EDL."  Is that the same

8    acronym that you said stands for English Defence League?

9    A.  Yes, it is.

10   Q.  And Mr. Elsheikh confirmed the accuracy of this statement.

11   Correct?

12   A.  Yes, that's correct.

13         MR. PAREKH:  And just the last page, please.  And if we

14   can just highlight or enlarge the highlighted portion of this

15   exhibit.

16   Q.  Can you just read that for the members of the jury?

17   A.  "I make this statement of my own free will,

18   12th September, 2011," signed El Shafee Elsheikh.

19         MR. PAREKH:  We can take it down now.

20   Q.  Officer Van-Der-Reijden, was El Shafee Elsheikh released

21   from custody after providing this written statement to you?

22   A.  Yes, he was.

23   Q.  To your knowledge, was El Shafee Elsheikh arrested with

24   another individual that day named Alexanda Kotey?

25   A.  Yes, he was.

1    Q.  And on that day, I'm referring to September 11, 2011?

2    A.  Yes, that's correct.

3    Q.  And based on your knowledge of this matter, do you know if

4    Alexanda Kotey provided any written or verbal statements

5    following this English Defence League incident?

6    A.  He didn't answer any questions in his interview, and he did

7    not provide a written statement.

8    Q.  Thank you.

9            MR. PAREKH:  No further questions.

10           THE COURT:  Any cross-examination?

11           MS. GINSBERG:  Yes, thank you, Your Honor.

12               **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

13   **BY MS. GINSBERG:**

14   Q.  Good afternoon, Detective.  My name is Nina Ginsberg, I'm

15   one of the attorneys who is representing Mr. Elsheikh.

16           You were in the room with Mr. Elsheikh when he was

17   writing the statement we just looked at?

18   A.  I was not in the room when the statement was written.  That

19   was a private meeting between him and his solicitor, so I was

20   not there then.

21   Q.  But he had agreed to make a voluntary statement, as distinct

22   from Mr. Kotey?

23   A.  I'm sorry, can you repeat the question?

24   Q.  He agreed to make a voluntary statement, unlike Mr. Kotey?

25   A.  Yes.

1    Q.  And in that statement, aside from using the words "pub," he

2    used the term "EDL."  You were just asked about that?

3    A.  Yes, that's correct.

4    Q.  And EDL is the organization that's also referred to by the

5    Metropolitan Police has the National Front?

6    A.  It's a similar organization.  I don't know if it's exactly

7    the same organization.

8    Q.  The other group that was present at the demonstration was

9    the National Front and/or the EDL?

10   A.  It was the EDL, yes.

11   Q.  Yes.  So his describing the -- that phrase was known to

12   everybody that was present at that demonstration.  Correct?

13   A.  I would imagine so --

14          THE COURT:  How would he know what everybody at that

15   demonstration knows?

16          Next question.

17   Q.  Well, was the "EDL" a common way to refer to the

18   National Front?

19          THE COURT:  I thought you said you didn't know whether

20   they were the same organization.

21          THE WITNESS:  I think they're a similar organization.

22   I don't think they're the same organization.

23          THE COURT:  Next question.

24          MS. GINSBERG:  Okay.

25   Q.  And in his statement, Mr. Elsheikh says that he did not

1    assist in anyone being stabbed.  Is that correct?  He denied

2    being involved in any way?

3    A.  Yes, that's correct.

4    Q.  And he also told you that he saw an ambulance when he first

5    arrived, and didn't know why the ambulance was there?

6    A.  Yes, that's correct.

7    Q.  And he said, at that point a group of white males started

8    shooting at him, and the others who were with him, and throwing

9    bottles towards them?

10            MR. PAREKH:  Objection, Your Honor.  That's not what it

11   says.

12            THE COURT:  All right.  Well, the document is in

13   evidence, isn't it?

14            MR. PAREKH:  It is, Your Honor.  It says "shouting,"

15   not "shooting."

16            THE COURT:  All right.

17            MS. GINSBERG:  I apologize, Your Honor.  He's correct.

18            THE COURT:  Well, if it's in evidence, they can read

19   it.  The jury can read it if they think it's important to read.

20   BY MS. GINSBERG:

21   Q.  Started shouting at him.  Correct?

22   A.  That's correct.

23   Q.  And throwing bottles.

24            And he also said that he never had any direct contact

25   with the people in the other group?

1    A.  Yes, that's correct.

2    Q.  Now, Mr. Elsheikh was released after you finished conducting

3    your investigation.  Correct?

4         THE COURT:  Asked and answered.  Next question.

5    Q.  And in connection -- as part of your investigation, you

6    reviewed the videos that had been taken of the scene?

7    A.  Up until that point.  He was released from the

8    investigation.  I took no more part in the investigation.

9    Q.  And did you not -- did you write a report or make a

10   statement with regard to your involvement with Mr. Elsheikh?

11   A.  Yes, I did.  I updated the crime report.

12   Q.  And do you agree with me that you concluded that --

13        MR. PAREKH:  Objection, Your Honor.

14        THE COURT:  Pick up the earphones.

15        (BENCH CONFERENCE ON THE RECORD.)

16        THE COURT:  All right.  Mr. Parekh, what's the

17   objection?

18        MR. PAREKH:  Your Honor, I believe Ms. Ginsberg is

19   about to read from a statement of report that's not in evidence.

20   I believe the proper procedure is for her to ask a question.

21        THE COURT:  What did you plan to do, Ms. Ginsberg?

22        MS. GINSBERG:  Your Honor, I plan to ask him if he

23   concluded that there was nothing that he had seen or read that

24   linked Mr. Elsheikh to this offense.

25        THE COURT:  Why can't she ask that question?

1    MR. PAREKH:  She can ask that question.  It appeared

2  she was about to read from the actual report that's not in

3  evidence.

4    THE COURT:  Just ask him:  Isn't it true that you

5  concluded that nothing you had seen and nothing you had seen or

6  heard connected him to any violent or any stabbing?

7    MS. GINSBERG:  Yes, sir, that's what I intended to do.

8    THE COURT:  You were pointing to a document.  Just go

9  ahead and ask him directly.

10    (END BENCH CONFERENCE.)

11  BY MS. GINSBERG:

12  Q.  Detective, isn't it accurate that you concluded that there

13  was nothing that you had seen or read that linked Mr. Elsheikh

14  to the stabbing that was being investigated?

15  A.  There's nothing I've seen, no.

16  Q.  And that you were confident that none of the individuals who

17  were arrested and who were suspected of being involved in the

18  stabbing, that none of them were seen or located on any of the

19  videos or the still images that you were provided to look at in

20  the course of your investigating this incident?

21  A.  I don't know who else was identified from the videos.  I

22  don't know.

23  Q.  But you were confident that Mr. Elsheikh was not one of

24  those people?

25  A.  As I understand it, yes, that's correct.

1    Q.  Thank you.

2              MS. GINSBERG:  I have nothing further.

3              THE COURT:  Any redirect?

4              MR. PAREKH:  No, Your Honor.

5              THE COURT:  Call your next witness.  Thank you.

6              You may step down, sir.

7              MR. PAREKH:  Your Honor, the United States calls

8    Mr. Matthew Husher to the stand.

9              THE COURT:  All right.

10             Come forward and take the oath, please, sir.

11             (Oath administered by courtroom deputy clerk.)

12             THE COURT:  Mr. Parekh, you may proceed.

13             MR. PAREKH:  Thank you, Your Honor.

14      **(MATTHEW HUSHER, having been duly sworn, testified as follows:)**

15             **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

16      **BY MR. PAREKH:**

17   Q.  Good afternoon, sir.

18   A.  Good afternoon.

19   Q.  If you can keep your voice up so everyone in the courtroom

20   can hear you, we would all appreciate it.

21   A.  Yes, I will.

22   Q.  Please state and spell your name for the record.

23   A.  My name is Matthew Husher, M-A-T-T-H-E-W, H-U-S-H-E-R.

24   Q.  How are you currently employed?

25   A.  I'm currently employed as a consultant to a nongovernmental

1    organization in Southeastern Africa, in Malawi.

2    Q.  What do you do?

3    A.  I advise local government officials on the investigation of

4    serious and organized crime, particularly in counter-trafficking

5    of wildlife.

6    Q.  And you're currently based in Southern Africa?

7    A.  Southeastern Africa, yes.  Malawi.

8    Q.  What did you do before you moved to Africa?

9    A.  I was a detective sergeant in the Metropolitan Police, in

10   the United Kingdom, London.

11   Q.  How long did you serve in the Metropolitan Police Department

12   in London?

13   A.  I served for 27 years.

14   Q.  What were your duties there?

15   A.  I was a detective sergeant investigating serious and

16   organized crime, particularly gang crime in London, firearms

17   trafficking, and drug-related investigations.

