1
                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                         Alexandria Division

3    UNITED STATES OF AMERICA,        :     Criminal Case
                                      :     No. 20-CR-00239-TSE
4                  Plaintiff          :
             v.                       :
5                                     :
     EL SHAFEE ELSHEIKH,              :     March 31, 2022
6                                     :     9:10 a.m.
                   Defendant          :
7    ...........................      :     .......................

8                   TRANSCRIPT OF TRIAL PROCEEDINGS
                              VOLUME 3
9               BEFORE THE HONORABLE T.S. ELLIS, III
                    UNITED STATES DISTRICT JUDGE
10                          and a jury

11   APPEARANCES:

12    FOR THE PLAINTIFF:        RAJ PAREKH
                                JOHN T. GIBBS
13                              DENNIS FITZPATRICK
                                ALICIA H. COOK
14                              U.S. ATTORNEY'S OFFICE
                                2100 Jamieson Avenue
15                              Alexandria, VA  22314
                                703-299-3700
16
      FOR THE DEFENDANT:        NINA J. GINSBERG
17                              ZACHARY ANDREW DEUBLER
                                DiMURO GINSBERG PC
18                              1101 King Street
                                Suite 610
19                              Alexandria, VA  22314
                                703-684-4333
20
                                EDWARD B. MacMAHON
21                              LAW OFFICES OF
                                EDWARD B. MacMAHON, JR.
22                              PO Box 25
                                107 East Washington Street
23                              Middleburg, VA  20118
                                540-687-6366
24
                                (APPEARANCES CONTINUED ON
25                              FOLLOWING PAGE.)

2

1    FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                                 CARMICHAEL ELLIS & BROCK
2                                108 N. Alfred Street
                                 1st Floor
3                                Alexandria, VA  22314
                                 703-684-7908
4

5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                 U.S. District Court, 9th Floor
6                                401 Courthouse Square
                                 Alexandria, Virginia  22314
7                                (240) 426-7767

8
                          ( Pages 1 - 219)
9

10
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                        C O N T E N T S

2
    WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS
3
    JENS SERUP
4   By Mr. Gibbs           17        --        11          --

5   FEDERICO MOTKA
    By Mr. Fitzpatrick     44        --        --          --
6

7                        E X H I B I T S

8   GOVERNMENT EXHIBITS                                  PAGE
```

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| Number 1-24A, E, F | 43 |
| Number 1-25C | 43 |
| Number 1-27B | 43 |
| Number 1-29D, E | 43 |
| Number 1-34 | 43 |
| Number 1-39 | 43 |
| Number 3-1 | 178 |
| Number 3-7 | 178 |
| Number 3-8 | 178 |
| Number 3-17 through 3-20 | 178 |
| Number 5-1 | 44 |
| Number 5-6 | 173 |
| Number 5-7 | 173 |
| Number 6-5 | 44 |
| Number 7-2 | 44 |
| Number 9-1 | 147 |
| Number 10-1 | 52 |
| Number 10-4 | 195 |
| Number 10-19 | 83 |
| Number 10-20 | 188 |
| Number 10-21 | 211 |
| Number 10-22 | 207 |
| Number 10-22A through 10-22F | 207 |
| Number 10-22G | 121 |
| Number 11-6 | 22 |
| Number 11-8 | 23 |
| Number 11-9 through 11-11 | 41 |
| Number 12-9 | 20 |
| Number 12-10 | 25 |
| Number 26-5 | 129 |
| Number 26-11 | 216 |
| Number 30-1 | 44 |

4

**P R O C E E D I N G S**

1
2          THE COURT:  Good morning, ladies and gentlemen.  This
3   is United States against El Shafee Elsheikh, 20-CR-239.  And it
4   is apparent to me that counsel for the government and the
5   defendant are present and prepared to proceed.  The defendant is
6   present as well.
7          All right.  There are two preliminary matters.  Let's
8   begin, I think -- I will put this on earphones.  And for those
9   of you sitting in the courtroom, the reason I do this is to
10  preserve the confidentiality of information that I have to
11  divulge to counsel and the defendants.  It isn't anything to do
12  with the merits of the case, which would be on the public
13  record, but it is necessary to do it this way to preserve the
14  confidentiality of the information that I'm going to provide to
15  the counsel.
16         (BENCH CONFERENCE ON THE RECORD.)
17         THE COURT:  All right.  Let's see.  That's Mr. Gibbs
18  sitting there.  Mr. Gibbs and Mr. MacMahon, you are in the front
19  seats.
20         MR. MACMAHON:  Yes, Your Honor.  Good morning.
21         THE COURT:  Can you both hear me?
22         MR. MACMAHON:  Yes.
23         MR. GIBBS:  Yes, Your Honor.
24         THE COURT:  It is my practice and firm policy that I
25  divulge to counsel and the defendant any communications that I

5

```
 1    receive from jurors.  I have two communications to report.  I
 2    will tell you, in essence, what they are.
 3            One of them is lengthy, and I'm going to have the court
 4    security officer take it to the podium where one counsel from
 5    each side can read it.  It's a page.  And I'll tell you what I
 6    intend to do about it, and, of course, solicit from you your
 7    views.
 8            Let's start with that one first, and then I'll get to
 9    the second one.  Let me have -- and let's mark this and make it
10    part of the record and give it to counsel at the podium, and I
11    will tell you in general what it is.  It is a note from a juror
12    who is identified in which she indicates that she is upset at
13    the fact that we no longer use social distancing and we no
14    longer use masks.  She thought that was what was going to happen
15    from the Court's web page or whatever, and she is disappointed
16    at that.  She's concerned about that.  "People are still dying
17    everywhere," and she makes it very clear that her concern is
18    very significant.
19            Have you made it an exhibit yet?  And it will be under
20    seal.  Because she deserves to have her sentiments kept private,
21    and I'm going to keep them private.
22            At the podium, please, Mr. Gibbs and Mr. MacMahon, you
23    may read it quickly.
24            MR. MACMAHON:  Your Honor, we have no objection to it
25    staying under seal.
```

6

```
 1            MR. GIBBS:  Agreed, Your Honor.

 2            THE COURT:  And if you need a minute, Mr. Gibbs and

 3    Mr. MacMahon, if you want to relay what you've read, in effect,

 4    to your co-counsel, that's fine.  I'll give you that minute.

 5    But I think I've summarized the essence of what it says.

 6            All right.  You may return it to the bench, please.

 7            Mr. MacMahon, Mr. Gibbs, I'll give you a minute to tell

 8    me, both counsel, what it is you've read, and you might tell me

 9    whether you think I have adequately summarized the essence of

10    it.  Have I done so?

11            MR. GIBBS:  Your Honor, we believe you have.  And I've

12    conferred with co-counsel; we have no objection to striking this

13    juror.

14            THE COURT:  All right.  Mr. MacMahon -- he took his

15    earphones off.  How about tapping him on the shoulder there.

16            Mr. MacMahon, I'm sorry to interrupt your conference

17    with your co-counsel, but I want to know initially whether you

18    think I have adequately summarized the essence of your note.

19            MR. MACMAHON:  You have, Your Honor.

20            THE COURT:  All right.  You didn't hear this, but

21    Mr. Gibbs, while you were conferring with counsel, says the

22    government has no objection to striking her.

23            Now, let me have you, Mr. MacMahon, complete your

24    conference with your co-counsel so we can proceed.

25            MR. MACMAHON:  Thank you, Your Honor.  We'll do it
```

1    quickly.

2              THE COURT:  Thank you.

3              MR. MACMAHON:  Your Honor, the defense agrees that the

4    witness can be struck.  We won't need her being that scared

5    sitting in the jury box in this case.

6              THE COURT:  Quite right.  I'm going to have her brought

7    in and I will thank her and excuse her.  And I'm not going to go

8    into anything, just thank her and excuse her and wish her well.

9              MR. MACMAHON:  Thank you.

10             THE COURT:  Now, there's one more.  This one is a

11   little bit more ambiguous.  There's nothing in writing that I

12   have from this juror, but what I do have from this juror is a

13   reference to the court security officer, that she has just

14   discovered or just been told or just known that she's now

15   pregnant, and she's a little concerned.

16             Now, what I would have in mind doing -- she hasn't

17   asked to be excused, but I think it's useful to have her come in

18   to the courtroom, have her put on earphones, and I will ask her

19   what her concern is.  I will tell her that we'll take

20   precautions, but I don't want her to be uneasy.  I don't want

21   her to be afraid or nervous.

22             And I will ask her a series of questions and listen to

23   her answers, and then I'll have her remove her earphones.  I'll

24   have you all tell me what you think, about what, if anything,

25   should be done about this particular juror.

8

1              Let me underscore, emphasize, she has not asked to be

2      excused.  She's just called to the court security officer's

3      attention that she has just learned that she is pregnant and

4      she's nervous.

5              MR. MACMAHON:  Fair enough.

6              THE COURT:  I think so.  So that's how I intend to

7      proceed there.  Any objection, Mr. Gibbs?

8              MR. GIBBS:  No, Your Honor.

9              THE COURT:  Mr. MacMahon?

10             MR. MACMAHON:  No, Your Honor.

11             THE COURT:  All right.  I'm going to have her take a

12     seat here in the front and give her earphones.  We're going to

13     start with the COVID one.  First the COVID one, then the

14     pregnant one.

15             (OFF THE RECORD.)

16             (Juror enters the courtroom.)

17             THE COURT:  Good morning, Ms. Moffitt.  Can you hear

18     me?

19             JUROR:  Yes, I can, sir.

20             THE COURT:  Ms. Moffitt, I'm going to use your number,

21     24.  I have the note that you gave to the court security officer

22     and I have read it, and I understand entirely your concerns.  I

23     understand them, and I'm going to excuse you from serving as a

24     juror in this case in the circumstances.  And I appreciate your

25     calling this to my attention.

9

1          And I want you to be sure about two things.  One is

2    that we are grateful, we thank you for your participation thus

3    far, and we understand entirely.  There's no judgment at all and

4    anything else.  People have different views, and it's clear to

5    me that you would be uneasy if we continued in the same regime

6    for the rest of the trial.  So I'm going to excuse you.

7          I hope that's satisfactory to you.

8          JUROR:  Okay.  Thank you, Your Honor.  If I get a cold,

9    I'll get an asthma attack, and it's a problem.  And I didn't

10   expect to feel so insecure here.

11         THE COURT:  That's quite all right.  Again, no judgment

12   at all.  You did exactly the right thing by calling it to my

13   attention.  I understand your concern, and I don't want you to

14   sit here for three weeks being concerned.

15         JUROR:  Okay.

16         THE COURT:  Thank you.  You may be excused.  You may

17   take your book with it.  Do you have it?

18         JUROR:  It's in the back room there.

19         THE COURT:  All right.  Where's the security officer?

20         I have excused this juror, and I want her to have her

21   book, and I want her to be able to go out.

22         I will ask that you not discuss the matter with anyone

23   for a while.

24         JUROR:  Yes.

25         THE COURT:  And if you're curious about what's

1   happening, you may call the clerk's office, and when the matter

2   is concluded, we'll tell you what's happened.

3          Once again, thank you for your service as a juror in

4   this case.  You may follow the court security officer out.

5   He'll see that you get your book and escort you out.

6          JUROR:  Okay.  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          (END BENCH CONFERENCE.)

9          (Juror exits the courtroom.)

10         THE COURT:  One more, and then we'll proceed with the

11  trial.  Thank you for your patience.

12         (Juror enters the courtroom.)

13         THE COURT:  Good morning, you may be seated.

14         (BENCH CONFERENCE ON THE RECORD.)

15         THE COURT:  Good morning.

16         JUROR:  Good morning.

17         THE COURT:  I'm talking to you on the earphones because

18  I want to ask you a couple of questions, and it involves your

19  private situation, which you're entitled to keep confidential.

20  But, of course, I need to know it and the attorneys and the

21  defendant needs to know it.

22         I understand that you have indicated to the court

23  security officer that you have learned that you are going to

24  have a child --

25         JUROR:  Uh-huh.

```
 1            THE COURT:  -- and that you have some concern about

 2    that.  And I need to know what your concern is, and to see if we

 3    can either accommodate that concern, or, if we cannot, what to

 4    do about it.

 5            I should have begun by congratulating you.

 6            JUROR:  Thank you.

 7            THE COURT:  It's wonderful news, I hope, to you.  I've

 8    lived a long time, much longer than most people had hoped, and I

 9    have children and grandchildren.  And I now believe, as I look

10    back on the many years, that that's the most important thing in

11    life, is your children, what you do for your children, and then

12    your grandchildren and what you do for them.  So I'm glad you've

13    started on that road.

14            Is this your first?

15            JUROR:  No.

16            THE COURT:  How many do you have?

17            JUROR:  Just one.

18            THE COURT:  So this is number two?

19            JUROR:  Uh-huh.

20            THE COURT:  Now, what, if any, concerns do you have,

21    given that you have now learned that you're pregnant?

22            JUROR:  Just if I get any morning sickness, what does

23    that look like if we're out here.

24            THE COURT:  I can assure you we will accommodate that.

25    All you have to do, if you have any nausea or anything like
```

1    that, raise your hand, and I will call a recess and give you an

2    opportunity to have a recess.  And I will not ask you to tell me

3    the reason.

4              JUROR:  Okay.

5              THE COURT:  Will that be sufficient for you?

6              JUROR:  Yeah.

7              THE COURT:  Do you think, then, that you can continue

8    to pay careful and close attention to the evidence as it's

9    presented in this case?

10             JUROR:  Yes.

11             THE COURT:  And render a fair and an impartial verdict

12   based only on the evidence and the Court's instructions on the

13   law?

14             JUROR:  Correct.

15             THE COURT:  Good.  For a moment, now, if you would

16   remove your earphones.  And I need to talk to the lawyers alone,

17   and I will get back with you in just a minute.

18             JUROR:  Thank you.

19             THE COURT:  On behalf of the government, Mr. Gibbs, do

20   you need to know anything further about this juror?

21             MR. GIBBS:  Judge, I don't believe so.  We've briefly

22   conferred.  She's put us at ease that she can continue.  As long

23   as we can accommodate any morning sickness concerns, that will

24   be fine.

25             THE COURT:  Mr. MacMahon?

1        MR. MACMAHON:  The same position here, Your Honor.

2    the Court's accommodations are more than sufficient to keep her

3    on the jury.

4        THE COURT:  All right.  Thank you.

5        I should have started with your number, but may I have

6    your name, please?

7        JUROR:  Eileen Liles.

8        THE COURT:  Ms. Liles, as I said, we're happy for you,

9    we congratulate you.  And if you do need a recess for anything

10   having to do with morning sickness, or indeed anything, don't

11   hesitate to raise your hand.  And since I know this information,

12   I'll accommodate you and give you a recess.

13       Do you have any other concerns growing out of your

14   learning that you are now to have a child?

15       JUROR:  No, that's it.

16       THE COURT:  Good.  All right.  And are you prepared now

17   to listen carefully to the evidence and render a fair and an

18   impartial verdict based only on the evidence and the Court's

19   instructions on the law?

20       JUROR:  Yes.

21       THE COURT:  Thank you, Ms. Liles, you may return.

22       JUROR:  Thank you.

23       ( Juror exits the courtroom.)

24       (END BENCH CONFERENCE.)

25       THE COURT:  You may be seated.

1              That, I think, completes everything I needed to do.  I

2      don't know of any other administrative matters that we need to

3      deal with.

4              The witness who is currently on the stand is

5      Jens Serup.  Is that right, Mr. Gibbs?

6              MR. GIBBS:  That's correct.  And he's in a witness room

7      outside.

8              THE COURT:  How long do you think it will take you to

9      complete his testimony?

10             MR. GIBBS:  Judge, I think it will be about 20 minutes.

11             THE COURT:  Let's have the full jury brought in now,

12     and we'll have Mr. Serup in after the jury is seated and we will

13     continue.

14             MR. GIBBS:  Thank you, Judge.

15             THE COURT:  Bring the jury in, please.

16             In case you're wondering, over to the right, your left,

17     there's a labyrinth of various rooms.  It used to be the

18     chambers of another judge.  My chambers are on this side, his

19     were over here.  He's no longer with us, and we now use that

20     area for conference rooms and everything else.

21             (Jury in at 9:33 a.m.)

22             THE COURT:  Good morning, ladies and gentlemen.  Thank

23     you for your patience.  We had some other matters to deal with

24     this morning.  We are now ready to proceed, and we will begin,

25     as we always do, with the deputy clerk calling the roll to

```
 1   ensure that all of you who -- all of you are here.

 2            All right, Ms. Randall, you may proceed.

 3            COURTROOM CLERK:  Juror Number 50, Laura Ann Younger.

 4            JUROR:  Present.

 5            COURTROOM CLERK:  Juror Number 29, Wayne Phoel.

 6            JUROR:  Present.

 7            COURTROOM CLERK:  Juror Number 3, James Bailes.

 8            JUROR:  Present.

 9            COURTROOM CLERK:  Juror Number 20, Alfred Keyser.

10            JUROR:  Present.

11            COURTROOM CLERK:  Juror Number 50, Esthar Zangeneh.

12            JUROR:  Present.

13            COURTROOM CLERK:  Juror Number 22, John Kugelman.

14            JUROR:  Present.

15            COURTROOM CLERK:  Juror Number 26, Jennifer Murray.

16            JUROR:  Present.

17            COURTROOM CLERK:  Juror Number 14, Anne Fay.

18            JUROR:  Present.

19            COURTROOM CLERK:  Juror Number 10, Erica Denham.

20            JUROR:  Present.

21            COURTROOM CLERK:  Juror Number 30, Camille Morrison.

22            JUROR:  Present.

23            COURTROOM CLERK:  Juror Number 47, Adrian White.

24            JUROR:  Present.

25            COURTROOM CLERK:  Juror Number 14, Mirenda Fields.
```

```
 1                JUROR:  Present.

 2                COURTROOM CLERK:  Juror Number 22, Gwendolin McCrea.

 3                JUROR:  Present.

 4                COURTROOM CLERK:  Juror Number 17, Lewis Hoge.

 5                JUROR:  Present.

 6                COURTROOM CLERK:  Juror Number 26, Eileen Liles.

 7                JUROR:  Present.

 8                COURTROOM CLERK:  Juror Number 39, Ralph Stallings.

 9                JUROR:  Present.

10                COURTROOM CLERK:  And your Juror Number 7, Laura

11     Buschman.

12                JUROR:  Present.

13           THE COURT:  Again, good morning, ladies and gentlemen,

14     and thank you for your prompt appearance this morning and your

15     patience since then.  We're now prepared to proceed, but I want

16     to confirm once again:  Were any of you unable to adhere to the

17     Court's instructions to refrain from discussing the matter among

18     yourselves or with anyone, or undertaking any investigation on

19     your own?

20           All right.  No hands.  So it is clear that you were

21     able to adhere to the Court's instructions in that regard.

22     Thank you.

23           We'll proceed now with the trial.  We were in the midst

24     of the direct examination of Mr. Serup.  Is that right,

25     Mr. Gibbs?
```

```
 1                 MR. GIBBS:  It is, Your Honor.

 2                 THE COURT:  All right.  Have him come forward, please.

 3                 Come forward, sir.  And you'll recall you're still

 4       under oath.

 5                 THE WITNESS:  Yes, sir.

 6                 THE COURT:  You may be seated.  Mr. Gibbs, you may

 7       proceed.

 8                 MR. GIBBS:  Thank you, Your Honor.

 9             (JENS SERUP, having been previously duly sworn,

10                        testified as follows:)

11          CONTINUED EXAMINATION BY COUNSEL FOR THE UNITED STATES

12       BY MR. GIBBS:

13       Q.  Good morning, sir.

14       A.  Good morning.

15       Q.  Sir, when we broke yesterday, you were testifying about a

16       particular email that was received by the people holding

17       Daniel Ottosen.

18                 MR. GIBBS:  And if we could pull 12-8 back up, and

19       enlarge the top of that.

20       Q.  And, Mr. Serup, this was the email you testified about

21       yesterday that had the link to the Gulf-up.com link, I guess you

22       called it, that had the video.  And you testified yesterday

23       about the video, but in the second highlighted line of this

24       email, it also says:  "You will find photos and video footage of

25       your loved ones."
```

 1          Were there also photos included with this email?

 2     A.   There was.

 3          MR. GIBBS:  If we could go to 10-22D and publish that.

 4          THE COURT:  Have I already admitted it?

 5          MR. GIBBS:  I believe it is admitted.  I'm sorry.  So

 6     let me do that, Your Honor.

 7     Q.   Mr. Serup, if you could take a look in the binder, which

 8     will be Binder Number 3, at 10-22D, as in delta.

 9     A.   10 -- sorry?

10     Q.   10-22D.

11     A.   Got it.

12     Q.   And what is 10-22D?

13     A.   It is a photograph with five hostages kneeling in front of a

14     dug grave, Daniel being furthest to the right.  And in front of

15     them there's a Al-Nusra flag, and there's what appears to be a

16     Syrian guy bound with his hands behind his back and blindfolded

17     and in front of the grave.

18     Q.   I think I may have given you the wrong one.  But the one we

19     have as 22-D, as in delta, I think that's a different

20     photograph.

21     A.   Sorry, my mistake.

22     Q.   No, that's fine.  And does that have three individuals

23     depicted on it?

24     A.   Yes.

25     Q.   And just briefly, if you could describe what that is and

1   then we'll move it into evidence.

2   A.   That is three victims, three other hostages, including

3   Daniel, Daniel further to the right, standing down that grave

4   holding up a sign, a paper sign with written text, and on Daniel

5   it reads --

6   Q.   Actually, let me stop you there.

7          MR. GIBBS:  Let's see if...Your Honor, at this time we

8   move in 10-22D, and ask to publish it.

9          MR. MACMAHON:  No objection, Your Honor.

10          THE COURT:  Admitted.  You may do so.

11          (GOVERNMENT EXHIBIT Number 10-22D was admitted into

12   evidence.)

13   Q.   Mr. Serup, what we have on our screen is that exhibit.  Can

14   you describe what we're looking at here?

15   A.   Yeah, we are looking at three hostages, Daniel being first

16   to the right wearing the white shirt, and they're all holding up

17   signs, written, which is basically communication to the

18   recipients of these photos.  And in Daniel's case it reads in

19   English, "I don't want to end up like him, pay 2 million, go to

20   Danish government."

21   Q.   And was that amount that was written on his sign of

22   2 million, was that consistent with the ransom demands that had

23   been conveyed to you during these negotiations?

24   A.   That is correct.

25   Q.   And at that time, at the time of receiving these photographs

20

1    and the video, how close to the 2 million were you?

2    A.  I can't recall exactly, but I would guess somewhere in

3    between 1.3, 1.5.

4    Q.  And the photograph that we see here, it does include only

5    three of the hostages.  But did you receive other photographs

6    that had more than that?

7    A.  Yes.

8    Q.  And how many hostages were depicted in those photographs?

9    A.  Five altogether.

10   Q.  Five altogether.  Okay.

11        MR. GIBBS:  So we can take that down.

12   Q.  And next if you could go to -- it's also in Binder 3,

13   Exhibit 12-9.

14   A.  Yep.

15   Q.  What is Government Exhibit 12-9?

16   A.  It is an email written from Safe-net -- Safe-mail.net, the

17   same email used by the perpetrators throughout the case, sent to

18   Susanne's Gmail account, dating 25th of April, 2014.

19        MR. GIBBS:  Your Honor, at this time we would move 12-9

20   into evidence, and ask to publish it.

21        MR. MACMAHON:  No objection, Your Honor.

22        THE COURT:  It's admitted.

23        (GOVERNMENT EXHIBIT Number 12-9 was admitted into

24   evidence.)

25        THE COURT:  Mr. Serup, you said Susanne.  Is that the

1    mother of Mr. Ottosen?

2              THE WITNESS:  That is correct, Your Honor.

3              THE COURT:  Next question.

4              MR. GIBBS:  Ms. Lopez, if we could enlarge the

5    highlighted portion at the top of the email dated April 25th,

6    2014.

7    BY MR. GIBBS:

8    Q.  Mr. Serup, in the second sentence of this email, where did

9    that figure of 1.3 million come from?

10   A.  In this email, they're referring to a previous email that we

11   had sent where we had informed them that we now had the

12   1.3 million in cash collected.

13   Q.  And, in fact, during the course of these negotiations, were

14   you very consistent in keeping the hostage-takers apprised of

15   how much money you had raised throughout?

16   A.  Yes.  We kept them informed when we had collected what we

17   thought was another significant amount, mainly just to buy time.

18   Q.  And, Mr. Serup, below that line that references the

19   1.3 million, can you read the next sentence that starts, For --

20   "As for"?

21   A.  The one starting with "you"?

22   Q.  No, I'm sorry, the one that starts with, "As for the proof."

23   A.  "As for the proof of life, it will be given when you have

24   raised the minimum of 1.3 million Euros."

25   Q.  And then can you read the sentence below that?

22

1   A.  "You will find the proof of life attached.  Clearly the

2   picture shows his desperation for your help."

3   Q.  And was there a photograph attached to this email?

4   A.  There was.

5   Q.  And if you could go to Exhibit 11-6 in the binder.  What is

6   11-6?

7   A.  It is a still photo of Daniel wearing a white shirt,

8   standing in front of another Jahbat Al-Nusra flag and holding up

9   a sign written, "We appreciate your quick reply and the fact

10  that four more have been united."

11  Q.  Was that the proof-of-life photograph that was attached to

12  the email we just looked at?

13  A.  Yeah.

14          MR. GIBBS:  Your Honor, at the time we would ask to

15  move in Government Exhibit 11-6, and publish it.

16          MR. MACMAHON:  No objection.

17          THE COURT:  Admitted.  You may do so.

18          (GOVERNMENT EXHIBIT Number 11-6 was admitted into

19  evidence.)

20  Q.  Mr. Serup, when you read it earlier, you actually read what

21  was written on the piece of paper.  Who were the "four more" who

22  are referenced in that photograph who have been released, or

23  have been united?

24  A.  So they are referencing the four French hostages that had

25  been released just prior to this.

1            MR. GIBBS:  Thank you.  We can take that down.

2   Q.  Mr. Serup, that was obviously a proof-of-life photograph.

3   Did Daniel's family also receive a proof-of-life audio message

4   from Daniel towards the end of his captivity?

5   A.  They did.

6   Q.  And if you could take a look in the binder at Government

7   Exhibit 11-8.

8   A.  (Witness complies.)

9   Q.  Do you have it there before you?

10  A.  Yes.

11  Q.  And do you recognize it?

12  A.  I recognize it.

13  Q.  And is this a disc that you listened to previously and you

14  signed it after listening to it?

15  A.  That's correct.

16            MR. GIBBS:  Your Honor, at this time we would ask to

17  move in Government Exhibit 11-8, and to play it for the jury.

18            MR. MACMAHON:  No objection, Your Honor.

19            THE COURT:  All right.  It's admitted.  You may do it.

20  How long is it?

21            (GOVERNMENT EXHIBIT Number 11-8 was admitted into

22  evidence.)

23            MR. GIBBS:  It's probably 20 seconds.  The volume on

24  this one is relatively low.  If Ms. Randall can turn up the

25  volume as high as it can go, I think we'll need that assistance.

```
 1                THE COURT:  All right.  Proceed.

 2                (Audiotape played in open court.)

 3     BY MR. GIBBS:

 4     Q.  Mr. Serup, the audio message we just listened to, how was

 5     that conveyed to you and the Ottosen family?

 6     A.  It was given and transported out by the four released French

 7     hostages.

 8     Q.  And those are the four hostages you just testified about a

 9     moment ago?

10     A.  Yeah.

11     Q.  So they carried it out for you.

12                And, Mr. Serup, did you recognize Daniel Ottosen's

13     voice on that audio?

14     A.  Yes, I can.

15     Q.  And in that audio, he referenced a figure of 300,000 Euros

16     to go, or 300,000 still to go.  Was that -- where did that

17     reference come from?

18     A.  It was a reference to the fact that we previously had

19     reported to the kidnappers that we were now at the 1.7 mark, so

20     he's referencing that obviously we're lacking the 300,000 still.

21     Q.  Thank you.  Now, as you were attempting to get to the

22     2 million figure, did the family eventually reach that amount

23     and raise that much money?

