1

                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA

2                          Alexandria Division

3     UNITED STATES OF AMERICA,          :     Criminal Case
                                         :     No. 20-CR-00239-TSE
4                  Plaintiff             :
             v.                          :
5                                        :
      EL SHAFEE ELSHEIKH,                :     April 1, 2022
6                                        :     11:10 a.m.
                   Defendant             :
7     ...........................        :     .......................

8                  TRANSCRIPT OF TRIAL PROCEEDINGS
                              VOLUME 4
9              BEFORE THE HONORABLE T.S. ELLIS, III
                    UNITED STATES DISTRICT JUDGE
10                          and a jury

11    APPEARANCES:

12     FOR THE PLAINTIFF:        RAJ PAREKH
                                 JOHN T. GIBBS
13                               DENNIS FITZPATRICK
                                 ALICIA H. COOK
14                               U.S. ATTORNEY'S OFFICE
                                 2100 Jamieson Avenue
15                               Alexandria, VA  22314
                                 703-299-3700
16
       FOR THE DEFENDANT:        NINA J. GINSBERG
17                               ZACHARY ANDREW DEUBLER
                                 DiMURO GINSBERG PC
18                               1101 King Street
                                 Suite 610
19                               Alexandria, VA  22314
                                 703-684-4333
20
                                 EDWARD B. MacMAHON
21                               LAW OFFICES OF
                                 EDWARD B. MacMAHON, JR.
22                               PO Box 25
                                 107 East Washington Street
23                               Middleburg, VA  20118
                                 540-687-6366
24
                                 (APPEARANCES CONTINUED ON
25                               FOLLOWING PAGE.)

2

```
 1    FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                                  CARMICHAEL ELLIS & BROCK
 2                                108 N. Alfred Street
                                  1st Floor
 3                                Alexandria, VA  22314
                                  703-684-7908
 4

 5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                  U.S. District Court, 9th Floor
 6                                401 Courthouse Square
                                  Alexandria, Virginia  22314
 7                                (240) 426-7767

 8
                              ( Pages 1 - 223)
 9

10
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **FEDERICO MOTKA** | | | | |
| By Mr. Fitzpatrick | 24 | -- | 52 | -- |
| By Mr. MacMahon | -- | 49 | -- | -- |
| **PATRICIA CHAVEZ MEJIA** | | | | |
| By Ms. Cook | 63 | -- | 120 | -- |
| By Ms. Ginsberg | -- | 115 | -- | -- |
| **GEORGE SMITH** | | | | |
| By Ms. Cook | 123 | -- | -- | -- |
| By Mr. Ellis | -- | 131 | -- | -- |
| **JASON RICHARDS** | | | | |
| By Ms. Cook | 133 | -- | -- | -- |
| By Mr. Ellis | -- | 136 | -- | -- |
| **SPECIAL AGENT JOHN M. CHIAPPONE** | | | | |
| By Mr. Parekh | 141 | -- | 220 | -- |
| By Mr. Ellis | -- | 206 | -- | -- |

4

1                              **E X H I B I T S**

2
       **GOVERNMENT EXHIBITS**                                    **PAGE**
3
       **Number 1-24A**                                           **47**
4      **Number 1-38**                                            **188**
       **Number 1-40**                                            **185**
5      **Number 2-7**                                             **40**
       **Number 3-14**                                            **81**
6      **Number 4-1**                                             **127**
       **Number 4-1A**                                            **129**
7      **Number 4-2**                                             **150**
       **Number 4-3**                                             **172**
8      **Number 4-4**                                             **189**
       **Number 4-5**                                             **184**
9      **Number 4-6**                                             **167**
       **Number 4-7**                                             **166**
10     **Number 5-4**                                             **204**
       **Number 6-8**                                             **199**
11     **Number 6-14**                                            **111**
       **Number 6-20**                                            **111**
12     **Number 7-8**                                             **42**
       **Number 8-9**                                             **43**
13     **Number 10-2**                                            **26**
       **Number 12-1**                                            **105**
14     **Number 25-1**                                            **162**
       **Number 25-1A**                                           **162**
15     **Number 26-1 through 26-19**                              **146**
       **Number 26-19A**                                          **146**
16     **Number 26-16**                                           **44**
       **Number 27-1 - 27-11**                                    **147**
17     **Number 27-11A**                                          **147**

18

19

20

21

22

23

24

25

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**P R O C E E D I N G S**

1

2        THE COURT:  This is United States against

3    El Shafee Elsheikh, 20-CR-239.  Counsel and the defendant are

4    present and prepared to proceed in this case.  We're in the

5    midst of the testimony of Mr. Motka.  Is that right?

6        MR. FITZPATRICK:  That's correct, Your Honor.

7        THE COURT:  And you're going to finish that testimony

8    reasonably quickly?

9        MR. FITZPATRICK:  Correct, Your Honor.

10       THE COURT:  We have a note from the jury, or at least a

11   message from the jury, indicating that they wanted this plastic

12   device removed, and I've had it removed so that they could hear

13   better, and that they were amenable to a shorter luncheon

14   recess.  And I am as well.  So we will be taking half-hour

15   lunches.

16       That should underscore, Mr. Fitzpatrick, to you, how

17   important it is that you streamline the presentation of the

18   government's evidence in this case.

19       MR. FITZPATRICK:  Understood, Your Honor.  At the

20   conclusion of the day, I can give you an update on where we are

21   with our scheduling.

22       THE COURT:  All right.  Good.  And I think that was

23   the -- oh, yes.  I'll also, as I told you earlier, tell the

24   jurors that they shouldn't construe -- you-all may be seated.

25   I'm sorry.  They shouldn't construe the lawyers avoiding them to

6

1    be rudeness.  It's merely what they're required to do.  Those

2    are the only things.

3            Anything further this morning?

4            MR. FITZPATRICK:  Yes, Your Honor.  If we could, have

5    we resolved the forfeiture-by-wrongdoing issue?  If I can

6    summarize the testimony that you heard from Mr. Motka yesterday,

7    he testified that when Marginedas was released, he heard

8    The Beatles warning them not to go public, to remain silent.  He

9    testified that shortly after Marginedas' release, that they came

10   in and they were beaten, and that Sergei was killed.

11           I believe the inferences are that that was connected to

12   the release of the witness because the media has publicized his

13   release and his captivity.  We think that was a further message

14   to silence the witness.  And then, Mr. Motka testified to

15   100 percent degree certainty that he felt silenced by the

16   conduct.

17           Therefore, Your Honor, I think we have leapt past the

18   preponderance of the evidence standard, and I think we've

19   conclusively proven that the forfeiture-by-wrongdoing hearsay

20   exception applies to the decedent's statements given to the

21   released hostages.

22           THE COURT:  Well, I have your brief on that.

23           Mr. MacMahon, do you want to say anything?

24           MR. MACMAHON:  Briefly, Your Honor.  First of all, I

25   don't think that Mr. Motka did say that he thought witnesses

1    would be killed if people talked.  He was told to be quiet, but

2    he didn't, I don't think, provide the sufficient foundation,

3    especially with respect to every deceased person that they want

4    to elicit these statements from.  The government seems to want a

5    blanket ruling that it applies to anything, that somebody's

6    deceased.  There's other hostages that are just missing, even on

7    their charts, not even seem deceased.  But since there was

8    evidence --

9         THE COURT:  I don't believe they want to elicit any

10   statements from hostages that weren't killed except for

11   Kayla Mueller.  And there may be a debate about why she is no

12   longer with us.  But everyone else, I think there's evidence

13   that they were killed.

14        Am I right, Mr. Fitzpatrick?

15        MR. FITZPATRICK:  Yes, Your Honor.  They were all

16   killed intently and deliberately.  And I think the evidence at

17   the end of the trial will show that Kayla Mueller was also

18   killed with intent.

19        MR. MACMAHON:  If I may, Your Honor.  On the

20   government's even summary chart, Mr. Cantlie is listed as

21   unknown.  There is no video of Mr. Cantlie being killed.

22   There's no proof in the record that Mr. Cantlie was ever killed.

23   I don't think anybody knows where Mr. Cantlie is.

24        THE COURT:  Mr. Fitzpatrick?

25        MR. FITZPATRICK:  He is clearly unavailable.  He hasn't

1    been heard from in years.  And his situation is set apart from

2    the other three Americans that --

3              THE COURT:  Do you intend to elicit any statements by

4    Cantlie?

5              MR. FITZPATRICK:  Yes.

6              THE COURT:  Made to whom?

7              MR. FITZPATRICK:  Made to Federico Motka.

8              THE COURT:  All right.  So how do I satisfy 804(b)(6)

9    in that regard?  That is, how can I conclude by a preponderance

10   that the defendants - that is, the ISIS or the conspiracy -

11   wrongfully caused the declarant's unavailability as a witness?

12             MR. FITZPATRICK:  Because he was, as Mr. Motka

13   testified, and as the government has submitted in its briefing

14   on this issue, which the Court can consider under Rule 104, the

15   Court can consider resolving this issue, the parties' briefing

16   and exhibits filed pretrial.  The evidence from Mr. Motka

17   supplements the government's pretrial submissions.

18             Mr. Cantlie, the evidence was that Mr. Cantlie was with

19   Mr. Motka throughout his entire captivity.  He was one of the

20   first two hostages detained.  That is the testimony.

21             You will hear further testimony about Mr. Cantlie's

22   conditions.  The Islamic State in the *Dabiq* magazines, which we

23   have already offered into evidence and which will be further to

24   come, utilized Mr. Cantlie for propaganda purposes and promote

25   his captivity, and used Mr. Cantlie as a vehicle for further

1    proceeding.  That all ended, and Mr. Cantlie has not been heard

2    from nor seen again.  The natural and probable and reasonable

3    inference is that he is no longer with us.  Are we willing to

4    say that affirmatively?  No.  The United States Government and

5    the United Kingdom Government always retains hope that released

6    hostages will be found until there's absolute moral certainty

7    that they are not with us any longer.

8            There is no doubt that Mr. Cantlie was mistreated by

9    the Islamic State, there's no doubt that he was used as a

10   propaganda vehicle, and there's no doubt that he hasn't been

11   heard from in several years.  Therefore, he falls within the

12   forfeiture-by-wrongdoing exception.

13           THE COURT:  Well, what is -- so what you argue is that

14   ISIS wrongfully caused his absence by taking him hostage, and we

15   don't know what happened to him?

16           MR. FITZPATRICK:  We don't know to a moral certainty

17   what happened to him, but we can draw reasonable conclusions.

18   And the reasonable conclusions would be that he was killed.

19   Because if he was released, he would express to this court and

20   others that he was severely mistreated, and he would describe

21   his misconduct.

22           THE COURT:  All right.

23           MR. FITZPATRICK:  And certainly by a preponderance of

24   the evidence, we can find that.  We're not on a moral certainty

25   standard; we're on a preponderance of the evidence standard.

10

```
1              THE COURT:  And I take it you raise this now because
2    you intend to go back over this with the current witness?
3              MR. FITZPATRICK:  On just two or three very discrete
4    points.  Not long, very discrete.
5              THE COURT:  All right.  I have your brief.
6              Mr. MacMahon, I have your brief.  You can say anything
7    further you wish at this time.
8              MR. MACMAHON:  Yes, Your Honor.  Again, there's no
9    evidence with respect to Mr. Cantlie, wherever he is - and we
10   all hope he's safe - that ISIS procured his absence from this
11   trial as --
12             THE COURT:  Well, why isn't the fact that we have not
13   heard from him for years, why isn't that evidence, that I can
14   deduce from that that I can -- that's circumstantial evidence
15   that he's not on this planet anymore?
16             MR. MACMAHON:  Well, certainly that's something you can
17   consider, Your Honor.  I wasn't saying that.  But it doesn't
18   meet the burden of proof.  There's lots of witnesses that are
19   here and haven't come to court.  I realize he was captured and
20   it's a terrible thing, but the government bears the burden of
21   proof on that, and I would suggest that they haven't.
22             THE COURT:  All right.
23             MR. MACMAHON:  And since the government proffered some
24   evidence, Mr. Nicolas Hénin, who will testify later, Your Honor,
25   in the document we produced to you, said that The Beatles --
```

1    after showing the video we saw yesterday, he was in that

2    picture; that The Beatles said, "This is what happens if your

3    countries do not pay a ransom fee."

4         And then in another letter to Mr. Foley, it says:  "No

5    media exposure whatsoever because it is highly likely that high

6    publicity will provoke the arrogance of your government not to

7    comply with our demands."

8         And so again, we don't think the standard of forfeiture

9    by wrongdoing is set.  What we hear is that the people whose

10   governments that were able to pay the demands paid the ransoms,

11   were released; and the people that governments didn't were

12   unfortunately killed.  But that there wasn't a link in terms of

13   procuring their absence.

14         THE COURT:  I wouldn't say, "unfortunately killed."  I

15   would say, "murdered."

16         MR. MACMAHON:  I don't quibble with that, Your Honor.

17         THE COURT:  Anything else?

18         MR. FITZPATRICK:  No.

19         THE COURT:  All right.  The matter is before the Court

20   on a dispute between the parties over whether witnesses can be

21   asked questions that will elicit from them statements made by

22   fellow hostages who are no longer with us because they were

23   either killed, or as we've just heard, there's at least one that

24   we don't know what, if anything, happened to him.  But we do

25   know it's been years.

1          Forfeiture by wrongdoing serves as an exception both to

2     the confrontation clause of the Constitution and to the rule

3     against hearsay.  It's embodied in 804(b)(6).  And guidance on

4     it can be found in Supreme Court decisions, in *Giles*, *Gray*, and

5     Fourth Circuit decision in *Dinkins*.

6          In essence, in order to apply the

7     forfeiture-by-wrongdoing exception, the District Court must

8     find, by a preponderance of the evidence, that the defendant

9     engaged or acquiesced in wrongdoing; and that that wrongdoing

10    was intended to render the declarant unavailable as a witness;

11    and, three, that it did, in fact, render the declarant

12    unavailable as a witness.

13         And it's important to note that the motive or intention

14    that must be shown by the conspiracy to render the defendant

15    unavailable as a witness does not have to be the sole or the

16    dominant purpose.  It can be one of many purposes.

17         The exception also applies under principles of

18    conspirator liability; namely, where the wrongful procurement

19    was in furtherance of and within the scope of and reasonable

20    foreseeable as a natural consequence of an ongoing conspiracy,

21    that is sufficient.

22         And in this case I was reluctant, because I understand

23    the necessity in the law for there to be a record from which the

24    Court can determine whether the judgment can be made by a

25    preponderance of the evidence.  And in my opinion, in this case

13

1    thus far -- and I think Mr. Fitzpatrick is correct that I can

2    consider not just the evidence that's been presented thus far in

3    the trial, but I may also consider other evidence that's been

4    submitted in the course of pretrial proceedings, including

5    things like the videos of the interviews and the like.  And I

6    also can consider the evidence I've heard from Mr. Motka.  He

7    testified that he was held captive in Syria for approximately

8    14 months, and that The Beatles were involved in holding him as

9    a captive, and that Mr. Motka witnessed ISIS flags flying from a

10   truck convoy.  He heard his captors discuss the existence of an

11   Islamic State.  And he also verified that he had contact with

12   the victims in the indictment, namely James Foley, Peter Kassig,

13   Steven Sotloff, and Kayla Mueller.  Mr. Motka also identified

14   other hostages, including David Haines.

15          Jens Serup also testified to engaging in ransom

16   negotiations with respect to Daniel Rye Ottosen, who was also

17   identified by Mr. Motka, and we've seen pictures of him.

18          There is also sufficient evidence to conclude by a

19   preponderance of the evidence that the defendant - in this case

20   Mr. Elsheikh - was a member of the ISIS hostage-taking

21   conspiracy.  He participated in media interviews, which I have

22   seen, while in SDF custody in 2019, in which he admitted his

23   involvement in a conspiracy.  These include interviews with

24   *The Washington Post* and with Sean Langan.

25          And I take it, Mr. Fitzpatrick, you will confirm that

14

1    those interviews will be presented as evidence in the record of

2    this case?

3              MR. FITZPATRICK:  They will be evidence in this case,

4    yes.

5              THE COURT:  Now, there was a suppression hearing in

6    this case, and I concluded in that suppression hearing that the

7    defendant failed to demonstrate that the interviews were

8    involuntary.  Rather, the evidence demonstrated that the

9    defendant made careful, calculated choices about what to say in

10   different context; and, therefore, there's reason to give weight

11   to the defendant's admissions in these interviews.

12             Specifically, Defendant - and I'm talking now about

13   Elsheikh - confirmed that he traveled to Syria and he joined

14   ISIS via a close associate and co-conspirator, Mohammed Emwazi

15   and Alexanda Kotey, who has now pled guilty and admitted his

16   involvement in the conspiracy; interacting with hostages - that

17   is, defendant confirmed in these interviews that he interacted

18   with hostages by collecting emails and other things, that he

19   physically struck hostages - and he was present at the execution

20   of the Syrian hostage which Mr. Motka also described and as to

21   which we saw a video at the end of the day yesterday.

22             The evidence also demonstrates that killing hostages

23   was in furtherance of the -- and within the scope and reasonably

24   foreseeable as a necessary and natural consequence of an ongoing

25   conspiracy.  Killing was also an established part of the

1    conspiracy and used by the conspirators to further their goals.

2          For instance, Mr. Motka's testimony reflects that

3    The Beatles executed a Russian hostage and showed other hostages

4    a picture of the Russian's corpse as a warning to keep silent

5    upon release.  And we saw pictures of that Russian, his dead

6    body, yesterday.  Was it yesterday?

7          MR. FITZPATRICK:  Yes, sir.

8          THE COURT:  And there's also evidence in the record,

9    including video and photographs, that the conspirators executed

10   a Syrian hostage.  This is the so-called spy.  And we saw that

11   yesterday as well.  Other hostages held signs during that event

12   designed to prompt their families quickly to produce ransom

13   payments.

14         Now, was there an intent to procure the unavailability

15   of witnesses?  As an initial matter, I think it's important to

16   note, as I do, that the evidence demonstrates that this

17   defendant, as well as co-conspirator Kotey, grew up in the

18   United Kingdom, and they had some awareness as to how Western

19   justice systems operate, and this defendant would have been well

20   aware of the possibility of prosecution and capture, as he

21   ultimately has been.

22         For example, we heard during trial that defendant was

23   arrested during a protest in London in 2012, and in the

24   post-capture media interviews, Defendant and Kotey declined to

25   answer certain questions in light of ongoing criminal

1    proceedings in other countries.  In other words, they're

2    somewhat savvy defendants, this defendant and his co-defendant,

3    as to Western legal systems.

4         And I'm also aware, from the record in this case -

5    hasn't been presented yet at trial, and I'll ask you in a minute

6    to confirm, Mr. Fitzpatrick, whether you will produce this -

7    that FBI Agent Chiappone, who interviewed Defendant at an SDF

8    facility in Syria, testified at the suppression hearing that

9    defendant demonstrated an understanding of his Miranda rights

10   and declined to answer several incriminating questions.  And

11   co-defendant Kotey flatly refused to be interviewed without an

12   attorney present the same day.

13        So the evidence does reflect that these are not

14   ignorant defendants who don't have some awareness of Western

15   legal systems.  Indeed, I don't think it's this case, so I don't

16   consider this, but I do recall in other cases that I've heard -

17   I don't think it was ISIS, but I think Al-Qaeda, which isn't

18   involved in this case - but Al-Qaeda would give their members

19   courses on how to take advantage of and throw a monkey wrench

20   into the Western legal system if they were caught and

21   prosecuted.  They told them what to do.  That didn't happen in

22   this case.

23        But I do think that these defendants, Kotey and

24   Elsheikh, did have some awareness of it and did manifest that in

25   refusing to answer some questions and answering others, and in

1    their behavior.

2         I think the evidence also demonstrates that

3    The Beatles, including this defendant, closely safeguarded their

4    identities.  They wore masks at all times and sought to develop

5    a culture of silence among current and former hostages.  We

6    heard some of that from this witness.

7         Mr. Motka testified that The Beatles interacted with

8    the hostages on numerous occasions, including during repeated

9    beatings and other physical attacks.  And despite the

10   substantial volume of interactions, Motka made clear that

11   The Beatles always wore full-faced balaclavas around the

12   hostages, and Motka also testified that George, John, and Ringo

13   required hostages to look away and face the wall when they were

14   present.  It's clear that The Beatles were striving to insulate

15   themselves from consequences of their hostage-taking scheme, if,

16   in the future, they were apprehended.

17        The Beatles also threatened hostages upon release

18   against speaking out about their experience.  Serup testified

19   that Daniel Ottosen was beaten shortly before his release as a,

20   quote, "parting gift," closed quotes, and photographs of

21   bruising were entered into the evidence of his beating.

22        Motka also testified that shortly after the release of

23   a Spanish hostage, Marginedas, The Beatles severely beat the

24   hostages and threatened them with the image of the executed

25   Russian man.  Motka also testified that The Beatles stated that

1    this was in retaliation for Marginedas speaking to the media.

2    Motka testified that this was definitely an attempt to silence

3    the hostages.

4          Now, of course, "don't speak to the media" could be

5    argued to be, well, that doesn't mean that they were

6    discouraging them from acting as witnesses in any subsequent

7    case.  Well, I draw that inference.  I think it's perfectly

8    obvious, inescapable inference.

9          Now, there seems to be no dispute that Foley, Sotloff,

10   Kassig, and Haines were all killed by the conspirators, and

11   you've heard some testimony to that effect, and their deaths

12   were made part of ISIS propaganda videos.

13         And I take it, Mr. Fitzpatrick, you can confirm now

14   that this trial record will put on evidence that ISIS killed

15   Foley, Sotloff, Kassig, and Haines?

16         MR. FITZPATRICK:  Yes, Your Honor.  There's already

17   some evidence in the record, and it will be clear by the end of

18   the testimony.

19         THE COURT:  And that will be clear because ISIS will

20   boast about it, won't it?

21         MR. FITZPATRICK:  Correct.  They publicized it.

22         THE COURT:  There's some dispute as to whether

23   Kayla Mueller was murdered or died while in ISIS captivity, as a

24   result of a Jordanian air strike or for some other reason.

25         In any event, purposefully holding Mueller or holding

1   her against her will in a war zone, where she might have died

2   from other reasons, is criminal wrongdoing, ultimately procuring

3   Mueller's unavailability.

4          So I have concluded that there is evidence now, both in

5   the existing pretrial record and in the trial record, and in the

6   forecasted trial record, that enables the Court to rule under

7   103 - I can take all of that into account - that there is ample

8   evidence from which the Court may conclude by a preponderance of

9   the evidence that the defendant was a member of a conspiracy,

10  that he engaged and acquiesced in wrongdoing that was intended

11  to render these declarants unavailable to testify, and that they

12  are unavailable to testify.

13         I know there's argument about Mueller, and who's the

14  other person that's never been heard from?

15         MR. FITZPATRICK:  John Cantlie.

16         THE COURT:  John Cantlie.  But I think the number of

17  years that have passed - and we're talking now about nearly

18  10 years for those.  Is that right?

19         MR. FITZPATRICK:  Well, there's some publications that

20  purport to depict Mr. Cantlie in early 2015, maybe early 2016.

21  So it's been at least six, maybe seven years.

22         THE COURT:  All right.  But I'm satisfied that if they

23  still existed, we would know about it.  And I think the

24  reasonable inference from all what's in the record is that

25  Cantlie and Ms. Mueller are no longer living, and that their

20

1    absence has been procured by the wrongful acts of the

2    conspiracy, including Mr. Elsheikh.

3         All right.  So you may elicit hearsay statements made

4    by these -- of course, there are exceptions to the hearsay rule

5    and confrontation.  By these people to witnesses that you may

6    present.

7         Anything further?

8         MR. FITZPATRICK:  No, Your Honor.

9         MR. MACMAHON:  Yes, Your Honor, if I could.  So to

10   preserve our objections as these questions are going, may we

11   have a continuing objection so we don't -- whichever one of us

12   may have one of these witnesses doesn't have to object to the

13   hearsay statements from these witnesses?

14        THE COURT:  In part, yes.  I'm not a fan of continuing

15   objections, so let's do it this way.  If Mr. Fitzpatrick seeks

16   to elicit from a witness a statement made by a dead hostage, you

17   only have to make the objection once.  And I'll simply say, for

18   the reasons previously stated on the record, the objection is

19   overruled, and we'll go ahead.

20        MR. MACMAHON:  Thank you, Your Honor.

21        THE COURT:  So there won't be any argument about it or

22   anything else, and I won't go through all of this.

23        Anything else this morning before I have the jury

24   brought in?

25        MR. FITZPATRICK:  No, Your Honor.

```
 1              THE COURT:  All right.  Bring the jury in, please.
 2              And I'll note that I'll issue an order reflecting --
 3     and there may be more in the order than what I've said orally,
 4     because I'll have more information then.  But I'll issue an
 5     order.
 6              It's by no means, Mr. MacMahon, a frivolous objection.
 7     Did you hear what I said?
 8              MR. MACMAHON:  Yes, Your Honor.
 9              THE COURT:  All right.  I just wanted you to be clear
10     about that.  I think it's appropriate for you to have raised
11     that objection.
12              I'm going to take luncheon breaks of only 30 minutes
13     from now on.
14              (Jury in at 11:37 a.m.)
15              THE COURT:  Good morning, ladies and gentlemen.  Thank
16     you for your patience.  I apologize to you for the delay.  I can
17     assure you that the time was necessary for me.  You shouldn't
18     think that the lawyers are in any way delaying this case.  They
19     are not.  I needed the time, and it was necessary.  Thank you
20     for your patience.
21              Now, I've removed the barrier here that one or more of
22     you thought might be an obstacle to hearing.  And I will take
23     luncheon recesses for 30 minutes, not longer, so we're going to
24     get this done.  We'll go as late in the afternoon as you are
25     available to go.  And I can assure you, I've told
```

1   Mr. Fitzpatrick and his colleagues, that the government needs to

2   do everything they can to streamline the case.

3          But I will tell you that there are a number of claims

4   that have been issued by the grand jury, as I've read to you,

5   and the government has the burden of proving those claims beyond

6   a reasonable doubt.  And that's a substantial, significant

7   burden, and so they have to put on a lot of evidence.  But I

8   have cautioned them not to gild the lily.

9          Now, the other thing is, you may have run across one of

10  the lawyers in the hall or somewhere else and they have made

11  efforts to avoid contact with you.  That's because I have

12  ordered that.  Don't think that they're standoffish or rude or

13  anything else.  They're just doing what I have directed them to

14  do.

15         All right.  We'll continue now.

16         Mr. Motka, come forward, sir.  You'll recall, you

17  remain under oath.

18         Actually, Mr. Motka, wait just a moment if you would.

19  If you would step outside for just a moment, please, sir.  I'm

20  sorry, I forgot, as Ms. Randall correctly reminded me, to call

21  the roll.

22         COURTROOM CLERK:  Juror Number 50, Laura Ann Younger.

23         JUROR:  Present.

24         COURTROOM CLERK:  Juror Number 29, Wayne Phoel.

25         JUROR:  Present.

23

1          COURTROOM CLERK:  Juror Number 3, James Bailes.

2          JUROR:  Present.

3          COURTROOM CLERK:  Juror Number 20, Alfred Keyser.

4          JUROR:  Present.

5          COURTROOM CLERK:  Juror Number 50, Esthar Zangeneh.

6          JUROR:  Present.

7          COURTROOM CLERK:  Juror Number 22, John Kugelman.

8          JUROR:  Present.

9          COURTROOM CLERK:  Juror Number 26, Jennifer Murray.

10          JUROR:  Present.

11          COURTROOM CLERK:  Juror Number 14, Anne Fay.

12          JUROR:  Present.

13          COURTROOM CLERK:  Juror Number 10, Erica Denham.

14          JUROR:  Present.

15          COURTROOM CLERK:  Juror Number 30, Camilla Morrison.

16          JUROR:  Present.

17          COURTROOM CLERK:  Juror Number 47, Adrian White.

18          JUROR:  Present.

19          COURTROOM CLERK:  Juror Number 14, Mirenda Fields.

20          JUROR:  Present.

21          COURTROOM CLERK:  Juror Number 22, Gwendolin McCrea.

22          JUROR:  Present.

23          COURTROOM CLERK:  Juror Number 17, Lewis Hoge.

24          JUROR:  Present.

25          COURTROOM CLERK:  Juror Number 26, Eileen Liles.

```
 1              JUROR:  Present.
 2              COURTROOM CLERK:  Juror Number 39, Ralph Stallings.
 3              JUROR:  Present.
 4              COURTROOM CLERK:  And Juror Number 7, Laura Buschman.
 5              JUROR:  Present.
 6              THE COURT:  All right.  Again, good morning, and we're
 7    going to proceed now.
 8              Mr. Motka can come forward.
 9              And we will recess for lunch and take 30-minute
10    lunches, and we will go as late in the afternoon as you are able
11    to do.  But I'm not going to ask you to do something that would
12    cause you to miss picking up your child or anything of that
13    sort.  But let's see if we can work a little harder at this.
14    And you're quite right to suggest that we need to shorten the
15    lunch periods and get it done.
16              Mr. Fitzpatrick, streamline it and let's go.
17              MR. FITZPATRICK:  Thank you, Your Honor.
18         (FEDERICO MOTKA, having been previously duly sworn,
19                       testified as follows:)
20         CONTINUED EXAMINATION BY COUNSEL FOR THE UNITED STATES
21    BY MR. FITZPATRICK:
22    Q.  Good morning, sir.
23    A.  Good morning.
24    Q.  As the Court as reminded you, you're still under oath.
25    A.  Yes.
```

1    Q.  We ended your testimony yesterday discussing the execution

2    of the Syrian prisoner.  Government Exhibit 10-22 and following

3    shows that you and your other hostages had taken your blindfolds

4    off.  Is that correct?

5    A.  Yes.

6    Q.  Were you able to observe George, John, and Ringo and what

7    they were wearing?

8    A.  Yes.

9    Q.  Can you describe what each was wearing?

10   A.  They were always masked with a black balaclava.  So far as I

11   remember, it was similar to the ones that were worn in other

12   videos that came out.  So the -- if I remember correctly, it was

13   a black kind of like a salwar kameez, a sort of long top with a

14   short collar a little bit like this one, and then black

15   trousers.  And then they would have a holster, brown leather

16   holster, with pistols going inside like that.

17            Yeah, so that's how I remember it.  I don't know if

18   every single one of them was the same, but I think, to the best

19   of my recollection, John - the one who I believe to be John, who

20   executed the Syrian - was wearing that.

21            THE COURT:  Mr. Motka, you mentioned the balaclava.

22   Just describe that briefly.

23            THE WITNESS:  It's a black head covering that covers

24   everything except a slit at the eyes across it.

25            THE COURT:  Next question.

26

1    Q.  And was that the common head covering that George, John, and

2    Ringo wore throughout your captivity?

3    A.  No.  I mean, there was also -- they would also -- George in

4    particular, I remember he would use like a scarf that's used in

5    the Muslim world, in the Arab world, that he would then

6    basically wrap it around his head and then tuck the ends in.

7            Sometimes the masks were sort of holes cut out, but

8    more rarely.  Yeah, there were different types of head

9    coverings.

10   Q.  Changing subjects, if you can take a look at 10-2, please,

11   in Binder 3.

12   A.  Okay.

13   Q.  Do you recognize the person shown in 10-2?

14   A.  Yes.

15   Q.  Who is that?

16   A.  It's Alan Henning.

17   Q.  And was Mr. Henning still held in captivity when you were

18   released?

19   A.  Yes.

20           MR. FITZPATRICK:  Move for admission of 10-2.

21           MR. MACMAHON:  No objection, Your Honor.

22           THE COURT:  Admitted.  You may display it if you wish.

23           MR. FITZPATRICK:  Thank you.

24           (GOVERNMENT EXHIBIT Number 10-2 was admitted into

25   evidence.)

27

```
1    Q.  For the benefit of the jury, is that Mr. Henning?

2    A.  Yes.

3           MR. FITZPATRICK:  If we could publish 1-21E.  It's

4    previously been admitted.

5    Q.  Do you recognize that person?

6    A.  Yes.

7    Q.  Who that?

8    A.  Alan Henning.

9    Q.  Mr. Motka, I want to take you back to your initial time at

10   The Box Prison you've previously described.  Do you recall

11   having a conversation with one of The Beatles where the term

12   "reverted" or "reverting" came up?

13   A.  Yes.

14   Q.  And who was that conversation with?

15   A.  Well, one of The Beatles, the one I considered to be Ringo.

16   Q.  And can you describe that conversation with Ringo?

17   A.  Yeah.  So I think I mentioned yesterday, the time in The

18   Box, there was more engagement between The Beatles, when they

19   were around, a little bit because they were there all day.  They

20   were part of the guard system at The Box.

