1                          UNITED STATES DISTRICT COURT
                        FOR THE EASTERN DISTRICT OF VIRGINIA
2                              Alexandria Division

3    UNITED STATES OF AMERICA,          :     Criminal Case
                                        :     No. 20-CR-00239-TSE
4                    Plaintiff          :
              v.                        :
5                                       :
     EL SHAFEE ELSHEIKH,                :     April 11, 2022
6                                       :     9:10 a.m.
                     Defendant          :
7    ............................       :     ........................

8                      TRANSCRIPT OF TRIAL PROCEEDINGS
                                  VOLUME 10
9                    BEFORE THE HONORABLE T.S. ELLIS, III
                        UNITED STATES DISTRICT JUDGE
10                              and a jury

11   APPEARANCES:

12    FOR THE PLAINTIFF:          RAJ PAREKH
                                  JOHN T. GIBBS
13                                DENNIS FITZPATRICK
                                  ALICIA H. COOK
14                                U.S. ATTORNEY'S OFFICE
                                  2100 Jamieson Avenue
15                                Alexandria, VA  22314
                                  703-299-3700
16
      FOR THE DEFENDANT:          NINA J. GINSBERG
17                                ZACHARY ANDREW DEUBLER
                                  DiMURO GINSBERG PC
18                                1101 King Street
                                  Suite 610
19                                Alexandria, VA  22314
                                  703-684-4333
20
                                  EDWARD B. MacMAHON
21                                LAW OFFICES OF
                                  EDWARD B. MacMAHON, JR.
22                                PO Box 25
                                  107 East Washington Street
23                                Middleburg, VA  20118
                                  540-687-6366
24
                                  (APPEARANCES CONTINUED ON
25                                FOLLOWING PAGE.)

2

1    FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                                 CARMICHAEL ELLIS & BROCK
2                                108 N. Alfred Street
                                 1st Floor
3                                Alexandria, VA  22314
                                 703-684-7908
4

5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                 U.S. District Court, 9th Floor
6                                401 Courthouse Square
                                 Alexandria, Virginia  22314
7                                (240) 426-7767

8

9                        ( Pages 1 - 221)

10

11          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| OMER KUZU | | | | |
| By Mr. Parekh | 18 | -- | 48 | -- |
| By Mr. MacMahon | -- | 38 | -- | -- |
| | | | | |
| DIDIER FRANCOIS | | | | |
| By Mr. Gibbs | 53 | -- | -- | -- |
| By Mr. Deubler | -- | 96 | -- | -- |
| | | | | |
| DONNA DEWELTZ | | | | |
| By Mr. Parekh | 97 | -- | -- | -- |
| By Mr. Ellis | -- | 101 | -- | -- |
| | | | | |
| DR. RICHARD WILLIAM RHODES | | | | |
| By Mr. Fitzpatrick | 115 | -- | -- | -- |
| By Mr. Ellis | -- | 154 | | |
| | | | | |
| LEA MULLA | | | | |
| By Ms. Cook | 178 | -- | -- | -- |

E X H I B I T S

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| Number 1-25B | 93 |
| Number 1-29A | 93 |
| Number 1-29B | 95 |
| Number 1-29C | 95 |
| Number 14-2 | 87 |
| Number 19-1 | 206 |
| Number 19-2 | 197 |
| Number 19-3 | 199 |
| Number 19-5 | 201 |
| Number 19-6 | 211 |
| Number 19-7 | 198 |
| Number 19-8 | 192 |
| Number 24-1 | 118 |
| Number 24-2A through 24-2E | 174 |
| Number 24-2E.1 | 170 |
| Number 24-3A | 174 |
| Number 24-4 | 153 |
| Number 24-5 | 174 |
| Number 24-5A | 174 |
| Number 24-6 | 143 |
| Number 24-7 | 174 |
| Number 24-7A | 174 |

4

**P R O C E E D I N G S**

1

2       THE COURT:  Good morning.  I have a very short note

3   from a juror, who asked to be released sharply by 6 o'clock

4   tomorrow, I believe.  April 12th is tomorrow.  I'll have this

5   made part of the record, and you may look at it at the next

6   recess.

7       I don't think there's any -- I tell the jurors that --

8   I won't identify her - she is identified here - but I will

9   simply tell them that one of you has asked to be released

10  sharply at 6:00, and I will accommodate that.

11      You had something, Mr. Parekh?

12      MR. PAREKH:  Yes, Your Honor.  As Your Honor knows,

13  this morning we're going to be presenting the testimony of

14  Omer Kuzu, who is a cooperating witness, a former ISIS member.

15  He's back there, and he'll be our first witness this morning.

16      Mr. MacMahon and I spoke yesterday evening, and I

17  understand that he would like to inquire as to Mr. Kuzu's

18  sentencing guideline range and the maximum penalties that he

19  could face if he's convicted -- well, he has been convicted, but

20  when he's sentenced for conspiring to provide material support

21  to ISIS.

22      Your Honor, I just wanted to -- so we avoid an extended

23  discussion in front of the jury, I wanted to let the Court know

24  that we do find that to be objectionable.  I think the case law

25  is pretty clear that, while Mr. MacMahon can inquire as to the

1  fact that Mr. Kuzu is facing a significant sentence, and that

2  he's hoping his cooperation will result in receiving a lower

3  sentence, we don't want the jury to speculate about the type of

4  penalties that Mr. Elsheikh would face if he's convicted.

5      In this instance, Mr. Kuzu pled guilty in Texas, the

6  Northern District of Texas, to conspiring to provide material

7  support to ISIS, the same charge Mr. Elsheikh is facing in

8  Count 8 of the indictment.  The difference is that Mr. Elsheikh

9  is facing also a resulting-in-death component.

10     And so by putting that in front of a jury, as far as

11  Mr. Kuzu's case is concerned, he would -- Mr. MacMahon will be

12  putting in the jury's mind the type of penalties that

13  Mr. Elsheikh will face.  And they may improperly speculate that,

14  Well, if Mr. Kuzu is facing 20 years, then Mr. Elsheikh is

15  probably facing much more, given that Mr. Elsheikh has a

16  resulting-in-death component.

17     So I wanted to front that for the Court in light of my

18  conversation.

19     THE COURT:  What authorities did you discuss with

20  Mr. MacMahon?

21     MR. PAREKH:  Yes, Your Honor.  It's *United States vs.*

22  *Walston*.  It's a 2018 Fourth Circuit case, 733 Fed.Appx 719.

23  That is an unpublished case, but it cites to

24  *United States vs. Cropp*, which is a published Fourth Circuit

25  decision.  I have both cases here.  I provided them to

1    Mr. MacMahon yesterday evening, shortly after our conversation.

2    And if Your Honor likes, I could read a very short paragraph to

3    illustrate the point that the Fourth Circuit makes.

4            THE COURT:  All right.

5            MR. PAREKH:  Okay.  So this is the final paragraph of

6    *United States vs. Walston*:  "We conclude that the District Court

7    did not abuse its discretion in limiting Walston's

8    cross-examination of the witness and did not violate his right

9    under the confrontation clause.  Here, as the initial charges

10   the witness faced were the same as one of the charges for which

11   Walston had been indicted, allowing Walston to inquire into the

12   exact range of statutory penalties that the witness faced would

13   have signaled to the jury the penalties Walston would face upon

14   conviction.  While the exposure of a witness' motivation in

15   testifying is a proper and important function of the

16   constitutionally protected right of cross-examination, allowing

17   the jury to learn of the sentence a defendant faces could

18   potentially nullify the verdict."

19           And then the Fourth Circuit cites the *Cropp* case,

20   127 F.3d at 358 to 359:  "The Court here properly weighed the

21   slight probative value of quantitative information about the

22   penalties the witness faced against the certain prejudice that

23   would result if the jury learned that a guilty verdict would

24   result in a mandatory minimum sentence for Walston."

25           THE COURT:  You're reading from what case now?

7

1          MR. PAREKH:  This is *United States vs. Walston*.

2          THE COURT:  What year?

3          MR. PAREKH:  It's 2018, unpublished decision, from the

4   Fourth Circuit --

5          THE COURT:  Appealed from there to the Supreme Court?

6          MR. PAREKH:  I don't believe so, Your Honor.

7          THE COURT:  And it cites an earlier case from the

8   Fourth Circuit?

9          MR. PAREKH:  It does, Your Honor.

10          THE COURT:  Was that panel unanimous?

11          MR. PAREKH:  That panel affirmed by published opinion;

12   Judge Irvin wrote the opinion in which Judge Boyle and

13   Judge Jackson joined.  Yes, Your Honor.

14          THE COURT:  Well, if it's Judge Irvin, it's back a few

15   years.

16          MR. PAREKH:  Yes.  *United States vs. Cropp* is a

17   1997 Fourth Circuit case, Your Honor.

18          THE COURT:  Yes.  Because Judge Irvin is no longer with

19   us.

20          And then what's the opinion that you read from?

21          MR. PAREKH:  I read from *United States vs. Walston*.

22          THE COURT:  That's 2018?

23          MR. PAREKH:  2018.  An unpublished decision,

24   Your Honor.

25          THE COURT:  And what was the panel in that case?

1          MR. PAREKH:  The panel on that case was Judges Traxler,

2    Duncan, and Thacker.

3          THE COURT:  Now, Mr. MacMahon, let me hear from you on

4    this issue.

5          MR. MACMAHON:  Thank you.  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. MACMAHON:  Obviously the cross-examination of a

8    cooperating witness involves trying to decide what benefits they

9    might get by testifying.  I mean, I don't think there's any need

10   to argue that to the Court.  The Court -- everybody is well

11   aware of that.

12         The question, in this case, is what prejudice would it

13   be to the government if I asked this witness if he was facing

14   20 years under this material support charge.

15         The cases that Mr. Parekh just read to you say it's

16   within your discretion.  And I was aware of those cases, but I

17   was not -- I'm not aware of any case that says there's a

18   prohibition in all cases on asking a cooperating witness --

19         THE COURT:  What is it that you would expect to elicit

20   from this particular witness?

21         MR. MACMAHON:  That he's facing a 20-year sentence, and

22   that he's hoping to get a much lower sentence by coming up here

23   and testifying; and in argument later, that that could be a

24   motivation to inflate his testimony to try to please the

25   government, all the normal things you hear in an argument about

1 that.

2    But in the specific case we're dealing with here, the

3 20-year material support charge is the least punishment,

4 essentially, that Mr. Elsheikh faces in this case.  You have all

5 of these life counts, and the jury is not allowed to know that.

6 I understand that, Your Honor.  But they'll know that when

7 you're dealing with people being murdered, that you're not

8 talking about somebody that's going to get a short sentence and

9 be released.  So the prejudice of the government of having them

10 potentially know, under Count 8, he might get 20 years, is very

11 low compared to his *Giglio* and *Brady* rights.

12    THE COURT:  Thank you.

13    Mr. Parekh, very briefly.

14    MR. PAREKH:  Yes, Your Honor.  I think we would even be

15 willing to go a little bit --

16    THE COURT:  It's correct, isn't it, that it's

17 discretionary?

18    MR. PAREKH:  That is correct, Your Honor.  And I have a

19 potential solution.  I don't think --

20    THE COURT:  I thought you might.  Clearly you don't

21 object to his eliciting that he hopes to receive a benefit for

22 cooperation, a benefit in terms of a reduced sentence.

23    What is it that you would suggest that gives the

24 defendant an opportunity to show that his testimony may be

25 affected by his desire to have a lower sentence?

```
1            MR. PAREKH:  Yes, Your Honor.  You're right, we don't

2     object -- in fact, I intend to elicit that during my direct

3     examination of Mr. Kuzu.

4            THE COURT:  Yes, I thought so.

5            MR. PAREKH:  What about if Mr. MacMahon simply asked

6     something like:  The sentence recommended for you is 240 months.

7     Correct?  And you're hoping the judge will sentence you to less

8     than that because of your cooperation, including your testimony.

9            I think Your Honor does not need to authorize that,

10    but we'll be a little bit forward leaning --

11           THE COURT:  Have you discussed that with Mr. MacMahon?

12           MR. PAREKH:  Yes, we discussed that, and I believe

13    Mr. MacMahon wants to elicit that he's facing a maximum of

14    20 years.  And while Mr. MacMahon is correct that the jury knows

15    that this case involves victims who were murdered by ISIS, we

16    still don't want the jury speculating about penalties

17    whatsoever.  Your Honor, I'm fairly certain, will give an

18    instruction to the jury that penalties are outside of their --

19           THE COURT:  That's correct.

20           MR. PAREKH:  Right.  Outside of the province of the

21    jury.

22           And so Mr. MacMahon is correct that Count 8,

23    Mr. Elsheikh is facing up to 20 years for material support to

24    ISIS, conspiring to provide material support to ISIS, but in

25    Mr. Elsheikh's case, that same count has a resulting-in-death
```

1    component to it, which is different than Mr. Kuzu's case.

2              THE COURT:  When do you plan to call this person?

3              MR. PAREKH:  Right now, Your Honor.  He's our first

4    witness.

5              THE COURT:  All right.

6              MR. PAREKH:  And the reason for that, Your Honor, it's

7    Ramadan, so he's fasting.  So we'd like him to testify first and

8    so he can be on his way afterwards.

9              THE COURT:  All right.  Anything else?

10             MR. PAREKH:  Nothing else, Your Honor.

11             THE COURT:  So you would suggest that to accommodate

12   both the defendant's interest in attempting to impeach this

13   witness' testimony by showing an interest, that the only thing I

14   should allow in terms of a penalty is that he faces a maximum of

15   20 years?

16             MR. PAREKH:  No, Your Honor, that the sentence

17   recommended for him is 20 years imprisonment, rather than a

18   maximum.  Because if you say "maximum," Your Honor, or

19   Mr. MacMahon says that, now the jury will know what Mr. Elsheikh

20   is facing, absent the aggravated component of Count 8.  And that

21   could lead to improper speculation, because then they may say,

22   well, if we convict Mr. Elsheikh of Count 8, he's facing 20; if

23   we check the box for resulting in death, it could be a lot more

24   than that.

25             THE COURT:  So the difference between you and

1    Mr. MacMahon is, you would say the sentence recommended for you

2    is 20 years; he would say the maximum sentence you could receive

3    is 20 years?

4         MR. PAREKH:  That's right, Your Honor.

5         THE COURT:  Mr. MacMahon, why is that -- why does that

6    make a difference to you?

7         MR. MACMAHON:  Well, because it's not accurate to say

8    that's his suggested sentence.  It isn't.  It's elevating the

9    guidelines to some kind of art form.  Because the maximum

10   penalty he's facing is 20 years under this charge.  So that's

11   the correct question to ask him.  That's --

12        THE COURT:  No, what you need to take into account is

13   that you may not get to ask that question at all.  You're in the

14   position of negotiating with the government.

15        MR. MACMAHON:  I fully understand that, Your Honor.

16   I'm trying to try this case just as we would any --

17        THE COURT:  I'm trying to understand why it makes a

18   difference to you, in terms of your impeachment of this witness,

19   the difference between, "The sentence that's recommended for you

20   is 20 years," and, "The maximum sentence you can receive is

21   20 years."

22        MR. MACMAHON:  And the answer, Your Honor, is that the

23   second is accurate, as a matter of law, as to what he's facing.

24        Mr. Elsheikh is not facing a 20-year count.  He's got

25   the enhancement to life on the material support because a death

1    resulted.  The possibility of this confusing this jury is so

2    slight that I would prefer, and I think I have the right, to ask

3    an accurate question and get an accurate answer.

4            THE COURT:  You don't have the right, under the

5    Fourth Circuit's -- it's my discretionary decision.

6            MR. MACMAHON:  That's true.

7            THE COURT:  You do have the right to try to impeach

8    this witness, and I want to ensure that that right is preserved.

9            But at the moment, I see no difference between, "A

10   sentence for you is 20 years," and, "The maximum is 20 years."

11           Well, you say, that's not accurate.  Accuracy doesn't

12   really come into the calculus of undermining someone's --

13   impeaching someone's testimony.  Whether it's accurate, whether

14   it's 20 years maximum or whether 20 years is what's

15   recommended for him, doesn't change the calculus on

16   whether he is effectively or ineffectively impeached.  It's

17   20 years.

18           I'm not sure I see a dispute.  I'll give you one more

19   opportunity, Mr. MacMahon.

20           MR. MACMAHON:  I don't have anything else to add,

21   Your Honor.  I understand that the Court has the discretion to

22   require the question to be changed, and obviously I'll abide by

23   the instruction, if that's what you tell me to do.

24           THE COURT:  All right.  Thank you, Mr. MacMahon.  I'm

25   glad to hear that you will abide by the Court's instruction.

1     But you always have.

2           Both arguments, I think, are underwhelming.  The

3     defendant's argument that he wants to ask the question, "What's

4     the maximum," because that's legally what's accurate, is not

5     persuasive to me.  And the government's argument that if he is

6     asked that, they will speculate about this or that, is also not

7     particularly persuasive to me.

8           But I think it is appropriate, and it is reasonable,

9     and it preserves this defendant's right to cross-examine and

10    impeach this witness' testimony, to inquire whether the penalty

11    that he faces - because it's what he faces - is 20 years.

12    That's what he faces.

13          Is that right, Mr. Parekh?

14          MR. PAREKH:  Yes, Your Honor.  His guidelines are

15    20 years.

16          THE COURT:  Well, then, you can ask him what the

17    penalty is that he faces, and he'll say -- do you think he'll

18    say 20 years?

19          MR. PAREKH:  I wasn't planning on eliciting the

20    precise years.  But, you know, the fact that he is cooperating

21    in order to receive a reduced sentence, and the fact that he

22    hasn't yet been sentenced, that was going to be what I asked in

23    direct.

24          THE COURT:  All right.  But clearly you would agree

25    that Mr. MacMahon is entitled to give the jury a basis for

15

1    judging how much his testimony might be affected by his desire

2    to have a reduced sentence.  Right?

3            MR. PAREKH:  Yes, Your Honor.

4            THE COURT:  Well, if he's only facing six months,

5    then the impeachment value wouldn't be great.  If he's

6    facing 100 years, it might be greater.  Do you agree with

7    that?

8            MR. PAREKH:  Yes, Your Honor.

9            THE COURT:  So I'm inclined to allow him to be asked

10   what the maximum penalty -- or what the penalty is that he

11   faces; not maximum, but what is the penalty that he faces.  And

12   we'll take his answer.  Is that clear?

13           MR. PAREKH:  Yes, Your Honor.

14           THE COURT:  Mr. MacMahon?

15           MR. MACMAHON:  Yes, Your Honor.

16           THE COURT:  All right.  You may bring the jury in.

17           (OFF THE RECORD.)

18           THE COURT:  Any objection to -- I'm going to have the

19   witness brought in and seat him in the witness box before the

20   jury comes in.  Mr. Parekh?

21           MR. PAREKH:  No objection, Your Honor.

22           MR. MACMAHON:  No objection.

23           THE COURT:  All right.  Bring him in.

24           MR. PAREKH:  Your Honor, we'll also be asking for an

25   in-court identification, so I presume the procedures that we

```
1    discussed before will apply in this case as well?

2              THE COURT:  Pick up the earphones.

3              (BENCH CONFERENCE ON THE RECORD.)

4              MR. PAREKH:  I believe the procedure the defense agreed

5    to was when we get to the questions, which will be early on,

6    about whether this witness recognizes anyone in the courtroom

7    that he's seen before, that Mr. Elsheikh would remove his mask

8    that he's currently wearing at counsel's table.

9              THE COURT:  All right.  Mr. MacMahon, that accords with

10   my memory.  Does it with yours?

11             MR. MACMAHON:  Yes, Your Honor.

12             THE COURT:  All right.  Let's proceed.

13             (END BENCH CONFERENCE.)

14             THE COURT:  Bring the jury in, please.

15             (Jury in at 9:23 a.m.)

16             THE COURT:  You may be seated, and, as always, we will

17   begin by having the deputy clerk call the roll.

18             COURTROOM CLERK:  Juror 50, Laura Ann Younger.

19             JUROR:  Present.

20             COURTROOM CLERK:  Juror Number 29, Wayne Phoel.

21             JUROR:  Present.

22             COURTROOM CLERK:  Juror Number 3, James Bailes.

23             JUROR:  Present.

24             COURTROOM CLERK:  Juror Number 20, Alfred Keyser.

25             JUROR:  Present.
```

17

1          COURTROOM CLERK:  Juror Number 50, Esthar Zangeneh.

2          JUROR:  Present.

3          COURTROOM CLERK:  Juror Number 22, John Kugelman.

4          JUROR:  Present.

5          COURTROOM CLERK:  Juror Number 26, Jennifer Murray.

6          JUROR:  Present.

7          COURTROOM CLERK:  Juror Number 14, Anne Fay.

8          JUROR:  Present.

9          COURTROOM CLERK:  Juror Number 10, Erica Denham.

10         JUROR:  Present.

11         COURTROOM CLERK:  Juror Number 30, Camille Morrison.

12         JUROR:  Present.

13         COURTROOM CLERK:  Juror Number 47, Adrian White.

14         JUROR:  Present.

15         COURTROOM CLERK:  Juror Number 14, Mirenda Fields.

16         JUROR:  Present.

17         COURTROOM CLERK:  Juror Number 22, Gwendolin McCrea.

18         JUROR:  Present.

19         COURTROOM CLERK:  Juror Number 17, Lewis Hoge.

20         JUROR:  Present.

21         COURTROOM CLERK:  Juror Number 26, Eileen Liles.

22         JUROR:  Present.

23         COURTROOM CLERK:  Juror Number 39, Ralph Stallings.

24         JUROR:  Present.

25         COURTROOM CLERK:  And Juror Number 7, Laura Buschman.

1          JUROR:  Present.

2          THE COURT:  Good morning again, ladies and gentlemen.

3   I trust that all of you had a restful and enjoyable weekend,

4   putting this matter out of your mind.

5          Good.  And let me inquire whether any of you were

6   unable to adhere to the Court's instructions to refrain from

7   discussing the matter among yourselves or with anyone, or

8   undertaking any investigation on your own.  If you did have

9   difficulty or were unable to do it, please raise your hands.

10  The record will reflect no hands are raised.

11         Now, one of you had an obligation that you needed to

12  deal with tomorrow, and needed to be released promptly at 6:00,

13  by 6 o'clock tomorrow.  I will do so.  I will accommodate that

14  request.

15         Now, we'll proceed again today in the government's

16  case-in-chief.

17         Mr. Parekh, you may call your next witness.

18         MR. PAREKH:  Thank you, Your Honor.  The United States

19  calls Omer Kuzu to the stand.

20         THE COURT:  All right.  And Mr. Kuzu is sitting over

21  here.  The deputy clerk needs to administer the oath to him.

22         Stand if you would, please, sir.

23         (Oath administered by courtroom deputy clerk.)

24         THE COURT:  Mr. Parekh, you may proceed.

25         MR. PAREKH:  Thank you, Your Honor.

1     **(OMER KUZU, having been duly sworn, testified as follows:)**

2          **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

3     BY MR. PAREKH:

4     Q.  Good morning.

5     A.  Good morning.

6     Q.  If you can please pull your chair forward, keep your voice

7     up; that way everyone in the courtroom could hear you.  We would

8     really appreciate it.

9          Please state and spell your name for the record.

10    A.  My name is Omer Kuzu, O-M-E-R, K-U-Z-U.

11    Q.  Mr. Kuzu, where are you from?

12    A.  I'm from Dallas, Texas.

13    Q.  What languages do you speak?

14    A.  I speak English, Turkish, and Arabic.

15    Q.  How old are you?

16    A.  I'm 26 years old.

17    Q.  Did you travel from the United States to Syria when you were

18    18 years old to join the Islamic State?

19    A.  Yes, sir.

20    Q.  Is the Islamic State, also known as ISIS, a foreign

21    terrorist organization?

22    A.  Yes, sir.

23    Q.  Were you captured as an ISIS member in Syria?

24    A.  Yes, sir.

25    Q.  When were you captured?

20

```
 1    A.   In March of 2019.

 2    Q.   Did you meet other ISIS members from around the world when

 3    you were in Syria?

 4    A.   Yes, sir.

 5    Q.   Does that include high ranking and important ISIS members?

 6    A.   Yes, sir.

 7         MR. PAREKH:   Your Honor, at this time I would like to

 8    publish Exhibit 4-6, which has previously been admitted into

 9    evidence.

10         THE COURT:   You may do so.

11    Q.   Mr. Kuzu, do you see Government Exhibit 4-6 in front of you?

12    A.   Yes, sir.

13    Q.   Do you recognize the person shown in this photograph?

14    A.   Yes, sir.

15    Q.   Who is it?

16    A.   Abu Thabit.

17    Q.   How do you know it's Abu Thabit?

18    A.   That's him.   I've met him before.

19    Q.   Where did you meet him?

20    A.   I met him in Syria, with ISIS.

21    Q.   Did you see him on multiple occasions while in Syria?

22    A.   Yes, sir.

23    Q.   Do you now know Abu Thabit by any other names?

24    A.   El Shafee Elsheikh.

25    Q.   Is "Abu Thabit" what's known as an alias or a nickname?
```

1    A.  Yes, sir.

2    Q.  Did Abu Thabit use his real name when you met him in Syria?

3    A.  No, sir.

4    Q.  Did you use an alias or a nickname when you were with ISIS

5    in Syria?

6    A.  Yes, sir.

7    Q.  Why?

8    A.  In order not to be a target for spies or foreign

9    intelligence agencies.

10   Q.  Do you see Abu Thabit, who you said you now know as

11   El Shafee Elsheikh, in the courtroom here today?

12   A.  Yes, sir.

13   Q.  Please identify that person by pointing where they're

14   sitting and noting how they are dressed.

15   A.  He's right there with the blue button-up shirt and the beard

16   and the glasses.

17          MR. PAREKH:  Your Honor, may the record reflect an

18   in-court identification of the defendant, El Shafee Elsheikh.

19          THE COURT:  So ordered.

20   Q.  Mr. Kuzu, I'll refer to Abu Thabit as the defendant,

21   El Shafee Elsheikh, throughout your testimony.  Do you

22   understand that?

23   A.  Yes, sir.

24   Q.  When did you first see the defendant?

25   A.  I first saw the defendant in late February and early March

1    of 2015.

2    Q.  Where did you first see the defendant?

3    A.  In Raqqa, Syria, at the telecommunications office where I

4    was working at the time.

5    Q.  Was Raqqa, Syria controlled by ISIS at that time?

6    A.  Yes, sir.

7    Q.  What was the significance of Raqqa at that time?

8    A.  It was the capital of ISIS.

9    Q.  We'll come back to the defendant, El Shafee Elsheikh, in a

10    moment.

11         Mr. Kuzu, did you previously accept responsibility and

12    plead guilty in a United States District Court to a terrorism

13    charge involving ISIS?

14    A.  Yes, sir.

15    Q.  Do you regret your decision to join and support ISIS?

16    A.  Yes, sir.  And I'm very sorry.  That's why I pled guilty.

17    And I'm here to tell the truth.

18    Q.  As part of your plea agreement, did you agree to cooperate

19    with the United States government?

20    A.  Yes, sir.

21    Q.  Have you been sentenced yet by a federal judge?

22    A.  No, sir.

23    Q.  Do you hope that your cooperation will lead to a lower

24    sentence?

25    A.  Yes, sir.

23

1    Q.  But has anyone in the United States Government promised you

2    anything whatsoever?

3    A.  No, sir.

4    Q.  Have you been paid any amount of money as part of your

5    cooperation and plea agreement?

6    A.  No, sir.

7    Q.  Are you guaranteed to receive a lower sentence as a result

8    of your cooperation with the United States Government?

9    A.  No, sir.

10   Q.  Mr. Kuzu, as part of your plea agreement, are you required

11   to provide truthful, honest, and complete information?

12   A.  Yes, sir.

13   Q.  What happens if you provide any false information, including

14   any false testimony before this jury today?

15   A.  I could be prosecuted for perjury, and it would be a

16   violation of my plea agreement.

17   Q.  All right.  Let's talk about how you joined ISIS.  Prior to

18   Syria, did you watch violent ISIS propaganda videos, to include

19   execution videos?

20   A.  Yes, sir.

21   Q.  Do you remember the name of any prominent and violent ISIS

22   videos that you watched before joining ISIS?

23   A.  Yes, sir.  "Flames of War."

24   Q.  What do you remember about "Flames of War"?

25   A.  I remember an ISIS member speaking on behalf of ISIS with

24

1    Syrian soldier hostages, and he shot them and they fell into

2    their own graves.

3    Q.  When did you travel from the United States to Syria?

4    A.  In October of 2014.

5    Q.  When did ISIS announce the creation of the Islamic State?

6    A.  June 1st, 2014.

7    Q.  Would it be accurate to state that you joined ISIS

8    approximately four months after the Islamic State had already

9    been announced?

10   A.  Yes, sir.

11   Q.  How did you get to ISIS territory in Syria?

12   A.  I took a plane to Turkey, and then a bus from Istanbul to

13   Urfa, which is a border town in Turkey, and then I was smuggled

14   over the border into Syria.

15   Q.  And at that point did you join ISIS?

16   A.  Yes, sir.

17   Q.  Shortly after you arrived in Syria and joined ISIS, did you

18   undergo military training?

19   A.  Yes, sir.

20   Q.  Describe for us the training you received from ISIS.

21   A.  I received five days of weapons training, involving the

22   AK-47, the PKC, which is a machine gun, and the RPG.

23   Q.  What is an RPG?

24   A.  It's a rocket-propelled grenade launcher.

25   Q.  Where did ISIS train you?

1    A.  In Mosul, Iraq.

2    Q.  Mr. Kuzu, you just testified about receiving military

3    training from ISIS on the use of a few different types of

4    weapons.  When you were with ISIS, did you ever train or use a

5    Glock pistol?

6    A.  No, sir.

7    Q.  Did you ever own a Glock pistol?

8    A.  No, sir.

9    Q.  Why not?

10   A.  Glocks were very expensive and rare.  They were not common.

11   And so I did not have one.

12   Q.  After receiving military training, did you become a combat

13   fighter for ISIS?

14   A.  No, sir.

15   Q.  Where did you go?

16   A.  I went to Raqqa, Syria.

17   Q.  What did you do for ISIS at that time?

18   A.  I joined the telecommunications office.  I was working in

19   the IT department.

20   Q.  What were your job duties for ISIS at that time?

21   A.  Typical IT work; you know, setting up computers and

22   networks, and on the side I was assigned some things.  So, for

23   example, I was assigned to create a backup communications system

24   for the walkie-talkies that ISIS used in case they went down.

25   Q.  In general, during your time with ISIS, were all of your

1    assignments in the telecommunications and the IT or information

2    technology fields?

3    A.  Yes, sir.

4    Q.  Did you utilize those skill sets to support ISIS on the

5    battlefield?

6    A.  Yes, sir.

7    Q.  In what sense?

8    A.  I was sent to Kobani for a week in order to help set up some

9    antennas for front line ISIS fighters for their walkie-talkies.

10   Q.  And when you say "Kobani," is that Kobani, Syria?

11   A.  Yes, sir.

12   Q.  What was happening in Kobani, Syria, at that time?

13   A.  ISIS was fighting the Syrian Democratic Forces, or the

14   Kurds.

15   Q.  How long were you in Kobani, Syria?

16   A.  About a week.

17   Q.  When was that, approximately?

18   A.  That was approximately in the beginning of February 2015.

19   Q.  At that point did you return to Raqqa, Syria?

20   A.  Yes, sir.

21   Q.  And would that be the middle of February 2015?

22   A.  Yes, sir.

23   Q.  Mr. Kuzu, were you ever a part of ISIS leadership?

24   A.  No, sir.

25   Q.  You testified that you traveled to join ISIS in October of

1    2014.  Do I have that right?

2    A.  Yes, sir.

3    Q.  Based on your knowledge as a former ISIS member, tell us

4    about how ISIS viewed those who traveled to Syria in 2012 or

5    2013, long before ISIS announced the creation of the

6    Islamic State.

7              MR. MACMAHON:  Your Honor, I object to lack of

8    foundation.  I don't think he was even there at that time.

