1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Case |
| | : | No. 20-CR-00239-TSE |
| Plaintiff | : | |
| v. | : | |
| | : | |
| EL SHAFEE ELSHEIKH, | : | April 13, 2022 |
| | : | 9:10 a.m. |
| Defendant | : | |

..............................   :   ........................

TRANSCRIPT OF TRIAL PROCEEDINGS
VOLUME 12
BEFORE THE HONORABLE T.S. ELLIS, III
UNITED STATES DISTRICT JUDGE
and a jury

**APPEARANCES:**

FOR THE PLAINTIFF:       RAJ PAREKH
                         JOHN T. GIBBS
                         DENNIS FITZPATRICK
                         ALICIA H. COOK
                         U.S. ATTORNEY'S OFFICE
                         2100 Jamieson Avenue
                         Alexandria, VA  22314
                         703-299-3700

FOR THE DEFENDANT:       NINA J. GINSBERG
                         ZACHARY ANDREW DEUBLER
                         DiMURO GINSBERG PC
                         1101 King Street
                         Suite 610
                         Alexandria, VA  22314
                         703-684-4333

                         EDWARD B. MacMAHON
                         LAW OFFICES OF
                         EDWARD B. MacMAHON, JR.
                         PO Box 25
                         107 East Washington Street
                         Middleburg, VA  20118
                         540-687-6366

                         (APPEARANCES CONTINUED ON
                         FOLLOWING PAGE.)

2

1       **FOR THE DEFENDANT:**          **JOHN EDWARD YANCEY ELLIS**
                                        **CARMICHAEL ELLIS & BROCK**

2                                        **108 N. Alfred Street**
                                        **1st Floor**

3                                        **Alexandria, VA  22314**
                                        **703-684-7908**

4

5     **OFFICIAL COURT REPORTER:**     **REBECCA STONESTREET, RPR, CRR**
                                        **U.S. District Court, 9th Floor**

6                                        **401 Courthouse Square**
                                        **Alexandria, Virginia  22314**

7                                        **(240) 426-7767**

8

9                            **( Pages 1 - 144)**

10

11           **COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              C O N T E N T S

2

3     PROCEEDINGS:                                        PAGE

4     CLOSING ARGUMENT BY PLAINTIFF                        7
      CLOSING ARGUMENT BY DEFENDANT                       41
5     REBUTTAL ARGUMENT BY PLAINTIFF                      70

6     JURY INSTRUCTIONS                                   84

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    **P R O C E E D I N G S**

2          THE COURT:  Good morning.  The record will reflect this

3   is United States against Elsheikh, 20-CR-239.  And the defendant

4   and counsel are present and prepared to proceed.

5          We will begin today with closing arguments, first by

6   the government and then the defendant.  I don't know whether

7   they will be completed prior to the morning break.  It may be

8   that after the government's argument, we'll have to take a

9   morning break, and after that break we'll hear from defense

10  counsel.  And then, if that doesn't take too long, we'll hear

11  the government's rebuttal, I hope before the luncheon recess.

12  And then instructions will be provided -- or will be given to

13  the jury after the luncheon recess.

14         All right.  You may bring the jury in, please, sir.

15         (Jury in at 9:07 a.m.)

16         THE COURT:  Good morning, ladies and gentlemen.  Again,

17  we'll begin as always with the deputy clerk calling the roll.

18         COURTROOM CLERK:  Juror 15, Laura Ann Younger.

19         JUROR:  Present.

20         COURTROOM CLERK:  Juror Number 29, Wayne Phoel.

21         JUROR:  Present.

22         COURTROOM CLERK:  Juror Number 3, James Bailes.

23         JUROR:  Present.

24         COURTROOM CLERK:  Juror Number 20, Alfred Keyser.

25         JUROR:  Present.

5

1           COURTROOM CLERK:  Juror Number 50, Esthar Zangeneh.

2           JUROR:  Present.

3           COURTROOM CLERK:  Juror Number 22, John Kugelman.

4           JUROR:  Present.

5           COURTROOM CLERK:  Juror Number 26, Jennifer Murray.

6           JUROR:  Present.

7           COURTROOM CLERK:  Juror Number 14, Anne Fay.

8           JUROR:  Present.

9           COURTROOM CLERK:  Juror Number 10, Erica Denham.

10          JUROR:  Present.

11          COURTROOM CLERK:  Juror Number 30, Camille Morrison.

12          JUROR:  Present.

13          COURTROOM CLERK:  Juror Number 47, Adrian White.

14          JUROR:  Present.

15          COURTROOM CLERK:  Juror Number 14, Mirenda Fields.

16          JUROR:  Present.

17          COURTROOM CLERK:  Juror Number 22, Gwendolin McCrea.

18          JUROR:  Present.

19          COURTROOM CLERK:  Juror Number 17, Lewis Hoge.

20          JUROR:  Present.

21          COURTROOM CLERK:  Juror Number 26, Eileen Liles.

22          JUROR:  Present.

23          COURTROOM CLERK:  Juror Number 39, Ralph Stallings.

24          JUROR:  Present.

25          COURTROOM CLERK:  Juror Number 7, Laura Buschman.

```
 1              JUROR:  Present.

 2              THE COURT:  Good morning, ladies and gentlemen.  I hope

 3    and trust that you had a quiet, restful evening, and thank you

 4    for being so prompt.  You've been prompt fairly regularly, and

 5    the Court appreciates that.

 6              We'll begin today with closing arguments.  Now, in the

 7    course of the closing arguments, counsel are entitled - and,

 8    indeed, the purpose of their oral argument is - to summarize and

 9    interpret the evidence as they see it for you.  However, if any

10    difference appears to you between the evidence as they say it is

11    and the evidence as you recall it, it is your recollection that

12    controls, because you're the sole judges of the facts of this

13    case.

14              Counsel are also, in their closing arguments, entitled

15    to refer to the Court's instructions.  They know what

16    instructions I'm going to give.  And they're entitled to mention

17    or refer to those instructions if they see fit to do so.

18    However, once again, if any difference appears to you between

19    the instructions as I give them to you and the instructions as

20    the lawyers say they are, you are to be guided, of course, by

21    what I say the instructions are.

22              Now, these arguments will be in the neighborhood - it's

23    a large neighborhood - of about an hour.  And I will let you

24    plan on a break after about an hour and a half or thereabouts.

25    We'll see.  But, as always, I've given each of you the privilege
```

1    of raising your hands, giving me the sports "time" signal if you

2    urgently need a recess.  And I'll do it.  And I will not inquire

3    of you, if you've raised your hand or given me the sports "time"

4    signal, the reason for your request.  It will be granted and

5    that's it.

6              But I ask that you not avail yourselves of that

7    privilege unless it's truly necessary, truly an exigent reason.

8              All right.  Mr. Parekh, are you ready to make your

9    closing argument on behalf of the government?

10             MR. PAREKH:  I am, Your Honor.

11             THE COURT:  All right.  And as you can see, ladies and

12   gentlemen, we've moved the podium so that counsel will be facing

13   you all.  They are admonished to remain at the podium.  They --

14   it's not like a TV program where they walk around and walk up to

15   the jury and that sort of thing.  He'll stay there, and

16   Ms. Ginsberg, who will argue for the defendant, will stay there.

17             All right.  Mr. Parekh, you may proceed, sir.

18             MR. PAREKH:  Thank you, Your Honor.  Members of the

19   jury, I want to begin my closing argument by thanking you for

20   the enormous personal and professional sacrifices that you have

21   all made for the past few weeks during this trial.  You have sat

22   patiently and tentatively through many hours of often harrowing

23   testimony, and heard 35 witnesses testify.

24             I submit to you that all the evidence you've seen and

25   heard all points in the same direction.  El Shafee Elsheikh,

1    beyond any reasonable doubt, is one of the three ISIS Beatles

2    who are collectively responsible for once holding 26 Western

3    hostages.  And as you've heard throughout this trial, the

4    horrifying and inhumane hostage-taking scheme that this

5    defendant and his co-conspirators carried out on behalf of ISIS

6    resulted in the deaths of four American citizens, as well as the

7    deaths of British and Japanese nationals.

8            You know through this trial that Mohammed Emwazi is

9    undeniably the executioner in the ISIS beheading videos.  But

10   now I submit to you that the first core question for you to

11   decide is whether this defendant, El Shafee Elsheikh, is one of

12   the three notorious ISIS Beatles.

13           For the past few weeks, ladies and gentlemen, we have

14   built for you a mosaic of evidence.  Some pieces may be bigger

15   than others, but together they form a clear and complete

16   picture.

17           Let's talk about the defendant and his two

18   co-conspirators that became the ISIS Beatles.  The evidence

19   demonstrates that they grew up together, radicalized together,

20   fought as high-ranking ISIS fighters together, held hostages

21   together, tortured and terrorized hostages together, and after

22   Emwazi was killed, Elsheikh and Kotey were ultimately captured

23   together in Syria.

24           Let's start with the most obvious reason to conclude

25   that Elsheikh was one of the three notorious Beatles.  He

9

1    brazenly told you himself.  You've watched video clip after

2    video clip of interviews in which the defendant admitted to and

3    described in granular detail his integral and essential

4    participation in the crimes that we've charged here which form

5    the horrendous criminal conduct in this case.  From his

6    admissions about taking email addresses and proof-of-life

7    questions and answers from the hostages, to physically beating

8    the hostages, to participating in the execution of the Syrian

9    hostage.

10           But before we get to Elsheikh's media interviews, I

11   would like to walk you through the evidence that, standing

12   completely on its own, proves beyond a reasonable doubt that

13   Elsheikh is, in fact, an ISIS Beatle.

14           How did Elsheikh, Emwazi, and Kotey become The Beatles?

15   Elsheikh knew Emwazi and Kotey from the United Kingdom before

16   they all traveled to Syria.  You've heard from released hostages

17   throughout this trial who have testified that The Beatles

18   treated each other like friends, they seemed to know each other

19   well, and acted as a trio and as a unit.  Elsheikh, Emwazi, and

20   Kotey, all traveled to Syria in 2012 for the same reason, within

21   close proximity to each other.  Elsheikh and Emwazi both

22   reported to the same ISIS supervisor since 2013; Elsheikh said

23   that he was depressed after Emwazi had died; and then Elsheikh

24   and Kotey were captured together in Syria in 2018.

25           Former ISIS member Omer Kuzu testified that Elsheikh

10

1    and who you know as Kotey appeared to be a duo and they acted as

2    a tag team.  Yet upon their capture, Elsheikh and Kotey both

3    used false names, they both claimed to be from Yemen.  They both

4    claimed to only speak Arabic.  And when Elsheikh was shown a

5    photo of Kotey, he said Kotey's name was Yahya Ibrahim, and

6    Elsheikh claimed that he had just recently met Kotey the day he

7    attempted to be smuggled out of Syria into Turkey.  To the very

8    end, ladies and gentlemen, the ISIS Beatles were protecting each

9    other.

10           So how did their radicalization journey begin?  You

11   heard evidence of the EDL protest in London which was held on

12   the 10th anniversary of the 9/11 attacks.  Who was arrested

13   there?  Elsheikh and Kotey.  This unique event is one of many

14   building blocks that helped prove up the identity of Elsheikh as

15   a Beatle.

16           This is a photograph of Elsheikh and Kotey on 9/11 in

17   2011 when -- right before they were arrested together.

18   Federico Motka testified that Ringo, one of the three Beatles,

19   spoke about the English Defence League and getting into a

20   confrontation with them outside of a pub.  Edouard Elias heard

21   The Beatles speak about the English Defence League at The

22   Riverside Prison in Raqqa.  Federico Motka also testified that

23   John Cantlie told him that Ringo mentioned the English Defence

24   League.

25           During the trial, you were probably wondering:  Why is

1     the government admitting this evidence, the handwritten letter

2     that Elsheikh confirmed was accurate?  Well, this is significant

3     identification evidence.  Back in 2011, Elsheikh signs and

4     confirms his statement.  Alexanda Kotey, with whom he was

5     arrested, does not give a statement.  This is a very specific

6     event that happened on a very specific date involving very

7     specific people.  This statement confirms what he, Ringo, stated

8     to Motka, Elias, and Cantlie:  Pub, English Defence League.

9     That's not mere coincidence, ladies and gentlemen.  That's

10    confirmation.

11           You heard the hostages testify about all the prison

12    locations where they were held.  And you heard in 2013 they were

13    held in Idlib and Aleppo, and then they were moved to Raqqa in

14    2014.  These prison locations match Elsheikh's confession to

15    FBI Special Agent John Chiappone.  Elsheikh admitted that he

16    lived in the very same cities at the very same time the hostages

17    were held there.

18           Abu Idris.  You heard a lot about him during this

19    trial.  Who told Special Agent Chiappone that he knew Abu Idris

20    personally in Syria, a high-ranking ISIS terrorist that went on

21    to commit an atrocious terrorist attack at the Brussels airport

22    in 2016, and someone Elsheikh said to the FBI in 2018, before he

23    participated in any interviews whatsoever, that he was,

24    quote/unquote, "a good guy"?  That was El Shafee Elsheikh.

25           Abu Idris is also the same subordinate guard who spoke

1    French that the hostages testified accompanied the

2    English-speaking British Beatles at several prison locations.

3    Patricia Chavez Mejia testified that Abu Idris was with

4    The Beatles when they asked her for email addresses.

5    Frida Saide testified that Abu Idris was with The Beatles when

6    The Beatles appeared at The Riverside Prison.  Nicolas Hénin

7    told you that Abu Idris told the hostages that the more they saw

8    The Beatles, the better it was for them, because they were in

9    charge of hostage negotiations.

10          And then Elsheikh told the FBI in March 2018, before he

11   participated in any media interviews, that he knew Abu Idris in

12   Syria and that they had the same ISIS supervisor.  Elsheikh also

13   stated that Emwazi reported to the same supervisor as Elsheikh

14   and Abu Idris.  Again, ladies and gentlemen, that's not mere

15   coincidence.  That's corroboration that Elsheikh is, in fact,

16   one of the ISIS Beatles.

17          You saw this photo a number of times during trial.  Who

18   sent the picture of himself in "Rambo mode" to his brother

19   wearing the same exact clothing that Edouard Elias testified was

20   worn by The Beatles?  This defendant, who is shown in this

21   photograph.

22          You also heard from former ISIS member Omer Kuzu who

23   said that when he first saw Elsheikh in Raqqa, Syria, he was

24   wearing a green beanie hat on his head and green military

25   clothing.  He also identified this photograph.  And then

1    Didier Francois testified that the three Beatles wore battle

2    dress, tactical vests, military boots with ammunition and radios

3    in their vest.  You heard about the Glock throughout this trial.

4    And Omer Kuzu testified that he saw Elsheikh on multiple

5    occasions with the Glock pistol.  He said Glocks are a symbol of

6    ISIS aristocracy.

7          As Judge Ellis stated, you're the sole judges of

8    witnesses' credibility and evidence in this case, end of story.

9    Let me explain to you why we put Mr. Kuzu on the stand.  The

10   purpose of Mr. Kuzu's testimony, ladies and gentlemen, was to

11   fill out what Elsheikh was doing after all the hostages were

12   released or were killed.  Because Elsheikh, as you've heard

13   throughout this trial, never withdrew from ISIS.  He was always

14   a part of the violent terrorist organization.  And so Kuzu

15   testified so that he can explain to you and so that you weren't

16   left wondering, what happened after Kayla Mueller died?  What

17   did Elsheikh do from 2015, February, March, all the way through

18   his date of capture?

19         Well, Omer Kuzu filled in those gaps so you didn't have

20   to guess what Elsheikh was up to.  He said that Elsheikh was

21   working on a special project whereby ISIS departments and ISIS

22   leaders could securely communicate with each other, and that he

23   had to be trusted in order to work on that special project.  He

24   was secretive, never told them directly what he was working on,

25   and he seemed to be more important than other ISIS leaders.  He

1   appeared to command respect, along with his friend, who you now

2   know is Alexanda Kotey, the other alleged Beatle.

3          Let's get back to the Glock.  Nicolas Hénin testified

4   that all three Beatles had Glock pistols.  No other guards did.

5   Edouard Elias testified that The Beatles had Glocks.

6   Didier Francois testified that the Glocks were unusual during

7   their captivity and only The Beatles had them.

8   FBI Special Agent Chiappone, when he interviewed Elsheikh,

9   testified that Elsheikh told him he owned a Glock when he was

10   with ISIS in Syria.  So we've corroborated this six ways to

11   Sunday, ladies and gentlemen.  It points, once again, to

12   Elsheikh being one of the three Beatles.

13          You heard a lot about the 17th Division.  Right?  A

14   significant ISIS battle, as you were told throughout this trial.

15   When Special Agent Chiappone testified, he talked about how

16   Elsheikh specifically stated that he went on military missions

17   with ISIS.  Guess what?  He only named two individuals,

18   Mohammed Emwazi and Alexanda Kotey.  Those are the two

19   individuals that he named that he went on military missions with

20   on behalf of ISIS.  Didn't name anyone else.  Three Beatles,

21   three names.

22          You heard this voice clip played.

23          (Audiotape played in open court.)

24          MR. PAREKH:  This is Elsheikh, as you know, describing

25   to you what's happening as that 17th Division battle is

1    unfolding or ending.  There's heads and bodies at the

2    roundabout.  You saw those pictures.  I'm not going to display

3    them now, but they're in evidence, and they'll be available for

4    you to look at during your deliberations if you so choose.

5        Why is this significant?  When Emwazi died, ISIS

6    eulogized him.  And you have two ISIS eulogies of

7    Mohammed Emwazi in evidence.  Both eulogies mention specifically

8    that Emwazi participated in the 17th Division battle that's

9    shown at the top of this slide, that's taken directly from

10   Government Exhibit 1-39, page 22.  And you'll also have it, I

11   believe, in 1-52.

12       So, again, Elsheikh mentions that he went on this

13   battle.  He mentions Mohammed Emwazi and Alexanda Kotey, and

14   this was so important to ISIS that they mention it in Mohammed

15   Emwazi's eulogy.

16       And I should also note that the heads and bodies that

17   Elsheikh talked about, and the decapitated heads that he sent,

18   you saw in evidence that that was sent towards the end of

19   July 2014.  What happened just a few weeks later?  The first

20   American hostage was beheaded.  Elsheikh knew what the terrorist

21   organization was doing, he knew what the objectives of the

22   conspiracy were, and not once did he withdraw from it.

23       Aafia Siddiqui.  You've heard this name countless

24   times.  She's all over the ransom emails, ladies and gentlemen;

25   Kayla Mueller ransom emails, the James Foley ransom emails,

1   Kayla's handwritten letters to her family, Steven Sotloff's

2   handwritten letters to his family.  Multiple hostages testified

3   that The Beatles specifically spoke about Aafia Siddiqui as a

4   way of justifying their treatment of the American and British

5   nationals.  The ransom emails are explicit that death was the

6   alternative if their demands were not met.

7           I believe you heard that The Beatles were obsessed with

8   her.  Well, guess what?  Who talked about the unjust sentence of

9   Aafia Siddiqui when he was interviewed by the FBI?  This

10  defendant.  Out of all of the individuals that he could have

11  named who were in prison in the United States, he named one,

12  Aafia Siddiqui, rolled off the tip of his tongue.  Why?  This is

13  why.  Because The Beatles were obsessed with her.  Elsheikh was

14  a Beatle, and even years later, when he's interviewing with the

15  FBI, he names Aafia Siddiqui as someone who he believed received

16  an unjust sentence.

17          You've heard a lot about Mohammed Emwazi.  I'm not

18  going to play the beheading videos.  They're in evidence, but

19  out of respect for you and for the public, we're not going to

20  publish them right now, just as we didn't during the trial.  But

21  they're available for you to look at if you so choose during

22  your deliberations.

23          This collage is significant because Elsheikh, as you

24  will recall during Special Agent Chiappone's testimony, Elsheikh

25  told the FBI during his March 2018 interviews that he knew that

1   Emwazi was the masked executioner in the U.S. and the UK

2   beheading videos.  And he said he knew that in part because he

3   knew what Emwazi looked like with a mask on, and that he had

4   seen him wear a mask before on several occasions.

5           Take a look at these photographs, ladies and gentlemen.

6   How in the world would Elsheikh have known what Emwazi looked

7   like with this type of mask, the balaclava, where you can only

8   see the eyes?  Where would Elsheikh have seen Emwazi wear this

9   mask before?  These aren't the pandemic masks that we've all

10  been accustomed to wearing now.  This was over seven years ago.

11  Were they going on ski trips together as ISIS members in Syria?

12  No, of course not.  There are just three possibilities drawing

13  on the inferences -- drawing inferences from the evidence you've

14  received.  One, Elsheikh was there at the execution videos; two,

15  he saw Emwazi with the mask on around the hostages; or, three,

16  both.  Any of those leads to the same bottom line conclusion,

17  Elsheikh is one of the three Beatles.

18          And to top it off, you also heard that Elsheikh told

19  the FBI that he too had worn a mask before, when discussing

20  Emwazi's mask-wearing on several occasions.

21          Now, ladies and gentlemen, the evidence I just

22  summarized proves beyond a reasonable doubt that Elsheikh is a

23  Beatle, and that's before we even get to the media interviews.

24  All the evidence I've summarized has nothing to do with the

25  media interviews.  But given the media admissions, what he told

18

1    you and the world, we have proved beyond any shadow of a doubt

2    that Elsheikh is, in fact, an ISIS Beatle.

3            You heard during this trial that a common ISIS

4    propaganda mantra is:  Don't hear about us, hear from us.  And

5    in the first portion of my closing argument, you heard a lot

6    about Elsheikh and why he is unquestionably one of the ISIS

7    Beatles.  And now you'll hear from him through his countless

8    on-camera admissions.

9            (Video played in open court.)

10           MR. PAREKH:  Ladies and gentlemen, one thing I'll get

11   into in a little more detail later are the details of the

12   conspiracy.  This clip right here is emblematic of what a

13   conspiracy is:  "Me, Alexe, and Emwazi."  Here Elsheikh was

14   telling you himself that he was part of The Beatles ISIS

15   conspiracy.  They all shared a common purpose in the detention

16   and torture of all of the hostages.

17           (Video played in open court.)

18           MR. PAREKH:  He knows how to inflict pain, and, indeed,

19   you heard throughout this trial that he did inflict pain.  He

20   knows how to cause real damage, and the hostages testified that

21   that's exactly what he gave, he and his co-conspirators.

