1

```
                     UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division

UNITED STATES OF AMERICA,          :
                                   :  Criminal Case
                Plaintiff          :  No. 20-CR-00239-TSE
          v.                       :
                                   :
EL SHAFEE ELSHEIKH                 :  August 19, 2022
                                   :  9:06 a.m.
                Defendant          :
........................           :  ........................


                   TRANSCRIPT OF SENTENCING HEARING
                 BEFORE THE HONORABLE T.S. ELLIS, III
                   UNITED STATES DISTRICT JUDGE

   APPEARANCES:

   FOR THE PLAINTIFF:          DENNIS FITZPATRICK
                               RAJ PAREKH
                               JOHN T. GIBBS
                               AIDAN TAFT GRANO-MICKELSEN
                               ALICIA H. COOK
                               U.S. ATTORNEY'S OFFICE
                               2100 Jamieson Avenue
                               Alexandria, VA  22314
                               703-299-3700

   FOR THE DEFENDANT:          NINA J. GINSBERG
                               ZACHARY ANDREW DEUBLER
                               DiMURO GINSBERG PC
                               1101 King Street
                               Suite 610
                               Alexandria, VA  2231
                               703-684-4333

                               EDWARD B. MacMAHON
                               LAW OFFICES OF
                               EDWARD B. MacMAHON, JR.
                               P.O. BOX 25
                               107 East Washington Street
                               Middleburg, VA  20118
                               540-687-3902

                               (Appearances continued on next
                               page)
```

