1

                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                         Alexandria Division

3

    UNITED STATES OF AMERICA,        :
4                                    :  Criminal Case
                     Plaintiff       :  No. 20-CR-00239-TSE
5            v.                      :
                                     :
6   EL SHAFEE ELSHEIKH,              :  December 10, 2021
                                     :  1:40 p.m.
7                    Defendant       :
    ..........................       :  ........................
8

9

                    TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE T.S. ELLIS, III
                 UNITED STATES DISTRICT JUDGE
11

      **APPEARANCES:**
12

      FOR THE PLAINTIFF:          DENNIS FITZPATRICK
13                                RAJ PAREKH
                                  JOHN T. GIBBS
14                                AIDAN TAFT GRANO-MICKELSEN
                                  U.S. ATTORNEY'S OFFICE
15                                2100 Jamieson Avenue
                                  Alexandria, VA  22314
16                                703-299-3700

17    FOR THE DEFENDANT:          NINA J. GINSBERG
                                  ZACHARY ANDREW DEUBLER
18                                DiMURO GINSBERG PC
                                  1101 King Street
19                                Suite 610
                                  Alexandria, VA  2231
20                                703-684-4333

21                                EDWARD B. MacMAHON
                                  LAW OFFICES OF
22                                EDWARD B. MacMAHON, JR.
                                  P.O. BOX 25
23                                107 East Washington Street
                                  Middleburg, VA  20118
24                                540-687-3902

25                                (Appearances continued on next
                                  page)

2

1    FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                                 CARMICHAEL ELLIS & BROCK
2                                108 N. Alfred Street
                                 1st Floor
3                                Alexandria, VA  22314
                                 703-684-7908
4

5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                 U.S. District Court, 9th Floor
6                                401 Courthouse Square
                                 Alexandria, Virginia  22314
7                                (240) 426-7767

8
                          ( Pages 1 - 79)
9

10
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**P R O C E E D I N G S**

1

2          COURTROOM CLERK:  Court calls criminal case

3  United States of America versus El Shafee Elsheikh, Case

4  Number 2020-CR-239.  May I have appearances, please, first for

5  the government.

6          MR. FITZPATRICK:  Thank you.  Good afternoon,

7  Your Honor.  Dennis Fitzpatrick, Raj Parekh, John Gibbs, and

8  Aidan Grano-Mickelsen on behalf of the United States.

9          THE COURT:  All right.  Good afternoon.  And on behalf

10  of the defendant?

11          MS. GINSBERG:  Good afternoon, Your Honor.

12  Nina Ginsberg, Edward MacMahon, Yancey Ellis, and

13  Zachary Deubler on behalf of Mr. Elsheikh.

14          THE COURT:  Good afternoon to you.  And Mr. Elsheikh is

15  present and in the custody of the marshals.

16          Good afternoon to you, sir.

17          THE DEFENDANT:  Good afternoon.

18          THE COURT:  All right.  I'm going to say again

19  parenthetically that Mr. Ellis is no relation to me, or, as he

20  would put it, I'm no relation to him.

21          All right.  This matter has been extensively briefed,

22  but more recently I received a request for oral argument, so I

23  granted it, as I typically do.  Even though it was difficult for

24  me to see what more there was to be said on this topic.

25          Who will argue today on behalf of the movant?

4

```
 1              MS. GINSBERG:  Your Honor, I'll be arguing on behalf of
 2    Mr. Elsheikh.  I think the government has the burden on this
 3    motion, but I'm prepared to go first if that's what the Court
 4    wants.
 5              THE COURT:  All right.  No, you don't need to go first,
 6    Ms. Ginsberg.  You're correct, the government does have the
 7    burden.
 8              MS. GINSBERG:  Your Honor, Mr. Ellis -- we have another
 9    motion that Mr. Ellis will be arguing that is also before the
10    Court that was not addressed in argument at the hearing.
11              THE COURT:  Other than the motion to suppress?
12              MR. FITZPATRICK:  Judge, if the Court pleases, I
13    believe there are three central issues before the Court today.
14    First is the routine booking question regarding some false
15    statements that the defendant and Mr. Kotey made when they were
16    undergoing their biometric enrollment.  The government seeks to
17    introduce those under the routine booking question exception as
18    evidence of their consciousness of guilt.  They provided false
19    names, dialects, country of origin.  I'll be handling that
20    motion.
21              Next, you have the issue -- the *Miranda* issue regarding
22    the so-called two-step interrogation.  Mr. Parekh will handle
23    that on behalf of the United States.
24              Thirdly, you have the voluntariness of the media
25    interviews that the defendant and Mr. Kotey took part in.
```

1    Mr. Gibbs will handle the voluntariness argument.

2         So I'll do routine booking questions, Mr. Parekh will

3    do the FBI *Miranda* statements, and Mr. Gibbs will do

4    voluntariness and the media interviews.

5         THE COURT:  Ms. Ginsberg, what's your lineup on those

6    three?

7         MS. GINSBERG:  Your Honor, Mr. Ellis will address the

8    booking questions, I will address the other two.

9         THE COURT:  All right.  Thank you.

10        All right.  Mr. Fitzpatrick, you may proceed.

11        MR. FITZPATRICK:  Thank you, Your Honor.  The routine

12   booking question should be the briefest of the three arguments.

13   As the Court knows from the record, the defendant and his

14   co-conspirator, Mr. Kotey, were apprehended by the SDF the first

15   week of January 2018.  Their identities were unknown to the

16   U.S. Government until on or about January 21st, 2018,

17   approximately 17 days later.  They underwent a standard

18   biometric enrollment that the DoD performs with recently

19   apprehended ISIS foreign fighters, or foreign fighters in

20   Northern Syria.

21        During that routine biometric enrollment process, the

22   defendant provided a false name.  He stated that his name was

23   Suhayb Abdallah Jasim, he claimed that he was from Yemen,

24   claimed that he only spoke Arabic, and additionally claimed,

25   with respect to the people he was apprehended with, when shown a

1    photograph of Mr. Kotey, said he only knew him as Yahya, and

2    that he had just met him during the attempt to leave Syria.

3           Judge, functionally, those are all the equivalent of

4    routine booking questions.  Those questions are not designed to

5    elicit incriminating responses, they are designed to identify

6    foreign fighters held within the custody of the SDF.  They fall

7    squarely within the exception, the *Miranda* exception created by

8    *Pennsylvania vs. Muniz*.

9           And again, Your Honor, as the Court knows from

10   *Rhode Island vs. Innis* and also from *Hiibel vs. Nevada* in 2004,

11   in order for the *Miranda* rule to apply, the requirement is that

12   they -- the questionings be designed to elicit an incriminating

13   response.  These questions were not designed to elicit an

14   incriminating response; it was designed to elicit truthful

15   information about who the SDF had within their custody for the

16   purposes of identifying foreign fighters for national security

17   reasons.  That was the sole sum and substance of eliciting this

18   information.

19          The defendant declined to do that.  He lied.  Those

20   lies are probative of his consciousness of guilt.  He does not

21   wish to be identified by his true name.  He wants to perpetuate

22   this falsehood that he's somebody else, he's an innocuous guy

23   just trying to get out of Syria.

24          Furthermore, Your Honor, it is also evidence of the

25   conspiracy.  Mr. Kotey provided the same false biographical

1    background; different fake name, but, nonetheless, a fake name,

2    also from Yemen, also claimed to only speak Arabic.  So it

3    elicits evidence of a coordinated design, a unity of purpose

4    that they shared with one another.

5           So for those reasons, Your Honor, the government feels

6    this falls squarely within the four corners of routine booking

7    question.

8           THE COURT:  What case would you refer me to as closely

9    factually apposite here, on this issue?

10          MR. FITZPATRICK:  In the Fourth Circuit, Your Honor,

11   it's the *D'Anjou* case from 1994, cited in the government's

12   papers.  That case is a defendant who was actually under arrest

13   for drug-trafficking crimes and provides false information

14   regarding his country of origin and his background.

15          The facts here are even better than that, because

16   there's not even the pretense here that this is a criminal

17   investigation.  This wasn't a criminal investigation, this was

18   solely to identify the defendant for the purposes of national

19   security.

20          THE COURT:  And I take it you would point out that

21   while there were plenty of -- or good reasons, at least in his

22   view, why he would give false information to an adversary on the

23   battlefield, that does not eliminate the inference of a guilty

24   conscience?

25          MR. FITZPATRICK:  No.  I think the defense can

1    certainly argue that, but I don't think it eliminates the

2    inference of a guilty conscience.  Ultimately, that will be a

3    jury question.

4              THE COURT:  It makes it a jury issue.

5              MR. FITZPATRICK:  Correct.

6              THE COURT:  He can tell the jury:  I didn't want to

7    tell them who I really was because it's a battlefield issue.

8              MR. FITZPATRICK:  Right.

9              THE COURT:  All right.  Thank you.

10             Let me hear from you on this issue.

11             MR. ELLIS:  Thank you, sir.  Your Honor, we would ask

12   you to deny the government's motion for the following reasons.

13   We would argue to the Court that it would not fall under the

14   *Miranda* exception for routine booking questions; number one,

15   most simply because Mr. Elsheikh was not under arrest.

16   Obviously he was not even in the United States of America, and,

17   according to the government's witnesses, he was not in the

18   custody of the United States.

19             Therefore, the justification for the booking exception

20   to *Miranda* just doesn't apply.  The justification was crafted by

21   the courts, after someone was arrested, to allow law enforcement

22   simply to complete the booking process with accurate

23   information.  And that's completely irrelevant in this

24   situation.

25             Further, Your Honor, the government has argued that --

1           THE COURT:  What case would you chiefly rely on?

2           MR. ELLIS:  Your Honor, I would rely on the same ones

3     as the government, and the main Supreme Court cases such as

4     *Rhode Island v. Innis* that crafted this exception.  Because it

5     says the justification is to complete the booking process.

6     That's why there is no -- there are no questions to -- excuse

7     me, asked to elicit information that would incriminate someone.

8     It's just to complete the booking process.

9           There was no booking process going on here, Your Honor.

10    According to the government's own witnesses,

11    biometric enrollment is not an administrative procedure.

12    Biometric enrollment is not simply to determine the names of the

13    people in custody.  It feeds into the apparatus of the

14    intelligence system of the United States.

15          And, Your Honor, you can find that in the classified

16    transcript at page 60, lines 14 through 18; page 143, lines 18

17    through 23; page 62, lines 4 to 6.  This is information from the

18    government's own witnesses that this biometric enrollment

19    process is part of the intelligence system.  It's not an

20    administrative procedure.

21          THE COURT:  But it's also not part of law enforcement.

22          MR. ELLIS:  That's correct, Your Honor.  But this is

23    specifically in response to the government's argument that it

24    should fall under the booking exception.

25          THE COURT:  All right.

1        MR. ELLIS:  Your Honor, next, on the topic of

2   consciousness of guilt, as the Court has pointed out, there are

3   a variety of reasons why Mr. Elsheikh, after being captured in

4   Syria, would not want to give his true identity --

5        THE COURT:  Yes, but that's a matter for the jury to

6   determine, if it's admissible.

7        MR. ELLIS:  Well, Your Honor, also under MRE 403, it's

8   for the Court to determine whether or not the probative value of

9   that evidence is substantially outweighed by the danger of

10  unfair prejudice.  And when the government's own witnesses

11  testify that there was an agreement to keep Mr. Elsheikh's

12  identity a secret in order for his own safety, I think that kind

13  of defeats their argument that it was due to consciousness of

14  guilt.  You can find that in the classified transcript at

15  page 81 --

16       THE COURT:  That's also a jury matter.  It's not a 403

17  issue.

18       MR. ELLIS:  We would argue it's part of the Court's

19  function under 403.

20       THE COURT:  All right.  I understand your 403 argument.

21  If you want to say anything more about it, you may do so.  At

22  the moment, I'm unconvinced that there's a 403 problem.

23       MR. ELLIS:  Lastly, Your Honor, I would say that the

24  government's final argument, or final basis, for admitting these

25  statements is that they fall under non-hearsay as statements of

1    a co-conspirator.  We have argued that that is not the case.  We

2    have cited cases in our response to the Court, primarily

3    *Dutton v. Evans*, 400 U.S. 74 from 1970, that these statements

4    are admitted only if the statement was made in the course and in

5    furtherance of the conspiracy, and not during a subsequent

6    period when the conspirators were engaged in nothing more than

7    concealment of the criminal enterprise.

8            And that's specifically the basis that the government

9    has offered as non-hearsay, that it was part of the concealment

10   scheme.  And so we could ask the Court to deny it on that basis

11   as well.