18   Q.  Did you retire from the Metropolitan Police Department in

19   London before you moved to Africa?

20   A.  Yes, I did.

21   Q.  When?

22   A.  In 2016.

23   Q.  Please just very briefly summarize your training and

24   experience that you obtained during your 27 years as a

25   law enforcement officer from the United Kingdom.

1    A.  In summary, I was a detective involved in covert and

2    proactive investigations, including surveillance, home address

3    searches, and undercover operations.

4    Q.  Did you participate in the execution of search warrants?

5    A.  I did, yes.

6    Q.  What is a search warrant?

7    A.  A search warrant is a warrant obtained officially through a

8    court procedure to search premises for offenses; for example,

9    firearms offenses.

10   Q.  Were you working for the Metropolitan Police Department in

11   London in August 2014?

12   A.  I was, yes.

13   Q.  I want to direct your attention to a specific date,

14   August 4th, 2014.  Do you remember anything notable happening

15   for you at work that day?

16   A.  Yes, I searched premises located at 9 Bertelli Place in

17   Southwest London.

18   Q.  Was that pursuant to a search warrant that you obtained by

19   court in the United Kingdom?

20   A.  Yes, it was.  It was pursuant to a firearms warrant obtained

21   at a court.

22   Q.  Where did you go?

23   A.  To 9 Bertelli Place in Southwest London.

24   Q.  Is that a residence there?

25   A.  Yes, It's a private residence.

1    Q.  Did you go on-site to that residence in August of 2014?

2    A.  I'm sorry, could you repeat the question?

3    Q.  Did you physically go on-site to that particular location in

4    London on August 4th, 2014?

5    A.  Yes, I did.

6    Q.  And what did you do when you got there?

7    A.  I obtained -- sorry, I followed firearms officers into

8    the premises once it was secured, and I searched the

9    premises.

10   Q.  Did you learn who resided at that premises?

11   A.  Yes.  It's a man called Khalid Elsheikh.

12   Q.  Did you learn Khalid Elsheikh's date of birth at that time?

13   A.  Yes.  As I recall it was 11th of August, 1987.

14   Q.  I want to show you two exhibits.  First let's start with

15   Binder 5, and it's Exhibit 25-7.

16   A.  Yes.

17   Q.  Do you have that in front of you, 25-7?

18   A.  I do.

19   Q.  And what is it?

20   A.  It's a copy of a Sudanese birth register certificate.

21   Q.  Is it a certified copy?

22   A.  It is, yes.

23          MR. PAREKH:  Your Honor, move to admit 25-7.

24          MS. GINSBERG:  There's no objection, Your Honor.

25          THE COURT:  It's admitted.  Next question.

1           (GOVERNMENT EXHIBIT Number 25-7 was admitted into

2     evidence.)

3               MR. PAREKH:  May we publish, Your Honor?

4               THE COURT:  You may.

5               MR. PAREKH:  Can we please enlarge the area, the top

6     half, with the date of birth and the name.

7     BY MR. PAREKH:

8     Q.  What we can see on the screen is a date of birth, and it's

9     11-8-1987.  Do you see that?

10    A.  I do, yes.

11    Q.  Is that the same date of birth that you learned is the date

12    of birth of Khalid Elsheikh, whose home you searched in August

13    of 2014?

14    A.  Yes, that's correct.

15    Q.  And just so we're clear, I know in the United States we

16    express dates a little differently.  How is it done in the

17    United Kingdom and other parts of the world?

18    A.  In the United Kingdom, we put our day first and our month

19    second, followed by our year.

20    Q.  And how are you able to recall Khalid Elsheikh's date of

21    birth so well?

22    A.  Because in the preparation for this trial, I examined

23    paperwork which I had completed or had sight of on the day of

24    his arrest.

25    Q.  Contemporaneous with the day of the search, on August 4th,

```
1    2014?

2    A.  Exactly.

3            MR. PAREKH:  And if we can just enlarge the name.

4    Q.  And so do you see "Khalid Elsheikh" on this

5    birth certificate?

6    A.  Yes, I do.

7    Q.  I want you to now -- before we turn to the next exhibit, do

8    you see where it says, "father's full name"?

9    A.  Yes, I do.

10   Q.  Can you just read that?

11   A.  Rashid Syd Ahmed Elsheikh.

12   Q.  And please read what it says for the mother's name.

13   A.  Maha Awad El Gizouli.

14   Q.  If we can please have you turn to Exhibit 25-6, also in

15   Binder 5.

16   A.  Yes.

17   Q.  Do you recognize this document?

18   A.  I do.

19   Q.  What is it?

20   A.  It's a copy of a Sudanese birth registration certificate.

21   Q.  Also a certified birth certificate?

22   A.  Yes.

23   Q.  And whose birth certificate is it?

24   A.  It's a birth certificate of El Shafee Elsheikh.

25           MR. PAREKH:  Move to admit.
```

 1            MS. GINSBERG:  No objection.

 2            THE COURT:  Admitted.

 3            (GOVERNMENT EXHIBIT Number 25-6 was admitted into

 4      evidence.)

 5            MR. PAREKH:  May we publish, Your Honor.

 6            THE COURT:  You may.

 7            MR. PAREKH:  Please enlarge "El Shafee Elsheikh" with

 8      the father's full name and the mother's full name.

 9      Q.  Okay.  If you can just read the father's full name and the

10      mother's full name?

11      A.  Rashid Syd Ahmed Elsheikh, Maha Awad El Gizouli.

12      Q.  And is this the same mother and father as the previous birth

13      certificate that we saw that belonged to Khalid Elsheikh?

14      A.  It is, yes.

15      Q.  So that would make the person's home that you searched in

16      August of 2014 the brother of Khalid Elsheikh?

17      A.  It would, yes.

18      Q.  And in other words, just so we're clear for the record,

19      Khalid Elsheikh and El Shafee Elsheikh are brothers?

20      A.  Yes, that's correct.

21      Q.  Okay.

22            MR. PAREKH:  We can take that down.

23      Q.  When you searched El Shafee Elsheikh's brother's home on

24      August 4, 2014, did you search Khalid Elsheikh's bedroom?

25      A.  I did, yes.

1    Q.  And among other items, did you find a black in color iPhone,

2    Model 4S?

3    A.  Yes, I did.

4    Q.  And did you have the court's authority to lawfully seize

5    that phone as evidence?

6    A.  Yes, I did.

7    Q.  Where did you find that phone?

8    A.  I found it on top of a set of drawers next to the bed.

9    Q.  Was there anything located right next to that phone?

10   A.  Yes, there was.

11   Q.  What was located?

12   A.  Two cash cards from the Nationwide Bank in the

13   United Kingdom, both in the name of Khalid Elsheikh.

14   Q.  Just so it's clear for the record, when you say "cash

15   cards," are we referring to debit or credit cards?

16   A.  Debit or credit cards.

17   Q.  And how close in proximity were Khalid Elsheikh's debit or

18   credit cards next to the iPhone 4S, black in color, that you

19   found?

20   A.  As I recall, they were directly next to the phone.

21   Q.  Did you find anything else in the bedroom with

22   Khalid Elsheikh's name on it?

23   A.  Yes.  I found a passport and I also found a prison release

24   document in his name.

25   Q.  Both items were in his name?

1   A.  I'm sorry?

2   Q.  Both items were in his name?

3   A.  Yes, they were.  Both items.

4   Q.  What did you do with the black in color iPhone 4S that you

5   found next to Khalid Elsheikh's two Nationwide cash cards?

6   A.  I seized it as my exhibit, and I put it inside a police

7   exhibit bag and sealed it up.

8   Q.  Can you please turn to government Exhibits 23-4, 23-5, and

9   23-6, all of which are located in Binder Number 4, please.  And

10  when you have Government Exhibit 23-4 in front of you, please

11  let me know.

12  A.  Yes.

13  Q.  Do you recognize what is shown in 23-4?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  It's a photograph of a black iPhone sealed in a police

17  exhibits bag.

18  Q.  And is it the same iPhone that you seized on August 4, 2014?

19  A.  It is.  It's my exhibit MJH6.

20  Q.  And please describe what is in Exhibit 23-5.

21  A.  That is an image of the rear of that same telephone, that

22  same mobile phone, and an image of the rear of the police

23  exhibits bag.