24     A.  They did.

25     Q.  So if we could go to Government Exhibit 12-10 in your
```

1    binder.  What is Government Exhibit 12-10?

2    A.  It was an email that was sent from Susanne Rye's email

3    address to the same Safe-mail.net address dated 10th of

4    June 2014.

5         MR. GIBBS:  Your Honor, at this time we would ask to

6    move in Government Exhibit 12-10, and publish the first page of

7    it.

8         THE COURT:  All right.

9         MR. MACMAHON:  No objection.

10        THE COURT:  Admitted.  You may do so.

11        (GOVERNMENT EXHIBIT Number 12-10 was admitted into

12   evidence.)

13        MR. GIBBS:  If we could highlight the first email at

14   the top from the Susan Rye account dated 10 June 2014.

15   Q.  Now, in that first paragraph, Mr. Serup, it indicates in the

16   highlighted portion that the money has arrived in Turkey.  Was

17   that what you included in this email?

18   A.  Yes.

19   Q.  And was this the first time you had told the hostage-takers

20   that you had the full amount of the money?

21   A.  That's correct.

22   Q.  And then in the second paragraph, the highlighted portion

23   from the sentence, it starts with "Alternatively."  I don't

24   think it's highlighted.  Could you read that entire sentence

25   that begins with the word "Alternatively"?

1  A.  "Alternatively, it is not possible to ask Daniel the

2  question, who bought his old car, and provide us the answer via

3  email?"

4  Q.  Mr. Serup, what was the purpose of asking that particular

5  question in this email to the hostage-takers?

6  A.  We were about to, I would say, hand over the 2 million

7  Euros, and it is a principle in negotiations that just before

8  you reach a deal, you want to verify that the victim is still

9  alive, and that, of course, obviously the people that you're

10  talking to still has direct access to the victim, in case of

11  those money just going to the different one or the victim not

12  being alive anymore.

13       So this was a way to -- for us to have them demonstrate

14  that Daniel was, in fact, still alive before we fired off that

15  money into nowhere.

16  Q.  And in addition to that, the fact that you had asked about

17  his old car, was that designed to elicit a particular response?

18  A.  It was.

19  Q.  And what was the purpose of eliciting a particular response

20  with that question?

21  A.  Up until this point, the hostages amongst them had agreed on

22  a coded way of messaging from the outside.  So they had come up

23  with this traffic light system that for the ones that would

24  receive proof of life -- at this point, you know, a lot of the

25  previous released had gone through pretty much the same model,

27

1    so they understood that there could be this opportunity for

2    people to ask these questions before the ransom was paid.

3           So they came up with a traffic light system, red,

4    yellow, green, which would refer to whether they were way off of

5    getting out; yellow, meaning it's looking good, progress is

6    being made; and green being, it's you're about to come out.

7           So in this particular question, we deliberately picked

8    a question that referred to his old car, which was green.  So

9    this was a way to signal to Daniel that he was, in fact, on his

10   way to coming out.

11   Q.   And which released hostage conveyed to you this code using

12   the traffic light signals, if you can remember?

13   A.   I don't recall.

14   Q.   Okay.

15   A.   It could have been several, but I don't recall who exactly.

16   Q.   But you were aware that that was a message that Daniel would

17   understand?

18   A.   Yeah.

19   Q.   And did you, in fact, receive a reply from the

20   hostage-takers to this June 10th email?

21   A.   We did.

22           MR. GIBBS:  If we could highlight that bottom email.

23   Q.   The bottom email, what is the date of that one on the

24   bottom?

25   A.   That one is dated 10th of June.

1    Q.   The same as the Susanne Rye email?

2    A.   Yeah.

3    Q.   And, Mr. Serup, if you would, could you read the third

4    highlighted paragraph there that begins, "Additionally"?

5    A.   "Additionally, you will confirm that you also have ready the

6    5,000-Euro-per-day cash fine that was issued by the Islamic

7    courts on the 4th of June, which brings the total amount, after

8    eight days, to 40,000 Euros cash in accordance with the same

9    specifications noted above."

10   Q.   Can you explain that reference to a 5,000-Euro fine from the

11   Islamic courts?

12   A.   For whatever reason, when we were reaching the end state,

13   they -- to put additional pressure on us, they issued an email

14   where they said that from now on, every day that you don't have

15   this money ready in country, we will put an additional

16   5,000 Euros on top of it, which was --

17   Q.   And did it, in fact, take eight days to get the 2 million

18   Euros in country?

19   A.   It did, in fact, take eight days to get the money in, yeah.

20   Q.   So did you have to get an additional 40,000 Euros on top of

21   the 2 million?

22   A.   Yes.

23   Q.   Now, in the earlier email we looked at you testified about

24   that proof-of-life question about the old car.  Did you get an

25   answer to that question?

1    A.  We got an answer to that question, yes.

2         MR. GIBBS:  So if we can go to the second page of the

3    exhibit.  If we could highlight the email at the bottom dated

4    June 11, 2014.

5    Q.  Mr. Serup, was this the answer you got -- or was this an

6    email you got that included an answer to the proof-of-life

7    question?

8    A.  Yes, it was.

9    Q.  Was the answer provided correct?

10   A.  The answer was correct.  It was, in fact, the very car that

11   Daniel sold to his parents.  And, actually, it was the money he

12   used to set up the trip to go originally.

13   Q.  And in the answer, did it indicate the color of the car?

14   A.  Apple green.

15   Q.  Thank you.

16        Did you also receive -- this exhibit is essentially a

17   series of emails.  Correct?  It's an email thread.  And did you

18   also receive specific instructions about what you were to do on

19   the next day, on June 11th?

20   A.  I did.

21        MR. GIBBS:  If we can go to the third page of the

22   exhibit.

23        THE COURT:  Let me point out, you asked two questions

24   previously.  You said, "This is essentially a series of emails.

25   Correct?"  And you never received an answer.  You went right on

1      to another question.  Avoid that in the future.

2            MR. GIBBS:  I can clear that up.

3      BY MR. GIBBS:

4      Q.  The particular exhibit we're looking at, it's a multipage

5      exhibit.  You need to answer audibly.

6      A.  Yeah.

7      Q.  And there's multiple emails here.  Correct?

8      A.  Yeah.

9      Q.  Thank you.

10           So on those multiple pages, we want to go to the bottom

11     of page 3.

12           MR. GIBBS:  If we can highlight that email dated

13     June 11th.

14     Q.  Mr. Serup, did this give you some preliminary instructions

15     on what you were to do in order to deliver the money?

16     A.  It did.

17     Q.  And in that message, at the top it said, "You will make your

18     way to Kilis ASAP."

19           Did you know where -- is it pronounced "Kee-lis" or

20     "Kill-lis"?

21     A.  "Kill-lis."

22     Q.  Did you know where Kilis was?

23     A.  I knew where that was.

24           MR. GIBBS:  If we can pull up Government Exhibit 2-1,

25     which is in evidence.

1    Q.  Can you identify Kilis on the map?

2    A.  Want me to circle it?

3    Q.  The location you've indicated.

4    A.  That's correct.  Kilis is a small town approximately

5    5 kilometers just north of the official Syrian-Turkish border.

6    And five kilometers south of that border is where Azaz is, and

7    Kilis, in fact, the border crossing called Bab al-Salama, where

8    Daniel crossed when he went in in May of 2015.

9    Q.  Thank you.  Now, beyond these instructions in the email we

10   just looked at, if we could go back to Exhibit 12-10.

11        MR. GIBBS:  We can take the map down.

12   Q.  If we could turn to the fifth page of 12-10.

13        MR. GIBBS:  And if we could highlight the top of that,

14   the first highlighted portion.

15   Q.  Mr. Serup, were these some of the additional instructions

16   you received on how to transfer the money?

17   A.  It was.

18   Q.  And then, if we can go to the next highlighted portion down

19   below that.

20        MR. GIBBS:  And enlarge it.

21   Q.  What are these instructions, Mr. Serup?

22   A.  So these are basically the instructions on where to be at

23   exact time with the money and cash, and to link up with whoever

24   was going to come and retrieve the money.  And then there was an

25   exchange of a code word, Turkcell and Vodafone, which is

 1    referring to the two major cell phone providers in Turkey.  And

 2    it was used as a means to verify that whoever I would meet

 3    would, in fact, be the right one, and they would know that I was

 4    the right one with the money.

 5    Q.  So the idea was that you would exchange these code words so

 6    it would be clear that --

 7    A.  Yeah, I would identify myself as Turkcell, and the

 8    individual I met would answer Vodafone.

 9    Q.  Mr. Serup, during all the time that you were receiving

10    communications from the hostage-takers, were they always

11    communicating with you in English?

12    A.  Yes.

13         MR. GIBBS:  If we can go to the last highlighted

14    portion of that email that begins, "To remind you again."

15    Q.  Can you just read that last highlighted portion?

16    A.  "To remind you again, your meeting is tonight at exactly

17    20:30 -- between 20:30 and 22:30.  Any complications or delays

18    will result in additional fines from the courts of the

19    Islamic State."

20    Q.  And did you make every effort to deliver the money promptly

21    to avoid any additional fines from the courts of the

22    Islamic State?

23    A.  I did.  I was at the location at exactly 20:30 exactly.

24         MR. GIBBS:  So let's go to that.  We can take the

25    exhibit down now.

1    Q.  So you said you went to the location in order to deliver the

2    money.  In fact, did you go there early to do some

3    reconnaissance of that area?

4    A.  I did.

5    Q.  Can you describe what you observed?

6    A.  So that area is a -- it's a plain land, grassy, very flat,

7    very few -- very few houses, only small hamlets.  Very

8    dispersed.  It's a quite secluded area.  And basically the

9    border between Syria and Turkey on that spot, at least at that

10   time, was very ferocious, so it was a very -- it was basically a

11   kind of no-man's-land.

12   Q.  And on that point of it being kind of a no-man's-land, were

13   you clear on which side of the border you were on?

14   A.  I believe I was on the Turkish side, the official Turkish

15   side, but I'm reminded again that in 2014, it was kind of

16   unclear where that exactly was.  Because there was an exception

17   from both sides that the border was somewhat to discussion, I

18   guess.

19   Q.  And in the email thread we saw earlier, part of the

20   instructions said you are to take a taxi to go do the money

21   drop.  Were you comfortable with that instruction?

22   A.  No.  I obviously did not want to be in a taxi with a Turkish

23   driver that most likely didn't speak English, I couldn't

24   communicate with, carrying 2 million cash Euro, sitting on the

25   border alone.  So I decided to go in my own car.

1    Q.  And, actually, you mentioned the amount of money.  The money

2    was, in fact, 2,040,000 Euros?

3    A.  2,040,000, I'm sorry.

4    Q.  That's fine.  After doing the daylight reconnaissance, did

5    you go back to that same area, I believe it was 22:30, so 10:30

6    at night?

7    A.  So I was given a window between 8:30 and 10:30, and I was

8    there on the spot.

9    Q.  And describe what happened after you got there.

10   A.  Yeah, so it was pitch black.  At this time it was night, no

11   lights at all; sporadic, a few refugees coming from the south,

12   which was quite normal.  They would just pass on into the night.

13          And then, I think I'd been there around 20, 30 minutes,

14   I noticed a motorcycle coming from the south going to the north,

15   with a quite distinct high sound from the exhaust, no lights,

16   and it drove past pretty quickly.  I was on the roadside with

17   the car, had the windows rolled down.

18          And it just went by really fast.  And in approximately

19   five, eight minutes later, I heard the same motorcycle coming,

20   this time from the north, driving past me again at a slower

21   pace, which, of course, kind of looked like a reconnaissance

22   from their side and just checking me out, I guess.

23          And it circled back, and after a couple of minutes it

24   came back and came to a stop approximately three meters behind

25   the car.

1    Q.  And how many people were on this motorcycle?

2    A.  Two individuals.

3    Q.  Were you able to see both of them during the course of your

4    interaction with them?

5    A.  Of course it was dark, but I could clearly see them.  I was

6    right next to them.  But they were masked, wearing black

7    fatigues.

8    Q.  And when you say they were masked, can you describe those

9    masks?

10   A.  Yeah, so they were both with full-face balaclava, so only

11   the eyes visible.

12   Q.  And you said balaclava.  Is that B-A-L-A-C-L-A-V-A?

13   A.  Yeah, it's the hoodie, not the dessert.

14   Q.  Right.  Not baklava, balaclava.

15   A.  Yeah.

16   Q.  At that point, once the motorcycle stopped, what happened?

17   A.  The driver of the motorcycle never came off the motorcycle.

18   He was staying on the motorcycle, ready.  And the guy behind,

19   who was sitting on the back, came off and came up against me.

20   Q.  Let me stop you there briefly.  The two men that you saw

21   that evening, were they armed in any way?

22   A.  Yeah.  So the guy that was on the motorcycle clearly had

23   some kind of overhung weapon on his back, and the guy coming

24   towards me had carried a handgun.

25   Q.  And describe the interaction when the guy who got off the

1    motorcycle with the handgun came over to you.

2    A.  Yeah, so I approached him really slowly, and I was with open

3    hands and really trying hard not to show -- or to show that I

4    was not carrying anything.  And he comes against me, and I then

5    gave him the code word, "Vodafone" or "Turkcell," and he replied

6    "Vodafone."

7             And I turned back real slowly and reached inside the

8    car and below the seat, where I had stashed a black sack with

9    all the cash in it, the 2,040,000 Euro.  And I slowly pulled

10   that out of the car, went towards him, and handed it out in a

11   stretched arm.

12            And he received it, he weighed the weight of it, and

13   then I said, "Do we have a deal," and shook his hand, and he

14   nodded.

15   Q.  And when you said, "Do we have a deal," what language did

16   you say that in?

17   A.  Like now, in English.

18   Q.  And did he appear to understand that?

19   A.  Clearly.

20   Q.  And so after --

21            THE COURT:  Who said -- I thought you testified that

22   you said, "Do we have a deal?"

23            THE WITNESS:  I said, "Do we have a deal?"  And he

24   nodded.

25            THE COURT:  So he didn't speak anything.

1          THE WITNESS:  He did not speak to me.  But I believe

2     the question, Your Honor, was whether I had the perception he

3     understood.

4          THE COURT:  All right.

5          THE WITNESS:  If I heard correctly.

6          THE COURT:  Next question.

7     BY MR. GIBBS:

8     Q.  And so after telling him, "Do we have a deal," he nods, he

9     takes the bag.  Where did that individual go?

10    A.  So he jumped back on the motorcycle, swings around, and goes

11    back south and disappears into the night.

12    Q.  What did you do at that point?

13    A.  I got in the car, drove off, texted Susanne and Kjeld

14    immediately that the money had been handed over.

15    Q.  So let's go forward from them.  So from the time the money

16    was handed over, how long was it until Daniel Ottosen's release?

17    A.  Eight days.

18    Q.  And what were you doing during those eight days?

19    A.  Waiting anxiously, spending most of my time doing

20    reconnaissance down along the border where I expected him to

21    come out, had various meetings with the border controls on the

22    Turkish side to make sure that they could identify Daniel if and

23    when he all of a sudden showed up.

24    Q.  And did you, in fact, leave photographs of him at the

25    various border crossings?

1    A.  I did.

2    Q.  And ultimately where was Daniel Ottosen released?

3    A.  So ultimately he was released at the border crossing which

4    is close to the Turkish side called Akçakale, on the other side

5    of the border that's called Tell Abyad, which is a split town.

6    And that town is situated approximately 75 kilometers due north

7    of Raqqa.

8    Q.  And being situated roughly 75 kilometers due north of Raqqa,

9    was that one of the closest border crossings to Raqqa?

10   A.  It was.  And it was also the border crossing where

11   Islamic State held the territory.  So, basically, on the south

12   side of the fence, Tell Abyad was still under Islamic State

13   control.

14   Q.  And, in fact, had other hostages who were held with Daniel

15   been released at that same border crossing previously?

16   A.  That's correct.

17          MR. GIBBS:  If we can pull up Government Exhibit 2-1.

18   Q.  I just want to have you identify that border crossing.

19   A.  That's the one.

20   Q.  And can you mark it on your screen there.  Thank you.

21          Mr. Serup, how were you actually notified that Daniel

22   was at the Tell Abyad border crossing?

23   A.  Yes, so I had been down there all day, on the day he was

24   released.  I had driven back to my hotel, which was

25   20 kilometers north of the border.  I was sitting there in the

1    evening, and then all of a sudden the phone rang, and it was

2    Susanne.  And she was crying, happy, and told me that Daniel had

3    just called her and that he was standing by the border.

4         And I ran right down to the car and drove fast down to

5    pick him up.

6    Q.  So you exceeded the speed limit a little bit?

7    A.  I think I did.

8    Q.  And when you got to the border crossing, did you see Daniel

9    at that point?

10   A.  Yeah, so I come down to this area, and it's a guarded area

11   where, obviously, because of the hostility between Islamic State

12   and the Turkish side, so they had been moved into a guard house.

13   And I come into this guard house, and there's Daniel sitting, I

14   believe watching "Wake Up."

15   Q.  And was anyone else with him when he was sitting there in

16   the guard house?

17   A.  Yeah, so he had been released with another victim.  I

18   believe it was Tony Neukirch.

19   Q.  And is that N-E-U-K-I-R-C-H?

20   A.  I believe so.

21   Q.  And Tony Neukirch was another hostage?

22   A.  He was a fellow hostage with Daniel.

23   Q.  And what nationality is Tony Neukirch?

24   A.  German.

25   Q.  When you got to the guard house there, did you have anybody

1    else with you?

2    A.  Yeah, so I brought -- we had a medic team down there,

3    because obviously we did not know what state Daniel was in

4    because they had chosen not to communicate any of those details

5    with us.  So I brought a medic with me for the purpose of being

6    able to handle Daniel in case he had injuries or needed urgent

7    medical care.

8    Q.  And did the medic give Daniel Ottosen a medical exam right

9    there on the spot?

10   A.  Yeah, so right there on the spot, we did a pat-down of

11   Daniel, took off his shirt and made sure he didn't have anything

12   that needed urgent health care.  So yeah, we medical checked him

13   right away.

14   Q.  And in the course of that medical check, were some

15   photographs of Daniel taken?

16   A.  That's correct.

17   Q.  If you could look in your binder to -- again, still

18   Binder 3.  It's 11-9.  Let's start with that one.

19   A.  (Witness complies.)

20   Q.  Do you recognize that one?

21   A.  Yes, I do.

22   Q.  And is this one of the photographs that was taken during the

23   medical exam?

24   A.  Yes.  I took this photo myself.

25          MR. GIBBS:  Your Honor, at this time I would like to

1    move in and publish 11-9.  And I would just note for the record,

2    11-10 and 11-11 are two additional photographs from this same

3    examination, if I could move them in all at once.

4               MR. MACMAHON:  No objection, Your Honor.

5               THE COURT:  All right.  11-9, 10, and 11 are admitted.

6               (GOVERNMENT EXHIBIT Numbers 11-9, 11-10, and 11-11 were

7    admitted into evidence.)

8               MR. GIBBS:  If we can publish 11-9.

9    BY MR. SERUP:

10   Q.  So, Mr. Serup, can you describe what we are seeing in this

11   photograph?

12   A.  Yeah, this is Daniel immediately after his release, and we

13   have taken off his shirt so what we're seeing is his upper

14   torso.  And we're seeing clear marks from beatings on his upper

15   right arm, on his ribs on the right side, and further down his

16   side on the ribs.

17   Q.  And in the upper left-hand corner, you can see a white

18   gloved hand.  Is that the hand of the medic who was doing the

19   examination?

20   A.  That is my guy.

21   Q.  So let's go to 11-10.  And what are we seeing in 11-10?

22   A.  So that would be a similar photo taken from Daniel from the

23   back, clearly showing his -- the bruises, the severe beatings he

24   sustained on his upper right arm, and further down on his

25   backside, side of the back, down towards the kidney area,

42

1    beatings as well, or bruises from beatings.

2    Q.  And finally, if we can go to 11-11.  And, Mr. Serup, what

3    does this photograph depict?

4    A.  Similar, this time showing the beatings on both sides of

5    his -- down in his kidney area.

6    Q.  And when you were there for the medical exam, were you able

7    to observe these bruises in his kidney area?

8    A.  I was.

9    Q.  And, Mr. Serup, during the course of the medical exam, did

10   Daniel Ottosen say how he got these bruises?

11   A.  He did.

12   Q.  What did he say?

13   A.  He said that they received them upon their release as a

14   reminder, or as a present and a reminder not to forget them.

15   And "them" being the people who held him.  A farewell present, I

16   believe he called it.

17   Q.  And that was the term he used, "a farewell present"?

18   A.  Yes.

19            MR. PAREKH:  Thank you, Mr. Serup.  That concludes my

20   questions.  I believe Mr. MacMahon may have some for you.

21            MR. MACMAHON:  I don't have any questions, Your Honor.

22            THE COURT:  Thank you.  You may step down.  Call your

23   next witness.

24            MR. GIBBS:  And is he excused, Your Honor?

25            THE COURT:  He's excused.

43

```
 1                    MR. FITZPATRICK:  Federico Motka.

 2                    THE COURT:  All right.

 3                    Come forward and take the oath, please, sir.

 4                    (Oath administered by courtroom deputy clerk.)

 5                    THE COURT:  All right.  Mr. Fitzpatrick, you may

 6      proceed.

 7                    MR. FITZPATRICK:  Thank you, Your Honor.  Your Honor,

 8      before we begin, the parties have conferred, and there are a

 9      number of exhibits that can be admitted without objection.  Can

10      I read those into the record?

11                    THE COURT:  Yes.  Yes.

12                    MR. FITZPATRICK:  Your Honor, 1-24 was admitted

13      yesterday.  Now, without objection, we'll admit 1-24A, 1-24E,

14      1-24F, 1-25C, 1-27B, 1-29D, 1-29E, 1-34, and 1-39.

15                    THE COURT:  All right.  Mr. MacMahon, are those all

16      unobjected to?

17                    MR. MACMAHON:  Yes, Your Honor.

18                    THE COURT:  All right.  They're admitted.  And in the

19      course of your examination, you may display them when you think

20      it is appropriate to do so.

21                    MR. FITZPATRICK:  Thank you, Your Honor.

22                    (GOVERNMENT EXHIBIT Numbers 1-24A, 1-24E, 1-24F, 1-25C,

23      1-27B, 1-29D, 1-29E, 1-34, and 1-39 were admitted into

24      evidence.)

25                    MR. FITZPATRICK:  Your Honor, I have four additional
```

```
 1    that are out of series.  May I read those?

 2              THE COURT:  Yes, do so.

 3              MR. FITZPATRICK:  5-1, 6-5, 7-2, and 30-1.

 4              THE COURT:  All right.  Mr. MacMahon, are those also

 5    unobjected to?

 6              MR. MACMAHON:  They are, Your Honor.  Thank you.

 7              THE COURT:  Those are admitted.

 8              (GOVERNMENT EXHIBIT Numbers 5-1, 6-5, 7-2, and 30-1

 9    were admitted into evidence.)

10              THE COURT:  And, again, with these as the others, you

11    may display them in your examination of Mr. Motka as you see

12    fit.

13              MR. FITZPATRICK:  Thank you, Your Honor.

14       (FEDERICO MOTKA, having been duly sworn, testified as follows:)

15             EXAMINATION BY COUNSEL FOR THE UNITED STATES

16    BY MR. FITZPATRICK:

17    Q.  Good morning, sir.

18    A.  Good morning.

19    Q.  I'm going to ask you a series of questions.  I ask that you

20    keep your voice up, and you have a microphone in front of you so

21    we can all hear your answers.  Do you understand that?

22    A.  Yes.

23    Q.  Please state your name.

24    A.  Federico Motka.

25    Q.  What is your nationality?
```

45

```
 1    A.   Italian.

 2    Q.   What year were you born?

 3    A.   1983.

 4    Q.   And in what part of Italy were you born?

 5    A.   In Trieste, in the Northeast of Italy.

 6    Q.   Could you spell the name of that, please.

 7              THE COURT:  Mr. Motka, please speak up just a bit more,

 8    please.

 9              THE WITNESS:  In Trieste, in the Northeast of Italy.

10    Q.   Could you spell that, please.

11    A.   T-R-I-E-S-T-E.

12    Q.   And, sir, at a young age, did your family move to the

13    Middle East?

14    A.   Yes.

15    Q.   And for what purpose?

16    A.   My father worked abroad for a logistics company.

17    Q.   And what country did you move to?

18    A.   All around.  We were in Iraq, Saudi Arabia, the

19    United Arab Emirates.

20    Q.   How young were you when you moved to the Middle East?

21    A.   I think around three months.

22    Q.   And were you educated in schools in the Middle East at a

23    young age?

24    A.   Yes, I went to British school systems.

25    Q.   At the age of 12, did you go to England for schooling?
```

1    A.  Yes.

2    Q.  And describe, did you continue your schooling in England?

3    A.  Yes, I did.  I went to boarding school in Bath, in the UK,

4    and then went to the London School of Economics in London.

5    Q.  And did you graduate from the London School of Economics?

6    A.  Yes.

7    Q.  And with what degree?

8    A.  A BSC in geography and economics.

9    Q.  And what year was that, do you recall?

10   A.  2004.

11   Q.  Did you continue your education at Johns Hopkins University?

12   A.  Yes, that's right.

13   Q.  And where was that?

14   A.  So I did a master's program which involved a first year in

15   Italy and the second year here in D.C.

16   Q.  And did you graduate from the Johns Hopkins University?

17   A.  Yes.

18   Q.  With what degree?

19   A.  A master's in development studies.

20   Q.  After graduating from Johns Hopkins University with your

21   graduate degree, did you begin a career in aid and development

22   work in various spots in the world?

23   A.  Yes.

24   Q.  I want to direct your attention to October of 2012.  Did you

25   begin some work doing humanitarian work in Syria, Jordan, and

1    Iraq?

2    A.  Yes, that's right.

3    Q.  Who were you working for at that time?

4    A.  I was working for a Swiss-based organization called

5    IMPACT Initiatives.  We did -- I was the global assessments

6    manager, and we did humanitarian needs assessments on the ground

7    on behalf of the NGO community and the donor community.

8    Q.  What is the relationship between IMPACT Initiatives and

9    ACTED, A-C-T-E-D?

10   A.  So IMPACT Initiatives was essentially an organization

11   created by members of the ACTED stuff, and so the executive

12   director of IMPACT Initiatives used to be the regional director

13   of ACTED.  He was my boss.  And I initially joined

14   IMPACT Initiatives from another organization before that.

15   Q.  Can you briefly summarize the work you're performing

16   beginning in October of 2012.

17   A.  Yeah.  So we started off working on the refugee crisis in

18   Syria, doing assessments in the refugee camps that were usually

19   managed by the United Nations UNHCR refugee council.  And part

20   of that was to understand sort of, A, what needs there were, but

21   also looking at the social dynamics within the camps to help

22   manage them.

23        Ultimately, refugee camps are fundamentally little

24   cities that you need to manage, so we did a lot of the

25   assessments, mapping, understanding how people were behaving

1    within them, making sure they had access to water, food,

2    livelihoods, et cetera.

3    Q.  What was happening in that region in Northern Syria and Iraq

4    socially and politically that required your work?

5    A.  Sorry?

6    Q.  What was happening in that region that required the type of

7    work that you were performing?

8    A.  Yeah, so the conflict in Syria had evolved significantly.

9    There was massive movements of refugees from inside Syria to

10   Turkey, Jordan, and Iraq.  One of the largest refugee camps in

11   the region at the time was in Northern Jordan, and that's sort

12   of where we started.  Then there was another very large camp

13   that was being established in the Kurdish region of Northern

14   Iraq, and then, of course, the camps in Turkey.

15          But I was primarily involved on the Jordanian side, and

16   from -- in Kurdistan and the Iraqi side.

17   Q.  Are you familiar with the term "the Arab Spring"?

18   A.  Yes.

19   Q.  Was your work in relationship to what was happening as a

20   result of the Arab Spring?

21   A.  I mean, in some shape or form, yes.  But, I mean, Syria

22   is -- I mean, it would be sort of a series of events that led

23   to -- across different North African and Middle Eastern

24   countries.

25   Q.  Drawing your attention to February 12th to February 18th of

1    2013, did you take a trip into Northeast Syria at that time?

2    A.  I did.

3    Q.  And what was the purpose of that trip?

4    A.  We were conducting a needs assessment to understand sort of

5    what the conditions were, the humanitarian conditions on the

6    inside border in the Northeastern area.  It was an area that was

7    less heavily in conflict, in active conflict.  A lot of people

8    were moving into Iraq through Northeastern Syria, and refugee

9    camps were being slowly -- there was a concern that they were

10   being overwhelmed.

11           So trying to understand what the situation in Syria was

12   in the areas that people were transiting through that were safer

13   would help us potentially respond directly there and be able to

14   support people before they became refugees.

15           MR. FITZPATRICK:  If we could publish 2-1, please.

16   Q.  Mr. Motka, we're going to put up a map of that region you've

17   described.  You'll see it in a second in front of you.  The

18   screen will color if you touch the screen in a particular area.

19           Can you just tell the judge and the jury, in that

20   February trip, where you entered Northeast Syria.

21   A.  Yeah, it was...so I entered here, and it was this whole area

22   in there (indicating).

23   Q.  What you just circled there, was that your work area?

24   A.  Yes.

25   Q.  Now, for that trip in February of 2013, did you complete

```
 1    that trip without incident?

 2    A.  Yes.

 3    Q.  So that was a safe trip?

 4    A.  Yes.

 5    Q.  Directing your attention to March 8th of 2013, did you

 6    reenter Syria on March 8th of 2013?

 7    A.  Yes.

 8    Q.  And what part of Syria did you enter then?

 9    A.  I entered Northeast Syria.

10           MR. FITZPATRICK:  If we can have the screen back up,

11    please.

12    Q.  When you entered Northwest Syria in March 8th of 2013, where

13    did you go?  And, again, mark the screen.

14    A.  We entered through a border crossing just here, Atmeh.

15    Q.  And both occasions you entered through Turkey, but on

16    opposite ends of the Syrian country?

17    A.  That's right.

18    Q.  When you entered on March 8th of 2013, who did you enter

19    Syria with?

20    A.  A colleague called David Haines.

21    Q.  And did David Haines work for the same organization?

22    A.  Sort of.  He worked for ACTED.  I was working for

23    IMPACT Initiatives, but I seconded with ACTED for the period of

24    that assessment.

25    Q.  The term "seconded," what does that mean?
```

1    A.  It basically meant that my contract was still with

2    IMPACT Initiatives, but I was under the management of ACTED and

3    working on behalf of that organization for the period that I was

4    there.

5    Q.  Okay.

6    A.  Because they had the infrastructure in the country and the

7    logistics.

8    Q.  Were you and David Haines working as a team when you entered

9    March 18th, 2013?

10   A.  Yes, that.

11   Q.  Now, you've described your job responsibilities.  What were

12   Mr. Haines' responsibilities?

13   A.  Yes, so David had joined ACTED as their regional logistics

14   and security manager.  So his job was to look at how ACTED could

15   set up the warehousing and logistics that are required to be

16   able to deliver aid to communities just on the inside of the

17   border between Syria and Turkey.

18        He was also tasked with understanding what the security

19   conditions were.  There was a lot of potential for unexploded

20   ordnance and things like that, so to understand what areas to

21   stay away from to maintain the integrity and safety of the team.

22        MR. FITZPATRICK:  With the assistance of the court

23   security officer, if we could go to Binder 3, please.

24   Q.  And if you could please turn to 10-1, and please take a look

25   at that photograph.

1    A.   (Witness complies.)

2    Q.   Do you recognize the person in photograph 10-1?

3    A.   Yes.

4    Q.   Who is that?

5    A.   That's David Haines.

6         MR. GIBBS:  Move to admit 10-1.

7         THE COURT:  It's not in the list of those?

8         MR. FITZPATRICK:  It was not, Your Honor.

9         (GOVERNMENT EXHIBIT Number 10-1 was admitted into

10   evidence.)

11   Q.   Is that Mr. Haines?

12   A.   That's right.

13        MR. FITZPATRICK:  You can take that down, please.

14        And this next one was previously admitted, Your Honor.

15   If we could publish 1-27B.

16   Q.   Who do we see in 1-27B?

17   A.   David Haines.

18        MR. FITZPATRICK:  Take that down, please.

19   Q.   When you entered on March 8, 2013 -- well, let me ask you

20   this:  Were you moving back and forth over the Turkish-Syria

21   border day to day?

22   A.   So we had not planned to initially, but we did cross the

23   border once into Syria, spent the day in internally displaced

24   persons camps along the border, and then returned to Turkey for

25   some meetings with coordination teams that were also helping us

1     in terms of like, just coordinating what we were going to do.

2          Because like I said, the assessments that we were

3     running wasn't on behalf of one organization.  It was actually

4     for the wider community.

5     Q.  The following day, on March 9, 2013, do you recall stopping

6     at a restaurant in Syria with Mr. Haines?

7     A.  Yes.

8     Q.  And can you describe the restaurant?

9     A.  Yeah, it was a small kebab-shop style.  Yeah, it was sort

10    of -- it had a few tables, small entryway.  It was near the town

11    center of Atmeh.

12    Q.  In the town center of Atmeh?

13    A.  Yes.

14    Q.  And did anything unusual or noteworthy happen at that

15    restaurant on March 9th?

16    A.  David later noted to me that he had noticed that someone was

17    potentially observing us, taking pictures on their phones.

18    Q.  And did you effort to leave Syria by a certain curfew on

19    that day?  Did you impose a curfew on yourselves?

20    A.  We had a self-imposed curfew of around 4:30 in the

21    afternoon.  Because it was March.  I mean, the sun was staying

22    up a little longer, but we wanted to be off the ground by

23    sunset.

24    Q.  I now want to turn to March 12th of 2013.  Do you recall

25    that day?

1    A.  Yes.

2    Q.  And did you and David Haines return to Syria through Atmeh

3    on March 12th of 2013?

4    A.  That's right.

5    Q.  Again, describe what you were doing on that day.

6    A.  Having started off our assessment with some other colleagues

7    with the IDP camps - so the internally displaced persons camps -

8    the next stage of our assessment was to move to some of the

9    towns that had been liberated, in that sense, some months prior.

10          So a lot of the people in the internally displaced

11   persons camps were from these areas around Aleppo, and we wanted

12   to go and see how these areas were and whether there was a

13   potential for return.  It's a much more dignified way of

14   delivering support in their own homes, as opposed to these

15   difficult-to-maintain muddy camps.

16   Q.  After completing your work that day, do you recall what time

17   you started to depart to return to Turkey?

18   A.  Yeah.  We weren't planning to return to Turkey.  We were

19   planning to spend the night in the ACTED safe house.  It was

20   just a basement apartment in a building near the border.  I

21   think we were already on the way back in early afternoon to make

22   sure we were back for our sort of curfew.

23   Q.  In addition to yourself and David Haines, who else was in

24   your vehicle?

25   A.  Yeah, so we had the area manager for ACTED, who was sort of

1    our main point of contact, who knew the area well and maintained

2    the relationships with the various brigades.

3            So at the time, the Free Syrian Army was a collection

4    of different brigades that operated in the area and controlled

5    different bits of territory, so you would be moving constantly

6    between an area controlled by one brigade versus the other.  And

7    the area manager had relatives who were within different

8    brigades, so he helped us move around.

9            So he was the driver of the vehicle we were in, and

10   then we had a translator, who I think was another family member

11   of his who came with us to help us with our conversations.

12   Q.  If you can, please, late in the day as you're driving back

13   to your safe house, describe some events that occurred.

14   A.  So, yeah, we were on our way -- I don't know if it was on

15   the way out or on the way back, exactly.  But on the way to and

16   from Atarib, where we went to do the sort of assessment within

17   sort of the towns and villages around Aleppo, we had been

18   stopped by a checkpoint that we weren't expecting.

19           And I mean, both David and I were sitting in the back

20   seat and sort of were talking to one another, discussing the

21   work that we were doing.  We were asked to show our passports;

22   we passed them to the area manager.  He passed them and they had

23   a conversation in Arabic.  They were giving them back and then

24   we drove on.

25           The only thing I noted at the time was that he was a

1    little bit nervous, or he wasn't completely calm, as he would

2    have been.  But other than that, it was a relatively -- it

3    wasn't super surprising in the sense that, as I said, there's

4    these different brigades.  Sometimes they would put up

5    checkpoints.  It was sort of a normal day-to-day.

6    Q.  How far did you travel in your vehicle before something

7    actually happened?

8    A.  Actually, at that point we were really interested -- well, I

9    in particular really wanted to speak to people at the IDP camps

10   who were coming -- who were residents of the towns, because

11   there were some questions that I had.  And one of our sort of

12   security protocols at the time was to do things off the cuff.

13   It's a lot easier to sort of maintain -- to not do things

14   regularly, for security purposes.

15          So what we discussed with the team, together, we said,

16   Well, could we go to one of the IDP camps?  Do we still have

17   time?  We thought we did, because it was only 3 o'clock in the

18   afternoon.  So we said, Okay, let's go and start running these

19   questions by them, so I could start working on the report that

20   evening.

21          So we went to the IDP camps, which is along the border,

22   along the barbed wire between Turkey and Syria.

23   Q.  Were you still within Syria?

24   A.  Yes.  Yes.

25   Q.  Please continue.

1    A.  We sat inside a tent with some community leaders from

2    Atarib.  I had a normal conversation.  And then, when it was a

3    little bit -- we were just at the edge of our curfew, so we

4    said, okay, well, we're going to start heading back.

5           We got into our vehicle, and then, as we drove away

6    from the IDP camp, I started a phone call with my boss in

7    Geneva.  Because we were so close to the border, we could pick

8    up Turkish cell network.

9           And as we drove down, sort of we passed two black

10   vehicles with tinted windows.  At the time I didn't -- other

11   than notice that they were there, I didn't really sort of pay

12   attention.  I was on the phone.  We took a turn off the sort of

13   main road into Atarib town from the IDP camp, through an olive

14   grove, so it was kind of a dirt track that was a shortcut to get

15   to our safe house.  And at that point the vehicles must have

16   been behind us.  I still didn't notice them.  I was still on the

17   phone.

18          When we reached the end of the track where it sort of

19   joined up with the main sort of asphalt road, one of the

20   vehicles came up, accelerated around us, and blocked off our

21   path.

22   Q.  Did that force you to stop?

23   A.  Yes.

24   Q.  And what happened next?

25   A.  And then masked gunmen came out of the vehicles.