21          So like I said, I think they were more relaxed around

22   us because maybe they didn't really believe we were going to get

23   anywhere any time soon.  So there was much more sort of

24   conversations or discussions between us and them.  And across

25   all three, they would tell us some things about themselves at
```

1    times.  And in this the context of the reversion -- so Ringo

2    would tell us a little bit about what he did in London, things

3    like that he performed Da'wah outside a mosque in -- I believe

4    it was in East London.  And I have in my recollection there's a

5    mosque near Whitechapel.

6    Q.  Do you understand what Da'wah what is?

7    A.  Yeah, it's talking about Islam and teaching Islam to others.

8    Q.  Okay.  Please continue.

9    A.  And in my -- I mean, I need to refer to my statement for

10   precision, that I gave back when I first was released.  But in

11   my recollection, he had said that he had reverted, which I

12   wasn't sure to me whether it meant that he had sort of been a

13   Muslim, been outside of the faith, and then come back in; or

14   whether it meant that he had been a different religion and then

15   reverted to Islam.

16        But, you know, Ringo was quite well versed in other

17   religions.  I mean, I've always described him since as being the

18   more intelligent of the three, in the sense that the other two

19   were more parroting what they were told, or, you know, they

20   would have knowledge of the Qur'an but they would just tell us

21   what was in it, as opposed to actually having a conversation.

22        And so Ringo at the time would have more of a

23   substantive conversation about the differences between Islam and

24   Christianity.

25        And so in the context of the reversion, there was a

1    conversation about the fact that he had been involved in

2    criminal activity and that -- I think at the time he had said

3    something around the fact that he had stolen mopeds in London.

4    And I think if I recall correctly -- yeah, he had also been --

5    he had also been involved in these kind of stop-and-search in

6    London, where basically -- stop-and-search was a practice of the

7    police where they could -- at the time, if there was two police

8    officers, they can stop someone on the street with no probable

9    cause or cause.

10   Q.   Did he discuss with you an altercation he had with a group?

11   A.   Yeah.  So yeah, so he had said that he had been once outside

12   of a pub with his mates, and that people from the

13   English Defence League had approached him and they had gotten

14   into a fight, and he had gotten into trouble as a result.

15   Q.   Okay.  Thank you.

16        With respect to George, John, and Ringo, did you

17   make -- over the course of your 14 months encountering them, did

18   you make assessments with respect to their dialects, how they

19   spoke?

20   A.   Yeah.  I pegged them down as being East Londoners.

21   Q.   And was this based on your upbringing within the British

22   school system?

23   A.   That's right.  And I had been at university in London as

24   well.

25   Q.   Let me ask you one follow-up.  That accent that you

1    described, is it particularly distinctive to you as opposed to

2    other accents within --

3    A.  Yeah, I think in the UK, a London accent is quite --

4    compared to Bristol or Birmingham or any other big city, it's

5    quite distinctive.

6    Q.  During your captivity, when you finally were placed in the

7    same cell and met personally James Foley and John Cantlie, did

8    you, and your fellow hostages devise a system to sort of pool

9    information?

10   A.  So we did do that right at the end of my -- of my time in

11   captivity.  When we recognized that potentially there was a

12   chance that I was going to be the next one to leave, David,

13   James, and John and I huddled within our cell and we sort of

14   tried to recall everything that we thought could be useful to

15   recount, if I was released, to help identify The Beatles.  But

16   also, particularly, the idea was that I would do everything I

17   could to help anyone trying to get them out.

18   Q.  Now, did Mr. Cantlie describe to you his conversation with

19   Ringo regarding the EDL confrontation?

20   A.  Yeah, he remembered --

21            MR. MACMAHON:  Objection, Your Honor.

22            THE COURT:  All right.  I've ruled on this, I think,

23   before.  Overruled.

24            Proceed.

25            MR. FITZPATRICK:  Thank you.

1    A.  He recalled the exact same information too.

2    Q.  You had your own independent recollection of that

3    conversation.  Is that correct?

4    A.  Yes.

5    Q.  Did you discuss with James Foley and John Cantlie the

6    circumstances of their captivity prior to you meeting them?

7    A.  Yes.

8    Q.  And what did they say with respect to their engagement or

9    their captivity with Beatles?

10           MR. MACMAHON:  Objection, Your Honor.

11           THE COURT:  All right.  It's overruled.

12           You may proceed.

13   A.  Sorry, could you repeat the question?

14   Q.  Yes.  Did you speak with James Foley and John Cantlie about

15   their captivity prior -- that had occurred prior to you meeting

16   them?

17   A.  Yes.  So they had said that George had been a feature before

18   our arrival, for sure.

19   Q.  And do you recall --

20           THE COURT:  You say, "had been a teacher"?

21           THE WITNESS:  A feature.

22           THE COURT:  A what?

23           THE WITNESS:  A feature.  He had been present in their

24   captivity before my arrival.

25           THE COURT:  Next question.

1    Q.  Do you know how long they had been held in captivity when

2    you met them?

3    A.  I knew from them that they were taken just around

4    Thanksgiving the year before.

5    Q.  And the year before would be 2012?

6    A.  '12.

7    Q.  Let's return now to your transfer out of ISIS custody and

8    your release.  Your testimony yesterday, we left off with the

9    three Beatles, George, John, and Ringo, transported you out of

10   the quarry prison.  Can you remind the jury and the judge, who

11   was sitting next to you when you were transferred out?

12   A.  Yeah.  So Ringo was sitting next to me, and I believe George

13   and John were in the seats, in the front seats.

14   Q.  Now, were you carrying any -- besides your personal

15   belongings, were you carrying anything out with you?

16   A.  Yeah.  I had hidden some notes that I was given by

17   Steven Sotloff and Peter Kassig to take to their family, that we

18   had cut out a piece of -- just from the inside of the cord where

19   my trouser, where you could tie your trousers to tighten them,

20   we managed to fit in small folded pieces of paper into the --

21   into the seam.

22   Q.  And were those letters discovered by The Beatles?

23   A.  Yes.

24   Q.  And describe that.

25   A.  So when I reached the location that they -- where I last saw

1    them, which was about four or five days before my release, they

2    told me to take all my clothes off and they gave me new clothes.

3    And then they found the notes.  And they didn't want to touch

4    the paper, so they basically threw them back at me and then told

5    me to read them out to them.

6    Q.  Explain that, when you say they didn't want to touch the

7    paper.

8    A.  They were being really, really careful to not provide

9    fingerprints or -- you know, anything that we -- we had been

10   writing -- we had been told throughout the time that we were in

11   the quarry to write messages to our family.  And George in

12   particular was always really careful, like he never touched the

13   paper unless he was wearing a glove or he would have a plastic

14   bag in his hand.  It was like they were being careful about that

15   kind of -- you know, of being able to be linked to his

16   fingerprints or whatever.

17          So at the time they just sort of cast the trousers

18   back, I pulled the notes out and opened them up, read them.

19   They conferred amongst themselves, and they're, like, yeah,

20   okay, why not.  And so they let me keep them.

21   Q.  When you say "they conferred amongst themselves," who

22   conferred?

23   A.  All three of them were there.  I can't remember exactly who

24   and who talked.

25          THE COURT:  When you say "all three," you mean

1        The Beatles?

2                THE WITNESS:  Yes.

3                THE COURT:  Next question.

4        BY MR. FITZPATRICK:

5        Q.  And were you allowed to take the letters?

6        A.  Yes.

7        Q.  And what happened -- describe your transfer.  Who did

8        The Beatles, George, John --

9                THE COURT:  The question is now compound.

10               MR. FITZPATRICK:  Thank you, Your Honor.

11       Q.  Who were you transferred to?

12       A.  So -- I'm sorry, who I was transferred --

13       Q.  Yeah, describe the transfer, your first transfer.

14       A.  Oh.  So, basically, when I was put in the car, the main

15       thing that was particularly surprising to me was the fact that

16       once we started to drive off, The Beatles actually asked me:

17       Freddy, who are The Beatles?

18               "Freddy," by the way, was quite a common way that they

19       called me, particularly Ringo and John.  Because from my very,

20       very early days at the warehouse, they nicknamed me "Freddy the

21       Flintstone" as a way to sort of, you know...yeah.

22               So they said, Freddy, who are The Beatles?

23               To be honest, for me it was like I crapped myself a

24       little bit, because at that point I was, like, I don't know

25       whether it's going for release or if it's turning into a bad

1    situation.  Because I wouldn't have known how they would have

2    known about The Beatles.  And so I told them who I thought was

3    who.

4              THE COURT:  What do you mean, you told them who you

5    thought was who?

6              THE WITNESS:  I said to the guy next to me, you're

7    Ringo; to the guy in front, you're John; you're George.  That's

8    how our naming convention of you guys were.

9    BY MR. FITZPATRICK:

10   Q.  Did you receive a reaction to that?

11   A.  They thought it was amusing, I would say.  So what I -- it's

12   hard to know for sure, but what I realized later was that they

13   actually were reading the notes that we were passing between us

14   and Kayla.  And the reason I thought that is because of the

15   types of questions they asked me in the car.  So they must have

16   understood that we were passing notes.

17             And so when we were -- I think yesterday we mentioned

18   that we would smell them because they had a particular musk;

19   George in particular.  So we would smell them.  And they would

20   just come in and go out again, and we were wondering why.  And

21   we were thinking -- at that point I sort of -- it's my guess,

22   but I thought they were coming in, reading the notes, and then

23   going, because the questions were linked somehow to the

24   conversations that we were having with Kayla.

25   Q.  How long was the drive until you stopped?

1    A.  Couple of hours.

2    Q.  And do you know where you were when you stopped?

3    A.  Well, yeah, I didn't know exactly where I was, but I was not

4    far from the border.  And the reason I can tell that is because

5    the next leg from that location, a few days later, to the

6    border, I was completely not handcuffed, not blindfolded.  The

7    guy who brought me was totally normal.  He even told me, like,

8    "Are you going to come back to Syria again?  Next time get a

9    visa," or something along those lines.  So it was...

10   Q.  In the time from your removal to the prison to that location

11   that you've described near the border, were you mistreated by

12   The Beatles in terms of physical mistreatment?

13   A.  Not at that point.  The physical mistreatment happened in

14   the cell when they came in before I met Louisa.  I didn't

15   realize it until I came out, but I had a bit of a black eye.

16   That was it, from that.

17   Q.  And describe that physical mistreatment.

18   A.  Well, it was -- so they came in -- we were all at the wall

19   as usual, and they were pulling people to the center and beating

20   them.  And then they pulled me to the center, and that was where

21   they were saying, "Are you ever going to go back to

22   Afghanistan?"  Like, smack and kick you.  And I was mainly on

23   the floor covering my head.

24   Q.  Who is "they"?

25   A.  The three Beatles.

1   Q.  After your release, did you have a medical examination?

2   A.  Yes.

3   Q.  And do you recall any diagnoses or injuries to your torso?

4   A.  Yeah, I had a hairline fracture to one of my ribs.

5   Q.  After -- when you were brought to that location that you've

6   described near the border, did The Beatles leave?

7   A.  Yeah.  So once -- they pretty much said good-bye to me

8   there.  I don't remember the exact wording, but they said

9   good-bye.  And that was it.  That was the last time I saw them.

10          After that, there was a guard who gave me -- I can't

11  remember if they gave me a new set of clothes or if the guard

12  gave me new sets of clothes.  But I got new sets of clothes.

13  Q.  And The Beatles, when they left you, they were wearing

14  balaclavas?

15  A.  Always.

16  Q.  So did you ever see their faces?

17  A.  No.  There was one time in the shadows I saw one of the

18  faces, but I wouldn't have -- it's not something that I could

19  use as a way to be able to identify an individual.  Actually,

20  twice, one time with George and one time with John.  But it was

21  always through the hatch whilst food was being passed through,

22  and usually it was in twilight hours, so it was shadows.

23  Q.  Understood.  That first location, how long were you there?

24  A.  Sorry, the location before release?

25  Q.  Yeah.  Why don't you describe from that location where you

1    were turned over until your ultimate release to freedom.

2    A.  Yeah, so I was in a room, a big room, for I think just over

3    a day.  And then they shifted me to another multi-room sort of

4    room with steps.  I saw actually there that there was a carve in

5    the wall where the names of -- I think it was the names of

6    either the French or the Spanish were carved into the wall, so I

7    knew that they had been there at one point after they left the

8    quarry.

9         And really, the worst thing there was mosquitos.  It

10   was crazy with mosquitos.  So I was really struggling with that.

11   But other than that, it was a relatively normal...

12   Q.  How long did it take until you were finally released to

13   freedom?

14   A.  I want to say four days, maybe on the fifth day -- on the

15   end of the fifth day, something like that.

16   Q.  Were you released into Turkey?

17   A.  Yes.  So this guy came to pick me up and he had told me to

18   get ready to go.  So I did my usual thing of, like, expecting

19   handcuffs and all that.  And he was, like, No, no, no.  Just

20   walked me out to a four-by-four, sat me in the front seat, put

21   his AK-47 on my side of the passenger seat, which I thought was

22   interesting, and then yeah, just chatted, and we drove to the

23   border.

24        I went into the administrative offices that ISIS had

25   there at the border.  I believe I did a proof of life at that

1    point.  Like, someone was on the phone asking me a question, and

2    then I think it was the color of my wall in the bedroom at home.

3            And then they walked me to the border point, where the

4    gate opened just about shoulder width, and I walked into Turkey.

5    Q.  And were you greeted by anyone in Turkey?

6    A.  It was a big group of both -- there was a military vehicle

7    and border guards and, yeah, some plain clothes, some military.

8    Q.  Mr. Motka, I want to show you -- if you would take a look at

9    Government Exhibit 2-7.  And I believe that falls within

10   Binder 2, please.

11   A.  Sorry, what number?

12   Q.  It's 2-7 and it's within Binder 2.  When you have that in

13   front of you, let me know.

14   A.  Yeah.

15   Q.  Does the map depict a -- does the chart reflect a map of

16   Northern, Northwest Syria?

17   A.  Yes.

18   Q.  And are there nine boxes surrounding the map?

19   A.  Yes.

20   Q.  What do the nine boxes represent?

21           THE COURT:  Is this in evidence?

22           MR. FITZPATRICK:  I expect it to be shortly,

23   Your Honor.  I just want to have him identify it.

24           THE COURT:  All right.

25   Q.  The nine boxes, what do they represent?

1   A.  They have the names of the prisons according to the way we

2   called them, plus the surnames of the people who were in each.

3   Q.  And does your name appear in each of the nine boxes?

4   A.  Yes.

5   Q.  Does this chart fairly and accurately reflect the

6   progression of the prison movements that you and your fellow

7   hostages encountered in 2013 and 2014?

8   A.  Yes.

9           MR. FITZPATRICK:  Move for admission of 2-7.

10          MR. MACMAHON:  No objection, Your Honor.

11          THE COURT:  It's admitted.  You may display it.

12          (GOVERNMENT EXHIBIT Number 2-7 was admitted into

13   evidence.)

14   Q.  Mr. Motka, for the benefit of the jury, is this the chart

15   that you've just explained to the Court?

16   A.  Yes.

17   Q.  Directing your attention to Blocks 8 and 9, are those the

18   last two prison locations you were held at?

19   A.  Yes.  Pre that last location near the border.

20   Q.  Correct.

21   A.  Yes.

22   Q.  The individuals listed below each of 8 and 9, are those

23   accurate listings of your fellow hostages?

24   A.  Yes.

25   Q.  There's an entry for five MSF aid workers.  Who are those?

1    A.   The three female MSF workers who I didn't know by name.

2             THE COURT:  Can you please speak up, Mr. Motka.

3             THE WITNESS:  Yes, sorry.

4    A.   The three MSF workers, and then Gert and Dan, the two male

5    ones.

6    Q.   Thank you.

7             THE COURT:  Remind me, what is MSF, Mr. Motka?

8             THE WITNESS:  Médecins Sans Frontières, Doctors Without

9    Borders.

10   Q.   With respect to the notes that you had, did you carry those

11   to your freedom?

12   A.   Yes.

13   Q.   I want to show you, beginning with Government Exhibit 7-8,

14   and that should be in Binder 3, please.

15   A.   Yeah.

16   Q.   Do you have Government Exhibit 7-8 in front of you?

17   A.   Yeah.

18   Q.   And what is this?

19   A.   This is the letter that Steven Sotloff gave to me to give to

20   his family.

21   Q.   And what is the date?

22   A.   18th of May, 2014.

23   Q.   And does that date precede your release from the desert

24   prison?

25   A.   Yes, I was released on the 25th.

42

 1             MR. FITZPATRICK:  Move for admission of 7-8.

 2             MR. MACMAHON:  Same objection as before, Your Honor.

 3             THE COURT:  All right.  I'll overrule it.  I'll admit

 4     the exhibit and you may display it.

 5             (GOVERNMENT EXHIBIT Number 7-8 was admitted into

 6     evidence.)

 7             MR. FITZPATRICK:  Thank you.

 8             And, Ms. Lopez, if you can highlight the first five

 9     lines.

10     BY MR. FITZPATRICK:

11     Q.  Mr. Motka, if you could please, from the beginning, read the

12     first five lines.

13     A.  "Poppyseed, Mommy, Lauren, I hope you are well.

14     Federico Motka of Italy should be delivering this letter to you.

15     He has been one of my best buddies in here.  So trust him,

16     listen to him, and try to meet up with him when he travels to

17     the USA.  He can explain my situation to you."

18     Q.  Thank you, Mr. Motka.  If you would like some water, we can

19     certainly accommodate you.  Are you okay?

20     A.  Yeah.

21     Q.  Mr. Motka, I would like you now to look at Government

22     Exhibit 8-9, also in Binder 3.

23             Mr. Motka, do you have 8-9 in front of you?

24     A.  Yes.

25     Q.  Do you recognize this letter?

43

1    A.  Yes.

2    Q.  What is this letter?

3    A.  It's what Peter Kassig wrote to his parents.

4           MR. FITZPATRICK:  Move for admission of 8-9.

5           MR. MACMAHON:  Same objection, Your Honor.

6           THE COURT:  All right.  I'll overrule the objection.

7    It's admitted.  You may display it.

8           (GOVERNMENT EXHIBIT Number 8-9 was admitted into

9    evidence.)

10          MR. FITZPATRICK:  If we could turn to page 2, the

11   bottom five lines.

12          Blow up the bottom five lines.

13   Q.  Mr. Motka, to the best of your ability, could you read the

14   bottom five lines of page 2?

15   A.  "But I would request that anything that can be spared be

16   divided between Sam and Jana, SERA, and the individuals in my

17   letter, and that my friend who carries this letter,

18   Federico Motka, will carry with him.  Please trust Federico to

19   carry out" --

20          MR. FITZPATRICK:  Excuse me.  Turn to page 3 and then

21   the top five lines.

22   Q.  Excuse me, Mr. Motka.

23   A.  -- "to carry out the tasks that I have entrusted him with.

24   He has become a dear friend in here and he knows what I want

25   done regarding this.  Please try and find a way for SERA to

 1    survive.  It's all I have in terms of a legacy, and I put my

 2    heart and soul into it."

 3    Q.  Thank you, Mr. Motka.

 4         MR. FITZPATRICK:  Your Honor, at this time move for

 5    admission of 26-16, and permission to publish.

 6         MR. MACMAHON:  No objection, Your Honor.

 7         THE COURT:  All right.  It's.  You may display it.

 8         (GOVERNMENT EXHIBIT Number 26-16 was admitted into

 9    evidence.)

10         (Video played in open court.)

11    Q.  Were you able to see the individual that's being shown in

12    that magazine?

13    A.  Yeah.  Yes.

14    Q.  And who is that individual?

15    A.  It's James Foley.

16    Q.  And that's the fellow captor you were describing -- the

17    fellow hostage you were describing?

18    A.  Yes.

19    Q.  Throughout your testimony?

20    A.  Yes.

21         MR. FITZPATRICK:  Please continue.

22         (Video played in open court.)

23    Q.  Mr. Motka, were you able to see that video and hear that

24    video?

25    A.  Yes.

1    Q.  Is the dialogue accurate with respect to Mr. Foley?

2    A.  Yes.

3          THE COURT:  Is that the picture that's being shown to

4    that person?

5          THE WITNESS:  The magazine?

6          THE COURT:  Yes.

7          THE WITNESS:  That's Mr. Foley, yes.

8          THE COURT:  And so was Emwazi to watch out for him

9    because he was troubled?

10          THE WITNESS:  No.  So my understanding of the video is

11   that he's talking about the person that I know as George, who I

12   think I described yesterday he had a particular hatred for James

13   and Pete, particularly as a result of the fact that James had

14   photographs on his laptop where he was an embed with the

15   U.S. Army as part of his photo -- as part of his journalism.  So

16   that was part of the beef that George had with James.

17          THE COURT:  And do you know who George was?

18          THE WITNESS:  I only knew individuals by the name that

19   I gave them.

20          THE COURT:  The Beatle names?

21          THE WITNESS:  The Beatle names, yeah.

22          THE COURT:  Next question.

23          MR. FITZPATRICK:  Thank you, Your Honor.

24   BY MR. FITZPATRICK:

25   Q.  The individual describing James Foley says that he was brave

1    enough to take it on the neck.  Do you have an anecdote that is

2    consistent with that dialogue and that statement?

3    A.   Yeah.

4    Q.   What is your anecdote?

5    A.   So when we were in The Dungeon, we were -- there was

6    difficulty with food.  We were given regular food.  It was just

7    not enough for 16 or whatever number of men we were at the time,

8    so we were very hungry a lot of the time.

9         And, yeah, we had big debates as to how -- whether or

10   not we could be asking -- so I think quite accurately it was

11   portrayed in the video that we were conditioned, and I would say

12   I was very much one of those conditioned to not -- you know, I

13   didn't want to put my head out or anything like that.  It was

14   just not what -- I just thought it was not worth the risk.

15        So we had a way -- I mean, at one point in time, the

16   guards also said, "There's too many of you; we don't want to

17   talk to all of do you; we want a spokesman."  When it was the

18   French-speaking guards, primarily, like at the community prison,

19   we sort of identified Didier Francois as the sort of person to

20   be the point.  He had gray hair, he was older.  That helps with

21   respect, for example, culturally.  Plus, he had some rapport

22   with some of the French guards, or he was able to talk to them,

23   in any case.

24        John and James - John Cantlie, primarily - was for the

25   British.  But in particular, James one time, at the -- this one

1    time at The Dungeon, we were really starving, and so he took it

2    upon himself to bang on the door and ask for food, which, you

3    know, it was a massive, massive risk at that point.  I don't

4    think it's right to characterize it that the guards came and

5    asked for food.  Yeah, then people might answer.  But it's a

6    bigger thing to bang on the door out of the blue, if you will,

7    and sort of call the -- he used to go, "Hey, Sheikh, hey,

8    Sheikh," and call the guards over to then talk to then about

9    food.

10          So that was the sort of -- that was a big thing.

11   Q.  And that was consistent with what the person being

12   interviewed was stating there?

13   A.  100 percent, yeah.

14   Q.  Mr. Motka, after your release, did you have the opportunity

15   to view a video that showed James Foley and a masked individual?

16   A.  Yes.

17   Q.  Where were you when you viewed that video?

18   A.  I believe I was with my mother in Switzerland.

19          MR. FITZPATRICK:  This has previously been admitted.

20   Permission to publish 1-24A.  It's a video that is 54 seconds

21   long.

22          THE COURT:  All right.  It's been admitted.  You may do

23   so.

24          (GOVERNMENT EXHIBIT Number 1-24A. was admitted into

25   evidence.)

48

```
1              (Video played in open court.)
2     BY MR. FITZPATRICK:
3     Q.  Mr. Motka, the person kneeling in the orange jumpsuit, who
4     is that?
5     A.  That's James Foley.
6     Q.  And the masked individual holding the knife standing next to
7     him, who is that?
8     A.  He -- I believe that individual to be George.
9     Q.  And is the basis of that assessment, is that your 14 months
10    in captivity with The Beatles?
11    A.  That's right.  I can give you examples of why if you...
12    Q.  Give me an example.
13    A.  So the way he says "Muslims," it's "Moslims."  And towards
14    the end he goes, "You, Obama."  It's quite distinctive.
15    Q.  You recognize that distinctive feature during your
16    captivity?
17    A.  Yeah.  I said as much in my statement as well.
18    Q.  Upon seeing that video for the first time, were you in
19    communication with the Metropolitan London Police Department?
20    A.  After I saw the video, yes.
21    Q.  And do you recall -- where were you when you had the
22    conversation with them?
23    A.  And so I was actually catching a train, so I was on the
24    platform in Switzerland at a train station, and I got a call
25    from SO15.
```

1    Q.  Do you know what SO15 is?

2    A.  It's a department of the Metropolitan police.

3    Q.  Are they the investigating department for this investigation

4    in the United Kingdom?

5    A.  Yeah, I believe they deal with counterterrorism stuff.

6    Q.  And did you express your understanding that that was George

7    to them on the day that you viewed the video?

8    A.  Yeah.  Yes.

9         MR. FITZPATRICK:  Your Honor, at this time I have no

10   further questions.  Thank you.

11        THE COURT:  Any cross-examination?

12        MR. MACMAHON:  Very briefly, Your Honor.

13        THE COURT:  All right.

14        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

15   **BY MR. MACMAHON:**

16   Q.  Mr. Motka, my name is Edward MacMahon.  I'm one of the

17   attorneys here for Mr. Elsheikh.

18   A.  Right.

19   Q.  You're almost done.

20        Before you were released from captivity, did any of

21   The Beatles tell you that you wouldn't be able to talk to the

22   police or the press about what happened to you?

23   A.  Not in the transport -- at least I don't recall it

24   specifically in the transport once I left the quarry.

25   Q.  You don't remember any of them saying that to you?

1   A.  They said it at the time in relation to the Black Friday

2   event I described yesterday.

3   Q.  And you didn't hear The Beatles say anything similar to the

4   hostage named Marc.  Right?

5   A.  That was in relation to the Black Friday event.  They said

6   that because Marc had spoken to the media, that they very

7   specifically said you weren't allowed to -- that this was what

8   the consequences were.  And that whatever happened -- so

9   whatever happens, if we did it -- if any of us who are released

10  would do it, there would be consequences for the people inside.

11  Q.  Is it your testimony - I'm sorry, I didn't hear you - that

12  you heard a reference to that same event on the day that you

13  were released?

14  A.  I don't recall something specifically like that on the day

15  of my release.

16  Q.  And on the day you were released, you carried with you these

17  two letters that we just looked at.  Right?

18  A.  That's right.

19  Q.  And that's because The Beatles allowed you to take those

20  letters.  Correct?

21  A.  That's right.

22  Q.  And told you to distribute them to their families?

23  A.  They didn't say to distribute them, but they just said I

24  could keep them.

25  Q.  And your testimony also was that The Beatles, all these

1  notes and messages that were left in the various holding

2  facilities, The Beatles allowed that to occur?

3  A.  So they would ask us to write certain letters.  Sometimes

4  they would dictate what we would have to say in them, and other

5  times they would just sort of say:  Write something to your

6  family.  So we wrote half a dozen in total at different times.

7  Q.  It was your testimony, I believe, that they were aware --

8  you learned that The Beatles were aware and were reading the

9  messages?

10 A.  You mean the messages between us and Kayla?

11 Q.  Yes.

12 A.  Yes.

13 Q.  And they allowed it to occur?

14 A.  I think they probably gleaned information from what we knew

15 from that.

16 Q.  And you made many statements to many different police

17 organizations since you were released.  Correct?

18 A.  That's correct.

19 Q.  And you told them that really John, George, and Ringo were

20 all cadets, that they had all said they had had some military

21 training.  Correct?

22 A.  No, I said that -- I think I believe in my statement I said

23 that for sure we had a feeling that George had been the cadet.

24 He did this soldierly -- sergeant -- I think I mentioned it

25 yesterday, that he behaved very much like a sergeant at arms,

1     shouting instructions, and he always would repeat a specific

2     number.

3             And when I said that we huddled together right before I

4     left, we recalled that number, and it was actually David Haines

5     who thought maybe that's his cadet number, because we thought

6     that that might be a link.

7     Q.  But you thought that for one reason -- that they all had

8     military training in England.  Correct?

9     A.  I never said that.

10    Q.  You said that one of them went to an academy at Portsmouth.

11    Is that correct?

12    A.  In relation to one of the individuals, yes.

13    Q.  Do you remember which one that was?

14    A.  I believe that was George.

15    Q.  And did George also tell you that his father had been

16    arrested and that he had done time in jail too?

17    A.  Yes.

18            MR. MACMAHON:  I don't have anything further,

19    Your Honor.

20            MR. FITZPATRICK:  Very briefly.

21        **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

22    **BY MR. FITZPATRICK:**

23    Q.  Upon your release, were you very cautious in making public

24    statements about your captivity?

25    A.  Yes.

1    Q.  And why was that?

2    A.  Because I was scared that that would have repercussions on

3    the guys I left behind.

4    Q.  And did you also make conditions on making statements to

5    governments?

6    A.  Yeah, I made -- I said -- whenever I spoke to anyone on the

7    Italian side, I said:  You'd better make sure you share this

8    with the Americans and the Brits.

9    Q.  And did you discuss about whether or not your statements

10   would be made public when you were discussing with the

11   governments?

12   A.  I said nothing should be made public.

13   Q.  And why is that?

14   A.  Because I saw the consequences on Black Friday.

15          MR. MACMAHON:  Thank you, Mr. Motka.

16          No further questions, Your Honor.

17          THE COURT:  Thank you.  You may step down.

18          Now, ladies and gentlemen, we'll take lunch.  Your

19   lunches are here, and we will recess until 1 o'clock.  If you

20   need longer, don't hesitate to ask for it.  But let's try for

21   1 o'clock and we'll march forward.

22          Who is your next witness?

23          MR. FITZPATRICK:  Next witness, Your Honor, will be

24   Patricia Chavez.

25          THE COURT:  And, Ms. Cook, that's your witness?

```
1            MS. COOK:  That's correct, Your Honor.

2            THE COURT:  All right, ladies and gentlemen.  Put your

3    books in the cubbyhole.  Remember to refrain from discussing the

4    matter among yourselves or with anyone, or undertaking any

5    investigation on your own.  And we will reconvene at 1 o'clock.

6    You may follow the court security officer out.

7            (Jury out at 12:27 p.m.)

8            THE COURT:  Court stands in recess until 2 o'clock.

9            MR. FITZPATRICK:  Just to put on the record, Mr. Motka

10   can be released.

11           THE COURT:  Yes.  Mr. Motka, where are you?

12           MR. FITZPATRICK:  He's outside.

13           THE COURT:  Yes, he may be released.

14           MR. FITZPATRICK:  Thank you.

15           (Recess taken at 12:28 p.m.)

16           MS. COOK:  Before we bring from the jury, there's one

17   issue we need to address with the Court.

18           THE COURT:  All right.

19           MS. COOK:  The defendant has been wearing his face mask

20   and glasses during the proceedings.  After Ms. Chavez testifies,

21   we will have two witnesses who will make an in-court

22   identification of the defendant.

23           THE COURT:  Yes, he can take his mask off of that.

24           MS. COOK:  We ask that he take off his glasses.  And

25   I'm asking that he do that before the witness takes the stand,
```

1    not just immediately before the witness is asked to identify the

2    defendant.

3              THE COURT:  What's your view, Ms. Ginsberg?

4              MR. ELLIS:  Your Honor, I'm addressing this because I

5    will be cross-examining the DoD witnesses.  We would just ask

6    the Court to go with the Court's original plan, which is when

7    the identification is ready to be made, Mr. Elsheikh can remove

8    his glasses and lower his mask at that time.  I'm not wearing a

9    mask right now, Your Honor, and I believe Mr. Elsheikh wants to

10   keep his on.

11             THE COURT:  Why?

12             MR. ELLIS:  For his own personal safety.

13             THE COURT:  Why?  What do you mean "his own personal

14   safety"?

15             MR. ELLIS:  COVID-19, sir.

16             THE COURT:  I see.  I have a suspicion that he wants to

17   keep it on to frustrate identification.

18             MR. ELLIS:  Well, Your Honor, again, the Court said

19   he'll take it down when the witness is ready to make the

20   identification.  I think that's --

21             THE COURT:  They may need it longer.  I very nearly

22   made him take it off while he appeared in these interviews,

23   because they would have no idea who that was that was being

24   interviewed.  I thought you-all would elicit from a witness who

25   that was who was being interviewed.

1              Where is Mr. Fitzpatrick?  You realize that you didn't

2    do that, so they didn't know who they were looking at?

3              MR. FITZPATRICK:  The individuals were masked.

4              THE COURT:  No, no, no.  The interview with the

5    journalist.

6              MR. FITZPATRICK:  Correct.

7              THE COURT:  They didn't know --

8              MR. FITZPATRICK:  Who is "they," Your Honor?

9              THE COURT:  The jury.

10             MR. FITZPATRICK:  Correct.  We'll tie that up later.

11             THE COURT:  All right.  But you say, "tie that up

12   later."  You lose the effect of that unless you're going to play

13   it later also.

14             MR. FITZPATRICK:  We will play additional clips later.

15   And the government disagrees with that assessment.

16             THE COURT:  The government what?

17             MR. FITZPATRICK:  We disagree with the assessment that

18   it will lose that impact.  We have --

19             THE COURT:  It's an assessment you make.  I'm telling

20   you that; of course you disagree with it.  I'm just telling you

21   that if I were doing it, I would do it differently.

22             MR. FITZPATRICK:  We disagree.

23             THE COURT:  And I have a little bit more experience

24   than you-all in trying cases.

25             MR. FITZPATRICK:  The government disagrees.