9              THE COURT:  All right.  But in the future,

10   Mr. MacMahon, note an objection, and we'll go to the earphones.

11             MR. MACMAHON:  I'm sorry.

12             THE COURT:  Do you understand that?

13             MR. MACMAHON:  I do.  I apologize, Your Honor.

14             THE COURT:  All right.  You want to establish any more

15   foundation, Mr. Parekh?

16             MR. PAREKH:  I can, Your Honor.

17             THE COURT:  All right.  Proceed.

18   BY MR. PAREKH:

19   Q.  Mr. Kuzu, how long did you spend as an ISIS member?

20   A.  Approximately four and a half years.

21   Q.  And during that time, did you learn a lot about the

22   organization?

23   A.  Yes, sir.

24   Q.  And did you learn how the organization views different

25   members of ISIS?

28

1    A.  Yes, sir.

2    Q.  Did you have the opportunity to interact with high-level

3    members of ISIS?

4    A.  Yes, sir.

5    Q.  And based on your time in Syria, do you have an

6    understanding of how ISIS viewed those who joined and went to

7    Syria prior to the announcement of the Islamic State?

8    A.  Yes, sir.

9           THE COURT:  All right.  I'll overrule the objection.

10   You may proceed.

11   Q.  Given that, Mr. Kuzu, and based on your knowledge as a

12   former ISIS member, tell us how ISIS viewed those who traveled

13   to Syria in 2012 or 2013, before the creation of the

14   Islamic State.

15   A.  They were individuals that were held in much higher regards

16   and much higher esteem.  They were trusted much more.  In fact,

17   some people were envious of them.

18   Q.  What were you doing for ISIS in late February and early

19   March of 2015?

20   A.  I was working at telecommunications in Raqqa, Syria.

21   Q.  And is that when you first saw the defendant you identified

22   in the courtroom today?

23   A.  Yes, sir.

24          MR. PAREKH:  Your Honor, I would like to show two

25   exhibits that have been previously admitted into evidence.  The

1    first is Exhibit 1-46, and the second is Exhibit 6-8, page 44.

2           And I believe Ms. Lopez will have them up on the screen

3    side by side.

4           THE COURT:  All right.  You may do so.  They've been

5    admitted.

6           MR. PAREKH:  And if we can zoom in on 1-46.  Okay.

7    BY MR. PAREKH:

8    Q.  Mr. Kuzu, do you see 1-46 before you?

9    A.  Yes, sir.

10   Q.  What type of document is this?

11   A.  This is a Tweet.

12   Q.  Do you see the date of that Tweet listed?

13   A.  Yes, sir.

14   Q.  What is the date?

15   A.  The 6th of February 2015.

16   Q.  Can you read Arabic?

17   A.  Yes, sir.

18   Q.  Just give us a general summary of what is stated in this

19   Tweet.

20   A.  "A Jordanian plane kills the female American prisoner in the

21   province of Raqqa."

22   Q.  Do you see a name of a female on this Tweet?

23   A.  Yes, sir.

24   Q.  What is that?

25   A.  Kayla.

1    Q.  And this Tweet is February 6, 2015, you said?

2    A.  Yes, sir.

3    Q.  Now if we can go to the next exhibit, 6-8.

4         MR. PAREKH:  And if we can enlarge the header and the

5    first three lines.

6    Q.  Mr. Kuzu, do you see Government Exhibit 6-8 enlarged in

7    front of you?

8    A.  Yes, sir.

9    Q.  Does this appear to be an email?

10   A.  Yes, sir.

11   Q.  What's the date on the email?

12   A.  February 7th, 2015.

13   Q.  Just read the highlighted lines, please.

14   A.  "To Kayla's family:  We are sure by now you have read the

15   recent news regarding your daughter, Kayla.  The news regarding

16   her death is indeed true."

17   Q.  Mr. Kuzu, focusing on these two dates, February 6th, 2015,

18   and February 7, 2015, did you meet the defendant,

19   El Shafee Elsheikh, in Syria for the first time ever after both

20   of those dates?

21   A.  Yes, sir.

22   Q.  Where did you meet him?

23   A.  At the telecommunications office in Raqqa, Syria.

24   Q.  Now, when you first saw him, how was he dressed?

25   A.  He had a Glock, he had a green military uniform, and a

1    beanie on his head.

2    Q.  What did you normally wear as an ISIS member in Syria?

3    A.  Afghani clothes.

4    Q.  Could you tell anything about the defendant's rank or

5    standing within ISIS based on how he was dressed?

6    A.  Well, the fact that he was carrying a Glock was significant

7    because Glocks were typically only carried by wealthy or

8    experienced individuals or people who had a position within the

9    hierarchy.  Also, his green military uniform.  And the fact that

10   he was very quiet, reserved, almost secretive, told me that he

11   was not an ordinary member.

12   Q.  That he was not an ordinary member of ISIS?

13   A.  Yes, sir.

14   Q.  And what do you mean by that?

15   A.  He seemed to be more important.

16          MR. PAREKH:  If we can put up Government Exhibit 4-6

17   again.

18   Q.  Do you see 4-6 in front of you?

19   A.  Yes, sir.

20   Q.  Was the defendant dressed similar to what you see in 4-6 the

21   first time that you saw him in Syria in late February, early

22   March of 2015?

23   A.  Yes, sir.

24   Q.  Was the defendant carrying any electronic equipment with him

25   when you saw him around that time?

1    A.  Yes, sir.  He had a laptop.

2    Q.  He had a laptop?

3    A.  Yes, sir.

4    Q.  How many times did you see El Shafee Elsheikh during that

5    period in 2015, meaning late February, early March?

6    A.  A few times, approximately five times.

7    Q.  And what was the duration of those visits?

8    A.  About 20 minutes.

9    Q.  What is the next time you saw the defendant?

10   A.  The next time I saw him was in the fall of 2016.

11   Q.  Where did you see him?

12   A.  At NIST, or the central technical office.

13   Q.  And NIST is what?

14   A.  It's the central technical office.  So in ISIS, it's -- it

15   works like a government.  So you have a bunch of different

16   departments, the department of finance, the department of

17   energy, department of human resources.  So each department had

18   its own IT department.  And so this central technical office was

19   the head IT department, which all these sub departments reported

20   to.

21   Q.  Do you know why the defendant was coming there?

22   A.  Yes, sir, he was coming there to work on a secure operating

23   system with my coworker.

24   Q.  Please explain what you mean by that.

25   A.  What do you mean?

1   Q.  What type of operating system was the defendant working on?

2   A.  This operating system was to be used by -- for departments

3   trying to communicate with each other.  And also ISIS

4   leadership, people high up in the position, it had to be secure

5   communication; specifically, instant messaging.

6   Q.  What would the purpose be for that type of operating system

7   for ISIS leadership to communicate with each other?

8   A.  It was for secure communications, so that their

9   communication would not be intercepted by intelligence agencies.

10   Q.  Would a project like that be entrusted to any low-level or

11   simple ISIS members?

12   A.  No, sir.  You had to be trusted.

13   Q.  Could you tell anything about the defendant's rank or

14   standing within ISIS based on this project?

15   A.  Well, he must have -- he was trusted in order to work on

16   that project.

17   Q.  Were you trusted to work on that project?

18   A.  No, sir.

19   Q.  Did the defendant ever tell you directly what he was working

20   on?

21   A.  No, sir.

22   Q.  And at this time, when you saw him in 2016, did the

23   defendant continue to carry a Glock pistol?

24   A.  Yes, sir.

25   Q.  Was that still considered a rare type of weapon for someone

1    in ISIS to be carrying?

2    A.  Yes, sir.  It was not common.

3    Q.  And please explain.

4    A.  It was typically only used or carried by wealthy individuals

5    or people with a lot of experience, or people who had a position

6    within the hierarchy of ISIS.

7    Q.  Was the Glock a symbol of anything?

8    A.  It was a symbol of ISIS aristocracy.

9    Q.  ISIS aristocracy?

10   A.  Yes, sir.

11   Q.  Besides the Glock firearm, what other military items or

12   firearms were considered the most desirable for important ISIS

13   members?

14   A.  The M16, and especially the M4.

15   Q.  After 2016, when is the next time that you saw the

16   defendant?

17   A.  I'm sorry, can you restate the question?

18   Q.  Yes.  After 2016, when is the next time that you saw the

19   defendant?

20   A.  I saw him at the end of 2017.

21   Q.  Please explain to the jury, what is happening with ISIS at

22   that particular point in time?

23   A.  ISIS is retreating, a lot due to offenses being carried out

24   by the Syrian regime south of the Euphrates River and the Kurds

25   on the north side of the river.

1    Q.  What do you mean by "offensives"?

2    A.  The Syrian regime and the Kurds were reclaiming land that

3    ISIS had taken, and they were fighting ISIS.

4    Q.  Where did you see the defendant at that time near the end of

5    2017?

6    A.  In October of 2017, I saw the defendant on the southern side

7    of the Euphrates River, in the countryside, on the second line

8    near the front lines.  Not the front lines, but the second line.

9    And he was at a control room site.

10   Q.  And when you say "front lines," are you referring to front

11   lines of the battlefield?

12   A.  Yes, sir.

13   Q.  Was the defendant with anyone at that time?

14   A.  Yes, sir.  He was with a very tall individual who was

15   carrying an M4.

16   Q.  And did you notice anything about that individual that the

17   defendant was with?

18   A.  Yes, sir.  He had an air of importance.  As I mentioned, he

19   was very tall and he seemed to be more important than the rest

20   of the ISIS members who were working at the site.

21   Q.  Was that also true of the defendant at the time?

22   A.  Yes, sir.

23   Q.  Did the person that the defendant was with have any

24   particular type of accent?

25   A.  Yes, sir, he had a British accent.

36

1    Q.  During prior interviews with the government, have you

2    previously identified this person?

3    A.  Yes, sir.

4         MR. PAREKH:  Your Honor, at this time I would like to

5    play Exhibit 27-3.  It's previously been admitted into evidence.

6         THE COURT:  All right.  You may do so if it's

7    previously been admitted.

8         (Video played in open court.)

9         MR. PAREKH:  We paused 27-3 at approximately 8 or

10   9 seconds.

11   Q.  Do you see two individuals seated on a couch?

12   A.  Yes, sir.

13   Q.  Who is the individual in the blue shirt?

14   A.  That's the individual that was standing next to the

15   defendant.

16        MR. PAREKH:  Please continue the clip.

17        (Video played in open court.)

18   Q.  Were you able to hear and see that clip?

19   A.  Yes, sir.

20   Q.  Who is the person speaking in that clip?

21   A.  Abu Thabit, the defendant.

22   Q.  Same person you identified in the courtroom?

23   A.  Yes, sir.

24   Q.  Did the defendant and the person in the blue shirt that you

25   just identified appear to be close friends?

1    A.  Yes, sir.

2    Q.  What was your impression of the two of them?

3    A.  They seemed to be a duo, or some sort of a tag team.

4    Q.  They seemed to be a duo or a tag team?

5    A.  Yes, sir.

6    Q.  And did they both appear to command the respect of the other

7    ISIS members that were there?

8    A.  Yes, sir.

9    Q.  Just explain that.

10   A.  They were at the front, next to the commander of the control

11   room, as opposed to the rest of the ISIS members who were

12   working there.  And they had this air of importance around them.

13   Q.  Did you see the defendant again at the end of 2017 in Syria?

14   A.  Yes, sir.  In December.

15   Q.  And describe the circumstances of that meeting.

16   A.  I saw him at the house of my brother-in-law, and he was

17   talking to my brother-in-law.

18   Q.  Was your brother-in-law an ISIS member at that time?

19   A.  Yes, sir.

20   Q.  What was your brother-in-law doing for ISIS?

21   A.  He was the head of Hijrah, the department of Hijrah, which

22   is immigration.  His job was to take people -- his job was to

23   bring people in and to take them out of ISIS, for ISIS

24   operations.

25   Q.  What was your understanding of why male ISIS members were

38

 1   being smuggled out of ISIS territory by your brother-in-law at

 2   the end of 2017, beginning of 2018?

 3   A.  It was to continue ISIS operations on the outside.  Some

 4   things were getting risky to do within ISIS-controlled territory

 5   and were not sustainable due to the war.  So male individuals

 6   were sent out outside of ISIS-controlled territory in order to

 7   continue ISIS operations and to conduct operations, which may

 8   include attacks.

 9   Q.  Thank you.

10           MR. PAREKH:  No further questions at this time.

11           THE COURT:  Cross-examination?

12           MR. MACMAHON:  Thank you, Your Honor.

13              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

14   **BY MR. MACMAHON:**

15   Q.  Good morning, Mr. Kuzu.  My name is Edward MacMahon, I'm one

16   of the attorneys for Mr. Elsheikh.

17   A.  Good morning.

18   Q.  Mr. Parekh asked you questions about your plea agreement

19   with the United States Government.  Do you remember those

20   questions?

21   A.  Yes, sir.

22   Q.  And the suggested sentence for you for your crimes is

23   240 months, isn't it?

24   A.  Yes, sir.

25   Q.  That's a long time in prison, isn't it?

```
 1    A.  Yes, sir.

 2    Q.  You don't want to do that much time, do you?

 3    A.  No, sir.

 4    Q.  And you know that, again, Mr. Parekh told you, you have an

 5    obligation to be truthful in your testimony in this court.

 6    Correct?

 7    A.  Yes, sir.

 8    Q.  And you know that it's up to the government to decide if

 9    they want to give you a recommendation of a shorter sentence.

10    Correct?

11    A.  Yes, sir.

12    Q.  And it's the government that decides whether you're truthful

13    or not, nobody else.  Correct?

14    A.  Yes, sir.  Although I will try -- I mean, I will be

15    truthful.

16    Q.  Right.  But you understand that in the end, if the

17    government doesn't think you've been truthful, then you're not

18    going to get a reduced sentence.  Right?

19    A.  Yes, sir.

20    Q.  Before you went to Syria, you testified you watched the

21    "Flames of War" on television -- or you watched -- strike that.

22          MR. MACMAHON:  I'm sorry, Your Honor.

23    Q.  You watched the video called "Flames of War."  Correct?

24    A.  Yes, sir.

25    Q.  You enjoyed that video, didn't you?
```

```
1    A.  I don't remember.

2    Q.  You don't remember enjoying how it glorified violence and

3    death?

4    A.  Yes, sir, I don't remember.

5    Q.  You also listened to speeches by Anwar al-Awlaki, didn't

6    you?

7    A.  Yes, sir.

8    Q.  And those were speeches suggesting that there would be

9    terrorist attacks against the United States.  Correct?

10   A.  Not in the speeches that I listened to.

11   Q.  But that was part of your reason to go off to Syria as well,

12   too, what you heard in those speeches?

13   A.  Yes, sir.

14   Q.  And you remember being interviewed by the government and you

15   refused to talk about listening to Mr. Al-Awlaki's speeches.

16   Correct?

17   A.  I'm sorry, could you repeat?

18   Q.  Do you remember being interviewed by the FBI and being asked

19   about listening to Anwar al-Awlaki, and declining to do so?

20   A.  I don't remember.

21   Q.  Now, the first thing you did when you decided to go to Syria

22   was to lie to your mother.  Right?

23   A.  Yes, sir, with the -- the grand plan was by my older

24   brother.

25   Q.  But you didn't have any problem lying to your mother.
```

1   Right?

2   A.  I did.

3   Q.  But you did it?

4   A.  Yes, sir.

5   Q.  Did you, before you got to Syria, see any videos of hostages

6   being beheaded?

7   A.  If it was within "Flames of War," yes.

8   Q.  Did you enjoy watching those videos, Mr. Kuzu?

9   A.  No, sir.

10  Q.  You still went to Syria, though.  Right?

11  A.  Yes, sir.

12  Q.  Now, you also -- do you remember telling the FBI that you

13  agreed with the term, "an eye for an eye"?

14  A.  Yes, sir.

15  Q.  Now, when you got to the Islamic State, there were lots of

16  people there from Britain, weren't there?

17  A.  Yes, sir.

18  Q.  There were lots of people there with British accents?

19  A.  Yes, sir.

20  Q.  Can you tell the jury how many people that was?

21  A.  A lot.

22  Q.  Now, you testified in front of a grand jury here in

23  Alexandria, Virginia.  Right?

24  A.  Yes, sir.

25  Q.  And you've met with the government four or five times, at

42

1    least, to go over your testimony.  Correct?

2    A.  Yes, sir.

3    Q.  And when was the first time that you actually mentioned to

4    the government that you saw Mr. Elsheikh with a Glock?

5    A.  Recently, sir.

6    Q.  Right.  So in your sworn testimony to the grand jury, not

7    one reference to a Glock.  Right?

8    A.  Yes, sir.  But that's because I was never asked the specific

9    question.

10   Q.  Right.  But you were asked many times by the FBI to describe

11   Mr. Elsheikh, what he was wearing, how he was talking.  Right?

12   A.  Yes, sir.  But they never asked me what specific firearms

13   were upon him.

14   Q.  Right.  So when was the first time that you decided to tell

15   the United States government that you saw this man with a Glock?

16   A.  They asked a question that led me to think of that.

17   Q.  Right.  They suggested to you that he was wearing a Glock.

18   Right?

19   A.  No, sir.  I remember distinctly that he had a Glock.

20   Q.  The question that prompted that in your mind was what?  Did

21   you see Mr. Elsheikh with a Glock?

22   A.  I've always had an image of him with a Glock.  They never

23   asked me a question prior to this that made me discuss that

24   detail.

25   Q.  So when was -- relative to today, was the first time that

43

1    you told the U.S. Government that you saw him with a Glock?

2    A.  Recently, maybe within the past -- within the past month.

3    Q.  In the picture that Mr. Parekh showed you of Mr. Elsheikh,

4    he's not wearing a Glock, is he?

5    A.  I don't recall.

6            THE COURT:  Do you want to put it up again?

7            MR. MACMAHON:  If I may ask Mr. Parekh the exhibit

8    number.  But the exhibit has appeared.  So thank you.

9            THE COURT:  Yes.  All right.

10   Q.  Do you see a Glock in that picture?

11   A.  No, sir.

12   Q.  And lots of people had Glocks in Syria, didn't they?

13   A.  No, sir, it was not common.

14   Q.  Well, there were lots of gun markets, people that had the

15   ability could buy a Glock, couldn't they?

16   A.  If they had the wealth.

17   Q.  And in similar -- all the times you met with the FBI, today

18   was the first time you mentioned you thought that he might

19   have -- Mr. Elsheikh may have been ISIS leadership.  Correct?

20           MR. PAREKH:  Objection, Your Honor.  That's not what

21   the testimony was today.

22           THE COURT:  The jury can decide.  I'll overrule the

23   objection.

24           Next question.

25   Q.  Wasn't today the first day -- maybe the word was

```
 1    "aristocracy."  It was your testimony that Mr. Elsheikh was ISIS
 2    aristocracy?
 3    A.  My testimony was that he was an important person and that
 4    the Glock was a symbol of ISIS aristocracy.
 5    Q.  And you never told the government that in any of your
 6    grand jury testimony or anything else.  Right?
 7    A.  If I remember correctly, I stated that the defendant was an
 8    important person before.
 9    Q.  But the term "aristocracy" is a new one.  Right?
10    A.  Yes, sir.
11    Q.  How much time, total, did you see Mr. Elsheikh when you were
12    working at the media office in Raqqa?  Did you say 20 minutes?
13    A.  I believe you're referring to the telecommunications office?
14    Q.  Yes, sir.  How much time total did you spend with him?
15    A.  I saw him a few times, approximately five times.  Each time
16    he was there about 20 minutes.
17    Q.  Did you talk to him?
18    A.  No, sir, apart from the traditional Islamic greetings.
19    Q.  So you've never learned from Mr. Elsheikh anything at all
20    about what he was doing for ISIS.  Correct?
21    A.  I learned about it later.
22    Q.  You learned about it later from Mr. Elsheikh?
23    A.  I was present, for example, in 2016, the fall of 2016, when
24    he would come into NIST, or the central technical office, to
25    work on the secure operating system.  His work was right in
```

45

1    front of my eyes.

2    Q.  So that was computer work for ISIS.  Correct?

3    A.  Yes, sir.

4    Q.  And this may not be the right way to ask it.  Was it a

5    9-to-5 job?

6    A.  No, sir.

7    Q.  What were the hours that you kept as an ISIS member?

8    A.  Oh, in general, an ISIS member, yes.  It depended on the

9    department.  Some departments you would work 12 hours; some

10   departments 9:00 to 5:00.  Other departments, only a few hours.

11   Q.  Do you remember the exhibit that Mr. Parekh showed you that

12   had Kayla's name in it?

13   A.  Yes, sir.

14   Q.  Did you draft that Tweet?

15   A.  No, sir.

16   Q.  Did you ever see it when you were working for ISIS?

17   A.  No, sir.

18   Q.  Did you -- do you know who sent that Tweet?

19   A.  No, sir, apart from the author on the picture.

20   Q.  You don't have any information that it was Mr. Elsheikh that

21   sent that Tweet, do you?

22   A.  No, sir.

23   Q.  In the email that you were shown about Kayla Mueller, did

24   you write that email and send it to the family?

25   A.  No, sir.

46

```
 1   Q.  And you don't have any information that Mr. Elsheikh did
 2   either.  Right?
 3   A.  I'm sorry, can you restate the question?
 4   Q.  You have no information that Mr. Elsheikh drafted the email
 5   that was sent to Kayla Mueller's family that we looked at
 6   earlier.  Right?
 7   A.  Correct.
 8   Q.  Did you know -- did Mr. Elsheikh have a car?
 9   A.  I don't know.
10   Q.  Did you know if he had any extra money as opposed to another
11   ISIS person that you were working with?
12   A.  No, sir.
13   Q.  He never told you anything about being involved in
14   kidnapping or executing Western hostages, did he?
15   A.  No, sir.
16   Q.  In fact, you never broached the subject with him at all, did
17   you?
18   A.  No, sir.
19   Q.  In the end, Mr. Elsheikh was unable to flee Syria as well.
20   Correct?  He was captured just like you were, wasn't he?
21            MR. PAREKH:  Objection, Your Honor.
22            THE COURT:  Sustained.  It's compound.
23            MR. MACMAHON:  I'm sorry.
24   Q.  You were captured trying to flee Syria.  Correct?
25   A.  No, sir.  I surrendered.
```

47

1    Q.  Where did you surrender?

2    A.  In Baghuz, Syria.

3    Q.  Do you have any information as to how Mr. Elsheikh was

4    captured?

5              THE COURT:  That would be hearsay, wouldn't it?

6              MR. MACMAHON:  If he were not present, yes, Your Honor.

7    I'll move on.

8              THE COURT:  All right.

9    Q.  But you don't have any information that the higher ranking

10   ISIS members were able to flee Syria easily.  Right?

11   A.  No, sir.  However, I did see the successful -- I saw a

12   doctor, an ISIS doctor, successfully smuggled to Turkey,

13   although later he was arrested.

14   Q.  So whatever Mr. Elsheikh's status was in ISIS, as you

15   testified, none of it saved him from being captured, did it?

16             MR. PAREKH:  Objection, Your Honor.  I'm not sure I

17   understand that question.

18             THE COURT:  Yes, I'm not either.

19             I'll sustain the objection, but you may rephrase it.

20             MR. MACMAHON:  Thank you, Your Honor.

21   Q.  Your testimony was that you thought Mr. Elsheikh had some

22   important role in ISIS.  Correct?

23   A.  Yes, sir.

24   Q.  But you can't tell us what that was.  Right?

25   A.  No, sir.

48

1           MR. MACMAHON:  That's all, Your Honor.

2           THE COURT:  Redirect examination?

3           MR. PAREKH:  Yes, Your Honor.

4      **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

5  **BY MR. PAREKH:**

6  Q.  Mr. Kuzu, would high-level ISIS members just go tell

7  everyone what they were doing for ISIS?

8  A.  No, sir.

9  Q.  Please explain that.

10  A.  You would be -- if you went around telling people what you

11  did, you would be easily a target for spies and foreign

12  intelligence agencies.

13  Q.  You were asked a number of questions by Mr. MacMahon about

14  whether you knew that Elsheikh was involved in hostage-taking.

15  Do you remember that?

16  A.  Yes, sir.

17  Q.  Did the defendant ever tell you anything he was doing in

18  2012?

19  A.  No, sir.

20  Q.  Did the defendant tell you anything he was doing in 2013?

21  A.  No, sir.

22  Q.  Did the defendant tell you anything he was doing in 2014?

23  A.  No, sir.

24  Q.  Did the defendant even mention the name Mohammed Emwazi to

25  you?

1    A.  No, sir.

2    Q.  Did the defendant tell you anything whatsoever about what he

3    was doing for ISIS?

4    A.  No, sir.

5    Q.  Was he secretive around you?

6    A.  Yes, sir.

7    Q.  You were asked some questions about your plea agreement with

8    the government.  Do you remember that?

9    A.  Yes, sir.

10   Q.  Who makes the final decision about what sentence you'll

11   receive?

12   A.  The judge.

13   Q.  And have you testified truthfully today to all the questions

14   that the government and the defense have asked you?

15   A.  Yes, sir.

16          MR. MACMAHON:  Objection, Your Honor.

17          THE COURT:  Pick up your earphones.

18          (BENCH CONFERENCE ON THE RECORD.)

19          MR. MACMAHON:  Your Honor, whether this witness has

20   testified truthfully or not is a matter for the jury to decide.

21   The government can't ask a witness, even on redirect, whether

22   they've been honest with the jury.  That invades the province of

23   the jury.

24          THE COURT:  Mr. Parekh?

25          MR. PAREKH:  I can withdraw the question.  He attacked

1       his credibility and made it seem as if he was testifying today

2       in order to please the government.

3               THE COURT:  Yes, Mr. MacMahon, I don't know of any case

4       that says that it is inappropriate for the government to ask the

5       witness if he has been truthful.  Do you know of any such case?

6               MR. MACMAHON:  I don't have one with me right now, but

7       I know there's a series of questions about what the jury gets to

8       decide.

9               THE COURT:  Yes, they do get to decide this.  But that

10      has nothing to do with whether the government can ask the

11      witness whether the witness has been truthful.

12              MR. MACMAHON:  I've made my objection.  I don't think

13      it's an appropriate question.

14              THE COURT:  Yes, but you haven't told me why.  All

15      you've said is it's not appropriate because credibility is the

16      province of the jury.  That's true.  But you have given me no

17      authority that suggests that it is inappropriate for the

18      government to ask the witness whether the witness has been

19      truthful.

20              Would you like a moment to confer with your numerous

21      counsel?

22              MR. MACMAHON:  No, I don't think so, Your Honor.

23              THE COURT:  All right.  I'll overrule the objection.

24      You may ask the question if you wish.

25              MR. PAREKH:  Thank you, Your Honor.

1            THE COURT:  In fact, it's been asked and answered, but

2    you may ask it again if you wish.

3            MR. PAREKH:  Thank you, Your Honor.

4            (END BENCH CONFERENCE.)

5    BY MR. PAREKH:

6    Q.  Mr. Kuzu, you were also asked questions about individuals in

7    Syria with a British accent?

8    A.  Yes, sir.

9    Q.  Do you remember that clip I played for you where the

10   defendant was seated next to an individual in a blue shirt?

11   A.  Yes, sir.

12   Q.  Did the individual in the blue shirt have a British accent?

13   A.  Yes, sir.

14   Q.  And you called them a duo on your direct examination.  Do

15   you remember that?

16   A.  Yes, sir.

17   Q.  Were there any other individuals with a British accent that

18   appeared to act as a duo to you with the defendant?

19   A.  No, sir.

20   Q.  And, finally, you were asked questions about the Tweet

21   involving Kayla Mueller's name.  Do you remember that?

22   A.  Yes, sir.

23   Q.  Are you familiar with al-Janubi?

24   A.  No, sir.

25   Q.  At the time that that Tweet had been sent, had you even met

52

1    the defendant for the first time?

2    A.  No, sir.

3    Q.  Do you know what the defendant was doing on February 6th or

4    February 7, 2015?

5    A.  No, sir.

6         MR. PAREKH:  Thank you.  No further questions.

7         MR. MACMAHON:  Thank you, Your Honor.

8         THE COURT:  All right.  No further cross?

9         All right.  We'll take a recess at this time, ladies

10   and gentlemen.  You can place your books in the customary

11   cubbyholes and avail yourselves of the soft drinks and I believe

12   a replenished stock of snacks.  Am I correct?  And we will

13   recess until 10:35.  You may follow the court security officer

14   out.

15         (Jury out at 10:12 a.m.)

16         THE COURT:  The witness may be excused at this time and

17   remains in the custody of the marshals.

18         Mr. Parekh, who is your next witness?

19         MR. PAREKH:  Your Honor, I believe it's

20   Didier Francois.

21         THE COURT:  That's another French hostage?

22         MR. PAREKH:  Yes, Your Honor.

23         THE COURT:  All right.  I think I recall the name.  All

24   right.  We will recess until 20 minutes to 11:00 -- 10:35.

25   Court stands in recess.

```
 1                    (Recess taken at 10:13 a.m.)

 2               THE COURT:  We'll bring the jury in.

 3                    (Jury in at 10:42 a.m.)

 4               THE COURT:  Mr. Gibbs, it appears you're the next

 5     prosecutor up.  Is that right?

 6               MR. GIBBS:  That is right, Judge.

 7               THE COURT:  All right.  You may call your next witness.

 8               MR. GIBBS:  The government calls Didier Francois to the

 9     stand.

10               THE COURT:  Come forward and take the oath, please,

11     sir.

12                    (Oath administered by courtroom deputy clerk.)

13        (DIDIER FRANCOIS, having been duly sworn, testified as follows:)

14                 EXAMINATION BY COUNSEL FOR  THE UNITED STATES

15     BY MR. GIBBS:

16     Q.  Sir, will you please state your name for the record, and

17     also spell it.

18     A.  Yes, my name is Didier Francois.  Didier is D-I-D-I-E-R, and

19     Francois is F-R-A-N-C-O-I-S.

20     Q.  Mr. Francois, what country are you from?

21               THE COURT:  Is it Mr. Didier or is it Mr. Francois?

22               THE WITNESS:  Yeah, it's Mr. Francois.

23               THE COURT:  Go ahead, Mr. Gibbs, sir.

24     Q.  And what country are you from, sir?

25     A.  I'm from France.
```

54

```
 1    Q.  And what is your occupation?

 2    A.  I'm a journalist, a war reporter.

 3    Q.  How long have you been a war reporter?

 4    A.  Since 1985.

 5    Q.  And are you still acting as a war reporter?

 6    A.  Yes, I am.

 7    Q.  And, in fact, are you flying out this evening to go back to

 8    Ukraine to cover the war there?

 9    A.  Yes, I do.

10    Q.  Mr. Francois, I would like to turn your attention to another

11    conflict, to the conflict in Syria in 2013.  I would like to

12    take you back to June of 2013.  At that time, what story were

13    you attempting to cover in Syria?

14    A.  If you remember well, in the end of May 2013 - excuse my

15    accent - the Syrian regime used chemical weapons against its

16    population in Northern Syria, which, of course, was an enormous

17    shock and an important news to cover.  So we knew the situation

18    was dangerous at the time there, but with my bureau, my chief

19    editor, we decided the risk was worth taking to go and cover

20    this and try to find some information about it.  And so we

21    decided to fly to Turkey and get into Syria through the northern

22    border and get this information.

23    Q.  And you talked about "we" wanted to cover that story.  Were

24    you with another French journalist at that time?

25    A.  Yes, I was with Edouard Elias.  He is a young photographer.
```

1    And we decided to work together and we'll make a picture for our

2    website, for the website of newspaper.  And we were together in

3    that trip.

4    Q.  And so just describe briefly for us what you and

5    Edouard Elias did on -- specifically on June 6th of 2013.

6    A.  So we flew in Turkey the night before.  We booked in a

7    hotel, and then the next day, on the 6th, we grab a taxi and

8    rode to the border close to a Syrian city called Azaz, through a

9    Turkish city called Kilis, to move into Syria and drive to

10   Aleppo.

11   Q.  And soon after crossing the border into Syria, were you and

12   Mr. Elias detained?

13   A.  Actually, we were captured on the way to Aleppo, in a little

14   village called Marea.