22           Federico Motka testified that he was waterboarded, that

23   he was beaten with a rubber cable for hours.  Daniel Rye Ottosen

24   testified that The Beatles hit him 25 times in his ribs on his

25   25th birthday.  Nicolas Hénin and Edouard Elias testified that

1    their beatings included all three Beatles.

2            And you heard repeatedly that James Foley,

3    David Haines, Federico Motka, you heard about their reaction to

4    The Beatles.  It was pure terror.  They were shaking, they were

5    crying.  Mock executions, beatings, being ordered to fight each

6    other, broken ribs, dead legs, psychological torment and

7    torture.  The Beatles threatened beheadings.

8            (Video played in open court.)

9            MR. PAREKH:  It was never published, it wasn't an

10   official video.

11           You heard from two of the hostages that are in the

12   Syrian execution photograph that's shown on the screen right

13   now.  Federico Motka and Daniel Rye Ottosen testified that all

14   three Beatles forced them to make signs.  They testified that

15   Ringo set up or held the camera while the Syrian man was

16   executed.

17           And you heard from Tyler Treml that this video was

18   indeed never publicly released or available, but yet Elsheikh

19   describes with precision the cards that the five hostages were

20   holding, the fact that they were seated around a semicircle, and

21   that there were photos taken of the hostages holding the cards

22   after the Syrian was shot and killed.  So how did Elsheikh know

23   all these details?  Because he was there.  And you know from the

24   evidence in this trial that he wasn't just present as an idle

25   observer, but he actively participated in this execution.

20

1            (Video played in open court.)

2            MR. PAREKH:  Did you hear how he described with

3    precision the proof-of-life emails?  He doesn't say "multiple

4    paragraphs;" he doesn't say "first, second, or third;" he says,

5    "one, two, three."  Take a look at all of the families' emails.

6    That's exactly how they're structured.  Why?  Because he wrote

7    them.

8            You know what else he said in that clip?  He said that

9    he took the email address of a brother of one of the family

10   members.  Take a look at the James Foley email.  What do you see

11   there?  Michael Foley.  You heard from Michael Foley.

12   Michael Foley is James Foley's brother.  That's not coincidence.

13   He was there.  He was taking the emails, and he's recounting

14   with precision exactly the structure of the emails and to whom

15   the emails were sent.  He's an ISIS Beatle.

16           (Video played in open court.)

17           MR. PAREKH:  Yet another example of how you know that

18   this defendant wrote the ransom emails.  He specifically uses,

19   "Secure their release."  Take a look at some of the emails to

20   the victim families, to the Sotloff family:  "Secure Steven's

21   release;" to the Mueller family, "Secure the release of four

22   French citizens;" again to the Mueller family, "No less than

23   5 million Euros will secure Kayla's safe release."

24           Why are these phrases able to roll off the tip of his

25   tongue so easily?  Because he wrote the emails.  What else is

 1      significant about this clip?  Take a look at how casually he
 2      mentions at the end:  "Don't know, maybe a breakdown in
 3      negotiation or whatever."  He's signaling that when the American
 4      families and the other families did not pay the ransom and there
 5      was a breakdown, whatever happened to them.  They were killed.
 6      He knew they were going to be killed.  He's writing the emails.
 7      He's not getting what he's asked for.  He and his
 8      co-conspirators are seeking totally unreasonable demands:
 9      100 million Euros, secure the release of all Muslim prisoners.
10      These are demands that could never have been met.
11             You heard that from the victim families.  And they were
12      very different than the European hostages, and that was for a
13      reason.  Because they always planned to kill the American and
14      UK hostages.  He's an ISIS Beatle, ladies and gentlemen.
15             (Video played in open court.)
16             MR. PAREKH:  Ladies and gentlemen, this is devastating
17      corroboration.  You heard from Frida Saide that this
18      proof-of-life video was never released.  She testified that she
19      was asked proof-of-life questions, including the name of her
20      childhood cat.  Didier Francois testified that he was asked
21      proof-of-life questions, including one about the name of his
22      cat.  Out of all of the proof-of-life questions he could have
23      recounted, he specifically selected the very precise one or a
24      similar one that multiple hostages were asked to provide.  Why?
25      Because he was there.  He was the one asking the hostages the

 1    proof-of-life questions.  He and his co-conspirators,

 2    Mohammed Emwazi and Alexanda Kotey, are the three ISIS Beatles.

 3             (Video played in open court.)

 4             MR. PAREKH:  You've seen this before.  Elsheikh is

 5    using the precise wording that was mentioned in the James Foley

 6    execution email:  "He will be executed as a direct result of

 7    your transgressions towards us."

 8             And then the note on the bottom, Government

 9    Exhibit 3-5, you'll recall that that was a script that was found

10    at the prison where the U.S. military did a raid.  "The

11    government must stop transgression."  Again, why is it that

12    these words are able to roll off the tip of his tongue so

13    easily?  Because he's there, he's writing the emails.

14             (Video played in open court.)

15             MR. PAREKH:  Ladies and gentlemen, this is devastating

16    corroboration.  You've heard from Frida Saide that this

17    proof-of-life video was never released publicly.  He's

18    recounting exactly verbatim what is stated in the beginning of

19    this proof-of-life video.  Why?  Because he was there.  And

20    you'll recall the testimony that, in addition to these three

21    women, who else was there?  Kayla Mueller.

22             These examples are just one of many granular details

23    that only The Beatles would know and distinctly remember.  This

24    evidence clearly shows you that Elsheikh was not only involved

25    in the proof-of-life emails, but, again, he wrote them.

1          (Video played in open court.)

2          MR. PAREKH:  Take a look at the indignation that he

3     expresses.  He knows he always wore a mask.  That's why he's

4     expressing so much surprise.  You heard released hostage after

5     released hostage testify that the three Beatles wore full face

6     masks and all they could see were their eyes.  That's why they

7     couldn't identify them, because the hostages stated that

8     The Beatles were always careful.  They were careful not the

9     leave fingerprints.  They wore gloves.  They wouldn't touch the

10    letters from the released hostages that were being sent out.

11         And what was the protocol when The Beatles would enter

12    their cell?  They had to kneel, they had to face the wall.

13    Don't look at them; otherwise, they would be beaten.  And one of

14    The Beatles, or all three of The Beatles, stated that if they

15    did look up, perhaps they would be killed.

16         You heard Daniel Rye Ottosen testify yesterday that he

17    struggled to even describe the mask.  You heard that testimony.

18    He was held in captivity for 13 months, and he was so afraid of

19    looking at The Beatles that he couldn't even describe the mask.

20    He said, "I think it was cloth-like but I was quite frankly too

21    afraid to look at them."  He made it difficult for the

22    Beatles [sic] to identify them because of the torture and the

23    beatings that they would be subjected to if they looked up.

24         Now, ladies and gentlemen, for the last part of my

25    closing argument, I'm going to transition to the elements of the

24

1    offenses.

2         So now you know beyond any doubt whatsoever that

3    Elsheikh is one of the ISIS Beatles.  So let's discuss the eight

4    charges and the elements, and how all of the evidence you've

5    seen and heard fits into the jury instructions that Judge Ellis

6    will soon give you.  As always, as Judge Ellis said, the Court's

7    instructions control.  This is merely a suggested road map.

8         So we've charged four conspiracy offenses.  Four out of

9    the eight charges involve conspiracy offenses.  And here I've

10   listed what the government must prove beyond a reasonable doubt:

11   "An agreement existed between two or more people to pursue a

12   criminal objective; Elsheikh knew the purpose of the agreement;

13   and Elsheikh knowingly joined the agreement intending to further

14   its purpose."

15        What were the criminal objectives of these conspiracy

16   offenses?  They're all closely related.  To commit

17   hostage-taking resulting in death; to murder U.S. nationals

18   abroad; to provide material support to terrorists resulting in

19   death; and to provide material support to a foreign terrorist

20   organization resulting in death.

21        So Count 1, the charge is conspiracy to take hostages.

22   What have you heard throughout this trial?  Well, the evidence

23   has shown that every released hostage testified about how they

24   were initially seized by members of ISIS and then continuously

25   detained by ISIS members, including The Beatles, the three

1   English-speaking guards with British accents.  You heard time

2   and time again from those witnesses that The Beatles acted as a

3   team, as a unit, and that they were very friendly with each

4   other.  It's clearly an agreement among them.

5          The Beatles were the lifeblood of the hostage

6   conspiracy.  They occupied a position of authority and they

7   worked together to accomplish its objectives.  And The Beatles

8   were not only the leader captors; they were intimately involved

9   in the ransom negotiations and the threats to kill, injure, or

10   continue to detain the hostages.  Every single released hostage

11   testified that The Beatles were the ones collecting email

12   addresses and information for the negotiations and conducting

13   the proof-of-life process.

14          You heard from each of the victims' families or their

15   colleagues about the ransom demands, that the money was in the

16   millions of Euros, or, for the U.S. citizens, political action

17   by the government, the release of Muslim prisoners, including

18   Aafia Siddiqui, and the cessation of coalition military activity

19   in Syria.  And you've seen the ransom demands themselves that

20   they explicitly threaten the lives, physical safety, and

21   continued detention of the U.S. hostages if their demands are

22   not met.

23          So, in short, ladies and gentlemen, the evidence is

24   overwhelming that members of ISIS, including The Beatles, of

25   which the defendant is a member, had an agreement to seize and

26

1    detain U.S. nationals and others, and threaten death, injury, or

2    continued detention of those hostages in order to compel their

3    families and governments to pay monetary ransom, or to engage in

4    or refrain from engaging in certain conduct.  That means that

5    the agreement satisfies all of the required elements for a

6    hostage-taking conspiracy.

7         Count 6, "Conspiracy to murder U.S. nationals."  There

8    are two ways that I believe you'll hear how the government can

9    prove that there was an agreement to murder U.S. nationals in

10   this case.  First, as you'll hear from the Court today, having

11   the intent to kill includes a plan to kill someone if a specific

12   demand is not met.  The evidence in this trial showed that from

13   the very beginning, The Beatles threatened death to the hostages

14   if their demands were not complied with.

15        But you also heard repeated testimony that their wrath

16   was particularly focused on the American and British hostages.

17   The ransom emails are explicit that death was an alternative if

18   the demands were not met.  And keep in mind, ladies and

19   gentlemen, this is conspiracy to murder U.S. nationals.  The

20   charge isn't here that Elsheikh personally murdered the

21   U.S. nationals.  It's an agreement.  It's not that Elsheikh

22   himself carried out the executions.

23        But the other way you can find the intent to kill is

24   looking closer in time to each hostage's death.  The evidence

25   shows that at some point after they were taken hostage,

1    The Beatles decided to kill the American hostages instead of

2    continuing to detain them.  You've been told about the videos

3    depicting the executions of Jim Foley and Steven Sotloff, the

4    video showing Peter Kassig's decapitated head, and email showing

5    Kayla Mueller's body.  Sometime after, they determined that

6    murdering the American hostages was better for their plans than

7    continuing to detain them or continuing to demand ransom.  And

8    at the moment that they and/or other members of ISIS decided

9    that, they formed the agreement to murder the U.S. hostages.

10           And you heard overwhelming direct evidence of that

11   intent expressed throughout this trial.  Remember when

12   Marcos Marginedas testified that when he was released in

13   April 2014, one of The Beatles told Jim Foley to touch him

14   because it was as close to freedom as Jim would ever get again?

15   And remember when Nicolas then testified and Edouard Elias

16   testified that all three Beatles made them listen to the words

17   of a parody of "Hotel California" that said that the hostages

18   would never leave and they would end up like Mr. Bigley, who was

19   beheaded?  And remember how the ransom email for Kayla Mueller

20   said that it was more beloved for them to put a bullet in the

21   back of her head than to release her for less than their

22   demands?  And if the family did not comply - and the family, of

23   course, couldn't comply, as you heard from their testimony -

24   that they would send them photos of Kayla's dead body?  Which is

25   exactly what happened here.

1          But perhaps most crystal clear is the email to

2    James Foley's family on August 12th, 2014, that explicitly

3    announced that James Foley would be executed.  And notice how

4    that email, like all the others, describes the captors as "we"

5    or "us."

6          So, ladies and gentlemen, the evidence shows well

7    beyond a reasonable doubt that at a minimum, by this point in

8    the hostage's captivity, The Beatles had entered an agreement

9    that they would deliberately murder the U.S. hostages.  And note

10   that several emails were sent to the families of the U.S.

11   hostages following James Foley's execution, all from the same

12   exact Safe-mail.net accounts that had been used before.

13         You can infer, members of the jury, that The Beatles

14   were continuing their activities together preparing to execute

15   the U.S. hostages.

16         Now, Count 6 has an additional requirement called an

17   overt act.  And that means that at some point after the

18   agreement was formed, at least one of the co-conspirators took a

19   substantial step towards accomplishing the objective of the

20   conspiracy; that is, towards murdering at least one of the

21   U.S. hostages.

22         Members of the jury, you have all the evidence you

23   need, unequivocal examples of such substantial steps.  Of

24   course, Mohammed Emwazi actually beheading the American hostages

25   on video; but, even before that, once the agreement was formed,

1    The Beatles continued to detain the hostages for the purpose of

2    killing them.   And that is another substantial step towards

3    accomplishing that objective.

4           So, ladies and gentlemen, the government has

5    demonstrated not only that the agreement existed, but that

6    substantial steps to complete the murder were, in fact, carried

7    out by the co-conspirators.

8           Now let's talk about Count 7, the agreement to provide

9    material support to terrorists.   Now, you'll actually see, when

10   we get to Count 8, that material support to ISIS includes things

11   like providing personnel.   So that's providing, including

12   Elsheikh himself providing himself, to the terrorist

13   organization, for services.

14          So to prove the conspiracy or the agreement charged in

15   Count 7, the government needs to prove that an agreement

16   existed, that a person would provide personnel or services,

17   knowing that their support would be used to carry out the

18   hostage-taking or murder crimes that the government has alleged.

19          And the crimes of hostage-taking and murder that the

20   government has proven over the course of this trial were large

21   undertakings involving a number of actors, including

22   The Beatles.   You heard testimony from every one of the released

23   hostages not only about The Beatles, but also about the massive

24   support structure surrounding these crimes.   The numerous

25   prisons the hostages were kept in and the local guards who kept

1    watch and did daily ministerial tasks like bringing the hostages

2    food or taking them to the toilet; all of these, ladies and

3    gentlemen, are examples of material support to these crimes.

4    And you can, for example, infer from their participation that

5    the local guards were all part of an agreement to provide the

6    personnel and services, knowing that it would be used for

7    hostage-taking and murder crimes alleged in the indictment, even

8    if they didn't particularly care about the success of the

9    endeavor.

10         So the government has proved beyond a reasonable doubt

11    that there was a wide-ranging scheme of material support to

12    these crimes.  And, of course, again, at the heart of this

13    conspiracy of material support were The Beatles, who themselves

14    provided services as the hostage negotiators, the torturers, and

15    the supervisors of these crimes.

16         Now let's go to Count 8.  This is the conspiracy to

17    provide material support to ISIS.  As I noted, material support

18    or resources includes things like personnel, including the

19    defendant himself, and services to a terrorist organization; in

20    this case, ISIS.

21         The evidence, ladies and gentlemen, for this charge is

22    straightforward and clear-cut.  You heard testimony from

23    Professor Hoffman that the Al-Nusra Front and ISIS have been

24    designated terrorist organizations.  You then heard testimony

25    from FBI Special Agent John Chiappone that in his interview of

1    the defendant in March 2018, the defendant admitted that he left

2    the United Kingdom in 2012, first joining Al-Nusra and then

3    joined ISIS in 2013.  You heard that he acquired weapons for

4    ISIS and that he saw a lot of death while he was there.  That's

5    conspiring with others like Kotey and Emwazi and other ISIS

6    fighters to provide services to ISIS as a fighter himself.

7          So the only question left on Count 8, ladies and

8    gentlemen, is whether the defendant knew that ISIS had engaged

9    or was engaging in terrorism.  Of course he did, ladies and

10   gentlemen.  In fact, this defendant put the terror in terrorism

11   himself.  And his exceptionally violent conduct on behalf of

12   ISIS clearly demonstrates that he knew that ISIS was engaging in

13   terrorism.  He was engaging in terrorism himself on behalf of

14   the organization.

15         And you heard from Tyler Treml and Professor Hoffman

16   about ISIS's very sophisticated media organization and their

17   highly advanced use of social media and propaganda.  ISIS's

18   terrorism was globally publicized, even outside the

19   organization.  So there's simply no way, on these facts, that

20   the defendant remained in the dark about ISIS's activities as a

21   terrorist organization.

22         I've just walked you through how the government has

23   proven that these conspiracies existed in the first place.  I

24   now am going to touch on the four what we call "substantive

25   counts" of the indictment, and that's the hostage-taking that

1    we've alleged in this case.  That's Counts 2 through 5.

2            Now, the law treats conspiracies, which are agreements

3    to commit a crime, and actually committing the crime, as

4    separate offenses.  But because The Beatles agreed to commit and

5    then did commit the offenses, much of the evidence I'll describe

6    here will be the same.  So let's go to proving the

7    hostage-taking.

8            Well, you know that all four victim families received

9    ransom demands in the form of money or the release of Muslim

10   prisoners or in exchange for Aafia Siddiqui.  For these charges,

11   ladies and gentlemen, you actually have three different

12   theories, or separate roads, all of which can lead to guilty, so

13   long as the government proves at least one of them beyond a

14   reasonable doubt.

15           The first way is as a principal, which means that

16   Elsheikh personally committed all of the acts necessary to

17   commit the offense himself.  For hostage-taking, that means that

18   Elsheikh seized and detained a specific victim named in the

19   count.  As you'll see, we have four separate counts, each

20   relating to a different U.S. victim.  "Or continued to detain

21   that person, and did so in order to compel a third party or a

22   government organization to pay a monetary ransom to do a

23   specific act or to refrain from doing a specific act as a

24   condition of that person's release."  And the government submits

25   to you that all of the evidence that I've recited says exactly

1    that.

2            As one of The Beatles, Elsheikh personally held the

3    hostages captive and wrote ransom demand emails to the families

4    of the victims demanding money or demanding that the U.S.

5    government do some act like releasing Muslim prisoners or

6    refraining from doing some act like ceasing military operations

7    in Syria.

8            The second way that Elsheikh can be found guilty of the

9    substantive offenses is by what's called "aiding and abetting

10   its commission."  This means that although some other person may

11   have personally committed all the acts necessary for the

12   offense, Elsheikh, one, "knew the crime was going to be or was

13   being committed; two, knowingly did some act for the purpose of

14   aiding, commanding, or encouraging the commission of that crime;

15   and, three, did so intending that the crime be committed."

16           So let me give you an example.  The person who

17   knowingly and intentionally aids a bank robber by driving him to

18   and from the bank is just as guilty of robbery as the one who

19   actually took the gun into the bank.  That's aiding and abetting

20   liability.

21           So likewise here, if you conclude that the government

22   has proved beyond a reasonable doubt that a particular act of

23   hostage-taking was committed by someone else, such as another

24   Beatle, including Mohammed Emwazi, but that Elsheikh knowingly

25   did an act that aided and abetted the hostage-taking, intending

1    that the hostage-taking be committed, that means that Elsheikh

2    is still guilty of committing the hostage-taking offense under

3    this theory of liability.

4           There's also a third theory of liability called

5    "co-conspirator liability."  For the sake of time, I'll just

6    skip past this one because I submit to you that the evidence is

7    overwhelming when it comes to the aiding and abetting theory of

8    liability.

9           Now, the last portion that I want to address is the

10   resulting-in-death component of these offenses.  Now, as

11   Judge Ellis will instruct you, if you find that the defendant

12   committed the basic offenses charged in Counts 1 through 5, 7,

13   or 8, such as joining the conspiracies to take hostages or to

14   provide material support or committing the substantive

15   hostage-taking, you will have to decide whether the commission

16   of the offense resulted in the death of at least one person

17   identified in that count.

18          The reason I'm addressing the resulting-in-death

19   section at the end is because the analysis for whether you find

20   the offense resulted in the death of a person named in the

21   indictment is all the same.  And it's actually very

22   straightforward, I submit to you.

23          As the Court will instruct you, the analysis for

24   resulting in death is called but-for causation, and it's a

25   straightforward question.  If the offense had not been

35

1    committed, would the victim have died?  That's it, ladies and

2    gentlemen, cause and effect.

3          And you will see in the Court's instructions that the

4    government does not have to prove that anyone, including the

5    defendant or anyone else, intended the offense to result in

6    death.  And you will also see in the instructions that we do not

7    have to prove that the defendant did some specific act that

8    resulted in the victim's death.  We don't even have to prove

9    that the victim's death was reasonably foreseeable to the

10   defendant.  Instead, we just have to prove cause and effect;

11   would the victim have died if the offense had not been

12   committed.

13         Well, you know, ladies and gentlemen, that the answer

14   here is a resounding "no" across the board.  The American

15   citizens, James Foley, Kayla Mueller, Steven Sotloff, and

16   Peter Kassig, as well as UK citizens David Haines, Alan Henning,

17   and Japanese citizens Haruna Yukawa and Kenji Goto, were all

18   killed as a direct result of the offenses committed by

19   The Beatles and their other ISIS co-conspirators.  The evidence

20   overwhelmingly establishes those facts.

21         James Foley and Steven Sotloff were beheaded on video

22   as a result of being taken hostage by the Islamic State and

23   The Beatles specifically.  If the defendant and his

24   co-conspirators had not engaged in this conspiracy and taken

25   them hostage, Jim and Steven would not have died in August and

1    September of 2014.  They would have lived and continued to

2    report on conflict zones around the world.

3         But for the defendant and his co-conspirators,

4    Peter Kassig also would not have been killed in November 2014

5    for the propaganda purposes of the Islamic State.  Peter would

6    have lived and continued to run SERA, bringing medical aid and

7    training to war torn regions to help alleviate their suffering.

8         And likewise, the UK and Japanese citizens were all

9    killed by Emwazi in videos that you have in evidence, resulting

10   from The Beatles' conspiracy to provide themselves and their

11   services to ISIS in pursuit of the crimes of hostage-taking and

12   murder.  Those too are deaths resulting from the commission of

13   Counts 7 and 8.  But remember, we only have to prove that at

14   least one had resulted in the death of a person.

15        And what about Kayla?  If Kayla had not been taken

16   hostage by the defendant and his co-conspirators, she would have

17   never been kept in captivity for all that time.  She would have

18   never been given to the Sayyafs as a slave, or to al-Baghdadi,

19   and she would have never died in February 2015.  She would have

20   lived and continued her calling as a humanitarian aide -- to

21   bring humanitarian aid to those in need.