2

```
1     FOR THE DEFENDANT:            JOHN EDWARD YANCEY ELLIS
                                    CARMICHAEL ELLIS & BROCK
2                                   108 N. Alfred Street
                                    1st Floor
3                                   Alexandria, VA  22314
                                    703-684-7908
4

5     OFFICIAL COURT REPORTER:     REBECCA STONESTREET, RPR, CRR
                                    U.S. District Court, 9th Floor
6                                   401 Courthouse Square
                                    Alexandria, Virginia  22314
7                                   (240) 426-7767

8
                              ( Pages 1 - 75)
9

10
                COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               **P R O C E E D I N G S**

2               COURTROOM CLERK:  Court calls criminal case

3    United States of America versus El Shafee Elsheikh, Case

4    Number 2020-CR-239.  May I have appearances, please, first for

5    the government.

6               MR. FITZPATRICK:  Good morning, Your Honor.

7    Dennis Fitzpatrick, Raj Parekh, John Gibbs,

8    Aidan Grano-Mickelsen, Alicia Cook, as well as Nicole Lopez and

9    Jennifer Donnarumma on behalf of the United States.  Your Honor,

10   after the victim impact testimony this morning, Mr. Parekh will

11   be making the arguments for the government.

12              THE COURT:  All right.  Thank you.  Good morning to all

13   of you.  Is anybody left back at the office?

14              MR. PAREKH:  Good morning, Your Honor.

15              THE COURT:  All right.  Who is here on behalf of the

16   defendant, Mr. El Shafee Elsheikh.

17              MR. DEUBLER:  Zachary Deubler for Mr. Elsheikh, along

18   with Yancey Ellis, Nina Ginsberg, and Ed MacMahon.  And the

19   defendant is also present.

20              THE COURT:  All right.  Yes.  Good morning,

21   Mr. Elsheikh.

22              All right.  In case there is any curiosity, I will

23   note - because otherwise Mr. Ellis, Yancey Ellis, would be

24   deeply concerned if I didn't mention it - there is no

25   relationship between Mr. Yancey Ellis and me.

4

1           Am I correct, Mr. Ellis?

2           MR. ELLIS:  Yes, sir.  Thank you.

3           THE COURT:  You're welcome.  I wouldn't want you stayed

4      by any false impression.  And you wouldn't -- I joke, of course,

5      but it's important to note.

6           All right.  The matter is before the Court for

7      sentencing, this defendant having been found guilty by a jury

8      after a -- Mr. Fitzpatrick, was it seven or eight days?

9           MR. FITZPATRICK:  The trial days?  I think it may have

10     been more than that.  I lost track.

11          MR. PAREKH:  It was March 29th that the trial started,

12     and the jury returned its verdict on April 14th, Your Honor, of

13     2022.

14          THE COURT:  So it was about a 15-day trial.

15          MR. PAREKH:  A little over two weeks, Your Honor.

16     That's correct.

17          THE COURT:  All right.  After a 15-day trial, a jury

18     convicted Mr. El Shafee Elsheikh of all counts in the

19     indictment.  There were eight of them.  He was convicted of

20     conspiracy to commit hostage-taking resulting in death, in

21     violation of Section 1203 of Title 18.  He was convicted of

22     hostage-taking resulting in the death of James Wright Foley,

23     also a felony, in violation of the same statute.  He was

24     convicted of hostage-taking resulting in the death of

25     Kayla Jean Mueller, also in violation of that same statute, a

1    felony.  And he was convicted of hostage-taking resulting in the

2    death of Steven Joel Sotloff, also a felony violation of the

3    same statute.  And he was convicted of hostage-taking in the

4    death of Peter Edward Kassig, also a violation of that same

5    provision, a felony.

6            And he was convicted of conspiracy, engaging in a

7    conspiracy to murder United States citizens outside of the

8    United States, in violation of Section 2332(b)(2), and he was

9    convicted of engaging in a conspiracy to provide material

10   support to terrorists, resulting in the death of the people that

11   I mentioned.

12           And he was convicted finally, in the final count, of

13   engaging in a conspiracy to provide material support to a

14   designated Foreign Terrorist Organization, ISIS, and that

15   conspiracy resulted in the death, in violation of yet another

16   statute.

17           So we are here today for the Court to decide what

18   sentence to impose on this defendant.  Let me inquire, to begin

19   with, Mr. Deubler, have you had an adequate opportunity to

20   review the presentence investigation report, and to review it

21   with your client?

22           MR. DEUBLER:  Yes, Your Honor.  Both the draft report

23   and the final.

24           THE COURT:  All right.  And, Mr. Parekh, have you had

25   an adequate opportunity to review the presentence report, and to

1    review it with your colleagues?

2            MR. PAREKH:  Yes, Your Honor.

3            THE COURT:  All right.  Now, there were, of course,

4    some objections, Mr. Deubler, that you raised.  I think some

5    were resolved, but some remain.  What objections do you have

6    today for the Court to consider?

7            MR. DEUBLER:  The only objections I will be addressing

8    today, Your Honor, are the guidelines enhancement.  So that's

9    the six-level sexual exploitation enhancement, the obstruction

10   of justice -- two-level obstruction of justice enhancement, and

11   the leadership role enhancement.

12           THE COURT:  So those are the objections that you are

13   asserting, and any other objections, you are not continuing to

14   assert?

15           MR. DEUBLER:  Correct, Your Honor.  They just dealt

16   with material that we thought was irrelevant, but has no bearing

17   on today's sentencing.

18           THE COURT:  Well, that was your position.

19           MR. DEUBLER:  That was our position.

20           THE COURT:  You're not asking for me to rule on it?

21           MR. DEUBLER:  No, Your Honor.

22           THE COURT:  All right.  So they will remain in the

23   presentence investigation report.

24           Now, Mr. Parekh, does the government have any

25   objections or corrections to the presentence report?

1          MR. PAREKH:  No, Your Honor.

2          THE COURT:  All right.  We'll begin first with,

3     Mr. Deubler, you can tell me -- although I've read your

4     memorandum and I've read the government's memorandum, so I have

5     a pretty good idea of the arguments, but you have an opportunity

6     now to address each of them.

7          Let's begin with the -- what's the first one you

8     mentioned, obstruction?

9          MR. DEUBLER:  The sexual exploitation.

10         THE COURT:  Oh, yes.  That's related to Kayla Mueller?

11         MR. DEUBLER:  Correct, Your Honor.

12         THE COURT:  All right.  What's your argument?  You may

13    repeat that.

14         MR. DEUBLER:  Yes, Your Honor.  In examining this

15    six-level enhancement, in the case of jointly undertaking

16    criminal activity, the government correctly points out that the

17    Court should examine three primary factors:  Whether the sexual

18    exploitation was within the scope, in furtherance, and was

19    reasonably foreseeable in connection with that criminal

20    activity.

21         A proper understanding of the timeline of this case is

22    necessary in order for this Court to properly evaluate it.  As

23    the government stated in its position on sentencing, the bulk of

24    the email ransom demands concerning Ms. Mueller with the Mueller

25    family occurred in May, July, and August of 2014.  At some point

1    in September of 2014, Ms. Mueller was moved out of the control

2    of the Beatles group into an ISIS leader's home, Abu Sayyaf.  I

3    believe the Court will remember that there was a military raid

4    conducted on that particular residence.

5         THE COURT:  I also remember there was testimony about

6    what occurred there, and I also recall there were more than one

7    witness who testified.

8         MR. DEUBLER:  Correct, Your Honor.

9         THE COURT:  All right.  Go on.

10        MR. DEUBLER:  At some point that transition from

11   The Beatles' custody into Abu Sayyaf's custody, we are unable --

12   we don't know when that happened.  We do know that in September,

13   that same month, the Muellers received their last ransom email

14   communications on September 19th, 2014.  So we don't know if

15   that happened immediately before or immediately after the

16   transfer to Abu Sayyaf's house.

17        That was the end of The Beatles' involvement with

18   Ms. Mueller.  None of the hostages at trial mentioned that

19   they --

20        THE COURT:  So your point is that this conspiracy

21   involves only The Beatles.

22        MR. DEUBLER:  In terms of what is reasonably -- whether

23   the sexual exploitation component was reasonably foreseeable to

24   The Beatles and was in furtherance of that conspiracy, it is our

25   position that it is not.  Because The Beatles were concerned

1    with raising funds for ISIS and forcing foreign and sovereign

2    governments to take certain political and military actions in

3    their various email demands.

4          The tragic, needless, and unfortunate - and, quite

5    frankly, disgusting - sexual abuse that occurred to the Yazidi

6    women and Ms. Mueller was not in furtherance of that goal --

7          THE COURT:  I prefer the word "horrendous."

8          MR. DEUBLER:  Horrendous, Your Honor.  Perfectly

9    adequate word.  I don't know what other word there is to

10   describe it.  But that conduct was not in furtherance of

11   The Beatles group's goals of holding hostages.

12         And the very final interaction -- or the very final

13   piece of evidence that we have --

14         THE COURT:  You recall, don't you, that one of

15   The Beatles - it might have been Elsheikh - told Ms. Mueller:

16   You're going to be held forever.  Do you recall that?

17         MR. DEUBLER:  Yes, Your Honor.

18         THE COURT:  Why doesn't that make it clear that the

19   conspiracy was indeed to hold her forever for all of their

20   purposes, and there's no doubt that Mr. El Shafee Elsheikh knew

21   that -- in fact, knew that it was part of ISIS's view that it

22   was appropriate to have sex with captured women?

23         MR. DEUBLER:  Two points to that, Your Honor.  First

24   is, we heard a lot of very disturbing testimony that The Beatles

25   terrorized their various hostages for the purpose of terrorizing

1   them.  If the United States Government had offered the amount of

2   ransom money for Ms. Mueller's release on September 19th, 2014,

3   I think I'm comfortable saying that she would have been

4   released.

5           THE COURT:  Why are you comfortable in saying that?

6           MR. DEUBLER:  Well, because all of the other hostages,

7   their governments who paid the ransom demands, those hostages -

8   and many of them testified in front of Your Honor - were

9   released.  So that's why I say I'm comfortable with saying that.

10          THE COURT:  All right.  Go on.

11          MR. DEUBLER:  The second point is, none of the female

12  hostages experienced any -- from what we know, from what the

13  evidence shows, experienced any sexual abuse while in the

14  custody of The Beatles.  Therefore, the actions --

15          THE COURT:  They weren't in the custody of The Beatles.

16  They were in the custody of ISIS, not The Beatles.

17          MR. DEUBLER:  Correct, Your Honor.  While The Beatles

18  were interacting with them, there was -- there were many

19  horrendous complaints about physical abuse, but no sexual abuse.

20          And the government points to one of Mr. Elsheikh's

21  media interviews conducted four years after the fact in which he

22  doesn't explicitly -- well, he says he doesn't disavow ISIS's

23  practice of holding slaves.  That was one media interview

24  conducted four years after the fact.  That doesn't affect the

25  analysis of whether, at the time, The Beatles knew that

1    Ms. Mueller and the Yazidi women were going to be sexually

2    abused when they were transferred into Abu Sayyaf's custody

3    and --

4            THE COURT:  They don't have to know, do they?  It has

5    to be reasonably foreseeable.

6            MR. DEUBLER:  Correct, Your Honor.

7            THE COURT:  All right.  And the fact that he said

8    something four years later, are you telling me that you think he

9    changed his view?  That four years after the incidents, he then

10   had a different view about abuse of women that he didn't have

11   back then?

12           MR. DEUBLER:  No, Your Honor.  But it --

13           THE COURT:  I don't think so.

14           MR. DEUBLER:  Right, Your Honor.  But that does not

15   mean his personal views meant that al Baghdadi's and

16   Abu Sayyaf's treatment of the Yazidi women and Ms. Mueller were

17   in furtherance of the conspiracy.

18           THE COURT:  All right.

19           MR. DEUBLER:  Your Honor, I don't want to belabor the

20   point, so the rest of the argument is laid out in my brief.  But

21   for those reasons, we do object to that enhancement, Your Honor.

22           THE COURT:  All right.  Mr. Parekh, you may respond.

23           MR. PAREKH:  Just briefly, Your Honor.

24           As the Court stated, the question is whether this is

25   reasonably foreseeable conduct.  And as the Court stated in its

1    order on March 24, 2022, the fact that Mueller and Mulla were

2    forcibly confined in the same facilities at the same times,

3    during which time conspirators were actively soliciting ransom

4    payments from Mueller's family, rebuts the contention that Mulla

5    and Mueller were victims of completely separate conspiracies.

6            The government takes issue with the defense's

7    contention that they were out of the control of The Beatles.

8    While they may not have been in the physical control of

9    The Beatles in September and thereafter, The Beatles certainly

10   had control of Kayla Mueller.  Otherwise, they would not have

11   been soliciting ransom payments --

12           THE COURT:  Well, isn't your argument, put simply, that

13   the conspiracy does not end with anything The Beatles do?  That

14   it goes beyond The Beatles?

15           MR. PAREKH:  That's correct, Your Honor.

16           THE COURT:  And isn't your argument that it isn't just

17   The Beatles; after all, the Beatles wouldn't have had the

18   authority to do what they did without al-Baghdadi and everyone

19   else at the top.  Am I right?

20           MR. PAREKH:  Correct, Your Honor.

21           THE COURT:  Is that your argument?

22           MR. PAREKH:  Yes, Your Honor.

23           THE COURT:  All right.  Go on.

24           MR. PAREKH:  And so the email on September 19th to the

25   Mueller family is continuing to seek ransom payments, even while

1    Kayla Mueller is in the custody of the Sayyafs, or soon to be in

2    the custody of the Sayyaf residence.  And that's where she was

3    being repeatedly raped by Abu Bakr al-Baghdadi.

4           And, of course, as Your Honor knows, there's the email

5    in February of 2015 announcing Kayla Mueller's death, which came

6    from the same Safe-mail account that was being used all along to

7    communicate with the Mueller family.  So this was a continuing

8    conspiracy, Your Honor.

9           And the defense notes that there's no evidence that

10   Elsheikh was linked to any of the publications that were found

11   in the Sayyaf residence.  Well, the government's argument is not

12   that Elsheikh is responsible for creating the contents of the

13   documents; rather, it is his statements and the evidence at

14   trial that established that he was familiar with and knew ISIS's

15   interpretations of Islamic law justifying enslavement and

16   sexual abuse of non-Muslim women.  And thus, that's the

17   reasonably foreseeable link to his ISIS co-conspirators' sexual

18   exploitation of Mueller during her continued captivity, which is

19   most relevant here, Your Honor.

20          And the Court even stated that the slavery documents

21   espouse ISIS's support for the capture of hostages and slaves,

22   and the defendant's corresponding statements demonstrate his

23   knowledge of and support for ISIS's objectives and activities.

24          And so the Court can, and should, infer that those

25   documents that were found at the Sayyaf residence, the same

1    individual who was holding Kayla when she was being raped by

2    Baghdadi, that those documents are quite probative that this was

3    reasonably foreseeable to Elsheikh.  Because years later, when

4    he's talking not just to Jenan Moussa, but also to

5    *The Washington Post,* he's repeating statements that are very,

6    very close in content to those documents, and even uses the word

7    "concubine."  And, as we state in our position paper, that word

8    was used in one of the documents that was located at the Sayyaf

9    residence during the 2015 raid.

10          So for all those reasons, Your Honor, we think you

11   should apply the enhancement.

12          I would also note, Your Honor correctly recognized at

13   the Kotey sentencing hearing, on page 7 of the transcript, that

14   there is evidence for this defendant.  And we understand why it

15   didn't apply to Kotey.  He didn't have a chance to object to