12           THE COURT:  All right.  Thank you.

13           You may respond briefly, Mr. Fitzpatrick.

14           MR. FITZPATRICK:  Your Honor, if the defense's position

15   is that *Miranda* doesn't apply, the government might accept that

16   position.  But nonetheless, this is -- the questions that were

17   asked --

18           THE COURT:  Well, his last argument has nothing to do

19   with *Miranda*, it has to do with whether the hearsay objection

20   applies.  And you say that it's part of the conspiracy to

21   continue to conceal their identities --

22           MR. FITZPATRICK:  Correct.

23           THE COURT:  -- as part of the conspiracy.  And you

24   heard his argument to the contrary.  He cited a case where it

25   said that the 801(d)(2)(E), which is what it is, doesn't apply

1    there.  Do you agree with that?

2           MR. FITZPATRICK:  I don't, Your Honor.  We address that

3    in our papers as well.  It is a co-conspirator statement.  It

4    shows an effort to jointly conceal their identities and to avoid

5    detection by their adversaries.

6           In addition, Your Honor, in the government papers we

7    also argue that it is non-hearsay because they are not false --

8    the false statements are not being offered for the truth of the

9    matter.  So with respect to Kotey's statements --

10          THE COURT:  In fact, they're being offered for the

11   untruth of the matter.

12          MR. FITZPATRICK:  Correct, Your Honor.

13          THE COURT:  Yes, I understood those arguments.  What

14   else?

15          MR. FITZPATRICK:  So, Your Honor, we'll rest on that,

16   Your Honor.  They are co-conspirator statements.  Alternatively,

17   the false statements are not being offered for the truth;

18   therefore, they're also admissible.

19          THE COURT:  All right.  Now, address, if you will, the

20   next issue, which is the motion to suppress.  Is that right?

21          MR. FITZPATRICK:  Correct, Your Honor.  Mr. Parekh will

22   take up the *Miranda* FBI issue.

23          THE COURT:  All right.  Mr. Parekh?

24          MR. PAREKH:  May I proceed, Your Honor?

25          THE COURT:  Yes, you may.

13

1          MR. PAREKH:  Your Honor, there are two legal questions

2     for the Court with respect to this issue, and the key cases are

3     *Oregon v. Elstad,* decided by the Supreme Court;

4     *Missouri v. Seibert*, decided by the Supreme Court; and

5     *United States vs. Khweis*, decided by the Fourth Circuit just

6     last year, in 2020.

7          The first legal question for the Court is, did the

8     government interrogators here use a deliberate two-step

9     interrogation technique in a calculated way to undermine the

10    later *Miranda* warning.  Absent deliberately coercive or improper

11    tactics, the *Miranda* warnings are presumed to be effective.  And

12    that's *Oregon v. Elstad*.

13         The second question is, if the answer to the first

14    question that I just posited is "yes," the Court must then

15    analyze whether the government - the FBI in this case -

16    instituted sufficient curative measures designed to ensure that

17    a reasonable person in Elsheikh's situation would understand the

18    import and effect of the *Miranda* warning and of the *Miranda*

19    waiver.

20         The government respectfully asks the Court to make

21    findings on both so that the record is clear, particularly given

22    that this precise issue was recently litigated in the

23    Fourth Circuit in another ISIS terrorism case known as

24    *United States vs. Khweis*, 971 F.3d 453, 2020.

25         Now, Your Honor, the Court may recall that on multiple

1    occasions, including in the landmark *Khweis* decision handed down

2    just last year, the Fourth Circuit has said that

3    Justice Kennedy's concurring opinion in *Missouri vs. Seibert* -

4    not the plurality opinion, but Justice Kennedy's opinion -

5    represents the holding of the *Seibert* court.  They said that in

6    *Khweis*; they also said that in the *Mashburn* case that we cited.

7           So let's go to the first question, Your Honor:  Was

8    there a calculated attempt to undermine *Miranda* warnings in this

9    case.  And the government submits that the record is

10   overwhelming that there was not.

11          First, the interviews that Mr. Elsheikh underwent were

12   intelligence-gathering interviews, initially, in January through

13   early March.  Your Honor heard extensive testimony about that,

14   and the fact that he underwent DoD, Department of Defense,

15   intelligence-gathering interviews.

16          Later on he undergoes an FBI Mirandized interview; two

17   separate entities conducting interviews, but both entities have

18   entirely different goals.  And there's extensive explanation and

19   evidence of that in the transcript.  These entities were not

20   coordinating, they weren't strategizing or otherwise sharing

21   information with each other; that is, the intelligence team and

22   the law enforcement team.

23          And if I could just briefly go through a few examples

24   of that, Your Honor.  And I'll be generic so as to not go into

25   classified information.  Your Honor heard testimony from

1   Individual 4, page 38 of the transcript:  "The DoD objective in

2   Northeastern Syria in 2018 was countering ISIS, and, in doing

3   so, DoD was attempting to collect actionable intelligence and

4   identify the identities of foreign terrorist fighters."

5        Page 61 of the transcript:  "The purpose of the

6   interrogations, January, February, and March of 2018, was to

7   collect intelligence, not to collect evidence for

8   law enforcement or for a criminal prosecution."

9        Also, page 71 of the transcript, Individual 4's

10  testimony:  "Elsheikh was deemed to be a high value individual

11  by DoD, and they assessed him to have high level intelligence on

12  ISIS."

13       Your Honor then heard testimony from Individual 5,

14  pages 86 to 97 of the transcript:  "The intelligence team's

15  primary mission in 2018 was defeating ISIS, and the objectives

16  of Mr. Elsheikh's interrogations were to obtain his true

17  identity, obtain the current location for Alexanda Kotey, the

18  location of any living hostages, the location of remains of

19  deceased hostages.  And other objectives, intelligence-gathering

20  objectives, included understanding ISIS's communication

21  capabilities and understanding ISIS's external attack operations

22  planning."

23       Page 98 of the transcript:  "The interrogations are not

24  designed to collect evidence for a law enforcement purpose or a

25  criminal prosecution."  And Individual 5 testified to Your Honor

1    that he didn't even know that there would be a U.S. prosecution.

2         Pages 99 to 100:  "There were multiple occasions that

3    Elsheikh was told that these interviews were for intelligence

4    collection only, and that if he was brought up on charges one

5    day, that would be in the future, and the process would be very

6    clear and apparent to him."

7         Your Honor heard testimony from Jonathan Kath, again,

8    more corroboration:  "The intelligence equities in Syria in

9    2018, including locating the remains of hostages killed by ISIS,

10   collecting biometrics of ISIS fighters, and understanding the

11   history and structure of ISIS."

12        He also testified that they were interested in

13   intelligence-gathering information, remains, gleaning

14   intelligence about the organizational structure of ISIS, and

15   future external operations planning.

16        He also testified that the interrogations are not

17   designed to collect evidence for potential prosecution.  And, in

18   fact, Elsheikh told him -- or he believed, through his

19   conversations with Elsheikh, rather, that Elsheikh did not

20   respect law enforcement, and he was concerned that Jonathan was

21   a member of the law enforcement team.  And it was made very

22   clear --

23             THE COURT:  Who was it who testified in this respect?

24             MR. PAREKH:  That was Jonathan Kath, Your Honor.

25             THE COURT:  All right.  Go on.

17

1          MR. PAREKH:  And he testified that they had a direct

2    conversation, and that he stated that this was an intelligence

3    interrogation entirely separate from a law enforcement

4    interrogation.  And I believe that also involved Individual 5.

5          And so those are all -- and Kath's testimony is in the

6    classified transcript, and the relevant portions, pages 203 to

7    210, I believe fairly summarize what I've just mentioned.  But,

8    of course, it's in the record.

9          These are all instances, Your Honor -- there's many

10   more, but these are all examples of how the government has shown

11   by a preponderance of the evidence that the DoD interrogations

12   were not designed in any way to elicit information that would be

13   useful for a criminal prosecution.  They didn't care about a

14   criminal prosecution.  Their objectives were intelligence.

15   Intelligence equities remained, heavy intelligence equities

16   remained at that time.  There were still living hostages.  So

17   they had good reason to collect this information.

18         Now, the second question, Your Honor, I believe the

19   evidence is overlapping with respect to whether there's an

20   intent to undermine *Miranda*.  But even assuming there was, which

21   there clearly wasn't in this case, did the government institute

22   sufficient curative measures.  And I'll just go through that

23   briefly, and I think Your Honor will find the *Khweis* decision to

24   be instructive in that regard, the Fourth Circuit's decision in

25   *Khweis*.

1        And, you know, the few points I want to mention on

2    that, the March 27th, 2018 Mirandized interview began 20 days

3    after the unwarned interviews had ended.  That's a period longer

4    than any break during the series of un-Mirandized interviews,

5    and, in fact, over three times longer.

6        The FBI agents asked the SDF commander of the Kobani

7    prison in Syria, where they went to conduct this March 27, 2018

8    Mirandized interview, to use a different room than what was used

9    during the prior interviews, prior American interviews, and they

10   also asked the SDF commander that an entirely different SDF

11   guard be present for the Mirandized interview than the SDF

12   guards present for the intelligence-gathering interview.

13       On the first point, whether or not they used a

14   different room, I'm going to turn back to that.  It goes to

15   their intent.  Here they are in a war zone.  Your Honor has all

16   kinds of testimony in the record indicating that these prisons

17   are controlled by the SDF, that Mr. Elsheikh is in SDF custody,

18   this is a dangerous war zone, ISIS fighters coming off the

19   battlefield are being housed in these prisons, and the FBI is

20   going out of their way to say:  Hey, before we get started, can

21   you give us a different room, can you have a different guard sit

22   in.  I know your rules require us to use your facilities, I know

23   your rules require us to have an SDF guard present, but could we

24   have a different room, different guard.

25       That goes to intent, Your Honor.  There's an intent to

1   undermine *Miranda*, they would say.  Forget about it, just have

2   the same guards, the same room; let's make this look exactly the

3   way he went through in the DoD interviews.  So that's powerful

4   evidence of their intent.

5        Also, as to whether or not there was a different guard,

6   I think the defense will argue that there wasn't.  I will point

7   Your Honor to a couple of the things in the record.  One, Kath

8   testified -- let me first start with Elsheikh's affidavit.  As

9   Your Honor knows Elsheikh submitted an affidavit sworn under

10  penalty of perjury which we've demonstrated contains numerous

11  material false statements.  But let's just say, for the sake of

12  argument, Your Honor wants to credit one of these, which is on

13  page 6 he says:  "During the first FBI interview, the SDF

14  official who was accompanying the FBI was the same SDF official

15  who was present during several of John's DoD interviews."

16       Now, John refers to Jonathan Kath, we would submit to

17  Your Honor.  Kath actually testified that the SDF guard who was

18  primarily present, or was present for a lot of his interviews,

19  was in his late 30s or 40s.  Your Honor then heard testimony

20  from FBI Special Agent John Chiappone, where he said:  The guard

21  who was there for our Mirandized interview looked really young,

22  looked to be about 18 years old.  Special Agent Nutter, who was

23  the other FBI agent present for that Mirandized interview said,

24  yeah, that guard looked really young, appeared to be in his

25  early twenties.

1          So we believe, Your Honor, that there's a fair

2     inference that it was a different guard.  But again, even if it

3     wasn't, for argument's sake, the agents asked for it and

4     Your Honor has in the record that the SDF commander told the

5     agents, yes, we'll give you a different room and a different

6     guard.

7          There are also, as we've been talking about, entirely

8     different government personnel attending the Mirandized

9     interview.  You have two FBI agents and an FBI linguist, whereas

10    during the intelligence interviews, those were conducted by an

11    entirely different organization, the Department of Defense.

12    Your Honor knows from the transcript that Mr. Elsheikh was

13    constantly asking his DoD interrogators, "Who do you work for?"

14    And they would say, DoD.  So in his mind, and what was

15    communicated to him, the intelligence interviews were conducted

16    by the Department of Defense; whereas the March 27th, 2018

17    interview that the government will be seeking to elicit

18    statements about during trial, if Your Honor denies the motion

19    to suppress, there, the FBI agents show up and they say, "We are

20    special agents from the FBI, here is our badge."  They're

21    showing their FBI credentials, they're telling him, "We're law

22    enforcement agents."

23          So that's another factor that goes both towards no

24    intent to undermine *Miranda*, but also curative measures, just

25    assuming, for argument's sake, that Your Honor wants to go to

1    the curative measures prong.

2         Agents Chiappone and Nutter, who conducted the

3    Mirandized interview, did not read, hear about, or learn any

4    information whatsoever about DoD's intelligence-gathering

5    interviews, nor did they ask Elsheikh about what he told the DoD

6    intelligence interviewers.  The agents therefore could not treat

7    the second set of interviews as continuous with the first.  They

8    could not ask leading questions, they could not cross-examine

9    Elsheikh with his previous statements.  They, in fact, had no

10   idea, as they testified to Your Honor during the evidentiary

11   hearing, what Elsheikh had said during the intelligence

12   interviews.