24  Q.  And just so it's clear for the record, that's the same

25  iPhone 4S that you lawfully seized on August 4, 2014?

```
1    A.  It's exactly the same, yes.

2    Q.  And finally, please turn to government Exhibit 23-6.

3    A.  Yes.

4    Q.  Do you recognize what is shown in that exhibit?

5    A.  Yes, that's a close-up image of the exhibit label on the

6    police exhibit bag.

7    Q.  Same one that you previously testified about?

8    A.  Yes, that's correct.

9         MR. PAREKH:  Your Honor, with those identifications,

10   move to admit 23-4, 23-5, and 23-6.

11        MS. GINSBERG:  No objection.

12        THE COURT:  They're admitted.  Next question.

13        (GOVERNMENT EXHIBIT Numbers 23-4, 23-5, 23-6 were

14   admitted into evidence.)

15        MR. PAREKH:  May we publish, Your Honor?

16        THE COURT:  You may.

17        MR. PAREKH:  Starting with 23-4, if we can put that on

18   the screen for the jury.

19   Q.  As you testified, this is the black in color iPhone 4S that

20   you seized from El Shafee Elsheikh's brother's home on August 4,

21   2014.  Is that correct?

22   A.  That is correct.

23   Q.  And this was sealed by yourself?

24   A.  It was.

25   Q.  On that same day?
```

1    A.  Yes, it was.

2         MR. PAREKH:  If we can turn to the next exhibit, 23-5.

3    Q.  This is the back of the evidence bag?

4    A.  That's correct.

5    Q.  And how do you know that?

6    A.  Because it has the same unique identification seal number

7    for the bag.

8    Q.  And if we can turn to 23-6.  I just want to ask you a few

9    questions about this.  Just to reorient ourselves, this is a

10   close-up of the evidence bag that we saw on 23-4?

11   A.  It is.

12   Q.  And is your signature -- well, where is your signature?

13   A.  My signature is located under the -- in the box which says

14   "signature" on the right-hand side.

15   Q.  And the unique label number that you just testified about,

16   is that at the top of this exhibit that starts with "MPSB"?

17   A.  Yes, that's correct.  And it's next to the bar code.

18   Q.  And is that the only bag in the entire United Kingdom that

19   would have that specific number?

20   A.  It is, yes.  It's unique.

21   Q.  And the bag says, "from," and a few lines down, "underneath

22   "bed."  Does "bed" stand for bedroom?

23   A.  Yes, it does.

24   Q.  And there's an address there, 9 Bertelli Place.  Is that the

25   same place where you went?

1    A.  It is, yes.

2    Q.  "Taken by DS Husher."  Is that you?

3    A.  That is.

4    Q.  And the date, again, it says 4/8/14.  Is that the 4th day of

5    August, 2014?

6    A.  That is correct.

7    Q.  So in the United Kingdom you just write the dates a little

8    bit differently?

9    A.  We do, yes.

10   Q.  And it says, "Sealed by D.S. Husher."  Is that you?

11   A.  That is correct.

12          MR. PAREKH:  We can take that down.

13   Q.  What did you do with this iPhone 4S after you sealed it in

14   the evidence bag?

15   A.  I handed it to a police exhibits officer who was

16   accompanying me on the search.  So I took it, I sealed it, and I

17   gave it to the exhibits officer, who's then responsible for

18   booking it into a book at the scene, and then transporting it to

19   the police station to go with the prisoner.

20   Q.  Would it have been standard protocol at that time for a

21   digital forensic examiner to have analyzed and examined the data

22   located on the phone, such as pictures, voice messages, and

23   text messages?

24   A.  It would be, yes.

25   Q.  And are you a digital forensic examiner?

1    A.  I am not.

2    Q.  Did a digital forensic examiner analyze the contents of this

3    same phone that you have been testifying about?

4    A.  Yes, they did.

5    Q.  And who was that person?

6    A.  My understanding, it's Matthew Hamilton.

7              MR. PAREKH:  Court's indulgence.

8              No further questions at this time, Your Honor.

9              THE COURT:  All right.

10             MS. GINSBERG:  Your Honor, we have no questions.

11             THE COURT:  Thank you.  You may step down, sir.

12             Mr. Fitzpatrick, are you the next victim?

13             MR. FITZPATRICK:  We're going to go a bit out of order,

14   Your Honor.

15             THE COURT:  All right.

16             MR. GIBBS:  Your Honor, the government calls Jens Serup

17   to the stand.

18             (Oath administered by courtroom deputy clerk.)

19             THE COURT:  All right.  Mr. Gibbs, you may proceed.

20   But let me ask you:  How long do you think it will take?

21             MR. GIBBS:  I believe this witness will take about an

22   hour, Your Honor.  He was the hostage negotiator involved with

23   one of the released hostages.  So there's a number of emails to

24   authenticate, some proof of lives, and then actually getting

25   them out.

1      THE COURT:  All right.  I thought the next witness was

2    going to be Mr. Motka.  All right.

3      It's 3:30, ladies and gentlemen.  I would ordinarily

4    take a recess at this time to reconvene at 4:00 and then go on

5    to the end of the day.  Let's do that, since this witness will

6    take about an hour, rather than break this witness up.

7      So, Mr. Serup, you may step down, sir.  We called you a

8    bit sooner than I should have.  But we're going to take a

9    recess, and during the recess, do not discuss this matter with

10   anyone, not with the lawyers or anyone else.  And we will recess

11   until 4 o'clock, and at that time we'll call you again.  And

12   this time we'll put you on the stand and ask you questions.

13   Thank you for your patience.

14     THE WITNESS:  You're welcome.

15     THE COURT:  All right, ladies and gentlemen, remember

16   to refrain from discussing the matter among yourselves or with

17   anyone, or undertaking any investigation on your own.  And we

18   will begin again at 4 o'clock.  All right.  You may follow the

19   court security officer out.  Remember to put your books in the

20   cubbyhole.

21     (Jury out at 3:36 p.m.)

22     THE COURT:  Court stands in recess until 4 o'clock.

23     (Recess taken at 3:37 p.m.)

24     THE COURT:  A juror has advised me that she or he, I

25   don't know which, needs to leave promptly at 5:00 for child care

1    responsibilities, which underscores the need for us to move this

2    matter along.

3         In addition, a juror has asked the court security

4    officer whether she can, in a recess, go out and walk around.  I

5    will say I understand that.  I'll address them all.  But the

6    answer is yes, but don't do it.  Of course you can do it, but

7    the fact that you go out and want to come back, all in

8    20 minutes, and go through security and everything else, it

9    isn't very practical.  And, in any event, the weather is not

10   particularly inviting these days.

11        But I'll allow it, but discourage it.  Any problem with

12   that on behalf of the government or the defense?

13        MR. GIBBS:  None from the government, Your Honor.

14        MR. MACMAHON:  No, Your Honor.  Can I ask the Court a

15   question very quickly.  There are so many jurors here.  We keep

16   bumping into them in the building.  Of course, we're not

17   speaking to them --

18        THE COURT:  I'll tell them that you cannot speak with

19   them, and they should not regard that as rude, but it's a

20   requirement.

21        MR. MACMAHON:  Thank you, Your Honor, that's what I was

22   asking.

23        THE COURT:  Who's your next -- you've called him?

24        MR. GIBBS:  That's correct, Judge.  Jens Serup.

25        THE COURT:  And he's your -- you're going to do it,

1      Mr. Gibbs?

2              MR. GIBBS:  Correct.

3              THE COURT:  And how long do you think he'll take?

4              MR. GIBBS:  I'm hoping that it will be an hour.

5              THE COURT:  All right.  Bring the jury in, please.

6              It's Mr. Serup, isn't it?

7              MR. GIBBS:  It is.  S-E-R-U-P.

8              THE COURT:  Just so we move things along, Mr. Gibbs,

9      why don't you have one of your team go fetch Mr. Serup.

10             (Jury in at 4:07 p.m.)

11             THE COURT:  Ladies and gentlemen, I forgot to ask you,

12     I hope your lunches were satisfactory.  Good.

13             Now, one of you has indicated - and I don't need to

14     know which one, it doesn't matter - that you need to be released

15     sharply at 5:00 for child care responsibilities.  And I'll

16     accommodate that and do that, but I want you to be sensitive to

17     the need to have this matter move along.  And if we can stay

18     some afternoons past 5:00, until later, we will do so.  But one

19     of you needs to leave today at 5:00, and I will accommodate

20     that.

21             The other point I wanted to mention is one of you - and

22     I don't know which one and it isn't necessary for me to know

23     which one - asked the court security officer whether, during the

24     recess, the juror could go out and walk around.  Well, the

25     answer is yes, but don't do it.  And here's why.

1          Recesses are about 20 minutes.  It's a long way out and

2     a long way back, and you have to go through security every time.

3     And you're going to have a difficult time doing that and have

4     any quality time as you walk around, and today and yesterday

5     freeze, or tomorrow and the next day get soaked in rain.

6          But, in point of fact, if you can do it quickly and you

7     really think it would help you, yes, you can go out and do it.

8     But I don't recommend it, in view of what we're trying to do

9     here.