```
 1   Q.  Do you recall how many?

 2   A.  Around six to eight.

 3   Q.  When you say "masks," do you recall what types of masks?

 4   A.  Yeah, the sort of black, full head, with, like, a slit for

 5   the eyes.

 6   Q.  Do they call those balaclavas?

 7   A.  Yes.

 8   Q.  Are you familiar with what balaclavas look like?

 9   A.  Yes, different ones.

10   Q.  What happened -- when the masked individuals approached your

11   car, were they armed?

12   A.  Yes, they were armed.  One person -- we had the windows

13   down.  One person came and grabbed an AK-47 that was actually

14   between the legs of our translator.  It was not actually that

15   common for us to have weapons in the car.  In this case I'm not

16   entirely sure why we did.  It certainly wasn't our usual

17   protocol.

18        But, yeah, so they ripped the gun out of from between

19   the legs of the translator who sat in the passenger front seat,

20   and then they told us to get out and put our -- get down on the

21   ground face down.  I was still on the phone while the whole

22   thing happened, so I used it -- my boss is Italian, so I said to

23   him in Italian, "I think we're getting kidnapped."

24        And then I dropped the phone with him still on the line

25   in the hope that maybe he could hear something that might get us
```

```
 1   out.

 2   Q.  Were you removed from the car?

 3   A.  Yes.

 4   Q.  And how were you removed from the car?

 5   A.  I'm just grabbed forcefully and shoved onto the ground.

 6   Q.  What happened to David Haines?

 7   A.  Same.

 8   Q.  And when you were removed from the car, where did you go?

 9   A.  So we were put down on the ground.  It took a few minutes

10   for -- I think David was closer to the vehicle that had sort of

11   blocked our path on the left-hand side of our car.  I was on the

12   olive grove side, if you will.  And so he was put into the boot

13   of one of the cars first, and then they took me and put me in.

14           And I saw, like, a guy on a bicycle come down, and he

15   looked shocked and kept on going.

16   Q.  You said the "boot" of a car.  In the United States, we call

17   that a trunk?

18   A.  Oh, yes.

19   Q.  Okay.  And were you and David Haines put in the same trunk

20   of a car?

21   A.  Yeah, so we were put initially in the same -- we were put in

22   the same boot -- trunk, sorry.  And they tried to get it closed,

23   but it wouldn't shut.  So we eventually had to get taken back

24   out and then put into the second vehicle.  And then we drove

25   off.
```

1    Q.  Did you notice -- the six individuals who abducted you, was

2    anyone speaking English?

3    A.  We didn't -- there wasn't really -- I mean, there was

4    English spoken, but only later in the journey.  So not at the

5    time when we were taken.

6    Q.  Once you and David are in the trunk of the vehicle, can you

7    describe what happened next?

8    A.  Yeah, so I had a -- I still had a Blackberry in my pocket

9    because I had a dual SIM sort of standard phone and the

10   Blackberry.  So I had that.  I tried to send a message, again,

11   to my boss, but the speed, we drove off super fast and we must

12   have driven away from the border, because I lost signal really

13   quickly.  I wasn't able to get anything off.

14          And pretty much for the first maybe 20 minutes, it was

15   just driving around.  Like it was lots of really heavy

16   acceleration, braking.  There was really lots of turns.  It felt

17   like someone was driving sort of erratically to get away, I

18   guess.

19   Q.  What happened at the end of the 20 minutes?

20   A.  So then they stopped and they opened the boot and asked us

21   to empty our pockets.  So things like my passport, which I had

22   in my pocket, my Blackberry, my wallet, things like that were

23   taken at that stage.

24   Q.  And how many abductors are asking you to do that?

25   A.  It was just -- I think there was one guy that opened the

1   boot and one guy behind.

2   Q.  Please continue.

3   A.  So, yeah, they pretty much took our things, closed the boot

4   and sped off again.  And then during the travel for the next

5   sort of hour and a bit, within that period through the back car

6   seat as the vehicle was moving, a British-accented person said,

7   who -- asked who David was.

8         And then he said, "Are you British?  Welcome to Syria,

9   you mutt," or something along those lines.  And sort of laughed

10  about it.

11        And then, whenever -- we noticed we were going through

12  quite a lot of checkpoints and there was a lot of "Allahu Akbar"

13  as they passed through, so sort of like cheering.

14  Q.  Was the cheering coming from inside the car or outside the

15  car?

16  A.  Both.

17  Q.  I'm sorry?

18  A.  Both.  The checkpoint and the people inside.  So we got a

19  sense at that point that we were potentially in the hands of

20  Jihadist elements.  We knew that there was a risk of that.  I

21  mean, I'd been through briefings.

22  Q.  Was it the chanting and shouting of "Allahu Akbar" that

23  alerted you to Jihadist elements?

24  A.  Yeah, the Syrian military is -- what's the word when you're

25  not religious?

1    Q.  Agnostic?

2    A.  Yeah.  I would have been surprised if it was elements of the

3    Syrian Army, so -- whereas "Allahu Akbar" is a call that's very

4    common, "God is great," amongst Jihadists.  But -- I mean,

5    Muslims.

6    Q.  At the end of that trip, where did you arrive?

7    A.  So it was right when -- sort of in the twilight hours at

8    that point.  We arrived.  It was in a rural area.  I sort of

9    placed us somewhere in Idlib, based on the geography.  I was a

10   geographer, so maps was my thing in the assessments and

11   everything, so I tried to sort of orient myself as much as

12   possible.

13          MR. FITZPATRICK:  If we could bring up 2-1 again.

14          I'm sorry, Mr. Motka, 2-1.

15   Q.  If you could point, just direct the jury to where Idlib is

16   on the map.

17   A.  So Idlib is here (indicating).  So it's some mountains, like

18   hills that go parallel to the border in waves, with valleys in

19   between in that area.  And so I could see hills and where the

20   sun was setting, so you could kind of orient a little bit.

21          Yeah, so we were in a rural area.  There was a small

22   building.  I can't remember if it was one or two floors or just

23   a bungalow style with an extra floor on top, but, yeah, a kind

24   of farmhouse for that area.  We were just taken straight into a

25   cell that was -- that had been -- that was basically a room with

```
 1    a big skylight, like a big metal cover at the top.  So the

 2    ceiling was really, really high, like much higher than a normal

 3    room.

 4          They put us in the cell, they strip-searched us, and

 5    then basically we were handcuffed with our hands behind our back

 6    once we had gotten some of our stuff back, like a jumper and a

 7    T-shirt and trousers, and told just to go to sleep and that they

 8    would come back at some stage.

 9    Q.  Were you and David Haines put in the same room?

10    A.  Yes.

11    Q.  How big was the room?

12    A.  Maybe 2 and a half meters by 4.

13    Q.  And were there any furnishings or anything in the room?

14    A.  There was a flat pan latrine, toilet in the corner,

15    essentially dangling across from the entrance, the cell door,

16    which had like a hatch.  And that's pretty much it.

17    Q.  And the individuals that were asking for your clothing and

18    putting you in the room, can you describe them?

19    A.  Yeah.  So at that time there was -- when we were

20    strip-searched, there was maybe like four or five people in the

21    room on the other end.  Four.  One of them felt -- I think one

22    of them is a person that I would put as a Sheikh, the leader of

23    the group, and then there was definitely at least one English,

24    British-accented speaker.

25    Q.  And did there come a point in time during that first
```

1    24 hours in The Box -- or I'm sorry, first 24 hours at that

2    location, did you and David come to nickname that location?

3    A.  Not at that stage, but later on, yes.

4    Q.  What did you later on nickname that location?

5    A.  We called that location "The Box."

6    Q.  And why is that?

7    A.  So at that time we were in the cell with a high ceiling.

8    Essentially if we fast forward a month, we were back in that

9    location, both of us together.  But instead of being in that

10   cell, we were in a different cell off of a kitchen which had a

11   very low roof.  It was maybe just about two people wide, so

12   shoulder width, and maybe 2 and a bit meters in length.  So it

13   was very boxy, and so "The Box."

14   Q.  Explain to the jury and the judge, what happened in those

15   first 24 hours at The Box.

16   A.  So essentially not much.  I mean, initially that first --

17   because it was 7 p.m. at that point, it was dark.  So after we

18   had been searched and they sort of looked -- they do a weird

19   thing where they looked into our mouths looking for chips or

20   something, they were saying, and our ears.  And then basically

21   we were left alone.  We were just told, don't make trouble and

22   everything will be fine.

23        And that was it, until the next morning, maybe

24   midmorning, they came in, they separated David and I.  So David

25   stayed in that cell, I was taken out and put in a room next

1    to -- essentially next-door-ish a little bit down a corridor --

2    I think it was a corridor.  I don't remember exactly.

3              So I was put in a chair, still handcuffed, and then

4    basically they started an interrogation of each of us, spending

5    about 20 minutes with each, and then just switching between us.

6    It was almost like they were trying to confirm each of our

7    statements across.

8    Q.  When you say "they," how many people are you talking about?

9    A.  I mean, I think there would be -- there would have been two

10   particular.  So the Sheikh, the guy that I would call the

11   Sheikh, the leader, plus someone we later sort of nicknamed

12   "George."

13   Q.  Okay.

14   A.  And then there would have been other guards of the location,

15   but they weren't directly involved.

16   Q.  Was "George" a British-speaking person?

17   A.  Yes.

18   Q.  And in addition to that British-speaking person, were there

19   other British-speaking individuals in your abduction and through

20   your first 24 hours at The Box?

21   A.  So, yes, there was at least two other British speaking.

22   Q.  And George and those two other British-speaking subjects,

23   would you encounter them going into the future?

24   A.  Yes.

25   Q.  Now, how long -- so March 12th of 2013 was your first day of

66

1    abduction, or captivity.  Is that correct?

2    A.  That's right.

3    Q.  When were you ultimately released from captivity?

4    A.  On the 25th of May of the next year.

5    Q.  Of 2014?

6    A.  Of 2014.

7    Q.  So you were in captivity for approximately 14 months?

8    A.  That's right.

9    Q.  And what was the -- did you have a name for the last prison

10   in which you were located?

11   A.  Yeah, it was "The Quarry," "Pipeline."  Depended on -- we

12   said -- we were debating what it might have been.

13   Q.  Do you recall what day you left The Quarry or The Pipeline

14   prison?

15   A.  Yeah, so about four-ish days before my release on the 25th.

16   Q.  So approximately May 21st?

17   A.  20th, 21st, yeah.

18   Q.  And was that prison that you described, was that located in

19   Raqqa?

20   A.  That's right.

21   Q.  And when you left, when you were transported out of the

22   prison prior to your release, who transported you out?

23   A.  Three British Jihadists who were there at my capture, and

24   who intermittently appeared across the whole 14-month period.

25   Q.  And describe the day you're transferred from The Pipeline

1   prison, how were you transported away from the prison.

2   A.  I was put into the back seat of a vehicle, and I had one --

3   so we called the three British Jihadists "Beatles."  It was a

4   nickname.  Essentially what we wanted to do is we started

5   calling them "the Brits," but we felt like if anyone listened to

6   when we were talking, when we were talking to one another, we

7   thought it was kind of stupid.  You could really quickly

8   understand who we were talking about.  So it was kind of an idea

9   to just give them nicknames.

10          So we had George, Ringo, and John, who were the three

11   that were there from day one and who were the three who then

12   took me from The Pipeline to a sort of holding cell for a few

13   days.

14          So the guy who I considered -- who I named Ringo was

15   sat next to me.

16   Q.  Where were you?

17   A.  I was sort of behind the driver's seat, next to the window.

18   So there was one guy next to me and then the driver and the

19   passenger, John and George.

20   Q.  It was just the four of you in the car?

21   A.  Yes.

22   Q.  And were the other three individuals you called The Beatles,

23   were they masked?

24   A.  Yes, they were always masked.

25   Q.  And wearing balaclavas?

1    A.  Yes.

2    Q.  And do you recall the individual that you described as

3    Ringo, could you see if he had any facial hair beneath his

4    balaclava?

5    A.  I mean, we -- yeah, across -- in that specific instance or

6    at any time?

7    Q.  At any time.

8    A.  Yeah, yeah.  He had not as full a beard, I would say, as

9    some of the others.

10   Q.  You had begun to mention sort of the naming convention that

11   you had arrived at for those three individuals, British-speaking

12   individuals.  How did you come up with that naming convention?

13   A.  I think it was John Cantlie who -- one of the British

14   hostages who was with -- who had been kidnapped along with James

15   Foley before us.  And they were already at the prison or the

16   location that we were taken to, The Box.  We didn't know that

17   they were there until much later.  At least I didn't.  But

18   eventually we ended up being put together, and that's when we

19   came up with the naming convention.

20   Q.  And this is while you were at The Box?

21   A.  At The Box.

22        MR. FITZPATRICK:  If we could publish - and this has

23   been previously admitted, Your Honor - 5 -1.

24        THE COURT:  All right.  You may do so.

25   Q.  Who is the individual in 5-1?

```
 1    A.  That's James Foley.

 2              MR. FITZPATRICK:  Thank you.  We can take that down.

 3              And if we could please do 1-24E, please.

 4    BY MR. FITZPATRICK:

 5    Q.  Do you recognize that individual?

 6    A.  Yes, that's James Foley.

 7    Q.  Let's turn --

 8              THE COURT:  How much more do you have?

 9              MR. FITZPATRICK:  Your Honor, this will be a lengthy

10    examination.

11              THE COURT:  All right.  That doesn't answer my

12    question.

13              MR. FITZPATRICK:  Three hours.

14              THE COURT:  In addition to what you've done?

15              MR. FITZPATRICK:  Correct.

16              THE COURT:  All right.  Ladies and gentlemen, we're

17    going to take the morning recess at this time.

18              Mr. Motka, you may step down, sir.  And during this

19    recess, which will be until 11:15, you are not to discuss your

20    testimony with anyone, with any of the lawyers or anyone else.

21              We will reconvene at 11:15.  You may step down, sir.

22              Ladies and gentlemen, you will hear the usual litany

23    again.  Refrain from discussing the matter among yourselves or

24    with anyone, or undertaking any investigation on your own.

25    We'll reconvene at 11:15.  Let me confirm that there are soft
```

1    drinks available for you.

2              COURTROOM CLERK:  Yes, Judge.

3              THE COURT:  There are.  All right.  You may follow the

4    court security officer.  Remember, no discussions among

5    yourselves or to with anyone, and no investigation of any kind.

6              (Jury out at 10:54 a.m.)

7              THE COURT:  We'll reconvene at 11:15.  And,

8    Mr. Fitzpatrick, I don't mean by any means to suggest that the

9    witness' testimony is or isn't important.  That's a judgment you

10   make.  But, as always, I'm sure you will take steps to do it as

11   expeditiously as you can.

12             MR. FITZPATRICK:  Of course, Your Honor.  We've taken

13   great pains to do that.

14             THE COURT:  All right.  Thank you.  Court stands in

15   recess until 11:15.

16             (Recess taken at 10:55 a.m.)

17             THE COURT:  Before I have the jury brought in, there's

18   another, this time, fairly minor issue.  A juror has handed -- I

19   don't know which one -- has handed the court security officer a

20   note that says, "May I have the spelling of the black mask?"

21             I intend to answer this by saying:  You don't need it.

22   I don't want you looking up anything in the dictionary.  If the

23   spelling or any more information is needed, I will rely on the

24   parties, through their attorneys, to bring that out.

25             Any objection to my saying that, Mr. Fitzpatrick?

```
 1              MR. FITZPATRICK:  No, Your Honor.

 2              THE COURT:  Mr. MacMahon.

 3              MR. MACMAHON:  No, sir.  No objection.

 4              THE COURT:  All right.  Are they close by?

 5              COURT SECURITY OFFICER:  All of them are in the

 6    conference room, sir.

 7              THE COURT:  All right.  Well, they won't stand until

 8    you knock on the door.

 9              COURT SECURITY OFFICER:  Okay.

10              THE COURT:  Bring them in, however.

11              COURT SECURITY OFFICER:  Yes, sir.

12              THE COURT:  I will have this made a part of the record,

13    and you-all can come and see it.  It's just a little blue sticky

14    note.

15              MS. GINSBERG:  Judge, that kind of suggests that

16    there's a risk that somebody might be inclined to look things

17    up.

18              THE COURT:  Yeah.  That's what I'm going to do.  I'm

19    going to say:  Don't do it.

20              MS. GINSBERG:  Thank you.

21              THE COURT:  Isn't that what I just said a minute ago?

22              MS. GINSBERG:  Yes.  I just think it might be wise to

23    repeat that several times when you admonish them at the end of

24    the day.

25              THE COURT:  All right.
```

```
 1              MR. FITZPATRICK:  Your Honor, do you want Mr. Motka to
 2    come in now?
 3              THE COURT:  Let's have him come in.  Let's get started.
 4              (Jury in at 11:25 a.m.)
 5              THE COURT:  Ladies and gentlemen, I had a note handed
 6    to the court security officer that says:  "May I have the
 7    spelling of the black mask?"
 8              The short answer is, no, you don't need it.  You are
 9    not to look up anything in books.  That includes that thing that
10    I used to use decades ago, but which I can't find one now in my
11    chambers, called a dictionary.  You don't need it.  Don't look
12    up anything in books.  Remember, if there's anything about the
13    spelling or anything about the nature of it, the lawyers will
14    have to bring that out in testimony.
15              All right.  Mr. Motka, you'll recall, sir, you remain
16    under oath.
17              THE WITNESS:  Yes, sir.
18              THE COURT:  Mr. Fitzpatrick, you may continue your
19    direct examination of this witness.
20              MR. FITZPATRICK:  Thank you, Your Honor.
21    BY MR. FITZPATRICK:
22    Q.  Sir, I want to direct you back to your first 24 hours.  You
23    had testified that you and Mr. Haines were separated and there
24    was a -- 20-minute sessions of back-and-forth interrogations.
25    Can you describe some of the questions that were asked of you?
```

1   A.  Yeah.  So at the beginning it was sort of, who are you?

2   What are you doing here in Syria?  Sort of the standard, if you

3   will.

4         But then it sort of -- it went into -- I mean, there

5   was a bit of questioning around whether we were spies, agents,

6   and then it sort of focused a lot, for the last part, on them

7   trying to present -- asking us which side we were on in the

8   civil conflict.

9         And then presenting -- the Sheikh in particular was

10  saying -- he would sometimes communicate in broken, with a few

11  words of English, to say, "We're with the Syrian Army."  And he

12  was trying to convince me that we were taken by the Syrian Army,

13  and I said, "I don't think so."

14  Q.  Did you express that to him?

15  A.  Yes.

16  Q.  What was the reaction?

17  A.  No, it was just continuing to sort of say:  Well, why have

18  you come to -- how did you come into Syria?  Why didn't you come

19  using a visa, through Damascus?  It was heavily trying to

20  influence me to think that we were with the Syrian Army.  And I

21  was saying to him -- I think he said:  How are you sure that

22  we're not with the Syrian Army?  And I said, because of the fact

23  that we had heard "Allahu Akbar" constantly, and that seemed odd

24  to me.

25        And eventually he sort of -- I remember that the

74

1    questioning ended when he sort of demanded -- he was saying:

2    Which side do you take?  And I said:  Well, as a humanitarian

3    aid worker, we try not to take sides.

4         But he wasn't having that.  By the end of it, I said:

5    Well, you know, if you want to judge me by my actions, I'm

6    working in the liberated areas, so you could say I'm for the

7    people who have been liberated from...and that sort of ended it.

8    Q.  And when you're communicating with him, what language were

9    you speaking?

10   A.  I always spoke in English.  He would say his question to the

11   guy that I called "George," and George would speak to me in

12   English.

13   Q.  So it was George and the Sheikh doing the interrogation in

14   tandem?

15   A.  That's right.

16   Q.  During that first 24 hours, did you have any physical

17   mistreatment engaged in towards you?

18   A.  No.

19   Q.  Other than what happened at the initial abduction?

20   A.  That's right.

21   Q.  After 24 hours, were you moved?

22   A.  So yeah.  So straight -- once this sort of back-and-forth

23   interrogation ended, I was guided to a car and put into the

24   trunk of a car again, and driven about 20 minutes, what I sort

25   of thought was south of that location we were at, to a location

75

```
 1    I called "The Warehouse."  Because it was like a big warehouse

 2    with one of those sort of roller doors so vehicles could go in.

 3           And on the inside, we drove in, and then they took me

 4    out, and in the corner, instead of -- I think it was the

 5    southeastern corner -- southwestern corner of the building,

 6    there was -- they had basically created some cells that were

 7    around each other, around sort of -- so there were lots of cells

 8    created into the room, with one cell right in the corner, which

 9    had a latrine.  And I was put into that.

10    Q.  And how big was that cell?

11    A.  Maybe a meter wide by three meters, of which one of those

12    meters in length was the latrine pan, which is kind of raised in

13    front.

14    Q.  So fairly -- very tight quarters?

15    A.  Yes.

16    Q.  During the transport, were you put in restraints?

17    A.  So I was handcuffed behind my back.  I don't remember -- I

18    would assume that I was, but I don't remember exactly at the

19    time of the transportation, no.

20    Q.  What about a blindfold?

21    A.  I don't remember.  I'm sorry.

22    Q.  And do you recall who transported you from The Box to

23    The Warehouse?

24    A.  Yeah, it was George, the guy I called "George."

25    Q.  Anyone else?
```

76

1   A.  Not that I recall.

2   Q.  And were you transported alone?

3   A.  Yes.

4   Q.  And how long did you stay at The Warehouse?

5   A.  About a month.

6   Q.  And during that tile, did you encounter other individuals

7   who you previously described as The Beatles?

8   A.  Yes.

9   Q.  And did you encounter them at The Warehouse?

10  A.  Yes.  So --

11  Q.  When did that begin?

12  A.  It was pretty much on the first night, first or second

13  night.  I was always handcuffed behind my back inside the cell,

14  and so in order to be able to go to the toilet, you had to have

15  someone pull your hands out of the back of the -- I mean, turn

16  around, put your hands through the hatch, or someone would have

17  to open the door and open your handcuffs and move them to your

18  front so you could do your business.

19          So they came to do that.

20  Q.  And who is "they"?

21  A.  The two guys that I called "Ringo" and "John."

22  Q.  And do you recall, were they staying at that location with

23  you?

24  A.  I don't know.  But the location was sort of quite heavily

25  frequented by lots of -- you could hear lots of people outside

1   who knew each other, so it felt like it was kind of like a base

2   of sorts.

3   Q.  Were there other prisoners there?

4   A.  No.  I was alone initially.  Eventually a Syrian -- a young

5   Syrian guy was put into the cell opposite mine, but it was maybe

6   two weeks into it.

7   Q.  While at The Warehouse, were you instructed -- with respect

8   to entry protocols, when The Beatles would come to your cell,

9   were you required to do something?

10  A.  Yeah.  So initially it wasn't super clear, but one of the

11  first few evenings when they came in the middle of the night to

12  sort of switch my cuffs around and allow me to go to the toilet,

13  something I said triggered them.  And they came in about

14  20 minutes later and started to beat and kick me, and told me

15  that I was a posh wanker because I went to boarding school.  And

16  they sort of said, you know, "You're arrogant and we're going to

17  bring you down," essentially was the general gist.  And so they

18  came and do that.

19          THE COURT:  Just a moment.  First of all, what's a posh

20  wanker?

21          THE WITNESS:  A sort of upper class -- how do you

22  describe?

23          MR. FITZPATRICK:  Is it a slang term?

24          THE WITNESS:  Yeah, it's a British idiom, I think it

25  is.  It's someone who is a bit of a dick.

78

```
 1              THE COURT:  Someone who is what?
 2              MR. FITZPATRICK:  I think he translated it to an
 3    American idiom, Your Honor.
 4              THE COURT:  All right.  But I need to hear it.  What's
 5    the American idiom?
 6              THE WITNESS:  A bit of a dick.
 7              THE COURT:  Oh.  Next question.
 8              MR. FITZPATRICK:  Thank you, Your Honor.  Was that a
 9    sufficient response, Your Honor?
10              THE COURT:  Yes, I'm aware of that.
11    BY MR. FITZPATRICK:
12    Q.  So was the first beating that you endured, was it a result
13    of that criticism of your bathroom etiquette?
14    A.  Yes.  So they asked me why I wouldn't wash my private parts,
15    and I was, like, I don't see the point in these circumstances,
16    was kind of -- and I think I said -- and they said:  Well, you
17    should.  Why don't you do it?  And I said:  To each their own,
18    or something along those lines.  And that was the arrogant part.
19    Q.  Who took offense at that?
20    A.  John in particular.
21    Q.  And how long did the beating last?
22    A.  It wasn't super long.  But it was quite intense, but it was
23    not super long.
24    Q.  In addition to John, who else participated?
25    A.  Ringo.
```

```
 1    Q.  And with respect to -- when The Beatles would come to --
 2    were interrogations --
 3             MR. FITZPATRICK:  Strike that last beginning of the
 4    question, Your Honor.
 5    Q.  Did interrogations of you continue at The Warehouse?
 6    A.  Yes.  So George, along with another prison guard called
 7    Abu Mohammed -- I think he had another Abu name as well.  I
 8    don't remember it exactly.  But he had more broken English.  He
 9    was someone from the region.  They would come together about
10    once every few days, and what they had done is, I had a laptop
11    in the car with me when we were kidnapped, and they had brought
12    the laptop and they were going through the files and asking me
13    for my password to things like Facebook, email, Skype, anything
14    like that.
15             And then they were looking through folders, and they
16    sort of selected folders in advance, and they were asking me
17    about them.  So things like budgets, you know, where is this --
18    what's this budget for?  Do you have this money?  That kind of
19    stuff.
20    Q.  So when George or the other Beatles, John and Ringo, would
21    come to your cell, was there something that your required to do?
22    A.  Yeah.  So eventually the rule was set that whenever they
23    came in, we had to kneel against with our face towards the wall
24    and keep our heads down.  We were never allowed to look at them
25    in the face.
```

1    Q.  In addition to the bathroom etiquette beating that you took,

2    were there other beatings during the month at The Warehouse?

3    A.  Really it was only for about a week, whenever George and

4    Ringo were around.  Whenever they came, they would, yeah, use --

5    it wasn't a beating.  It was more sort of like punches here and

6    there, intimidation.

7    Q.  And where would they punch you?

8    A.  A lot in the arms, in the back, in muscular areas.  A lot of

9    kicking on the ground, things like that.  Never in the face.

10   Q.  And were you handcuffed while these beatings were taking

11   place?

12   A.  Yes.

13   Q.  Did there come a point in time when you were returned to

14   The Box?

15   A.  Yes.  About a month into my captivity with ISIS.

16   Q.  And do you know why you were returned to The Box?

17   A.  Yeah.  So there was -- the Syrian prisoner that was brought

18   in, before he arrived, sort of the guy who was sort of bringing

19   me food and more day-to-day, let's say, charge, he had told me

20   not to make any noise, that I wasn't -- that he didn't want me

21   to engage with the Syrian, and the Syrian shouldn't even know I

22   was there, kind of.

23          So we followed that rule.  But then the Syrian prisoner

24   would be taken out every time to go to the toilet, at an outside

25   location, because there wasn't a toilet in his cell.  And he

1    noticed that one of the hinges on his door that was built into

2    this sort of cement brick was -- he could take away the brick

3    around it, the brick and mortar, so he was trying to sort of

4    figure out how he might get it loose.  And essentially he would

5    speak to me and started saying, "Who are you?  I know you are

6    English."  Because they spoke English with me.

7            And we started exchanging that he was a student in

8    Aleppo, that he had a kid, that he was sick, and that he was

9    going to try and escape.

10   Q.  How did that impact you?

11   A.  Well, it freaked me out a little bit, but -- only because I

12   was, like, well, either I joined him, was my thinking -- not

13   that it was realistic.  But either I try and join him, or I have

14   to -- if he does manage to escape and I don't raise an alarm,

15   how is that going to impact me?  That was my question.

16           He never managed to do very much, but about a week into

17   that sort of back-and-forth, I don't know what happened, but he

18   eventually told the prison guards that that was what -- that we

19   were talking and that he knew a little bit about me.

20           And so then he was moved away, and that night the sort

21   of Sheikh came.  But it was a different Sheikh.  Sheikh was

22   always the name of sort of the leader within that -- emir or

23   Sheikh of the area.  And he said I would get punished for what I

24   did.

25   Q.  What did he accuse you of doing?

1    A.  Trying to -- well, first of all, talking to the Syrian, and

2    then trying to escape, he thought.

3    Q.  And what was the result?  What happened?

4    A.  So I was beaten that night.  I was taken out of the cell and

5    beaten with a thick rubber cable, for about an hour it went on.

6    And then that was put away, and he said, "Well, you don't know

7    punishment yet," was kind of his parting remarks.

8    Q.  Who said that?

9    A.  The Sheikh.  And he said, "Tomorrow you will see."

10          So, yeah, you can imagine that night, I wasn't...but

11   then the next morning George appeared, picked me up quite calm,

12   put me in the car; boot, again.  At this point I know I was

13   handcuffed almost always behind my back.

14   Q.  And you were in the boot of the car?

15   A.  Yeah.  And then he brought me back to The Box, but this time

16   to the cell that is The Box.  It was the low -- the smaller, low

17   ceiling one next to the kitchen.  And he put me back in the cell

18   with David, and then for about two days, things were really

19   calm.  We got food.

20          And then I saw -- so the guards there were primarily

21   George, Abu Mohammed, and a guy who we called "the punisher,"

22   for obvious reasons.  And the three of them were sort of like, I

23   would say, the main people there.  And then sort of two days in,

24   two days after this calm, I think it was around the time I took

25   this photograph on the cell phone, they took me out to take a

1    photograph against a sheet.  And then pretty much from that

2    afternoon onwards, a regime of punishment and stress positions.

3    Q.  When did George and Ringo reappear?  Excuse me, John and

4    Ringo.

5    A.  So John and Ringo, pretty much from the end of the first

6    week at The Warehouse until about a few weeks into being back at

7    The Box had disappeared, so we didn't see them.  But they came

8    back in, yeah, a few weeks after I had -- we had arrived back --

9    I had been taken back to The Box.

10            MR. FITZPATRICK:  If we can go to Binder 3 and show the

11   witness 10-19.

12   Q.  Do you recognize what's shown in 10-19?

13   A.  What's that, sir?

14   Q.  Do you recognize that photograph?

15   A.  Yes.

16   Q.  And what is that?

17   A.  That's the picture I just mentioned in which I was taken --

18   which was holding a piece of paper in front of me.

19   Q.  Does that piece of paper accurately reflect the date of when

20   the picture was taken?

21   A.  Yes.

22            MR. FITZPATRICK:  Move to admit 10-19.

23            MR. MACMAHON:  No objection, Your Honor.

24            THE COURT:  It's admitted.

25            (GOVERNMENT EXHIBIT Number 10-19 was admitted into

1    evidence.)

2          MR. FITZPATRICK:  Permission to publish.

3    BY MR. FITZPATRICK:

4    Q.  Mr. Motka, that would be the 18th of April, 2013.  Is that

5    correct?

6    A.  That's right.

7    Q.  And what is your -- who is taking this picture?  Do you

8    recall?

9    A.  I think it was -- I don't remember who took it specifically,

10   but it was in that time period where it was only George,

11   Abu Mohammed, and the punisher who were there.

12   Q.  And you are more than a month into your captivity.  What is

13   your physical condition like at this point?

14   A.  It was all right, to be honest, you know, other than sort of

15   the sporadic moments.  At this point I was fed relatively

16   normally --

17   Q.  Before this picture was taken, did George or the other

18   captors do anything with your hair?

19   A.  Yeah.  So you can see the sort of -- they tried to make a

20   spike, like a Mohawk of some sort.  They were having a lot of

21   fun with it.

22   Q.  What did that indicate to you?

23   A.  Once this was done, David and I thought it was all a little

24   bit of them just having fun.  There was a lot of boredom for

25   these guys all day long in this location rurally, so we thought

85