```
1            THE COURT:  I know it does.  You're wrong.  But that's

2    your problem.  You can disagree with me.

3            But when is it -- you may sit down for a moment.  I'll

4    let you tell me -- tell me, Ms. Cook, what you want to do here.

5            MS. COOK:  When Ms. Mejia Chavez is done testifying, I

6    would ask that the defendant remove his mask and glasses at that

7    point, because the very next --

8            THE COURT:  When is it that you want to do this?

9            MS. COOK:  After Ms. Chavez Mejia has left the stand.

10   The next witness after Ms. Chavez Mejia will be George Smith,

11   and he will do an in-court identification.

12           THE COURT:  And Mr. -- who's going to deal with this?

13   Mr. Deubler?

14           MR. ELLIS:  No, sir.

15           THE COURT:  Mr. Ellis?

16           MR. ELLIS:  Yes, sir.

17           THE COURT:  You want him just to remove it at that

18   time.

19           MR. ELLIS:  When the witness is ready to make the

20   identification, we would prefer to remove it at that time.  It

21   doesn't need to be a quick up and down, Your Honor.  He can

22   leave it down for a few minutes if the witness needs.  I don't

23   see the logic that he needs to be unmasked the entire witness

24   testimony.

25           THE COURT:  Well, you just referenced what the logic
```

1    is.  He may need to look at it for a time, and we can't sit here

2    for five or 10 minutes while he looks at it.

3              MR. ELLIS:  I will also point out that these same two

4    witnesses have already identified him, Your Honor, in the

5    pretrial hearings.

6              THE COURT:  I see.  Is that right, Ms. Cook?

7              MS. COOK:  Your Honor, they did.  But at that hearing

8    the defendant was not wearing glasses.

9              THE COURT:  Well, he can take those off too.

10             MS. COOK:  Just to clarify, Your Honor, I have no

11   problem with the defendant putting the mask and glasses back on

12   after the identification.  What I'm trying to avoid is an overly

13   suggestive process where he suddenly is removing everything

14   while the witness is on the stand looking for him.

15             THE COURT:  All right.  The witness will be here?

16             MS. COOK:  That's correct.

17             THE COURT:  He's there.  It will be pretty close.  He

18   can stand, remove the mask, they can look at him for a minute,

19   and he can put the mask back on.  Is that a problem?

20             MS. COOK:  Your Honor, I was hoping to make it a little

21   less obvious than that.  But if the defense is not objecting to

22   that procedure, that's fine with the government.

23             THE COURT:  What do you mean, "less obvious"?

24             MS. COOK:  If the defendant has to stand and remove his

25   mask, it's going to be quite obvious that he's the person to be

1    identified by the witness.

2            THE COURT:  I see.  All right.  I think your point is

3    well taken.  So you just want him to remove his mask during her

4    testimony, and they want him to remove his mask just at the time

5    that they ask for the identification?

6            MS. COOK:  That's correct.

7            THE COURT:  And which is it?

8            MS. COOK:  The first witness will be George Smith, and

9    that is the first in-court identification.  The witness after

10   George Smith, Jason Richards, will also do an in-court

11   identification.

12           THE COURT:  How about Mejia?

13           MS. COOK:  Mejia will not do an in-court

14   identification.

15           THE COURT:  So as I understand it, then, when you're

16   ready to have Smith or Richards identify him, you can ask at

17   that point to have the defendant remove his mask, and I will

18   require him to remove his mask.  He won't stand, he'll just

19   remove his mask.  And you will ask the witness:  You see that

20   fellow, can you identify him?

21           MS. COOK:  Your Honor, the government's request was to

22   have the defendant remove his mask and glasses before Mr. Smith

23   takes the stand.

24           THE COURT:  And their problem with that is that that

25   contravenes his desire to remain protected.

1          MS. COOK:  Correct.

2          THE COURT:  He's the last person there, isn't he, next

3     to Mr. Ellis.  The last person on that end?  Mr. Ellis, what if

4     we moved him social distance away?

5          MR. ELLIS:  I mean, Your Honor, that seems to be just

6     as obvious as what the government was saying they weren't trying

7     to do.  And I would just remind the Court --

8          THE COURT:  But it addresses your concern.

9          MR. ELLIS:  Well, that -- yeah, that --

10         THE COURT:  So if I do that, you don't have an interest

11    in that?

12         MR. ELLIS:  Well, I'm vaccinated, sir.  I don't mind.

13         THE COURT:  Yes.  But, I mean, your side has no

14    interest in whether it looks like it's a good identification or

15    not.

16         MR. ELLIS:  Sure.  But if he's 6 feet from all counsel,

17    then he's going to be sat off by himself anyway, Your Honor.

18    I'm sure the Court remembers, both of these witnesses took about

19    two seconds to identify him at our pretrial hearing.

20         THE COURT:  Actually, I don't have a clear memory of

21    that.  I'm glad you reminded me.

22         Is that your recollection, Ms. Cook.

23         MS. COOK:  They identified the defendant readily.

24         THE COURT:  Why don't we have him sit where he is and

25    remove the mask and the glasses, and give them a minute to look

1    at him and let them identify him and then he put it back on.

2    How's that?

3          MS. COOK:  Your Honor, I'm simply trying to avoid a

4    suggestive procedure.  But if the defense is not objecting, the

5    government is okay with having him remove the mask and the

6    glasses while Mr. Smith is on the stand.

7          THE COURT:  All right.  That's a reasonable point to

8    make.

9          Mr. Ellis, do you have any plans or intent to suggest

10   that the proposal that you've made, that he sit where he's

11   sitting, and that at the time or close to the time that she's

12   going to ask the witness to identify him, that he'll remove his

13   glasses and his mask, she'll ask to identify him, and then put

14   it back on?  Am I clear that you don't plan or have any idea

15   that you're going to suggest that that process is suggestive?

16         MR. ELLIS:  We will absolutely not do that, Your Honor.

17         THE COURT:  All right.  Are we ready?  Ms. Cook, is

18   that satisfactory?

19         MS. COOK:  It is, Your Honor.  If I could just ask

20   Mr. Ellis, could I give you just some kind of a subtle sign to

21   indicate it's time to remove those items?

22         MR. ELLIS:  I guess I would say, Your Honor, as soon as

23   we hear the question, "Are you able to identify the defendant,"

24   at that time we'll have Mr. Elsheikh remove his glasses and

25   mask.

1          MS. COOK:  That's fine, Your Honor.

2          THE COURT:  All right.  Bring the jury in.

3          Mr. Fitzpatrick, you're not the first person I've

4   disagreed with on how to present a case.  I've heard a lot of

5   cases in 35 years and a lot of cases before that.  Not many of

6   them are in full agreement with how I would do it.

7          MR. FITZPATRICK:  I understand, Your Honor.

8          MS. GINSBERG:  Judge, just so the Court knows, we would

9   have objected to that procedure as being unnecessarily

10  suggestive in the context of already having been announced that

11  this was The Beatle who was engaged in this particular conduct.

12         So I --

13         THE COURT:  Why do you say this?

14         MS. GINSBERG:  The videos that -- I mean, the videos

15  were portrayed as being videos of the people who were

16  The Beatles, so that if they were seen afterwards, they were

17  already identified as being The Beatles.  We would have said

18  that that was an unnecessarily suggestive identification.

19         THE COURT:  Does that have anything to do with this

20  witness?

21         MS. GINSBERG:  No.

22         THE COURT:  The two witnesses that Ms. Cook is talking

23  about?

24         MS. GINSBERG:  No.  I was just commenting on your

25  comments to Mr. Fitzpatrick.

63

1           THE COURT:  I see.  So what you're saying - I didn't

2    understand it, but I do now - that if there had been an effort

3    to identify Mr. Elsheikh earlier, you would have said that in

4    the circumstances -- everyone rise, please.

5           I understand your point.

6           (Jury in at 1:13 p.m.)

7           THE COURT:  Call your next witness, Ms. Cook.

8           MS. COOK:  Thank you, Your Honor.  The government calls

9    Patricia Chavez Mejia.

10          (Oath administered by courtroom deputy clerk.)

11          THE COURT:  All right.  Ms. Cook, you may proceed.

12          MS. COOK:  Thank you.

13          **(PATRICIA CHAVEZ MEJIA, having been duly sworn,**

14                       **testified as follows:)**

15          **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

16   **BY MS. COOK:**

17   Q.  Good afternoon.

18   A.  Hi.

19   Q.  Will you please state your name and spell it.

20   A.  Yes, my name is Patricia Chavez Mejia.

21   Q.  Ms. Chavez Mejia, I'm going to ask you to slow down a bit

22   and speak up to make sure everyone can hear you.

23   A.  Okay, my name is Patricia Chavez Mejia.  Patricia,

24   P-A-T-R-I-C-I-A, Chavez, C-H-A-V-E-Z, Mejia, M-E-J-I-A.

25   Q.  How are you currently employed?

1    A.  I work for the Federal Service of Public Health in Belgium.

2    Q.  Do you currently live in Belgium?

3    A.  Yes.

4    Q.  What languages do you speak?

5    A.  I speak Spanish, English, French, and Dutch.

6    Q.  How were you employed in late 2013?

7    A.  I used to work as a nurse for Médecins Sans Frontières, an

8    NGO.

9    Q.  Is that sometimes called Doctors Without Borders in English?

10   A.  Yes, that's correct.

11   Q.  For purposes of today, can we refer to it by the acronym

12   "MSF"?

13   A.  Yes.

14   Q.  Did you go to Syria in 2013 as part of your employment with

15   MSF?

16   A.  Yes.

17   Q.  When did you arrive in Syria?

18   A.  We arrive around 26th of 23 -- November 23, 2013.

19   Q.  Where did you go in Syria?

20   A.  We arrived -- we entered by the Kilis border and we make the

21   way around Aleppo, Idlib, Darkush, and then we arrive to just

22   around those areas like Ubin city, a small city.

23        MS. COOK:  Can we please display Exhibit 2-1.  This has

24   already been admitted, Your Honor.

25        THE COURT:  You may do so.

1    Q.  Ms. Chavez Mejia, can you see the map displayed on your

2    screen there?

3    A.  Yes.

4    Q.  If you touch the screen, it will make a mark.  Can you

5    please indicate in general where Ubin is?

6    A.  (Witness complies.)

7    Q.  Thank you.  Where were you working in Ubin?

8    A.  In Ubin, I was working in a hospital.

9    Q.  What did you do at the hospital?

10   A.  I was responsible for the emergency department as a nurse.

11   Q.  As a nurse?

12   A.  Yes.

13   Q.  What kinds of patients would come to the hospital?

14   A.  Any kind of patients.  With MSF, we receive, yeah, normal

15   people that are living in surrounding areas but that can also be

16   people that they're for the conflict.  So that can be rebels or

17   can be people from the Syrian Army or also from Dawlah, the

18   local militia in this place.

19   Q.  Did you say people from Dawlah?

20   A.  Yes.

21   Q.  What is Dawlah?

22   A.  Dawlah was one of the local rebels that were in this area.

23   It's -- yeah, the Islamic State.

24   Q.  So would your hospital treat anybody who came for medical

25   care?

1   A.  Yes, that is the politics of MSF.

2   Q.  Where did you live?

3   A.  We lived in a small house around the hospital, nearby the

4   hospital, like five minutes by car.

5   Q.  Did you have other MSF colleagues there as well?

6   A.  Yes, we were international team, around 10 people, more or

7   less, yeah.

8   Q.  Do you recall January 2nd of 2014?

9   A.  Yes.

10   Q.  Does that day stand out to you?

11   A.  Yes.

12   Q.  What happened on that day that makes it stand out?

13   A.  Well, it was the day of our kidnapping.

14   Q.  Will you please tell us what you were doing right before the

15   kidnapping.

16   A.  Yes.  So the last part of the year, there was a couple of

17   free days, so it was really a calm day in the hospital.  We were

18   just catching up with friends, Skyping and chatting with family.

19          And in the evening we have to go back to the house

20   because we had, yeah, an exposure -- sorry.  Our administrative

21   colleague had to explain something about HR, so we went back to

22   the house for this presentation.  And the other part of the

23   team, they had to remain at the hospital because they have a

24   C-Section that was ongoing, so only half of the team went back

25   to the house.

```
 1              And we were just having shower, eating, normal things
 2   you do when you go back home after your work.  And we were
 3   planning to watch a movie with our projectors, so we were just
 4   relaxing.  And then we heard a lot of noise outside, and, yeah,
 5   we thought, so, what, one of our guards is probably making jokes
 6   or screaming or something.
 7   Q.  Ms. Chavez Mejia, let me stop you there for just one moment.
 8   A.  Yes.
 9   Q.  When you say half of your team was in the house with you,
10   does that mean that four of your colleagues were with you at
11   that time?
12   A.  Yes.  We were five of us, yes.
13   Q.  How many of your female colleagues were with you in the
14   house?
15   A.  The two other female -- yeah, two other women.
16   Q.  Tell me the countries that those women are from.
17   A.  One of them is from Switzerland and the other one from
18   Sweden.
19   Q.  And what is the name of your colleague from Sweden?
20   A.  It's Frida Saide.
21   Q.  What are the countries that your male colleagues in the
22   house were from at that time?
23   A.  Danish and Belgium.
24   Q.  You were starting to tell us that you heard a noise.  Please
25   continue.
```

1    A.  So we heard all these noise around, and we thought, yeah,

2    probably there is someone coming to the house.  We considered it

3    like normal, that Dawlah people come to check in our house, that

4    we were, yeah, following the rules of the Muslim customs in the

5    place.  Like, you can't have women and men in the same place.

6    We have separate rooms and we don't eat together.  And, yeah, we

7    were doing kind of the opposite because we are international

8    people and we are not Muslims.

9         So we were together in the same room, and I thought

10   maybe we are in trouble for that.  But when a guy came in the

11   place shouting and looking for something, I realized it was not

12   the case that there was these local people.  I saw a man, fully

13   black dressed, and having a Kalashnikov in his back.  And then a

14   lot of other people, like five, six men just entering the house.

15   So I just cover my face and they asked me to come with them.

16   Q.  Ms. Chavez Mejia, what language were these men speaking?

17   A.  It was -- well, I remember fragments of that, like saying,

18   "Come, come, go, go," like not making conversation, you know.

19        But one of them attract my attention because he asked,

20   *qui parle francais*, "who is speaking French."  I didn't answer

21   because I thought maybe it's not good that I show that I speak

22   French.  I don't know.

23        Yeah, but he asked me, and then he realized it was me

24   because it was someone who previously came to the hospital.  So

25   he recognized me.

69

1    Q.  And this person knew that you spoke French?

2    A.  Yes.

3    Q.  A moment ago you started to explain that they took you out

4    of the house.  Can you please describe what you were wearing at

5    that time?

6    A.  Well, I was going to wear my pajamas, like leggings and just

7    a T-shirt and just my veil.  So I didn't have time to grab

8    anything to cover or something, so it was just the clothes that

9    I had at the moment.

10   Q.  When you were taken from the house, were you restrained?

11   A.  Yes.  As soon as they asked me to move, they first sit --

12   asked me to sit on the floor and they handcuffed -- put

13   handcuffs on my hands.  So I had them on my hands.

14   Q.  Where did the men take you?

15   A.  Well, I don't know where they took me because they cover me,

16   covered my head.  But we went to a house --

17   Q.  I'm sorry, let me have you back up.

18        Immediately after they had you go out of the house,

19   what happened next?

20   A.  When we went out of the house, there were, like, four or

21   five cars in front of the house with a lot of these black guys.

22   I call them ninjas because of the way they were dressed.  And

23   there was a lot of movement.

24        So they put the national staff in the back of the cars,

25   they put my friend Frida in one of the cars, and the two guys,

1    my Switzerland colleague and me, in the back of the pickup.  And

2    they also came in the car.

3            And yeah, they make a lot of movement.  It was really a

4    small street, so it was very difficult to turn.  And all the

5    people on the street were watching us, but nobody could say

6    anything or do anything.  And they just moved, so we just left

7    the place.

8    Q.  So you were in a car with three of your colleagues?

9    A.  Yes.

10   Q.  Were you able to see where you were going?

11   A.  No.  They cover our heads with blankets.  Yeah, we could

12   hear that we pass near the hospital and there was kind of

13   tension at that moment.  It was a lot of small roads at the

14   beginning.  And then we took, like, a highway because, yeah, the

15   speed increased and there was a lot of wind and, yeah, you could

16   feel that we were in this big road.

17   Q.  Do you have a sense of how long you were in the car?

18   A.  I can say more than 30 minutes.

19   Q.  What happened when the car stopped?

20   A.  When the car stopped, it was -- it was a very -- a place

21   very -- a lonely place.  There was not many houses around that I

22   recall.  And there was this one house where we get in.  And in

23   this place there was a lot of carpets on the floor and a fire to

24   warm.  And they asked us to sit near the fire so they can ask

25   questions.

1    Q.  When you say, "they asked us to sit by the fire," are you

2    referring to yourself and your four MSF colleagues?

3    A.  Yes.

4    Q.  Who else was in the house?

5    A.  Excuse me?

6    Q.  Who else was in the house?

7    A.  Well, there were some fighters that I -- yeah, you could see

8    people -- many shoes around.  And us.

9    Q.  Did the fighters have weapons?

10   A.  Yes.

11   Q.  Were you still handcuffed?

12   A.  Yes.

13   Q.  How were you feeling at this point?

14   A.  It was very scary, because, yeah, they were very aggressive.

15   They were asking a lot of questions, personal questions.  They

16   kind of threat me to sexual abuse me, so it was very scary,

17   actually.

18   Q.  Did they tell you why they had taken you?

19   A.  They said that they felt we are spies, that we work with CIA

20   or things like that, and that they have to interrogate us for

21   that.

22   Q.  Had the people who took you also taken items from the house

23   where you had been living?

24   A.  Yes.

25   Q.  What did they take?

72

```
 1    A.  They took everything.  They took our luggages, they took our
 2    computers, the medical equipment we had in the house.  We had a
 3    lot of food with us, because with, yeah, MSF you have to survive
 4    if there is a lot of shelling.  So there's like a bunker in the
 5    house, and they took everything they had in there, in that
 6    place.
 7    Q.  You mentioned that these men took your computers.  Did the
 8    men ask you any questions about the computers?
 9    A.  Yes, they asked the password so they can open the computers,
10    and they started checking all the pictures.  "Yeah, Is this your
11    passport?  Is this your computer?  Is this you?  Is this your
12    family?  Is this your husband or your wife or your friend, your
13    mother?"  Everything, yeah.
14    Q.  Did you and your colleagues try to explain to the men who
15    had taken you who you were?
16    A.  Yes, several times.  We thought at the beginning that there
17    was a confusion, that they didn't know that we were running
18    medical operations and that probably they thought that maybe we
19    are with the Free Syrian Army or something.
20         So we explained that we had contact with Dawlah
21    leaders, with the local Dawlah leaders.  We said we know
22    Abu Moaz, which is the local leader in the place, and that he
23    knows what we do; that we run a medical hospital, that we are
24    neutral organization and everything.  But, yeah, that didn't
25    change anything.
```

73

1    Q.  A moment ago in your testimony you said you were sexual

2    abused.

3    A.  Excuse me?

4    Q.  You said that you were sexually abused.

5    A.  They threatened me to abuse me.

6    Q.  What was the threat?

7    A.  Well, this French guy, he start asking me with whom I want

8    to go.  And he say, "Do you want to go to spend the night with

9    my friend?  He's Iraqi, he is very kind.  Or with me?"

10          And as I didn't answer, he said -- he just point me

11   with his gun in my knees and obliged me to tell.

12   Q.  I'm sorry, obliged you to what?

13   A.  To tell with whom I want to go.  Sorry.

14   Q.  Take a minute.

15   A.  It didn't happen, anything.  It was just to scare me.  So...

16   Q.  Did you end up having to spend the night in that house?

17   A.  Yes, we spend the night in that house.

18   Q.  Were your MSF colleagues with you?

19   A.  Yes, I was with Frida and Imtebi (ph) in the same room.

20   Q.  Did the men take the handcuffs off?

21   A.  No, no, we spent the night with it.

22   Q.  You spent the night with the handcuffs on?

23   A.  Yes.

24   Q.  Did you have enough clothing for winter?

25   A.  No.  Just blankets.  We asked for many blankets so we can

```
 1    protect ourselves from the cold.

 2    Q.  Were you moved from that house the next day?

 3    A.  Yes.  In the morning we were put in the car again to move.

 4    Q.  Were you sill restrained?

 5    A.  Yes.

 6    Q.  Were you taken to a few different locations during those

 7    first few days after you were kidnapped?

 8    A.  Yes.  Like three, four different places.

 9    Q.  During those first few days, were you able to brush your

10    teeth?

11    A.  No.

12    Q.  Were you able to shower?

13    A.  No.

14    Q.  Were you able to change your clothes?

15    A.  No.

16    Q.  Did you get enough to eat?

17    A.  What was there?  Yes.

18    Q.  Did each of these locations have guards?

19    A.  Excuse me?

20    Q.  Did each of these locations have guards?

21    A.  Yes.

22    Q.  Did you meet any guards who spoke English with a British

23    accent?

24    A.  Yes.

25    Q.  Who is the first guard you met that had a British accent?
```

1    A.   The first guy is Abu Aisha.  At the moment I didn't know his

2    name.  But he enter in the room and he said, "Yes, hi, girls,

3    I'm your guard and I'm going to take care of everything here.

4    We are used to treat people like you that are going on trial

5    afterwards, and, don't worry, we already have female here, so

6    it's going to be fine."

7              And, yeah.

8    Q.   What kinds of things would Abu Aisha do for you?

9    A.   Well, he was the logistics guy of the house.  He does

10   everything like electricity, fix the door, or bring you things.

11   I don't know if he cooked himself, but, yeah, he was around the

12   place.

13   Q.   Did you meet any other captors who spoke English with a

14   British accent?

15   A.   Yes.  As soon as we arrive in this place, there were also,

16   yeah, four other people that came in our room.  Three of them,

17   they speak English, and the fourth one speak French.

18   Q.   So thinking just about those other three men who spoke

19   English, did you later learn a name for those three men?

20   A.   Yes.  We learned that the other hostages used to call them

21   The Beatles.

22   Q.   Is it okay if we refer to those three men as The Beatles

23   going forward in your testimony?

24   A.   Correct.  Yes.

25   Q.   Please talk about the first time that you had any

1    interaction with The Beatles.

2    A.  Well, they entered in the room, and as soon as they arrive,

3    they start shouting, like, "Cover your face; I never want to see

4    your face again."

5           And they were very aggressive with that.  At that

6    moment, we didn't have anybody else asking to cover like that.

7    But it was very, like -- something bad is going to happen to you

8    if you don't cover your face.

9           So from that moment, we did it.  We cover all the time.

10   Q.  Did The Beatles ask you questions?

11   A.  They asked our nationalities.  I think at that point they

12   also asked email addresses.  But I think at that moment they

13   asked the nationalities because they said -- so where are you

14   from?  I said, I'm from Peru, but I live in Belgium.  And the

15   other female hostages, they also said their nationalities, and

16   said, "And do you think your government is going to make a trade

17   for you, for your release?"

18   Q.  You mentioned that there was a fourth man who was also with

19   The Beatles.  Did you also learn a name for that fourth man?

20   A.  Yes, I learned he was Abu Idris.

21   Q.  Did Abu Idris also speak with you that first time that you

22   met The Beatles?

23   A.  Yes.  He was very surprised that I was from Belgium -- well,

24   that I live in Belgium.  And he said:  "Oh, you live -- you are

25   from Belgium.  I'm also from Belgium and my family is there.

1   They are not terrorists like me."

2   Q.  Did Abu Idris speak French?

3   A.  Yes.

4   Q.  How were The Beatles dressed?

5   A.  They were with black trousers with pockets on the legs and

6   kind of dresses until the knee.

7   Q.  Could you see their faces?

8   A.  No.

9   Q.  Why not?

10   A.  They were covered with a balaclava, do you say?

11   Q.  Did you say balaclava?

12   A.  Yes.

13   Q.  After the location where you saw The Beatles for the first

14   time, were you taken to a different place where there were other

15   people from European countries?

16   A.  Yes.  After we moved to a place that they called

17   "The Office."

18   Q.  And could you hear other people that were in The Office?

19   A.  Yes.  We already heard some people in the previous place,

20   but of course in this place, we also heard and could see a part

21   of the people that were there.

22   Q.  Had you been separated from your male colleagues?

23   A.  Yes.

24   Q.  Did you also see Abu Aisha at The Office?

25   A.  Yes.

78

1   Q.  Was there a difference between Abu Aisha and The Beatles?

2   A.  Yes.  Abu Aisha was a basic guard.  He was not leading

3   anything.

4   Q.  I'm sorry, I didn't hear that last part.

5   A.  He was not leading anything.  He was not doing something

6   else.  I mean, the ones who had the contacts with other people

7   were The Beatles, not Abu Aisha.  Abu Aisha was cooking and

8   preparing things in the house.

9   Q.  Did you also see Abu Idris at The Office?

10  A.  Yes.

11  Q.  Did Abu Idris ever bring someone to talk to you at The

12  Office?

13  A.  Yes.  We had been asking for a long time to see the emir,

14  and at one point they arrive and Abu Aisha opened the door and

15  Idris was with them.  And he said:  Okay, girls, now you asked

16  to see the emir, here you are.

17          So they asked us to face the wall so we could not see

18  him, and he entered the room.  And Abu Idris was on one of the

19  corners of the room kind of translating the conversation.

20  Q.  Did you try to explain to the emir who you were?

21  A.  Yes, again, we tried to explain him.

22  Q.  Did you try to explain the work you had been doing in Syria?

23  A.  Yes.

24  Q.  About how long did you spend at The Office?

25  A.  It was about 10 days.

```
1    Q.  Could you hear anything happening outside The Office?

2    A.  Outside, like shelling?  You mean like outside outside?

3    Q.  Outside the building.

4    A.  Yes.  Yes.  Sometimes there was shelling, but I could not

5    say we were near, nearby the frontline.  But sometimes you could

6    hear shelling going on.

7    Q.  Were there windows in the room where you were being held?

8    A.  Yes.  There was a big window that was kind of covered with

9    cartons.

10   Q.  What happened when you were moved from The Office?

11   A.  When we were moved to The Office, it was a moment where --

12   yeah, the emir also said:  You are going to be released soon.

13   So there was a date that everything prepared to move.  Yeah, we

14   didn't know what was going on, but there was a lot of movement

15   in the house.  They start to pack things.  All the mattresses

16   were put together and the kitchen was clear, and suddenly I

17   heard we were probably moving at 2:00, but we wait until the

18   evening so it was becoming dark.

19        And then we were taken downstairs, because we were in

20   the first floor, and we just -- we were put it in a car and we

21   move like two minutes around to a very, very big hangar where we

22   gather with -- hangar.  You know, a place where you -- well, it

23   was -- it's a place.