15   Q.  And do you know how to spell that village?

16   A.  Yes, M-A-R-E-A.  Sorry.

17   Q.  And can you describe the detention of you and Mr. Elias at

18   this village called Marea.

19   A.  Well, we were actually on the road to Aleppo, south.  And at

20   the exit of this village, there is - or there was - a petrol

21   station that -- it was broken, really.  And one pickup with

22   armed people inside were waiting for us.  We were traveling in a

23   minivan with this driver I'm usually was using in Syria.  This

24   wasn't the first time I was covering the situation in this area.

25   Then there was a car, too.  It was a van, and the other car came

```
 1    behind us.  The first one stopped us and these armed people came
 2    to us and asked:  "Where are the French?"
 3              And then they handcuffed us, took us our belts, our
 4    shoes off, our telephone, and our glasses, and they put it in a
 5    van.
 6    Q.  First of all, keep your voice up and speak slowly.  It makes
 7    it much easier.  You're doing a great job.  It makes it easier
 8    when you do that.  And I have a tendency to talk fast as well.
 9              When you talked about being stopped and there were
10    armed people that asked, "Where are the French," first of all,
11    how many armed people are we talking about?
12    A.  We were thinking about six people in the pickup, one staying
13    at the wheel, one sitting on the back of the pickup, four were
14    holding Kalashnikov to us who were next to us.  There was this
15    van behind.  I don't know if it was the driver and the guy
16    sitting next to him.  And the car with four people inside.
17    Q.  And you said these people were armed.  How were they armed?
18    What type of weapons?
19    A.  The usual weapon of the fighters over there, there was
20    normal Kalashnikov.  And there were other weapons.
21    Q.  And Kalashnikov, is that also known as an AK-47?
22    A.  Yeah, it was an AK-47.
23    Q.  And where did these armed men take you and Mr. Elias?
24    A.  Well, they brought us to a place, sounds like a very big
25    warehouse close to an airport, and where we were listening to at
```

1    the same time birds singing and trying to fly in the warehouse,

2    and torture.  People were tortured there.

3    Q.  And could you hear the sounds of torture inside this big

4    warehouse?

5    A.  Yeah.  All day and all night.  It was a place basically

6    where there was only -- I mean, they were doing torture all the

7    time.  And we were brought on the first floor through concrete

8    stairs.  That's when we had -- we were blindfolded.  We were

9    walking on some bodies on the way in the corridors, before we

10   were handcuffed to a radiator.

11   Q.  And I want to get to that being handcuffed to the radiator.

12   But once you and Mr. Elias were moved to The Warehouse, were the

13   two of you separated?

14   A.  Yes.  Edouard was handcuffed to a radiator in the first

15   room, on the first floor, just after the stairs and before the

16   toilets.  And I was handcuffed in the biggest room.  It was

17   opened to all of the warehouse, which was just after.  So, yeah,

18   we were separate.  But we could hear each other because we were

19   not -- we were just in -- and there was no door in between.  The

20   door wasn't closed between the two places.

21   Q.  Mr. Francois, briefly could you just describe some of the

22   treatment you endured during your first four days being held

23   there at The Warehouse.

24   A.  Okay.  As soon as they capture you, they want to subdue you

25   into, you know, being totally obedient to their orders.  So I

1    was handcuffed to the radiator, I was blindfolded.  There was a

2    blindfold with pepper spray on it, and, of course, you cannot do

3    anything with this.

4          We were repeatedly beaten with either sticks or some

5    batons, and sometimes with the foot.  They would also refuse us

6    to sleep.  We were not allowed to sleep.  So they come beat us

7    all the hours so to be sure that we don't sleep.  And they will

8    not give us water for three days and a half.  And that makes you

9    really, first, afraid, because you know that after three days,

10   it starts to be a problem and then you start to lose your

11   control, the control of your consciousness.  And there was no

12   food, of course.

13         So that was the basic treatment during that four days.

14   Q.  And, Mr. Francois, also during that four-day period, did you

15   hear the sounds of a person that you later learned was

16   Daniel Ottosen while you were being held in The Warehouse?

17   A.  Yes.  I was handcuffed on my radiator, and on my right-hand

18   side, where I was listening to some echos and the torturing, I

19   heard one guy being tortured and beaten and spoke to in English.

20   And there was the sound of a chain which was -- obviously he was

21   suspended.  And, yes, we realized after those four days when we

22   were moved to Aleppo that it was Daniel Ottosen.

23   Q.  All right.  And I would like to go to that move to Aleppo.

24   So after this big warehouse, were you moved to a prison that you

25   and some of the other hostages called The Hospital, or

1    The Eye Hospital?

2    A.  Yes.  Actually, it was the hospital in Aleppo.  It was a

3    pediatric or eye hospital.  It was also known as a -- before it

4    was taken by ISIS, it was known as a headquarter of Notra (ph),

5    which is another group.  In fact, it was in the center of

6    Aleppo.

7    Q.  And so in this hospital location in Aleppo, after you were

8    moved there, were you housed there with some other Western

9    hostages?

10   A.  All the Western hostages which were captured at that time

11   were -- started to be regrouped in this hospital end of July,

12   beginning of August 2013, yeah.  They started to gather, so we

13   saw Federico, James, John --

14   Q.  Yeah, and I'll get to that.

15   A.  Sorry.

16   Q.  Just in terms of the location, so you were captured in

17   June of 2013.  What year and month were you released?

18   A.  I was released on the 19th of April, 2014.

19   Q.  And so during that period, from June of 2013 to April of

20   2014, were you held hostage continuously in that period?

21   A.  Continuously, yes.

22        MR. GIBBS:  Ms. Lopez, if we could pull up government

23   Exhibit 2-7.

24   Q.  Mr. Francois, starting with Box Number 4, which is called

25   The Hospital or The Eye Hospital, and moving to Box Number 9,

1    The Desert Prison, does this exhibit accurately depict the

2    various prisons you were held in from June of 2013 through

3    April of 2014?

4    A.  So, yeah, Aleppo hospital was from June to beginning of

5    September.  So we were brought into Sheikh Najjar in September;

6    from Sheikh Najjar to The Office in the -- at al-Assad, in the

7    Idlib region, on the 23rd of December; from that place to this

8    mansion a few days later; back to The Office beginning of

9    January.

10          Then, from The Office to Raqqa, first two days in a

11   stadium, and then The Riverside for almost a month, so a few

12   weeks.  And then, from The Riverside House to the Desert prison,

13   until we were released through another small place on the border

14   of Turkey.

15   Q.  And we'll get to just about all those prisons, but I want to

16   start with the fifth box, the one that's called The Dungeon.

17   A.  Yes.

18   Q.  And you were held in that prison from when to when, roughly?

19   A.  It was from the beginning of -- the start of September

20   through the 23rd of December, 2013.

21   Q.  So about four months there?

22   A.  Yes.

23   Q.  And did you call this location Sheikh Najjar?

24   A.  Yes, it was in this area of Sheikh Najjar, which is north of

25   Aleppo.

1        MR. GIBBS:  You can take that down.

2   Q.  Mr. Francois, when you first got to the Sheikh Najjar

3   prison, who were your prison guards when you first arrived

4   there?

5   A.  It was mainly the guards we had before in the Aleppo prison,

6   which was a mix of Syrian guards and French guards.

7   Q.  When you say French guards, are these French-speaking

8   guards?

9   A.  They are French nationals speaking French.

10  Q.  Okay.  They were French guards?

11  A.  They are French who joined ISIS.

12  Q.  So in the beginning, it was a mix of Syrian and French

13  guards.  At some point after your arrival at Sheikh Najjar, did

14  you meet three British-speaking individuals who you came to know

15  as The Beatles?

16  A.  Yes.  Actually, it was the middle of September.  We were at

17  the time not yet in the basement prison -- because the prison

18  was basically built around us in this wood factory.  So when we

19  arrived in this prison, we were put on the ground floor in a

20  small room, a long room with one little window at the end of it.

21  And we were staying there.

22        And one day we heard a very loud bang on the door,

23  which was quite unusual because of the ways the guards were

24  usually doing.  It was the French and the Syrian guards.

25  Q.  Yeah, how did the Syrian guards typically enter?

1    A.  Well, the Syrian guards were just doing the kind of guard

2    job, which was, like, taking you to the toilets and bringing you

3    some food and bringing you to interrogate -- or to question

4    you...

5              THE WITNESS:  Is it okay?

6    A.  To questioning.  I was looking for the word.  And the French

7    were more aggressive with us, especially because we were French,

8    and obviously we -- they didn't like much what we represent for

9    them.  But so we were -- we had some beatings sometimes by them,

10   but most of the time they were using food, the deprivation of

11   food.

12             But they were really banging on the doors strongly.

13   And when we went to -- we are going to the toilet door, they

14   will tell us to rise, to put a blindfold on our eyes, to stay in

15   line, and we would -- and they would walk us to the toilets and

16   bring us back.  And then we could take our blindfold off and

17   stay together and do whatever we had to do.

18   Q.  So that's the other guards.

19   A.  Yeah.

20   Q.  But you were describing this particular day where there was

21   the loud banging.  So pick it up at that point for us.

22   A.  And so from the loud bang, I see immediately John, James,

23   Federico, David, you know, drop to their knees and put their

24   hand on the walls.

25   Q.  Just for the record, so they extended their arms up above

 1    their heads and put them against the wall?

 2    A.  Yeah.  And because it was a long -- they were confused

 3    because it was a long room, so there was no walls anywhere.  So,

 4    basically, you could see that all of a sudden they really

 5    started to panic, and we realized something was changing.

 6         And then The Beatles came in, and it was the first

 7    time -- actually, what I saw was coming in -- because we were

 8    not allowed to look.  And what I saw was people coming in --

 9    three guys coming in with battle dress, military boots, guns,

10    like Glocks 21, which was quite unusual, kind of, you know,

11    tactical vests, coming into the room.  And yeah, immediately the

12    atmosphere changed radically in the room.

13    Q.  And you described their dress as battle dress.  Can you

14    elaborate on that a little bit?

15    A.  Yeah.  You might have seen those pictures already.  It's

16    kind of camis, that's in camo, and, you know, some long military

17    pants.  I don't know what you call this.  And some military

18    boots and this tactical vest on which you can put some magazines

19    and a radio, for instance.

20    Q.  And you testified that in particular James Foley,

21    John Cantlie, Federico Motka, and David Haines had a very

22    visceral reaction to seeing them?

23    A.  It was totally incredible.  I mean, you could see -- and the

24    body language, the way they reacted, it was pure terror.  It

25    was -- and, of course, we knew what's happened to them before,

1   because when we were in the Aleppo hospital, we discussed with

2   David and with James and John and Federico about what's happened

3   to them in what they called The Box, which was the first place

4   where they were detained and where they were detained by the

5   The Beatles.  And actually, that's where they called them

6   The Beatles, to try to distinguish between these three guards.

7         And they told us all about the torture, the beatings,

8   how they were forced to fight each other.  They were called by

9   dog names, the waterboarding, the numbers they were given.  And

10  we could see, because we were very surprised the way we -- it's

11  just totally crazy to speak that way, but we were kind of free

12  to act in a way in our cells, in The Hospital, compared to the

13  way they were treated in The Box.

14        We -- you know, I could speak and discuss with the

15  chief of security, the guard at the prison where I was detained,

16  and I was surprised that we could speak.  Because they were not

17  allowed to speak even between themselves when they were with

18  The Beatles.  So they knew exactly what was going to happen.

19  Q.  Right.  So the treatment between The Hospital and the way

20  you were treated there, versus once The Beatles came into the

21  scene, was very different.  Correct?

22  A.  Yeah.  Again, I'm really sorry, because it's strange to

23  speak that way.  Because it was not a holiday camp, really, in

24  Aleppo.  We were beaten, we were starved, they were torturing

25  people in front of our door.  In the morning, sometimes when we

1    are going to the toilets, we will find a corpse who has been

2    beheaded or throat slitted, and we were walking in the blood

3    barefoot to go to the toilets.

4          But even this -- and we -- and they were making people

5    make monkey shouts or a dog barking.  You know, they were

6    torturing, all night, the people there.  So it was not an easy

7    place, but it seemed to be much, much better than what they had

8    been through.

9    Q.  And you mentioned that in this first encounter with

10   The Beatles, the four hostages who had been there with them

11   before faced the walls and put their hands up.  Did you learn

12   that that was the procedure that was required each time

13   The Beatles came into the cell?

14   A.  Yes.  They told us that.  But, you know, being told

15   something and realizing it is not the same.

16   Q.  And what was your experience of what would happen if

17   The Beatles came into the cell and a hostage didn't face the

18   wall and put his hands up?

19   A.  Well, my character -- I did it because I'm stupid or

20   something.  But whenever somebody speaks to me, I will turn to

21   look at it in the eye.  But, so, no, I got a beating for it.

22   But it's difficult to adapt to these crazy kind of rules.

23   Q.  Mr. Francois, I want to talk about these three

24   British-speaking captors that you referred to as The Beatles.

25          THE COURT:  Excuse me just a minute, just a moment.

1    Did you say that you didn't do it on one occasion and you got a

2    beating?

3              THE WITNESS:  Well, actually, I did on several occasion

4    get some beating.  Only once I didn't actually get a beating.

5    But, yeah, the rule was they would beat you if you do that.  But

6    it's -- you know, for all of us, we were not used to it.  It was

7    difficult to adapt to this.  Because naturally, I don't know if

8    that's the way...but someone address or speak to you or say

9    something, you turn to look.  It's -- I don't know.

10             THE COURT:  All right.  Thank you.

11             (OFF THE RECORD.)

12   BY MR. GIBBS:

13   Q.  Mr. Francois, what names did the hostages give to the three

14   Beatles?

15   A.  It was John, George, and Ringo.

16   Q.  And with regards to Ringo, did that Beatle ever engage in

17   theological discussions with the other hostages?

18   A.  Well, at one stage when we were in The Riverside House in

19   January, they organized kind of, how do you call this?  A kind

20   of Da'wah thing.  Like a tradition --

21   Q.  Is that Da'wah, D-A-W-A-H?

22   A.  Yes.

23   Q.  Can you explain what Da'wah is?

24   A.  Well, Da'wah is a tradition where you try to convince

25   somebody to convert or adopt your religion.  But in my -- well,

1   I saw it much more as a way always try to justify why we were

2   hostages, why they were doing this Islamic State or this

3   caliphates, the way, so-called.

4        It was always a way of explaining -- you know, they

5   were telling us -- because most of us were either journalists or

6   aid workers, but, actually, they didn't look at it like that

7   way.  They were saying:  You're Westerners; like, you

8   participate in elections, so you are responsible for the

9   government you are electing.  And this government is bombing

10  Muslim people, killing Muslim people, so that's the reason why

11  you should be here.  The same thing, you pay taxes in your

12  country, so by paying taxes to your country, you participate in

13  the war against Muslims, so it's logical for us to capture you

14  and keep you.

15       And Guantanamo, it was -- there was an obsession about

16  this, Guantanamo.  They always wanted to organize a little

17  Guantanamo.  They wanted us to wear some orange jumpsuits

18  because it was supposed -- so we --

19            THE REPORTER:  I'm sorry, can you slow down?

20            THE COURT:  Pick up your answer when you said, "they

21  wanted us to wear orange jumpsuits because."

22  A.  Yes.  We were in Syria.  They didn't have these orange suits

23  all the time, so most of the time we were not wearing them.  But

24  sometimes they were trying to get some during the marketplace,

25  so when we were doing some videos for demands sent to our loved

1    ones or families, then we wear orange jumpsuits.  And they were

2    telling us it was because it was like in Guantanamo, like the

3    prisoners at Guantanamo wore that, so we should wear them.

4           So that's when we were in the Riverside prison.  They

5    said because it's like in Guantanamo.  They had CCTV cameras --

6           MR. DEUBLER:  Objection, Your Honor.  Can we have the

7    headphones, please?

8           THE COURT:  All right.

9           (BENCH CONFERENCE ON THE RECORD.)

10          THE COURT:  I typically don't allow objections in the

11   middle of an answer, but in this case, since the answer was

12   becoming a narrative, what is your objection?

13          MR. DEUBLER:  That is exactly it, Your Honor.  Several

14   of these answers.  And I understand we're dealing with a French

15   national here whose primary language is not English, but we're

16   getting into a lot of narrative responses.

17          So that is the objection, Your Honor, nonresponsive and

18   narrative answers.

19          THE COURT:  Mr. Gibbs?

20          MR. GIBBS:  Judge, I can attempt to ask more targeted

21   questions and try to keep them more short.

22          THE COURT:  Yes.  On the other hand, this witness is

23   entitled to say things that are responsive.  And if it goes on,

24   Mr. Deubler, then it's certainly responsive.  Some of these

25   questions do call for a narrative and an explanation.

1           But in this case what I will do is, the objection came

2      in the middle of a sentence, and you're not asking to strike

3      what he said, are you, Mr. Deubler?

4           MR. DEUBLER:  No, sir.

5           THE COURT:  So we will proceed, but I will indicate to

6      the witness that he should attempt to answer the question that's

7      put to him, and no more, and Mr. Gibbs will be entitled to ask

8      him for explanations if he wishes.

9           All right.  Let's go on.

10          (END BENCH CONFERENCE.)

11          THE COURT:  Mr. Francois, it's important to answer the

12     question that's put to you.  I understand that you feel that the

13     question may call for more than is asked of you, but answer the

14     question that's put to you.  Mr. Gibbs may elicit more

15     information from you if he wishes to do so.

16          THE WITNESS:  Okay, Your Honor.  I'm sorry.  Because

17     it's a bit different from the French system, so I have to adapt,

18     I suppose.

19          THE COURT:  Yes, I'm fully aware of that.  I've been

20     there numerous times to participate in joint efforts.  It is

21     very different.

22          Proceed, Mr. Gibbs.

23     BY MR. GIBBS:

24     Q.  Mr. Francois, you testified a moment ago that in these

25     Da'wah sessions, Ringo would use them as an opportunity to

1    justify holding journalists and aid workers.  And then you

2    talked about the orange jumpsuits and Guantanamo Bay, and you

3    described it as an obsession among The Beatles.

4              THE COURT:  Are you going to ask a question?

5              MR. GIBBS:  Yes, Judge.

6              THE COURT:  Let's get to it without rehearsing

7    everything we've heard.

8    BY MR. GIBBS:

9    Q.  What was it about Gitmo that was an obsession with

10   The Beatles?

11   A.  Sorry, can you ask me again?

12   Q.  You used the term "obsession" to describe Guantanamo.

13   A.  Yes.

14   Q.  What was it about that that was an obsession?

15   A.  Because they were always speaking about it.  They were

16   always comparing our situation with the situation of the

17   prisoners at Guantanamo.

18             So they said:  You should not complain, because

19   basically our brother in Guantanamo are going through worse

20   situations than you are.  So that's really why we should do it

21   that way.

22   Q.  And you also testified that the Da'wah session is actually

23   an opportunity to try to convert people to Islam.  I want to ask

24   you about some of your fellow hostages.  Did James Foley say

25   that he had converted to Islam?

1    A.  Actually, he did.  But before I left --

2             THE WITNESS:  Should I go into this?

3    Q.  You can answer the question.

4             THE COURT:  Yes, go ahead.

5             THE WITNESS:  Sorry.

6             THE COURT:  Because you said, "Yes, but."

7             THE WITNESS:  Yes, sorry.

8    A.  Yes.  On the last day before I left, which we spent a long

9    part of the night discussing together, and he asked me to convey

10   a message to his mother to explain her what was the reason of

11   his conversion.

12   Q.  And what did he say was the reason for his conversion?

13   A.  James was an amazing person -- excuse me.  Sorry.

14            THE COURT:  That's all right.  Take your time.  Take

15   your time.

16   A.  He was very strong and very soul in his face.  I knew he was

17   a Christian and a Catholic, like his mother, and he needed to

18   pray.  It was very important for him.  And he had the feeling

19   that the only way he could pray was to actually convert.  And he

20   didn't care much, because for him there was only one god.  So he

21   didn't care which name we give him.

22            So that's why he converted, so he could pray.

23   Q.  And then how about another fellow hostage, Steven Sotloff.

24   Did he also indicate to The Beatles and his jailers that he had

25   converted to Islam?

1    A.  Yes, he did, actually.

2    Q.  But did he, in fact, stay faithful -- well, Steven Sotloff

3    was Jewish.  Correct?

4    A.  Yes, he was.  But he didn't say that.

5    Q.  Did he stay faithful to Judaism even when he was praying?

6    A.  Yes.  Because that was in December, and in this room was

7    where we came for the first time and it was Yom Kippur.  And

8    even though we had very little to eat, that night he said he

9    wanted to eat.  And that night was one of the days where we had

10   eggs, which was quite a treat.  So actually, we kept the boiled

11   egg for him.

12         And when he converted himself, he was always praying to

13   move a little bit more towards Jerusalem so he can actually

14   pray.  So he wanted to pray.

15   Q.  And he moved in which direction?  I'm sorry?

16   A.  Towards Jerusalem.

17   Q.  So more towards Jerusalem --

18   A.  Because when you pray the Muslim prayer, you have to be

19   towards Mecca.  So he was moving a little bit more towards

20   Jerusalem.  So that was the way of keeping his faith and being

21   able to pray the way he wanted to pray.

22   Q.  Mr. Francois, I want going to go back to the three Beatles

23   for a moment.  You testified earlier about the way they dressed.

24   In addition to that description, would they cover their faces

25   when they came into your cells?

73

1    A.  Yeah, always.  Except for once I saw a face.  But most of

2    the time, yeah, all the times they were covered.

3    Q.  And how were The Beatles armed when you saw them?  Did

4    they --

5    A.  Armed?

6    Q.  Yeah, did they carry firearms?

7    A.  Yeah, they were always carrying -- the three of them were

8    carrying Glocks 21, most of them with standard magazine.

9    Glock 21, a nine millimeters pistol, which was quite unusual

10   because most of the guards didn't carry pistols.  They usually

11   had an AK-47.

12          And they were the only ones coming in the cells with

13   weapons, because most of the time the guards leave their weapons

14   in the area.  They would never move into the cell with a weapon.

15   Q.  Mr. Francois, during your stay at the Sheikh Najjar prison,

16   were you beaten by any of The Beatles in front of your fellow

17   hostages?

18   A.  Yes.

19   Q.  Can you describe that beating?

20   A.  Well, one of them -- because I don't know what stupid thing

21   I said, but I said something after John, about the negotiation,

22   something.  So he said:  You don't know anything thing about

23   what you're speaking, so come in the middle of the room.  That

24   was on the 23rd, I think, of December, just before we are moved

25   to the other place.  And I got a beating in the middle of the

1    room in front of other guys.  I got one of my teeth broken at

2    that time.

3    Q.  When you got called to the center of the room and got a

4    beating where your tooth was broken, do you recall which Beatle

5    it was that gave you this beating?

6    A.  It has always been difficult for me to -- because they were

7    named The Beatles by the English-speaking hostages who could

8    recognize their accents.  You listen to my accent, so I was not

9    able to appropriately recognize the different accents.  So I was

10   always very confused with the names, except that one was

11   left-handed and was more punching, and two of the ones were more

12   into wrestling whenever they were beating you.

13          They were always together everywhere, and they were all

14   extremely violent and always quite sadistical, and always

15   participating in the beating of the hostages.  So it didn't make

16   a difference which one was actually beating us up.

17          THE COURT:  So you said they were extremely violent and

18   always -- did you say sadistic?

19          THE WITNESS:  Yes.

20          THE COURT:  I beg your pardon?

21          THE WITNESS:  Sadistic is a good word.  They had a

22   sadistic attitude, if you compare to the other ones.  That's my

23   opinion.

24          THE COURT:  What do you mean by "sadistic"?

25          THE WITNESS:  Like, for instance, they were always not

1   only physical violence, but they would always try to break your

2   mind.  Like, there's this game -- it was not on me, but it was a

3   game they come in and say:  Okay, manicure or pedicure?  And,

4   okay, that mean 40 beating with a baton on the hand or

5   40 beating with a baton on the foot.  The game was that,

6   pedicure or manicure, is which one where we start.  You will get

7   your 80 beatings anyway.

8           If that isn't sadistic, I don't know what is.

9           THE COURT:  Next question.

10  BY MR. GIBBS:

11  Q.  Mr. Francois, during your time as a war correspondent, did

12  you actually receive a bullet wound?

13  A.  Yes.

14  Q.  And where was that bullet wound?

15  A.  It was one in the leg.  I lost 15 centimeters of bone in my

16  femur.

17  Q.  Was this an AK-47 round?

18  A.  Yes, it was.

19  Q.  Was it in your upper left thigh?

20  A.  Yes, it is.

21  Q.  Did The Beatles learn of that injury?

22  A.  Yeah.  Because it's very visible.

23  Q.  So you can see it still to this day?

24  A.  Yes.

25  Q.  And would The Beatles target that part of your body when you

1    were beaten?

2    A.  Yes.  Especially when we were in the -- because I didn't

3    realize, because when we were in the prison, the place where

4    there was an oil pipe, yeah, they were repeatedly beating -- or

5    one of them actually was really beating me on the wound, on the

6    scar, which is, of course, more like 40 times, 70 times.  I

7    don't remember whether it was 40 or 70, because it was always

8    kind of the numbers of the beatings of each scene.  And they

9    were repeatedly the beating on the same place, always.

10   Q.  Now, Mr. Francois, did James Foley suffer any particularly

11   brutal beatings that resulted in him becoming unconscious for a

12   period of time?

13   A.  Yes.  Actually, one day, again, in the same prison, the

14   night before, we knew The Beatles were around because they were

15   wearing very a strong perfume with musk, which is quite common

16   with the Jihadists.  So we could smell through the door that

17   they were -- but they didn't show up that night.

18        The next night they came, they were really in a frenzy.

19   That's when they gave the beating to everybody.  But then they

20   really concentrated on James and asked him at one stage to stand

21   in the middle of the room with his arms like Christ on the cross

22   and started to beat him.  And then they choked him and come in

23   the back and pulled on the carotid -- pushing the carotids to

24   block the blood and the breathing.

25        Then James fainted and fall on the concrete floor, and

1    he hardly mark, very hardly on the floor, and he had a huge

2    bruise and very big black eye. The next day it was so big that

3    the usual guards that were from Tunisia came in and saw his face

4    was really bad.  And they were -- and we asked them:  Can you do

5    something for it; you know, can you find some medicine or

6    complain or do something?

7    Q.  And what did they say?

8    A.  You know:  It's way over us.  We have no control of those

9    guys.  They're in charge and do what they wan, and that's all we

10   can say.

11   Q.  So the Tunisian guards said The Beatles were in charge?

12   A.  Yes, they were.

13   Q.  Mr. Francois, while we're on the topic of James Foley, can

14   you describe what he was like when he was dealing with the

15   guards?  And I'm talking about the regular day-to-day guards.

16   A.  Well, the strength of James was to be very equal in temper.

17   He was strong and very -- saw very deep.  And he was also trying

18   to keep us together.  Because, you know, there are a lot of

19   tensions during detention between us, because of the fear,

20   because of the anger, because of the beatings, because of the

21   stress.  So there are arguments, and he was always trying to

22   keep us together and to cool down the situation when they were

23   heating up.

24          And he was also one of the person, you know, who stood

25   up and asked the guards for more water, for a toilet, for food

1    or blankets.  He would speak up.  He would never -- he would do

2    it in a gentle, nice manner, but very persistent manner.

3    Q.  And was he very well respected by the other hostages because

4    of that, because he would speak up for them?

5    A.  Yeah, he was one of the -- was the backbone of this small,

6    strange community there.

7    Q.  Mr. Francois, I want to move forward to some of the

8    negotiations for the hostages.  You testified that -- about

9    The Beatles and also about the French-speaking guards.  But in

10   terms of the negotiation, who was in charge of getting the

11   emails?  Was it The Beatles or the French-speaking guards?

12            THE COURT:  You should have stopped when you said, "Who

13   was in charge?"  Re-ask your question.

14   Q.  Mr. Francois, who was in charge of getting the emails for

15   the negotiations?

16   A.  We -- The Beatles were, for the part of the negotiation we

17   started in January and who actually got two released.  We could

18   see them -- well, they started before, actually.  Sorry, in

19   October.

20            The first proof of life we have to give as a French

21   group, the four of us, was on the 24th of October, where

22   The Beatles came and took us out from the same Sheikh Najjar.

23   And we went into a little room just behind where an ISIS flag

24   was put on the wall.  They wanted us to wear the orange

25   jumpsuits, but there were only three of them and we are four.

1    So they asked us to take two.

2            We had to comb our hair and to wash.  And then the

3    three other French hostages came first and have to give their

4    name and age --

5            THE COURT:  All right.  Next question.  You may ask

6    about all of this, but let's do it in a question-and-answer

7    form.

8    Q.  And so, Mr. Francois, this event in October --

9            THE COURT:  Don't lead.  Just ask the question, what

10   happened, if that's what you want to elicit.

11   Q.  Well, who was directing you on what to do during this

12   particular proof-of-life video?

13   A.  The Beatles did, actually.  The three of them were there,

14   and they were giving us what we had to read.  And I was given

15   the paper on which I had to read the demands they wanted to give

16   the French government, saying that so far we are well treated

17   and that we get food and medicine, but they should, you know,

18   give to their demands.  If not, the situation will worsen

19   dramatically.

20           So that was what they were asking.

21   Q.  And was this proof of life filmed in any way?

22   A.  It was filmed and sent to the French.

23   Q.  Who was doing the filming?

24   A.  The Beatles did.  I don't know which one.  But one was

25   behind the camera and one was giving us the paper.

1    Q.  And was there a flag set up at all during this particular

2    proof-of-life video?

3    A.  What?  A flag, yes.  An ISIS flag was staying -- we were --

4    so the three -- the first one came.  The first French took off

5    his orange suit so I could put it on.  He was the first one.

6    And then we were all of us put in front of the flag, and we were

7    to speak, and the camera was in front of us.  The flag was

8    behind us, and we had to make this statement in front of the

9    camera, and The Beatles were behind the camera and filming.

10   Q.  Mr. Francois, I would like to ask about a particular

11   proof-of-life question.

12          MR. GIBBS:  Before we do that, Ms. Lopez, if I can have

13   you play government Exhibit 26-5, and I'll tell you when to stop

14   it.

15          (Video played in open court.)

16   Q.  Mr. Francois, did you receive a proof-of-life question while

17   you were being held hostage very similar to the one we just saw

18   on that clip?

19   A.  Yeah, very similar.  The first question, the first proof of

20   life I had to do was the name of my cat.

21   Q.  What was the name of your cat?

22   A.  Rosie.

23   Q.  And who asked you that question?

24   A.  The Beatles.

25   Q.  And you gave the correct answer?

1    A.  Obviously I did, because it's when it all started.

2    Q.  Mr. Francois, I would like to move ahead to a prison you

3    talked about a little bit, The Riverside Prison.

4    A.  Yes.

5    Q.  After you and the other hostages got to Riverside, did the

6    hostage negotiations seem to pick up speed?

7    A.  Yes.

8    Q.  And can you describe what was going on in The Riverside

9    Prison at that time related to the negotiations?

10   A.  Well, first, it was one of ISIS leader which we never saw

11   before who came in with a translator and started to speak to us

12   about a negotiation.  That was mid-January.

13            And we were staying in that Riverside.  The Beatles

14   were coming very often to take address, email, and information

15   from all the hostages in the room.  And we could see them

16   because there was another room next to ours which was --

17   basically we were in the bedroom, and there was a living room

18   there which was facing the river.  And in between those two

19   rooms, there was a wall, but it was in glass, a windowed wall.

20   You could see through it.  And we could see The Beatles sitting

21   in the living room and working at the computers.

22            So that was at that time, and that's when every one of

23   us had this question asked them and address asked.

24   Q.  And when The Beatles would come into the room with the

25   hostages and ask questions, what would they do after that?