22        Now, remember that this defendant admitted that he

23   personally extracted an email address from her.  Let's talk

24   about the circumstances of her continued captivity.  When Kayla

25   was at The Desert Prison, Frida Saide heard the three Beatles

1   all tell Kayla she will be held forever if the ransom demands

2   are not paid.  Remember this testimony:  There's an email sent

3   even after the July 4th raid, again from the same Safe-mail.net

4   email address and after Kayla is moved to a different prison,

5   where The Beatles are continuing to demand ransom.  That's

6   August 1st, 2014.  And then you have an email from September 19,

7   2014.  She was held as a slave in the Sayyaf residence where she

8   was locked in a room, threatened, raped, and never allowed to

9   communicate with her family.  And this email, again, was sent by

10  The Beatles after she had been moved to another prison.

11          What this shows you, ladies and gentlemen, was that the

12  conspiracy was continuing.  ISIS was continuing to demand ransom

13  for her release, even while she was being moved around to other

14  prisons.  It was all one continuous event where Kayla was not

15  allowed to leave captivity.  She was being kept against her

16  will, and she died as a result of being held as a captive.

17          Now, you remember that Lea Mulla testified that they

18  were in a home surrounded by weapons, they were locked in a

19  room, and women who had been kidnapped and made slaves by ISIS

20  were raped, including Kayla Mueller, who she said had been raped

21  by the leader of ISIS, Abu Bakr al-Baghdadi, the then-leader of

22  ISIS.  All of this demonstrates the extreme coercion of her

23  captivity by ISIS.

24          Then you heard, ladies and gentlemen, even years later,

25  you heard this defendant defend the ISIS ideology that kept

38

1    Kayla Mueller as a slave.  Listen to what he says.

2            (Video played in open court.)

3            MR. PAREKH:  Even years later, ladies and gentlemen,

4    Elsheikh is continuing to defend the practice of slavery.  And

5    you know from all the testimony you heard at this trial that

6    Kayla Mueller was held captive and she was held as a slave until

7    her death.

8            Now, what about that claim that she was killed by

9    Jordanian air strike?  You may be wondering that.  Right?  You

10   saw that ISIS Tweet and the press announcement.  Ladies and

11   gentlemen, the government submits that Kayla's death in an air

12   strike is just another one of ISIS's propagandistic lies.  You

13   heard ISIS and The Beatles repeatedly threaten Kayla's life in

14   their ransom demands.  They said it would be more beloved to put

15   a bullet in the back of her head than to release here.  They

16   said if their demands were not met, they would send Kayla's

17   family photos of her dead body, and the government submits that

18   they did exactly that.

19           But even setting that aside, ladies and gentlemen, the

20   law does not require you to conclude that ISIS or The Beatles

21   directly killed Kayla for you to find that the hostage-taking

22   offenses charged resulted in her death.  Assume this unlikely

23   scenario that she was killed in a Jordanian air strike.  First

24   of all, why was she at that home in the first place?  She was at

25   that home because ISIS never let her go.  So she would have

1    never been killed by this so-called air strike if she was never

2    taken hostage in the first place by this defendant and his

3    co-conspirators.  So even in that unlikely scenario, which the

4    government submits is a bunch of baloney, that still would

5    result in Kayla's death from the hostage-taking offense that we

6    described.

7         But take a look at the very first email that Kayla's

8    parents are sent on May 23rd, 2014.  They call her a prisoner.

9    And then, when ISIS issues its announcement, what's the title?

10   "Killed an American Female Prisoner."  She was always a

11   prisoner.  She was never let go, she was never free.  She was

12   always held as a captive.  And so whatever may have happened to

13   her - and the government submits that she was killed by ISIS -

14   that's obviously for you to decide.

15        But the government submits to you that that's what the

16   evidence showed, that she was killed by ISIS.  No matter what

17   alternative theory you believe, her death resulted as a

18   commission of the hostage-taking offenses.

19        This is also significant, ladies and gentlemen.  The

20   same exact Safe-mail.net account that's used to communicate with

21   Kayla's family is the one that's used to announce her death to

22   her family.  So this notion that The Beatles were not involved,

23   that's not true.  The same exact email account is being used to

24   tell her family that she died.  Well, how did The Beatles know

25   the day after or a few days after that she was killed in an air

1    strike and where she was located, unless they were following her

2    captivity the whole time.

3         They were referring to her family and sending

4    photographs of Kayla's dead body almost in real time, just a day

5    or two after.  Why?  Because she was being held all along by

6    ISIS, and The Beatles were fully aware of where she was located.

7         So that brings us to the end, ladies and gentlemen.

8    The deceased victims in this case, including Kayla Mueller,

9    Peter Kassig, Steven Sotloff, and James Foley, as well as the

10   British and Japanese citizens, they were humanitarian aid

11   workers and journalists who were subjected to unjustifiable acts

12   of cruelty.  These individuals came to Syria to promote peace

13   and enlightenment in a country torn by war, and to alleviate

14   suffering among those most in need.

15        This defendant, El Shafee Elsheikh, responded with

16   systematic, premeditated, and relentless abuse and torture of

17   the individuals that he and his co-conspirators took hostage,

18   including those who tragically died as a result.

19        What these horrific crimes left behind is a legacy of

20   brutal killings and shattered families.  Based on all of the

21   evidence you have seen and heard, we respectfully request that

22   you return a verdict of guilty for each and every count on your

23   verdict form.

24        Thank you very much.

25        THE COURT:  All right, ladies and gentlemen, you've

1      been sitting now for roughly an hour and four minutes, or

2      thereabouts.  The next argument may take almost that long.  Do

3      you want to take a recess now before beginning the other one?

4             All right.  We will do that.  Pass your books to the

5      right, put them in the usual cubbyholes, and we will recess now

6      until 10:35.  Will that give you enough time to have a soft

7      drink?  Good.  10:35, and avail yourselves of the snacks.

8      Remember not to discuss the matter among yourselves or with

9      anyone, or undertake any investigation on your own.

10            You may follow the court security officer out.

11            (Jury out at 10:15 a.m.)

12            THE COURT:  Court stands in recess until 10:35.

13            (Recess taken at 10:16 a.m.)

14            (Jury in at 10:42 a.m.)

15            THE COURT:  Ladies and gentlemen, I hope you found

16     snacks and soft drinks.

17            All right.  We'll proceed now to hear closing argument

18     on behalf of the defendant and the government's rebuttal.

19            Ms. Ginsberg, are you ready to make your closing

20     argument on behalf of the defendant?

21            MS. GINSBERG:  Yes, thank you, Your Honor.

22            THE COURT:  You may proceed.

23            MS. GINSBERG:  Members of the jury, I want to thank you

24     again, as Mr. Parekh did, for your service these last few weeks.

25     We know we've asked you to make a lot of personal sacrifice to

1    be here, and you, unlike many other juries, have been asked to

2    listen to some very horrific evidence.  And we appreciate the

3    toll that that, I'm sure, has taken on you, as it's taken on

4    every single person in this courtroom.

5            As Mr. MacMahon told you at the beginning of this

6    trial, the right of an accused to a trial by jury is one of the

7    most fundamental freedoms enshrined in our Constitution.  It's

8    one of the rights that FBI Agents Dan Story and Brian Driscoll

9    risked their lives by going to Syria to preserve.  And as

10   Mr. MacMahon also told you at the beginning to this trial,

11   juries serve as a bulwark to protect the accused, because no

12   person in our country can be convicted of a crime - and that's

13   any crime, no matter how horrific - unless the government proves

14   his guilt beyond a reasonable doubt.

15           Mr. Elsheikh is one of those persons.  He's presumed to

16   be innocent.  And now it falls to you as jurors to decide

17   whether the government has met its burden.

18           It's also impossible to go on without first

19   acknowledging the brutal torture and deaths of James Foley,

20   Steven Sotloff, Peter Kassig, and Kayla Mueller, and of

21   David Haines, Alan Henning, and John Cantlie.  They were

22   loathsome, unforgivable, and senseless acts.

23           The same has to be said for the former hostages who

24   suffered the same brutal mistreatment, but were fortunate enough

25   to survive.  Each of the hostages risked or lost his or her life

1    to bring the world news about the war in Syria, or to provide

2    aid to victims of Bashar al-Assad's war on his own people.

3    These extraordinary men and women, and the members of their

4    families, were and are among the bravest people any of us may

5    ever have the privilege to know.

6          None of what happened to the hostages is in dispute.

7    The question you must decide, however, is whether Mr. Elsheikh,

8    the person accused in this case, bears responsibility for these

9    acts.  And while you have heard that he voluntarily became a

10   member of ISIS and heard evidence about his statements to the

11   media, we submit that the evidence has not shown beyond a

12   reasonable doubt that Mr. Elsheikh was involved in the

13   kidnappings, torture, or deaths of any of the hostages.

14         Now, Mr. Parekh has told you why the government

15   believes that they have.  I would like to make some -- put some

16   perspective on those arguments.

17         First, none -- Mr. Elsheikh was not identified in this

18   courtroom by any of the former hostages.  Let me say it again.

19   Mr. Elsheikh has never -- was never identified at this trial by

20   any of the former hostages.  That is what people would probably

21   call the white elephant in the room.  No one who wasn't a law

22   enforcement officer, who already knew Mr. Elsheikh's identity,

23   identified Mr. Elsheikh, except for Omer Kuzu, who is hoping

24   that the government will help him reduce what he expects to be a

25   20-year sentence in American prison.

1              Mr. Elsheikh went to Syria in 2012 to fight against the

2     Assad regime.  He was captured fleeing from Syria by the Syrian

3     Democratic Forces, known as the SDF, in January of 2018.  ISIS

4     didn't exist when he went to Syria.  Mr. Elsheikh admitted,

5     however, that he did become a member of ISIS.  And however

6     unacceptable you may believe that to be, that is not the

7     majority of the crimes that he is charged with in this case.

8              You may find him guilty of providing material support

9     to a terrorist organization, which is the first part of Count 8

10    in the indictment, but to hold him responsible for the deaths

11    charged in Count 8 and the remaining seven counts of the

12    indictment, you must find that he was a member of The Beatles.

13    Mr. Parekh tried very hard to convince you that he was.  We

14    submit that you cannot do that based upon any identification of

15    Mr. Elsheikh that has been made in this courtroom or by the

16    overwhelming evidence that was presented during this trial.

17             You've heard evidence from Agent Chiappone that

18    Mr. Elsheikh admitted his involvement in ISIS during his FBI

19    interview that occurred two months after he was captured by the

20    SDF.  Through all of 2018, he made no admissions regarding any

21    involvement in the hostage-taking scheme, either to the FBI or

22    during any of the seven media interviews that were played to

23    you, um, by the government that occurred in 2018.

24             You also heard the reason that changed in 2019 was so

25    that he could avoid being sent to Iraq for a summary trial and

1    execution.  It wasn't until Mr. Elsheikh had been held as a

2    prisoner of the SDF for a year and a half, which is longer than

3    some of the hostages in this case were held, and was facing the

4    real threat of being sent to Iraq for a summary trial and

5    execution that he implicated himself in the hostage-taking

6    scheme, by telling reporters things that he could have learned

7    in ways that did not mean that he had to be present or had to be

8    a member of The Beatles.

9           Now, as hard as the government tried, it has not proven

10   that Mr. Elsheikh was one of The Beatles.  Former hostages sat

11   20 -- 10, maybe 20 feet from Mr. Elsheikh in this courtroom.

12   They looked straight at him.  Not one of the four prosecutors in

13   this case asked any of the former hostages to describe any of

14   The Beatles' physical attributes.

15          We heard a lot about the masks that they wore.  We

16   heard that they tried to conceal their identities.  But after

17   months and even years of captivity with The Beatles, you didn't

18   hear any of the former hostages describe any physical attribute

19   or attribute of a person's demeanor that could identify

20   Mr. Elsheikh.  Not a single hostage was asked by the government

21   to describe his or her captor's physical appearance, even if

22   only as compared to the other Beatles or compared to the height

23   and weight of any of the hostages.

24          None of the hostages was asked questions about

25   The Beatles' height, their body size, their weight, their skin

1    tone, the size of their hands, the size of their feet, the way

2    they walked, all things that they had more than ample

3    opportunity to observe.  The former hostages were never asked

4    about any aspect of The Beatles' demeanor, and whether it

5    matched anything about Mr. Elsheikh, even after they watched

6    some of the media clips that they actually saw in this

7    courtroom.

8            Mr. Ottosen described the person he called Ringo at the

9    Syrian execution.  It was the only time that the hostages

10   described not being blindfolded.  He said he stood meters away

11   from the hostages holding a camera, closer or the same distance

12   between each of them in this courtroom and Mr. Elsheikh.

13           Mr. Motka also testified that the hostages' blindfolds

14   were removed at the Syrian execution.  They all saw that

15   Mr. Emwazi wore black trousers and long black tops.  Mr. Motka

16   testified that Ringo was holding a camera during the Syrian

17   execution, standing four meters away from him.

18           Several of the hostages described riding in cars with

19   The Beatles, yet none of them was asked anything about

20   Mr. Elsheikh's physical appearance and whether it resembled the

21   person that he described that either he or Mr. Motka or

22   Mr. Ottosen described as Ringo.

23           Several of the hostages, including Mr. Ottosen, said

24   that The Beatles sometimes wore gloves.  The only hostages who

25   said that The Beatles wore gloves were the hostages who were

1    questioned by Mr. Parekh.

2          Would you please display Government's Exhibit 1-24E,

3    25C, 27B, and 29E.

4          In the most public and brutal acts engaged in by

5    Mr. Emwazi, Mr. Emwazi did not wear gloves.

6          Another of the hostages also testified that they

7    overheard their captors talking out of their presence.

8    Mr. Motka testified that during the early part of his captivity

9    The Beatles joked with each other and engaged with the hostages.

10   He said The Beatles told them some things about their personal

11   lives but that things changed by the time they arrived at

12   The Riverside Prison.

13         Now, Mr. Motka did testify that he heard the person he

14   identified as Ringo say he was outside a pub at a protest and

15   got into an altercation with the EDL.  Both Mr. Kotey and

16   Mr. Elsheikh were at that demonstration.  Police

17   Constable Barry Goodman described Mr. Kotey's demeanor at that

18   demonstration.  He testified when he was arrested, Mr. Kotey's

19   demeanor was like someone in a street gang, antagonistic and

20   calling people racists.  Mr. Elsheikh, on the other hand,

21   prepared a written statement denying his involvement.

22         None of the former hostages was asked to describe the

23   discussions they heard The Beatles having about their lives that

24   could be used in any way to identify Mr. Elsheikh.  When

25   discussing whether the government had proved that Mr. Elsheikh

1    was one of The Beatles, I hope you'll ask yourselves why.  I

2    submit the reason is because anything that they heard would not

3    have identified Mr. Elsheikh.

4         This is especially true because the hostages themselves

5    testified that they spoke and talked amongst themselves about

6    The Beatles' personal characteristics.  The hostages had a

7    number of other opportunities to observe The Beatles and to

8    identify Mr. Elsheikh.  The hostages were able to observe other

9    people being tortured by guards in the corridor outside the room

10   where they were being held by looking through the space under

11   the door or when being taken to the toilet.  They also testified

12   they heard The Beatles in the corridors.

13        They rode in vehicles with them, at least during one of

14   the prison transfers and prior to several of the hostages being

15   released.  Even though they wore masks, the hostages had --

16   certainly had opportunities to see and hear their captors.

17        Most of the hostages testified that at The Mansion

18   Prison, The Beatles were staying in the room which was called

19   The Tearoom by one of the witnesses, between the male and the

20   female hostages.  One of the hostages said that he heard

21   The Beatles using a computer.  If they could hear a

22   hostage [sic] using a computer, they certainly would have

23   overheard the hostage -- The Beatles talking with each other.

24   And anything they overheard them saying would have been

25   information that could have been used to help identify who their

1    captors were.  They were not asked by the government about what

2    they did hear, and that's because it did not describe

3    Mr. Elsheikh.  If it had, you can be certain you would have

4    heard that question answered by one of the hostages.

5         There was also no forensic evidence linking

6    Mr. Elsheikh to any of the locations where the hostages were

7    held.  The raid on Abu Sayyaf's house in May of 2015 produced a

8    wealth of evidence that was possessed by members of the ISIS

9    leadership.  I think you'll recall that Abu Sayyaf was described

10   by Agent Driscoll as part of the ISIS leadership.

11        Would you display, please, Government's Exhibit 20-1

12   and 20-2.

13        These are the computers, electronic devices, telephones

14   that were seized by the FBI from Abu Sayyaf's home.  If

15   Abu Sayyaf was in a leadership role and if Mr. Elsheikh was also

16   in a leadership role, as the government would have you believe,

17   and as Mr. Kuzu attempted to convince you was the case, would

18   there not have been some communication between Abu Sayyaf and

19   Mr. Elsheikh found on one, even one of the computers or

20   telephones found at Abu Sayyaf's home?

21        I think you've all seen enough police shows to know

22   that the FBI would have examined every single device that was

23   seized from that residence, and if they found even a single

24   communication with Mr. Elsheikh on any of the computers or

25   phones, you would have heard about that testimony in this trial.

1          The same is true for the raid on July 4th, 2014, raid

2    at The Desert Prison described by both Mr. Hénin and Mr. Ottosen

3    as the final prison where they were held before being released.

4    Agent Story led the FBI raid to The Desert Prison.  The evidence

5    that was recovered was undoubtedly forensically examined, even

6    if, as Agent Story testified, the purpose of the raid was not to

7    conduct a forensic investigation.

8          Several of the hostages, including Mr. Elias, testified

9    that The Beatles were often present at The Desert Prison.  They

10   found weapons, radios, cuffs, iron restraints, two telephones at

11   that location.  No evidence linked Mr. Elsheikh to the prison,

12   not a fingerprint, not a scrap of DNA, not a hair from his head

13   was discovered in the prison or the two adjacent buildings at

14   the site of the raid.  Even though the purpose of the raid was

15   not for a forensic investigation, it is impossible to believe

16   that the evidence that they did seize was not forensically

17   examined.

18         Mr. Kuzu would have you believe that Mr. Elsheikh was

19   part of the ISIS aristocracy, the term that he admitted he came

20   up with for the first time during this trial, a term I'm certain

21   he thought would please the government.  He met with the

22   government four or five times to prepare for his grand jury and

23   trial testimony.  He was asked to -- he was asked each time to

24   describe his interactions with Mr. Elsheikh.  He never told the

25   government that he saw Mr. Elsheikh with a Glock during any of

1   his four or five prep sessions before he testified under oath
2   before the grand jury.
3           Mr. Kuzu knows that the government, not the judge in
4   his case, but that it is the government that will decide whether
5   he was telling the truth at this trial, and whether he deserves
6   a reduction from his 20-year sentence.
7           Mr. Kuzu admitted watching ISIS media propaganda, and
8   specifically admitted watching the film -- the video, "Flames of
9   War," which you've seen parts of.  But he wouldn't answer
10  Mr. MacMahon's question, when he was asked whether he enjoyed
11  it.  But he also didn't go to Syria and join ISIS until after he
12  had watched those videos.  I ask you, is that a person who can
13  be believed?
14          Now, it was very important to the government that all
15  of The Beatles be present at each of the incidents with the
16  hostages, and the reason for that is that none of the hostages
17  were able to identify Mr. Elsheikh.  How many times did
18  Mr. Parekh ask his witnesses if all three Beatles were always
19  present, and whether The Beatles always wore masks and always
20  wore gloves?  You heard from at least three of the hostages, who
21  were brutally tortured -- that were brutally tortured by other
22  ISIS fighters and guards, who wore masks, guards who came into
23  contact with these hostages before they ever were confronted
24  with The Beatles. The early days of a number of the hostages'
25  captivity were described as being filled with gruesome forms of

1    torture, and that torture was inflicted before any of those --

2    any of those individuals ever came in contact with The Beatles.

3         Mr. Hénin testified that there were two and sometimes

4    three Beatles of The Beatles present.  Mr. Motka testified that

5    The Beatles switched who came to ask for email addresses, that

6    they were dressed in dark green or black.  Other hostages

7    testified that they wore green.  The Beatles, they said they

8    wore gloves when touching something.

9         Mr. Hénin described what he called the Da'wah preaching

10   session that focused on, he said, predominantly The Beatles'

11   justification for their capture.  He said an eye for an eye,

12   attacks on tourists.  That is the exact same way Mr. Kotey

13   described collateral damage in one of the joint media

14   interviews.

15        He also described an incident when the only -- only one

16   Beatle he identified as George came into their cells and

17   punished him for his prior escape attempts.  I submit to you

18   that it is not possible, from the testimony you heard during

19   this trial, to determine whether the hostages were talking about

20   the same person when they described one of The Beatles as Ringo

21   and one of The Beatles as George.

22        The government needed -- for that very reason, the

23   government needed all three Beatles to be present, because no

24   one could agree on which Beatle was Ringo, which Beatle was

25   George, and no one could identify Mr. Elsheikh as one of

1    The Beatles.

2           Ms. Chavez testified that The Beatles covered their

3    faces.  She said they wore black tunics and black pants, but she

4    described nothing else about their appearances.  She testified

5    that The Beatles started to come to The River House after the

6    first three or four days, and she was one of the witnesses who

7    testified that they stayed in the room in between the male and

8    female hostages.  She said she could hear them talking to the

9    male hostages.  She could hear them preaching to the men.  They

10   all had opportunities to learn information that they could use

11   to describe The Beatles.

12          Ms. Chavez also testified that it was a person she knew

13   as Abu Ahmed, who she also identified as Mr. Emwazi, as the

14   Beatle who asked the women for their email addresses and

15   proof-of-life questions.  She also testified that all of

16   The Beatles talked about Aafia Siddiqui.  She never described

17   any of them as wearing gloves.

18          Frida Saide also testified that The Beatles moved in to

19   that room between the men and the women hostages.  She also

20   heard The Beatles talking with the male prisoners, but she was

21   never asked to describe anything that distinguished their voices

22   or anything about their appearance.

23          Mr. Elias didn't see The Beatles until he moved -- he

24   was moved into the Sheikh Najjar prison.  He testified that

25   The Beatles lived in that room when they were at The Riverside

1   Prison.  He said he heard them working on computers.  If he was

2   able to hear the sound of the computers, he must have been able

3   to hear them talking.  The only reason not to ask him what he

4   heard is that none of The Beatles could have been identified as

5   Mr. Elsheikh.

6          Mr. Elias also testified that he saw shadows of their

7   faces.  Ask yourselves why he wasn't asked if he could identify

8   Mr. Elsheikh or describe any of the features he observed on

9   those Beatles.