16   certain evidence that was adduced during Elsheikh's trial.  But

17   it's quite different for Elsheikh, who we didn't have a plea

18   agreement with, there were no stipulated offense levels.  And so

19   it's relevant, and you should apply it in Elsheikh's case,

20   Your Honor.

21          THE COURT:  All right.  What's the second argument that

22   you wish to raise, Mr. Deubler?  Is it the obstruction?  Is that

23   the one?

24          MR. DEUBLER:  Yes, Your Honor.

25          THE COURT:  All right.  I'll hear you on that.

1      MR. DEUBLER:  Your Honor, I have no intention of

2  relitigating the weeks-long suppression hearing that we all went

3  through in November of last year.  I'm just going to hit some of

4  my highlights.

5      THE COURT:  For that, I commend you.

6      MR. DEUBLER:  Simply, Your Honor, Mr. Elsheikh's

7  inability to carry his evidentiary burden at that November 2021

8  hearing does not mean that his declaration is a perjurious

9  statement.  By way of corroboration, Mr. Kotey gave a number of

10  statements to the government and to the FBI regarding abuse that

11  he underwent and that he personally observed while at SDF

12  facilities.  And though these statements were not enough to

13  convince Your Honor that Mr. Elsheikh's statements should be

14  declared involuntary and suppressed, they do lend enough support

15  to his declaration to stave off a perjury finding.  And I just

16  have four examples, Your Honor.

17      One, in Mr. Elsheikh's declaration, he claims he was

18  beaten by the SDF when they discovered that he had been giving

19  his true name and identity to the United States

20  Department of Defense rather than to SDF investigators.  In

21  Kotey's debriefing sessions, Kotey states that when the SDF

22  tried to talk to Mr. Elsheikh, he stuck with his fake name and

23  ignored the SDF.  They struck him repeatedly and stated that

24  Elsheikh was not going to lie to them and be truthful with the

25  Americans.

1          Second, Mr. Elsheikh claimed that the SDF pushed him

2     down a flight of stairs.  Kotey stated that he was also pushed

3     down a flight of stairs, and, quote, "landed on a pile of

4     people.  Kurds in military clothing were beating everyone with

5     plastic pipes."

6          Third, Mr. Elsheikh claimed that his last uncoerced

7     media interview took place in 2018.  Mr. Kotey states that his

8     last, quote, "voluntary interview" was in the beginning of 2019.

9          And finally, Your Honor --

10         THE COURT:  I never heard testimony from Kotey in that

11    regard, and I never had to consider whether that statement was

12    accurate, truthful, or otherwise.

13         MR. DEUBLER:  Correct, Your Honor.  We did submit the

14    government's proffer letter detailing all of this at the

15    hearing.  And I would -- just to respond to Your Honor's point,

16    Mr. Kotey made these statements to FBI agents under a

17    plea agreement.  Lying to the FBI is a crime, and being

18    untruthful with the government is also a breach of his

19    plea agreement.  So if the government thought that Mr. Kotey was

20    lying, they could have charged him with a crime, seek the same

21    obstruction enhancement --

22         THE COURT:  But they didn't have to.  Why -- I don't

23    know why you asked me to draw that strained inference.  You

24    know, he's already subject to several life terms, and they ought

25    now to prosecute him for being untruthful in a proffer?

17

1          MR. DEUBLER:  No, but they would have --

2          THE COURT:  I don't think so.

3          MR. DEUBLER:  No, Your Honor.  But they could have

4    sought to be released from the plea agreement that requires them

5    to make best efforts to transfer him after 15 years to the UK.

6    Or simply, they could have sought an obstruction of justice

7    enhancement during his sentencing.  They did none of those

8    things.

9          So the government, at least, doesn't think they are

10   outright lies, and they lend just enough credibility to

11   Mr. Elsheikh's declaration to stave off a perjury enhancement.

12         That's all, Your Honor.

13         THE COURT:  All right.  Mr. Parekh?

14         MR. PAREKH:  Your Honor, just to pick up on that last

15   point, Kotey's debriefs is an ongoing process.  Just because the

16   government hasn't opined on the truthfulness or veracity of

17   Kotey's statements at this point in time in no way means that

18   we're vouching for the credibility of those statements right

19   now.

20         As Your Honor knows, he's going to be serving a life

21   term imprisonment.  His cooperation agreement exists for life,

22   and that's going to be a process that unfolds over many years.

23   Moreover, the point here is that Elsheikh submitted a false

24   declaration to Your Honor.  Kotey didn't do that.  Kotey didn't

25   litigate his statements.  He pleaded guilty, and he did not

1    provide a statement under penalty of perjury the way Elsheikh

2    did.

3            Two points, Your Honor.  One, we agree with the defense

4    that Your Honor does need to make, by a preponderance of the

5    evidence, a perjury finding under Fourth Circuit case law, and

6    we cited that in our position on sentencing.

7            And along with that, Your Honor, on the SDF abuse

8    allegations, Your Honor has issued an extremely detailed,

9    thorough opinion that -- where Your Honor found that the SDF

10   officials who testified were credible, and the defendant's

11   claims were not credible.  These are not the sort of allegations

12   where you can have it both ways.  Either the abuse occurred or

13   it didn't occur.  And Your Honor found at numerous points during

14   the opinion that you issued, after hearing testimony for

15   multiple days, that the SDF's testimony was credible and the

16   defendant's account was not.

17           But even putting aside the SDF abuse allegations, which

18   we believe were proven to not be true, and we stand by that,

19   let's put that aside for one moment, Your Honor.  His

20   declaration is full of willful misstatements, false testimony

21   that he provided to Your Honor in the form of a declaration

22   under penalty of perjury.

23           And I would just direct Your Honor to Paragraph 8 of

24   his declaration, where Elsheikh says, under penalty of perjury,

25   to this Court:  "The FBI told me there was no lawyer for me, and

1    that getting one here was going to be extremely difficult, given

2    the unusual situation I was in.  I told the agents I did not

3    want to speak with anyone until I got my lawyer, and refused to

4    sign the sheet of paper.  Despite my requests for a lawyer, the

5    agent kept trying to speak with me.  I had to repeat my request

6    for a lawyer multiple times."  And it continues, where it claims

7    that the lawyers [sic] used a joke to lure him into the

8    interview.

9         Your Honor, the defense doesn't rebut this at all.  And

10   Your Honor can find just on those statements alone, as the Court

11   did in its opinion, that Elsheikh lied.  Here you have testimony

12   from Special Agent Chiappone, from the suppression hearing on

13   November 18th, 2021, a brief series of questions about those

14   very statements:

15        "Did either you or Special Agent Nutter tell him there

16   was not going to be any lawyer for him, and that getting one

17   here was going to be extremely difficult given the unusual

18   situation he was in?"

19        "No, sir."

20        "Did the defendant tell you that he did not wish to

21   speak with anyone until he got his lawyer?"

22        "No, sir, he did not."

23        "Did the defendant ever ask for a lawyer at any point

24   during the March 27, 2018 interview with them?"

25        "No, sir, he did not."

1          "Did you use any jokes that the defendant made to lure

2     him into waiving his Miranda rights and speaking voluntarily

3     with you?"

4          "No, sir, we didn't use any jokes to lure him."

5          And then Special Agent Nutter testified before this

6     court and indicated the same.  And, as Your Honor knows, your

7     opinion states that you found the testimony of

8     Special Agents Chiappone and Nutter to be credible.

9          And so putting aside those SDF allegations, Your Honor

10    can find, just on Paragraph 8 alone of Elsheikh's declaration,

11    that he gave false testimony regarding a material matter with

12    the willful intent to deceive, rather than as a result of

13    confusion, mistake, or faulty memory.

14          Thank you.

15          THE COURT:  Mr. Deubler, the third point.

16          MR. DEUBLER:  Your Honor, that's the leadership

17    enhancement, and I have nothing further to add besides what's

18    already stated in my papers.  So we would rest on the papers on

19    the 3B1.1 four-level leadership enhancement.

20          THE COURT:  All right.  Mr. Parekh?

21          MR. PAREKH:  In that case, Your Honor, we'll rest on

22    our papers as well.

23          THE COURT:  All right.  The matter is before the Court

24    on three objections by the defendant to enhancements found by

25    the probation officer.  The three enhancements were -- it's an

1    eight-level enhancement, I believe, for the sexual abuse of

2    Kayla Mueller.

3              MR. PAREKH:  Six levels, Your Honor.

4              THE COURT:  Six levels.  And it's a two-level

5    enhancement for knowingly providing false testimony.  Is that

6    correct?

7              MR. PAREKH:  It is, Your Honor.

8              THE COURT:  And a two-level enhancement for leadership

9    role?

10             MR. PAREKH:  This would be a four-level enhancement.

11             THE COURT:  Four levels because it's --

12             MR. PAREKH:  It's five or more participants.

13             THE COURT:  Five or more.  That's right.

14             The law issued by the Supreme Court in their

15   consideration of what the guidelines require are -- the law is

16   unmistakably clear.  The first step in a sentencing must be the

17   correct calculation of the guidelines.  And this is so, even in

18   circumstances as are present here, when some of the issues

19   raised really don't affect the ultimate offense level

20   calculation.

21             And I think that's true here, isn't it, Mr. Parekh?

22             MR. PAREKH:  Yes, Your Honor.  And I don't believe

23   there's any dispute between the parties that no matter what,

24   whether you apply these enhancements or you don't apply these

25   enhancements, the correct offense level is 43, pursuant to

1    Chapter 5A of the sentencing guidelines.

2         MR. DEUBLER:  That's correct, Your Honor.

3         THE COURT:  All right.  So I would be quite happy to

4    ignore these disputes, but it isn't appropriate.  And I think

5    the Supreme Court properly says the guidelines must be

6    calculated correctly before sentence, and I think the rationale

7    for that is that it ensures that the sentencing court is fully

8    cognizant of all the facts and circumstances, and is not somehow

9    misled by facts relating to an enhancement which wouldn't or

10   shouldn't apply.

11        So all of this is by way of saying, I don't think any

12   of this affects the guidelines.  Counsel have confirmed that.

13   But it must be done.  That is, the Court must decide these three

14   issues even though it doesn't make any difference to the final

15   offense level calculation.

16        Now, the first point is whether the six-level

17   enhancement should apply with respect to the sexual abuse of

18   Ms. Mueller.  Now, what the Court must find there is that as

19   part of the convicted conspiracy, that it was reasonably

20   foreseeable.  Is that right, Mr. Parekh?

21        MR. PAREKH:  Yes, Your Honor.

22        THE COURT:  It is my view and my conclusion that the

23   sexual abuse of Kayla Mueller was within the scope of and in

24   furtherance of the hostage-taking and the ISIS conspiracy.  I

25   don't agree that the conspiracy is limited to what The Beatles

1   did, exactly that.  Yes, The Beatles were the people who caused

2   horrendous harm to these hostages, including those who were

3   killed by them.

4          I think the hostages that were killed were all killed

5   by Emwazi, except for Kayla Mueller.  Is that right, Mr. Parekh?

6          MR. PAREKH:  On the videos that were introduced at

7   trial, Emwazi was the beheader.  With Kayla Mueller, she

8   certainly, we believe, was killed by ISIS.

9          THE COURT:  Yes, I understand that.  And anyway, the

10  jury accepted that.

11         MR. PAREKH:  Yes, Your Honor.

12         THE COURT:  Because they convicted on that count.  But

13  it was ISIS's contention that some Jordanian bombing caused

14  that.  Is that right?

15         MR. PAREKH:  That's right, Your Honor.

16         THE COURT:  All right.  To go on, I think the scope,

17  that the government has persuaded me by a preponderance of the

18  evidence that the probation officer's conclusion is correct;

19  that is, that the sexual abuse of Kayla Mueller -- and no one

20  can doubt that that occurred, sexual abuse by this al-Baghdadi.

21  And by the way, refresh my recollection on what ultimately

22  happened to el- Baghdadi.

23         MR. PAREKH:  Your Honor, he was killed by the

24  United States Government in October of 2019.

25         THE COURT:  Yes.  I knew that, but I think it's

1    important to note that.

2         All right.  I think that sexual abuse was within the

3    scope of and in furtherance of the conspiracy that Mr. Elsheikh

4    was convicted for.  And I think it was reasonably foreseeable to

5    him that sexual abuse of Ms. Mueller or any other female would

6    have been -- would have occurred.

7         And in this regard, there was evidence submitted that

8    he - admittedly, subsequent to this, but I don't think his views

9    changed - endorsed the ISIS view that women could be enslaved.

10   That is, non-Muslim women could be enslaved.  Indeed, he told

11   the reporter that there's a whole jurisprudence about slavery

12   and the rights of slaves and the rights of slave owners.  And I

13   have no doubt that at the time all of this occurred, that was

14   his view too.  I don't think his view ever changed.

15        So I think the documents and the testimony establish

16   that it was reasonably foreseeable to him that Kayla Mueller

17   would be sexually abused by al-Baghdadi.  I'm not going to

18   proceed to recite all of the testimony.  There was testimony

19   about recovered ISIS documents from the Sayyaf residence that

20   contained similar statements about Muslims [sic] not having any

21   protection in the Islamic State, and that it's permissible to

22   shed their blood and take their money and abuse them.

23        I think it was also significant that Mr. Elsheikh used

24   the term "concubine" in that interview.  One of the ISIS

25   documents mentions that concubines -- that including concubines

1   for unmarried men was present.

2          Again, in summary, I think that the sexual abuse of

3   Kayla Mueller by al-Baghdadi was within the scope of the

4   convicted conspiracy, and that it was reasonably foreseeable to

5   Mr. Elsheikh that that would occur to her.

6          I also recall testimony that she was told that she

7   would be held forever.  There wasn't any -- I think that

8   statement was made to her by who, Mr. Parekh?

9          MR. PAREKH:  Released hostage Frida Saide.

10          THE COURT:  Yes, that's what she testified.  But one of

11   The Beatles said that to her.  Am I correct?

12          MR. PAREKH:  Yes, Your Honor.  My best recollection is

13   that she was referring to the three Beatles collectively.

14          THE COURT:  Yes.  But in any event, that's what

15   The Beatles knew.  So I don't have any doubt that the

16   enhancement for sexual abuse of Kayla Mueller was properly

17   included by the probation officer, and so that will be added.

18          We turn next to the obstruction of justice.  I think

19   Mr. Deubler makes an important argument, because 3C1.1 should be

20   appropriately cabined.  It shouldn't be easily applied, because

21   defendants have the right to assert their innocence, and when

22   they assert their innocence and that isn't credible, it isn't

23   perjury.  They're entitled to do that.

24          The reason that I conclude that the enhancement is

25   appropriately imposed in this case, as the probation officer

1    concluded -- I don't give any weight, of course, to the

2    probation officer's conclusion.  I have to determine it on the

3    basis of the record presented to me.  Now, that record includes

4    my rulings in the suppression hearing, and I think I wrote an

5    order in the suppression hearing in which I said quite clearly

6    that I didn't find Mr. Elsheikh's testimony -- not his

7    testimony.  His statements credible.

8           And these were statements that he made under penalty of

9    perjury.  Is that right, Mr. Parekh?

10          MR. PAREKH:  Yes, that is correct.

11          THE COURT:  So I have already concluded that his

12   statements were false.  They were clearly material, and I think

13   the enhancement was appropriately imposed by the probation

14   officer.

15          I had to make an independent perjury analysis before

16   applying that, and I did so.  I found, and I find today, by more

17   than a preponderance of the evidence - although the standard is

18   preponderance - that he gave false testimony, that it was