13        And that's an extremely important factor.  Because they

14   told Elsheikh that, and it was 100 percent true.  Not once were

15   they reading or hearing about what was happening in the

16   intelligence-gathering interviews.  They weren't seeking that

17   information out, and if information was actually sent to them,

18   which I'll get to in a second, they were deleting that

19   information and not opening it, not reading it.

20        The FBI agents did not provide any advice or guidance

21   whatsoever with respect to the intelligence-gathering interviews

22   of Elsheikh, and they didn't even speak to any of the

23   intelligence interrogators regarding their interviews with

24   Elsheikh.  That's on page 61 to 62 of, I believe, Day 2 of the

25   transcript, or possibly Day 3.  They even instructed the FBI

1   linguist to not receive any intel information.  Importantly,

2   Your Honor, the FBI told Elsheikh they did not know what, if

3   anything, he had said in prior interviews, a disclosure that

4   would indicate a reset to a reasonable person in Elsheikh's

5   position.

6           In addition to informing Elsheikh of his right to

7   remain silent, they also advised him that he did not need to

8   speak with them today just because he had spoken with others in

9   the past.  And the Advice of Rights form - I believe that's

10  Government Exhibit 12-7 - elaborated that the agents were not

11  interested in any of the statements he may have made to others

12  previously, and, in fact, the form explicitly stated, "We are

13  starting anew."

14          These circumstances, Your Honor, were more than

15  sufficient to allow a reasonable person in Elsheikh's position

16  to distinguish between the unwarned interviews with the

17  Department of Defense and the later Mirandized interviews with

18  the FBI, and to, quote, "appreciate that the interrogation had

19  taken a new turn," end quote.  And I believe that's from the

20  *Seibert* and/or the *Khweis* decision.

21          What is extremely powerful evidence, Your Honor, of the

22  fact that Elsheikh knew that this was an entirely different set

23  of interviews, right -- because that's really a key question

24  that Your Honor has to determine, in addition to evaluating the

25  credibility of the witnesses that testify.  Did Elsheikh

23

1    understand that just because he had made certain admissions to

2    the DoD during the intel interviews, that he did not need to

3    repeat those admissions to the FBI.

4            Your Honor, that, I think, is --  you have overwhelming

5    evidence of that.  Two important examples.  One, as Your Honor

6    knows, during the intelligence-gathering interviews,

7    Mr. Elsheikh spoke in detail about Mohammed Emwazi, who the

8    government submits was the beheader on much of the beheading

9    videos that the government will be seeking to introduce at

10   trial.  He declined to speak in detail about Mohammed Emwazi.

11           But even more powerful is the fact that the

12   hostage-taking scheme that the defendant is charged with in

13   Counts 1 through 6 of the indictment, the agents asked him

14   whether he had participated in the hostage-taking scheme and he

15   declined to provide that information.  He said he didn't want to

16   talk about it, and the FBI agents respected that and they moved

17   on.

18           If he thought for one moment that he had to repeat what

19   he told DoD -- because he had made those admissions to DoD.

20   Your Honor has extensive evidence of that in the record.  The

21   DoD intelligence-gathering reports were admitted during the

22   evidentiary hearing, and Your Honor can see that he made those

23   admissions about the hostage-taking scheme to the

24   Department of Defense.  That is some of the most incriminating

25   information in terms of his admissions.

24

1          But he didn't repeat any of that to the FBI.  Why?

2    Because he knew and understood the import and the effect of the

3    *Miranda* warnings.  "Okay.  You're telling me, FBI agents, that I

4    don't need to talk about things that I don't want to talk about.

5    Fine, I don't want to talk about the hostage-taking."  That's a

6    clear example that he clearly understood the *Miranda* warnings

7    that the agents had provided him, and the agents respected them.

8          Your Honor can also see -- and again, I know the

9    evidence here is overlapping, but Government Exhibits 12-1 and

10   12-2, Your Honor.  Briefly, 12-1 and 12-2 are contemporaneous

11   emails that the lead FBI interrogator, to Special

12   Agent John Chiappone, he's telling individuals in the

13   U.S. Government, "I'm on the law enforcement team, so don't send

14   me anything regarding the intelligence-gathering interviews."

15   This is well before this case was charged, was litigated.

16   Right?  This is him telling them, the U.S. Government folks, "If

17   you receive intel information, don't pass it to me."

18          12-2, he says, "I just deleted Mike's email.  Not sure

19   what it said, but since I'm on the law enforcement team, I did

20   not want to take that chance.  Please have someone filter this

21   before adding me and take me off the distribution."

22          Again, goes to the agent's mind and their intent.  If

23   they were seeking to undermine *Miranda*, they would have just

24   read the emails and they would have said:  Oh, this is great

25   insight for me to use when I later interrogate Elsheikh in a

1   Mirandized interview.  Instead, they are actively going out of

2   their way to say:  Not only am I not going to read this

3   information, but take me off the distribution.  I don't even

4   want to take the chance.

5         Your Honor heard extensive testimony about the

6   conditions of the March 27th, 2018 interview.  Right?  Elsheikh

7   was unrestrained during the interview, no handcuffs, no leg

8   restraints.  He had a relaxed and calm demeanor when he was

9   brought into the room by the SDF guard, and he remained that way

10  during the interview.  He wasn't timid, he wasn't scared, he

11  wasn't angry in any way.  He was very comfortable answering the

12  FBI's questions.  He was comfortable correcting the translator.

13  He wasn't afraid to speak up at all.  He appeared very much in

14  control.

15        A lot of the things I'm saying are almost verbatim

16  quotes from the transcript.  He didn't appear to be confused;

17  his answers tracked the FBI agent's questions; he was making eye

18  contact with the FBI; he was paying attention during the reading

19  of the *Miranda* rights.  The agents observed no signs of injury,

20  abuse, bruising.  And when they asked him about his health, he

21  said he was surprised at how well he's been treated, and that

22  the treatment he has received from the SDF was actually

23  different than the propaganda that ISIS had previously published

24  about the SDF to its members.  Page 77 of Day 3 of the

25  transcript, I believe.

26

1          He was able to clean clothes, work out, play chess,

2     converse with other inmates and prisoners, and he never once

3     mentioned needing any medical attention.  No one in the room had

4     any visible weapons; everyone was dressed casually.  Elsheikh

5     was offered restroom breaks, prayer breaks, food, beverages,

6     cigarettes, Chai tea.  As I mentioned, the agents introduced

7     themselves as FBI agents, they both showed their credentials --

8          MS. GINSBERG:  Judge, I'm sorry, but to quote your

9     phrase about in recognition of the shortness of life, this

10     testimony has absolutely nothing do with whether this was a

11     two-step process, which is the subject --

12          THE COURT:  That's your view.  It's not his view.

13          Next.

14          MR. PAREKH:  Another example, Your Honor, of the

15     evidence indicating that Elsheikh knew and understood the import

16     of the *Miranda* warnings he was given - which, of course, does go

17     to the two-step argument the defendant is making - he had

18     admitted during the Mirandized interview that he had committed

19     robberies.  And Your Honor will recall that the testimony of

20     Special Agents Chiappone and Nutter was that:  "We asked him

21     about those robberies, and we asked him to provide details.  And

22     he said that he did not wish to answer any further questions

23     about robberies that he had committed, and he would not provide

24     any further information on those."  That's on pages 93 to 94 of

25     the transcript.

```
 1              He also provided minimal information about
 2     Alexanda Kotey.  In the intelligence-gathering interviews, he
 3     provided details about Kotey's involvement in the hostage-taking
 4     scheme, but yet when he was asked about Kotey during the
 5     Mirandized interviews, he declined to provide those details, and
 6     said:  If you want to find out information about Kotey, go ask
 7     him, don't ask me.
 8              He also, as I mentioned, didn't want to disclose
 9     whether he had participated in a hostage-taking scheme, and the
10     agents moved on.  He said he didn't want to talk about anything
11     related to the hostages and the beheading videos; whereas during
12     the intelligence-gathering interviews, he freely provided that
13     information.
14              Your Honor also knows from the testimony - and I
15     believe the defense has argued in their papers - that Elsheikh
16     didn't waive his rights; that the agents just continued asking
17     him questions despite his request for a lawyer.  Elsheikh also
18     claims that in his affidavit to the Court.
19              There was no evidence of that at all during the
20     suppression hearing.  In fact, the evidence was the opposite,
21     that the agents actually -- they understand what an invocation
22     is.  Powerful evidence of that is that when they went to
23     interview Alexanda Kotey, Your Honor heard testimony that Kotey
24     invoked his rights and said, "I'm not going to talk to you
25     unless I have a lawyer."  The agents never had a Mirandized
```

1    interview with Alexanda Kotey as a result of that invocation.

2         At that time, of course, they had no idea back in 2018

3    that Alexanda Kotey would be pleading guilty before Your Honor

4    in 2021.  Nobody had any idea.  At that time Kotey and Elsheikh

5    weren't even charged.  Again, powerful evidence that these

6    agents understood the meaning of *Miranda*, and when someone

7    invoked, they stopped.  That's what Kotey did; they stopped

8    asking him questions and they moved on.

9         So there's no evidence whatsoever that Elsheikh had

10   invoked his right to counsel, or that he had stated that he did

11   not wish to answer questions.  He refused to sign the *Miranda*

12   form.  Fine, yes, he didn't want to sign the *Miranda* form.

13   That's in the record.  But he said he was willing to answer

14   questions, just questions that he wanted to answer, not

15   everything.  And that was illustrated by many of the things that

16   I just discussed.

17        Page 156 of the transcript, right?  That's

18   Special Agent Julius Nutter's testimony.  He corroborates nearly

19   everything, I believe, that Special Agent Chiappone testified.

20   But this is also really powerful evidence that the defendant

21   knew the import and effect of *Miranda*.  Actually, Elsheikh, when

22   his rights were being read to him, he stopped

23   Special Agent Chiappone and he said, "Tell me more about this

24   'we are starting anew.'  What does that mean?"

25        Two things there, Your Honor.  One, it shows he was

1    paying attention.  Right?  He wasn't just letting the agents

2    read through.  He was paying attention, and he specifically

3    asked a question about, "What does that mean, we are starting

4    anew?"  And page 156 of the transcript, Special Agent Nutter

5    testified that:  "Special Agent Chiappone advised the defendant

6    that starting anew meant it did not matter who he had spoken to

7    earlier.  This is a new and totally separate interview; that he

8    is not obligated to speak to us based on any prior statements

9    that he has made or any other individuals that he has spoken

10   to."

11        Finally, Your Honor, I'm wrapping up.  Justice Kennedy

12   in *Seibert* says -- and rather than paraphrasing his opinion, I

13   have the opinion in front of me.  This is Justice Kennedy's

14   controlling concurrence in *Seibert*, 542 U.S. 600, 2004

15   Supreme Court case.  Justice Kennedy, of course, says that, "The

16   admissibility of post-warning statements should continue to be

17   governed by the principles of *Elstad* unless the deliberate

18   two-step strategy was employed."

19        And so I've been describing to Your Honor all of the

20   evidence which indicates that there was no deliberate or

21   calculated attempt to undermine *Miranda*.  So the government's

22   position is that the Court can find, on prong one, no attempt to

23   undermine *Miranda.*  Elsheikh was given *Miranda* rights, and, in

24   fact, he was given even greater *Miranda* rights than what

25   individuals are normally given.  Right?  And Your Honor sees

1        that in all of the advisements he's given in

2        Government Exhibit 12-7.

3                But again, Your Honor, we would respectfully urge the

4        Court to find on both prongs.  We think that would be helpful

5        for the record.  And in *Khweis*, the Fourth Circuit declined to

6        reach prong one.  The Fourth Circuit said:  Okay, even assuming

7        that there was a deliberate attempt to undermine *Miranda*, the

8        curative measures were sufficient in this case.

9                And so that's why we think it's important for

10       Your Honor to make factual findings on both prongs.

11               And when it comes to the curative measures,

12       Justice Kennedy's controlling opinion says, and I'm reading from

13       the opinion:  "For example, a substantial break in time and

14       circumstances between the pre-warning statement and the *Miranda*

15       warning may suffice in most circumstances, as it allows the

16       accused to distinguish the two contexts and appreciate that the

17       interrogation has taken a new turn.  Alternatively, an

18       additional warning that explains the likely inadmissibility of

19       the pre-warning custodial statement may be sufficient."