10         All right.  Mr. Gibbs, call Mr. Serup back.  Is he

11    here?

12         MR. GIBBS:  He is on the witness stand, Judge.

13         THE COURT:  You'll recall, sir, you're still under

14    other.  You have to answer "yes" for the purposes of the record,

15    Mr. Serup.

16         THE WITNESS:  I remember, yes, Your Honor.

17         THE COURT:  Did I pronounce your name correctly?

18         THE WITNESS:  You did, sir.

19       **(JENS SERUP, having been duly sworn, testified as follows:)**

20            **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

21    **BY MR. GIBBS:**

22    Q.  Good afternoon, sir.  Sir, could you please state and spell

23    your name for the record.

24    A.  Jens Serup, J-E-N-S, S-E-R-U-P.

25    Q.  Mr. Serup, are you from Denmark?

1    A.   I'm from Denmark.

2    Q.   Are you a former member of the Danish military?

3    A.   That's correct.

4    Q.   For how long were you on active duty in the Danish military?

5    A.   Almost 20 years.

6    Q.   Were you a commissioned officer?

7    A.   I was a commissioned officer.

8    Q.   What was your focus during your final five years on active

9    duty in the military?

10   A.   I was running a hostage survival program and hostage

11   operational rescue program for the Danish defense, Danish

12   Ministry of Defense.

13   Q.   And in 2010, did you leave active service in the Danish

14   military?

15   A.   I did.

16   Q.   Did you stay in the reserves?

17   A.   I am still in the reserves, with the rank of captain.

18   Q.   And when you left active duty in 2010, what did you do at

19   that point?

20   A.   I went into the private security business and set up my own

21   risk consulting firm called Guardian Security Risk Management.

22   Q.   Guardian Security?

23   A.   Yeah.

24   Q.   And were you still with Guardian in the spring of 2013?

25   A.   I was.

1   Q.  At that time were you contacted by an individual, a fellow

2   Dane, by the name of Daniel Rye Ottosen?

3   A.  I was.

4   Q.  Who was Daniel Rye Ottosen?

5   A.  Daniel is a young, at that time Danish, he used to be a

6   gymnastic.  At that time he had changed career to being a

7   freelance photographer.

8   Q.  And why was he contacting you at that time?

9   A.  He was planning on going to Syria, Northern Syria, to do a

10  photo project documenting refugees and their status in

11  Northern Syria, and he had heard about me through journalists.

12  We work with a lot of journalist security.  So he picked up on

13  my name, and he knew I had spent a significant amount of time on

14  the Turkish-Syrian border.

15  Q.  Did you discuss with Daniel the possibility of him doing a

16  hostile environment course with you?

17  A.  I did.

18  Q.  Is that something you taught routinely?

19  A.  Yeah, we run quite a lot of these hostile environment

20  courses for journalists, photographers, NGOs going into

21  high-risk zones.

22  Q.  How long does that course typically take when you teach it?

23  A.  Three to four days.

24  Q.  Did Daniel Ottosen have time to do the three- to four-day

25  course?

1    A.  No, he didn't, because timewise it didn't fit.  So instead,

2    he took a one-day crash course.

3    Q.  With you?

4    A.  With me.

5    Q.  So, first of all, this was in the spring of 2013.  Is that

6    correct?

7    A.  Yeah, I believe this must have been in February, March '13.

8    Q.  And at that time, what advice did you give him about going

9    into Syria?

10   A.  I warned him off against the very fluid and very, I would

11   say, volatile situation that were in Syria at that time, or

12   still is.  At that time there were a gazillion groups.  It was

13   very difficult to navigate, very difficult to find friend from

14   foe.  And I told him that this rather benign environment was

15   maybe not the best place to go.

16       And I said to him even if he did go, he should stay as

17   close to the Turkish border as possible, and preferably just go

18   in and out the same day, and not spend the night inside Syria.

19   Q.  Did you later find out that he had, in fact, gone into

20   Syria?

21   A.  I did.  I got to an email from him - this must have been in

22   April, when I was out doing some other stuff - where he briefly

23   told me that he was intending on going into Syria in May, and

24   that we would talk when he came out.  And then I didn't hear

25   from him again.

1  Q.  So let's go forward to May of 2013, then.  Did you receive a
2  phone call at that time from Daniel Ottosen's father?
3  A.  I did.
4  Q.  How did he seem in that phone call?
5  A.  Quite disturbed and worried.
6  Q.  And what is Daniel Ottosen's father's name?
7  A.  Kjeld Ottosen.
8  Q.  And is Kjeld spelled K-J-E-L-D?
9  A.  Correct.
10  Q.  Now, where were you at that time when you got this phone
11  call from Kjeld Ottosen?
12  A.  I was on another task in Kyiv, Ukraine.
13  Q.  And what did Daniel Ottosen's father tell you in that
14  conversation?
15  A.  He told me that he called because Daniel had left him an
16  envelope, like an emergency envelope; in case something should
17  happen to him or they didn't hear from him, that they should
18  call this number.  And he had given them my number in a sealed
19  envelope, basically.
20  Q.  And Daniel, had he not returned at that point?
21  A.  No, he had not showed up.  He was supposed to arrive on
22  Turkish Airlines from Istanbul, and they were concerned that he
23  wasn't on the flight that he said he would be on.  And they
24  couldn't get in contact with him.  Nobody had heard from him,
25  neither them or his girlfriend.

1    Q.  So as a result of getting that information from

2    Daniel Ottosen's father, what did you do at that point?

3    A.  Well, I tried to explain to them that it could be possible

4    logic explanations for him not being on that plane, the border

5    closed, the phone system down, him having lost his phone, being

6    hospitalized.  But I did worry about it, because I knew that

7    because of my other work, that the situation in Northern Syria

8    was quite bad.

9         And, of course, I was disturbed that no one could ahold

10   of him.  So I started using some of the sources I had developed

11   down there at that time to try to figure out what could have

12   happened to him.

13   Q.  And, in fact, you talked about -- you know, it sounds like

14   you were trying to reassure his parents a little bit that maybe

15   he missed his flight or problems like that.  But, in fact, he

16   never did show up.  Correct?

17   A.  He never showed up, no.  And nobody could get ahold of him.

18   And he was completely silent on all social media, and we were

19   tracking him on all channels.

20   Q.  So I would like to focus on that first couple months after

21   you received that phone call from Daniel Ottosen's father.  Can

22   you describe your efforts to try and locate Daniel during that

23   time period?

24   A.  Yeah, basically I flew down there right away trying to

25   figure out what happened to him.  I, a couple of days later, met

1    the driver and fixer that he was using, a female Syrian called

2    Aya, and she could basically give me an eyewitness account of

3    how he was apprehended that morning in Azaz.  Azaz is a small

4    village on the border to -- Syrian border to Turkey.

5           MR. GIBBS:  If we could, could we pull up Exhibit 2-1.

6    Q.  Because you mentioned a location, and I'm going to have you

7    identify.

8    A.  Yep.

9    Q.  You can actually touch the screen and circle or mark what's

10   on there.  Can you just identify Azaz?

11   A.  So Azaz is here (indicating), which is a small village just

12   kilometers south of the official Turkish-Syrian border.  And

13   that's where he went, and he crossed at that point called

14   Bab al-Salama.

15   Q.  So you mentioned earlier that his driver, a person named

16   Aya -- which is A-Y-A.  Correct?

17   A.  Yes.

18   Q.  And his fixer, they had both --

19   A.  So, basically, Aya was a fixer, and the driver, Iman, was

20   still apprehended this time with Daniel.  I spoke to him later

21   when he was released.

22   Q.  And after speaking to the fixer and going down there, in the

23   early stages of this hostage-taking, were you able to

24   communicate with someone to potentially negotiate for Daniel's

25   release?

1    A.  Yeah.  So due to the nature of my other work down there, I

2    developed a substantial network of TPIs, or third-party

3    intermediaries, and one of these individuals had access to the

4    elements that we knew at that time had apprehended Daniel.

5           So through their intermediary contacts, we were able to

6    establish a contact with an individual, an Iraqi called

7    Abu Sayyaf, who we knew at that time was responsible for

8    Daniel's capture.

9    Q.  And as a result of working with these TPIs and communicating

10   with them, the people you believed were holding Daniel, were you

11   able to get a demand for his release from them?

12   A.  Yeah.  We got an initial demand of 600,000 U.S. dollars.

13   Q.  And how was that demand for the $600,000 characterized?  How

14   was that described?

15   A.  Well, first of all, it was carried through, as I said, a

16   third-party intermediary, so it was never conveyed in writing

17   but it was conveyed verbally.  And it was actually conveyed in a

18   coded way saying that they wanted 60 notebooks, which were the

19   equivalent to about 600,000 U.S. dollars.