```
1    it was just them having fun.  We didn't really take it very
2    seriously.
3    Q.  So when you returned to The Box, you were put into the same
4    cell as David Haines.  Is that correct?
5    A.  Yes.
6    Q.  Did there come a point in time when you learned that there
7    were other Westerners within The Box?
8    A.  Yeah.  So --
9    Q.  When did that occur?
10   A.  Not long -- I mean, basically when the sort of regime of
11   punishment started.  Because what they would do is they would
12   start with one of us.  So James Foley and John Cantlie were in
13   the cell that we were held in the very first night.
14   Q.  When did you learn that they were there?
15   A.  When we could hear their voices when they would -- so they
16   did -- they played lots of games with us.  They gave us dog
17   names, so that what we needed to do is, if they ever called
18   out -- like any time of day or night, if they ever called out,
19   we needed to immediately respond; otherwise, they would come and
20   it would be a punishment.
21   Q.  What was your dog name?
22   A.  (No verbal response.)
23   Q.  We can come back to it later.
24   A.  Yeah, sorry, I'm blanking.
25   Q.  No, that's fine.
```

```
 1              When you returned, did you discuss with David, upon
 2    your return, his treatment in the month that you were separated?
 3              MR. MACMAHON:  Your Honor, objection.
 4              THE COURT:  Just a moment.
 5              All right.  Pick up the earphones, please.
 6              (BENCH CONFERENCE ON THE RECORD.)
 7              THE COURT:  The question, as I see it, was, when you
 8    returned, did you discuss with David upon your return his
 9    treatment in the month that you were separated?
10              And then there was an objection.
11              What's the objection?
12              MR. MACMAHON:  The objection, Your Honor, is, this
13    is -- I think we're getting into the area that we briefed to
14    you, and Mr. Haines, unfortunately, is deceased.  And these
15    questions and I think a series more are going to elicit
16    statements that Mr. Haines made for which there are no
17    applicable hearsay exceptions, obviously being offered for the
18    truth of the matter asserted, meaning identification of Ringo
19    and others.  And I don't believe that there's an exception that
20    would allow these hearsay statements to come in.
21              THE COURT:  Well, except the exception of forfeiture by
22    wrongdoing.
23              MR. MACMAHON:  That's correct, Your Honor.  The Court
24    hasn't made its ruling in that regard.
25              THE COURT:  That's right.  Let me ask Mr. Fitzpatrick,
```

87

1    the question you've asked does not itself call for hearsay, and

2    the question you've asked is not itself objectionable.  However,

3    Mr. MacMahon wants to head you off at the pass.

4              Is that right, Mr. MacMahon?

5              MR. MACMAHON:  That's one way to put it, Your Honor.

6    Witnesses sometimes giving narrative answers.  It's easier to

7    object ahead of time in these circumstances.

8              THE COURT:  Mr. Fitzpatrick?

9              MR. FITZPATRICK:  Judge, that's correct.  Mr. Motka had

10   significant contact with James Foley, David Haines, and

11   John Cantlie over the course of 14 months.  His testimony

12   necessarily will draw on things that they said in conversations.

13             Our position, Your Honor, we still maintain that the

14   forfeiture-by-wrongdoing exception applies here.  We begin with,

15   in the case of a hostage-taking, that it's a natural and

16   probable consequence of hostage-taking if one of the

17   opportunities is to kill them, that they're killing them to

18   silence them.

19             I think a good example that the Court has already heard

20   is the testimony from Jens Serup.  He describes

21   Daniel Ottosen had two options:  He could be released or he

22   could be killed.  He, in fact, was released.  He will testify

23   later in this case.  If he had been killed, he would be

24   silenced, he would be unable to testify.

25             So, Your Honor, one of the potential intentions of the

1    captors is to silence these witnesses.  They may have other

2    intentions, send a message, inflict grievous harm and the like,

3    but one purpose is to silence them.

4          And I think on the record so far, the Court can find by

5    a preponderance of the evidence that that's what hostage-takers

6    intend.  They intend to silence the people they are not going to

7    release to forestall what is happening today.  These people are

8    testifying, Daniel Ottosen will testify.  They can do that

9    because they weren't killed.

10          THE COURT:  Mr. Fitzpatrick, you need to lower your

11   voice, please.

12          MR. FITZPATRICK:  Sorry, Your Honor.

13          THE COURT:  Now, the question that was asked was headed

14   toward which particular hostage, Mr. Fitzpatrick?

15          MR. FITZPATRICK:  David Haines.

16          THE COURT:  And will there be evidence that

17   David Haines was murdered?

18          MR. FITZPATRICK:  Yes.

19          THE COURT:  How soon is that going to come?

20          MR. FITZPATRICK:  Well, it will come in subsequent

21   witnesses, Your Honor.  We will not elicit that -- well, this

22   witness may be able to testify to it, but it will become more

23   clear with subsequent witnesses.

24          THE COURT:  Why would this witness not be able to say

25   it?

1          MR. FITZPATRICK:  Well...

2          THE COURT:  Was he not present when Haines was killed?

3          MR. FITZPATRICK:  No, Your Honor.  No, sir.  This

4     witness was released on May 25th, 2014; David Haines was killed

5     in September of 2014.

6          Now, he knows David Haines was killed.  He's identified

7     David Haines' picture preceding his killing, but he would know

8     David Haines was killed from the video that ISIS released and

9     the media reports attendant to that.

10         THE COURT:  All right.  And let's assume that we

11    proceed on that basis.  What evidence do you propose that I rely

12    on to show that the intention of the captors is to silence the

13    person; that is, the person who's killed?

14         MR. FITZPATRICK:  I'm sorry, Your Honor, I just wanted

15    to correct myself.  My colleague told me that Professor Hoffman

16    testified that David Haines was killed.  So that is in the

17    record.

18         THE COURT:  All right.  Now tell me, what testimony or

19    evidence do you rely on to establish that the purpose and the

20    intent of the kidnappers, hostage-takers, is to silence these

21    people that they killed?

22         MR. FITZPATRICK:  Your Honor, the record already has

23    email communications in which the hostage-takers send emails

24    saying, no media involvement whatsoever.  They explicitly make

25    conditions for silence.

 1          Our argument is based on circumstantial and inferential

 2     evidence, inferences drawn from the circumstances of

 3     hostage-taking, the demands of silence, the ransom demands, the

 4     conditions of silence in the ransom demands.

 5          THE COURT:  What do you have in that regard that

 6     relates to Haines rather than Ottosen?

 7          MR. FITZPATRICK:  Only that they're colocated and went

 8     through identical circumstances.  We do not have ransom emails

 9     for Mr. Haines.

10          THE COURT:  All right.  Mr. MacMahon?

11          MR. MACMAHON:  Yes, Your Honor.  I mean, I don't think

12     the government has put on any evidence of an intent to silence

13     witnesses to keep them from testifying in any kind of a

14     proceeding.  Mr. Serup actually said it was all about the money,

15     and we also have -- you've heard some of these demands that have

16     already been admitted in evidence of asking for people -- you

17     know, asking Obama not to bomb anymore.  There doesn't seem to

18     be any connection between any proceeding.

19          And, again, Mr. Motka, thank God he's here, Your Honor,

20     but they didn't execute all these witnesses as part of a scheme

21     to keep people quiet.  So I don't think the government would

22     have laid the foundation, as we set forth in our brief, which I

23     know is long.

24          THE COURT:  Well, it is true, isn't it, Mr. MacMahon,

25     that I have to make this assessment by the preponderance of the

 1    evidence, and it is true that I can rely on circumstantial

 2    evidence.  And it is true further, isn't it, that it isn't

 3    necessarily that the hostage-takers have only one goal and one

 4    purpose.  Am I correct on those three things?

 5            MR. MACMAHON:  You are, Your Honor.  That's all in our

 6    brief as well.

 7            THE COURT:  Well, then, why isn't it sufficient?

 8    Clearly they have more than one purpose in doing what they're

 9    doing, and why isn't one of those purposes to keep people quiet?

10            MR. MACMAHON:  Your Honor, I don't believe there's any

11    evidence in the record that there was a need to keep people

12    quiet.  The only demands to keep hostages quiet had to do with

13    media and media statements.  It doesn't have anything to do with

14    proceedings whatsoever.

15            And again --

16            THE COURT:  But they wore masks, balaclavas, so they

17    wanted to keep their identity a secret.  They clearly didn't

18    want these people talking afterwards, did they?

19            MR. MACMAHON:  Obviously they didn't, Your Honor.  But

20    they also released them in such a way that they could come and

21    testify like they are in this case.

22            THE COURT:  When they were released, yes, they were

23    released, but the captors no longer exist.  And the government

24    represents that they have evidence that when they released

25    people, they told them if they spoke, it would go hard for the

1    people still in custody.

2            MR. MACMAHON:  That's true, Your Honor.  If I may, that

3    was just with respect to the media.  There's no evidence before

4    you that had anything to do with a legal proceeding or

5    otherwise, which I think is the foundation of the rule.

6            THE COURT:  Well, it is because that's the context in

7    which it typically occurs.  But I think the rule about

8    forfeiture by wrongdoing would cover silence not just in court

9    proceedings, but also to the media.  In other words, it silences

10   them.

11           MR. FITZPATRICK:  Your Honor?

12           THE COURT:  Yes, Mr. Fitzpatrick.

13           MR. FITZPATRICK:  Sorry for interrupting.  I would

14   note, in our memo on this issue, we make reference -- and this

15   will be also future testimony from Mr. Marginedas, who will

16   testify that he had a threat not to speak.  And then subsequent

17   to that, there were reports about his circumstances, and then a

18   week after that, a Russian named Sergei was killed.  We will

19   address that testimony with this witness.

20           So that's another -- and that's laid out at Exhibit 13

21   to our memo.

22           THE COURT:  With which witness?

23           MR. FITZPATRICK:  With this witness we'll testify to

24   the circumstances of Sergei, the Russian, being killed while

25   they were in captivity.

1          THE COURT:  And what do you think that goes to?

2          MR. FITZPATRICK:  He was killed a week after Marginedas

3    was released.  And the inference we can draw from that is that

4    that was a message that if anyone speaks, you will be killed.

5          THE COURT:  And did Marginedas speak?

6          MR. FITZPATRICK:  There were media reports

7    concerning -- Court's indulgence for one second.

8          I'm sorry, Your Honor, I just wanted to clarify.  His

9    release was reported on in the media upon his release, and that,

10   we argue, precipitated the killing of Sergei.

11         THE COURT:  All right.  What I'm going to do is to take

12   the luncheon recess now.  Mr. Fitzpatrick, then we will go on

13   the record without these earphones, and I think you need to

14   either put on evidence, more evidence than you have, to indicate

15   what the intent of the hostage-takers was in connection with

16   these people.  And to some extent you can forecast it, but I

17   think it's better if you put it on.  And at the end I will have

18   the full -- or a reasonable basis for me to conclude whether you

19   have or have not established by a preponderance the requisite

20   intent that's required for forfeiture by wrongdoing.

21         Let me reiterate what I want you to do.  I'm going to

22   take a recess for lunch, then we will come back -- we'll be here

23   on the record and I'll ask you to give me a full description of

24   the evidence that you intend to produce.  And I may even want

25   you to produce it before you elicit some of these statements, at

1  least to the extent you can do it with this witness, and then

2  you can forecast it with other witnesses.  I want you to put on

3  everything, and tell me about everything you have that is

4  admissible that will establish or tend to show what the intent

5  of these hostage-takers was.

6       Now, once again, it isn't necessary that it be their

7  sole purpose, but it is necessary that it be an intent that they

8  should be kept quiet.  And Mr. MacMahon has argued that that was

9  just to the press, it wasn't to court proceedings.  And there is

10  authority, many of them involving court proceedings, but I don't

11  take it as limited to that.

12       MR. FITZPATRICK:  Understood.

13       THE COURT:  But I will consider that -- if you have any

14  case that says, Mr. MacMahon or Mr. Fitzpatrick, that it's

15  limited to court proceedings, keeping them quiet for court

16  proceedings rather than just keeping them quiet, I want to know

17  about it.

18       I know there are various cases in the Supreme Court and

19  other courts based on conclusions that they were murdered or

20  kept quiet from testifying in court, but that's just the context

21  of that case.  It doesn't mean, as I see it, Mr. MacMahon, that

22  the rule of forfeiture by wrongdoing is limited to an intent to

23  keep them quiet from court proceedings.  I think there could be

24  other circumstances where forfeiture by wrongdoing, where an

25  intent to keep people quiet in other contexts operates.  But I

1    may be wrong about that.  So, Mr. MacMahon, you'll have an

2    opportunity to look.

3            And probably what I'll do is take the lunch recess now.

4    I will reconvene at quarter to 1:00, and then you can tell me

5    anything further you want to tell me, including, Mr. MacMahon

6    and Mr. Fitzpatrick, pointing to me what in the briefs you filed

7    you think I should review again at this time.

8            Any questions, Mr. Fitzpatrick?

9            MR. FITZPATRICK:  No questions, Your Honor.  I would

10   note that 804(b)(6) is not the only exception we could rely

11   upon.  We could also rely upon the residual rule, excited

12   utterance, physical conditions, things of that.  Forfeiture by

13   wrongdoing resolves it completely.

14           THE COURT:  Yes, but you haven't established any

15   predicate for that yet, and Mr. MacMahon has not yet asserted

16   hearsay.  He has indicated an intention to do so.  So if you

17   want to rely on one of those exceptions, then you have to

18   establish the predicate for it.

19           For example:  Did you have a conversation with X?  Yes.

20   And in that conversation, did it cover how he was feeling or

21   what he -- in other words, set the predicate for excited

22   utterance.

23           And then Mr. MacMahon can make an objection and I can

24   resolve it.  Do you understand?

25           MR. FITZPATRICK:  Yes.

1            THE COURT:  But you're right, forfeiture by wrongdoing

2    would eliminate -- might eliminate the need to do all that.  But

3    the issue there is, I need to have a full record so I can make a

4    factual finding.  At the moment I have very little.  So if you

5    want to rely on forfeiture by wrongdoing, you need to look at

6    your witness list and your evidence and put as much of it on as

7    you can now.  I'll let you call a witness back if you want to

8    establish predicates, and then have that witness come back.  But

9    it's very important that the Court have a factual basis to

10   decide the intent of the hostage-takers.

11            MR. FITZPATRICK:  Understood.

12            THE COURT:  All right.  Mr. MacMahon, did you want to

13   say anything?

14            MR. MACMAHON:  No, Your Honor, thank you.

15            (END BENCH CONFERENCE.)

16            THE COURT:  Ladies and gentlemen, I need to deal with

17   something.  It's lunch time, so I'm going to excuse you to have

18   your lunch.  Put your books in the cubbyhole, remember to

19   refrain from discussing the matter among yourselves or with

20   anyone, or undertaking any investigation on your own.  And I

21   hope the lunches are satisfactory.  We will reconvene at 1:15.

22            Thank you.  You may follow the court security officer

23   out.

24            (Jury out at 12:06 p.m.)

25            THE COURT:  Let me reiterate briefly what I intend to

1    do.  I'm going to take a recess now, and I'm going to reconvene,

2    let's make it at quarter to 1:00.  At that time -- I may even

3    delay that.  Let me think about that.  About quarter to 1:00.

4    At that time, Mr. Fitzpatrick --

5                MR. FITZPATRICK:  I'm sorry for interrupting,

6    Your Honor.  Do you want to release the witness?

7                THE COURT:  Thank you for reminding me.

8                Mr. Motka, you may step down, sir.  And you'll have to

9    refrain from discussing your testimony with anyone during this

10   recess.  We won't need you again until at least 1:15.  Thank

11   you, sir.

12               Let me be clear about this.  And by "this," I mean the

13   government's intention to elicit from various witnesses what

14   persons who are no longer living, hostages who were killed, what

15   they said while they were in captivity.  And the government

16   wants to elicit that testimony from various witnesses.

17               The defendant has indicated an intention to object to

18   that testimony on hearsay grounds, and also on grounds, really

19   constitutional grounds, that to admit that testimony would

20   violate the defendant's right of confrontation because those

21   witnesses are not here and cannot be, in effect, confronted.

22               And I say all of this so that all of you in the

23   courtroom, it's important that you understand what's happening,

24   to the extent that you can, or are able to.  There were some

25   things I did today using the earphones, but that didn't go to

1    the merits of the case.  It had more to do with private things

2    for the jurors.  But this does go to the merits of the case.

3            As I said, the government wants to elicit testimony

4    from witnesses who spoke to hostages who were killed, who were

5    executed.  And the objection to that is that it's hearsay and

6    that it's a violation of the right of a defendant to confront

7    the persons who testify against him under the Constitution.

8            There is an exception to that right.  It's called a

9    forfeiture by wrongdoing.  That is, that you forfeit that right

10   by the wrongdoing; in this case, the execution.  However, one

11   element that must be established by the evidence in the case,

12   before the forfeiture by wrongdoing can be invoked, to avoid

13   confrontation and indeed hearsay as well, is that it must be the

14   intent of the hostage-takers to silence the victims.

15           Most of the case law relates to silencing them to

16   testify in court, and that may not be what the evidence is going

17   to show.  I don't know.  The defense argues that they had other

18   reasons, and there was evidence of that.  The law is pretty

19   clear, I think, sensibly, that hostage-takers don't need to have

20   their intent to keep people silent as their sole objective.  It

21   can be one of many purposes.

22           So that's what's essentially going on.  And I have

23   asked you, Mr. Fitzpatrick, when we reconvene, to look at your

24   proof and see how much of that you can put into evidence before

25   you elicit from Motka or anybody else what particular hostages

1    who were later killed said to them.

2          Now, some of the -- it seems to me that some hearsay

3    exceptions might apply to some of that testimony.  I don't know.

4    But I believe that -- because you-all haven't addressed this in

5    your memoranda.  But I think if the hearsay exception were to

6    apply, I think you said excited utterance was one.  What was

7    another one?

8          MR. FITZPATRICK:  Mental or physical condition.

9          THE COURT:  Yes.

10          MR. FITZPATRICK:  Expression of mental or physical

11   condition.

12          THE COURT:  Right.  Now, Mr. MacMahon, I'm not sure,

13   and I'll expect you to address whether, if I find that the

14   evidence establishes one of those traditional hearsay

15   exceptions, that that is sufficient to admit the testimony.  And

16   I think your -- at least as I remember your memorandum, I think

17   you would say no, because there's still a confrontation right.

18   Is that correct?

19          MR. MACMAHON:  That's correct, Your Honor.  And, of

20   course, it would apply to each statement then, and not every

21   statement would be a mental condition.

22          THE COURT:  Right.  But if I decide that there's been

23   forfeiture by wrongdoing, the wrongdoing being the execution of

24   these people, that obviates the necessity to worry about any of

25   the hearsay exceptions.

1          MR. MACMAHON:  That's correct, Your Honor.

2          THE COURT:  So, again, Mr. Fitzpatrick, the reason I'm

3    being so explicit about this is, it's very clear that I must

4    have a factual predicate.  Typically this is done prior to

5    trial, but, of course, it can't always be done prior to trial

6    with an evidentiary hearing.  And it's perfectly permissible to

7    do it in the course of the trial based on trial evidence.

8          But what I don't want is, I don't want it all to be

9    based on forecasted evidence.  I would like you to put it on,

10   and if you have to forecast some small portion of it, that would

11   be fine.  And the reason for that is, if the government fails to

12   establish the predicate, it's hard to un-ring the bell after

13   I've already permitted the testimony.  And if there isn't the

14   adequate predicate for forfeiture by wrongdoing, it's virtually

15   impossible to tell the jury, forget that the witness said this

16   or that.  You can't un-ring the bell.

17         So let's get as much of that before the Court.  It may

18   or may not be sufficient.  I don't know.  I haven't heard it

19   all.  All right.

20         I thank counsel.  Let's go on and we will reconvene,

21   let's make it 10 minutes to 1:00.  The jury may have to sit and

22   wait a while, but I want to get this matter clearly done.

23   You've filed briefs.

24         MR. FITZPATRICK:  Correct.

25         THE COURT:  And I appreciate what you've done.  It's

1    been helpful.  But now we're at the time where the rubber has to

2    meet the road.  This is the time I have to make a determination,

3    and it must be a determination based on to a large extent on

4    evidence presented.  It can be based to some extent on

5    forecasted evidence, but I would prefer to minimize that, to the

6    extent we can.

7              MR. FITZPATRICK:  Understood.

8              THE COURT:  I go through this because I have very clear

9    and strong views about the fact that trials like this should be

10   public and people should understand what's going on.  But I

11   can't help but note the irony that when I began to explain the

12   reasons why I'm going through all of this, everyone else left.

13             MR. FITZPATRICK:  We paid attention, Your Honor.

14             THE COURT:  Well, you're the right ones to pay

15   attention.  But I do take seriously that these should be public

16   trials.

17             Court stands in recess.

18             (Recess taken at 12:16 p.m.)

19             THE COURT:  Mr. Fitzpatrick, I think when I left, is I

20   wanted to hear from you a forecast of what you intend to present

21   that satisfies the element of 804(b)(6).  And you were going to

22   do that, and you were going to consider whether you would put on

23   some of that before we continue with this witness testifying as

24   to what the hostage -- what's his name?

25             MR. FITZPATRICK:  This person?