24        THE COURT:  A place where you put airplanes?  Did you

25   say, "hangar"?
```

```
 1              THE WITNESS:  Yes, hangar.
 2              THE COURT:  Next question.
 3   A.  There we gather with a lot of other cars to move together.
 4   BY MS. COOK:
 5   Q.  Were you eventually taken from The Office to Raqqa?
 6   A.  Yes.  That was the beginning of the trip.
 7   Q.  Did it take a few days to get to Raqqa?
 8   A.  It takes two days, more or less.  We did stop first, you
 9   know.
10   Q.  Were Frida and your Swiss colleague with you during that
11   trip?
12   A.  Yes.
13   Q.  Did you know where your male colleagues were?
14   A.  No.  At that moment, no.
15   Q.  Did you stay at some different locations on the way to
16   Raqqa?
17   A.  Yes, we make first one stop on the first night, day, and
18   then we arrived to Hama and, yeah, we stayed another night there
19   in Hama.
20              MS. COOK:  With the assistance of the court security
21   officer, please look at Exhibit 3-14.  It's in Volume 2.
22   A.  Yes.
23   Q.  Do you recognize that?
24   A.  Yes.
25   Q.  What is that?
```

1   A.  That was the flag or the -- yeah, the flag they had

2   everywhere in their cars, in the houses, in everywhere you

3   arrived.

4   Q.  And is this the flag that you saw frequently after you were

5   kidnapped?

6   A.  Yes.

7           MS. COOK:  The government moves for the admission of

8   Exhibit 3-14.

9           MS. GINSBERG:  No objection, Your Honor.

10          THE COURT:  Admitted.  You may display it if you wish.

11          (GOVERNMENT EXHIBIT Number 3-14 was admitted into

12  evidence.)

13  Q.  Ms. Chavez Mejia, is this the flag of Dawlah?

14  A.  Yes.

15  Q.  The flag of the Islamic State?

16  A.  (No verbal response.)

17          THE COURT:  You'll have to say "yes."  You can't simply

18  nod.

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  Proceed.

21  Q.  Where did you first see this flag displayed after you were

22  kidnapped?

23  A.  I cannot recall the first place.  But while we were moving,

24  there were a lot of cars that were flying this flag.

25  Q.  The flag was flying from cars?

1    A.  Yes.

2    Q.  Did you also see it at some of the buildings where you were

3    held?

4    A.  Yes.

5           MS. COOK:  Thank you.  We can take it down.

6    Q.  In Raqqa, were you taken to a house where you were able to

7    see your male colleagues?

8    A.  Yes.

9    Q.  Were your male colleagues with other men?

10   A.  Yes.

11   Q.  Can you describe what the men were wearing?

12   A.  Well, the first time they came of the truck, they were

13   handcuffed two by two and they were with suit, orange suits,

14   like orange pajamas like what you use in jail here in America.

15   Q.  How did the men seem to be doing healthwise?

16   A.  They look very bad, actually.  They look skinny, yeah,

17   neglected.  They had their long beards and they looked very

18   scary.  They didn't even look at us, actually, when we were

19   there in the place.  They just passed by.

20   Q.  Did you stay at that location where you first saw the men in

21   orange?

22   A.  No, it was not safe enough to lock them in the house, so we

23   had to move somewhere else.

24   Q.  Where were you taken next?

25   A.  We were taken very nearby, in a house that was in front of

1       the river, actually.

2       Q.  Did you have a name for that house?

3       A.  Yes.  It was the River Palace.

4       Q.  Were there guards at the River Palace?

5       A.  Yes.

6       Q.  What do you remember about the guards there?

7       A.  By the time we arrived to Raqqa, they were looking for the

8       place we had to stay.  And at one moment they just handle us to

9       a guy with a scar.  And this scar guy had, like, three, four

10      people working with him that eventually stay in the house with

11      us, like guards.  There were, like, four of them in the place.

12      Q.  Did you have a name for the guard with the scar on his face?

13      A.  It was Scarface.

14      Q.  And the guards that were with Scarface, do you remember

15      anything about the clothing of those other guards?

16      A.  Yes.  The other guards -- well, they were, like, normal

17      people, local people in Syria.  They were not exactly wearing

18      black clothes or something.  There was one of them that has this

19      Twitter sweatshirt -- well, two of them, I guess, they had this

20      Twitter thing, and the other one was with a leather jacket.

21      Q.  What were conditions like during the first couple of days at

22      the River House?

23      A.  It was very nice, actually, because after all the time we

24      had with a lot of stress with the movement and everything, we

25      arrived to this place.  And, like, first night we received

84

1    chicken with fries and sugar, things, tea.  We could prepare tea

2    for the guys.  And it was kind of a relief that we arrived to

3    this place, and the people, you could see they were local and

4    they didn't have that hate when they talked to you; like, okay,

5    we're just impressed that there were women there.  They live

6    with the guys in a different way, maybe, but with us they were

7    very normal.

8    Q.  So you said that the guards who were first at the

9    River House didn't have that hate for you.  Who did have that

10   hate for you?

11   A.  Well, when you see the guys that come into your room and

12   they just look at you and say, "Cover your face, I don't want to

13   see you again," I mean, you can see you are being addressed for

14   nothing you have done.

15   Q.  And who is it that said that to you?

16   A.  Sorry?

17   Q.  Who is it that said you have to cover your face?

18   A.  Abu Ahmed.

19   Q.  Who is that?

20   A.  He's the one from the case called "Jihadi John."

21   Q.  Is he one of The Beatles?

22   A.  Yes.

23   Q.  Why did you call him Abu Ahmed?

24   A.  I heard the guys and I heard someone called him in the

25   house.

1    Q.  You heard someone else call him Abu Ahmed?

2    A.  Yes.

3    Q.  Did you have names for the other Beatles?

4    A.  Not us.  From the exchange we had with the guys, we knew how

5    they called the other guys.

6         MS. GINSBERG:  Your Honor, same objection as

7    Mr. MacMahon's.

8         THE COURT:  All right.

9         MS. COOK:  Your Honor, I'm not trying to elicit an

10   out-of-court statement.  I will clarify the question.

11        THE COURT:  All right.  Do so.

12   Q.  At the time you were being held, did you and your female

13   colleagues have any names for the other two Beatles?

14   A.  The Beatles.

15   Q.  You just called them all "The Beatles"?

16   A.  Yes.  Number one or number two.

17   Q.  Going back to the first couple of days at the River House,

18   were you able to move around throughout the house?

19   A.  Yes.  We arrived on Saturday something, and the first three,

20   four days in the house was very calm.  And we could go outside,

21   take tea in the terrace with the river in front.

22        It was very surrealistic, actually.  Because I was a

23   detainee, but still I could move around and I could cook with

24   the other two women for the guys.  We could, yeah, circulate as

25   we want.  We could go to toilet and wash our clothes and shower

1    or something.  So these four first days were kind of, yeah,

2    calm, I have to say.

3    Q.  Were you able to talk with the male hostages?

4    A.  Just small exchanges.  As we could bring the tea, for

5    example, I could cross the guys.  I remember a tall guy and I

6    knew after he was James.  And he just look at me and said, "Oh,

7    Patricia, you are lucky.  Your clothes are so much nicer than

8    ours."  I was, like, oh, yes, okay, someone else is trying to

9    make fun of our situation.  So yes.  And then I --

10   Q.  Ms. Chavez Mejia, let me just ask you:  At the time that

11   James said that to you, was he dressed in orange?

12   A.  Yes.

13   Q.  Were the men allowed to move around the house like you and

14   your female colleagues?

15   A.  They could go with supervision from their room to the tea

16   room that was next to the place.  But it was just really for the

17   very, very beginning, like one or two times, something.

18           And after, as I'm saying, the situation changed very

19   quickly, so they were not able to move anymore.  They had to

20   remain in the room.  So, yeah, they couldn't go out anymore from

21   the place.

22   Q.  You testified a moment ago that you and your female

23   colleagues were allowed to cook for the men.  Were you able to

24   observe what kind of health condition the men seemed to be in?

25   A.  Well, in one of the exchanges we had with our Belgian

1    colleague, he said that the situation was very difficult for the

2    male because they have been not eating well.  And now that they

3    are start eating, it's very difficult.  They had a lot of

4    diarrhea, and, yeah, some even things in the hair or things like

5    that.

6          So it was -- yeah, he explained that it was very bad,

7    that some people were there for more than one year, and that we

8    had maybe to prepare rehydration liquids so they can also drink

9    a little bit of that and regain some forces.  So...

10   Q.  You said that the situation changed pretty quickly.  What do

11   you mean by that?

12   A.  Well, the four days after - I think it was a Wednesday or

13   something, in my memory - in the afternoon I saw the guard, Ali,

14   talking with two men talking outside the kitchen where I was.

15   And eventually one of them came this and went upstairs, had a

16   talk -- Frida was upstairs - and then he came back and asked me:

17   Are you going well?  And it was in French, so it was Abu Idris

18   who was there.

19          And so I thought, What's going on?  Why they are here?

20   Because they were not on the radar anymore.  And then that

21   changed, because the guards that were there, that were friendly,

22   they left.  And there were only a guard that was called Hussein

23   and the Twitter guy.  And two other guys that were kind of

24   rough; they can't talk to us, they didn't want to see us.  And

25   the male said that they were guards they had previously in

1    another prison.

2           So, yeah, it was -- we could not go in the living room

3    anymore, we could not go outside anymore.  We could just go to

4    the toilet and downstairs, and like two times a day and that's

5    it.

6    Q.  And that change happened after Abu Idris showed up at the

7    River House?

8    A.  Yes.

9    Q.  Did The Beatles also come to the River House?

10   A.  I think they were together at the moment, but I didn't see

11   the other ones.  Like, they didn't talk to me.  But I heard

12   someone saying:  Hmm, this is like five stars hotel.

13          So they were annoyed that we were having some kind of

14   normal time.

15   Q.  Who is it that said, "Hmm, this is like a five star hotel"?

16   A.  It was an English guy, British accent.  I cannot say who it

17   was.  It was not Abu Ahmed.  It was not that.  It was not

18   Abu Ahmed.

19   Q.  Was it one of The Beatles?

20   A.  Yes.

21   Q.  How often did The Beatles come to the River House?

22   A.  After that moment, they start coming more and more.  And

23   suddenly they brought their backpacks, and they get in the room

24   that was next to our room and they stay there.  So they were

25   there all the time.

1   Q.  After The Beatles started staying there, were you able to

2   move around the house anymore?

3   A.  Yes, they didn't have any option because they are not going

4   to cook for us.  So I have to still cook for myself, so I have

5   to go to the kitchen to eat.  So we can still move from our room

6   to the kitchen.

7   Q.  Were you able to go out on the terrace?

8   A.  No.

9   Q.  Were you able to go interact with the male hostages?

10  A.  No.

11  Q.  Were the men staying near the room where you were?

12  A.  Yes.

13  Q.  Could you overhear The Beatles interacting with the men?

14  A.  Yes.  Abu Ahmed manages to take the chair next to the window

15  of the door of the guys and start having a long conversation of

16  preaching Islam and the Qur'an, and, yeah, talking maybe

17  politics or whatever they can talk with the guys.  But for me,

18  it was like mental harassment, actually, because it was on and

19  on and on and on, and he didn't stop until 3:00, 4:00 in the

20  morning, maybe.

21  Q.  Did that make it hard to sleep?

22  A.  Yes.  Sure.

23  Q.  How did The Beatles treat the men at the River House?

24  A.  It was kind of a military harassment, I have to say.

25  Sometimes you could hear:  James, James, are you there, James?

```
 1              And the guy had to answer:  Yes, sir.
 2              And, yeah, I could hear James or Peter screaming -- I
 3    mean, they screamed their names to talk with them.
 4    Q.  By "they," do you mean The Beatles?
 5    A.  Yes.
 6    Q.  Did you ever overhear The Beatles doing anything to James at
 7    night?
 8    A.  I know that the guys -- well, one of the guys, they couldn't
 9    lay down.  You know, they had to remain --
10              MS. GINSBERG:  Objection, Your Honor.  I don't think
11    there's a proper foundation.
12              THE COURT:  I'll overrule that.
13              But you can make sure in your question to obviate any
14    foundation problem.
15              MS. COOK:  Thank you, Your Honor.
16              THE COURT:  Go ahead, Ms. Cook.
17    Q.  Ms. Chavez Mejia, was there ever a night when you could hear
18    The Beatles saying things to James?
19    A.  I cannot recall, no.
20    Q.  Okay.  Did The Beatles ever interact with you and Frida and
21    your Swiss colleague?
22    A.  Yes.
23    Q.  What did they do?
24    A.  At one moment they came -- well, he came in the room, Ahmed,
25    asking us, again, for the fourth time, I think -- not him, but
```

1    many people ask already our email addresses and the person they

2    can contact for the negotiations.  And eventually we gave the

3    email address we wanted them to contact in MSF, and, yeah, he

4    took it.

5    Q.  Would The Beatles ever come into your room at the

6    River House?

7    A.  Yes.

8    Q.  Did you have to do anything when The Beatles came into your

9    room?

10   A.  We always have to cover our faces when they come.

11   Q.  Would The Beatles announce before they would come in to your

12   room?

13   A.  No.  They, yeah, just open the door.  But in this place, it

14   was different.  In other places, you really have to unlock the

15   door.  In the River House, you could hear them coming, and,

16   yeah, it was kind of different.

17   Q.  So they could just walk into your room at any moment?

18   A.  Yes.  Yes.

19   Q.  Were there ever times when you didn't have your face covered

20   and you were worried about that?

21   A.  Yes.

22   Q.  What would you do?

23   A.  To run and fly to my bed or wherever my scarf was so I can

24   cover.  Because I was afraid that if I'm not covered, it's my

25   fault, and that I'm going to be blamed for that.

1    Q.  While you were at the River House, did The Beatles ask you

2    any proof-of-life questions?

3    A.  Yes.  At the beginning of February, Abu Ahmed came with a

4    little paper in his hand and a needle on the floor and start

5    asking the questions.  It was clearly the proof of life we wrote

6    in our MSF, yeah, contracts.

7    Q.  Did The Beatles ever threaten you or any of your female

8    colleagues?

9    A.  Yes.  My Switzerland colleague, she was very combative

10   woman, and she didn't want to remain silent or to say -- you

11   know, to stay and do what you are said to do.  And she start

12   talking with the guy, and the guy suddenly say:  "Woman, shut

13   up; otherwise, I will cut your tongue."

14   Q.  While you were at the River House, were you visited by

15   someone referred to as the Sheikh?

16   A.  Yes.

17   Q.  What happened when the Sheikh came to see you?

18   A.  Well, suddenly someone came in the room and stayed in the

19   door, and we were, as usually, with our faces covered.  And it

20   was with someone else who was not one of The Beatles, and he was

21   translating in French, actually.  It was not a normal person

22   that we used to see.  And he said, "He's asking you to uncover

23   your faces."

24          So he asked to see us.  And so we uncovered the faces,

25   and he asked the nationalities again, and then he just left.

1    Q.  Was it unusual to have this person ask that you uncover your

2    face?

3    A.  It was very scary at the moment because, well, I didn't

4    think about that personally, but my Switzerland colleague said:

5    Oh, my god, why is he doing that?  Maybe he wants to sell you as

6    slaves or he's going to do something.

7            So we start having, like, nightmares about that,

8    because we thought, okay, what is going to happen with us now?

9    Q.  How long did you spend at the River House?

10   A.  Something like 10 days.

11   Q.  Who told you that you would be leaving the River House?

12   A.  At some point -- at the time, actually, The Beatles arrive

13   to the house.  This guy, Hussein, he said, You are going to be

14   released in seven days.  And as we said that to the guys, they

15   said:  Probably we are going to be moved.

16           So we realized that every time they tell you, "You are

17   going to be released," it's because it's true -- that happens in

18   the previous locations as well that they say, "You are going to

19   be released," and then you move somewhere else and you arrive to

20   a new prison.

21           So we start counting the days, and, yeah, eventually

22   this seventh day came and it was true.  I mean, we were start to

23   moving, saying, okay, we are moving now.  So we gather all our

24   stuff.  And first the guys start moving and they said:  You are

25   going home.

1    So they went back -- they went down the stairs and were

2    put in the truck, and, yeah, we follow.  The pickup was there

3    for us.  I guess it was one of The Beatles themselves that drive

4    us to the place.

5    Q.  When you were in the car being driven, could you see where

6    you were going?

7    A.  No.  I was with the blanket on my head.  But -- yeah, it was

8    kind of easy for me to know where I was in the place because I

9    memorized how we came and when we are arriving to the main road

10   in Raqqa.  So I could picture the place in my head.

11   Q.  Did you drive very far?

12   A.  No.  We just, like, 10 minutes, maybe.  So we went to the

13   big road, and then at one moment we turned right.  And we were

14   in the middle of the desert, so there was to noise, no houses.

15   And we arrived to the place.

16   Q.  What happened when the pickup stopped?

17   A.  Well, they said that we were going to be for short time in

18   this place, that we were going to be released soon, and that we

19   don't have to worry, and that we have to go in.

20   Q.  Who is "they"?

21   A.  One of the guards.

22   Q.  Did you go into the place?

23   A.  Yes.

24   Q.  Were you told to go to a particular room?

25   A.  Yes.  There was -- well, when we enter, you have one door

```
 1    and the second door was opened, and they said you could go

 2    there.

 3              MS. COOK:  Could we please display Exhibit 3-7.  This

 4    has previously been admitted.

 5              THE COURT:  All right.  You may do so.

 6    Q.  Ms. Chavez Mejia, do you recognize this?

 7    A.  Yes.

 8    Q.  What is this?

 9    A.  Yes.

10    Q.  What is this?

11    A.  That is the Yahya's Guest House.

12    Q.  You called this place "Yahya's Guest House"?

13    A.  Yes.

14    Q.  Can you please touch the screen and indicate which room you

15    were told to go to into?

16    A.  (Witness complies.)

17    Q.  Thank you.

18              MS. COOK:  We can take it down.

19    Q.  Was Frida with you at that time?

20    A.  Yes.

21    Q.  Was your Swiss colleague with you at that time?

22    A.  Yes.

23    Q.  When you went into that room that you just marked, was

24    anyone else in the room?

25    A.  No.
```

1   Q.  Was anyone else brought to the room later?

2   A.  Yes.

3   Q.  Please describe that.

4   A.  Well, we started to put things together.  Like, when you

5   arrive somewhere, you try to organize yourself.  And as soon as

6   we arrived, the door opens again, and a woman came with a veil

7   covering her face.  So at the beginning we thought:  Oh, who are

8   you?

9          And when she uncovered, she was very surprised she was

10  having other female people, because you don't see a lot of

11  female there.  At least they are wives or someone from the

12  locals.  So we were very surprised.  And there were a lot of

13  questions.  My two colleagues start asking things.  And I can

14  only remember she said, "I am Kayla and I'm from America."

15         And she said, "How long have you been here?"

16         And she said, seven months.

17  Q.  How long did you end up staying at Yahya's Guest House?

18  A.  More than one month.

19  Q.  And was Kayla with you that whole time?

20  A.  Yes.

21         MS. COOK:  Could we please display Exhibit 6-5, which

22  has been previously admitted.

23         THE COURT:  You may do so.

24  Q.  Do you recognize the person in this photograph?

25  A.  Yes.

1    Q.   Who is this?

2    A.   It's Kayla Mueller.

3            MS. COOK:   Thank you.   We can take it down.

4    Q.   You've referred to this location where you met Kayla as

5    Yahya's Guest House.   Why did you call it that?

6    A.   That's the name of the guy that was in charge of this place.

7            MS. COOK:   Can we please display Exhibit 3-8, which has

8    previously been admitted.

9    Q.   Ms. Chavez Mejia, is this similar to the room where you were

10   held at Yahya's Guest House?

11   A.   Yes.

12   Q.   Did your room have white walls like this?

13   A.   Yes.

14   Q.   Did your room also have a window?

15   A.   Yes.

16   Q.   Could you see out of the window?

17   A.   No.

18           MS. COOK:   Thank you.

19   Q.   Was there any furniture in the room?

20   A.   There were mattresses and carpet.

21   Q.   Were you ever allowed out of the room?

22   A.   Yes, to go to toilet.

23   Q.   How many times a day?

24   A.   Two times, three times.

25           MS. COOK:   Could we please display Exhibit 3-17, which

 1    has already been admitted.

 2             THE COURT:  All right.

 3    Q.  Do you recognize this?

 4    A.  Yes.

 5    Q.  What is this?

 6    A.  It's the door that leads to the bathroom and toilet.

 7             MS. COOK:  Please display Exhibit 3-18, which has

 8    already been admitted.

 9    Q.  Do you recognize this?

10    A.  Yes.

11    Q.  What is this?

12    A.  That's the sink that was in the -- next to the bathroom.

13             MS. COOK:  And please display Exhibit 3-19, which has

14    already been admitted.

15    Q.  Do you recognize this?

16    A.  Yes.

17    Q.  What is this?

18    A.  That is the bathroom where Kayla was held before we arrived.

19    Q.  Kayla told you she was held here?

20    A.  Yes.

21    Q.  For how long?

22    A.  Around two weeks.

23    Q.  Were you allowed to shower at Yahya's Guest House?

24    A.  Yes.

25    Q.  How often?

1    A.  Once a week.

2    Q.  Were you allowed to wash your clothes at Yahya's Guest

3    House?

4    A.  Yes.

5    Q.  How often?

6    A.  Also once a week.

7    Q.  Going back to the room where you were with Kayla and Frida

8    and your Swiss colleague, what would you do during the day?

9    A.  There was a lot of chatting.  We had a lot of time to talk

10   and to eat whenever we want, because, yeah, the food was

11   available there.  We do exercise, we read.  Kayla brought a lot

12   of books and -- well, a lot.  Some books.  She brought the

13   Qur'an.  She brought things she had while she was studying

14   Arabic or something like that.

15   Q.  Did Kayla speak French?

16   A.  Yes.

17   Q.  Did she practice her French with you?

18   A.  Yes.

19   Q.  Did Kayla talk to you about her own kidnapping?

20   A.  Yes.

21   Q.  What did she tell you?

22          MS. GINSBERG:  Objection, Your Honor.

23          THE COURT:  All right.  I'll overrule the objection for

24   the reasons I've already articulated.

25          Next question.

1          Or you may answer the question.  I'll overrule the

2     objection.

3     BY MS. COOK:

4     Q.  What did Kayla tell you about her own kidnapping?

5     A.  Well, Kayla was working with an NGO in Turkey.  And she had

6     a boyfriend, a friend, that had to go to an MSF facility in

7     Aleppo to make a technical operation of something over the

8     internet, and she wanted to go with him.  And, well, they were

9     not very sure, but finally she went with him.

10          And for some reason, they lost the path they had to

11     take to go back.  But at one moment where they were with the MSF

12     car, they were caught.  Yeah, they asked them to stop, someone

13     asked to stop, and they were taken.

14     Q.  Was Kayla's friend or boyfriend taken with her?

15     A.  Yes.

16     Q.  Did Kayla's friend or boyfriend initially stay in the prison

17     where Kayla was?

18     A.  Yes.

19     Q.  Did Kayla say whether she ever saw the friend or boyfriend

20     again after her initial kidnapping?

21     A.  Yes.  He got released, and something like three weeks later

22     or something that I recall, he came back to try to negotiate

23     something that she could be released.  He was planning to tell

24     that they were married and that -- so, please, she can go with

25     him.  But Kayla was too scared to lie.  She thought that maybe

1    I'm going to be beaten or blamed if I lie, and that is going to

2    be worse.  So she didn't want to say that they were married.

3    Q.  Did Kayla talk to you about the places where she was held

4    before Yahya's Guest House?

5    A.  Yes.

6    Q.  What did she describe to you?

7            MS. GINSBERG:  Your Honor, same objection.

8            THE COURT:  All right.  It's the same person, though,

9    isn't it?  So I've ruled on that.

10           MS. GINSBERG:  You've ruled, Your Honor.

11           THE COURT:  All right.  You may answer that question.

12   I've overruled the objection.

13   Q.  Did Kayla describe to you the places where she was held

14   before Yahya's Guest House?

15   A.  Yes.  She talked about some places where she was taken with

16   families, where she could, yeah, spend some time with families.

17   But she also talk about a place that was like a cave.  I

18   imagined a dark place.  She talked about something like a long

19   corridor with doors on both sides.  And she also described one

20   place where she was held that was very small, like a dog kennel,

21   where she could not even stretch her hands.  And there were also

22   other people on the other kennels.

23           There is another place where she it was.  It was, yeah,

24   a full room for her.  I imagine that's very scary because she

25   said there were cockroaches at night, so it was very difficult

1   to sleep.  Because as soon as you begin to sleep, you start

2   feeling the things coming on your body.  So it was very

3   disgusting.

4   Q.  Did Kayla tell you how long she had to spend in the dog

5   kennel?

6   A.  I cannot recall, but it was more than one night.

7   Q.  Did Kayla tell you if she could hear things happening to

8   other prisoners in the places where she was held?

9   A.  Yes.  She talked about one of the guards that was kind of

10  friendly with her.  I recall she said that the guy had a stick

11  with a wire, like electricity thing, and that he came in the

12  room, like, making small chat, like you talk with a friend, and

13  he just had this thing that was used to beat the other

14  prisoners.

15         There was blood on the wire, she said, and it was very

16  difficult to understand how a person can be one moment so

17  aggressive and bad with someone, beating him, and at the next

18  time just very kind and talkative and, I don't know, just...

19  Q.  Did Kayla talk to you about her family?

20  A.  Yes, a lot.  We have told each other all of our lives.

21  Q.  Were the male hostages also at Yahya's Guest House?

22  A.  Yes.

23  Q.  How did you know that?

24  A.  Well, we could always hear the truck when they are coming

25  somewhere, so we could actually be relieved that they are

103

1    following us.  So we heard when they arrived and they were put

2    on the room next to ours, so the first door, the picture you

3    just saw.  And you could also hear that the guys would open the

4    door to go to the bathroom as well, so they were actually there.

5         MS. COOK:  Could we display Exhibit 3-7 again.

6    Q.  Could you indicate on this screen which room the men were

7    held in?

8    A.  (Witness complies.)

9    Q.  Thank you.

10        As the men were walking past your room to go to the

11   bathroom, could you see anything?

12   A.  Yes.  This side of the door on the ground, it was not open

13   and close.  So you would have the wind come in when the door was

14   opened from the outside, and you can also see kind of reflection

15   from the floor when the people were passing by.  So actually,

16   you could see orange one, orange two, going to the toilet and

17   bathroom.

18   Q.  As time went on at Yahya's Guest House, were there fewer and

19   fewer men going past your room?

20   A.  Yes.

21        MS. COOK:  Thank you.  You can take that down.

22   Q.  Did The Beatles ever come to Yahya's Guest House?

23   A.  Yeah.  Actually, not very -- yeah, like three or four days

24   after we arrive to Yahya's Guest House, they came and made a

25   video from us.  It was very quickly after we arrived, actually.

1    Q.  Did The Beatles do that in the room where you were being

2    held with Kayla?

3    A.  Yes.

4    Q.  How did The Beatles treat Kayla?

5    A.  Very differently that they treated us.  They were more

6    aggressive with her.  They will blame her for everything that

7    America has done, that it's her fault that her government

8    doesn't care about her, that the government doesn't want to make

9    a trade for her, things like that.

10   Q.  You mentioned a moment ago that when The Beatles came to

11   your room, they filmed a video of you and your colleagues.  With

12   the assistance of the court security officer, will you please

13   look at Exhibit 29-1, which is in Volume 5.

14   A.  Yes.

15   Q.  Do you recognize that?

16   A.  Yes.

17   Q.  What is that?

18   A.  That is the video that -- well, where I appear for my proof

19   of life.

20   Q.  And is that a disc that you had an opportunity to watch

21   before testifying?

22   A.  Yes.

23   Q.  Did you initial that disc after watching it?

24   A.  Yes.

25   Q.  And is that an accurate copy of the portion of the filming

 1   that The Beatles did with you and your colleagues?

 2   A.  Yes.

 3           MS. COOK:  The government moves for the admission of

 4   Exhibit 12-1.

 5           MS. GINSBERG:  No objection, Your Honor.

 6           THE COURT:  Admitted.  You may display it.

 7           (GOVERNMENT EXHIBIT Number 12-1 was admitted into

 8   evidence.)

 9           (Video played in open court.)

10   Q.  Who is the woman who is speaking?

11   A.  It's my Swedish friend Frida.

12   Q.  And who is the person on Frida's right?

13   A.  It's our Switzerland colleague.

14   Q.  And who is the other person in the video?

15   A.  It's me.

16   Q.  Was Kayla in the room while this was being filmed?

17   A.  Yes, she was there on the left.

18   Q.  What did Kayla have to do while the video was being filmed?

19   A.  Just stay aside.

20   Q.  Who was it that filmed this video?

21   A.  It was The Beatles.

22   Q.  Was one of The Beatles holding the camera?

23   A.  Yes.

24   Q.  Did The Beatles tell Frida what to say?

25   A.  Yes.

1    Q.  Did the Beatles tell you how to act in the video?

2    A.  Yeah.  They said that we had to look like more scared, you

3    know, because we were in our normal situation, and I guess they

4    didn't -- well, they didn't beat us or they didn't harm us at

5    the moment.  But it have to look like to make it more real for

6    the one who is going to see it outside.

7    Q.  Earlier you testified that you were at Yahya's Guest House

8    for over a month.  Were you told late in March that you were

9    going to be released?

10   A.  Yes.  Actually, I remember there was a moment where they

11   took a picture of us, and at some point there was one night

12   where I heard the truck coming and there was movement.  The guys

13   were leaving.  So at the beginning I thought, oh, we are moving

14   again.

15           So we gather everything and we never moved.  And

16   suddenly the guys came back, or the truck came back.

17           So it was very weird.  We thought, okay, something is

18   going on.  And there is, like, long time when you have any news,

19   after the video and the proof of life and everything.  So we

20   were wondering, what was going on with us.

21           And we asked Yahya what was happening.  And I don't

22   know if he did it on purpose, but he said:  You know, the

23   Spanish guys are left and you will be going on three to 10 days.

24           So it was, like, okay, now things are moving, but we

25   don't have any news, like official news that we are leaving.

1    But we know.  So we started counting the days from that moment,

2    and the day that we supposed to leave.  So let's say 26th of

3    March, it was the day we were moving.  So we were there just

4    waiting, and in the afternoon they opened the door very quickly

5    and it was --

6    Q.  Ms. Chavez Mejia, who is "they"?

7    A.  Sorry?

8    Q.  Who is they?

9    A.  Yahya opened the door, very nervous, saying:  Three MSF

10   women, you are leaving.  And so everybody start to move because

11   we were not prepared to leave at that moment.

12          And suddenly, Abu Ahmed came in the room, and the

13   women, when we are going to move, we are gathering things.  And

14   he was, like:  Oh, women, please calm down and let's think.

15          And eventually the other guys came in.  I cannot recall

16   exactly if they opened the door after or what.  But I remember

17   they asked us to face the wall.  And suddenly they say:  Okay,

18   we are not going to move today because there is security

19   problems.  We had an understanding with your organization, but

20   today it's not possible to move, and we are going to move

21   tomorrow.

22          So that was it.  And then they asked Kayla to write a

23   letter to her family.

24   Q.  Let me take you back for a moment.  You said that Abu Ahmed

25   came into the room.  Is that right?

1    A.  Yes.

2    Q.  And did I understand that the other Beatles came in as well?

3    A.  Yes.

4    Q.  While The Beatles were there, did they tell Kayla to do

5    something?

6    A.  They asked her to write a letter for her family.

7    Q.  Did The Beatles give you and your colleagues any

8    instructions about Kayla?

9    A.  Yes.  They said that if she was released, it was our

10   responsibility, that we have to do the negotiations for her.

11   They asked -- I don't know if that was at that moment, but they

12   asked Frida to memorize an email address so the exchange can be

13   done -- I mean, the negotiations can be done.  And they

14   instructed Kayla what she had to tell to her family.

15   Q.  In the letter Kayla was supposed to write?

16   A.  Yes.

17   Q.  Did The Beatles tell you anything about your male

18   colleagues?

19   A.  Well, they came in the room with the camera and the pictures

20   of the guys, the video of the guys, saying also that, This is

21   what is happening with your colleagues.

22        So they show us that they have bruises in their bodies,

23   like they have been beaten.  And it's kind of telling you, look,

24   this is what is happening to your colleagues, so you have to

25   take the message that they have to continue the negotiations for

1    them.

2    Q.  Did Kayla write a letter that night?

3    A.  Yes.  So as I'm telling you, that happened in the afternoon,

4    and then Kayla took the time to start writing.  And it was very

5    complicated for her because it's kind of heartbreaking what you

6    have to tell to your family.  She didn't really know what she

7    had to write.

8            Okay, on one side there is what they ask you to do, but

9    she didn't want her family to pay anything.  She didn't want her

10   family to sell their things to try to get her out.  She wanted

11   them to just, okay, continue and, yeah, maybe if it takes more

12   time, but not to ruin themselves to try to get her out.

13           So it was very difficult for her to write her -- this

14   letter.

15   Q.  Did Kayla write more than one letter?

16   A.  Yes.  We were afraid that what she was going to tell to her

17   family was going to be read by The Beatles, so she thought:

18   Maybe we are going to do two things.  And in one I said:  I can

19   take it back, so I can take the letter; I'm going to hide it.

20   And the other one is, like, the public letter that you will be

21   writing.

22   Q.  So the second letter would be one that would be okay if

23   The Beatles read it?

24   A.  Yes.

25   Q.  Did Kayla write the two letters before you were taken out of

```
1    the room?

2    A.  Yes.  We still had the full night because we were leaving

3    the day after.  So we had that night to write it.