82

1    A.  They would go back to the other room.  And we could not hear

2    what they were doing or, of course, see what they were typing on

3    the computer.  But they were working at that computer.

4    Q.  And then, Mr. Francois, after The Riverside Prison, were you

5    moved to another location near Raqqa called The Desert Prison?

6    A.  Yes.

7    Q.  Was that the final prison you were held in before you were

8    released?

9    A.  Almost.  It was the final prison except for this one week on

10   the border of Turkey when we walked out, yeah.

11   Q.  So after The Desert Prison, you were in a wait station for

12   some period of time before being released?

13   A.  Yes.

14           MR. GIBBS:  Ms. Lopez, if we can pull up government

15   Exhibit 3-7.

16   A.  Yes, that's the place.

17   Q.  I'm sorry, what is this, Mr. Francois?

18   A.  Well, basically, the first door you see on your right-hand

19   side, that was our cell.  The single door we realized at the end

20   when we came out of it was the women cell.  The guards were

21   sitting on the left-hand side.  The door you see in the back was

22   the toilets and the shower.  And it was a place for guards here.

23   Q.  This was a photograph from inside The Desert Prison.  Is

24   that correct?

25   A.  That is, yeah.

1           MR. GIBBS:  You can take that down.

2    Q.  Mr. Francois, soon after you and the other hostages were

3    moved to The Desert Prison, was a Spanish hostage called

4    Marcos Marginedas released?

5    A.  Yes, he was.

6    Q.  And was anyone beaten just prior to him being released?

7    A.  Yes.  Me.

8    Q.  And how were you beaten?

9    A.  Well, I guess -- I was put on the wall, and that's when I

10    was beaten a lot on my wound.  The message was that one of

11    The Beatles were calling me a snake.  He said:  You're a snake.

12    You're a bigger snake because you've been -- they might have

13    found on the internet my reporting in Mali, where I was

14    following the French troops for my radio.  And they said:  You

15    should never be released; you, the French, are fighting our

16    brothers in Mali.  You're beating the French soldiers doing

17    this, you're not -- and the beating was given.

18    Q.  And did you receive --

19    A.  And -- I'm sorry.

20    Q.  I'm sorry.

21    A.  No, no.

22    Q.  Did you receive any injuries during this beating when Marcos

23    was released?

24    A.  Yes.  I had my finger broken.

25    Q.  Now, about a month after that, were two other Spanish

84

1    hostages named Ricardo Vilanova and Javier Espinosa released?

2    A.  Yes.

3    Q.  What did The Beatles do to you and the other French hostages

4    at that time?

5    A.  Well, during this period of time, the French hostages were

6    beaten more often.  I think it was a message for the French

7    authorities, I think, I'm not sure, to make pressure on them.

8    Because they knew that the released hostages will tell of this.

9    That's my opinion.

10   Q.  So were you and the other French hostages beaten in front of

11   Spanish hostages?

12   A.  Yes.

13   Q.  Now, Mr. Francois, a short time before you were released,

14   did you get to see an American hostage named Kayla Mueller?

15   A.  Yes, the night before.

16   Q.  So the night before you were taken out?

17   A.  Yes.

18   Q.  Can you describe that event?

19   A.  Well, it was the first time that we never -- we didn't

20   actually face the wall.  The Beatles came into the room with

21   Kayla.  Kayla was wearing a dress, a local dress.

22         And so they present her to us, and they actually

23   started to make some demands.  And they told us that we were

24   going to be released in the next few days, and that we should

25   convey to the American and the British government some demands

1  for -- that if Kayla were to be released, it would be to be

2  given $5 million or the release of Siddiqui, which is a woman

3  scientist who was arrested in Britain for being accused of being

4  a member of Al-Qaeda.  And then they were asking for 100 million

5  for the main hostages, British and American.

6  Q.  And in terms of the demand for Kayla Mueller, the 5 million

7  or the release of Aafia Siddiqui, did you know who

8  Aafia Siddiqui was at that time?

9  A.  Yes, I knew.

10  Q.  And other than those demands, did Kayla Mueller speak to the

11  hostages when she came out?

12  A.  Yes.  I think she did, yeah.  She was quite strong.  And,

13  yeah, she explained she has been there for quite a while.  And

14  we -- you know, it was a strange situation.  When we discover

15  another hostage and you have a confirmation, you realize there

16  was a demand for her.

17         And she was -- and also, because I heard her voice

18  before when we were in the other place.  But I don't know if I

19  should talk about this more.

20  Q.  Why don't you take us back to that.  So you said you heard

21  Kayla's voice before?

22  A.  Yes.

23  Q.  And can you describe that?

24  A.  When we were in Sheikh Najjar at one stage, in front of our

25  cells, there was a corridor and very small cells on the other

1    side.  One night I heard Abu Omar, one of the French guards,

2    speak to a girl in French and English.  And he brought her an

3    orange, and she was asking him for some tampons.

4         So it was the voice of Kayla, but we never saw her at

5    that time.  We just heard her voice.  So she confirmed for us at

6    that time that she was also detained in Sheikh Najjar.

7    Q.  On the occasion -- the day before you were released, when

8    she was brought you, you said The Beatles brought her out.

9    After this interaction with her, who took her back to her cell?

10   A.  The Beatles.

11   Q.  Was that the last time you saw her?

12   A.  Yes, it was the last time I saw her.  Or maybe it was the

13   next morning?  Because they told us to write some letters so we

14   can bring out those letters, but they said it was being from few

15   days.  Some of the people in the cells, some of the hostages,

16   didn't write a letter.

17        And the next morning, when they came back and some

18   people didn't write those letters, so John asked them -- I mean,

19   they said:  Why didn't you write these letters?  So John said:

20   But you tell us it was a few days.  So they give us some more

21   time so that people could write letters.

22   Q.  Let's move to those letters.  So this is -- actually, I tell

23   you what.

24        MR. GIBBS:  If the court security officer could hand

25   you the binder that has 14-2 in it.

87

1    Q.  Mr. Francois, if you take a look at -- it should be

2    Tab 14-2.

3    A.  Yes.

4    Q.  And, sir, what is government Exhibit 14-2?

5    A.  Well, it's a letter which John Cantlie wrote and gave me to

6    bring out.

7           MR. GIBBS:  Your Honor, at this time we would move in

8    government Exhibit 14-2 and ask to publish it.

9           MR. DEUBLER:  Same 804(6) objection that the Court has

10   previously ruled on.

11          THE COURT:  So it's overruled, and it's admitted.  You

12   may do so.

13          (Government EXHIBIT Number 14-2 was admitted into

14   evidence.)

15          MR. GIBBS:  Ms. Lopez, if you can highlight that middle

16   paragraph, or enlarge it.  It begins, The six British and six

17   American prisoners.

18   Q.  Do you see that, Mr. Francois?

19   A.  Yes, I do.  Yes.

20   Q.  That statement in there about the six British and Americans

21   and the demand of $100 million, is that consistent with what you

22   were told in the cell when Kayla Mueller was brought out?

23   A.  Yes.  Because it was told in front of everybody, so all the

24   hostages were there at that time, all of us.

25   Q.  And farther down it mentions 5 million or Aafia Siddiqui

1    being released.  Was that also a demand that was made in the

2    cell that day with Kayla?

3    A.  Yes.

4         MR. GIBBS:  Ms. Lopez, if we can go to the last

5    highlighted block and enlarge it.

6         THE COURT:  You'll have to do a better job about making

7    that clear.

8         Is that what you asked to have highlighted?

9         MR. GIBBS:  It is.  It's the bracketed portion there.

10   Q.  Mr. Francois, can you make that out?

11   A.  Which one?  The one...

12   Q.  The one that begins, "If the money."

13   A.  "If the money is not found..."

14        THE COURT:  I have a hard time seeing it.  See if you

15   can do a better job with enlarging that, please.

16   A.  "John will never" --

17        THE COURT:  Just a moment.  Let's see if we can do a

18   better job of enlarging that.

19        MR. GIBBS:  Unfortunately, Your Honor, I think it's

20   because of the way it was carried out.  It's a fairly dark copy.

21   But it's in evidence.  The jury will have it.  I think it's

22   probably more legible.

23        THE COURT:  Well, if Mr. Francois can read it, he may

24   read it.  I can't.  I have a hard time reading it.

25        Go ahead, sir.  If you can read it, you may do so.

```
1            THE WITNESS:  I'm trying, sorry.  "If the money is not
2   found, will never be" -- "I will never be released" -- no, "If
3   the money is not found, will never be released" -- I don't know.
4            No, "I will remain prisoner here," and it's black.
5   Q.  No, that's fine.
6   A.  That's better.  Okay.  "If the money is not found, we will
7   remain prisoner here until we die, either by whatever cause or
8   execution."
9   Q.  And this was a letter provided to you and the French
10  hostages by John Cantlie?
11  A.  Yes, it was, yes.
12            MR. GIBBS:  We can take that down.  Thank you.
13  Q.  And, in fact, in the days leading up to your release,
14  Mr. Francois, did you spend a lot of time talking to
15  John Cantlie, James Foley, and Peter Kassig?
16  A.  I did spend a lot of time speaking with James and Peter.
17  And Pierre and Nicolas were speaking with David and John.
18  Q.  And when you were speaking to -- let's start with
19  James Foley.  What were his spirits like before you and the
20  other French hostages were released?
21  A.  You know, it's a difficult time.  It's strange because you
22  feel guilty of being freed and leaving behind the hostages that
23  you know the fate might be dreadful.  And I knew it too.
24            And so we were speaking of, you know, can you face such
25  a situation for them, from their point of view?  We could not
```

1    even try to say -- you know, to reassure them that everything

2    was going to be okay, because we knew it might not be okay at

3    all.

4              So it was a kind of farewell discussion, and where we

5    were trying to put our emotion together.  They were trying to

6    focus.  Peter, for instance, was really trying to face his

7    death.  He was always very emotion to -- you know, he didn't

8    much trust in that fact that he would to survive, but he was a

9    an amazing, strong character, and lively.  He was always trying

10   to focus himself.  At that time, that was -- you know, we spent

11   the night in this cell and said:  How can you face this?  He has

12   been in danger before.  He has been in a bad situation before.

13   And he was trying to focus on this.

14             So he was very strong, and he said -- he sort of was

15   trying to gather all the strength he had in himself to be able

16   to face this with pride.  And that was very important for him.

17             And James basically was afraid of the situation of his

18   brother who was in the Air Force, and he didn't want his brother

19   to have problems because of his situation.  And he wanted me to

20   convey to his mother his relation to the faith and to his

21   beliefs.  That was very important for him.

22             That was --

23             THE COURT:  What did he want to convey to his mother?

24             THE WITNESS:  He wanted me to convey to his mother

25   that, I mean, basically he didn't convert because he refused his

1      original religion.  He didn't.  He converted because he wanted

2      to be able to worship.

3              THE COURT:  Next question.

4      BY MR. GIBBS:

5      Q.  Mr. Francois, you testified a moment ago that you carried

6      some letters out.  Were you also asked to memorize some email

7      addresses to carry out?

8      A.  Yes, I was.

9      Q.  Who asked you to do that?

10     A.  The Beatles.

11     Q.  And who removed you and the other three French hostages from

12     The Desert Prison?

13     A.  The Beatles did.  And then we drove another car for a local

14     leader who bring us through those checkpoints to the point where

15     we were released.

16     Q.  And before you were released, did one of The Beatles come

17     back to you a final time?

18     A.  Yes.  A few days before we actually were released, he came

19     to us - I remember there were two Beatles and not three - to

20     remember -- I had to learn some new emails.

21     Q.  So you had an additional email address to remember?

22     A.  Yeah.  I forget the first one and remember the other one.

23     Q.  Was that the last time you saw any of The Beatles, when you

24     were given that email address?

25     A.  Yeah.  Well, except for the videos when they killed...

```
 1    Q.  Right.  In person.

 2    A.  (No verbal response.)

 3    Q.  Mr. Francois, after you were released, were you reluctant to

 4    speak to the media?

 5    A.  Yes, of course I was.

 6    Q.  And why was that?

 7    A.  There were two reasons.  The first reason was that we were

 8    threatened that if we spoke to the media, they will torture the

 9    other hostages who stayed behind.  So if we gave information,

10    they would suffer from our information.

11         The second thing is, we were in the process of giving

12    information to our local police, trying to apprehend them

13    because they are dangerous people, and we didn't want this

14    information to be public, so they can do their job.

15    Q.  Mr. Francois, you testified a moment ago about the execution

16    videos that came out beginning in August 2014.  Do you recall

17    that?

18    A.  Sorry?

19    Q.  You testified a moment ago about seeing the execution

20    videos?

21    A.  Yes, we did.

22         MR. GIBBS:  Your Honor, at this time we would ask to

23    move in and publish government Exhibit 1-25B.  This is a clip

24    from "A Second Message to America," and that entire video is

25    already in evidence.
```

1          MR. DEUBLER:  No objection, Your Honor.

2          THE COURT:  Admitted.  You may do so.

3          (Government EXHIBIT Number 1-25B was admitted into

4    evidence.)

5          (Video played in open court.)

6    BY MR. GIBBS:

7    Q.  Mr. Francois, did you recognize one of the hostages that you

8    were held with in that video?

9    A.  Yes, David.

10   Q.  What's David's last name?

11   A.  Haines.

12         MR. GIBBS:  Your Honor, we make the same request to

13   move in and publish government Exhibit 1-29A, the clip

14   from "Another Message to America and Its Allies." And

15   the full exhibit -- or the full video is already in

16   evidence.

17         MR. DEUBLER:  No objection, Your Honor.

18         THE COURT:  Admitted.  What is the full video exhibit

19   number?

20         MR. GIBBS:  1-29.

21         THE COURT:  All right.  You may do so.

22         (Government EXHIBIT Number 1-29A was admitted into

23   evidence.)

24         (Video played in open court.)

25   Q.  Mr. Francois, did you recognize two of your former fellow

1    hostages in that clip?

2    A.  Yes, of course.  That's Alan Henning and Peter Kassig.

3    Q.  And then finally --

4         MR. GIBBS:  With the court security officer's

5    assistance, it's Exhibits 1-29A and 1- -- or 1-29B and C in the

6    binder.  Let's start with the first one.  Thank you.

7    A.  Which one?  Sorry.

8    Q.  If you could take a look at Exhibit 1-29B, as in bravo.

9    A.  A, yes.

10   Q.  If you could just indicate what 1-29B is.

11   A.  Yeah, I don't think you want to see that.  It's a picture of

12   one of The Beatles slitting the throat of Alan.

13   Q.  I think the binder may be --

14        THE COURT:  Just one moment.  You said, "That's a

15   picture of one of The Beatles," what?

16        THE WITNESS:  How do you say in English, cutting.

17        THE COURT:  Slitting the throat?

18        THE WITNESS:  Yes.

19        THE COURT:  Next question.

20   Q.  And can you tell who the person is who's having his throat

21   slit?

22   A.  Yeah, Alan Henning.

23        MR. GIBBS:  We would move in and not publish 1-29B.

24        MR. DEUBLER:  No objection, Your Honor.

25        THE COURT:  It's admitted.  It's available for the jury

1   if they wish to look at it.

2          (Government EXHIBIT Number 1-29B was admitted into

3   evidence.)

4          MR. GIBBS:  Your Honor, if we could go to the last

5   exhibit that I will ask the witness about, which is the next

6   one, 1-29C.

7   A.  So I have to change the picture?

8          THE COURT:  Are you asking him what 1-29C is?

9   A.  Yeah.

10  Q.  Correct.

11  A.  Again, you have the body of Alan Henning with his handcuffed

12  in the back laying in the sun, and his head has been taken off

13  his body and is standing on his back.

14  Q.  You can set that aside.

15  A.  And it's --

16         MR. GIBBS:  Judge, we would ask to move that in as

17  well, and we will not publish that, obviously.

18         THE COURT:  You're talking at the same time the witness

19  is talking.  So don't, please.

20         What is it you said, Mr. Francois?

21         THE WITNESS:  This is -- there's blood everywhere

22  and...

23         THE COURT:  All right.  It's admitted without

24  objection.  Next question.

25         (Government EXHIBIT Number 1-29C was admitted into

1    evidence.)

2              MR. GIBBS:  I have no further questions, Your Honor.

3    Thank you.

4              THE COURT:  Cross-examination?

5              MR. DEUBLER:  Very briefly, Your Honor.

6                **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

7    **BY MR. DEUBLER:**

8    Q.  Good morning, sir.  My name is Zachary Deubler, I'm one of

9    the attorneys for Mr. Elsheikh.

10             It's true that you participated, in 2016, in an HBO

11   documentary about James Foley.  Correct?

12   A.  Maybe.  Yeah, yeah, yeah.  I give it to you, so maybe that's

13   the one you're referring to.

14   Q.  Well, you participated in a documentary about James Foley?

15   A.  Yeah, okay.

16   Q.  And in that documentary you detailed a lot of what we just

17   talked about here today.  Correct?

18   A.  Yes.  Yes.

19             MR. DEUBLER:  That's it, Your Honor.

20             THE COURT:  All right.  Any redirect?

21             MR. GIBBS:  No, Judge, thank you.

22             THE COURT:  You may step down.  May this witness be

23   excused?

24             MR. GIBBS:  He may, Your Honor.

25             THE COURT:  Mr. Francois, you may be excused.  You may

1    remain in the courtroom now that you've testified, but you may

2    also leave and return to France or wherever you wish.

3               THE WITNESS:  Thank you, Your Honor.

4               THE COURT:  Good luck to you.

5               MR. PAREKH:  Your Honor, it's Detective Donna Deweltz.

6               THE COURT:  How long will this take?

7               MR. PAREKH:  I hope it's three minutes, Your Honor.

8               THE COURT:  All right.  Let's call this witness.

9               MR. PAREKH:  The United States calls Donna Deweltz.

10              THE COURT:  You may administer the oath to the witness.

11              (Oath administered by courtroom deputy clerk.)

12              THE COURT:  All right.  Mr. Parekh, you may proceed.

13              MR. PAREKH:  Thank you, Your Honor.

14      **(DONNA DEWELTZ, having been duly sworn, testified as follows:)**

15               **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

16    **BY MR. PAREKH:**

17    Q.  Good morning.

18    A.  Good morning.

19    Q.  If you can please keep your voice up so everyone in the

20    courtroom could hear you, we would really appreciate it.

21    A.  Okay.

22    Q.  Please state and spell your name for the record.

23    A.  Donna Deweltz, D-O-N-N-A, D-E-W-E-L-T-Z.

24    Q.  And if you can keep your voice up, we would appreciate it.

25               Where do you currently reside?

1   A.   In London, in the United Kingdom.

2   Q.   How are you currently employed?

3   A.   I'm a police officer with the Metropolitan Police Service.

4   Q.   In London, you said?

5   A.   Yes.

6   Q.   What is your title there?

7   A.   Detective constable.

8   Q.   How long have you worked for the Metropolitan Police Service

9   in London?

10  A.   25 years.

11  Q.   And during those 25 years, have you obtained extensive

12  experience conducting interviews?

13  A.   I have.

14  Q.   I want to direct your attention to the date of May 7th,

15  2009.  Did you interview someone on that date?

16  A.   I did.

17  Q.   Who?

18  A.   El Shafee Elsheikh.

19  Q.   Do you see El Shafee Elsheikh in the courtroom here today?

20  A.   I do, yes.

21  Q.   Can you identify that person?

22  A.   I can.  The man in the blue shirt.

23           MR. PAREKH:  Your Honor, may the record reflect an

24  in-court identification of the defendant, El Shafee Elsheikh.

25           THE COURT:  So ordered.  Next question.

1    Q.  Did you know where El Shafee Elsheikh was living in 2009?

2    A.  I did.

3    Q.  Where?

4    A.  9A Abbey Road, in London, in the UK.

5    Q.  Where did you interview him?

6    A.  At Chelsea police station.

7    Q.  Is that also in London?

8    A.  It is.

9    Q.  Did you learn his date of birth?

10   A.  I did.

11   Q.  What is it?

12   A.  It's the 16th of July, 1988.

13   Q.  Did he tell you his brother's name?

14   A.  He did.  Khalid Elsheikh.

15   Q.  Was the May 7, 2009, interview that you conducted with

16   Elsheikh recorded?

17   A.  It was, yes.

18   Q.  Was a copy of that interview made for senior forensic audio

19   specialist Anna Bartle?

20   A.  Yes, it was.

21   Q.  Did Anna Bartle pass a copy of your interview recording to

22   Dr. Richard Rhodes?

23   A.  Yes, she did.

24   Q.  Have you listened to your May 7, 2009, recorded interview

25   with El Shafee Elsheikh?

1   A.  I have.

2   Q.  And have you listened to a voice sample of that same

3   interview with El Shafee Elsheikh that Dr. Richard Rhodes made

4   for purposes of a forensic voice comparison?

5   A.  Yes, I have.

6   Q.  Please turn to Exhibit 24-6A.

7   A.  Can you just repeat the reference number, please?

8   Q.  Yes.  It's 24-6A.

9           THE COURT:  Mr. Parekh, I can't resist this.  Your

10   three minutes expired.

11          MR. PAREKH:  You know, you're very correct to call me

12   out on that, Your Honor, but maybe if we can deduct the time for

13   the binder, I may be able to make it.

14          THE COURT:  One of the first things I learned from a

15   very senior litigator, don't ever tell a judge how much time you

16   have left with precision.

17          MR. PAREKH:  You're right, Your Honor.

18          THE COURT:  It will never happen, and the judge -- most

19   judges are mean and they won't forget it.

20          MR. PAREKH:  Your Honor, I learned that in your

21   courtroom years ago, and that's why I qualified it by saying, "I

22   hope."

23          THE COURT:  All right.

24          MR. PAREKH:  Hope springs eternal.

25   Q.  Do you see 24-6A?

1    A.  Yes, I do.

2    Q.  Have you listened to that?

3    A.  Yes, I have.

4    Q.  Did you sign that disc?

5    A.  I did.

6    Q.  And is it a voice sample of Elsheikh from your May 7th,

7    2009, interview with him?

8    A.  Yes, it is.

9         MR. PAREKH:  Move to admit 24-6A.

10        MR. DEUBLER:  I think it's already in evidence, but no

11   objection.

12        THE COURT:  It's admitted.  I believe you're correct,

13   Mr. Deubler.  Let me check.

14        COURTROOM CLERK:  Yes, Judge.

15        THE COURT:  It's already in evidence.

16        Next question.

17        MR. PAREKH:  Deduct the time from that, and I'm

18   finished now.  Thank you, Your Honor.

19        THE COURT:  Any cross-examination?

20        MR. ELLIS:  Just briefly, Your Honor.

21            **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

22   **BY MR. ELLIS:**

23   Q.  Detective, what type of recording device did you use?

24   A.  It was audio tapes.

25        THE COURT:  This is a violation of a rule.  I'm going

1    to permit it, don't worry about it.  But I told you-all at the

2    outset, the lawyer who objects is the lawyer who gets to do

3    something on the witness, not anyone else.  But go ahead.  But

4    don't violate the rule in the future.

5              MR. ELLIS:  Yes, sir.

6    BY MR. ELLIS:

7    Q.  Full-sized audiocassette, mini audio cassette?

8    A.  Normal size.

9    Q.  And did you use a microphone?

10   A.  Yes.

11   Q.  And what was the distance of the microphone to Mr. Elsheikh?

12   A.  It's a small room, and the microphones are on the walls.

13   Q.  Okay.  So can you give the approximate size of the room?

14   A.  I would say from that chair to over here (indicating).

15   Q.  Okay.

16             MR. ELLIS: So the witness is saying about 10 meters.

17   A.  Yeah, about 10 meters.

18             THE COURT:  No, not 10 meters.  That's 30 feet.

19             Tell me again what the distance is.  From where to

20   where?

21             THE WITNESS:  So I would say from your box maybe to the

22   end of that lady --

23             THE COURT:  What box?

24             THE WITNESS:  Where that gentleman stands.

25             THE COURT:  Yes.  To where?

1            THE WITNESS:  To where this lady sits, is about the

2      size of the room.

3            THE COURT:  That's more on the order of 15 to 20 feet,

4      not 30 feet.

5            MR. ELLIS:  Very well, Your Honor.

6      BY MR. ELLIS:

7      Q.  And at the time you did the interview, you were in -- was it

8      a soundproof room?

9      A.  I can't say for sure it's soundproof, but I was able to

10     clearly hear what Mr. Elsheikh was saying.

11     Q.  And during your interview, do you know if Mr. Elsheikh was

12     upset, emotionally?

13     A.  No, he was fit for interview.  He was more than happy to

14     answer my questions.

15     Q.  So he wasn't angry?

16     A.  No.

17     Q.  Do you know if he was sick or ill?

18     A.  He was not sick or ill.  He was fit to be detained and to be

19     interviewed.

20     Q.  And did you guys talk about any of that, his physical

21     condition at the time?

22     A.  Yes.  When he's booked in, the sergeant asks him a number of

23     questions about whether or not he's fit to be at the police

24     station.

25     Q.  And, again, that date was May of 2009?

```
1    A.  7th of May 2009.

2             MR. ELLIS:  That's all I have, Your Honor.  Thank you.

3             THE COURT:  Any redirect?

4             MR. PAREKH:  I'm out of time, Your Honor.  No, no

5    redirect.

6             THE COURT:  Good answer.  Thank you, you may step down,

7    Constable.  I guess Detective is more correct.

8             THE WITNESS:  Detective Constable.

9             THE COURT:  You're excused.

10            MR. FITZPATRICK:  The government's next witness is

11   Richard Rhodes.

12            THE COURT:  So this will take a while?

13            MR. FITZPATRICK:  It will, Your Honor.

14            THE COURT:  We'll recess for lunch at the time.  Let me

15   confirm that your lunches are here.  And we will -- how long do

16   you think this witness will take on direct examination?

17            MR. FITZPATRICK:  On direct examination, Your Honor, an

18   hour to an hour and 15 minutes, max.

19            THE COURT:  All right.  Remember to refrain from

20   discussing the matter among yourselves or with anyone, or

21   undertaking any investigation on your own.  And I hope you will

22   enjoy the lunches that you've ordered, and we'll reconvene at,

23   let's make it 1 o'clock.  You may follow the court security

24   officer out.

25            (Jury out at 12:03 p.m.)
```

```
 1              THE COURT:  Court stands in recess until 1 o'clock.
 2              MR. ELLIS:  Your Honor, I just wanted to notify the
 3    Court that we are going to request to briefly voir dire
 4    Dr. Rhodes.  I believe he's going to be offered as an expert
 5    witness, so I wanted to notify the Court about that.
 6              THE COURT:  You can do it by cross-examination.
 7              MR. ELLIS:  Our objection is to his qualifications --
 8              THE COURT:  Have you submitted anything in writing?
 9              MR. ELLIS:  No, sir.  We're going to object when he's
10    offered as an expert.
11              THE COURT:  I will tell you, then, as I'll tell you
12    now, your objection as to his competency as an expert, you may
13    do it on cross-examination.
14              MR. ELLIS:  It's actually to the reliability of his
15    methods, Your Honor.
16              THE COURT:  I will repeat it one more time.  You may do
17    it by way of cross-examination.  Court stands in recess.
18              (Recess taken at 12:04 p.m.)
19              THE COURT:  To begin with, Mr. Fitzpatrick handed
20    something to the deputy -- be seated just for a moment.
21              You handed something to the deputy clerk to be brought
22    in to me.  I don't allow that, and I think it's now been
23    returned to you.  Is that right?
24              COURTROOM CLERK:  Yes, Judge.
25              THE COURT:  It was a case or something.  But I don't
```

1    like doing things that way.  Please don't do things that way,

2    because I don't know whether copies have been given to defense

3    counsel or anything of that sort.  Probably so, but I don't know

4    that; and, therefore, I could be receiving an *ex parte*

5    communication, which I do what I can to prevent.  I don't accept

6    those.

7          Now, second point, I think it's Mr. Ellis, isn't it,

8    who's going to do the Rhodes?

9          MR. ELLIS:  Yes, sir.

10          THE COURT:  And Mr. Ellis asked for an opportunity to

11    voir dire Mr. -- Professor Rhodes, whatever he is.  And I

12    indicated I didn't want that to happen, or I wasn't going to

13    allow that to happen.

14          And I thought I would add something to that.  Many

15    years ago, maybe as many as 40 or 50, I was a lecturer in NITA,

16    National Institute of Trial Advocacy.  I don't even know if they

17    still exist.  Does that still exist?

18          Well, Mr. Ellis says it does.  I'm pleased to hear

19    that.  And I gave lectures and classes at various places.

20    University of Texas is one I can remember; I don't remember many

21    others.  I don't think anywhere in Virginia then.

22          But one of the things I always advocated and told

23    lawyers -- these were trial advocacy lectures for young to

24    middle-level litigators to prepare them or enhance their

25    litigating skills.  And typically I advocated to these people

1    that whenever you have an expert who's going to testify in

2    opposition to your side, always ask, as Mr. Ellis did, for an

3    opportunity to voir dire the expert before he testifies.  The

4    reason I advocated it for these lawyers was, look, you need to

5    get before the jury as much of your stuff, your position, your

6    dirt on the guy, before he testifies.  It diminishes the impact

7    of his testimony.  Well, of course, that's not really

8    legitimate, but I was an advocate then.

9           In any event, it occurred to me, as I was reminiscing

10   about this, that I don't know as much about this particular

11   circumstance as I thought I did.  I know that the government has

12   provided the defendants with reports on this testimony, and a CD

13   about what opinions he's going to offer so I can make some

14   assessment about that when I attach it to -- or when I consider

15   it together with the credentials and experience.

16          I've now reviewed that material.  And the reason for

17   this, Mr. Ellis, is I typically do allow voir dire in advance

18   when there's a reasonable probability that the testimony may not

19   be admitted as expert testimony.  And I do so in those

20   circumstances because I don't want the bell to be rung before I

21   can unring it, if you know what I mean.  In other words, if I

22   have the jury hear expert testimony that I later determine is

23   not admissible for some reason or other, the bell is hard to

24   unring.  It can be, but it's still difficult to do.

25          So let me get a better handle on this.

1    Mr. Fitzpatrick, what opinions, in summary, is this witness to

2    offer?

3             MR. FITZPATRICK:  Well, Your Honor, the direct

4    examination, once we lay out his qualifications and his

5    experience and background, will be focused on with three

6    Telegram voice messages that he sent to his brother in July of

7    2014.  Those have been previously admitted through --

8             THE COURT:  Refresh my recollection.

9             MR. FITZPATRICK:  -- witness Matthew Hamilton.  It was

10    the PowerPoint presentation.

11            THE COURT:  Yes, but tell me what the messages were.

12            MR. FITZPATRICK:  The messages -- there were three

13    messages, approximately a minute or less each.  And he explains

14    that he is in Syria, and in part that the brothers had had a

15    successful fight regarding Syrian Army Division 17.  And he

16    makes references to heads on spikes and things like that.

17            THE COURT:  So he will testify that it's his opinion

18    that what?

19            MR. FITZPATRICK:  His opinion is that the speaker on

20    those three recording is very strongly associated with

21    El Shafee Elsheikh, the known voice recording.  So it concludes

22    that -- the first conclusion is that the three clips, the three

23    messages, are the same person; and then the second conclusion is

24    that those are very strongly associated with El Shafee Elsheikh.

25            And that's reflected, Your Honor, in

1    Government's Exhibit 24-6, his report.

2              THE COURT:  Yes, I have that in front of me.  These

3    messages are telephonic?

4              MR. FITZPATRICK:  Telegram.  It's a messaging app.  So

5    the defendants created voice messages that he then sent via a

6    messaging app to his brother.  They were recovered during the

7    search warrant.

8              THE COURT:  So when the brother hears it, it's the

9    voice?

10             MR. FITZPATRICK:  Correct.

11             THE COURT:  All right.  And so his opinion is going to

12   be that those messages came from the defendant?

13             MR. FITZPATRICK:  Yes.  That the speaker on those three

14   messages matches that of the defendant.

15             THE COURT:  All right.  Any other opinions he's going

16   to give?