10         All of the released hostages were taken into that small

11  room to make proof-of-life videos.  They were within feet of

12  each of The Beatles.  Again, ask yourselves why were they not

13  asked to describe any of the features that could be used to

14  identify Mr. Elsheikh as one of them.  This can be the only

15  reason why it was so important that Mr. Elias and the other

16  hostages testified that there were always three Beatles present.

17         Mr. Elsheikh admitted his involvement with ISIS.  He

18  didn't attempt to hide that when he was interviewed by the FBI.

19  Mr. Hoffman, the government's terrorism expert, told you that

20  the uprising against the Assad regime caused a horrific

21  humanitarian crisis that aid workers and journalists from around

22  the world responded to.

23         Mr. Gibbs also told you in his opening statement that

24  ISIS fought against the Assad regime.  You know from the

25  Telegram chats on Khalid Elsheikh's phone that as a member of

1     ISIS, Mr. Elsheikh also fought against Division 17 of the Assad

2     regime.  Khalid Elsheikh received the "Rambo" photo of

3     Mr. Elsheikh on July 12th, 2014, and photos from a Division 17

4     battle on July 25th, 2014.

5          Mr. Elsheikh was involved in his fight against the

6     Assad regime in the months immediately prior to the first

7     execution.  It is for you to decide whether someone who was a

8     person who was engaged as an ISIS fighter was also somebody who

9     was preparing hostage -- involved in hostage negotiations and

10     preparing for hostage executions at the same time he was busy in

11     a battle with the Assad regime.

12          Now, Mr. Elsheikh and Mr. Kotey both gave fake names

13     and spoke only in Arabic when they were captured in January of

14     2018.  But once Mr. Elsheikh's identity was discovered, he

15     immediately identified Mr. El Kotey [sic] rather than conceal

16     the identity, as he might -- Mr. Kotey's identity, as he might

17     have done as a co-conspirator.

18          When he was interviewed by Agent Chiappone in March of

19     2014, it was at a time when it was still early in his SDF

20     custody.  He had at that point only been in prison for a period

21     of about two months.  The interview was conducted in an SDF

22     prison, an interpreter -- an FBI interpreter, Agent Chiappone

23     testified, was present for the interview so that the SDF

24     guard -- one of his SDF guards would know what Mr. Elsheikh had

25     said.

 1          He admitted to training in firearms in the British

 2   cadets.  He didn't hide -- he didn't attempt to hide his

 3   association with the cadets.  And, in fact, you heard in one of

 4   the interviews, both Mr. Elsheikh and Mr. Kotey admitted that

 5   they had been members of the British Army Cadets.

 6          Mr. Elsheikh did know and was friends with Mr. Emwazi

 7   and Mr. Kotey.  He described in some detail the basis of their

 8   friendships.  He told the agent that Mr. Emwazi and Mr. Kotey

 9   entered Syria together two months after he did, and that he knew

10   Mr. Emwazi from a mosque in West London.

11          Mr. Elsheikh certainly could have learned everything he

12   said about the hostages during the 2019 media interviews from

13   his friends, Mr. Kotey or his friend Mr. Emwazi.  He started as

14   a fighter and later took part in ISIS operations.  He went on

15   missions with Mr. Emwazi and Mr. Kotey, as Mr. Parekh said.  He

16   admitted that he worked under an ISIS member who took part in

17   other, um, ISIS attacks.  He admitted having every reason to

18   know and trust the information that he received from both

19   Mr. Kotey and Mr. Emwazi.

20          During the media -- during Mr. Elsheikh's FBI

21   interview, Agent Chiappone also testified about the media

22   interviews.  He testified that Mr. Kotey was in custody for

23   about two months before the first media interview.  Several of

24   the interviews occurred in March, the same month as the FBI

25   interview, and lasted until approximately August of 2018.

57

1              His next interview was not until May or June of 2019,

2    eight or nine months after the 2018 interviews.  Agent Chiappone

3    testified that after his March 2018 interview, he never saw

4    Mr. Elsheikh in Syria again.  Ask yourselves what could have

5    happened to Mr. Elsheikh during those eight or nine months in

6    SDF custody, a prison in an SDF prison.  You only have to look

7    at his appearance in the 2019 CNN interview to have any idea

8    about what may have happened.

9              And ask yourselves, why did -- of all of the

10   interviews, the clips of interviews that the government showed

11   you, why did they not show you any part of that CNN interview?

12   And the only reason can be is that they did not want you to see

13   the condition that Mr. Elsheikh was in when he participated in

14   the interview that was the first time that he ever, ever

15   admitted any involvement with the hostages.

16             By the time of Mr. Langan's interview, which was a

17   month -- approximately a month later, Mr. Elsheikh had been in

18   SDF custody for a year and a half, and he had committed himself,

19   during the prior CNN interview, to admitting that he was

20   involved with the hostages.

21             Could you please play Government Exhibit 27-7, which is

22   the BBC interview of Mr. Elsheikh and Mr. Kotey in 2018.

23             (Video played in open court.)

24             MS. GINSBERG:  You can see in 2018 what their physical

25   appearances looked like, what their attitudes were, what their

1    demeanors were.  This was an interview that happened shortly

2    after Mr. Elsheikh was taken into SDF custody.  He was engaged

3    with the interviewer.  He wasn't afraid to talk about his

4    participation in the cadets.  He wasn't hiding from any of the

5    interviewer's questions.

6         Would you play Defendant's Exhibit 9, which is the

7    CNN -- clip from the CNN interview in June of 2019.

8         (Video played in open court.)

9         MS. GINSBERG:  The government didn't show you this

10   interview.  They did not want you to see the condition that

11   Mr. Elsheikh was in in June of 2019.  Mr. Elsheikh looked like a

12   completely different person.  He was depleted.  He was, in this

13   video, a broken man.  And he's asked by the CNN interview, what

14   has changed?  And what had changed were two things.

15   Mr. Elsheikh had been in SDF prison for a year and a half, run

16   by a paramilitary force in a conflict region, one of whose major

17   purposes was battling ISIS.  And what else had changed was that

18   recently, as the interviewer said, French hostages had been sent

19   by the SDF to Iraq, and those hostages had been executed.

20        And, in response, Mr. Elsheikh says, "Enough is enough.

21   I want this" -- "I just want this to be over.  At this point I

22   have to do something to help myself in the situation I'm in."

23        And what was the situation he was in?  He was in a

24   prison with -- in the custody of the SDF regime that you heard

25   had total control over what would happen to him, and you heard

1    the interviewer say, "People will hear you say that you were

2    doing this for your own self-preservation, that you know the

3    French nationals have been sentenced to death in Iraq."

4         Ladies and gentlemen, that is exactly what happened.

5    And Sean Langan said the same thing in a clip of his interview

6    taped -- videotaped testimony.  He testified that he told

7    Mr. Elsheikh, "I'll tell you what happened to them.  They got

8    death by hanging after a 10-minute trial."  And he said he hoped

9    to convince Mr. Elsheikh to admit his involvement with the

10   hostages by telling him that it might help him go to England or

11   the United States and get a fair trial.

12        You have the clips and the transcripts from

13   Mr. Langan's interview.  They're Defense Exhibits 2, 3, 5, and

14   11.  Watch them again, read the transcripts of the interviews.

15   Mr. Elsheikh says in one of those interviews, "A confession

16   maybe would even speed up the process of going to America."

17        And both of the DoD witnesses, George Smith and

18   Jason Richard, the agents who performed the biometric

19   enrollments that identified Mr. Elsheikh and Mr. Kotey, they

20   both testified that the SDF had complete, complete discretion

21   about what happened to the detainees, and that they could

22   transfer them to the custody of another government.

23        And after Mr. Elsheikh's interview with Mr. Langan, he

24   was resigned to a Western prosecution to avoid being sentenced

25   and executed in Iraq.  And that is evident in his subsequent

1    videos and in the admissions he makes regarding his knowledge of

2    the hostages.  And he became at that point committed to

3    repeating those admissions in the hopes of being sent to the

4    United States for what he thought would be a fair trial.

5         Now, there were also other sources of information for

6    the statements that Mr. Elsheikh made in his media interviews.

7    Some of the things he said didn't require him to know anything

8    about the hostages.  For example, he admitted his role with

9    The Beatles began when there were only two hostages.  He could

10   have said his role began at any point with the hostages.

11        He collected -- he said he collected emails,

12   proof-of-life letters, and drove released hostages on the first

13   leg when they were released.  This is all information about

14   things that happened to the hostages that was well-known to the

15   public by 2019.

16        The phrases highlighted by Mr. Parekh that Mr. Elsheikh

17   used during the media interviews were common words like

18   "please," that were used by Mr. Elsheikh five and six years

19   after the emails he compared them to were sent.  Ask yourself,

20   does anybody who has lived through a time in a war zone and has

21   spent a year and a half in a foreign country's prison remember

22   the exact words that he could have used in an email that was

23   sent five or six years ago?

24        By the time of the 2019 interviews, there was a lot of

25   other information about the hostages that was publicly

1    available.  The hostage videos had been seen widely around the

2    world.  Mr. Treml testified that the song

3    "Osama bin Laden" [sic] was publicly available.  He himself was

4    aware from the public media.

5         Bruce Hoffman testified that Ms. Siddiqui's 86-year

6    sentence was a *cause célèbre*.  Mr. Hoffman also testified that

7    ISIS used its media operations to claim credit for its military

8    successes, and used as an example the battle with Division 17

9    and said that some -- that the information was public about the

10   Assad regime's fighters being crucified and nailed to telephone

11   poles, and that that information was also publicized by

12   Al-Hayat, one of ISIS's media entities.

13        Mr. Ottosen testified that he -- um, he and

14   Mr. Francois participated in an HBO documentary called "The

15   James Foley Story."  And Mr. Francois also told you that he was

16   part of that documentary.  That documentary was released on

17   November 30th, 2016.  Mr. Ottosen also wrote a book called, "The

18   ISIS Hostage:  One Man's True Story of 13 Months in Captivity,"

19   that was published in Danish in 2015 and was also published in

20   English.

21        Mr. Ottosen testified that the HBO documentary he made

22   with Mr. Francois, and his book, contained a detailed accounting

23   of the hostage's time in captivity, and included a lot of the

24   information that he testified about during this trial.  That

25   would certainly have included descriptions of their worst

62

1    punishments, the deadly punishment, the use of stress positions,

2    and information about James Foley's unusual bravery demonstrated

3    by his willingness to ask for additional food for the hostages.

4         The HBO documentary also -- and Mr. Ottosen's book

5    would have also named all of the released hostages, information

6    that the government would have you believe only a Beatle would

7    have known.  And information about the times he saw

8    Kayla Mueller and the fact that Kayla Mueller was left alone in

9    a room would almost certainly have been included in either the

10   documentary or the book.  Mr. Elsheikh could easily have learned

11   about all of this information from his close association with

12   Mr. Emwazi and Mr. Kotey before he was captured and from the

13   time he spent in captivity with Mr. Kotey until he was released

14   to the American government.

15        Now, the government would have you believe, because

16   these men were friends, were described by Mr. Kuzu as "a duo" -

17   Mr. Kotey and he were described as a duo - that that means that

18   Mr. Elsheikh must have agreed with and, in fact, participated in

19   some of the worst activities that the other two individuals, um,

20   were engaged in.

21        Now, I'm certain each of you knows of a family member

22   or a friend who has had someone who they care about who has

23   either been involved in something they didn't approve of, may

24   have been convicted of a crime, may have been involved with

25   drugs, may have, in fact, hurt other people.  But I'm sure you

1    have seen in your own lives --

2          MR. FITZPATRICK:  Objection, Your Honor.

3          THE COURT:  Put on the earphones.

4          (BENCH CONFERENCE ON THE RECORD.)

5          THE COURT:  Can you hear me, Mr. Fitzpatrick?

6          MR. FITZPATRICK:  Yes, Your Honor.

7          THE COURT:  What's your objection?

8          MR. FITZPATRICK:  Your Honor, this is a golden rule

9    type of argument.  She's asking the jury to put themselves in

10    the position of the parties.  That's not appropriate.

11          THE COURT:  All right.  Ms. Ginsberg?

12          MS. GINSBERG:  Your Honor, I'm asking them to use their

13    common experience as --

14          THE COURT:  Yes, but you argued the golden rule, so you

15    need to abandon that.  In other words, you're using, well, how

16    would you feel, or how would you react, what would you think.

17    That's the golden rule that you may not use.  But you may argue

18    what your position is and why you think it's reasonable.

19          MS. GINSBERG:  Thank you, Your Honor.  I understand.

20          THE COURT:  Well, I'm not sure I understood fully what

21    you wanted to argue.  Maybe there's more --

22          MS. GINSBERG:  I'm arguing that people in their

23    experience have known other people who have condemned or not

24    approved of the acts of people they loved, but never stopped

25    loving them and never abandoned them.

64

1           THE COURT:  All right.  What you could say,

2    Ms. Ginsberg, is, instead of saying, "How would you feel this,

3    that, and the other," you could say that, "It's true that people

4    continue to love people that they know have engaged in

5    bad"...that sort of thing.  But not quite in the golden rule

6    way.

7           But I'm not precluding you from making the essential

8    argument.  Do you understand what I'm saying?

9           MS. GINSBERG:  Yes, I do.  Thank you.

10           (END BENCH CONFERENCE.)

11           THE COURT:  You may proceed, within the Court's

12    direction.

13           MS. GINSBERG:  Certainly in your personal experience

14    you have heard --

15           THE COURT:  You're doing it -- not in personal

16    experience.

17           MS. GINSBERG:  It is reasonable to assume that there

18    are individuals who have had people who they love do things that

19    they do not approve of, that, in fact, have caused a great deal

20    of harm to other people, but that those individuals do not

21    abandon or stop loving the people who do those acts.  And I

22    would submit that what you heard described about Mr. Elsheikh's

23    relationship and friendship with Mr. Kotey and with Mr. Emwazi

24    is just that type of relationship, and does not by itself mean

25    that he, in any way, condoned or participated in the conduct

1    that was -- that he knew about and received information about

2    from either one or both of those two individuals.

3           And there was plenty -- Mr. Elsheikh had plenty of

4    opportunity to learn this information from Mr. Kotey while they

5    were -- before they were captured in 2018, when they were held

6    together -- when he was held together with Mr. Kotey in the --

7    in SDF custody.  And you know that he was held with Mr. Kotey

8    because we saw him with Mr. Kotey, um, in the 2018 interviews.

9           He could also have learned details about the Syrian

10   operation from the ISIS -- the Syrian execution from the ISIS

11   media operation.  In fact, the email that was sent to

12   Mr. Ottosen's family through Jens Serup with the Gulf-up.com

13   link to the video and stills of the Syrian execution with the

14   five hostages holding the signs was available on one of the

15   prominent file-sharing sites used by ISIS.  And the site -- we

16   know that because the link, the Gulf-up.com link, was sent to

17   Mr. Ottosen's family so that they could view those, um, videos

18   and still -- the video and stills.

19          The government also just showed you a clip of the three

20   MS -- MSF -- the three women who were held in captivity in

21   the -- with their heads covered in what looked like burkas, and

22   Ms. Saide was heard saying, "Please, please."  The clip that the

23   government played for you with Mr. Elsheikh repeating the words

24   "please, please," was in response to questions he was not being

25   asked about the Doctors Without Borders hostages, but was a

1    phrase he used in response to an answer about one of the male

2    hostages.

3            The government also played a clip where Mr. Elsheikh

4    used the words "transgress" or "transgression," in an attempt to

5    link it to an email sent to Mr. Kassig's family, and in the

6    Foley -- the emails sent to the Foleys.  "Transgress" and

7    "transgressions" are words that you can find used in ISIS

8    publications, in the ISIS publication *Dabiq*, where the words

9    appear in Government's -- Government's Exhibit 1-35, 1-36, 1-37,

10   1-38, and 1-40, five separate issues of the *Dabiq* publication

11   that were introduced to you by the government.

12           And in Government Exhibit 1-40, you also find the term

13   "an eye for an eye," which was a term that's used frequently in

14   public discourse, but is also used and also appeared in

15   Exhibit 1-40, and was a phrase that was used in one of the

16   emails sent to Mr. Kassig's family.

17           Now, I want to speak a little bit about the jury

18   instructions.  In order to find Mr. Elsheikh guilty of Counts 1

19   through 7, you must find that the government has proven beyond a

20   reasonable doubt that he was a member of The Beatles.  I submit

21   to you that the government has not met that burden.

22           If you do not find Mr. Elsheikh was a member of

23   The Beatles, you must find him not guilty of Counts 1 through 7.

24           If you find Mr. Elsheikh joined ISIS or provided

25   material support to the ISIS conspiracy, you may find him guilty

1    of Count 8.  But Count 8 also requires that you determine

2    whether Mr. Elsheikh's participation in ISIS was the but-for

3    cause of the four American hostages' death.

4         The judge will instruct you if you find the defendant

5    is guilty of conspiring to provide material support or resources

6    to terrorists, you must determine whether the government has

7    proved beyond a reasonable doubt that the victims' death

8    resulted from the commission of the offense.  The offense

9    charged in Count 8 of the indictment is conspiring to provide

10   material support to ISIS, not to the separate hostage-taking

11   conspiracy.

12        In other words, you must find, in order to convict

13   Mr. Elsheikh of the resulting-in-death portion of Count 8, that

14   the government has proven beyond a reasonable doubt that

15   Mr. Elsheikh's specific material support of ISIS, either as an

16   ISIS fighter or someone who worked in the IT department,

17   resulted in the deaths of the American hostages, if you don't

18   also find that he was one of The Beatles.

19        (Brief pause.)

20        THE COURT:  Anything further?

21        MS. GINSBERG:  Just briefly, Your Honor.

22        THE COURT:  All right.  There was a long pause there.

23        MS. GINSBERG:  Yes, I was considering.  Thank you.

24        When you're deciding whether Mr. Elsheikh's statements

25   to the media are proof beyond a reasonable doubt that he was a

1    member of The Beatles, you must also decide whether those

2    statements were voluntary.  Judge Ellis will instruct you

3    regarding the voluntariness of his statements and the weight

4    that the statements should be given.

5         You only need watch Mr. Elsheikh's 2019 media

6    interviews to determine his physical and mental condition at the

7    time that he made any of the admissions that he was involved

8    with the hostages.  The interview was given shortly after a

9    number of the French hostage -- French ISIS fighters had been

10   sent to Iraq and been executed and after Mr. Elsheikh's

11   imprisonment with the SDF.

12        Mr. Langan's videotaped testimony could also not be

13   more clear.  We submit that the government has not proven that

14   Mr. Elsheikh was a part of the conspiracy to kidnap or kill

15   hostages in Syria, and we ask you find him not guilty of all of

16   the charges that require a finding that his conduct, his

17   participation in ISIS, resulted in the death of the hostages.

18   Thank you.

19        THE COURT:  All right.  Ladies and gentlemen, it's near

20   the noon hour, and I take it, Mr. Parekh, you have rebuttal?

21        MR. FITZPATRICK:  I'll be doing the rebuttal,

22   Your Honor.

23        THE COURT:  And how long do you think?  An hour?

24        MR. FITZPATRICK:  Less than an hour, but I will take

25   the hour, Your Honor.  I'll take the offer of the hour and do

1    it --

2         THE COURT:  Well, I haven't offered an hour.

3         MR. FITZPATRICK:  I'll meet you in the middle,

4    Your Honor, and say 45 minutes.

5         THE COURT:  Rather than proceed at this time, let's

6    take the luncheon recess at this time.  Then we'll hear from the

7    government, and then I will give you instructions on the law and

8    permit you to deliberate and retire on your verdict.

9         Remember to put your books in the cubbyholes and

10   refrain from discussing the matter amongst yourselves or with

11   anyone, and from undertaking any investigation on your own.

12        You may follow the court security officer out.

13        (Jury out at 11:50 a.m.)

14        THE COURT:  Mr. Fitzpatrick, see if you can keep it to

15   45 minutes or less.

16        MR. FITZPATRICK:  I appreciate that, Your Honor.  I

17   will.

18        THE COURT:  Court stands in recess until 1 o'clock.

19        (Recess taken at 11:50 a.m.)

20        THE COURT:  We'll have the jury brought in.

21        (Jury in at 1:04 p.m.)

22        THE COURT:  Ladies and gentlemen, I trust your lunches

23   once again were adequate.  Good.

24        We'll proceed with the government's rebuttal argument,

25   and after that I will give you instructions and permit you to

70

1    retire and deliberate on your verdict.

2         Mr. Fitzpatrick, are you ready to make the government's

3    rebuttal argument?

4         MR. FITZPATRICK:  Yes, Your Honor.

5         THE COURT:  Proceed.

6         MR. FITZPATRICK:  Thank you.

7         Ladies and gentlemen, like Mr. Parekh, and our

8    colleague, Ms. Ginsberg, I want to thank you for your service.

9    I share in that appreciation.  I'm not going to keep you very

10   long.  But there's a lot of misinformation and some speculation

11   that you heard in the defense closing argument, and I think it's

12   appropriate to clear it up.

13        The first thing I would like to do is call up

14   Government Exhibit 12-8, please.  This is -- Government

15   Exhibit 12-8 was introduced through Mr. Jens Serup.  He was the

16   benefactor in helping Daniel Ottosen in his hostage release

17   circumstances.  Ms. Ginsberg argued to you that these videos and

18   photographs were made public.  These videos and photographs were

19   never made public.

20        The defendant had no ability to see these in open

21   source material.  He described them in Government Exhibit 26-10,

22   and the circumstances of the Syrian execution in 26-11, because

23   he was there, because he was holding the camera; because he was

24   panning the camera to the executed Syrian as he was falling into

25   the ditch.

1          How do we know why this was never made public?  Well,

2   first of all, Mr. Treml told you that, the expert in ISIS media

3   distribution.  He told you that.  Moreover, the exhibit itself -

4   and Mr. Serup told you this - it's password protected with a

5   very extensive security measured protocol for password

6   protection.  You see it right there.  The point of the Gulf-up

7   was, this is a common ISIS file-sharing account.  It was not

8   made publicly available.

9          The second point is the comparison of Mr. Elsheikh's

10  treatment in SDF custody with that of the hostages that you've

11  heard over the past two weeks.  Please, please, ladies and

12  gentlemen, think about that.  Agent Chiappone testified that the

13  defendant told him that he was treated very well while in SDF

14  custody, and that his treatment was completely different from

15  what ISIS propaganda had stated.  The defendant told

16  Agent Chiappone that he was allowed to play chess, wash clothes,

17  pray, work out, shower.  This is the exact opposite of how you

18  heard the American, British, and European hostages being

19  treated.