19   material, and it was with the intent to deceive rather than the

20   result of any confusion or mistake or faulty memory.

21          And I didn't believe it.  I didn't find it credible.  I

22   didn't think it was true.  I did accept the testimony of the

23   officers who testified, but anybody who has been before me in

24   the past 35 years knows that I do not always accept the

25   testimony of law enforcement officers, and I have, on more than

1    one occasion, rejected it.  The fact that they're

2    law enforcement officers does not guarantee that they are always

3    truthful.  My experience over the last almost nine decades of

4    being on the planet is no human beings are always truthful,

5    whether they're law enforcement officers or judges or

6    defendants.

7            And so I have made a careful examination of these

8    declarations in support of his motion to suppress alleging that

9    he made involuntary statements while being severely abused, and

10   I find that that was false testimony.  It did concern a material

11   matter, and it wasn't a result of confusion, mistake, or faulty

12   memory.

13           And let me end this discussion by saying that I'm

14   always careful about 3C1.1.  It should not be applied in a way

15   that really penalizes a defendant from asserting his innocence

16   or otherwise saying things.  And although I know this isn't

17   material to the guideline calculation, I nonetheless have to pay

18   attention to it.  And I have.

19           I think I should point out, in the end, I don't really

20   think that his false statements in support of his motion to

21   suppress are really going to have any material effect on my

22   sentencing decision.  It really won't.  But, as the

23   Supreme Court has made clear, I need to calculate the guidelines

24   correctly.

25           And the enhancement is appropriately applied by the

1    probation officer, and I find by a preponderance of the evidence

2    that all of the requirements are met.  I just point out that, in

3    the end, the fact that he wasn't truthful on his statements in

4    support of his motion to suppress are not going to be material

5    to me in what sentence I impose.

6          Now we come to the third one.  I should also mention

7    that the way I look at these 3C1.1, when it's in a statement in

8    support of a motion to suppress, is I have to identify the

9    perjurious statement, and I do that.  And I think the government

10   has done it in its brief, and I agree with that.  He said that

11   he made a number of statements in his statements, and I think

12   the government has correctly identified those.  And the

13   government has correctly pointed out that I said in an order

14   that I didn't believe him and I believed the agents.

15         So I have identified the specific statements, and I

16   have found that they are all material and that they were false.

17   Now, when I say material, they were, I think, material to the

18   suppression motion, but I have to tell you - and it's why I make

19   this remark - I don't think it's material to my sentencing

20   decision.  But I think they were material to the process in

21   which they were submitted.

22         Now we come to -- and I think I've already said I

23   didn't think they were the product of mistake or confusion.

24   These were allegations that I found were false of torture and

25   abuse and that sort of thing.  And I think I should also

1    reflect, as both counsel know, but for those who are present,

2    that I did hear testimony from several persons who were guards

3    at the prisons run by the SDF; that is, the Kurds, where

4    Mr. Elsheikh was held before he was brought to the

5    United States.

6         Now the leadership enhancement under 3B1.1.  I think it

7    is clear that in order to qualify for that enhancement, the

8    defendant doesn't have to be an organizer or leader of all of

9    the participants involved in the conspiracy or activity, but he

10   has to be an organizer or a leader of one or more other

11   participants.  And here, of course, the conspiracy is not

12   limited to The Beatles.  There were guards who followed their

13   orders and others.  And he was clearly a leader of them.

14        So I think the notion that this applies only to the

15   four -- three Beatles.  It's three, isn't it?

16        MR. PAREKH:  Yes, Your Honor.

17        THE COURT:  The three Beatles is not accurate.  And

18   more than one of those Beatles could be a leader and an

19   organizer, and I think Mr. El Shafee Elsheikh qualifies for

20   that.  The evidence at trial I think made clear that the three

21   of them occupied positions of leadership or authority over the

22   other ISIS conspirators.  Certainly they had leadership

23   positions over the day-to-day guards, and they also, of course,

24   made decisions about meting out punishments and inhumane

25   treatment.

1          There was also testimony from hostages who survived,

2     and that they made clear that the guards -- those other guards,

3     not the hostages, had no control over The Beatles.  The Beatles

4     were the ones in charge.

5          And I think the other testimony I heard from hostages

6     made clear that there were other guards; they seemed far less

7     authoritative than The Beatles.  The Beatles were really in

8     charge of the hostages.  It was clear that The Beatles were

9     clothed, as it were, with badges of authority.  I think one of

10    the witnesses, a former ISIS member, testified that Elsheikh was

11    armed with a Glock firearm, which he said he recognized as a

12    symbol of ISIS, I think he used -- I don't know if he used the

13    word "leadership," but ISIS hierarchy.

14          MR. PAREKH:  ISIS aristocracy, Your Honor.

15          THE COURT:  Aristocracy, all right.  Hierarchy is fine.

16    He was up there, or he wouldn't have had that symbol.

17          So I think the leadership enhancement is appropriately

18    applied, and I find that by a preponderance of the evidence.

19          Again, I point out that this isn't material to the

20    guideline calculation.  It would be the same even if the

21    enhancement of two levels were not applied.  But it must be

22    determined.

23          Now, in this case -- I mean, I take into account all of

24    the testimony in determining an appropriate sentence, so even if

25    it were to be determined by an appellate court that the

1    leadership enhancement was inappropriately applied, I don't

2    think that would affect or change my decision on an appropriate

3    sentence.  Because I heard an abundance of testimony over

4    two weeks about exactly what happened from hostages who

5    survived, from SDF -- or not SDF guards, but I did hear from --

6    Mr. Parekh, what was the name of the fellow that started with a

7    K?  Kuzu?

8              MR. PAREKH:  Omer Kuzu, Your Honor.

9              THE COURT:  And he was a guard?

10             MR. PAREKH:  He was a former ISIS member who testified

11   against Elsheikh.

12             THE COURT:  All right.  The point I'm making is I heard

13   a lot of testimony about what actually happened, and I think

14   that's what will govern my determination of an appropriate

15   sentence.

16             All right.  I have made rulings.  Have I omitted

17   anything, Mr. Parekh?  I give you that opportunity because

18   you're the prevailing party on this dispute.

19             MR. PAREKH:  I don't believe so, Your Honor.  And just

20   to supplement my answer to one of your questions just now, the

21   testimony throughout the trial was that there were three main

22   Beatles.  As Your Honor knows, of course, and as Your Honor

23   stated, there were many other co-conspirators involved in the

24   scheme, but the hostages consistently testified that there were

25   three main Beatles, and we've identified them as

1    Mohammed Emwazi, Alexanda Kotey, and this defendant,

2    El Shafee Elsheikh.

3              THE COURT:  Yes, that's my clear impression.

4              All right.  We now come to the portion of the

5    sentencing hearing where each side will have an opportunity to

6    make arguments.  And I'll be asking -- well, before that, I'm

7    going to hear from the victims' families.

8              MR. FITZPATRICK:  Yes, Your Honor.  I was going to ask

9    when you would like to proceed with that.

10             THE COURT:  Now.  But I may take a recess before that.

11   Let me ask, Mr. Deubler, so I can plan for the future, does your

12   client wish to allocute?

13             MR. DEUBLER:  One moment, Your Honor.

14             THE COURT:  Let me tell him, Mr. Elsheikh -- we have an

15   interpreter, don't we?  He speaks fluent English, having been

16   raised in the United Kingdom.

17             MR. DEUBLER:  Correct, Your Honor.

18             THE COURT:  All right.  Mr. Elsheikh, you have an

19   absolute right to address the Court, and to say anything at all

20   you wish to the Court by way of extenuation, mitigation, or,

21   indeed, anything you think I should know before I decide what

22   sentence to impose.  You're not required to say anything if you

23   don't wish to, but you have the opportunity to do so if you do.

24             I assume you've discussed that with your counsel, but

25   I'll give you a brief opportunity to do so now.  And if you need

1  more time to discuss it with him, Mr. Deubler, I'll take a brief

2  recess and allow you to do that.

3          MR. DEUBLER:  Your Honor, Mr. Elsheikh would like to

4  wait until the end of the hearing to make that decision, if the

5  Court permits it, before Your Honor pronounces sentence.

6          THE COURT:  All right.  I'll permit that.

7          MR. DEUBLER:  Thank you, Your Honor.

8          THE COURT:  All right.  Now, Mr. Fitzpatrick or

9  Mr. Parekh, I take it there are four victims' family members who

10  are here and wish to be heard?

11          MR. FITZPATRICK:  That's correct, Your Honor.

12          THE COURT:  And they have an absolute right to be heard

13  under the law, appropriately.  So I will hear from them.  Who's

14  first?

15          MR. FITZPATRICK:  First will be Daniel Ottosen.

16          THE COURT:  Mr. Ottosen, good morning, sir.  You may

17  come forward to the podium and we will hear you.

18          MR. FITZPATRICK:  Your Honor, Mr. Ottosen's parents and

19  sister are in the audience as well.

20          THE COURT:  Yes.  Let me do that right now.  Let me

21  acknowledge that we have here today Susanne Rye Ottosen, his

22  mother; Kjeld Rye Ottosen, his father; Daniel Ottosen, we'll

23  hear from; Javier Espinosa; Marsha Mueller; Carl Mueller;

24  Ed Kassig; and Paula Kassig are all here today.  And I'm

25  acknowledging their presence.

1            Mr. Ottosen, come forward, sir.

2            MR. DANIEL OTTOSEN:   Thank you, Your Honor.   Silence is

3    something that has changed for me, and I know it's something

4    that have changed for a lot of people inside this room today.

5            Eight years ago I was driving around with my friend

6    Pierre Torres, and one of my good friends.  I said that I think

7    I had eight month in Syria with Pierre.  And we drove to

8    Great Britain, and we wanted to speak to the families and tell

9    them what we experienced in Syria, families of those who haven't

10   returned yet.  And then we received the information that one of

11   our friends had been executed.

12           And Pierre and I stopped the car, and we were sitting

13   on top of a hill, and we were sitting there in silence.  We just

14   watched the movie, the propaganda film.  And the reason why we

15   were sitting in silence was because we were afraid.  We were

16   afraid what will happen next.  And we had good reason to be

17   afraid.

18           But I came home alive and I had the opportunity to go

19   back to my life, and also to hear the stories of my families, my

20   mom, my dad, my sisters, my girlfriend.  And it was clear that

21   the idea of silence for them also changed.  Because I don't

22   think it's the actual horror that touches us the most.  For me,

23   it's always the silence, when you know that something is going

24   on that you are very afraid of.

25           I know my dad, he rode his bike a lot, probably got in

1      very good shape those 13 months while I was away, because that

2      was the only way he could be alone with his thoughts and be in

3      silence.  I know my mom walked a lot, worked, and did try to

4      continue their lives, because that was their only way they could

5      be in their own heads, and that was the only way they could be

6      in silence.

7              When I was sitting in Syria and we saw one of the first

8      guys leave the room, Marcos, I remember that there was also a

9      silence afterwards.  We were sitting there; nobody said anything

10     because we were afraid, would we ever go the same way.  And the

11     days passed and Federico left the room.  And we were sitting,

12     eight guys left; me, the German guy, Tony, and the three

13     Americans and the three British guys.  And at that time, I think

14     that was the worst silence I've ever experienced, because we

15     knew that only a little part of us would ever go home.

16             The last three weeks of my time in Syria, I couldn't be

17     inside of my own head.  I couldn't stand the silence in my head.

18     Sometimes it could be a relief, when some of the guards or the

19     so-called Beatles came into the room and beated us so badly,

20     because it somehow stopped my thoughts.  I could relax for a

21     moment because I knew now I can only concentrate on my pain;

22     like my dad did on his bike, he only concentrated on his pain.

23     And that's much easier than being with your thoughts of not

24     knowing, not being able to do anything.

25             But one hour, two hours later, we knew that it was a

1    question of time before they will come back, and then the

2    silence continued.  It would grow bigger and bigger, and, in the

3    end, the only way that I could escape my own head was to take

4    out a piece of paper and start to practice.  And that piece of

5    paper, that was the farewell letter from one of my friends to

6    his family.  That was his way of saying good-bye, I'm not coming

7    home, and I think I'm going to die.

8            So I was sitting there and I was using a man's death

9    letter, farewell letter, to ease my own pain in my own head, to

10   do anything to not sit there in silence and be afraid.

11           And today, it's very difficult for me when I think

12   about how I used that letter.  I came out and I was released,

13   and it was amazing because so many things happened everywhere.

14   People talked to me, I could take a shower, I could go to the

15   toilet, I could do whatever I want to do.  And it was amazing,

16   right until I had to sit down by myself with my own thoughts.

17           And then a huge struggle started, to be able to sit

18   down with my own thoughts.  And I actually managed to do that.

19   I managed to get control of my own thoughts by somehow trying to

20   forget.  And in 2017, in November, I got a small child, a small

21   kid, and he finally managed to put everything else into my head

22   than silence.  I was so worried about him, and I suddenly had

23   somebody to take care of.  And that was amazing, because

24   suddenly I felt like a normal person again could be together

25   with myself and my own thoughts, worrying about him instead of

1    something that happened many years ago.

2         And then suddenly, two of those Beatles guys, one month

3    later, was taken by the SDF.  And things changed again.  Now,

4    suddenly, I couldn't be together in my own head anymore.  The

5    silence again started to yell at me.  It was strange, because I

6    thought I had moved on.  I thought my family suddenly was a

7    bright future for me.  And this whole trial started.  I didn't

8    know what to feel, what to expect, what to do.  And that

9    occupied my thoughts while I was sitting there in silence.

10        And that's why, for me, it's a very, very, very big day

11   today.  Because I think that silence for me, in the future, will

12   be something different.  I don't have to worry about things.  I

13   don't know how it will appear, how it will end up.  And I think

14   all of us will sit down when we go home, in our car, in our

15   airplanes, our bikes, however we are going to get home, and

16   there will be some silence, some kind of silence.

17        And in 20 years we will sit in silence.  Once in a

18   while we will think about this whole thing, the horrors and the

19   families that we suddenly got together, people that we didn't

20   know before, but suddenly now we feel like we have a connection

21   to one another.  And I think I'll always think about those

22   people who occupied my thoughts, the thoughts of my parents, my

23   sisters, my girlfriend, and so many that I love; that he will

24   now sit in silence and think.  And I think that's very scary.

25   Everybody who have been sitting by themselves with their own

1    thoughts knows that it can be very difficult.

2            So therefore, I don't think I will ever get over this

3    experience.  I don't think I will attempt to get over this.

4    It's a part of me.  I will always live with it and I will always

5    think about it.  But at least some kind of justice is done, and