20               And so Justice Kennedy provides two examples.  He

21       doesn't say those are the only two examples, and that those are

22       dispositive, that it has to be those two examples.  But in this

23       case, the government actually satisfies both examples, exactly

24       from Justice Kennedy's opinion and from the Fourth Circuit's

25       opinion in *Khweis*.

1          Going to the second alternative example, the *Miranda*

2    form explicitly says:  "If you previously made statements to

3    others in the U.S. Government, it is likely that those

4    statements will not be usable against you in a U.S. court.

5    Anything you now say can be used against you in a U.S. court."

6          So already, Your Honor, on curative measures, we've

7    already done what Justice Kennedy gave as an example, right, in

8    the second one.

9          In the first, which is separate and apart from the

10   alternative example that I read, where he says, "a substantial

11   break in time and circumstances," 20 days had elapsed between

12   the last intelligence-gathering interview and the first

13   Mirandized interview.  That's over three times of any prior

14   break that he had had.  The government submits that that is

15   certainly substantial, 20 days.  In *Khweis*, that was actually a

16   case that --

17          THE COURT:  You said that's over three times any prior

18   break that who had had?

19          MR. PAREKH:  Yeah, so in the DoD intelligence-gathering

20   interviews, which were from January to early March - March 7th

21   was the last DoD intelligence-gathering interview - there were,

22   at times, breaks.  In other words, DoD wasn't interviewing

23   Elsheikh every single day.

24          And so that was -- the reason I use that language is,

25   that comes straight from the *Khweis* decision, from the majority

1    opinion; that in *Khweis*, there was intelligence-gathering

2    interviews followed by law enforcement interviews, Mirandized

3    interviews.  Right?  It was actually a case that I was on the

4    trial team on.  And Khweis was captured on the battlefield in

5    Iraq.  He had joined ISIS for a period of months; he then was

6    brought into a Kurdish facility and he was interrogated.

7          First, in that case, he was actually interrogated by an

8    FBI agent during the intelligence-gathering interviews, followed

9    by FBI agents interrogating him during a series of Mirandized

10   interviews.  And in *Khweis*, the break in time during

11   intelligence-gathering interviews, the longest break was

12   six days.

13         And so in Khweis, what we did was we had a 10-day

14   attenuation break such that in between the last

15   intelligence-gathering interview and the first Mirandized

16   interview, there were 10 days of time that had elapsed.  And the

17   reason we did that in Khweis was we wanted to show Khweis that

18   this is an entirely difference phase that you're undergoing now.

19         In this case, in the Elsheikh matter, we doubled the

20   attenuation period that the Fourth Circuit last year blessed in

21   *Khweis*.  The Fourth Circuit said that 10 days was more than

22   sufficient, given that the prior break was six days; here, the

23   longest break that Mr. Elsheikh underwent during the

24   intelligence-gathering interviews conducted by the DoD was

25   six days, similar to Khweis.  But yet, when it came time to

1    conduct the Mirandized interview of him on March 27, 2018,

2    20 days had elapsed between any prior intelligence-gathering

3    interview and the beginning of his Mirandized FBI interview.

4         So when Justice Kennedy says a substantial break in

5    time, well, if the Fourth Circuit found that 10 days was

6    substantial -- and, in fact, in the *Khweis* decision, the

7    Fourth Circuit quotes a decision from the Supreme Court, *Dixon*,

8    I believe it is.  In *Dixon*, the break was four hours.  In

9    *Seibert*, I believe the break was something like 15 to

10   20 minutes.  It was very short.  Right?  Which the Supreme Court

11   found problematic, in addition to a lot of other things.  They

12   had the same officer who had done the un-Mirandized interview

13   perform the Mirandized interview, and he was grabbing her hand

14   and saying:  Well, didn't you just confess to me, 15, 20 minutes

15   ago, or, rather, in the prior interview?

16        This is not a *Seibert* situation, Your Honor.  20 days

17   of a gap, different organizations performing these interviews,

18   different interrogators.  The FBI has no idea what Elsheikh said

19   during the intelligence-gathering interviews.  So that goes to a

20   substantial break in time.

21        And then, Justice Kennedy says a substantial change in

22   circumstances.  Right?  And here I've already talked about that:

23   The change in personnel; FBI versus DoD; entirely different

24   purposes of the interview, which was explained to him, right, in

25   the intelligence-gathering interviews.  Your Honor has numerous

1    references in the transcript where DoD is telling Mr. Elsheikh,

2    "This is for intelligence collection;" whereas when the FBI

3    comes to him, they say, "Hey, listen, anything you say now can

4    be used against you in court."  That was never once said to him

5    during the intelligence-gathering interviews.  So that's a very

6    different circumstance.  Different SDF guard, we would posit.

7         And also, the Mirandized statements themselves on the

8    form.  We went above and beyond, and included the additional

9    warning that explains the likely inadmissibility of the

10   pre-warning statements, in addition to all the other statements

11   about:  Hey, you don't need to talk to us just because you may

12   have spoken to others in the past.  We're starting anew.

13        So we believe we've satisfied both examples, including

14   additional curative measures that were undertaken, as I've

15   already described and as Your Honor has seen in the transcript.

16        And so for all those reasons, Your Honor, we believe

17   Your Honor should find on both prongs; that there was no

18   deliberate attempt to undermine *Miranda,* but even assuming, for

19   the sake of argument, that there was, that there was more than

20   sufficient curative measures, and that we followed exactly what

21   Justice Kennedy had indicated in his opinion in *Seibert,* and

22   what the Fourth Circuit had indicated was more than sufficient

23   in *United States vs. Khweis* last year.

24        Thank you.

25        THE COURT:  Thank you.  Ms. Ginsberg?

1           MS. GINSBERG:  Your Honor, I'm going to be considerably

2    briefer.

3           THE COURT:  That would be welcome.

4           MS. GINSBERG:  First of all, the government has made

5    sort of a blanket statement that there were glaring lies in

6    Mr. Elsheikh's declaration.  The government has no proof of

7    that.  That's the government's opinion, but it should not be

8    stated as a matter of fact.

9           Your Honor, we are not disputing that the purpose of

10   the DoD interviews was intelligence-gathering, and Mr. Parekh

11   went to great lengths to describe all the various intelligence

12   reasons for the 26 separate DoD interviews.  The fact remains

13   that the intelligence purposes of the DoD interviews do not

14   necessarily bear on Mr. Elsheikh's understanding that these

15   interviews had different purposes.  Because they did ask the

16   types of questions in both interviews -- whether their primary

17   purpose was intelligence-gathering or not, similar questions

18   were asked, whether by design or otherwise, in both sets of

19   interviews.

20          There were -- I think the best indications of what was

21   in Mr. Elsheikh's mind -- and the Court -- we don't disagree

22   with any of the legal analysis that the government has

23   presented.  I think we probably made the same arguments in our

24   pleadings.  But the question is not what was necessarily in the

25   minds of the interrogators, but what was in Mr. Elsheikh's mind;

1    whether he was in a position to distinguish the difference

2    between the DoD interviews and the FBI interviews.

3            And, Your Honor, it's our position that that did not

4    occur, and that the so-called curative measures were not

5    sufficient measures for Mr. Elsheikh to be able to differentiate

6    between the DoD interviews and the law enforcement interviews.

7    And I'll give the Court several examples as to why we believe

8    that's the case.

9            Mr. Elsheikh was subject to 26 separate DoD interviews.

10   They occurred in two separate locations, two separate prisons.

11   The first set of interviews were conducted at a prison called

12   Ayn Issa.  Those were conducted by DoD, members of the

13   Department of Defense interrogators, but also by someone who was

14   a member of the FBI fly team, Jonathan Kath.  And he

15   participated in the DoD interviews, and actually conducted

16   separate interviews with Mr. Elsheikh at the second prison, the

17   Kobani prison, which was the same prison at which the FBI

18   interviews occurred.  And Detective -- Agent Kath admitted

19   freely that he concealed -- he purposefully concealed his

20   identity as an FBI agent from Mr. Elsheikh.  He actually

21   testified that he lied to Mr. Elsheikh right out of the gate and

22   told -- in discussing what his identity was, when he was asked

23   by Mr. Elsheikh if he -- about the FBI and the relationship

24   between the DoD individuals and the FBI.

25           The interview rooms that were used to conduct the

1    interviews by Agent Kath were the -- at least with respect to

2    Mr. Kotey, the same rooms as the FBI interviews of Mr. Kotey.

3    So what we know is that despite a request by the FBI to get --

4    to have the interviews conducted in different rooms, that at

5    least with respect to Mr. Kotey, the interviews conducted by

6    Agent Kath in his capacity as a part of the DoD investigative

7    team was the same room that the FBI agents conducted their

8    law enforcement interview of Mr. Kotey.

9          And none of the agents was able to say that that was

10    not also the case with respect to the interviews conducted --

11    the law enforcement interviews conducted of Mr. Elsheikh.  And

12    Mr. Elsheikh, in his declaration, affirmatively states that he

13    was interviewed in the same room by Agent Kath as he was

14    interviewed by the FBI law enforcement interrogators.

15          He was, in fact, presented with a written *Miranda* form.

16    He refused to sign it.  He asked the agents specifically for an

17    explanation for what "starting over" meant, and was told

18    generally, I don't have to -- you don't have to talk to the FBI

19    just because you participated in the DoD interviews.  That

20    doesn't -- the fact that he didn't have to participate in the

21    interviews with the FBI does not mean the same thing as not

22    viewing the interviews as a continuation of the earlier -- of

23    the earlier interviews.

24          The agents advised Mr. Elsheikh, in connection with the

25    *Miranda* form, that he had the right to have a lawyer.  They

38

1    actually -- agents knew at the time that they read him this form
2    that they didn't have the ability to provide him with a lawyer.
3    They knew, at a minimum, that they would have to ask permission
4    of the SDF to gain access to -- to provide Mr. Elsheikh with a
5    lawyer, should he have requested it.  And, in fact, they found
6    out the next day that the SDF would not permit Mr. Kotey to have
7    a lawyer, despite the fact that he had requested it.
8            But the agents had a plan from the outset, which was
9    indicated in their course of action plans, to minimize the
10   *Miranda* warnings and the impact of the *Miranda* warnings on
11   Mr. Elsheikh.  And Your Honor has, I believe it's Defendant's
12   Exhibit 10, that has an email from Agent Nutter to
13   Agent Chiappone.  These are the two FBI law enforcement
14   interrogators, where all three course of action notes begin with
15   "Downplay Advice of Rights as procedural requirement to conduct
16   interview."
17           That is the clearest, the absolute clearest expression
18   of what the intent of the FBI law enforcement agents were in
19   distinguishing between the DoD interviews and the
20   law enforcement interviews.  And it's consistent with -- it's
21   consistent with their intentional representation that he had the
22   right to a lawyer, without having any knowledge that they would
23   ever be able to provide him with one.
24           Probably the most critical overlap between the DoD
25   interviews and the SDF interviews was -- and the law enforcement

1    interviews was the presence of SDF either interrogators or

2    guards, as they were described differently by different agents.

3    But there were SDF officials who were present at each of the DoD

4    interviews and at each of the law enforcement interviews.

5            The interviews were conducted in Arabic, a requirement

6    of the SDF to allow the interviews to occur.  So there is, at a

7    minimum, a question as to the total accuracy of the translations

8    between the questioning and answering -- the answers provided by

9    Mr. Elsheikh.  And that's particularly problematic with respect

10   to any requests that he made to have a lawyer present.

11           Mr. Elsheikh knew at the time of the law enforcement

12   interviews that the DoD had previously been cooperating with the

13   SDF and exchanging information with the SDF, because he knew

14   that the DoD had disclosed his true identity to the SDF.

15   Mr. Elsheikh had concealed his true identity during the SDF

16   intake processing, and it wasn't until the DoD came in and did

17   the biometric enrollments that the SDF learned his true

18   identity.

19           So throughout all of these interviews, there are SDF

20   personnel sitting in the interviews who Mr. Elsheikh knows have

21   some form of information-sharing agreement with the

22   U.S. Government officials.

23           They also are the same individuals that Mr. Elsheikh

24   claims had been beating him at various intervals at the time he

25   was captured, after he was captured, and at different times

1    within that timeframe of the various DoD and FBI interviews.

2          And we know from admissions that were made by a number

3    of the DoD interviewers, interrogators, that part of their

4    agreement with the SDF to have access to

5    Mr. Elsheikh and the other prisoners required them to share

6    their 302s, and required the information-sharing agreements that

7    allowed the SDF to know what Mr. Elsheikh had said to the DoD,

8    and allowed the DoD and the FBI to know what Mr. Elsheikh had

9    said to the SDF.  And there were representatives from the SDF

10   that were present during each of the DoD and law enforcement

11   interviews.