20   Q.  And was it characterized as a payment or a fine, or was

21   there any particular description?

22          THE COURT:  The question is now compound, and don't

23   lead.

24   Q.  Was there a particular description used to describe the

25   $600,000?

1    A.  Yeah, it was not described as ransom.  It was described as a

2    fine from the Islamic court.

3    Q.  And as a result of receiving that demand of $600,000 as a

4    fine issued by the Islamic court, what did you do at that point?

5    A.  Well, since we believed that we had communications up and

6    going and that we had a potential chance of making an agreement,

7    we flew in the necessary money to meet that demand, and we were

8    pretty much ready to make the deal.  And, yeah, hoped to settle

9    that within -- this must have been June, early July, about 2013.

10   Q.  And during that time period while you were trying to get the

11   money down there and get Daniel's release, were you also

12   receiving some proof of lives from people -- the people that

13   were holding Daniel?

14   A.  Yeah, we were receiving photos and videos.

15   Q.  Let's talk about some of the photos and videos.  If you

16   could take a look, it's Binder 3 behind you.  I want to have you

17   identify a couple of those.

18        What is Government Exhibit 11-1?

19   A.  That is a still photo of Daniel wearing a battle fatigue

20   Syrian-type uniform, holding up a sign reading

21   30th of June, 2013, and with a name Majid.

22        MR. GIBBS:  Your Honor, I would ask to move in

23   Exhibit 11-1 and publish for the jury.

24        MR. MACMAHON:  No objection.

25        THE COURT:  Admitted.  You may do so.

```
 1            (GOVERNMENT EXHIBIT Number 11-1 was admitted into
 2      evidence.)
 3      BY MR. GIBBS:
 4      Q.  So, Mr. Serup, 11-1, that's a photograph of Daniel Ottosen?
 5      A.  That's correct.
 6      Q.  Was there anything about the way he looked physically that
 7      concerned you at that time?
 8      A.  Yeah.  Since I met Daniel before his entering into Syria, I,
 9      of course, immediately noticed that he had lost quite a
10      substantial amount of weight.  He was already a pretty fit young
11      guy before he went in.  He was a former elite gymnastic.  And in
12      this photo I noticed that he looked like somebody who had lost
13      substantial weight in a relatively short time.
14      Q.  What, if you can make it out - we can enlarge it - does the
15      note that Daniel Ottosen is holding, what does that say?
16      A.  It says the date.  And then, we agreed with the -- or
17      instructed the TPI that we needed proof, so to guarantee the
18      proof that this photo was not rigged or an older photo, we
19      wanted to add proof that actually it was taken at the place and
20      time where we could identify he would be alive.  So we had Majid
21      write his name on that board, which is the one that Daniel is
22      holding in his hand.
23      Q.  So is Majid the TPI that was helping to get him out?
24      A.  That's correct.
25            THE COURT:  Tell me again what TPI is.
```

```
 1              THE WITNESS:  Third-party intermediary.
 2              THE COURT:  Thank you.  Next question.
 3     BY MR. GIBBS:
 4     Q.  Now I would like you to look at the next exhibit, which is
 5     11-3 in your book.  And what is Government Exhibit 11-3?
 6     A.  That is a still photo of Daniel wearing a white shirt and
 7     looking even more -- skinnier, or he lost more weight.
 8     Q.  And was this a proof-of-life photo that was received during
 9     the hostage negotiations in 2013?
10     A.  That's correct.
11              MR. GIBBS:  Your Honor, we would ask to admit
12     Government Exhibit 11-3, and publish it.
13              MR. MACMAHON:  No objection, Your Honor.
14              THE COURT:  Admitted.
15              (GOVERNMENT EXHIBIT Number 11-3 was admitted into
16     evidence.)
17     Q.  Again, how did you receive this particular photo, Mr. Serup?
18     A.  We received this photo -- as I recall, it was part of a
19     video.  So this still photo is actually part of a video.
20     Q.  So let's go to the video, then.
21              MR. GIBBS:  If we could take that down.
22              Your Honor, I believe the video is Exhibit 11-2.  We
23     would ask to publish it.
24              And I would note for the record, we found the volume to
25     be a little bit low.  It is audible.  We'll turn it up as loudly
```

1    as we can, and we do have a transcript.  If we can just make

2    sure the mics are maxed out.

3              THE COURT:  How long is it?

4              MR. GIBBS:  Probably 10 seconds.

5              THE COURT:  Oh, all right.  Go ahead.  If I can't hear

6    it, I may have you play it twice.  But turn up the volume,

7    please.  Go ahead, you may play it.

8              Any objection to its admission?

9              MR. MACMAHON:  No, Your Honor.

10             THE COURT:  All right.  Play it, please.

11             (GOVERNMENT EXHIBIT Number 11-2 was admitted into

12   evidence.)

13             (Audiotape played in open court.)

14             THE COURT:  It's audible, but the visual isn't there.

15             (Video played in open court.)

16   Q.  Mr. Serup, how did you say that you got this particular

17   video?

18   A.  This video was handed to us through a third-party

19   intermediary, a TPI.

20   Q.  And the information that -- and was that Daniel Ottosen in

21   the video?

22   A.  It was.

23   Q.  You said that was on August 21st, 2013?

24   A.  Yeah.

25   Q.  Was the information he provided about the names of his

1    parents and his girlfriend accurate?

2    A.  Accurate.

3    Q.  So you've testified about a couple of proof-of-life

4    photographs and a proof-of-life video in the summer of 2013.

5    After receiving that and after attempting to move the money down

6    to Syria, did the communications with the people holding Daniel

7    stop for a significant length of time?

8    A.  Yeah.  So right about the time we received this, I believe

9    was the last proof-of-life video we got through that source or

10   channel, the contact, the direct contact, dwindled.  We had

11   increasingly problems with any of our third-party intermediaries

12   to get meetings with ^  Abu Sayyaf and the chain of command that

13   was in his group.

14          So as we progressed into the fall of 2013, we lost

15   contact, and the deal we thought we had with ^  Abu Sayyaf

16   disappeared, evaporated, and we could no longer get access to

17   the people holding Daniel.

18   Q.  And, in fact, I want to move forward, but you raised that

19   point for the deal you had.  The deal was for $600,000.  Is that

20   correct?

21   A.  That's correct.

22   Q.  And you actually had that money in hand?

23   A.  We had that money in Turkey, ready for the swap.

24   Q.  And obviously the swap didn't happen at that time.  Correct?

25   A.  No.

1    Q.  Let's jump ahead to early 2014.  After that, you know, a

2    number of months without hearing anything about Daniel, did you

3    finally receive a communication related to him?

4    A.  We did.

5    Q.  And when I say "you," actually, the initial one was to his

6    family.  Correct?

7    A.  Yeah.  So communication was established in early 2014 with a

8    direct mail to Susanne, her private Gmail account.

9    Q.  So let's start with that.  If you could go to Government

10   Exhibit 12-2, which should be in that same binder.

11   A.  Yeah.

12   Q.  And what is Government Exhibit 12-2?

13   A.  It is an email dated the 8th of February 2014, sent from a

14   Safe-mail account directly to Susanne Rye's personal email

15   account.

16   Q.  And this was the first, as it turned out, of a number of

17   emails with the people holding Daniel.  Is that correct?

18   A.  That's correct.

19        MR. GIBBS:  Judge, just to streamline this, we have

20   all those exhibits -- all those emails exhibited as 12-2

21   through 12-9.  If I could simply move those all in at this

22   point.

23        THE COURT:  All right.  Any objection to those?

24        MR. MACMAHON:  No, Your Honor.

25        THE COURT:  They're admitted.  Next question.

1           (GOVERNMENT EXHIBIT Numbers 12-2, 12-3, 12-4, 12-5,

2    12-6, 12-7, 12-8, and 12-9 were admitted into evidence.)

3           MR. GIBBS:  Can we publish 12-2?

4           THE COURT:  Yes, you may.

5           MR. GIBBS:  If we can highlight at the top the header

6    information to start with.

7    BY MR. GIBBS:

8    Q.  And who is this -- who is the email to and what email

9    address is it from, at least the part you can see there?

10   A.  Yeah, so the email is addressed to Susanne Rye, to her

11   personal Gmail account, and it's written from a Safe-mail.net

12   account.

13   Q.  And what's the date of this email?

14   A.  9 February, 2014.

15          THE COURT:  Why are there black boxes here?  What's

16   redacted?

17          MR. GIBBS:  Personal information, Your Honor.  So, for

18   example, Susanne Rye is Daniel's mother, and without the

19   redactions, that would be her actual email address.

20          THE COURT:  All right.  Next question.

21          MR. GIBBS:  Could we highlight the message at the

22   bottom, the one dated February 8th, I believe.