```
1              THE COURT:  No, the person who...
2              MR. FITZPATRICK:  David Haines.
3              THE COURT:  David Haines said to him.
4              MR. FITZPATRICK:  Yes.
5              THE COURT:  Go ahead, sir.
6              MR. FITZPATRICK:  Judge, on reflection over the break,
7    I would suggest the best way to proceed is, if we continue with
8    Mr. Motka's testimony, he will come to a series of events in
9    February of 2014 in which a Spanish hostage, Marcos Marginedas,
10   is released.  Mr. Marginedas, his release was reported in the
11   news, and as the Court knows from our briefing, The Beatles told
12   Marginedas not to speak with anybody, including security forces.
13   The Beatles threatened Marginedas that if he spoke to the press
14   or government authorities, they would punish the remaining
15   hostages and make them suffer.
16             THE COURT:  Now, how does that evidence come in?
17             MR. FITZPATRICK:  Well, Mr. Marginedas will testify
18   next week.  But, in addition, Mr. Motka was -- after
19   Mr. Marginedas was released and his release was reported in the
20   press, The Beatles came into their cell and beat a number of the
21   hostages, including putting James Foley in a headlock until he
22   passed out.  Shortly after that --
23             THE COURT:  And this witness --
24             MR. FITZPATRICK:  This witness will testify to that.
25   He's a fact witness.  He observed that and he participated.  He
```

1    was subject to it.

2           THE COURT:  All right.

3           MR. FITZPATRICK:  Shortly after that, a Russian hostage

4    was taken out, not in the presence -- taken out from the other

5    hostages, shot in the back of the head.  A photograph of that

6    was brought back in on a computer screen and shown to all the

7    hostages.  That all takes place within a two-week time period.

8           So that will be the additional evidence that will

9    support the forfeiture by wrongdoing, on top of all the other

10   evidence, the protocols for kneeling and turning their back when

11   entering, the fact that the captors were masked --

12          THE COURT:  I take it you intend at some point to

13   introduce the media interviews of this part, this defendant?

14          MR. FITZPATRICK:  Yes.

15          THE COURT:  And am I correct that in the media

16   interviews that he gave, I think he admits that he took part in

17   guarding the hostages?

18          MR. FITZPATRICK:  Yes.

19          THE COURT:  And so I think I'm not too concerned about

20   a future prediction or prediction about future evidence, when

21   I've actually seen the evidence myself.

22          MR. FITZPATRICK:  Correct.

23          THE COURT:  And it's come in the motion to suppress and

24   other things.  And I think you don't need to press on whether

25   this defendant -- whether there's a preponderance of the

1    evidence that this defendant was a member of the ISIS conspiracy

2    and hostage-taking effort.  But I'm focused on the intent.  As

3    you know, 804(b)(6) requires that it be an intent to keep them

4    from testifying, in effect.

5            MR. FITZPATRICK:  Yes.

6            THE COURT:  Now, I remarked that -- earlier, that that

7    doesn't mean that it has to be -- but, actually, testifying is

8    part of the rule, 804(b)(6).  But that doesn't mean I cannot

9    draw inferences from evidence that would suggest that their

10   intent was to keep them silent from talking to the government.

11           Now, do you have evidence where this witness was told,

12   when he was released:  Don't talk to the press?  Or what

13   evidence do you have that you're going to present that a

14   released witness was told not to talk to the press or the

15   government?

16           MR. FITZPATRICK:  Well, certainly Mr. Marginedas.  And

17   Mr. Motka will testify that he took every precaution not to make

18   his cooperation publicly known.  So, yes, I mean, they were on

19   notice not to speak publicly about their circumstances.

20           THE COURT:  But are you going to elicit from Motka that

21   he was told by his captors that when he was released, he was not

22   to talk to the government or to the press about his capture and

23   captivity?

24           MR. FITZPATRICK:  I don't think it's that clean,

25   Your Honor.  And I don't want to get pinned down to make it

1       that -- it's not that precise.

2              THE COURT:  What is he going to say, you know, from

3       that perspective, or for that question?

4              MR. FITZPATRICK:  He will say that he took it upon

5       himself to be very cautious about signing statements, about

6       promoting his cooperation with various law enforcement.

7              THE COURT:  All right.  But what about Marginedas?

8              MR. FITZPATRICK:  Marginedas was told -- The Beatles

9       told Marginedas not to speak with any government authorities, to

10      include security services.  And Marginedas was the -- if not the

11      first, one of the first several hostages released.

12             THE COURT:  All right.  And he will testify next week?

13             MR. FITZPATRICK:  Next week, yes.  Late next week or --

14      yes.

15             Your Honor, to sort of streamline this, I mean, if we

16      can continue, we can get through the Marginedas, the

17      February-into-early-March Marginedas, the beatings, and then the

18      Sergei killing.  And then really the key piece of evidence that

19      we're seeking --

20             THE COURT:  The what killing?  I'm sorry.

21             MR. FITZPATRICK:  The Sergei killing, the Russian

22      killing.

23             THE COURT:  All right.  And the key piece, you're

24      saying?

25             MR. FITZPATRICK:  The letters, the Sotloff and Kassig

1    letters, that Mr. Motka carried out to deliver to the families,

2    those we're seeking to get out by forfeiture of wrongdoing.

3    That's probably the top tier of evidence to try to get in under

4    that exception.

5              So what I would suggest, we continue the testimony,

6    let's hear Mr. Motka describe the Marginedas beating and the

7    Sergei killing, and then we can revisit whether or not the

8    letters fall under that exception once you hear that testimony.

9              THE COURT:  All right.  Mr. MacMahon, do you have any

10   views you want me to hear at this time?  The question that has

11   been asked this witness is what the -- that question really

12   didn't call for hearsay.  You were anticipating it.  It's

13   perfectly appropriate for you to raise the objection, but it

14   seems to me that what Mr. Fitzpatrick has suggested obviates the

15   necessity for me to decide on an objection, if you do make it,

16   and if he asked the question that you anticipated, which is:

17   What did So-and-So say?

18             MR. MACMAHON:  Right.  I think what's where it was

19   going, Your Honor.  And I know we wrote a whole brief on this,

20   but the witnesses who -- excuse me, hostages that were released

21   were allowed to take letters out for them.  They weren't -- and

22   people that didn't pay or governments that didn't pay were

23   killed.  There isn't any evidence that the killing itself was

24   any -- these killings were part of an effort to try to keep

25   these people silent.  And there's evidence in the record of

1    that.

2         THE COURT:  I know that's your position, and I'll have

3    to make that determination.

4         MR. MACMAHON:  Right.  Okay.

5         THE COURT:  I take your point that it isn't direct.  If

6    I reach that conclusion, it's an inference that I draw from the

7    circumstances.

8         MR. MACMAHON:  Yes, Your Honor.  But if he's not going

9    to elicit the statements about what the dead hostages made now,

10   I don't have an objection.  I would agree that we could

11   continue.

12        MR. FITZPATRICK:  Yes, Judge.  What I'll do is -- we

13   can do it now.  I'll withdraw the last question and move on with

14   another line of questioning.

15        THE COURT:  That's fine.  All right.  Let's go on.

16        Bring the jury in, please.

17        (Jury in at 1:37 p.m.)

18        THE COURT:  Ladies and gentlemen, I apologize for the

19   delay, but it was necessary.  I needed the extra time.  And let

20   me ask whether you found your lunches satisfactory.  Good.

21        Let's have Mr. Motka return.  Is he here?  Yes, there

22   he is.

23        Mr. Motka, you'll return to the stand, sir.  You'll

24   recall, you're still under oath, sir.

25        Mr. Fitzpatrick, you may proceed, sir.

1          MR. FITZPATRICK:  Thank you, Your Honor.

2     BY MR. FITZPATRICK:

3     Q.  Sir, I'm going to rephrase my last question to you before we

4     broke.  Can you describe David Haines' condition when you

5     arrived back at The Box.

6     A.  He had lost a little bit of weight, but in general, he was

7     all right, I would say.

8     Q.  And upon your return to The Box, how long -- how much time

9     passed before things changed in terms of physical mistreatment

10    of yourself or Mr. Haines?

11    A.  Two days.

12    Q.  And after two days, can you describe physically what

13    happened?  What type of treatment did you encounter?

14    A.  Yeah, so whenever George, or any of The Beatles, for that

15    matter, were around, it would -- they were the only ones who

16    actually came in to the cells, and they would come in and beat

17    us.  So it was quite physical beatings.

18          And then, between -- for the rest of the time there was

19    a lot of -- people like the punisher would -- the guy we called

20    "the punisher," he would use an electrocution gun -- not gun,

21    but a little device, and he would ask us to put body parts up

22    against the door.  He would never come in, so he would use the

23    hatch to put body parts like stomachs, or sometimes he would ask

24    us to put our feet through the hatch.  So we'd always be

25    handcuffs to the back, so you can imagine on our back and the

1   feet coming up.

2   Q.  What kind of device did he use on you?

3   A.  It's kind of like a stun gun, I would call it.  But instead

4   of -- it just created an electric current.  And he'd put it

5   against -- and a lot of times putting our hands out backwards

6   out the hatch.  And his game was essentially, like, if you

7   moved, then it would keep going, and he would just sort of wait

8   for you and just go -- and to the point that sometimes by the

9   end of it, you wouldn't -- like your hands became completely

10  rigid.

11  Q.  Can you describe the pain sensation as a result of the stun

12  gun?

13  A.  Yeah, I mean, it was...I mean, an electric current going

14  through you, so it was sharp pain.  And then he would do -- I

15  mean, it was very -- it went from being ridiculously childish,

16  to full-on, you know, depending who was there -- everyone egged

17  each other on.  So it would start off with maybe a

18  nipple-twisting through, and then they would sort of escalate.

19          And, like I said, if there was a Beatle around, then

20  potentially they would come in.  And that kind of happened maybe

21  once or twice a day, and a lot of the time, morning and evening,

22  because they would go out during the day and then come back.

23          THE COURT:  Who is that "they"?

24          THE WITNESS:  The Beatles, the three.

25          THE COURT:  All right.  And who was actually doing this

1    beating or nipple-twisting or whatever you called that?

2         THE WITNESS:  It changed.  Mainly doing the kind of

3    more childish stuff, which was through the door, it was the two

4    other guards.  But then the bigger, more physical beatings

5    happened when The Beatles came into the cell.  They would also

6    get the other two guards to come in with them and then get them

7    to beat us.  It could be anything from kicking and punching.

8         George -- they used these kind of thick cables

9    sometimes.  There was a lot of stress positions.  So we had to

10   hold stress positions for hours.

11        THE COURT:  And did The Beatles actually administer the

12   beatings, some of the beatings?

13        THE WITNESS:  Yes.  Yes.

14        THE COURT:  Next question.

15   BY MR. FITZPATRICK:

16   Q.  When did John and Ringo reappear at The Box after you

17   returned?

18   A.  A few weeks into being back there.

19   Q.  And did the physical mistreatment that you described, did it

20   increase when John and Ringo reappeared?

21   A.  Yeah.  They egged each other.  Right?  So it was really -- I

22   would describe it like school kids in a yard bullying someone

23   kind of thing.  They would jump on each other, and escalated,

24   and sometimes it became childish; sometimes it became much more

25   physical.

1    Q.  While you were in The Box in that time period, and let's

2    just say from mid-April through June, could you hear other

3    prisoners or other captives within The Box being mistreated?

4    A.  Only -- it was only ever us and then John Cantlie and

5    James Foley in the other cell.  Because sometimes they would

6    start over at theirs, and we knew we would be next.  So you

7    would hear them and their screams, and then there would be us

8    they would come after.  Or sometimes it would be the other way

9    around, so you'd hear them afterwards.

10         But the thing was we had to not make noise.  It was

11   kind of George's thing.  The more you kept quiet, the more

12   likely, perhaps, that it didn't go on for so long.  So they were

13   trying to like suppress...

14   Q.  Did anyone of The Beatles or collectively, did they ever

15   describe to you the purpose of these beatings?

16   A.  It was punishment.  So for me, it was the issue of speaking

17   to the guy.  The whole reason I understood to have been brought

18   back, David had hidden some money and he had to try to flush it

19   down the toilet, and it came back up because the toilet kept

20   flooding.  And they saw that.

21         John and James had been playing around with their

22   handcuffs at one point, and they figured out that you could open

23   them, that they were kind of shabby.  So I think they got caught

24   trying to open them up, so it was a sort of escape attempt.

25   Q.  Did there come a point in time when you were subjected to

1    some mistreatment involving water coming through a pipe?

2    A.  Yes.

3    Q.  And when was that?

4    A.  So after Ringo and John could come back, there was one

5    evening where George and Ringo were alone - I think

6    Abu Mohammed might have been there - and they -- so, basically,

7    it was quite late.  It was already dark.  And we heard something

8    going on in James and John's cell, and it sounded very different

9    from the usual.  We couldn't figure out what it was.

10           But then, George and Ringo came to our cell, and they

11   handed David a phone and they asked him to read an article --

12   Q.  Let me stop you right there.  Before you get to that, what

13   you heard from James and John's room, how long did that go on

14   for?

15   A.  I couldn't say.  I'm sorry.

16   Q.  Okay.  That's fine.

17           But was it immediately after that that they turned to

18   your room with David?

19   A.  Pretty much, yeah.

20   Q.  And who came into your room?

21   A.  George and Ringo.

22   Q.  And when they came in, what was the first thing they did?

23   A.  So they handed David this phone and asked him to read an

24   article, or read what was on the screen.  And David read an

25   article that was talking about a woman called Aafia Siddiqui,

1    who was imprisoned in the U.S. at Fort Something Or Other, and

2    had been -- the article was talking about how she had been

3    subjected to mistreatment by her guards.  And it alleged that.

4    Q.  And was Mr. Haines -- was he ordered to read that article?

5    A.  Yes.

6    Q.  And was he ordered to read it aloud?

7    A.  Yes.

8    Q.  And did you hear it?

9    A.  Yes.

10   Q.  Okay.  Please continue.

11   A.  Yeah, essentially once he read it, they -- I think it was

12   Ringo who said, this is an eye for a eye or something along

13   those lines.

14   Q.  And who said that?

15   A.  To my recollection, it was Ringo.  It could have been either

16   of them, but in my mind it's Ringo.

17   Q.  And what happened -- after he said this is an eye for an

18   eye, what happened next?

19   A.  Then at that point they filled a bucket of water and they

20   took me -- I think I went first.  And I was still handcuffed

21   behind my back, and they took my head and they dunked it into

22   the bucket of water.  And then they pulled it up after a while.

23   They did that maybe a couple of times.

24            And then George asked me:  Do you think this is

25   waterboarding?

1    Q.  And what was your response?

2    A.  I think my answer was:  I don't know.

3              And he said:  No, this isn't.

4              And then they sort of took it to the next level, which

5    was to then turn me on my back with my head over the top of the

6    toilet pan, the hole --

7    Q.  Now, describe the toilet facilities for the jury.  What was

8    it like?

9    A.  It was a flat pan with a hole in the center, with two places

10   for you to put your feet so you can squat.

11   Q.  So it's flat on the ground?

12   A.  Yeah.  It's not like a seated toilet.

13   Q.  So what happened next?

14   A.  So it had a wall of bricks around to stop water if it were

15   to go into the room.  So, basically, we had our hands on that,

16   holding onto that, and then the shoulders were over the top of

17   the toilet area where the hole is.

18             And then George, who was holding the hose pipe which

19   was attached to the wall, opened on the water and would just

20   spray the hose directly into our -- up the nose and mouth.

21   Q.  Now, describe how your body is situated.  Where are your

22   feet?

23   A.  Feet were sort of -- I mean, your back is over the top of a

24   hump, so your head is down below your sort of buttocks area and

25   your feet are over the other end.

1          THE COURT:  One question at a time, Mr. Fitzpatrick.

2          MR. FITZPATRICK:  I understand, Your Honor.  Thank you.

3          THE COURT:  You said describe, and then you said

4   something about the feet.  Keep it one at a time, please.

5          MR. FITZPATRICK:  Thank you, Your Honor.

6          THE COURT:  Next question.

7   BY MR. FITZPATRICK:

8   Q.  So when you were in that position, what happened next?

9   A.  He just used the hose to push water -- to put water to go

10  directly into the nose and mouth.  And then, after a bit of

11  time, he said:  Do you think this is waterboarding?

12          And I said:  No.

13          And then he said:  Yeah, you're right.

14          And then they took my jumper off --

15  Q.  Who is "they"?

16  A.  George and Ringo.  And then I had a wool sort of jumper,

17  V-neck.

18          MR. FITZPATRICK:  Can we see 10-19, please.

19  Q.  When you say "jumper," is that a British term for sweater?

20  A.  Yes.  Yeah, that's the one.  It's maroon-colored.

21  Q.  That's the one you were wearing?

22  A.  Yeah.

23          MR. FITZPATRICK:  Take that down.

24  Q.  What happened with your sweater?

25  A.  Ringo basically bunched up the sweater and put it over the

1    top of my face, and then George poured water onto the jumper.

2    As it soaked up, it started to become impossible to breathe, and

3    so then you just start to gasp.

4    Q.  Can you describe your physical reaction for the jury?

5    A.  You sort of -- you start to panic a little bit.  I was

6    trying to breathe out of the side of my mouth initially.  It

7    seemed to work.  And after a while, just the water is -- like

8    once the jumper absorbed all the water, it's impossible to --

9    and then you start to lose oxygen and you start to gasp for

10   breath, and then you just start drinking water, and eventually

11   the water starts to go into your lungs.  And then you start to

12   shake a little bit.  And that sort of progresses.  And that's

13   kind of every time when George would say:  Okay, well, that's

14   enough.

15   Q.  The sweater that was over your face, who is managing the

16   sweater?

17   A.  To my recollection, it was Ringo.

18   Q.  Do you know why it was George who said:  Okay, that's

19   enough?

20   A.  George was more of the guy in charge.  He had been

21   throughout the time, whereas Ringo and John would appear and

22   come and go maybe more.

23   Q.  Can you recall anything being said to you while this was

24   happening?

25   A.  No, to be honest.

1    Q.  Is there any way to gauge how long that event took?

2    A.  No.

3    Q.  Is it fair to say that it felt like forever?

4    A.  Yes.

5    Q.  After that, what happened with David Haines?

6    A.  David went through the exact same spiel.

7    Q.  Did you witness it?

8    A.  Yes.

9    Q.  Did it happen immediately after your event?

10   A.  Yes.

11   Q.  How were you feeling immediately after your event?  What was

12   your physical condition like?

13   A.  Terrible.  That was by far the worst thing that had happened

14   up until then.  And we had been through a fairly intense period

15   of beatings and psychological -- it feels stupid to say it, but

16   like it was just a whole -- everything together, there wasn't a

17   minute's peace ever, even during the night.  It was like how

18   quickly you responded to the numbers they called or the names

19   that they called for the dogs, you know, that you would have to

20   tell them something, a story.  I don't know, sometimes -- and it

21   depended.  It was always depending on who was there and what

22   they felt like in the moment.

23        But this was -- this felt -- I mean, this -- and my

24   body was just, you don't have any energy left.  In fact, one of

25   the guards the next morning, or even a few hours later, he

1    actually brought us tea, which was unheard of at that point.  I

2    mean, we were getting no food at that time, like very, very

3    little food.  Usually food was only ever given after a major

4    beating, almost like to regive you energy.  But otherwise, it

5    was not.

6    Q.  So after your waterboarding event, did you describe what you

7    recall for David Haines' waterboarding event?

8    A.  He basically went through the exact same thing.  And I think

9    he -- I can't remember exactly, but I think he passed out or

10   collapsed at one point at the end.  He coughed up a significant

11   amount of water, is what I remember.

12   Q.  And do you recall the next day, what was David Haines'

13   physical condition like as one day progressed to the next, after

14   the waterboarding?

15   A.  By that point in time, I think we had lost massive amounts

16   of weight.  I would have put myself down by about 20 kilos

17   compared to what I came in as.  David, I would have placed him

18   between maybe 90 and 100 kilos, and he was at least 30 less.

19          At one point when they allowed us to shower, which was

20   really, really rare, but when we smelled too bad, they let us

21   wash.  And I remember the first time I saw him take his jumper

22   off, his -- any part of his -- the muscular part of his body was

23   blue.  We didn't realize it when we -- when we were there.

24   Q.  And what was that from?

25   A.  The beatings.

1    Q.  I want to suspend your narrative in the progression for a

2    minute, and I want to turn to a prison location called "The

3    Dungeon."  Do you recall The Dungeon?

4    A.  Yes.

5    Q.  And do you recall approximately when you went to

6    The Dungeon?

7    A.  It was in late August, early September.

8    Q.  And how long were you at The Dungeon?

9    A.  Through until about three months, or through until the end

10   of December.

11   Q.  During that period at The Dungeon, did there come a point in

12   time when you became aware that there was negotiations,

13   potential negotiations, for your release?

14   A.  So we had a period of time in mid to late November where

15   everyone was pulled out of the cell we were in one by one by

16   various combinations or by an individual from The Beatles it was

17   only ever The Beatles at that time.  And they would ask us for

18   email addresses, which we had given many times before, but this

19   was a very sort of sequential, everyone went round, everyone got

20   pulled out and asked for email addresses.

21        And about, yeah, maybe from early December onwards, in

22   approximately the same sequence that we had been asked for email

23   addresses, we were getting pulled out to be asked proof-of-life

24   questions.  So we understood that there was some communication

25   with the outside world.

1    Q.  With the assistance of Mr. Hartigan, I would like to show

2    you Binder 3 of our exhibits, and Exhibit 10-22G.

3    A.  It's which number?

4    Q.  Binder 3, and Exhibit 10-22G.  What do you see in front of

5    you?

6    A.  An email.

7    Q.  I want to start with the top of the page, the first page of

8    10-22G.  It's a three-page exhibit.  At the top -- first of all,

9    do you understand French?

10   A.  Yes.

11   Q.  At the top it says, "*de*."  What does "*de*" mean in French?

12   A.  From.

13   Q.  Can you read the email address?

14   A.  990055@safe-mail.net.

15   Q.  Do you know that email address?

16   A.  No.

17   Q.  And in French, what is "*envoyè*"?

18   A.  Sent.

19   Q.  And what is the date after that?

20   A.  Monday the 2nd of December, 2013.

21   Q.  And then it says, "à."  What is à?

22   A.  To.

23   Q.  And there's a series of names that have been blacked out,

24   beginning with Marie-Pierre.  Who is Marie-Pierre?

25   A.  Marie-Pierre was the head of ACTED.

1    Q.   Who is Frederic Roussel?

2    A.   He's the number two at ACTED.

3    Q.   Would you have known his email address?

4    A.   Yes.

5    Q.   Next is Luca Pupulin.  Who is that?

6    A.   My boss at IMPACT Initiatives.

7    Q.   Would you have known that person's email address?

8    A.   Yes.

9    Q.   Next is "Motka@" redacted.  Who owns that email address?

10   A.   My parents.

11   Q.   And then "Moritz" redacted.  Who is Moritz?

12   A.   He's a German friend of mine.

13   Q.   Then there's an email address that says "EJH1982@" redacted.

14   Who is that?

15   A.   A British friend of mine.

16   Q.   Are those all email addresses that you provided to

17   The Beatles?

18   A.   Yes.

19               MR. FITZPATRICK:  Move to admit 10-22G.

20               MR. MACMAHON:  No objection, Your Honor.

21               THE COURT:  All right.

22               (GOVERNMENT EXHIBIT Number 10-22G was admitted into

23   evidence.)

24               MR. FITZPATRICK:  Permission to publish.

25               THE COURT:  Yes.  It's admitted.  You may display it.

1    Q.  If you could read from the beginning of the text down to the

2    first line that begins after the Number 1.  So I guess the seven

3    lines, can you read that, please?

4    A.  "This is a letter regarding Federico Motka.  He is in our

5    custody and alive and doing well; however, no video or picture

6    evidence will be granted at the current stage.  Three questions

7    will be granted to prove we have Federico.  These questions must

8    be personal to a degree that only he can possibly know the

9    answers, some realizations that must be understood before

10   negotiations begin."

11   Q.  Now, when members of The Beatles, of the three, the troika

12   of Beatles came and were soliciting email addresses, do you

13   recall any one in particular who had solicited email addresses?

14   A.  It was a mix at that time.  They depended on -- sometimes it

15   was George, sometimes it was John and Ringo together, sometimes

16   it was John and George.  It was a combination.

17   Q.  Were you able to observe, not only your own negotiations or

18   exchanges of emails, but those other hostages as well?

19   A.  As in when they gave them the email addresses?

20   Q.  Yes.

21   A.  No, we would be taken out of the cell we were all in, around

22   the corner from me, and then we would be providing the

23   information, sometimes writing it down ourselves, sometimes they

24   would ask us to spell it out.

25            MR. FITZPATRICK:  Ms. Lopez, if you could expand the

1    paragraph that begins with "indeed."  If you can expand that,

2    please.

3    Q.  Do you see on the screen in front of you, Mr. Motka, we've

4    expanded the paragraph that begins with "Indeed."  The rhetoric

5    that's explained there, is that familiar to you?  That rhetoric,

6    is that familiar to you from your captivity with The Beatles?

7    A.  100 percent, yes.

8    Q.  Can you explain that?

9    A.  So, I mean, first of all, the -- so as an aid worker, their

10   position in relation to what I did was that they felt that aid

11   workers were just a tool of foreign policies of Western

12   governments trying to leverage their views on the world.

13           And then, in particular, John, he had a specific way of

14   looking at things that he sort of repeated to me quite often,

15   which was that he -- you know, he hated aid workers the most

16   because he said, you know, soldiers, you can identify them on

17   the battlefield; they're there, you can do something about it

18   yourself as another soldier and enemy fighter.  Journalists have

19   to put a name to their article, and you can combat that through

20   your own media.  But aid workers, they're unidentifiable.  They

21   work within the communities and they change people by offering

22   them free stuff and bringing them over to your ideology as the

23   aid worker.  And so he said:  That's the hardest ones to fight.

24           So he sort of saw this hierarchy, with aid workers at

25   the bottom.

124

1    Q.  The term "NGO" is used.  Do you know what that means?

2    A.  Nongovernmental organization.

3    Q.  And did you consider yourself working for an NGO at that

4    time?

5    A.  Absolutely.

6         MR. FITZPATRICK:  If you could highlight the next

7    sentence that begins with "Understand."

8    Q.  And that paragraph there, was that consistent with some of

9    the rhetoric you heard from The Beatles as well?

10   A.  Yes.

11        MR. FITZPATRICK:  If we could now move down and

12   highlight or enlarge Paragraph 2.

13   Q.  Mr. Motka, so the record is clear, I'm going to read this

14   for you:  "The war on Islam and the Muslims led by the

15   Imperial West and its allies has left a trail of destruction all

16   over the Muslim world, affecting the innocent Muslims with

17   respect of their lives, wealth, and safety.  With many killed,

18   more injured, and those lying behind bars, we adopt the strict

19   policy of," quote, "an eye for an eye, a tooth for a tooth."

20        That last phrase, had you heard that before?

21   A.  Yes.

22   Q.  And was that consistent with your prior testimony of what

23   Ringo said to you before you were waterboarded?

24   A.  Yes.

25   Q.  That paragraph ends with, "Giving the enemies of Islam a

1    drink from their own bitter cup."

2           Is that consistent with the rhetoric you heard from

3    The Beatles?

4    A.  Yeah, absolutely.

5    Q.  And continuing on that initial email, the Safe-mail.net

6    account from your captors, they explicitly place the condition

7    that no media attention is drawn to this case at all.  And that

8    is reflected in all caps with an exclamation point.  Is that

9    correct?

10   A.  Yes.

11   Q.  And then the final paragraph asks for demands as a condition

12   of your release.  Is that correct?

13   A.  Yes.

14   Q.  If you could turn to the next page.  Does this page reflect

15   a response from your employers at ACTED?

16   A.  Yes.

17   Q.  And they are responding to the initial request that says,

18   "Three questions will be granted to prove we have Federico."  Is

19   that correct?

20   A.  Yes.

21          MR. FITZPATRICK:  If we could highlight from

22   "regarding" to the bottom, please.

23   Q.  There's a line there that says, "The first name of Berti's

24   husband."  Does that make sense to you?

25   A.  Yes.

1    Q.  And why does that make sense to you?

2    A.  Berti is my godmother, and her husband's name is Hatmut,

3    German, which is sort of not -- it's a bit more old school, not

4    common.

5          THE COURT:  You'll have to speak up a bit more,

6    Mr. Motka, please.

7          THE WITNESS:  Sorry.

8          THE COURT:  Thank you.  Proceed.

9    Q.  So what is Berti's husband's name?

10   A.  Hatmut.

11   Q.  And is that a German name?

12   A.  Yeah, it's more of an old school, less world -- less used

13   German name.

14   Q.  And what's the next question that was asked?

15   A.  The name of Federico's cat.

16   Q.  And were these two questions communicated to you by your

17   captors?

18   A.  Yes.

19   Q.  And which captors communicated these questions to you?

20   A.  I don't remember.

21   Q.  Do you recall, was it one of The Beatles?

22   A.  Yes.

23   Q.  And I want you to turn to the next page, which is a

24   response, "de," from the Safe-mail account.  And it says,

25   "Regarding Federico Motka, in response to your questions."  Are

127

1    those the answers that you provided to The Beatles?

2    A.  Yes.

3    Q.  With respect to Question 2, "The name of Federico's cat,"

4    what did you respond?

5    A.  Schnuffi.

6    Q.  What is Schnuffi?

7    A.  It's a combination of a German word, for it to sneeze,

8    because as a kitten he sneezed, and my parents called him

9    Schnuffi.

10   Q.  And did you receive additional information that that cat was

11   dead?

12   A.  Yes.

13   Q.  And did your captors communicate that to ACTED?

14   A.  Yes.

15   Q.  After that, you also provided an additional piece of

16   information.  Is that correct?

17   A.  Yeah.  Because they wanted three questions, and they

18   said that they only asked two, so let's give them something in

19   addition.

20          THE REPORTER:  I'm sorry.  Can you please speak up.

21          THE COURT:  Yes, I'm having difficulty hearing you.  If

22   you could speak up, please, sir.

23          THE WITNESS:  Yes, sir.

24   A.  So I was told that because they had asked three questions

25   and there were only two -- they asked for three questions and

128

1   only two were sent back, so they said, give us something only

2   you would know to send back.

3   Q.  And what did you send back?

4   A.  I told them about the name -- the nickname my grandfather

5   gave me when I was a little boy.

6   Q.  And after that, did your captors make a reference to

7   David Haines?

8   A.  Yes.

9   Q.  What did they say?

10  A.  Do you want me to read it?

11  Q.  Yes, please.

12  A.  "Evidently Federico is unlike David Haines, and is of less

13  use and importance to us.  Therefore" -- go on?

14  Q.  No, that's sufficient.  Thank you.

15          At this time period, in the first two weeks of

16  December, were you still being held with David Haines?

17  A.  Yes.

18  Q.  And that was where at this time period?

19  A.  In The Dungeon.

20          MR. FITZPATRICK:  At this point, Your Honor, I would

21  move for admission of video clip 26-5, and permission to

22  publish.

23          THE COURT:  Any objection to video clip 26-5?

24          MR. MACMAHON:  May I consult with counsel for one

25  second, Your Honor?

1          THE COURT:  Yes, you may.

2          MR. MACMAHON:  No objection, Your Honor.

3          MR. FITZPATRICK:  Your Honor, this clip is 1 minute and

4     43 seconds.

5          THE COURT:  All right.  It's admitted and you may

6     publish.

7          (GOVERNMENT EXHIBIT Number 26-5 was admitted into

8     evidence.)

9          (Video played in open court.)

10         MR. FITZPATRICK:  Thank you.

11    BY MR. FITZPATRICK:

12    Q.  All right, Mr. Motka.  Let's go back to our timeline, and

13    we'll return to The Box.

14         After the waterboarding event, were you involved in an

15    event that you would call "The Royal Rumble"?

16    A.  Yes.

17    Q.  And in relationship to the waterboarding event, do you

18    recall how much time passed until the royal rumble?

19    A.  It can't have been more than a few weeks.

20    Q.  Not more than a few weeks?

21    A.  Yeah.

22         THE COURT:  Again, sir, if you would keep your voice

23    up, please.

24         THE WITNESS:  Sorry.

25         THE COURT:  Thank you.

1    Q.  At the outset, with respect to James Foley and John Cantlie,

2    what was significant about The Royal Rumble?

3    A.  It was the first time that I was put in a cell with James

4    and John.  So it was the first time we had actually seen them

5    face-to-face.

6    Q.  And who put you in the cell with James and John?

7    A.  All three of The Beatles were there that day.

8    Q.  Can you name them?

9    A.  George, Ringo, and John.

10   Q.  And how far were James and John from your cell?

11   A.  A few meters.  I mean, direct lane, it must have been

12   four meters, but then just to go around to the entrance, a few

13   extra.

14   Q.  And at that time, describe your physical condition, how

15   you -- describe your physical condition at that time.

16   A.  We were massively weak.  We had lost a lot of weight.  We

17   weren't getting fed.  We were emaciated in some sense.

18   Q.  When you would receive food, what kind of food was it?

19   A.  It depended.  There was these things, like the equivalent of

20   SPAM, sort of little tins of processed meat sometimes.

21   Sometimes it was just bread and a couple of olives, like the

22   flat round breads that they have in the Middle East.

23   Q.  And with respect to David, can you describe his physical

24   condition at that time from your observations?

25   A.  He had lost massive amounts of weight.  At that point he

1    hadn't yet started his more internal issues that he had later.

2    That came when we were given access to food again.  So we just

3    weren't able to handle any kind of food when we actually did get

4    it eventually, after we left The Box.

5    Q.  When you were placed in the cell with James Foley and

6    John Cantlie, do you recall making any observations about their

7    physical condition?

8    A.  Yeah, they were exactly the same.

9    Q.  And describe -- explain to the judge and the jury what

10   happened when you were placed in the room with James and John.

11   A.  So, yeah, we were brought into James and John's cell.  They

12   closed the door, and then they went up to the roof and opened

13   the skylight, sort of metal lid, and then they were shouting

14   instructions to us.  And they called it "The Royal Rumble."  We

15   didn't call it that.  So they were super excited.  It was kind

16   of like their fun event of the day.

17   Q.  Did they order you to do anything?

18   A.  Yes, they ordered us to fight one another in a sort of

19   tag-team-style boxing-type match.

20   Q.  Can you explain how that unfolded?

21   A.  So John and James were told to fight David and I, and

22   basically we would have to -- two of us would stand on the side

23   whilst the other two fought.  And then, if you were too tired,

24   you would have to sort of tag yourself out and then the other

25   guy would come in.

1        But we were so weak and shattered that we barely had

2    the muscle strength to even lift our arms.  John -- I think

3    James passed out.  John passed out.  David almost passed out.

4    Q.  Was there a consequence for losing The Royal Rumble?

5    A.  Yeah.  The threat was whoever they deemed to have lost the

6    fight would get waterboarded.

7    Q.  And do you recall any of The Beatles doing sort of a

8    play-by-play as you were fighting?

9    A.  Yeah.  They would do little, like, comment -- sort of radio

10    equivalent, radio-fight-live commentary kind of thing.

11    Q.  Do you recall which one?

12    A.  No.

13    Q.  How long did this fight last?

14    A.  It lasted -- I remember it turned dark by the time it ended,

15    so it would have been like the twilight hours.  So it could have

16    been an hour or so.

17    Q.  At the end of the hour, when the fight ended, did any of

18    The Beatles inflict any further punishment on you or the others?

19    A.  No.  At that point in time they declared John the winner,

20    and I was the loser.  And they said I would get waterboarded

21    later.  But then that didn't materialize, and it was more just a

22    beating.

23    Q.  You received a beating?

24    A.  Yeah.  Not a huge one, but yeah.

25    Q.  Do you recall who beat you?

1    A.  I can't recall right now.  I refer to it in my statement.

2    Q.  No, that's fine.  And you had said earlier that James and

3    David, during the fight, had passed out?

4    A.  Yeah.

5    Q.  Were they given any aid?

6    A.  No.  We were just in there ourselves.  They were up on the

7    top, right, so we just helped them up, yeah, and they would say:

8    Come on, continue.

9    Q.  At the end of that, what were your living arrangements like

10   at the end of The Royal Rumble?

11   A.  Well, we were brought back into our cell, and then maybe

12   within a week, Ramadan had started.  So this would have been

13   sort of, I think, late July, or sort of July.  And it wasn't

14   until about a week, maybe a week -- for sure a few days into

15   Ramadan that we were suddenly put all together in John and

16   James' cell for maybe four or five days.

17           And then it was around then that then we were told we

18   were being transferred, and the three Beatles, plus a new guy

19   had arrived who was a sort of quiet, big -- he was a big guy.  I

20   think I remember thinking of him as a Turk.  I don't know why.

21   I sort of labeled him as a Turk.  And he came, and he was -- he

22   was a big guy, and just before they moved us, they really went

23   to town with sort of beatings and smacking us around.

24   Q.  Again, who is "they"?

25   A.  The three Beatles plus this big Turk.

1    Q.  And this was before you were moved from The Box?

2    A.  It was literally like in the hour or so before we were

3    moved.  It was almost like they wanted to -- I mean, this sort

4    of happened often across the period of captivity, that before

5    something big like a move would happen, either they would play

6    psychological games, like we were being released -- so it was

7    almost to keep us from thinking to do anything.  And in this

8    case, they were beating us.

9    Q.  And were all three Beatles there for that last beating at

10   The Box?

11   A.  Yes.

12   Q.  And in addition to yourself, did you observe David Haines,

13   James Foley, and John Cantlie being beaten?

14   A.  Yes.

15   Q.  Were you all together?

16   A.  Yes.  We were lined up against a wall, and they would pull

17   one guy away from the wall.  And then we would sort of be

18   allowed to get up or get back again -- it was always -- our

19   position was always up against the wall as a kind of submission.

20           And John, I remember that time, he really had it in for

21   me, and he kept on egging the guy, the big Turk guy, on to go

22   at -- you know, to lay in.  So it was kind of -- he kept on

23   going around.

24   Q.  And at that time, in July of 2013 --

25           THE COURT:  You said, "lay in."  What do you mean by

1    that?

2              THE WITNESS:  To get involved and punch and kick.

3              THE COURT:  Next question.

4              MR. FITZPATRICK:  Thank you, Your Honor.

5    BY MR. FITZPATRICK:

6    Q.  In that July of 2013 time period, are the four of you the

7    only Western hostages that you're aware of?

8    A.  Yes.

9    Q.  And before we leave The Box, do you recall George making any

10   statements about creating conditions in the prison environment

11   sort of analogous to another situation?

12   A.  Yeah, he always spoke about Guantanamo.

13   Q.  And what did he say?

14   A.  He always said, you know:  We want to recreate the condition

15   that our brothers are in in Guantanamo.

16              And he had a pile of -- he kept showing us a pile of,

17   like, orange material, similar to the kind of colors you see on

18   prisoners in the videos.  And so a lot of his -- a lot of his --

19   what he did to us in that period of April through July was his

20   idea of what conditions in Guantanamo were like.

21   Q.  With respect to the punishments that were meted out against

22   you and others by The Beatles, George, Ringo, John, could you

23   distinguish each three by which types of physical punishments

24   they preferred?

25   A.  Yes.

136

1    Q.  And let's start with George.  What did he prefer?

2    A.  So George was more into boxing, I think, as far as I

3    remember.  John, he kicked a lot.  He was always about using his

4    feet.  I don't know, that's my big recollection.  And Ringo used

5    to always talk about how he liked wrestling.  And so things like

6    I remember him putting people into headlocks and things like

7    that.

8    Q.  Did he ever put James Foley into a headlock?

9    A.  Yes.

10   Q.  When was that?

11   A.  It was much, much later, when we had been moved, by that

12   time, to Raqqa, on the day that we call Black Friday.

13   Q.  And what was James Foley's response upon being put in a

14   headlock by Ringo?

15   A.  He passed out.

16   Q.  Upon leaving The Box, where were you moved?

17   A.  After leaving The Box, it was kind of like a house, an

18   isolated location.  But it was a building, so it really wasn't

19   so much a prison as much as it was a normal house that had

20   been -- where the windows had been all blocked up.  And it

21   wasn't cell doors.  It was more just doors.

22   Q.  And do you recall giving that location a name?

23   A.  Yeah.  We called -- we nicknamed it the "Swede's Hotel."

24   Q.  And why was that?

25   A.  Well, the guy we were handed over to, at one point he came

1  in to look at us after The Beatles had left, and he asked David

2  to stand up and turn around and to look at him.  And David

3  described him as being a blond, blue-eyed, and he had a kind of

4  accent that sounded North European, so hence Swede.

5      And the reason for the hotel bit was that they really

6  fed us well at that location.  I think he was quite shocked at

7  how he saw us, because we got the same kind of food that they

8  ate at the end of the day, at the end of Ramadan.

9  Q.  And how long were you at the Swede's Hotel?

10 A.  Not more than 10 days, I would say.

11 Q.  And did The Beatles sort of absent themselves after the

12 Swede's Hotel?  Were they gone for a while?

13 A.  Yeah, George had said something to the equivalent of that he

14 was handing over the files to someone else, or that he would be

15 handing the files over to someone else and were someone else's

16 responsibility at that point.

17 Q.  And from the Swede's Hotel, where were you moved from there

18 after 10 days?

19 A.  So from there we went to -- we were placed in the basement

20 of a large building in what we thought were -- it was an urban

21 area, so we thought it was a city of some sort.

22 Q.  And did you give that location a name?

23 A.  Yeah.

24 Q.  What did you call it?

25 A.  We called it "Community Prison."

1    Q.  And did it have some semblance or look like a hospital?

2    A.  Well, we understood that it was -- at the time we didn't

3    know what exactly it was.  We knew it was -- it had a -- we were

4    in the lower ground, because there would be windows only on the

5    top level that looked on the ground level, let's say.

6    Q.  Okay.

7    A.  And it was a big corridor with lots of rooms, cells, big

8    rooms going off of it.  And I think we were told it was

9    something linked to a Sharia court.

10   Q.  Understood.  And was it at this location, the

11   Community Prison, that George made the statement that he was

12   handing over your files?

13   A.  I mean, yeah, it was round about in the period of the

14   transport that he said that.

15   Q.  And do you know who your files were handed over to?

16   A.  Not exactly.  But I know that there was a completely

17   different management team, if you will, of that location.  It

18   was much more French-speaking Jihadists, and The Beatles

19   effectively disappeared at that point until September.

20   Q.  Speaking of files, do you recall being assigned a number?

21   A.  Yes.

22   Q.  And what was your number?

23   A.  I think I was 38.  I was either 37 or 38.  So David and I

24   had been given a number 37, 38; John and James had numbers 32

25   and 33.  And George specifically told us what our numbers were,

139

1    and we had to -- and he would call the numbers either in English

2    or Arabic, and that was the way we were supposed to know who was

3    to respond to him.

4    Q.  The management, as you said, of the Community Prison was

5    mostly French.  Do you recall a significant member of the French

6    guard crew?

7    A.  Yeah, there was a few of them.  There was one guy,

8    Abu Idris.

9    Q.  I'm sorry, say that one more time.

10   A.  Abu Idris.  I think he was Belgian.

11   Q.  What language did he speak?

12   A.  French.  He also spoke a little bit of English.  It was two

13   other French guys, one guy we called Abu Muscles.  We would sort

14   of make up names sometimes.  He was a French, from France, not

15   Belgium, speaking French from France.

16          And there was at least two other guys.  Right now the

17   *nom de guerre* of the sort of manager or the head of that group

18   escapes me.  But I remember he spoke quite a few different

19   languages, including Dutch, French.

20   Q.  And when you were at that Community Prison, did other

21   Westerners start arriving and joining you as captives?

22   A.  Yeah, I think some Westerners were already there when we

23   arrived.  So --

24   Q.  Who did you meet first?

25   A.  So we met -- so we met Didier and Edouard, so

1   Didier Francois and Edouard Elias, two French journalists.  So

2   when we had arrived for the first sort of 48 hours, we were

3   completely ignored.  We weren't allowed to go to the toilet, we

4   weren't given any food.  It was almost like we didn't -- we

5   tried banging on the door at one point.  We had just come from

6   the Swede's Hotel, and the food there, like I said, was really

7   quite good, but our bodies weren't even able to, like, hold it.

8   We were vomiting, and it went straight -- almost like within

9   20 minutes it would be out on the other end.

10          So we were having -- we were pretty desperate for

11   toilets, and it was all rather --

12   Q.  In those first few days, were you allowed toilet access?

13   A.  No.  So they came in and gave us potatoes and then let us go

14   to the toilet and clean up.

15          And then maybe within a week or so, they started to

16   differentiate between myself and David and James and John,

17   because James and John had converted to Islam.  So they were,

18   like, oh, well, these -- so they got more blankets and things.

19   And then eventually they pulled them out of the cell and moved

20   them somewhere else, and that was the day that Didier and

21   Edouard were pulled into our cell.

22          So we went from two to four there, and then we were all

23   moved to another location where Didier and Edouard, where they

24   came to meet David and I, and slowly, slowly there were more

25   Westerners added.

1   Q.  By this point in time, with The Beatles absent, had the

2   physical mistreatment subsided?

3   A.  Yeah.  Yeah.  I mean, in terms of the regime, it was

4   entirely different.  I mean, David and I were very conditioned

5   around how we should behave, and I remember when Didier came in

6   through the door, he was chatting to the guards in French and he

7   was asking them for food.  And we would never -- we weren't ever

8   able to do that kind of thing in The Box.  It was a 180-degree

9   change in terms of how you could engage and interact, obviously,

10  you know, within the confines of prison.

11  Q.  Given your physical condition at that time, were you in any

12  condition to fight back at all?

13  A.  No.  No.  I could barely do a press-up on my knees.

14  Q.  In addition to Didier Francois and Edouard Elias, what other

15  Westerners did you see at the Community Prison?

16  A.  So after Didier and Edouard, we spent about a week where we

17  knew there were other French people, plus a Danish journalist in

18  the room next door.  Because we could communicate through a --

19  it was kind of like a cable from the generator outside would

20  come in through the window and along the wall and then through

21  the wall.  So we were able to communicate with them.

22          And eventually they put them into our cell.  They

23  brought them in, and that was Pierre Torres, Nicolas Henin, and

24  Dan Rye Ottosen.

25  Q.  And when that move happened, how many of you were living in

142