4    Q.  Please turn to Exhibit 6-14, which is in Binder 3.

5    A.  Can you please say which one?

6    Q.  6-14.

7    A.  (Witness complies.)

8    Q.  Do you recognize this?

9    A.  Yes.

10   Q.  What is this?

11   A.  This is the letter that Kayla wrote, one of the letters.

12   Q.  One of the letters?

13   A.  (No verbal response.)

14   Q.  Please also turn to Exhibit 6-20.

15   A.  (Witness complies.)

16   Q.  Do you recognize this?

17   A.  Yes.

18   Q.  What is this?

19   A.  This is the public letter that Kayla wrote.

20   Q.  So this is the second letter that Kayla wrote?

21   A.  Yes.

22   Q.  The one that would be okay for The Beatles to read?

23   A.  Yes.

24   Q.  Did you carry these letters out for Kayla?

25   A.  Yes.
```

111

1    Q.  Were you with Kayla when she wrote them?

2    A.  Yes.

3         MS. COOK:  The government moves the admission of

4    Exhibit 6-14 and 6-20.

5         MS. GINSBERG:  No objection.

6         THE COURT:  They're admitted.  You may display them.

7         (GOVERNMENT EXHIBIT Number 6-14, 6-20 was admitted into

8    evidence.)

9         MS. COOK:  Can we please publish 6-20.

10        THE COURT:  Ms. Cook, can you tell me how much more you

11   have in your direct examination?

12        MS. COOK:  I would estimate 10 to 15 minutes.

13        THE COURT:  All right.  Proceed.

14        MS. COOK:  Could we please enlarge the highlighted

15   portion at the top of 6-20.

16   Q.  Ms. Chavez Mejia, are you able to see a reference here where

17   Kayla is saying she will serve a life sentence just like

18   Aafia Siddiqui unless 5 million Euros is given as a ransom?

19   A.  Yes.

20   Q.  Do you recognize the name Aafia Siddiqui?

21   A.  Yes.

22   Q.  How do you recognize that name?

23   A.  It's a name that The Beatles used to talk all the time where

24   they were annoyed with Kayla.

25   Q.  What did they say about Aafia Siddiqui?

1    A.  They wanted her to be exchanged by Kayla.  So, like, they

2    could free Kayla if America would free Aafia.

3           And also, what they would say, that it's not just that

4    she's in prison, and that Kayla is kind of the justification of

5    why they are taking her as prisoner.

6    Q.  And how often did The Beatles talk about Aafia Siddiqui to

7    you and your colleagues?

8    A.  Like, every time they come in the room.

9    Q.  Did they also talk about Aafia Siddiqui to Kayla?

10   A.  Yes.

11   Q.  Did Kayla give you the letters to carry out?

12   A.  Yes.

13   Q.  Did you hide one of them?

14   A.  Yes.

15   Q.  Where did you hide it?

16   A.  In my bra.

17   Q.  Were you and Frida and your Swiss colleague removed from the

18   room at Yahya's Guest House?

19   A.  Yes.

20   Q.  Who took you out of the room?

21   A.  Well, the day after, in the morning, Yahya opened the door

22   and he said we are going in the car.  And we get in the pickup,

23   and it was Abu Ahmed who was driving himself.

24   Q.  Is Abu Ahmed one of The Beatles?

25   A.  Yes.

113

1   Q.  Was Kayla still in the room when you left?

2   A.  Yes.

3   Q.  Where were you driven?

4   A.  Well, we were supposed to leave to the -- to be released.

5   We start driving, like, yeah, I don't know, 20 minutes or

6   something.  But suddenly we stopped, and we were waiting and

7   waiting and waiting.  And yeah, suddenly I think Ahmed receive a

8   text or something, and he get very annoyed, and he just did that

9   in his wheel.

10          MS. COOK:  Your Honor, for the record, the witness

11  indicated fists slamming down.

12          THE COURT:  So ordered.

13  A.  Then he start the car again, and he went on the opposite

14  side.  So we turned back.  And yeah, I didn't know where we were

15  going at the moment, but as we stopped, I realized we were again

16  in the house.  So we went back to the house.

17  Q.  You were returned to Yahya's Guest House?

18  A.  Yes.

19  Q.  Were you taken back to the room that you had shown us

20  earlier on the photo?

21  A.  Yes.

22  Q.  Was Kayla still there?

23  A.  Yes.

24  Q.  Had Kayla done anything while you were away?

25  A.  Well, she thought we were going, so she had to have a

1  project, and she moved everything.  She removed all the

2  mattresses and put everything on the side, and she just left one

3  of the mattresses for herself.  So when we arrived, she was kind

4  of happy that she had again new mates, but she didn't realize it

5  was us.  And then suddenly:  What are you doing here again?

6         And yeah, we said:  I don't know, something went wrong

7  and we are not moving.  So...yeah.

8  Q.  How much longer did you spend at Yahya's Guest House?

9  A.  We thought we were staying for the night.  They said, again,

10 there was a problem and that we were probably moving the next

11 day.  But, yeah, we went on the few moments after, actually.  It

12 was like two, three hours, and then they came again.

13 Q.  Were you taken to a car again?

14 A.  Yeah.  So this time, actually, when they opened the door and

15 we went to the car again, it was not anymore Abu Ahmed who was

16 driving.  There were other guards that were driving and they

17 took us to -- yeah, we went first to some location near Raqqa,

18 or in Raqqa.  And we were just outside the house waiting,

19 waiting, waiting.  And yeah.

20 Q.  Taking you back to Yahya's Guest House for a moment, that

21 second time you were taken out and actually left Yahya's house

22 for good, did you say good-bye to Kayla?

23 A.  Yes.

24 Q.  Was she left in the room there?

25 A.  Yes.

1   Q.  I want to take you back to your earlier testimony about

2   Aafia Siddiqui.  Who is it what would talk to you about

3   Aafia Siddiqui?

4   A.  The Beatles.

5   Q.  Was it all three of The Beatles?

6   A.  Yes.

7   Q.  Were you and your MSF colleagues eventually released into

8   Turkey?

9   A.  Yes.

10  Q.  What did you do with the letters that Kayla had written?

11  A.  I hand over to MSF.

12          MS. COOK:  If I could have the Court's indulgence for a

13  moment.

14          THE COURT:  Yes.

15          MS. COOK:  Thank you.  I have no further questions.

16  Ms. Ginsberg will have some questions for you now.

17          MS. GINSBERG:  Thank you, Your Honor.

18          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19  **BY MS. GINSBERG:**

20  Q.  Ms. Chavez Mejia, I'm Nina Ginsberg.  I'm one of

21  Mr. Elsheikh's attorneys.  I have just a few questions, if you

22  don't mind.

23          You have mentioned the name of one of The Beatles a

24  number of times, someone you refer to as "Abu Ahmed."  Correct?

25  A.  (No verbal response.)

116

1    Q.  And as far as you perceived him, he was the leader of the

2    people you have called The Beatles.  Correct?

3    A.  Yes.

4    Q.  And the reason you thought he was the leader is that he gave

5    all the instructions and he basically told everybody what to do?

6    A.  No, I think he was a very talkative guy, but the other ones

7    were also in their way leading the thing.

8         It's just the others didn't want to talk with us.  It

9    was like the others -- you know, the guys, they didn't even want

10   to look at us.  We were like -- it's like they were disgusted

11   for us.  So they don't talk to us.  We are not -- we don't mean

12   anything for them, so we don't exist, it's better they don't see

13   us.

14        But Ahmed did.  Ahmed talked to us.  I mean, he said

15   things.  But it's not like the others were not saying anything.

16   You know, I remember one of The Beatles in the room, he just

17   checked that there were food on the floor.  And he came to our

18   food and he kick it with his foot.  I said, like, oh, my god,

19   it's our food.  There's no respect for anything.

20        And he was annoyed that we had something to eat there.

21   He was annoyed that we were having these, yeah, smooth

22   conditions.  Maybe for him it was better that we didn't have

23   anything, that we were starving, and it was not the case.  I

24   guess that annoyed them.

25   Q.  But as far as someone telling you what to do, the person who

1   did that was generally Abu Ahmed?

2   A.  No, the others said also, "Face the wall," or "Cover your

3   face."

4   Q.  Abu Ahmed is the person who asked you to provide the email

5   addresses.  Correct?

6   A.  Yes, he is the one who came.

7   Q.  And he is the one who instructed you providing proof-of-life

8   information and the video.  Correct?

9   A.  Yes.

10  Q.  So in terms of all the ransom negotiations, he was the

11  person instructing about communicating with your families or

12  communicating with MSF?

13  A.  I cannot say.  They were always the three of them.  The one

14  who was making the movie was not Ahmed.

15  Q.  All right.  You described the guards as being friendly.  Is

16  that correct?

17  A.  Yes.

18  Q.  And the guards were also friendly to Kayla.  Is that

19  correct?

20  A.  Yes.

21  Q.  And when you said that Abu Ahmed was more aggressive, or the

22  people you call The Beatles were more aggressive with Kayla, you

23  were talking about being verbally aggressive.  Correct?

24  A.  Yes.

25  Q.  And what you meant was that they were more critical of her,

1     they blamed -- they essentially blamed her for -- blamed her for

2     the actions of her government?

3     A.   It was more than that.   It was like mental harassment also

4     for what your family is going to do, what your friends are going

5     to do for you.   And not only for her, I mean, for us as well.

6     But it was more than only America.   There was only kind of hate

7     for her because she represented America.   So, yeah, it...

8     Q.   Okay.   And they -- essentially all of the discussions of the

9     negotiations were geared towards receiving ransoms in exchange

10    for releasing you and the other hostages.   Correct?

11    A.   As much I heard, yes.

12    Q.   In fact, I think you testified that when you were released,

13    you were told that it was your responsibility to assist with the

14    negotiations for the ransom for Kayla's life.   Right?

15    A.   Yes.

16    Q.   And you said that there were two letters that Kayla wrote.

17    Correct?

18    A.   (No verbal response.)

19    Q.   And one was because -- one was written with the thought that

20    someone might read it, the captors right read it.   The other one

21    was meant to be kept secret?

22    A.   Yes.

23         MS. GINSBERG:   Would you mind putting government

24    Exhibit 6-14.

25    Q.   Do you recognize this letter?

1    A.  Yes.

2    Q.  And this is the letter that you carried out in your bra?

3    A.  Yes.

4    Q.  And this was not discovered by The Beatles, or anybody else?

5    A.  No.

6    Q.  And will you please --

7         THE COURT:  Ms. Ginberg, would you speak up just a

8    little more?

9         MS. GINSBERG:  Yes, I'm sorry, Your Honor.

10   Q.  And do you see about the fourth line down in this letter

11   where Kayla writes:  "Please know that I am in a safe location,

12   completely unharmed and healthy"?

13   A.  Yes.

14   Q.  And she says in parentheses:  "Put on weight and fat."

15   Correct?

16   A.  Yes.

17        THE COURT:  Next question.

18   Q.  Just a few more questions.  When you said that you heard

19   discussions about Aafia Siddiqui, it was all of The Beatles who

20   were discussing Ms. Siddiqui.  Correct?

21   A.  Yes.

22   Q.  And it was also all of The Beatles who you overheard

23   preaching about Islam?

24   A.  To Kayla?  Or I didn't understand the question.

25   Q.  I thought you testified that you heard The Beatles talking

1    with the male hostages through the night, and they were

2    essentially preaching about Islam?

3    A.  Yes.

4    Q.  And that was all of the Beatles.  Correct?

5    A.  Yes.

6          MS. GINSBERG:  Thank you.  I don't have any more

7    questions.

8          THE COURT:  Any redirect?

9          MS. COOK:  Yes, Your Honor.

10    **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

11    **BY MS. COOK:**

12    Q.  Did you have an opportunity to watch The Beatles interacting

13    with each other?

14    A.  Well, when we were in the River House, they were in the

15    living room where we could not enter.  You know, there is this

16    door that was a little bit open, and they were there.

17    Q.  How did they treat each other?

18    A.  They talked, I mean, normally.  They looked like friends.

19    They are -- yeah.  I mean, there is no -- you don't have this

20    rank between them, if it's what I can say.  They are like

21    equals.  They are doing the same things, like together.  You

22    always see them together, and yeah, maybe making jokes about us.

23    Or if there is something about us, it's common.  I mean, they

24    have the same approach with us.

25    Q.  Did they seem to know each other well?

1    A.  Yes.

2    Q.  You were asked about whether guards were friendly with you

3    and Kayla.  Do you remember those questions?

4    A.  Yes.

5    Q.  Were The Beatles different from those guards?

6    A.  Yeah.  They -- I mean, do you mean different in the

7    treatment they have with Kayla?  Or what do you mean?

8    Q.  What was the difference in treatment between the guards who

9    were friendly and The Beatles?

10   A.  Well, the guards were more like in the -- trying to preach

11   us about Muslim and Islam, being kind, bringing us sweets or the

12   food.  But The Beatles will never do that.  I mean, they -- it's

13   business.  You just talk and come -- you do what you have to do,

14   and that's it.  It's very straight to the point what they have

15   to say, and that's it.  And if they have to tell something to

16   blame you, it was more like to harass us than to talk.  The

17   other ones were talking.  They maybe wanted to teach us

18   something.  But they didn't.

19   Q.  The Beatles didn't want to teach you?

20   A.  No.

21   Q.  You were told that -- or made to feel that you had

22   responsibility for Kayla's release.  Is that right?

23   A.  Yes.

24   Q.  Did The Beatles make you feel afraid for Kayla if a ransom

25   wasn't paid?

1    A.  Well, they said a lot of things.  At this moment if they

2    said she was going to die, I don't remember they said they

3    were going to kill her.  I don't remember like that.  But yeah,

4    you can say that if the government doesn't make any

5    negotiation, it's -- yeah, something is going to happen with

6    her.

7    Q.  The letter that Ms. Ginsberg walked through with you a bit,

8    who did Kayla mean that letter to go to?

9    A.  She wanted that letter to go to her family.

10   Q.  So was it Kayla's plan to have her parents read this letter?

11   A.  The public one, you mean, or the...

12   Q.  The one that you hid in your bra.

13   A.  Yeah, that was for the parents.  And it was also --

14   sorry, if I can say.  It was also for us to give some

15   instructions, because there were names of people that the

16   family can contact or that we can contact in case we need to

17   find someone, you know, to reach the family or to do

18   something.  So there were different instructions in the letter

19   as well.

20   Q.  At the time that you met Kayla, how long had she been held

21   by ISIS?

22   A.  Already seven months.

23   Q.  Did Kayla want to be at Yahya's Guest House?

24   A.  She wanted to be there?

25   Q.  Did she want to be there at Yahya's Guest House?

```
 1    A.   No.

 2    Q.   Where did Kayla want to be?

 3    A.   She wanted to go home.

 4    Q.   Did she want to be reunited with her family?

 5    A.   Yes.

 6    Q.   While she was in custody, was she able to talk to her

 7    family?

 8    A.   Where she was in custody, she was able to?

 9    Q.   While she was in custody in that room with you, was she able

10    to talk to her family?

11    A.   No.

12    Q.   Was she able to walk out of the room whenever she wanted?

13    A.   No.

14         MS. COOK:  No further questions, Your Honor.

15         THE COURT:  All right.  Thank you.  You may step down.

16         Call your next witness, please.

17         MS. COOK:  The government calls George Smith.

18         THE COURT:  How long a witness is this?

19         MS. COOK:  I anticipate 20 to 30 minutes.

20         THE COURT:  All right.  Let's proceed.  I'll plan on a

21    recess when we finish this recess.

22         Come forward and take the oath, please, sir.

23         (Oath administered by courtroom deputy clerk.)

24         THE COURT:  You may proceed, Ms. Cook.

25         MS. COOK:  Thank you.
```

1      **(GEORGE SMITH, having been duly sworn, testified as follows:)**

2              **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

3      **BY MS. COOK:**

4      Q.  Good afternoon.  Will you please state your name and spell

5      it for the record.

6      A.  George Smith, G-E-O-R-G-E, S-M-I-T-H.

7      Q.  How are you currently employed?

8      A.  I'm a senior analyst for the Department of Defense.

9      Q.  How long have you been an analyst for the Department of

10     Defense?

11     A.  11 years.

12     Q.  What was your location in January of 2018?

13     A.  I was in Northeast Syria.

14     Q.  When did you arrive in Syria?

15     A.  Sometime in the middle of December 2017.

16             MS. COOK:  Could we please display Exhibit 2-1, which

17     has already been admitted.

18             THE COURT:  Yes.

19     Q.  Mr. Smith, if you touch the screen, it will leave a red

20     mark.  Could you please indicate for the jury the general area

21     where you were living in January of 2018?

22     A.  (Witness complies.)

23     Q.  Thank you.

24             Will you briefly describe your assignment in Syria at

25     that time?

1    A.  My duties included supervising the biometric enrollments and

2    accounting for ISIS foreign terrorist fighters captured by the

3    Syrian Democratic Forces.

4    Q.  What are the Syrian Democratic Forces?

5    A.  It's a Kurdish-led partner force in Northeast Syria.

6    Q.  In January 2018, or the time you arrived in Syria, was the

7    SDF taking numerous ISIS fighters into custody?

8    A.  Yes, hundreds.

9    Q.  What was going on in that part of the world at that time?

10   A.  The SDF were conducting a military offensive against

11   ISIS-held territory in Northeast Syria, and in that they were

12   capturing ISIS fighters on the battlefield as well as ISIS

13   fighters trying to get smuggled out of Syria into Turkey.

14   Q.  And what was the objective of the SDF and U.S. military

15   forces in that area?

16   A.  To defeat the ISIS caliphate.

17   Q.  You testified a moment ago that part of your assignment was

18   identifying persons in SDF custody.  Will you please describe

19   how you would identify them?

20   A.  We would receive notices from the SDF of who they had in

21   custody, and then we would also send teams to the various

22   Kurdish prisons or SDF prisons to biometrically enroll the

23   foreign terrorist fighters.

24   Q.  What is a biometric enrollment?

25   A.  It's a process by which we obtain biographic information

1    such as full names, place of birth, place of birth, language

2    spoken, as well as things like iris skins, fingerprints, and

3    photographs.

4    Q.  Were the fingerprints that you collected submitted to a

5    database?

6    A.  Yes.

7    Q.  Was the database capable of running comparisons with known

8    fingerprints?

9    A.  Yes.

10    Q.  Did your team conduct biometric enrollments of persons in

11    SDF custody on January 21st, 2018?

12    A.  Yes.

13    Q.  On that day, did you supervise the biometric enrollment of a

14    person who said his name was Suhayb Abdullah Jasim al-Salih?

15    A.  Yes.

16    Q.  Does that name, Suhayb Abdullah Jasim al-Salih, stand out to

17    you?

18    A.  Yes.

19    Q.  Do you have a memory of enrolling that person?

20    A.  Yes.

21    Q.  What did the person claiming to be Suhayb Abdullah Jasim

22    al-Salih say was his country of origin?

23    A.  Yemen.

24    Q.  What language did that person speak during the biometric

25    enrollment on January 21st?

```
 1    A.  Arabic.

 2    Q.  Did Suhayb Abdullah Jasim al-Salih give you any indication

 3    that he could speak languages other than Arabic?

 4    A.  No.

 5    Q.  Please to Tab 4-1 in Volume 2.

 6    A.  Okay.

 7    Q.  Do you recognize the person in that photograph?

 8    A.  Yes.

 9    Q.  Who is that?

10    A.  That was the individual who identified himself as

11    Suhayb Abdullah Jasim.

12    Q.  And is that the person you interacted with on January 21st,

13    2018?

14    A.  Yes.

15         MS. COOK:  The government moves the admission of

16    Exhibit 4-1.

17         THE COURT:  It's admitted.  I didn't hear an objection.

18         MR. ELLIS:  No objection, Your Honor.

19         THE COURT:  All right.  It's admitted without

20    objection.

21         (GOVERNMENT EXHIBIT Number 4-1 was admitted into

22    evidence.)

23         MS. COOK:  Permission to publish.

24         THE COURT:  You may.

25    Q.  Mr. Smith, do you see the person in -- that's displayed on
```

1    the photo in 4-1 in the courtroom today?

2    A.  Yes.

3    Q.  Will you please point to that person and describe what that

4    person is wearing?

5    A.  To my left, in a blue suit.

6             THE COURT:  All right.  The record will reflect that

7    the witness has identified the defendant, El Shafee Elsheikh.

8             Next question.

9    Q.  On January 21st, 2018, did the person claiming to be

10   Suhayb Abdullah Jasim say how he came into SDF custody?

11   A.  Yes.

12   Q.  What did he say?

13   A.  He said he was captured while being smuggled out of Syria

14   into Turkey.

15   Q.  Did he say if he was captured with other persons also trying

16   to be smuggled into Turkey?

17   A.  Yes.  It was a large group captured at that time.

18   Q.  On that same day, did you also biometrically enroll a person

19   who claimed his name was Yahya Ibrahim bin-Mustafa al-Salij?

20   A.  Yes.

21   Q.  Does that name, Yahya Ibrahim, stand out to you?

22   A.  Yes.

23   Q.  What country did that person claim to be from?

24   A.  Yemen.

25   Q.  What language did Yahya Ibrahim speak during the enrollment

1    on January 21st, 2018?

2    A.  Arabic.

3    Q.  Please turn to Exhibit 4-1A.

4    A.  Okay.

5    Q.  Do you recognize the person in that photograph?

6    A.  Yes.

7    Q.  Who is that?

8    A.  That was the individual who identified himself as

9    Yahya Ibrahim during that biometric enrollment.

10          MS. COOK:  The government moves admission of

11   Exhibit 4-1A.

12          MR. ELLIS:  No objection, Your Honor.

13          THE COURT:  It's admitted.  You may display it if you

14   wish.

15          (GOVERNMENT EXHIBIT Number 4-1A was admitted into

16   evidence.)

17          MS. COOK:  Please display 4-1A.

18          THE COURT:  Next question.

19   Q.  Was the person that we saw previously in 4-1, who claimed to

20   be Suhayb Abdullah, shown photos of other persons captured with

21   him?

22   A.  Yes.

23   Q.  Was the person who claimed to be Suhayb Abdullah shown a

24   picture of the person from 4-1A who claims to be Yahya Ibrahim?

25   A.  Yes.

1   Q.  What did Suhayb Abdullah say about the person in 4-1A?

2   A.  He identified him as Yahya Ibrahim and said he had only met

3   him when the group was being smuggled and said he was from

4   Yemen.

5   Q.  Were the fingerprints of the individuals you screened on

6   January 21st submitted to the database?

7   A.  Yes.

8   Q.  Including the prints of the person shown in Exhibit 4-1?

9   A.  Correct.

10  Q.  Did you receive any notifications about any of the

11  individuals that you enrolled?

12  A.  Yes.  I received a phone call and then a follow-up email

13  that the fingerprints for the individual who identified himself

14  as Suhayb Abdullah were a match in the database.

15  Q.  A match to who?

16  A.  El Shafee Elsheikh.

17  Q.  When did you receive the notification?

18  A.  I don't remember the exact date.  Shortly after the

19  biometric enrollment.

20  Q.  What did you do after receiving the notification that

21  El Shafee Elsheikh's prints were a possible match to someone you

22  had screened on January 21?

23  A.  I notified my DoD chain of command, and then I reached out

24  to my colleague, Jason Richards, and asked him to go to the

25  prison to verify El Shafee Elsheikh's identity.

1    Q.  Are you familiar with the name Mohammed Emwazi?

2    A.  Yes.

3    Q.  In 2015, were you aware of information that the Department

4    of Defense publicly released about Mohammed Emwazi?

5    A.  Yes.

6    Q.  What was that information?

7    A.  Mohammed Emwazi was killed in a DoD air strike in Raqqa,

8    Syria, in November 2015.

9           MS. COOK:  May I have the Court's indulgence for a

10   moment?

11          THE COURT:  Yes.

12          MS. COOK:  I have no further questions.

13          THE COURT:  Any cross-examination?

14          MR. ELLIS:  Yes, sir, just briefly.

15          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

16   **BY MR. ELLIS:**

17   Q.  Mr. Smith, how many were in the group in which Mr. Elsheikh

18   was captured?

19   A.  I don't remember the exact amount.

20   Q.  Could you give an estimate?

21   A.  10 to 12.

22   Q.  And when you were notified that that group was captured,

23   were you given any type of evidence in which they were captured

24   with?

25   A.  What do you mean by "evidence"?

1  Q.  Documentary, physical evidence that would be related to this

2  case?

3  A.  We were just notified that they were captured, and we

4  weren't given access to the items they were captured with.

5  Q.  Were you aware if there were any items they were captured

6  with?

7  A.  I don't recall at this time.

8  Q.  Was Mr. Elsheikh in DoD custody at that point, or

9  United States custody?

10  A.  No, he was in SDF custody.

11  Q.  And did the DoD consider SDF to be an autonomous force, or

12  partner force, as you stated?

13  A.  A partner force.

14  Q.  And were they in complete control of their own detainees?

15  A.  Was the SDF in complete control?

16  Q.  Correct.

17  A.  Yes.

18  Q.  So they had complete dominion, they had complete discretion

19  over what happens to those detainees?

20  A.  Yes.

21  Q.  So they could -- in other words, the DoD could not have

22  forced them to turn Mr. Elsheikh over?

23  A.  No, we can't.

24  Q.  If they wanted to send him to any other government in the

25  world, they could have done so?

1    A.  Yes.

2    Q.  Including the government of Iraq?

3    A.  Yes.

4           MR. ELLIS:  That's all the questions I have,

5    Your Honor.

6           THE COURT:  Any redirect?

7           MS. COOK:  No, Your Honor.

8           THE COURT:  Thank you.  You may step down.

9           Is the next witness as short as that one?

10          MS. COOK:  Yes, Your Honor.

11          THE COURT:  Let's do it.  Is that all right, ladies and

12   gentlemen?  Let's do it.

13          MS. COOK:  The government calls Jason Richards.

14          (Oath administered by courtroom deputy clerk.)

15          THE COURT:  Ms. Cook, you may proceed.

16          MS. COOK:  Thank you.

17    **(JASON RICHARDS, having been duly sworn, testified as follows:)**

18              **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

19   **BY MS. COOK:**

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  Will you please state your name and spell it for the record.

23   A.  Yeah, it's Jason Richards, J-A-S-O-N, R-I-C-H-A-R-D-S.

24   Q.  Who is your current employer?

25   A.  The Department of Defense.

1    Q.  How long have you worked for the Department of Defense?

2    A.  Just short of 19 years.

3    Q.  Where were you in January 2018?

4    A.  I was in Northeastern Syria.

5    Q.  On or about January 22nd, 2018, did you become aware that

6    the SDF may have captured an individual named

7    El Shafee Elsheikh?

8    A.  Yes, I did.

9    Q.  How did you become aware?

10   A.  Through any analyst, Mr. George Smith.

11         MS. COOK:  Could we please display Exhibit 4-1, which

12   has previously been admitted.

13   Q.  Do you recognize the person in this photograph?

14   A.  Yes, I do.

15   Q.  Did you speak with this person on January 23rd, 2018?

16   A.  Yes, I did.

17   Q.  Do you see that person in the courtroom today?

18   A.  Yes, I do.

19   Q.  Will you please point to the person and indicate something

20   that he is wearing?

21   A.  He's right here, and he's wearing - let's say, I can't see -

22   looks like a blue shirt.

23         MS. COOK:  Your Honor, may the record reflect the

24   witness has identified the defendant?

25         THE COURT:  So ordered.  Next question.

1    Q.  When you began speaking with Mr. Elsheikh, what name was he

2    using?

3    A.  He was using Suhayb Abdullah Jasim al-Salih.

4    Q.  What language was he speaking?

5    A.  He was speaking in Arabic.

6    Q.  Did he give you any indication he could speak English?

7    A.  No.

8    Q.  On January 23rd, 2018, did he tell you his real identity?

9    A.  Yes.

10   Q.  What did he say his name was?

11   A.  El Shafee Elsheikh.

12   Q.  Did he switch from Arabic to another language?

13   A.  Yes, he did.

14   Q.  What language did he switch to?

15   A.  To English.

16   Q.  Did you notice whether Mr. Elsheikh spoke with an accent?

17   A.  Yes, I did.

18   Q.  What was that accent?

19   A.  British-English.

20   Q.  Did he tell you where he was from?

21   A.  Yes, he did.

22   Q.  Where did he say he was from?

23   A.  From London, England.

24          MS. COOK:  Can we please display Exhibit 4-1A, also

25   previously admitted.

1    Q.  Did you ask Mr. Elsheikh about the person in this photo?

2    A.  Yes, I did.

3    Q.  Did Mr. Elsheikh tell you the name of the person in 4-1A?

4    A.  Yes, he did.

5    Q.  What did Mr. Elsheikh say this person's name was?

6    A.  Alexanda Kotey.

7    Q.  Did you personally later speak with the person in 4-1A?

8    A.  Yes, I did.

9    Q.  Did you learn the name of the person shown in 4-1A?

10   A.  Yes, I did.

11   Q.  And what did this person say his name is?

12   A.  Alexanda Kotey.

13          MS. COOK:  May I have the Court's indulgence for a

14   moment?

15          THE COURT:  Yes.

16          MS. COOK:  I have no further questions, Your Honor.

17   Thank you.

18          THE COURT:  Any cross-examination?

19          MR. ELLIS:  Yes, sir.

20            **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

21   **BY MR. ELLIS:**

22   Q.  Mr. Richards, was Mr. Elsheikh in U.S. custody at that

23   point?

24   A.  No, he was not.

25   Q.  Whose custody was he in?

1  A.  He was in the SDF's custody, the Syrian Democratic Forces.

2  Q.  And the Syrian Democratic Forces is a Kurdish army, or

3  fighting force?

4  A.  A Kurdish paramilitary force, yes.

5  Q.  And does the SDF have complete autonomy over their detainees

6  that they capture?

7  A.  Yes, they do.

8  Q.  Were you allowed to take their detainees without their

9  permission?

10 A.  No, we were not.

11 Q.  If the SDF decided to transfer their detainees to another

12 government, were they permitted to do so?

13 A.  Yes, they would be.  They would notify us, but they would.

14 Q.  Was it possible at that point in January 2018 that the SDF

15 could transfer Mr. Elsheikh to the government of Iraq?

16 A.  I do not believe that they had a unilateral relationship

17 with the government of Iraq to do so at that time, so I do not

18 know if it was possible.  I would find that highly unlikely to

19 do it unilaterally.

20 Q.  Well, not unilaterally, but obviously if they contacted the

21 government and that government wanted the transfer, then it was

22 their discretion.  Correct?

23 A.  They could, yes.

24 Q.  To your knowledge, was Mr. Elsheikh captured with any type

25 of evidence on his person?

1    A.  Yes, he was.

2    Q.  Okay.  And was that all turned over?

3    A.  Turned over to whom?

4    Q.  To the DoD?

5    A.  Yes, it was.

6         MR. ELLIS:  Could I have one minute, Your Honor?

7         THE COURT:  Yes.

8         MR. ELLIS:  That's all I have, Your Honor.

9         THE COURT:  All right.  Any redirect?

10         MS. COOK:  No, Your Honor.

11         THE COURT:  Thank you.  You may step down.

12         All right, ladies and gentlemen, progress.  We'll take

13    the afternoon break at this time.  We will reconvene at 3:30.

14    How's that?  3:30.  Remember to refrain from discussing the

15    matter among yourselves or with anyone, or undertaking any

16    investigation on your own.  I haven't succeeded yet in providing

17    snacks, but the soft drinks are still there.  It's a reminder

18    that the power I wield is very limited.  It's even more limited,

19    I assure you, when I get home.

20         You may follow the court security officer out.

21         (Jury out at 3:05 p.m.)

22         THE COURT:  Court stands in recess until 3:30.

23         MS. COOK:  My apologies.  Can the last three witnesses

24    be excused?

25         THE COURT:  Yes.  If there's no objection, that's

1    always the case.  Yes, they may.

2           MS. COOK:  Thank you, Your Honor.

3           (Recess taken at 3:06 p.m.)

4           THE COURT:  Mr. Parekh, you're the next designated

5    victim?

6           MR. PAREKH:  Yes, Your Honor.

7           THE COURT:  And you have Chiappone and two SDF -- the

8    two SDF will be by video.  Is that right?

9           MR. PAREKH:  Yes, Your Honor.  And I don't believe

10   we'll play those at this time.  We may play them later on in our

11   case, or, if there's a rebuttal case, we may wait to play it

12   then.

13          So after Special Agent Chiappone, we would have

14   Peshwaz Faizulla.  And just to preview for the Court,

15   Special Agent Chiappone, I believe, will be a very lengthy

16   witness, and we've done our very best to streamline our

17   evidence.  As Your Honor knows from the November suppression

18   hearing in this case, we had Special Agent Chiappone and

19   Special Agent Nutter testify.  We are not calling

20   Special Agent Nutter at trial for efficiency reasons, although

21   he could corroborate much of Special Agent Chiappone's

22   testimony.  And we also don't expect to call a summary agent.

23          So Special Agent Chiappone would in effect also be our

24   summary agent.  So we're essentially combining three witnesses

25   into one.  And we also anticipate playing a number of the media

1      clips, probably almost all of them.  So I just wanted to give

2      Your Honor --

3              THE COURT:  Media clips, you mean the interviews?

4              MR. PAREKH:  Yes, the interviews that the defendant

5      participated in with the media organizations.

6              THE COURT:  And when would you do that?  With Chiappone

7      or someone else?

8              MR. PAREKH:  We would do that with Chiappone.

9              THE COURT:  So that's now?

10             MR. PAREKH:  That's now.  And so I anticipate

11     Special Agent Chiappone may take us through the end of the day,

12     depending on how long Your Honor wishes to go this evening.  But

13     I wanted to let you know that because we're combining three

14     witnesses into one, he'll be a longer witness.

15             THE COURT:  Anything else?

16             MR. PAREKH:  Nothing else, Your Honor.

17             THE COURT:  And you may be seated, I'm sorry.

18             MR. PAREKH:  Your Honor, Special Agent Chiappone is in

19     the courtroom.  May he take the witness stand?

20             THE COURT:  Yes, he may.

21             Come forward, sir.  Before you take the witness stand,

22     just stand beside it if you would, please, sir.

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  Because we'll administer the oath to you.

25             (Jury in at 3:37 p.m.)

1           THE COURT:  Mr. Parekh, you may call the next witness

2    for the government.

3           MR. PAREKH:  Thank you, Your Honor.  The United States

4    calls Special Agent John Chiappone to the stand.

5           THE COURT:  And he's here.  You may administer the oath

6    to Special Agent Chiappone.

7           (Oath administered by courtroom deputy clerk.)

8           MR. PAREKH:  May I proceed, Your Honor?

9           THE COURT:  You may indeed.  And just to forewarn, you

10   expect this to be a lengthy witness?

11          MR. PAREKH:  I do, Your Honor.  Special Agent Chiappone

12   will be discussing a number of the media clips throughout his

13   testimony.

14          THE COURT:  All right.  Now, ladies and gentlemen, I'll

15   be asking you when we get close to 5:00 o'clock whether you're

16   willing go a little later.  I don't mean 8 o'clock, I mean

17   somewhere between 5:00 and 6:00 or whatever you're willing to

18   do.  Thank you.

19          Proceed, Mr. Parekh.

20          MR. PAREKH:  Thank you, Your Honor.

21      **(SPECIAL AGENT JOHN M. CHIAPPONE, having been duly sworn,**

22                       **testified as follows:)**

23             **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

24   **BY MR. PAREKH:**

25   Q.  Good afternoon, sir.

1    A.   Good morning, sir.

2    Q.   If you can please state and spell your name for the record.

3    A.   Special Agent John M. Chiappone, C-H-I-A-P-P-O-N-E.

4    Q.   How are you currently employed?

5    A.   Currently employed as a special agent with the

6    Federal Bureau of Investigation.

7    Q.   And what do you do for the FBI as a special agent?

8    A.   Currently I'm assigned as an assistant legal attache' in

9    Berlin, Germany.  But, in general, I investigate crimes that are

10   committed against or in the United States.

11   Q.   And what did you do prior to your current assignment with

12   the FBI in Germany?

13   A.   So I began my law enforcement career in 2001, with the

14   Bristol County Sheriff's Office, where I deployed to Ground Zero

15   in the recovery efforts of 9/11.  Subsequently I was a member of

16   the United States Army, where I was assigned to Germany and

17   Afghanistan, where I was awarded a Bronze Star Medal.

18           Following the United States Army, I joined the FBI,

19   where I began investigating bank robberies in the Boston

20   division.  Transferred to the Phoenix division, where I was on

21   the joint terrorism task force, and then transferred to the

22   flagship office, the largest office of the FBI, in New York,

23   where I was on the joint terrorism task force, Squad CT1.

24           On Squad CT1 I was responsible for investigating

25   terrorist crimes that occurred either in Western Europe or whose

1    subjects had come from Western Europe.  Those cases include the

2    one we're here for today.  I was the FBI New York's lead agent

3    deploying to the Bataclan attacks in Paris in 2015, and I was on

4    the joint investigation team between the United States and the

5    Belgian federal police for the March 22nd attacks of 2016, sir.

6    Q.  In what country?

7    A.  That was in Belgium, sir.

8    Q.  How long have you been an FBI counterterrorism agent?

9    A.  I've been working counterterrorism for the FBI for over

10   10 years, sir.

11   Q.  Would it be accurate to state that much of your

12   counterterrorism work is focused on the terrorist organization

13   known as ISIS?

14   A.  Yes, sir, that's where I've primarily worked for the last

15   eight years.

16   Q.  Is ISIS also known as the Islamic State?

17   A.  Yes, sir, it is.

18   Q.  Were you assigned to an investigation involving

19   Mohammed Emwazi, Alexanda Kotey, and El Shafee Elsheikh?

20   A.  Yes, sir, I was in August 2014.

21   Q.  Based on your involvement in this investigation, was

22   El Shafee Elsheikh taken into custody overseas by the FBI and

23   then brought over to the United States to face charges in this

24   prosecution?

25   A.  Yes, he was in October 2020.

1    Q.  And was the Eastern District of Virginia the first

2    United States district to which the defendant,

3    El Shafee Elsheikh, was brought to from overseas in October 2020

4    to face the charges in this case?

5    A.  Yes, it was, sir.

6    Q.  I want to now ask you some questions about your involvement

7    in this investigation prior to the defendant,

8    El Shafee Elsheikh, arriving here in the Eastern District of

9    Virginia in October 2020.  Did anything notable happen in

10   January 2018 with respect to this investigation?

11   A.  Yes, sir.  In January of 2018, I was notified that

12   El Shafee Elsheikh and Alexanda Kotey were both captured by

13   Syrian Democratic Forces in Syria.  I was then subsequently

14   notified that I would be a member of a law enforcement team that

15   would fly with myself and another agent to interview

16   Mr. Elsheikh in Kobani, Syria.

17   Q.  Did you actually travel to Syria to conduct an in-person

18   interview with defendant, El Shafee Elsheikh?

19   A.  I did, sir.  I interviewed El Shafee Elsheikh on March 2018.

20   Q.  Do you see El Shafee Elsheikh in the courtroom here today?

21   A.  I do, sir.

22   Q.  Can you please identify that person by an article of

23   clothing they're wearing and location of where that person is

24   sitting?

25   A.  He's the gentleman sitting in the suit here, who just

1    removed his glasses and his mask at the defense table, sir.

2            MR. PAREKH:  Your Honor, may the record reflect an

3    in-court identification of the defendant, El Shafee Elsheikh?

4            THE COURT:  So ordered.  Next question.

5    BY MR. PAREKH:

6    Q.  Do you have a binder in front of you that has

7    Government Exhibits 26-1 through 26-19A?  We'll start with those

8    first.

9    A.  I do, sir.

10   Q.  Okay.  Can you please turn to the 26 series of that binder?

11   A.  Yeah.  I'm at the 26 series, sir.

12   Q.  And prior to your testimony today, did you review all of the

13   exhibits from 26-1 through 26-19A?

14   A.  Yes, sir, I have.

15   Q.  What are they?

16   A.  So the 26 series are a series of video clips and their

17   corresponding transcripts of an interview done in July of 2019

18   following my interview with Sean Langan, a reporter from the UK.

19   Q.  And who is Sean Langan interviewing in all of those video

20   clips?

21   A.  In these video clips he's interviewing El Shafee Elsheikh.

22   Q.  And is that the person you identified in the courtroom

23   today?

24   A.  It's the same person I identified in the courtroom today,

25   sir.

146

1   Q.  And are each of those transcripts accurate, based on your

2   review of them?

3   A.  I have not found any mistakes in my review, sir.

4           MR. PAREKH:  Your Honor, we move to admit the 26

5   series, 26-1 through 26-19A.

6           THE COURT:  All right.

7           MR. ELLIS:  Your Honor, no objection.  We filed a

8   pretrial motion on this, and the Court has already ruled.

9           THE COURT:  All right.  Proceed.  They're admitted.

10          (GOVERNMENT EXHIBIT Numbers 26-1 through 26-19A were

11  admitted into evidence.)

12          MR. PAREKH:  Thank you, Your Honor.

13  Q.  And in the same binder in front of you, can you please take

14  a look at Government Exhibits 27-1 through 27-11A.

15  A.  Yes, sir.

16  Q.  Prior to your testimony today, did you review all of those

17  exhibits?

18  A.  I have, I sir.

19  Q.  What are they?

20  A.  These are more media clips from a variety of outlets, to

21  include CNN, BBC, VICE News, *The Washington Post* reported by

22  Jenan Moussa, and the corresponding transcripts for those.

23  Q.  And who is being interviewed in those video clips?

24  A.  El Shafee Elsheikh.

25  Q.  And in some of those video clips is El Shafee Elsheikh

1   sitting with another individual?

2   A.   In some of the video clips, he's sitting with another

3   individual, and that individual is Alexanda Kotey.

4   Q.   How do you know that that individual is Alexanda Kotey?

5   A.   I met Alexanda Kotey in Kobani, Syria, in March of 2018.

6   Q.   In March of 2018?

7   A.   Yes, sir, in March of 2018.

8   Q.   In person?

9   A.   In person.

10  Q.   And the El Shafee Elsheikh that's being interviewed in all

11  of these media clips in the 27 series, is that the same person

12  you identified sitting in the courtroom today?

13  A.   It's the same person I identified sitting in the courtroom

14  today and the same person I interviewed on March 27, 2018.

15  Q.   Are there corresponding transcripts for all of those media

16  clips in the 27 series?

17  A.   Each one has a corresponding transcript, sir, and I found no

18  discrepancies when I reviewed them, sir.

19          MR. PAREKH:   Your Honor, move to admit 27-1 through

20  27-11A.

21          THE COURT:   Without objection they're admitted.

22  Proceed.

23          (Government EXHIBIT Numbers 27-1 through 27-11, 27-11A

24  were admitted into evidence.)

25  Q.   Special Agent Chiappone, you testified earlier that you

1  personally interviewed the defendant, El Shafee Elsheikh, in

2  March of 2018?

3  A.  I did, sir.

4  Q.  On what date?

5  A.  March 27th, 2018.

6  Q.  And did you interview him with another FBI special agent?

7  A.  I did.  I interviewed him with FBI Special

8  Agent Julius Nutter.

9  Q.  Where did you both travel to to interview him?

10 A.  So Julius and I linked up in the Washington, D.C. area and

11 we drove down to Fort Bragg, North Carolina, where we took a

12 military plane from Fort Bragg to Ramstein Air Base in Germany.

13 Subsequently flew to Iraq, and then from Erbil, Iraq, we took a

14 helicopter into a U.S. military facility in Syria.

15 Q.  And where did you go next?

16 A.  Once we were going into the interview, we drove to Kobani,

17 Syria, and went to a prison run by Syrian Democratic Forces in

18 Kobani, Syria.

19 Q.  What is the Syrian Democratic Forces?

20 A.  The Syrian Democratic Forces are U.S. allies in Syria in the

21 fight against the Islamic State, sir.

22 Q.  Are they also known as the SDF?

23 A.  They are also known as the SDF.

24 Q.  Describe what happened when you went to the Kobani prison to

25 meet the defendant, El Shafee Elsheikh.

1    A.  Well, when we arrived at the prison, I went inside, myself

2    and Special Agent Nutter, and we met with the head of the

3    prison, and we asked permission to speak to El Shafee Elsheikh.

4    Q.  And did you also ask him for permission to conduct the

5    interview prior to beginning?

6    A.  Prior to beginning the interview, when we were meeting with

7    him, we asked him permission if we could -- to interview him.

8    Q.  And did you do anything else before you got inside the

9    prison?

10   A.  Before we got inside the prison, we took our body armor off

11   and left our rifles with another FBI agent.

12   Q.  And just so it's clear for the record, sometimes I may say

13   "the defendant," but I'm referring specifically and only to the

14   defendant you identified in the courtroom, El Shafee Elsheikh.

15   Do you understand that?

16   A.  Completely understand, sir.

17   Q.  Where did you go next?

18   A.  We went down the hall and to the last room on the left,

19   which was the interview room that was provided by the SDF for us

20   to conduct the interview.

21   Q.  I want to show you Government Exhibit 4-2, which should be

22   in Binder Number 2.

23          MR. PAREKH:  And with my thanks to the court security

24   officer.

25   A.  You said 4-2, sir?

1    Q.  Yes.

2    A.  I'm at 4-2, sir.

3    Q.  Do you recognize what is shown in that exhibit?

4    A.  I do.  This is the interview room I used on March 27th,

5    2018, to interview El Shafee Elsheikh.

6         MR. PAREKH:  Move to admit 4-2.

7         THE COURT:  Admitted without objection.

8         (GOVERNMENT EXHIBIT Number 4-2 was admitted into

9    evidence.)

10         MR. PAREKH:  May we publish?

11         THE COURT:  You may.

12    Q.  Describe for the jury what we're looking at here.

13    A.  So it's an interview room that we utilized, and what you can

14    see in the room, besides the furniture, of course, is the air

15    conditioning and the window with the natural light that's coming

16    in.  And next to the silver, I believe it's a water tank of some

17    sort, there's a restroom there.

18    Q.  Describe the temperature of the room when you interviewed

19    the defendant on March 27th, 2018.

20    A.  The room was quite comfortable, to the point of we did not

21    have to use the air conditioner.

22    Q.  How was the lighting during your interview?

23    A.  The lighting was great.  This photograph, I believe, was

24    taken with natural light, without any flash.

25    Q.  Did the defendant, Elsheikh, get brought into the room shown

1    in Government Exhibit 4-2?

2    A.  He was, sir.

3    Q.  And during your interview with the defendant, was he

4    restrained?

5    A.  He was not restrained, sir.

6    Q.  What was the defendant's demeanor when he was brought into

7    the room?

8    A.  The defendant was relaxed and very easy to talk to.

9    Q.  Did he seem stressed in any way?

10   A.  He did not, sir.

11   Q.  Did he seem angry?

12   A.  He did not.

13   Q.  Did he seem scared?

14   A.  No, sir.

15   Q.  Timid in any way?

16   A.  Not at all, sir.

17   Q.  Did the defendant sit down?

18   A.  He did sit down.  He sat down in a leather chair while

19   Special Agent Nutter and I sat in two plastic chairs, sir.

20   Q.  And is that shown in Government Exhibit 4-2?

21   A.  It is, sir.

22        MR. PAREKH:  Thank you, we can take it down.

23   Q.  Did the defendant have plenty of personal space around him

24   when you interviewed him?

25   A.  He did, sir.