17             MR. FITZPATRICK:  Your Honor, there is a second part to

18   his testimony.  If we resolve his expert qualifications and if

19   the Court receives him as an expert, the second part of his

20   testimony, which is the voluminous part of his testimony, I

21   anticipate will be stipulated to and, at the appropriate time,

22   will offer that up the Court.  And that will involve the

23   Mohammed Emwazi voice identification in all of the beheading

24   videos.

25             THE COURT:  All right.  Now, I think that puts some

1    flesh on the bones and helps me understand it.

2            Mr. Ellis, do I understand your objection to go to his

3    competency to make that comparison?

4            MR. ELLIS:  No, sir.  It's to his methodology.  We have

5    been unable to find any empirical studies which validate the

6    methodology that he uses, or shows that it has any proficiency

7    to do what he says it can do.  So it's mainly towards that

8    subject.

9            THE COURT:  Mr. Ellis, wouldn't that really go to

10   whether the jury would accept his expert opinion?  Not to his

11   qualifications to reach an opinion, but rather to the weight or

12   effect or believability of the opinion?

13           MR. ELLIS:  That may also be true, Your Honor.  But I

14   believe under *Daubert* and its progeny, the Court must make a

15   finding on relevancy, which this is obviously relevant

16   testimony, but also on reliability as a precondition to the jury

17   hearing such testimony.

18           THE COURT:  And why is it you don't think it's

19   reliable?

20           MR. ELLIS:  Well, Your Honor, I'm unable to find any

21   cases in the entire federal judiciary in the last 10 to 15 years

22   that accepted this type of expert.

23           THE COURT:  Have you found any rejected that it?

24           MR. ELLIS:  Your Honor, there's one case out of the

25   Southern District of New York, they had a lengthy *Daubert*

1    hearing, but then a plea agreement was reached, so there's no

2    decision on that.

3            THE COURT:  All right.

4            MR. ELLIS:  So, no, to answer the Court's question.

5            But I'm also unable to find any studies that show that

6    these methods can be used with a proficiency that's more than

7    just a coin flip.

8            THE COURT:  That's more than just a what?

9            MR. ELLIS:  A coin flip, Your Honor, a random

10   conclusion.

11           THE COURT:  Mr. Fitzpatrick?

12           MR. FITZPATRICK:  I anticipate that the witness'

13   examination, he'll get into significant detail about his

14   methodology, and his background and experience using that

15   methodology.  This is the accepted methodology that he --

16   methodology that he uses, and is the accepted methodology used

17   around the world --

18           THE COURT:  I see that he's a Brit.

19           MR. FITZPATRICK:  Yes, he's a British subject.

20           THE COURT:  His degrees are from Britain, but I take it

21   the science crosses borders.

22           MR. FITZPATRICK:  Science is science, Your Honor, yes.

23           THE COURT:  I think Mr. Ellis is correct that I should

24   make that determination.  But I think I can save time if I have

25   you elicit from him what he did, why he thinks it's valid, and

1    why he thinks it's reliable.  And then I can ask Mr. Ellis if,

2    in light of everything he's heard, does he still want to

3    cross-examine him.  And I'll consider it at that point.  We do

4    that on the earphones because the jury will be here.  But that

5    will save time and it will move things forward.

6            So bottom line, Mr. Ellis, I understood fully one

7    reason why you might want to do it, but that's not a valid

8    reason.  The real valid reason that you would want to do it is

9    because it may exclude the testimony altogether if the Court as

10   gatekeeper doesn't allow the evidence under *Daubert*.  I don't

11   want to have a full *Daubert* hearing.  We're in the middle of a

12   trial with a jury seated and typically we can do this in the

13   fashion I've indicated.

14           I'll have you call your witness; you may elicit,

15   Mr. Fitzpatrick, his statement of what he did, why he did it,

16   why he thinks it's reliable, and what, if anything, the state of

17   the art says about the reliability and validity of what he's

18   done.

19           And then we will pick up the earphones, Mr. Ellis, and

20   you can tell me whether you want to cross-examine then or wait

21   until he's done with his testimony.

22           MR. FITZPATRICK:  Thank you, Your Honor.

23           THE COURT:  All right.  Anything further as a

24   preliminary matter?  Do I need to see this whatever it is you

25   handed to Ms. Randall?

 1            MR. FITZPATRICK:  We've shared it.  We alerted the

 2    defense, we shared it with the defense.  If the Court pleases, I

 3    can hand up another copy.

 4            THE COURT:  What is it?

 5            MR. FITZPATRICK:  It's a case from 2021 that addresses

 6    the issue, which the Court just reminded us, is the gatekeeper

 7    function for accepting expert testimony.  But it reiterated the

 8    point that the Court should make findings of fact regarding the

 9    reliability of the expert's qualifications and methodology.

10            THE COURT:  But I can do that when you've done, and if

11    he has anything before you elicit the testimony.

12            MR. FITZPATRICK:  Correct.  Correct.

13            THE COURT:  All right.  Let's proceed in that fashion.

14    Let's bring the jury in.

15            MR. FITZPATRICK:  The last housekeeping matter,

16    Your Honor, we had told the Court we would be done with four

17    witnesses.  We actually have our next two witnesses available.

18    So if the Court pleases, we can go on to Witness Mulla and

19    Witness Driscoll if the Court has time.

20            THE COURT:  All right.  Can you do those right now

21    before you do Rhodes?  Or you prefer to do Rhodes first?

22            MR. FITZPATRICK:  Prefer to do Rhodes now.  Mulla will

23    be a lengthy witness; Driscoll not so much.  But our preferred

24    order is Rhodes, Mulla, Driscoll.

25            THE COURT:  And, Ms. Cook, those are your witnesses.

1    Is that correct?

2              MS. COOK:  That's correct, Your Honor.

3              THE COURT:  All right.  Now, you understand,

4    Mr. Fitzpatrick, that you're going to elicit everything you

5    would elicit that establishes qualifications and competence as

6    an expert in a particular field that you'll articulate.  And

7    then I'll deal with any findings I have to make on the

8    earphones.  And you can hand that case up here if you wish.  I

9    have it.

10             Just for future reference, in criminal cases, *Daubert*

11   issues ought to be raised pretrial.  It's very clumsy and --

12             MR. ELLIS:  I understand, Your Honor.  It in part had

13   to do with funding, and the timing of our funding.

14             THE COURT:  Timing of your what?

15             MR. ELLIS:  Of our funding being approved.

16             THE COURT:  All right.

17             (Jury in at 1:22 p.m.)

18             THE COURT:  Mr. Fitzpatrick, you may call your next

19   witness, please.

20             MR. FITZPATRICK:  Thank you, Your Honor.  The

21   United States calls Richard Rhodes.

22             THE COURT:  Come forward and take the oath, please,

23   sir.

24             (Oath administered by courtroom deputy clerk.)

25             THE COURT:  All right.  You may proceed,

1    Mr. Fitzpatrick.

2            MR. FITZPATRICK:  Thank you, Your Honor.

3        **(DR. RICHARD WILLIAM RHODES, having been duly sworn,**

4                **testified as follows:)**

5            **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

6    **BY MR. FITZPATRICK:**

7    Q.  Good afternoon, sir.  I'm going to be asking you a series of

8    questions.  There's a microphone in front of you.  Please don't

9    place anything on the microphone, and please pull up so the

10   microphone can catch your responses.  Do you understand that?

11   A.  Yes.

12   Q.  Please state your name.

13   A.  It's Dr. Richard William Rhodes.

14   Q.  And please spell your last name.

15   A.  It's R-H-O-D-E-S.

16   Q.  Sir, what is your occupation?

17   A.  I'm a senior forensic consultant at JP French Associates,

18   which is a forensic speech and acoustics laboratory based in the

19   UK.

20   Q.  Can you explain the nature of your work?

21            THE COURT:  He wasn't done.

22            THE WITNESS:  Pardon?

23            THE COURT:  You weren't done.

24            THE WITNESS:  Yeah.

25   A.  And so the nature of our work is that we assist either the

1    prosecution or the defense in criminal cases where there are

2    audio recordings.

3            THE COURT:  You also teach at a university?

4            THE WITNESS:  That's correct, yes.  So the role I have

5    at the laboratory is my full-time job.  Alongside that, we have

6    a relationship with the university in the city of York which

7    involves supervising on a master's program, supervising Ph.D.

8    research, and helping to inform what they do at the university.

9    Q.  And is that all in the area of forensic speech comparison

10   and related matters?

11   A.  Yes, there are a range of tasks to do with the forensic

12   analysis of audio recordings, speech, and voices.  The main work

13   that I carry out is comparing voices in different recordings.

14   Q.  And is that the nature of forensic speech comparison?

15   A.  Yes.  The purpose of a speaker comparison or a voice

16   comparison is really to assess the strength of evidence that

17   different speakers in different recordings are either the same

18   person or different people.  So it's to analyze voices to see

19   whether they're similar or different, and to assess the strength

20   of that evidence.

21   Q.  And you previously testified that you're an independent

22   organization.  Is that correct?

23   A.  That's correct.  Yes, we receive instructions from police

24   forces, from lawyers who are engaged for the defense, and we're

25   independent of any police force or legal firm.  So we highly

 1    value our own independence and objectivity.

 2    Q.  Have you performed some contractual work on behalf -- with

 3    the London Metropolitan Police Services in a matter called

 4    Operation Comparatist?

 5    A.  Yes, that's correct.

 6    Q.  And did you perform this work in conjunction with

 7    Professor Peter French?

 8    A.  Yes, that's also correct.

 9    Q.  Describe the working relationship with

10    Professor Peter French on Operation Comparatist.

11    A.  Yes, we worked on the recordings, and first independently,

12    but then together.  And Peter French is chairman of the

13    laboratory that I work for, and he was the most senior analyst,

14    so at the time he authored the reports we produced in that case.

15    Q.  And when did you begin your work with JP French and

16    Associates [sic]?

17    A.  I've worked there since 2012.  And previous to that, I was

18    at University of York carrying out a higher education for a

19    master's and a Ph.D. degree.

20    Q.  Dr. Rhodes, I would like you to turn to government

21    Exhibit 24-1.  24-1, is that a report prepared by you on

22    October 20th of the year 2020?

23    A.  Yes.

24    Q.  And is your CV or curriculum vitae attached to that report?

25    A.  It is, yes.

1    Q.  Can you turn to page 5.

2         MR. FITZPATRICK:  Permission to publish his curriculum

3    vitae.

4         THE COURT:  24 dash what?

5         MR. FITZPATRICK:  It's 24-1.

6         THE COURT:  You may do so.

7         MR. FITZPATRICK:  Thank you.

8         Just page 5, Ms. Lopez.

9         THE COURT:  Well, I'm admitting all of 24-1.  You may

10   publish as many or as few pages as you wish.

11        MR. FITZPATRICK:  Thank you, Your Honor.

12        (Government EXHIBIT Number 24-1 was admitted into

13   evidence.)

14        MR. FITZPATRICK:  The next page, please.

15   Q.  Do you see on the screen there, Dr. Rhodes, is that the

16   first page of your CV?

17   A.  Yes.

18   Q.  And can you please describe, for the benefit of the jury,

19   your educational background in the field of forensic speaker

20   comparison.

21   A.  Yes.  I have an undergraduate bachelor's degree with

22   first-class honors in applied English language studies, and I

23   have two postgraduate degrees which are specific to the field of

24   forensic speech science.  And that's a master of science degree

25   and a Ph.D. degree, so a doctorate, and they're both from the

1    University of York.

2    Q.  And when were you granted your Ph.D.?

3    A.  It was finished in 2012, and it was -- I was awarded it in

4    2013.

5    Q.  Were you working with JP French and Associates while your

6    Ph.D. was pending and being granted?

7    A.  Yes, that's correct.

8    Q.  Describe the -- the judge asked you earlier about some of

9    your teaching responsibilities.  Do you teach in the area of

10   forensic speaker comparison?

11   A.  Yes.  So the reason you keep hearing about the

12   University of York is that it's a specialist center for teaching

13   and research in the forensic analysis of speech.  As part of

14   that, it runs a master's degree course, and there are a number

15   of research projects that happen there with Ph.D. students who

16   work on those.

17        So within that center, we give lectures and also

18   supervise research of those students.

19   Q.  And, sir, have you published in the subject matter of

20   forensic speaker comparison?

21   A.  I have, yes.

22   Q.  Can you please explain some of your publications.

23   A.  Yes.  So these are publications which appear in

24   peer-reviewed journals.  What that means is that other people in

25   the field have assessed those articles and have concluded that

120

1    they were suitable.  I've published on my Ph.D. research, which

2    is about the aging voice and the impact that has on forensic

3    analysis, I've published on how we assess forensic speaker

4    comparison analysis, and I also have a chapter that's

5    forthcoming in a handbook, which is an overall textbook about

6    forensic speech analysis.  And that chapter is on guidance for

7    practitioners who work in this area.

8    Q.  Dr. Rhodes, at the bottom of the first page of your CV under

9    "Publications," the middle publication from *Science & Justice*,

10   the journal, can you read that into the record, please?

11   A.  Yes.  So the two authors are myself and my colleague from

12   the university, Vincent Hughes.  That was published in 2018.

13   And the title is, "Questions, Propositions, and Assessing

14   Different Levels of Evidence:  Forensic Voice Comparison in

15   Practice."

16   Q.  And what is the citation for that?

17   A.  It's from a journal called *Science & Justice*, and it's

18   Edition 58, Issue 4 of that journal.  And that's a general

19   journal which publishes about a range of different forensic

20   science activities.

21   Q.  Sir, are you also a member of different professional

22   organizations in the field of forensic speaker comparison?

23   A.  Yes.

24   Q.  And how many in total are you a member of?

25   A.  I'm a member of a number of organizations.

1   Q.  Can you name for us the prominent organizations?

2   A.  Yes.

3   Q.  Let's say the top two or three.

4   A.  Yeah, so the two most important would be the International

5   Association for Forensic Phonetics and Acoustics, or to use the

6   short name, IAFPA.  And that's an international association for

7   people who work in this field.  And as well as being a

8   professional member of that organization, I'm also the chair of

9   that organization.

10          And the other would be the Chartered Society of

11  Forensic Sciences, which is a UK-based association which covers

12  a whole range of different forensic disciplines.

13  Q.  And what is the role of these professional organizations

14  within the field of forensic speaker comparison?

15  A.  So the role of these organizations primarily is to bring

16  together researchers and practitioners from different countries

17  and different organizations.  And the organization organizes an

18  annual conference where people present their research and

19  their -- and what they do in case work practice, and it also

20  publishes a journal.  And this shares research methods, case

21  work methods between different practitioners.

22  Q.  Is there a standard within the professional organizations

23  that you belong to regarding impartiality with respect to your

24  work?

25  A.  Yes.  And it's in that IAFPA organization's code of

1    practice, and really it's the central principle in almost any

2    guidance for a forensic scientist; that their number one duty is

3    to the court rather than to the party who instructs them.  And

4    so objectivity is really the number one duty of an expert.

5    Q.  And does that duty of impartiality, is that reflected in the

6    reports that you prepare for the Metropolitan Police Services?

7    A.  Yes.  So although we are instructed by the police service in

8    this case, we always give fair and balanced consideration to the

9    evidence, which includes looking for other explanations for the

10   evidence that we find other than the one the police provide us

11   with.

12   Q.  And, Dr. Rhodes, have you testified previously in crime

13   courts within the United Kingdom in the field of forensic

14   speaker comparison?

15   A.  Yes, I have.

16   Q.  Approximately how many times?

17   A.  So I have worked on around a thousand cases; I would

18   estimate more than half of those to be to do with forensic

19   speaker comparison.  I was the primary author of 550 to 600 of

20   those reports.  So some of that work I was part of the team that

21   worked on it, and some of that work I was the sole author.  And

22   I've testified in court about those reports 19 times in

23   19 different cases.

24   Q.  With respect to the methodology that you use to complete a

25   forensic speaker analysis, can you explain that beginning with

1    the number of steps or the framework that you use?

2    A.  Yes.  So I suppose the first part of the method that we use

3    is actually to assess whether the samples we're provided with

4    are suitable for analysis.  So I would call that a suitability

5    assessment or an adequacy assessment.

6            Once we've decided that they are suitable, we'll

7    proceed to analysis.  And the method of analysis we use is

8    called "auditory and acoustic phonetic analysis."  I'll break it

9    down, because I'm aware that most people aren't aware of those

10   terms.

11           So phonetics is the study of voices and the sounds of

12   speech.  So essentially we're using methods from the established

13   field of phonetics to analyze voices.  We're doing that in two

14   main ways.  The first is auditory listening, so it's critically

15   listening to different elements of people's voices, how they

16   pronounce different sounds, what's the internation used by the

17   speaker, what's the rhythm or the tempo of the speech.  And it's

18   not listening in the way you're listening to me now, it's in a

19   very analytical way, where we break voices down into smaller

20   component parts.  We measure those or assign them to different

21   categories based on established methods and speech analysis, and

22   we compare them.

23           At the same time as listening, we also carry out what's

24   called "acoustic analysis."  Now, that means making direct

25   measurements of different sound frequencies from recordings.

1    The reason that we do this is that different people produce

2    different sound frequencies when they speak.  So these methods

3    or these measurements can be used to assist in determining

4    whether it's the same person talking.

5              And the reason why that method works is because

6    people's biology, their physiology, the shape of their mouth,

7    the shape of their throat is different, and people also behave

8    in different ways when they're speaking.  So those acoustic

9    measurements reflect both biology and behavior.

10   Q.  And the acoustic measurements that you've just described,

11   can you explain how that's done?

12   A.  Yes.  We make those measurements in specialized computer

13   software that's been specifically designed for analyzing speech.

14   And the software that we use produces visualizations on the

15   screen of the sound, and also allows us to take measurements of

16   specific areas of different sounds.  So that might be the key

17   frequencies in a vowel sound or it might be how long a certain

18   consonant lasts, for example.

19   Q.  Is another term --

20             THE COURT:  Your voice kind of gets quieter when you

21   finish a sentence.  Would you do us a favor and keep it up

22   throughout?

23             THE WITNESS:  Of course.

24             THE COURT:  Thank you.

25             Next question.

1  BY MR. FITZPATRICK:

2  Q.  Is another term used for the acoustic computer-based

3  analysis you described, is that instrumental?

4  A.  That could be one way to describe it.  And that would simply

5  mean using an instrument, for example, a piece of equipment or a

6  piece of software, yes.

7  Q.  Can you explain to the Court and to the jury how the two

8  steps, for lack of a better word - the auditory basis and then

9  the instrumental or computer basis - can you explain how they

10  work together to form a conclusion?

11  A.  The two methods aren't used completely separately.  So for

12  most of the different aspects of the voice that we're looking

13  at, we use the two in tandem.  So normally what we can hear is

14  corroborated by what we can measure and vice versa.  There are

15  some different features of the voice which are only apparent

16  from either listening or measuring, but for most features, we

17  use both methods together and they help to corroborate each

18  other.

19  Q.  And the methodology that you've just explained, is this the

20  consistent protocol within the field of forensic speaker

21  comparison?

22  A.  Yes, it is.  It's a standard procedure which we would

23  operate in the same way across different cases.  This work was

24  carried out in the United Kingdom.  This method is the only

25  method in use for evidentiary purposes in the United Kingdom,

1     and it's the most prevalent method, the most predominant one

2     used across the world used by expert practitioners.

3     Q.  Is this methodology independent of any particular

4     investigation you've been assigned to or contracted to work on?

5     A.  There is a standard method which we would employ in cases.

6     I suppose we would always assess, in a particular investigation

7     or case, whether it's an appropriate method to use and whether

8     the samples are suitable for that method.

9     Q.  In other words, you didn't create this methodology for the

10    sole purpose of working on this case, did you?

11    A.  No.  It's been in existence for, I would say, 25 to

12    30 years.  It's not an ad hoc method that we've invented, it's a

13    standard one that's been used and that's established in the

14    field.

15    Q.  And does this methodology sort of grow naturally or directly

16    out of your academic research?

17    A.  Well, the method itself is something which is standardized

18    and in existence outside of any particular research that I've

19    carried out.  And it's employed in this case because it's the

20    appropriate way to answer the question being posed by the police

21    force in the case.

22    Q.  You testified that this methodology is the only accepted

23    methodology within the United Kingdom.  Can you comment on its

24    use in other countries throughout the world?

25    A.  I can because there are three quite widespread surveys of

127

1    both experts and who work independently like I do, or for

2    government labs, and those who work for law enforcement agencies

3    across the world.  These were carried out across the last

4    decade, and they show responses from between something like 36

5    to 45 different agencies who carry out voice comparison work.

6          And across those who responded, this method was the

7    most widely used method.

8    Q.  Are you familiar with another methodology of forensic

9    speaker comparison, or voice identification, called "voice

10   printing"?

11   A.  I am, yes.

12   Q.  And is voice printing an acceptable methodology for forensic

13   speaker comparison?

14   A.  I wouldn't consider that it is.  It wouldn't be accepted, I

15   don't think, in the United Kingdom.  And the organization which

16   I'm a member and chair of actually has a direct resolution which

17   recommends that this method is neither analytical nor based on

18   any solid scientific foundation, and it shouldn't be used for

19   this purpose.

20         MR. FITZPATRICK:  Your Honor, at this time I would

21   offer Dr. Richard Rhodes as an expert in forensic speaker

22   comparison.

23         THE COURT:  Just a moment.  Is this methodology that

24   you have described generally accepted, you say, in the

25   United Kingdom?

 1              THE WITNESS:  Yes.

 2              THE COURT:  And you know that why?

 3              THE WITNESS:  Because of the results of this particular

 4     survey, of all the practitioners in the United Kingdom, and

 5     because through this organization I have professional contact

 6     with other experts who operate in the United Kingdom, and I'm

 7     aware of the methods that they use.

 8              THE COURT:  Have you previously testified in courts in

 9     the United Kingdom using this methodology, and have it admitted

10     in evidence?

11              THE WITNESS:  Yes.

12              THE COURT:  What about the United States?

13              THE WITNESS:  I personally haven't testified in the

14     United States before.  Our laboratory has, but not on forensic

15     speaker comparison.  And I have to admit a slight gap in my

16     knowledge of the law across the many states of the U.S. and how

17     this evidence has been admitted.

18              I do know that some of the respondents to this survey

19     are based in North America, and this is the method that they

20     use.

21              THE COURT:  Well, you list in your CV a number of

22     publications.  So I take it you're familiar with publications

23     that would cover this methodology that are issued in the

24     United States?  Because they're not all European or British

25     publications.  Right?

1          THE WITNESS:  I would expect to be familiar with some

2     of them.

3          THE COURT:  I beg your pardon?

4          THE WITNESS:  I would expect to be familiar with some

5     of them.  I wouldn't expect to know every publication about

6     voice comparison methodology.

7          THE COURT:  Well, what I'm asking is:  What, if

8     anything, can you tell us about voice comparison methodology and

9     the state of the art in the United States?

10         THE WITNESS:  I know in the past there has been some

11    controversy about the use of this voice print identification

12    method which we mentioned earlier, and in some cases that has

13    not been admitted.  I wouldn't know much about the method that

14    I've described and in which states or in which types of trial

15    it's been admitted before.

16         THE COURT:  All right.  Put the earphones on, please.

17         (BENCH CONFERENCE ON THE RECORD.)

18         THE COURT:  All right.  Mr. Fitzpatrick, can you hear

19    me?

20         MR. FITZPATRICK:  Yes, sir.

21         THE COURT:  Mr. Ellis, can you hear me?

22         MR. ELLIS:  Yes, sir.

23         THE COURT:  All right.  I think we've heard some

24    testimony now about the methodology that this particular witness

25    has used in this case.  Am I right, Mr. Fitzpatrick?

1          MR. FITZPATRICK:  Yes, Your Honor.

2          THE COURT:  All right.  And we know that there's really

3   no question about the relevancy of this.  The real question in

4   the *Daubert* analysis is reliability, as in testing, peer review,

5   literature, rates of error, and general acceptance.  We know

6   that it is generally accepted in the United Kingdom, and we know

7   that it has been used in courts there.

8          What, Mr. Fitzpatrick, do you think we can conclude

9   from this testimony about the other aspects of the *Daubert*

10  hallmarks of reliability analysis?

11         MR. FITZPATRICK:  Yes, Your Honor.  So I think he's

12  testified in sufficient detail about the two-step process, the

13  process that he undergoes to do a forensic speaker comparison.

14  The first step is the auditory basis, and he testified that they

15  break down the speech into component parts.  So they're not

16  necessarily listening for meaning, they're listening for sound,

17  consonant sounds, vowel sounds, and the like.  He breaks the

18  speech down into component parts, and then they listen in

19  repeated circumstances to the sounds and they draw conclusions

20  based on that auditory analysis.

21         The next step is they place the sound through a series

22  of instrument-based or acoustic-based analyses that are computer

23  generated, and they receive an analysis based on that.

24         The next step is that they then compare the two, and if

25  there is consistency - in other words, if 1 corroborates 2 and

1    if 2 corroborates 1 - then they are allowed to go to the next

2    step, which we'll get to later, which is drawing a conclusion.

3            So he's testified in, I would argue, explicit detail

4    about the science behind forensic speaker comparison.

5            In addition, he's testified that this is --

6            THE COURT:  Just a minute.  You just described a

7    four-step process.  Is that right?  Is it --

8            MR. FITZPATRICK:  Yes, Your Honor.  Yes.

9            THE COURT:  Did you elicit that four-step process from

10   this witness?

11           MR. FITZPATRICK:  Yes.  He did it on his own.  He said

12   suitability.  So the first step is, is the material suitable

13   enough to listen to.  That's the threshold.  Then it's auditory;

14   then it's instrument-based; and then, what we'll get to next are

15   his conclusions based on doing that examination.

16           THE COURT:  Well, what I think you should do,

17   Mr. Fitzpatrick, once more, is let's go through that.  If this

18   were a *Daubert* hearing, of course, I would do it.  I don't want

19   to excuse the jury yet again if I don't have to.

20           So let's go ahead, Mr. Fitzpatrick, and go through

21   those steps again with this witness.

22           And then, Mr. Ellis, I'll pick up the earphones and ask

23   you whether you object to his giving an expert opinion comparing

24   voices in -- that are in the record.

25           MR. ELLIS:  Yes, sir.

```
 1                    (END BENCH CONFERENCE.)
 2    BY MR. FITZPATRICK:
 3    Q.  I want to back up briefly and revisit the steps in your
 4    methodology.  Earlier in your testimony you discussed the
 5    suitability of the recordings.  Is that the first step in the
 6    process?
 7    A.  It's part of the proprietary work.  The first step in the
 8    process is actually to get the recordings themselves, to edit
 9    and extract speech from those longer, wider recordings and to a
10    sample of speech, and then as part of that first step, we would
11    be assessing the suitability of those.
12    Q.  So the editing, is it fair to say that you're extracting
13    samples of speech from a known recording or a suspect recording?
14    A.  Yes.
15    Q.  And when you do that, are you concerned with the meaning of
16    the speech?
17    A.  No, not really at all.  In fact, we're not looking at what
18    speakers are saying or what people mean when they're speaking;
19    we're simply measuring what their voice sounds like, how they
20    pronounce different -- so it's more about how they say things
21    and what they're saying.  So it's what their accent is, what
22    their voice sounds like, rather than what they mean by the words
23    in the recording.
24    Q.  And that preparatory work that you've just described, is
25    that the preparatory work that you undertook for all of your
```

1    reports regarding Operation Comparatist?

2    A.  Yes.  Some of that work, I was assisted by another colleague

3    as well.

4    Q.  And once the preparatory work is completed, is that when you

5    turn to the auditory analysis of your methodology?

6    A.  Yes.

7    Q.  And then following auditory is the instrumental or the

8    acoustic analysis.  Is that the third step?

9    A.  Yes.  Although the auditory and the acoustic analysis, not

10   necessarily one after the other.  They might come at the same

11   time.  Normally we would actually be breaking the tests down to

12   different types of voice features rather than the two different

13   methods used separately.

14        So we might use both methods to assess how vowel sounds

15   are pronounced, or the pitch of the voice, or the rhythm or

16   tempo, for example.

17   Q.  And once those steps are completed, do you take it to the

18   final step, where you take it through an evaluation and draw a

19   conclusion based upon a scale that is accepted within the

20   industry?

21   A.  Yes, that's correct.

22        THE COURT:  And have you published, in peer-reviewed

23   journals, descriptions of this methodology that you've described

24   here?

25        THE WITNESS:  Yes, I've published about the

1    interpretation process and some of the analysis processes.  And

2    the method itself has appeared in published books, book

3    chapters, journal articles, and peer-reviewed conference

4    proceedings since around the late '80s and 1990s.

5            THE COURT:  All right.  Pick up your earphones, please.

6            (BENCH CONFERENCE ON THE RECORD.)

7            THE COURT:  Mr. Ellis, do you have any objections to

8    his qualifications as an expert?

9            MR. ELLIS:  Yes, sir.  Put simply, sir, there's been no

10   testimony yet regarding whether his theory has been or can be

11   tested; and, therefore, we don't know if he can actually do what

12   his method purports to do.  There's been no testimony about --

13           THE COURT:  I see your point.  He's right, isn't he,

14   Mr. Fitzpatrick?  You didn't elicit that testimony.

15           MR. FITZPATRICK:  Well --

16           THE COURT:  In other words, all Mr. Ellis is asking is

17   whether this witness can provide any evidence that the

18   methodology that he has described has been tested, and the

19   results of that.  Is there an error analysis or anything?

20           MR. FITZPATRICK:  Yes, Judge.  I can take him through

21   those questions.  I believe the answer that we may receive is

22   that he's explained the methodology and its reliability based on

23   the two-step process.  So he's gone into some detail there.

24           Now, with respect to particular testing, it's very

25   difficult to do particular testing in different circumstances.

1    But I will ask him those questions.

2         THE COURT:  Yes, it may not be feasible to do that, and

3    there may be no such evidence.  But I can still make a

4    determination, Mr. Ellis, as to whether I think it is

5    sufficiently reliable under *Daubert* to permit it.  So let's

6    proceed.

7         MR. FITZPATRICK:  Thanks.

8         (END BENCH CONFERENCE.)

9    BY MR. FITZPATRICK:

10   Q.  A few additional questions, Professor Rhodes.  With regard

11   to your standards or testing of this methodology, can you

12   explain how this --

13        THE COURT:  Just ask him directly, has the methodology

14   that you've described been tested?

15        THE WITNESS:  It has, yes.  The individual component

16   parts are routinely tested; and, more importantly, they're

17   tested to see how they respond to different conditions that come

18   up in forensic case work.

19        So not only do the methods work at differentiating

20   different speakers, but how do they respond to different

21   situations, or when speakers are more animated or raising their

22   voice in different situations, because these are the sorts of

23   issues which occur in forensic case work.

24        THE COURT:  And what, if anything, has this testing

25   that you're telling us has been made of this methodology,

1    reflected about the accuracy or rate of error or anything else

2    about this methodology that you've described?

3              THE WITNESS:  It shows that the methods work in

4    differentiating between speakers, but it also shows us that

5    voices are not like DNA, and there is no foundation for saying

6    that voices are unique to different speakers.  And this is one

7    of the reasons why we wouldn't ever give a 100 percent

8    categorical certain match on voice comparisons.

9              So what the research tells us is that it can be used as

10   supporting evidence to say, yes, there is support for these two

11   speakers being the same person, but there is no unique match.

12             THE COURT:  All right.  Anything further,

13   Mr. Fitzpatrick?

14             MR. FITZPATRICK:  No, Your Honor.

15             THE COURT:  All right.  Mr. Ellis and Mr. Fitzpatrick,

16   pick it up one further time.

17             (BENCH CONFERENCE ON THE RECORD.)

18             THE COURT:  I will ask again, Mr. Ellis, do you object

19   to his testifying -- that doesn't mean you can't attack the

20   testimony that he gives, and argue that it's not entitled to

21   weight.  But I want to know whether you think it should be

22   excluded altogether because the hallmarks of reliability aren't

23   adequately established.