20         With respect to the June 2019 CNN interview, first of

21  all, the defense played you one clip; more importantly, the

22  Sean Langan clips and *The Washington Post* clips, which you've

23  seen in the government's evidence, occurred after that.  You can

24  view Mr. Elsheikh in those clips.

25         Look at 26-7, the so-called protocol clip.  He's very

1    confident.  He is looking directly in the eye, he contradicts --

2    he sets straight Mr. Langan when he's trying to say that someone

3    saw you.  It didn't happen.  No one saw him.  Because he said it

4    wasn't the protocol.  And he said it with confidence, and you

5    can hear him say that in 26-7.

6            Also, with respect to his demeanor, his ability, his

7    comfort with himself, his ability to control his own mental

8    faculties, his own decision-making, his free will, all of that,

9    ladies and gentlemen, is expressed in 27-8.  He has an extensive

10   discussion with *The Washington Post* reporter on Islamic matters,

11   on the so-called Da'wah, which, by the way, perfectly coincides

12   with Nicolas Hénin's testimony, that they described one of

13   The Beatles, most likely Ringo, as being comfortable and sort of

14   proselytizing and preaching about the Islamic faith.  He does

15   that in 27-8.  That was in August of 2019, two or months after

16   the June 2019 CNN interview.  And if there was more in that CNN

17   interview that was helpful to the defense, you surely would have

18   heard that.

19           Now, the government has an obligation to present to you

20   relevant evidence, relevant evidence that tends to establish a

21   fact in this case.  And the relevant evidence from these media

22   interviews was the defendant's participation in The Beatles trio

23   hostage-taking scheme.  Over and over and over, in the 26 series

24   and the 27 series of those media clips, every single clip, I

25   submit to you, has a purpose.  Some are smaller or

1    circumstantial, corroborative purposes; some are larger

2    purposes.

3            For instance, 27-11, look at the last five or

4    six lines, the concluding statements in 27-11.  I may have said

5    26.  That was wrong.  It's 27-11.  The defendant admits he's a

6    Beatle.  He says it in those statements.  He's being asked by

7    the reporter:  "Aren't there four of you?"

8            He says:  "No, there are three.  There are three."

9            And then they have a discussion about, you know, "They

10   probably couldn't think of another name that only had three, so

11   they called us The Beatles."

12           In addition, think back to the Jenan Musa interview,

13   which is in the 27 series.  It's early in the 27 series.  She

14   asks -- you'll know it because he makes the statements about

15   slavery.  But there's an important point that he tells

16   Jenan Musa before he makes the slavery statement.  And she asks

17   him directly:  "Are you a member" -- "What do you think" -- or,

18   "Are you a member of The Beatles?"

19           And he doesn't say:  Heck no, no way, what are you

20   talking about?  He doesn't give the commonsense, natural

21   response to that question.  He says:  "John Lennon wouldn't like

22   it much."  He gives a flippant answer.  That's a tacit

23   admission.  You can exercise your common sense, your good sense,

24   as the judge will instruct you later, and draw that conclusion.

25   That's tacit admission.

1          Now, further, ladies and gentlemen, on the speculation

2     that we heard from the defense argument, he learned of all this

3     through his buddies, AK - Alexanda Kotey - and Mohammed Emwazi.

4     First of all, there's no evidence in the record of that, which

5     is the definition of speculation.  And the judge, once again,

6     will instruct you as to you're not allowed to base your

7     decisions on speculation.  It's the evidence, it's the facts,

8     it's the law, and it's the reasonable inferences drawn from the

9     facts and the evidence.

10          There's no evidence that he learned of this stuff from

11     his two buddies and then simply regurgitated it to the media.

12     In fact, the evidence demonstrates exactly the opposite.  The

13     evidence in the case shows that this was a secretive

14     organization.  They operated and they performed, they exercised

15     good operational security.  They were always masked.  They wore

16     gloves.  They required the hostages to turn around, kneel, face

17     the wall.  They exercised professional-level, quality-level,

18     high-grade level operational security.  It's not -- it defies,

19     once again, common sense that his two buddies are going to share

20     details with Mr. Elsheikh if he wasn't there.

21          And the James Foley story and the Ottosen book, I

22     simply don't know where to begin with that.  So the defendant is

23     in Syria as an ISIS fighter or in SDF custody, and he has the

24     wherewithal, the ability, you know, an Amazon delivery of a book

25     by Daniel Ottosen that was published in Denmark and they

1    translated into English.  He can call up the James Foley story?

2    Once again, by the way, ladies and gentlemen of the jury, no

3    evidence of that, no evidence in this record whatsoever that

4    there are any details in those two pieces of media that the

5    defendant could learn.  None whatsoever.

6          And it just sort of begs the obvious question, in the

7    wild circumstance that that was even possible, that you could

8    get the Jim Foley story and the Daniel Ottosen book, what's he

9    doing getting it?  Why?  It doesn't make any sense whatsoever.

10          On the issue of the summary trial and the execution in

11    Iraq, there's no hard core evidence of that.  There's a

12    reporter's question, there's a dialogue; there's no evidence of

13    that.  And if you look at the Government's Exhibit 28-11, it was

14    our 30-second rebuttal case - 30 seconds - the defendant seems

15    to acknowledge that.  You'll have it.  You have the transcript

16    and you'll have the recording.  He says -- I'm paraphrasing, but

17    he says:  I don't see how the Iraqi system has any authority

18    over us.  He says:  I'm not a legal expert, but I like to think

19    a lot, and I have a lot of time.  I don't see how the Iraqi

20    system has any authority over us.

21          He's perfectly comfortable with that assertion.  He's

22    not worried at all about a 10-minute trial and summary execution

23    in Iraq.  It simply is belied by the evidence in this case.

24          No one ID'd Mr. Elsheikh from that witness box.  They

25    were always masked.  They exercised operational security.  It is

1    now seven, eight years later, and the media interviews were four

2    or five years later.

3            You heard from Dr. Rhodes that accents matter.

4    Variation from listener and speaker accents completely matters

5    when trying to identify speakers or other individuals.

6            Further, the witnesses themselves were scared to death

7    when they were encountering The Beatles.  You've heard that.

8    Daniel Ottosen was the last witness to testify to that.  I mean,

9    he was petrified to look at these guys.  Federico Motka used

10   some colorful language at times, but you heard others say when

11   The Beatles would come and go, it would take Mr. Motka and

12   Mr. Haines a long time to calm down because they remembered what

13   it was like at The Box.

14           So the reasons for no identification is, again, the

15   government has an obligation to provide to you its best

16   evidence.  And its best evidence came from the words of the

17   defendant, the smart defendant, the Rambo mode defendant, the

18   sure defendant.  See the protocol, right?  The committed

19   defendant.  These are all his words in these clips.

20           In addition to 27-11, I would suggest, submit to you

21   that you should look again at 26-16, one of the Sean Langan

22   clips.  The defendant is shown a magazine or a periodical that

23   has an open picture of Jim Foley.  Federico Motka, from that

24   witness stand, said:  Yes, that's Jim Foley, that is who I was

25   held with beginning in April of 2013, for the next 13 or

77

1    14 months.

2         The defendant then goes on to describe Jim Foley in

3    particular detail, details that only a personal participant

4    would know.  He gave him the anecdote about asking for food.  He

5    said that James was brave, and chillingly, chillingly the

6    defendant said, And James was willing to take it on the neck.

7         That is someone who has personal participation in this

8    scheme.  This is not someone who was making up or recalling

9    events that he read in a book or that he saw in a documentary.

10   That is personal participation recollection, plain and simple.

11        And with respect to the argument that -- and

12   Mr. Parekh, in the opening government argument, described the

13   Frida Saide proof of life.  Frida Saide was the one in the

14   middle.  She had two women next to her dressed in traditional

15   Islamic garb, and they're giving a proof-of-life video or

16   they're giving a plea for their release.  And she says, "Please,

17   please, please."

18        And you have one of the clips where the defendant is

19   recounting these things.  And he says, "Well, we tell them to

20   say, please, please, make it look ominous."  My words, but I'm

21   paraphrasing.

22        Again, that recollection is personal participation.

23   The defense would have you believe that, oh, it's just a common

24   word and he's got no ability to remember that five or six years

25   later.  Well, one, you do if you were there and if you

1    participated in this, and if you had a plan and if you were

2    executing your plan.  So, yes, you really can remember details

3    like that five or six years later.

4          But moreover, the counter from the defense is that he's

5    remembering all of this stuff from a book and a documentary.  So

6    he's got the ability to memorize facts from a book and a

7    documentary, but he's not going to be able to remember words

8    that were spoken five or six years ago when he was personally

9    there?  It makes no sense.  The argument falls apart.

10         On this whole notion, this whole canard of false

11   confessions, look at the details.  In part Mr. Parekh drew it

12   out in the government's initial opening, but I'll repeat just a

13   couple of them and maybe add a couple more.

14         The proof-of-life questions about a cat.  I mean,

15   that's an intimate, exacting detail in this case.  Louisa Akavi

16   being an older woman, Louisa Akavi is not one of the

17   prominent -- sadly, they all deserve our grace and

18   consideration, but sadly, Louisa Akavi is not a prominent figure

19   in this scheme.  And he acknowledges the New Zealander, the

20   kiwi.  The makeshift chess, he mentions that.  Kayla Mueller

21   being alone in a dark cold room; how the proof-of-life videos

22   needed to be scary and filled with pleas for help.  And, again,

23   26-16, Foley was not timid and demanded food.

24         Some of these arguments, ladies and gentlemen, just

25   don't pass the straight-face test, and respectfully, I would ask

1    that you reject them.

2           With respect to the whole voluntariness question, I've

3    addressed this some, and Ms. Ginsberg raised it, that there's

4    this suggestion that his statements were somehow involuntary.

5    This defendant is a savvy operator.  I've mentioned to you

6    already the operational security.  Remember the Telegram chats

7    that he sends to his brother, and he's talking about how they've

8    had a conquest of Syrian Division 17, and, you know, he's giving

9    other details and he's sort of catching himself, that, "Maybe

10   I'm saying too much as I transmit this message across

11   international borders electronically."  And he ends and says,

12   "Talk to my lawyer."  Right?  He's savvy.  He knows what he's

13   doing.  This is someone with control over his mental faculties,

14   control over his decision-making.  He knows what he's doing.

15          On the argument about no DNA, you know, Ms. Ginsberg is

16   right, if there was relevant probative DNA evidence in this

17   case, we would have presented it to you.  There isn't any.  But

18   gloves, masks, and the passage of time don't result in DNA

19   evidence.  This is not television.  You heard that comment as

20   well, sort of have you refer to the television shows that are

21   common these days.

22          Respectfully, respectfully, you have now spent more

23   than 10 days, 11 days in this courtroom.  You now are very

24   accustomed to the court's procedures, how formal the procedures

25   are, how exacting the procedures are.  You go on headsets to

1   engage in legal arguments with the Court.  This isn't

2   television.  We did not conclude this investigation and

3   prosecution in 40 minutes or 45 minutes with 15 minutes of

4   commercials.  That's not the way it works.

5          This argument that no one could agree on who is who

6   among The Beatles, again, I refer you to the Jenan Musa

7   interview, and also 27-11.  He's acknowledging those things.

8          And I think it's important to draw out a distinction

9   for you, ladies and gentlemen, concerning circumstantial

10  evidence, which Judge Ellis will instruct you on, and mere

11  speculation, which is improper.  In the government's initial

12  opening, I'll give you one example of circumstantial evidence.

13  Right?  And Mr. Parekh described it as "devastating

14  corroborative evidence."  And it goes back to the "please,

15  please."  You had a witness testify, identified her proof of

16  life where she says, "Please, please, please." So that's a piece

17  of evidence in the case.  You then have an interview with the

18  defendant where he describes the same thing, please, please.  So

19  you have two pieces of evidence in this case.  And with

20  circumstantial evidence, you link up Piece of Evidence 1 with

21  Piece of Evidence 2, and you apply reason and you apply your

22  common sense, and you can draw inferences if you wish and you

23  make a conclusion.

24         And the reason why Mr. Parekh said that was devastating

25  corroborative evidence, among other things, is because it

1    demonstrates that he was there.  It is a form of admission,

2    tacit or otherwise.  Remember, it's all based on the evidence,

3    what came from the witness box.

4         Speculation is when the argument is prompted by, "Ask

5    yourselves."  It's a signal for you.  When you hear "ask

6    yourselves," you're being asked to speculate.  You're being

7    asked to go outside the record in the case, look up at the wall,

8    look over there, and to wonder and to lose focus of the

9    evidence.  That's speculation, and that's impermissible.

10        And on the last point in rebuttal, ladies and

11   gentlemen, before some concluding remarks, with respect to the

12   witnesses in the witness box and no in-court identification,

13   I've already addressed with you, they were masked, operational

14   security, the long passage of time.

15        You'll remember the French witness, Edouard Elias.  He

16   was shown a redacted photo, the face redacted out, of the "Rambo

17   mode" picture, which we proved, which we proved is the

18   defendant.  We have proven that beyond any doubt, reasonable or

19   otherwise.  And when describing the gear, the guard, the

20   military equipment that The Beatles wore, he said, "That's it."

21   Edouard Elias.  That's a form of in-court identification.

22   Again, it's circumstantial.  You have to link, link, draw some

23   inferences, apply reason, apply common sense, and come to a

24   conclusion.  You can do that.

25        If we could please put up 26-5.  My apologies, 2-5.  I

1    apologize, Your Honor.

2              Ladies and gentlemen, I promised that I would not keep

3    you hear for a prolonged period, and I'm going to try my best to

4    keep to that promise.  Because you have been very attentive and

5    it's been a long trial, and you've absorbed a lot of material.

6              In our system of criminal justice, in the United States

7    system of criminal justice, appropriately so, the jury gets the

8    final word.  We wouldn't have it any other way.  And it is sort

9    of a hallmark of our justice system that you citizens get to

10   decide these cases, and, again, that's the perfect system,

11   respectfully.

12             But I want the last words, if you will, to be about the

13   four American hostages.  And they are representative of all of

14   the hostages in this case, all 26 of them; the British

15   decedents, the Japanese decedents, the released European

16   hostages.

17             But what you see up on the screen right now, ladies and

18   gentlemen, are four individuals who always wanted to do the

19   right thing.  Always.  You heard that again in testimony in this

20   case.  James Foley, he was brave, he was thoughtful of others.

21   He could have escaped, but he didn't want to leave John Cantlie

22   behind.

23             Kayla Jean Mueller, she was a prodigy.  She graduated

24   from college in two and a half years because she wanted to get

25   out in the world and help people.  James Foley wanted to report

1    on the world's problems.

2          Steven Joel Sotloff, brilliant writer, you heard that

3    in this case.  And Mr. Sotloff also cared about others.  When

4    they learned that Kayla was there, he went to a program of sort

5    of passing notes, and he told the others, "I'll take

6    responsibility if we're caught."  And he stood up for himself

7    and he did it, he followed through.

8          Peter Edward Kassig, that man -- the evidence in this

9    case, through his father and other evidence, that man had a

10   heart that would fill this courtroom.  He had a heart that was

11   bigger than this courtroom.  He founded and operated an

12   ambulance service in a war torn part of the world.

13         All these people wanted to do was to do the right

14   thing.  And it's a part of our history and it's a part of our

15   culture.  A great American once said:  It's always the right

16   time to do the right thing.  And these four Americans lived by

17   that creed.

18         So with that, ladies and gentlemen, I respectfully

19   submit to you that now is the right time to do the right thing.

20   The government has proven this case beyond any doubt, reasonable

21   or otherwise.  El Shafee Elsheikh was a member of The Beatles

22   trio.  You heard in exacting detail from Mr. Parekh's beginning

23   closing argument, exacting detail.

24         But we've certainly proven this case beyond a

25   reasonable doubt.  Is it possible to speculate and to get

1    distracted by shiny objects?  It's possible, but it's not

2    reasonable.  And the standard is reasonable doubt.  And, ladies

3    and gentlemen, for all eight counts, we have proven this case

4    beyond a reasonable doubt.

5         And I humbly suggest to you that a conviction on all

6    eight counts is the right thing to do.  Thank you.

7         THE COURT:  All right.  Ladies and gentlemen, I have

8    now to give you instructions.  These instructions may take as

9    long as an hour.  Is there any reason why you would need a

10   recess at this time?  All right.  Let's proceed.

11        Members of the jury -- let me say as a prefatory

12   comment, that you will not have these instructions in writing,

13   but you will have a tape recording of these instructions that

14   will be provided to you if you wish to hear them again.  You're

15   not required to hear them again, but it is provided to you if

16   you feel you need to.

17        Members of the jury, now that you have heard the

18   evidence and the arguments of counsel, it becomes my duty to

19   give you instructions as to the law applicable to this case.

20   All of the instructions of law given to you by the Court, those

21   given to you at the beginning of the trial, those given to you

22   during the trial, and these final instructions, must guide and

23   govern your deliberations.  It is your duty as jurors to follow

24   the law as stated by the Court, and to apply the rules of law to

25   the facts as you find them from the evidence in the case.

1        Now, counsel have quite properly referred to some of

2   the governing rules of law in their arguments.  If, however, any

3   difference appears to you between the law as stated by counsel

4   and the law as I state it to you, you are, of course, to be

5   governed by the Court's instructions.

6        Nothing I say in these instructions is to be taken as

7   an indication that I have any opinion about the facts of the

8   case, or what that opinion is.  It is not my function to

9   determine the facts, but yours.

10       You are not to single out one instruction alone as

11   stating the law, but must consider the instructions as a whole.

12   And neither are you to be concerned with the wisdom of any rule

13   of law stated by the Court.  Regardless of any opinion you may

14   have as to what you think the law ought to be, it would be a

15   violation of your sworn duty as jurors if you ignore the law as

16   I give it to you and apply some other law.  It would also be a

17   violation of your sworn duty as jurors of the facts to base a

18   verdict upon anything but evidence in the case.

19       You've been chosen as jurors for this trial in order to

20   evaluate all the evidence and to decide each of the factual

21   questions presented by the allegations brought by the government

22   in the indictment and the plea of not guilty by the defendant.

23   In deciding the issues presented to you for decision in this

24   trial, you must not be persuaded by prejudice -- bias,

25   prejudice, or sympathy for or against any of the parties in this

1    case, or any public opinion.  You should not be influenced by

2    any person's race, color, religion, national ancestry, or sex.

3    Justice through trial by jury must always depend upon the

4    willingness of each individual juror to seek the truth as to the

5    facts from the same evidence presented to all jurors, and to

6    arrive at a verdict by applying the same rules of law given by

7    the Court.

8            As I told you at the outset, the law presumes the

9    defendant to be innocent of a crime.  Thus, a defendant,

10   although accused, begins the trial with a clean slate, with to

11   evidence against him.  And the law permits nothing but legal

12   evidence presented before the jury to be considered in support

13   of any charge against the accused.  So the presumption of

14   innocence alone is sufficient to acquit a defendant, unless the

15   jurors are satisfied beyond a reasonable doubt of the

16   defendant's guilt after careful and impartial consideration of

17   all the evidence in the case.

18           It is not required that the defendant -- or that the

19   government prove guilt beyond all possible doubt.  The test is

20   one of reasonable doubt.  And the jury will remember that a

21   defendant is never to be convicted on mere suspicion or

22   conjecture.  The burden is always on the prosecution to prove

23   guilt beyond a reasonable doubt.  This burden never shifts to

24   the defendant, for the law never imposes on a defendant in a

25   criminal case the burden or duty of calling any witnesses or

1    producing any evidence.  So if the jury, after careful and

2    impartial consideration of all the evidence in the case, has a

3    reasonable doubt that the defendant is guilty of a charge, it

4    must acquit.

5           Now, there's nothing particularly different in the way

6    that a juror should consider the evidence in a trial from that

7    in which any reasonable and careful person would treat any very

8    important question.  It must be resolved by examining facts,

9    opinions, and evidence.  You're expected to use your good sense

10   in considering and evaluating the evidence in the case, for only

11   those purposes for which it has been received, and to give such

12   evidence a reasonable and fair instruction in light of your

13   common knowledge and the natural tendencies and inclinations of

14   human beings.  If the defendant be proved guilty beyond a

15   reasonable doubt, say so.  If not proved guilty beyond a

16   reasonable doubt, say so.

17          Keep constantly in mind that it would be a violation of

18   your sworn duty to base a verdict upon anything other than the

19   evidence received in the case and the instructions of the Court.

20   Remember as well that the law never imposes on a defendant in a

21   criminal case the burden or duty of calling any witnesses or

22   producing any evidence, because the burden of proving guilt

23   beyond a reasonable doubt is always with the government.

24          Now, the evidence in the case, as I told you at the

25   outset, consists of the sworn testimony of the witnesses,

88

1    regardless of who may have called them, all exhibits received in
2    evidence, regardless of who may have produced them -- and you'll
3    have all the exhibits with you in the jury room, and you'll also
4    have a device, or devices -- if it involves playing clips or
5    films or videos, you'll have that equipment there with you.
6    That is, all exhibits received into evidence, regardless of who
7    may have produced them, all facts which may have been agreed or
8    stipulated to - and there were some of those, you'll have those
9    in the jury room - and all -- I don't think I took judicial
10   notice of any facts.
11           MR. FITZPATRICK:  I don't recall you did.
12           THE COURT:  I'm going to omit that, Ms. Ginsberg.
13           MS. GINSBERG:  Yes, sir, I agree.
14           THE COURT:  Now, any proposed testimony or proposed
15   exhibit to which an objection was sustained by the Court, and
16   any testimony or exhibit ordered stricken by the Court must be
17   entirely disregarded, and anything you may have seen or read or
18   heard outside the courtroom is not proper evidence and must be
19   entirely disregarded.
20           Questions, objections, statements, and arguments of
21   counsel are not evidence in the case.  You are to base your
22   verdict only on the evidence received in the case.  And in your
23   consideration of the evidence received, however, you're not
24   limited to the bald statements of the witnesses, or to the bald
25   assertions in the exhibits.