6    therefore, I will thank the people who have worked very hard to

7    make this happen, with all of my heart, and also from my family.

8    And I hope that everybody will have the opportunity to be in

9    silence once again.

10           Thank you.

11           THE COURT:  All right.  Mr. Fitzpatrick?

12           MR. FITZPATRICK:  Your Honor, Diane Foley, the mother

13   of James Wright Foley.

14           THE COURT:  Yes.  Can you just clarify for me

15   Mr. Ottosen's relationship?

16           MR. FITZPATRICK:  Mr. Ottosen was a long-serving

17   hostage.  He's from Denmark.

18           THE COURT:  Yes, I remember that.

19           MR. FITZPATRICK:  And one poignant part of his

20   testimony was that he was very close with James Foley.

21           THE COURT:  That's what I wanted you to remind me of.

22           MR. FITZPATRICK:  Yes.  And James recited a letter over

23   and over again to Daniel, which Daniel memorized.  When he was

24   released, he recited that letter from James to James' mother and

25   father, Diane and John Foley.

1          THE COURT:  Thank you for that reminder.  All right.

2     Ms. Foley?

3          MS. DIANE FOLEY:  Honorable Judge Ellis and all

4     dedicated attorneys here, both defense and prosecuting, I just

5     want to thank you all, thank you for all the time you've spent

6     on this.  And for an opportunity also to address Elsheikh.

7          This trial has revealed the horrific human rights

8     crimes you committed while a member of ISIS from 2012 to 2015.

9     Your crimes of kidnapping, starvation, waterboard, and torture

10    have been heard by all of us in this courtroom.  Hatred truly

11    overtook your humanity, El Shafee.  Four Americans were drawn to

12    Syria in 2011, 2012:  Journalist Steven Sotloff; our son,

13    James Foley, to bear witness to the Syrian people's yearning for

14    freedom; and compassionate aid workers Kayla Mueller and

15    Peter Kassig, to relieve their suffering.

16         Thanks to the dedicated collaboration of US and UK

17    systems of justice, you have received a humane and fair trial.

18    You had dedicated attorneys for you, El Shafee.  You've been

19    found guilty and sentenced to life imprisonment in the

20    United States of America.  You have been held accountable for

21    your depravity.  This is essential to deter future international

22    hostage-taking and murder.

23         El Shafee, you will spend the rest of your life in

24    prison for your horrific deeds, but you too have lost.  You have

25    lost your country, your citizenship, your freedom, and your

1    family.  We've all lost.

2          Today is the eighth anniversary of Jim's gruesome

3    beheading.  Knowing Jim, my suffering and that of our family

4    would have given Jim the deepest pain.  However, Jim would also

5    want all of you to know that your hate-filled crimes did not

6    win.  James Wright Foley lives on.

7          Jim would say:  El Shafee, you did not kill me.  I am

8    very alive in my mother, my father, my sister, and my brothers.

9    I'm alive in my family and friends, and their friends, too.

10         I'm alive in the mercy and justice of this trial.  I

11   live on in those who survived your brutality, like Daniel, and

12   bravely testified on this witness stand.  They've shared their

13   truth of your actions in Syria.

14         I live on in the dedication and humanity of the

15   prosecuting attorneys, of your defense attorneys, of the jury,

16   and Judge Ellis.  I live on in the journalists, photographers

17   who have borne witness to this trial, and this message of strong

18   accountability around the world.

19         I live on in the stories I've told, those heard in this

20   courtroom and in the stories yet to be told.  I'm alive in all

21   who aspire to moral courage in whatever they choose to do.

22         I'm alive in Steven Sotloff's 2LIVES Foundation, and in

23   the James W. Foley Legacy Foundation.  I am alive in everyone

24   who promotes safety and the return of wrongful detainees and

25   hostages around the world.  I live on in families who yearn for

1    the return of their loved ones, and accountability for captors.

2           In many ways, I am more alive than ever before.  My

3    name and the names of Steven Sotloff, Kayla Mueller, and

4    Peter Kassig are known around the world and inspire courage in

5    journalism, government officials, and compassionate people to

6    put an end to the terror of international hostage-taking, and to

7    strengthen the safety of those who work in conflict zones.

8           I'm alive in all who have watched "Jim: The James Foley

9    Story," documentary, and are inspired to live a life of goodness

10   and compassion.

11          Love is so much stronger than hatred.  I pity you,

12   El Shafee, for choosing hatred and for succumbing to a false

13   theology.  Because Islam is truly a religion of mercy and

14   justice.  I pray that your time in prison will give you a chance

15   to reflect, to pray, repent, and perhaps even seek to make

16   amends for the suffering you've inflicted on so many innocent

17   people.

18          The god I believe in will forgive you, if you ask.  My

19   hope is that your powerful conversion will bring healing to you,

20   your families, and the world.  Thank you.

21          MR. FITZPATRICK:  Your Honor, this is

22   Mr. Fernando Colina.  He is Diane Foley's brother-in-law,

23   Jim Foley's uncle.  He was very close with Jim Foley as a child

24   and young man.

25          THE COURT:  All right.  Mr. Colina, I'll hear from you

1    now, sir.

2           MR. COLINA:  Thank you, Your Honor.  Good morning,

3    everybody.  My name is Fernando Colina, I am James' uncle

4    through my marriage to Rita, who is, or was, Diane's sister.

5           THE COURT:  Could I ask you to speak up a little bit

6    more, Mr. Colina?  I can't hear you.

7           MR. FERNANDO COLINA:  Yes.  Unfortunately, my wife

8    cannot be with us today.  My wife of 47 years died earlier this

9    year, but I know that everything I say here she will completely

10   agree with.

11          I met James sometime in 1974 when he was no more than

12   one year old.  He let me hold him in my arms, but he truly loved

13   it more when I tossed him up in the air.  And if I close my

14   eyes, I can still remember the sound of his laughter.

15          Later, he became truly another brother for my young

16   children.  And on a trip to Spain, where I was born, Rita and I

17   recruited him to act as that, an older brother for our

18   six-year-old boy, Joseph, and our two-year-old girl, daughter,

19   Maria.  Jim was 12 at the time.  One day Joseph jumped into the

20   pool and hit his head on the side.  He lost consciousness in the

21   water.  And I am sure that Jim's quick response and thinking in

22   asking for help, and providing it himself, saved my son's life.

23          Looking back, I see that this was the start of the life

24   dedicated to save lives and relieving suffering.  He will go on

25   to so many examples of his vocation to make this a better world

43

1    for all of us.

2         Jim's murder had a profound impact on me and my family.

3    Rita, Joseph, Maria, and I mourned, and are still mourning, his

4    death, as that of a son and sibling.  But I won't dwell on that

5    right now.  Instead, I want to call your attention to the sense

6    of injustice that we all feel, and the need to redress it to the

7    extent that it is possible.

8         The contrast between Jim and his killers couldn't be

9    starker.  Their motivations couldn't be farther apart.  Jim was

10   motivated by his desire for justice.  He went to Syria to

11   respond to the report of the suffering.  He wanted to give a

12   voice to those without one.  He would have given a voice to his

13   future murderers.

14        Compare this with the motivations of his killers:

15   Revenge, senseless torture, and murder, in the interest of a few

16   seconds of a propaganda video.  This is hate with a capital H.

17   Jim's motivation was love; his killers' was hate.

18        I believe that justice can only be served if Elsheikh

19   receives the maximum sentence allowable by law, and I just pray

20   for it, and ask this court to do so.

21        Thank you very much.

22        THE COURT:  All right.  You may be seated.

23        Ms. Prieto, is she here, Mr. Fitzpatrick?

24        MS. MONICA GARCIA PRIETO:  Yes, good morning,

25   Your Honor.  Good morning, everyone.  Thank you.

1          For the first weeks after Javier was kidnapped, our son

2     slept on the floor to experience the same treatment that he

3     thought was suffering his father.  Our daughter, four years old

4     at the time, kept calling his mobile, the one that you stole, to

5     leave messages on his voicemail imploring him to come back.

6     Every time she cried for her dad, all our neighbors could hear

7     her.  Our friends, our relatives, our coworkers, everyone I knew

8     shared in our pain.

9          When you kidnap a person, you are not only destroying

10    his entire life, but also the life of every single person around

11    him.  A universe of people got their lives frozen.  Nothing was

12    really important anymore.  Everything turn around the missing

13    person, with no more expectations in life but the end of their

14    real nightmare.

15         At least Javier made it, and survived, unlike some

16    others.  But the American courts cannot provide justice to many,

17    many, many others, many other victims.  Tens of thousands of

18    persons in Muslim countries, the ones that you claim to defend,

19    are still living in the same nightmare because they are not

20    lucky enough to get news about the relatives kidnapped by your

21    organization.  They are still wondering if they are alive or

22    dead.  And that means they will never close a chapter.  They

23    were held, kidnapped by you and people like you, who only think

24    you have the power to decide about others lives.

25         I'm sure you don't care about this, but I hope you will

1    have enough time to think about them.  You said you were trying

2    to build an Islamic State.  You were acting like petty

3    criminals.  I only hope that during your time in prison, you

4    will come to understand the extent of damage that you have

5    caused.

6              Thank you very much.

7              THE COURT:  All right.  And Mr. Fitzpatrick, Ms. Prieto

8    is the wife of Javier Espinosa?

9              MR. FITZPATRICK:  Yes, Your Honor.  Mr. Espinosa is in

10   the courtroom today.  He was one of the 19 male hostages.  He

11   did not testify at trial.

12             THE COURT:  Yes, he's entitled to be here, and his wife

13   is entitled to make that statement.

14             Any other statements, Mr. Fitzpatrick?

15             MR. FITZPATRICK:  No, Your Honor.

16             THE COURT:  All right.  I'm going to take a recess now

17   before I hear argument of counsel on the sentence that I should

18   impose.  I haven't determined what that is.  I will hear

19   argument; I will then give Mr. El Shafee Elsheikh the

20   opportunity to allocute, if he wishes.  If he does not, I will

21   then impose sentence.

22             I will take a recess from now until 11 o'clock.  I do

23   that because there are a number of you here, as many as 60 or 70

24   or 80 or 90, and we only have a couple of bathrooms.  You may

25   have to go to different floors.  So I want to give everyone an

1     opportunity.  We've been here now for an hour and a half.

2             So we'll recess until 11 o'clock, at which time I will

3     hear argument from counsel on what they believe would be the

4     imposition of appropriate sentences for these convictions.  And

5     then I will give the defendant an opportunity to allocute.  At

6     his request, I allowed him to listen to all of this.

7             But let me point out that I will also make, as a part

8     of the record, and attached to the presentence report, all of

9     the other letters that the victims' families have submitted.

10    And I think one of the things that has been said, I want to

11    underscore.

12            Yes, this happened several years ago, and yes, the

13    trial was this year.  But I hope, as a people, we will never

14    forget this.  As a people, we should never forget what happened.

15    And I hope that it will be kept alive, people will write about

16    it.  There is a public record as to this entire trial, what

17    people testified to, what they said, what the lawyers for the

18    government, what the lawyers for the defendant argued, and what

19    they did.  All of that is in the public record.  And, of course,

20    two of the victims were journalists, and there should be other

21    journalists who will write about this, keep it alive.

22            And I think that was the allocution of one of the

23    persons who spoke today, that Ms. Foley indicated that that

24    particular decedent will live on in countless ways.  I want to

25    underscore one of the ways that that could happen, is for the

1    story of what happened, as told in this trial, should be kept

2    alive.  Other journalists should write about it.  Keep it alive.

3    We should remember this, as a people.

4            All right.  Court stands in recess until 11 o'clock.

5            (Recess taken at 10:30 a.m.)

6            THE COURT:  All right.  At the conclusion of the last

7    session, I made clear that a part of the record would be the

8    attachments to the presentence report, which are the statements

9    of family members of the victims and other victims.  But I

10   wanted to be even clearer -- I also gave Mr. El Shafee Elsheikh

11   the opportunity to allocute at the end, before I impose

12   sentence, and that's fine.

13           But I also wanted, on this record, to remind some

14   people who may not know it that in the Kotey sentencing, at the

15   government's request, I required the government -- not the

16   government, but the marshals, to bring Mr. El Shafee Elsheikh

17   here so that he could hear the statements of family members of

18   victims and others in the Kotey sentencing, so they wouldn't

19   have to do it twice.

20           And he was here.  He was brought into the courtroom and

21   he did listen.  And let me be clear, because I want to make that

22   portion of that transcript a part of this case and this

23   transcript as well.  There was Bethany Haines and Mike Haines,

24   who are family members of British hostage David Haines, and

25   Dragana Haines as well.

48

1            There was Lucy Henning, a family member of

2    Alan Henning.  I think both Alan Henning and

3    David Haines were British.  And Alan Henning was killed.

4            Then we had also Shirley Sotloff and Art Sotloff, of

5    course family members of Steven Sotloff, a journalist who was

6    killed.

7            And then we had Ed Kassig and Paula Kassig, who were

8    family members of Peter Kassig, a hostage aid worker, who was

9    killed.

10           I want to be sure I get this right, so Mr. Parekh and

11   Mr. Deubler, if I make a mistake, correct me, please.  Have I

12   made one so far?

13           MR. PAREKH:  No, Your Honor.

14           MR. DEUBLER:  No, Your Honor.

15           THE COURT:  All right.  Then we come to Marsha Mueller

16   and Carl Mueller, who spoke at the sentencing, who are family

17   members of Kayla Mueller, who was an aid worker.  Then we have,

18   who spoke at the Kotey sentencing, Michael Foley, the brother of

19   James Foley, a journalist; we also heard from

20   Radwan Safarjalany, who was a friend of Kayla Mueller, and

21   Mohammed Mahmoud, an associate of Peter Kassig's.

22           Those were the people who spoke at the Kotey

23   sentencing.  Is that right, Mr. Parekh?

24           MR. PAREKH:  Yes, Your Honor.

25           THE COURT:  Now, that transcript needs to be made a

1    part of this second, because Mr. El Shafee Elsheikh was brought

2    here at the Court's order so that he could hear those victims'

3    statements at that time.  And that should be made clear.

4            So now that we've heard these statements by victim

5    families -- and I think it's important, for example, for people

6    to know that Daniel Rye Ottosen was a witness.  He was a hostage

7    and released after some time, and he was a witness in the trial

8    of El Shafee Elsheikh.  Is that correct, Mr. Parekh?

9            MR. PAREKH:  Yes, Your Honor.

10           THE COURT:  All of that should be clear in the record,

11   and we have clarified.  Of course, we know about Ms. Foley and

12   Mr. Colina and Ms. Prieto.  That should complete that record.

13           We're now at the point where counsel can offer their

14   arguments on what they think an appropriate sentence is in this

15   case.  Mr. Parekh, you may go first.

16           MR. PAREKH:  Thank you, Your Honor.  As Your Honor

17   knows from our sentencing memorandum, the United States

18   respectfully requests that you impose eight concurrent terms of

19   life imprisonment for all eight charges on which the defendant

20   was indicted and found guilty by the jury.

21           While a life sentence is mandated for the first five

22   counts, we believe the imposition of a life term of imprisonment

23   for Counts 6, 7, and 8 is the only appropriate and just sentence

24   for those charges as well.  Not simply because the advisory

25   guidelines call for life imprisonment, but because a lifetime in