12         The length of time -- there was a break of 20 days

13   between the DoD interviews and the SDF interviews, but the

14   overall length of the DoD interviews was, I believe, at least

15   30 days, perhaps longer.  And the fact that there were

16   additional -- there was a break of 20 days...

17              THE COURT:  Excuse me a moment.

18              (OFF THE RECORD.)

19              THE COURT:  All right.  You may continue.

20              MS. GINSBERG:  The break of 20 days between the DoD --

21   the end of the DoD interviews and the beginning of the FBI

22   interviews is not as significant when looked at in terms of the

23   overall length of the DoD interviews, which was considerably

24   longer than any of the case -- any of the interviews that were

25   involved in the cases that the government cited.  So the whole

1    interview process had a much longer timeframe, and the break for

2    that reason would have seemed to Mr. Elsheikh not to be nearly

3    as significant.

4         Mr. Elsheikh knew, and it says in his -- included in

5    his declaration that he was -- when the SDF discovered that he

6    had given a false identity as a result of the U.S. biometric

7    enrollments, that he was beaten by the SDF.  So to the extent

8    that coercion was present -- to the extent that coercion is

9    relevant to the two-step inquiry, coercion -- the fact that

10   there was no coercion exerted on him directly by the

11   U.S. Government officials conducting the different interviews

12   does not lessen the impact of the coercion that was present as a

13   result of having the SDF interviewers and guards present during

14   all of these interviews.

15        Your Honor, it is -- there are -- it's difficult for us

16   not to acknowledge that there are factors that are in the

17   *Seibert* decision that the government has satisfied.  But the

18   extent to which the U.S. Government interrogators had agreements

19   with the SDF officials, and the extent to which the SDF

20   officials were present throughout these interviews is, I would

21   submit, sufficiently overwhelming to mitigate against the

22   curative measures that the government did put into effect.

23        They made attempts, and there's no question they made

24   attempts, to follow the rule book that was set out in *Khweis*,

25   and, from their perspective, did that reasonably effectively.

 1      But whether Mr. Elsheikh was in a position, given the length of

 2      the DoD interviews, the overlapping environments that these

 3      interviews were conducted in, that all of the interviews were

 4      conducted in, and the fact that -- the very significant fact

 5      that the SDF officials were present for all of these interviews,

 6      we would submit would render the curative measures insufficient

 7      to permit Mr. Elsheikh to distinguish, for this purpose, the

 8      difference between the law enforcement and intelligence

 9      interviews.

10              THE COURT:  All right.  Thank you.

11              Mr. Parekh, you have a very brief response, and then

12      we'll go to Mr. Fitzpatrick's part.  No, I guess Mr. Gibbs.

13              MR. PAREKH:  Very briefly, Your Honor.

14              Ms. Ginsberg started off her argument by indicating

15      that there aren't false statements in Mr. Elsheikh's affidavit.

16      We respectfully disagree, and we believe Your Honor has

17      three days of transcripts which indicate numerous examples that

18      we pointed out that there were material false statements made.

19              Number two, Ms. Ginsberg said, well --

20              THE COURT:  Are they in your brief?

21              MR. PAREKH:  In terms of the material false statements?

22      Yes.  For example, one of them is that Mr. Elsheikh says that

23      the SDF had indicated that -- at some point in Derik prison, in

24      2018, he indicates they beat him for 20 minutes with a bat.  The

25      SDF said you can't even have bats in the prison, number one.

43

 1          Number two, there was no signs of abuse, mistreatment,

 2    injury whatsoever on Mr. Elsheikh when he was at Derik prison,

 3    and Your Honor heard testimony from two Derik SDF officials that

 4    corroborate that.

 5          Number three, we pointed out in our brief that

 6    Mr. Elsheikh did not repeat what he merely had said in his DoD

 7    interviews.  Unlike what he claims in his affidavit, he says

 8    that:  The SDF abused me and had indicated that from this point

 9    forward, all of the media interviews that I give and all of the

10    statements I make, I have to repeat what I told DoD.

11          And Your Honor heard testimony through witnesses,

12    including Special Agent Dan O'Toole, which pointed out that that

13    was false, and Your Honor saw video clips during the suppression

14    hearing which indicated that was false.

15          Mr. Elsheikh also had indicated that he made specific

16    statements to the *Washington Post* during his interview.

17    Your Honor has the entire *Washington Post* interview, because the

18    defense had subpoenaed the *Washington Post*, and none of the

19    statements that Mr. Elsheikh claimed in his affidavit that he

20    told the *Washington Post* is in the *Washington Post* interview.

21    Nor is it in the Sean Langan interview, if they want to argue

22    that he had made a mistake.  And so there are other indications

23    as well.  I think Mr. Gibbs will go through them.

24          Ms. Ginsberg had indicated that it's a major factor

25    that similar questions were asked between the

1    intelligence-gathering interviews and the Mirandized interviews.

2    That has no consequence whatsoever.  That's not borne in any

3    case law.  The fact is, is that there were entirely different

4    personnel conducting these interviews, and the FBI team had no

5    idea what the intelligence-gathering team had asked.

6         And perhaps the most powerful evidence to rebut nearly

7    everything that Ms. Ginsberg said is that the statement that the

8    FBI wanted to get, the topic that they wanted to ask

9    Mr. Elsheikh about, which is, "Tell me about the hostage-taking

10   scheme," which he spoke extensively about, and his involvement

11   in, during the intelligence-gathering interviews; he declined to

12   tell the FBI agents about his participation in the

13   hostage-taking scheme.  He declined to give them details about

14   his conversations with Mohammed Emwazi, at least at one

15   particular point, and he declined to provide other details

16   regarding questions that were asked of him.

17        So if he thought this was one continuous interview with

18   the DoD, then he would have just continued speaking about his

19   involvement in this horrific, murderous, savage hostage-taking

20   scheme in which he participated.

21        Two more points, Your Honor.  Ms. Ginsberg pointed out

22   that there was some discussion regarding downplaying the *Miranda*

23   rights.  Your Honor asked questions about that on pages 128 to

24   129 of Day 3 of the transcript.  That was a statement in an

25   email from Special Agent Nutter well before the Mirandized

1    interview had actually been conducted.  It was a February 2018

2    email.  Special Agent Nutter did not read the *Miranda* rights to

3    Mr. Elsheikh.  The *Miranda* rights were read by

4    Special Agent Chiappone.

5            And Your Honor asked him:  "Did you downplay those

6    rights?"

7            He said no.

8            And Your Honor took him through a series of questions

9    where he indicated he read the form verbatim, Mr. Elsheikh was

10   paying attention, Mr. Elsheikh was looking at him, Mr. Elsheikh

11   asked a question about the form, and in no way was there any

12   downplaying of those rights.

13           So that's a basic credibility finding that Your Honor

14   can make.

15           And finally, Ms. Ginsberg pointed out that we tried to

16   follow the *Khweis* decision.  Not only did we try to follow the

17   *Khweis* decision, but we went well above and beyond what the

18   Fourth Circuit said was permissible in *Khweis*.  And, again,

19   powerful testimony.  If the agents wanted to undermine *Miranda*,

20   Your Honor wouldn't have heard the following testimony:

21           Special Agent Chiappone told Your Honor that before he

22   traveled to Syria, he read Judge O'Grady's opinion, the

23   District Court opinion in *Khweis*.  And he was asked:  Why did

24   you read that?

25           He said:  Because we wanted to make sure that we

1    followed the law exactly as it was laid out in this court.

2         And so that's very powerful evidence, Your Honor, that

3    these agents were not trying to undermine *Miranda*.  When you

4    have an agent telling you under oath that, I actually read a

5    decision by a fellow judge of this court to make sure that I

6    followed exactly the boundaries, powerful evidence that there

7    was no attempt to undermine *Miranda*.  And even assuming there

8    was - which there was not - curative measures were implemented.

9         Thank you, Your Honor.

10        THE COURT:  All right.  Mr. Gibbs?

11        MR. GIBBS:  Thank you, Your Honor.  The last topic I

12   would like to discuss with Your Honor this afternoon involves

13   the defendant's motion to suppress the media interviews the

14   defendant gave.  And I'm sure Ms. Ginsberg will clear this up in

15   her portion, but I don't believe the defense is moving to

16   suppress the 2018 media interviews.  Because if you read the

17   defendant's affidavit, essentially what he says is, beginning in

18   2019, the later media interviews, he claims that he was

19   subjected to so much mistreatment, so much physical abuse that

20   his will was overborne, and that those statements to the media

21   in 2019 were rendered involuntary.

22        In response to that, Your Honor, the government called

23   three SDF witnesses who testified here before Your Honor.  I

24   would submit that they came across as very consistent, very

25   credible.  Over the course of more than a day, they testified

1    about SDF prisons, their roles in them, the way the prisons are

2    run.  And they were very consistent, on cross-examination and on

3    direct, that they were not aware of the type of mistreatment

4    that Mr. Elsheikh alleged specifically as to himself, or that

5    type of mistreatment at SDF prisons generally.

6         The government also called a number of DoD witnesses

7    who testified that at times, as part of their duties doing these

8    interrogations, they would go into SDF prisons, and so they were

9    able to observe somewhat the inner workings of the SDF prisons.

10   They also testified consistently, and they also said the same

11   thing about DoD treats allegations of mistreatment very

12   seriously.  And when they get them, they investigate them and

13   they report them; whether the allegations are deemed to be

14   credible, on one end, not credible, on the other, or there's

15   uncertainty, and they're not sure how to determine it.

16        And, in fact, Your Honor heard from one interrogator

17   who testified that at one point Mr. Elsheikh made a statement to

18   him about having been mistreated within the SDF prison, and the

19   interrogator made it very clear and said:  Look, if you're

20   telling me this, I need to report this.  I need to get

21   information.  Tell me who did this to you.  Tell me what

22   happened.  And the defendant refused to do that.

23        But the interrogator didn't give up.  He continued to

24   press him, until finally the defendant said:  Oh, don't worry

25   about it.  He said:  That 120-pound Kurdish - and he used a slur

1    to describe him - couldn't hurt a fly.

2         So, Your Honor, we would submit that the government put

3    on a good deal of evidence demonstrating that the SDF prisons

4    were well run, that the senior people within SDF took detainee

5    treatment seriously, and that the DoD interrogators who were in

6    those prisons for some periods of time also didn't observe

7    mistreatment; but they took it seriously, and they made it clear

8    to SDF that detainees had to be treated properly.

9         In response, the defense didn't put on any witnesses.

10   However, they do point to Mr. Elsheikh's declaration.  We would

11   submit that since the government never had a chance to test

12   that, it shouldn't be afforded a great deal of weight.  But we

13   would also submit to Your Honor that there are some interesting

14   aspects to the declaration.

15        Mr. Parekh described for Your Honor a couple of

16   instances where there were demonstrably false statements in the

17   declaration.  The one he mentioned about the *Washington Post*

18   interview, the defendant actually puts specific quotes in the

19   declaration at page 9 about what he claims happened.  And he

20   says that when he was interviewed by the *Washington Post*, the

21   interviewer asked him why he looked so bad in the CNN interview,

22   and he responded by saying:  Let's just say, I was not feeling

23   so good.

24        As Mr. Parekh indicated, the *Washington Post* uploaded

25   that entire interview.  Special Agent O'Toole testified that he

1    watched the entire interview, and he also testified that that

2    exchange never happened.

3          The defendant also claimed in the declaration at

4    page 10 that when he went into DoD custody, he was examined by a

5    doctor.  And he claims that he told the doctor that:  I was

6    severely mistreated at the hands of the SDF.  And again, that's

7    at page 10.

8          Special Agent O'Toole also testified that he

9    interviewed the doctor and asked him about that, and the doctor

10   told him that the defendant told him no such thing.

11         We also entered in the case an exhibit which was the

12   doctor's -- the written report that the doctor produced.  If we

13   could pull up 15-7.  This is in evidence, Your Honor.

14         So the defendant claimed that he told the doctor about

15   this physical abuse.  As you heard, Special Agent O'Toole

16   testified that it didn't happen.  But if we look at the form

17   itself - and again, this individual is clearly a doctor, by the

18   handwriting - Mr. Elsheikh provided information to the doctor.

19   At the top where it says "current medical problems," it lists

20   "coughing, sneezing, runny nose for the last two days."

21         Down the right-hand column, there was -- it lists drug

22   allergies.  The doctor put "NKOA," no known allergies [sic].

23   For food allergies it puts, "No.  Prefer vegetarian, will eat

24   fish."  And then farther down for job, it lists mechanic.