23   Q.  And, Mr. Serup, is this the message that was received by the

24   parents of Daniel Ottosen?

25   A.  It is.

1    Q.  And can you read the sentence three lines in that begins,

2    "If you want"?

3    A.  "If you want to confirm we are really the ones holding

4    Daniel, then we will except three questions from his family of a

5    personal nature that only Daniel could possibly be able to

6    answer correctly."

7    Q.  And was the word "except" in that sentence misspelled?

8    A.  Yep.

9          MR. GIBBS:  You can take that down.

10   Q.  Now, after the receipt of this email, did Daniel Ottosen's

11   parents contact you?

12   A.  We were already in contact, but, of course, they --

13   naturally they immediately took contact with me, knowing that we

14   now had direct communications through another media or another

15   line, another channel than we had used to.

16         MR. GIBBS:  Actually, can we put that back up?  I'm

17   sorry.  There's one other thing I wanted to ask you about.  My

18   apologies.  If we can just highlight that bottom part again.

19   Q.  Can you read the next sentence that starts, "the conditions

20   of Daniel's"?

21   A.  "The conditions of Daniel's safe return is no media

22   involvement whatsoever and a cash payment.  Reply fast with

23   clearly written email messages to this email address and no

24   attachments.  Act fast as to not endanger the safety of Daniel."

25   Q.  Now, with regards to that warning about no media

1    involvement, did you follow that throughout this -- you know,

2    throughout the months trying to get Daniel out?

3    A.  We did.  And at this point we had already spent -- or I had

4    spent a significant amount of time speaking to Danish media

5    outlets, because the word about Daniel's missing in Syria was

6    already out and circulating amongst most journalists in Denmark.

7    So I was taking a lot of time explaining to chief editors,

8    et cetera, why not to print any news about him and the group

9    that was holding him.

10           MR. GIBBS:  And then could we go to the email at the

11   top dated February 9, 2014, and enlarge that.

12   Q.  Mr. Serup, who actually wrote this email?

13   A.  I did.

14   Q.  And did you do it by yourself or in consultation with

15   Daniel's family?

16   A.  I did it in close consultation with Daniel's family, mom and

17   dad.  So I would draft the message, and meet with them or

18   discuss with them what the content of the message should be and

19   explain to them why I had drafted it this way.  And then we

20   would agree and then send it.

21   Q.  And it would be sent using the Susanne Rye email address.

22   Correct?

23   A.  All communication throughout the entire case was entirely

24   done from Susanne's email account.

25   Q.  And they were to this Safe-mail account?

1    A.   The very same.

2    Q.   Safe-mail.net.

3         And how did you come up with the proof-of-life

4    questions?  Was that in consultation with the parents?

5         THE COURT:  The question is compound.

6    Q.   How did you come up with the proof-of-life questions?

7    A.   We came up with them in cooperation.  I gave them the idea

8    that knowing that Daniel had, at this time, been gone for almost

9    a year, and we knew that he was kept under severe circumstances,

10   I came up with the idea that it would be good to give him

11   locations that would spark him at least some kind of joy to

12   remember.  That's why we picked those particular subjects to ask

13   into.

14   Q.   All right.

15        MR. GIBBS:  So let's go to the next email, then, which

16   is in evidence as Government's Exhibit 12-3.  If we could

17   publish that.  And if we can enlarge the email at the bottom

18   dated February 13th.

19   Q.   Mr. Serup, did you receive answers to the

20   three proof-of-life questions you sent in the prior email dated

21   February 9th?

22   A.   We did.

23   Q.   Were the answers correct?

24   A.   They were fully correct.

25   Q.   And in the course of that email, how much did -- was

```
 1   demanded for the release of Daniel Ottosen?

 2   A.  Two million Euros, cash.

 3   Q.  And was that amount of money a problem for Daniel Ottosen's

 4   parents?

 5   A.  It was a huge problem.

 6   Q.  And what was Daniel's father, what was his occupation?

 7   A.  Yeah, so Daniel's father is a truck driver and the mom is a

 8   hairdresser.

 9   Q.  And can you read the last line of that message to you dated

10   February 13th?

11   A.  The last line?

12   Q.  Correct.  Starting, "The longer."

13   A.  "The longer you take, the less likely it is that Daniel will

14   live."

15   Q.  Now, after receiving this email from the hostage-takers, did

16   you draft a response that was sent back to that Safe-mail.net

17   account?  Did you reply to this email?

18   A.  We did.

19         MR. GIBBS:  So if we can go up to the February 14th

20   email, in the middle that begins, "To the people responsible for

21   Daniel."

22   Q.  Mr. Serup, is this a response you sent to that email?

23   A.  That is correct.

24   Q.  And did you say in that response that the amount that they

25   were seeking, the 2 million Euros, was unrealistic?
```

```
 1   A.   In so many words.

 2   Q.   And were you hoping to negotiate for a more realistic amount

 3   for his parents?

 4   A.   That was my initial hope, yeah.

 5   Q.   And then did you get a response to this email?

 6   A.   We did.

 7        MR. GIBBS:  So if we can go to the email up at the top

 8   dated February 16th, and enlarge that.

 9   Q.   And if you would, Mr. Serup, it's short.  Would you just

10   read the response that you received?

11   A.   "Susanne and Kjeld, you have renewed Daniel's hope.  We

12   anticipate your email proposal while reminding you that you are

13   negotiating for the life of your only son, and that time is a

14   factor."

15        MR. GIBBS:  We can take that down.

16   Q.   Mr. Serup, after receiving that email, what efforts did you

17   and the family make to try to raise as much money as you could

18   for Daniel's release?

19   A.   Yeah, we were pretty much scrambling everything we could

20   think of, borrowing from friends, family, collecting from

21   various communities.  Quite a bit campaign to fundraise the

22   ransom money was conducted, at the same time trying to observe

23   the issue of the media involvement, or to the non-media

24   involvement, which was quite difficult to manage at the same

25   time.  But we succeeded.
```

1    Q.  And so even though you were reaching out to a lot of people

2    and doing this fundraising, you were still working to keep it

3    out of the media.  Correct?

4    A.  Yeah.

5          MR. GIBBS:  If we can go to Government Exhibit 12-4,

6    which is in evidence.  If we can highlight the email at the

7    bottom dated February 25th from the Susanne Rye account.

8    Q.  Mr. Serup, in that first line, it references a reply email

9    that was sent back on February 17th.  Do you see that?

10   A.  Yeah.

11   Q.  And I don't believe we have this email, but had you

12   communicated with the hostage-taker to keep them apprised of how

13   much money you had raised by that point?

14   A.  Yeah.  Once we had what we felt was a substantial amount of

15   money, we gave them that offer.  That was 251,000 U.S. dollars.

16   And we deliberately changed that currency into dollars to make

17   it bigger.  They asked for Euros, but we thought that number

18   looked better.

19         And basically we tried to put as much money in there to

20   at least throw some kind of life insurance for Daniel, making it

21   more difficult or illogic to kill him.  And we knew at that --

22   at this time that we were competing up against all the other

23   hostages, because I was fully aware that there was an ongoing

24   process with various of the other cases that were running

25   simultaneously with this.

```
 1    Q.  And why did you characterize the fact of telling them you
 2    had raised $250,000 as life insurance for Daniel?
 3    A.  I'm sorry?
 4    Q.  I think you used the phrase "life insurance" for Daniel.
 5    A.  Yeah, well, like a -- I was making an analogy.  It was
 6    basically to put enough money on the table that the perpetrators
 7    behind would think this is too much money to throw away by just
 8    killing him.
 9    Q.  If we go to the top, did you receive a reply to that email
10    dated March 3rd, 2014?
11    A.  We did.
12    Q.  And can you just read that first sentence at the top, "We
13    are not happy"?
14    A.  "We are not happy about the meager amount you have raised.
15    This does not help your son in any way.  We are demanding
16    2 million Euros for the release of your son."
17    Q.  That's good.
18              MR. GIBBS:  And then if we can enlarge the bigger
19    yellow block in the middle there.
20    Q.  Mr. Serup, in the highlighted block it says:  "We also
21    remind you of the millions spent by your country's newspaper
22    companies to print insults of our beloved Messenger and
23    Prophet Muhammad."
24              Did you recognize that reference in that email?
25    A.  Naturally it's a well-known fact that ever since these
```

1    cartoon drawings were printed in 2006, there was quite a spur

2    of -- a very negative reaction towards the drawings in the

3    entire Muslim world, Muslim community.  And especially the more

4    radical groups had picked this up and used this as kind of an

5    excuse for carrying out acts of terrorism.

6    Q.  So did this reference cause you to have additional concerns

7    for Daniel's safety?