```
 1    one room?

 2    A.  At that point we were seven.

 3    Q.  Can you describe the length and width of that room?

 4    A.  It was quite a big room at that point.  It was maybe 3 and a

 5    half or 4 meters by 5.

 6    Q.  After that, did another American arrive as a captive at the

 7    community hospital?

 8    A.  Yeah, Steven Sotloff.

 9    Q.  Do you recall when he arrived?

10    A.  It would have been early, early August, I would say.

11         MR. FITZPATRICK:  This has been previously admitted,

12    Your Honor.  Permission to publish 7-2.

13         THE COURT:  All right.  You may do so.

14    Q.  Mr. Motka, who do we see in Government Exhibit 7-2?

15    A.  That's Steven Sotloff.

16    Q.  And he is the American who joined you in early August of

17    2013?

18    A.  Yes.

19         MR. FITZPATRICK:  And if we could please publish 1-25C.

20    Q.  Do you recognize that person?

21    A.  Yes.

22    Q.  And who is that?

23    A.  Steven Sotloff.

24    Q.  And then last one is 1-24F.  And who is that?

25    A.  Steven Sotloff.
```

143

1    Q.  When you were at this Community Prison, how common was it to

2    hear female voices?

3    A.  Not at all.

4    Q.  Did there come a point in time when you became aware of a

5    female being held at the Community Prison?

6    A.  So there was -- we knew that there was one cell in the

7    Community Prison that was holding women and children, but

8    Syrians.  It was only in, I would say, August as well that we

9    heard the voice of a Western woman.

10   Q.  And did you -- was the Western woman bilingual?

11   A.  Yes.  So the voice that we heard was a woman who initially

12   spoke French, and she sounded terrified, and towards right at

13   the end of -- so she -- I can't remember exactly what she was

14   saying, but she spoke French, and towards the end she said,

15   "Please don't hurt me," in English.

16   Q.  And did you come at a later point in time to meet that

17   person that you heard say that in person?

18   A.  Yes.

19   Q.  And who was that?

20   A.  Kayla Mueller.

21   Q.  Do you recall an event at the Community Prison where

22   Steven Sotloff was interrogated?  Do you recall that event?

23   A.  Yes.

24   Q.  And can you describe the circumstances of that

25   interrogation?

1    A.  I would have to refer to my statement I made earlier.

2    Q.  We can return to that later.

3         We don't need to discuss the particulars of the

4    interrogation.  Do you recall threats that were made to

5    Steven Sotloff regarding that interrogation?

6    A.  I'm sorry, my memory is hazy.  But I remember something

7    around cutting a finger off, or some nail, pulling a fingernail.

8    My memory, I remember pliers or something like that.

9    Q.  Would things like that circumstance happen periodically?

10   A.  So nothing like that had happened to us, but one thing we

11   knew about the Community Prison was that there was a lot of

12   screaming, like torture was happening to other prisoners.

13        I mean, when we would be taken -- so none of the cells

14   had a toilet.  There was a main sort of a bathroom, like a

15   normal building bathroom - you know, multiple stalls and sinks -

16   down the corridor, so we would be lined up, taken to the

17   bathroom, locked in the bathroom, and given a few minutes to do

18   our business and taken back.  And often there would be bodies of

19   Syrians who had been beaten or tortured just lying on the

20   corridors, bloodied and blued.

21   Q.  You testified earlier that in July, at about Ramadan,

22   The Beatles had moved on and handed over your files.  Did there

23   come a point in time when they returned?

24   A.  Yes.

25   Q.  And did they return as a group?

1    A.  I mean, yes, I think so.  The first time they came in, there

2    was at least two in my memory.  We had been moved from the

3    Community Prison to the place that we called "The Dungeon,"

4    which was, I found out later, was on the outskirts of Aleppo, in

5    a kind of industrial area.  And we had been moved -- because

6    when they moved us, like the whole infrastructure that we were

7    moved to wasn't really a prison at that point.  It was just the

8    downstairs of an industrial building, a basement.  And we were

9    put in a room.

10           But then they sort of started building around us the

11   prison, so we were moved upstairs whilst the work was going on

12   downstairs, in this really, really tight room that barely -- it

13   was wide enough for the people -- we would sleep one head here,

14   with your feet coming to the middle.  And the next person, sort

15   of with your heads in each -- against the wall and your feet

16   coming towards the middle.  But obviously you would sleep with

17   your feet next to the other person's head.

18   Q.  Understood.  Understood.

19   A.  So by then, sort of no one had met The Beatles except for

20   David and I, and John and James at this point were still

21   separated from us.  And we had obviously told them, the other

22   guys, about them.  But it wasn't until they came and they had

23   everyone line up facing away from the door, the sort of

24   corridor-looking thing, and they created sort of people sitting,

25   and someone walked up and down.  I'm 90 percent sure George was

1    there, but, like I said, I think it was multiple.  And they

2    walked up and down and they didn't really say very much.  They

3    just looked around and then left again.

4            But David and I had understood who it was, and --

5    Q.  What was your reaction?

6    A.  Oh, we crapped our pants.  We were scared.  This was -- this

7    was -- we had just started to relax a little bit in some shape

8    or form, so this was -- this was the worst kind of news for us

9    at that point.  And I remember --

10           THE COURT:  What was the worst kind of news?

11           THE WITNESS:  The fact that they had been there,

12   The Beatles.

13           THE COURT:  You mean the fact that they had returned?

14           THE WITNESS:  Yes.

15           THE COURT:  Next question.

16           MR. FITZPATRICK:  Thank you, Your Honor.

17   Q.  What you've described, was that The Dungeon prison?

18   A.  Yes.

19   Q.  And we've previously gone over some of that with your email.

20   I would like you to turn to Government Exhibit 9-1.  I believe

21   it's in Binder 3 as well.

22   A.  (Witness complies.)

23   Q.  And 9-1 is two pages of photographs.

24   A.  Uh-huh.

25   Q.  Take a look at that for a minute, and then describe to me

1  what you see in 9-1.

2  A.  Yeah, the second image, which shows a row of cells with no

3  doors, that would have been the inside of The Dungeon -- imagine

4  before it was an open space and they built those individual

5  cells to hold one person.  And that would have been directly

6  opposite the entrance to our room cells, which were originally

7  there, that -- so not constructed, let's say, in addition.  So

8  this was the opposite side of that.

9        MR. FITZPATRICK:  Move for admission of 9-1.

10        MR. MACMAHON:  No objection, Your Honor.

11        THE COURT:  Admitted.

12        (GOVERNMENT EXHIBIT Number 9-1 was admitted into

13  evidence.)

14        MR. FITZPATRICK:  And permission to publish.

15        THE COURT:  Yes, you may.

16  Q.  Mr. Motka, this is the first page of that exhibit, if I

17  understand?

18  A.  Yes.

19  Q.  So, again, for the benefit of the jury, what are we seeing

20  in this photograph?

21  A.  So these kind of single cells that had been constructed

22  across the hall, let's say, from our entrance to the cell that

23  we were held in.

24  Q.  So describe your cell in relation to these cells.

25  A.  So, yeah, our cell was -- so there were two rooms along the

1    edge, let's say, with two doors.  We had been held in both of

2    them - initially in one, and then the darker room, which was

3    The Dungeon, hence the name, because it was spray painted in

4    black - and I think it was furniture that was spray painted or

5    something like that.  So the walls were colored --

6    Q.  How many captives in each -- how many of yourself and other

7    captives were in the other rooms?

8    A.  In The Dungeon, it would have been -- before John and James

9    were brought back into the room with Tony, it would have been

10   seven plus three, 10.  Then Mark was added, 11; Sergei, 12.  So

11   we're looking at a dozen.

12   Q.  Were there prisoners kept in these individual cells as well?

13   A.  Yeah, we were only put in there once individually, and then

14   only for a few hours, and then brought back in.  Almost when

15   they were doing, like, checks, pulling up mattresses -- not

16   mattresses, but the blankets and things that we had.  But

17   otherwise, it was mainly Syrians or other prisoners.

18        MR. FITZPATRICK:  If we could go to the second page,

19   please.

20   Q.  Is this just another vantage point of what you've just

21   described?

22   A.  Yeah.  So if you're looking at it down the hall, we would

23   have been on the left-hand side.

24   Q.  Okay.

25   A.  And when I was talking about the proof-of-life emails, we

149

```
 1   would have been taken out.  And you can see sort of right in the
 2   dark, furthest left, there's sort of -- that's where we
 3   were brought -- I was brought around to ask my emails and the
 4   proof-of-life questions, and then brought back in.
 5   Q.  Thank you.
 6        MR. FITZPATRICK:  We can take that down.
 7   Q.  Let's go and discuss other -- you began to do it.  Let's
 8   discuss other hostages that joined your captivity group.
 9        Was there an individual named Sergei added?
10   A.  Yes.
11   Q.  What was his nationality?
12   A.  We believe him to have been Russian.
13   Q.  And do you recall when he was added?
14   A.  It would have been late October, early November.
15   Q.  Tell us, for those we haven't mentioned, Marc Marginedas,
16   you know that person?
17   A.  Yes.
18   Q.  When was he added?
19   A.  He was added maybe late September, early October.
20   Q.  And who -- with respect to -- who else joined The Dungeon,
21   other Westerners?
22   A.  So -- yeah, so when John and James who -- were actually --
23   so when John and James were taken out of the cell from David and
24   I, that was the first time we had been split sort of since
25   The Box, in late July, early August.  And we didn't really see
```

1    them -- even though we knew at one point that they were in a

2    cell somewhere in the dungeon for a little short while, but we

3    didn't see them again until they were added in the big group

4    that sort of started forming in our dungeon cell.

5            And when they were added, they were added with

6    Tony Neukirch, a German who had also been added to them

7    separately.  So it was the first time I had gotten to see Tony.

8    Yeah.

9    Q.  At The Dungeon, did you also hear a Western female voice at

10   that location?

11   A.  We did one time, yes.

12   Q.  And do you recall what in particular struck you about what

13   you heard?

14   A.  Yeah.  So at one point we heard the guards -- we didn't

15   know -- like, we hadn't perceived that there was a Western woman

16   there, but until one day the guards had started asking someone

17   in another cell for -- if they needed shampoo or feminine

18   hygiene products.  And that's when we heard her answer, and it

19   sounded like an American accent.

20   Q.  Speaking in English?

21   A.  In English.

22   Q.  And did you later recognize that voice as Kayla Mueller?

23   A.  Yes.

24   Q.  Describe David Haines' physical condition at The Dungeon.

25   A.  Yeah, so over the course of the month that we were at the

1    Community Prison, despite the fact that we were getting okay-ish

2    food, we were -- David was -- he never really recovered from

3    that period where we were all having quite severe diarrhea and

4    intestinal issues.  So he sort of -- whereas most of us managed

5    to gain weight and sort of hold food down, he never managed.

6            And by the time we were in The Dungeon, we had one time

7    a visit by a Sheikh in the middle of the night, I remember.  It

8    was kind of random in the sense that it wasn't -- we weren't

9    expecting it or there wasn't any sort of announcement.  It just

10   happened.  He came in.  We were all up against the wall.  He

11   looked at David, and then he asked about David and myself in

12   particular.  And I believe, if I remember correctly, it was also

13   Didier, and they were talking something about a Red Crescent

14   group coming to check on our health, and that that was going to

15   happen sometime in October.  I think the 10th of October was the

16   date that we were given.  This was sort of mid-September.

17           And so straight after that, David was also given -- was

18   brought an IV drip, which he needed.  So it all fit together in

19   terms of this narrative that they were weaving.

20   Q.  Did there come a point in time at The Dungeon where

21   The Beatles appeared on a more regular basis?

22   A.  Yeah.  I mean, so September was the first time, and then

23   pretty much from November onwards, it would be more regular with

24   the proof-of-life processes.

25   Q.  And you described earlier The Dungeon, being taken out of

1   the room to a more private area, each hostage individually?

2   A.  So that was when all of us were taken through this

3   proof-of-life process, so we all had the exact same experience.

4   But then the French hostages had been doing proof-of-life

5   videos.  And even David had done a kind of -- it wasn't so much

6   a proof-of-life video.  He had done a video where he was asked

7   to read some propaganda stuff about telling the UK to stop

8   supporting the Free Syrian Army.

9        At one point, even in the Community Prison, we were

10  taken out to take a picture in front of -- I think it was a

11  picture, or we -- I remember going into an office room where the

12  ISIS flag was hanging, and that was the first time we saw the

13  ISIS flag.

14       So things had been happening on and off, like some more

15  serious than others.  But when The Beatles came, it sort of

16  became more structured in terms of regularity and what was

17  happening.

18  Q.  And that's when the negotiation proof-of-life process began,

19  when they returned?

20  A.  Yeah, when we felt something more serious had taken place.

21  Q.  Did there come a point in time when all the hostages, the

22  Western hostages, were moved from The Dungeon?

23  A.  Yeah.  Day before -- it was either day before Christmas Eve

24  or on Christmas Eve.

25  Q.  Of 2013?

1    A.   Yes.

2    Q.   Where did you move?

3    A.   We were moved to a kind of luxury -- I mean, it certainly

4    felt like a luxury villa, again, always in the basement.  And

5    what happened was that the big group of us was split into two.

6    And by the time that the room that I was -- that I had been put

7    into with -- oh, we had also been given these orange jumpsuits,

8    the exact material that we'd seen George hold up to us to show

9    up -- telling us what he was thinking, which hadn't yet been

10   sewn into clothing.

11   Q.   When were the orange jumpsuits introduced to you?

12   A.   At this luxury villa.

13   Q.   Did you nickname that "The Mansion"?

14   A.   Yes.

15   Q.   Who was given the orange jumpsuits?

16   A.   All of us.  On the back of them they had written -- they

17   wrote in big numbers, these numbers that we mentioned earlier.

18   So 37, 38, 32, 33.

19   Q.   When you were moved to the mansion, who transferred you from

20   the community -- from The Dungeon to the mansion?

21   A.   It was the French-speaking guards still, primarily.  But we

22   know that The Beatles were there, at least one or two of them.

23   I can't say for sure how many.

24   Q.   During the actual physical transfer?

25   A.   Yeah, they were there.  They sort of came and told us we

1    were about to be moved.  And then Abu Idris was more sort of in

2    charge of the actual movement and handcuffing and all that.  But

3    they were certainly there and sort of -- I'm almost -- I mean,

4    it's hard to remember exactly, but I know that they came, and I

5    think they announced that we would be moved.

6    Q.  Did you meet additional Western hostages when you moved to

7    The Mansion?

8    A.  Yeah.  By that -- once I was in -- once we were in the

9    room -- so David and I had remained somehow together, and so we

10   were still in the room together with Didier and Nicolas.  And

11   then when we arrived, already in the room was Javier Espinosa,

12   Ricardo Vilanova, and Peter Kassig.  So two Spaniards and an

13   American.

14   Q.  And who was the American?

15   A.  Peter Kassig.

16          MR. FITZPATRICK:  This had been previously admitted,

17   Your Honor.  I would like to publish 30-1.

18          THE COURT:  You may do so.

19   Q.  Do you see 340-1, Mr. Motka?

20   A.  Yes.

21   Q.  And who is that?

22   A.  Peter Kassig.

23          MR. FITZPATRICK:  And if we could please take that

24   down.

25          And if we could publish 1-29B.  No, that is the wrong

1      photograph.  I'm sorry, 1-29D.

2      Q.  Who is that person?

3      A.  That's Peter Kassig.

4          MR. FITZPATRICK:  You can take that down.  Thank you.

5      Q.  How often were you told to wear the orange jumpsuits when

6      you were at The Mansion?

7      A.  At that point it was our entire attire.

8      Q.  So were all of the Western hostages wearing orange

9      jumpsuits?

10     A.  I believe so, yes.

11     Q.  And that would include the three American males?

12     A.  Yeah.  I think they didn't have that much of the material,

13     so some people had a completely -- sort of almost like a silk

14     curtain material, more shiny.  And the one that I had was more

15     the material that George had had, which was more cotton.

16     Q.  How long did you remain at The Mansion?

17     A.  It wasn't very long.  Because relatively soon -- maybe a

18     couple of weeks, because we started to notice that there was

19     more and more heavy fighting getting louder and louder.  So it

20     felt like it was coming towards us.  Shelling, machine gun fire.

21         I mean, across the entire time we were in The Dungeon,

22     there was also sort of shells falling nearby.  One was close

23     enough where everything sort of shook, you know, dust and stuff.

24     But never to the extent like so regularly as it sort of was

25     increasing at The Mansion.

1          And, in fact, the day that we left The Mansion, it was

2     almost like a really rushed process.  It wasn't at all

3     organized.  It was more like -- it felt like we were getting out

4     of there.  And there was one -- we were -- at The Mansion there

5     were different guards than the French at that point.  There was

6     another British-speaking guy who we nicknamed Paul, but for all

7     intents and purposes, he wasn't The Beatles.  It was just

8     because he had an English accent.

9          And then there was another guy who we called "the chef"

10    because he always brought us packet noodles, which was amazing

11    for us.  He was of North African descent, we thought.  He spoke

12    Spanish.  And they were always asking:  Oh, we need to ask for

13    permission to do this or do that.

14         And that day they were sort of quite hectic.  And I

15    think they let slip that we were being moved rapidly because of

16    fighting and something like that.

17    Q.  And from The Mansion, where did you move?

18    A.  So we were put in the back of a flat bed truck, a covered

19    flat bed truck, and moved to -- and in fact, in the back of the

20    flat bed truck were two other hostages that we hadn't met

21    before.

22    Q.  Who was that?

23    A.  It was Gert and who we called Big Dan.  Sorry, I don't

24    remember their surnames.  They were MSF staff, so

25    Médecins Sans Frontières, Doctors Without Borders.  We were

1    thrown in the back and driven to what we called "The Office,"

2    which was sort of a building complex that had a big warehouse

3    downstairs and sort of offices on the floors, potentially two

4    floors of offices upstairs.

5          We were put into a room that was fundamentally, like --

6    it was glass panels, windows, right, for a whole wall, which

7    they sort of tried to tape up with newspapers.  But we could see

8    out a little bit.

9          But they recognized -- you know, they recognized that

10   this wasn't a proper cell, so they kind of came down quite hard

11   on us at that time, picking on in particular John and Steve and

12   James.

13   Q.  This is at The Office?

14   A.  This is at The Office.

15   Q.  What happened to them?

16   A.  So they were -- I think at some stage they wanted to sort of

17   intimidate us, so they came up with this thing that they had

18   seen, John, James and Steve whisper to each other.  So they

19   were, like, You're plotting to escape, so this is what we do to

20   plotters.

21          THE COURT:  You say, "They came up with this thing."

22   Who is "they"?

23          THE WITNESS:  The guards.

24          THE COURT:  Continue with your answer.

25   A.  And the guards -- someone quite senior -- I don't know if it

1    was the Sheikh that I sort of refer to regularly -- or someone

2    senior came in and brought a sword into the room and was sort of

3    showing how he would use it to behead one of us if we tried

4    something.  And then, they handcuffed -- this was the first time

5    we saw these.  They handcuffed us -- not us.  Steven and, I want

6    to say, John and James - I'm not sure if it was just Steven and

7    one of the other two - with handcuffs that basically linked your

8    feet to your hands, and told them to sort of wear those for -- I

9    think they wore them for like two or three days.

10   Q.  And in the move to The Office, what was The Beatles' role

11   again?

12   A.  I don't remember them being present at that point.

13   Q.  Okay.  Did there come a point -- how long were you at The

14   Office?

15   A.  Not more than a couple of weeks.

16   Q.  And from The Office, where were you moved?

17   A.  So sometime in early January, we were -- so sometime in

18   early January, in the middle of the night, Alan Henning was

19   added to our group.  He had been picked up.  So he was another

20   one who came in.

21        And within the 24 hours of him having joined us, we

22   were -- Abu Idris came in with the guy that we nicknamed Paul

23   and said -- and he started pairing us off, so getting two people

24   together.  And basically our left hand would be handcuffed to

25   the right hand of the guy next to you.

1    They did that, and then they would take two at a time

2    down and put us either into the back of a, what do you call it,

3    a pickup truck, or into the back of a car, and we were

4    sped-driven maybe -- it wasn't a huge distance, maybe 5,

5    10 minutes down the road to where we were then -- so one half of

6    us was loaded into the back of another truck that was filled

7    with -- if I remember correctly, it was explosives on the bottom

8    and then boxes of dates, and then big bags of blankets.  And

9    we --

10   Q.  Was food -- was food in low commodity then?

11   A.  Yeah.  I mean, these guys were -- essentially each move was

12   as a result of trying to get away from -- from my understanding,

13   was to get away from the fighting.  So it wasn't like anything

14   was organized in the way that maybe it had been in the past.

15   You know, you're going from one prison to another -- or location

16   where the designers had designed it as a prison and then created

17   it to another.  We were just being moved super on the fly.

18   Q.  Do you recall an issue with lice at The Office?

19   A.  Yeah, we had problems with lice pretty much most of the time

20   from December onwards.

21           THE COURT:  Did you say lice or lights?

22           THE WITNESS:  Lice.

23           THE COURT:  L-I-C-E?

24           THE WITNESS:  Yes.

25           THE COURT:  Next question.

1    Q.  So you were paired with someone, cuffed with someone on your

2    move from The Office.  Who was that?

3    A.  Peter Kassig.

4    Q.  And what was the next prison facility that you arrived at?

5    A.  Then we spent about five days on the road moving only at

6    night in the back of this truck.  And eventually, we made it to

7    where -- so the landscape changed drastically.  So what was

8    Northwestern Syria, to a more desert landscape that is common in

9    Eastern Syria, so closer to Raqqa.

10           On the last day of that move where, we had moved around

11   constantly -- so we knew we were part of a convoy, because at

12   one point we ate dates because that was the only food that we

13   had access to.  So we just opened the boxes and would eat the

14   dates.  But dates give you diarrhea, so I had massive problems.

15           So I asked to be let out one night, and Peter and I

16   went.  And it was cold, a sort of winter night, a bit of fog,

17   but you could see, like, trucks with the ISIS flags on the front

18   in a single file in both directions, as far as you could see.

19   So we knew we were sort of part of a bigger convoy.

20           And we reached Raqqa, and we were put in what we

21   believed was an abandoned police station initially, for like

22   maybe one or two nights, and then from there we were moved to

23   another sort of luxury -- or semi-luxury villa.  And then, in

24   relatively rapidly, in quick succession - I don't even remember

25   if we spent the night or daytime there - we were moved to what

1    we called "the Riverside," where we spent a few weeks.

2    Q.  So in that entire five-day trek, were you always cuffed to

3    Peter Kassig?

4    A.  Yes.

5    Q.  When you arrived at the Riverside, did you determine you

6    were in Raqqa at that point?

7    A.  Yeah.  So we could tell that we were -- that the river in

8    front of us was the Euphrates.  Pierre and Nicolas had been

9    captured in Raqqa, so they sort of knew the area quite well.  So

10   they were fairly certain that we were somewhere near the city.

11          And, in fact, if you looked out, if you were able to

12   look out, which we were a few times, all the way down the river,

13   you could sort of see a city in the distance that we thought we

14   weren't actually that far.  You know, there was all sort of talk

15   that if we managed to get to the water, we could manage to float

16   down the river towards the city and disappear, not knowing that

17   Raqqa had fallen to ISIS.

18   Q.  With respect to the numbers of Westerners who now made up

19   the captivity group, by the time you got to the Riverside, how

20   many were you?

21   A.  I would need to go through all the names.

22   Q.  That's fine.  We can return to that later.

23          THE COURT:  Is this a good time to take a recess?

24          MR. FITZPATRICK:  Yes, Your Honor, if the Court is

25   willing.

```
 1              THE COURT:  All right.  Mr. Motka, you may step down,

 2     sir.  And remember, during this recess, do not discuss the

 3     matter with anyone or anything about your testimony.  And we

 4     will reconvene at -- make that 3:30.

 5              All right.  How much more do you anticipate with this

 6     witness?

 7              MR. FITZPATRICK:  As you can tell, this witness has a

 8     lot of information.  I expect at least two more hours.

 9              THE COURT:  Remember, ladies and gentlemen, not to

10     discuss the matter with anyone, or undertaking any investigation

11     on your own.  Put your books in the cubbyhole, help yourselves

12     to soft drinks.

13              Do we have snacks back there?  No snacks.  Maybe we can

14     remedy that in the future.  Nuts is always safe.

15              You may follow the court security officer.  I'll see

16     what I can do about that.

17              (Jury out at 3:05 p.m.)

18              THE COURT:  Mr. Fitzpatrick, would you tell me again

19     how much more in terms of time you have with this person, this

20     witness?

21              MR. FITZPATRICK:  Yes, Judge, I'm trying to give a

22     fair, conservative estimate and say two hours.  Where we are --

23     in terms of the timeline, we are in January of 2014.  Mr. Motka

24     is released in May of 2014, and there's one further transfer of

25     prisons, which is actually the primary prison, the desert
```

1    prison.

2           THE COURT:  Now, when we originally recessed it was for

3    the purpose of you considering whether you would put on more

4    evidence before you would ask this witness questions about what

5    certain of the hostages told him.  And I'm now pretty clear that

6    he saw many of the hostages and may have spoken to them; that

7    is, hostages who were later killed.  Am I correct?

8           MR. FITZPATRICK:  Correct.

9           THE COURT:  And am I correct that you would hope to

10   elicit from this witness statements that they made to him when

11   he was with them?

12          MR. FITZPATRICK:  Yes.  And it's not a large number of

13   statements.  There are a discrete number of statements.  But

14   yes, there are statements that we would like to elicit from this

15   witness that other hostages made.

16          THE COURT:  All right.  And I take it at that time you

17   would ask that the Court rule on the objection that has been

18   lodged.  Is that right?

19          MR. FITZPATRICK:  Yes, Your Honor.  And just to put a

20   finer point on it, so we're in January of 2014 on the timeline;

21   February of 2014 is the Marginedas release.  The remaining

22   hostages are beat, and then Sergei is killed.  We think that

23   factors in to the forfeiture-by-wrongdoing analysis.

24          And then, in May --

25          THE COURT:  Tell me why, again.  Because of orders they

1    were given when some were released?

2           MR. FITZPATRICK:  Yes.  Marginedas was told that he

3    would not -- that he should not speak upon his release.  The

4    media then reported on his release.  The Beatles interpreted

5    that as him speaking.  They beat the remaining hostages and then

6    killed Sergei.

7           That's relevant to some future evidence.  In May of

8    2014, Mr. Motka is released and he carries out letters written

9    by Steven Sotloff and Peter Kassig for delivery to their

10   families, which, in fact, Mr. Motka took out and then were

11   delivered to the families of Steven Sotloff and Peter Kassig.

12   We think those letters come in under the

13   forfeiture-by-wrongdoing exception.

14          THE COURT:  All right.  Anything else you want to tell

15   me?

16          MR. FITZPATRICK:  No, sir.

17          THE COURT:  All right.  Court stands in recess.  What

18   time did I say?

19          MR. FITZPATRICK:  3:30, Your Honor.

20          THE COURT:  3:30.

21          (Recess taken at 3:09 p.m.)

22          THE COURT:  Mr. Motka can return to the stand, and I'll

23   have the court security officer bring in the jury.

24          Come forward, and you may resume the stand.  When the

25   jury is back, I'll remind you you're under oath.