```
 1   Q.  And when the defendant was brought into the room that we
 2   just saw in 4-2, did he appear injured in any way?
 3   A.  He did not, sir.
 4   Q.  Did you notice any signs of mistreatment?
 5   A.  None, sir.
 6   Q.  Did he have any bruises on his face?
 7   A.  He did not.
 8   Q.  Did he appear to be in any pain whatsoever?
 9   A.  None whatsoever, sir.
10   Q.  When you met the defendant, El Shafee Elsheikh, did you ask
11   him about his health?
12   A.  I did, sir.
13   Q.  What did he say?
14   A.  He said he was actually surprised at how well the SDF had
15   treated him and that the propaganda that he had been given by
16   ISIS, the Islamic State, was completely opposite of how he was
17   treated.  He said he had time to wash his clothes, play chess,
18   drink tea, speak with other prisoners, conduct physical
19   activities, work out, and pray, sir.
20   Q.  Did he also tell you that he had the ability to shower?
21   A.  He did, sir.
22   Q.  Did you have any visible weapons on you?
23   A.  I did not have any visible weapons, sir, but I had a
24   concealed Glock 19M that no one could see in the room.
25   Q.  Same for the Special Agent Nutter?
```

```
 1   A.  Same for Special Agent Nutter.

 2   Q.  Did anyone in the room have any visible weapons whatsoever?

 3   A.  There were no visible weapons in the room, sir.

 4   Q.  Was the defendant offered any food or beverages prior to

 5   beginning the interview?

 6   A.  He was.  We offered him a variety of things, such as Haribo

 7   gummy bears, cigarettes, some chocolate, various soda, and water

 8   as well, sir.

 9   Q.  Did you offer the defendant restroom and prayer breaks?

10   A.  We did, sir.  He never took us up on that offer, but we did.

11   Q.  Besides Special Agent Nutter and yourself and the defendant,

12   who else was in the room with you?

13   A.  We had an FBI translator in the room as well as a guard from

14   the SDF, sir.

15   Q.  Were any of them visibly armed?

16   A.  No one was visibly armed, sir.

17   Q.  What languages did the defendant speak?

18   A.  The defendant spoke English, albeit with a British accent,

19   as well as fluent Arabic.

20   Q.  Did the defendant answer questions in English?

21   A.  He answered questions in English.  Yes, he did, sir.

22   Q.  And was the defendant comfortable answering your questions?

23   A.  He was comfortable answering all our questions.  And if our

24   to translator translated something, whether from Arabic to

25   English or English to Arabic, he was very comfortable correcting
```

1    him on any of those translations.

2    Q.  When you were first introduced to the defendant --

3              THE COURT:  Just so we're clear, what was the

4    translator there for?

5              THE WITNESS:  So the translator, Your Honor, he was

6    there so that he could ensure that the Syrian Democratic Forces

7    person in the room knew what we were saying.

8              THE COURT:  All right.  So you said that Mr. Elsheikh

9    sometimes corrected the translator.  Did you say that?

10             THE WITNESS:  I did, sir.

11             THE COURT:  And so he was correcting the translator's

12   Arabic translation?

13             THE WITNESS:  Sometimes he would correct the

14   translator's Arabic translation.  Or if Mr. Elsheikh said

15   something in Arabic and the translator translated it to English,

16   he would correct that translation at times as well, sir.

17             THE COURT:  Next question.

18   Q.  Did the defendant also speak English during your interview

19   with him?

20   A.  He spoke fluent English, sir.

21   Q.  When you were first introduced to the defendant on

22   March 27th, 2018, how did you introduce yourself to him?

23   A.  I introduced myself like similar what I did today, sir, as

24   Special Agent John Chiappone from the FBI.  I provided him to

25   view my FBI credentials just as I have done with every interview

1    I've conducted in my time with the FBI.

2    Q.  What happened after the introduction?

3    A.  Well, following the introduction, we did the wellness check

4    that we had originally spoke about a few minutes ago, and then I

5    read the defendant his rights, sir.

6    Q.  And what rights did you advise him of?

7    A.  I advised him of his right to remain silent, I advised him

8    of his right to an attorney, I advised him that anything he said

9    to me today could be used against this him in court, and I

10   advised that he could stop the interview.

11   Q.  In what language did you advise the defendant of his rights?

12   A.  I advised the defendant of his rights in English, sir.

13   Q.  Are those also known as Miranda rights?

14   A.  They are commonly known as Miranda rights, sir.

15   Q.  After you advised the defendant of his rights, did he

16   voluntarily agree to speak with you and Special Agent Nutter?

17   A.  He did, sir.

18   Q.  I'm now going to ask you some questions about that

19   interview.

20   A.  Okay.

21   Q.  Approximately how long did the interview last on March 27,

22   2018?

23   A.  I spoke to Mr. Elsheikh for approximately two and a half

24   hours.

25   Q.  And do you recall the statements that the defendant made to

1    you?

2    A.  I do, sir.

3    Q.  How do you recall those statements?

4    A.  For multiple reasons, sir.  One, although I've conducted

5    numerous interviews as my time as an FBI agent, this was the

6    first time I flew to Syria to conduct an interview.  At that

7    point I had been investigating Mr. Elsheikh since August of

8    2014, so it was something I had been preparing for for a long

9    time.

10         And then, following the interview, I recorded

11   everything that I had learned in an FBI FD-302, which is our

12   standard form for documenting an interview.

13         So in preparation for today, I had also reviewed my

14   report, the FD-302, so I could make sure everything I say is

15   accurate, sir.

16   Q.  During your interview, did the defendant make any statements

17   to you about his personal background?

18   A.  He did, sir.  The defendant told me that he was born outside

19   the United Kingdom, and then immigrated to the United Kingdom at

20   a young age.  He also mentioned that he had a variety of

21   nicknames, some of which were also referred to as kunyas.

22         He stated he was known as Abu Thabit.  He also said he

23   was known as Abu al-Rahman, and he stated he was called "Shaf"

24   from a very young age.

25   Q.  I just want to slow down for a moment and I want to --

1   A.  I'm sorry, I'm talking too fast.

2   Q.  So let's back up for a moment.

3   A.  Yes, sir.

4   Q.  You used the word "kunyas."

5   A.  Yes, sir.

6   Q.  Please describe what that means.

7   A.  So a kunya is a nickname that is commonly used by members of

8   the Islamic State, but also in Islam.  Typically it will say

9   "Abu" and a subsequent name, and traditionally that means father

10  of and that name.  Although in many cases, members of the

11  Islamic State have taken kunyas with not actually being a father

12  of someone with that second name.

13  Q.  And are kunyas also used to withhold the name of a true

14  person belonging to ISIS?

15  A.  Many ISIS members use kunyas because it allows them to do

16  public statements without using their actual name, sir.

17  Q.  And was one of the kunyas that the defendant gave you about

18  himself Abu Thabit?

19  A.  Yes, sir, that was the first kunya he gave.  He was

20  Abu Thabit.

21  Q.  Did the defendant make any statements about his activities

22  while he was residing in the United Kingdom?

23  A.  He did, sir.  The defendant stated he used to be a

24  British Army Cadet.  A British Army Cadet is a group of youth

25  under the age of 18 that was receiving military training at a

1    variety of British bases.

2    Q.  And did the defendant tell you whether he obtained

3    military-type training while he was part of the British Army

4    Cadets?

5    A.  He did, sir.  He stated that he specifically received

6    firearms training, to include the SA80 rifle and the LSW.  He

7    also mentioned he did physical fitness training with the British

8    Army Cadets, and that he received map and compass training which

9    came in very useful when he began fighting for the

10   Islamic State.

11   Q.  Before we get to the defendant's statements about the

12   Islamic State --

13   A.  Yes, sir.

14   Q.  -- did El Shafee Elsheikh talk about engaging in any

15   criminal activity while he resided in the United Kingdom?

16   A.  He did, sir.  He stated that while in the UK, he had

17   conducted robberies, assaults, that he was involved in knife

18   fighting and neighborhood-to-neighborhood fighting as well.  He

19   had also mentioned he was previously arrested, and that he had

20   been advised by a solicitor and interrogated by police.

21   "Solicitor" is a British term for lawyer, sir.

22   Q.  I want to show you Government Exhibit 22-13, which has

23   already been admitted.

24           MR. PAREKH:  If we can publish that.

25           THE COURT:  You may.

159

1    Q.  Can you see Government Exhibit 22-13?

2    A.  I can, sir.  I have it on the screen.

3    Q.  Who is this individual?

4    A.  This individual, sir, is El Shafee Elsheikh, the same

5    gentleman sitting there, except for in this picture he's not

6    wearing glasses as he is in the courtroom, sir.

7    Q.  Same person you interviewed in March of 2018?

8    A.  Same person I interviewed March 27, 2018.

9         MR. PAREKH:  Your Honor, I now want to play Government

10   Exhibit 27-7.  It's about a minute long in total.

11        THE COURT:  All right.

12        MR. PAREKH:  It's already been admitted.

13        THE COURT:  It's already been admitted?

14        MR. PAREKH:  Yes, sir, at the outset of --

15        THE COURT:  That's right.  What's the exhibit number?

16        MR. PAREKH:  It's 27-7 and we'll play 27-6 right after

17   that, you know.  27-7 is one minute and one second,

18   approximately; and 27-6 is 21 seconds, approximately.

19        THE COURT:  And these are television news clips?

20        MR. PAREKH:  Yes.  Special Agent Chiappone identified

21   the defendant sitting in the courtroom is the one being

22   interviewed in these clips.

23        THE COURT:  All right.  Proceed.

24        MR. PAREKH:  If we can please start with 27-7.

25        (Video played in open court.)

```
 1              MR. PAREKH:  Before we play 27-6.
 2    BY MR. PAREKH:
 3    Q.  Special Agent Chiappone, who is the defendant in that clip?
 4    A.  Can you repeat the question, sir?
 5    Q.  Who is the defendant in that clip?
 6    A.  Can you bring the picture back up, sir, just so I can say
 7    left and right.  The defendant was on the left and on the right
 8    was Alexanda Kotey.
 9    Q.  Okay.  There was a person in dark clothing and a person in
10    lighter-colored clothing?
11    A.  Yes, sir.  I don't have the picture up here right, but, yes,
12    El Shafee Elsheikh was wearing dark clothing and Alexanda Kotey
13    was wearing looked like a tan shirt.
14    Q.  Thank you.
15              MR. PAREKH:  If we can play 27-6, please.
16              (Video played in open court.)
17    Q.  So obviously the first person speaking was?
18    A.  The first person speaking using the phonetic alphabet is
19    El Shafee Elsheikh.
20    Q.  And the second person?
21    A.  Alexanda Kotey, sir.
22    Q.  Based on your training and experience and the time that you
23    personally spent with Elsheikh interviewing him in Syria, can
24    you put these statements into context for us?
25              MR. ELLIS:  Objection to the question, Your Honor.
```

```
 1              THE COURT:  Say it again.

 2              MR. ELLIS:  Objection to the question.

 3              THE COURT:  Just tell me the nature.

 4              MR. ELLIS:  Just a vague question, Your Honor.

 5              THE COURT:  All right.  Vagueness is not necessarily an

 6   objection.  I'll overrule it.

 7   BY MR. PAREKH:

 8   Q.  You may answer.

 9   A.  So El Shafee Elsheikh was utilizing the phonetic alphabet in

10   the second clip, which is the alphabet utilized by military and

11   law enforcement people around the world to speak clearly on a

12   radio so if you're spelling it out, it can be easily understood.

13              In the second clip, El Shafee Elsheikh references the

14   British Army Cadets, which is the same thing he had described to

15   me when I interviewed him on March 27, 2018.

16              MR. PAREKH:  I now want to play 26-13, approximately

17   the first 39 seconds.  We'll turn back to that clip later, but

18   for now, if we can just play the first 39 seconds or so of

19   26-13.

20              (Video played in open court.)

21   Q.  Did you ask the defendant if he was willing to talk to you

22   about ISIS?