24             I don't think you would argue, Mr. Ellis, that he's not

25   qualified by reason of experience or education, or that the

1    testimony he's going to give is not relevant.  What you're

2    saying is, it's not reliable?

3            MR. ELLIS:  That's correct, Your Honor.  And he didn't

4    give any information about these purported studies that he's

5    relied on that have validated his method, or any rates of error.

6            And that also applies, Your Honor, based on the case

7    that was handed up to you, the *Sardis v. Overhead Door Corp.*,

8    that also implies when he's using inferences.  The inferences,

9    the methods in coming to those conclusions, also should be

10   tested, and there should be information about their accuracy and

11   validity.

12           THE COURT:  All right.  Anything further,

13   Mr. Fitzpatrick?

14           MR. FITZPATRICK:  No, Your Honor.

15           THE COURT:  All right.  The matter is before the Court

16   on essentially a *Daubert* objection to this witness testifying

17   and giving his opinion with respect to the comparison of voices

18   on audio tapes or other tapes.  This witness clearly is

19   presented to provide relevant information, relevant opinions.

20   The question is whether it is reliable.  And he is clearly

21   qualified by reason of experience and education to give this

22   testimony.  The only question is whether the methodology that he

23   has described is adequate to pass muster under *Daubert*.

24   Typically, under *Daubert*, we look at many things, such as

25   testing, peer review, rate of error, general acceptance, and so

1    forth.

2         In my view, it is adequate to pass muster under

3    *Daubert*.  Which does not mean, however, that you are precluded

4    from attacking the weight that it should be given and its

5    accuracy.  But I'm satisfied -- and you can go into the error

6    rates if you want to.  Do whatever you wish.  But I'm satisfied

7    that there is sufficient here that *Daubert* is satisfied, and

8    that this witness can proceed to give his opinion based on the

9    methodology that he's described to compare voices.

10        All right.  Let's proceed.

11        MR. FITZPATRICK:  Your Honor, just one issue.  With the

12   Court's ruling, we've reached stipulation to a good portion of

13   Dr. Rhodes' testimony.  I would like to enter the stipulation on

14   redirect rather than at the conclusion of my direct examination,

15   to give Mr. Ellis an opportunity to cross-examine.

16        THE COURT:  That's fine.  Do as you wish.  But let's be

17   clear:  You haven't even offered his CV yet, even though I'm

18   sitting here looking at it in detail.  You need to offer all of

19   that, his CV, after he's described it.  He's described some of

20   it.  Let's go ahead, Mr. Fitzpatrick.

21        MR. FITZPATRICK:  Thank you, Your Honor.

22        (END BENCH CONFERENCE.)

23        THE COURT:  Ladies and gentlemen, the reason we do that

24   is, of course, a great deal of discussion between the judge and

25   the lawyers shouldn't be for the jury because they're arguments,

1    and they're not really part of the evidence in the case.  And

2    the only reason I do it on earphones is that I don't want to

3    excuse you and go all the way back and then come back.  As much

4    as possible and as efficiently as possible, I would like to do

5    it this way.  And the lawyers are cooperating in that regard,

6    and this device we use is helping a great deal.

7         So I give that to you by way of explanation.  In the

8    old days - and I was here in the old days - we had bench

9    conferences.  You'll see lots of movies where the judge says,

10   "Come to the bench."  I try to do that less and less,

11   particularly if I have to excuse a jury every time I do that.

12   That's not efficient.  I have done this in England as well, not

13   presided but...too many stories.

14        Go ahead, Mr. Fitzpatrick.

15        MR. FITZPATRICK:  Thank you, Your Honor.  Just so I'm

16   clear, I am offering Dr. Rhodes as an expert --

17        THE COURT:  Yes, and I'm accepting it.  And let me

18   point this out, ladies and gentlemen.  It is appropriate for me

19   to decide whether this witness can offer expert opinions on this

20   subject.  Typically witnesses can't offer their opinions unless,

21   by reason of education or experience or special training, they

22   have the ability to offer opinions that would be helpful to a

23   jury in deciding a case.

24        However, the extent to which you accept a particular

25   witness as an expert in that field, and the extent to which you

1    accept that witness' expert opinions are matters left entirely

2    up to you.  And I will give you further instructions on that as

3    well as other matters at the end of the case.

4              Proceed, Mr. Fitzpatrick.

5              MR. FITZPATRICK:  Thank you, Your Honor.

6    BY MR. FITZPATRICK:

7    Q.  Sir, if I could turn your attention back to 24-1, please, at

8    the beginning, the cover page.  Is this the report that you

9    prepared for the Metropolitan Police Services on October 20 of

10   2020?

11   A.  It is, yes.

12   Q.  And the résumé that -- or your curriculum vitae that you

13   were referring to, is this the appendix to this report?

14   A.  Yes.

15             MR. FITZPATRICK:  Move to admit government

16   Exhibit 24-1.

17             MR. ELLIS:  No objection, Your Honor.

18             THE COURT:  Admitted.  Next question.

19             (Exhibit previously admitted.)

20   Q.  With respect to that report, were you asked by the

21   Metropolitan Police Services to perform a review of the prior

22   work in Operation Comparatist that you and Professor French

23   performed?

24   A.  Yes.

25   Q.  And what were your conclusions on that review?

1    A.   The purpose of the review were really twofold.  And the

2    first was that I was to present this evidence to you today, as

3    Professor French was the original author and he subsequently

4    retired.  And the second was because there had been some passage

5    of time since the reports that we originally produced in 2014

6    and 2015.

7         So the purpose of the review was to see whether there

8    should be any further testing because of changes in any

9    regulatory standards since the first reports had been produced.

10   And, actually, the methodology used and the findings were all

11   still able to be relied upon.  And any significant changes in

12   the advice and the guidance on how we should do things, that had

13   mainly already been taken into account at the time of the

14   original reports.

15   Q.   And so did you communicate back to the Metropolitan Police

16   Services in Report 24-1 that you stood by all the prior work

17   that you had done in that case?

18   A.   Yes.  That those reports could be relied upon, and no

19   further work had to be taken -- and had to be made in order for

20   those reports to be relied upon.

21   Q.   Dr. Rhodes, do accents influence a person's ability to

22   identify a voice?

23   A.   Yes, they can.  Yes.

24   Q.   And what about, does a difference in language, the ability

25   to speak a particular language, influence a person's ability to

142

1    identifies a voice?

2    A.  Yes, it definitely can.

3    Q.  And does a person's voice change depending upon the

4    circumstances a person finds themselves in?

5    A.  Yes.  This is one of the key reasons why voice analysis is

6    different from other types of analysis such as DNA.  So the way

7    I'm speaking now is quite slow, quite methodical, and certainly

8    very different from how I would speak to my friends in a

9    restaurant or how I would speak to someone in an outdoor setting

10   while we were playing sport, for example.

11           So your voice changes day-to-day, whereas other methods

12   rely on something that's more of a fixed characteristic, like,

13   for example, the sequencing of your DNA.

14           So voices are quite flexible, they change on what

15   situation that you're in, who you're talking to, and also

16   people's emotional state as well.

17   Q.  Thank you, sir.  I would like you to now turn to government

18   Exhibit 24-6.

19   A.  Yes.

20   Q.  Do you have 24-6 in front of you?

21   A.  Yes.

22   Q.  And what's the date of 24-6?

23   A.  It's from the 25th of March 2015.

24   Q.  And did you work in the preparation of this report?

25   A.  I did, yes.

143

1   Q.  And turning your attention to the second page, what was the

2   purpose of this report?

3   A.  We were instructed by the Metropolitan Police force to

4   compare the voice that was present in three voice messages that

5   had come from the messaging app Telegram, with the voice of

6   Mr. Elsheikh.

7               MR. FITZPATRICK:  Move to admit, Your Honor, 24-6.

8               THE COURT:  All right.  It's admitted.

9               (Government EXHIBIT Number 24-6 was admitted into

10  evidence.)

11              MR. FITZPATRICK:  Thank you.  If we could publish the

12  second page, please.

13              THE COURT:  24-6?

14              MR. FITZPATRICK:  Yes, sir.

15              THE COURT:  Just a moment.  Okay, I have it now.  Go

16  ahead.

17              MR. FITZPATRICK:  Thank you, Your Honor.  If we could

18  turn to page 2 of 8, please.

19              THE COURT:  Just a moment.  The author of that report

20  was Peter French.  Is that right?

21              THE WITNESS:  That's right, yes.

22              THE COURT:  And he's retired?

23              THE WITNESS:  Yes.

24              THE COURT:  And did you work on that report?

25              THE WITNESS:  I did.  I carried out a substantial

1    amount of the analytical work, and Professor French and I

2    together agreed to the conclusion of that report.

3              THE COURT:  All right.  Proceed.

4              MR. FITZPATRICK:  Thank you.

5    BY MR. FITZPATRICK:

6    Q.  And what you just testified to, is that reflected on page 1

7    of the report?  You see your name identified there?

8    A.  Yes, that's right.

9    Q.  Thank you.  If you could now turn to page 2, under

10   "Materials Received," are the identifications -- the police

11   identifications of the material received, is that what you

12   received for this forensic speaker comparison in 24-6?

13   A.  Yes.

14   Q.  And these are the Telegram messages that you've previously

15   described and explained?

16   A.  Yes.  So these three audio recordings, each came in a folder

17   marked MJH/6, MSH/2, 3, and 4.

18   Q.  And did you also receive a known police interview recording

19   of El Shafee Elsheikh that was identified as MJF/12?

20   A.  Yes, we had that recording at the laboratory.

21   Q.  And can you explain the preparatory work for the different

22   sets of recordings?  Describe what you extracted from the

23   Telegram recordings.  Why don't you do that first?

24   A.  Yes.  So in each of the Telegram recordings, there's only

25   one speaker.  And we extracted all the speech from those

1   recordings that was in English because some of the material was

2   in a form of religious Arabic.  And speakers, obviously, when

3   they're speaking a different language, they use a different set

4   of sounds and words.  We also removed some sections that were

5   just noise and not speech.

6           So from the slightly longer recordings, we were left

7   with samples of speech from each of those messages.

8   Q.  And is that reflected on page 3 of your report, under

9   "Adequacy of Material"?

10  A.  Yes.

11  Q.  And what was the length of the three extractions that you

12  did for the three different recordings?

13  A.  So the recording from the exhibit ending 2, which was called

14  audio 14, that sample was 40 seconds long.  And the other two

15  samples from MSH/3 and 4, which were called audio 12 and audio

16  15, were 14 seconds long.

17  Q.  And did you perform an auditory review or analysis of those

18  three recordings independently?

19  A.  Yes, we did.

20  Q.  And did you identify an accent that is consistent among all

21  three recordings?

22  A.  Yes.

23  Q.  What is the accent?

24  A.  The accent could be described as multicultural London

25  English.

1    Q.  And what is that?

2    A.  So the term "multicultural" is really an umbrella term.  It

3    means accents or dialects that come about in an area where

4    speakers are from lots of different backgrounds.  So these tend

5    to be city or urban environments.  And London obviously refers

6    to the area of the largest city, the capital of England, and the

7    accent can be found in London and some of the surrounding areas

8    in the southeast of England.

9              THE COURT:  What is your accent?

10             THE WITNESS:  It's a good question.  Your Honor, my

11   accent originally started in the southeast of England, but I've

12   lived in the north of England, so I have a mixture.

13             THE COURT:  Next question.

14             MR. FITZPATRICK:  Thank you, Your Honor.

15   Q.  Your review of those three recordings, did you draw any

16   conclusions regarding the speech in those three recordings,

17   beyond identifying the accent?

18   A.  Yes.  All of the voice and speech patterns that we found in

19   those three recordings were very similar to each other.  There

20   were no significant differences between them.  And some of the

21   voice features that were found in those recordings were very

22   distinctive.  And we could analyze a range of these features,

23   because although these samples are relatively short samples of

24   speech, they were very good quality.

25   Q.  Then did you then -- well, strike that question.

```
 1              MR. FITZPATRICK:  I apologize, Your Honor.

 2    Q.  Can you describe your preparatory work for MJF/12, the known

 3    Elsheikh interview?

 4    A.  Yes, we carried out a similar editing procedure with this

 5    interview recording, and this came on an exhibit from the

 6    Metropolitan Police lab, from Anna Bartle, who works there, and

 7    she had taken what was originally a tape recording.  She had

 8    digitized that tape, checked that it was playing back at the

 9    correct speed, and started to extract some of the speech.

10              I took that recording, and I went back to the original

11    interview recording that she had made and made sure we had as

12    much analyzable and suitable speech as possible from that

13    recording.  And that amounted to a sample of two minutes and

14    two seconds in duration.

15    Q.  And if you could please take a look at government

16    Exhibit 24-6A.  There should be a disc there.  Do you recognize

17    that disc?

18    A.  Yes.

19    Q.  And how do you recognize that disc?

20    A.  You have played me the content of that disc.

21    Q.  I'm sorry?

22    A.  You've played me the content of that disc.

23    Q.  And are your initials on that?

24    A.  Yes, I've signed it.

25    Q.  And is that the two-minute-and-two-second extraction of the
```

1    Elsheikh police interview?

2    A.  It is, yes.

3    Q.  Did you then undergo an evaluation, a forensic speaker

4    comparison, of the Telegram messages with the known Elsheikh

5    police interview?

6    A.  Yes, we did.

7    Q.  And did you use the methodology that you've explained

8    previously in your testimony?

9    A.  Yes, that's the method we used.

10   Q.  And if we could then turn to -- if we could -- well, let's

11   turn to page 4 of 8, please.

12           THE COURT:  4 of 8 on what?

13           MR. FITZPATRICK:  Page 4 of 8 of 24-6.

14           THE COURT:  Next question.

15           MR. FITZPATRICK:  And if you could expand the bottom

16   section, Ms. Lopez, 5, "Results."

17   Q.  Dr. Rhodes, we'll turn to the chart that's on page 7 of 8 in

18   a moment.  But if you could explain your results when you

19   completed your forensic speaker comparison that you've just

20   described.

21   A.  Yes.  So the section on the screen here relates to the

22   comparison across the three Telegram messages.  So we put aside

23   the reference interview sample for one moment.  This describes

24   to you what I said just earlier, that there are close

25   similarities across those three Telegram messages, no

1    significant differences.

2    Q.  And if we could go to page 5.

3         THE COURT:  Just a moment.  It might help,

4    Mr. Fitzpatrick, if you made clear what's being compared to

5    what.

6         MR. FITZPATRICK:  I will, Your Honor.

7         THE COURT:  All right.

8    Q.  Can you explain, Dr. Rhodes, the comparison between the

9    known Elsheikh voice recording with the Telegram chat messages,

10   explain your results for that comparison?

11   A.  Yes.  We were able to analyze a range of different voice and

12   speech features and compare them between the interview recording

13   and the three Telegram messages.  Now, the first --

14        THE COURT:  The interview recording of Mr. Elsheikh?

15        THE WITNESS:  Mr. Elsheikh, yes.

16        THE COURT:  And?

17        THE WITNESS:  The three Telegram messages.

18        THE COURT:  Next question.

19        MR. FITZPATRICK:  Thank you, Your Honor.

20   Q.  And then turning to page --

21        THE COURT:  Let me ask this:  Are the three Telegram

22   messages in evidence?

23        MR. FITZPATRICK:  They have, Your Honor.

24        THE COURT:  What is that number?

25        MR. FITZPATRICK:  Your Honor, that is at 24-6C, D, and

```
 1    E.
 2              THE COURT:  All right.  Let's proceed.
 3              MR. FITZPATRICK:  Thank you.
 4    BY MR. FITZPATRICK:
 5    Q.  Turning to page 6 of 8, your conclusions.
 6              MR. FITZPATRICK:  If we can blow up the bottom
 7    paragraph before we turn to the next page.
 8    Q.  Can you explain your conclusions upon doing that forensic
 9    speaker comparison?
10    A.  Yes.  So what this paragraph means is that we don't just
11    consider the likelihood that the speaker in those recordings is
12    Mr. Elsheikh.  We also consider the likelihood that it could be
13    somebody else.  So it's the balance of those probabilities that
14    leads to the scale and the conclusion on the scale.
15              And to do that, we consider two main factors.  So
16    what's the degree of similarity between the voice samples; and
17    it makes, hopefully clear sense, that if they're very similar,
18    it supports the view that it's the same person.  And if there
19    are differences, it supports the view that they're different
20    people.
21              However, there's a further element as well.  Just
22    because two voices are similar, it doesn't necessarily mean they
23    have to belong to the same person.  If the features are just
24    very common amongst a group who have the same accent, for
25    example, there will be lots of other speakers who share those
```

1    features.  So we're also assessing how distinctive the voice is.

2         If the voice is not at all distinctive, there may be

3    lots of other people who would have a similar voice.  But if it

4    is distinctive, the probability that someone else would also

5    share the same features is very low, and so the evidence is

6    stronger.

7         So based on how similar the samples were and the fact

8    that the voice features were very distinctive, we came to the

9    conclusion that the evidence provides very strong support for

10   the view that the speaker in those recordings is Mr. Elsheikh.

11   Q.  Thank you, Dr. Rhodes.

12        MR. FITZPATRICK:  If we could pull up the chart on

13   page 7 of 8.  If we could expand from the line that is

14   immediately above the chart through the chart.  We're going to

15   expand that, please.

16   Q.  For the benefit of the jury, Dr. Rhodes, is this the

17   conclusion that you were just referring to that's reflected in

18   the chart?

19   A.  Yes.  So you would look towards the top of that chart.  It's

20   not the top point, it's the second one:  Very strong support for

21   the view that Mr. Elsheikh is the questioned speaker in those

22   Telegram recordings.

23        And this scale is a standardized scale that's used

24   across different areas of forensic science to express different

25   levels of the strength of evidence.  It's a balanced and

1    mirrored scale.  So you can see at the middle point, the

2    evidence would be inconclusive; i.e., it doesn't really tell you

3    anything.  On the bottom half of that scale would be negative

4    outcomes, or outcomes which indicate that there are different

5    people involved.  And on the top half of that scale would be

6    conclusions that indicate the same person is involved with

7    different levels of support, going from limited support at the

8    weaker end to very strong at the stronger end.

9    Q.  Dr. Rhodes, the --

10            THE COURT:  Just a moment.  This is just to illustrate

11   the range of the degrees of support.  Right?

12            THE WITNESS:  Exactly right, Your Honor.

13            THE COURT:  It's not your conclusion --

14            THE WITNESS:  No.

15            THE COURT:  -- for any specific comparison?

16            THE WITNESS:  No.

17            THE COURT:  Next question.

18   Q.  Just to clarify, on that scale, for the purposes of this

19   comparison, what was your result?  What was your conclusion?

20   A.  So it's the second line from the top, very strong support

21   for the view that the suspect - or the defendant, Mr. Elsheikh -

22   is the questioned speaker, so the speaker in the Telegram

23   recordings.

24            MR. FITZPATRICK:  Sufficient, Your Honor?  Yes.

25   BY MR. FITZPATRICK:

1   Q.  With respect to the using of this scale, in February of

2   2015, did the scaling procedures change for use in your

3   conclusions?

4   A.  Yes, that's right.  Before this scale was introduced, there

5   was a different method of expressing the conclusions, but it

6   encapsulated the same principles; so this idea of how similar

7   are the samples and how distinctive are the features within

8   them.

9   Q.  And if you could turn to government Exhibit 24-4, please.

10  A.  Yes.

11  Q.  And is this the report that you and Professor French

12  prepared to explain the change in scaling procedures?

13  A.  It is, yes.

14          MR. FITZPATRICK:  Move for admission of 24-4.

15          THE COURT:  All right.  I've already ruled on your

16  objection.  You've preserved that, Mr. Ellis, but I'll admit

17  this over that objection.

18          (Government EXHIBIT Number 24-4 was admitted into

19  evidence.)

20          MR. FITZPATRICK:  Court's indulgence.

21          THE COURT:  Yes.

22          MR. FITZPATRICK:  Your Honor, no further questions at

23  this time.

24          THE COURT:  I thought...oh, go ahead.

25          Mr. Ellis, you have cross-examination.

1          MR. ELLIS:  Thank you, sir.

2              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

3    **BY MR. ELLIS:**

4    Q.  Dr. Rhodes, on the last page of your report there's a

5    standard caveat, and it says:  "Forensic speaker comparisons do

6    not provide strength of evidence comparable to DNA analysis, for

7    example, and it's recognized that there could be people in the

8    population who are indistinguishable in respect of voice and

9    speech patterns."

10             Is that correct?

11   A.  Yes, that appears in the report.  Yes.

12   Q.  And in previous reports there was also listed the

13   qualification that, "When relied upon in a criminal prosecution,

14   voice ID evidence should be used in conjunction with other

15   evidence."

16             Is that correct?

17   A.  Yes.

18   Q.  And so this evidence is not meant to be used in a vacuum, I

19   guess, correct?  Or by itself?

20   A.  Yes.

21   Q.  Now, what was the relevant population in this case?

22   A.  It would be other young adult male speakers of a

23   multicultural variety of English.

24   Q.  Do you have any idea how big that population is?

25   A.  Residing in London, I wouldn't have a precise figure.  The

1   population of London, I think, is somewhere between 8 and

2   9 million people.  You would have to start breaking it down how

3   many males, how many young males, and how many males of this

4   accent type.

5   Q.  And what would be the percentage of that population that

6   would have an indistinguishable voice?

7   A.  The conclusion, very strong support for the view that the

8   speaker is Mr. Elsheikh, what that really means is - and what I

9   said before about you can't use a voice to uniquely identify

10  someone - is that I can't completely rule out the possibility

11  that somebody else would share all of the features that we found

12  in these recordings.  But I would consider that probability to

13  be very low.

14  Q.  Okay.  But just as far as the overall population, could you

15  give us a percentage or a figure about the number of people that

16  share an indistinguishable voice?

17  A.  I would say it would be very, very small.  I think a

18  percentage would be misleading because that's an opinion based

19  on my experience with this variety of English.  It's not based

20  on, for example, a database, so I couldn't give you an accurate

21  percentage figure.

22  Q.  All right.  So what you were asked to do in this case, is

23  you had a known police interview.  Correct?

24  A.  Yes.

25  Q.  And it was a very poor quality police interview.  Correct?

1    A.   The police interview was quite poor quality relative to what

2    we normally receive for police interviews.  So normally a police

3    interview is quite a controlled environment, people are speaking

4    close to a microphone indoors, and the recordings are normally

5    quite good quality.

6           This recording, however, had some hiss noise on it, and

7    it also had some interference from an automated time track.  So

8    police interview recordings on cassette tapes have two tracks;

9    one is what's happening in the interview room, the other is an

10   automated time track.  So it's a synthetic female voice saying,

11   The time now is 1 minute and 10 seconds.

12          In this case, some of that material from that time

13   track had leaked onto the main audio track, so some sections of

14   that recording had overlaid, with the main speech, some

15   low-level background speech.

16   Q.   And you were asked to compare this poor quality known sample

17   to three random voicemails.  Correct?

18   A.   Yes.

19   Q.   And they were mobile phone voicemails, you were told?

20   A.   All we received in the first instance was the audio

21   recording, which sounded like the sort of voice note you might

22   leave on an app.  We noted that these were better quality than

23   what would normally be found in a telephone or landline

24   voicemail message.  So we made some inquiries with the police

25   force to say:  Well, what are these recordings?  Where did they

1      come from?

2              And we were informed they had come from a messaging

3      app, yes.

4      Q.  And am I right that when voice goes through mobile services

5      and apps, acoustic information is removed?

6      A.  It can be.  However, as I've sort of just explained,

7      acoustic information is removed more drastically by telephone

8      transmission than by the transmission in this case.  So what

9      tends to happen with a telephone call is that lower frequencies

10     and higher frequencies are just cut out, and that's why people,

11     when you speak to them on the phone, sound a little bit tinny or

12     a little bit distant.

13             However, in this case, that removal of the low and high

14     frequency wasn't really an issue because this app didn't do

15     that.  So it's better quality than, say, a phone call.

16     Q.  So can you tell us what empirical studies show that this

17     method is valid based on these approximate case conditions?

18     A.  The empirical studies that have been carried out in terms of

19     the test methods that we use --

20     Q.  I'm sorry to cut you off.  Just prior to that, could you say

21     what empirical is?

22     A.  Oh, "empirical" means to do with numbers.

23     Q.  Data in evidence.  Correct?

24     A.  Pardon?

25     Q.  Data in evidence?

1    A.  Yes.  Yeah.

2    Q.  And so can you tell us what empirical studies there are that

3    shows that this study is capable to determine your conclusion in

4    these approximate case cause?

5    A.  There aren't, to my knowledge, which exactly match these

6    case conditions, and that's true in all voice comparison

7    exercises.  And it's because the types of conditions that we

8    come across are different for every case.

9            Now, an empirical validation study would have to go and

10   record people who have a similar accent, speaking in similar

11   conditions on a number of different occasions.  And the research

12   studies which are carried out typically can take between two to

13   three years, and cost upward of 300,000 pounds, up to a million

14   pounds, for example.  And so this is clearly not possible within

15   the context of every single forensic case.

16           So what we have are empirical studies that show the

17   different test methods that we use work in scenarios which are

18   somewhat similar to this, which we can rely on to say, Well,

19   these methods work.

20           But what I can't give you is any particular performance

21   statistic for exactly the conditions found in this case.  And I

22   want to be really clear about that.

23   Q.  In other words, so we can't know how often this method gets

24   it right?

25   A.  No.  Not in these exact case conditions, no.

1    Q.  Have you been tested using your methods?

2    A.  I have, yes.  So that training incorporates both testing

3    using cases where we know the outcome, whether it's the same

4    speaker or not, but also cases where my competence is tested by

5    comparing the results that I've produced with other

6    practitioners.

7            So in the UK guidance, we have a distinction between

8    what are called measurement-based methods and interpretive-based

9    methods, or opinion-based methods.  And so an example of working

10   out the accuracy of a measurement-based method would be, for

11   example, This chemical is 52 percent cocaine, with a precision

12   level of plus, minus, nought but 1 degree and percent points,

13   for example.

14           That isn't the case for opinion-based evidence, and

15   that's one of the reasons why we don't give a categorical

16   outcome.  We say:  This evidence supports the view that it's the

17   same person, but we're not saying we're 100 percent on that.

18   Q.  So, for example, we're talking about DNA, and you had a

19   known sample and you gave an analyst 20 random samples, they

20   should be able to pick out the random sample that matches the

21   known sample.  Right?

22   A.  If two of the samples are from the same person, yeah.

23   Q.  Correct.  So have you ever been tested in that fashion?

24   A.  I have, yes, as part of my training.  But it's not something

25   where we can do upwards of a hundred, a thousand tests per year

1    to give you what would be an error rate, because the comparison

2    work takes, we estimate, between 10 to 15 hours per comparison.

3    It's just not feasible to do that.

4    Q.  So when was the last time that you were tested?

5    A.  It would be as part of my training when I started in the

6    role.  So about...

7    Q.  2012?

8    A.  Or '13, yes.

9    Q.  You haven't been tested again since then?

10   A.  No.  In terms of a proficiency test with a known outcome.

11   However, again, the guidance stipulates that one way of

12   assessing the competence of a practitioner is comparing the

13   results they produce with the results of other practitioners,

14   and because we have two practitioners work a conclusion for

15   every case, we have data that shows how close our different

16   conclusions are.

17   Q.  And so I'm glad you brought that up.  So when you do double

18   testing like that to compare results, do you know each other's

19   results before you compare?

20   A.  This is one area where the situation has changed since this

21   report.  So at the time of this report, we came together to

22   discuss the conclusion.  What we would typically do now is do

23   that conclusion-forming process independently and then discuss.

24          So I can't say that this has happened for this report.

25   The conclusion was discussed and agreed between Professor French

1    and myself.  What that does do is offer at least two opinions

2    rather than one, but I can't say that they were arrived at fully

3    independently.

4    Q.  I would like to ask you just a few questions about the

5    standards that you use.  Okay?  So you said in this case there

6    are three voicemails.  Correct?

7    A.  Yes.

8    Q.  And two of the voicemails were only 14 seconds long.  Right?

9    A.  Yes.

10   Q.  And there was a mixture of English and Arabic spoken.

11   Correct?

12   A.  In the longer recording, but not in that 14-second sample.

13   Q.  The two short voicemails were all English?

14   A.  No.  So the two shorter voicemails were, I think, about

15   33 seconds and 22 seconds.  And when you cut it down to just

16   English, it came to 14 seconds.

17   Q.  I see.

18   A.  Yeah.

19   Q.  Do you have standards for what is the minimum amount of

20   audio that you need?

21   A.  No, we don't.  We make a suitability assessment on the basis

22   of, actually, a number of different factors.  So there's no

23   minimum threshold for the amount of speech or the amount of

24   words, for instance.  And those factors are quality, the

25   quantity of speech, how well matched the recordings are, for

1    example, for speaking level of speaking, and whether someone is

2    raising their voice or lowering their voice.  And then the other

3    factor is, well, how distinctive are the voice features within

4    that recording.

5         And it's also true that you can find very marked

6    differences between samples with a very small amount of speech.

7    So it would be immediately apparent, even from two to three

8    seconds of speech, if you were comparing, say, an American

9    speaker with a Brit, or an English speaker with a Scottish

10   speaker, for instance.

11        So we wouldn't naturally rule out samples even if they

12   were very short, because they're still able of producing a

13   result that the experience are different.

14   Q.  Regarding the quality of the police report -- and you found

15   it suitable, you said?

16   A.  Yes, it was suitable for analysis.

17   Q.  What is the standard for when a recording quality is

18   suitable?

19   A.  Again, there are no fixed standards.  There are some, I

20   guess, thresholds we would apply, so we need to able to

21   identify -- have enough material to identify the accent of the

22   speaker to measure a range of different voice and speech

23   features to make both auditory ratings of those and acoustic

24   measurements.  And we were able to do so in this case with these

25   recordings.

1   Q.  The prosecutor asked you about this, but you went to a new

2   reporting methodology around 2015.  Correct?

3   A.  Yes, the start of January 2015.

4   Q.  And in this case, you found that there was very strong

5   support that the voice in the voicemails was Mr. Elsheikh.

6   Correct?

7   A.  Yes.

8   Q.  Could you give us an example of what that means?  Or excuse

9   me, could you explain what "very strong support" means?

10  A.  Yes.  I think the best way is what I said earlier.  So

11  because they're very similar and the features in there are very

12  distinctive, it's very strong supporting evidence for the view

13  that the speaker is Mr. Elsheikh.

14          But, again, I would like to stress:  This isn't a

15  100 percent categorical match, so there is a possibility that

16  it's someone other than Mr. Elsheikh.  But the possibility of

17  somebody else matching all the different voice and speech

18  patterns that we find, I would judge to be very remote, very

19  small.

20  Q.  Well, could you give us an example of what would your

21  findings be if this was, for example, moderately strong support?

22  How would that differ?

23          MR. FITZPATRICK:  I'm going to object to the form of

24  the question.  Facts not in evidence.

25          THE COURT:  He can answer.  It's one of the categories,

1    Mr. Ellis?

2              MR. ELLIS:  Yes, sir.

3              THE COURT:  He may answer.

4    A.  I suppose there are many different ways one could arrive at

5    a conclusion of moderately strong support.  So recordings could

6    be somewhat less similar, the features within the recordings

7    could be less distinctive so that there would be the possibility

8    that actually there's quite a few speakers in a population that

9    would share those features.  And there's lots of different ways

10   that that conclusion could come about.

11   Q.  But this scale is the equivalent of your likelihood ratio.

12   Correct?  It's not a likelihood ratio per se?

13   A.  It's not generated on the basis of a numerical likelihood

14   ratio, no.

15   Q.  It's the way that you report your results.  I guess what I'm

16   trying to figure out is:  How do you differentiate between the

17   results on that scale?

18   A.  Yes, so we differentiate using the scale on the basis of the

19   assessment that I described earlier, which is how similar are

20   those samples, and then how distinctive they are.  So it's a

21   judgment on, well, how many other speakers could share those

22   features.