1          In other words, you're not limited solely to what you
2     see and hear as the witnesses testify or as the exhibits are
3     admitted.  You're permitted to draw from the facts which you
4     find have been provided such reasonable inferences as you feel
5     are justified in light of your experience and common sense.
6          And the questions asked by a lawyer for either party in
7     this case are not evidence.  If the lawyer asks a question of a
8     witness which contains an assertion of fact, you may not
9     consider the assertion by the lawyer as any evidence of that
10    fact.  Only the answers are evidence.
11         Now, as I told you at the outset, there are two types
12    of evidence which are generally presented during a trial, direct
13    evidence and circumstantial evidence.  Direct evidence is the
14    testimony of a person who asserts or claims to have actual
15    knowledge of a fact, such as an eyewitness.  Circumstantial
16    evidence is proof of a chain of facts and circumstances
17    indicating the existence of a fact.
18         The law makes no distinction between the weight or
19    value to be given to either direct or circumstantial evidence.
20    Nor is a greater degree of certainty required of circumstantial
21    evidence than of direct evidence.  You should weigh all the
22    evidence in the case, and, after weighing all the evidence in
23    the case, if you are not convinced of the guilt of the defendant
24    beyond a reasonable doubt, you must find the defendant not
25    guilty.

1        I've mentioned inferences.  Inferences are simply

2   deductions or conclusions which reason and common sense lead the

3   jury to draw from the evidence in the case.

4        Now, testimony and exhibits can be admitted into

5   evidence during the trial only if certain criteria or standards

6   are met.  It's the sworn duty of the attorney on each side of a

7   case to object when the other side offers testimony or an

8   exhibit which that attorney believes is not properly admissible

9   under the rules of law.  Only by raising an objection can a

10  lawyer request and obtain a ruling from the Court on the

11  admissibility of evidence being offered by the other side.  You

12  should not be influenced against an attorney or his or her

13  client because the attorney has made an objection.

14       Do not attempt, moreover, to interpret my rulings on

15  objections as somehow indicating how I think you should decide

16  this case.  I'm simply making a ruling on a legal question.  By

17  allowing the testimony or other evidence to be introduced over

18  the objections of an attorney, the Court does not, unless

19  expressly stated, indicate any opinion as to the weight or

20  effect of such evidence.  And, as stated before, and indeed many

21  times, you're the sole judges of the credibility of all the

22  witnesses and the weight and effect of all evidence.

23       On the other hand, where the Court has sustained an

24  objection to a question addressed to a witness, jurors must

25  disregard the statement, the question entirely.  You may draw no

1    inference from the wording of the question or speculate as to

2    what the witness would have said had he or she been permitted to

3    answer the question.

4         I don't recall doing this.  I'll do it anyway.  It is

5    the duty of the Court to admonish an attorney who, out of zeal

6    for his or her cause, does something which I feel is not in

7    keeping with the rules of evidence or procedure.  You are to

8    draw absolutely no inference against the side to whom an

9    admonition of the Court may have been addressed during the trial

10   of this case.

11        And during the course of the trial, I occasionally

12   asked questions of a witness.  Very rarely, but I occasionally

13   asked questions of a witness.  Do not assume that I hold any

14   opinion on the matters to which my questions related.  The Court

15   may have asked the question simply to clarify a matter, not to

16   help one side of the case or hurt another side.

17        And remember, once again, at all times, you as jurors

18   are the sole judges of the facts of this case.

19        Counsel, any reason to give 12?

20        MR. FITZPATRICK:  No, Your Honor.

21        MR. MACMAHON:  No, Your Honor.

22        THE COURT:  All right.  I won't.

23        The rules of evidence, as I told you, ordinarily do not

24   permit witnesses to testify as to their own opinions or their

25   own conclusions about issues in the case.  And an exception to

1    this rule exists as to those witnesses who were described as

2    expert witnesses.  An expert witness is someone who, by

3    education or experience, may have become knowledgeable in some

4    technical, scientific, or very specialized area.  Such knowledge

5    or experience may be of assistance to you in understanding some

6    of the evidence, or in determining a fact.  An expert witness in

7    that area may state an opinion as to relevant and material

8    matter in which he or she claims to be an expert.

9          You should consider the expert received into evidence

10   in this case and give it such weight as you may think it

11   deserves.  You should consider the testimony of expert witnesses

12   just as you consider other evidence in the case.  If you should

13   decide that the opinion of an expert witness is not based on

14   sufficient education or experience, or if you should conclude

15   that the reasons given in support of the opinion are not sound,

16   or if you should conclude that the opinion is outweighed by

17   other evidence, you may disregard the opinion in part or in its

18   entirety.  As I've told you several times, you, the jury, are

19   the sole judges of the facts of this case.

20         Now, I think I also mentioned this.  If any reference

21   by the Court or by counsel to matters of testimony or exhibits

22   does not coincide with your recollection of that evidence, it is

23   your recollection which should control during your

24   deliberations, and not the statement of the Court or counsel.

25   As I've said several times, you're the sole judges of the

1    evidence received in this case.

2           Now, you as jurors are the sole and exclusive judges of

3    the credibility of each of the witnesses called to testify in

4    this case, and only you determine the importance or the weight

5    that their testimony deserves.  And after making your assessment

6    concerning the credibility of a witness, you may decide to

7    believe all of that witness' testimony or only a portion of it,

8    or none of it.

9           In making your assessment, you should carefully

10   scrutinize all of the testimony given, the circumstances under

11   which each witness has testified, and all of the other evidence

12   which tends to show whether a witness is worthy of belief.

13   Consider each witness' intelligence, motive to testify, state of

14   mind while on the stand.  Consider the witness' ability to

15   observe matters to which he or she has testified, and consider

16   whether he or she impresses you as having an accurate memory or

17   recollection of these matters.  Consider also any relation a

18   witness may bear to either side of the case, the manner in which

19   each witness might be affected by your verdict, and the extent

20   to which, if at all, each witness is either supported or

21   contradicted by other evidence in the case.

22          Now, inconsistencies or discrepancies in the testimony

23   of a witness or between the testimony of different witnesses may

24   or may not cause you to disbelieve or discredit such testimony.

25   Two or more persons witnessing an incident or a transaction may

1    simply see or hear it differently.  Innocent misrecollection,

2    like failure of recollection, is not an uncommon experience.  It

3    gets more common as you get older.  In weighing the effect of

4    the discrepancy, however, always consider whether it pertains to

5    a matter of importance or an insignificant detail, and consider

6    whether the discrepancy results from innocent error or from

7    intentional falsehood.

8          After making your own judgment or assessment concerning

9    the believability of a witness, you can then attach such

10   importance or weight to that testimony, if any, that you feel it

11   deserves.  You will then be in a position to decide whether the

12   government has proven the charges beyond a reasonable doubt.

13         Now, as I've told you, as I think I mentioned to you

14   earlier, the defendant in a criminal case has an absolute right,

15   under our Constitution, not to testify.  The fact that the

16   defendant did not testify must not be considered or discussed by

17   the jury in any way when deliberating and in arriving at your

18   verdict.  No inference of any kind may be drawn from the fact

19   that the defendant decided not to exercise -- or decided to

20   exercise the privilege under the Constitution and did not

21   testify.  And, as stated before, the law never imposes on a

22   defendant in a criminal case the burden or duty of calling any

23   witnesses or of producing any evidence.

24         And as I told you I think at the outset, the indictment

25   in this case is only a formal method used by the government to

1    accuse a defendant of a crime.  It is not evidence of any kind

2    against the defendant.  The defendant is presumed to be innocent

3    of the crime or crimes charged.  Even though the indictment has

4    been returned against the defendant, the defendant begins the

5    trial with absolutely no evidence against him, and the defendant

6    has pled not guilty to this indictment, and therefore denies

7    that he's guilty of the charges.

8           The defendant is not on trial for any act or any

9    conduct not specifically charged in the indictment.  A separate

10   crime is charged in each count of the indictment.  Each charge

11   and the evidence pertaining to it should be considered

12   separately by the jury, and the fact that you may find a

13   defendant guilty or not guilty as to one of the charges --

14   offenses charged should not control your verdict as to the other

15   offenses charged.

16          Now, you've heard testimony of law enforcement

17   officials and -- the United States Department of Defense

18   personnel?

19          MR. FITZPATRICK:  Yes, Your Honor.

20          THE COURT:  The fact that a witness may be employed by

21   the federal government as law enforcement or

22   Department of Defense does not mean that his or her testimony is

23   necessarily deserving of more or less consideration, or greater

24   or lesser weight than that of an ordinary witness.  At the same

25   time, it is quite legitimate for defense counsel to try to

1    attack the credibility of a law enforcement or Department of

2    Defense witness on the grounds that his or her testimony may be

3    colored by a personal or professional interest in the outcome of

4    the case.

5            It is your decision, after reviewing all of the

6    evidence, whether to accept the testimony of the law enforcement

7    and Department of Defense witnesses, and to give that testimony

8    whatever weight, if any, you find it deserves.

9            You also heard evidence that Omer Kuzu hopes to receive

10   a reduced sentence on criminal charges pending against him in

11   return for his cooperation with the government in this case.

12   Kuzu entered into an agreement with the prosecution which

13   provides that in return for his assistance, the prosecution will

14   recommend a less severe sentence, which could be less than the

15   240 months recommended sentence for the crime of which he has

16   been convicted.

17           If the prosecutor handling this witness' case believes

18   he has provided substantial assistance, that prosecutor can

19   file, in the court in which the charges are pending against this

20   witness, a motion to reduce his sentence below the 240 months

21   sentence recommended.  The judge has no power to reduce a

22   sentence for substantial assistance unless the prosecution,

23   acting through the United States Attorney, files such a motion.

24   If such a motion for reduction of sentence for substantial

25   assistance is filed by the prosecution, then it is up to the

1    judge to decide whether to reduce the sentence at all, and, if

2    so, how much to reduce it.

3           You may give the testimony of this witness such weight

4    as you think it deserves.  Whether or not the testimony of the

5    witness may have been influenced by his hope of receiving a

6    reduced sentence is for you to decide.

7           Your decision on the facts of this case should not be

8    determined by the number of witnesses testifying for or against

9    a party.  You should consider all the facts and circumstances in

10   evidence to determine which of the witnesses you choose to

11   believe or not to believe.  You may find that the testimony of a

12   smaller number of witnesses on one side is more credible than

13   the testimony of a greater number of witnesses on the other

14   side.

15          Look at 24.  Were there demonstrative exhibits that are

16   going to be sent back?

17          MR. FITZPATRICK:  There are, Your Honor.

18          THE COURT:  All right.  That's right.

19          Certain demonstrative evidence has been admitted and

20   has been shown to you during the trial for the purpose of

21   explaining facts that are allegedly contained in recordings,

22   documents, or testimony, which are also in evidence.  These

23   demonstrative exhibits are not independent evidence of those

24   facts; rather, they have been prepared by a party to aid you in

25   understanding the evidence to which the exhibits refer.

1          Your deliberations should focus on weighing the

2    evidence to which the exhibits refer, but you may use the

3    demonstrative exhibits to help you understand the meaning and

4    significance of that evidence.  You must independently assess

5    whether these exhibits accurately summarize or explain the

6    underlying evidence, and then give that underlying evidence such

7    weight or importance, if any, as you feel it deserves.

8          The indictment charges that the offenses alleged were

9    committed on or about -- or in or about or on or about a certain

10   date.  Although it's necessary for the government to prove

11   beyond a reasonable doubt that the offense was committed on a

12   date reasonably near the date range alleged in the indictment,

13   it is not necessary for the government to prove that the offense

14   or offenses were committed precisely on the dates charged.

15         The term "knowingly" is used in the indictment and

16   these instructions.  To describe an alleged state of mind -- or

17   the alleged state of mind of the defendant means that the

18   defendant was conscious and aware of his actions or omissions,

19   realized what he was doing or what was happening around him, and

20   did not act because of ignorance, mistakes, or accident.

21         The intent of a person, or the knowledge that a person

22   possesses at any given time, may not ordinarily be proved

23   directly because there's no way of directly scrutinizing the

24   workings of the human mind.  In determining the issue of what a

25   person knew or what a person intended at a particular time, you

1    may consider any statements made or acts done by that person,

2    and all other facts and circumstances received in evidence which

3    may aid in your determination of that person's knowledge or

4    intent.

5         You may infer, but you are certainly not required to

6    infer, that a person intends the natural and probable

7    consequences of acts knowingly done or knowingly omitted.  It's

8    entirely up to you, however, to decide what facts to find from

9    the evidence received during the trial.

10        Parties have submitted typewritten transcripts of

11   certain tape recordings which have been admitted into evidence.

12   Some of these recordings are in English, others are in Arabic.

13   For the English language recordings, you are specifically

14   instructed that one of the transcripts, correctly or

15   incorrectly, reflects the content of the conversations or the

16   identity of the speaker is entirely for you to determine.

17        You should make this determination without prejudice or

18   bias, based on the testimony regarding preparation of the

19   transcripts, your own comparison of the transcript to what you

20   hear or heard on the tapes, and any other relevant evidence or

21   testimony.  Should you determine that the transcript of an

22   English language recording is incorrect or inaccurate in any

23   respect, you should disregard it to that extent.

24        For the Arabic language recordings, the transcripts are

25   also a translation from the original language to English.  That

1    translation has been performed by a translator that this court

2    has deemed qualified to do so.  Although some of you may know

3    the Arabic language, it is important that all jurors consider

4    the same evidence that has been presented in open court.

5    Therefore, you must accept the English translation contained in

6    the transcript and disregard any different meaning of the

7    non-English words.

8           You have heard that the defendant made a statement to

9    various media outlets and law enforcement officials.  Whether

10   that statement -- whether such a statement was voluntarily

11   given, and, if so, what weight to give it, is entirely up to

12   you.  In other words, these are questions of fact which you --

13   which are up to the jury to decide.

14          In determining whether the statement was voluntary and

15   what weight to give it, if any, you should consider the totality

16   of the circumstances.  In determining whether any statement,

17   confession, admission, or act or omission alleged to have been

18   made by the defendant outside of court and after a crime has

19   been committed was made or done -- or was knowing and

20   voluntarily made or done, the jury should consider the age,

21   training, education, occupation, and physical and mental

22   condition of the defendant and his treatment while making the

23   statement as shown by the evidence in the case.

24          Now, Count 1 -- Counts 1, 6, 7, and 8 each charge the

25   defendant with conspiring to commit certain offenses.  A

1    criminal conspiracy is an agreement or a mutual understanding

2    knowingly made or knowingly entered into by at least two people

3    to achieve a certain objective that is itself a crime.

4         A conspiracy is, in a very true sense, a partnership in

5    crime.  The government must prove that the defendant you're

6    considering, and at least one other person, knowingly and

7    deliberately arrived at an agreement or other understanding that

8    they or perhaps others would pursue some endeavor which have

9    completely satisfied all the elements of the substantive

10   criminal offense.  It is the proof of this conscious

11   understanding and deliberate agreement by the alleged members

12   that should be central to your consideration of the charge of

13   conspiracy.

14        A criminal conspiracy or agreement, like any other kind

15   of agreement or understanding, need not be formal, written, or

16   even expressed directly in every detail.  To prove the existence

17   of a conspiracy or an illegal agreement, the government is not

18   required to produce a written contract between the parties, or

19   even produce evidence of an express oral agreement spelling out

20   all of the details of the understanding.

21        To prove that a conspiracy existed, moreover, the

22   government is not required to show that all of the people named

23   in the indictment as members of the conspiracy were, in fact,

24   parties to the agreement, or that all of the members of the

25   alleged conspiracy were named or charged, or that all of the

1    people whom the evidence shows were actually members of a

2    conspiracy agreed to all the means and methods set out in the

3    indictment.  Unless the government proves beyond a reasonable

4    doubt that a conspiracy, as just explained, actually existed,

5    you must acquit the defendant of the conspiracy count.

6            Before the jury may find that a defendant or any other

7    person became a member of the conspiracy charged in the

8    indictment, the evidence in the case must show beyond a

9    reasonable doubt that the defendant knew the purpose or goal of

10   the agreement or understanding, and deliberately entered into

11   the agreement intending in some way that the underlying crime be

12   committed.  It is not necessary that the defendant agree to

13   commit the offense or any element of the offense personally, but

14   he must agree or intend that the underlying crime be committed

15   by some member of the conspiracy.

16           If the evidence establishes beyond a reasonable doubt

17   that the defendant you are considering knowingly and

18   deliberately entered into an agreement intending that the

19   offense alleged in the indictment be committed, it is not

20   important that the defendant did not join the agreement at its

21   beginning, or did not know all of the details of the agreement,

22   or did not know all of his or her co-conspirators, or did not

23   participate in each act of the agreement, or did not play a

24   major role in the accomplishing the unlawful goal, or had only a

25   slight connection with the conspiracy.

1           Merely associating with others and discussing common

2     goals, mere similarity of conduct between or amongst such

3     persons, or merely being present at a place where a crime takes

4     place or is discussed, or even knowing about criminal conduct,

5     does not of itself make someone a member of a conspiracy or a

6     conspirator.  Unless the government proves beyond a reasonable

7     doubt that a conspiracy, as just explained, actually existed,

8     then you must acquit the defendant.

9           The government is not required to prove that the

10    parties to or members of the alleged conspiracy or agreement

11    were successful in achieving any or all objects of the agreement

12    or conspiracy.  Likewise, if you conclude that the government

13    proved beyond a reasonable doubt that the defendant joined a

14    criminal agreement knowingly and deliberately, any subsequent

15    change or abandonment of the criminal objective does not mean

16    the defendant is not guilty of the conspiracy.

17          Because the crime of conspiracy occurs during the

18    entire time a criminal agreement exists, a defendant is guilty

19    of committing the offense through every moment of the

20    agreement's existence, even if he or others later alter,

21    abandon, or terminate the agreement.

22          Now, Title 18 of the U.S. Code, Section 1203(a),

23    defines the offense of hostage-taking and conspiring to commit

24    hostage-taking.  The statute provides, in pertinent part,

25    whoever, whether inside or outside the United States, seizes or

104

1    detains and threatens to kill, to injure, or to continue to

2    detain another person in order to compel a third person or a

3    government organization to do or abstain from doing any act as

4    an explicit or implicit condition for the release of the person

5    detained, or attempts or conspires to do so, shall be guilty of

6    a crime when certain jurisdictional requirements that I'll

7    explain shortly are satisfied.

8         So Count 1 of the indictment charges that from in and

9    around November 2012, continuing to on or about February 7,

10   2015, the defendant, El Shafee Elsheikh, who was first brought

11   to and found in the Eastern District of Virginia, along with

12   Alexanda Amon Kotey, Mohammed Emwazi, and others known and

13   unknown to the grand jury, did conspire to seize, detain,

14   threaten to kill, injure, and continue to detain nationals of

15   the United States of America traveling outside the

16   United States, including James Wright Foley, whose death

17   resulted from this offense; Kayla Jean Mueller, whose death

18   resulted from this offense; Steven Joel Sotloff, whose death

19   resulted from this offense; Peter Edward Kassig, whose death

20   resulted from this offense, each in order to compel a third

21   person and a governmental agency, including but not limited to

22   the United States of America and any part of its government, to

23   pay a monetary ransom for the release of that U.S. national, and

24   to do and abstain from doing any act as an explicit or implicit

25   condition of the release of that person.  And that's all in

1    violation of Title 18 U.S. Code Section 1203.

2          So in order to prove the defendant guilty of conspiring

3    to commit hostage-taking as alleged in Count 1 of the

4    indictment, the government must prove each of the following

5    elements beyond a reasonable doubt:

6          First, two or more persons entered into a conspiracy,

7    the object of which was to commit hostage-taking, as described

8    in the indictment.  Second, at some point, at some time during

9    the existence or life of the conspiracy, the defendant knew of

10   the purpose of the conspiracy.  And, third, with knowledge and

11   purpose of the conspiracy, the defendant deliberately joined the

12   conspiracy with the intent to further its purpose.

13         And finally, to establish jurisdiction, whereas here,

14   the offense took place outside the United States, the government

15   must prove beyond a reasonable doubt at least one of the

16   following:

17         That the person seized or detained, or whose seizure or

18   detention was the object of the conspiracy, was a national of

19   the United States; that the defendant was found in the

20   United States; or that the United States government was the

21   organization sought to be compelled.

22         The government has also charged that this offense

23   resulted in a person's death.  Therefore, when it comes time to

24   deliberate on Count 1, you must first determine whether the

25   government has proven beyond a reasonable doubt that the

1    defendant is guilty of conspiring to commit hostage-taking,

2    given the elements I've just described to you.

3           If you find that the defendant is guilty of conspiring

4    to commit hostage-taking, you must then determine whether the

5    government has proven beyond a reasonable doubt that at least

6    one person's death resulted from the commission of this offense.

7    And I'll give you instructions on the standard for death

8    resulting at the end of my instructions on the other counts.

9           Now, Counts 2 through 5 of the indictment charge that

10   from in or about November 22, 2012, to on or about August 19,

11   2014, the defendant, El Shafee Elsheikh, who was first brought

12   to and found in the Eastern District of Virginia, and

13   Alexanda Kotey and Mohammed Emwazi and others, known and

14   unknown, all aided and abetted by each other, did seize, detain,

15   threaten to kill, injure, and continue to detain

16   James Wright Foley, a national of the United States of America

17   traveling outside the United States, in order to compel

18   James Wright Foley's parents and a governmental organization,

19   including but not limited to the United States of America and

20   any part of its government, to pay a monetary ransom for the

21   release of James Wright Foley, and to do or to abstain from

22   doing any act as an explicit or implicit condition for the

23   release of James Wright Foley, and James Wright Foley's death

24   resulted from the commission of this offense.

25          Those are the allegations of the indictment, and the

1    indictment says in violation of Title 18 U.S. Code Section 1203

2    and 2.

3            And Count 3 is essentially similar, and this one goes

4    to Kayla Jean Mueller.  It reads as follows:  From on or about

5    August 4, 2013, to on or about February 7, 2015, the defendant,

6    El Shafee Elsheikh, who was first brought to and found in the

7    Eastern District of Virginia, and Alexanda Amon Kotey and

8    Mohammed Emwazi and others known and unknown to the grand jury,

9    all aided and abetted by each other, did seize, detain, and

10   threaten to kill, injure, and continue to detain

11   Kayla Jean Mueller, a national of the United States of America

12   traveling outside the United States, in order to compel

13   Kayla Jean Mueller's parents and a governmental organization,

14   including but not limited to the United States of America and

15   any part of its government, to pay a monetary ransom for the

16   release of Kayla Jean Mueller, and to do or abstain from doing

17   any act as an explicit or implicit condition for the release of

18   Kayla Jean Mueller.

19           And the indictment also alleges that

20   Kayla Jean Mueller's death resulted from the commission of this

21   offense, all in violation of Title 18 Sections 1203 and 2.