1    prison is warranted for Elsheikh under all of the 3553(a)

2    sentencing factors.

3         The Court is, of course, fully acquainted with the

4    facts of this case, but I would like to just underscore some

5    points and supplement the reasons why the brutal callousness of

6    the horrifying hostage-taking scheme that Elsheikh and his

7    co-conspirators carried out on behalf of ISIS have earned him

8    nothing short but a lifetime in prison for all eight counts.

9         In March and April of this year, the Court, the jury,

10   and the public heard the testimony of 35 witnesses, and saw

11   volumes of exhibits that were introduced and admitted during

12   Elsheikh's trial.  Among those 35 witnesses, the families of the

13   four deceased American victims testified, 10 released hostage

14   victims testified, multiple United Kingdom law enforcement

15   personnel, FBI, and Department of Defense witnesses testified.

16   Various expert witnesses testified.  Former ISIS member Omer

17   Kuzu testified against the defendant, and during pretrial

18   proceedings, as Your Honor alluded to this morning, three Syrian

19   Democratic Forces officials testified in this courtroom, the

20   first time the SDF has ever testified in any U.S. court.

21         The trial illustrated the importance of always

22   upholding the rule of law and the fair and impartial

23   administration of justice.  For years, Elsheikh and Kotey evaded

24   justice during ISIS's murderous crusade across wide swaths of

25   Syria and elsewhere.  Elsheikh, along with Emwazi and Kotey,

1    committed their shocking and unconscionable crimes in the most

2    cowardly fashion, with their faces covered as they hid behind

3    full masks.  This prosecution unmasked the barbaric and sadistic

4    ISIS Beatles.  For the first time, the victims had the

5    opportunity to face an unmasked Elsheikh during trial and

6    describe the atrocious crimes that he committed against them.

7            Now, going to the sentencing factors, Your Honor, we

8    believe the nature and seriousness of the offenses are the most

9    compelling sentencing considerations.  Elsheikh is the highest

10   ranking and most notorious ISIS member to have ever faced a jury

11   trial in the United States.  And, as the evidence at trial

12   demonstrated, Elsheikh, Emwazi, and Kotey helped lead a network

13   of at least nine detention facilities in which 26 civilian

14   hostages from 12 countries were held captive in Syria.

15           His vicious acts of terrorism against the world spread

16   carnage and fear and caused deep despair.  And, as we sadly

17   know, these devastating crimes resulted in the deaths of at

18   least eight American, British, and Japanese citizens, among

19   others, including gruesome beheadings that were publicized on a

20   global scale and perversely touted by ISIS propaganda.

21           These victims did absolutely nothing to provoke any of

22   this.  Central to the nature and circumstances of these offenses

23   is that these cold and calculated terrorists abducted kind and

24   altruistic souls who were just trying to help people in a region

25   embroiled in conflict.

1              The world recognizes the inviability of civilians.

2    This defendant, along with Kotey and Emwazi, ignored the

3    universal norms of humanity, and inflicted pain and

4    psychological torment on journalists and aid workers who were

5    there to shine a light on the shadowy corners of international

6    conflict, such as American citizens James Foley and

7    Steven Sotloff, and Japanese citizen Kenji Goto; humanitarian

8    aid workers who sought to alleviate suffering among vulnerable

9    populations in a war zone, such as American citizens

10   Peter Kassig and Kayla Mueller, and British citizens

11   David Haines and Alan Henning; and Japanese citizen

12   Haruna Yukawa, who courageously aspired to provide security for

13   his country's companies that were operating in conflict zones.

14             Your Honor, these series of crimes are as grave, as

15   sadistic, and as utterly reprehensible as it gets.  The

16   circumstances under which they occurred are the most aggravating

17   they could be.  Your Honor may recall that during media

18   interviews, Elsheikh admitted that he hit most of the hostages,

19   that he knows how to inflict pain; that the objective was

20   punishment, and that no one was hit in the face, so they instead

21   would hit in the meat of the muscle.

22             The ISIS Beatles fed on the powerless.  The horrors of

23   the hostages' captivity continuously haunted them with

24   meticulous clarity.  To paraphrase a line in Dante's "Inferno,"

25   we lack the vocabulary of such pain.

1          Among the macabre details that were revealed at trial,

2     this court and the jury and the public heard about "The

3     Royal Rumble," during which The Beatles placed Federico Motka

4     and David Haines in a cell with James Foley and John Cantlie and

5     ordered them to fight each other, with the threat of being

6     waterboarded for losing the fight.  They were malnourished, and

7     The Beatles did a sports-broadcaster-style play by play as they

8     punched each other and passed out.  Motka testified that:  We

9     were so weak and shattered, we barely had strength to lift our

10    arms.

11          You also heard testimony that Kayla Mueller described

12    to Patricia Chavez Mejia when she was being kept in one tiny

13    cell like a dog kennel.  And Lea Mulla testified that Kayla was

14    repeatedly raped by the then-leader of ISIS,

15    Abu Bakr al-Baghdadi.

16          You heard from Marc Marginedas, who testified that

17    The Beatles hated the US and UK hostages the most, including

18    savagely beating Steven Sotloff in front of the other hostages.

19          At the Riverside Prison in Raqqa, for example, and

20    after The Beatles arrived, the hostages were handcuffed to each

21    other.  They were prevented from using the toilet.  They were

22    begging for medicine.  The Beatles set up a camera, even, to

23    ensure that the hostages weren't taking the handcuffs off at

24    night, and The Beatles made James Foley and Peter Kassig stand

25    all night in tight handcuffs.

1          One of the Beatles even drew a sword on Peter Kassig's

2     face with a broken pencil, as if to signal what was going to

3     happen to him.  One of the Beatles placed a gun to

4     Marc Marginedas' head, playing games with his mind about whether

5     he would be released or whether he would be executed.

6          And the Beatles' torture also included sadistic mind

7     games, such as forcing the hostages to memorize the words to

8     "Hotel Osama," the parody song where the lyrics went something

9     like, "You will never leave.  If you try, you will die

10    Mr. Bigley style," which is a reference to British citizen

11    Kenneth Bigley, who was beheaded in 2004 by al-Zarqawi, a former

12    senior Al-Qaeda official.  And while The Beatles were forcing

13    the hostages to sing this parody, they were laughing and they

14    were demanding "louder, louder."

15         You also heard that The Beatles once threatened to cut

16    out Frida Saide's Swiss colleague's tongue.  They once beat a

17    male hostage badly outside of a hall, such that

18    Patricia Chavez Mejia saw blood stains later.  Frida Saide said

19    that The Beatles were genuine psychopaths without any moral

20    values.

21         They even showed -- on their laptop, they went around

22    the cell and showed an image of a Russian hostage who was killed

23    and shown in that photograph with a bullet wound through his

24    head.  And they did this to silence the other hostages who would

25    be released from talking to the media, and told them that if

1    their country didn't negotiate, this is what would happen to

2    them.

3           We heard today from Daniel Rye Ottosen, and he

4    testified at trial that on his 25th birthday, The Beatles came

5    in his cell and told him that he had a stupid mom who asked them

6    to greet him for his birthday.  And so one of the Beatles kicked

7    him in the ribs 25 times in the same spot.  Another Beatle at

8    another point hit Daniel so hard with a club that his vision

9    flickered.

10          And Ringo, who we proved at that trial was, in fact,

11   El Shafee Elsheikh, told him, when the hostages were forced to

12   kneel at the edge of the grave where the Syrian national was

13   executed:  Don't look at me, you'll regret it.  And The Beatles

14   put him back in the car and whispered to Ottosen that he would

15   be next.

16          Your Honor also saw throughout this trial that

17   Elsheikh's conduct didn't just stop after the hostages were

18   either released or killed in February of 2015.  Before then, in

19   July of 2014, Your Honor heard a voicemail that he left for his

20   brother, who was in the UK.  And he described, as this

21   17th Division battle was unfolding, as ISIS was seeking to claim

22   the base of the 17th Division of the Syrian Army, that, "The

23   brothers have engaged in combat and they brought back heads to

24   the city."  And he described, "There's many heads; this is just

25   a couple I took a photo of."  And he sent his brother images of

1    what appeared to be severed heads on poles on or about

2    July 25th, 2014.  And that was just weeks before the first

3    American hostage, James Foley, was beheaded.

4            After the hostages were either released or killed,

5    Elsheikh continued to serve within the hierarchy and upper

6    echelons of ISIS.  And that existed through his capture in

7    January of 2018.  As Your Honor previously alluded to, Omer Kuzu

8    testified at trial, and he indicated that in the fall of 2016,

9    Elsheikh was coming to work at the ISIS central technical office

10   in Syria, and he was working on a secure operating system that

11   was to be used for ISIS leadership, among others, to communicate

12   securely with each other so that their messages would not be

13   intercepted by intelligence agencies.

14           And I think it's a reasonable inference to draw,

15   Your Honor, that Elsheikh wasn't just leaving ISIS to go into

16   Turkey as a former ISIS member.  He was meeting with Kuzu's

17   brother-in-law right before he tried to leave ISIS territory,

18   and his brother-in-law, as you'll recall, was the head of

19   Hijrah, and his job entailed bringing ISIS members in and out of

20   Syria for ISIS operations, which may include attacks on behalf

21   of ISIS outside of Syria.

22           History and characteristics of the defendant, there's

23   nothing in Elsheikh's background that can even remotely explain

24   or justify his cowardly actions against the hostages, which were

25   driven by hate and extreme cruelty.  There's just no

1    justification conjurable by the human mind that can explain any

2    of these crimes.

3            Page 12 of Elsheikh's position on sentencing states, in

4    part, that Elsheikh enjoyed the love and comfort of a large

5    extended family, all of whom took turns looking after each

6    other.  He also stated that he never lacked a playmate or was

7    left to fend for himself.  That is the height of irony and

8    hypocrisy, and exactly what Elsheikh tried to do to the hostages

9    that he and his co-conspirators held captive and tortured.

10   Well, he failed.  Rather than fend for themselves, the hostages

11   took care of each other with boundless compassion.  The

12   defendant united them, and, as we have all seen, united their

13   families and loved ones.

14           The legacy of the victims will forever carry on, while

15   this defendant will have a lifetime in prison to reflect upon

16   the immeasurable physical damage and psychological torment that

17   he inflicted on such compassionate and altruistic souls.

18           Turning to affording adequate deterrence to criminal

19   conduct, sending this defendant to prison for the rest of his

20   life will ensure that he can never again carry out the

21   diabolical conduct in which he engaged, and can never harm

22   anyone again.

23           As for general deterrence, Your Honor, the life terms

24   of imprisonment this court will impose in this case will send an

25   unmistakable message that hostage-taking is a scourge on the

1    entire international community, and that these atrocities will

2    be met with fair but swift justice in the United States.  For

3    any hostage-taker, the passage of time will offer you no escape.

4         The imposition of eight concurrent life sentences will

5    also ensure that there are no unwarranted sentencing disparities

6    between Elsheikh's sentence and the sentence that this court

7    imposed on his co-defendant, Alexanda Kotey, who pleaded guilty

8    in this very courtroom nearly one year ago.  Elsheikh remains

9    defiantly remorseless and unrepentant, and, like Kotey, should

10   spend the rest of his life in prison.

11        Finally, Your Honor, turning to protecting the public

12   from further crimes of Elsheikh, a life sentence is also needed

13   to protect the public from further crimes of him, who he has

14   demonstrated a complete respect [sic] for the law and human

15   dignity, and Elsheikh has exhibited a callous disregard for the

16   victims that he and his co-conspirators ruthlessly victimized.

17        The resilience, courage, and perseverance that these

18   victim families and the released hostage victims have

19   demonstrated in the face of deep anguish is exemplary.  But they

20   will forever carry the emotional scars of relentless

21   psychological and physical pain that will never heal, an

22   emptiness in their hearts that will never be filled.

23        As Your Honor heard, today is a solemn day of

24   remembrance, and a painful anniversary.  Eight years ago, on

25   August 19, 2014, the world was devastated by images depicting

1    the death of James Foley.  He, like all of the victims in this

2    case, knew the importance of giving a voice to the voiceless.

3    And as we heard from multiple released hostages who testified at

4    trial, James Foley would be the one who would take it on the

5    neck for everyone else.  He would bang on the door of his cell

6    demanding more food for his fellow hostages, because they were

7    always hungry.  They weren't given enough food.  And he would

8    ask for more water and blankets for everyone, to keep their

9    spirits up so that they would never be broken.  That was

10   James Foley.

11        Some of the most compelling pieces of evidence in this

12   case are from the words of the victims themselves, as they were

13   being held by the ISIS Beatles in chambers of terror.  Turning

14   back to Dante's "Inferno," there's a line in the poem that

15   states, "There's no greater sorrow than to recall happiness in

16   times of misery."

17        And as I conclude, Your Honor, I would just like to

18   read a few lines of each of the portions of these letters to

19   illustrate the victims' unbelievable resolve and the pure love

20   that they had for their families, in the most unimaginable

21   circumstances, as a result of what this defendant and his

22   co-conspirators put them through.  And these are lines,

23   Your Honor, that, for the most part, are different than the

24   lines that we put into the record for Kotey's sentencing.

25        So if Your Honor will permit me, I'll just read a few.

1           THE COURT:  Yes, you may proceed.

2           MR. PAREKH:  Before I get to the letters -- and

3    Your Honor heard this earlier.  James Foley's letter was

4    dictated to Daniel Rye Ottosen, and that was because he didn't

5    want to bother the other hostages, so he never tried to send one

6    out.  And John Cantlie told him:  Jim, send one out with Daniel.

7    And so it took Daniel three weeks to memorize before he was

8    released into Turkey in June of 2014.  And after being released,

9    as Your Honor heard, he called the Foley family and recited

10   Jim's letter.  It was the first and only time that Daniel said

11   it out loud, in which he described it as delivering a good-bye

12   to his mother, to his parents.

13          Kayla Mueller stated in her letter:  "Just the thought

14   of you all sends me into a lot of tears.  If you could say I've

15   suffered at all throughout this whole experience, it is only

16   knowing how much suffering I have put you all through.  By God,

17   by your prayers, I have felt tenderly cradled in free fall.

18   I've been shown in darkness, light, and have learned that even

19   in prison, one can be free.  I am grateful.  I do not want the

20   negotiations for my release to be your duty.  If there's any

21   other option, take it, even if it takes more time.  The thought

22   of your pain is the source of my own.  Simultaneously, the hope

23   of our reunion is the source of my strength.  By God's will, we

24   will be together soon.  All my everything, Kayla."

25          Steven Sotloff wrote:  "Happy Mother's Day, Mommy.  I

1    think we share May 11th this year.  You deserve so much more

2    than just one day dedicated to you.  You both worked so hard to

3    make sure I was okay.  I hope you will have no regrets as

4    parents, because you always went above and beyond for me.  Thank

5    you.  I never meant to cause you pain.  I am sorry.  I love you.

6    All my love, Steven."