25         So this is a defendant who spoke to the doctor at some

1   length about his medical situation, but at no time after he had

2   been moved from SDF custody into DoD custody did he ever tell

3   the doctor who was examining him about the mistreatment that he

4   claims he endured at the hands of SDF.  And, in fact, there's a

5   notation at the top for "Injuries/Abuse," and the doctor noted,

6   "No concerns here."

7          Farther down within the form it lists

8   "Impression/Plan," and the doctor indicated that he was "clear

9   for detention."

10         Now, Your Honor, despite that, in the defendant's reply

11  brief, which is at Docket 141, at page 12 of that reply, they

12  attached two still photos from the CNN interview in 2019.  And

13  they claim in their motion that, quote, "During the interview,

14  bruising is clearly observable on Elsheikh's face and head."

15         Could we bring the form back up real briefly?

16         So, Your Honor, on the form itself, the doctor did a

17  physical exam.  He did note one thing on the defendant's body.

18  And if we look at the figure to the left there, facing forward,

19  for the forehead the doctor listed -- and this was --

20  Special Agent O'Toole testified about this, that the doctor

21  identified a prostration mark, a bruise caused from prayer, on

22  the defendant's forehead.

23         So despite all the allegations about being hit in the

24  head, an infected ear, being kicked down the stairs, the only

25  visible injury that the doctor identified in the course of

1    examining the defendant was a bruise that the defendant had

2    given himself.  And the other thing is, in the declaration, the

3    defendant never said:  During the course of my SDF custody and

4    my mistreatment, I was hit in the head in such a way that it

5    left a bruise on my forehead.

6          Now, Your Honor, ultimately, the defendant's

7    declaration is nine and a half pages, single spaced, but it

8    really comes down to one specific claim.  The defendant claims,

9    starting at page 8, about the mistreatment he endured, and then

10   he said:  "After the beatings ceased, the head of the prison

11   said, 'Consider this your first day of detention.  Everything

12   that happened before never happened.  You have no rights.  This

13   is the best it is going to get.  From this point on, it can only

14   get worse unless you can do what you're told.  From now on, you

15   don't refuse to speak to anyone, and when you speak to anyone,

16   you tell them exactly what you told the American DoD.'"

17         The next page, at page 9, the defendant claims, or

18   said:  "At this point I knew that I would not be physically

19   beaten if I kept restating my false DoD confessions to the media

20   outlets.  I felt like a broken and abused animal, doing whatever

21   I could do to be properly fed and not be physically abused."

22         Given that, you would think the defendant would do what

23   he was told to do, repeat what he said to DoD.  So I want to

24   look at two instances of what he told DoD.

25         So if we can publish Exhibit 2-3, which is in evidence.

1   Your Honor, the second paragraph of this is the part that I want

2   to focus on.  Your Honor, the defendant was asked, and he spoke

3   to DoD about what he knew about the murders and beheadings of

4   James Foley and Steven Sotloff.  And he gave this very detailed

5   information about what he claims Mohammed Emwazi, the person who

6   beheaded them, said to him about those murders.  And, in fact,

7   the information was so specific that he provided a map track on

8   this particular document of the location in the desert where he

9   and Emwazi used to go shooting, where he claims that these

10  beheadings likely took place.  Or at least that's what Emwazi

11  had said.

12          But, Your Honor, the defendant never said this to

13  anyone.  Special Agent O'Toole testified --

14          THE COURT:  You mean anyone other than the DoD?

15          MR. GIBBS:  I'm sorry.  In 2019, during those media

16  interviews, after the defendant claimed he was told to repeat

17  what he had said to DoD, he never said that in any of them.

18          In fact, Your Honor, I would like to play one short

19  clip of the Sean Langan interview to demonstrate that.  And,

20  Your Honor, just to sort of set up this clip, Sean Langan had

21  asked the defendant about what Emwazi told him about the

22  James Foley execution.  The defendant responded that he didn't

23  tell him anything.  And Langan really presses him about, well,

24  you know, he trusted you enough to see him execute someone.

25          And what Langan was talking about there was this

1    incident where a Syrian hostage was executed; Elsheikh was

2    there, Emwazi was there, Kotey was there.  The hostage was

3    executed with a gun.  Five of the western hostages were there

4    holding signs up.  And as you'll hear in this clip, Elsheikh

5    wants to differentiate between the James Foley execution video,

6    which was a published ISIS video -- and ISIS had a very

7    sophisticated media operation.  He wanted to differentiate

8    between that and this murder of the Syrian hostage.

9         So that's sort of the wind-up to this clip.

10         (Video played in open court.)

11         THE COURT:  What was your purpose, again, in showing

12    this clip?

13         MR. GIBBS:  So this clip, Your Honor -- or in this

14    clip, the defendant is asked specific questions about what

15    Mohammed Emwazi told him about the murder of James Foley.  And

16    his answer, in sum and substance is:  He didn't tell me

17    anything.  I confronted him about it, and he gave me a look

18    which I interpreted to mean that he had murdered James Foley.

19         So he didn't repeat what he told DoD about the details

20    of James Foley's murder, how he was murdered, where he was

21    murdered, what happened to the body.  And again, if the defense

22    argument is, his will was overborne and he was forced to repeat

23    what he said to DoD, he didn't do that.  Which is the hallmark

24    of voluntariness.  He made a considered judgment and determined

25    he wasn't going to do that.  So he didn't repeat to Sean Langan

1        what he told DoD about the murder of James Foley.

2                THE COURT:  All right.  Anything further?

3                MR. GIBBS:  Just briefly, Your Honor, there's one other

4        exhibit I want to publish quickly.  It's the second page of 5-2.

5        If we could enlarge the paragraph at the top about the death of

6        Goto and Yukawa.

7                THE COURT:  All right.  Mr. Gibbs, where does this come

8        from?

9                MR. GIBBS:  Your Honor, this is a summary of another

10       DoD interview of the defendant.  He made -- he provided this

11       information related to two Japanese hostages who were actually

12       killed very late in the hostage-taking scheme.  They weren't

13       killed until January of 2015.  They were also beheaded.  There

14       was also a Norwegian hostage who was held by ISIS.

15               So this is very specific detailed information that

16       Mr. Elsheikh provided to the DoD about the two murdered Japanese

17       and about the Norwegian hostage.  Mr. Elsheikh was asked very

18       specific questions by a number of media interviewers, including

19       Sean Langan repeatedly, about his role in the negotiations for

20       the hostages, and as Special Agent O'Toole testified at the

21       hearing, the defendant never repeated this information in any of

22       the media interviews.  In fact, he never repeated any

23       information anywhere close to this, and certainly not with this

24       level of detail.

25               So, Your Honor, this really gets to the heart of the

1    defense argument.  If the defense argument is the abuse was so

2    overwhelming that his will was overborne such that his

3    statements became involuntary, we're stuck with the fact that

4    the defendant makes a very specific allegation.  He says it

5    wasn't just abuse for the sake of abuse, it was abuse for a very

6    specific purpose:  Repeat what you said to DoD to the media in

7    2019.  So either the abuse really didn't happen, or, if there

8    was mistreatment of some sort, the defendant chose not to do

9    what he was told to do by the SDF, and he didn't repeat that DoD

10   information.

11         And finally, I think showing how little SDF really

12   cared about this, as you heard from the government's

13   presentation, Sean Langan wanted to interview the defendant at

14   least twice, and it was only after the blowup with

15   Alexanda Kotey, when they got angry with each other on camera,

16   that he was prohibited from doing that.  So SDF doesn't let him

17   interview the defendant because Sean Langan and Alexanda Kotey

18   had a screaming match?  After they had abused and physically

19   mistreated El Shafee Elsheikh for weeks and overbore his will

20   and forced him to give these interviews?  It simply makes no

21   sense, Your Honor.

22         And we would submit, there's no basis on which to

23   suppress the 2019 media interviews, and certainly we don't think

24   the 2018 were even part of the defendant's motion.

25         Thank you, Your Honor.

56

```
 1                  THE COURT:  Ms. Ginsberg?

 2                  MS. GINSBERG:  Thank you, Your Honor.  Mr. Gibbs is

 3       correct, we are not seeking to suppress the 2018 media

 4       interviews.  During those interviews, Mr. Elsheikh made it very

 5       clear in his affidavit, declaration, that he was not tortured in

 6       a manner that he describes in the declaration.  He did describe

 7       a number of beatings over a period of time by SDF guards, but he

 8       is not alleging that the 2018 interviews were the product of

 9       abuse or torture.

10                  Your Honor, the government has pointed out some very

11       specific inconsistencies between the declaration and statements

12       that were made to the media.  But I think what might be helpful

13       to the Court is to hear some additional comparisons of evidence

14       that support the allegations that were made in Mr. Elsheikh's

15       declaration.

16                  First and maybe most important, or most corroborative,

17       was the debriefing of Mr. Alexanda Kotey that was provided to

18       the defense and was made an exhibit at the hearing.  And for the

19       Court's purposes, that is Defendant's Exhibit 121.  That

20       debriefing describes the events that occurred when Mr. Elsheikh

21       and Mr. Kotey were captured.  Mr. Kotey's description of the

22       capture, of the beatings that they and other prisoners endured,

23       is almost identical to the description that Mr. Elsheikh gives

24       in his declaration of those events.

25                  Mr. Kotey's further descriptions of beatings that
```

1    occurred at different times while they were in SDF custody are,

2    in significant respects, parallel if not identical to some of

3    the descriptions that Mr. Elsheikh included in his declaration.

4         There are two areas that are very specific that are

5    part of Mr. Kotey's debriefing, that virtually mirror

6    Mr. Elsheikh's description of the torture that are rel --

7    perhaps more relevant to this motion.  One is the torture -- or

8    the beatings that occurred following the time of the riot at the

9    Derik prison, and the torture that both of them endured prior to

10   the 2019 CNN interviews.  And I'll address those things more

11   specifically when I get to those topics.

12        But at least some Department of Defense officials who

13   identified -- who interviewed Mr. Kotey when he was delivered

14   into DoD custody confirmed -- or made findings that Mr. Kotey's

15   reports of torture were credible.  He made reports to the DoD

16   approximately five months before he was released from DoD -- SDF

17   custody into DoD custody, that he was abused in a number of

18   ways.

19        There is an exhibit, Defendant's Exhibit 121, which

20   details the specific acts of abuse that Mr. Kotey claims he was

21   subjected to.  That report has findings in it that, based on not

22   only the interview with Mr. Kotey, but physical examination of

23   Mr. Kotey, that those reports were credible.

24        So while at the hearing, the government took the

25   position that they weren't vouching for the credibility of

58

1    Mr. Kotey's debriefing, at least certain DoD officials to whom

2    Mr. Kotey reported acts of abuse found those credible.  And I

3    think Your Honor can read the debriefing on October 8th of this

4    year of Mr. Kotey where he describes the abuse, and can see that

5    at least with respect to critical aspects of Mr. Elsheikh's

6    declaration, that Mr. Kotey has confirmed the same abuse.

7         Mr. Gibbs made -- argues that this court should treat

8    the testimony of the SDF officials as credible; that their

9    allegations that there were no -- that no abuse occurred in the

10   prison, with the exception of the one incident that was reported

11   before the time that SDF Witness 2 actually was working at

12   that -- at the Derik prison.  Your Honor, it's our position that

13   that testimony was ludicrous.  And I would just like to go

14   through some of those witnesses and point out some of the

15   inconsistencies.

16        But I think there is sufficient -- Your Honor heard the

17   testimony.  There's sufficient reason to believe that much of

18   that testimony is not, in fact, credible; that these denials --

19   frankly, the way they described the conditions at the prison

20   sound like it would be not a bad place to go and spend a week.

21   And I just don't think that that's a credible description of

22   what was going on.

23        But SDF Witness Number 1, who has oversight of all of

24   the prisons and is responsible for coordinating the coalition

25   partners, meetings with the detainees, claimed he spent half his

1    time between Ayn Issa and Derik prisons, both of which

2    Mr. Elsheikh was held at.  What it turned out, his knowledge of

3    the conditions at Ayn Issa prison in the years 2018 and 2019,

4    which is the time Mr. Elsheikh was detained in those prisons,

5    consisted of one visit to that prison over a two-year period.

6    And based on one visit to Ayn Issa prison, he told this court

7    that he could vouch for the conditions of the prisoners and the

8    conditions at that prison.

9         The same with Kobani.  He testified that he visited the

10   Kobani prison once in that two-year timeframe, in August of

11   2019, and that the conditions in all of the prisons that he was

12   responsible for were the same; that he saw no fear or worry on

13   the detainees' faces.  He testified, with respect to the Kobani

14   prison, that he didn't have time to even talk with the

15   prisoners, but claims that he heard no complaints from any of

16   the guards.