8    A.  Yeah, a lot.  And at this point we were, of course -- we

9    were very worried that this might turn into a more political

10   religious motivated kidnapping and not a kidnap-for-ransom

11   issue, but a -- you know, something with other nonstandard

12   demands, but more in the political, religious way.

13   Q.  And then, Mr. Serup, in the last highlighted block we have

14   before us, it references a Spanish citizen by the name of

15   "Marcos."  Who was Marcos?

16   A.  He was one of the Spanish hostages that were taken and held

17   with the rest, including Daniel.  And he had been released just

18   previous to this email.

19   Q.  Thank you.

20          MR. GIBBS:  If we can take down 12-4 and publish 12-5.

21   And if we can enlarge the largest paragraph down at the bottom

22   that starts -- or yeah, just enlarge that area, yeah.

23   Q.  Mr. Serup, at the end of that paragraph that begins, "It has

24   taken us," can you read that into the record for us?

25   A.  Sorry, you want me to read from -- yeah, sorry.

1          "It has taken us nine months to bring us where we are

2     now, and the prospect of ever reaching 2 million Euros seems a

3     lifetime away."

4     Q.  And was that, in fact, true?  Were you making slow progress

5     in getting to the 2 million Euro figure?

6     A.  Yeah.  I would believe at this point we were maybe just

7     about half.

8          MR. GIBBS:  And if we could highlight the top, I just

9     want to get the date that you sent that.

10    Q.  What was the date?

11    A.  March 4th of 2014.

12    Q.  And telling the hostage-takers about your slow progress, was

13    that an attempt, on your part, to try to buy some time?

14    A.  It was an attempt to buy time, and it was an attempt to

15    maybe hope for a little compassion.  And the fact of the matter,

16    it was a family negotiating.

17         At this point I think it was a bit obvious to the

18    perpetrators that on some of the other cases they were running

19    simultaneously, they were dealing with organizations, employers,

20    people with much more resources.  And in this case we were

21    dealing with a Danish family with a truck driver and a

22    hairdresser, and I hoped that we could somehow convey that

23    narrative through our communications so they would realize that

24    they didn't have to wait for 2 million Euros to come; that maybe

25    they could give us a discount for the fact we were a family.

1    Q.  Thank you.

2         MR. GIBBS:  If we could publish Government

3    Exhibit 12-6.  And you can, yeah, just take it off the screen.

4    Can we publish, not the picture, but let's start with the blue

5    email at the bottom.  So if we could highlight the email at the

6    bottom in blue, which I believe is dated March 8th.

7    Q.  Do you see that on your screen there, Mr. Serup?

8    A.  I do.

9    Q.  And this is purportedly from the Ottosen family?

10   A.  Yeah.

11   Q.  Actually, Mr. Serup, do you have the hard copy in front of

12   you.  I want to direct you to the part of the email where you

13   talked about Daniel's birthday.

14   A.  Sorry, can you repeat that?

15   Q.  Yeah.  If you could take a look at Government Exhibit 12-6,

16   the hard copy.

17   A.  Yeah, I've got it.

18   Q.  And there was a portion of that email where you talk about

19   Daniel's birthday.

20   A.  Yeah.  So, basically, when we wrote this email, when I wrote

21   this email, Daniel's birthday, 25 years birthday, were two days

22   away.  So we put in a wish for them to convey the greetings from

23   Kjeld and Susanne and the siblings on his birthday.  And we did

24   that because, again, to support the narrative that this was a

25   family, and any mother and dad who would write an email to

1  someone who has held their son on a birthday occasion would

2  mention that.  So we put that in there basically to convey that

3  and sustain that message.

4  Q.  And did you receive a response to that email a couple days

5  later?

6  A.  We did.

7       MR. GIBBS:  If we could highlight the email at the top.

8  Q.  Mr. Serup, is this the email response that you received?

9  A.  It is.

10  Q.  And eight lines into that email, it says:  "Or we could send

11  him to you in a body bag, as our lions are hungry to spill

12  Danish blood as a revenge for the insults on our beloved

13  Messenger Muhammad."

14       Did you also recognize that reference?

15  A.  I did.

16  Q.  What was that a reference to?

17  A.  Again, that was a reference to these Muhammad drawings that

18  were printed by the Danish newspaper and used as a reason to

19  hurt Daniel, basically.  The front here was to utilize that

20  as -- I guess as an argument for hurting him, maybe killing him.

21  Q.  And then just below that, Mr. Serup, if you could read that

22  line that reads, "Attached is a picture."

23  A.  Yeah.  "Attached is a picture of a man who shared a cold

24  cell with your son for a long time.  The fate of Daniel could

25  very well be the same if you continue stalling and wasting

1    time."

2    Q.  And what was, in fact, attached to this email?

3    A.  A very graphic photo of what we later learned was a fellow

4    hostage, a Russian individual, who in the photo was a photo that

5    left no -- nothing to the imagination.  He was shot through the

6    head, and most of his brain matter was caught in the beard.

7    Q.  And what effect did receiving a photograph like that have on

8    your efforts to try to raise the ransom money as quickly as

9    possible?

10   A.  Well, first of all, it came as an immense shock to the

11   family to open that email and see that photo.  And, of course,

12   we knew at this time, but this was kind of like just to prove

13   the fact that we were up against people who we couldn't be sure

14   wouldn't do what they needed to do to speed up the process.

15          And knowing from my experience when you're dealing with

16   multiple hostage scenarios, there's always the risk that the

17   perpetrators might sacrifice one to beef up the pressure on the

18   rest or get a better price for the rest.  And my concern,

19   together with the family, was naturally that Daniel might be

20   that one to sacrifice to -- yeah, to prove a point to the rest.

21   And naturally this reference to the Muhammad drawings and so

22   forth just underlined that, basically.

23   Q.  And you mentioned the parents.  So when this email was sent

24   with the graphic photo attached to it, did Daniel's mother and

25   father actually see that email?

214

1    A.  They did.  Because up until this point it was Susanne's

2    private email account.  So the *modus operandi* we were using is

3    that she would regularly use her email, and then if there was an

4    email from this Safe-net, because they were always using the

5    same email address, or they were through the case, we had this

6    agreement that then she would call me and then we would open it

7    together, or that she would open it and tell me what was in it

8    and then we'd discuss it and back and forth.  But up until this

9    point, she was still the one opening, together with Kjeld, the

10   emails that were going in.

11   Q.  And did that method of getting the emails change after

12   receiving this photograph?

13   A.  Yeah, I suggested that instead of them getting this kind of

14   graphic photos straight into their email - and knowing, again,

15   from my experience it's something that kidnappers do, kind of

16   like a shock-and-awe tactic against the victim's families - and

17   I said to take that shock-and-awe effect away from them, I would

18   much rather be the one screening every email coming in to make

19   sure that they didn't have to encounter that kind of videos or

20   graphics of their face.

21   Q.  And were his parents agreeable to that?

22   A.  Yeah.  So from this point I took over, not the control of

23   the -- but I got access to the email account.  And then, of

24   course, I would only open the emails that were obviously coming

25   from the Safe-net, or something that looked suspicious.

1    Q.  And finally in that email, in the last line of that email,

2    it says:  "Your next email better contain specific details about

3    the amount of cash raised so far."

4           Do you see that?

5    A.  Yeah.

6    Q.  And did you, in fact, send a follow-up email to the hostage

7    takers with that specific information?

8    A.  We did.

9           MR. GIBBS:  So we can take that down and go to

10   Exhibit 12-7.  And if we can highlight the email in the middle.

11   Q.  What is 12-7, Mr. Serup?

12   A.  That is an email dated 9th of April -- sorry, 7th of

13   April 2014.

14   Q.  And in that email, did you tell the hostage takers how much

15   money you had to date?

16   A.  Yeah.

17   Q.  How much did you say?

18   A.  845,000 Euros.

19   Q.  Was that, in fact, accurate?

20   A.  That was accurate.

21          MR. GIBBS:  And then if you can zoom out and go to the

22   highlighted text at the bottom.

23   Q.  And after sending that email saying you had 845,000 Euros,

24   can you just read the response you received?

25   A.  Yeah, so we received a response from them where they state

1    that they - being the perpetrators - state that, "it's good to

2    see your progress in cash for Daniel's release."

3           And then they state that, "We do not reply to your last

4    two messages since the main context of these messages contain

5    little or no information about a satisfactory amount."

6           So, basically, what they were stating to us here is

7    that they were not interested in birthday wishes and anything

8    that was remotely humane contact.  It was strictly about the

9    money and how far we had -- we were in getting the money.

10          MR. GIBBS:  So let's take down 12-7 and publish 12-8,

11   which is also in evidence.

12   Q.  Just for the record, Mr. Serup, if you identify what this is

13   and what the date of it is.