```
 1              All right.  Bring the jury in, please.
 2              Looking ahead, I have another matter at 5:00.  This may
 3     go beyond 5:00 a little bit, whatever the jurors can tolerate,
 4     and then I would ask you to vacate promptly so I can deal with
 5     yet another matter.
 6              MS. GINSBERG:  Your Honor, is it all right if we leave
 7     our -- we'll move the things from the table, but is it all right
 8     if we leave our things in the first row?
 9              THE COURT:  Yes, ma'am.
10              MR. FITZPATRICK:  Your Honor, with that schedule that
11     you've just laid out, it does look like Mr. Motka's testimony
12     may continue until tomorrow.
13              THE COURT:  Yes, I understood that.
14              MR. FITZPATRICK:  Thank you, Your Honor.
15              THE COURT:  I'm sure that doesn't come as welcome news.
16              (Jury in at 3:37 p.m.)
17              THE COURT:  Mr. Motka, you'll recall, sir, you remain
18     under oath.
19              Mr. Fitzpatrick, you may continue your direct
20     examination of this witness.
21              MR. FITZPATRICK:  Thank you, sir.
22     BY MR. FITZPATRICK:
23     Q.  Mr. Motka, by the time -- when you were moved to the
24     Riverside prison, have you reached your final number of male
25     captives altogether?
```

1    A.  Yes.

2    Q.  Are there any more additions after Riverside?

3    A.  No, I don't think so.

4    Q.  Let's walk through the nationalities that are now together

5    at the Riverside, beginning with yourself.  You're an Italian

6    citizen?

7    A.  Yeah.

8    Q.  Was there a German?

9    A.  Yeah, one German, four French, three Spaniards, three

10   Americans, three Brits, a Russian.  So I think it was about 19.

11   Q.  If my math is correct, I believe that's 19.  Okay.

12         Now, at -- and were you aware of women being held at

13   the Riverside?

14   A.  Yes.  So we knew from Gert and Dan that three of their

15   colleagues, female colleagues, had been captured with them.

16   Q.  So there were a total of five MSF, Médecins Sans Frontières,

17   hostages?

18   A.  That's right.

19   Q.  Two male and three female?

20   A.  That's right.

21   Q.  Directing your attention to on or about February 2nd of

22   2014, do you recall an event where a Sheikh arrived at the

23   Riverside?

24   A.  Yes.

25   Q.  And who did he arrive with?

```
 1    A.  I think it was George.

 2    Q.  And --

 3              THE COURT:  I'm sorry, you think it was who?

 4              THE WITNESS:  George.

 5              THE COURT:  One of The Beatles?

 6              THE WITNESS:  Yes.

 7              THE COURT:  Again, sir, let me remind you, I'm an old

 8    man, my ears are weak.  Please speak up.

 9              THE WITNESS:  Yes.

10    Q.  And was there a contingent along with the Sheikh and George

11    of other guards?

12    A.  I don't remember.  There might have been other people

13    outside the room, but inside the room with us for sure was

14    George and the Sheikh.

15    Q.  And do you recall, were they armed?

16    A.  I don't recall.

17    Q.  And did they communicate anything to you about the

18    negotiations for the Western hostages?

19    A.  Yeah.  So the Sheikh at the time had said something to the

20    extent that the French and Spanish, and for Dan, the Danish

21    hostage, there had been some progress, but that the -- he had

22    said that the American and British governments were not

23    engaging.  And he was -- yeah, he sounded frustrated, angry

24    about it.

25    Q.  Could you discern --
```

1              THE COURT:  Was he speaking English?

2              THE WITNESS:  No, he was translating through George.

3              THE COURT:  Next question.

4      BY MR. FITZPATRICK:

5      Q.  And do you recall how long that visit lasted?

6      A.  It was a good half-hour, if not longer.

7      Q.  Did there come a time in the Riverside stay when John and

8      Ringo joined George and spent more time at Riverside?

9      A.  Yeah.  I mean, so initially at the Riverside we were under

10     guard by some younger guys who didn't fit the bill of the sort

11     of more fanatical Jihadists.  I mean, they had Twitter logos on

12     their jumpers.  We smelled cigarette smoke.  I mean, all these

13     things were *haram* within ISIS ranks.

14     Q.  What is *haram*?

15     A.  Forbidden.  And, again, as usual, things were happening --

16     like improvised around us.  So they had installed a CCTV-type

17     camera inside the room, which looked like it had an infrared

18     ability because you could see the red around it when it was

19     dark.  But, basically, you know, at some stage those guys

20     disappeared, I think because they felt they weren't serious

21     enough.  I don't know.  But they disappeared, and then George

22     and The Beatles, or John and Ringo, were more present again for

23     the rest of the short period that we were still there.

24     Q.  During the course of the your testimony, you've described a

25     lot of contact with guards and a lot of contact with Beatles.

1          Can you distinguish the two for the jury, how the two

2      acted differently?

3      A.   Yeah.   So, I mean, guards were sort of more at this point --

4      apart from the time in the box, The Beatles rarely were involved

5      in things like food, bringing us food, taking us to the toilet,

6      or anything of that sort of day-to-day nature.   They came in

7      primarily for a purpose.

8          And then for me, the biggest differentiator was that

9      The Beatles were more violent.   I mean, they were angry at the

10     West.   They hated everything we represented in the West.   They

11     would do -- we had these conversations around, you know, why

12     they -- it was always around why our institutions were the

13     worst, or why the legal system -- it was constantly -- there was

14     a true hatred for everything political, religious, the way

15     society was going.   It was about the West.

16         And a lot of it, like, you know, especially in the time

17     in The Box, when The Beatles -- I felt -- this is my perception.

18     But my perception during the time that I was in captivity was

19     that they sort of rose in rank.   And initially they were sort of

20     more like young guys together on an adventure kind of thing.

21     You know, they would joke with each other, and that's when they

22     sort of were in the beatings with us.   They would egg each other

23     on and try and...and they would sort of talk about where they

24     had been and what they had been doing.   They were much more --

25     you know, we could hear -- they would talk to us, they would

1    engage us.

2          You know, we -- for example, you know, we gleaned

3    information about them at the time because they would

4    essentially give it to us.  I mean, I don't think that early on

5    they even thought we were getting out, in a sense, in the early

6    period of the time in The Box.  So we sort of -- there would be

7    more engagement, more discussion.

8          By the time we got to the Riverside, we were talking

9    about them just coming in, doing a thing, leaving, and then the

10   guards would be the day-to-day people who would engage with us.

11   Q.  And when you said that it appeared to you that they had

12   risen in stature or rank within -- did you mean within the

13   organization?

14   A.  Yes.

15   Q.  And what organization was that at the time?

16   A.  ISIS, the Islamic State in Iraq and Iran.

17   Q.  Did you know that -- you described in the convoy every car

18   had an ISIS flag waving.  Did that help form your belief?

19   A.  Well, yes.  I mean, in any case, by about June of 2013, we

20   were being told about an Islamic State, that essentially this

21   wasn't an Al-Qaeda or an organization.  This was a state with

22   state actors, like, you know, taking care of municipal, and we

23   were prisoners and there was a court system.  And it wasn't just

24   an organization that was behind all of this.

25         And so we started hearing about an Islamic State in --

1   I think in late June.  And I think I said earlier, the first

2   time I saw this Islamic State flag was in the office at the

3   Community Prison, then again on the trucks.  So we sort of

4   developed an understanding that there was something bigger going

5   on, and they wanted us to understand that there was a state

6   structure behind it.

7   Q.  Did you see that same ISIS flag at Riverside?

8   A.  I don't remember seeing it specifically at the Riverside.

9   It was flying at the top of The Office location, but I don't

10  remember seeing it specifically at the Riverside.

11  Q.  What about when you ultimately ended up at the desert or

12  pipeline prison?

13  A.  No, I don't remember seeing it there either.

14  Q.  Going back to the Riverside, the last week, when The Beatles

15  returned, did you see a change in treatment towards the Western

16  hostages?

17  A.  Yes.  I mean, George -- at that time the Sheikh came.  The

18  Sheikh had for some reason picked a little bit on James.  He

19  referred to the fact that James had photographs of -- at a time

20  when he was an embed with the U.S. Army and he had photos of him

21  with, like, bulletproof vests and some in military fatigues.

22  And so he said, like, you know, See, this is you with the

23  Western forces.

24       And there were other things from early, early on in

25  James' captivity that really annoyed them.  And George in

 1    particular had this issue particularly with people who were

 2    somehow linked to the military.  So he had issues -- or he used

 3    that moment where the Sheikh sort of picked on James, and he

 4    sort of jumped off on to that sort of by then sort of -- it was

 5    kind of like a trigger for him to be allowed to do other stuff

 6    to James.  And so he --

 7    Q.  Did that occur?  Did physical abuse --

 8    A.  Yeah, straight after that.  Him and Pete Kassig, because

 9    Peter was an Army ranger.

10    Q.  What did The Beatles learn about Peter in that last week?

11    A.  Well, they knew that he was an Army Ranger through his

12    interrogation.

13    Q.  Upon learning that, what happened?

14    A.  That's where George started like -- he would do these

15    things -- he did it in The Box as well, where he would shout in

16    a military-style, sergeant-style voice, and he would command

17    Peter and James to stand up all night or -- yeah, stuff like

18    that.

19    Q.  I want you to please take a look at Government Exhibit 5-6

20    and 5-7.  Were you able to find 5-6, Mr. Motka?

21    A.  I got up to -- oh, sorry.  Yeah.

22    Q.  I believe it's in the end of Binder 2.

23    A.  Yep.

24    Q.  You had -- earlier in your testimony you said that the

25    Elsheikh was chastising James for being a mercenary and wearing

 1    certain garb.  Is it consistent with what you see in 5-6?

 2    A.  I mean, I can't say for sure.  It was just a description of

 3    these photos that they had seen from his laptop when he got

 4    captured.

 5    Q.  Do you recognize the person in 5-6?

 6    A.  Yeah, that's James.

 7    Q.  James Foley?

 8    A.  James Foley.

 9             MR. FITZPATRICK:  Let's take a look at 5-7 as well.

10             THE COURT:  Have you published?

11             MR. FITZPATRICK:  Yes, Your Honor.  If I could have him

12    identify 5-7 as well, we'll publish them.

13             THE COURT:  They've been admitted?

14             MR. FITZPATRICK:  I'm about to move them in.

15             THE COURT:  All right.

16    Q.  Can you look at 5-7?

17    A.  Yes.

18    Q.  Who is that?

19    A.  James Foley.

20             MR. FITZPATRICK:  Move to admit 5-6 and 5-7.

21             MR. MACMAHON:  No objection, Your Honor.

22             THE COURT:  Admitted.  You may show them.

23             (GOVERNMENT EXHIBIT Numbers 5-6 and 5-7 were admitted

24    into evidence.)

25    Q.  Is that Mr. Foley that we see in the photograph?

1    A.  Yes.

2             MR. FITZPATRICK:  And if we can go to 5-7.

3    Q.  Is that also Mr. Foley wearing a protective vest?

4    A.  Yes.

5    Q.  Thank you.  With respect to -- were you able to describe --

6    upon learning that Peter Kassig was a military veteran, can you

7    just describe again what types of abuse he received because of

8    that?

9    A.  I mean, on that -- I mean, at the time, the thing that --

10   the thing that I remember specifically that one time in the

11   Riverside was George making him and James stand up like for

12   overnight and even longer.  But then, over the course of the

13   next few months, he would particularly single them out whenever

14   they came in and did their thing.

15   Q.  When they were forced to stand on their feet overnight, did

16   you observe that?

17   A.  Yes.

18   Q.  And did they, in fact, comply and stand on their feet

19   overnight?

20   A.  Yeah.  There was a CCTV camera that would --

21   Q.  I'm sorry?

22   A.  There was a CCTV that we thought was being watched, so yes.

23   Q.  What would be the consequence if you would not stand on your

24   feet?

25   A.  We --

1    Q.   For them?

2    A.   They would very much get punished.

3    Q.   Last question on that.  Do you recall Ringo questioning

4    Steven Sotloff about something, addressing his heritage?

5    A.   Oh, yes.  It was kind of interesting.  So Ringo was sort of

6    the only one who kept on asking Steven if he was Jewish.  And it

7    wasn't something that we barely knew until -- I don't know when

8    it was that we found out, but it was something that he kept

9    quite to himself.  And he was the only one who perceived and

10   kept sort of asking him:  Are you Jewish?  Are you sure you're

11   not Jewish?

12   Q.   Was Ringo persistent about that?

13   A.   No.  But he asked it a few times, I think.

14   Q.   And were you able to discern a reaction from Steven upon

15   being asked those questions?

16   A.   Steven would say no.

17   Q.   And do you know why?

18   A.   Well, he was worried that it would single him out for worse

19   treatment if he was.

20   Q.   If he acknowledged that he was Jewish?

21   A.   If he acknowledged it, yes.

22   Q.   Did there come a point in time when the entire group of men

23   was moved to the last prison facility --

24   A.   Yes.

25   Q.   -- that you were at?

1    A.  Yes.  Yes.  So we were moved from the Riverside to the

2    location we called "The Quarry."

3    Q.  Do you recall when that was?

4    A.  Mid-January.

5    Q.  And can you describe -- who made that transfer of you?

6    A.  I don't recall.  I don't recall particularly well that

7    specific transfer.  It was kind of a shortish one.

8    Q.  Did you remain in Raqqa?

9    A.  Yeah.  We were moved away from the river out into the

10   desert.

11   Q.  And when you moved to the desert, did you become aware of an

12   additional female who was held at the desert prison?

13   A.  Yeah.  So when we arrived at The Quarry, we understood that

14   a female Western hostage was already there.  There were also the

15   three MSF hostages who had been with us over the course of the

16   journey, and they were at the Riverside.  So they were sort of

17   more present.  And then this additional Western female was at

18   The Quarry already.

19   Q.  Did there come a point in time when one of the Spaniards was

20   released?

21   A.  Yes.  Marginedas was the first of our group to have been

22   released.

23   Q.  And do you recall when he was released?

24   A.  Early, mid-February.

25   Q.  And when you were at the desert prison, were all the men

1    located in one room?

2    A.  Yes.  Except for like a short period of time where the

3    Muslim men had been shifted out.  But it was a week, not more.

4    Q.  I would like to show you Government Exhibit -- if you can

5    look at Government Exhibit 3-1, please.

6    A.  (Witness complies.)

7    Q.  Do you recognize what's shown in 3-1?

8    A.  Yeah, that's a layout of the quarry.

9    Q.  And is The Quarry also known as "pipeline" or "desert"?

10   A.  That's the one.

11   Q.  And does this diagram fairly and accurately depict the

12   layout of the detention or prison facility you were held in?

13   A.  Yes.

14   Q.  I'm going to have you now turn to 3-7.  If you could,

15   please, look at 3-7, 3-8.

16   A.  Uh-huh.

17   Q.  Do you recognize those photographs?

18   A.  Yep.

19   Q.  And what are those photographs?

20   A.  So one photograph is of the inside, from the entrance to

21   behind, looking at the main corridor inside of The Quarry, or

22   pipeline prison.  And the other one is a photograph looking from

23   the entrance of the room we were held into the room.

24   Q.  And then if I could have you look at 3-14, and tell me if

25   you recognize that photograph.

178

1    A.  Yeah, that's the Islamic State flag.

2    Q.  Do you know where that flag is being shown right there?

3    A.  Yeah.  Oh, I don't know where this particular flag is being

4    shown, but it's the one I saw on the trucks and the office.

5    Q.  And then, please, if you would look at 3-17, 18, 19, and 20.

6    A.  Uh-huh.

7    Q.  Do you recognize those four photographs?

8    A.  Yep.

9    Q.  What are those?

10   A.  The entrance to the bathroom which we used, the sort of

11   picture from the entrance down towards the sink, a picture of

12   the shower room -- actually, both the other two are pictures of

13   the shower room.

14   Q.  And this is all of the desert or pipeline or quarry prison?

15   A.  That's right.

16   Q.  And this is the last facility you were held in before you

17   were released?

18   A.  Second to last.  I was moved for five days near the border.

19   Q.  Correct.  But with other Western hostages?

20   A.  Yeah, this is the last one.

21          MR. FITZPATRICK:  Your Honor, move to admit 3-1, 3-7,

22   3-8, 3-17, 3-18, 3-19, and 3-20.

23          MR. MACMAHON:  No objection, Your Honor.

24          THE COURT:  They're admitted.

25          (GOVERNMENT EXHIBIT Numbers 3-1, 3-7, 3-8, 3-17, 3-18,

1    3-19, and 3-20 were admitted into evidence.)

2           THE COURT:  Do you want to display any?

3           MR. FITZPATRICK:  Yes, please.  If we could publish

4    3-1.

5    BY MR. FITZPATRICK:

6    Q.  So, Mr. Motka, up on your screen can you explain to the jury

7    what we're seeing in this diagram?

8    A.  Yeah, so this is the layout of The Quarry.  What's labeled

9    as "BLD 4," I don't know, but I can -- I mean, the first room on

10   the left --

11   Q.  Put a mark.

12   A.  (Witness complies.)

13   Q.  There you go.

14   A.  There you go.

15   Q.  Where you've just put a mark, what is that?

16   A.  That's where we were held.

17   Q.  When you say "we," who are you talking about?

18   A.  All the Western men.

19   Q.  So that would be 19 of you?

20   A.  Yes.

21   Q.  And can you tell us what the measurements of that room are?

22   A.  Maybe 3 by 4, 4 by 5 meters.

23   Q.  And there were -- all right.

24           And then was there a location where women were held?

25   A.  Yeah.  So to my knowledge, it's a little bit complicated

1    because the women were held in different parts of this prison.

2         But as far as I know with confidence, Kayla was held in

3    that room there, and then I know that Louisa Akavi and Kayla

4    were here because I saw them there.  And we believe from the

5    noises that also the MSF women were in this room with the

6    different cells.

7    Q.  And where were the bathroom and shower facilities?

8    A.  That's here.

9    Q.  Okay.

10        MR. FITZPATRICK:  If we can go to 3-7, please.

11   Q.  For privacy reasons, there is an individual blocked out

12   there.  But do you recognize what's shown in this photograph?

13   A.  Yeah, absolutely.  This is the main corridor.  Here is the

14   entrance to the cell that we were in.  This is the entrance to

15   the cell where Kayla was.  This here is the guards' room, that's

16   the bathroom, and behind this sort of blacked-out area here is

17   the kitchen entrance.  And also here you can make out just the

18   corner of the door which would have been to that room with the

19   four cells in the diagram.

20   Q.  Thank you.

21        MR. FITZPATRICK:  If you can take that down and publish

22   3-8.

23   Q.  Do you recognize that room?

24   A.  Yes.

25   Q.  What is that?

1    A.   That's the room where we were being held.

2    Q.   When you say "we," who are you talking about?

3    A.   Sorry.   Myself and the Western men.

4    Q.   There were 19 of you in that room?

5    A.   Yes.

6    Q.   For how long?

7    A.   From mid-January, and then from mid-February onwards, it was

8    progressively fewer and fewer as people were being released.

9    Q.   Understood.

10          MR. FITZPATRICK:   If we could take that down, please,

11   and go to 3-17.

12   Q.   What is that?

13   A.   The entrance to the bathroom.

14          MR. FITZPATRICK:   3-18.

15   Q.   What is that?

16   A.   Looking from the entrance, which would be behind you on the

17   right, down to the sink, and then on the left-hand side it looks

18   like a little corridor.   That went into a toilet stall, and the

19   second entrance just by the sink is the shower room.

20   Q.   And 3-19, what is this?

21   A.   That's a photograph looking into the shower room.

22   Q.   And 3-20?

23   A.   Same shower room.

24   Q.   What was the protocol from being -- from going from your

25   room to the bath or the shower?

1    A.  So it depended.  So when we were being taken to go to the

2    toilet, maybe four of us at a time would be pulled out of the

3    room, walked down to the bathroom.

4         Once we were all inside, they would lock the bathroom

5    door and give us about four or five minutes for each of us to go

6    to the toilet, wash in the sink.  And then we would have to

7    basically line up against the wall that you saw in the sort of

8    corridor looking at the sink -- line up against the wall, and

9    one person would knock on the door that we had finished.  Then

10   they would reopen and take people out and then rotate to the

11   next group.  That's for toilet ones.

12        When we were allowed to shower, we were taken two by

13   two.  So one person would be inside the shower room, though it

14   didn't have that sort of shower pipe at the time, and one person

15   would be left in the corridor.  And they would close the

16   doors -- the door to the shower room would be closed so that

17   essentially we were in two separate -- we were separated.  But

18   then we would shower, and once we were done, let them know.  Or

19   they would come in and say:  Well, you're done, come on.  And

20   take us back to the room.

21   Q.  And how often were you allowed to use the bathroom

22   facilities?

23   A.  Definitely two times a day, sometimes more often, and if

24   there was an emergency, you could also ask.

25   Q.  Thank you.

1          Turning to when you -- you earlier testified that

2     Marc Marginedas was released sometime in February, you believe?

3     A.   Yes.

4     Q.   And do you recall, were you present when he was given any

5     instructions?  Or how was he removed --

6          THE COURT:  The question is now compound.

7          MR. FITZPATRICK:  It is, Your Honor.

8     Q.   How was he removed from the room?

9     A.   So when Marc left, The Beatles came.  And they didn't -- so

10    we didn't know it was all going to happen, so they initially

11    came in and told us to get our stuff together, that we were

12    going to be moved.

13         And so as was the protocol when they were around, we

14    would have to be kneeling, faced against the wall, head down.

15    So we basically got whatever stuff we had, like blankets and

16    things, change of clothes that we had accumulated along the way,

17    and then we would get it all ready.

18         Then they came in, took Marc, left, and essentially

19    never come back for anybody else.  So I think the idea was that

20    Marc wouldn't be sure that we hadn't been moved.  So it was kind

21    of like a play to make whoever was leaving the room think that

22    maybe we were all moving and they, you know...

23    Q.   Are you familiar with the term "operational security"?

24    A.   No.

25    Q.   Okay.  With respect to -- so did that happen?  When Marc was

1    moved, you-all were moved as well?

2    A.   So when Marc was moved, we stayed eventually.  Like, no one

3    ever came to pick anyone else up.  So after an hour or so, we

4    weren't sure what was happening, but it was dark, so we sort of

5    relaxed.

6    Q.   Did you hear any instructions that The Beatles gave to Marc

7    upon his release?

8    A.   The only thing that I remember is the information to not

9    talk publicly.  That was the only sort of --

10   Q.   And who said that?

11   A.   One of The Beatles.  I'm not sure exactly.

12   Q.   With respect to prisoner releases, were The Beatles always

13   involved in prisoner releases?

14   A.   Yes.  They were the only ones involved.

15   Q.   And would they work together as a trio?

16   A.   Mainly, yes.

17   Q.   After Mr. Marginedas was released, were you visited by

18   The Beatles shortly after he was released?

19   A.   Yes.

20   Q.   And what happened when you were visited by The Beatles after

21   Marginedas was released?

22   A.   So I believe they came in and they asked -- they told Sergei

23   that he too was going to be released, that his government had

24   paid, or something along those lines, and they took him away.

25   Q.   And was that an event that you would later characterize as

1    "Black Friday"?

2    A.   Thereafter, yes.

3    Q.   Thereafter.  But prior to that, was there any punishment

4    meted out prior to Sergei being...

5    A.   No.  The main sort of big moment of punishment was

6    Black Friday.

7    Q.   Okay.  So continue, then.  What happened to Sergei on that

8    event?

9    A.   Well, we never saw Sergei again.  And that day of Black

10   Friday, what we termed "Black Friday," The Beatles came in with

11   a small laptop.  When I say "small," it was more like an

12   11-inch-type screen, as opposed to your sort of standard laptop.

13   And they basically showed us -- on the screen they showed us a

14   picture of Sergei with bullet wounds in his head.  And they went

15   around every single one of us initially to show us, and they

16   said, You have to describe what you're seeing in the picture, so

17   they knew we were actually looking at it.

18          And so they went around the whole room, and then

19   they -- you know, that was the day that, for example -- they

20   went around sort of pulling people away from the wall, beating

21   them, pushing them back.  And that was the day that - I think we

22   mentioned it earlier - that James Foley was taken into a

23   headlock by Ringo and he passed out.

24   Q.   Okay.

25   A.   And it happened as well to Dave -- David Haines and

186

1    Peter Kassig.

2    Q.  By whom?

3    A.  I think it was the same guy, but it could have been any of

4    the three Beatles.

5    Q.  But how confident are you that it was Ringo on James Foley?

6    A.  I'm pretty confident.  I mean, it's been many years, but...

7    Q.  In that event where they're showing the photograph of Sergei

8    on the laptop, were all three Beatles present?

9    A.  Yes.

10   Q.  And you that viewed the photograph of Sergei on the laptop.

11   Did you observe the three American males and the three British

12   males?  Were they made to watch the photo as well?

13   A.  Everyone -- I mean, keep in mind we were all facing the

14   wall, on our knees, so, like -- and then they would go -- we

15   were all around the edges of the room.  So, you know, one at a

16   time they would go around.  So I would hear them, each person's

17   voice describing the photograph that they were seeing because

18   that was what we were instructed to do.  And they just took it

19   around.

20        So I didn't see them look at the photo, but I heard

21   them describe the photo that they were looking at.

22   Q.  By this point, how long had Sergei, the Russian, been held

23   with you?

24   A.  From late 2013, so November-ish time, in The Dungeon,

25   until -- that must have been late February, so three months-ish.

1    Q.  Three-plus months.  Okay.

2           If I could have you please take a look at 10-20,

3    please.  I believe that's in Binder 3.  I will tell you, this is

4    a graphic photograph.

5    A.  Sorry, which number?

6    Q.  10-20.

7    A.  (Witness complies.)

8    Q.  Do you recognize that photograph?

9    A.  Yes.

10   Q.  What is that photograph?

11   A.  That's the photograph they showed us of Sergei.

12   Q.  This is Sergei that was shown to you on the laptop?

13   A.  Yes.

14   Q.  As well as all the other Western hostages?

15   A.  Yes.

16          MR. FITZPATRICK:  Move to admit 10-20.

17          MR. MACMAHON:  Your Honor, my only objection would be

18   to 403.  It's a very graphic picture.  He's certainly

19   authenticated it.

20          MR. FITZPATRICK:  This is the crime, Your Honor.

21          THE COURT:  Yes, I know.  So I'll overrule the

22   objection.  It may be difficult to watch, but it is part of the

23   case.  So it isn't -- it does have probative value that isn't

24   substantially outweighed by unfair prejudice.

25          MR. FITZPATRICK:  Thank you, Your Honor.

1               THE COURT:  It's admitted.

2               (GOVERNMENT EXHIBIT Number 10-20 was admitted into

3      evidence.)

4      BY MR. FITZPATRICK:

5      Q.  Is that Sergei we see up on the screen?

6      A.  Yes.

7               MR. FITZPATRICK:  You can remove it.

8      Q.  While that was occurring, did The Beatles or any one of them

9      individually provide any admonishments towards the group, any

10     threats?

11     A.  Yeah.  So they said that in a way it was kind of a

12     justification, was that Marc Marginedas had spoken to media

13     after he was released and this was the consequence, and that if

14     anyone spoke to the media after their release, there would be

15     consequences on people in the group.  And I believe it was

16     George who said that it was the Sheikh who shot him, and that he

17     had shot him thereafter.  He boasted about it.

18     Q.  Did you interpret that as an effort to silence you?

19     A.  100 percent.

20     Q.  After that, were The Beatles -- describe the presence of

21     The Beatles at the desert prison in terms of regularity,

22     consistency.

23     A.  At that location they would only turn up for a proof of

24     life, for a release, or for an event, something that they had

25     planned to happen.  Towards the sort of last few weeks of my

1    captivity, being held there, there was times that we smelled --
2    they wore a specific musk.  We learned to sort of identify these
3    things.  And we could tell that they were coming and going from
4    the building, but they weren't actually coming to us.  They
5    could have been going to the ladies or doing other things in the
6    location.  But in terms of engagement with us, it was very
7    purely for something specific.
8    Q.  And, again, addressing the distinction between The Beatles
9    when they would arrive and then the daily guards, can you
10   characterize the distinction between the two at the desert
11   prison?
12   A.  I mean, again, the guards would do things like lead us to go
13   to the toilet twice a day.  They would bring us the food.  They
14   would check up on us.  The Beatles really only came when they
15   needed something, or needed to do something.
16   Q.  And, again, when they would arrive, what would be your
17   reaction upon their arrival?
18   A.  It was always -- it was very sort of -- there was a rule.
19   They would usually sort of knock on the door or bang on the
20   door.  That indicated to us it was them as opposed to the guard,
21   who would just sort of open the lock.
22          And so we would turn -- so in that photograph that you
23   saw with the window, I was at that window and kneeling, and I
24   used a lot of the time the reflection of the metal to see
25   shadows behind me, so to know kind of where they were and what

1    not.  So it was like that.

2    Q.  Did there come a time when you were in the desert prison

3    when a scenario arose where you were passing notes with the

4    women captives?

5    A.  Yeah.  So in about sometime around late April-ish, the

6    American and British men were made -- so by the time we had

7    reached the desert prison, because of the lice, we had gotten

8    rid of the orange jumpsuits.  We just weren't able to get rid of

9    them, so they just took away everything and gave us other

10   clothing.

11        But they had a bag of six, eight, sort of a small

12   number of orange jumpsuits that they had handed to the British

13   and Americans to do a video.  And the British and Americans were

14   taken from the room that we were in around to the room that in

15   the diagram had a desk in it.  So the one where I said that we

16   know Kayla Mueller was there.  And the reason we knew that is

17   because they then went on to do a filming with some -- you know,

18   saying -- this was sort of a message kind of film, who they

19   were, what they did, how the UK and American governments didn't

20   care about us, about them.  And, yeah, that essentially how hard

21   it was to watch the Europeans leaving and knowing that they were

22   being left behind.  That was the premise of the message.  And

23   they filmed that in the room next door.

24        And when they came back, they -- we realized that they

25   had seen in the corner, like, blankets and things folded up that

1   looked like one person was staying there, and we believed it was

2   Kayla.  And so we made a plan the next time to drop a note in

3   that room down the trouser leg kind of thing in the room next

4   time they went, which was actually only a couple of days later.

5         So Steve had a hole in his pocket, I think, and he just

6   dropped this little note that we pre-prepared and he kicked it

7   over.  And he said he scared himself because it didn't land

8   where he wanted it to, and he was worried it would get seen.  So

9   he kicked it over to where the blankets were in the corner.

10        She saw it.  And then we had left instructions to use a

11  small bit of a window in the toilet where you could sort of hide

12  something without it being necessarily visible unless you went

13  to look for it.  And we started a process of exchanging these

14  tiny notes.

15  Q.  And you would send notes to her, and she would send notes

16  back to you?

17  A.  That's right.

18  Q.  And would she sign her name?

19  A.  Yes.

20  Q.  Since we've mentioned the name "Kayla" several times, I want

21  to show you Photograph 6-5, please, in your binder.  I believe

22  that is Binder 3.  6-5, Binder 3.

23        THE COURT:  Do you want to display this, offer it?

24        MR. FITZPATRICK:  I'll move its admission and ask to

25  publish.