23   A.  I did, sir.

24   Q.  Did the defendant make any statements about traveling to

25   Syria?
```

1   A.  He did, sir.  He said he left the United Kingdom in 2012 and

2   traveled to Sweden, and then subsequently traveled to Istanbul,

3   Turkey, and then Adana, Turkey, where he crossed the

4   Turkish-Syria Border with the assistance of sheepherders.  He

5   did that on foot, sir.

6   Q.  I want to show you Government Exhibit 25-1A and 25-1.

7   A.  Yes, sir.

8   Q.  And that's in Binder Number 5.

9   A.  Can you say the numbers again, sir?

10  Q.  25-1A and 25-1.

11  A.  25-1A and 25-1?  Okay, I'm here, sir.

12          MR. PAREKH:  Your Honor --

13  Q.  Well, let me first ask you:  What are these documents?

14  A.  So these documents are travel itinerary that was purchased

15  in Sweden, where it ends in Istanbul and then Adana, sir.

16          MR. PAREKH:  Move to admit 25-1 and 25-1A.

17          MR. ELLIS:  No objection.

18          THE COURT:  Admit.

19          (GOVERNMENT EXHIBIT Numbers 25-1 and 25-1A were

20  admitted into evidence.)

21          MR. PAREKH:  If we can just publish 25-1, please.  And

22  if we can just zoom in on the middle part of this exhibit.

23  Q.  Just explain to the jury what we're looking at here.

24  A.  So it's a travel record.  I don't think you can see it in

25  here, but a little bit lower you can see that it was purchased

1    from a travel agency in Sweden.  Travel record goes from

2    Copenhagen to Istanbul, then Istanbul to Adana.

3    Q.  Is that consistent with what the defendant told you?

4    A.  Yes, sir.  The defendant left out the Copenhagen leg, but I

5    know from my investigation that after he purchased in Sweden, he

6    then got to Copenhagen separately and then took this flight.

7          MR. PAREKH:  We can take that down.

8    Q.  So the defendant told you that he traveled to Syria in 2012.

9    Is that correct?

10   A.  That's correct, sir.

11   Q.  Did the defendant state why he wanted to go to Syria?

12   A.  He stated that Muslims from around the world were going to

13   Syria to support the fight against the regime and that he wanted

14   to fight against the Syrian regime.

15   Q.  Did Elsheikh make any statements to you about joining any

16   terrorist organizations in Syria?

17   A.  He did, sir.  He said he first joined the Al-Nusra Front,

18   and then he subsequently, approximately mid-2013, joined the

19   Islamic State.

20   Q.  Was the Al-Nusra Front aligned with any other terrorist

21   organizations?

22   A.  Yes, sir.  Al-Nusra Front was aligned with Al-Qaeda, and

23   Mr. Elsheikh had told me that Al-Nusra Front and Al-Qaeda had

24   similar religious beliefs.

25   Q.  Did the defendant make any statements about what role he had

1   in the Al-Nusra Front?

2   A.   He stated he was a fighter in the Al-Nusra Front and that he

3   had fought with Al-Nusra Front against the regime.

4   Q.   Just so it's clear, is Al-Nusra Front another designated

5   Foreign Terrorist Organization?

6   A.   Yes, sir, it is.  It's also known as Jabhat al-Nusra.

7   Q.   And designated by the United States government?

8   A.   Designated by the United States Government, sir.

9   Q.   Did Elsheikh make any statements to you about acquiring a

10   weapon after he arrived in Syria?

11   A.   He did, sir.  He stated within the first two weeks of his

12   arrival, he was able to acquire an AK-47.

13   Q.   What else?

14   A.   That AK-47 he described quite specifically.  He stated it

15   was classic style with wood grips and black steel, and he also

16   said it had a fold-under stock, sir.

17   Q.   Did he state how he used that AK-47?

18   A.   He stated he used that AK-47 to fight with both

19   Al-Nusra Front and the Islamic State.

20   Q.   Did the defendant tell you when he joined ISIS or the

21   Islamic State?

22   A.   He stated in mid-2013, sir.

23   Q.   Okay.  And did the defendant state what role he had in ISIS?

24   A.   He stated he was a fighter with ISIS, sir, and that as a

25   fighter, he saw a lot of death.

1   Q.  And did he state whether he fought in battles?

2   A.  He did say that he fought in battles with the Islamic State,

3   many times with small groups of approximately four people.

4   Q.  Did the defendant make any statements to you about acquiring

5   any other weapons in addition to the AK-47 rifle while he was in

6   Syria?

7   A.  He did, sir.  The defendant stated that he acquired an M4

8   fully automatic rifle with a Picatinny rail system.

9   Q.  What does that mean?

10  A.  A Picatinny rail system is the system that allows you to

11  attach different attachments such as sights, night vision

12  devices, flashlights, to a rifle, sir.

13  Q.  And what other weapons?

14  A.  He also mentioned he had acquired 24 Yugoslavian hand

15  grenades, as well as a Glock 19 Generation 3, as well as an M16

16  rifle that had three-shot burst ability, sir.

17  Q.  I want to show you what's been marked as Government

18  Exhibit 4-7, which is in Binder Number 2.

19  A.  I'm at 4-7, sir.

20  Q.  Do you recognize the items that are depicted in this

21  exhibit?

22  A.  Yes, sir.  These are two rifles.  One is an AK-47 and the

23  other is an M16 rifle, both fitting the description that the

24  defendant gave me of his rifle, sir.

25          MR. PAREKH:  Move to admit 4-7.

1          MR. ELLIS:  No objection.

2          THE COURT:  It's admitted.  You may display it.

3          (GOVERNMENT EXHIBIT Number 4-7 was admitted into

4     evidence.)

5     BY MR. PAREKH:

6     Q.  Now that we have the image up on the screen, can you explain

7     to the jury how the image of these two weapons are consistent

8     with the statements that the defendant made to you about the

9     weapons he acquired when he traveled to Syria, or at least some

10    of the weapons he acquired?

11    A.  Yes, sir, I can.  So the rifle on the left-hand side is an

12    AK-47.  You can see it has black metal like the defendant

13    described, as well as a wood hand grip and a wood front grip.

14    And then it has a fold-under stock that you can see at the pivot

15    point there as well.

16          The weapon on the right is an M16 rifle.  And although

17    I cannot -- you just can't zoom in close enough to see its

18    select fire capability, it's consistent with the M16 rifles I

19    used in the United States Army that had three-shot burst

20    capability.

21    Q.  Can you please turn to Exhibit 4-6 in the same binder you

22    have in front of you?

23          THE COURT:  I thought you said he acquired an M4, not

24    an M16.

25          THE WITNESS:  Your Honor, he acquired both.  He

1    acquired a fully automatic M4 as well as an M16 with three-shot

2    burst, Your Honor.

3            THE COURT:  Next question.

4    BY MR. PAREKH:

5    Q.  Just so it's clear, the images that we saw are just two of

6    the number of items, weapons, that the defendant stated to you

7    he acquired in Syria?

8    A.  Yes, sir.  These two weapons here were two of four firearms

9    that he described, and there are no hand grenades in the

10   photograph, sir.

11   Q.  Or Glocks?

12   A.  No Glocks, no M4s, no hand grenades in this photo.  This is

13   just the AK-47 and an M16 that meet the description of what the

14   defendant described to me.

15   Q.  Please turn to Government Exhibit 4-6, please.

16   A.  I have 4-6, sir.

17   Q.  Who do you see depicted in that photo?

18   A.  This photo is a photo of El Shafee Elsheikh, the defendant

19   that's sitting at the table, and the same man I interviewed on

20   March 27, 2018.

21           MR. PAREKH:  Move to admit 4-6.

22           THE COURT:  It's admitted without objection.  Proceed.

23           (GOVERNMENT EXHIBIT Number 4-6 was admitted into

24   evidence.)

25           MR. PAREKH:  Can you please publish it.

1    Q.  What do you see in this photo besides the defendant?

2    A.  Besides the defendant, I see body armor, I see four

3    magazines that appear to be AK-47 magazines, I see a dagger, and

4    a radio.  And then in his right hand, I see an AK-47 that also

5    appears to be consistent with the AK-47 that the defendant

6    described, as well as the AK-47 in the previous photo.

7            I say that because if you look -- it's very hard to

8    see, but if you zoom in and look at the web of the defendant's

9    hand, you can barely make out the wood grip.  And additionally,

10   near the defendant's trigger finger, or the index finger, you

11   can see the hinge for a fold-under stock, sir.

12   Q.  How are you so well versed in weaponry?

13   A.  Well, sir, I've been in law enforcement and military for

14   21 years.  I have fired AK-47 rifles, I have fired M16 rifles, I

15   have fired M4 rifles, and I have fired Glocks.  And I have

16   thrown hand grenades, sir.

17   Q.  As part of your service in?

18   A.  As part of my service in the United States Army, as part of

19   my duties as a deputy sheriff, and as part of my duties as an

20   FBI agent, including being a SWAT team member in two divisions.

21           MR. PAREKH:  We can take that down, please.

22   Q.  Did Elsheikh make any statements to you about whether he

23   added anything to the M4 rifle that he told you about?

24   A.  He did, sir.  He stated that he added a red dot sight and a

25   PVS-14, which both can be attached to the Picatinny rail system

1    that I described early.

2    Q.  What is a red dot sight?

3    A.  A red dot sight is an aiming device you can put on the

4    weapon.  The dot would not go on your target, but it would stay

5    within the confines of that device.  But you could acquire your

6    target faster than standard iron sights because you just have to

7    put the red dot on your target, sir.

8    Q.  And please explain, based on your training and experience,

9    what is a PVS-14?

10   A.  PVS-14 is a monocular, so single lens, night vision device

11   that was developed and utilized by the United States Army.  I've

12   used a PVS-14 in 2005 to 2006 in Afghanistan, sir.

13   Q.  Did the defendant keep the PVS-14 for the duration of his

14   time with ISIS?

15   A.  He did not, sir.  The defendant told me he gave the PVS-14

16   to another ISIS member as a gift.

17   Q.  Did the defendant describe to you, during your interview,

18   where he lived in Syria and the years where he lived there?

19   A.   He did, sir.  He stated that prior to 2014, he lived in

20   Idlib, Syria, and Aleppo, Syria.  And then after 2014 - so 2014

21   for the rest of his time there - he lived in Raqqa, Syria, sir.

22          MR. PAREKH:  If we can just briefly put up Government

23   Exhibit 2-7, which has already been admitted in evidence.

24   Q.  Taking a look at this exhibit, Special Agent Chiappone, are

25   you generally familiar with locations in Syria?

1    A.  I am, sir.

2    Q.  And now that we have this exhibit up, where did the

3    defendant tell you he lived prior to 2014?

4    A.  So prior to 2014, the defendant stated he lived in Idlib,

5    Syria, which you can see just above the end, in Northwest.  And

6    then he also stated he lived in Aleppo, which has the giant dot

7    right next to it.

8    Q.  And just so it's clear for the record, Idlib and Aleppo are

9    Boxes 1 through 7.

10   A.  Yes, sir.  If you look at Box 1, 2, 6, and 7, it says,

11   "Idlib," and it has a description.  And then Box 4 and 5 says,

12   "Aleppo," and also has other descriptions.

13   Q.  And in 2014 and beyond, where did the defendant tell you he

14   lived?

15   A.  2014 and beyond, the defendant stated he lived in Raqqa,

16   Syria, which you can see also labeled in Number 8, Riverside,

17   and Number 9, The Desert Prison.

18        MR. PAREKH:  Thank you.  We can take that down.

19   Q.  Did the defendant describe to you, during your interview

20   with him, participating in any military operations with ISIS?

21   A.  Yes, sir, he did.  The defendant told me he fought against

22   the Syrian regime 17th Division in a group of four fighters.  He

23   also stated that, although typically he needed permission to

24   fight against somebody, he did not ask permission from his boss

25   to fight in the 17th Division, sir.

1    Q.   Did Elsheikh tell you who his boss was while with ISIS?

2    A.   He did, sir.  Mr. Elsheikh told me that he reported to

3    Oussama Atar, also known as Abu Ahmed al-Iraqi.

4    Q.   Based on your training and experience and as a longtime

5    counterterrorism agent for the FBI, who is Oussama Atar?

6    A.   Oussama Atar is an ISIS terrorist that was part of my

7    investigations for the March 22, 2016, attacks at the Brussels

8    airport and the November 11th, 2015, attacks at the Paris -- at

9    the Bataclan, Stade de France, and various cafes around Paris.

10   Q.   We'll circle back to those two attacks.

11   A.   Yes, sir.

12   Q.   Did Elsheikh mention to you during your interview how

13   Oussama Atar received that alias or nickname?

14   A.   He did, sir.  He said Oussama Atar spoke French, but he

15   received the nickname "al-Iraqi" from his time he spent in a

16   prison in Iraq in the early days of the formation of ISIS.

17   Q.   Did you show the defendant, Elsheikh, a photograph of that

18   person, Oussama Atar?

19   A.   Yes, sir, I showed him an unlabeled photograph of

20   Oussama Atar, and he identified that photograph as Oussama Atar,

21   also known as Abu Ahmed al-Iraqi, and he stated both names, sir.

22   Q.   I want to show you Government Exhibit 4-3, which is in the

23   same binder in front of you.

24   A.   Yes, sir, I have 4-3.

25   Q.   What is 4-3?

1    A.  This is the photo that I showed the defendant,

2    El Shafee Elsheikh, of Oussama Atar.

3                MR. PAREKH:  Move to admit 4-3.

4                THE COURT:  It's admitted without objection.  You may

5    display it.

6                (GOVERNMENT EXHIBIT Number 4-3 was admitted into

7    evidence.)

8    Q.  Again, just so it's clear, did you tell the defendant who

9    this was in the photo?

10   A.  No, sir.  I showed him the photo exactly as we see here.

11   There was a number written in the corner that was not there, but

12   other than that it's the same exact photo.

13   Q.  He said this person was his supervisor?

14   A.  He said this person was his supervisor, sir.

15               MR. PAREKH:  We can take it down.

16   Q.  Now I want to ask you to provide a little bit more detail

17   about what specific battles the defendant told you he

18   participated in.

19   A.  So like I mentioned earlier, he stated he fought against the

20   17th Division of the Syrian regime.  He said he fought north of

21   Raqqa.  The 17th Division is a Syrian military unit that was

22   responsible for the north, northeast part of Syria, sir.

23   Q.  Was that a significant battle that ISIS took part in?

24   A.  Yes, sir, it was.  It received, I think, a lot of press as

25   well, sir.

1   Q.  And who did the defendant state he joined on that specific

2   battle?

3   A.  On that battle he didn't say specifically who he fought

4   with.  He just stated he joined a group of -- or he was part of

5   a group of four fighters, sir.

6   Q.  I want to show you Government Exhibit 1-33 which I believe

7   has already been admitted.  And if we can go to page 42 and

8   publish that for the jury, Your Honor.

9           THE COURT:  What exhibit number?  1 dash --

10          MR. PAREKH:  33.

11          THE COURT:  Let me confirm that that's been admitted.

12          COURTROOM CLERK:  Yes, Judge.

13          THE COURT:  All right.  You may do so.  Proceed.

14  Q.  And do you know what 1-33 is?

15  A.  1-33 is an issue of *Dabiq* magazine, which is an online ISIS

16  magazine that was published as propaganda, sir.

17  Q.  We're now on page 42?

18  A.  Yes, sir.

19  Q.  What are we looking at on page 42?

20  A.  It's an article in *Dabiq* magazine, the ISIS propaganda,

21  about the capture of Division 17, sir.

22  Q.  And this is the same battle that the defendant told you he

23  participated in?

24  A.  Yes, it's the same division he said he fought against, sir.

25          MR. PAREKH:  We can take that down.

1  Q.  Did the defendant Elsheikh mention to you during the

2  interview any specific individuals that he went on military

3  missions with on behalf of ISIS?

4  A.  Yes, sir, he did.  The defendant stated he went on military

5  missions with Mohammed Emwazi and Alexanda Kotey.

6  Q.  Did the defendant mention conducting operations with ISIS

7  with any other individuals besides Mohammed Emwazi and

8  Alexanda Kotey?

9  A.  No, sir, those are the only two he mentioned for conducting

10  operations.

11  Q.  So it was the three of them?

12  A.  Yes, sir.

13  Q.  Did the defendant state when Mohammed Emwazi and

14  Alexanda Kotey arrived in Syria?

15  A.  He did, sir.  He stated Mohammed Emwazi and Alexanda Kotey

16  traveled to Syria in 2012 together, and that they arrived

17  approximately two months after he did.

18  Q.  Okay.  Now I want to turn to Mohammed Emwazi, which you've

19  mentioned in your testimony.

20  A.  Yes, sir.

21  Q.  Did the defendant Elsheikh make any statements to you about

22  how he knew Mohammed Emwazi?

23  A.  He did, sir.  He said he knew Mohammed Emwazi from the

24  mosque on Harrow Road in West London, that they went swimming

25  together, and that they would pray together at both Friday

1    prayers and weekday prayers.

2    Q.  So just so it's clear, the defendant stated he knew

3    Mohammed Emwazi from his time in the United Kingdom, before they

4    traveled to Syria?

5    A.  Yes, sir.  He specifically stated West London.

6    Q.  Did the defendant state whether he knew Mohammed Emwazi by

7    any other names or nicknames?

8    A.  He did, sir.  He stated that Mohammed Emwazi was known as

9    Abu Muharib, and that the United States had given

10   Mohammed Emwazi the nickname "Jihadi John."

11   Q.  Did Elsheikh tell you whether he and Emwazi worked with any

12   of the same people while they were in Syria?

13   A.  Yes, sir.  Elsheikh stated that him and Mohammed Emwazi met

14   Ousamma Atar at the same time in 2013, and that Mohammed Emwazi

15   also reported to Ousamma Atar, AKA Abu Ahmed al-Iraqi.

16   Q.  So the prior photo that the jury saw, Elsheikh told you that

17   he and Mohammed Emwazi reported to that same individual in ISIS?

18   A.  Yes, sir, Exhibit 4-3.

19   Q.  And did Elsheikh make any other statements about

20   Mohammed Emwazi during your interview with him?

21   A.  He stated that Mohammed Emwazi was killed, and that when

22   Mohammed Emwazi was killed, that the defendant was depressed

23   about that, sir.

24   Q.  I'm sorry, can you say that again?

25   A.  He said when Mohammed Emwazi was killed, the defendant was

1    depressed about that, sir.

2    Q.  Depressed?

3    A.  Depressed.

4    Q.  Did you ask the defendant, El Shafee Elsheikh, about the

5    videos showing the murders of United States citizens?

6    A.  I did, sir.

7    Q.  And did Elsheikh tell you whether he knew who the masked

8    individual was in the execution videos of United States citizens

9    held by the Islamic State?

10   A.  Yes, sir.  The defendant, El Shafee Elsheikh, stated that he

11   knew Mohammed Emwazi was the individual in the execution videos

12   of the United States and the United Kingdom persons.

13   Q.  Okay.  Let's break them up, if you don't mind.

14   A.  Yes, sir.

15   Q.  Starting first with the execution videos of the

16   United States citizens, have you seen those videos?

17   A.  Unfortunately, sir, I have.

18        MR. PAREKH:  Your Honor, I believe these three exhibits

19   are already admitted, and if I could just put them up together.

20   They're 1-24E, 1-25C, and 1-29D.

21        THE COURT:  Have they already been admitted?

22        COURTROOM CLERK:  Yes, Judge.

23        THE COURT:  You may do so.

24   Q.  Special Agent Chiappone, what are we looking at, this

25   collage?

1    A.  So this is a collage of screenshots from the execution

2    videos that I was referencing that depict James Foley,

3    Steven Sotloff, and Peter Kassig, sir.

4    Q.  And are all three of these individuals United States

5    citizens?

6    A.  All three of these individuals are United States citizens

7    that have been murdered, sir.

8    Q.  And murdered by the Islamic State?

9    A.  Murdered by the Islamic State, yes, sir.

10    Q.  And did Elsheikh tell you how he knew that the masked

11    executioner in all of these execution videos is, in fact,

12    Mohammed Emwazi?

13    A.  Yes, sir, he did.  He stated he knew Mohammed Emwazi's voice

14    and that he had seen Mohammed Emwazi on several occasions wear a

15    mask, and that he knew what Mohammed Emwazi looked like while

16    Mohammed Emwazi was wearing a mask, sir.

17    Q.  Same questions for Government Exhibit 1-27B and 1-29E.

18         MR. PAREKH:  Which I believe have already been

19    admitted, Your Honor.

20         THE COURT:  All right.  Let me confirm that first.

21         COURTROOM CLERK:  Yes, Judge.

22         THE COURT:  All right.  You may display them.

23         MR. PAREKH:  Thank you.

24    Q.  Special Agent Chiappone, what are we looking at here?

25    A.  So these are screenshots from the execution video of

1    David Haines and Alan Henning, both UK citizens who were

2    murdered by the Islamic State.

3            THE COURT:  Let me inquire, Agent Chiappone, it looks

4    like there's Arabic written at the bottom.

5            THE WITNESS:  Yes, sir, that appears to be Arabic to me

6    as well.

7            THE COURT:  So were these screenshots obtained from

8    ISIS propaganda?

9            THE WITNESS:  Yes, sir.  ISIS, when they made these

10   videos, they published them for the world to see.  In the

11   videos, the masked man was speaking in English.  I don't read

12   Arabic, Your Honor, so I can't say if that was a subtitle or

13   not.  But he was speaking English in the video, and it was

14   published for the world to see.

15           THE COURT:  Next question.

16   Q.  Did the defendant tell you who he knew the masked

17   executioner is in these particular videos of the United Kingdom

18   citizens who were murdered by ISIS?

19   A.  Yes, sir.  The defendant stated that the masked individual

20   in the execution videos of both the United States and the

21   United Kingdom hostages was Mohammed Emwazi.

22   Q.  And, again, just so it's clear, did he state how he knew

23   what Mohammed -- that he knew what Mohammed Emwazi looked like

24   with a mask on?

25   A.  He stated he's seen Mohammed Emwazi several times with a

1    mask on and knew what Mohammed Emwazi looked like when Mohammed

2    Emwazi was wearing a mask.

3    Q.   And in the exhibit that we just saw, including the one

4    that's up on the screen now, do you know what type of mask the

5    executioner is wearing in these videos?

6    A.   It's commonly referred to as a balaclava, sir.

7    Q.   What does that mean?

8    A.   It's a mask that you typically can only see the eyes and

9    around the eyes of the person who's wearing it.

10        MR. PAREKH:   We can take that down.

11   Q.   During your interview with the defendant,

12   El Shafee Elsheikh, did Elsheikh tell you that he himself ever

13   wore a mask?

14   A.   Yes, sir, he did.   Elsheikh said he wore a mask.

15   Q.   And your interview with the defendant was back in

16   March 2018?

17   A.   March 27, 2018.

18   Q.   And that was before the pandemic, where we all wear sort of

19   the medical or cloth masks?

20   A.   Yeah.   And on March 27, 2018, nobody was thinking about the

21   pandemic or the cloth masks that we've all had to wear, sir.

22   Q.   Did Elsheikh tell you why he thought Emwazi had carried out

23   the murders of United States, United Kingdom citizens?

24   A.   Elsheikh said that he thought Emwazi was ordered to carry

25   out the executions, sir.

```
 1    Q.  I want to play for you Government Exhibit 27-3.

 2            MR. PAREKH:  Your Honor, it's a 35-second clip and then

 3    I'll play a series more.

 4            THE COURT:  Has it been admitted?

 5            MR. PAREKH:  It has, Your Honor.  All of the clips that

 6    I'm now seeking to play were admitted at the outset of

 7    Special Agent Chiappone's testimony.

 8            THE COURT:  All right.  You may do so.

 9            (Video played in open court.)

10    Q.  Just so it's clear, who is speaking in this clip?

11    A.  That is the defendant, El Shafee Elsheikh, sir.

12    Q.  And who is he sitting next to?

13    A.  He's seated next to Alexanda Kotey, sir.

14            MR. PAREKH:  If we can now play 27-10, please.  This is

15    a minute and 39 seconds.

16            THE COURT:  You may do so.

17            (Video played in open court.)

18            MR. PAREKH:  And if we can now play Government

19    Exhibit 27-11.

20            (Video played in open court.)

21            MR. PAREKH:  And if we can now play Government

22    Exhibit 26-17.

23            (Video played in open court.)

24            MR. PAREKH:  And if we can now play Government

25    Exhibit 26-7, please.
```

```
 1                  (Video played in open court.)

 2     BY MR. PAREKH:

 3     Q.  Special Agent Chiappone, please explain the significance of

 4     the last clip that we just watched in the context of your own

 5     interview with the defendant?

 6     A.  Yes, sir.  In that clip, the defendant, El Shafee Elsheikh,

 7     states that it's protocol to wear a mask.  And when I

 8     interviewed the defendant on March 27, 2018, the defendant told

 9     me that he too had worn a mask.

10     Q.  And just so it's clear for the record, all the clips that we

11     just saw, who was speaking?

12     A.  El Shafee Elsheikh is who you can see in the photo, sir.

13     The video.

14     Q.  Meaning the person being interviewed?

15     A.  Yes, sir, the person being interviewed.

16     Q.  During your interview with the defendant, did he make any

17     statements about Alexanda Amon Kotey?

18     A.  He did, sir.

19     Q.  What did he say?

20     A.  He stated Kotey was his friend and that Kotey was also known

21     as Abu Salih.

22     Q.  And you previously testified that the defendant told you he

23     knew Mohammed Emwazi from back in the United Kingdom.  Is that

24     correct?

25     A.  Yes, sir.  He knew Alexanda Kotey in the United Kingdom as
```

182

1    well.

2    Q.  And what did he say about that relationship?

3    A.  He stated they were good friends and that -- I believe he

4    stated that sometimes they would stay at each other's houses.

5    Q.  I'm sorry, I didn't hear the last.

6    A.  They would stay at each other's houses, sir.

7    Q.  And did he indicate what year they had met?

8    A.  I don't recall, sir.  I can refresh my memory with the 302.

9    Q.  We can turn back to it.

10             Did the defendant state that he knew Alexanda Kotey by

11   any other names or nicknames?

12   A.  He did, sir.  He stated he knew him as Abu Salih.

13   Q.  Abu Salih?

14   A.  Abu Salih.

15   Q.  During your interview with the defendant, did you show him

16   photographs of other ISIS members?

17   A.  Yes, sir, I did.

18   Q.  Please turn to Exhibit 4-5, which is in Binder Number 2.

19             THE COURT:  What number, Mr. Parekh?

20             MR. PAREKH:  4-5, Your Honor.

21   A.  Yes, sir, I am at 4-5.

22   Q.  And do you recognize that exhibit?

23   A.  Yes, sir.  This is the photo I showed the defendant of

24   Najim Laachraoui.

25   Q.  And did the defendant indicate whether he recognized

1    Najim Laachraoui?

2    A.  He did.  He identified the photo as Abu Idris, sir.

3    Q.  And what did he say?

4    A.  He stated Abu Idris, the individual in this photo, had blown

5    himself up at the March 22nd attacks in Brussels.  I don't think

6    he said March 22nd attack but he said at the Brussels Airport,

7    sir.

8    Q.  Did he mistaken any other statements about Abu Idris?

9    A.  He stated that he had met Abu Idris, described Abu Idris as

10   a good guy, and that Abu Idris also reported to Ousamma Atar,

11   sir.

12   Q.  So he stated he, Mohammed Emwazi, and Abu Idris all reported

13   to the same supervisor in ISIS?

14   A.  Yes, sir, he did.

15   Q.  Did he indicate the last time that he saw Abu Idris?

16   A.  He said sometime in 2015, sir.

17   Q.  Where?  What country?

18   A.  It was in Syria.  I don't recall the city.

19   Q.  Earlier in your testimony you described knowing about the

20   so-called Brussels attack?

21   A.  Yes, sir.  I was embedded with the Belgian federal police

22   for the investigation into the Brussels attack that killed

23   32 people, to include four Americans, sir.

24   Q.  And what happened during that attack?

25   A.  A group of suicide bombers blew up bombs at the airport in

1    Brussels, and then another group of suicide bombers blew up a

2    bomb at the subway at the center of Brussels, sir.

3            MR. PAREKH:  Move Exhibit 4-5, Your Honor.

4            THE COURT:  Admitted.  You may display it if you wish.

5            (GOVERNMENT EXHIBIT Number 4-5 was admitted into

6    evidence.)

7    Q.  Just so it's clear, this is the individual that the

8    defendant, Elsheikh, identified as Abu Idris?

9    A.  This is the individual that Elsheikh identified as

10   Abu Idris, sir.

11   Q.  Based on your personal experience investigating the Brussels

12   airport attack, in what year was Abu Idris born?

13   A.  Abu Idris was born in May of 1991, sir.

14           MR. PAREKH:  If we can take that down.

15   Q.  Can you please turn to Government Exhibit 1-40.  It should

16   be in Binder Number 1.

17           MR. PAREKH:  With the assistance of the court security

18   officer.

19   A.  1-40, I have it.  I'm good.  I have it, sir.

20   Q.  Okay.  And can you please -- do you have that exhibit in

21   front of you?

22   A.  I have 1-40.  I'm sorry, I missed the page number.

23   Q.  First, what is 1-40?

24   A.  1-40 is another issue of *Dabiq* magazine, the same propaganda

25   magazine that I described earlier.

1          MR. PAREKH:  At this time I would move to admit 1-40.

2          MR. ELLIS:  No objection to it.

3          THE COURT:  It's admitted.  You may show it.

4          (GOVERNMENT EXHIBIT Number 1-40 was admitted into

5    evidence.)

6    Q.  Can we please go first to page 6 of 1-40.

7          MR. PAREKH:  And if we can enlarge the top half showing

8    the two individuals.

9    Q.  What are we looking at here?

10   A.  That is a photo, and the man on the right is

11   Abu Idris al-Baljiki, who is also known Najim Laachraoui.  He is

12   the individual who the defendant said he knew and identified in

13   the photo that I showed him.  It's also the same individual that

14   conducted the suicide bombing attack at the Brussels airport on

15   March 27, 2016.

16   Q.  And if we can go to page 7 of this same exhibit.

17         MR. PAREKH:  Court's indulgence, Your Honor.

18         THE COURT:  We're there.  We're on page 7.

19         MR. PAREKH:  Yes, Your Honor.  I'm just turning to the

20   exhibit in the binder in front of me.

21   Q.  Okay.  And does this physical exhibit describe the Brussels

22   attack?

23   A.  It does, sir.  And specifically on this page, if you look,

24   it says:  "Najm Lashrawi."  It is spelled differently than we

25   traditionally spell it in the FBI.  But it's listed up there on

```
 1    the top heading.
 2              MR. PAREKH:  If we can just enlarge that.
 3    A.  I can draw it.  I apologize, I'm not good at drawing.  But
 4    there.
 5    BY MR. PAREKH:
 6    Q.  This is the same individual that the defendant identified as
 7    Abu Idris?
 8    A.  Yes, sir, it is.
 9    Q.  If you can now turn to Exhibit 4-4, please.
10    A.  4-4?
11    Q.  Yes.  It should be in Binder Number 2.
12    A.  Yes, sir, I have 4-4.
13    Q.  What is that exhibit?
14    A.  This is a picture of Abdelhamid Abaaoud, sir.
15    Q.  And did you show the defendant that particular photograph?
16    A.  I did, sir.  And the defendant identified Abaaoud as
17    Abu Umar al-Baljiki, and stated that Abaaoud -- or he said
18    Abu Umar al-Baljiki was involved in the Paris attacks that
19    occurred on November 11, 2015.  Again, sir, I don't think he
20    stated the date.
21    Q.  But he stated that he knew that person conducted the Paris
22    attacks?
23    A.  He said this person was involved in the Paris attacks.  He
24    also said he had met this person three times in Raqqa and that
25    this person also reported to Oussama Atar, also known as
```

1    Abu Ahmed al-Iraqi.

2    Q.  And based on your participation in the Paris attack

3    investigation, just briefly describe that for the jury.

4    A.  So the attacks on November -- I think I said November 11th

5    earlier.  It was November 13th, so I correct myself.  If I did

6    say the date wrong, I apologize.

7         But the attacks on November 13th, 2015, in Paris were a

8    three-pronged attack conducted by nine people.  Those people did

9    attacks at the Stade de France; it was a soccer stadium.  They

10   did attacks at the Bataclan, which is a concert hall.  And they

11   also did attacks at various cafes around the city of Paris.

12   Those attacks included firearms and explosives; 130 people were

13   killed, including one United States citizen, sir.

14   Q.  And what was your involvement with that investigation?

15   A.  So the night the attack happened, I was notified that I

16   would be the lead New York agent to fly to Paris, so due to the

17   lack of commercial flights, I took a team of six individuals on

18   the FBI director's plane and flew to Paris to assist our legal

19   attache' office in the investigation, sir.

20   Q.  And did he indicate that he had met Abu Umar al-Baljiki as a

21   member of ISIS in Syria?

22   A.  He did, sir.  He said met him on three occasions and last

23   saw him in 2015.

24   Q.  And, again, just so it's clear for the record, the two

25   attacks that you've described, the Brussels attack and the Paris

1    attack, which terrorist organization carried out those attacks?

2    A.  Both attacks were carried out by ISIS, sir.

3    Q.  I want you to turn to Government Exhibit 1-38, please.  That

4    should be also in Binder Number 2.

5    A.  I have 1-38, sir.

6    Q.  What is 1-38?

7    A.  It's another issue of *Dabiq* magazine, sir.

8    Q.  And that's 1-38, the tab?

9    A.  Yes, this is 1-38.

10          MR. PAREKH:  Move to admit 1-38.

11          MR. ELLIS:  No objection.

12          THE COURT:  Admitted.  You may display it.

13          (GOVERNMENT EXHIBIT Number 1-38 was admitted into

14   evidence.)

15   Q.  So, again, this is *Dabiq* magazine published by ISIS, you

16   stated?

17   A.  This is an issue of *Dabiq* magazine published by ISIS.

18          MR. PAREKH:  If we can go to page 73 of this exhibit.

19   Okay.  If we can just enlarge the photograph of the individual

20   shown on page 73, please.

21   Q.  What's the significance of this, Special Agent Chiappone?

22   A.  Sir, this photograph is attached to an interview of Abu Umar

23   that was published in *Dabiq* magazine about another plot.  And

24   it's the same photo, although the photo I showed was zoomed in

25   on his face.  But it's the photo I showed El Shafee Elsheikh.

1    Q.  And the photo you showed the defendant, is that Government

2    Exhibit 4-4?

3    A.  I would have to verify the number, sir.  But, yes, I believe

4    it was.  It was the last photo we showed of Abdelhamid Abaaoud.

5            MR. PAREKH:  Your Honor, move to admit 4-4, and to

6    publish that.

7            MR. ELLIS:  No objection.

8            THE COURT:  You may do so.

9            (GOVERNMENT EXHIBIT Number 4-4 was admitted into

10   evidence.)

11   Q.  So the same photograph that the defendant identified that we

12   just saw in *Dabiq*?

13   A.  Yes, sir, I just zoomed in on it.

14   Q.  Okay.  If we can go to Government Exhibit 1-39, please.

15   A.  Yes, sir, I'm at 1-39.

16           MR. PAREKH:  And, Your Honor, I have 1-39 as being

17   previously admitted.

18           THE COURT:  Yes, I think so.

19           COURTROOM CLERK:  Yes, Judge.

20           THE COURT:  Yes, it has been.  It's another issue of

21   *Dabiq* magazine.

22           MR. PAREKH:  Yes, Your Honor.  If we can go to page 55.

23   Q.  What are we looking at on page 55?

24   A.  So this is a picture of the attackers from the Paris attacks

25   I spoke about.  In the center you can see that it's

1    Abu Umar al-Baljiki, also known as Abdelhamid Abaaoud.

2    Q.  Same person the defendant identified in your interview with

3    him?

4    A.  Yes, sir, the same person the defendant identified in the

5    interview, same person that was in the last photo.

6    Q.  And if we can go to page 32, please.  Page 22.  I apologize.

7              MR. PAREKH:  Can you just zoom in on the name

8    Abu Muharib.

9    Q.  What's the significance of page 22 of Government

10   Exhibit 1-39?

11   A.  This is a eulogy to Abu Muharib, also known as

12   Mohammed Emwazi.

13   Q.  And same person that the defendant identified as

14   Abu Muharib?

15   A.  Yes, sir, same person the defendant identified as

16   Abu Muharib.  He was killed November 12th 2015, sir.

17   Q.  And if we can go to the next page of this same exhibit, page

18   23, please.

19             MR. PAREKH:  And if we can highlight the bottom where

20   it says, "17th Division," that paragraph, please.

21   Q.  Can you just read that?

22   A.  "He participated in the conquest of the Taftanaz Air Base

23   near Idlib and the 17th Division base near Raqqa.

24   Q.  Just unpack this for us.  What's the significance of this as

25   it relates to your interview with the defendant sitting in this

1   courtroom?

2   A.   Twofold, sir.  One, the defendant told me he fought against

3   the 17th Division north of ar-Raqqah; and additionally, the

4   defendant stated he fought with Mohammed Emwazi.  Now, he did

5   not state they fought together at this one, but he stated both

6   those things individually, sir.

7   Q.   And ISIS, in Emwazi's eulogy, is claiming that Emwazi fought

8   in the 17th Division battle?

9   A.   Yes, sir.  This is a published eulogy by ISIS stating that

10  Emwazi participated in the battle of the 17th Division near

11  ar-Raqqah, Syria.

12          MR. PAREKH:  And, Judge, I would also move in

13  Exhibit 4-5, to the extent it has not already been admitted.

14  That's the Najim Laachraoui picture.

15          THE COURT:  Let me verify that.

16          COURTROOM CLERK:  It's admitted, Judge.

17          THE COURT:  It's been admitted.

18          MR. PAREKH:  Thank you, Your Honor.

19          THE COURT:  Give me a forecast, Mr. Parekh, about what

20  you have left with this witness.

21          MR. PAREKH:  Yes, Your Honor.  The vast majority of the

22  remaining testimony will be playing additional interviews that

23  have already been admitted into evidence.  So I forecast

24  hopefully less than 30 minutes to go.

25          THE COURT:  All right.

1          MR. PAREKH:  But could be a little bit give or take,

2    more or less.

3          THE COURT:  Ladies and gentlemen, I leave it to you.

4    It's now two minutes to 5:00 or to three minutes to 5:00.  We

5    can go on for 30 minutes, we could go on for three hours.  But

6    I'm not going to ask you to do that.  But how long do you wish

7    to go today?  Would 30 minutes be acceptable?

8          Let's do it, then.  Thank you.

9          Go ahead, Mr. Parekh.

10          MR. PAREKH:  Let's do it.  All right.

11    Q.  Government Exhibit 27-2, it's a 21-second clip, Your Honor.

12    If we can play that.

13          THE COURT:  All right.  You may do so.  It's been

14    admitted.

15          (Video played in open court.)

16    Q.  Special Agent Chiappone, who is speaking in the blue shirt?

17    A.  The blue shirt -- hard to see from here, but I believe the

18    blue shirt was El Shafee Elsheikh, sir.

19    Q.  Who is in the red shirt?

20    A.  It's Alexanda Kotey, sir.

21          MR. PAREKH:  If we can now play 27-1, 56 seconds.

22          (Video played in open court.)

23    Q.  Just so it's clear, the person in the blue shirt?

24    A.  The blue shirt, El Shafee Elsheikh; red shirt,

25    Alexanda Kotey.

1          MR. PAREKH:  If we can play Government Exhibit 26-1.

2     It's a clip that's approximately 1 minute and 17 seconds.

3          THE COURT:  All right.  Proceed.

4          (Video played in open court.)

5     BY MR. PAREKH:

6     Q.  Before we play the next clip, does the defendant's statement

7     here corroborate what he told you, that he left in 2012, came to

8     Syria in 2012?

9     A.  Yes.  He states, "I left in 2012," sir.

10    Q.  And his brother came to Syria in 2015?

11    A.  He did, sir.

12    Q.  Okay.

13         MR. PAREKH:  If we can now play Government

14    Exhibit 26-2.  It's 2 minutes and 58 seconds.

15         (Video played in open court.)

16    Q.  Just to point out one of the statements, did the defendant

17    state in this clip that he was there from the beginning, when

18    James Foley and John Cantlie were in detention?

19    A.  Yes, sir, James Foley and John Cantlie were the first two

20    hostages that were kidnapped, sir.

21         MR. PAREKH:  If we could now play Government

22    Exhibit 26-3, that's approximately 32 seconds.

23         (Video played in open court.)

24         MR. PAREKH:  And now Government Exhibit 26-6, 1 minute

25    and 48 seconds, approximately.

```
 1                    (Video played in open court.)
 2    BY MR. PAREKH:
 3    Q.  Before we go to the next clip, the defendant here said a
 4    name, Kayla.  Do you know who he was referring to?
 5    A.  Yes, sir.  He was talking about a female American hostage,
 6    Kayla Mueller, who was also kidnapped and eventually was
 7    murdered, sir.
 8              MR. PAREKH:  I want to go to --
 9              THE COURT:  Who was eventually murdered?
10              THE WITNESS:  Kayla Mueller, Your Honor.
11              THE COURT:  Yes.  Let me ask you, Agent Chiappone, was
12    John Cantlie ever released?
13              THE WITNESS:  He was never released, Your Honor, and
14    there was never a video published of John Cantlie with a final
15    disposition that I'm aware of, Your Honor.
16              THE COURT:  So he's just disappeared.  We don't know?
17              THE WITNESS:  Unfortunately, Your Honor, we don't know
18    what happened to John Cantlie.
19              THE COURT:  Next question, Mr. Parekh.
20              MR. PAREKH:  Yes, Your Honor.  We'll now play
21    Government Exhibit 26-10.  It's approximately 1 minute and
22    31 seconds.
23                    (Video played in open court.)
24    Q.  Do you know which execution the defendant is speaking about
25    in this particular clip?
```

1    A.  I do, sir.  Unfortunately, I've seen that video as well.

2    Q.  And which one is that?

3    A.  It was an execution of - I don't really know his

4    nationality, I believe he was a Syrian - that was conducted in

5    front of many of the hostages.

6          MR. PAREKH:  Can we now play Government Exhibit 26-12,

7    21 seconds.

8          (Video played in open court.)

9    Q.  In this clip, the defendant is admitting that he hit most of

10   the prisoners?

11   A.  Yes, sir.

12   Q.  And which prisoners is he referring to?

13   A.  He's referring to -- in this video, he simply spoke about

14   James Foley, one of the American prisoner citizens, sir.

15   Q.  When he says "most of the prisoners," is he speaking about

16   the hostages held by The Beatles?

17   A.  He's speaking about all of the hostages held by The Beatles,

18   regardless of nationality, sir.

19          MR. PAREKH:  If we can now play Government

20   Exhibit 27-5.

21          Your Honor, this was previously played for the jury,

22   but I believe you wanted us to ask one question.  So I'll just

23   solicit that through Special Agent Chiappone.  It's a short

24   clip.

25          THE COURT:  All right.