23   Q.  At the time that you were doing these evaluations, did your

24   laboratory take confirmation bias or contextual bias into

25   effect?  Did you account for that?

1   A.  Yes, we did take account for that.  It's quite a large field

2   if we're talking about contextual bias.  But because the

3   conclusions that we've reached here are based on subjective

4   judgment or an opinion, we have to be really careful that we

5   completely protect that opinion and keep it as impartial as we

6   can by avoiding being biased by any sort of information that we

7   don't need to know.  So that might be, for example, whether

8   someone has committed a similar crime before or whether there

9   are other types of evidence in the case that suggests that it's

10  them.

11        And the way we avoid this, and avoided this throughout

12  this case, was that the material that's sent to us is

13  pre-prepared by the audio laboratory at the Metropolitan Police

14  Service.  So what they do is they take a case and they remove

15  any information that we don't need to know, and they only

16  provide us with specific information regarding the recordings,

17  what our instructions are, and the recordings themselves.

18        So we're not provided with any other information on the

19  case, any kind of steer towards an outcome.  And we tend not to

20  have really direct contact with police officers or those that

21  are involved in investigating the case.  So they act as a filter

22  for any potential biassing information.

23  Q.  So if I heard you correctly, your opinion is not based

24  solely on the voice; it's also based on other factors in the

25  investigation?

1    A.  No, it's the opposite of that.

2         THE COURT:  That's what I heard him say.

3         MR. ELLIS:  I must have misunderstood, Your Honor.

4    Q.  Did you compare the three voicemails against any other

5    multicultural London accents or just the known sample of

6    Mr. Elsheikh?

7    A.  Do you mean any other people with that accent?

8    Q.  Correct.

9    A.  No.

10   Q.  And did you know it was Mr. Elsheikh when you were asked to

11   make the comparison?

12   A.  Did I what --

13   Q.  The suspect, did you know who it was when you were asked to

14   make the comparison?

15   A.  Yes.  We would have to know that in order to identify who to

16   compare it with, yes.

17   Q.  And did you know what he was accused of or suspected of at

18   that time?

19   A.  I can't say that we had, I suppose, no background, because

20   we had been involved in comparisons involving Mr. Elsheikh

21   previously with different material.

22         If I can comment on what the outcome of those

23   comparisons --

24   Q.  I think Mr. Fitzpatrick is going to get into that in a few

25   minutes.

1    A.   Okay.

2    Q.   So you had some idea of what he was suspected of?

3    A.   In broad brush strokes, we knew that he was previously

4    involved in the case; however, we had no idea whether and how

5    these recordings related to other recordings in the case.   It

6    just came as:   Please compare these three recordings with this

7    interview recording.

8    Q.   Just to make sure -- I'm not sure if you answered me or not.

9         THE COURT:   He did.

10   Q.   You had a general idea of what he was suspected of?

11   A.   I knew he was a known individual in a case which was related

12   to terrorism offenses, yeah.

13        MR. ELLIS:   That's all the questions I have,

14   Your Honor.

15        THE COURT:   Redirect.

16        MR. FITZPATRICK:   Judge, the redirect will be focused

17   on a stipulation that the parties have reached with respect to

18   the remainder of Dr. Rhodes' testimony.

19        I can hand up the stipulation as government

20   Exhibit 24-9, Mr. Hartigan.

21        If the Court pleases, the stipulation results in the

22   admission of a number of exhibits.   If the Court pleases, I

23   could read the exhibits into the record and then read three key

24   paragraphs of the stipulation.

25        THE COURT:   You may do so.

168

1          MR. FITZPATRICK:  The stipulation reflected in 24-9,

2    Your Honor, the following exhibits are admitted without

3    objection:  24-2, 24-2A, which is an audio/video recording of "A

4    Message to America"; 24-2B, which is an audio/video recording

5    entitled "A Second Message to America"; 24-2C, which is an

6    audio/video recording entitled "A Message to the Allies of

7    America"; 24-2D, which is entitled, "Another Message to America

8    and Its Allies," also an audio and video recording; 24-2E is

9    admitted, 24-2E.1.

10         THE COURT:  Let me stop you for a moment.  Typically I

11   read stipulations.  I don't mind your doing it, but you're not

12   reading the whole thing.

13         MR. FITZPATRICK:  No, Your Honor, I was going to list

14   out the exhibits that are admitted --

15         THE COURT:  You listed the exhibits, but you don't tell

16   them what the exhibit is.  The exhibit, for example:  "24-2B is

17   a true and accurate recording of 'A Second Message to America,'

18   including approximately 31 seconds of speech by a masked

19   individual."

20         Right?

21         MR. FITZPATRICK:  Correct, Your Honor.

22         THE COURT:  And aren't you going to offer evidence as

23   to who that masked individual was?

24         MR. FITZPATRICK:  Yes, Your Honor.  That comes up

25   further in the stipulation.

1            THE COURT:  In the stipulation.  But if you hope to do

2      it thoroughly, they have no idea what you're doing.

3            MR. FITZPATRICK:  Correct, Your Honor.  I was just

4      trying to make clear that all the exhibits are admitted, then

5      turn to the stipulation.

6            THE COURT:  All right.  I would do it at the same time.

7      There won't be any doubt about what exhibits are admitted.

8            MR. FITZPATRICK:  Fine, Your Honor.  Your Honor, I

9      don't want to encroach on the Court's turf, if you wish --

10           THE COURT:  No, you go ahead.

11           MR. FITZPATRICK:  Your Honor, I'll begin at paragraph 2

12     of the stipulation.  Paragraph 1 covers the testimony that

13     Dr. Rhodes has already presented today.

14           Beginning at paragraph 2:  Government Exhibit 24-2E is

15     a true and accurate recorded police interview conducted with

16     Mohammed Emwazi on 9 February, 2012.

17           Government Exhibit 24-2E.1 is a 190-second clip of

18     known speech of Mohammed Emwazi from this interview.  The

19     recording has an evidence identification of RAJ/1002.

20           THE COURT:  22-E.1 [sic], have you offered that?

21           MR. FITZPATRICK:  Yes, Your Honor.

22           THE COURT:  Any objection to 24-E.1 [sic]?

23           MR. ELLIS:  This is all covered by the stipulation,

24     Your Honor.

25           THE COURT:  It's admitted.  Let's proceed.

1          (Government EXHIBIT Number 24-2E.1 was admitted into

2     evidence.)

3          MR. FITZPATRICK:  Yes, Your Honor.  And the opening

4     paragraph begins:  "The proper chain of custody was maintained

5     on the exhibits identified below and this Court having qualified

6     Dr. Richard Rhodes as an expert, these exhibits are otherwise

7     admissible under the Federal Rules of Evidence in this matter."

8          THE COURT:  All right.  Proceed.

9          MR. FITZPATRICK:  Thank you.  Paragraph 3:  Government

10    Exhibit 24-2A is a true and accurate recording of "A Message to

11    America," including approximately 50 seconds of speech by a

12    masked individual.  The recording has an evidence identification

13    of GW/5175/1.

14         Government Exhibit 24-2B is a true and accurate

15    recording of 'A Second Message to America,' including

16    approximately 31 seconds of speech by a masked individual.  The

17    recording has an evidence identification of AC/5228/1."

18         Paragraph 5:  Government Exhibit 24-2C is a true and

19    accurate recording of "A Message to the Allies of America,"

20    including approximately 39 seconds of speech by a masked

21    individual.  The recording has an evidence identification of

22    GW/8006/1.

23         Paragraph 6:  Government Exhibit 24-2D is a true and

24    accurate recording of "Another Message to America and Its

25    Allies," including approximately 17 seconds of speech by a

1    masked individual.  The recording has an evidence identification

2    of HP/5230.1.

3          Paragraph 7:  Government Exhibit 24-3A is a true and

4    accurate recording of, "Although the Disbelievers Dislike It,"

5    including approximately 104 seconds of speech by a masked

6    individual.  The recording has an evidence identification of

7    ABA/1 [sic]."

8          Paragraph 8 --

9          THE COURT:  I think it's ABA/9.

10          MR. FITZPATRICK:  Apologies, Your Honor.  Backslash 9.

11          Paragraph 8:  Government Exhibit 24-2 (5 November,

12    2014); 24-3 (4 December, 2014); and 24-4 (4 February, 2015), are

13    reports on forensic speaker comparison analyzing the speech

14    characteristics of the masked speaker across the five recordings

15    in government Exhibits 24-2A, 24-2D, and 24-3A.  Dr. Rhodes

16    concludes that the masked speaker is the same person in all five

17    recordings.  Dr. Rhodes then analyzed the known recording of

18    Mohammed Emwazi in government Exhibit 24-2E.1 with the masked

19    speaker in 24-2A to 24-2D and 24-3A using a two-step process of

20    auditory evaluation and a series of instrument (computer-based

21    evaluation).  Dr. Rhodes concludes with strong support that the

22    masked speaker is Mohammed Emwazi in all five recordings.

23          Dr. Rhodes also compared the masked speaker in all five

24    recordings with known recordings of six other men, including

25    El Shafee Elsheikh and Alexanda Kotey, concluding with extremely

1    very strong support that the masked speaker was not one of the

2    six men.

3            Paragraph 9:  Government Exhibit 24-5A is a true and

4    accurate recording of "A Message to the government and People of

5    Japan," including 52 seconds of speech by a masked individual.

6    The recording has an evidence identification of AMB/5494.

7            Paragraph 10:  Government Exhibit 24-5 (4 February,

8    2015) is a report on forensic speaker comparison analyzing the

9    masked individual in government Exhibit 24-5A with the masked

10   individual in government Exhibits 24-2A, 24-2B, 24-2C, 24-2D,

11   and 24-3A.  Dr. Rhodes concludes that it's the same speaker in

12   all six recordings.

13           Dr. Rhodes then analyzed the known voice recording of

14   Mohammed Emwazi in government Exhibit 24-2E.1 with the masked

15   speaker in 24-5A using the same two-step process of, one,

16   auditory evaluation; and, two, a series of instrument

17   computer-based evaluation.  Dr. Rhodes concludes with strong

18   support that the masked speaker in government Exhibit 24 -5A is

19   Mohammed Emwazi.

20           Dr. Rhodes also compared the masked speaker with known

21   recordings of six other men, including El Shafee Elsheikh and

22   Alexanda Kotey, concluding with extremely very strong support

23   that the masked speaker was not one of the six men.

24           Paragraph 11:  Government Exhibit 24-7A is a true and

25   accurate recording of "A Message to the government of Japan,"

1    including 29 seconds of speech by a masked individual.  The

2    recording has an evidence identification of HP/5533/1."

3           Paragraph 12:  Government Exhibit 24-7 (20 May, 2015)

4    is a report on forensic speaker comparison analyzing the masked

5    individual in government Exhibit 24-7A with the masked

6    individual in government Exhibits 24-2A, 24-2B, 24-2C, 24-2D,

7    24-3A, and 24-5A.  Dr. Rhodes concludes that it is the same

8    speaker in all seven recordings.

9           Dr. Rhodes then analyzed the known voice recording of

10   Mohammed Emwazi in government Exhibit 24-2E.1 with the masked

11   speaker in 24-7A using the same two-step process of, one,

12   auditory evaluation; and, two, a series of instrument

13   computer-based evaluation.  Dr. Rhodes concludes with strong

14   support that the masked speaker in government Exhibit 24-7A is

15   Mohammed Emwazi.

16          Dr. Rhodes also compared the masked speaker with known

17   recordings of six other men, including El Shafee Elsheikh and

18   Alexanda Kotey, concluding with extremely very strong support

19   that the masked speaker was not one of the six men.

20          With the parties' signatures at the end of the

21   stipulation.

22          THE COURT:  And all of the exhibits mentioned your

23   offering?

24          MR. FITZPATRICK:  Yes, Your Honor.

25          THE COURT:  Let me confirm, any objection to those?

1    They're part of the stipulation.

2             MR. ELLIS:  That's correct, sir.

3             THE COURT:  So they're admitted.

4             So to the deputy clerk, all of the exhibits in this

5    stipulation, which is now a part of the record, should be

6    indicated as admitted.

7             (Government EXHIBIT Numbers 24-2A, 24-2B, 24-2C, 24-2D,

8    24-2E, 24-3A, 24-5, 24-5A, 24-7, 24-7A were admitted into

9    evidence.)

10            MR. FITZPATRICK:  No further questions, Your Honor.

11            THE COURT:  Thank you, Dr. Rhodes, you may step down.

12            MR. FITZPATRICK:  May the witness be excused,

13   Your Honor?

14            THE COURT:  Without objection, and hearing none, yes.

15   Dr. Rhodes, you may remain in the courtroom or return to London

16   as you wish, sir.

17            THE WITNESS:  Thank you.

18            THE COURT:  Who is your next witness?

19            MR. FITZPATRICK:  Ms. Cook will be doing the direct

20   examination of Ms. Lea Mulla.

21            THE COURT:  All right.  We'll need some time, then.

22   How long do you anticipate she'll take?

23            MS. COOK:  I estimate an hour and a half.

24            THE COURT:  And following her, whom do you have?

25            MS. COOK:  Agent Brian Driscoll.

175

1          THE COURT:  And how long is he?

2          MS. COOK:  No more than an hour.

3          THE COURT:  So if we get through with Mulla today, as I

4    hope and plan, we will have Driscoll, Gallagher, and Czekala and

5    Johnston tomorrow.  Is that right?

6          MR. FITZPATRICK:  No, Your Honor.  We've reached a

7    stipulation regard to Czekala and Johnson.  If we get through

8    Mulla and Driscoll today, we'll only have Mr. Ottosen for

9    tomorrow.  And that will conclude the government's

10   case-in-chief.

11         THE COURT:  We probably won't get through Gallagher

12   today.

13         MR. FITZPATRICK:  Driscoll.

14         THE COURT:  We will get through Mulla.  Maybe we will.

15         All right.  Ladies and gentlemen, another recess here

16   for 20 -- let's recess until 3:25.  My watch is different from

17   that.  3:25, at which time, Ms. Cook, we'll start with your

18   witness.

19         MS. COOK:  Thank you, Your Honor.

20         THE COURT:  Remember to refrain from discussing the

21   matter among yourselves or with anyone, or undertaking any

22   investigation on your own.  And, again, help yourselves to the

23   drinks, soft drinks, and snacks.  You may follow the court

24   security officer out.

25         (Jury out at 2:59 p.m.)

1          THE COURT:  I'm sort of interested, Mr. Ellis, when you

2     said that you searched and couldn't find anything on this

3     methodology, but as I look at his CV, he's written articles

4     about it.  So your search must have been just limited to the

5     U.S.

6          MR. ELLIS:  Yes, sir, it was court cases in the

7     United States.

8          THE COURT:  Court cases.  All right.  Well, the record

9     is there, and I think it clearly was a *Daubert* objection, and I

10    think we have the essence of a *Daubert* hearing here.  It might

11    have taken a little less time without the presence of a jury,

12    but I think having heard it all, including your

13    cross-examination, Mr. Ellis, I think the *Daubert* ruling was

14    appropriate, and no reason to doubt the admissibility of his

15    testimony.

16         But as I told you, you were free to attack the weight

17    of his evidence, and you did so, and you can use that in your

18    closing argument if you wish.  Who will do the closing argument

19    for the government?

20         MR. PAREKH:  I will, Your Honor.

21         THE COURT:  And for the defendant?

22         MS. GINSBERG:  I will, Your Honor.

23         THE COURT:  All right.  Thank you.  I'll be asking you,

24    of course later on, how long you think you need, and we'll --

25    I'll hear from you at that time.

1          All right.  Court stands in recess until 3:25.

2          (Recess taken at 3:01 p.m.)

3          THE COURT:  You may bring the jury in, please.

4          (Jury in at 3:30 p.m.)

5          THE COURT:  Ms. Cook, you may call your next witness

6     for the government, please.

7          MS. COOK:  Thank you, Your Honor.  The government calls

8     Lea Mulla.  Your Honor, Ms. Mulla requires the assistance of

9     Arabic translators.  Mr. Peshwaz and Mr. Sayid are providing

10    those services.

11         THE COURT:  Well, they need to be sworn.

12         MS. COOK:  Yes.

13         THE COURT:  Let's do it this way:  You may both stand

14    there.  You may administer the oath -- well, before that, may I

15    have your names, please.

16         INTERPRETER FAIZULLA:  Peshwaz Faizulla.

17         INTERPRETER SAYID:  Mustafa Sayid.

18         THE COURT:  Have you-all served as interpreters in

19    English and Arabic?  Is that it?

20         INTERPRETER FAIZULLA:  Yes.

21         INTERPRETER SAID:  Yes.

22         THE COURT:  And have you done it in this court before?

23         INTERPRETER FAIZULLA:  Yes, we did.

24         INTERPRETER SAID:  Yes, Your Honor.

25         THE COURT:  I do recall now that you have.

1          So you are able to translate simultaneously as someone

2     is speaking Arabic into English, and someone who is speaking

3     English simultaneously into Arabic?

4               INTERPRETER SAID:  Yes, Your Honor.

5               INTERPRETER FAIZULLA:  Correct.

6               THE COURT:  Is there any other language involved other

7     than English and Arabic?

8               INTERPRETER FAIZULLA:  We also speak Kurdish.

9               INTERPRETER SAID:  But we use Arabic.

10              THE COURT:  You may administer the oath.  They're both

11    fully competent and capable of serving as interpreters in

12    English and Arabic.  Having served already in this court, I

13    think I've already ruled that they were competent in other

14    cases.

15              You may administer the oath now to the witness.

16              (Oath administered by courtroom deputy clerk.)

17              THE COURT:  Does your microphone work?

18              THE INTERPRETER:  I was trying to test.

19              THE COURT:  It works.

20              All right.  Ms. Cook, you may proceed.

21              MS. COOK:  Thank you, Your Honor.

22         **(LEA MULLA, having been duly sworn, testified as follows:)**

23              **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

24    **BY MS. COOK:**

25    Q.  Good afternoon.

1    A.  Good afternoon.

2    Q.  Please state your name.

3    A.  My name is Lea Mulla.

4         MS. COOK:  And that is spelled L-E-A, M-U-L-L-A.

5    Q.  Where did you grow up?

6    A.  Shakal, Kurdistan.  Iraq.

7    Q.  Did you grow up as a Yazidi?

8    A.  Yes.

9    Q.  What language did you speak in your home?

10   A.  Kurdish.

11   Q.  Did you learn any other languages in school?

12   A.  I learned Arabic and Kurdish.

13   Q.  Are you speaking Arabic today?

14   A.  Yes.

15   Q.  When did you first hear about --

16        THE COURT:  You asked her whether -- what is Yazidi?

17   You might want to ask her that.

18        MS. COOK:  Very well, Your Honor.

19   Q.  Will you please explain what Yazidi means.

20   A.  Yazidi is another religion, similar to Christianity.

21   Q.  Did you grow up in a Yazidi community?

22   A.  Yes.

23   Q.  Was your family Yazidi as well?

24   A.  Yes, they were all Yazidis.

25   Q.  I want to turn your attention to August of 2014.

```
 1    A.  Okay.

 2    Q.  Did ISIS come to the village where you and your family were

 3    living in August of 2014?

 4    A.  Yes.

 5    Q.  Do you recall the day?

 6    A.  Yes.

 7    Q.  What date did ISIS come?

 8    A.  It was August 3rd, 2014.

 9    Q.  How did you hear that ISIS was coming to your village?

10    A.  I learned from people who told my family.

11    Q.  What did you and your family do when you learned that ISIS

12    was coming?

13    A.  We left the house and we escaped, we flee.

14          MS. COOK:  I'm sorry.  What did you say?

15          THE INTERPRETER:  I just used a synonym for "escape."

16    A.  We fled.

17    Q.  Where did you flee to?

18    A.  To the mountain.

19    Q.  What mountain is that?

20    A.  Mount Sinjar.

21    Q.  How old were you on August 3rd, 2014?

22    A.  I was 15.

23    Q.  Did your family make it to Mount Sinjar?

24    A.  We arrived at the foot of the mountain, but we couldn't get

25    on the mountain.
```

1    Q.  Why couldn't you get on the mountain?

2    A.  Because of the traffic jam of all the cars that piled up

3    there.

4    Q.  Was your family stopped in the traffic jam?

5    A.  Yes.

6    Q.  While you were stopped there with your family, did ISIS

7    fighters come?

8    A.  Yes.

9    Q.  Please describe what happened.

10   A.  They came first and they fired shots over our heads so that

11   we stopped.  And then, when we stopped, they came and they

12   captured us.

13   Q.  How did you know the fighters were ISIS?

14   A.  Through their flag because they put up their flags.

15   Q.  How many ISIS fighters were there?

16   A.  There were a lot, plenty of cars.

17   Q.  Did they have weapons?

18   A.  Yes, there were plenty of weapons.  And from their clothes,

19   we recognized them.

20        MS. COOK:  Could we please display Exhibit 3-14, which

21   is already in evidence.

22        THE COURT:  Yes, you may do so.

23   BY MS. COOK:

24   Q.  Do you recognize this?

25   A.  Yes, this is the ISIS flag.

```
 1    Q.  Did you see flags like this on August 3rd, 2014?

 2    A.  Yes.

 3    Q.  And were these on the cars of the ISIS fighters that came

 4    that day?

 5    A.  Yes.

 6    Q.  You said that the ISIS fighters captured you.  Were you

 7    talking about you yourself and your family?

 8    A.  Myself and my family, all the people who were there, they

 9    took us all.

10    Q.  What happened to your family?

11    A.  Returned to Sinjar.

12    Q.  What happened to your family at Sinjar?

13    A.  We stayed in Sinjar until 6:00 p.m., and then they separated

14    me from my family.

15    Q.  Where did you stay in Sinjar until 6:00 p.m.?

16    A.  We stayed at the office, the registrar's office of the town

17    of Sinjar.

18    Q.  How many members of your family were with you at the

19    registrar's office?

20            THE INTERPRETER:  I'm sorry, can you repeat the

21    question?  Her family member or other families?

22            MS. COOK:  Her family.

23    A.  We were eight.

24    BY MS. COOK:

25    Q.  What happened at 6:00 p.m.?
```

1    A.  They took -- separated me from my family along with other

2    young girls, and they took us all to Mosul.

3    Q.  How did they transport you to Mosul?

4              THE INTERPRETER:  I don't think the question reached --

5    I'll repeat the question.  And the question was, how did they

6    transport you?

7              MS. COOK:  Yes.

8    A.  It was a bus.

9    Q.  How many other women and girls were on the bus?

10   A.  I don't know how many, but there were many.

11   Q.  Was the bus crowded?

12   A.  Yes.

13   Q.  Where did the ISIS fighters take you in Mosul?

14   A.  I don't know for sure, but it looked like it was a sports

15   hall or stadium.

16   Q.  Was it a large building?

17   A.  Yes.

18   Q.  Who else was at the large building?

19   A.  Myself and many other girls that ISIS took.

20   Q.  Were there ISIS members at the large building?

21   A.  Yes.

22   Q.  Did they have weapons?

23   A.  Yes, many.

24   Q.  What did the ISIS members do at the large building?

25   A.  They put us in that building.  Some were talking, some were

184

1    crying, and then they could come and beat us.

2    Q.  How long were you at the large building?

3    A.  I don't recall exactly, but maybe around a week.

4    Q.  Where were you taken after the large building?

5    A.  They came and they selected some, not all, some of the

6    girls, and they took them to a house, which was -- it seemed to

7    be a Christian family house.

8    Q.  Who is it that came and selected girls from the large

9    building?

10   A.  ISIS people.

11   Q.  Were you selected and taken from the large building?

12   A.  Yes.

13   Q.  Were you taken to the house you just described that looked

14   like it had once belonged to Christians?

15   A.  Yes.

16   Q.  How many girls were taken there with you?

17   A.  There were a lot, again.

18   Q.  How long did you stay at the house that looked like it had

19   once belonged to Christians?

20   A.  It wasn't a lot.  I think three to five days.

21   Q.  Where were you taken after that house?

22   A.  After that, they took us to Syria.

23   Q.  Were other girls taken with you to Syria?

24   A.  Yes.

25   Q.  Do you know where in Syria they took you?

1   A.   They took us to Raqqa.

2   Q.   Where did they take you in Raqqa?

3   A.   They took me to a house that was a white house, white color

4   house, that behind it was a mountain and in front of it was a

5   body of water.

6   Q.   How many other girls were at the white house?

7   A.   There were many, many.

8   Q.   What did -- I'm sorry, let me start over.

9        Were there ISIS members at the white house?

10  A.   Yes, there were.

11  Q.   What did the ISIS members do there?

12  A.   They pushed us inside the building, and whoever cried or

13  talked, they would beat.

14  Q.   How long did you spend at the white house?

15  A.   Again, around a week.

16  Q.   Did somebody come to the white house and pick you to take

17  you away?

18  A.   Yes.

19  Q.   Who was that person?

20  A.   His name was Abu Khaled.

21  Q.   Did Abu Khaled have any guards with him?

22  A.   Yes.

23  Q.   Did the guards have weapons?

24  A.   Yes.

25  Q.   How many girls did Abu Khaled pick?

186

```
 1    A.   Nine.
 2              MS. COOK:   Could we please display Exhibit 1-23, which
 3    is already in evidence.
 4              THE COURT:   You may do so.
 5    Q.   Do you recognize this person?
 6    A.   Yes.
 7    Q.   Who is this?
 8    A.   This is Abu Khaled.
 9    Q.   Do you know another name for this person now?
10    A.   Yes.
11    Q.   What is the other name?
12    A.   Abu Bakr al-Baghdadi.
13    Q.   Where did Abu Khaled take you and the other girls?
14    A.   He selected us first and then left.   Then later, his guards
15    took us to the house where his family was.
16    Q.   Did you stay in the house of Abu Khaled and his family?
17    A.   Yes.
18    Q.   How did Abu Khaled treat you?
19    A.   Not good.
20    Q.   What did he do?
21    A.   Because we were all crying, they beat us up.
22    Q.   Did Abu Khaled beat you?
23    A.   Yes.
24    Q.   Did Abu Khaled tell you anything about himself?
25    A.   No.
```

```
 1    Q.  Did other ISIS members treat Abu Khaled with respect?

 2    A.  Yes.

 3    Q.  Did Abu Khaled have weapons?

 4    A.  Yes, many.

 5    Q.  How did Abu Khaled's family treat you?

 6    A.  Again, not good.

 7    Q.  What did the family do to you?

 8    A.  The family were reporting on us, whatever we were doing, to

 9    Abu Khaled.

10    Q.  Did the family make you do work in the house?

11    A.  Yes.

12    Q.  Did Abu Khaled tell you and the other girls what was going

13    to happen to you?

14    A.  I do not understand the question.

15    Q.  Did Abu Khaled tell you and the other girls that you would

16    be married to ISIS fighters?

17    A.  Yes.

18    Q.  How did that make you feel?

19    A.  I was frightened.

20    Q.  How long were you at Abu Khaled's house?

21    A.  In this house, I stayed only one day.  The second day we

22    escaped, all of us, because airplanes were bombing -- about to

23    bomb the house.  So we went to the other house.

24    Q.  Was the other house also where Abu Khaled stayed?

25    A.  Yes.
```

1    Q.  And was Abu Khaled's family also at that other house?

2    A.  Yes.

3    Q.  How long did you stay at that second house with Abu Khaled

4    and his family?

5    A.  Some 10 days.

6    Q.  Did Abu Khaled cover his face?

7    A.  Only the day when he selected us, he was covering his face.

8    Q.  Inside the two houses that you've just described, was

9    Abu Khaled's face uncovered?

10   A.  Yes.

11   Q.  Did Abu Khaled say anything about your family?

12   A.  He told me that, "Forget about your family; your family,

13   you're not going to see them again."

14   Q.  Did Abu Khaled say what would happen if you tried to escape

15   from ISIS?

16   A.  He said that, "We're going to kill you."

17   Q.  Did ISIS members ever come to Abu Khaled's house?

18            THE INTERPRETER:  I'm sorry, can you repeat, please.

19   Q.  Did other ISIS members come to Abu Khaled's house?

20   A.  Yes.

21   Q.  Did they take girls away with them when they left?

22   A.  Yes.

23   Q.  You testified earlier that you stayed at Abu Khaled's second

24   house for 10 days.  Where were you taken after the 10 days?

25   A.  He took us to a house that belonged to a friend of his.

```
 1    Q.  Do you know where that house was?

 2    A.  It was the house of Abu Annis.  It was a large house that

 3    has a big yard.

 4    Q.  Was that house also in Syria?

 5    A.  Yes.

 6    Q.  Do you know what part of Syria the house was in?

 7    A.  It was in Aleppo.

 8    Q.  How long did it take to get to Aleppo?

 9    A.  It was a long way, but I don't know exactly.

10    Q.  Did it take a long time to get to Aleppo?

11    A.  Yes, we left in the morning, and we arrived in the evening.

12    Q.  How long did you stay at Abu Annis' house?

13    A.  A few days.

14    Q.  How did you leave Abu Annis' house?

15    A.  I escaped.

16    Q.  How did you escape?

17    A.  I escaped at night.  When they were asleep, I escaped.

18    Q.  Did anyone go with you?

19    A.  Yes.  Other Yazidi girls, we were four.

20    Q.  Were two of the girls about your same age?

21    A.  Yes.

22    Q.  And were there girls who were younger who also escaped with

23    you?

24    A.  Yes.

25    Q.  Where did you go?
```

```
 1    A.  I don't know exactly, but we left and there was a

 2    neighborhood.  We -- in that neighborhood, we saw some people

 3    who came to us and they said, "We will help you."

 4            And they took us to their house.  But then they

 5    informed ISIS, and then ISIS came and they took us back.

 6    Q.  Where did ISIS take you?

 7    A.  They took us to the house of Abu Khaled.

 8    Q.  Where was that house?

 9    A.  The same house that was in Aleppo.

10    Q.  Same house in Aleppo?

11    A.  They took us to that house, they beat us up, and then they

12    took us to prison.

13    Q.  Who beat you up?

14    A.  Abu Khaled and his guards.

15    Q.  What did Abu Khaled and his guards do to you?

16    A.  They broke my hand.

17    Q.  Did they beat the other girls who escaped with you?

18    A.  Yes, but I got the lion's share.  I got more.

19    Q.  Why is that?

20    A.  Because some of the girls, out of fear, they confessed that

21    I was the one who plotted this escape.

22    Q.  You said that the beating broke your hand.  Is that right?

23    A.  Yes.

24    Q.  Did you have any other injuries?

25    A.  Yes.
```

```
1    Q.  What injuries did you have?
2    A.  All my body was bruised up.  It turned blue, and I had open
3    wounds as well.
4    Q.  Did the other girls have injuries as well?
5    A.  Yes.
6    Q.  After the beating, where were you taken?
7    A.  They took us to prison.
8    Q.  Do you know where the prison was located?
9    A.  I don't remember exactly, but I would say Shaddadi area,
10   maybe.
11   Q.  I'm sorry, where?
12   A.  I don't remember exactly, but I think it was in Shaddadi.
13   Q.  Is that the Syria?
14   A.  Yes.
15   Q.  With the assistance of the court security officer, please
16   look at Exhibit 19-8, which I believe is in Volume 3.
17              THE COURT:  Has it been admitted?
18              MS. COOK:  Not yet, Your Honor.
19              THE COURT:  All right.
20   Q.  19-8.  Do you recognize that?
21   A.  Yes, this was the prison.
22   Q.  Is this the prison you were taken to after you were beaten
23   by Abu Khaled?
24   A.  Yes.
25              MS. COOK:  The government moves the admission of
```

1    Exhibit 19-8.

2              MS. GINSBERG:  No objection.

3              THE COURT:  It's admitted.  You may display it if you

4    wish.

5              MS. COOK:  Thank you, Your Honor.

6              (Government EXHIBIT Number 19-8 was admitted into

7    evidence.)

8              MS. COOK:  Can we please enlarge the picture.

9    Q.  If you touch the screen, it will leave a red mark.  Will you

10   please indicate the building where you were held.

11   A.  That's the building.

12             MS. COOK:  For the record, Your Honor, the witness has

13   drawn a circle around the building behind the fence.