22           Count 4, essentially similar, this one relates to

23   Steven Joel Sotloff.  From on or about August 4, 2013, to on or

24   about September 2, 2014, the defendant, El Shafee Elsheikh, who

25   was first brought to and found in the Eastern District of

1    Virginia, Alexanda Amon Kotey, and Mohammed Emwazi and others

2    known and unknown to the grand jury, all aided and abetted by

3    each other, did seize, detain, and threaten to kill, injure, and

4    continue to detain Steven Joel Sotloff, a national of the

5    United States of America traveling outside of the United States,

6    in order to compel Steven Joel Sotloff's parents and the

7    governmental organization, including but not limited to the

8    United States of America, and any part of the government, to pay

9    a monetary ransom for the release of Steven Joel Sotloff, and to

10   do and abstain from doing any act as an explicit or implicit

11   condition for the release of Steven Joel Sotloff.

12          And the indictment also alleges Steven Joel Sotloff's

13   death resulted from the commission of this offense, all in

14   violation of Title 18 U.S. Code Sections 1203 and 2.

15          Count 5 of the indictment is essentially similar.  This

16   one pertains to Peter Edward Kassig.  From on or about

17   October 2nd, 2013, to on or about November 16, 2014, the

18   defendant, El Shafee Elsheikh, who will first be brought to and

19   found in the Eastern District of Virginia, Alexanda Amon Kotey,

20   and Mohammed Emwazi, and others known and unknown to the grand

21   jury, all aided and abetted by each other, did seize, detain,

22   and threaten to kill, injure, and continued to detain

23   Peter Edward Kassig, a national of the United States of America

24   traveling outside the United States, in order to compel

25   Peter Edward Kassig's parents and a governmental organization,

 1    including but not limited to the United States of America, and

 2    any part of its government, to pay a monetary ransom for the

 3    release of Peter Edward Kassig, and to do or -- or to do and

 4    abstain from doing any act as an explicit or implicit condition

 5    for the release of Peter Edward Kassig.

 6            And the indictment also alleges Peter Edward Kassig's

 7    death resulted from the commission of this offense, all in

 8    violation of Title 18 U.S. Code Sections 1203 and 2.

 9            Now, in order to prove Defendant guilty of

10    hostage-taking as alleged in Counts 2 through 5 of the

11    indictment, which I've just read to you, the government must

12    prove each of the following elements beyond a reasonable doubt:

13            First, that the defendant seized or detained the victim

14    named in the indictment; second, that the defendant threatened

15    to kill, injure, or continue to detain that person; third, that

16    the defendant acted with the purpose of compelling a third

17    person or government organization to act in some way, either to

18    do or to abstain from doing any act as an explicit or implicit

19    condition for releasing the person detained; and fourth, to

20    establish jurisdiction, whereas here the offense occurred

21    outside the United States, the government must prove beyond a

22    reasonable doubt at least one of the following:

23            First, that the defendant [sic] seized or detained was

24    a national of the United States, or that the defendant [sic] was

25    found in the United States, or that the United States government

1    was the organization sought to be compelled.

2          The government has also charged that these offenses

3    resulted in the death of each victim named in the indictment.

4    Therefore, when it comes time to deliberate on Counts 2 through

5    5, you must first determine whether the government has proven

6    beyond a reasonable doubt that the defendant is guilty of

7    hostage-taking under the elements I have just described.  If you

8    find that the defendant is guilty of hostage-taking on a

9    particular count, you must then determine whether the government

10   has proven beyond a reasonable doubt that the victim's death

11   resulted from the commission of that offense.  And I'll give you

12   instructions for the standard of death resulting at the end of

13   the instructions on these counts.

14         The first element the government must prove beyond a

15   reasonable doubt for these counts is that the defendant seized

16   or detained a person.  To seize or detain means to restrain,

17   hold, or confine a person against that person's will and without

18   that person's consent for an appreciable period of time.  The

19   government does not have to prove that the defendant used

20   physical force or violence to restrain the hostages.  It is

21   sufficient that the defendant threatened, frightened, deceived,

22   or coerced the hostages so as to cause the hostages to remain

23   under Defendant's control.

24         The second element the government must prove beyond a

25   reasonable doubt is that the defendants threatened to kill,

1    injure, or continue to detain the hostages.  A threat is a

2    serious statement expressing an intention to kill, injure, or

3    continue to detain someone, as distinguished from idle or

4    careless talk, exaggeration, or something said in a joking

5    manner.  A statement is a threat if it was made under such

6    circumstances that a reasonable person hearing or reading the

7    statement would understand it as a serious expression of intent

8    to inflict harm on the person detained.

9         The third element the government must prove beyond a

10   reasonable doubt is that the defendant acted with the purpose to

11   compel a third party or governmental organization to do or to

12   abstain from doing some act as a condition for releasing the

13   person detained.  To satisfy this element, the government must

14   prove that the threat the defendant made was for the purpose of

15   compelling a third party other than the person being held to do

16   something, including paying a ransom, or to refrain from doing

17   something.  Further, the defendant must have acted knowingly and

18   intentionally, and not as a result of accident or mistake.  And

19   the term "governmental organization" includes the United States

20   government or any agency or department thereof.

21        A person may violate the law, even though he does not

22   personally do each and every act constituting the offense, if

23   that person aided and abetted the commission of the offense.

24   Section 2(a) of Title 18 of the U.S. Code provides that whoever

25   commits an offense against the United States, or aids, abets,

1    counsels, commands, induces, or procures its commission, is

2    punishable as principal.

3         Now, before a defendant may be held responsible for

4    aiding and abetting others in the commission of a crime, it's

5    necessary for the government to prove beyond a reasonable doubt

6    that the defendant knowingly and deliberately associated himself

7    in some way with the crime charged, and participated in it with

8    the intent to commit the crime.

9         In order to prove the defendant guilty of aiding and

10   abetting the commission of the crimes charged in Counts 2

11   through 5 of the indictment, the government must prove beyond a

12   reasonable doubt that the defendant knew that the crime charged

13   was to be committed, or was being committed, that the defendant

14   knowingly did some act for the purpose of aiding or commanding

15   or encouraging the commission of that crime, and that the

16   defendant acted with the intention of causing the crime charged

17   to be committed.

18        Before the defendant may be found guilty as an aider or

19   abetter to the crimes, the government must also prove beyond a

20   reasonable doubt that someone committed each of the essential

21   elements of the offenses charged, as I have previously explained

22   those offenses to you.

23        Merely being present at the scene of a crime, or merely

24   knowing that a crime is being committed or is about to be

25   committed is not sufficient conduct for the jury to find that

113

1     the defendant aided and abetted the commission of that crime.

2     The government must prove that a defendant knowingly and

3     deliberately associated himself with the crimes in some way as a

4     participant and someone who wanted the crime to be committed,

5     not as a mere spectator.

6          Now, a person may also be found guilty of committing an

7     offense when his co-conspirator commits a substantive crime in

8     furtherance of their conspiracy, and that crime was reasonably

9     foreseeable to him.

10         (Brief pause.)

11         THE COURT:  I paused briefly to allow the deputy clerk

12    to turn the tape over on the machine.  I thought I had paused at

13    the right time but she said, no, we have more.  It was a timing

14    difference.

15         A person may also be found guilty of committing an

16    offense when his co-conspirator commits a substantive crime in

17    furtherance of their conspiracy, and that crime was reasonably

18    foreseeable to that person.  In other words, a defendant is

19    accountable for the crimes committed by his co-conspirators as

20    long as those crimes were committed during the life of the

21    conspiracy, were in furtherance of the conspiracy, and were

22    reasonably foreseeable to the defendant.

23         In this case the government has charged the defendant

24    with conspiring with others to commit hostage-taking resulting

25    in death in Count 1, and has charged the defendant with

1    committing four substantive offenses of hostage-taking resulting

2    in death in Counts 2 through 5.  If you find that the government

3    has proven beyond a reasonable doubt the existence of the

4    conspiracy charged in Count 1, and the defendant's membership in

5    that conspiracy, you may also consider whether the defendant is

6    guilty of Counts 2 through 5 through the reasonably foreseeable

7    actions of his co-conspirators.

8           In other words, you may find the defendant guilty of

9    Counts 2 through 5 because he personally committed the acts

10   satisfying the essential elements, because he aided and abetted

11   others who did as defined above, or because his

12   co-conspirators -- or because his co-conspirators committed

13   these crimes in furtherance of their shared conspiracy, and

14   these acts were reasonably foreseeable to him, meaning the

15   defendant.

16          In order to find the defendant guilty of one or more of

17   Counts 2 through 5 through the actions of his co-conspirators,

18   you must find that the government proved beyond a reasonable

19   doubt the following elements with respect to each individual

20   count:

21          First, that the essential elements of the particular

22   charged offense were committed by a member of the conspiracy

23   detailed in Count 1; second, that the charged offense was

24   committed during the existence or life of the conspiracy

25   detailed in Count 1, and in furtherance of its objective; third,

1    that at the time the charged offense was committed, the

2    defendant was also a member of the conspiracy detailed in

3    Count 1; and, fourth, that the commission of the charged offense

4    was reasonably foreseeable to the defendant.

5            If you find all four of these requirements proven

6    beyond a reasonable doubt with respect to a specific substantive

7    offense, you should find the defendant guilty of that offense.

8    If any one of these requirements is not proved beyond a

9    reasonable doubt with respect to a particular count, you may not

10   rely on this theory to find defendant guilty of that count.

11           Count 6 of the indictment charges that from in and

12   around November 2012, and continuing to on or about February 7,

13   2015, the defendant, El Shafee Elsheikh, who was first brought

14   to and found in the Eastern District of Virginia,

15   Alexanda Amon Kotey, and Mohammed Emwazi and others known and

16   unknown to the grand jury did conspire to commit murder, as

17   defined by Title 18, U.S. Code Section 1111(a), by unlawfully

18   killing James Wright Foley, Kayla Jean Mueller,

19   Steven Joel Sotloff, and Peter Edward Kassig, nationals of the

20   United States, while these nationals were outside of the

21   United States, each killing being willful, deliberate,

22   malicious, and premeditated and with malice and forethought.

23           Now, that's all in violation of Title 18 U.S. Code

24   Section 2332(b)(2), which defines the offense of conspiracy to

25   murder U.S. nationals outside of the United States as follows:

1          Whoever outside of the United States engages in a

2     conspiracy to kill a national of the United States, shall, in

3     the case of a conspiracy by two or more persons to commit a

4     killing that is murder, if one or two of such persons do any

5     overt act to effect the object of that conspiracy, be punished.

6          Now, the essential elements.  In order to prove that

7     the defendant is guilty of -- in order to prove the defendant

8     guilty of conspiring to murder U.S. nationals outside the

9     United States, as alleged in Count 6, the government must prove

10    beyond a reasonable doubt each and every element of the

11    following -- each and every one of the following elements:

12         First, that two or more persons entered into a

13    conspiracy, the objective of which was to murder one or more

14    nationals of the United States; second, that the defendant

15    knowingly and voluntarily became a member of the conspiracy with

16    intent to further its purpose; third, that the defendant engaged

17    in the conspiracy while outside the United States; and fourth,

18    that one or more members or one or more of the conspirators

19    committed an overt act to effect the object of the conspiracy.

20         The killing alleged in the indictment for this count,

21    Count 6, is murder as defined in 18 U.S.C. Section 1111(a).

22    Murder is the unlawful killing of a human being with malice

23    aforethought.  Murdering includes any kind of willful,

24    deliberate, malicious, and premeditated killing.  Malice

25    aforethought may be proved by an intent to kill or injure, or by

117

1    evidence of conduct that is reckless and wanton and a gross

2    deviation from a reasonable standard of care, such that you may

3    infer that the defendant was aware of the serious risk of harm

4    or serious bodily harm.

5         A killing is murder when it is perpetrated from a

6    premeditated design, unlawfully and maliciously, to effect the

7    death of any human being, including if a person intended to kill

8    someone other than who was ultimately killed.  Premeditation

9    exists when a person has a fully formed conscious purpose to

10   kill, even for a moment, as long as the person has sufficient

11   time to be aware of the act he is about to commit and the

12   probable result of that act.  Likewise, a killing is murder when

13   it is committed in the perpetration of or in an attempt to

14   perpetrate the crime of kidnapping.

15        Intent to kill.  An intent to kill need not be

16   unconditional; that is, an intent to kill need not be an intent

17   to kill the person in all circumstances.  If a person intends to

18   kill as an alternative, or if some condition or demand is not

19   complied with, that constitutes an intent to kill under the law.

20        Now, Count 7 of the indictment charges that from in or

21   around November of 2012 and continuing to on or about

22   February 7, 2015, the defendant, El Shafee Elsheikh, who was

23   first brought to and found in the Eastern District of Virginia,

24   Alexanda Amon Kotey, and Mohammed Emwazi, and others known and

25   unknown to the grand jury, did conspire to provide material

1    support or resources, as that term is defined in Title 18

2    U.S. Code Section 2339(a), namely personnel, including

3    themselves, and services, knowing and intending that they were

4    to be used in preparation for and in carrying out a violation of

5    Title 18 U.S. Code Section 1203, hostage-taking, and Title 18

6    U.S. Code Section 2332(a), murder.  The deaths of James Wright

7    Foley, Kayla Jean Mueller, Steven Joel Sotloff, and Peter Edward

8    Kassig, each a citizen of the United States, as well as the

9    deaths of British and Japanese nationals, resulted from the

10   commission of this offense, all in violation of U.S. Code

11   Section 2339(a).  That's what's alleged in the indictment.

12        Now, Title 18 U.S. Code Section 2339(a) provides that

13   whoever provides material support or resources, knowing or

14   intending that they are to be used in preparation for or in

15   carrying out a violation of Section 1203, hostage-taking, or

16   Section 2332, murder of a U.S. national abroad, and if the death

17   of any person results from that, they should be punished.

18   That's Section 2339(a) of Title 18.

19        Now, in order to prove Defendant guilty of a conspiracy

20   to provide material support or resources to terrorists, alleged

21   in Count 7, the government must prove beyond a reasonable doubt

22   each of the following elements:

23        First, that two or more persons entered into a

24   conspiracy, the object of which was for a co-conspirator to

25   provide material support or resources to be used in preparation

1    for or in carrying out the commission of a violation of

2    18 U.S.C. Section 1203, hostage-taking, or Section 2332, murder

3    of U.S. nationals outside the U.S.  And, secondly, knowing the

4    object of the conspiracy, that the defendant joined the

5    conspiracy with intent to further its purposes.

6          Those are the two elements that the government must

7    prove beyond a reasonable doubt in order to establish -- in

8    order to carry their burden of showing that the defendant is

9    guilty of Count 7.

10          The government has also charged that this offense

11    resulted in a person's death.  Therefore, when it comes time to

12    deliberate on Count 7, you must first determine whether the

13    government has proven beyond a reasonable doubt that the

14    defendant is guilty of conspiring to provide material support or

15    resources to terrorists, under the elements or in accordance

16    with the elements I've just described.

17          And if you find that the defendant is guilty of

18    conspiring to provide material support or resources to

19    terrorists, you must then determine whether the government has

20    proven beyond a reasonable doubt that at least one person's

21    death resulted from the commission of this offense.  And I'll

22    give you instructions on the standard for death resulting at the

23    end of the counts.

24          Finally, Count 8 of the indictment charges that from in

25    or about 2012 and continuing thereafter, up to and including in

1    or about January 2018, in offenses committed outside the

2    jurisdiction of any particular state or district of the

3    United States, the defendant, El Shafee Elsheikh, who was first

4    brought to and found in the Eastern District of Virginia,

5    Alexanda Amon Kotey, and Mohammed Emwazi, and others known and

6    unknown, did conspire to provide material support or resources,

7    as that term is defined in United States Code Title 28

8    Section 2339(a) and (b), namely personnel, including themselves,

9    and services to a Foreign Terrorist Organization, namely ISIS,

10   which at all relevant times was designated by the United States

11   Secretary of State as a Foreign Terrorist Organization, pursuant

12   to Section 219 of the Immigration and Nationality Act, knowing

13   that ISIS was a designated Foreign Terrorist Organization, that

14   ISIS engages and has engaged in terrorist activity, and that

15   ISIS engages and has engaged in terrorism.

16        The deaths of James Wright Foley, Kayla Jean Mueller,

17   Steven Joel Sotloff, Peter Edward Kassig, each a citizen of the

18   United States, as well as the deaths of British and Japanese

19   nationals, resulted from the commission of this offense, in

20   violation of Title 18, U.S. Code Section 2339(b).

21        Now, Title 18 Section 2339(b) provides that whoever

22   knowingly provides material support or resources to a Foreign

23   Terrorist Organization, or attempts or conspires to do so, and

24   if death results of any person -- and if the death of any person

25   results, shall be punished.  That's Title 18 Section 2339(b).

1            In order to prove the defendant guilty of a conspiracy

2    to provide material support to a Foreign Terrorist Organization,

3    as alleged in Count 8, the government must prove beyond a

4    reasonable doubt each of the following elements:

5            First, that two or more persons engaged in a

6    conspiracy, the object of which was for a co-conspirator to

7    provide material support or resources to a designated terrorist

8    organization, or -- that's the first element.  Let me repeat it.

9    Two or more persons engaged in a conspiracy, the object of which

10   was for a co-conspirator to provide material support or

11   resources to a designated Foreign Terrorist Organization.  The

12   second element is, knowing the object of the conspiracy, the

13   defendant joined the conspiracy with the intent to further its

14   purpose.  And the third element is that the defendant knew that

15   the organization was a designated terrorist organization, or

16   knew that the organization had engaged in or was engaging in

17   terrorist activity or terrorism.

18           Those are the three elements of the offense in Count 8

19   that the government must prove beyond a reasonable doubt.

20           The government has also charged that this offense

21   resulted in a person's death, which is a more serious form of

22   the crime.  Therefore, when it comes time to determine [sic] on

23   Count 8, you must first determine whether the government has

24   proven beyond a reasonable doubt that the defendant is guilty of

25   conspiring to provide material support or resources to

1    terrorists under the elements I've just described.

2         And if you find that the defendant is guilty of

3    conspiring to provide material support or resources to

4    terrorists, you must then determine whether the government has

5    proven beyond a reasonable doubt that the victim's death

6    resulted from the commission of this offense.  And as I've said

7    with respect to the others, I'm going to give you instructions

8    on the standard for death resulting in a few minutes.

9         Now, "material support and resources," that term means

10   any property, tangible or intangible, or service, including

11   currency or monetary instruments or financial securities,

12   financial services, lodges -- lodging, training, expert advice,

13   assistance, safe houses, false documentation or identification,

14   communications, facilities, weapons, lethal substances or

15   explosives, personnel, one or more individuals who may be or

16   include oneself, and transportation, except medicine or

17   religious materials.

18        The term "expert advice" or "assistance" means advice

19   or assistance derived from scientific, technical, or other

20   specialized knowledge.

21        Personnel.  The defendant can be convicted for a

22   violation of this statute in connection with providing personnel

23   if you find he conspired to provide one or more individuals,

24   including himself, to work under ISIS's direction or control.

25   Individuals who act entirely independently of the

1    Foreign Terrorist Organization to advance its goals or

2    objectives are not considered to be working under the

3    Foreign Terrorist Organization's direction or control.

4         If you find that the object of the conspiracy was

5    merely to provide a person who would work independently of the

6    organization to advance shared goals or purpose, that does not

7    suffice as conspiring to provide personnel to the organization.

8    Agreeing merely to be present with other members of the

9    organization, but not under its direction or control, is not

10   agreeing to provide personnel within the meaning of the statute.

11        To find that the defendant conspired to provide

12   personnel, you must conclude that the object of the conspiracy

13   was to provide a person to ISIS who would work under its -

14   meaning ISIS's - direction or control, rather than act

15   independently of the organization.

16        The reference to service -- service refers to concerted

17   activity, not independent advocacy.  Service means the

18   performance of work commanded or paid for by another, or an act

19   done for the benefit or the command of another.

20        The term "Foreign Terrorist Organization" has

21   particular meaning under 18 U.S.C. Section 2339(b).  In order

22   for an organization to qualify as a Foreign Terrorist

23   Organization, the organization must have been designated as such

24   by the Secretary of State through a process established by law.

25        I instruct you as a matter of law that ISIS, or the

1    Islamic State, has been designated a Foreign Terrorist

2    Organization by the United States Secretary of State, and was so

3    designated under a previous name, Al-Qaeda in Iraq, by the

4    Secretary of State on October 15, 2004.  I instruct you that in

5    May 2014, the Secretary of State amended the designation to add

6    the alias Islamic State of Iran [sic] and the Levant (ISIL) as

7    the primary name of this Foreign Terrorist Organization, and

8    added the following aliases to the ISIL listing:

9         Among others, the Islamic State of Iran [sic] and

10   al-Sham (ISIS); the Islamic State of Iraq and Syria (ISIS), and

11   Daesh.  I think what I meant was Islamic State of Iraq and

12   Syria, and Daesh, which is another term for ISIS.

13        The term "terrorist activity" includes any activity

14   that, had it been committed in the United States, would be

15   unlawful under the laws of the United States or any state, and

16   it involves the seizing or detaining or threatening to kill,

17   injure, or continue to detain another individual in order to

18   compel a third person, including a government organization, to

19   do or to abstain from doing any act as an explicit or implicit

20   condition for the release of the individual seized or detained,

21   or the use of any explosive, firearm, or other weapon or

22   dangerous device other than for mere personal monetary gain, to

23   attempt to endanger, directly or indirectly, the safety of one

24   or more individuals, or to cause substantial damage to property.

25        To engage in terrorist activity means to commit or

1    incite the commission of terrorist activity with the intention

2    to cause death or serious bodily injury, to prepare for or plan

3    terrorist activity, or to gather information on potential

4    targets for terrorist activity, or to solicit funds for

5    terrorist activity.

6           The term "terrorism" means premeditated

7    politically-motivated violence perpetrated against the

8    noncombatant targets by sub-national groups or clandestine

9    agents.

10          A conviction on Count 8 requires proof that the

11   defendant conspired to provide material support to an

12   organization designated as a Foreign Terrorist Organization.

13   It's not a crime if the defendant conspired to provide material

14   support to an individual who happens to be a member of a

15   terrorist organization, if the defendant did not know that the

16   material support would benefit the Foreign Terrorist

17   Organization.

18          In other words, you must conclude that the defendant

19   knew that the material support he conspired to provide would

20   support the organization, not merely that it would benefit a

21   particular person who also happened to be a member of that

22   organization.