7         Peter Kassig wrote:  "The first thing I want to say is

8    thank you, both to you and Mom, for everything you have done for

9    me as parents, for everything you have taught me, shown me, and

10   experienced with me.  I know I've given you and Mom a fair bit

11   of trouble over the years, but not a day goes by that I don't

12   think of you both, how much I love you, how much I miss you, and

13   what a wonderful time I had with you both making many good

14   memories we have as a family."

15        "Don't worry, Dad.  If I go down, I won't go down

16   thinking anything but what I know to be true, that you and Mom

17   love me more than the moon and the stars.  Just know that I am

18   with you, every stream, every lake, every field and river, in

19   the woods and in the hills, in all the places you showed me.  I

20   love you, Bock (ph)," referring to Peter's childhood nickname.

21        Rather than becoming martyrs to their monstrous cause,

22   Elsheikh and Kotey have been fairly and impartially convicted in

23   an open courtroom of their barbaric crimes.  We recognize that

24   the incalculable pain and deep despair that everyone who has

25   been victimized by the ISIS Beatles have endured, and continue

1    to endure, their losses can never be erased.  They can never be

2    made whole.  But through the prosecution of the ISIS Beatles and

3    this court's impartiality from beginning to end, the victim

4    families, the released hostages, and their loved ones have

5    finally obtained a measure of justice through humanity by giving

6    Elsheikh and Kotey the fair and open legal process that reflects

7    the enduring strength of this nation and its core values.

8              Elsheikh and Kotey will never be able to hurt anyone

9    ever again.  They will spend the rest of their lives in prison,

10   and that is an appropriate and just ending.  Thank you.

11             THE COURT:  Mr. Ellis?

12             MR. DEUBLER:  Deubler, Your Honor.

13             THE COURT:  Sorry.  Mr. Deubler.

14             MR. DEUBLER:  Thank you, Your Honor.  Your Honor, the

15   conduct performed by ISIS in this case is horrific, tragic,

16   needless, and just simply inexcusable.  It has been adequately

17   addressed in the multi-week trial, in Mr. Kotey's sentencing,

18   and by the government just now, so there's no need for me to

19   readdress it here.  Suffice it to say that the surviving victims

20   and the family members of those lost will have physical and

21   emotional scars that will never heal, and will last into the

22   next generation.

23             Here, Mr. Elsheikh faces multiple mandatory life

24   sentences, and there's no argument from the defense that these

25   sentences should be otherwise.  As such, the only issue before

1    the Court now, in sentencing Mr. Elsheikh, is whether to provide

2    the BOP a recommendation regarding his place of confinement.

3           As part of our position on sentencing, we submitted the

4    declaration of Jack Donson, a 23-year veteran of the BOP's

5    security classification, correctional programs, treatment, and

6    reentry departments.  According to Mr. Donson, absent a judicial

7    recommendation to the contrary, quote, "Mr. Elsheikh faces the

8    likely possibility of being designated to Florence ADX, based on

9    his simple status as an international terrorist, in combination

10   with the SAMs."

11          Our position on sentencing, and Mr. Donson's

12   declaration, includes details on Florence.  But in brief, here,

13   ADX Florence is a prison designed after two BOP guards were

14   murdered by inmates.  As such, those who are sent to that prison

15   are done so primarily out of concern for their behavior, posing

16   a serious flight risk, or will distract from the running of the

17   institution.

18          Inmates are locked in a small, approximately

19   75-square-feet cell, 23 hours a day, aside from being shackled

20   in handcuffs and leg irons to be moved to a caged shower area or

21   rec area.  Recreation, when offered, is offered one hour daily

22   based on the availability of staff, and conducted in a small

23   caged area.  All programming is done on closed circuit, from

24   what I understand, black and white televisions.

25          According to Mr. Donson, under the BOP's own security

1    assessment scoring system, Mr. Elsheikh's score is commensurate

2    with a minimum security because he is void of the typical

3    classification factors that elevate a person's classification,

4    such as serious history of violence, escape, and predatory

5    behavior.  Mr. Donson notes that the BOP specifically excludes

6    the instant offense from their scoring criteria.

7            Also submitted to the Court was a very brief letter

8    from the Alexandria ADC detailing that Mr. Elsheikh has had no

9    serious major disciplinary infractions.  According to the BOP's

10   programming statement regarding inmate security designation and

11   custody classification, ADX Florence units are designed for male

12   inmates who have demonstrated an inability to function in the

13   less restrictive environment.

14           Again, Your Honor, to date, there is simply no evidence

15   to demonstrate that Mr. Elsheikh has been anything but a model

16   prisoner since being detained.  There have been no complaints by

17   the United States Marshal Service about the violations of his

18   SAMs, and there's been no complaint, as evidenced by the ADC's

19   letter to this court, that he's incurred any major disciplinary

20   infraction.

21           A reasonable alternative exists for those inmates that

22   must be designated to secure facilities that will comply with

23   the requirements of SAMs.  And just for the benefit of everyone

24   here, SAMs, the Special Administrative Measures put in place by

25   the Attorney General that control the flow of communication to

1    Mr. Elsheikh, from Mr. Elsheikh, with the outside world.

2         The BOP operates two CMUs specifically designed for

3    inmates whose activities or offenses trigger a need for tightly

4    monitored communications with the outside world.  These

5    Communication Management Units, USP Marion and USP Terra Haute,

6    according to Mr. Donson's opinion, quote, "unlike Florence ADX,

7    CMUs allow programming and some human interaction in an

8    administrative high security environment that does not

9    negatively affect" -- "that carries with it no negative effects

10   normally associated with extreme confinement."

11        We ask that the Court make the recommendation to the

12   BOP that is in line with the proffered recommendation that

13   Mr. Donson submitted to this Court, found on page 20 of our

14   position on sentencing.

15        Thank you very much, Your Honor.

16        THE COURT:  Mr. Parekh, do you wish to respond?

17        MR. PAREKH:  Briefly, Your Honor.  If Your Honor

18   recognized the declaration from Mr. Donson that was submitted in

19   this particular sentencing hearing, or in connection with this

20   sentencing hearing, it's because it's nearly identical to the

21   one that Mr. Kotey submitted.  In fact, Mr. Donson is the same

22   declarant for both of these cases.

23        And what I saw in the materials that the defense

24   submitted was Mr. Donson's résumé, and on his résumé he listed

25   his website.  Your Honor, I think it's important to point this

1    out.  And when you go to his website, the first thing that you

2    see is a statement from Mr. Donson that states, in part:

3    "Unfortunately, Lady Justice is not blind in our federal justice

4    system today.  Anyone who gets caught up in the federal justice

5    system quickly comes to the realization how unfair this system

6    is to a defendant."

7           Clearly Mr. Donson has never been in this court and has

8    never attended this trial.

9           In Mr. Kotey's sentencing, Your Honor stated on page 87

10   of the transcript:  "I don't agree with your expert, or with

11   anyone else, that BOP's designations are reflexive."

12          BOP is legally required, as Your Honor knows, to follow

13   the process outlined in 18 U.S.C. 3621, and their own

14   regulations or policies as it relates to the designation

15   process.  And similar to the Court's --

16          THE COURT:  Remind me what I said in the Kotey

17   sentencing.

18          MR. PAREKH:  What you said in the Kotey sentencing is

19   that you didn't agree with their expert, or with anyone, that

20   BOP's process is reflexive.

21          THE COURT:  All right.  Go on.  They do have to go

22   through a process.

23          MR. PAREKH:  They have to go through a process,

24   Your Honor.  And in the end, as Your Honor stated, the decision

25   as to where the defendant begins to serve his sentence

1    appropriately rests with the Bureau of Prisons, which has more

2    complete information in connection with the designation process.

3            And some obvious distinctions, Your Honor.  Your Honor

4    did not recommend that Kotey not go to ADX, and so what

5    meritorious reason would there be to make any different

6    recommendation in Elsheikh's case?  While Kotey is not more or

7    less legally culpable than Elsheikh, as they both committed

8    horrendous crimes, the main arguments that Kotey's counsel had

9    are inapplicable to Elsheikh.

10           Elsheikh didn't plead guilty and accept responsibility.

11   Elsheikh obstructed justice, as Your Honor found, by submitting

12   a false sworn declaration to the Court.  Elsheikh did not meet

13   with any of the victim families or released hostage victims.

14   They would love to meet with him and get answers to their

15   questions about what happened to their loved ones, but he didn't

16   do that.  And that's his choice.  But Mr. Kotey's counsel argued

17   that he's doing all these things.  He's part of the process,

18   he's meeting with the victim families, he pled guilty.  Elsheikh

19   did none of those things.  And in Kotey's case, notwithstanding

20   all of those things, Your Honor declined to make any such

21   recommendation.

22           And so for those reasons, Your Honor, we don't think

23   that the Court should wade into that territory here, and we

24   think that the decision appropriately rests with the

25   professionals at BOP.  Thank you.

1           THE COURT:  All right.  Mr. Deubler, does your client

2    wish to allocute at this time?

3           MR. DEUBLER:  No, Your Honor.

4           THE COURT:  All right.  The matter is now before the

5    Court for imposition of sentence.  Mr. El Shafee Elsheikh, come

6    to the podium.

7           Mr. Elsheikh, you stand convicted by a jury, after

8    hearing two weeks of testimony, of eight very serious crimes.  I

9    presided over that trial, so I'm aware of the evidence that was

10   presented.

11          The law requires that I consider a variety of factors

12   in imposing an appropriate sentence.  First, I need to consider

13   the nature and circumstances of the offense and the history and

14   characteristics of the defendant, and I have done that.  I think

15   the summary that Mr. Parekh made of the conduct was accurate,

16   accurately reflects the testimony that was submitted at trial,

17   and I'm not going to repeat it.

18          What I am going to do is to be clear by characterizing

19   it.  The behavior of this defendant and his co-defendant can

20   only be described as horrific, barbaric, brutal, callous, and,

21   of course, criminal.  So the need for the sentence to impose

22   respect for the law and to provide for just punishment for the

23   offense is an important factor the Court must consider, and I

24   think that's principal among the factors that leads me to impose

25   the sentence that I will do in a moment.

1             The second factor that I mentioned was the

2    characteristics of the defendant, and that's fully set out in

3    the presentence investigation report.  And indeed, the

4    Bureau of Prisons will have that.  There's nothing in his

5    background that would suggest that, as he grew up in Britain, he

6    was brutalized horrifically or barbarically by the British

7    system or by Britain.  He wasn't.  He had a pretty decent

8    childhood, not marked by brutality and cruelty.

9             I also have to consider that the sentence I impose

10   should reflect and provide for respect for the law, and provide

11   for just punishment for the offense.  And it has to afford

12   deterrence; that is, it must stand as a beacon, as a warning to

13   others that if you do this, there will be severe consequences.

14            I have considered all of these factors.  I've also

15   considered the guidelines.  The guidelines for several of the

16   counts are mandatory life, but I'm not bound by that.  I could

17   impose something other than that.  I cannot impose any capital

18   sentence, because the government hasn't sought that.  And I have

19   considered the various kinds of sentences.

20            In the end, it is the judgment of this court -- and

21   it's a judgment, it's not a mathematical calculation.  I know we

22   went through adding offense levels and so forth, but sentencing

23   is not a mathematical calculation.  It's not mechanical, and

24   it's never completely automatic.  It has to consider these

25   factors that I have gone through:  The need to impose a sentence

1    that promotes respect for the law, that provides just punishment

2    for the crime, and that affords adequate deterrence, both

3    deterrence for the individual being sentenced and general

4    deterrence; that is, as I think I said, it must be a beacon, a

5    warning to others not to engage in this sort of conduct.

6           So it is the judgment of this court,

7    Mr. El Shafee Elsheikh, that you be committed to the custody of

8    the Bureau of Prisons, with respect to Counts 1, 2, 3, 4, 5, 6,

9    7, and 8, all of them, I'm going to impose on you a sentence of

10   life.  There is no parole in the federal system.  And those life

11   sentences will be served concurrently, not consecutively.  I've

12   always thought that was silly, when judges do that.  So they

13   will be served concurrently.

14          You are to pay a $100 special assessment for each of

15   the counts, for a total of $800.  I don't impose a punitive fine

16   because I don't see any evidence in the presentence report that

17   you have the capacity to pay a sentence.  But restitution is

18   required.

19          Do you have a restitution order, Mr. Parekh?

20          MR. PAREKH:  We do not, Your Honor.  We've consulted

21   with the victims, and no victim sought restitution in this

22   matter.

23          THE COURT:  All right.  So you're not requesting the

24   entry of a restitution order?

25          MR. PAREKH:  That's correct, Your Honor.

1          THE COURT:  All right.  The defendant has asked that I

2    make a recommendation that would avoid his being sent to

3    Colorado.  I declined to do so with Mr. Kotey, and for the same

4    reasons, I decline to do so in this case.

5          The Bureau of Prisons will reach a determination, and I

6    think I heard you say, Mr. Deubler, that they go through a

7    process which does not necessarily include the offenses of

8    conviction.  Did you say that?

9          MR. DEUBLER:  For the security classification

10   component.

11         THE COURT:  Right.  And that's one factor, the security

12   classification.

13         MR. DEUBLER:  Correct, Your Honor.

14         THE COURT:  But they will go through a process and

15   consider where he should go.  And I am not going to interfere in

16   that process in this case.  I have in some cases.  I frequently

17   recommend sending a defendant to a place where he will be near

18   his family, in circumstances.  Not in cases of this magnitude,

19   but I have.  And I will continue to do so.

20         But in this case I see no persuasive reason to

21   interfere with the Bureau of Prisons' normal process.  Indeed, I

22   sentenced Mr. Kotey when, Mr. Parekh?

23         MR. PAREKH:  April 29th.

24         THE COURT:  So has he been designated?

25         MR. PAREKH:  He has not been finally designated,

1    Your Honor.  I believe he is on the move, or may be on the move,

2    but I don't believe there is a final ultimate designation yet.

3              THE COURT:  All right.  And he's currently at the

4    Alexandria Detention Center?

5              MR. PAREKH:  Your Honor, he may be within the

6    Eastern District of Virginia at --

7              THE COURT:  Somewhere?

8              MR. PAREKH:  Somewhere else.  It could be

9    Northern Neck.  But I'm not absolutely certain of that standing

10   here at this moment.

11             THE COURT:  Have I omitted anything from the sentence,

12   Mr. Parekh?

13             MR. PAREKH:  Yes, Your Honor.  The defendant has a

14   right to appeal within 14 days.

15             THE COURT:  Yes, I will mention that.  Anything other

16   than that?

17             MR. PAREKH:  Your Honor, I take it you would decline to

18   impose any supervised release conditions?

19             THE COURT:  I see no purpose in that.  I don't expect

20   he will be released on supervision.

21             MR. PAREKH:  Yes, we agree, just to make it clear.

22             THE COURT:  If that occurs, a judge will have to impose

23   conditions.  And I don't have any reason to believe that that

24   would happen, so I'm not going to do it.

25             Any objection to that, Mr. Deubler?