17        He claimed that the prisoners all had sleeping mats,

18   blankets, pillows, and comfortable living conditions.  There was

19   an email that was attached to the original motion to suppress

20   that we filed.  It was classified at the time, but it...

21        THE COURT:  Seems like a good time for me to mention

22   that I literally have hundreds of pages of briefs on these

23   issues.  That's why I was sort of surprised you-all wanted oral

24   argument in addition to this mountain of paper I have already

25   received.

1          But I did allow oral argument, and I have no regrets

2    about that.  Go ahead and finish your argument, Ms. Ginsberg.

3          MS. GINSBERG:  Thank you, Your Honor.  And the point, I

4    think, of this argument is to try and tie the testimony that was

5    heard over those three days to the arguments that were made in

6    the briefs.  Which Your Honor is right, you have a mountain of

7    written briefs.

8          But getting back to this witness -- in fact, all of the

9    witnesses who testified that the conditions at these prisons

10   were comfortable, and that there were no issues with respect to

11   the quality of the care that the prisoners were receiving, the

12   Department of Defense interrogators, in an email in January of

13   2018, speaking of the Ayn Issa prison - which was the same

14   prison that SDF Witness Number 1 described as having comfortable

15   conditions - wrote that there were no less than 50 prisoners

16   sleeping on top of each other at Ayn Issa prison.  Quite

17   different from the description that they all had their own beds

18   and they had mattresses and plenty of space on the floor.

19         That same witness testified that -- and this is a minor

20   point, but that he never heard that the prisons were infested

21   with bugs in that time period.  SDF Witness Number 2 said they

22   had an infestation of lice, and that it was widespread.

23         The witness --

24         THE COURT:  None of that would be sufficient to be

25   overborne -- someone's will to be overborne.

1         MS. GINSBERG:  No, of course not.  But the point I'm

2    making right now is that the Court should look very seriously at

3    the credibility of the witnesses who testified that there was no

4    torture or no abuse in these prisons.

5         THE COURT:  They didn't know of any, is what they were

6    saying.  If it occurred -- it may have occurred.  I think you're

7    correct to point out that they might not know.  That's different

8    from saying they're lying.

9         MS. GINSBERG:  Well, I totally agree with what

10   Your Honor is saying.  But they also testified that had there

11   been abuse there, they would have known.

12        THE COURT:  Yes, they did testify, because of their

13   reporting mechanism.  But we don't know whether that was

14   failsafe or not.

15        MS. GINSBERG:  Exactly.

16        THE COURT:  And that's your point.  But again, it

17   doesn't get me to whether your client's will was overborne.

18        MS. GINSBERG:  Your Honor, the point of all of the

19   inconsistencies in the SDF testimony is that he has alleged

20   specific acts of abuse at these prisons, and specifically at

21   Derik prison.  And there --

22        THE COURT:  Tell me, even if I accepted all of that, do

23   you think his will was overborne?

24        MS. GINSBERG:  I do.  I wouldn't be standing here --

25        THE COURT:  I know you would say that.  But I'm

1    suggesting to you that I might not agree with that.  And all

2    this other Who Shot John isn't one way or the other.  Certainly

3    the person who runs the prison is going to say, "I was doing a

4    good job, I tried to do this, I tried to do that."  Now, you

5    argue that there were instances of abuse.

6              MS. GINSBERG:  Your Honor, if I may, Mr. Elsheikh

7    described the abuse he suffered prior to the CNN interview --

8              THE COURT:  I've read that, and I don't need to be

9    instructed by you again on that.  Whether I find that credible

10   or not is something I have to determine.

11             MS. GINSBERG:  Well, I was going to read to you from

12   Mr. Kotey's debriefing of the same exact time period, and what

13   he said with respect to these media interviews.

14             THE COURT:  He has since pled guilty.

15             MS. GINSBERG:  That's right.  He has pled guilty and

16   has been --

17             THE COURT:  And he's not asserting that anymore.

18             MS. GINSBERG:  Judge, he never -- let me -- Mr. Kotey

19   never asserted that the abuse that he suffered made his

20   statements involuntary.  He never did.

21             THE COURT:  That's right.

22             MS. GINSBERG:  He said:  I was abused, but I still made

23   the voluntary choice to participate in these interviews.

24             The point that I'm trying to make is that Mr. Kotey

25   confirms the specific allegations of abuse --

63

```
1              THE COURT:  No, he didn't say:  I was present when that
2    happened to Elsheikh.
3              MS. GINSBERG:  No, but he describes it as -- well, some
4    of it he did.
5              THE COURT:  Yeah, but he didn't say:  I saw it happen
6    to Elsheikh.
7              MS. GINSBERG:  No.  But Your Honor --
8              THE COURT:  Look, I have read all of that.  Tell me
9    what you think I should be -- the arguments you're making from
10   Kotey, just tell me that argument.
11             MS. GINSBERG:  Mr. Kotey said the prior two --
12             THE COURT:  Just tell me what the argument is.  He said
13   he was tortured.  Now, you tell me why I should assume that that
14   makes it true for Elsheikh.
15             MS. GINSBERG:  Because Your Honor has to determine the
16   credibility of Mr. Elsheikh's testimony.  The SDF agents --
17             THE COURT:  He didn't give testimony --
18             MS. GINSBERG:  Well, his declaration.
19             THE COURT:  -- he gave a declaration that is not
20   subject to cross-examination.  So immediately it's more suspect
21   than if he had appeared and testified.
22             MS. GINSBERG:  That's correct.
23             THE COURT:  Thank you.
24             MS. GINSBERG:  But Your Honor will consider everything
25   else that was testified to at the hearing to inform the Court's
```

1  decision regarding the credibility of that declaration.  Some of

2  that evidence is evidence from the SDF agents.  We spent more

3  than an entire day hearing that there was no abuse that

4  they were aware of --

5          THE COURT:  Well, they didn't testify to examples of

6  abuse, but, as I recall, one guard was fired, removed.

7          MS. GINSBERG:  Yes.  And the testimony with respect to

8  that was that he was -- a report was made that he knocked

9  somebody's hat off of a prisoner's head.  They believed that

10  part of it.  The allegation was made by that particular prisoner

11  that he was also choked.  Based on the denial of the guard, the

12  choking -- they determined the choking didn't occur.  But they

13  fired him.  They removed him from the prison.

14          Your Honor, the fact that they would make a

15  determination to fire somebody for knocking somebody's hat off,

16  and accepting an explanation that -- a denial from a guard that

17  he didn't choke them, is an indication of the kind of cover-up

18  of the abuse that I think the Court could infer --

19          THE COURT:  I see that argument, and I don't think it's

20  off the mark.  That is to say, I see the basis for that

21  argument.  Does your client have any motive to falsify?  That's

22  a rhetorical question.  The answer is yes.  I have to make a

23  decision whether he's lying or whether he's not.

24          MS. GINSBERG:  That's right.

25          THE COURT:  All right.

1          MS. GINSBERG:  And my reason for referring and relying

2     on Mr. Kotey's description of the abuse that occurred around

3     the -- prior to the CNN interview, and the expectations of the

4     SDF with respect to the media interviews, is that that is

5     corroboration -- it is corroboration of the allegations that

6     Mr. Elsheikh -- the allegations of abuse that Mr. Elsheikh says

7     that he himself suffered.

8          THE COURT:  All right.  I understand that.  What else

9     do you have?

10         MS. GINSBERG:  As it happened, Mister --

11         THE COURT:  Just a moment.

12         (OFF THE RECORD.)

13         THE COURT:  Ms. Ginsberg, I'm not limiting you in any

14    way, but can you give me an estimate of how much more you have?

15         MS. GINSBERG:  Maybe 15 minutes, Your Honor.

16         THE COURT:  And, Mr. Gibbs, how much by way of

17    response?

18         MR. GIBBS:  Your Honor, at the end of Ms. Ginsberg's

19    presentation, if there are particular points the Court wants me

20    to respond to, I'm happy to --

21         THE COURT:  No, I want your judgment.

22         MR. GIBBS:  Maybe none, but less than five minutes, for

23    sure.

24         THE COURT:  I'm going to recess now for 15 minutes, and

25    then, when I return, Ms. Ginsberg, I'll expect you to finish

1    your argument in the time you've indicated you need.  And then,

2    Mr. Gibbs, you may then respond, and then we're done for the

3    day.

4              Court stands in recess.

5              (Recess taken at 3:27 p.m.)

6              THE COURT:  Ms. Ginsberg, you may complete your

7    argument.

8              MS. GINSBERG:  Thank you, Your Honor.  With respect to

9    the media interviews, I want to read from Mr. Kotey's

10   debriefing.  He says that:  Following an ANA interview that

11   Mr. Elsheikh refused to participate in, Elsheikh was removed

12   from his cell, handcuffed behind his back, beaten, and placed in

13   another cell.  The next time he saw Elsheikh was at the CNN

14   interview with Nick Patton Walsh, which took place at the end of

15   Ramadan.  Leading up to this interview, Kotey had been subject

16   to what he described as food deprivation, and had been left in

17   handcuffs for approximately one month.  Elsheikh informed Kotey

18   that this time he believed he had an injury to his ear, which

19   resulted from being struck.  Following the interview, beatings

20   and rough treatment at the prison continued.

21             During the media interviews, SDF interrogators were

22   always present in the room, but not always the same

23   interrogators.  The interrogator in the room during Langan's

24   interview of Kotey had previously interrogated Kotey.

25             Regarding SDF expectations of Kotey and Elsheikh with

1    respect to the media interviews, they were expected to

2    participate in all media interviews or be subject to further

3    food deprivation and violence.  They were also expected to admit

4    to nothing less than they had already -- had previous -- than

5    they had already in previous interviews and interrogations.

6            THE COURT:  And, of course, they didn't.

7            MS. GINSBERG:  They didn't what?

8            THE COURT:  They didn't admit to everything they

9    had previously --

10           MS. GINSBERG:  Judge, I'm going to get to that.  They

11   didn't admit to everything, but Mr. Elsheikh, in his media

12   interviews, with very limited exceptions, made admissions that

13   were very similar to admissions that he made over the course of

14   these 26 DoD interviews, which occurred over a year before the

15   media interviews in 2019.  And the notion that he should be

16   expected to remember exactly what he said during these

17   interviews I think is not --

18           THE COURT:  Not what he said, what he did.

19           MS. GINSBERG:  Judge, he was not asked the precise same

20   questions --

21           THE COURT:  I understand.  I'll look at it carefully,

22   but I think you would have to concede that he didn't tell them

23   everything.

24           MS. GINSBERG:  No, he didn't tell them everything --

25           THE COURT:  That's right.

1           MS. GINSBERG:  -- but he could not have.  Because these

2     interviews took tens, if not hundreds, of hours.

3           THE COURT:  So your answer is, he did his best to do

4     it.

5           MS. GINSBERG:  He did the best he could.  And,

6     Your Honor, I have --

7           THE COURT:  And I'll make a judgment as to whether

8     that's true or not.  Let's proceed.

9           MS. GINSBERG:  Your Honor, in the Langan interview,

10    Mr. Langan testified that Mr. Elsheikh was escorted by two

11    guards and two -- two interrogators who -- or two other SDF

12    individuals who sat in the room during the interview and filmed

13    the interview.  Mr. Langan expressed concern that something bad

14    could happen to Mr. Elsheikh if Mr. Elsheikh criticized the SDF

15    on camera.  He said that at page 221 and 222 of his testimony.

16    He acknowledged that his photographer --

17          THE COURT:  Who is "he"?

18          MS. GINSBERG:  Langan.  Mr. Langan.

19          THE COURT:  So you want me to credit Langan, who is --

20    in this situation?  This is the same Langan who got into a near

21    fistfight with Kotey later on?

22          MS. GINSBERG:  Your Honor, I want you to take into

23    account to the same extent that you're taking into account

24    evidence that the government is asking you to rely on, that we

25    would suggest is equally suspect, if this is suspect at all.

```
 1              THE COURT:  All right.
 2              MS. GINSBERG:  But I think the Court ought to weigh all
 3      of the evidence, and I'm just pointing out --
 4              THE COURT:  I promise you I will.  It won't be
 5      necessarily to the government's liking or to yours.
 6              MS. GINSBERG:  I understand that, Your Honor.
 7              THE COURT:  Good.
 8              MS. GINSBERG:  But Mr. Langan also testified that his
 9      photographer and he knew, based on conversations that they had
10      with him, that Mr. Elsheikh had a fear of being sent to Iraq.
11      And Mr. Langan raised the prospect of him being sent to Iraq
12      several times during the interview.
13              Mr. Langan testified that the photographer and he both
14      agreed that Mr. Elsheikh looked like a broken man, and he quoted
15      the photographer, saying, "It looked to us like the game was
16      up."  He also was quoting the photographer as saying the fact
17      that the French prisoners were being sent --
18              THE COURT:  Now we're talking about what some
19      unidentified photographer said?
20              MS. GINSBERG:  Who was present at the interview.
21              THE COURT:  But he wasn't under oath and hasn't
22      submitted anything.
23              MS. GINSBERG:  No.  But this is Mr. Langan's
24      description of what was occurring during this interview.
25              THE COURT:  All right.  Go on.
```

1          MS. GINSBERG:  And he said that the --

2          THE COURT:  Who is "he" now?

3          MS. GINSBERG:  Mr. Langan testified that the

4    photographer stated that:  The news of the French prisoners

5    being sent to Iraq has knocked the stuffing out of him, meaning

6    Mr. Elsheikh, and that he looked like a broken man compared to

7    the earlier interview -- media interviews in 2018, when he was

8    seen joking with -- at least on some occasions, joking with some

9    of the interviewers.