14   A.  So this is an email that we received on the 19th of April,

15   again, from the Safe-net, same email account, and it's an email

16   that describes --

17   Q.  Actually, let me stop you there.  If we go to the second

18   page, I want to walk you through this.

19          MR. GIBBS:  Can we enlarge the highlighted block?

20   Q.  And can you explain what this message -- first of all, who

21   is it from and to?

22   A.  So, basically, this email is from us - "us" being me and

23   Kjeld and Susanne - and we were trying to reach the people that

24   successfully had negotiated the three Spanish hostages out, the

25   reference that was made in previous emails to Marcos.  And we

1   were trying to establish contact with these people behind that

2   facilitated release in order to get some details about

3   logistics, and apparently a message that the perpetrators said

4   they had sent out with Marcos, a message that was intended to

5   reach Kjeld and Susanne.

6   Q.  And in this particular message, the reference to three

7   female hostages --

8   A.  Yeah.

9   Q.  -- who did they work for when they went into Syria?

10  A.  I believe they were worked for Médecins Sans Frontières,

11  Medicine Without Borders [sic].

12  Q.  So Médecins Sans Frontières, MSF --

13  A.  Yeah, MSF.

14  Q.  -- English, it's Doctors Without Borders?

15  A.  Doctors Without Borders, sorry.

16  Q.  And when you got -- when you attempted to contact these

17  people, did you have a problem with the message that was sent?

18  A.  Yeah.  So basically, the email that we were trying to --

19  that we had received from the perpetrators about how to contact

20  this group or these individuals bounced back.  So we never got

21  that information up and going.  We never had -- we never -- we

22  got an Mailer Daemon back.  We were firing off that email into

23  oblivion.

24  Q.  And is that why some of the subject lines on this particular

25  email say, "delivery failure"?

1    A.  Yeah.

2         MR. GIBBS:  Let's go to page 1, if we could, and go to

3    the email at the top of page 1.  If we could enlarge that.

4    BY MR. GIBBS:

5    Q.  Now, what is this that we see on our screen, Mr. Serup?

6    A.  That is part of an email that we then received from the

7    perpetrators where they described that -- and with this email,

8    reading what it reads, it describes a link to a compressed file,

9    and describing that in that file we will find photos and videos

10   of our loved ones.

11        And then they state that there's a URL address to a

12   Gulf-up, which is a file sharing service.  And then there's a

13   password on how to retrieve this compressed data file.  It's a

14   long password ending with 9/11, which is clearly a reference

15   to -- we all know what that reference is to.

16   Q.  Can you just read the first two lines of that email that

17   begins, "Below is a link"?

18   A.  Yeah.  "Surely after viewing the footage and photos you will

19   have an increased appreciation for the severity of the

20   situation.  Stop wasting valuable time and get our demanded cash

21   sum before it's too late."

22   Q.  And the URL that was sent to you, it ended in

23   www.gulf-up.com.  Had you ever heard of that site before?

24   A.  No.

25   Q.  You mentioned there was a lengthy password.  Were you able

1    to use that password to access this particular video?

2    A.  Yes.

3    Q.  And it worked?

4    A.  It worked.

5    Q.  And can you describe what you saw when you accessed that

6    video?

7    A.  Yeah, so in that video there is a video and some still

8    photos.  The video depicts five hostages, whereas Daniel is one

9    of them, kneeling in front of a grave, a predug grave.  And then

10   there is what appears to be a Syrian national male individual in

11   his mid-40s, and he's being shot through the head on live, in

12   front of the hostages.  He falls into the grave.

13         And then, the individual who shoots empties his

14   magazine six, seven bullets into the body, and -- yeah, again,

15   it leaves no -- nothing to the imagination about that there's a

16   killing going on in that video right in front of the hostages.

17   Q.  And you said it was right in front of the hostages.  Was

18   Daniel one of those hostages?

19   A.  Yeah, Daniel was, I believe, sitting out to the far right of

20   those five hostages.

21   Q.  And so you mentioned there was a video.  You said there were

22   also some still photos?

23   A.  Yeah.

24   Q.  If you could take a look at Government Exhibit 10-22D, as in

25   delta?

1    A.  10?

2    Q.  Yeah, 10-22D.

3            MR. GIBBS:  Your Honor, I would note that we have

4    reached the 5 o'clock hour.  I've probably got another -- I

5    think it's a little longer than I thought, maybe 20 minutes.

6            THE COURT:  All right.  I promised you we would recess,

7    and we will.  All right.  10-22 is what we'll start with.

8            MR. GIBBS:  Correct.

9            THE COURT:  All right.  We'll do that.

10           Mr. Serup, you may step down, sir.  Remember, you may

11   not discuss your testimony with anyone.  And we'll begin

12   tomorrow morning at 9 o'clock to complete your testimony.  Thank

13   you for your patience.

14           THE WITNESS:  You're welcome, Your Honor.

15           THE COURT:  All right, ladies and gentlemen, the usual

16   litany.  You must refrain from discussing the matter among

17   yourselves or with anyone, especially your family.  Again, they

18   will be intensely interested in what you've been doing, and they

19   will ask you questions, and again you'll be tempted to answer

20   the questions, and, again, you must resist that temptation and

21   not answer the question.

22           There will come a time when their curiosity will have

23   diminished, and they will no longer believe you've been doing

24   what you say you've been doing.  But you'll have to deal with

25   that.  I will see you tomorrow morning at 9 o'clock.

1          Let me forecast one thing for you.  I believe we will

2   not begin on Friday at 9 o'clock.  At the moment I think I will

3   be required to begin on Friday at 10 o'clock.  Maybe that's a

4   blessing for some of you who have come from afar.  I have

5   another matter at 8 o'clock, and I am not confident that I will

6   finish by 9:00, and I don't want you-all moving heaven and earth

7   to get here at 9 o'clock, only to be asked to sit here and wait

8   for me to finish something that I have to finish on Friday

9   before this case.  But I'm confident that by 10 o'clock I will

10  have completed it.

11          Thank you for your patience today.  Remember, don't

12  discuss the matter with anyone, don't undertake any

13  investigation on your own.  I'll see you tomorrow morning at

14  9 o'clock.  Thank you.

15          (Jury out at 5:02 p.m.)

16          THE COURT:  Mr. Gibbs, I take it you have about another

17  20 minutes?

18          MR. GIBBS:  That's my estimate, Judge.

19          THE COURT:  And the next witness is who?

20  Federico Motka.

21          MR. FITZPATRICK:  He is a lengthy witness.

22          THE COURT:  And what is the subject, generally, of his

23  testimony?

24          MR. FITZPATRICK:  Your Honor, he was a co-hostage with

25  the Americans and all the other Europeans.  He is the longest

1    serving hostage -- you know, he's living, obviously.  He was

2    there for 14 months.  So he has a long time period to cover.

3            THE COURT:  All right.  And then you forecast that the

4    persons then will be Mejia, Smith, and Richards.

5            MR. FITZPATRICK:  Correct, Your Honor.  Ms. Cook will

6    handle them.  Mejia may be a lengthy witness; Richards and Smith

7    will be shorter.

8            THE COURT:  All right.  Well, Ms. Cook, right before

9    you begin, I will ask you for an estimate, as you would, and I

10   will again request that you-all make every effort to focus

11   sharply what you want to elicit from these people and make it as

12   succinct, clear, and brief as you can.  Consistent with your

13   duty to prove beyond a reasonable doubt each of the elements of

14   the offense, but not to gild the lily.

15           All right.

16           MS. COOK:  Understood, Your Honor.

17           THE COURT:  Thank you.  All right.  We'll begin

18   tomorrow morning at 9 o'clock.

19           Yes, Mr. MacMahon?

20           MR. MACMAHON:  Yes, thank you, Your Honor.  Ms. Bishop

21   wants to know if we can leave our boxes in the courtroom

22   tonight, if that's okay with the Court.

23           THE COURT:  Yes, I think so.

24           COURTROOM CLERK:  Yes, Judge.

25           THE COURT:  All right.  We will do that.

1          MR. MACMAHON:  Thank you.  Nothing else from the

2     defense, Your Honor.

3          THE COURT:  All right, thank you.  Court stands in

4     recess until 9 o'clock tomorrow morning.

5               (Off the record at 5:05 p.m.)

6

7

8

9

10

11

12

13

14

15              **CERTIFICATE OF OFFICIAL COURT REPORTER**

16

17          **I, Rebecca Stonestreet, certify that the foregoing is a**

18     **correct transcript from the record of proceedings in the**

19     **above-entitled matter.**

20

21

22     **____//Rebecca Stonestreet_____          __10/6/22___**

23     **SIGNATURE OF COURT REPORTER                DATE**

24

25