```
1                 THE COURT:  All right.

2                 MR. MACMAHON:  No objection, Your Honor.

3                 THE COURT:  All right.  It's admitted.

4                 (Exhibit admitted at page 44.)

5                 MR. FITZPATRICK:  Can we see 6-5, please.

6    BY MR. FITZPATRICK:

7    Q.  Do you recognize that person?

8    A.  Yes.

9    Q.  And who is that?

10   A.  Kayla Mueller.

11   Q.  And that's the person that you were held in captivity with

12   at the desert prison?

13   A.  Yeah.  Keep in mind that when we started the messaging, we

14   hadn't yet physically seen her at that point.  We would

15   eventually, but at that point it was more just we only knew who

16   she was through messages.

17   Q.  Let's stick on that subject.  When would -- do you recall

18   the first time you saw Kayla Mueller in person?

19   A.  So definitely George, potentially others, the other two of

20   The Beatles, brought Kayla into our room just before the French

21   hostages were released.  It was after the three MSF women.  So

22   the MSF guys and the MSF women were released separately.

23            And it was between the MSF women's release and the

24   French men's release that they brought Kayla into the room and

25   had her -- they lined us up to look at her, stood up on one end
```

 1    of the room, like looking towards the door on the left.  She

 2    sort of stood there and read a statement about who she was.

 3           And then George said that the MSF women hadn't done

 4    enough for Kayla, something along those lines, and it would fall

 5    to the French to help her, or something along those lines.

 6    Q.  Okay.  And do you have any recollections of Kayla's demeanor

 7    as she was reading that message?

 8    A.  Yeah, she was stoic, I would say.  She held herself really

 9    well, I mean, to the point that one of The Beatles said, you

10    know, "She's braver than any of you are" kind of statement.

11    Q.  After that occasion, was she escorted back out of the room?

12    A.  Yes.

13    Q.  And did you see Kayla a second time?

14    A.  Yes.

15    Q.  And when was that?

16    A.  Not a few days later.

17    Q.  And what happened on that occasion?

18    A.  This time they brought her in and they sat her down, and

19    then they left the room.  They let us chat with her for

20    20 minutes.

21    Q.  What was that like?

22    A.  It was very strange.  I mean, they'd never -- we didn't

23    think that -- you know, nothing like that had ever happened.

24    But it was sort of we were allowed -- we were essentially with

25    her in the same room, and I don't know whether they stood

```
 1   outside and listened or what.  But we were just allowed to ask

 2   her questions, talk to her.

 3   Q.  Were the French men still with you?

 4   A.  I think so.  I'm not 100 percent, but I think so.

 5   Q.  How would you characterize Kayla's state of mind during that

 6   20-minute meeting?

 7   A.  She was like us, I think.  She was dealing with it

 8   and...yeah.  Hopeful.

 9   Q.  Let's continue on that same theme.  Did there come a third

10   time when you saw Kayla and another woman closer in time to your

11   release?

12   A.  Yeah.  Sometime after the MSF men and before I was released,

13   The Beatles brought in Kayla and Louisa Akavi.  Potentially they

14   brought in Louisa alone first and then they brought in Kayla

15   second.  In any case, they were both in the room there with us.

16        Louisa was kidnapped separately, much later from the --

17   she worked with the committee of the Red Cross, ICRC, and she

18   came across as really scared.  She looked like someone who was

19   relatively new to the -- I know this sounds bad, but to the

20   game, but it was sort of a survival game in a way.  And she

21   wasn't doing well, which I think was the reason why they then

22   brought Kayla in as well.

23        And so we had a similar situation where we had Louisa

24   and Kayla together talking to us.  I don't recall if they left

25   us alone or if they were there somehow.  And Louisa just told us
```

1    about herself.

2    Q.  Do you know, was Kayla brought in for a particular purpose

3    in relation to Louisa?

4    A.  If my memory serves me right, I think she was brought in to

5    help calm her down, or to help to be a presence, a calm

6    presence.

7    Q.  Okay.

8    A.  But I don't remember if they came in together or one after

9    the other.

10   Q.  If you could take a look at Government Exhibit 10-4, which

11   should be in Binder 3 again.

12   A.  (Witness complies.)

13   Q.  Do you recognize the person in 10-4?

14   A.  Yes.

15   Q.  Who is that?

16   A.  Louisa Akavi.

17          MR. FITZPATRICK:  Move for admission.

18          MR. MACMAHON:  No objection.

19          MR. FITZPATRICK:  10-4, please.

20          (GOVERNMENT EXHIBIT Number 10-4 was admitted into

21   evidence.)

22   Q.  For the benefit of the jury, can you say who this is?

23   A.  That's Louisa Akavi.

24   Q.  And what was the last time you saw Louisa and Kayla Mueller?

25   A.  So in the afternoon that I was picked up to be taken to the

1   place where I would be held for a few days before my release,

2   basically The Beatles came in and they were sort of -- so they

3   came this -- so they came in and they sort of did their usual

4   thing where they came and pulled people away from the wall, beat

5   them.

6           They pulled me away from the wall, beat me in

7   particularly and were saying things like, Are you ever going to

8   work in a Muslim country again?  Are you ever going to go to

9   Afghanistan?  And places that I had worked in the past.

10  Q.  How many Beatles were there for that?

11  A.  All three.

12  Q.  Please continue.

13  A.  So they did all of that.  And then effectively they then

14  brought me -- they took me to Louisa -- to where Louisa and

15  Kayla were being held, which is that room with the four cells in

16  the diagram.

17          I stood in the doorway, and they told me to take a note

18  from -- that Louisa had written that I was supposed to pass it

19  on to the ICRC.  And they asked me to get information from

20  Louisa about who I should be contacting at the ICRC.  So she

21  gave me the name of a few colleagues of hers and told me who

22  they were and what their names were.

23          And then, when that -- so she stood in front of me and

24  Kayla was just behind her.

25  Q.  So Louisa and Kayla were sharing a cell?

1    A.  Yeah.  So I think at the time, like, I don't think those

2    four cells -- the doors were open, so it sort of looked like it

3    was one room.  It wasn't, like, the four...so I was still in the

4    doorway of the main, but you could see the four rooms, if you

5    will.

6         So, yeah, Kayla was sort of -- I think she was just

7    behind her, and so I took the note.  She told me who to contact.

8    And then -- I'm -- it's been a while, but I want to say that it

9    was actually Ringo who led me back to the cell door where all

10   the men were, where I had just come out of before.

11        And at this point they had thrown a blanket sort of

12   folded over my head, so I still could see.  But they actually

13   opened the door again and said, Say good-bye to your friends.

14        And I said good-bye and they said good-bye to me, and

15   then he closed the door and pulled the rest of the blanket over

16   and led me to the car.  And that's where -- and then we drove

17   off --

18   Q.  Let's stop there.  We'll pick up there in just a minute.

19        I want to talk about one other event in or about March

20   of 2014.  Did there come a time when a Syrian male was

21   introduced to the room?

22   A.  Yes.

23   Q.  And do you recall when that was?

24   A.  It was -- I don't think it was March.  I think it was after

25   the French men had left and before the MSF guys were released.

1    So I would say late April.

2           And yeah, so George came in.  It was really early in

3    the morning.  And he brought a Syrian man who -- he just brought

4    him in and he said something along the lines of, Here's another

5    cellmate who will be with you for years, or something along

6    those lines.  And he just left.

7           And we were a little bit surprised.  We were never --

8    we were always kept quite separate to the sort of local Syrian

9    or other Jihadist fighters who maybe would have been in prison

10   for whatever reason, from that population.  So even though we

11   might have been in the same location overall, like, they would

12   never mix.  And that was the first time.

13          So initially I think we were all a little nervous that

14   it was a test in some shape or form to get us to -- if we talked

15   to him or tried to pass a message or something like that, that

16   then he would just let them know and then, you know, we'd fail

17   or something.

18   Q.  So you were cautious?

19   A.  So initially we were really, really cautious.  Then the

20   Syrian man started banging on the door demanding to be allowed

21   to pray.  And slowly, a have a few hours had passed, we started

22   to realize, okay, maybe this wasn't...so we started to talk a

23   little bit as a group with him, sort of a little bit of English,

24   a little bit in really bad Arabic.

25          And he kept on telling -- he would ask us questions

1   about if this was a place where people were tortured or beaten

2   or killed or anything like those happened.

3           And we were, like, No, actually, nothing like that has

4   happened; you can relax.

5           And he told us that he was -- he had been - what's the

6   word? - denounced by a family member, I think it was his brother

7   or something like that, for not being a good enough Muslim, and

8   that was the reason he was there.

9   Q.  Did he state to you what was going to happen to him?

10  A.  He was convinced he was going to die.

11  Q.  Did something happen soon after that, when George returned?

12  A.  Yeah, George returned and he had some paper, A4 paper, and

13  pens, like felt marker pens.  And he asked Gert and Big Dan from

14  MSF to write out a message he dictated to them.  In fact, he

15  might even had -- no, no, he dictated.  It was a mixture of

16  dictating, and he also wrote down some parts of the message that

17  he wanted us to write.

18          So Big Dan, Gert, Little Dan, so Danish Dan -- Big Dan

19  was also Danish, but MSF -- Little Dan, myself, and Tony.  So

20  five of us were supposed to write messages on A4 paper.

21  Q.  When he brings in the paper and the pens, is it just George?

22  Or where are John and Ringo?

23  A.  I don't recall at that time that there was anyone other than

24  George involved in that specific moment.

25  Q.  What happened with the notes?

1    A.  So, basically, the notes were sort of, like -- messages

2    like, please -- or just X million more, 3, 2, 1, different

3    numbers, or I will be next.

4         Or, you know, there was one note that George wrote out

5    and he wanted me to translate into German because it was for

6    Tony.  But Tony wasn't able to do the English-to-German

7    translation as well, so I did it for him.  And it was something

8    like:  Father, you are wasting your time, talk to the German

9    government, something -- you know, it's this amount and talk to

10   the German government.

11   Q.  After all your notes were written --

12        MR. FITZPATRICK:  Strike that last question,

13   Your Honor.  Thank you.

14   Q.  When you were writing those notes, were you doing that in

15   the presence of all the other hostages?

16   A.  Yes.

17   Q.  In that relatively small room you described?

18   A.  Yes.

19   Q.  After you prepared the notes, what happened next?

20   A.  So once we had done all the notes, it was at that point that

21   George came in with some rags, a ripped up piece of blanket,

22   sort of bandana size, and he told Gert and myself, Dan, and

23   Tony -- the two Dans and Tony to put them on.

24        And then one by one we were led out of the room, and I

25   was sat in the back seat of a car, which also was unusual

1    because usually we would be in the boot or something like that.

2    I was sat in the back seat of the car and then two other people

3    were put in next to me.  So Tony was on the immediate -- I was

4    on the door edge.  Tony was on my right and next to him was

5    Danish Dan.

6    Q.  Daniel Rye Ottosen?

7    A.  Sorry?

8    Q.  Daniel Rye Ottosen?

9    A.  Yes.

10   Q.  So there were three of you in the back?

11   A.  Yes.  And then George got in and he asked us if we had our

12   notes, and we said no.  And so he wound down the window and

13   called out to - I believe it was Ringo - and said:  Do you

14   have -- I forgot the notes; can you go get the notes?

15   Q.  What was Ringo's reaction to that?

16   A.  I mean, I was blindfolded, but I think he was surprised and

17   said, Yeah, yeah, sure.  So he went back into the room, got

18   them, and dropped them into the car, I guess.  And then we drove

19   off.

20           And on the way towards that that location, which was

21   maybe, like, not more than a few kilometers away, like, we were

22   on a hard desert track.  It wasn't any kind of asphalted road.

23   He said:  Do you know what's about to happen?

24   Q.  Who said that?

25   A.  George.  And I think no one replied, and he asked again.

1    And then I replied:  I think we're about to witness an

2    execution.

3    Q.  Who said that?

4    A.  I did.  And he said:  Yeah, that's exactly it.

5            So then we reached a point where there was a JCB

6    bulldozer, you know, the big ones, those yellow with, what do

7    you call it, a lifter, a scoop, so a bulldozer thing.  And we

8    drove up to it, and the other car arrived with the other two

9    guys, Gert and Dan, and that car had the other Beatles, so Ringo

10   and John.  And I believe there was also one of the guards from

11   the -- the more senior of the guards from The Pipeline prison,

12   Abu Yahya.

13   Q.  So there were four Jihadists?

14   A.  Yes.  Abu Yahya was armed with an AK-47, I think.

15   Q.  Who was?

16   A.  Abu Yahya, so the fourth one.  So the others had the kind of

17   holsters with pistols that they had kind of regularly with two

18   guns on either side, like, strapped to their shoulders.

19   Q.  All three of The Beatles, George, John, and Ringo?

20   A.  Yeah.  I think all three of them had it.  I don't know if

21   all three of them were wearing it on the day, but I saw them at

22   different times.  They would have that when you were getting

23   beaten and you could see stuff.

24   Q.  So what happened after the five hostages arrived at this

25   site out in the desert near the ditch?  What happened next?

A.  So we were -- basically it was really windy.  We were taken
to -- so, basically, there was a ditch that had been dug out
with the scoop of this bulldozer, kind of.  It looked like it
had been dug out a while back because it was kind of hardened.
And we were lined up.  If you were looking at the ditch sort of
in front of you, we were lined up at the end of it.  So it was
me -- I think me, Tony, Dan, Gert, and Big Dan in the line.  And
we each were told to hold up our pieces of paper but keep
looking down at the ground.  So we were led there with our
blindfolds on, and at that point we were told:  Okay, you can
lower your blindfold but, look at the ground.

        So we just pulled them down and then held on to this
piece of paper.  But there was problems because the wind kept
on -- it was blowing around in the wind like if you're just
holding it.  So they told us to put it on our chest so at least
the wind was blowing it onto our chest and keeping it still.

        Then they laid out a flag sort of on the edge going
into the pit, at the sort of -- one of the ends right in front
of us.  But it wasn't the ISIS flag.  It was the flag of Jihad,
so the black one with the white Arab writing quite densely.  And
they had a bit of an issue keeping that one down because of the
wind, so they put rocks around and then talked to each other
about that.

Q.  In terms of roles, who sort is sort of directing the stage,
if you will?

1    A.  My recollection was that it was George who sort of was

2    choreographing, and Ringo was behind the camera.  He was holding

3    a camera and sort of taking positions to take photos and

4    whatnot.  Abu Yahya was was sort of lingering in the background

5    behind them.  And I can't remember if John was there at that

6    moment specifically.

7            But eventually the Syrian that was in the cell with us,

8    I hadn't seen him because at that point, you know, we worked on

9    the notes, we had put on our blindfolds and were taken out, so I

10   don't know how he had gotten to that location.  But he was

11   brought blindfolded and handcuffed behind his back.  And John

12   took up position behind him with a gun.

13   Q.  Now, where is the cameraman?

14   A.  So the camera is almost opposite -- so if you have the pit,

15   the hole dug up, we were on the one end of it; he was sort of

16   essentially on the other end of it but a little bit to the

17   right.

18   Q.  How many meters away from you?

19   A.  Four.

20   Q.  And who was the cameraman?

21   A.  Ringo.

22   Q.  And what type of camera was he holding?

23   A.  It was kind of like -- it was a digital SLR, sort of, you

24   know, with a lens.

25   Q.  Do you have familiarity with cameras?

1    A.  Yes.  I have a similar one.  I had a specific Nikon type.  I

2    don't know whether it was Nikon or Canon.

3    Q.  What's a unique function of that type of camera?

4    A.  It can do video and photographs, and you can zoom in with

5    the lens.

6    Q.  So there came a time when all three Beatles were there plus

7    the guard with the AK-47, and the Syrian was there.  Describe

8    what happened next.

9    A.  Basically they -- I mean, they were mainly involved with

10   themselves.  They were saying, you know, We're going to have one

11   try at this, so, you know, don't do it -- you know, are we good?

12   Are we all set up?  That kind of talk amongst themselves.  And

13   then, when they were ready, they shot the Syrian.

14   Q.  Who is "they"?

15   A.  Sorry, John -- who I believe to be John, shot the Syrian.

16   Q.  Can you describe that?

17   A.  Yeah.  So John would have been -- sorry, John would have

18   been sort of to my left, standing up behind the Syrian sort of

19   in a stance slightly turned.  I don't think he was turned -- it

20   wasn't like that.  It was sort of on this side.  And he -- yeah,

21   and he -- so he was there.

22          To his left was George and Ringo, who I believe was

23   Ringo holding the camera.  And Abu Yahya might have been behind

24   him out of shot.

25   Q.  How close was George to the Syrian when he shot him -- was

1    John?

2    A.   John.  He was close.  Maybe a meter between the gun and him.

3    Q.   Do you recall how many times he shot?

4    A.   So it was one initial shot, and then when he fell into the

5    grave, it was -- he shot him multiple times thereafter in the

6    body.

7    Q.   And did the Syrian fall into the grave directly in front of

8    you?

9    A.   Yes.

10   Q.   And Ringo was holding the camera -- it was a handheld

11   camera.  Is that correct?

12   A.   Yes.

13   Q.   It wasn't on a tripod?

14   A.   Not to my recollection.

15   Q.   If I could have you take a look at Exhibit 10-22, again in

16   Binder 3, I believe.  Mr. Motka, I'm just going to ask you to

17   look at 10-22, and then 10-22A through F, look at them and tell

18   me when you're done.

19   A.   (Witness complies.)

20   Q.   Have you looked at all those photographs?

21   A.   Yes.

22   Q.   And 10-22 and then 10-22A through F, do those photographs

23   and screenshots depict what you just described to the jury?

24   A.   That's exactly right.

25             MR. FITZPATRICK:  Move for admission of 10-22 and then

207

1    10-22A and 10-22F.

2              MR. MACMAHON:  No objection, Your Honor.

3              THE COURT:  Admitted.

4              MR. FITZPATRICK:  And published?

5              (GOVERNMENT EXHIBIT Numbers 10-22, 10-22A, 10-22B,

6    10-22C, 10-22D, 10-22E, and 10-22F were admitted into evidence.)

7              THE COURT:  They can be published.

8              MR. FITZPATRICK:  Thank you, sir.

9              If we can publish starting with 10-22, please.

10   BY MR. FITZPATRICK:

11   Q.  Now, with the aid of this photograph and for the benefit of

12   the jury, can you please describe what we're seeing in this

13   photograph, starting with identifying yourself.

14   A.  I'm on the furthest left.

15   Q.  Would you mark yourself.

16   A.  (Witness complies.)  That's me here.  Then next to me to my

17   left, or to the right on the picture, is Gert.  To the right of

18   him is Big Dan.

19   Q.  Now, those two individuals, who are they with?

20   A.  They're the MSF.

21   Q.  Médecins Sans Frontières?

22   A.  That's right.

23   Q.  And who is the fourth individual?

24   A.  The fourth one is Tony Neukirch, the German.

25   Q.  And who is at the end?

1    A.  Dan Rye Ottosen, the Danish photo journalist.

2    Q.  And is that the Jihadi flag you described earlier?

3    A.  That's right.

4         MR. FITZPATRICK:  Go to 10-22A, please.

5         THE COURT:  Before you go on, who is the person on the

6    right, if you know?

7         MR. FITZPATRICK:  Yes, I'm sorry.

8         THE WITNESS:  That was the Syrian that was brought into

9    the room earlier that morning.

10        THE COURT:  So he's the prisoner.

11        THE WITNESS:  That's right.

12        THE COURT:  All right.  Proceed, Mr. Fitzpatrick.

13        MR. FITZPATRICK:  Thank you, Your Honor.  10-22A,

14   please.

15   Q.  What are we seeing here?

16   A.  These are the shots that they were doing before the

17   execution.

18   Q.  So who is taking these photographs?

19   A.  To my recollection, it was Ringo.

20        MR. FITZPATRICK:  If we can go to 10-22B.

21   Q.  And what are we seeing here?

22   A.  So this was after the execution.  They made us get into the

23   grave, the pit, and took photographs with the dead body.

24   Q.  And when you say -- who is "they"?

25   A.  The Beatles.

```
 1   Q.  And if we could move to 10-22C.  Is that yourself?

 2   A.  That's me.

 3   Q.  And what does your sign say?

 4   A.  "3 million, please hurry, don't leave me to my death."

 5   Q.  And were you told --

 6   A.  Oh, "3 million to go" -- I think I'm covering the G-O.

 7   "Please hurry."

 8   Q.  Were you ordered to write that?

 9   A.  Yes.

10   Q.  And who told you to write that?

11   A.  George.

12   Q.  And it's cut off somewhat, but who is the person to your

13   right?

14   A.  That's Tony Neukirch, the German.

15   Q.  Did you help him with his sign?

16   A.  Yes.

17   Q.  And why was that?

18   A.  Tony is somewhat dyslexic, so he had trouble.  And he also

19   wasn't particularly good at English, so George asked if anyone

20   could do the translation.  And he knew that I spoke German, so

21   he asked me to do it.

22   Q.  So you have familiarity and talent with the German language?

23   A.  I'm fluent in German.

24   Q.  Fluent in German.  If we could turn to 10-22D, please.  That

25   picture in the middle, that's Mr. Neukirch?
```

1    A.  Yes.

2    Q.  Is that the sign that you wrote?

3    A.  "Father, you're wasting your time.  One million for my life.

4    Go to the German government."

5    Q.  And then to the left of Mr. Neukirch, to the right, who is

6    that?

7    A.  That's Daniel Rye Ottosen.

8    Q.  Did you assist him with his note as well?

9    A.  Yeah.  Dan, for whatever reason, he was struggling writing

10   the note.  He kept writing the "G" backwards.

11   Q.  Okay.

12   A.  And George was getting really frustrated because he kept

13   making him write it all over again.  Then he hit him on the back

14   of his head and said:  Get out of the my way.  I had already

15   done mine and Tony's, so he said:  Okay, you do it.

16          So I wrote it.

17   Q.  And then 10-22E, who is the individual to the left of

18   Daniel Rye?

19   A.  That's Gert.

20   Q.  And his sign says, Just 2 million left?

21   A.  That's right.

22   Q.  And then 10-22F, please.

23   A.  Yes.

24   Q.  And who is the person to the left of Gert?

25   A.  That's Big Dan, his colleague from MSF.

1    Q.  And his sign says, Or we will be next?

2    A.  That's right.

3    Q.  And who directed that to be written on the page?

4    A.  George.

5    Q.  I want to show you, if we could, in the same Binder 3,

6    10-21.  It should be a disc.

7    A.  Yep.

8    Q.  Do you recall reviewing a videotape of the scenes that

9    you've just described?

10   A.  Yes.

11   Q.  And is that depicted -- is the video contained on disc 10-21

12   of that -- the video that you reviewed earlier, is that on

13   10-21?

14   A.  It says, yeah, Video of Syrian execution.

15   Q.  Yes.

16           MR. FITZPATRICK:  Move for admission, 10-21.

17           MR. MACMAHON:  No objection, Your Honor.

18           THE COURT:  Admitted.  You may display it if you wish.

19           (GOVERNMENT EXHIBIT Number 10-21 was admitted into

20   evidence.)

21           MR. FITZPATRICK:  Thank you, Your Honor.  I will tell

22   the Court, this will be graphic.  It's 14, 15 seconds long.

23           THE COURT:  All right.  Go ahead.

24           MR. FITZPATRICK:  You can publish it.

25           (Video played in open court.)

1    BY MR. FITZPATRICK:

2    Q.  Did you witness the camera pan to the Syrian as he was

3    falling into the ditch?

4    A.  I don't know.  We were told to look at the Syrian, and the

5    way I managed to deal with that moment was to look past him and

6    fixate on a point on the horizon behind him.

7    Q.  How did you -- you were all in the ditch.  How did you get

8    out of the ditch?

9    A.  So I struggled getting out.

10   Q.  Were you weak?

11   A.  What's that?

12   Q.  Were you still weak at that point?

13   A.  Yeah.  Yeah, a little bit -- it was a little bit better, but

14   still...yeah, it was just that the ground was breaking up and I

15   struggled to get out.

16        And I think it was John who helped me out, and he asked

17   me, like, you know, what I thought about what I had seen.  And I

18   think I answered with something like, It was horrific.

19        He said, That's a good answer.

20        Then he led me back to the car.

21   Q.  And were you all taken back to the prison?

22   A.  Yeah.  So we were loaded again in the car in the same order

23   that we were driven to, and George got in the car and he was

24   hyper.  Like, he was -- he had gotten really excited.  He put in

25   *nasheeds* -- you're not allowed to listen to music if you believe

1    in their version of Islam.

2            And so they listened to *nasheeds*, which is sort of

3    poems, some -- but not -- I don't know how to describe it.  So

4    he put *nasheeds*, I think, on the stereo and cranked up the

5    volume, and he started, like, driving really fast.  He was

6    shouting out the *nasheeds* as well.  He was hyper.  I would

7    describe him as, like, superexcited by what he had seen.

8            THE COURT:  What are you saying?  Masheeds?

9            THE WITNESS:  *Nasheeds*.

10           THE COURT:  Spell that if you would, please.

11           THE WITNESS:  N-A-S-H-I-D [sic].

12           THE COURT:  What is that?

13           THE WITNESS:  It's not -- it's poems.  He might be able

14   to tell you better.  But poems that are sort of not sung per se,

15   but, yeah, I mean, they have a lyrical quality.  But there's no

16   music in the background.  So it's just people sort of reading

17   out these poems in a lyrical way.  It's meant to not be music

18   because you're not supposed to be...

19           MR. FITZPATRICK:  It's common in the Muslim faith,

20   Your Honor.

21           THE COURT:  Thank you, Mr. Fitzpatrick.  Let's let the

22   witness tell me that.

23           MR. FITZPATRICK:  Thank you, Your Honor.

24   Q.  When you --

25           THE COURT:  Just a moment.  Is it religious?

```
 1              THE WITNESS:  Usually, yeah.
 2              THE COURT:  All right.  Next question.
 3   BY MR. FITZPATRICK:
 4   Q.  When you returned to the prison, were the five of you placed
 5   back into the room with the other males?
 6   A.  Yes.
 7   Q.  And did you discuss with the other males what you had
 8   observed?
 9   A.  Yeah.
10   Q.  What was your reaction later that night to seeing that
11   event?
12   A.  It was hard.  A lot of us sort of became very -- we didn't
13   really want to talk all that much.  A few of us just were really
14   quiet.  I mean, we -- the guys back in the cell sort of asked us
15   what had happened, and they had said that they had heard
16   gunshots, so they kind of figured.  Because we weren't -- like I
17   said, we had not driven a huge distance, so they sort of figured
18   it out.
19              And David helped me and the others sort of -- you know,
20   we sort of kept to ourselves a little bit.  It was tough.
21   Q.  Did a guard come in and provide further explanation about
22   the Syrian?
23   A.  Yeah.  So one of the guards who we used to call him
24   "Abu angry" because he used to get really -- or "Abu yella"
25   because he used to say:  Get on with it, get on with it, yella,
```

1    yella.

2         And he came in and explained that this guy was an

3    informant or a traitor, and so, you know, the Shari'a court had

4    sentenced him and said this was a legitimate -- he tried to

5    essentially legitimize what had happened.

6         MR. FITZPATRICK:  Thank you, Mr. Motka.

7         At this time I would move admission of 26-11 and ask to

8    publish it.  It is a video that is 1 minute and 13 seconds long.

9         MR. MACMAHON:  No objection.

10        THE COURT:  All right.  I'm going to be asking you for

11   a time when we'll break for the evening.

12        Yes, Mr. MacMahon?

13        MR. MACMAHON:  I was just saying no objection,

14   Your Honor.  I'll sit back down.

15        MR. FITZPATRICK:  Your Honor, I might suggest after we

16   play this video would be a good time to break for the evening.

17        THE COURT:  All right.  Put on the earphones if you

18   would, please.  And we'll move on.  And you-all will have to

19   expedite your vacating.  I have another matter yet here to take.

20        All right.  Put on the earphones, please, and activate

21   the noise machine.

22        (BENCH CONFERENCE ON THE RECORD.)

23        THE COURT:  Can you hear me, Mr. Fitzpatrick?

24        MR. FITZPATRICK:  Yes, Your Honor.

25        THE COURT:  And Mr. MacMahon?

```
 1              MR. MACMAHON:  Yes, Your Honor.

 2              THE COURT:  Tell me, Mr. Fitzpatrick, what it is that

 3     this is?

 4              MR. FITZPATRICK:  26-11.

 5              THE COURT:  Yes, sir.

 6              MR. FITZPATRICK:  This is one of the Langan-Elsheikh

 7     clips where Mr. Elsheikh provides explanation and description of

 8     the events we just saw in the video.

 9              THE COURT:  All right.  And was there an objection,

10     Mr. MacMahon?

11              MR. MACMAHON:  No, Your Honor, there was -- I had no

12     objection.

13              THE COURT:  Oh, okay.  I misunderstood you.

14              (END BENCH CONFERENCE.)

15              THE COURT:  All right.  26-11 is admitted, and you may

16     display it.

17              (GOVERNMENT EXHIBIT Number 26-11 was admitted into

18     evidence.)

19              THE COURT:  It's a video?

20              MR. FITZPATRICK:  Yes, Your Honor.

21              THE COURT:  How long?

22              MR. FITZPATRICK:  1 minute and 13 seconds.

23              THE COURT:  I can't hear it.  Turn it way up.  Before

24     you do it, obtain from the witness some explanation of who this

25     person is on the video.
```

1          MR. FITZPATRICK:  This may be a good time to go on the

2     headsets or take it up after court.

3          THE COURT:  I beg your pardon?  No, I said elicit from

4     this witness does he recognize this person.  Would he?

5          MR. FITZPATRICK:  Not necessarily, Your Honor.

6          THE COURT:  How does the jury know what they're

7     watching?

8          MR. FITZPATRICK:  This will come in -- Agent Chiappone

9     will tie this all together, Your Honor, tomorrow.

10          THE COURT:  Wouldn't it make better sense to wait to

11     play this when he's on the stand?

12          MR. FITZPATRICK:  He has quite a few, Your Honor.  I

13     think in context it's appropriate for right now.

14          THE COURT:  All right.  Let's proceed.

15          (Video played in open court.)

16          MR. FITZPATRICK:  Thank you, Your Honor.  I know the

17     Court has other matters.  I don't know if now is an appropriate

18     time to take a break.

19          THE COURT:  Yes, it is.  But we're not going to come

20     back tonight in this case.  I'm going to excuse the jury now.

21     Thank you.

22          And, Mr. Motka, you may step down, sir.  And we will

23     recommence tomorrow morning at 10 o'clock, not 9 o'clock.

24     10 o'clock.

25          All right, ladies and gentlemen, put your books in the

1    cubbyhole again this evening.  They will be safeguarded by the

2    court security officer.  He'll ensure that no one looks at them,

3    no one sees them, and no one troubles them.  And I guarantee you

4    he can do it.

5          Remember not to discuss this matter among family,

6    friends, or anybody at all.  Don't undertake any investigation.

7    I'll see you tomorrow morning, remember, at 10:00.  I have

8    another matter at 8:00 and I expect it will be done by then.

9          You may follow the court security officer out.

10          (Jury out at 5:03 p.m.)

11          THE COURT:  Anything further this evening,

12   Mr. Fitzpatrick?

13          MR. FITZPATRICK:  No, thank you, sir.

14          THE COURT:  For the defendant?

15          MR. MACMAHON:  I'm sorry, I keep interrupting.  Nothing

16   for the defense, Your Honor.

17          THE COURT:  We're in recess in this matter until

18   10 o'clock tomorrow.  I'll take a brief recess now.

19          (Off the record at 5:03 p.m.)

20

21

22

23

24

25

219

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    _____//Rebecca Stonestreet_____          __10/11/22___

9    SIGNATURE OF COURT REPORTER                 DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25