```
 1                    (Video played in open court.)
 2    BY MR. PAREKH:
 3    Q.  Who is the person speaking?
 4    A.  Which one, sir?
 5    Q.  The one who was just speaking right before the journalist's
 6    starts speaking?
 7    A.  The individual that is not the journalists is
 8    El Shafee Elsheikh, sir.
 9    Q.  And is he seated next to someone else?
10    A.  Yeah, I believe he was, sir.
11    Q.  Let's watch the rest of the clip --
12    A.  Let's watch the rest of the clip, sir.  If I could --
13    Q.  -- and now if you can pay attention to who he's seated next
14    to.  I'll ask you when we stop.
15    A.  I was reading the subtitles.  I'm sorry.
16                    (Video played in open court.)
17    Q.  So the first person speaking in the clip with the Nike shirt
18    on is?
19    A.  The Nike shirt is the defendant, El Shafee Elsheikh.
20    Q.  And the other person who the defendant is seated next to?
21    A.  The other person is the individual the defendant was
22    captured with, Alexanda Kotey, sir.
23              MR. PAREKH:  Your Honor, the next clip is a little bit
24    longer.  It's approximately 8 minutes and 52 seconds.  That's
25    Government Exhibit 27-8.
```

```
 1              THE COURT:  Is this the last one?
 2              MR. PAREKH:  It is not quite the last one, but we're
 3    getting there, Your Honor.
 4              THE COURT:  All right.
 5              (Video played in open court.)
 6    BY MR. PAREKH:
 7    Q.  Just so it's clear forget record, the person who is being
 8    interviewed in this clip?
 9    A.  It's El Shafee Elsheikh, sir, the defendant.
10    Q.  Is there an interview he did with The Washington Post?
11    A.  It is, sir, in 2019.
12              MR. PAREKH:  If we could now play Government
13    Exhibit 26-18, 41 seconds, approximately.
14              (Video played in open court.)
15    Q.  So here the defendant mentions Alexe.  Do you know who he's
16    speaking of?
17    A.  He's referring to Alexanda Kotey, sir.
18    Q.  And he mentions another individual?
19    A.  He mentions Mohammed Emwazi, sir.
20    Q.  So the three people, El Shafee Elsheikh, Mohammed Emwazi,
21    and Alexanda Kotey, are those the same three people that you had
22    been investigating since August 2014?
23    A.  The same three individuals that I've been investigating
24    since August 2014.
25    Q.  During your interview with the defendant in March of 2018,
```

 1    did he make any statements about an individual named

 2    Aafia Siddiqui?

 3    A.  He did, sir.  The defendant stated that Aafia Siddiqui, he

 4    felt Aafia Siddiqui had been wronged by the United States and

 5    that he didn't have faith in the U.S. legal system because of

 6    that.  He felt that her sentence of 80 years was unjust.  And he

 7    said something along the lines of:  She did nothing and got

 8    80 years.

 9    Q.  And based on your investigation of the defendant,

10    Alexanda Kotey, and Mohammed Emwazi, did that name,

11    "Aafia Siddiqui," have any particular significance to you when

12    this defendant mentioned it?

13    A.  It did, sir.  In at least four different emails that were

14    sent from the Islamic State to the hostage families,

15    Aafia Siddiqui's name was mentioned an her release was asked for

16    from the United States.

17    Q.  Okay.  I want to show you Government Exhibit 6-8, please.

18    And that should be in Binder Number 3.

19    A.  I have 6-8, sir.

20    Q.  And what is 6-8?

21    A.  This is a letter to the family of Kayla Mueller from the

22    Islamic State, sir.

23    Q.  And did the Mueller family turn that letter over to the FBI?

24    A.  They did, sir.

25          MR. PAREKH:  Move to admit 6-8.

199

1          MR. ELLIS:  No objection, sir.

2          THE COURT:  Admitted.  You may display it.

3          (GOVERNMENT EXHIBIT Number 6-8 was admitted into

4     evidence.)

5          MR. PAREKH:  If we can first publish page 4.  And if we

6     can publish the highlighted portion, the top highlighted

7     portion, please.

8     BY MR. PAREKH:

9     Q.  Okay.  Do you see the paragraph that says:  "Our demand is

10    simple and achievable"?

11    A.  I do, sir.

12    Q.  Please read the rest of that.

13    A.  It says:  "The release of our sister, Dr. Aafia Siddiqui,

14    who is currently a prisoner of the United States of America,

15    will secure the instant release of Kayla and her safe return

16    home."

17    Q.  And Aafia Siddiqui, is that the same person that the

18    defendant mentioned to you during your interview with him?

19    A.  That is the same person the defendant mentioned in my

20    interview, sir.

21          MR. PAREKH:  Let's go to page 5 of this exhibit.  And

22    if we can enlarge the highlighted top portion, please.

23    Q.  Can you just read that?

24    A.  The whole portion, sir?

25    Q.  Yes, please.

1    A.  "We remind you of our demands and conditions.

2    Dr. Aafia Siddiqui or 5 million Euros cash for

3    Kayla Jean Mueller.  No media attention at all.  Fast and clear

4    responses and no attachments."

5    Q.  And just so it's clear for the record, who is receiving

6    these demands?

7    A.  This is the Mueller family, sir.

8    Q.  And is it from Kayla Mueller's captors?

9    A.  It's from Kayla Mueller's captors to her family, sir.

10   Q.  Just so we have it for the record, what is the date of this

11   email, pages 4 and 5?

12          THE WITNESS:  Can you un-zoom, sir?

13          MR. PAREKH:  If we can go to page 4.

14   A.  This one is dated May 29, 2014, sir.

15   Q.  Okay.  If you can now turn to page 7 of this same exhibit.

16   And is this a June 3rd, 2014, email from Kayla Mueller's captors

17   to the family of Kayla Mueller?

18   A.  It is, sir.

19          MR. PAREKH:  And if we can just enlarge the highlighted

20   portion, please.

21   Q.  Okay.

22   A.  Read it, sir?

23   Q.  Yes.  If you could just read the first sentence after, "The

24   objectives are clear."

25   A.  "The release of Dr. Aafia Siddiqui in exchange for

1    Kayla Mueller is our main demand.  As you may" --

2    Q.  Sorry.

3    A.  Like me to stop, sir?

4    Q.  Yes, you can stop right there.

5    A.  Okay, sir.

6    Q.  Aafia Siddiqui, the same person that the defendant mentioned

7    to you during your interview with him?

8    A.  The same person, sir.

9         MR. PAREKH:  And if we can go to page 33 of this same

10   exhibit.

11   Q.  And is this a September 19th, 2014, email that

12   Kayla Mueller's parents received from her captors?

13   A.  It is, sir.

14        MR. PAREKH:  And if we can just go to the first -- if

15   you could just highlight the first two sentences of this email

16   with the header.

17   A.  Yes, sir.  Read it?

18   Q.  Well, Ms. Lopez is going to enlarge it.

19   A.  Roger that, sir.

20   Q.  Okay.  So September 19, 2014, just read those two sentences,

21   please.

22   A.  "Kayla's safe release is still a possibility, considering

23   our demands are met.  As we made clear before, we demand the

24   safe release of our sister, Dr. Aafia Siddiqui."

25        MR. PAREKH:  You can take that down.

1          Your Honor, I just have three more video clips to play,

2     and one more exhibit, and then I should be wrapping up.

3          THE COURT:  All right.  Proceed.

4          MR. PAREKH:  If we can now play Government

5     Exhibit 26-13.  We previously played the first 39 seconds.

6     We'll now play the clip in total, Your Honor.

7          (Video played in open court.)

8     BY MR. PAREKH:

9     Q.  Based on your training and experience, when the defendant

10    here says, "Subduing of prisoners is used as a preventive

11    meanings of escape and distance," what is he referring to there?

12         MR. ELLIS:  I'll object.

13         THE COURT:  What's the nature of the objection?

14         MR. ELLIS:  Your Honor, he's asking to speculate what

15    Mr. Elsheikh was thinking.  It's an improper opinion.

16         THE COURT:  Repeat your question, Mr. Parekh.

17         MR. PAREKH:  Based on his training and experience --

18    I'll rephrase.

19         Based on this special agent's training and experience,

20    in the context of individuals keeping others as hostages, what

21    does it mean to subdue a prisoner.

22         THE COURT:  All right.  I'll overrule the objection.

23         You may answer.

24    A.  Sir, I take subduing to mean to commit an act of violence to

25    make that individual subservient to you.

```
 1              MR. PAREKH:  I want to just play the first 38 seconds
 2     of Government Exhibit 26-8.
 3              (Video played in open court.)
 4              MR. PAREKH:  And the last clip, Your Honor, is
 5     Government Exhibit 26-19.  It's 2 minutes and 35 seconds.
 6              THE COURT:  All right.
 7              MR. PAREKH:  And if we can pause this for one moment, I
 8     want to ask the special agent one question.
 9     BY MR. PAREKH:
10     Q.  In the two clips that we've played so far, did you hear the
11     defendant use the word "transgress"?
12     A.  Yes, sir.  He used the word "transgress" as well as another
13     form of it, "transgression."
14              MR. PAREKH:  If we can play Government Exhibit 24-19.
15              (Video played in open court.)
16     Q.  Just so it's clear for the record, the defendant states at
17     the end, "I call it transgression."  Is that correct?
18     A.  That's correct, sir.
19     Q.  And who is the defendant speaking to?
20     A.  The defendant is speaking to a British reporter, Langan,
21     Mr. Langan.
22              THE COURT:  Go ahead.
23     Q.  So the three clips that we saw, what stood out to you as
24     being unique and consistent during these three prior clips that
25     we just displayed?
```

1   A.  The defendant, El Shafee Elsheikh, consistently used the

2   term "transgression" or a form of that, "transgress."  This was

3   significant to me due to an email that was sent to the Foley

4   family and --

5   Q.  Let me stop you there.

6   A.  Roger that, sir.

7   Q.  If you can turn to Government Exhibit 5-4, please.

8   A.  I have 5-4, sir.

9   Q.  And is this an email that the Foleys received from the

10  captors of their son?

11  A.  Yes, sir, it's an email from the captors of their son to the

12  Foley family, sir.

13  Q.  And their son was James Foley?

14  A.  Their son was James Foley, sir.

15  Q.  Did the FBI receive those emails?

16  A.  We received copies of these emails as well, sir.

17          MR. PAREKH:  Move to admit 5-4.

18          THE COURT:  It's admitted.  You may display it.

19          (GOVERNMENT EXHIBIT Number 5-4 was admitted into

20  evidence.)

21          MR. PAREKH:  Yes, Your Honor.

22          Page 15 of 5-4, please.  If we can enlarge this

23  exhibit.  Okay.  If we can just enlarge starting with:  "You and

24  your citizens will pay the price of your bombings and ending

25  with "towards us."  It should be the bottom of the first email,

1    the top half.

2    Q.  Do you see on the bottom?

3    A.  I see the area you're referring to, sir.

4    Q.  Okay.  And if you can just read from, "You and your

5    citizens," down to the end.

6    A.  "You and your citizens will pay the price of your bombings,

7    the first of which being the blood of American citizen

8    James Foley.  He will be executed as a direct result of your

9    transgressions towards us."

10          MR. PAREKH:  Ms. Lopez, if we could just highlight the

11   date that this email was sent to the Foley family.

12   Q.  What's the date of this email?

13   A.  12 August, 2014, sir.

14   Q.  So August 12, 2014, is that email significant in light of

15   the clips that we just saw of the defendant?

16   A.  It is, sir.

17   Q.  Please explain.

18   A.  This email is significant for two reasons, like I previously

19   mentioned.  One, it happened on August 12th.  I should say three

20   reasons, sir.  August 12th, 2014; second, he mentions

21   Dr. Aafia Siddiqui; and lastly, the writer mentions that

22   James Foley will be executed as a "direct result of your

23   transgressions."

24   Q.  "Transgressions" is the same word that the defendant used

25   three times in the three prior clips that we saw?

1    A.  Yes, sir.

2    Q.  And was James Foley executed?

3    A.  Yes, sir.

4    Q.  How soon after this email was sent was James Foley executed?

5    A.  James Foley was executed one week after this email, sir, on

6    August 19, 2014.

7             MR. PAREKH:  The Court's indulgence.

8             No more questions.

9             THE COURT:  How long do you think you need for

10   cross-examination?

11            MR. ELLIS:  Your Honor, I would say perhaps a

12   half-hour.

13            THE COURT:  All right.  Ladies and gentlemen, we can

14   cease today and come back Monday, or finish it.  Which do you

15   prefer to do?

16            Go ahead, proceed with your cross-examination.

17         **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

18   **BY MR. ELLIS:**

19   Q.  I would first like to talk to you about the substance of

20   your interview with Mr. Elsheikh in March of 2018.  Okay?

21   A.  Absolutely, sir.

22   Q.  So the reason that Mr. Elsheikh said he went to Syria was to

23   fight the Syrian regime.  Correct?

24   A.  That's correct, sir.

25   Q.  Now, is that the same regime that the Syrian Democratic

1    Forces were fighting?

2    A.  Honestly, sir, I don't know that.

3    Q.  You talked about when he moved there, where he lived?

4    A.  Yes, sir.

5    Q.  You indicated that he had stated that he had lived in Idlib

6    and Aleppo?

7    A.  That's correct, sir.

8    Q.  When he told you that, he also said during that time that he

9    moved around a lot?

10   A.  I don't have the exact statement, sir, but yes, he did say

11   he moved around, but specifically mentioned those three cities

12   on those specific date ranges.

13   Q.  Correct.  So those were two of the places he lived before

14   2014, among others?

15   A.  I would have to refresh my memory, when you say "among

16   others," with the 302, sir.

17   Q.  You can refresh your memory.

18          MR. ELLIS:  If the court security officer would hand

19   you the defense exhibit binder, and you can flip to Exhibit 13.

20   It's a copy of your 302, sir.

21          COURT SECURITY OFFICER:  What binder, sir?

22          MR. ELLIS:  The defense.

23   A.  You said 13, sir?

24   Q.  Correct.  I'm sorry, you probably want to look at page 3 of

25   7 of your --

208

```
 1    A.  I've got it, sir.

 2    Q.  Okay.

 3    A.  So he said he moved around a lot because he was involved in

 4    fighting.

 5    Q.  So based on your summary, it indicates that there was other

 6    places that he lived besides the two that you identified?

 7    A.  It's possible he lived in other places, sir.  He didn't

 8    specify any other places besides those.

 9    Q.  And Aleppo is one of the larger cities in Syria,

10    Northwestern Syria.  Correct?

11    A.  Yeah, it's a large city.  I don't know the exact population.

12    Q.  Somewhat more developed?

13    A.  I've never been to Aleppo, sir.  I've only been to Kobani,

14    Syria, and then our U.S. base in Syria.  So I cannot speak to

15    the development of Aleppo.

16    Q.  And at that time in March of 2018, you asked him some

17    questions about Mr. Kotey and Mr. Emwazi.  Correct?

18    A.  I did, sir.

19    Q.  And what he said to you about Mr. Kotey was that Mr. Kotey

20    was a friend?

21    A.  He did, sir.

22    Q.  He described Mr. Emwazi as an acquaintance?

23    A.  He did, sir.

24    Q.  You indicated he had fought against the 17th Division?

25    A.  I did, sir.
```

```
 1    Q.  He described to you a little bit about the ISIS military

 2    organization as well.  Right?

 3    A.  He did.

 4    Q.  He said they had a type of formal military organization.

 5    Correct?

 6    A.  He stated they were units, yes, sir.

 7    Q.  And that he wasn't a part of that formal organization.

 8    Correct?

 9    A.  That's correct, sir.

10    Q.  When he described to you fighting against the 17th Division,

11    he said that he had kind of just gone with three other people on

12    their own?

13    A.  Yes, sir, he said he was part of a group of four people, and

14    he did not have permission to do that fighting.

15    Q.  Now, you also described speaking to him about Abu Idris?

16    A.  Abu Idris, yes, sir.

17    Q.  And he said that he knew Abu Idris?

18    A.  He did, sir.

19    Q.  But that he had never heard any discussions about European

20    attacks?

21    A.  That's correct, sir.

22    Q.  And he had no knowledge of what Abu Idris ended up doing in

23    Brussels?

24    A.  No, sir.  He stated that Abu Idris did the attack at the

25    Brussels airport.
```

1    Q.  And he had no prior knowledge of his plan to do that?

2    A.  Yes, he did state that, sir.

3    Q.  And those attacks were widely publicized in ISIS propaganda.

4    Correct?

5    A.  Yes, sir.

6    Q.  So anyone following ISIS propaganda would know about that?

7    A.  Anyone following the news anywhere in the world would know

8    about that, sir.

9    Q.  Fair enough.

10           Now, you indicated that you essentially had been

11   preparing for your interview of Mr. Elsheikh for four years?

12   A.  I had been preparing for a long time.  I was hoping for the

13   opportunity for four years, but the direct preparation was not

14   for four years.

15   Q.  I'm guessing you reviewed a substantial amount of evidence.

16   Correct?

17   A.  I reviewed my case file, yes, sir.

18   Q.  You also reviewed some UK evidence as well.  Correct?

19   A.  Actually, sir, I was not part of the team that reviewed the

20   UK evidence.

21   Q.  You never reviewed any materials from the United Kingdom?

22   A.  I received, especially early on in 2014, 2015, some material

23   from the United Kingdom.  But I was not part of the team that

24   deployed in -- I believe it was January or February 2018 to the

25   United Kingdom to review the entire evidence.

1    Q.  Correct.  No, I understand that.

2         But what I'm asking you is:  Did you review those

3    materials as you investigated the case?

4    A.  Yeah, I've seen British evidence, yes, sir.

5    Q.  And obviously you had identified three suspects.  Correct?

6    A.  There was three main suspects, yes, sir.

7    Q.  And so I'm sure as a seasoned investigator you investigated

8    their backgrounds in detail?

9    A.  Yes, sir.  Most of their background was done by the British

10   government, and we got what we could, yes, sir.

11   Q.  Did you learn that Mr. Kotey had been arrested for stealing

12   a scooter in 1998?

13   A.  I can say definitively Mr. Kotey had been arrested.  I don't

14   recall a scooter with Mr. Kotey.

15   Q.  You don't recall reviewing materials that indicated that he

16   was arrested for stealing a Piaggio scooter?

17   A.  I don't, sir.

18        MR. PAREKH:  Objection, Your Honor, beyond the scope.

19   This didn't come up in direct examination.

20        THE COURT:  I'll overrule it.

21        But let's -- how much do you have -- it is arguably

22   beyond the scope, but that's all right.  How much do you

23   anticipate?

24        MR. ELLIS:  On this topic, Your Honor, just a few

25   questions.

1          THE COURT:  That's not what I was asking.

2          MR. ELLIS:  In total, Your Honor?

3          THE COURT:  Yes.

4          MR. ELLIS:  Your Honor, I would say I have about

5    15 minutes or so, 20 minutes.

6          THE COURT:  Are you still on board, ladies and

7    gentlemen?  All right.  Let's finish it.

8    A.  I don't recall a scooter, sir.

9    BY MR. ELLIS:

10   Q.  Do you recall learning that Alexanda Kotey was interested in

11   boxing?

12   A.  I recall Mohammed Emwazi being interested in boxing, sir,

13   but I can't say specifically Alexanda Kotey.

14   Q.  All right.  I want to talk to you a little bit now just

15   about the whole timeline starting from your interview.  Okay?

16   A.  Okay, sir.

17   Q.  So when you interviewed Mr. Elsheikh, how long had he been

18   in custody of the SDF at that point?

19   A.  12 weeks, sir.  Let's just say 12 weeks from when I was

20   notified, sir.  So I don't know the exact date of his capture.

21   I know I found out on or about January 28th.

22   Q.  So that would be about two months from when you found out?

23   A.  Yes, sir.  So eight weeks.  Bad math.

24   Q.  And shortly after your interview with Mr. Elsheikh is when

25   he began doing some of these media interviews.  Correct?

1    A.  That's correct, sir.

2    Q.  And he did several media interviews in March and April of

3    2018.  Correct?

4    A.  Yes, that's correct, sir.

5    Q.  I believe there was also one in August of 2018 of that year?

6    A.  That sounds right, sir.

7    Q.  And then there was a substantial gap in the media

8    interviews.  Correct?

9    A.  Yes, sir.

10   Q.  I believe the next interview after August 2018 wasn't until

11   May of 2019.  Correct?

12   A.  I can't say for certain, sir, but that sounds correct.

13   Q.  Okay.  So in between those initial few interviews, there was

14   about an eight-, nine-month gap?

15   A.  Yes, sir.

16   Q.  And you indicated that the Department of Defense or the

17   United States took custody of Mr. Elsheikh in October of 2019?

18   A.  Well, I didn't indicate that, sir.  But that's around the

19   time he went to the Department of Defense, in 2019.

20   Q.  So then he had been in Kurdish custody for almost two years?

21   A.  Year and a half, sir.

22   Q.  January to October of -- January 2018 to October 2019?

23   A.  Yeah, 20 months, roger.

24   Q.  Almost two years?

25   A.  Sure.

```
 1    Q.  And you never interviewed Mr. Elsheikh in 2019.  Correct?
 2    A.  I did not, sir.
 3    Q.  And you actually never saw him in Syria again after that
 4    first interview in March of 2018?
 5    A.  I saw him in Syria in March 2018, yes.
 6    Q.  And then after that, it wasn't until he was extradited here
 7    to the United States.  Correct?
 8    A.  Yeah.  Subsequently to March 2018, I saw him in the
 9    United States.  That's correct.
10    Q.  All right.  I have a few questions about the Sean Langan
11    interview that you were testifying about.
12    A.  Okay, sir.
13    Q.  The date of that interview was mid-July of 2019.  Correct?
14    A.  July 2019 for sure, sir.
15    Q.  So that was about four months before he was eventually
16    transferred over to the United States?
17    A.  Approximately, sir.
18    Q.  And by July of '19, 2019, he had been in custody for about a
19    year and a half?
20    A.  That's about right, sir.
21    Q.  And during the Langan interview, at certain points,
22    Mr. Langan tells Mr. Elsheikh that it's a possibility he could
23    be transferred to Iraq?
24    A.  I don't recall that, sir.  If you have a clip that says
25    that, but I have not watched the entire Langan video.
```

1   Q.  Before you prepared to come testify in this case, you didn't

2   the -- I believe you testified on direct that you had reviewed

3   the videos --

4   A.  I reviewed all the videos in the exhibits, sir.  There's

5   hours of video footage that I have not viewed all of it, sir.

6   Q.  And you're not familiar with the Sean Langan -- the complete

7   Sean Langan interview?

8   A.  I have not watched the complete Sean Langan interview, sir.

9   Q.  And you don't recall at any point him communicating to

10  Mr. Elsheikh that going to Iraq was a --

11        MR. PAREKH:  Objection, Your Honor.  He just said he

12  hasn't watched the full video.

13        THE COURT:  All right.  I'll sustain it.  But then

14  you're testifying, Mr. Ellis.

15        MR. ELLIS:  It's cross-examination, sir.

16        THE COURT:  No, not if he says he doesn't know.  Then

17  you're making an effort to put information coming from you, not

18  from the witness.  And you'll have an opportunity to present

19  evidence like that if you want to.

20        MR. ELLIS:  Thank you, sir.

21  Q.  So by the time that we were watching the video clips -- like

22  I said, the time we were the video clips from Sean Langan --

23  A.  Yes, sir.

24  Q.  -- that's a year and a half into the custody.  Correct?

25  A.  When he did his videos?  Yes, sir.

1    Q.  And do you recall from the Sean Langan interview him stating

2    to Mr. Elsheikh that making some admissions may be the only --

3              MR. PAREKH:  Objection, Your Honor.  He just -- same

4    objection.

5              THE COURT:  Pull up the earphones.

6              (BENCH CONFERENCE ON THE RECORD.)

7              THE COURT:  Can you hear me, Mr. Parekh?

8              MR. PAREKH:  I can hear you, Your Honor.

9              THE COURT:  And, Mr. Ellis, can you hear me?

10             MR. ELLIS:  Yes, sir, I can.

11             THE COURT:  Now, what's the question before the

12   witness, Mr. Ellis?

13             MR. ELLIS:  Whether he recalls, from his viewing of the

14   videos, that Mr. Langan stated that if Mr. Elsheikh made some

15   admissions, it may be the only way to save himself.

16             THE COURT:  You're talking now about statements made by

17   the interviewer?

18             MR. ELLIS:  Yes, sir.  For its effect on the listener,

19   sir.

20             THE COURT:  What's your objection, Mr. Parekh?

21             MR. PAREKH:  Yes, Your Honor.  The witness has clearly

22   stated that he's watched the Langan clips that the government

23   has prepared in its exhibit binder.  I believe what Mr. Ellis is

24   attempting to do is improper, because he's trying to put this in

25   front of the jury knowing that the witness has not listened to

1    any of such portions of that interview.

2         And so it's the same objection as the prior objection,

3    which is that this witness has only reviewed the portions that

4    have been admitted.

5         THE COURT:  Well, that's true, but isn't he also

6    trying -- what he really wants to do, Mr. Ellis, I think, is to

7    get before the jury your view that he was told by an interviewer

8    that he might be sent to Iraq.  And that's an argument you want

9    to make that goes to voluntariness.  But that's hearsay.

10        MR. ELLIS:  It's not hearsay, Your Honor.  It's not

11   offered for its truth.  It's simply offered for the government

12   fact that it was said to Mr. Elsheikh.

13        THE COURT:  What's your view of that, Mr. Parekh?

14        MR. PAREKH:  I don't think this witness is the witness

15   that he would be able to get that in there through, Your Honor,

16   because this witness has not viewed that portion of the --

17        THE COURT:  All right.  Well, Mr. Ellis could then find

18   that piece of the interview and play that, and then ask it?

19        MR. PAREKH:  Again, I think, Your Honor, I plan on

20   filing a memorandum this weekend where we're going to discuss

21   the rule on completeness which will be objected to.  I don't

22   think this witness will be the proper one.  We would tell the

23   defense that they can play their own clips during their

24   case-in-chief.  We planned to respond if they filed such a

25   memorandum, and we are planning to do so.

1              THE COURT:  Mr. Ellis?

2              MR. ELLIS:  Yes, Your Honor.  I don't know if this

3    witness has reviewed these videos more than just the

4    government's clips.  I'm not sure.  That's why I asked the

5    question.

6              THE COURT:  Who said he viewed more than the

7    government's clips?

8              MR. ELLIS:  He's investigated this case for four years,

9    and he's forwarded --

10             THE COURT:  But he said very clearly that he had

11   reviewed these exhibits.

12             MR. ELLIS:  I understand that, Your Honor.  He also had

13   forwarded all of these media interviews to different people in

14   the U.S. Attorney's Office, so at some point he has viewed more

15   than just the exhibit.

16             THE COURT:  No, at some point he may have seen

17   something like that.

18             MR. ELLIS:  Correct.

19             MR. PAREKH:  Your Honor, I have a suggestion.

20   Mr. Ellis can ask, "Have you reviewed any other clips of

21   Langan's interview with my client other than the clips that were

22   played for you today?"  And if his answer to that question is

23   no, then he knows that the answer to the next question would be

24   no as well.

25             THE COURT:  Well, I think that's a reasonable

1     suggestion.

2           In any event, Mr. Ellis, you can find that somewhere

3     and play it in your case-in-chief.  And I'm not sure it's worth

4     taking the time today to try to find that or even explore this

5     further.  But the suggestion Mr. Parekh makes is not a bad one.

6     How much more do you have with this witness?

7           MR. ELLIS:  After this, Your Honor, it's just a couple

8     of questions.

9           THE COURT:  Let's get it done.

10          (END BENCH CONFERENCE.)

11          MR. ELLIS:  May I proceed, sir?

12          THE COURT:  Yes, you may.

13    BY MR. ELLIS:

14    Q.  Special Agent Chiappone --

15    A.  Yes, sir.

16    Q.  -- have you at any point during your investigation reviewed

17    more of the Sean Langan interview than what has been introduced

18    by the government?

19    A.  I have not, sir.

20          MR. ELLIS:  May I have a moment, Your Honor?

21          THE COURT:  Yes.

22    Q.  Agent Chiappone, besides Mr. Kotey, Mr. Emwazi, and

23    Mr. Elsheikh, were there other people being investigated to be

24    potentially members of The Beatles?

25    A.  There were, sir.

1   Q.   Can you say how many?

2   A.   There was one other one that was considered, sir.

3   Q.   And no more than that?

4   A.   There could have been others, but there was one main one,

5   sir.

6          MR. ELLIS:   That's all the questions I have.

7          THE COURT:   Any redirect?

8          MR. PAREKH:   Very briefly, Your Honor.

9      **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

10   **BY MR. PAREKH:**

11   Q.   Just tacking on to the last question that Mr. Yancey Ellis

12   asked you, did your investigation indicate -- when he said

13   "The Beatles," what did you take his question to mean?   How many

14   individuals?

15   A.   Four, sir.

16   Q.   And did your investigation reveal how many individuals were

17   actually considered The Beatles?

18   A.   At the conclusion of the investigation, we determined it was

19   three, sir.

20   Q.   And last question.   In all the clips that we've played

21   today, how many other individuals does this defendant sitting in

22   the courtroom name as being part of the activities that he

23   described related to the hostages?

24   A.   He only names Mohammed Emwazi and Alexanda Kotey, and he

25   specifically states in one of the videos that we reviewed that

1    it was not correct that there were four, that that was BS made

2    up by Central Command.

3          MR. PAREKH:  No further questions.

4          THE COURT:  All right.  Thank you.  You may step down.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Ladies and gentlemen, thank you for your

7    willingness to hear more.  I think we made some progress today.

8    So put the matter out of your mind for the weekend, have a

9    restful and a nice weekend.  I hope we'll have good weather.

10   Don't discuss the matter with anyone.  Don't do any research or

11   look up anything.

12          It will amuse you to know that I needed the definition,

13   in another case, of a particular term.  And I remember many,

14   many years ago, I had a dictionary in my chambers.  Somehow or

15   other, over the last 30 some years, that's disappeared.  People

16   don't use dictionaries anymore.  I couldn't find it.  I had to

17   wait until somebody came in to punch the right button on the

18   machine to call up the dictionary that exists on the machine.

19   I've clearly outlived my ability to survive in the electronic

20   world.

21          All right.  Put the matter out of your mind, don't

22   undertake any investigation.

23          Now, on Monday, I have one last apology to make.  We

24   won't begin until 11 o'clock, because, again, I will have to

25   struggle with another matter.  But I promise you that will be

1    the last time, and we will forge forward.  I'm also going to

2    move and make an effort to find people with real power to see if

3    we can find some snacks to go with your soft drinks.

4          Thank you for your careful and close attention to the

5    evidence in this case as it's been presented, and I will see you

6    Monday at 11 o'clock.

7          (Jury out at 6:04 p.m.)

8          THE COURT:  Court stands in recess until Monday at

9    11 o'clock.

10          MR. DEUBLER:  Your Honor, very, very, very quickly,

11    just the forecast, Mr. Parekh mentioned that the defense would

12    be filing something this weekend.  I just wanted to tell

13    Your Honor that it is regarding media interview clips that we

14    would like to introduce during our case-in-chief.  We wanted to

15    do it this weekend to give the government time to respond.  But

16    we are not asking the Court to do anything next week, we are

17    going to be asking the Court to take up the issue before the

18    defense case-in-chief.

19          THE COURT:  All right.  Thank you for that information.

20          MR. DEUBLER:  Yes, sir.

21          THE COURT:  Court stands in recess.

22          COURTROOM CLERK:  Sir?

23          THE COURT:  No, you may be seated for a moment.  This

24    is an interesting note from the jury, unsigned.  I'll make it

25    part of the record.

1          "Could the jury receive some extra notebooks?"

2          The answer on Monday will be yes, and I will ensure

3    that they receive -- whoever needs an extra notebook will

4    receive it.

5          Court stands in recess until Monday at 11 o'clock.

6          (Off the record at 6:05 p.m.)

7

8

9

10

11

12

13

14

15              **CERTIFICATE OF OFFICIAL COURT REPORTER**

16

17          **I, Rebecca Stonestreet, certify that the foregoing is a**

18    **correct transcript from the record of proceedings in the**

19    **above-entitled matter.**

20

21

22    **____//Rebecca Stonestreet_____          _____**

23    **SIGNATURE OF COURT REPORTER                DATE**

24

25