14             THE COURT:  Yes, I see that.  But, you know, you and

15   your colleagues have used this device repeatedly, but it doesn't

16   leave a record unless you print this out, and we haven't done

17   that.

18             But I see that, and let's proceed.  The record doesn't

19   show it because the record won't have this picture with this red

20   circle around it.  You understood that, I think.

21             MS. COOK:  Yes, Your Honor, which is why I described

22   the exhibit just now.

23             THE COURT:  All right.  Proceed.

24             MS. COOK:  Thank you.

25   BY MS. COOK:

1    Q.  Were you put in a cell inside this building?

2    A.  Yes.

3    Q.  What did the cell look like?

4    A.  It was a small room that had a small bathroom within it,

5    that had also a small showerhead.

6    Q.  Was there any furniture in the room?

7    A.  Yes.

8    Q.  What kind of furniture did it have?

9            THE INTERPRETER:  Could you repeat the question,

10   please.

11   Q.  What kind of furniture was in the room?

12   A.  I don't understand the question.

13   Q.  Was there a bed?

14   A.  No.

15   Q.  What did you sleep on?

16   A.  On the ground.

17   Q.  Was there a window?

18   A.  A very small, very tiny window very close to the ceiling.

19   Q.  Was anyone else in the room with you?

20   A.  Yes.

21   Q.  Who else was in the room?

22   A.  Two female Americans.

23   Q.  What were their names?

24   A.  Kayla and Louisa.

25           MS. COOK:  Can we please display Exhibit 6-5, which is

194

1    already in evidence.

2    Q.  Do you recognize the person in this photo?

3    A.  Yes, this is Kayla.

4         MS. COOK:  Can we please display Exhibit 10-4, which is

5    already in evidence.

6    A.  This is Louisa.

7    Q.  Were Kayla and Louisa already in the cell when you were

8    brought to this prison?

9    A.  Yes.

10   Q.  Were there any other Yazidi girls in the cell?

11   A.  Two others were with me.

12   Q.  Were there a total of five of you in the room?

13   A.  Yes.

14   Q.  How long did you spend in the cell in that building?

15   A.  A month.

16   Q.  During that month, did you talk to Kayla?

17   A.  Yes.

18   Q.  What language did you and Kayla speak to each other?

19   A.  Usually we would try to use our hands and try to express

20   ourselves, with very few Arabic words in between.

21   Q.  Did you and Kayla speak in Arabic to each other?

22   A.  Yes.

23   Q.  Did Kayla have any things with her?

24   A.  Yes, she had a little notebook with her.

25   Q.  Would Kayla write in the notebook?

1   A.  Yes.

2   Q.  Did Kayla tell you how old she was?

3   A.  Yes, 26.

4   Q.  How did the guards treat you and the other girls and women

5   at that prison?

6   A.  They would command us for me and the other girls not to talk

7   to Kayla and the others, and if we did anything that they didn't

8   like, that they would beat us.

9   Q.  Were you ever let out of the room while you were at that

10  prison?

11  A.  No.

12  Q.  What would you do during the day?

13  A.  Just talk to each other and spend the time doing little

14  games to spend the time.

15  Q.  Did you teach Kayla a game?

16  A.  Yes.

17  Q.  Did you help Kayla with her Arabic?

18  A.  Arabic and Kurdish.

19  Q.  Did Kayla help you with your English?

20  A.  Yes.

21  Q.  How did Kayla treat you?

22  A.  Very nicely.

23  Q.  Did Kayla have any markings on her body?

24  A.  Yes, she had a tattoo on her abdomen.  It was in the shape

25  of a feather.

```
 1   Q.  Did Kayla tell you how long she had been in that room before
 2   you were brought to the prison?
 3   A.  Before I arrived, she had been there for about a month.
 4   Q.  Was Kayla ever taken out of the cell?
 5   A.  Just one day that they took her and brought her back.
 6   Q.  Was Kayla emotional when she was brought back?
 7   A.  Yes, and she was very afraid.
 8   Q.  Why was Kayla afraid?
 9   A.  She said because the ISIS are going to marry us off, and if
10   we resist or try to run away, that they would kill us
11   immediately.
12   Q.  Do you remember what date you were brought to this building?
13   A.  Yes.
14   Q.  What date was that?
15   A.  It was the 26th of August.
16   Q.  Do you remember what date you were removed from the
17   building?
18   A.  Yes.  It was September 24th.
19   Q.  Was anyone else moved with you?
20   A.  It was me and a young Yazidi girl and Kayla.
21   Q.  What happened to Louisa?
22   A.  She stayed in that prison.
23   Q.  Did you ever see Louisa again?
24   A.  No.
25   Q.  How were you moved from the prison?
```

1    A.  Abu Sayyaf came and took us to his home.

2    Q.  Had you ever met Abu Sayyaf before?

3    A.  No.

4    Q.  Please turn to Exhibit 19-2 in the same binder.

5    A.  (Witness complies.)

6    Q.  Do you recognize the person in that photograph?

7    A.  Yes, that is Abu Sayyaf.

8        MS. COOK:  The government moves the admission of

9    Exhibit 19-2.

10       MS. GINSBERG:  No objection.

11       THE COURT:  It's admitted.  You may display it if you

12   wish.

13       (Government EXHIBIT Number 19-2 was admitted into

14   evidence.)

15   Q.  Is this a photograph of Abu Sayyaf?

16   A.  Yes.

17   Q.  And were you moved from the prison to Abu Sayyaf's home in

18   September of 2014?

19   A.  Yes.

20       MS. COOK:  Thank you.

21   Q.  Where did Abu Sayyaf take you?

22   A.  They took us to a red building in Shaddadi.

23   Q.  Will you please turn to Exhibit 19-7 in the binder.

24   A.  (Witness complies.)

25   Q.  Do you recognize what's in that photograph?

198

1    A.  Yes, that is the red building, red house.

2    Q.  Is that the building Abu Sayyaf took you to?

3    A.  Yes.

4         MS. COOK:  The government moves the admission of

5    Exhibit 19-7.

6         MS. GINSBERG:  No objection.

7         THE COURT:  It's admitted.  You may display it if you

8    wish.

9         (Government EXHIBIT Number 19-7 was admitted into

10   evidence.)

11   Q.  Was Kayla also brought to this building?

12   A.  Yes.

13   Q.  Are you able to see the portion of the building where you

14   were held?

15   A.  Yes.

16   Q.  Could you please circle it on the screen?

17   A.  That's it.

18   Q.  Where did you stay in the red apartment?

19   A.  We were in a room which had a locked door.

20   Q.  Who else was in the room with you?

21   A.  It was me, Kayla, and another young Yazidi girl.

22   Q.  Were there any other Yazidi girls in the red apartment?

23   A.  Yes.

24   Q.  How many?

25   A.  Four.

1    Q.  Was there anyone else living in the red apartment?

2    A.  It was Umm Sayyaf and Abu Sayyaf.

3    Q.  Who was Umm Sayyaf?

4    A.  The wife of Abu Sayyaf.

5    Q.  Did Umm Sayyaf have any responsibility with regard to you,

6    Kayla, and the other Yazidi girls?

7         THE INTERPRETER:  Could you repeat the question?

8    Q.  Did Umm Sayyaf have any responsibility over you, Kayla, and

9    the other Yazidi girls?

10   A.  Yes, she kept a watchful eye on us, and would inform

11   Abu Sayyaf of all of our actions.  And she was also the one who

12   was showing us how to dress in the ISIS style.

13   Q.  What was the ISIS style?

14   A.  It is the head scarf, hijab, and a black body garment.

15   Q.  Please turn to Exhibit 19-3 in the binder.

16   A.  (Witness complies.)

17   Q.  Do you recognize the person in that photograph?

18   A.  Yes, that is her.  That is Umm Sayyaf.

19        MS. COOK:  The government moves the admission of

20   Exhibit 19-3.

21        MS. GINSBERG:  No objection.

22        THE COURT:  Admitted.  You may display it if you wish.

23        MS. COOK:  Thank you, Your Honor.

24        (Government EXHIBIT Number 19-3 was admitted into

25   evidence.)

1    BY MS. COOK:

2    Q.  Is this Umm Sayyaf?

3    A.  Yes.

4    Q.  Were there any weapons in the red apartment?

5    A.  Yes.

6    Q.  Were you ever threatened with the weapons?

7    A.  Yes.

8    Q.  What were the threats?

9    A.  He would point a weapon at us and say, "If you do anything,

10   if you try to escape or anything, I will shoot you with this

11   weapon."

12   Q.  Who pointed the rifle at you?

13   A.  Abu Sayyaf.

14   Q.  Please turn to Exhibit 19-5 in the binder.

15   A.  (Witness complies.)

16   Q.  This exhibit has a few pages.

17            MS. COOK:  Can we please ask the witness to look

18   through all of the pages.

19   A.  Yes.

20   Q.  Did you see weapons like these in the red apartment?

21   A.  Yes.

22            MS. COOK:  The government moves the admission of

23   Exhibit 19-5.

24            MS. GINSBERG:  No objection.

25            THE COURT:  It's admitted.  You may display it if you

1   wish.

2        (Government EXHIBIT Number 19-5 was admitted into

3   evidence.)

4        MS. COOK:  Thank you, Your Honor.

5        Can we please go to the second page and the third page,

6   the fourth page, and the last page.

7   Q.  How did Umm Sayyaf treat you?

8   A.  Not well at all.  She treated us like slaves.

9   Q.  What did she make you do?

10       THE INTERPRETER:  Can I ask the witness to repeat,

11  rephrase, to permit me to understand?

12       (Interpreter clarification with witness.)

13  A.  She would force us to prep the young girls for ISIS to come

14  and to take.

15  Q.  Did ISIS fighters come to the red apartment?

16  A.  Yes.

17  Q.  Did ISIS fighters take Yazidi girls away from the apartment?

18  A.  Yes.

19  Q.  How did Abu Sayyaf treat you and the other girls?

20  A.  Also very badly.  We were terrified of him.

21  Q.  Did Abu Sayyaf ever hit you?

22  A.  Yes.

23  Q.  Why would he hit you?

24  A.  Because he heard that we had previously tried to escape from

25  Abu Khaled's home.

202

1    Q.  Did Kayla know that Abu Sayyaf hit you?

2    A.  Yes.

3    Q.  How did Kayla know that?

4    A.  She saw it.

5    Q.  Did Kayla know that Umm Sayyaf threatened you?

6         THE INTERPRETER:  Could you repeat the question?

7    Q.  Did Kayla know that Umm Sayyaf threatened you?

8    A.  Yes.

9    Q.  How did Kayla know that?

10   A.  Because she threatened Kayla, too.

11   Q.  Did Abu Sayyaf ever show you videos?

12   A.  Yes.

13   Q.  What kind of videos did Abu Sayyaf show you?

14   A.  It was videos of beheadings that they were doing, and he

15   said that if you try to escape, this is what would happen to

16   you.

17   Q.  Do you recall ever seeing a video that showed a man in an

18   orange jumpsuit?

19   A.  Yes.

20        MS. COOK:  Could we please display Exhibit 1-24E, which

21   is already in evidence.

22   BY MS. COOK:

23   Q.  Do you recognize this?

24   A.  Yes.

25   Q.  What is this?

```
 1    A.  This is a video of someone who is an American.  And the

 2    video that he showed me, it was showing them beheading him.

 3    Q.  Was Kayla there when Abu Sayyaf showed this video?

 4    A.  Yes.

 5    Q.  Did -- let me start that question over.

 6         Was Kayla there when Abu Sayyaf threatened to behead

 7    you if you tried to escape?

 8    A.  Yes.

 9    Q.  How long did you stay at the red apartment?

10    A.  Approximately a week.  I'm not quite sure of the duration.

11    I'm guessing a week.

12    Q.  Where did you go after the red apartment?

13    A.  I escaped.

14    Q.  After the red apartment?

15    A.  No, I escaped from another place.  They took us from the red

16    apartment building to another location we referred to as "The

17    Dirty House."

18    Q.  Do you know why you were moved from the red apartment to The

19    Dirty House?

20    A.  No, I don't know.

21    Q.  Why did you call it The Dirty House?

22    A.  Because the treatment that we saw there was worse, and it

23    was at that location where they would take young girls and they

24    would rape them.

25    Q.  Was The Dirty House also in Shaddadi?
```

```
 1    A.  Yes.

 2    Q.  Who drove you to The Dirty House?

 3    A.  Abu Sayyaf.

 4    Q.  Was anyone else in the car with you and Abu Sayyaf?

 5    A.  It was Abu Sayyaf, Umm Sayyaf, a few armed ISIS individuals,

 6    me, Kayla, and Yazidi girls.

 7    Q.  Can you describe The Dirty House?

 8    A.  It was a house that had its -- that had a yard.  Did you

 9    want me to describe the inside of the house?

10    Q.  Let's start with the outside.  What do you remember about

11    the outside of the dirty house?

12    A.  I recall the street leading up to the house, the front yard,

13    and we were taken inside the house.

14    Q.  Was there a wall around the outside of The Dirty House?

15    A.  Could you repeat the question?

16    Q.  Was there a wall outside The Dirty House?

17    A.  Yes.

18    Q.  What do you remember about the inside of The Dirty House?

19    A.  There was a room, several rooms.  There was a room specific

20    for Abu Sayyaf and Umm Sayyaf.  There was a guest room, there

21    was a kitchen, and there was the room that we were led to and

22    that we were put into and locked in.

23    Q.  Who else was locked in the room with you?

24    A.  It was me, Kayla, and the other Yazidi girls.

25    Q.  Did you sleep in that room at night?
```

1    A.  Yes.

2    Q.  Did you sleep next to anyone in that room?

3    A.  Yes, next to Kayla.

4    Q.  How did Kayla treat the other Yazidi girls that were in that

5    room?

6    A.  Very nice, very well.  But the thing was that Abu Sayyaf and

7    Umm Sayyaf would not allow Kayla and the Yazidi girls or the

8    girls with Kayla to interact.

9    Q.  Did Abu Sayyaf and Umm Sayyaf tell Kayla to not talk to the

10   Yazidi girls?

11   A.  Yes.

12   Q.  Did you sometimes talk to Kayla anyway?

13   A.  Yes.  When they were not there, we would talk to Kayla.

14   Q.  Were you ever allowed out of the room?

15   A.  Once we were let out because there was an air raid and

16   because the house might have been targeted.  So that's the only

17   time we were let out of the room, to evacuate the location.

18   Q.  Were you allowed to go into other parts inside the house?

19   A.  Only the kitchen and the bathroom.

20   Q.  Why would you be allowed to go into the kitchen?

21   A.  To clean the kitchen.

22   Q.  Was Abu Sayyaf a member of ISIS?

23   A.  Yes.

24   Q.  How do you know that?

25   A.  Because ISIS members would come to his house and he would

1    leave and go about with them.

2    Q.  Were there weapons at The Dirty House?

3    A.  Yes.

4    Q.  Were you ever shown videos on a laptop?

5    A.  Yes, it was videos of images of them killing people.  The

6    aim was to terrorize us.

7    Q.  Who would show you the videos?

8    A.  Abu Sayyaf and Umm Sayyaf.

9    Q.  Do you remember the color of the laptop?

10   A.  Yes.

11   Q.  What color was it?

12   A.  It was red.

13   Q.  Please turn to Exhibit 19-1 in the binder.

14          THE INTERPRETER:  Could you say the number again?

15   Sorry.

16          MS. COOK:  19-1.

17   A.  (Witness complies.)

18   Q.  Do you recognize what's in that photograph?

19   A.  Yes, that's the laptop.

20          MS. COOK:  The government moves the admission of

21   Exhibit 19-1.

22          MS. GINSBERG:  No objection.

23          THE COURT:  Admitted.  You may display it if you wish.

24          (Government EXHIBIT Number 19-1 was admitted into

25   evidence.)

```
 1    BY MS. COOK:

 2    Q.  Is this the laptop that you were shown videos on at

 3    The Dirty House?

 4    A.  Yes.

 5              MS. COOK:  Thank you.

 6    Q.  Did Abu Khaled come to The Dirty House?

 7    A.  Yes.

 8    Q.  How did you know that he was there?

 9    A.  He came and took Kayla.

10    Q.  Where did Abu Khaled take Kayla?

11    A.  I don't know.  He came and took her during the nighttime and

12    returned her the next morning.

13    Q.  Did Kayla come back to the room the next morning?

14    A.  Yes.

15    Q.  Were you there?

16    A.  Yes.

17    Q.  Was Kayla upset?

18    A.  Yes.

19    Q.  How did you know she was upset?

20    A.  She was very sad, very nervous, and was crying.

21    Q.  Had you ever seen Kayla upset like that before?

22    A.  Only one other time, when we were in the prison when they

23    took her.

24    Q.  Did Kayla tell you what had happened that made her upset?

25    A.  Yes.
```

1    Q.  What did Kayla tell you?

2    A.  She said that she had been raped and threatened, and told

3    that if she were to try to run away, that they would kill all of

4    us.

5    Q.  Did Abu Khaled stay at The Dirty House?

6    A.  Yes.

7    Q.  Were there other times when Abu Khaled took Kayla out of the

8    room?

9    A.  Another time he did.

10    Q.  Was Kayla also upset when she was returned to the room after

11    that time?

12    A.  Yes, she was very scared and very nervous.

13    Q.  Had Kayla been raped by Abu Khaled again?

14    A.  Yes.

15    Q.  Did Abu Khaled rape anyone else at The Dirty House?

16    A.  Me.  Yes.

17          THE INTERPRETER:  Pardon me.  I'm sorry, yes.

18          MS. COOK:  I'm sorry.  I'm going to have to have you

19    repeat that.

20    Q.  Did Abu Khaled rape anyone else at The Dirty House?

21    A.  Yes.

22    Q.  Who?

23    A.  Other Yazidi also girls were.

24    Q.  Did Abu Sayyaf rape anyone at The Dirty House?

25    A.  Yes.

```
1    Q.  Did Abu Sayyaf rape Yazidi girls who were there?

2    A.  Yes.

3    Q.  Is this why you called this house The Dirty House?

4    A.  Yes.

5    Q.  How long were you at The Dirty House?

6    A.  Four days.

7    Q.  How did you leave The Dirty House?

8    A.  From a window.

9    Q.  Did you escape?

10   A.  Yes.

11   Q.  Why did you decide to escape from The Dirty House?

12   A.  From fear.  Because of what I was seeing, what was happening

13   and what was being done to the girls, it was from fear.

14   Q.  Did you tell anyone else that you were planning to escape?

15   A.  Yes, Kayla.

16   Q.  Did you want Kayla to go with you?

17   A.  Actually, I was afraid for her to join me.

18   Q.  Why were you afraid for Kayla?

19   A.  Because I imagined that if they had apprehended us trying to

20   escape, that they would have killed us in the way that we saw on

21   those videos.

22   Q.  Did Kayla tell you if she would try to escape with you?

23   A.  No.

24   Q.  Why did Kayla not try to escape with you?

25   A.  Afraid.
```

1   Q.  What was she afraid of?

2   A.  Afraid that if she was captured trying to escape, that she

3   would be beheaded.

4   Q.  Did you tell anyone other than Kayla that you were going to

5   try to escape?

6   A.  Kayla and one other Yazidi girl.

7   Q.  Did the other Yazidi girl agree to try to escape with you?

8   A.  Yes.

9   Q.  Did Kayla do anything to help you escape?

10   A.  Yes.  That she would keep quiet and help us to do it, and

11   also provided the time, the proper time, when to do it, from the

12   watch that she had with her.

13   Q.  Did Kayla ask you to do anything before you escaped?

14   A.  Yes.

15   Q.  What did she ask you to do?

16   A.  She told me that once I escaped, to tell the world, to tell

17   the U.S. that there is a young girl by this name who has been

18   kidnapped by ISIS.

19   Q.  How did you escape from The Dirty House?

20   A.  Midnight, after midnight, 1:00 in the morning, from a

21   window.

22   Q.  Will you please turn to Exhibit 19-6 in your binder.

23   A.  (Witness complies.)

24   Q.  Do you recognize what's in that photograph?

25   A.  Yes, that's the window that I escaped from.

1          MS. COOK:  The government moves the admission of

2     Exhibit 19-6.

3          MS. GINSBERG:  No objection.

4          THE COURT:  It's admitted.  You may display it if you

5     wish.

6          (Government EXHIBIT Number 19-6 was admitted into

7     evidence.)

8     Q.  Can you describe how you were able to get out this window?

9     A.  We were not eating, so I got very thin.  There was an

10    opening of a space.  I put my hand first, then my other hand,

11    then my head and the rest of my body out the window.

12    Q.  Did the other Yazidi girl go with you out the window?

13    A.  Yes.

14    Q.  Did you have any injuries from going through this window?

15    A.  Yes.

16    Q.  What injuries did you have?

17    A.  My hand, my arm were all bruised, injured, because of the

18    tight space.

19    Q.  Is there a wall outside the window?

20    A.  Yes.

21    Q.  How did you get over the wall?

22    A.  There was a small coverage, a shed for a power generator

23    close to the wall.  We climbed on that, and then from there over

24    the wall -- onto the wall and then over it.

25    Q.  Where did you go?

1    A.  I don't know.  We just got out and run.

2    Q.  Did you run for a long time?

3    A.  Yes.

4    Q.  Did you find someone who helped you?

5    A.  We saw a house, and then we went into the house and asked

6    them to help us.  They helped us by showing us the territories

7    of the YPG.  And when we went there -- and from there to

8    Hasakah.

9    Q.  Were you able to get in touch with anyone from your family?

10   A.  Yes, I contacted my brother.  He came and took me from

11   Hasakah.

12   Q.  After you were reunited with your brother, did you want to

13   help Kayla?

14   A.  Yes.

15   Q.  What did you do?

16   A.  I told him that there was this girl that I wanted to help,

17   and he said, "Okay, I know people."  And he had a friend who was

18   an interpreter, and he took us to the Americans.

19   Q.  Did you talk to the Americans?

20   A.  Yes.

21   Q.  Did you tell them about Kayla?

22   A.  Yes.

23   Q.  Did you tell them everything you could remember about the

24   houses where Abu Sayyaf lived?

25   A.  Yes.

1   Q.  Do you know about how long after you escaped you talked to

2   the Americans?

3   A.  Maybe a month, two months.

4   Q.  Why did you talk to the Americans?

5   A.  I told them that there was this American young woman

6   kidnapped by ISIS, and I told them everything that I knew about

7   the situation.

8           MS. COOK:  If I could have the Court's indulgence for a

9   moment, Your Honor.

10          THE COURT:  Yes.

11          MS. COOK:  Thank you.  I have no further questions at

12   this time.

13          MS. GINSBERG:  No questions, Your Honor.

14          THE COURT:  All right.  Ms. Mulla, you may step down.

15          MS. COOK:  Your Honor, may this witness be excused?

16          THE COURT:  Without objection, yes, she can be excused.

17          You may step down.  She's excused.

18          You have two witnesses left, Ms. Cook?

19          MS. COOK:  That's correct, Your Honor.

20          THE COURT:  We can't finish them today.

21          MS. COOK:  No.

22          THE COURT:  All right.  We'll recess for today.  You

23   may not leave your books there because I have another matter

24   commencing shortly after 5:00.  So you need to remove your

25   books.

1          (OFF THE RECORD.)

2          THE COURT:  Ladies and gentlemen, again, put your books

3   in the customary cubbyholes and refrain from discussing the

4   matter with anyone, or undertaking any investigation on your

5   own.

6          As I told you, if this case lasted long enough - and it

7   has - there would be less curiosity about what you've been

8   doing, and increasing doubts about what you say you've been

9   doing.

10          But I think, Ms. Cook, if I'm correct, that the

11   government will finish its case tomorrow.  Is that correct?

12          MS. COOK:  Yes, Your Honor.

13          THE COURT:  And after that, ladies and gentlemen, as I

14   forecasted to you, I will then determine or ascertain from the

15   defense whether the defense intends to offer any evidence, and

16   how long that will take.  And after that, what will remain will

17   be closing arguments, instructions of the Court, and you'll be

18   retired to deliberate on your verdict.

19          I'm sorry, I'm never able to see you.  But everything I

20   say, I hope you will listen to and assume that I do intend it

21   for you, which I do.  But you're the only person in the crowd

22   that I can't see.

23          All right.  Have a pleasant evening, put the case out

24   of your mind, and follow the court security officer out.  I'll

25   see you at 9 o'clock tomorrow morning.

 1              (Jury out at 4:49 p.m.)

 2         THE COURT:  We have heard testimony now for two weeks

 3    and one day, a lot of testimony.

 4         And you say, Mr. Fitzpatrick or Ms. Cook - I don't know

 5    which of you is going to address it - you say you have two

 6    witnesses left.

 7         MR. FITZPATRICK:  Yes.

 8         THE COURT:  And they won't take long, you think.

 9         MR. FITZPATRICK:  I believe the first witness will be

10    shorter than 60 minutes, 60 minutes or less.  The next witness

11    will be the final released hostage, I anticipate 90 minutes, two

12    hours.  So a total of three hours.

13         THE COURT:  Well, what I'm asking you to do is to

14    consider carefully whether these witnesses are really necessary

15    or cumulative.  And I'll -- we're going to convene at 9 o'clock

16    and go forward, but I won't be disappointed if you tell me at

17    that time that you've taken my words to heart and one or both of

18    those witnesses aren't necessary.

19         MR. FITZPATRICK:  I appreciate that.  I can tell the

20    Court right now that neither witness is cumulative.  They

21    address separate issues.  Neither are cumulative.  But we'll

22    take to heart the Court's recommendation, and we'll certainly

23    streamline the evidence.

24         THE COURT:  All right.  I understand your view that

25    they're not cumulative, but I think you would understand that

1    others might have a very different view.

2            MR. FITZPATRICK:  I understand.

3            THE COURT:  Including me.

4            MR. FITZPATRICK:  I understand.

5            THE COURT:  All right.  We'll recess until 9:00.

6            Let me add, Ms. Ginsberg, that I'll be inquiring -- of

7    course, we'll go to motions, and then I'll want to know quite

8    promptly whether you have any evidence to offer.  And if you

9    don't, or if the defendant does not testify, I will want to

10   voir dire the defendant at the witness stand -- or not the

11   witness stand, the podium.  So you may want to prepare him.

12           Simply put, he has the right to testify before the

13   jury, he has the right to remain silent.  Both of those rights

14   are absolute.  Now, that's a choice he must make, not his

15   lawyers.  Of course, he may obtain or accept advice from his

16   lawyers as to whether to testify or not, but, ultimately -- and

17   I'm addressing this to Mr. Elsheikh as well.

18           You should be hearing me, sir.  That the choice

19   ultimately has to be made by you.  And I will ask you questions

20   at the podium to ensure that you have made that choice.  I don't

21   know what it is, but whatever it is, that it's your choice.  And

22   then we will proceed from there.  After that, I will find out

23   whether there's any evidence.  You don't need to say anything

24   now, Ms. Ginsberg.  But we'll go from there to an instructions

25   conference.

1          And as you know, Ms. Ginsberg and Mr. Fitzpatrick,

2     since you both have tried cases before me before, there will be

3     a set of standard opening and standard closing instructions.

4     The substantive instructions will be in the middle, like an Oreo

5     cookie.  We'll go through those one at a time to dispose or

6     resolve any objections you have or any additions.

7          And, Mr. Fitzpatrick, you've already submitted the

8     Government's instructions.  And, Ms. Ginsberg, I think I have

9     the defendant's objections.

10          MS. GINSBERG:  Yes, Your Honor.

11          THE COURT:  So I will address those, give you an

12     opportunity to be heard, I'll resolve those and then we will go

13     to closing arguments and final instructions.  I can't predict

14     for certain how much we'll get done tomorrow.  I just don't

15     know.

16          MS. GINSBERG:  Judge, I've spoken with Mr. Parekh, and

17     we both would ask the Court -- I understand the Court's desire

18     to get through this trial and the need for the jury to get on

19     with their lives, but we would ask the Court, just for planning

20     purposes, if the Court would allow us to give closing arguments

21     on Wednesday morning so that we have tomorrow evening to finish

22     preparing.

23          THE COURT:  All right.  The only way I won't grant that

24     is if these witnesses -- I don't want to send the jury home at

25     10 o'clock tomorrow.

1          MS. GINSBERG:  I don't think that will happen,

2    Your Honor.

3          THE COURT:  All right.  Well, I'll do -- how long do

4    you think you need for your closing argument, Mr. Parekh?

5          MR. PAREKH:  Your Honor, my closing argument, I hope to

6    finish within an hour and a half, and then we would like to save

7    about 30 minutes for a rebuttal.

8          THE COURT:  Ms. Ginsberg?

9          MS. GINSBERG:  No longer than an hour, Your Honor.  I

10   should say I hope, but I don't expect any longer than an hour.

11         THE COURT:  I'll think about that request.  I've had

12   cases that have lasted longer than this where I have not allowed

13   more than an hour, Mr. Parekh.  But I'll think about it.

14         As a practical matter, it's very difficult to get

15   people to listen for more than an hour.  It's no accident that

16   nothing on television, no program or anything else, typically

17   lasts for more than an hour except a movie of some kind.  And

18   even then, most viewers quit watching after an hour.  It's been

19   so long since I've seen a movie, I can't really identify with

20   that.  It's a long time.

21         All right.  I'll think about it.  Did you have anything

22   else, Mr. Parekh or Ms. Ginsberg, to address at this time?

23         MS. GINSBERG:  Not for the defense, Your Honor.

24         THE COURT:  All right.  Thank you.

25         MR. PAREKH:  Your Honor, I think your movie comment is

1      appropriate, because I do intend to play a small selection of

2      admitted video clips during my closing argument.  So I won't be

3      speaking to the jury that entire time, I'll be playing clips.

4      And I think some of the testimony that we'll elicit tomorrow

5      will be incorporated within my closing argument.

6              So I do join Ms. Ginsberg's respectful request - and I

7      know I'm walking into the lion's den by asking you this - but in

8      light of the fact that the jury will hear testimony tomorrow,

9      including from a released hostage, and the fact that we may want

10     to do some testing of the videos to make sure that they play

11     properly through our PowerPoint presentation, and finally,

12     because the parties, of course, would like to make sure that we

13     are explaining the law accurately -- of course, your

14     instructions control always, but to the extent we refer to them,

15     we would like to do it accurately, and have the evening to --

16             THE COURT:  You'll have the instructions before you

17     make your closing argument.

18             MR. PAREKH:  Yes, Your Honor.

19             THE COURT:  So I expect that we will finish that part -

20     that is, the Court's instructions conference - tomorrow.

21             All right.  I understand what you and Ms. Ginsberg are

22     seeking to do.  Anything else today, Mr. Parekh?

23             MR. PAREKH:  No, Your Honor.

24             THE COURT:  Ms. Ginsberg?

25             MS. GINSBERG:  No, sir.

1           THE COURT:  Mr. Fitzpatrick?

2           MR. FITZPATRICK:  Just one quick -- am I correct

3    that -- did the jury send out a note that they would like to

4    recess at 4 o'clock tomorrow?

5           THE COURT:  6:00, is my recollection.

6           Is that right, Ms. Randall?

7           COURTROOM CLERK:  I'm checking, Judge.

8           MR. FITZPATRICK:  My mistake, Judge.  I saw the note

9    and I thought it was a 4.

10          COURTROOM CLERK:  6:00.

11          THE COURT:  6:00.  You're free to come to the clerk's

12   table and look at that.  And I would also recommend to you that

13   you come to the clerk's table to ensure that your version or

14   your view of what -- excuse me.  I'm sorry -- to be sure that

15   your record of what has been admitted comports with what the

16   deputy clerk has.  And if there are any problems or objections,

17   I'll have to resolve them.

18          (OFF THE RECORD.)

19          THE COURT:  Court stands in recess in this case until

20   9 o'clock tomorrow morning.

21          (Off the record at 4:59 p.m.)

22

23

24

25

1              **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    _____//Rebecca Stonestreet_____                    _____

9    SIGNATURE OF COURT REPORTER                          DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25