23          It is a crime if the defendant conspired to provide

24   material support to an organization by providing material

25   support to a member of that organization so long as he knows

1       that the material support would ultimately benefit the

2       organization, not merely the person in his individual capacity.

3               If you find that the defendant knew that a person to

4       whom he conspired to provide material support was a member of a

5       Foreign Terrorist Organization, you may consider that fact in

6       determining whether the defendant also knew that the material

7       support would ultimately benefit the organization.  But it is

8       not sufficient for a conviction to conspire to provide material

9       support to a member of a Foreign Terrorist Organization without

10      knowing that the material support would also benefit the

11      organization.

12              Now, the government has charged that the offenses in

13      Counts 1 through 5, 7, and 8 each resulted in the death of one

14      or more persons named in the indictment.  That means that if you

15      conclude that the government has proved beyond a reasonable

16      doubt every element of an offense I have previously explained --

17      as I've previously explained, you must then determine whether

18      the government has also proved beyond a reasonable doubt that a

19      death resulted from the commission of the offense.

20              Now, in order to prove that a death resulted from the

21      commission of an offense, the government must prove beyond a

22      reasonable doubt that the person's death was a consequence of

23      the offense being committed.  That means that the government

24      must prove beyond a reasonable doubt that but for the commission

25      of the offense, the victim would not have died.

127

```
 1          It is sufficient if the government proves that the
 2   commission of the offense combined with other factors to cause
 3   the victim's death, as long as these other factors would not
 4   have resulted in the victim's death, regardless of whether the
 5   offense happened.  The government is not required to prove that
 6   the defendant or anyone else intended to cause harm to --
 7   intended to cause the victim's death, or that the victim's death
 8   was foreseeable to the defendant or others.  The government does
 9   not have to prove that any act personally done by the defendant
10   caused the victim's death.  It needs to prove beyond a
11   reasonable doubt only that the defendant is guilty of committing
12   the offense under the law previously explained to you, and that
13   if the offense had not been committed, the victim would not have
14   died.
15          If a particular count alleges the death of more than
16   one person, it is sufficient for the government to prove beyond
17   a reasonable doubt only that one such death resulted from that
18   offense.  The government need not prove that the offense
19   resulted in the death of every victim alleged in the count.
20          If you conclude that the government has proven beyond a
21   reasonable doubt that the defendant committed an offense charged
22   in Counts 1 through 5, 7, or 8, but that the government has not
23   proved beyond a reasonable doubt that a death resulted from that
24   offense, you should write "guilty" as to that offense on your
25   verdict form, which I'll explain to you in just a minute - I'll
```

1    explain the verdict form - but check the box stating that death

2    did not result from the commission of the offense.

3         If you conclude that the government has proved beyond a

4    reasonable doubt both that the defendant committed an offense

5    charged in Counts 1 through 5, 7, or 8, and that a death

6    resulted from that offense, then you should write "guilty" as to

7    that offense, and check the box stating that a death resulted

8    from the commission of the offense, and that the defendant is

9    therefore guilty of the more serious resulting in death offense.

10        Now, we are near the end.  You must not base your

11   verdict in any way on sympathy or bias or guesswork or

12   speculation.  Your verdict must be based solely on the evidence

13   and the instructions given to you by the Court.

14        Your verdict must represent the considered judgment of

15   each juror.  In order to return a verdict, it's necessary,

16   therefore, that each juror agree to verdict.  In other words,

17   your verdict must be unanimous.  It is your duty as jurors to

18   consult with one another and to deliberate with a view to

19   reaching an agreement, if you can do so without violence to your

20   individual judgment.  You must each decide the case for

21   yourself, but do so only after an impartial consideration of the

22   evidence in the case with your fellow jurors.

23        And in the course of your deliberations, do not he

24   hesitate to reexamine your own views and to change your opinion,

25   if convinced it is erroneous.  But do not surrender your honest

1    conviction as to the weight or effect of the evidence solely

2    because of the opinion of your fellow jurors, or for the mere

3    purpose of returning a verdict.  Remember at all times you're

4    not partisans.  You're judges, judges of the facts.  Your sole

5    interest is to seek truth from the evidence in the case.

6            Now, the punishment provided by law for the offenses

7    charged in the indictment is a matter exclusively within the

8    province of the Court, and should never be considered by the

9    jury in any way in arriving at an impartial verdict as to the

10   offenses charged.

11           Now, during your deliberations, you must not

12   communicate with or provide any information to anyone by any

13   means about this case.  You must not use any electronic device

14   or media.  I'm not going to list all the potential electronic

15   devices or media, but you can't use any of it.  You can't speak

16   to anybody about this case during your deliberations using any

17   electronic means.  No chat rooms or blogs or websites, anything

18   like that.  You can't communicate to anyone any information

19   about this case, or to conduct any research about this case,

20   until I accept your verdict.  And at that time, when you're all

21   done, I'll have some suggestions and instructions for you.

22           Now, when you retire to the jury room, you will select

23   one of your members to act as your foreperson, and your

24   foreperson will preside over your deliberations and will be your

25   spokesperson here in court.

1          Now, forms of the verdict have been prepared for your

2     convenience, and I'm now going to explain the form of the

3     verdict to you.  The verdict form is -- anyone who wishes to

4     stand, you may do so.  The form of the verdict is five pages,

5     and I'm going to explain them to you.

6          First, there is the name of the case, United States

7     against El Shafee Elsheikh, and it says, "Verdict Form."  And

8     then the next thing is Count 1, and Count 1 is labeled

9     "conspiracy to commit hostage-taking."  And it says, 1A:  We the

10    jury unanimously find the defendant, El Shafee Elsheikh, either

11    guilty or not guilty.  That's a decision you must make, and you

12    have to write in either "guilty" or "not guilty" there.

13         If the jury find that the defendant is guilty of

14    conspiring to commit hostage-taking under Count 1, then you have

15    to answer 1B.  If you find that the defendant is not guilty of

16    conspiring to commit hostage-taking under Count 1, you don't

17    have to answer any other questions and you can go to Count 2.

18    But if you find that he's guilty as to Count 1, and you write in

19    "guilty," you must answer the question on 1B.  And, of course,

20    as you know, that's the question about death resulting.

21         There, 1B says -- there are two things.  One is, "We

22    the jury unanimously find that a death resulted from the

23    commission of this offense, and that the defendant is therefore

24    guilty of conspiring to commit hostage-taking resulting in

25    death."  If you find that beyond a reasonable doubt, you check

1     that.

2           Right below that it says:  "We the jury unanimously

3     find that death did not result from the commission of this

4     offense, and that defendant is therefore not guilty of

5     conspiring to commit hostage-taking resulting in death."  If you

6     reach that conclusion, you put a check there.

7           Then we go to page 2, which is labeled at the top

8     "Count 2, Hostage-Taking."  And this one refers to

9     James Wright Foley.  It's 2 through 5 as to each one of the

10    hostages.  And under 2A it says:  "We the jury unanimously find

11    the defendant, El Shafee Elsheikh" - and as you may find, either

12    guilty or not guilty, you write that in - "of hostage-taking as

13    charged in Count 2 of the indictment."

14          Now, again, as with Count 1, if you find the defendant

15    guilty of hostage-taking under Count 2, you have to answer

16    Question 2B.  If you find the defendant is not guilty of

17    hostage-taking under Count 2, you don't have to answer 2B and

18    you can go on to Count 3.

19          And 2B is very much like 1B:  "We the jury unanimously

20    find that James Wright Foley's death resulted from the

21    commission of this offense, and that the defendant is therefore

22    guilty of hostage-taking resulting in death."  If you find

23    unanimously that the evidence warrants that, you check that.

24          Under 2B, it's also:  "We the jury unanimously find

25    that James Wright Foley's death did not result from the

1    commission of this offense, and that the defendant is therefore

2    not guilty of hostage-taking resulting in death."  If that's

3    your conclusion, check that.

4            Then we go to Count 3.  Count 3 is essentially the same

5    as Count 2, except it refers to Kayla Jean Mueller.  And, again,

6    you'll have an opportunity to write whether you find the

7    defendant, El Shafee Elsheikh, guilty or not guilty of that.

8            And then you'll have -- if you find him guilty, you

9    have to answer 3B.  If you find him not guilty, you don't have

10   to answer question 3B.

11           Count 4, similar.  Count 4 refers to

12   Steven Joel Sotloff.  And, again, 4A says:  "We the jury

13   unanimously find the defendant, El Shafee Elsheikh," either

14   guilty or not guilty, as you may conclude.  And if you find that

15   he's guilty, you have to answer 4B.  If you find he's not

16   guilty, you need not answer 4B.

17           Count 5, similarly, but this one relates to

18   Peter Edward Kassig.  And, again, under 5A, you have a place to

19   mark whether you find the defendant -- unanimously find the

20   defendant guilty of hostage-taking as charged in Count 5.  If

21   you find he's not guilty, you don't have to answer 5B.  If you

22   find he is guilty, you must answer 5B.

23           Count 6 is entitled "Conspiracy to Murder

24   U.S. Nationals Outside the United States."  And, again, 6 says:

25   "We the jury unanimously find defendant, El Shafee Elsheikh,"

1   either guilty or not guilty, as you may find, "of conspiring to

2   murder U.S. nationals outside the United States as charged in

3   Count 6 of the indictment."

4        Then, Count 7 of the indictment is titled "Conspiracy

5   to Provide Material Support to Terrorists."  And 7A says:  "We

6   the jury unanimously find the defendant, El Shafee Elsheikh,"

7   either guilty or not guilty, as you may find, you write that in,

8   "of conspiring to provide material support to terrorists, as

9   charged in Count 7 of the indictment."

10       If you find that the defendant is not guilty of

11  conspiring to provide material support to the terrorists as

12  charged, you don't have to answer 7B.  But if you find he is

13  guilty, you must go on and decide 7B, where you can write,

14  either:  "We the jury unanimously find that the death resulted

15  from the commission of this offense, and that the defendant is

16  therefore guilty of conspiring to provide material support to

17  terrorists resulting in death," or, as you may find, "We the

18  jury unanimously find that a death did not result from the

19  commission of this offense, and that the defendant is therefore

20  not guilty of conspiring to provide material support to

21  terrorists resulting in death."

22       Then the last page of the verdict form is Count 8.

23  It's titled "Conspiracy to Provide Material Support to a Foreign

24  Terrorist Organization."  And, again, this one has a place for

25  you to mark whether you find unanimously the defendant guilty or

1   not guilty of conspiring to provide material support to a

2   Foreign Terrorist Organization as charged in Count 8.

3           And, again, if you find he's not guilty, you need not

4   answer the questions on 8B.  If you find he is guilty, you must

5   answer the questions by checking either, "We the jury

6   unanimously find that a death resulted from the commission of

7   this offense, and that defendant is therefore guilty of

8   conspiring to provide material support to terrorists resulting

9   in death."  Or you may find, "we the jury unanimously find that

10  a death did not result from the commission of this offense, and

11  the defendant is therefore not guilty of conspiring to provide

12  material support to terrorists resulting in death."

13          So that's the verdict form.  Now, you will take this

14  form to the jury room, and when you've reached your unanimous

15  agreement as to your verdict, you will have your foreperson fill

16  in, date, and sign the form setting forth your verdict on which

17  you've unanimously agreed, and then return your verdict to the

18  court here.

19          Now, I think it is proper to add the caution that

20  nothing in these instructions and nothing in any form of the

21  verdict prepared for your convenience is meant to suggest or to

22  convey to you in any manner or way any intimation as to what

23  verdict I think you should find.  What the verdict is or shall

24  be is your sole and exclusive duty and responsibility.

25          Now, when you retire to the jury room, you'll select

1    one of your number to serve as your foreperson.  The foreperson

2    will preside over your deliberations and will be your

3    spokesperson here in court.  I think I already mentioned that to

4    you.

5            Now, if it becomes necessary during your deliberations

6    to communicate with the Court, you may send a note by the court

7    security officer, and he'll be right outside the door of the

8    area in which you're going to be deliberating.  And no member of

9    the jury should ever attempt to communicate with the Court by

10   any means other than by a signed writing, and the Court will

11   never communicate with any member of the jury on any subject

12   touching the merits of the case, other than in writing or orally

13   here in open court.  Now, I may communicate with you on some

14   matter not relating to the merits of the case, such as how long

15   you wish to deliberate and that sort of thing.

16           You'll note from the oath about to be taken by the

17   court security officer that he, too, as well as all other

18   persons, are forbidden to communicate in any way or manner with

19   any member of the jury on any subject touching the merits of the

20   case.

21           You may administer the oath to the court security

22   officer.

23           (Oath administered by courtroom deputy clerk.)

24           THE COURT:  All right.  Ladies and gentlemen, I'm now

25   going to release you to go into the jury room to begin your

1    deliberations.  But before I do so, I think it has been apparent
2    to some of you the number of jurors that will deliberate in this
3    case.  The number of jurors who will deliberate is 12.  It is
4    the first 12 of you plus the first alternate, because we've
5    already excused one juror.
6          So the jurors to be excused are Number 22, that's
7    Ms. McCrea; Mr. Hoge; Eileen Liles, Ralph Stallings, and
8    Laura Buschman.  Did I pronounce that correctly?
9          Well, I can now excuse you.  But let me underscore our
10   gratitude to you.  We could not have proceeded without your
11   participation in this case.  Now, you will not be deliberating,
12   unless there are some very unusual circumstances that arise.  So
13   I want you to take your books, you may go home, but do not
14   discuss the case with anybody yet.  When it's all over and a
15   verdict has been returned, you'll receive word from the clerk's
16   office that the case is over, and then you may discuss the case
17   with whoever you please.
18         But in that regard, let me add a caution that I will
19   repeat when the case is over.  It is always disturbing to me
20   when I read in the media or the press jurors discussing what
21   went on during the course of their deliberations or what went on
22   during the course of the trial.  Certainly for those who
23   deliberate, I think you owe each other a duty of
24   confidentiality.  It's a matter for you to decide.  I won't
25   order you to do it, but I think you owe each other a duty of

1   confidentiality.  I think if people knew about what happens in

2   deliberations, it does an injury to the deliberative process.

3   People would not feel free to give a full and complete

4   expression of their views if they thought it was going to be

5   grist for the media mill.  So I tell you that in advance.

6        And you-all, I ask that you not to discuss the matter

7   with anybody completely until the case is over.  And we will

8   call you immediately when that occurs.

9        So, again, you may go home now, but I thank you for

10   your service.  We couldn't have done this without you.  You are

11   an essential part.  I don't know whether you're relieved or

12   disappointed.  But you get to go home now.

13        Thank you.  You may follow the court security officer.

14        Usually, counsel, I have counsel at the bench to do

15   that, but I'm sure if you had any different views about who was

16   to be excused and who was not, you would have told me.

17        MS. GINSBERG:  Your Honor, we rely on the deputy clerk

18   to have kept track.

19        THE COURT:  The answer is no, that it's no different.

20   I do too, but I have my own markings.  But I think she is

21   correct.

22        Any problem with that, Mr. Fitzpatrick?

23        MR. FITZPATRICK:  No, Your Honor.

24        THE COURT:  All right.  Now, of course you can stand.

25   Now I'm going to release you to go into the jury room.

1    Actually, the jury room for this courtroom is different from the

2    one you're going to be deliberating in.  Right?

3             COURT SECURITY OFFICER:  We'll be in the big conference

4    room.

5             THE COURT:  Big conference room, but that's not the

6    jury room.  This courtroom has been here since 1995.  Before

7    that, we were on Washington Street in a courthouse that was

8    built 80 years ago.  And when we built this courtroom, or this

9    courthouse, jury rooms, because we had old-fashioned judges who

10   are all gone except me - no, there's one more left - they

11   designed the jury rooms to be very small to kind of encourage

12   jurors to get it done.

13            We don't do that anymore.  You're in a much larger

14   room, and we're going to guarantee that you have whatever

15   conveniences you need, drinks, snacks, and the like, and you may

16   deliberate as long or as little as you like.  That's a matter

17   entirely up to you.

18            Now, do not begin your deliberations until all of the

19   exhibits are brought in, the jury verdict form is brought in,

20   the tape recorder with my instructions is brought in.

21            And are there already devices to play the exhibits if

22   there are videos?  They're already in there.

23            COURTROOM CLERK:  Yes, Judge.

24            THE COURT:  And once all of that is brought in and the

25   door is closed and all 12 of you are there, then you may begin

1    your deliberations.  But not until then.  And if any one of you

2    needs to use the facilities or needs to be excused, cease your

3    deliberations.  You can't talk about the case - which is

4    deliberating - unless all 12 of you are there.  And, as I've

5    said once or many times, I'll say it again:  You may deliberate

6    as long as or little as you prefer.

7          All right.  You may follow the court security officer

8    to the jury room, and I'll have the material brought in

9    promptly.

10          (Jury out at 3:13 p.m.)

11          THE COURT:  All right.  It's 3:15.  I would ask that

12   you tell the deputy clerk where you can be reached if she --

13   Ms. Randall is a jewel.  And I've been trying cases for

14   35 years, and she is at the top of the list of deputy clerks.

15   She makes everything a lot easier, which is very important,

16   because, as you get older, you don't really -- you don't stay on

17   top of everything as much as you did.

18          You-all are very fortunate you weren't here in the mid

19   '80s, when I first came here.  I shudder to think what I was

20   like.  All right.

21          Is there anything else to be accomplished right now on

22   behalf of the government?

23          MR. FITZPATRICK:  No, Your Honor.

24          THE COURT:  Ms. Ginsberg, on behalf of the defendant,

25   or Mr. MacMahon?

```
1            MS. GINSBERG:  No, Your Honor, nothing else.

2            THE COURT:  All right.  Mr. Deubler and Mr. Ellis,

3    everybody is here.  I won't mention everybody.

4            I want to thank counsel for your cooperation.  You did

5    expedite this case.  It was scheduled to last three weeks; it

6    didn't.  And that's largely due not to any effort of mine, but

7    to your efforts to move things along and to cooperate.  And I

8    appreciate it.  They don't know this as well, but I'm sure they

9    would appreciate it, "they" meaning the jury.

10           Thank you.  Remember, we may need to reach you if there

11   are any questions or a verdict.  Court stands in recess.

12           (Recess taken at 3:15 p.m.)

13           THE COURT:  Thank you for assembling so quickly.  This

14   is, I think, largely inconsequential, but I wanted to do it.

15           In the course of providing the instructions to the

16   jury, I omitted two and a half lines.  I doubt seriously that

17   you were unaware of it.

18           But typically what I do is I have counsel at the bench

19   following instructions, and I inquire whether they have any

20   objection, or whether I carefully read or provided the

21   instructions in accordance with the instructions conference.

22   But it's been brought to my attention that I omitted three lines

23   on page 5.

24           MS. GINSBERG:  Is that the stipulation?

25           THE COURT:  Yes.
```

141

1          MS. GINSBERG:  Yes, I think we both saw that,

2    Your Honor.

3          THE COURT:  I would be shocked if you hadn't.

4          MS. GINSBERG:  And I think it's fair to say that

5    neither of us objected to that being omitted.

6          THE COURT:  All right.  I wanted that on the record.

7          MR. FITZPATRICK:  The government concurs.

8          THE COURT:  It's inconsequential because the sentence I

9    did give right before that says, "The evidence consists of any

10   facts that have been agreed or stipulated to."

11         So I think there's no question that they know that's

12   part of the factual record, and I'm not surprised that you-all

13   were aware that I had omitted the two and a half lines that

14   followed that.  But in the old days you would have brought that

15   to my attention.  It was brought to my attention, it's

16   inconsequential.  If there's no objection, we're not going to do

17   anything about it.

18         Any objection on behalf of the government?

19         MR. FITZPATRICK:  None from the government, Your Honor.

20         MR. MACMAHON:  Your Honor, I was following along and

21   not Ms. Ginsberg.  You also told the jury the same thing every

22   time you read a stipulation, so we wouldn't have any objection.

23   I think the jury was told every instruction as the evidence came

24   in.

25         THE COURT:  Thank you for that addition.  Yes, I agree

1    with that.

2           I'm sorry if I have disturbed your afternoon of work,

3    but I wanted to go ahead and make that clear for the record.

4    And I will reassemble you only if there is a question or a

5    verdict.  I intend to allow the jury to deliberate as long as

6    they wish today or tomorrow, and I will let you know as soon as

7    I hear from them.

8           Thank you.

9           (Recess taken at 4:09 p.m.)

10          THE COURT:  We have a note from the jury indicating

11   they want to go home and return.  It says:  "Your Honor, we are

12   recessing at 5:40 p.m. on the 13th of April, 2022.  We will

13   resume deliberation at 10 a.m. the 14th of April, 2022, signed

14   Camille Morrison, Number 30."

15          She's not recessing.  I will recess.  I will

16   reconvene --

17          MS. GINSBERG:  I think they took your directions a

18   little bit too far.

19          THE COURT:  Yes, they did.

20          I will make this a part of the record.  You-all may

21   review it if you wish at the podium or the clerk's table when we

22   recess.

23          Bring them in, please.

24          (Jury in at 5:50 p.m.)

25          THE COURT:  Ladies and gentlemen, I have your note,

1    which reads:  "Your Honor, we are recessing at 5:40 p.m. on the

2    13th of April, 2022.  We will resume deliberation at 10 a.m.

3    14th of April, 2022, signed Camille Morrison, Number 30."

4         I told you you could deliberate as long or as little as

5    you like.  That doesn't mean you can recess when you want to and

6    you can resume when you want to.  But you can.  So don't worry

7    about it.  I will do the recessing and I will do the resumption

8    of deliberation.

9         But this evening when you get home, as usual, you must

10   refrain from discussing the matter with yourselves or with

11   anyone, or undertaking any investigation on your own.  And we

12   will, as you request, return tomorrow morning at 10:00.

13        I take it you don't want to return at 9:00?  All right.

14   We'll return at 10:00 and I'll convene you again, we'll go

15   through the usual, and you'll be permitted to retire and

16   continue your deliberations.

17        Remember, now, you may not discuss the matter with

18   anyone or among yourselves.  All right.  You may follow the

19   court security officer out.

20        (Jury out at 5:51 p.m.)

21        THE COURT:  Court stands in recess until 10 o'clock

22   tomorrow morning.

23        (Off the record at 5:52 p.m.)

24

25

144

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Rebecca Stonestreet, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     ____//Rebecca Stonestreet//____              __10/24/22____

10    SIGNATURE OF COURT REPORTER                      DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25