```
 1                 MR. DEUBLER:  No, sir.

 2                 THE COURT:  All right.  Mr. El Shafee Elsheikh, you

 3      have an absolute right to appeal your conviction and sentence to

 4      the Court of Appeals for the Fourth Circuit.  You can either ask

 5      me to note that appeal now or you can have 10 -- is it 10 now,

 6      or 14 days now?

 7                 MR. PAREKH:  It's 14.

 8                 THE COURT:  14 days from today in which to note an

 9      appeal.

10                 Which is it, Mr. Deubler?

11                 MR. DEUBLER:  He would note his appeal now, Your Honor.

12                 THE COURT:  All right.  I'll direct the clerk to note

13      the appeal.

14                 Anything further in this matter today?

15                 MR. PAREKH:  Not from the government, Your Honor.

16                 THE COURT:  Mr. Deubler?

17                 MR. DEUBLER:  Very, very, very briefly, Your Honor.  As

18      we just covered, he will be noting his appeal, and I believe, as

19      part of Mr. Elsheikh's appeal, he will be alleging certain

20      ineffective grounds that would disqualify his current lawyers.

21      I say all that, if we could ask the Court that we hold off on

22      his transfer to the Bureau of Prisons for a month so that in

23      case new counsel is appointed, they can meet him.

24                 THE COURT:  No.

25                 MR. DEUBLER:  Understood.
```

1          THE COURT:  There's nothing I have before me, and I

2    would be surprised if there could be a credible claim of

3    ineffective assistance of counsel.  You all -- is Ms. Ginsberg

4    here?  Yes, you're here too.  I think you have been diligent,

5    all three of you, including my non-namesake, Mr. Ellis, you've

6    been diligent and you've done what the system expects you to do.

7    You've been zealous in the defense of your client.  But

8    ineffective assistance of counsel claims, sometimes they're

9    valid, sometimes they're not.  Sometimes they are efforts to

10   game the system.  I don't know.

11          And no, he's not going to stay here.  The Alexandria

12   Detention Center has limited space, and the Bureau of Prisons

13   can do as they wish from here on out.

14          MR. DEUBLER:  Understood, Your Honor.

15          THE COURT:  Anything further from you, Mr. Parekh?

16          MR. PAREKH:  No, Your Honor.

17          THE COURT:  Mr. Deubler?

18          MR. DEUBLER:  No, Your Honor.

19          THE COURT:  I do want to thank counsel for your

20   cooperation during this lengthy proceeding.  It's been very

21   important.  And I want to emphasize, as I said earlier, we

22   should not forget what happened here.  We should not forget the

23   victims, the victims' families, and the actions of the

24   defendant.  We should not forget this.  This is a significant

25   episode in the history of our country and our justice system,

1    and I hope it should be memorialized as to what happened, what

2    the families said, and what the lawyers said.

3              All right.  Just a moment.

4              Once again, I thank counsel for your cooperation.

5    Court stands in recess.

6              (Off the record at 11:50 a.m.)

7

8

9

10

11

12

13

14

15              **CERTIFICATE OF OFFICIAL COURT REPORTER**

16

17          **I, Rebecca Stonestreet, certify that the foregoing is a**

18    **correct transcript from the record of proceedings in the**

19    **above-entitled matter.**

20

21

22

23    **___//Rebecca Stonestreet//___          __10/27/22____**

24    **SIGNATURE OF COURT REPORTER                    DATE**

25