10         THE COURT:  And, of course, some of the abuse he claims

11   he suffered was in 2018.

12         MS. GINSBERG:  But he testified -- he claims in the

13   declaration that he did experience certain beatings, but not to

14   the extent of the beatings that he suffered and the abuse that

15   he suffered in the months preceding the CNN interview, which was

16   the first of the interviews where he -- it's the first time he

17   made any reference to the hostages.

18         (Brief pause.)

19         THE COURT:  Go ahead, Ms. Ginsberg.

20         MS. GINSBERG:  I think Your Honor saw and can look at

21   the -- if we can put up the clip from the CNN -- from the Langan

22   interview.  Your Honor, this is a clip that we've included on a

23   disc that we've given Ms. Randall, which it's very difficult to

24   hear.  But we've made a disc of all of the media clips and clips

25   from the recordings that were made of Mr. Elsheikh and Mr. Kotey

1    while they were in DoD custody, which the government has relied

2    on and we have relied on in our briefs, and we've put them all

3    on one disc for the Court's convenience.

4           THE COURT:  Completely or excerpted?

5           MS. GINSBERG:  These are all excerpts that we have

6    relied on, we relied on in our pleadings.

7           THE COURT:  So when I look at this, it should be your

8    excerpts, not what the government wants me to see?

9           MS. GINSBERG:  That's correct.  And the government has

10   submitted its own excerpts.

11          THE COURT:  All right.  Go on.

12          MS. GINSBERG:  This is an excerpt from Mr. Elsheikh's

13   interview with Mr. Langan, where he is being asked by Mr. Langan

14   why he is withholding information, why he is hesitating to

15   answer questions and withholding information.

16          And I think Your Honor can see, with respect to the

17   marks on Mr. Elsheikh's face, the mark that he had at the top of

18   his head from praying, the prostration mark, is in a very

19   different place and is very different than the several bruising

20   marks that can be seen on the lower and side portion of his

21   forehead.

22          THE COURT:  I'll look, but I'm not sure I see what you

23   see.  Go ahead.

24          (Video played in open court.)

25          MS. GINSBERG:  Your Honor, I apologize, the audio is

1    not very good.

2              (Video played in open court.)

3              MS. GINSBERG:  Lastly, with respect to Mr. Langan's

4    observations of Mr. Elsheikh during the interview, he described

5    Mr. Elsheikh as diminished and emaciated as compared to his 2018

6    interviews.

7              THE COURT:  Didn't look emaciated to me there.  Did you

8    look at his Body Mass Index when he got to DoD?

9              MS. GINSBERG:  Your Honor, he weighed --

10             THE COURT:  Answer my question.

11             MS. GINSBERG:  I saw his Body Mass Index -- I don't

12   recall the Body Mass Index, but his weight when he arrived at

13   DoD was significantly higher than what it was at this time.

14             THE COURT:  All right.  Go on.  You know that because

15   he was weighed at this time?

16             MS. GINSBERG:  He was weighed.

17             THE COURT:  At this time?  When you claim he was

18   emaciated, he was weighed?  The answer is no, he wasn't.

19             MS. GINSBERG:  He wasn't weighed at this time.  But I

20   have seen the earlier interviews, and his physique is noticeably

21   different.

22             THE COURT:  All right.  Go on.

23             MS. GINSBERG:  So the motivation that Mr. Elsheikh

24   claimed in his declaration, initially in the DoD interviews and

25   throughout, was that he, first and foremost, from a

1    psychological point of view, was afraid of being sent to Iraq

2    and being subjected to summary trials and possible execution.

3    And there was evidence that that -- of that threat throughout

4    the whole time that he was detained.

5           He was told by Agent Kath that one of the options was

6    to send him to -- one of the options about what would happen to

7    him was to send him to Iraq.  One of the other -- JR, one of the

8    other DoD interviewers, testified that it would be coercive, in

9    his opinion, if they threatened to send Mr. Elsheikh to Iraq.

10   So that is, even in the minds of the DoD interrogators, a

11   realistic threat that would serve as a coercive factor in --

12   effect on an individual in his circumstances.

13          Mr. Langan cautioned him about the likelihood of -- in

14   that interview, about the likelihood of being prosecuted in the

15   UK or the United States being increased if he made admissions

16   regarding his involvement with the hostages.  And even as late

17   as just prior to Mr. Elsheikh being brought from DoD custody in

18   Iraq to the United States for prosecution, Attorney General Barr

19   wrote a letter, which I've provided to the government and will

20   provide to the Court, in which the -- he made it clear that

21   Mr. Kotey and Mr. Elsheikh were being held by the United States

22   military authorities overseas, in their theatre of military

23   operations; that it was not tenable to continue holding them

24   there for an extended period; that final decisions had to be

25   made; and, accordingly, given these circumstances, it should be

1    clearly understood that the United States will move forward with

2    plans to transfer Kotey and Elsheikh to Iraq for prosecution in

3    the Iraqi justice system unless, by October 15th, 2020, all

4    litigation in the United Kingdom seeking to prevent the use of

5    United Kingdom evidence in the United States has been fully and

6    finally resolved.

7              So there is evidence, clearly, throughout the course of

8    Mr. Elsheikh's detention that the specter of being sent to Iraq

9    if he didn't comply with what was being expected of him was a

10   real and present fear, and that it was a fear that is considered

11   and should be -- considered by the DoD, and should be considered

12   by this court as a form of coercion.

13             And the fact that Mr. Langan mentioned it several times

14   during his interview, and then elicited statements from

15   Mr. Elsheikh concerning the hostages, is -- brings that fear and

16   that element of coercion right into the media interview.  Even

17   though it was not a threat being made by the government, but --

18   who was the one that could send him to Iraq, but Mr. Langan made

19   a very intentional -- what appears to be a very intentional

20   effort to remind Mr. Elsheikh that if he didn't become

21   forthcoming and didn't begin to make statements involving his

22   involvement with hostages, making it more possible to prosecute

23   him in this country, that he could be sent, and would likely be

24   sent, to Iraq.

25             Finally, Your Honor - almost finally - with respect to

1    Mr. Elsheikh's reports of abuse to the medical team or the

2    doctors or psychologists at the Department of Defense prison in

3    Iraq, though he did not mention -- did not complain of abuse

4    during the medical examination that Mr. Gibbs discussed and

5    showed the Court, previously, there is a -- he was interviewed

6    by a member of the Combat Operational Stress Control Group,

7    which is part of the DoD operation in Iraq, and during that

8    interview he did disclose abuse.  And the person with whom this

9    interview was had described Mr. Elsheikh's mental condition as

10   displaying some mental trauma.

11          Your Honor, I believe this exhibit was part -- was

12   attached to one of our prior pleadings, but the Court can see

13   what report he --

14          THE COURT:  What is it that you're displaying now?

15          MS. GINSBERG:  This is the report that was made by the

16   Combat Operational Stress Control Group personnel who

17   interviewed Mr. Elsheikh, and he said that:  "Mr. Elsheikh

18   acknowledged physical abuse while in SDF custody.  Due to this

19   abuse, he displayed some degree of mental trauma, though" --

20   "however, Elsheikh did not exhibit characteristics consistent

21   with PTSD."

22          THE COURT:  In other words, he made a complaint, they

23   recorded the complaint, and they said it didn't amount to PTSD?

24          MS. GINSBERG:  That's correct.

25          THE COURT:  All right.

1          MS. GINSBERG:  Your Honor, with respect to the

2    differences - or the purported differences - between his media

3    statements and the DoD statements, there are certainly more

4    differences, and there were certainly things that he was

5    specifically asked about in the DoD interrogations that he was

6    not asked about during the media interviews.  But, generally

7    speaking, these DoD interviews lasted a -- spanned a period of

8    30 days; there were 26 separate interviews, and they occurred

9    over a year before the media interviews.

10         The notion that he should -- Mr. Elsheikh should

11   remember exactly what he said and what he was asked during those

12   interviews I don't think is -- is a substantial reason to

13   believe that he was intentionally withholding statements during

14   his media interviews, and not intending to comply with the

15   instructions that he had received to repeat what he had

16   previously admitted.

17         Um...

18         (Brief pause.)

19         THE COURT:  Anything else?  Because that's been --

20   that's not the first time I've heard this.  Anything else,

21   Ms. Ginsberg?

22         MS. GINSBERG:  If I could have a minute, Your Honor.

23         THE COURT:  Yes, you may.

24         MS. GINSBERG:  Your Honor, I think we do have a

25   document which is a declassified version of the TIRs, which are

1    the descriptions -- the reports of the DoD interviews.  I don't

2    want to put them in the record, but if the Court would find it

3    useful to compare -- for comparison purposes --

4                THE COURT:  We already have that in the record.

5                MS. GINSBERG:  I think what you have is a classified

6    version of it.

7                THE COURT:  That's right.  We're down there in the SCIF

8    doing that.

9                MS. GINSBERG:  I was trying to save the Court a little

10   bit of effort.  This is considerably shorter.

11               THE COURT:  We're doing it thoroughly.

12               MS. GINSBERG:  Thank you, Your Honor.

13               But I would say, in substance, I think when the Court

14   reviews these TIRs and the content of the media interviews, the

15   Court will see that with very few exceptions, Mr. Elsheikh made

16   similar admissions regarding his involvement with the hostages.

17               THE COURT:  All right.  Thank you.  You've said that

18   before.  Anything else?

19               MS. GINSBERG:  Yes.  I think the Court can also infer

20   that Mr. Elsheikh's admissions during -- that he -- the

21   admissions during the media interviews were, in his mind,

22   sufficiently similar to stave off future beatings and future

23   periods of starvation, and that he had a motive to comply with

24   these -- with the demands of the SDF to repeat these statements,

25   but also not further incriminate himself in public media

78

1    statements that would be publicly broadcast and certainly

2    admissible against him in court.

3            THE COURT:  All right.  Thank you.

4            MS. GINSBERG:  Thank you, Your Honor.

5            THE COURT:  Mr. Gibbs?

6            MR. GIBBS:  Thank you, Your Honor.  Judge, very

7    briefly, on the point Ms. Ginsberg made about the threats of an

8    Iraqi prosecution, in the defendant's declaration at page 3, at

9    the bottom, he makes a passing reference to being aware of that,

10   and yet nowhere else in the declaration does he claim that that

11   was some sort of motivation.  And, in fact, at the end of the

12   declaration he claims that the statements he gave to the media

13   in 2019 were due to one fact and one fact only:  The physical

14   abuse that he claims that he endured that overbore his will.

15           So the Iraqi conversation had nothing -- you know,

16   based on his declaration, that had no bearing on what he claims

17   he was forced to do.

18           The only other point I want to make, Judge, is, I'm

19   glad the defense played that last clip for Your Honor, because I

20   think it's, once again, instructive.  That was a clip with

21   Sean Langan, where Sean Langan is pressing him very hard about:

22   Why are you not being more forthcoming?

23           And he tells him:  You know, given my current

24   disposition, I'm not willing to be more forthcoming.  And not

25   being forthcoming means not repeating what he told DoD.

1          So, again, it's a perfect example of being pressed and

2     pressed by the interviewer, and he refuses to repeat that

3     information, because his will was not overborne and he was

4     speaking voluntarily.

5          Thank you, Judge.

6          THE COURT:  All right.  I'll take the matter under

7     advisement and deal with it as promptly as I can.

8          Call the next matter, please.

9          (Off the record at 4:20 p.m.)

10

11

12

13

14

15             **CERTIFICATE OF OFFICIAL COURT REPORTER**

16

17          **I, Rebecca Stonestreet, certify that the foregoing is a**

18     **correct transcript from the record of proceedings in the**

19     **above-entitled matter.**

20

21

22

23     **___//Rebecca Stonestreet//___          __10/27/22____**

24     **SIGNATURE OF COURT REPORTER                    DATE**

25